**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

|  |  |
|---|---|
| EVANGELINE J. PARKER,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>REEMA CONSULTING SERVICES, INC.<br><br>　　　　　Defendant. | Civil No. 8:17-cv-01648-RWT<br><br>Jury Trial Demanded |

**PLAINTIFF EVANGELINE PARKER'S**
**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

I.  INTRODUCTION ...................................................................................................1

II.  STATEMENT OF FACTS .....................................................................................2

III.  LEGAL STANDARD.............................................................................................5

IV.  ARGUMENT...........................................................................................................7

    A.  Ms. Parker Has Stated a Viable Hostile Work Environment
        Claim..............................................................................................................8

        1.  Ms. Parker's Harassment Was Based on Gender...........................9

        2.  Ms. Parker's Harassment Was Severe and Pervasive..................12

        3.  There Is a Basis for Imposing Liability on RCSI ........................15

    B.  Ms. Parker Has Stated a Viable Retaliation Claim ..................................17

    C.  Ms. Parker Exhausted Her Administrative Remedies For Count
        III.................................................................................................................23

V.  CONCLUSION......................................................................................................26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Allen v. TV One, LLC,
  C.A. No. 15-cv-1960, 2016 WL 337533 (D. Md. 2016) .....................................................9, 10

Anand v. Ocwen Loan Servicing, LLC,
  754 F.3d 195 (4th Cir. 2014) .............................................................................................6

Ashcroft v. Iqbal,
  556 U.S. 662 (2009).........................................................................................................6, 11

Bass v. E.I. DuPont de Nemours & Co.,
  324 F.3d 761 (4th Cir. 2003) ...........................................................................................12

Boyer-Liberto v. Fontainebleau Corp.,
  786 F.3d 264 (4th Cir. 2015) ..............................................................17, 18, 19, 20

Brown v. Marsh,
  777 F.2d 8 (D.C. Cir. 1985).............................................................................................23, 26

Chacko v. Patuxent Inst.,
  429 F.3d 505 (4th Cir. 2005) ...........................................................................................25, 26

Clark Cnty. Sch. Dist. v. Breeden,
  532 U.S. 268 (2001).........................................................................................................21, 23

E.E.O.C. v. Navy Fed. Credit Union,
  424 F.3d 397 (4th Cir. 2005) .............................................................................17, 18, 19

Edwards v. City of Goldsboro,
  178 F.3d 231 (4th Cir. 1999) ...........................................................................................6, 7

Fed. Express Corp. v. Holowecki,
  552 U.S. 389 (2008).........................................................................................................25

Foster v. Univ. of Md-E. Shore,
  787 F.3d 243 (4th Cir. 2015) ...........................................................................................21, 23

Harris v. Forklift Sys.,
  510 U.S. 17 (1993)...........................................................................................................12

Hartsell v. Duplex Prods., Inc.,
  123 F.3d 766 (4th Cir.1997) ............................................................................................20

High v. R & R Transp., Inc.,
    C.A. No. 1:15-cv-554, 2017 WL 1102854 (M.D.N.C. Mar. 16, 2017) .......................24, 25, 26

Hill v. Lockheed Martin Logistics Mgmt., Inc.,
    354 F.3d 277 (4th Cir. 2004) ...............................................................................................17

Jew v. Univ. of Iowa,
    749 F. Supp. 946 (S.D. Iowa 1990) .....................................................................................10

McDonnell Douglas Corp. v. Green,
    411 U.S. 792 (1973)..............................................................................................................17

McGruder v. Epilepsy Found. of Am., Inc.,
    2012 WL 832800 (D. Md. Mar 9, 2012)...............................................................................20

Miles v. Dell, Inc.,
    429 F.3d 480 (4th Cir. 2005) ................................................................................................24

Okoli v. City of Baltimore,
    648 F.3d 216 (4th Cir. 2011) ................................................................................................18

Philips v. Pitt Cty. Mem'l Hosp.,
    572 F.3d 176 (4th Cir. 2009) ..................................................................................................6

Price v. Thompson,
    380 F.3d 209 (4th Cir. 2004) ................................................................................................23

Rose-Stanley v. Virginia,
    C.A. No. 2:15-cv-00007, 2015 WL 6756910 (W.D. Va. 2015) ......................................11, 12

Slade v. Hampton Roads Reg'l Jail,
    407 F.3d 243 (4th Cir. 2005) ..................................................................................................7

Smith v. First Union Nat. Bank,
    202 F.3d 234 (4th Cir. 2000) ........................................................................................ passim

Sydnor v. Fairfax Cty., Va.,
    681 F.3d 591 (4th Cir. 2012) ................................................................................................25

Tobey v. Jones,
    706 F.3d 379 (4th Cir. 2013) ..................................................................................................6

Trotter v. Kennedy Krieger Inst., Inc.,
    C.A. No. 11-cv-3422-JKB, 2012 WL 3638778 (D. Md. Aug. 22, 2012)..................................7

United States v. $2,200,000 in U.S. Currency,
    C.A. No. 12-cv-3501-ELH, 2014 WL 1248663 (D. Md. Mar. 26, 2014)..................................6

Univ. of Texas Sw. Med. Ctr. v. Nassar,
    133 S. Ct. 2517 (2013)..................................................................................................20

Vance v. Ball State Univ.,
    133 S. Ct. 2434 (2013)............................................................................................15, 16

Veney v. Wyche,
    293 F.3d 726 (4th Cir. 2002) ....................................................................................7

Williams v. Cerberonics, Inc.,
    871 F.2d 452 (4th Cir. 1989) .....................................................................................23

Ziskie v. Mineta,
    547 F.3d 220 (4th Cir. 2008) .....................................................................................17

**Other Authorities**

29 C.F.R. § 1601 ...........................................................................................................24

Plaintiff Evangeline J. Parker, by and through her attorneys, respectfully opposes the motion to dismiss filed by Defendant Reema Consulting Services, Inc. ("RCSI") (ECF No. 31).

## I.      <u>INTRODUCTION</u>

RCSI's motion to dismiss violates the fundamental rule for such motions—it fails to accept the facts as pled and in the light most favorable to Ms. Parker, and fails to draw all inferences in her favor.  Instead, RCSI attempts to twist the facts into a story that is easier to address than the truth—that RCSI created and condoned a hostile work environment for females like Ms. Parker; that Ms. Parker was fired when she raised her concerns with RCSI management; and that Ms. Parker was unlawfully terminated based on her sex.

