**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

EVANGELINE J. PARKER                        *

    Plaintiff                              *

v.                                          *      Case No. 8:17-CV-01648-TDC

REEMA CONSULTING SERVICES, INC. *

    Defendant                              *

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

**<u>DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT</u>**

Defendant, Reema Consulting Services, Inc. ("RCSI" or "Defendant"), moves pursuant to F.R.Civ. P. 56 for Summary Judgment on the claims of Plaintiff Evangeline J. Parker ("Parker" or "Plaintiff"), who has alleged that while employed by RCSI she was subjected to a "hostile work environment" based on gender and terminated for complaining of harassment in violation of the Civil Rights Act of 1964 ("Title VII").  Although this case has a storied past taking it to the Fourth Circuit Court of Appeals and back, it is critical to note that the Fourth Circuit decision was based entirely on the Court's initial grant of a Motion to Dismiss premised solely on the allegations in the Complaint.  After having the full benefit of discovery to demonstrate the truth of those allegations, it has become abundantly clear that the facts raised in the Complaint never existed.

Plaintiff's hostile work environment claim is premised upon her allegation that she was the subject of a rumor that she had had a romantic relationship with a supervisor. After the completion of discovery, however, there is no genuine dispute that there was no a rampant rumor nor can Parker prove that she was subjected to an actionable hostile work environment under Title VII. Plaintiff's own testimony demonstrates that the alleged rumor did not alter her working conditions,

was only of an extremely limited duration and was based only on her perceptions that it existed not her actually hearing it from anyone at RCSI. The undisputed testimony from other witnesses at RCSI demonstrates that they were unaware of any rumor about Parker. In fact, the record demonstrates that Plaintiff disseminated the rumor when she accused her subordinates of spreading the rumor.

RCSI is also entitled to summary judgment on Parker's retaliation claim because she cannot establish a prima facie case and she was terminated for legitimate, non-retaliatory reasons. Parker's subordinates complained about abusive conduct by Parker. When her supervisor attempted to discuss the subordinates' complaint with Parker, she became so combative that even she concedes her behavior was insubordinate. Human Resources conducted investigations of the subordinates' claims as well as Parker's allegation regarding the rumor and concluded that the claims of the rumor could not be substantiated and, in fact, Parker herself was responsible for perpetuating the rumor when she accosted her subordinates to "set things straight."

To avoid any further conflict, HR cautioned employees to not engage in rumors, RCSI reinforced its anti-harassment policies, and accelerated its annual facility-wide training. Parker was also instructed to stay away from one employee (Donte Jennings) who Parker had accused of having started a rumor to avoid further conflict between her and Mr. Jennings. Despite these efforts, a few days later Mr. Jennings complained to HR that Parker continued to confront him. RCSI's Human Resources Director investigated Mr. Jennings' complaint and concluded that Parker had violated the directive to avoid Mr. Jennings and was further demonstrating a lack of managerial discretion.

At the conclusion of the investigation, HR recommended Parker's termination and the President of RCSI, Rajesh Vora, alone determined that Parker's abusive conduct towards her

subordinates and her own admitted prior insubordination towards her supervisors warranted her termination.   She was terminated on May18, 2016 not because of a hostile work environment and not because RCSI was retaliating but because Parker continued to refuse to follow directions and displayed gross disrespect for those employees working under her.

## FACTUAL BACKGROUND

RCSI is a small, disadvantaged business specializing in providing logistics, warehouse, operations and administrative support services to the federal government.  Parker was hired by RCSI on December 1, 2014 as a General Clerk II, to work on a project providing warehouse support to the Department of State Office of Anti-Terrorism Assistance for sensitive and high-value equipment.  J.R. 1, Exhibit 1, Offer Letter dated November 26, 2014.  Parker was promoted three times, eventually to the position of Assistant Manager.  J.R. 2, Exhibit 2, Promotion and Salary Increase Letter dated March 16, 2015; J.R. 3, Exhibit 3, Offer of Promotion dated May 16, 2015; J.R. 4, Exhibit 4, Letter dated April 7, 2016.   In that latter role she was one of five women who held managerial roles in a workforce of 25 employees. Although she was promoted, issues related to her perception of her role as a manager arose early on and she was counseled about her role as a supervisor.  See, e.g., J.R. 5, Exhibit 5, Written Warning dated September 2015.

Parker noted her disagreement with the assessment and resented the criticism indicating that it was "not her role to babysit employees."  When confronted about this comment at her deposition, Parker reinforced her misunderstanding of a managerial role and stated  "I wanted to manage, not babysit." J.R. 32, Exhibit 6, Deposition of Evangeline Parker at p. 102, line 10.

Damarcus Pickett served as the Deputy Program Manager on the program and Larry Moppins[1] served as the Contract's Subject Matter Expert.  Mr. Pickett and Mr. Moppins had worked together for several years prior to working for RCSI and socialized outside of work with their wives. J.R. 39, Id. at p. 131, lines 6-18 ("…I know he and Larry had a relationship. They were pretty close, like, buddies, if you will.")  Sometime in February or March, 2016, Mr. Moppins noted Mr. Pickett's declining work performance, apparent declining health, dramatic weight loss and Mr. Pickett had expressed woes about marital troubles to Mr. Moppins.  J.R. 162, Exhibit 7, Deposition of Larry Moppins at p. 76, line 11 to p. 77, line 13. Mr. Moppins also frequently observed Parker and Mr. Pickett privately spending long periods of time together at work, which had no job-related explanation.  Id.  Because of these observable changes and incidents, Mr. Moppins asked Mr. Pickett whether he was having a sexual relationship with Parker.  Id.  Mr. Pickett denied that he was having affair with Parker, and both men considered the matter closed.  J.R. 162, Id. at p. 77 lines 8-19; J.R. 234, Exhibit 8, Deposition of DeMarcus Pickett at p. 89, lines 10-17.  See also, J.R. 54, Exhibit Parker Deposition, p. 189, line 22- 190, line 2 ("…I'm pretty sure Demarcus told him that was false or it wasn't true.").

