**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

EVANGELINE J. PARKER,

        Plaintiff,

v.

REEMA CONSULTING SERVICES, INC.

        Defendant.

Civil No. 8:17-cv-01648-TDC

Jury Trial Demanded

**PLAINTIFF EVANGELINE PARKER'S**
**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF CONTENTS................................................................................ i

TABLE OF AUTHORITIES ......................................................................... ii

TABLE OF EXHIBITS IN JOINT RECORD.................................................v

I.     INTRODUCTION .................................................................................1

II.    STATEMENT OF FACTS .....................................................................1

       A.     Ms. Parker Had a Promising Career at RCSI, Before the False,
              Gender-Based Rumor and Hostile Work Environment .............................1

       B.     Ms. Parker's Promising Career Was Cut Short Due to the False,
              Gender-Based Rumor and Hostile Work Environment .............................4

       C.     Ms. Parker's Attempts to Resolve the Hostile Work
              Environment Were Met with Resentment, Hostility, and an
              Inadequate Investigation .............................................................8

       D.     Ms. Parker Was Terminated in Retaliation for Complaining of a
              Hostile Work Environment ...................................................................12

III.   ARGUMENT........................................................................................16

       A.     Ms. Parker's Harassment Constituted a Hostile Work
              Environment........................................................................................16

              1.     The Harassment against Ms. Parker Was Severe and
                     Pervasive Enough to Constitute a Hostile Work
                     Environment.................................................................................16

              2.     The Gender-Based Hostile Work Environment Altered
                     Ms. Parker's Working Conditions ...............................................21

              3.     There Is a Basis for Imposing Liability on RCSI ........................23

       B.     RCSI's Remedial Actions Are Insufficient to Avoid Liability................26

       C.     Ms. Parker Was Terminated in Retaliation for Complaining of a
              Hostile Work Environment...................................................................29

IV.    CONCLUSION....................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Anderson v. G.D.C., Inc.,
281 F.3d 452 (4th Cir. 2002) ..............................................................................................31

Bass v. E.I. DuPont de Nemours & Co.,
324 F.3d 761 (4th Cir. 2003) ..............................................................................................16

Boyer-Liberto v. Fontainebleau Corp.,
786 F.3d 264 (4th Cir. 2015) ...............................................................................17, 21, 30

Brenneman v. Famous Dav's of Am., Inc.,
410 F. Supp. 2d 828 (S.D. Iowa 2006) ..........................................................................20, 21

Brown v. Perry,
184 F.3d 388 (4th Cir.1999) ...............................................................................................27

Burgess v. Bowen,
466 Fed. Appx. 272 (4th Cir. 2012)......................................................................................31

Burlington Indus. Inc. v. Ellerth,
524 U.S. 742 (1998)..............................................................................................................21

Dube v. Hadco Corp.,
No. 87-554-SD, 1999 U.S. Dist. LEXIS 21184 (D.N.H. Feb. 4, 1999) ................................22

Faragher v. City of Boca Raton,
524 U.S. 775 (1998)..............................................................................................................25

Foster v. Univ. of Maryland-Eastern Shore,
787 F.3d 243 (4th Cir. 2015) ...............................................................................................31

Goad v. N.C. Farm Bureau Mut. Ins. Co.,
No. 1:16-CV-1332, 2017 U.S. Dist. LEXIS 198571 (M.D.N.C. 2017)..................................28

Gott v. Town of Chesapeake Beach,
44 F. Supp. 3d 610 (D. Md. 2014)..................................................................................29, 30

Harris v. Forklift Sys., Inc.,
510 U.S. 17 (1993).................................................................................................. *passim*

Harris v. Mayor of Balt.,
429 F. App'x 195 (4th Cir. 2011) .........................................................................................17

Harris v. Mayor of Balt.,
    797 F. Supp. 2d 671 (D. Md. 2011)..................................................................23, 25, 26

Hill v. Lockheed Martin Logistics Mgmt., Inc.,
    354 F. 3d 277 (4th Cir. 2004) ...................................................................................30

Jaudon v. Elder Health, Inc.,
    125 F. Supp. 2d 153 (D. Md. 2000) ...........................................................................33

Jew v. University of Iowa,
    749 F. Supp. 946 (S.D. Iowa 1990) ...........................................................................22

Jones v. Hydro Conduit Corp.,
    C/A No. 3:10-776, 2012 U.S. Dist LEXIS (D.S.C. 2012) .........................................34

Lettieri v. Equant, Inc.,
    478 F.3d 640 (4th Cir. 2007) ...............................................................................31, 32

Meritor Sav. Bank v. Vinson,
    477 U.S. 57 (1986)...............................................................................................28, 29

Merritt v. Old Dominion Freight Line, Inc.,
    601 F.3d 289 (4th Cir. 2010) ....................................................................................34

Mosby-Grant v. City of Hagerstown,
    630 F.3d 326 (4th Cir. 2010) ....................................................................................17

O'Mara v. Va. Dep't of Corr.,
    Civ. No. 16-489, 2017 U.S. Dist. LEXIS 86347 (E.D. Va. 2017)............................34

Okoli v. City of Baltimore,
    648 F.3d 216 (4th Cir. 2011) ...............................................................................17, 31

Parker v. Reema Consulting Servs., Inc.,
    915 F.3d 297 (4th Cir.), cert. denied, 140 S. Ct. 115 (2019) .......................... passim

Rainey v. Conerly,
    973 F.2d 321 (4th Cir. 1992) ....................................................................................34

Ray v. Int'l Paper Co.,
    909 F.3d 661 (4th Cir. 2018) ...............................................................................23, 24

Smith v. First Union Nat'l Bank,
    202 F.3d 234 (4th Cir. 2000) ....................................................................................27

Sowers v. Kemira, Inc.,
    701 F. Supp. 809 (S.D. Ga. 1988)..............................................................................33

Spain v. Gallegos,
    26 F.3d 439 (3d Cir. 1994)..................................................................................22

Sparks v. Pilot Freight Carriers, Inc.,
    830 F.2d 1554 (11th Cir. 1987) ....................................................................31, 32

Terry v. Laurel Oaks Behavioral Health Ctr., Inc.,
    1 F. Supp. 3d 1250 (M.D. Ala. 2014) ...............................................................28

Valleriani v. Route 390 Nissan LLC,
    41 F. Supp. 36 307 (W.D.N.Y. 2014)................................................................30

Vance v. Ball State Univ.,
    133 S. Ct. 2434 (2013)................................................................................23, 25

Walker v. Mod-U-Kraf Homes, LLC,
    775 F.3d 202 (4th Cir. 2014) ............................................................................35

Williams v. Silver Spring Volunteer Fire Dep't,
    86 F. Supp. 3d 398 (D. Md. 2015)...............................................................26, 28

Yashenko v. Harrah's NC Casino Co., LLC,
    446 F.3d 541 (4th Cir. 2006) ............................................................................31

iv

**TABLE OF EXHIBITS IN JOINT RECORD**

| JR (1st Pg.) | Ex. | Description |
|---|---|---|
| JR1 | 1 | Nov. 26, 2014 Offer Ltr. |
| JR2 | 2 | Mar. 16, 2015 Offer Ltr. |
| JR3 | 3 | May 16, 2015 Offer Ltr. |
| JR4 | 4 | Apr. 7, 2016 Offer Ltr. |
| JR5 | 5 | Sept. 1, 2015 Written Warning re "Process for Verifying Inventory" |
| JR6 | 6 | Parker Dep. |
| JR143 | 7 | Moppins Dep. |
| JR211 | 8 | Pickett Dep. |
| JR331 | 9 | Price Dep. |
| JR463 | 10 | Rajesh Vora Dep. |
| JR514 | 11 | Wallace Dep. |
| JR551 | 12 | May 17, 2016 Investigation Report |
| JR553 | 13 | Apr. 27, 2016 Email fr. Moppins to Price |
| JR555 | 14 | May 23, 2016 Stmt. fr. Wallace |
| JR557 | 15 | Cathy Price Notes |
| JR574 | 16 | April 25, 2016 Sexual Harassment Complaint |
| JR579 | 17 | Apr. 25, 2016 Email fr. Price to Parker |
| JR580 | 18 | May 12, 2016 Memorandum re Notif. of Hostile Work Environ. |
| JR581 | 19 | May 16, 2016 Stmt. fr. Carter |
| JR582 | 20 | May 16, 2016 Written Warning re "Poor Management Performance" |
| JR585 | 21 | May 16, 2016 Written Warning re "Failure to Follow Instructions" |
| JR587 | 22 | May 18, 2020 Official Separation of Employment Notice |
| JR589 | 23 | Sexual Harassment Policy Manual |
| JR596 | 24 | Aug. 24, 2016 Charge of Discrimination |
| JR598 | 25 | Reema Vora Dep. |
| JR629 | 26 | Jan. 22, 2016 Ltr. of Employment Verification |
| JR630 | 27 | Feb. 15, 2016 Performance Eval. |
| JR632 | 28 | Birgans Dep. |
| JR652 | 29 | Employee Handbook |
| JR703 | 30 | May 17, 2016 Ltr. fr. Parker to Price |
| JR704 | 31 | Apr. 27, 2016 Email fr Price to Parker, Pickett, Moppins |
| JR705 | 32 | May 18, 2016 Email fr. Parker to Price |
| JR706 | 33 | May 13, 2016 Email fr. Moppins to Reema Vora, Rajesh Vora, Price |

## I.    INTRODUCTION

Defendant RCSI's motion for summary judgment (ECF 116) ("Mem.") raises numerous factual issues and attempts to twist the facts—that Ms. Parker suffered a hostile work environment imputable to RCSI and was fired when she raised her concerns—into a story that is easier for RCSI to address than the truth. Ms. Parker was the subject of a malicious, and false, rumor spread by subordinates and supervisors alike that she used sex, rather than merit, to gain promotions. The fallout of this rumor fundamentally altered the conditions of her employment: she was told that she would no longer advance, and when she made a complaint, she was fired.

## II.    STATEMENT OF FACTS

Ms. Parker began working at RCSI in December 2014, when she was hired to work as an inventory control clerk at RCSI's warehouse facility in Sterling, Virginia. JR1, Ex. 1, Offer Ltr.; JR343, Ex. 9, Price Dep. (49:1-50:25). RCSI provides logistics, warehouse, operations, and administrative support services to the government, and, when Ms. Parker worked there, had a contract supporting the Department of State, Anti-Terrorism Assistance. JR466-467, Ex. 10, Rajesh Vora Dep. (13:25-14:18). Ms. Parker had experience in transportation, and decided to pursue the inventory control clerk role to learn more about the logistical aspect of transportation. JR11, Ex. 6, Parker Dep. (17:18-19). She saw it as a good opportunity to build her experience in the logistics business. JR11, id. (17:17-18:1).

