**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

EVANGELINE J. PARKER                     \*

    Plaintiff                                \*

v.                                                  \*        Case No. 8:17-CV-01648-TDC

REEMA CONSULTING SERVICES, INC.  \*

    Defendant                               \*

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**DEFENDANT'S MEMORANDUM IN SUPPORT OF**
**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

Donald J. Walsh (Bar # 09384)
Gregory P. Currey (Bar #28583)
Wright, Constable & Skeen, LLP
7 St. Paul Street, 18th Floor
Baltimore, Maryland 21202
Telephone: (410) 659-1320

*Attorneys for Defendant*

{00427833v. (15424.00002)}

**TABLE OF CONTENTS**

ARGUMENT ................................................................................................................ 2

I.   Plaintiff Must Proffer Admissible Evidence ...................................................... 2

II.  Plaintiff Has Not Proffered Admissible Evidence to Establish a Hostile Work Environment Based upon Sex ............................................................................ 4

A.  The Alleged Substance of the Rumor is Not Supported by the Record ........................... 4

B.  Parker Was Not Subject to a Severe and Pervasive Work Environment Due to Sex ...... 5

C.  RCSI Took Prompt, Remedial Action to Address Parker's Complaints ........................ 10

III.  Parker has Failed to Proffer Admissible Evidence to Overcome Summary Judgment on her Retaliation Claim ............................................................... 14

A.  Parker's Beliefs are Not Objectively Reasonable. ........................................... 14

B.  The Decision to Terminate Parker was Not Made by Moppins .................................... 17

C.  Parker was Terminated for Legitimate, Non-Retaliatory Reasons ............................... 19

CONCLUSION .......................................................................................................... 20

CERTIFICATE OF SERVICE ................................................................................... 21

Reema Consulting Services, Inc. ("Defendant" or "RCSI"), has moved for summary judgment on Plaintiff Evangeline J. Parker's ("Plaintiff" or "Parker") claims that she was subjected to sexual harassment and retaliation by RCSI.  Notwithstanding Parker's Opposition, for the reasons set forth below and in RCSI's Memorandum in Support of Motion for Summary Judgment, there remains no genuine issues of material fact and RCSI is entitled to summary judgment on both of Plaintiff's claims as a matter of law.

The entire premise for this suit, as presented by Parker to the District Court and to the Fourth Circuit, is that there was a widely-circulated workplace rumor of Parker's sleeping with a management employee to get promoted.  Despite pushing this story in pleadings and appellate briefs, Parker has been unable to muster any factual support for this allegation.  Rather than defend against Summary Judgment with admissible evidence, Parker relies on conjecture and speculation of wrongdoing where none was shown to actually exist.  Once the admissible facts are reviewed in their proper context, Parker's allegations are demonstratively unsupported.

For example, Parker has produced *no* evidence that any individual has uttered or heard a rumor that she was promoted because she was sleeping with anyone.  Even Parker's own conduct which spread the rumor by aggressively confronting her subordinates and demanding that if they wanted to know "who she was fucking" to just ask her, did not include any notion that the alleged affair was done to obtain promotions.  Most demonstrative of this point, Parker grossly mischaracterized Moppins' participation in and knowledge of her alleged rumor.  Not only did Moppins only question Pickett privately on one occasion about his relationship with Parker because of Pickett's observable health and work changes, Moppins never spoke of this with anyone and never suggested this behavior contributed to Parker's promotions.  In fact, Parker agreed that "Mr. Moppins personally recommended each of her promotions."  *Opposition* at 2,

JR346, 348, 350, 352, Exhibit 9, Price Dep. (60:12-15, 66:1-67:8, 77:13-21, 84:6-12).  The reality

is that a rumor was spread solely by Parker in her confrontation of her coworkers.

Parker's effort to avoid summary judgment also conveniently ignores her conduct

violating her managerial responsibilities as well as management direction.  Parker does not deny

that she was insubordinate in screaming at Moppins nor does Parker deny that she continued to

pursue and harass her coworkers in the warehouse even after she was given clear direction to

stay away from them.  Parker admitted in her deposition that she was insubordinate toward

Moppins during their first meeting. "I did get loud with Mr. Moppins, disrespectfully as far as

getting loud and being combative, yes."  J.R. 60, Exhibit 6, at p. 216, lines 18-20; J.R. 575,

Exhibit 16; J.R. 59, Exhibit 6 at p. 209, lines 15-19.  She also undeniably ignored RCSI's

directive to stay away from Jennings, *see, e.g.* J.R.71, Exhibit 6, at p. 257, line 4 to p. 259, line

11, and confronted him and others about the rumor in the warehouse, even after Jennings was

forced to submit a complaint against Parker.