Ms. Parker was the subject of a malicious, and false, rumor about a sexual affair.  Read in the light most favorable to Ms. Parker (as the facts must be read at this stage) the rumor undoubtedly related to Ms. Parker's gender.  The implication in the rumor was clear—that a female must engage in extramarital affairs in order to advance at RCSI.  And although Mr. Damarcus Pickett was also a subject of the rumor, the implications for him were different, as was his treatment by RCSI.  First, there was no suggestion that Mr. Pickett advanced in his career only because of an extramarital affair—that implication was reserved only for Ms. Parker, a female.  Second, no one at RCSI told Mr. Pickett that he would not advance further in the company because of the rumor  Third he was not disciplined nor terminated because of the rumor.

When Ms. Parker complained about the hostile work environment that she was subjected to, she was terminated.  The causal link is clearly pled in the complaint.  The reasons provided by RCSI for Ms. Parker's termination were all a sham, which were used in an attempt to cover

up the real reason Ms. Parker was fired.  Ms. Parker was fired in retaliation for contacting HR about her concerns regarding a hostile work environment on the basis of her sex.

## II.      STATEMENT OF FACTS

Ms. Evangeline J. Parker was hired by RCSI in 2014 as a clerk in RCSI's Sterling, Virginia warehouse facility.  ECF No. 1, Compl. at ¶ 7.  She was a promising employee, quickly earning six promotions from her initial position as a clerk to the managerial position of Assistant Operations Manager—the position she held at the time RCSI terminated her.  Id. at ¶¶ 7-9.  She earned her promotions based on her distinguished performance and professionalism, but was subjected to an untrue and malicious rumor that she had a sexual relationship with her co-worker, Mr. Damarkus Pickett, in order to obtain her managerial position.  Id. at ¶¶ 10-12.  Mr. Pickett was RCSI's Deputy Program Manager, and was a married, higher-ranking manager at RCSI.  Id. at ¶ 12.  He confirmed that the rumor was untrue.  Id.

The false and sexually-explicit rumor that Ms. Parker advanced in her career only because of an extramarital affair was pervasively spread and created a hostile work environment for Ms. Parker.  The rumor originated with Mr. Donte Jennings—a male co-worker who began working at RCSI at around the same time as Ms. Parker in the same position in which she started.  Id. at ¶¶ 13-14.  Ms. Parker advanced at the company faster than Mr. Jennings, and she became his superior, causing him to become jealous.  Id. ¶¶ 14, 25.  Indeed, few females had been promoted to managerial positions at RCSI for several years.  Id. at ¶ 11.  Other male employees continued to spread this false rumor.  Mr. Larry Moppins was the highest ranking manager at RCSI's warehouse facility, and he too spread the derogatory rumor.  Id. at ¶¶ 15-16.  As a result of the rumor, Ms. Parker's work environment became hostile, as she was openly disrespected by employees she was responsible for supervising.  Id. at ¶ 17.  Mr. Pickett was not

treated in a similar manner as Ms. Parker.  See, e.g., id. at ¶ 20.  Ms. Parker was subjected to a hostile work environment based on her gender.

Ms. Parker took steps to resolve the hostility in her work environment, but the hostility grew more severe and pervasive.  First, she informally discussed the rumor with Mr. Jennings and other employees in an effort to set the record straight that the rumor was false.  Id. at ¶ 18. But shortly thereafter, on April 21, 2016, Mr. Moppins called a full staff meeting.  Id. at ¶ 19. When Ms. Parker arrived a few minutes late due to a work-related phone call, accompanied by Mr. Pickett—the male who was a subject of the false rumor—Mr. Moppins let only Mr. Pickett into the room.  Id. at ¶ 20.  Mr. Moppins did not let Ms. Parker—the female who was a subject of the false rumor—into the room, and instead slammed the door in her face and locked her out.  Id. Mr. Moppins's discriminatory and hostile behavior was humiliating for Ms. Parker.  Id. at ¶ 21. And the meeting involved a discussion of the false rumor—whereas Mr. Pickett was allowed to participate and defend himself during the meeting, Ms. Parker was not.  Id. at ¶¶ 21-22.

Even still, Ms. Parker continued to take steps to remedy the hostile work environment. She arranged a meeting with Mr. Moppins on April 22, 2016—the day after he slammed the door in her face and conducted a meeting at which the false rumor about her sexual affair was discussed.  Id. at ¶ 23.  Instead of being treated with respect, Ms. Parker was treated with hostility and informed that she would no longer be recommended for advancement at the company because of the rumor.  Id. at ¶ 24.  In particular, Mr. Moppins stated that he had "great things" planned for Ms. Parker at RCSI, but that he could no longer recommend her for promotions or higher-level tasks because of the rumor, and stated that he would not allow her to advance any further within the company.  Id.  Mr. Moppins's harsh comments and failure to

3

listen to Ms. Parker's side of the story not only aggravated the hostile work environment to which she was subjected, but put her in fear of losing her job.  Id. at ¶ 26.

The work environment continued to become increasingly hostile.  On or about April 25, 2016, Mr. Moppins called Ms. Parker to a meeting at which she—the female subject of the rumor—was blamed entirely for disrupting the workplace.  Id. at ¶ 27.  Mr. Pickett—the male subject of the rumor—was also present at the meeting, but he was not blamed for the disruption. Id.  Mr. Moppins told Ms. Parker that he should have fired her the day before when she came in "huffing and puffing about this BS rumor"—he lost his temper, and began screaming at Ms. Parker before dismissing her after saying, "don't let this happen again."  Id.  Read in the light most favorable to Ms. Parker, Mr. Moppins's actions and words communicated to Ms. Parker that it is not acceptable for a female to raise concerns of sexual harassment or hostile treatment in the workplace.

Ms. Parker again tried to remedy the hostile work environment by filing an official complaint.  The same day as the meeting at which Mr. Moppins reprimanded Ms. Parker for seeking to remedy the hostile work environment, she filed a sexual harassment complaint with RCSI's Human Resources Manager, Ms. Cathy Price, against Mr. Moppins and Mr. Jennings. Id. at ¶ 28.  Ms. Price organized a meeting with Ms. Parker, Mr. Moppins, and Mr. Pickett, and encouraged the three managers to apologize to one another and put the prior incidents behind them.  Id. at ¶ 29.  After the meeting, Ms. Price assured Ms. Parker that her job was not in jeopardy.  Id.  But Ms. Parker would soon be fired in retaliation for her complaint.

Whereas Ms. Parker's sexual harassment complaint was not taken seriously, Ms. Parker was terminated after Mr. Jennings complained about her.  In particular, while Ms. Parker was away on a pre-approved vacation, Mr. Jennings—the male employee who started the false

4

rumor—alleged that **Ms. Parker** was creating a hostile work environment against **him**. Id. at ¶ 31. Unlike when Ms. Parker (a female) filed a complaint supported by a witness, Mr. Jennings's complaint (unsupported by a witness) resulted in immediate restrictions. In particular, upon her return to work on May 17, 2016, Ms. Parker was instructed to have no contact with Mr. Jennings, even though she had not been given an opportunity to review or respond to his complaint. Id. at ¶ 31. Ms. Parker never acted inappropriately towards Mr. Jennings and his complaint was untrue. Id. at ¶¶ 32-33. Nonetheless, she followed the instructions that were given to her and kept away from Mr. Jennings. Id. at ¶ 33. However, Mr. Jennings spent time in Ms. Parker's work area, and directed long stares at Ms. Parker, smirking and laughing at her. Id. The hostile work environment pervaded, and although Ms. Parker raised her concerns with her supervisor and the Human Resources Department, the situation never improved. Id. at ¶ 34.