Mr. Moppins and Mr. Pickett both agree that this discussion was the only time Mr. Moppins mentioned anything about a possible relationship between Mr. Pickett and Parker.  J.R. 163, Exhibit 7 at p. 78, lines 10-12. No evidence has been obtained to show that this or a similar conversation occurred on any other occasion.  Mr. Moppins also never questioned Parker (or anyone else) about Mr. Pickett and never at any time questioned Parker's promotions or insinuated they were the result of any promiscuity or her relationship with Mr. Pickett.  J.R. 163, 151, Id. at p. 78, lines 10-12; p. 32, line 22 to p. 33, line 2. Parker herself testified that she is

---

[1]    Mr. Moppins was not an employee of RCSI but was a 1099 subcontractor.  Exhibit Deposition of Rajesh Vora, at p. 32, lines 8-22.

unaware of any instances of Mr. Moppins discussing or sharing the rumor.  J.R. 51, Exhibit 6 at p. 177, lines 6-20.   In fact, even though Mr. Moppins was not an employee of RCSI and had no decision-making authority over its employees, Mr. Moppins supported and was a proponent for each of Parker's advancements at RCSI.  Id.; J.R. 348, Exhibit 9, Deposition of Cathy Price at p. 67, lines 2-13; J.R. 471, Exhibit 10, Deposition of Rajesh Vora at p. 33, lines 17-24.

A few days after Mr. Moppins questioned Mr. Pickett, Romaine Thomson, a former RCSI employee, stopped by RCSI and joked with Mr. Pickett that she heard that he and Parker "had something going on."  J.R. 36, 37, Exhibit 6, at p. 120, line 12 - 121, line 17.  Mr. Pickett called Parker, who was driving home from work, to tell her about Ms. Thomson's comments and also noted Mr. Moppins' prior question. Id.; J.R. 235, 236, Exhibit 8, at p. 96, line 13 to p. 97, line 9.

Mr. Pickett testified that he only told Parker so that she would be aware of the situation and not, "Fly off the handle," if she heard it.  J.R. 236, Id. at p. 100, lines 5-6.  Otherwise, Mr. Pickett described the issue as "a BS rumor" that, "Wasn't that big a deal." J.R. 237, Id. at p. 102, lines 18-19 and p. 104, lines 5-6. According to Parker, the telephone call lasted four or five minutes and she did not discuss it with anyone else that evening.  J.R. 38, 39, Exhibit 6, at p. 127, lines 14-16., p. 132, lines 10- 14. After his conversation with Parker, Mr. Pickett did not hear any more of the matter for weeks.  His only other time of hearing anything about a sexual relationship between he and Ms. Parker was weeks later, in late April, when Parker's subordinates complained to him and Mr. Moppins that Parker had been treating them poorly, confronted them each in the warehouse and accused them of discussing a rumor about her and Mr. Pickett.  J.R. 239-241, Exhibit 8, p. 109, lines 11-19, page 116, line 17 to page 117 line 2.

Parker testified that within a day or two after the discussion with Mr. Pickett, early one morning before their shift started and no one else was around, she confronted her subordinate, Donte Jennings, about the rumor because she believed he was spreading it.  J.R. 41-42, Exhibit 6 at p. 140, line 17 to 141, line 12.  Parker further testified that when she confronted Mr. Jennings, he did not appear to understand what Parker was talking about.  Id.  Despite the fact that Mr. Jennings was Parker's subordinate employee and she could have disciplined him if she believed that he engaged in inappropriate conduct, she did not report him to Human Resources or issue any discipline.  J.R. 44, Id. at p. 152, lines 12 to 20.

According to Parker's own testimony, the alleged rumor had no impact on her working conditions between the time that she first learned of it from Mr. Pickett in March of 2016, and an all-hands meeting that occurred over one month later on April 21, 2016.  J.R. 36, 44, Id. at 120, lines 7-9; p. 150, lines 4-14. Parker testified "Nothing occurred until about the time of this meeting when it resurfaced and this was what was discussed in the meeting that I should have been at but I wasn't allowed to be."  Id.  Parker did not attend the meeting she referenced and there is no admissible evidence that the alleged rumor was discussed at the meeting.  Id.

Rather than testify that she heard the rumor in the warehouse, Parker testified only that during the time frame between her call with Mr. Picket in March and April 21, 2016, Mr. Jennings and another of her subordinates, Manley Ferguson, had "little conversations and little kind of looking sessions with the laughter afterwards."  J.R. 44, Id. at p. 151, lines 10-15.  Parker conceded in deposition that she merely suspected that Messrs. Jennings and Ferguson were discussing the alleged rumor, offering only that, "I could tell things were being said but I couldn't prove it, and so you just kind of continue on with your day." J.R. 44, Id. at p. 150, lines 9-11.

Parker further testified that her perceived harassment was limited to Mr. Ferguson and Mr. Jennings, and she explicitly stated that no other employees engaged in any behavior that related to the alleged rumor.  J.R. 44, Id. at p. 152, lines 5-7. Parker testified:

> Q:      Okay.  Other than those two employees doing that, did any other employee do anything that made you feel that it was something based on the rumor that they were treating you differently?
> A:      No.  Everyone was - everyone did what they were supposed to do.  You know, I really didn't have to say anything to anyone about not doing their job.  You know, nothing wrong, like I said, with whistling while you work.  Laughter and talk was permitted while they worked as long as it didn't interfere with the work.  So they worked.

J.R. 44-45, Id. at 152 line 21 to 153 line 9.

There is no evidence that the alleged rumor was known within the workplace at that time to anyone other than Mr. Pickett.  For example, Angela Wallace, Parker's former supervisor, had not heard of the alleged rumor before she was asked to attend a meeting with Parker and Mr. Moppins as a witness on or about April 21, 2016.  J.R. 526, Exhibit 11, Deposition of Angela Wallace at p. 48 line 4 to 49 line 22.

> Q:  So going into this meeting, you had not even heard the rumor?
> A:  Correct.

Id. at p. 49, lines 20-22.  Similarly, Cathy Price, RCSI's Human Resources Manager, had not heard of the alleged rumor prior to Parker filing a complaint with Human Resources about the alleged rumor on April 25, 2016.  J.R. 369, Exhibit 9, Deposition of Cathy Price at p. 151 line 25 to p. 152 line 2.