### A.    Ms. Parker Had a Promising Career at RCSI, Before the False, Gender-Based Rumor and Hostile Work Environment

During her employment, Ms. Parker rapidly rose through the ranks at RCSI, earning several merit-based promotions over her first fifteen months of employment. JR524, Ex. 11, Wallace Dep. (40:22-41:14). Specifically, she held the following positions: **(1)** Shipping Supervisor, beginning December 1, 2014, in which she oversaw the shipping and receiving operations of all inventory at

1

the warehouse, JR345, Ex. 9, Price Dep. (56:18-57:16); JR1, Ex. 1; JR14, Ex. 6, Parker Dep. (29:19-22); **(2)** Receiving Supervisor (Material Coordinator), beginning Mar. 16, 2015, in which she oversaw shipping and receiving inventory in the Receiving Department, JR346, Ex. 9, Price Dep. (59:7-24); JR2, Ex. 2; JR16, Ex. 6, Parker Dep. (39:6-17); **(3)** Assistant Inventory Control Manager, beginning May 16, 2015, in which she directly supervised the performance of two employees, JR348, Ex. 9, Price Dep. (66:1-25); JR3, Ex. 2; JR18, Ex. 6, Parker Dep. (45:7-15); **(4)** Quality Compliance Control, beginning in the summer of 2015, in which she ensured fulfillment and inventory were properly tracked, monitored the daily reports of various departments, and guaranteed shipments were received in a certain amount of time, JR349, Ex. 9, Price Dep. (71:7-72:5); JR20, Ex. 6, Parker Dep. (55:7-57:7); and **(5)** Logistics Manager, beginning March 1, 2016, with the added responsibilities of Warehouse Assistant Manager, which was Ms. Parker's first position in management, JR352, Ex. 9, Price Dep. (82:18-84:2, 85:13-17); JR4, Ex. 4. Managers who worked with Ms. Parker thought she was deserving of her promotions. JR524, Ex. 11, Wallace Dep. (40:22-41:14); JR255-257, Ex. 8, Pickett Dep. (176:3-181:2).

According to Mr. Larry Moppins, the highest-ranking manager of operations at the warehouse who reported directly to the company's owner, Mr. Rajesh Vora, he and Mr. Vora repeatedly promoted Ms. Parker based on her work performance and problem-solving skills. See, e.g., JR152-153, Ex. 7, Moppins Dep. (35:5-10, 37:10-39:9) ("she was a good worker"); JR255, Ex. 8, Pickett Dep. (176:8-18); JR473-474, Ex. 10, Rajesh Vora Depo (40:3-44:6). In fact, Mr. Moppins personally recommended each of her promotions. JR346, 348, 350, 352, Ex. 9, Price Dep. (60:12-15, 66:1-67:8, 77:13-21, 84:6-12). The company considered Ms. Parker a "star performer," or one of the best employees at RCSI. JR450, Ex. 9, Price Dep. (339:9-340:5). Other managers also recognized her stellar performance, including Mr. Damarcus Pickett, the Deputy

Program Manager who reported directly to Mr. Moppins. JR227, Ex. 8, Pickett Dep. (61:10-62:8, 63:8-10). Mr. Pickett testified she was usually one of the first employees back from breaks, always ready to work, and "out-worked basically everybody," contributing to her promotions. JR229; 256, id. (69:7-13, 179:22-180:21). Even the client—the State Department—was aware of her impressive work ethic. JR257, id. (181:20-182:18).

On multiple occasions, Ms. Parker's supervisors noted her "Excellent" work performance and upward trajectory. See, e.g., JR518, Ex. 11, Wallace Dep. (17:17-19:16, 18:10-15, 21:13-22:22). For example, in 2015, a year before Ms. Parker was fired, her manager (Ms. Angela Wallace) wrote that Ms. Parker "has shown a lot of progress in understanding the operation of Logistics [and] appears to be making upward progress," JR519, id. (18:10-15), and she "is doing an outstanding job at positioning herself for longevity," JR519, id. (21:17-22). In January 2016, four months before she was fired, RCSI wrote, "[t]he outlook for Ms. Parker's continued employment with us is very good and we hope to have her with our Company for many years to come." JR629, Ex. 26, Ltr. of Employment Verification. Her performance evaluation for the period ending March 31, 2016—1.5 months before she was fired—was similarly glowing: "Ms. Parker has the skills and knowledge to run her departments with very little help and guidance from upper management. Ms. Parker is a great asset to the warehouse management team as I am very please [sic] with the way she has handled her new position," ranking her potential for promotion as "Excellent." JR630, Ex. 27, Performance Eval. by A. Wallace.

Not only was Ms. Parker highly regarded among the management staff, but she was also well liked and favored by her subordinate employees. See JR518, 520, Ex. 11, Wallace Dep. (14:22-15:4, 25:15-18). Ms. Parker had a reputation as someone who was always respectful toward upper-level management or other employees. See JR520, id. (24:14-22. 58:2-7). Her managers

3

described her as an employee with a "good attitude [who] works well with others" who "knows how to communicate with her peers and management." See JR519, id. (18:10-15, 19:5-6). Likewise, subordinate employees described her as a "good person," "good leader," and "fair" manager. JR636, 639-640, Ex. 28, Birgans Dep. (15:1-9, 17:8-10, 26:6-9, 30:2-9).

**B.     Ms. Parker's Promising Career Was Cut Short Due to the False, Gender-Based Rumor and Hostile Work Environment**

As Ms. Parker entered her new role as a manager, a false rumor was beginning to circulate at RCSI that Ms. Parker was engaged in a sexual relationship with Mr. Pickett to gain promotions. JR638, Ex. 28, Birgans Dep. (23:20-24:14); JR370, Ex. 9, Price Dep. (155:13-17). The rumor was false not only because she earned her promotions on merit, but also because she and Mr. Pickett were not involved in a sexual relationship. JR401, id. (278:23-279:4).

Although the specific origins of the rumor are unclear, it is apparent a number of employees, including Mr. Moppins, the highest ranking warehouse manager, see, e.g., JR149-150, Ex. 7, Moppins Dep. (24:6-13, 26:11-12), contributed to its dissemination. In February 2016, Mr. Moppins entered Mr. Pickett's office and asked him, "you f—ing Parker?," which offended Mr. Pickett. JR233, Ex. 8, Pickett Dep. (88:19-90:4). This false accusation also violated RSCI's Employee Handbook, which prohibits "verbal . . . conduct of a sexual nature," JR696, Ex. 29, as well as its Sexual Harassment Manual, which instructs employees to "[a]void . . . talk about sex," JR592, Ex. 23; JR366, Ex. 9, Price Dep. (141:7-142:10).

Mr. Moppins had a history of retaliatory behavior against his employees, and was regarded as "not [being] a good person to work with." JR263, Ex. 8, Pickett Dep. (205:16-210:4); JR640, Ex. 28, Birgans Dep. (30:21-31:9, 30:21-22, 31:16-19). Employees at RCSI described him as a "controlling," "forceful," and "threatening" individual who would often threaten to fire or demote employees to "take [their] money away" if he was mad at them. JR640, Ex. 28, Birgans Dep.

4

(30:12-32:23). Employees further believed Mr. Moppins had the authority to fire people, "if [Mr. Moppins] want[ed] you to get fired, he will fire [you]," and "once he felt like he didn't want you there, for whatever reason . . . he could get you out of there." JR226-227, Ex. 8, Pickett Dep. (58:2-59:21, 63:15-64:4). As such, many employees were scared to complain about Mr. Moppins for fear of repercussions, including being fired. JR640-641, Ex. 28, Birgans Dep. (33:25-34:15). Mr. Kenton Birgans, a warehouse employee who reported to Ms. Parker, also testified Mr. Moppins commonly made sexual statements in the workplace and, including in meetings; for example, because RCSI employees ended their shift at 4:30 pm, Mr. Moppins often said "You can come get this lobster at 4:31," which was understood to be a reference to his genitalia. JR640, id. (32:24-33:20). Moreover, employees understood that even if they complained about his behavior to HR, there was nothing that could be done to discipline him because "he was wrote [sic] into the contract" between the State Department and RCSI. JR228, Ex. 8, Pickett Dep. (65:3-21). The perception was Mr. Moppins was in charge, and "it had to be his way or no way." JR640-641, Ex. 28, Birgans Dep. (33:18-34:15, 34:22-35-6).

After Mr. Moppins's conversation with Mr. Pickett in February 2016, the false rumor—that Ms. Parker had engaged in a sexual relationship with Mr. Pickett in order to gain promotions—spread throughout RCSI. For example: **(1)** Ms. Romaine Thompson, a warehouse employee, told Mr. Pickett that a rumor of an affair between him and Ms. Parker was spreading in the warehouse, and people were "talking," JR235, 249, 270, Ex. 8, Pickett Dep. (96:13-97:9, 151:10-15, 235:17-21); **(2)** Mr. Birgans testified he "overheard [the rumor] a couple times probably from a few different people," JR635, Ex. 28, Birgans Dep. (12:14-13:9, 13:18-14:2, 24:19-21); **(3)** Ms. Manley Ferguson, a warehouse specialist, informed Mr. Moppins of a "rumor within the warehouse of a personal relationship between Ms. Parker and/or Mr. Pickett," JR172, Ex. 7,

Moppins Dep. (114:6-115:7); JR553, Ex. 13, Email; **(4)** Mr. Donte Jennings, a warehouse employee, was (according to Mr. Moppins) "constantly telling Cathy Price," RCSI's part-time HR manager, about the rumor, and discussed it with his manager, Mr. Carlos Carter, JR165, Ex. 7, Moppins Dep. (86:4-10); and **(5)** Ms. Price stated "there were conversations over the weekend" about the rumor, involving Mr. Pickett, Ms. Thompson, and Mr. Jennings, JR400, Ex. 9, Price Dep. (277:15-278:3).

Mr. Pickett decided to inform Ms. Parker of the rumor's existence after he heard of it from two different sources. JR236, Ex. 8, Pickett Dep. (99:10-100:5). Because the rumor was circulating in the warehouse portion of the workplace, both Mr. Pickett and Ms. Parker surmised Mr. Jennings, who had started as a warehouse clerk around the same time as Ms. Parker but quickly became Ms. Parker's subordinate after her promotions, JR344, 351, Ex. 9, Price Dep. (52:12-53:23, 81:11-82:13), was involved in its spread. JR235, 249, 270, Ex. 8, Pickett Dep. (96:13-97:9, 151:10-15, 235:17-21); JR36-37, 41, Ex. 6, Parker Dep. (120:10-122:10, 137:6-19).