Once a spotlight is cast on the admissible evidence, no reasonable juror could conclude

that Parker was the victim of harassment or retaliation.

## ARGUMENT

### I.    Plaintiff Must Proffer Admissible Evidence

In opposing summary judgment, Plaintiff has largely parroted the allegations from the

Complaint, without supporting and admissible evidence and has even mischaracterized witness

testimony, including her own. This is insufficient to overcome summary judgment.  Whether

attempting to demonstrate discrimination through direct evidence or the burden-shifting analysis

set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), the plaintiff always bears the

ultimate burden of proving that the employer intentionally discriminated (or retaliated) against

her. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253 (1981); *Hughes v. Bedsole,* 48 F.3d 1376, 1384 (4th Cir.), *cert. denied,* 516 U.S. 870 (1995). In fact, when plaintiff cannot, as a matter of law, establish the necessary elements of her claims, the Court has an affirmative obligation to grant summary judgment and prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993); *Coleman v. McCarthy* Civil Case No. SAG-17-116420, 21 WL 165130 * 3 (D. Md. January 15, 2021).

Importantly, evidence submitted opposing summary judgment must be admissible and based upon personal knowledge. *Williams v. Griffin,* 952 F.2d 820, 823 (4th Cir.1991). Inadmissible evidence, such as hearsay, is insufficient and may not be considered by the Court in ruling on a summary judgment motion. *U.S. Dep't of Hous. & Urban Dev. v. Cost Control Mktg. & Sales Mgmt. of Va., Inc.*, 64 F.3d 920, 926 (4th Cir. 1995). "[A] party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (*citations omitted*). A party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999).

Equally important, "a party's 'self-serving opinion ... cannot, absent objective corroboration, defeat summary judgment.' " *CTB, Inc.,* 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.,* 370 F.3d 423, 433 (4th Cir. 2004)). In other words, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012). As demonstrated by RCSI and the Joint Record, Plaintiff's Opposition is fraught with mischaracterizations of the testimony, speculation and inadmissible hearsay insufficient to

overcome summary judgment.

## II.    Plaintiff Has Not Proffered Admissible Evidence to Establish a Hostile Work Environment Based upon Sex

### A.  The Alleged Substance of the Rumor is Not Supported by the Record

Plaintiff's harassment complaint is solely premised upon her allegation that a rumor circulated that she was having an affair with her supervisor *in order to obtain promotions*.  In the Opposition, she states, "a false rumor was beginning to circulate at RCSI that Ms. Parker was engaged in a sexual relationship with Mr. Pickett *to gain promotions*." Opposition*,* p. 10 (emphasis added). In support of this assertion, Plaintiff cites only to the depositions of Kenton Birgans and Human Resources Manager Cathy Ann Price.  The cited testimony of Mr. Birgans, however, did not support this conclusion.

> Q:  And what was that rumor?
> A:  That her and Mr. DeMarcus were having a relationship outside of work.

J.R. 638, Exhibit 28, Birgans Dep. p. 23 l. 20 to p. 24 l. 14.  This clearly does not support an allegation that the rumor was that she had received her promotions due to a sexual relationship. Parker's citation to Cathy Price's testimony was misleadingly pulled out of context.  In proper context, it was clear that Ms. Price testified regarding her initial receipt of the complaint from Parker. J.R. 369-370, Exhibit 9 at p. 155 l. 8 to p. 155 l. 20.  Ms. Price could not substantiate the rumor as alleged.

When Parker testified in deposition, other than sheer speculation, she also provided no evidence that anyone stated that she received promotions because of an alleged affair.  Not one shred of admissible evidence in this case corroborates Plaintiff's allegation-- and the very foundation of her Complaint-- that the rumor included an assertion that she received promotions due to the alleged affair.  Most importantly, as even Parker points out in her Opposition, every

management employee who provided testimony on the subject confirmed that all of her promotions were merit-based. Opposition, pp. 2-3.

## B. Parker Was Not Subject to a Severe and Pervasive Work Environment Due to Sex

As noted above, Parker's entire premise for her claims are premised upon rumors that she was having an affair to obtain promotions. *Compl.*, ¶12**.**  In her Opposition, Plaintiff cites a long passage from the Fourth Circuit's opinion in this case on RCSI's Motion to Dismiss and points to that as somehow supporting her position that she has demonstrated a hostile work environment. *Opposition,* pp. 17-18.  In that passage, Plaintiff emphasizes the following language from the Court's opinion: "If we are to take the allegations from the complaint and the reasonable inferences therefrom as true, as we must, the harassment related to the rumor was all-consuming from the time the rumor was initiated until the time Parker was fired." *Id.*  Although Plaintiff seems to recognize in her Opposition that these claims only work "if proven," Plaintiff completely disregards the fact that she must now present *admissible evidence* and may not simply rely on the complaint, speculation, inadmissible hearsay or bald assertions.