One day after she returned to work from her vacation, Ms. Parker was fired. On May 18, 2016, Mr. Moppins issued two written warnings to Ms. Parker, arising from the false rumor surrounding her sexual conduct. Id. at ¶ 35-36. She was immediately fired by Mr. Moppins— just three weeks after she filed a sexual harassment complaint against him. Id. at ¶¶ 36-38. Unlike male employees, who were allowed three or more written warnings under RCSI's "three strike" rule, Ms. Parker was fired after just two written warnings issued at once. Id. at ¶¶ 36-39. RCSI's "three strikes" rule was disparately enforced such that male employees were generally not fired even after receiving three or more warnings, while some female employees were terminated without three warnings or with all warnings being issued at once. Id. at ¶ 39.

## III.    LEGAL STANDARD

A party seeking dismissal under Fed. R. Civ. P. 12(b)(6) must show that, "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot

prove any set of facts in support of his claim entitling him to relief." Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999). All complaints must meet the "simplified pleading standard" of Rule 8(a)(2), which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

To determine whether a complaint meets this standard, a court first must divide genuine factual allegations, which are entitled to deference, from "[t]hreadbare recitals of the elements of a cause of action supported by mere conclusory statements." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Next, the court must "assume [the] veracity [of the genuine factual allegations] and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679. A complaint will survive when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." Id. at 678. A court must "draw on its judicial experience and common sense" to determine whether a reasonable inference can be made, and thus whether the pleader has stated a plausible claim. Id. at 679.

In applying its experience and common sense, however, a court must accept all genuine factual allegations as true and construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. See Tobey v. Jones, 706 F.3d 379, 390 (4th Cir. 2013). A court may not "consider extrinsic evidence" supplementing those allegations, unless that evidence consists of documents that are attached to or incorporated into the complaint, "integral to the complaint," and "authentic." Anand v. Ocwen Loan Servicing, LLC, 754 F.3d 195, 198 (4th Cir. 2014); Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009) (citing Blankenship v. Manchin, 471 F.3d 523, 526 n.1 (4th Cir. 2006)). Declarations, affidavits, and other statements are among the evidence excluded from consideration if not attached or incorporated to the complaint or not integral to the complaint. See, e.g., United States v.

6

$2,200,000 in U.S. Currency, C.A. No. 12-cv-3501-ELH, 2014 WL 1248663, at *9 (D. Md. Mar. 26, 2014) (declining to consider statements of scientists in motion to dismiss); Trotter v. Kennedy Krieger Inst., Inc., C.A. No. 11-cv-3422-JKB, 2012 WL 3638778, at *5 (D. Md. Aug. 22, 2012) (declining to consider a declaration in deciding a motion to dismiss). Such evidence is unreliable at the pleading stage and would be subject to further discovery as to authenticity, meaning, and completeness.

Finally, if the motion to dismiss involves "a civil rights complaint, [a court] must be especially solicitous of the wrongs alleged and must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." Edwards, 178 F.3d at 244; accord Slade v. Hampton Roads Reg'l Jail, 407 F.3d 243, 248 (4th Cir. 2005) (same); Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (same).

## IV.   ARGUMENT

Ms. Parker has alleged sufficient facts to support her claims for: (1) hostile work environment; (2) retaliation; and (3) gender discrimination. She was subjected to a hostile work environment that was severe or pervasive and based on her gender—the impetus being an untrue and explicit rumor that she had sex with a superior to obtain a promotion. When she complained about the unfair and disparate treatment that she received, she was disciplined and fired. She was fired after just two warnings arising out of the false rumor—male employees were not subjected to this type of disciplinary action, and were not fired after receiving three or more warnings. Ms. Parker is not required to prove her case at this early stage, or develop each and every fact with absolute certainty. Rather, at this stage in the case, where discovery has not yet begun, Ms. Parker is required only to allege facts sufficient to make her claims plausible—an obligation she has not only met, but exceeded.

7

**A.      Ms. Parker Has Stated a Viable Hostile Work Environment Claim**

Ms. Parker has stated a viable hostile work environment claim.  As RCSI rightly states in

its brief, to plead a hostile work environment, Ms. Parker need only allege that:

> (1) she experienced unwelcome harassment; (2) the harassment was
> based on her gender, race, or age; (3) the harassment was sufficiently
> severe or pervasive to alter the conditions of employment and create
> an abusive atmosphere; and (4) there is some basis for imposing
> liability on the employer.

ECF No. 31-1 ("RCSI Brief") at 5 (citing Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761,

765 (4th Cir. 2003)).  Ms. Parker has done just that, alleging that she experienced unwelcome

harassment based on her gender—Mr. Jennings started an untrue and unwanted rumor about Ms.

Parker because she—a female—advanced more quickly than him.  Compl. at ¶¶ 13-15, 25.  And

she was harassed not only by Mr. Jennings, but also by Mr. Moppins and others at the company.

Id. at ¶¶ 16-28, 35-38.

RCSI does not dispute that Ms. Parker experienced unwelcome harassment.  See RCSI

Brief at 5-12.  The dispute relates to whether such harassment was based on Ms. Parker's gender,

whether the harassment was severe or pervasive, and whether there is a basis of imposing

liability.  But the facts alleged in the complaint show that, because of her gender, Ms. Parker was

subjected to a false rumor initiated by Mr. Jennings.  Compl. at ¶¶ 13-15, 28.  Because of her

gender, Ms. Parker was treated unfairly by her superior, Mr. Moppins—slamming a door in her

face, humiliating her in front of her team, and screaming at her, without subjecting Mr. Pickett to

such humiliation and disrespect.  Id. at ¶¶ 20, 24, 27.

The harassment was severe and pervasive.  Mr. Moppins's behavior, slamming a door in

Ms. Parker's face and screaming at her, was abusive.  And it altered the conditions of her

employment.  In fact, Mr. Moppins informed Ms. Parker that because of the rumor—predicated

on the fact that a female employee was able to advance to a managerial position—he could no

8

longer recommend her for promotions or higher-level tasks because of the rumor, and stated that he would not allow her to advance any further within the company. Id. at ¶ 24.