Neither Parker nor Mr. Pickett testified that Parker ever mentioned the matter to Mr. Pickett again during that timeframe, complained that it was affecting her performance or workplace, or asked that he assist her in dealing with any concern about a rumor.  Up to that

point in time, Parker had not reported the rumor to Human Resources or even discussed it with Mr. Moppins.  J.R. 44, Exhibit 6 at p. 152, lines 12 to 20.

The only other person that Parker identifies as having discussed the alleged rumor during this time frame was Ms. Thompson, a RCSI former employee, who Parker regarded as a friend. J.R. 36, 42, Id. at p. 120, line 13, p.143, lines 18 to 144, lines 1.  Parker testified that a few days after talking to Mr. Pickett she confronted Ms. Thompson at a kickball game and told her the rumor was not true.  J.R. 42, Id. at 142, line 15 to 144, line 4.

Other than the "little conversations," between Mr. Jennings and Mr. Ferguson, the only other event that Parker claims contributed to a "hostile work environment" was her alleged exclusion from the April 21, 2016 all-hands meeting.  All testimony and evidence are that the purpose of the all-hands meeting was to address a client issue, not the rumor or Parker.  J.R. 169, Exhibit 7, at p. 105, lines 15 to 22.   In fact, there is no evidence that Parker was excluded from this meeting due to her gender or in retaliation for engaging in protected conduct.  To the contrary, Parker conceded that she was invited to the meeting but had arrived late due to personal reasons. J.R. 44-46, Exhibit 6, at p. 152, lines 12 to 20, p. 157, lines 8-9.  She also conceded that she had not raised issues related to the rumor with Mr. Moppins or reported it to Human Resources prior to the all-hands meeting, such that there could not even be any rational connection between her alleged exclusion from the meeting and the alleged rumor.  Id.  She does not know why Mr. Moppins closed the door.  J.R. 46, Id. at p. 159, lines 10-12 ("Q: And do you know why you were excluded at that time? A: I don't know why.").

As noted above, Parker herself admits that she was late for the meeting, in part, due to a personal call with her daughter but claims that Mr. Moppins "slammed the door in her face" and locked it.  J.R. 45, Exhibit 6 at p. 154 line 14 to p. 156, line 8., p. 158, lines 17-18.  Other than to

broadly state that "everyone" saw Mr. Moppins allegedly slam the door in her face, she could not see anyone in the room and she merely assumed that "everyone" saw it. J.R. 46, Id. at p. 158 lines 20 – 22 through p. 159, lines 1-10.  In fact, no other witnesses have corroborated the claim that the door was slammed in Parker's face.  Several witnesses did, however, testify that Mr. Moppins was a stickler for prompt attendance and closed the door to meetings at (or even before) their scheduled start times.  As Ms. Wallace testified:

> Q: In regards to these all-hands meetings, was Mr. Moppins strict about being on time for them?
> A:  Yes.
> Q:  Why do you say that?
> A:  I'm only assuming that as a military man, that's just the way that he ran the warehouse.
> Q:  Right.
> A:  Yeah.
> Q:  So if a meeting was called for 9:00 a.m., he expected everybody to be there by 9:00 a.m.?
> A:  At 8:50.
> Q:  At 8:50.  Do you ever recall him not letting somebody in who showed up at 9:01 or 9:03?
> A:  Yeah.  The door was shut at the meeting time, so if you weren't there, you weren't -- you weren't in.
> Q:  Mm-hmm.  Did that ever happen to you?
> A:  No.  No.
> Q:  But you saw it happened to others?
> A: Yes.

J.R. 531, Exhibit 11, at p. 69 line 8 to p. 70 line 6. Mr. Moppins was strict with all employees, "When the door shut, the door shut.  It doesn't matter who you are." J.R. 532, Id. at p. 70, lines 18-19.   Mr. Pickett's testimony was similar, explaining, "You know, so yeah, it was common for people to be, or to get the door shut on them.  It's not uncommon, no." J.R. 240, Exhibit 8, at p. 114, lines 17-19.  Parker got angry when she was excluded from the all-hands meeting and left work without receiving prior permission, without clocking out. J.R. 46, Exhibit 6 at p. 160, lines 13-21.

While there is some dispute as to what occurred at the meeting beyond the planned topic, there is no evidence that the alleged rumor was discussed in this meeting.  In fact, Mr. Pickett could not recall any all-hands meeting where the staff talked about Parker.

> Q: Okay. So, do you recall there being an all hands meeting where the staff talked about Ms. Parker?
> A: I don't recall a meeting like that, specific about Ms. Parker?
> Q: Uh-huh?
> A: I don't, no.

J.R. 240, Exhibit 8 at p. 115, lines 4-10.

During the April all-hands meeting, after discussion about the client issue, employees raised complaints about their supervisors. J.R. 551, Exhibit 12, Reema Consulting Services Inc. Sexual and Other Unlawful Harassment Report.  As things grew heated in the meeting, Mr. Moppins adjourned the all-hands meeting to meet with the complaining employees outside of the all-hands meeting.  Id.  See also, J.R. 184, Exhibit 7 at p. 163, lines 6-16.  Mr. Moppins and Mr. Pickett met with two of the complaining employees, Mr. Jennings and Mr. Ferguson, in the privacy of Mr. Moppins' office.  Id.  During this meeting, Mr. Jennings and Mr. Ferguson, complained that Parker mistreated them and accused them of spreading a rumor about her. Reema Consulting Services Inc. Sexual and Other Unlawful Harassment Report. J.R. 553, Exhibit 13, Email from Larry Moppins dated April 27, 2016.  Mr. Pickett testified as to his recollection of the meeting as follows:

> I think Manley and Arnel may have been getting a - I don't know if it was a verbal counseling, or counseling, or something like that, and Manley alluded to the fact that in this meeting, like "She's only mad because she thinks I had something to do with that rumor, or something like that." He felt like I think he was getting picked on by her, something like that.
>
> Because she thinks that he was part of this rumor, whatever the case may have been.  So, then, the rumor came up again in that sense in front of Larry.  So, now, Larry's like "Whoa, well, what rumor?" And then he's  [ referring to Mr. Jennings]

like "Oh, that she's fucking Pickett," or something like that, something along those lines.