Shortly thereafter, Ms. Parker attempted to quell the false rumor by telling the employees she believed were spreading it to stop. Ms. Parker first spoke with Mr. Jennings one or two days after learning of the rumor. JR41, Ex. 6, Parker Dep. (140:17-141:21). She next spoke with three employees—Ms. Maddie Littleton, Ms. Tambeni Daughtry, and Ms. Thompson. JR41, id. (140:17-142:12). She asked Ms. Thompson why she had spoken with Mr. Pickett, not Ms. Parker herself, about the rumor, and informed her the rumor was not true. JR41, id. (143:1-144:4). Ms. Parker then asked Ms. Littleton and Ms. Daughtry if they were involved in spreading the rumor, and asked them what they knew about the rumor. JR41, id. (149:16-21). After Ms. Parker asked employees to stop spreading the false rumor, the employees were upset, and complained to Mr. Moppins about her conduct. JR370, Ex. 9, Price Dep. (156:5-:157:18). The employees were

6

resentful that she approached them. JR370, id. (156:7-16).

Ms. Parker's efforts to stop the harassing behavior were in compliance with RCSI's Sexual Harassment Manual. Specifically, the manual instructs employees who have experienced harassment to "inform the alleged harasser they were offended and they expect the behavior to stop immediately," JR593, Ex. 23, to "put[] the person on notice," JR367, Ex. 9, Price Dep. (142:19-143:16). (This policy violates EEOC Guidance and Supreme Court case law, as discussed below; however, Ms. Parker was required to follow it.) The manual states that only after confronting their harasser and telling them to stop should the complainant go to HR. JR367, id. (143:17-20); JR615, Ex. 25, Reema Vora Dep. (66:3-68:15); JR589, Ex. 23, Manual.

On April 21, 2016, after the rumor had been circling at the company, Mr. Moppins held an all-hands meeting. "All-hands" meetings are mandatory for all staff members, and Mr. Moppins typically called them to discuss warehouse operational issues. JR342, Ex. 9, Price Dep. (42:3-44:8). Such meetings did not typically address HR issues. JR343, id. (47:24-48:6). On the rare occasion that HR matters came up in such meetings, Ms. Price would usually have advance notice to join. JR342, id. (44:11-45:3). Ms. Parker and Mr. Pickett testified that, although they arrived to the April 21, 2016 meeting together, Mr. Moppins allowed Mr. Pickett to enter the meeting, while he slammed the door in Ms. Parker's face, with her slight tardiness provided as the justification for exclusion from the meeting. JR225, 226, 239, Ex. 8, Pickett Dep. (56:13-15; 57:3-8; 111:9-13); JR46, Ex. 6, Parker Dep. (157:13-16). He then locked the door, humiliating her in front of all the warehouse employees. JR46, 52-53, id. (158:17-159:4, 184:15-185:12). As Ms. Parker stood on the other side of the door, she immediately heard laughter fill the room. JR46, id. (160:8-9). Feeling humiliated, she took the remainder of the day off, and went home. JR46, id. (158:8-13).

The next day, Ms. Parker learned from a co-worker that the rumor had been perpetuated at

7

the meeting—namely, that employees had discussed "how [they] fe[lt] like [Parker] use[d] [her] sexuality to get to the top, things like that," and two employees had complained Ms. Parker was "bossy." JR47, Ex. 6, Parker Dep. (162:2-163:13). Ms. Wallace, Ms. Parker's former supervisor, similarly recalled that Ms. Parker was shut out of an all-hands meeting by Mr. Moppins, where Ms. Parker's alleged treatment of subordinates was discussed. See, e.g., JR532, 534, 536, Wallace Dep. (70:1-15, 79:20-80:1, 89:22-2). Further, according to Ms. Price, who was not present at the meeting, "Mr. Moppins allowed the employees to voice any concerns they had" and some employees said "Ms. Parker ha[d] been disrespectful to subordinates and had approached each of them about an alleged rumor between her and Demarcus Pickett (her supervisor)." JR381, Ex. 9, Price Dep. (199:2-200:17). Despite RCSI's assertion that "there is no admissible evidence that the alleged rumor was discussed at the meeting," Mem. at 6, 8, it is undisputed that Ms. Parker's management was discussed at the meeting. Indeed, one of the two termination warnings (discussed below) refers to an "all-hands meeting conducted in April 2016 in which employees disclosed concerns." JR582, Ex. 20. These "concerns," discussed in more detail after the meeting, related to the rumor and Ms. Parker's efforts to ask her harassers to stop. JR582-583, id.

### C.    Ms. Parker's Attempts to Resolve the Hostile Work Environment Were Met with Resentment, Hostility, and an Inadequate Investigation

Given that Ms. Parker's efforts to resolve the hostile work environment on her own were unsuccessful, she attempted to resolve them through the chain of command. First, the day after the all-hands meeting, she arranged a meeting with Mr. Moppins in an attempt to resolve the issue. JR525, 528, Ex. 4, Wallace Dep. (42:1-49:15, 54:3-56-12); JR49, Ex. 6, Parker Dep. (172:11-17). During this meeting, Mr. Moppins blamed Ms. Parker for bringing the situation to the workplace. JR52, id. (181:22-182:2, 183:4-8). He stated he had "great things" planned for her, but he would not allow her to advance any further. JR52, id. (182:2-8). Instead of openly listening to address

Ms. Parker's concerns, Mr. Moppins instead used the meeting to chastise Ms. Parker about complaints alleged against her by other employees during the time when the rumor was spread. JR525, 528, Ex. 4, Wallace Dep. (42:1-49:15, 54:3-56:12).

On April 25, 2016, three days after the all-hands meeting, Ms. Parker was called to another meeting with Mr. Moppins where he remarked he "should have fired [her]" the day before when she came in "huffing and puffing" about the rumor. JR58, Ex. 6, Parker Dep. (208:20-209:12); JR163, Ex. 7, Moppins Dep. (81:4-6). He began screaming at Ms. Parker and lost his temper. JR51-52, id. (179:21-183:18). RCSI alleges that Ms. Parker's behavior during these meetings was "combative" and "insubordinate," Mem. at 2, but this is not the observation of all who were present. Ms. Wallace, for example, who attended each meeting, testified that she would not call Ms. Parker's behavior "insubordination," but rather an emotional response between two people who were expressing differing opinions. JR525, Ex. 11, Wallace Dep. (42:1-49:15, 53:19-54:2, 59:14-20, 61:3-16, 62:4-7). Mr. Pickett testified to the same effect. JR279, Ex. 8, Pickett Dep. (269:13-271:5). Ms. Wallace also noted that Ms. Parker's goal was to get Mr. Moppins to address the rumor, but he refused. JR525, Ex. 4, Wallace Dep. (42:1-49:15, 56:1-6, 67:1-4).

That same day, when efforts to discuss the situation with Mr. Moppins were unsuccessful, Ms. Parker filed a sexual harassment complaint against Mr. Moppins and Mr. Jennings. JR338, 371, Ex. 9, Price Dep. (27:18-20, 158:20-159:6). She filed the complaint with Ms. Price, RCSI's part-time HR manager. JR338, id. (28:18-29:17). Ms. Price was the head of RCSI's HR department, and had sole authority to determine, with in-house counsel, discipline imposed on employees, and to investigate HR complaints. JR341, id. (38:25-39:5, 115:9-20, 33:18-21, 120:2-122:4, 122:8-12); JR602, Ex. 25, Reema Vora Dep. (16:24-17:20). Ms. Parker's complaint was the first sexual harassment complaint that RCSI or Ms. Price had received or investigated. JR363,

408-409, Ex. 9, Price Dep. (128:12-21, 309:19-310:19). When asked whether the resolution of a sexual harassment complaint can result in discipline against the harasser, Ms. Price responded, "**typically, no, not against the harasser**. But it depends on all the facts and the information of what's going on." JR363, id. (128:5-21) (emphasis added). She further noted that RCSI does not take action to prevent retaliation against the complainant unless it determines it can validate the complaint. JR364, id. (130:3-13).

Ms. Price did not keep Ms. Parker's complaint confidential. Instead, on the same day she received the complaint, she sent an email to Ms. Parker, Mr. Moppins, Mr. Pickett, and Ms. Wallace (Ms. Parker's former supervisor), regarding "recent events that ha[d] been brought to HR's attention in regards to workplace gossip and rumors," indicating she was conducting an investigation. JR579, Ex. 17, Email; JR375, Ex. 9, Price Dep. (176:11-14). Ms. Price included Mr. Moppins (the alleged harasser) on the email's cc line because she wanted to make sure he was "aware of certain things." JR376, id. (179:11-21). This contravened the standard practice of protecting confidentiality. JR363, id. (127:15-22).

Next, Ms. Price began her investigation, which she did not limit to the issue of sexual harassment, but instead investigated Ms. Parker's own conduct, (even though no HR complaints had been filed against Ms. Parker). Ms. Price testified that she investigated the behavior of "all the managers," including the complaint against Mr. Moppins by Ms. Parker, the "inappropriate conduct and behavior" of Ms. Parker, and "[Ms. Parker's] interactions with her subordinates." JR396, Ex. 9, Price Dep. (259:10-22). Ms. Price did not consider the conduct of Mr. Jennings (an alleged harasser) to be within the scope of her investigation. JR396, id. (260:7-9).

Ms. Price selected four "witnesses" to interview, but she did not interview Mr. Moppins— the alleged harasser. Specifically, she selected Ms. Wallace, Mr. Pickett, Mr. Birgans, and Mr.

Ferguson as witnesses. JR574, Ex. 16. While she first testified she did not interview anyone outside of these four, JR374, Ex. 9, Price Dep. (170:13-20), Ms. Price later asserted she spoke with three additional employees—Ms. Maddie Littleton, Mr. Carter, and Mr. Jennings—but had not noted these interviews in her Investigation Questionnaire. Ms. Price did not interview Mr. Moppins, which violated the standard practice of interviewing all relevant witnesses. JR362, 374, 397-398 id. (125:19-24, 170:13-173:10, 264:23-266:9).

After Ms. Parker submitted her HR complaint, Mr. Moppins stopped communicating with her. For example, he would not answer her emails, including some requiring his approval, and failed to include her in meetings involving Ms. Parker's respective department, and to which she had historically been invited. JR69, 84, Ex. 6, Parker Dep. (250:6-252:22, 311:8-17). One of the employees she oversaw, Mr. Ferguson, made comments to her, including "[d]on't be surprised if somebody don't come in and take your position right from under you," and refused to work when she was around. JR74-75, id. (270:7-271:13, 274:5-13). Mr. Jennings and Mr. Ferguson would also smirk and laugh at her. JR74, id. (271:14-272:15); JR703, Ex. 30, Ltr.