According to Parker's own deposition testimony, as opposed to the allegations in the Complaint or the gross mischaracterizations in her Opposition, the alleged rumor had no impact on Plaintiff's working conditions between the time that she first learned of it from Pickett in February or March of 2016, and the all-hands meeting that occurred over one month later on April 21, 2016.  J.R. 36, 44, *Id.* at 120, lines 7-9; p. 150, lines 4-14. Parker testified "Nothing occurred until about the time of this meeting when it resurfaced and this was what was discussed in the meeting that I should have been at but I wasn't allowed to be." *Id.*  Notwithstanding her sheer speculation about what happened in the meeting, there is no admissible evidence that any rumors much less the alleged rumor was discussed at the meeting.

At best, between the time that Pickett told her about Moppins' question in private to Pickett, Parker testified that she saw her subordinates Jennings and Ferguson having "little conversations," look at her and stop talking when she came into the room.  J.R. 44, *Id.* at p. 151, lines 10-15.  Parker conceded in deposition that she only suspected that Messrs. Jennings and Ferguson were discussing the alleged rumor, offering only that, "I could tell things were being said but I couldn't prove it, and so you just kind of continue on with your day." J.R. 44, *Id.* at p. 150, lines 9-11.  As this Court is well aware, Plaintiff's own speculation is insufficient to create a genuine dispute of material fact. *Felty*, 818 F.2d at 1128; *Harris*, 499 F. App'x at 294.  After the full benefit of discovery, Parker could not offer any admissible evidence that such conversations about her were taking place beyond her own suspicions and self-serving conclusions.

Importantly, Parker further testified that her perceived "harassment" was limited to Ferguson and Jennings, both who were her subordinates, and she explicitly stated that no other employees engaged in any behavior related to the alleged rumor.  J.R. 44, *Id.* at p. 152, lines 5-7.

> Q:    Okay.  Other than those two employees doing that, did any other employee do anything that made you feel that it was something based on the rumor that they were treating you differently?
> A:    No.  Everyone was - everyone did what they were supposed to do.  You know, I really didn't have to say anything to anyone about not doing their job.  You know, nothing wrong, like I said, with whistling while you work.  Laughter and talk was permitted while they worked as long as it didn't interfere with the work.  So they worked.

J.R. 44-45, *Id.* at 152 line 21 to 153 line 9.

In Parker's complaint to Price on April 25, 2016, and in her Opposition at p. 4, Parker claims, without evidence, that Moppins was responsible for spreading the rumor, however, there is simply no evidence to support this claim.  No person has identified that Moppins ever discussed the rumor with them.  In fact, the unrefuted testimony of both Moppins and Pickett is that Moppins asked Mr. Pickett in private about Pickett's health and declining work

performance. J.R. 162, Exhibit 7 at p. 76, line 11 to p.77, line 13; J.R. 234, Exhibit 8 at p. 89, lines 10-17.  Except for the unsupported speculation of Parker, this discussion was the only time Moppins mentioned anything about a possible relationship between Pickett and Parker.  J.R. 163, Exhibit 7 at p. 78, lines 10-12.  There is no evidence that this or a similar conversation occurred on any other occasion.  In fact, both Moppins and Pickett testified that Moppins was completely unaware of any rumors until after the April 21, 2016 all-hands' meeting when Parker's subordinates complained to Moppins about Parker's abusive actions toward them.  J.R. 184-186, p. 164 l. 10 to p. 170 l. 20; *see also* Wallace Dep at p. 56 l 10-20 ("He's unfamiliar with the rumor…").

Moppins also never questioned Parker (or anyone else) about any relationship with Pickett and never at any time questioned Parker's promotions or insinuated they were the result of any promiscuity or a relationship with Pickett. J.R. 163, 151, Id. at p. 78, lines 10-12; p. 32, line 22 to p. 33, line 2. Parker testified she was unaware of any instances of Moppins discussing or sharing the rumor.

> Q:    And during any of that period of time [March through April 2016], did Mr. Moppins do anything that you know of that spread this rumor?
> A:    That I know of?
> Q:    Yes ma'am.
> A:    Other than the conversation with Pickett?
> Q:    Well, that was what prompted Mr. Pickett—
> A:    Right.
> Q:    --to first tell you, right?
> A:    No.
> Q:    Okay, do you know if Mr. Moppins talked to anybody else about that rumor?
> A:    Do I know?
> Q:    Yes, ma'am.
> A:    No.