Finally, there is a basis for imposing liability on RCSI. Ms. Parker formally raised her concerns with RCSI's Human Resources department. Id. at ¶¶ 28-29. Rather than being protected, she was terminated. Id. at ¶¶ 35-38.

### 1.    Ms. Parker's Harassment Was Based on Gender

Ms. Parker suffered unwelcome harassment from her coworkers based on her gender, and the fact that she was elevated to a managerial position. This is not a case where a mere "uncomfortable rumor" led to a hostile work environment. Cf. RCSI Brief at 5 (quoting McDonnell v. Cisneros, C.A. Nos. 94-cv-4440, 94-cv-7314, 1995 WL 110131, *8 (N.D. Ill. 1995)). Instead, the facts as alleged in the complaint show that Ms. Parker was subjected to hostility because she advanced more quickly in the company than Mr. Jennings, a male employee. Compl. at ¶¶ 13-15, 25. Ms. Parker alleged that Mr. Jennings started the unfair rumor because he was jealous of her career advancement, and that very few women advanced to managerial positions at the company. Id. at ¶¶ 11, 25. In other words, RCSI was not the type of place where females routinely advanced to managerial positions, and the fact that Ms. Parker rose in the ranks so quickly resulted in her coworkers (both subordinates and superiors) subjecting her to unwelcome harassment based on her gender.

This case is similar to others where hostile work environment claims survived a motion to dismiss. For example, in Allen v. TV One, LLC, C.A. No. 15-cv-1960, 2016 WL 337533, at *2 (D. Md. 2016), the plaintiff alleged that she was subjected to false rumors that she was romantically involved with the CEO of the company where she worked, and that she was only hired because of this alleged relationship. When the plaintiff raised her concerns with the CEO, he did nothing to address the rumors. Id. In that case, this Court held that the plaintiff had

9

sufficiently alleged that "she was the individual target of harassment because she is a woman." Id. at *8.  Much like Allen, here, there is "'nothing gender neutral" about Ms. Parker's offensive treatment because "but for her status as a woman in the workplace, Plaintiff would not have been subjected to alleged harassment by her supervisors."  Compare id. with Compl. at ¶¶ 10-12; see also Jew v. Univ. of Iowa, 749 F. Supp. 946 (S.D. Iowa 1990) (finding a rumor to be based on sex because if the plaintiff were not a woman, "it would not likely have been rumored that [she] gained favor with the Department Head by a sexual relationship with him.").  Ms. Parker would have not been subjected to a hostile work environment at RCSI if she were not a woman.

Ms. Parker has shown and demonstrated with specificity beyond that required by Rule 12 that she was suffered a hostile work environment because of her gender.  She alleged that Mr. Jennings was jealous of her success, that few females had risen to managerial positions at RCSI in several years,[1] that Mr. Jennings started the false rumor because of his jealousy (predicated on her gender), and that she was treated worse than her male colleagues, including Mr. Jennings and Mr. Pickett.  Compl. at ¶¶ 16, 23-24.  For example, when Mr. Jennings complained of a hostile work environment, RCSI immediately took action, directing Ms. Parker not to interact with him. Id. at ¶¶ 31-34.  By contrast, when Ms. Parker complained of a hostile work environment and sexual harassment, first Mr. Moppins urged Ms. Parker to stop "huffing and puffing about this BS rumor."  Id. at ¶ 27.  When she complained to the Human Resources Manager, Ms. Price, she simply urged Ms. Parker and other managers to apologize to one another and put the incident behind them.  Id. at ¶¶ 28-29.  Similarly, despite being teased about the rumor, Mr. Pickett was not subjected to a hostile work environment—he was allowed to attend the meeting at which the

---

[1] The fact that other females had managerial positions at RCSI does not excuse it from a hostile work environment claim.  Cf. RCSI Brief at 7.  Ms. Parker alleged that only a few females had rose to management positions in the past several years.  Compl. at ¶ 11.

rumor was discussed, and was not told that he would not be able to advance at the company as a result. Id. at ¶¶ 16, 20. By contrast, Ms. Parker suffered humiliation and abuse, including Mr. Moppins slamming the door in her face and excluding her from a meeting in front of her colleagues, as well as informing Ms. Parker that she would not be able to advance further in the company, as a result of the rumor predicated on her gender. Id. at ¶¶ 20, 24, 27.

RCSI's motion violates the most important rule in advancing a motion to dismiss—it fails to accept Ms. Parker's allegations as true and draw all reasonable inferences in her favor. For example, RCSI argues that the "alleged rumor fueling her Complaint is based on her conduct and not her gender." RCSI Brief at 6. RCSI goes on to argue that the hostile work environment related to an "alleged misdeed which found its place into workplace gossip" related to "an affair with a supervisor not an activity which was premised on her being female." Id. at 7. This argument fails to accept, **first**, that the rumor was completely false, and **second**, that the rumor was premised on the fact that a female employee rose in the ranks more quickly than her male counterpart. See, e.g., Compl. at ¶¶ 11, 13-15, 25. RCSI even concedes that Ms. Parker asserted "that the negativity about her rumored relationship with Mr. Pickett was based only on her gender and not her alleged conduct," but erroneously argues that this assertion is incorrect. RCSI Brief at 7. The law requires the Court to accept all allegations as true, and interpret them in the light most favorable to Ms. Parker. See Iqbal, 556 U.S. at 679.

This case is unlike Rose-Stanley v. Virginia, C.A. No. 2:15-cv-00007, 2015 WL 6756910 (W.D. Va. 2015), on which RCSI relies, see RCSI Brief at 6-7, where "rumors and resulting conversation might have made [the plaintiff] uncomfortable" but did not amount to discriminatory changes in the terms and conditions of employment. Here, by contrast, Ms. Parker was told that she would not advance at RCSI because of the false rumor predicated on her

11

gender.  See Compl. at ¶¶ 24, 27.  Moreover, unlike that case, where the plaintiff and her male counterpart were questioned about a rumor, Rose-Stanley, 2015 WL 6756910, at *6 (quoted in RCSI Brief at 6-7), here, Ms. Parker has alleged that she was treated differently from Mr. Pickett, as discussed above.  See Compl. at ¶¶ 16, 20, 24, 27.  Beyond the fact that Mr. Pickett was permitted to attend the meeting where Ms. Parker had the door slammed in her face, and was not told that he would not be able to advance at the company based on the rumor, the implications of the rumor were entirely different as to Mr. Pickett.  Although the rumor suggests that he engaged in an extramarital affair, the rumor does not suggest that Mr. Pickett attained **his** managerial position due to his sexual conduct.  By contrast, the rumor directly calls into question **her** qualifications for the management position, undermining her authority with subordinate employees.  See Compl. at ¶¶ 12-17.  The reasonable inference of the rumor was that Ms. Parker was unqualified to become a manager so quickly because she was a female.