J.R. 238, Exhibit 8 at p. 106, lines 5-19.  Again, there is no evidence that these concerns were raised in the all-hands meeting.  J.R. 239, Id. at p. 109, line 2-5.   Mr. Pickett expressed surprise at the fact that issues with the rumor came up again, stating, "And I was like, 'Oh, wow, that came back up.  That was crazy.'"  J.R. 238, Id. at p. 109, lines 18-19.  This was the first time that Mr. Moppins learned that Parker believed a rumor about her and Mr. Pickett was spreading at RCSI.  J.R. 167, Exhibit 7 at p. 96, line 7 to p. 97, line 16.

The next morning, Parker requested a meeting with Mr. Moppins which was attended by Mr. Pickett and Ms. Wallace as witnesses. J.R. 49, Exhibit 6, p. 172 lines 4-20.  During this meeting, Parker insisted that Mr. Moppins should not listen to these employees but that he should instead stand by her as a manager. Ms. Wallace's documentation of the meeting states:

> The conversation escalated when Ms. Parker tried to express her feelings in regards to Mr. Moppins taking sides with the employees of the warehouse.  When asked by Mr. Moppins, how did she come to that conclusion, she stated your feedings into the rumor mill.  Mr. Moppins stated that he had no notion of the rumor until it was brought to his attention that day.

> Ms. Parker told Mr. Moppins that she did not feel she had his support and he was choosing to listen to the warehouse employees over her.  Ms. Parker stated she felt he should be shutting those rumors down when approached by the warehouse workers.  Mr. Moppins in turn told Ms. Parker, whether it was true or not, due to his position at RCSI, in all fairness he has to listen to everyone within the warehouse, not just the managers.

J.R. 555, Exhibit 14, Statement of Events from Angela Wallace dated May 23, 2016.  All in the meeting agreed Parker became so combative that Ms. Wallace had to stop the meeting and walk Parker into the hall to tell her calm down and cease being so insubordinate.  J.R. 555, Id.  See also J.R. 52, Exhibit 6 at p. 183 lines 8 to 13 ("Ms. Wallace did her best to try and neutralize the situation…And so I left because I knew I needed to go and calm down because he's still my

boss...").  Parker also admitted at her deposition that she was insubordinate that day.  J.R. 58, Id.,

p. 208 lines 15-18.

The following workday, Monday, April 25, 2016, Mr. Moppins called Parker into a

meeting with him, Mr. Pickett and Ms. Wallace. J.R. 58, Id. at p. 206, line 19 to p. 207, line 7.

At this meeting, Mr. Moppins told Parker that her behavior at the prior meeting was

unacceptable, that she could have been fired for it and she would be if she conducted herself that

way again.  J.R. 58, Id. at p. 207, lines 2-7. According to Parker's testimony, she apologized for

her insubordination, but then Parker accused Mr. Moppins of spreading a rumor about her

because of his questioning of Mr. Pickett in February.  J.R. 58, Id. at 207, lines 8-14.  Parker

testified that it was only after this meeting on April 25, 2016, that she reported the alleged rumor

to Human Resources Director Ms. Price for the first time.  J.R. 59, Id. at p. 210, lines 9-10.

Ms. Price took copious notes and then began her investigation of Parker's complaint.[2]

"When she brought the complaint to me, I did the investigation immediately.  I started it

immediately." J.R. 557, Exhibit 15, Investigation notes, J.R. 377, Exhibit 9, at p. 184, lines 23-

25.   Ms. Price interviewed Mr. Jennings and Mr. Moppins since they were the subject of the

complaint, as well as witnesses identified by Parker, including Angela Wallace, Kenton Birgans,

Manley Ferguson, and DeMarcus Pickett.  J.R. 574, Exhibit 16, Reema Consulting Services, Inc.

Sexual and Other Unlawful Harassment Investigation Questionnaire.  Ms. Price's investigation

also included interviews with individuals present at the all-hands meeting to determine whether

Mr. Moppins had slammed the door in Parker's face.  Not a single witness corroborated this

allegation.  J.R. 372, 373, Exhibit 9, at p. 165, line 19 to p. 166, line 8.

---

[2]     During the interview process, Parker contributed gossip of her own, sharing that a
supervisor and a former employee were hooking up, as well as Ms. Thompson and Mr. Jennings,
none of which was relevant to her claims.  J.R. 574, Exhibit 16, Reema Consulting Services, Inc.
Sexual and Other Unlawful Harassment Investigation Questionnaire

After receiving Parker's complaint, Ms. Price also immediately sent out an email directing all parties to cease discussing the alleged rumor outside of the investigation into Parker's complaint and the employees' complaints about Parker's management.  J.R. 579, Exhibit 17, Email from Cathy Price dated April 25, 2016.[3]  It stated,

> Due to recent events that have brought [sic] to HR's attention in regards to workplace gossip and rumors.
>
> I am advising all parties on this email to cease having or entertaining this subject outside of HR.   If I have not sat with you to hear your version, please come see independently.  I will take information from all side and issue a final resolution. Also, I would like to advise individual about our workplace code of conduct and sexual harassment policies (review policy manual).  Gossip is an ugly thing that can cause defamation of one's character and create a hostile work environment.  I understand emotions are high and the natural reaction is to defend oneself. But that is not the best approach.  If you have something to add to or want to share, please direct all conversation to me, ONLY.

Id.  There is no evidence that anyone, other than Parker, raised or discussed the rumor after this date.

During the investigation, Ms. Price met with Parker and Mr. Jennings.  J.R. 387, Exhibit 9 at p. 224, lines 10-11.  After this meeting, Ms. Price told Mr. Jennings and Parker to stay away from one another.

> Q:  Who gave that instruction?
> A:  I did.  I told Mr. Jennings that he was to refrain from going around Ms. Parker, and I told Ms. Parker to -- not interact with Mr. Jennings because at that time, he was no longer reporting to her.

J.R. 387, Id. at p. 225, lines 11-16.

Ultimately, Ms. Price concluded that there was no widespread rumor about Parker in the warehouse.  J.R. 551, Exhibit 12.  Instead, Ms. Price discovered that Parker was aggressively confronting subordinate employees about the rumor, that Parker herself had only heard about it

---

[3]     In addition to her instruction to everyone to stop any discussion of rumors, Ms. Price accelerated RCSI's harassment training for the entire workforce.

from Mr. Pickett and herself raised it with former employee, Ms. Thompson. Id.; See also J.R. 38, 40, 42, Exhibit 6, at p. 127, lines 14-16., p. 132, lines 10- 14, p. 142, line 15 to 144, line 4.