Mr. Moppins also continued to threaten Ms. Parker's job security. On April 27, 2016, in the midst of her investigation, Ms. Price organized a meeting with Ms. Parker, Mr. Moppins, Mr. Pickett, and Ms. Wallace. JR704, Ex. 31, Email; JR378, Ex. 9, Price Dep. (186:22-188:20). The goals of the meeting included discussion of "Ms. Parker and her management with her employees," and to "get peace" because the company's contract performance was suffering. JR378, id. (188:10-20). In this meeting, Ms. Price encouraged Ms. Parker to apologize to Mr. Moppins (which she did). JR379, id. (191:14-192:7). When Ms. Price asked Mr. Moppins if he wanted to apologize, he responded: "Apology? . . . I already know what I'm going to do." JR65, Ex. 6, Parker Dep. (234:8-21). As a result, Ms. Parker "felt that Mr. Moppins was basically threatening her from having any

11

further promotions within the company." JR379, Ex. 9, Price Dep. (193:17-22); JR52, Ex. 6, Parker Dep. (181:22-182:13). After the meeting, Ms. Price assured Ms. Parker her job was not in jeopardy. JR65, id. (234:20-235:2).

That same day, Mr. Moppins sent Ms. Price an email in which he explained that, in February 2016, he had approached Mr. Pickett and asked him if he was sleeping with Ms. Parker, and that he had first learned of the rumor in mid-April. JR553, Ex. 13, Email; JR380, Ex. 9, Price Dep. (194:24-195:4). This demonstrated that Mr. Moppins violated company prohibitions on talking about sex, see JR696, Ex. 29; JR592, Ex. 23, and explained his role in the false rumor; yet Ms. Price took no specific action after receiving this email. See JR380, id. (196:2-18).

### D. Ms. Parker Was Terminated in Retaliation for Complaining of a Hostile Work Environment

Ms. Parker's tenure at RCSI did not last a month after the meeting in which Mr. Moppins threatened Ms. Parker in response to being named in her HR complaint. On May 12, 2016, while Ms. Parker was on a pre-approved vacation from May 11 to May 16, 2016, see JR383, Ex. 9, Price Dep. (209:6-11), Mr. Jennings emailed to Mr. Moppins a complaint alleging that Ms. Parker's conduct had created a hostile work environment against him, which Mr. Moppins sent to Ms. Price. JR580, Ex. 18, Notification; JR384, id. (210:10-211:8). Part of Mr. Jennings's complaint was that Ms. Parker "was approaching him about the rumor" (as required by the Sexual Harassment Manual). JR386, id. (220:10-14).

As part of RCSI's typical course of business, Mr. Moppins was not involved in any sexual or workplace harassment investigations, JR362, Ex. 9, Price Dep. (122:24-25, 123:24-25). Yet, in this case, Mr. Moppins took it upon himself to "inquire" or "investigate" the complaint of hostile work environment against Ms. Parker that Mr. Jennings had sent him. JR393, id. (249:16-21). Ms. Price also investigated the complaint by speaking with Mr. Jennings, Mr. Birgans, and Mr. Carter.

12

JR385, id. (216:5-21). As to whether she interviewed Ms. Parker, Ms. Price gave contradictory testimony, stating both that she did not, JR385, id. (217:16-25), and that she did, JR388, id. (226:16-23). Ms. Parker testified she was not interviewed or informed of the prohibitions by Ms. Price—when she emailed Ms. Price asking to meet with her, and wrote a letter about Mr. Jennings's behavior, Ms. Price replied she was busy. JR72-73, 75, Ex. 6, Parker Dep (264:1-265:5, 266:7-12, 275:1-276:18); JR705, Ex. 32, Email; JR703, Ex. 30, Ltr.

When Ms. Parker reported back to work after her vacation, Mr. Carter approached her and informed her she could not be in the section of the warehouse where Mr. Jennings worked because Jennings had filed "some type of claim or charge" against her. JR71, Ex. 6, Parker Dep. (257:11-258:9). Ms. Parker went to Mr. Moppins's office to ask what happened, and Mr. Moppins confirmed Ms. Parker was prohibited from being in Mr. Jennings's work area due to a complaint against her. JR71, id. (259:1-13). Although Ms. Parker complied with her given instructions to limit her interactions with Mr. Jennings, he was permitted to linger in her work area, where he directed long stares, smirked, and laughed at her. JR73, 74, Ex. 6, Parker Dep. (265:19-21, 271:18-20). Mr. Pickett confirmed Mr. Jennings frequently made a point to come through Ms. Parker's work area, despite not directly working in that area himself, and appeared to intentionally linger there to antagonize her, thereby directly disobeying the directive to avoid Ms. Parker. JR271, Ex. 8, Pickett Dep. (238:14-241:18). Mr. Jennings also engaged other workers in Ms. Parker's work area in conversations, undermining her authority by encouraging Ms. Parker's subordinates to be unproductive. JR73-74, Ex. 6, Parker Dep. (265:20-22, 271:7-13). Unbeknownst to Ms. Parker, while she was on vacation, Mr. Moppins sent an email to Ms. Price, Mr. Vora (the owner of RCSI), and Ms. Vora (in-house counsel for RCSI), with the subject "Evangeline Parker—misconduct." JR706, Ex. 33, Email. In that email, he complained that Ms. Parker "has threatened to file Sexual

13

Harassment charge on [him] for supposedly starting rumors about her relationship with the Deputy PM," and asked to speak with Mr. and Ms. Vora "directly about Ms. Parker's attempt to hold [him] hostage from performing any disciplinary actions against her." JR706-707, id.

Three days after sending this email, and upon Ms. Parker's return from her vacation, Mr. Moppins drafted two separate "written warnings," each of which recommended Ms. Parker's termination. JR582, Ex. 20; JR585, Ex. 21; JR340, Ex. 9, Price Dep. (37:4-18). Unlike the usual course in which Ms. Price recommends discipline for any work performance issues of an employee, JR341, id. (38:25-39:5, 115:9-20); in this instance, Mr. Moppins made the decision with RCSI's in-house counsel, JR390-392, id. (237:4-238:6, 244:18-245:18). In one warning, Mr. Moppins's explanation of the termination included the following:

> Upon attempting to counsel you again on Monday, you once again began **ranting** about how I allowed the employees to talk about you and **that I was wrong for asking DaMarcus to disclose if he was having an affair with you**. **You were going to press charges of sexual harassment against me for spreading untrue rumors about you** and DaMarcus. You became so **emotional** . . .

> CORRECTIVE ACTION REQUIRED: **Termination of employment**. Ms. Parker, your disrespectful behavior on your behalf is unprofessional and not condoned by Reema Consulting Services, Inc. **At no time should you have approached any employee with this type inquiry**. . . .

JR583, Ex. 20, Written Warning (emphases added). The next day, May 17, 2016, Mr. Moppins met with Mr. Vora, Ms. Vora, and Ms. Price, as requested in his May 13, 2016 email. JR404, Ex. 9, Price Dep. (291:2-13). After this meeting, Mr. Moppins emailed this group the warnings he had drafted, forming the basis of Ms. Parker's termination. JR454, id. (353:21-354:3).

Not coincidentally, on the same day she met with Mr. Moppins, Mr. Vora, and Ms. Vora to discuss Ms. Parker's "misconduct," Ms. Price completed her report documenting her investigation of Ms. Parker's sexual harassment complaint. JR551, Ex. 12, Investigation Report. The report concluded, among other things, that "the rumor actually started with Miss Evangeline

Parker sharing with another employee (Angela Wallace) that she had feelings for her boss (Demarcus Pickett) . . . . From this, the rumor grew." JR551-552, id. She did not provide her basis for this conclusion. In fact, the only documented conversation is with Ms. Parker herself, who denied that she had suggested to anyone she was involved in a sexual relationship with Mr. Pickett. JR401, Ex. 9, Price Dep. (278:23-279:4). Further, Mr. Pickett testified that several items in Ms. Price's report were false, including Ms. Price's assertion that employees had approached Mr. Pickett to complain of Ms. Parker's treatment of them, and that Mr. Pickett had spoken with Ms. Price about this fact. JR247, Ex. 8, Pickett Dep. (141:2-143:2). Ms. Price also noted Mr. Moppins had investigated the rumor and Ms. Parker's "behavior and conduct with the employees." JR551, Ex. 12. This contravened RCSI protocol, under which Mr. Moppins lacked authority to do HR investigations. JR362, Ex. 9, Price Dep. (122:24-25, 123:24-25). Ms. Price determined that Ms. Parker's sexual harassment claim was unfounded. JR388, id. (228:13-17). Ms. Price's report recommended Ms. Parker be terminated "due to inappropriate behavior and misconduct (insubordination with superior)." JR552, Ex. 12. It recommended no discipline for Mr. Moppins or Mr. Jennings. JR552, id.

On May 18, 2016, RCSI terminated Ms. Parker's employment in violation of its own policies, based on the two warnings written by Mr. Moppins. JR406, Ex. 9, Price Dep. (298:8-10). RCSI's Employee Handbook states RCSI engages in "progressive discipline," meaning employees are given an opportunity to correct any issues, and employees are notified of alleged performance problems and permitted to improve performance. JR661-662, Ex. 29, Handbook ("Employment at will"); JR697, id. ("Disciplinary action"); JR358, Ex. 9, Price Dep. (106:15-114:2). In contrast, Ms. Parker was terminated immediately upon receipt of these warnings, JR399, id. (273:15-17), without opportunity to correct.

15

III.    **ARGUMENT**

      **A.    Ms. Parker's Harassment Constituted a Hostile Work Environment**

In the Fourth Circuit, a hostile work environment exists where the plaintiff shows that:

> (1) she experienced unwelcome harassment; (2) the harassment was based on her gender, race, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer.

Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003).

There is sufficient evidence upon which a jury could find that Ms. Parker experienced unwelcome harassment based on her gender, and the harassment she suffered was sufficiently severe or pervasive to create an abusive atmosphere. Indeed, RCSI does not dispute that Ms. Parker experienced unwelcome harassment, so that element is met. See Mem. at 5-12. Because the record is replete with evidence upon which a jury could find in Ms. Parker's favor on all of the required elements, summary judgment is improper. At most, RCSI's arguments simply raise material issues of fact regarding: (1) the pervasiveness of the gender-based hostile work environment; (2) the extent to which it altered Ms. Parker's working conditions; (3) facts supporting attribution of the hostile work environment to RCSI; (4) RCSI's insufficient remedial measures; and (5) RCSI's retaliation for Ms. Parker's complaint with HR. The existence of these material issues of fact requires that RCSI's motion be denied.