J.R. 51, Exhibit 6 at p. 177, lines 6-20.

Given this testimony, Parker's ongoing claims that she was subjected to a hostile work environment due to Moppins' spreading a rumor about her are without merit.  Even Parker agreed Moppins had an obligation to question Pickett.

> Q.      So if Mr. Parker -- I'm sorry, if Mr. Moppins felt that Mr. Pickett was having a relationship with any one of his subordinates – not necessarily you, could have been anybody -- did he have the right to make an inquiry as to whether that was happening or not?
> A Yes. According to Reema's handbook, yes.
> Q And according to your philosophy as well?
> A Yes.

J.R. 67, Exhibit 6, at p. 244, lines 4-12.

In an effort to save her unsupported harassment claim from summary judgment, Parker asserts in her Opposition that Jennings' complaint about her, after she disregarded the directive to leave him alone, was "harassment" and quotes the Fourth Circuit opinion in this case as if it were evidence. Opposition, p. 19. Specifically, Parker quotes: "She…faced a false harassment complaint launched by the male employee who started the rumor and was sanctioned based upon that complaint."). *Id.* The fatal flaw with Plaintiff's tactic is that the Fourth Circuit was merely reciting the *allegations* of the Complaint and there is no actual evidence, other than Plaintiff's speculation and hearsay, that Jennings filed a "false harassment complaint" or that he started the rumor or even perpetuated it.  More importantly, it conflicts with Parker's own testimony that Jennings did not know what she was talking about when she confronted him about the rumor.

> Q:      And what exactly did you say to Donte?
> A:      Good morning.  Like, you know, if there's anything you would like to know about me and what I'm doing in my personal life, feel free to come and ask me. He looked at me real weird, like, what are we talking about, and, I didn't say anything about you….

J.R. 40, Exhibit 6 at 133 at line 1 to line 8.

Parker's effort to mischaracterize her exclusion from the all-hand's meeting also fails to demonstrate facts necessary to avoid summary judgment.  Multiple witnesses testified that it was common for Moppins to exclude latecomers from meetings.  Wallace testified that she recalled seeing Parker (and others) shut out of all-hands meetings by Moppins due to tardiness. J.R. 531-532, p. 69, l 8 to p. 70, l. 7.  Most importantly, at the time of the meeting Moppins was unaware of the rumor.  There is no rational inference that closing the door on Parker was related to a rumor, her gender and for any reason other than her disrespect by being late.

Several employees, both male and female, testified that Moppins' overall management style was demanding, harsh and controlling.  Pickett, when discussing Moppins' managerial style, attributed it to Moppins' years in the military and stated, "I feel like Larry's always been an equal opportunity asshole, if you will.  Yeah, he's equal opportunity in that regard."  J.R. 240, Exhibit 8, at p. 115, lines 1-3.  As Birgans' testimony made clear, Moppins used profane language with all employees, regardless of gender.[1]  In fact, Mr. Birgans testified that he resigned because he could not tolerate Moppins' conduct towards him.  J.R. 641, Exhibit 28, at p. 37, lines 3-11. Wallace also confirmed that Moppins expected employees to do things his way, although she attributed Mr. Moppins' conduct to being strict due to his military background. J.R. 531, Exhibit 11, at p. 69 line 8 to p. 70 line 6, 18-19.

As this Court is aware, to demonstrate illegal harassment, the behavior must be "because of" the employee's gender or sex.  *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998). "An environment which is equally harsh for both men and women or for both young and old does not constitute a hostile work environment under the civil rights statutes." *Brennan v.*

---

[1]     Although Birgans testified that Moppins made sexually offensive comments to male and female employees, Parker offered no evidence that she had ever heard such language.

*Metro. Opera Ass'n,* 192 F.3d 310, 318 (2nd Cir.1999). In other words, an employer which indiscriminately subjects its employees to a hostile work environment commits no violation of Title VII, the ADEA or the PHRA. *Lack v. Wal–Mart Stores, Inc.,* 240 F.3d 255, 261–262 (4th Cir.2001); *Holman v. Indiana*, 211 F.3d 399, 403 (7th Cir.2000); *Henson v. City of Dundee*, 682 F.2d 897, 904, 905 n. 11 (11th Cir.1982).   Thus, Title VII does not cover the "equal opportunity" harasser on the basis that members of both sexes were exposed to identical disadvantageous conditions of employment. *See, e.g., Lack* at 262*, (citing Holman* at 402).