### 2.    Ms. Parker's Harassment Was Severe and Pervasive

This case presents the textbook example of a severe and pervasive hostile work environment.  RCSI simply ignores the facts as pled by focusing only on the existence and spreading of the rumor.  See RCSI Brief at 9-11.  But Ms. Parker detailed not only persistent, abusive behavior, she also alleged that she was told that she would not advance in her career because of the rumor predicated on her gender.  Compl. at ¶ 24.  There can be no reasonable doubt that this conduct altered the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere.  See Bass, 324 F.3d at 765.  The work environment described in the complaint was hostile and abusive, not only to Ms. Parker subjectively, but to a reasonable person objectively.  See Harris v. Forklift Sys., 510 U.S. 17, 21-22 (1993).  Applying the factors identified in RCSI's brief, it is inescapable that Ms. Parker pled a hostile work environment:

12

> In determining the existence of a hostile work environment, the court must examine the totality of the circumstances, which may include (1) the frequency of the alleged discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating; or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with the plaintiff's work performance.

RCSI Brief at 9-10 (citing Harris, 510 U.S. at 17). The frequency, severity, threatening and humiliating nature, and interference with Ms. Parker's work performance all weigh in favor of a finding that the hostile work environment was severe and pervasive.

**First**, the frequency of the alleged discriminatory conduct is described in detail in the complaint. Ms. Parker alleged that just two weeks after she started in her managerial role, she learned of a false rumor that she engaged in a sexual affair with Mr. Pickett to attain her job position. Compl. at ¶ 12. She alleged that Mr. Pickett was confronted about the rumor, and that the rumor spread in the office, making the workplace increasingly hostile. Id. at ¶¶ 16-17. The rumor was discussed at a meeting for all warehouse employees on April 21, 2016, at which Mr. Moppins slammed the door in Ms. Parker's face, did not allow her to participate, and humiliated her. Id. at ¶¶ 19-22. The gender-based rumor caused Ms. Parker to fear losing her job the very next day, on April 22, 2016, when Mr. Moppins reprimanded her for raising her concerns with him and told her that she would not advance at the company as a result. Id. at ¶¶ 23-26. The rumor further caused Ms. Parker to suffer an abusive and hostile environment on April 25, 2016, when Mr. Moppins lost his temper and screamed at Ms. Parker, stating that he should have fired her. Id. at ¶ 27. In May of 2016, Ms. Parker suffered harassment by Mr. Jennings, and eventually was fired as a result of the hostile work environment. Id. at ¶¶ 31-36. The frequency of conduct supports a finding that the hostile work environment was severe and pervasive.

**Next**, the conduct was severe, physically threatening, and humiliating. For example, Ms. Parker alleged that Mr. Moppins physically slammed the door in her face, and that she was

13

"humiliated, in front of all the warehouse employees, by Mr. Moppins's inappropriate behavior." Id. at ¶¶ 20-21.  She further alleged that Mr. Moppins screamed and lost his temper at her.  Id. at ¶ 27.  Ms. Parker adequeately alleged that Mr. Jennings engaged in conduct that is threatening and abusive in nature, including "direct[ing] long stares at Ms. Parker," smirking, and laughing at her.  Id. at ¶ 33.  These facts show that the hostile work environment was severe and pervasive.

**Finally**, the hostile work environment unreasonably interfered with Ms. Parker's work performance.  For example, "[s]he was treated with open resentment and disrespect from a number of her co-workers, including employees that she was responsible for supervising."  Id. at ¶ 17.  In other words, the hostile environment impacted her supervision of other employees. Further, Ms. Parker was not permitted to attend a mandatory meeting for all warehouse staff, and was humiliated in front of employees she was in charge of supervising, undermining her authority.  Id. at ¶¶ 19-22.  Further impacting her job performance was the fact that employees Ms. Parker was charged with supervising were permitted to talk about her in the meeting at which she was not permitted to attend, again undermining her authority.  See id. at ¶ 22.  Further, Mr. Jennings interfered with Ms. Parker's performance by distracting employees under her supervision during working hours.  Id. at ¶ 33.

Perhaps the most straightforward example of the severity of the hostile work environment is the fact that Ms. Parker was told she would not advance in the company as a result of the gender-based rumor and the fact that she raised her concerns about it with Mr. Moppins:

> In the meeting, Mr. Moppins blamed Ms. Parker for bringing the situation to the workplace.  Further, Mr. Moppins stated that he had "great things" planned for Ms. Parker at RCSI but that he could no longer recommend her for promotions or higher-level tasks because of the rumor.  He also stated that he would not allow her to advance any further within the company.

14

Id. at ¶ 24.  And Ms. Parker was terminated because of the gender-based rumor.  Id. at ¶¶ 35-38.

It is difficult to imagine a more explicit allegation showing that the hostile work environment altered the conditions of Ms. Parker's employment and unreasonably interfered with her job performance and resulted in her termination.  RCSI's argument that the rumor "played no part in the employment decisions of RCSI or how it was treating her," RCSI Brief at 10, is directly contradicted by the facts as pled (which must be accepted as true at this stage).

From a subjective and objective standard, the environment was abusive and crippled Ms. Parker's performance and advancement, resulting in her termination.

### 3.      There Is a Basis for Imposing Liability on RCSI

Next, there is a basis for imposing liability on RCSI.  The hostile work environment was not limited to activities of subordinates—one of the harassers was also a supervisor, Mr. Moppins.  Moreover, RCSI failed to adequately address Ms. Parker's complaints even after she sought redress through multiple means.

**First**, in this case, the alleged harassers included Mr. Moppins, a supervisor.  Therefore, the rule on which RCSI relies—requiring negligence in controlling the hostile work environment—does not apply here.  See RCSI Brief at 12.  "In cases in which the harasser is a 'supervisor,' . . . different rules apply.  If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable."  Vance v. Ball State Univ., 133 S. Ct. 2434, 2439 (2013).

RCSI even admits that Ms. Parker made an "allegation that a supervisor was . . . involved in commenting on the rumor."  RCSI Brief at 12.  But Mr. Moppins's involvement in the hostile work environment was not limited to his lewd comment to Mr. Pickett regarding the false rumor.  See Compl. at ¶ 16.  Mr. Moppins also contributed significantly to the hostile work environment by, inter alia, slamming the door in Ms. Parker's face and not allowing her to enter a meeting at

15

which the rumor was discussed, id. at ¶ 20, informing her that she would not be able to advance further at the company as a result of the rumor and the fact that Ms. Parker raised her concerns with him, id. at ¶ 24, losing his temper and screaming at her, informing her that he should have fired her for raising her concerns, id. at ¶ 27, and ultimately terminating her based on the gender-based rumor, id. at ¶¶ 35-38. Mr. Moppins, a supervisor, was involved in the hostile work environment such that there is a strict liability basis for imposing liability on RCSI.