As Ms. Price was finishing her investigation into Parker's claims, she called for a meeting between Parker, Mr. Moppins, Mr. Pickett, and Ms. Wallace to discuss the situation with the rumor and achieve reconciliation and closure so that they could refocus on the mission.  J.R. 378, 379, Exhibit 9 at p. 186, lines 4-25; p. 190, line 18 to 191, line 7. At this meeting in April 27, 2016, all parties apologized to one another in an effort to allow RCSI to move forward productively. J.R. 379, Id. at p. 191, lines 14-21.  On or about May 2, 2016, Ms. Price met with Mr. Jennings and instructed him to complete sexual harassment training to ensure that he understood appropriate conduct in the workplace. J.R. 580, Exhibit 18, Memorandum from Donte Jennings dated May 12, 2016.  During that conversation with Ms. Price, consistent with his complaints raised after the all-hands meeting in April, Mr. Jennings reported that Parker had been verbally abusive and antagonizing him.  J.R. 386, Exhibit 9, at p. 221, line 9 to 222, line 7.

Shortly thereafter, on May 12, 2016, Mr. Jennings filed a written complaint against Parker. J.R. 580, Exhibit 18.  Mr. Jennings complained that although he had been transferred from Parker's supervision, she followed him in the warehouse, harassed him and made demeaning faces and gestures toward him.  Id.; J.R. 393, Exhibit 9 at p. 247, line 19 to p. 248, line 6.  Ms. Price investigated this new allegation and interviewed or obtained statements from a number of employees, including Parker, Mr. Moppins, Ms. Wallace, Mr. Birgans, and Carlos Carter.  J.R. 553, Exhibit 13, J.R. 555, Exhibit 14, J.R. 581, Exhibit 19, Statement of Carlos Carter. Ms. Price concluded that Parker had persisted in harassing Mr. Jennings after she had been instructed to avoid him.  J.R. 551, Exhibit 12.

Ms. Price concluded that Parker was continuing to ignore management's direction and retaliating against the employees who had lodged a complaint about her behavior, including Mr. Jennings, and reported her findings to both Mr. Moppins and the President of RCSI, Rajesh Vora. Ms. Price recommended termination.  With regard to her findings, Ms. Price testified:

> A:  …Ms. Parker continued to be insubordinate to the instructions that not only I had given her; she continued to have inappropriate behavior with the employees, her subordinates.
>
> When -- with regards to her language with the employees in the back of the warehouse, apparently it continued, where she was becoming more abusive in language.  She was threatening the employees by saying, I'm your boss, and you're going to do what I tell you to do.
>
> And even after my e-mails about cease from having these conversations and even in one-on-one meetings about not continuing to speak about this issue in the workplace, she continued to do so.  In addition to, her interactions with Mr. Moppins were becoming insubordinate.

J.R. 391, Exhibit 9. at p. 239, line 14 to p. 240, line 8.

After discussing the issues with Ms. Price and at her direction, Mr. Moppins prepared two proposed written warnings for Parker identifying the situations and noting termination and submitted them to Ms. Price for approval.  Id.  J.R. 582, Exhibit 20, Written Warning dated May 16, 2016; J.R. 585, Exhibit 21 Second Written Warning dated May 16, 2016.[4]

Ms. Price also reported her findings and conclusions to Mr. Vora, who was the sole person with hiring and firing authority at RCSI.  J.R. 341, Exhibit 9 at p. 38 line 5-14.  After reviewing and hearing all of the evidence provided, Mr. Vora made the decision that Parker's insubordination and inability to demonstrate managerial understanding merited her termination, which was documented in her termination letter.  J.R. 587, Exhibit 22, Termination Letter; J.R. 486, Exhibit 10, p. 92, lines 11-24.  Parker was terminated on May 18, 2016.  Id.

---

[4]     Mr. Moppins was not an RCSI employee and had no authority to hire or fire. J.R. 471, Exhibit 10, Deposition of Rajesh Vora at p. 33, lines 17-24.

**LEGAL ARGUMENT**

### I.    Summary Judgment Standard

The Court must grant summary judgment "if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Only "facts that might affect the outcome of the suit under the governing law" are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.  "When the moving party has met its responsibility of identifying the basis for its motion, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" White v. Rockingham Radiologists, Ltd., 820 F.2d 98, 101 (4th Cir.1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324). "Thus, Rule 56 mandates summary judgment against a party 'who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Cmty. First Bank v. Cmty. Banks, 360 F. Supp. 2d 716, 721 (D. Md. 2005) (quoting Celotex Corp., 477 U.S. at 322).

### II.    RCSI is Entitled to Judgment as a Matter of Law on Count I of Parker's Complaint Alleging a Hostile Work Environment

To establish a Title VII hostile work environment claim, Parker must prove that: (1) she experienced unwelcome harassment; (2) the harassment was based on her gender; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. Bass v. E.I. DuPont de Nemours & Co, 324 F.3d 761 at 765 (4th Cir. 2003); see Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001).

Viewed in the light most favorable to Plaintiff, the evidence falls far short of the type of severe or pervasive gender-based activity necessary to state a hostile work environment claim. As this Court has previously held, "plaintiffs must clear a high bar in order to satisfy the severe or pervasive test ...." E.E.O.C. v.  Cent. Wholesalers, Inc., 573 F.3d 167, 176 (4th Cir. 2009).  No matter how disrespectful the treatment, "cursing, yelling, and reprimanding" are insufficient to give rise to a hostile work environment claim. Bass (finding "a story of a workplace dispute regarding [plaintiff]'s reassignment and some perhaps callous behavior by her superiors" insufficient); Chacko v. Patuxent Inst., 429 F.3d 505, 512, n. 3 (4th Cir. 2005) (expanding a hostile work environment claim to cover common workplace occurrences, such as being ordered out of an office, forbidden from leaving early, and receiving intimidating responses to letters, would "countenance a federal cause of action for mere unpleasantness").