      **1.    The Harassment against Ms. Parker Was Severe and Pervasive Enough to Constitute a Hostile Work Environment**

The evidence establishes that this cruel, false rumor, as well as how it was handled by RCSI, constituted severe and pervasive hostility that altered Ms. Parker's work conditions. RCSI focuses on the pervasiveness of the rumor about Ms. Parker, not severity or even the pervasiveness or severity of the harassment due to the rumor. The Fourth Circuit has held, however, that this inquiry "is properly viewed in the disjunctive, requiring only that a plaintiff prove the harassment

16

was severe or pervasive." Harris v. Mayor of Balt., 429 F. App'x 195, 201 n. 7 (4th Cir. 2011). RCSI cannot establish that no factual issues exist as to severity and pervasiveness.

Workplace harassment must be "sufficiently severe **or** pervasive to alter the conditions of the victim's employment and create and abusive working environment" to constitute a hostile work environment claim. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (emphasis added). In the Fourth Circuit, the question of whether the harassing conduct is sufficiently severe or pervasive "is quintessentially a question of fact." Mosby-Grant v. City of Hagerstown, 630 F.3d 326, 335 (4th Cir. 2010). The relevant inquiry is not "a mathematically precise test," Harris, 510 U.S. at 22, nor does it require each incident to independently satisfy the severe or pervasive test. See Okoli v. City of Baltimore, 648 F.3d 216, 220 (4th Cir. 2011). Rather, the Court must consider "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it interferes with an employee's work performance." Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015) (quoting Harris, 510 U.S. at 23). Applying the factors set forth by the Supreme Court in Harris ("frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," 510 U.S. at 23) leads to the inescapable conclusion that factual issues prevent summary judgment. In fact, the evidence of record confirms the facts alleged in the Complaint, which the U.S. Court of Appeals for the Fourth Circuit found to be sufficiently severe and pervasive, if proven:

> The complaint alleges that, over the period from Parker's promotion to Assistant Operations Manager in March 2016 until she was fired on May 18, 2016, the rumor and its adverse effects harmed Parker. The frequency alleged in the complaint was greater than what the district court characterized as "a few slights." Indeed, the harassment was continuous, preoccupying not only Parker, but also management and the employees at the Sterling facility for the entire time of Parker's employment after her final promotion.

17

The harassment began with the fabrication of the rumor by a jealous male workplace competitor and was then circulated by male employees. Management too contributed to the continuing circulation of the rumor. The highest-ranking manager asked another manager, who was rumored to be having the relationship with Parker, whether his wife was divorcing him because he was "f—king" Parker. The same manager called an all-staff meeting, at which the rumor was discussed, and excluded Parker. In another meeting, the manager blamed Parker for bringing the rumor into the workplace. And in yet another meeting, the manager harangued Parker about the rumor, stating he should have fired her when she began "huffing and puffing" about it. During this period, Parker was also told that because of the rumor, she could receive no further promotions in the company. She then faced a false harassment complaint launched by the male employee who started the rumor and was sanctioned based on that complaint— first, with the instruction to stay away from the rumormonger and second, with the termination of her employment. **If we are to take the allegations from the complaint and the reasonable inferences therefrom as true, as we must, the harassment related to the rumor was all-consuming from the time the rumor was initiated until the time Parker was fired.**

Parker v. Reema Consulting Servs., Inc., 915 F.3d 297, 304-305 (4th Cir.) (emphasis added), cert. denied, 140 S. Ct. 115 (2019). The record evidence clearly bears out these allegations.

**First**, contrary to RCSI's representation that Ms. Parker "only identifies a single time when the alleged rumor was discussed with an active co-worker," Mem. at 19, the record includes evidence of frequent discussion and harassment from the time Ms. Parker was promoted until she was fired. See Harris, 510 U.S. at 23 ("frequency of the discriminatory conduct"). For example, Mr. Pickett first heard the rumor when Mr. Moppins asked him if he was "f—king Parker," in February 2016, just weeks after Ms. Parker's promotion. JR553, Ex. 13, Email; JR233, Ex. 8, Pickett Dep. (88:17-89:2). The next day, Ms. Thompson mentioned the same rumor to Mr. Pickett, indicating that the "warehouse [was] talking." JR236, id. (96:13-98:14). Mr. Birgans also testified that he heard about the rumor "a couple times from a few different people." JR638, Ex. 28, Birgans Dep. (25:19-21). Moreover, Mr. Moppins confirmed that Mr. Jennings was "constantly telling Cathy Price" about the rumor, as well as Mr. Carter. JR165, Ex. 7, Moppins Dep. (86:4-10). Thus, the rumor was not limited to an isolated comment as RCSI claims, Mem. at 19, but permeated throughout the warehouse. Parker, 915 F.3d at 304 ("The frequency alleged in the complaint was

18

greater than what the district court characterized as 'a few slights.'").

Moreover, RCSI's myopic focus on the spreading of the rumor ignores the frequency (and severity) of the continued harassment stemming from the rumor. Between March 2016, when the rumor began to circulate, and mid-May 2016, when Ms. Parker was terminated, she suffered multiple incidents of harassment that detracted from her job performance, discouraged her from remaining on the job, and kept her from advancing in her career. See Harris, 510 U.S. at 22 ("A discriminatorily abusive work environment, . . . can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers."). For example, on April 22, 2016, when Ms. Parker met with Mr. Moppins in an attempt to stop the spread of the rumor, Mr. Moppins stated that, despite having "great things" planned for her, he would not allow her to advance at RCSI because of the rumor. JR52, Ex. 6, Parker Dep. (182:2-8). On April 25, 2016, Mr. Moppins lost his temper and screamed at Ms. Parker, stating that he should have fired her when she first came in to raise her concerns. JR58-59, id. (208:20-209:12). Mr. Jennings also harassed Ms. Parker by filing a false complaint of harassment against her, frequenting her work area, and lingering there to antagonize her. JR271, Ex. 8, Pickett Dep. (238:14-241:18). Mr. Jennings likewise undermined her authority, causing her employees to be unproductive. JR73, Ex. 6, Parker Dep. (265:20-22, 271:7-13); Parker, 915 F. 3d at 304 ("During this period, Parker was also told that because of the rumor, she could receive no further promotions in the company. She then faced a false harassment complaint launched by the male employee who started the rumor and was sanctioned based on that complaint."). And it "is particularly relevant that the alleged harassment began just one to two weeks after [her promotion] and continued throughout the duration of [her] employment, a period of approximately two months." Brenneman v. Famous Dav's of Am., Inc., 410 F. Supp. 2d 828, 840 (S.D. Iowa 2006).

19

**Second**, the harassing behavior was severe, humiliating, and abusive—much more than a mere offensive utterance. See Harris, 510 U.S. at 23 ("its severity; whether it is physically threatening or humiliating, or a mere offensive utterance"). The rumor itself was humiliating, as the Fourth Circuit has held, because it suggested that Ms. Parker got her promotions through sex, not merit. Parker, 915 F.3d at 305 ("[I]t 'goes right to the core of somebody's merit as a human being' to suggest they were promoted not on worth but for sexual favors. The rumor and its consequences thus entailed 'open resentment and disrespect from her coworkers,' including those she was responsible for supervising."); see also ECF No. 40-1 at 32-20-33:8 ("And so I would condemn as I think any reasonable person would in the strongest possible terms that making a rumor like that and spreading it is vial [sic], vulgar behavior, which is alleging that somebody's conduct has been totally unacceptable and inappropriate.").

The harassment was also physically threatening. Parker, 915 F.3d at 305 ("The harassment emanating from the rumor also had physically threatening aspects, even though harassment need not be physically threatening to be actionable."). For example, Mr. Moppins slammed a door in Ms. Parker's face at the all-hands meeting,[1] humiliating her in front of all the warehouse employees, JR225, Ex. 8, Pickett Dep. (56:13-15; 57:3-8; 111:9-13); JR46, Ex. 6, Parker Dep.

---

[1] RCSI's recitation of the facts regarding the "all-hands meeting," Mem. at 20, ignores Ms. Parker's testimony that Mr. Moppins slammed the door on her and locked her out, allowing Mr. Pickett to enter (contradicting Mr. Moppins's justification for excluding Ms. Parker due to tardiness). JR45, Ex. 6, Parker Dep. (154:18-156:12). The evidence demonstrates that Ms. Parker was humiliated when the entire warehouse witnessed Mr. Moppins slam the door in her face in an abusive, physical manner, leading to laughter within the meeting room. JR46, id. (157:13-160:11). The meeting did not simply "address a client issue" as RCSI asserts—the record evidence shows that the meeting included a discussion of the rumor, including the suggestion that Ms. Parker "use[d] [her] sexuality to get to the top," and it was unfair that she "got promoted and they didn't." JR45-48, id. (156:13-166:1). Moreover, when Ms. Parker attempted to discuss the situation with Mr. Moppins, he shouted at her and told her that he should have fired her. JR58-59, id. (206:14-207:14, 209:8-18). This type of behavior is not only humiliating, but also threatening.

(157:13-16), screamed and lost his temper with her in meetings in front of other employees, JR58, id. (208:20-209:12), and threatened her possibility for advancement at RCSI, JR52, id. (182:2-8) (indicating that due to the rumor, he could no longer recommend her for promotions or higher-level tasks, and would not allow her to advance any further). Mr. Moppins's role as Ms. Parker's supervisor elevated the threatening character of his behavior. Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 763 ("[A] supervisor's power and authority invests his or her harassing conduct with a particularly threatening character"); Boyer-Liberto, 786 F.3d at 278 ("Simply put, 'a supervisor's power and authority invests his or her harassing conduct with a particular threatening character.'" (citation omitted)); Brenneman, 410 F. Supp. 2d at 840 ("Moreover, the harassment was instigated by her supervisor, increasing the probability that the situation would be an intimidating one."). Mr. Jennings also engaged in threatening behavior, staring at her to antagonize her. JR271, Ex. 8, Pickett Dep. (239:10-240:14).

### 2. The Gender-Based Hostile Work Environment Altered Ms. Parker's Working Conditions

The gender-based rumor and hostile work environment that resulted from it "unreasonably interfere[d] with [Ms. Parker's] work performance," by altering her work conditions. Harris, 510 U.S. at 23. Parker, 915 F.3d at 305 ("In short, RCSI's . . . entire relationship with Parker, as well as Parker's employment status, was changed substantially for the worse."). At a minimum, triable issues of fact regarding whether and to what extent the gender-based hostile work environment altered Ms. Parker's work conditions exist.