While Parker asserts in her Opposition that the rumor was discussed at the meeting, she offers no admissible evidence to support this allegation.  Notably, although it is accurate that Parker was discussed in the meeting, the admissible evidence is that employees were complaining about her management style at which point Moppins adjourned the all-hands meeting and met with the complaining employees privately.

## C. RCSI Took Prompt, Remedial Action to Address Parker's Complaints

Even if Parker proffered admissible evidence to establish a hostile work environment based on sex, RCSI is entitled to summary judgment because the evidence demonstrates that it took prompt, remedial action after she reported her complaint and that the remedial action actually worked.  The *Faragher-Ellerth* defense has two components, "One of which focuses on the employer's responsibility to prevent or correct workplace harassment, and the other of which focuses on the employee's responsibility to protect herself and others from harassment by using the procedures the employer has in place to promptly report it." *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1292 (11th Cir. 2007).  Even if the process in which an employer arrives at a remedy in the case of alleged sexual harassment is somehow defective, the defense is still available if the remedial result is adequate. *Walton v. Johnson & Johnson*

{00427833v. (15424.00002)}                                     10

*Services, Inc.*, 347 F.3d 1272 at 1288 (11th Cir. 2003)("[W]here the substantive measures taken by the employer are sufficient to address the harassing behavior, complaints about the process under which those measures are adopted ring hollow"). In other words, a reasonable result cures an unreasonable process because Title VII is concerned with preventing discrimination, not with perfecting process. *See Faragher*, 524 U.S. at 805–06 (Title VII's "primary objective, like that of any statute meant to influence primary conduct, is not to provide redress but to avoid harm").

According to Parker's testimony, she heard that her subordinates were complaining about her conduct at the Thursday, April 21, 2016 all-hand's meeting. J.R. 47, Exhibit 6, Parker Dep. at p. 163, lines 11-13.  As a result, the next morning, she met with Moppins, Wallace and Pickett. Parker further testified that during this meeting she admitted that she had confronted Jennings about the rumor and screamed at Moppins, forcing Wallace to taken Parker out and end the meeting.  J.R. 52 Exhibit 6 at p. 181, lines 16-21.   Moppins, Pickett and Wallace consulted with Price and met with Parker again on Monday, April 25, 2016 to notify Price that her conduct towards Moppins at the prior meeting was insubordination for which she could be terminated and would not be tolerated.  Seeking to protect her job in light of poor behavior, Parker left this meeting, she went to Price's office to file a complaint of harassment against Moppins and Jennings.

As soon as Parker came to Price, Price initiated an investigation and sent out an email directing that everyone immediately ceases gossip and rumors. J.R. 337, Exhibit 9, at p. 184 l. 20-25.

> Due to recent events that have brought to HR's attention in regards to workplace gossip and rumors.
>
> I am advising all parties on the email to cease having or entertaining this subject outside of HR. If I have not sat with you to hear your version, please come see independently. I will take information from all side and issue a final resolution. Also, I would like advise individual about our workplace code of conduct and

sexual harassment policies (review policy manual). Gossip is an ugly thing that can cause defamation of ones character and create a hostile work environment. I understand emotions are high and the natural reaction is to defend oneself. But that is not the best approach. If you have something to add to or want to share, please direct all conversation to me, ONLY.

Otherwise, there will be no discussion of this issue outside of HR. Not to employees, co-worker, supervisor, etc. Let's focus and return to the mission work at hand.

J.R. 574, Exhibit 16.  Parker testified that after the email, the rumor stopped. J.R. 64, Exhibit 6 at 229, l. 9 to 12.  Parker also advised the EEOC that at a subsequent meeting "[a]pologies were made to one another and I felt the situation would die itself down."  J.R. 596.

Incredibly, in Parker's Opposition, she turns Ms. Price's successful efforts to stop the alleged rumor on its head and called Price's email a "breach of confidentiality."  Opposition, p. 10.  Parker goes so far as to criticize Price's email for including Moppins as a recipient, even though Parker also alleges that he was a "harasser." Contrary to Parker's assertions in the Opposition, in deposition, she agreed that Price's email was appropriate.

> Q:     Did you have a disagreement with anything that – obviously you read the email that came from Ms. Price, correct? . . .
> A:     Yes. Sorry.
> Q:     Thank you.  Did you have a disagreement with anything she said in her email, the one that's dated April 25th?
> A:     And you asked, did I have an issue with –
> Q:     Right, with anything she said there?
> A:     No.
> Q:     And was it appropriate what she said, in your estimation?
> A:     I would agree it's appropriate.
> Q:     After she sent this, do you know whether there was any further discussion at work about the gossip or rumors?
> A:     No, not to my knowledge.

J.R. 63 - 64, Exhibit 6 at 228, l. 8 to 230, line 12.