**Second**, even if Mr. Moppins were not an alleged harasser (he is), Ms. Parker has alleged evidence showing that RCSI was negligent with respect to the offensive behavior, failing to control the situation despite numerous attempts by Ms. Parker to raise her concerns. See Vance, 133 S. Ct. at 2439 ("If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions."). For example, when directly confronting her subordinates was not enough to remedy the situation, see Compl. at ¶ 18, Ms. Parker arranged a meeting with Mr. Moppins to address her concerns, id. at ¶ 23. At that meeting, Ms. Parker was informed that she would no longer be recommended for advancement at the company because of the rumor. Id. at ¶ 24. This constitutes negligence with respect to the offensive behavior. And she again attempted to remedy the hostile work environment by filing an official complaint with Human Resources—but the complaint was not taken seriously and the parties involved were simply asked to apologize. Id. at ¶¶ 28-29. Ms. Parker also raised her concerns about Mr. Jennings's hostility towards her after he lodged his own complaint, informing her supervisor and Human Resources—but the situation never improved because RCSI negligently failed to remedy the hostile work environment. Id. at ¶¶ 31-34. And Ms. Parker was fired as a result of the gender-based rumor and hostile environment. Id. at ¶¶ 35-38.

16

There are, thus, two separate theories under which liability should be imposed on RCSI arising out of the hostile work environment.  Not only did supervisors participate in the hostile environment culminating in Ms. Parker's termination, but RCSI also failed to address her complaints about non-supervisors.

### B.    Ms. Parker Has Stated a Viable Retaliation Claim

Ms. Parker has also alleged sufficient facts to provide RCSI with a fair notice of her retaliation claim and its basis.

To give a rise to a prima facie case of retaliation under Title VII, Ms. Parker is required to plead the following elements: (1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal link between the two events.  Ziskie v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008); Smith v. First Union Nat. Bank, 202 F.3d 234, 248 (4th Cir. 2000).  Under the burden-shifting scheme set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), once a prima facie case is presented, the burden shifts to RCSI to articulate a legitimate, non-retaliatory reasons for the adverse employment action.  Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 298 (4th Cir. 2004).  Read together and taken as true, the facts alleged in the complaint are sufficient to make out a prima facie case of retaliation and thus meet the pleading requirements.

With respect to **the first element**, Ms. Parker is protected when she opposes "not only . . . employment actions actually unlawful under Title VII but also employment actions [she] reasonably believes to be unlawful."  E.E.O.C. v. Navy Fed. Credit Union, 424 F.3d 397, 406 (4th Cir. 2005).  Critically, the 4th Circuit, siting en banc, has recently clarified the standard for the reasonable belief requirement in the second prong by holding "an employee is protected from retaliation when she opposes a hostile work environment that, although not fully formed, is in progress."  Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 282 (4th Cir. 2015) ("The

17

Title VII violation may be complete, or it may be in progress."). In other words, "an employee is protected from retaliation for opposing an isolated incident of harassment when she reasonably believes that a hostile work environment is in progress, with no requirement for additional evidence that a plan is in motion to create such an environment or that such an environment is likely to occur." Id. at 284.

Here, Ms. Parker has sufficiently alleged that she opposed the hostile work environment in which she was unfairly oppressed and harassed because of her sex and feared retaliation for raising her concerns with Mr. Moppins. Specifically, Ms. Parker communicated with RCSI's employees, including Mr. Jennings and other employees, in an effort to stop the spreading of the rumor about her. Compl. ¶¶ 13, 18; see also Navy Fed. Credit Union, 424 F.3d at 406 (recognizing as oppositional activities "staging informal protests," "voicing one's own opinions in order to bring attention to an employer's discriminatory activities," and "complain[ts] . . . about suspected violations"). Next, Ms. Parker discussed her concerns with her supervisor, Mr. Moppins, in the hopes that he would fairly and appropriately handle the issues caused by the rumor and discipline any of the employees who were perpetuating the rumor. Compl. at ¶¶ 23-25; see also Okoli v. City of Baltimore, 648 F.3d 216, 223-24 (4th Cir. 2011) (finding complaining to supervisors about harassment qualifies as protected activity, even where the complaint "did not explicitly mention sexual harassment" and did not "detail the sexual incidents [the employee] later relayed"). Finally, Ms. Parker reported the sexual harassment and Mr. Moppins' mishandling of the rumor to RCSI's HR manager. Compl. at ¶¶ 27-28.

Even if (for the sake of argument) the alleged unlawful discrimination did not actually occur, the complaint contains sufficient facts supporting that, in opposing the sexual harassment and subsequent retaliatory hostile environment, Ms. Parker reasonably believed that unlawful

18

discrimination occurred or at least was in progress.  See, e.g., Compl. ¶ 13 ("As the rumor spread, Ms. Parker's work environment became increasingly hostile.  She was treated with open resentment and disrespect from a number of her co-workers . . . ."); id. at ¶ 26 ("Mr. Moppins's harsh comments and failure to listen to Ms. Parker's side of the story not only aggravated the hostile work environment to which she was subjected, but put her in fear of losing her job."); id. at ¶ 28 ("[I]t became clear to Ms. Parker that Mr. Moppins had no intention of fairly and appropriately handling the issues caused by the rumor or disciplining any of the employees who were perpetuating the rumor," and thus she "went to Ms. Cathy Price, RCSI's Human Resources Manager, to file a sexual harassment complaint against Mr. Moppins and Mr. Jennings.").  Therefore, Ms. Parker's course of conduct alleged in the complaint, viewed as a whole, is sufficient to plead the first element of a prima facie retaliation claim.

Although it cites to a long list of case law regarding reasonable belief, RCSI seems to only criticize that Ms. Parker failed to plead a retaliation claim because "there did not exist a hostile work environment," without arguing she lacked any reasonable belief.  RCSI Brief at 14 (further asserting "if the factual scenario protested would not amount to illegal discrimination, it will not support a claim for retaliation.").  This argument fails for at least two reasons.  First, RCSI failed to take as true all factual allegations that a hostile work environment based on Ms. Parker's gender actually occurred as demonstrated above in Section IV.A.  Second, RCSI's argument is self-contradictory as it ignores the well-established law that allows for protection when an employee opposes "employment actions [she] reasonably believes to be unlawful." E.g., Navy Fed. Credit Union, 424 F.3d at 406; Boyer-Liberto, 786 F.3d at 282.

Even if RCSI contended Ms. Parker had lacked a reasonable belief, its argument could not be salvaged for failure to apply the proper standard as articulated by the Fourth Circuit's

19

recent decision in <u>Boyer-Liberto</u>.  <u>Id.</u> at 284 ("an employee is protected from retaliation for opposing an isolated incident of harassment when she reasonably believes that a hostile work environment is in progress . . . .").  Indeed, RCSI only cites pre-<u>Boyer-Liberto</u> case law and, as a result, applies an obsolete—and incorrect—legal standard.  RCSI Brief at 13-14.