To be actionable, "the conduct in question must be judged by both an objective and a subjective standard: [t]he conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." Harris v. Forklift Sys., 510 U.S. 17, 21–22 (1993). In determining the existence of a hostile work environment, the court must examine the totality of the circumstances, which may include (1) the frequency of the alleged discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating; or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with the plaintiff's work performance. Harris, 510 U.S. at 17. No single factor is dispositive.

> These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." Properly applied, they will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." We have made it clear that conduct must be extreme to amount to a

change in the terms and conditions of employment, and the Courts of Appeals have heeded this view.

Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (citations omitted).

Importantly, the Fourth Circuit Court of Appeals has noted that "[e]vidence of a general atmosphere of hostility toward those of the plaintiff's gender is considered in the examination of all the circumstances." Id.  Here, the evidence adduced in discovery does not establish that Parker was subjected to "severe or pervasive" conduct. Her complaints that the alleged rumor was spread around the workplace were simply not factually substantiated and created solely to support her Complaint.

### A. The Rumor Was Not Pervasive

Contrary to Parker's suspicion that the alleged rumor was "circulating," there is no evidence that anyone employed at RCSI was aware of rumors about Parker. Mr. Pickett himself only learned about it when former employee Ms. Thomson made a joke to him about it (and in fact, may have been the source of the rumor).  J.R. 36, Exhibit 6 at p. 120, line 13.  Beyond this one former employee who maintained a personal relationship with Parker outside of RCSI, Parker suspected only that her subordinate, Mr. Jennings, was spreading the rumor, but she testified that when she confronted him, it appeared to her that Mr. Jennings had no idea what she was talking about. J.R. 41, 42, Id. at p. 140, line 17 – p. 141, line 12.

Other witnesses, including Ms. Wallace and Ms. Price, RCSI's Human Resources Manager, did not learn of the alleged rumor until several weeks later, in late April and each heard it from Parker. J.R. 369, Exhibit 9, at p. 151 line 25 to p. 152 line 2.  See also, J.R. 59, Exhibit 6 at p. 210, line 6 – p. 211, line 7.

Mr. Pickett, who first informed Parker of the alleged rumor, thought that it "wasn't a big deal" and heard nothing else about it until over six weeks later after Mr. Jennings and Parkers'

other subordinates complained about her management style after the all-hands meeting. J.R. 239-241, Exhibit 8, p. 109, lines 11-19, page 116, line 17 to page 117 line 2. Neither Parker nor Mr. Pickett testified that Parker ever mentioned the rumor to him again during that timeframe, complained that it was affecting her performance, or asked that he assist her in dealing with the rumor.

The infrequency of the alleged conduct prevents Parker from using it to establish a hostile work environment claim. Parker only identifies a single time when the alleged rumor was discussed with an active co-worker - namely when Mr. Pickett informed her of the rumor. The Fourth Circuit has routinely held that isolated comments, no matter how odious, are not severe or pervasive enough to be actionable. See, e.g., Irani v. Palmetto Health, 767 Fed. Appx. 399, 417 (4th Cir. 2019)(holding that two isolated comments, including referring to plaintiff as "Achmed the terrorist" were insufficient to establish a hostile work environment).

**B. The Rumor Did Not Alter Parker's Working Conditions at RCSI**

There also is no genuine dispute of material fact that the alleged rumor had no effect on Parker's working conditions. At most, Parker stated that two of her subordinate employees, Mr. Ferguson and Mr. Jennings, had "little conversations and little kind of looking sessions with the laughter afterwards." J.R. 44, Exhibit 6, at p. 151, lines 10-15. Parker's testimony further reveals that she merely suspected that these two employees were discussing the alleged rumor: "I could tell things were being said but I couldn't prove it, and so you just kind of continue on with your day." J.R. 44, Id. at p. 150, lines 9-11. Parker explicitly testified that no other employees even did anything like that. J.R. 44-45, Id. at p. 152, lines 5-7, p. 152 line 21 to p. 153 line 9.

Moreover, despite the fact that Mr. Jennings was her subordinate employee and RCSI had documented policies prohibiting discrimination and harassment, she did not report him to Human

Resources or issue any discipline to him during this time.  J.R. 44, Id. at p. 152, lines 12 to 20,

J.R. 589, Exhibit 23, RCSI Discrimination and Harassment Policy.

Other than the "little conversations," between Mr. Jennings and Mr. Ferguson, the only

other event that Parker claims contributed to a hostile work environment was her exclusion from

an all-hands meeting on or about April 21, 2016.  The purpose of the all-hands meeting was to

address a client issue, not the rumor or Ms. Parker.  J.R. 169, Exhibit 7, at p. 105, lines 15 to 22.

There is no evidence that Parker was excluded from this meeting due to her gender or in

retaliation for engaging in protected conduct.  As Mr. Pickett explained and Ms. Wallace

insinuated, Parker was excluded from the meeting because she was late to the meeting.  J.R. 239,

Exhibit 8, page 110, lines 8-12.   In fact, Parker acknowledges that she was invited to the

meeting, such that there could not even be an inference that there was any intention to exclude

her.  J.R. 46, Exhibit 6 at p. 157, lines 8-9.

### C. The Alleged Rumor Existed for Less than Two Months and was Not Attributable to RCSI

As Plaintiff conceded in her deposition, between the time that she learned of the rumor

until late April 2016, she heard nothing about the rumor from any colleagues and she only

suspected that it was being discussed.  Ultimately, to the extent that the rumor continued during

this two-month period, it was solely because Parker herself raised it "with other employees in an

effort to set the record straight," despite her supervisors' admonition to stop "huffing and puffing

about this BS rumor."  J.R. 551, Exhibit 12.

Only after Parker learned that her subordinates had complained about her management

style and she erupted in insubordinate conduct at Mr. Moppins, did Parker complain about the

alleged rumor to Cathy Price, RCSI's Human Resources Director on April 25, 2016. When Ms.

Price received Parker's complaint, she immediately initiated an investigation and directed employees not to discuss the alleged rumors or her investigation. Ms. Price also conducted a meeting with Parker and the managers in which they exchanged apologies and accelerated annual sexual harassment retraining for the entire staff. RCSI's prompt action through Ms. Price was sufficient to suggest this alleged rumor was of the legal magnitude necessary to pursue relief under Title VII.