**First**, the hostile work environment included open resentment and hostility from subordinate employees. "Rumors have been found severe and pervasive enough to create a hostile work environment when they have been accompanied by insults and accusations that the subject of the rumors used the relationship to gain power and the rumors contributed to an adverse

employment action." Dube v. Hadco Corp., No. 87-554-SD, 1999 U.S. Dist. LEXIS 21184, at *14 (D.N.H. Feb. 4, 1999) (citing Spain v. Gallegos, 26 F.3d 439, 450 (3d Cir. 1994); Jew v. University of Iowa, 749 F. Supp. 946 (S.D. Iowa 1990)). Here, the very nature of the rumor—that Ms. Parker advanced because of a sexual affair, JR40, Ex. 6, Parker Dep. (134:8-135:3, 136:6-20)— undermined Ms. Parker's working conditions as a manager and created an environment in which Ms. Parker's qualifications were called into question, JR48, id. (165:16-166:1) (discussing rumor that Ms. Parker used her "sexuality to get to the top," and subordinate employees commenting that it was unfair that she "got promoted and they didn't"). Moreover, contrary to RCSI's emphasis on "little conversations and . . . looking sessions with the laughter afterwards," Mem. at 19 (citing JR44, Ex. 6 (151:10-15)), the record illustrates that Ms. Parker was undermined by her subordinates, JR70, id. (253:6-10). For example, Mr. Ferguson made comments to her, including "[d]on't be surprised if somebody don't come in and take your position right from under you," and refused to work when she was around. JR69, id. (270:7-271:13, 274:5-13). Mr. Jennings and Mr. Ferguson would also smirk and laugh at Ms. Parker. JR69, id. (271:14-272:15). These facts are similar to those in Spain v. Gallegos, where the plaintiff "faced an environment in which her co-workers treated her as an outcast" because of an untrue rumor that she was engaged in a sexual relationship with her superior. 26 F.3d at 450.

**Second**, RCSI ignores that management contributed to the continuing circulation of the rumor and resulting harassment, which elevates the severity of the hostility. See Parker, 915 F.3d at 305 ("That this harassment came from Parker's supervisor made it all the more threatening."); Spain, 26 F.3d at 450 ("Spain has alleged that she faced an environment in which her co-workers treated her as an outcast and in which her supervisors evaluated her negatively for advancement."). For example, the hostile work environment included admonishments by Mr. Moppins—the

22

highest-ranking manager at the warehouse—that Ms. Parker would no longer advance at the company for raising her concerns to him. See, e.g., JR58-59, Ex. 6, Parker Dep. (206:14-208:8, 209:8-18); JR65, id. (233:2-235:3). Moreover, Mr. Moppins ignored her and excluded her from management meetings as a result of the rumor—particularly after she complained of it to HR. JR69, id. (250:6-252:22). From a subjective and objective standard, the environment was abusive and crippled Ms. Parker's performance and advancement, resulting in her termination.

### 3.    There Is a Basis for Imposing Liability on RCSI

Next, there are two separate bases upon which a jury could impose liability on RCSI, each of which independently makes summary judgment inappropriate: (1) the hostile work environment that culminated in Ms. Parker's firing was in part created and maintained as a direct result of the actions and rhetoric of Ms. Parker's direct supervisor (Mr. Moppins); and (2) RCSI was negligent in addressing Ms. Parker's complaints even after she sought recourse against her co-workers (Mr. Moppins and Mr. Jennings).

**First**, RCSI is strictly liable because Mr. Moppins, a supervisor, was involved in the harassment that led to Ms. Parker's firing. The Supreme Court has been unequivocal that if a supervisor's harassment ends in a tangible employment action, the employer is strictly liable. Vance v. Ball State Univ., 133 S. Ct. 2434, 2439 (2013). This is true regardless of whether the employer knew of, approved, or sought to prevent or stop the act. Harris v. Mayor of Balt., 797 F. Supp. 2d 671, 679 (D. Md. 2011). A plaintiff must show some nexus between the harassment and the employment action. Ray v. Int'l Paper Co., 909 F.3d 661, 667 (4th Cir. 2018).

Here, Mr. Moppins, an individual who unquestionably had supervisory authority over Ms. Parker, actively engaged in harassing Ms. Parker by creating a hostile work environment. See Parker, 915 F.3d at 304 ("Management too contributed to the continuing circulation of the rumor."). Mr. Moppins asked Mr. Pickett whether his wife was divorcing him because he was "f—

23

king" Ms. Parker. JR36-37, Ex. 6, Parker Dep. (120:10-121:3, 123:6-10). Mr. Moppins's statements, combined with his own dissemination of the rumor, exacerbated the hostile work environment. However, Mr. Moppins's role in facilitating a hostile work environment did not end at that vile comment. Specifically, Mr. Moppins intentionally excluded Ms. Parker from an all hands meeting—slamming the door in her face and locking it. JR225, 226, 239, Ex. 6, Ex. 8, Pickett Dep. (56:13-15, 57:3-8, 111:9-13); JR46, Ex. 6, Parker Dep. (157:13-16, 158:17-159:4).

Mr. Moppins's harassment culminated in Ms. Parker's termination. At a subsequent meeting between Ms. Parker and Mr. Moppins, he became visibly angry, shouting that he should have fired Ms. Parker when she approached him about the unprofessional nature of his conduct at and substance of the all hands meeting. JR58, Ex. 6, Parker Dep. (208:20-209:12). In response to Ms. Parker raising her concerns about the gross and false rumor of her sleeping her way to the top, Mr. Moppins threatened to personally prevent her from receiving any further promotions. JR52, id. (182:2-8). Mr. Moppins, growing increasingly agitated and bitter over Ms. Parker's pursuit of accountability, even excluded her from management meetings in which she was typically a part. JR84, id. (311:8-17). Ultimately, Mr. Moppins recommended that Ms. Parker be fired because she approached him about his role in promoting the rumor. JR582, Ex. 20, Written Warning. She was fired shortly thereafter. JR587, Ex. 22, Separation Notice. Mr. Moppins's harassment, as a supervisor at the time, created a work environment that was hostile and abusive and served as a nexus to the tangible employment action ultimately taken against Ms. Parker. See Ray, 909 F.3d at 664 (finding a sufficient nexus between a supervisor's sexual harassment of the employee and his direct involvement in the decision to deny her voluntary overtime—a tangible employment action). Thus, RCSI is strictly liable for the egregious behavior of Ms. Parker's former supervisor.

**Second**, even if this Court were to determine that Mr. Moppins was not a supervisor, there

24

is exceedingly sufficient evidence for a jury to find that RCSI was negligent in addressing Ms. Parker's complaints against her co-workers, Mr. Moppins and Mr. Jennings. The Supreme Court has been clear that an employer is directly liable for an employee's unlawful harassment if the employer was negligent with respect to the offensive behavior. Faragher v. City of Boca Raton, 524 U.S. 775, 789 (1998); see also Vance, 133 S. Ct. at 2439 ("If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions."); Harris v. Mayor of Balt., 797 F. Supp. 2d at 762. When directly approaching her subordinates about the spreading of the rumor was not enough to remedy the situation, JR370, Ex. 9, Price Dep. (156:7-16), Ms. Parker arranged a meeting with Mr. Moppins to address her concerns. JR525, 528, Ex. 4, Wallace Dep. (42:1-49:15, 54:3-56-12); JR49, Ex. 6, Parker Dep. (172:11-17). Instead of substantively addressing those concerns at that meeting, Mr. Moppins told Ms. Parker that he would not allow her to advance any further in the company for raising her concerns. JR52, id. (182:2-8). Ms. Parker, again, attempted to remedy the hostile work environment by filing an official complaint with HR—but the complaint was not taken seriously. In fact, Ms. Price emailed multiple individuals not related to Ms. Parker's harassment claim against Mr. Moppins, and copied Mr. Moppins (the harasser) to keep him apprised—breaching the critical need for confidentiality. JR375-376, Ex. 9, Price Dep. (176:11-14; 179:11-21). Ultimately, the only thing that came out of that "investigation" was an insufficient request that the parties involved simply apologize to each other. JR379, id. (191:14-192:7). Instead of apologizing, Mr. Moppins, in front of Ms. Price, used the opportunity to foreshadow his plan to have Ms. Parker fired—an appalling breach of company protocol met with no response from Ms. Price. JR65, id. (234:8-21).

Upon returning from her vacation, Ms. Parker was informed that Mr. Jennings had filed a complaint against her and that she was prohibited from being around him—not from HR, but from

a fellow colleague. JR71, Ex. 6, Parker Dep. (257:11-258:9). Ms. Price never officially notified Ms. Parker of the complaint against her, nor did she give Ms. Parker an opportunity to review or respond to Mr. Jennings's frivolous complaint through any investigative means. JR71, id. (260:1-22). Ms. Parker attempted to schedule a meeting with Ms. Price to discuss the complaint, but Ms. Price stated she was busy. JR71, id. (260:14-18). Despite the mandate to stay away from each other, Mr. Jennings continued to roam around Ms. Parker's work area to antagonize her by engaging with her subordinates during work hours and smirking and staring at her. JR74, id. (271:14-272:15). When Ms. Parker requested a meeting with HR concerning Mr. Jennings's hostility towards her, Ms. Price again claimed to be too busy. JR705, Ex. 32, Email; JR71, Ex. 6, Parker Dep. (266:7-15). Ms. Parker drafted a letter detailing Mr. Jennings's hostile behavior and walked it to Ms. Price's office because Ms. Price was not responding to her emails—she never responded. JR72, id. (264:1-265:5, 266:13-15); JR703, Ex. 30, Ltr. At every turn, Ms. Parker's continued pleas for help from her workplace were met by inadequate and botched investigations negligently conducted by RCSI, the entity that had the power and authority to control and correct her working conditions, ending in her ultimate termination.

### B.   RCSI's Remedial Actions Are Insufficient to Avoid Liability

RCSI's request for summary judgment under the Faragher-Ellerth affirmative defense to Ms. Parker's hostile work environment is also without merit because RCSI cannot demonstrate: (1) that it exercised reasonable care to prevent and promptly correct any harassing behavior, and (2) that Ms. Parker unreasonably failed to take advantage of any preventive or corrective opportunities provided by RCSI or to avoid harm otherwise. Williams v. Silver Spring Volunteer Fire Dep't, 86 F. Supp. 3d 398, 414 (D. Md. 2015). As an initial matter, the Faragher-Ellerth defense is unavailable because RCSI fired Ms. Parker. See Harris v. Mayor of Balt., 797 F. Supp. 2d at 680 (defense proper only "[w]here otherwise actionable harassment **does not** culminate in

26

[a] tangible employment action" (emphasis added)). RCSI does not dispute that an adverse employment action was taken, Mem. at 13-15, or that Mr. Moppins recommended Ms. Parker's termination after she filed a complaint against him. JR340, Ex. 9, Price Dep. (37:4-18); JR582, Ex. 20; JR585, Ex. 21. Thus, RCSI cannot avail itself of the Faragher-Ellerth defense.