Parker also went to great lengths in her Opposition to criticize the investigation of RCSI's Human Resources Manager, Price.  As the admissible evidence establishes, Price immediately and successfully acted to end the rumor and conducted a thorough investigation.  Although

Parker criticism is done without any background in HR or using the benefit of any expert testimony, courts have long held that there is no "exhaustive list" or "particular combination" of remedial measures or steps that an employer need employ in response to a discrimination complaint. *EEOC v. Central Wholesalers, Inc.*, 573 F.3d 167, 174 (4th Cir. 2009). Among other things, the courts have considered the promptness of the employer's investigation when complaints are made, whether offending employees were counseled or disciplined for their actions, and whether the employer's response was actually effective. The cessation of "harassment shows effectiveness, which in turn evidences such reasonable calculation." *Id.; see also Mikels v. City of Durham*, 183 F.3d 323, 330 (4th Cir. 1999) (noting that we "have given great weight to the fact that a particular response was demonstrably adequate to cause cessation of the conduct in question").  There is no debate that the investigation here was prompt, took appropriate action in light of the findings and the harassment immediately ceased.

During her investigation, Price interviewed several witnesses including those identified by Parker.  She learned that there was no widespread rumor in the workplace and that Parker herself had spread the rumor by confronting coworkers.[2]  In addition to conducting an immediate investigation and shutting down the rumor, Price also expedited harassment training for all employees and directed Jennings and Parker to stay away from each other.  J.R. 63, Exhibit 6 at p.225, lines 8-14; Price Dep. P. 225 lines 11-16.  Price also held a meeting on April 27, 2016, with Parker, Moppins, Pickett and Wallace to exchange apologies and to move forward.  J.R. 378, 379, Exhibit 9 at 186, lines 4-25; p. 190, line 18 to 191, line 7.

---

[2]    Parker admitted that she confronted Jennings.  J.R. 60, Exhibit 6 at p. 126, l. 1-5.

RCSI's prompt, remedial action to stop the rumors that were the subject of Parker's complaint defeats any claim she may have had that she was subjected to a hostile work environment claim as a matter of law.

### III. Parker has Failed to Proffer Admissible Evidence to Overcome Summary Judgment on her Retaliation Claim

In Parker's Opposition, she also grossly mischaracterizes the record and ignores her own misconduct in addressing her retaliation claim. Notwithstanding her Complaint, the admissible evidence reflects that Parker's alleged harassment allegations arose only after multiple subordinates complained about her mistreatment of them and, in particular, her allegations against Moppins arose only after she screamed at him in the April 22, 2016 meeting for not supporting her management style against employees she "did not want to babysit."  Parker defends her retaliation claim only by ignoring her misconduct.

Seeking to deflect from her conduct, Parker attempts to cast Moppins as the master of her demise, even though he promoted her, made the choice to not fire her for insubordination when she first screamed at him even though the recommendation for her termination were independently reviewed by Price and RCSI's in-house counsel before the final decision to terminate her was made by RCSI's owner, Rajesh Vora, who had the sole authority to terminate her.

#### A. Parker's Beliefs are Not Objectively Reasonable.

While Parker complained to Price on April 25, 2016 that Moppins was involved in spreading the rumor, there is no evidence that Parker had an objectively reasonable belief that Moppins engaged in harassment.  Parker first learned that Moppins had questioned Pickett about whether he was having an affair with Parker in early February or March, 2016.  As noted above,

that single question to Pickett had nothing to do with Parker's advancement in the company.[3] Importantly, not until more than a month had passed, after she was shut out of the all-hands meeting for which she was admittedly late, after other employees complained about her management style, after she confronted employees in the warehouse and after she yelled at Moppins for not supporting her poor management style did Parker complain to HR about an alleged rumor. This is the same rumor which Parker said stopped after Price sent an email instructing all to stop, which could not be substantiated despite Price's investigation and which, despite discovery, could not be supported beyond Parker's own speculation.

Not only was no adverse action taken as a result of the rumor or her complaints about the alleged rumor, Parker's behaviors and claims were not objectively reasonable to support her claims. As explained in *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001) (per curiam), the Court made clear that where the law and facts make clear that illegal discrimination had not occurred, an employee's alleged contrary belief is unreasonable. In this case, Parker had previously been counseled in September, 2015 for her poor management style. J.R. 5, Exhibit 5. In response to that counseling, Parker remained defiant. "I disagree with the contents of this counseling. With all due respect I don't manage by babysitting." *Id.* This attitude was accentuated as employees raised problems with her in the all-hands meeting later echoed in private meetings that Parker was being very disrespectful of them "harping on she is in charging [sic]" and they were "being treated like a slave and constantly having to hear, 'I'm in charge.'" J.R. 582, Exhibit 20.