Furthermore, RCSI's reliance on <u>McGruder v. Epilepsy Found. of Am., Inc.</u> is misplaced.  RCSI Brief at 14.  In that case, this Court found no underlying discrimination based on any protected characteristic (i.e., race) and thus no reasonable belief about such discrimination where the plaintiff expressed her opposition to the defendant's concern that "if Plaintiff were to terminate [a subordinate] based on poor performance, it would look like Plaintiff was discriminating based on race."  <u>McGruder v. Epilepsy Found. of Am., Inc.</u>, 2012 WL 832800, at *5 (D. Md. Mar 9, 2012).  Indeed, <u>McGruder</u> is inapplicable here because of its disparate facts.  Unlike in <u>McGruder</u>, here, Ms. Parker has alleged an underlying discrimination based on her gender—she was subjected to the hostile work environment based on her gender, and such discrimination actually occurred or was reasonably believed to occur or be in progress.

Turning to **the second element**, RCSI does not contend Ms. Parker failed to plead RCSI's adverse employment action.  RCSI Brief at 12-15.  Regardless, Ms. Parker's termination alleged in the complaint is sufficient to establish that she suffered an adverse employment action by RCSI.  <u>Hartsell v. Duplex Prods., Inc.</u>, 123 F.3d 766, 775 (4th Cir.1997) (recognizing termination is clearly an adverse employment action).

Finally, for the **third element**, Ms. Parker has established the burden to show a "but-for" causation for a <u>prima</u> <u>facie</u> retaliation claim.  <u>Univ. of Texas Sw. Med. Ctr. v. Nassar</u>, 133 S. Ct. 2517, 2533 (2013) ("Title VII retaliation claims must be proved according to the traditional principles of but-for causation," requiring "proof that the unlawful retaliation would not have

20

occurred in the absence of the alleged wrongful action or actions of the employer."); see also

Foster v. Univ. of Md-E. Shore, 787 F.3d 243, 251 (4th Cir. 2015) ("[T]he causation standards

for establishing a prima facie retaliation case and proving pretext are not identical.  Rather, the

burden for establishing causation at the prima facie stage is 'less onerous.'").

Ms. Parker has pleaded a number of specific facts suggesting the existence of a "but-for"

causation.  For example, Ms. Parker alleged that Mr. Moppins expressed retaliatory animus

against her both verbally and nonverbally on multiple occasions.  When Mr. Moppins held the

warehouse-wide meeting to discuss the rumor about Ms. Parker, among others, on April 21,

2016, he slammed the door in her face and humiliated her.  Compl. at ¶¶ 19-22.  The next day

when he met with Ms. Parker, Mr. Moppins blamed her without listening to her side of the story

and made the harsh statements that "he could no longer recommend her for promotions or

higher-level tasks because of the rumor," and that "he would not allow her to advance any

further within the company."  Compl. at ¶¶ 23-25.  During the second meeting with Ms. Parker

on April 25, 2016, Mr. Moppins again revealed his animosity against her stating that "he should

have fired her the day before."  Id. ¶ 23.  Mr. Moppins's expressions of animus against Ms.

Parker constitutes a sufficient basis for a "but-for" causation.

As another example, Ms. Parker has alleged the close temporal proximity between her

opposition to the sexual harassment (and the subsequent retaliatory hostile environment) and her

termination.  She was terminated approximately **three weeks** after she reported sexual

harassment to the Human Resources manager, and **within a month** after she first spoke with Mr.

Moppins about the sexually-explicit rumor.  Compl. at ¶¶ 23, 28, 38.  This temporal proximity

strongly suggests the existence of a causal link.  See, e.g., Clark Cnty. Sch. Dist. v. Breeden, 532

21

U.S. 268, 273 (2001) (temporal proximity between the employer's knowledge of protected activity and adverse action is sufficient for causation if the proximity is "very close").

As yet another example, Ms. Parker has pled that both reasons raised by RCSI for firing her were false and pretextual. The first reason which was based on Mr. Jennings's allegations is baseless on its face, because his accounts were not only denied by Ms. Parker but corroborated by no witness. Compl. at ¶¶ 31, 37. The second reason—stating Ms. Parker's poor management ability and insubordination to Mr. Moppins—is suspicious and belied by at least the following facts alleged in the complaint:

- She was an exemplary employee while at RCSI—she started as a lowest-level position at RCSI and were quickly promoted all the way to the highest-level position in under one and half years. Compl. at ¶¶ 8-10.

- She was never issued any warning before the meeting in which she was terminated. Id. at ¶ 37.

- She was terminated within **three months** after assuming the managerial role because of the untrue, sexually-explicit rumor that was initiated and spread by jealous co-workers. Id. at ¶¶ 11, 25, 38.

Taken together and as true, these factual allegations are more than sufficient to pass a muster at the pleading stage.

Despite these specific facts strongly suggesting the existence of a "but-for" causality, RCSI turns a blind eye to all the alleged facts but the close temporal proximity. See RCSI Brief at 14 ("Parker's only other causal link to a retaliation claim is the notion that she was terminated three weeks after she filed a harassment claim against Mr. Moppins."). Based on this mischaracterization, RCSI goes on to assert "timing alone is insufficient to show the necessary nexus for retaliation." Id. at 15. Not only is this argument factually incorrect, but is supported by no legal authority. Id. (citing no case law).

22

Contrary to RCSI's baseless assertion, the close temporal proximity, alone, satisfies Ms. Parker's burden to present a prima facie "but-for" causation.  See Clark Cnty. Sch. Dist., 532 U.S. at 273 (2001) (temporal proximity between the employer's knowledge of protected activity and adverse action is sufficient for causation if the proximity is "very close"); Foster, 787 F.3d at 253 (4th Cir. 2015) (citing King v. Rumsfeld, 328 F.3d 145, 151 & n.5 (4th Cir. 2003) (holding that a two-and-a-half month gap between protected activity and an adverse employment action was sufficiently narrow to establish the causation prong of the prima facie case solely on the basis of temporal proximity)); Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004) ("A causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against the employee shortly after learning of the protected activity."); Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989) (three-month period of time found sufficient to prove causal connection in prima facie case).  While evidence as to the proximity of time "far from exclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality." Cerberonics, 871 F.2d at 457.

Accordingly, accepting Ms. Parker's factual allegations as true and drawing all reasonable inferences in her favor, she has pleaded protected activity, adverse employment action (termination), and a causal connection between that protected activity and the termination of her employment.  Ms. Parker's complaint thus states a claim for retaliation.