"An employer is only liable for sexual harassment committed by its employees if no adequate remedial action is taken ... [and employers] cannot be held to a standard under which they are liable for any and all inappropriate conduct of their employees." Spicer v. Com. of Va., Dep't of Corr., 66 F.3d 705, 710-11 (4th Cir. 1995).

> There is no "exhaustive list" or "particular combination" of remedial measures or steps that an employer need employ to insulate itself from liability.  Among other things, we have considered the promptness of the employer's investigation when complaints are made, whether offending employees were counseled or disciplined for their actions, and whether the employer's response was actually effective.

E.E.O.C. v. Xerxes Corp., 639 F.3d 658, 669 (4th Cir. 2011)(Internal citations omitted.). Given this brief, two-month period and the actions undertaken by RCSI, there is no genuine dispute of material fact that the situation was never severe and pervasive enough to confer liability. This is insufficient to support a finding of the kind of gender-biased, offensive environment which courts have previously found actionable.

Under such circumstances, it is impossible for Parker to demonstrate a viable hostile work environment claim that is attributable to RCSI. The Fourth Circuit has routinely held that isolated comments, no matter how odious, are not severe or pervasive enough to be actionable. See, e.g., Irani v. Palmetto Health, 767 Fed. Appx. 399, 417 (4th Cir. 2019)(holding that two

isolated comments, including referring to plaintiff as "Achmed the terrorist" were insufficient to establish a hostile work environment).

Because Parker cannot establish, as a matter of law, that the alleged harassment was severe or pervasive or that it was otherwise attributable to RCSI, RCSI is entitled to summary judgment on Parker's hostile work environment claims.

### III. RCSI Took Prompt, Effective Remedial Action When Parker Reported the Alleged Harassment.

Immediately upon receiving Parker's complaint, RCSI's Human Resources Manager investigated the rumor, met with Parker and managers and accelerated annual sexual harassment retraining for all RCSI employees.  J.R. 551, Exhibit 12.  Even Parker admitted that at that time "apologies were made to one and other and [Parker] felt the situation would die itself down." J.R. 596, Exhibit 24, Charge of Discrimination.  Ultimately, to any extent that the rumor was shared either before or after Parker reported it to Human Resources , it not because of RCSI but due to Parker's own conduct. J.R. 551, Exhibit 12, Compl. at ¶18, Compl. ¶27.  At most, this rumor existed for only two months before Parker's termination and she was on a preapproved vacation for one of those weeks.

Even under the best circumstances, given these facts taken directly from Parker, she cannot state a plausible cause of action. When no tangible employment action is taken, an employer may avoid liability by raising the affirmative defense created under Faragher and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998). This defense requires "(a) that the employer exercised reasonable care to prevent and correct promptly any ... harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. at 765; Vance v. Ball State Univ., 570 U.S. 421 (2013); McKinney v. G4S Gov't Sols.,  Inc., 711 F. App'x 130,

135 (4th Cir. 2017). "Distribution of an anti-harassment policy provides compelling proof that the company exercised reasonable care in preventing and promptly correcting ... harassment." Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 266 (4th Cir. 2001) (internal quotation omitted) (addressing sexual harassment).

In the present case, RCSI took reasonable action to stop the rumors.  RCSI's Human Resources Manager immediately investigated Parker's complaint, directed everyone involved to refrain from discussing any rumors and completed her investigation and convened a meeting with all managers and Parker two days later.  J.R. 574-579, Exhibit 16, 17.   At that meeting, "[a]pologies were made to one and other and I felt the situation would die itself down."  J.R. 596, Exhibit 24.   In addition, on May 2, 2016, all employees were required to go through sexual harassment retraining, starting with Managers and Supervisors.  J.R. 382, Exhibit 9, at page 204, lines 2-25.   It is difficult to fathom what more RCSI have done to reasonably address the rumor and Parker's concerns. Again, as the Fourth Circuit explained in Xerxes, "A remedial action that effectively stops the harassment will be deemed adequate as a matter of law."  E.E.O.C. v. Xerxes Corp., 639 F.3d 658, 670 (4th Cir. 2011)(citing Knabe v. Boury Corp., 114 F.3d 407, 411–12 n. 8 (3d Cir.1997).  RCSI also is thereby entitled to summary judgment on Parker's hostile work environment claims pursuant to the Faragher-Ellerth standard.

### IV.  RCSI Is Entitled to Summary Judgment on Parker's Retaliation Claims

Summary judgment also must be granted on Parker's retaliation claim.  Parker's retaliation claim should be evaluated under the burden-shifting framework espoused in McDonnell Douglas Corp. v. Green, 411 U.S. 792, (1973). To establish a prima facie case of retaliation, Parker must show that (1) she engaged in a protected activity; (2) RCSI acted adversely against her; and (3) the protected activity was a "but-for" cause of her termination and

not simply a "motivating factor." See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir.2004) (en banc). If Parker establishes her prima facie case, which she cannot, the burden would shift to RCSI to provide a legitimate, non-retaliatory explanation for its decision to terminate her. Id. Upon such a proffer, the burden then returns to Parker to show that the proffered reason was pretext for retaliation. See id.

Parker cannot establish a prima face case of retaliation because her complaint was not a "but for" cause of her discharge and since she was terminated for legitimate, non-retaliatory reasons.

As set forth above, after investigating Parker's complaint, Ms. Price informed Parker that, since Mr. Jennings was no longer under Parker's supervision, she and Mr. Jennings were to stay away from each other. This should have and could have ended the matter. Notwithstanding this direction, Parker ignored management's direction and continued to confront employees who had lodged a complaint about her behavior, including Mr. Jennings. Mr. Jennings made a complaint that Ms. Price investigated. J.R. 551, Exhibit 12. Ms. Price concluded that Parker, who is a supervisory employee, violated clear directives and presented her findings to RCSI's president, Rajesh Vora, who was the sole person with hiring and firing authority at RCSI. Id., J.R. 341, Exhibit 9 at p. 38 line 5-14; J.R. 472, Exhibit 10, p. 36, lines 18-23; J.R. 603, 612, Exhibit 25, Deposition of Reema Vora, p. 20, lines 12-16; p. 57, lines 13-20. After reviewing and hearing all of the evidence, Mr. Vora, who had the sole authority or termination, made the decision that Parker's insubordination and inability to demonstrate managerial understanding merited her termination. J.R. 587, Exhibit 22, Termination Letter.