Even assuming the defense was applicable here, RCSI still fails to satisfy its two required prongs. **First**, RCSI's response to Ms. Parker's complaints of harassment was far from a reasonable course that prevented and promptly rectified the spread of the rumor throughout the warehouse and corresponding harassment against Ms. Parker. The Faragher-Ellerth standard requires an employer to effect remedial measures that are **reasonably calculated** to end the harassment. See Brown v. Perry, 184 F.3d 388, 396 (4th Cir.1999). This was not the case here, where Ms. Price and RCSI's response failed in numerous ways. Ms. Price's investigation was flawed because it did not focus on the allegations of sexual harassment, but instead included irrelevant matters. See Smith v. First Union Nat'l Bank, 202 F.3d 234, 245 (4th Cir. 2000). In Smith, the Fourth Circuit held that the employer's investigation was deficient in part because it focused on the alleged harasser's "management style," not the allegations of sexual harassment. Id. at 240. Ms. Price's investigation here was even more deficient in that, as she admits, it focused on Ms. Parker's (the victim's) allegedly inappropriate behavior and interactions with subordinates, not just the complaints of harassment she made. JR396, Ex. 9, Price Dep. (259:10-22). This failure vitiates RCSI's defense.

Further, Ms. Price did not protect the confidentiality of Ms. Parker's complaint, did not interview Mr. Moppins,[2] the alleged harasser, nor did she require that Mr. Moppins avoid Ms.

---

[2] RCSI misrepresents the record when it notes that "Ms. Price interviewed . . . Mr. Moppins." Mem. at 12. Ms. Price changed her testimony on which employees she interviewed as part of her

Parker during the course of the investigation, each of which are steps required by case law and relevant policy guidance. Terry v. Laurel Oaks Behavioral Health Ctr., Inc., 1 F. Supp. 3d 1250, 1262 (M.D. Ala. 2014); see also Equal Employment Opportunity Commission, Policy Guidance on Current Issues of Sexual Harassment, § E (March 19, 1990) ("EEOC Guidance"),[3] available at https://www.eeoc.gov/laws/guidance/policy-guidance-current-issues-sexual-harassment.   RCSI also failed to protect Ms. Parker against retaliation when, against EEOC Guidance and law, it permitted the harasser, Mr. Moppins, to circumvent HR's authority and conduct his own HR "investigations" into the rumor, as well as into Mr. Jennings's complaint against Ms. Parker, and then recommend that Ms. Parker be fired. See supra, § II.D; EEOC Guidance, § E(1); Goad v. N.C. Farm Bureau Mut. Ins. Co., No. 1:16-CV-1332, 2017 U.S. Dist. LEXIS 198571 at *8 (M.D.N.C. 2017) (failure to address retaliatory conduct "raise[s] a question of fact as to whether [the defendant's sexual harassment response] was effective"). RCSI failed to take reasonable measures to respond effectively to Ms. Parker's complaint.

RCSI's harassment policies themselves are defective and dysfunctional, precluding Defendant from establishing the defense. Williams v. Silver Spring Volunteer Fire Dep't, 86 F. Supp. 3d 398, 414-15 (D. Md. 2015) ("[I]f the plaintiff can show that . . . 'the policy was otherwise defective or dysfunctional,' the presence of an anti-discrimination policy is no longer compelling proof that the company exercised reasonable care in preventing sexual harassment."). RCSI's Sexual Harassment Manual, which requires that a victim confront her own harasser, JR589, Ex.

---

investigation. Compare JR374, Ex. 9, Price Dep. (170:18-20); JR576, Ex. 16 (interviewed only Angela Wallace, Kenton Birgans, Manley Ferguson, DaMarcus Pickett) with JR397-398, Ex. 9, Price Dep. (264:23-266:14) (interviewed Evangeline Parker, DaMarcus Pickett, Donte Jennings, Angela Wallace, Maddie Littleton, Kenton Birgans, Carlos Carter). Even with the changing testimony, Ms. Price did not testify that she interviewed Mr. Moppins.

[3] The EEOC Guidelines are "a body of experience and informed judgment to which courts . . . may properly resort for guidance." Meritor Sav. Bank v. Vinson, 477 U.S. 57, 65 (1986).

23; JR367, Ex. 9, Price Dep. (142:19-143:16), has been deemed ineffective by both the Supreme Court and the EEOC. See Meritor Sav. Bank v. Vinson, 477 U.S. 57, 72 (1986) (policy that required employee to first complain to supervisor, the perpetrator, was not "calculated to encourage victims of harassment to come forward"); EEOC Guidance, § E(1) (policy "should not require a victim to complain first to the offending supervisor").

RCSI's defense also fails on the second prong. Ms. Parker took advantage of reporting procedures outlined in RCSI's policy by following RCSI's then-existing, albeit ineffective, protocol to quell the rumor and then file an HR complaint. See supra, § II.B-C. RCSI, therefore, cannot satisfy either prong of the Faragher-Ellerth defense.

### C.     Ms. Parker Was Terminated in Retaliation for Complaining of a Hostile Work Environment

Ms. Parker's retaliation claim must be decided by a jury. Direct evidence of discrimination is sufficient to prove retaliation. Gott v. Town of Chesapeake Beach, 44 F. Supp. 3d 610, 615 (D. Md. 2014). Ms. Parker has provided such evidence here: **a written admission by Mr. Moppins that Ms. Parker's complaints served as a basis for his recommendation that Ms. Parker be fired**. When a statement "both reflect[s] directly on the alleged discriminatory attitude and [ ] bear[s] directly on the contested employment decision," the statement is direct evidence of discrimination. Id. at 615 (internal citation omitted). In one of the two warnings drafted by Mr. Moppins and used to terminate Ms. Parker, he explained Ms. Parker was being fired because she confronted him about his role in the rumor and had threatened to file charges of sexual harassment:

> Upon attempting to counsel you again on Monday, **you once again began ranting** about how I allowed the employees to talk about you and **that I was wrong for asking DaMarcus to disclose if he was having an affair with you**. **You were going to press charges of sexual harassment against me for spreading untrue rumors about you** and DaMarcus. You became **so emotional** that Ms. Wallace had to escort you from the conference room . . .
>
> CORRECTIVE ACTION REQUIRED: **Termination of employment** . . .

JR583, Ex. 20, Written Warning (emphases added); JR340, Ex. 9, Price Dep. (37:4-18.); JR390-392, id. (237:4-238:6, 244:18-245:18). This written statement reflects on Mr. Moppins's discriminatory attitude not only because it contains sexist language accusing Ms. Parker of "ranting" and becoming "emotional," Valleriani v. Route 390 Nissan LLC, 41 F. Supp. 36 307, 316 (W.D.N.Y. 2014) (calling women "too f—ing emotional" evidenced gender-based hostility), but also because it states that a motivating factor in his decision was Ms. Parker's protected activity—filing a complaint. Gott, 44 F. Supp. 3d at 615 (summary judgment denied based on statement that employer was "looking for younger people"). Further, the warning bears directly on the contested employment decision because it states that Ms. Parker will be fired. Standing alone, this warning is sufficient to deny summary judgment.

Contrary to RCSI's assertion, the Fourth Circuit has been clear that the McDonnell-Douglas burden shifting test is not applicable where direct evidence of discrimination exists. Gott, 44 F. Supp. at 615 (citing Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F. 3d 277, 284 (4th Cir. 2004)). Even if the Court applies the McDonnell-Douglas burden-shifting, however, Ms. Parker's claim survives. Under this framework, a prima facie case for retaliation exists because (1) Ms. Parker engaged in protected activity, (2) RCSI took an adverse employment action against her, and (3) there was a causal link between the two events. Boyer-Liberto, 786 F.3d at 282. Because Defendant has conceded the first two elements of the prima facie case,[4] and there is

---

[4] Defendant does not address the first and second elements of the prima facie case in its motion, thereby conceding them. Mem. at 23-27. Even were these two elements at issue, there is sufficient evidence in the record for a jury to find in favor of Ms. Parker. Ms. Parker engaged in protected activity when she filed a complaint of sexual harassment on April 25, 2016, JR338, 371, Ex. 9, Price Dep. (27:18-20, 158:20-159:6); JR574, Ex. 16, and when she opposed the false rumor by speaking to others including Mr. Moppins in an effort to quash it. See Okoli, 648 F.3d at 223-24 (4th Cir. 2011); Anderson, 281 F.3d at 458 (employee who informed supervisor who had touched

evidence upon which a jury could find a causal link between Ms. Parker's harassment complaint and her firing, a prima facie case exists. Thus, the burden falls on Defendant to articulate a legitimate, nonretaliatory reason for the adverse employment action. Anderson v. G.D.C., Inc., 281 F.3d 452, 458 (4th Cir. 2002). If RCSI succeeds in doing so—a burden it cannot meet here— Ms. Parker will nevertheless prevail because she can prove that RCSI's asserted reason is a pretext for retaliation. Id.

Ms. Parker can also establish causation. The Fourth Circuit has explained that "very little evidence of a causal connection is required to establish a prima facie case of retaliation." Burgess v. Bowen, 466 Fed. Appx. 272, 284 (4th Cir. 2012) (internal quotations omitted). The proximity of less than a month between Ms. Parker's protected activity and her termination alone is grounds for denial of summary judgment. See Foster v. Univ. of Maryland-Eastern Shore, 787 F.3d 243, 253 (4th Cir. 2015) ("two-and-a-half month gap between protected activity and an adverse employment action" established causation "solely on the basis of temporal proximity").

Further, if a plaintiff's job security is threatened, or she is stripped of work after she makes a complaint, causation is established. Lettieri v. Equant, Inc., 478 F.3d 640, 650-51 (4th Cir. 2007); Anderson, 281 F.3d at 458 (4th Cir. 2002); Sparks v. Pilot Freight Carriers, Inc., 830 F.2d 1554, 1565 (11th Cir. 1987). In Sparks, the Eleventh Circuit reversed the district court's grant of summary judgment to the employer, in part because the plaintiff's supervisor and harasser threatened to have her fired. Sparks, 830 F.2d at 1565. In Lettieri, the court found that a post-complaint comment to plaintiff that "her role was not really needed," and the reduction of her

---

her that she would "cut his f—ing throat if he ever did that again" engaged in protected activity). Ms. Parker suffered an adverse action when she was fired. JR406, Ex. 9, Price Dep. (298:8-10); Yashenko v. Harrah's NC Casino Co., LLC, 446 F.3d 541, 551 (4th Cir. 2006).

supervisory responsibilities, was sufficient to establish causation. Lettieri, 478 F.3d at 650.