---

[3]    As Parker explicitly acknowledged, Moppins approved all of her promotions. *Opposition* at 2, JR346, 348, 350, 352, Exhibit 9, Price Dep. (60:12-15, 66:1-67:8, 77:13-21, 84:6-12).

This same complete lack of respect and awareness came up again when Parker was angrily shouting at Moppins.  As Ms. Wallace relayed the events of the meeting:

> Ms. Parker told Mr. Moppins that she did not feel she had his support and he was choosing to listen to the warehouse employee's [sic] over her. Ms. Parker stated she felt he should be shutting the rumors down when approached by the warehouse workers. Mr. Moppins in turn told Ms. Parker, whether it was true or not, due to his position at RCSI, in all fairness has to listen to everyone within the warehouse, not just the managers.

> Mr. Moppins also informed Ms. Parker that this was not the problem at hand that he had issue with. The current course of action was based on her attitude and demeanor in regards to her team in the warehouse and how she conducted herself.

J.R. 555, Exhibit 14.  In her final termination notice, Parker still refused to accept responsibility denying that one of her subordinate coworkers had witnessed her disrespect another employee.  "I am absolutely sure Mr. Birgans had none of these things to say." J.R. 585, Exhibit 21.  In fact, Mr. Birgans confirmed the events relayed in the termination notice as reported by another supervisor. J.R. 637, 642, 642, Exhibit 28 at p. 18-20, 39, 42-43.

Once viewed through an objective lens, none of the events relayed by Parker reasonably lead to an objective conclusion that RCSI retaliated against her related to the rumor or her reporting the events to HR.  All of the adverse events Parker reported to HR occurred before she even reported the rumor to HR including all of her promotions which Parker agrees were supported by Moppins.  The rumor played no role in Parker showing up late to the all-hands meeting, in the complaints of the employees made in that meeting, in Parker's management style and disrespect for her underlings, or in Parker's decision to scream at Moppins during the meeting so aggressively that she needed to be escorted from the room by Ms. Wallace.  Only after these things occurred did Parker go to HR complaining of the rumor.  Importantly, once Ms. Price sent her email to avoid gossip, according to Parker, the rumor stopped.

Finally, the rumor played no role in the decision of management to terminate Parker for her continued disrespect of employees after Moppins spoke to her, after Ms. Price started her investigation and after she was told to stay away from employees who were not engaging in the rumor at this point.  Although Parker suggests that Moppins took action, the unrefuted evidence is that Ms. Price recommended termination because of Parker's unstoppable and destructive behavior which was agreed upon by Mr. Vora, who Parker has not implicated in any wrongdoing.

Under any reasonable interpretation of the facts, Parker's termination was unrelated to the alleged rumor which she cannot even substantiate occurred and was solely premised on her own behaviors and as objectively viewed by the only person who could terminate her—Mr. Vora.  No objectively reasonable belief could tie the alleged rumor to Parker's termination.

**B.  The Decision to Terminate Parker was Not Made by Moppins**

All testimony, other than Parker's unsupported assertion, is that the decision to terminate her employment was made by Rajesh Vora, RCSI's president, after consultation with Price and in-house counsel, Reema Vora.  In order for Parker's retaliation claims to survive summary judgment on her theory that Moppins terminated her, this Court must find that (1) Moppins retaliated against Plaintiff for making a good-faith claim against him; and (2) RCSI's investigation of her and Jennings' claims of harassment were negligent. *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016). Plaintiff cannot meet those standards.

In order to impose liability on an employer for the discriminatory motivations of a supervisor for an adverse employment decision, Parker must demonstrate that this supervisor was the formal decision-maker, *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 288 (4th Cir. 2004), i.e., the plaintiff "must come forward with sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally

responsible for the decision or [as] the actual decision maker for the employer." *Id.* at 291. A plaintiff employee must establish that the employer acted negligently by relying on the non-decision maker's animus to be successful in an employment discrimination claim. *Vasquez* at 272. Only when an employer adopts an employee's unlawful animus by acting negligently with respect to the information provided by the employee can the employee's motivation be imputed to the employer and used to support a claim for discrimination under the "cat's paw" theory. That did not occur here.

Foremost, Parker has not established that there was any gender motivated malice by Moppins toward Parker. By all accounts, Moppins was a demanding person to work for but the effects of this demeanor were noted by all, regardless of gender. While Moppins was involved in the providing information to HR and the RCSI about Parker's employment, RCSI cannot be held liable under any alleged retaliatory animus that he may have held toward Parker.