**C.      Ms. Parker Exhausted Her Administrative Remedies for Count III**

RCSI argues that Ms. Parker has not exhausted her administrative remedies relating to Count III.  This is an affirmative defense that RCSI bears the burden of proving, but for which it has not.  Brown v. Marsh, 777 F.2d 8, 13 (D.C. Cir. 1985) (stating that "because untimely

exhaustion of administrative remedies is an affirmative defense, the defendant bears the burden of pleading and proving it").

Ms. Parker timely and effectively exhausted all administrative remedies necessary for her to bring her complaint before this Court, including not only Counts I and II, but also Count III regarding the disparate application of the three strike rule at RCSI.  Specifically, Ms. Parker timely filed a charge of discrimination with the EEOC on August 24, 2016, and received a notice of right to sue on or about February 19, 2017.  Compl. at ¶¶ 42-43.  In her charge of discrimination, Ms. Parker claimed that she was subjected to the hostile environment based on her sex and suffered retaliatory termination.  ECF No. 14-2 at 1-2.

Ms. Parker's complaint is not required to recite in haec verba her EEOC charge of discrimination.  A plaintiff in a Title VII case is required to file a charge of discrimination with the EEOC, and the EEOC charge "defines the scope of [plaintiff's] subsequent right to institute a civil suit."  Smith v. First Union Nat. Bank, 202 F.3d 234, 247 (4th Cir. 2000).  The charge must be "sufficiently precise to identify the parties, and to describe generally the action or practices complained of," 29 C.F.R. § 1601.12(b), such that a claimant's "employer is put on notice of the alleged violations," Miles v. Dell, Inc., 429 F.3d 480, 491 (4th Cir. 2005).  The scope of a plaintiff's Title VII lawsuit is not, however, strictly limited only to those discrimination claims expressly stated in the EEOC charge.  High v. R & R Transp., Inc., C.A. No. 1:15-cv-554, 2017 WL 1102854, at *3 (M.D.N.C. Mar. 16, 2017) (citing Chisholm v. U.S. Postal Serv., 665 F.2d 482, 491 (4th Cir. 1981)).  In particular, discrimination claims "reasonably related to the charge, and those developed by reasonable investigation of the charge can also be asserted in a subsequent lawsuit in federal court."  High, 2017 WL 1102854, at *3 (citing Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir. 1996)).

24

"Title VII . . . sets up a remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process." Fed. Express Corp. v. Holowecki, 552 U.S. 389, 402 (2008) (internal quotation mark and citation omitted). And the Fourth Circuit has recognized that "[i]t would be inconsistent with this framework to require untrained parties to provide a detailed essay to the EEOC in order to exhaust their administrative remedies." Sydnor v. Fairfax Cty., Va., 681 F.3d 591, 594 (4th Cir. 2012). In High v. R&R Transportation, Inc., the United States District Court for the Middle District of North Carolina examined cases in which claims were barred based on inadequate EEOC charges:

> Generally, a claim in a plaintiff's civil suit will be barred if: (i) the charge alleges one basis of discrimination (e.g., sex) and the complaint alleges a different basis of discrimination (e.g., race), see Jones[ v. Calvert Grp., Ltd., 551 F.3d 297, 300 (4th Cir. 2009)]; (ii) the charge alleges one type of discrimination, (e.g., failure to promote) and the complaint alleges a different type of discrimination (e.g., discrimination in pay and benefits), see Chacko v. Patuxent Inst., 429 F.3d 505, 509 (4th Cir. 2005); or (iii) the charge "reference[s] different time frames, actors, and discriminatory conduct than the central factual allegations in [the] formal suit," id. at 506.

High, 2017 WL 1102854, at *3.

Here, Ms. Parker's EEOC charge details her harassment beginning in March 2016 and continuing until she was terminated in May 2016. ECF No. 14-2 at 1-2. She alleges that she was discriminated against and terminated based on her gender and the unfounded gender-based rumor started by her co-worker Mr. Jennings and perpetrated by her supervisor Mr. Moppins. Id. at 2. This case is distinguishable, therefore, from Chacko v. Patuxent Inst., 429 F.3d 505 (4th Cir. 2005), on which RCSI relies. See RCSI Brief at 16-17. In that case, the plaintiff's EEOC charge alleged harassment by a supervisor without mentioning harassment by co-workers, and the Fourth Circuit concluded that "the administrative charges and the evidence at trial describe two

25

different cases [which] is precisely the sort of disjunction that the administrative complaint process is designed to avoid."  Chacko, 429 F.3d at 512.

Unlike Chacko, here, Ms. Parker's EEOC charge and complaint relate to the same individuals and the same unlawful harassment.  Compare ECF No. 14-2 with Compl. at ¶¶ 35-39, 51-52.  Both the EEOC charge and the complaint allege that Ms. Parker was terminated based on her gender.  See ECF No. 14-2 at 2 ("I believe I have been . . . discharge[d] due to my sex [Female].").  The facts alleged in the complaint "are reasonably related to, and would likely follow from, a reasonable investigation of Plaintiff's EEOC charges regarding alleged sexual harassment."  See High, 2017 WL 1102854, at *4.

Because Ms. Parker's EEOC charge states that she was terminated based on her gender and generally described that discrimination she faced, she has exhausted her administrative remedies, and RCSI has not met its burden in proving this affirmative defense.  Brown v. Marsh, 777 F.2d at 13 (D.C. Cir. 1985).

## V.      **CONCLUSION**

For the foregoing reasons, the Court should deny RCSI's motion to dismiss.

Respectfully submitted,

Dated:  July 12, 2017              By:    */s/ Andrew R. Kopsidas*
Andrew R. Kopsidas (Bar No. 16057)
Daniel Tishman (*admitted pro hac vice*)
Min Suk Huh (*admitted pro hac vice*)
Laura C. Whitworth (*Pro Hac Vice* to be filed)
**FISH & RICHARDSON P.C.**
The McPherson Building
901 15th St., N.W., 7th Floor
Washington, DC 20005
Phone: (202) 783-5070
Fax: (202) 783-2331

26

Christine T. Dinan (*Pro Hac Vice* to be filed)
Matthew K. Handley (Bar No. 18636)
Dennis A. Corkery (Bar No. 19076)
**WASHINGTON LAWYERS' COMMITTEE
FOR CIVIL RIGHTS AND URBAN
AFFAIRS**
11 Dupont Circle NW, Suite 400
Washington, DC 20036
Telephone: (202) 319-1000
Facsimile: (202) 319-1010

*Counsel for Plaintiff Evangeline J. Parker*

27

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Response in Opposition was served by means of the Court's CM/ECF system to all counsel of record who have consented to electronic service on this the 12th day of July, 2017.


/s/ Andrew R. Kopsidas
Andrew R. Kopsidas

28