Parker's conduct in antagonizing Mr. Jennings and insubordination was the cause of her termination and defeats her ability to establish a prima facie case of retaliation and constitutes a

legitimate, non-retaliatory reason for her termination.  Insubordination, failure to perform assigned tasks and follow management instructions are legitimate, non-discriminatory reasons for termination.  Kline v. Certainteed Corp., 205 F. Supp. 2d 468, 475 (D. Md. 2002).  The Fourth Circuit has also made clear that an employee's violation of workplace standards in response to a co-worker's harassment is a legitimate, non-discriminatory reason for termination which is not excused by the underlying harassment.  See, e.g. Walker v. Mod-U-Kraf Homes, 775 F.3d 202 (4th Cir. 2014).

In Walker, the plaintiff was terminated after confronting her alleged harasser at a company picnic, along with her boyfriend.  Id. at 212.  After the confrontation escalated due to the plaintiff's actions and the alleged harasser was physically attacked by the plaintiff's boyfriend, the defendant terminated the plaintiff's employment for engaging in physical aggression toward her alleged harasser.  Id. at 212.  The Fourth Circuit rejected the plaintiff's retaliation claims, concluding that no reasonable jury could find that the company's decision to terminate the plaintiff was pretextual, despite the fact that her harasser was not terminated as a result of the altercation and that the termination occurred at the same time the company was investigating the plaintiff's claims of harassment.  Id.

An employee who asserts a right protected under Title VII is "shielded from retaliation on account of [that] assertion" but is not "insulated from the consequences of ... poor performance." Ziskie v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008). The Court may intervene in an employer's decision to fire an employee only if the reason for that decision was the employee's protected activity. "In assessing a defendant's proffered reasons, the Fourth Circuit has repeatedly observed that it is not a court's province to decide whether an employer's reason for terminating an employee was wise, fair, or even correct, ultimately, so long as it truly was the

reason for the employee's termination." Bagwell v. Downtown Partnership of Baltimore, Inc., No. CV ELH-18-1786, 2020 WL 247293, at *7 (D. Md. Jan. 15, 2020)(citations and internal quotation marks omitted); see also Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 252 (4th Cir. 2015); see also, DeJarnette v. Corning Inc., 133 F.3d 293, 298-99 (4th Cir. 1998)( "Title VII is not a vehicle for substituting the judgment of a court for that of the employer").  Accordingly, an employee must "show that retaliation was the real reason" she was fired, and that she "would not have been terminated but for her employer's retaliatory animus." Foster, 787 F.3d at 252 (citations and internal quotation marks omitted).

Similarly, Plaintiff's own conclusory allegations, absent supporting evidence, that the decision to terminate her employment was in retaliation for her protected conduct are insufficient to rebut RCSI's legitimate, non-discriminatory reasons for her termination.  See Ross v. Cecil Cty. Dep't of Soc. Servs., 878 F. Supp. 2d 606, 615 n.10 (D. Md. 2012); See also Hawkins v. PepsiCo, Inc., 203 F.3d 274, 281 (4th Cir. 2000) (" '[A] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action.' ") (quoting Williams v. Cerberonics, Inc., 871 F.2d 452, 456 (4th Cir. 1989)).

Finally, to support her Complaint, Parker cannot rely on the mere temporal proximity between her complaint of discrimination and her termination to rebut RCSI's legitimate, non-discriminatory reason for her termination.  While temporal proximity of events may establish a prima facie case for retaliation, "temporal proximity alone does not rebut [a defendant's] legitimate, and uncontested, ground of termination." Simons v. Mi-Kee-Tro Metal Mfg., Inc., No. PJM-18-1270, 2019 WL 4143005, at *5 (D. Md. Aug. 30, 2019) (quoting New v. Family Health Care, P.C., 2019 WL 2744682 (D. Md. 2019)).

In <u>Simons</u>, this Court granted summary judgment in the defendant's favor on the plaintiff's retaliation claim because, beyond temporal proximity, the plaintiff did not offer any "facts to refute [the defendant's] stated reason for his termination as pretextual." <u>Id.</u>; <u>see also</u> <u>New</u>, at *5 (concluding that "temporal proximity alone d[id] not rebut Defendants' legitimate, and uncontested, ground of termination"); <u>Yancey v. Nat'l Ctr. on Insts. & Alts.</u>, 986 F. Supp. 945, 956 (D. Md. 1997) (concluding that plaintiff "established a prima facie case of retaliatory discharge under Title VII" based on temporal proximity, but granting defendant's motion for summary judgment because the defendant "presented a legitimate, non-retaliatory reason for [the plaintiff's] discharge" and the plaintiff "failed to meet her final burden under the McDonnell Douglas analysis, given that she did not "present[ ] any evidence beyond temporal proximity ... to show that she would not have been discharged 'but for' her complaints of sexual harassment" and therefore did not "establish[ ] that [the defendant's] proffered reason [was] a pretext for a true retaliatory one"), aff'd, 141 F.3d 1162 (4th Cir. 1998).

RCSI has demonstrated as a matter of law, that Parker's complaint was not the "but for" cause of her termination and she was terminated for legitimate, non-discriminatory reasons for Parker's termination.  Parker has no evidence that these reasons for her termination are pretextual. For the reasons set forth above, RCSI is entitled to judgment as a matter of law on Parker's retaliation claims.

<strong><u>CONCLUSION</u></strong>

For the reasons set forth above, RCSI hereby requests that this Court enter judgment on its behalf and against Plaintiff Evangeline Parker as to all claims in the Complaint.

_/s/ Donald J. Walsh_
Donald J. Walsh (Bar # 09384)
Gregory P. Currey (Bar #28583)
Wright, Constable & Skeen, LLP
7 St. Paul Street, 18th Floor
Baltimore, Maryland 21202
Telephone: (410) 659-1320
Fax: (410) 659-1350
dwalsh@wcslaw.com
gcurrey@wcslaw.com