Here, Mr. Moppins (who was indisputably aware of the protected activity)[5] both threatened Ms. Parker with termination and took away her job duties. After Ms. Parker opposed the false rumor, Mr. Moppins launched into a series of escalating threats, telegraphing his anger and intent to fire her. In an April 22 meeting, he threatened Ms. Parker with lack of promotions for confronting him about the rumor. JR52, Ex. 6, Parker Dep. (182:2-8). Three days later, he remarked he "should have fired [her]" the day before when she came in "huffing and puffing" about the rumor." JR58, id. (208:20-209:12); JR163, Ex. 7, Moppins Dep. (81:4-6). Two days later, Mr. Moppins threatened her, ominously noting, "I already know what I'm going to do." JR65, id. (234:8-21). Mr. Moppins also stopped working with Ms. Parker, by not answering her emails and dropped her from work meetings in which she had previously been included. JR69, 84, id. (250:6-252:22, 311:8-17). Finally, while Ms. Parker was on vacation, and five days before her termination, Mr. Moppins sent an email to Mr. Vora, Ms. Vora, and Ms. Price complaining that Ms. Parker threatened to file a complaint on him for starting the false rumor and asking to speak about her "misconduct." JR706, Ex. 35. These actions are more than sufficient to prove causation.

RCSI's argument that Mr. Vora, the company's owner, was the ultimate decision-maker regarding Ms. Parker's termination, Mem. at 24, is a weak attempt to paper over the heavy and inappropriate influence of her boss Mr. Moppins, whom Ms. Parker had named as one of her harassers. "Clearly, a sufficient causal connection would exist if the jury concluded that [the

---

[5] RCSI does not dispute that Mr. Moppins was aware of Ms. Parker's protected activity, nor can it. See Mem. at 23-27. Ms. Parker spoke with Mr. Moppins directly about his role in the rumor and the fact that she was thinking of filing a complaint; other employees reported to Mr. Moppins that Ms. Parker was similarly speaking with them about the rumor; and, immediately after Ms. Parker filed an HR complaint, Ms. Price sent an email to Mr. Moppins, Ms. Parker, and others regarding "workplace gossip and rumors," JR579, Ex. 17, Email, and later called a meeting in which she asked the managers to apologize. JR379, Ex. 9, Price Dep. (191:14-192:7).

supervisor and harasser], in fact, did substantially influence [the company's] decision to terminate plaintiff." Jaudon v. Elder Health, Inc., 125 F. Supp. 2d 153, 167 (D. Md. 2000) (collecting cases). In Jaudon, the court concluded that, because there existed an open question of whether the plaintiff's supervisor and harasser "checked the box on the disciplinary form recommending termination," a jury could find the plaintiff's supervisor, against whom she had filed a complaint, had influenced the company's decision to fire her. Id. at 168; see also Sowers v. Kemira, Inc., 701 F. Supp. 809, 824 (S.D. Ga. 1988) (supervisor/harasser's "power" to prevent or delay plaintiff's promotion sufficient for jury to find causation).

A jury could plainly reach the same conclusion here, where Mr. Moppins went far beyond merely "checking the box," Jaudon, 125 F. Supp. 2d at 168, on Ms. Parker's termination form. He made the decision to terminate Ms. Parker with RCSI's in-house counsel, JR390-392, Ex. 9, Price Dep. (237:4-238:6, 244:18-245:18), and, in doing so, he circumvented what Ms. Price described as RCSI's typical procedure in which she, as HR manager, recommends appropriate discipline for employees. JR341, 360, id. (38:25-39:5, 115:9-20). Mr. Moppins also personally "investigated" Mr. Jennings's HR complaint against Ms. Parker which, again, contravened Ms. Price's assertions that only she was authorized to conduct HR investigations. Compare JR393, 398-399, id. (249:16-21, 267:7-270:22) and JR582, Ex. 20, Warning, with JR362, Ex. 9, Price Dep. (123:24-25) and JR339, 361-362, id. (33:18-21, 120:2-122:4,122:8-12). Mr. Moppins was the author of the warnings serving as the basis for termination. JR391, id. (240:25-241:7, 244:18-20). Finally, after meeting with RCSI leadership and Ms. Price, Mr. Moppins emailed these warnings to them the day before Ms. Parker was fired. JR706, Ex. 33, Email; JR454, Ex. 9, Price Dep. (353:15-354:3); JR404, id. (291:2-13). Mr. Moppins's actions showed he drove the decision to fire Ms. Parker after her complaint about him, establishing causation.

33

RCSI's proffered reasons for Ms. Parker's termination, that she was fired for "antagonizing Mr. Jennings and insubordination," Mem. at 24, and "accosting her subordinates to 'set things straight'" about the rumor, id. at 2, are transparently pretextual and without credible support. **First**, RCSI's failure to follow its own policies, and selective implementation of its policies, is evidence of pretext. Jones v. Hydro Conduit Corp., C/A No. 3:10-776, 2012 U.S. Dist LEXIS at \*15 (D.S.C. 2012) (citing Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 296-7 (4th Cir. 2010)). Ms. Parker's efforts to quell the rumor were **required** by RCSI's own Sexual Harassment Manual (in contravention of EEOC Guidance, see supra, § III.B), and thus do not provide a legitimate basis for her termination. The manual requires employees who have experienced harassment to confront their harasser, or tell them to "stop," JR593, Ex. 23, Manual, or "whatever puts them on notice" about the unwanted behavior prior to filing an HR complaint. JR367, Ex. 9, Price Dep. (142:19-143:16). Ms. Parker's efforts to speak with co-workers whom she believed to be spreading the false rumor about her, and her repeated requests that Mr. Moppins take the false rumor seriously, were an effort to "put [these individuals] on notice." In contrast, Mr. Moppins was neither disciplined nor investigated even when he made clear in an email to HR that he violated RCSI's prohibition on workplace "talk about sex," JR592, Ex. 23, by asking Mr. Pickett if he was having a sexual relationship with Ms. Parker. JR553, Ex. 13.

**Second**, determining whether Ms. Parker did, in fact, act inappropriately is an issue of material fact requiring credibility determinations that preclude summary judgment. See O'Mara v. Va. Dep't of Corr., Civ. No. 16-489, 2017 U.S. Dist. LEXIS 86347 at \*32 (E.D. Va. 2017) (citing Rainey v. Conerly, 973 F.2d 321, 324 (4th Cir. 1992)). RCSI's account that Ms. Parker antagonized Mr. Jennings is supported chiefly by Mr. Jennings's written complaint, JR580, Ex.

34

18.[6] That document—uncorroborated by any direct testimony in this case—is refuted by Ms. Parker, who testified that she never acted inappropriately toward Mr. Jennings; rather, RCSI permitted him to linger in Ms. Parker's work area, smirking and laughing at her, and distracting Ms. Parker's subordinates by engaging them in conversation. JR71, Ex. 6, Parker Dep. (258:21-260:2); see also JR703, Ex. 30. Mr. Pickett confirmed Ms. Parker's account, testifying that Mr. Jennings intentionally antagonized Ms. Parker and lingered in her work area.[7] JR271, Ex. 8, Pickett Dep. (238:14-241:18). Finally, Ms. Parker's former manager Ms. Wallace, who witnessed the encounters between Mr. Moppins and Ms. Parker, disagreed that Ms. Parker was insubordinate. JR525, Ex. 4, Wallace Dep. (42:1-49:15, 53:19-54:2, 59:14-20, 61:3-16, 62:4-7). Ms. Parker has provided more than enough evidence of causation and pretext to avoid summary judgment.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny RCSI's motion for summary judgment.

Dated:  January 19, 2021                    Respectfully submitted,

                                            By:  */s/ Andrew R. Kopsidas*
                                                 Andrew R. Kopsidas (Bar No. 16057)
                                                 Joseph V. Colaianni (admitted *pro hac vice)*
                                                 Daniel A. Tishman (admitted *pro hac vice*)
                                                 Taylor Caldwell (admitted *pro hac vice*)
                                                 Tracea Rice (admitted *pro hac vice*)
                                                 **FISH & RICHARDSON P.C.**
                                                 1000 Maine Avenue, SW, Suite 1000
                                                 Washington, DC 20024
                                                 Telephone: (202) 783-5070
                                                 Facsimile: (202) 783-2331

---

[6] RCSI also attempts to rely on a statement by another employee, Carlos Carter, describing a hearsay statement by a third employee, Kenton Birgans, who denies any recollection of even making such a statement. JR581, Ex. 19; JR637, Ex. 28, Birgans Dep. (20:11-20).

[7] Walker v. Mod-U-Kraf Homes, LLC, 775 F.3d 202 (4th Cir. 2014) is inapposite. There, the fact that the plaintiff assaulted a coworker was largely undisputed. Id. at 212. Here, Ms. Parker's account that Mr. Jennings was the offending party is supported by multiple witnesses.

Dennis A. Corkery (Bar. No. 19076)
Joanna K. Wasik (Bar. No. 21063)
Tristin Brown (Bar No. 21321)
**WASHINGTON LAWYERS' COMMITTEE
FOR CIVIL RIGHTS AND URBAN AFFAIRS**
700 14th Street NW, Suite 400
Washington, DC 20036
Telephone: (202) 319-1000
Facsimile: (202) 319-1010

*Counsel for Plaintiff Evangeline J. Parker*

36

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 19th day of January, 2021 true and correct copies of the above and foregoing MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT have been filed and served through the Court's ECF system on the following:

Donald J. Walsh
Gregory P. Currey
**WRIGHT, CONSTABLE & SKEEN, LLP**
Attorneys for Defendant
7 St. Paul Street, 18th Floor
Baltimore, Maryland 21202
Telephone: (410) 659-1354
Facsimile: (410) 659-1350
dwalsh@wcslaw.com
gcurrey@wcslaw.com

/s/ Andrew R. Kopsidas
Andrew R. Kopsidas  (Bar No. 16057)
kopsidas@fr.com
**FISH & RICHARDSON P.C.**
1000 Maine Avenue, SW
Suite 1000
Washington, DC 20024
Telephone: (202) 783-5070
Facsimile: (202) 783-2331

37