In addition, RCSI conducted a full and fair investigation. When Parker first brought information about the rumor to Price, Price immediately began her investigation of Parker's complaint after telling everyone to cease further discussions and comments outside of HR and to let her continue her investigation. "When she brought the complaint to me, I did the investigation immediately. I started it immediately." J.R. 557, Exhibit 15, Investigation notes, J.R. 377, Exhibit 9, at p. 184, lines 23-25. Price interviewed Jennings and Moppins since they were the subject of the complaint, as well as witnesses identified by Parker, including Angela Wallace, Kenton Birgans, Manley Ferguson, and DeMarcus Pickett. J.R. 574, Exhibit 16. Price's investigation also included interviews with individuals present at the all-hands meeting to determine whether Moppins had slammed the door in Parker's face. Not a single witness corroborated Parker's allegations. J.R. 372, 373, Exhibit 9, at p. 165, line 19 to p. 166, line 8.

Ms. Price concluded that the claims of the rumor could not be substantiated and, in fact, Parker was responsible for perpetuating the rumor when she accosted coworkers to "set things straight."

After investigating Parker's complaint, Ms. Price also informed Parker that, since Jennings was no longer under Parker's supervision, she and Jennings were to stay away from each other. Notwithstanding this direction, Parker ignored management's direction and continued to confront employees who had lodged a complaint about her behavior. Jennings understandably then made a complaint which Ms. Price was compelled to investigate. J.R. 551, Exhibit 12. Although Parker self-servingly claims that the allegations were false, it is antithetical to her claims to this Court to insist that Ms. Price should not have investigated Jennings' claims.

Ms. Price concluded, with the concurrence of witnesses, that Parker as a supervisory employee violated clear directives. Ms. Price presented her findings to RCSI's president, Rajesh Vora, who was the sole person with hiring and firing authority at RCSI. J.R. 341, Exhibit 9 at p. 38 line 5-14; J.R. 472, Exhibit 10, p. 36, lines 18-23; J.R. 603, 612, Exhibit 25, p. 20, lines 12-16; p. 57, lines 13-20. After reviewing the situation with Ms. Price, Mr. Vora, made the decision that Parker's insubordination and inability to demonstrate managerial understanding merited her termination. J.R. 587, Exhibit 22. Parker does not deny she ignored the direction given to her.

### C. Parker was Terminated for Legitimate, Non-Retaliatory Reasons

Parker's undeniable conduct in antagonizing Jennings and insubordination was the cause of her termination and defeats her ability to establish a prima facie case of retaliation and constitutes a legitimate, non-retaliatory reason for her termination. This insubordination was the culmination of a long string of reported complaints about Parker's behavior before she first approached HR about her alleged rumor. Insubordination, failure to perform assigned tasks and

follow management instructions are legitimate, non-discriminatory reasons for termination. *Kline v. Certainteed Corp.,* 205 F. Supp. 2d 468, 475 (D. Md. 2002).

Parker only attempts to deflect her behavior in confronting Jennings by claiming that she was required to do so under RSCI's anti-harassment policy. This is disingenuous. She was not terminated for confronting who she perceived as her harassers; her termination was for confronting Jennings *again*, after she was explicitly told to stay away from him. The directive to avoid him was echoed by management long after she reported to Ms. Price about the rumor and it had stopped. There is no allegation that the rumor was the reason she still approached Jennings after he raised his complaints about her behavior to management. Nothing rationally ties her inability to avoid contact with Jennings to the rumors.

The Courts have long found that even an employee's violation of workplace standards in response to a co-worker's harassment is a legitimate, non-discriminatory reason for termination which is not excused by the underlying harassment. *See, e.g., Walker v. Mod-U-Kraf Homes*, 775 F.3d 202 (4th Cir. 2014) cited in RCSI's Summary Judgment Motion. On the record in this case, Parker has simply failed to establish that she had a good faith complaint of discrimination that was the "but for" cause of her termination.

## CONCLUSION

For the reasons set forth above and in RCSI's Memorandum in Support of its Motion for Summary Judgment, summary judgment should be entered in favor of RCSI.

/s/ Donald J. Walsh
Donald J. Walsh (Bar # 09384)
Gregory P. Currey (Bar #28583)
Wright, Constable & Skeen, LLP
7 St. Paul Street, 18th Floor
Baltimore, Maryland 21202
Telephone: (410) 659-1320

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 9th day of February, 2021, a copy of the foregoing Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment, was served on all counsel of record via the Court's electronic filing system and via email.

/s/ *Donald J. Walsh*
Donald J. Walsh

{00427833v. (15424.00002)}                 21