**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| EVANGELINE J. PARKER | * | |
| Plaintiff | * | |
| v. | * | Case No. 8:17-CV-01648-TDC |
| REEMA CONSULTING SERVICES, INC. | * | |
| Defendant | * | |

* * * * * * * * * * * * *

# JOINT RECORD TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, PLAINTIFF'S MEMORANDUM IN OPPOSITION, AND DEFENDANT'S REPLY IN SUPPORT

# Table of Contents

Exhibit 1 - Nov. 26, 2014 Offer Letter ..... 1
Exhibit 2 - Mar. 16, 2015 Offer Letter ..... 2
Exhibit 3 - May 16, 2015 Offer Letter ..... 3
Exhibit 4 - Apr. 7, 2016 Offer Letter
Exhibit 5 - Sept. 1, 2015 Written Warning re "Process for Verifying Inventory" ..... 5
Exhibit 6 - Evangeline Parker ..... 6
Exhibit 7 - Larry Moppins ..... 143
Exhibit 8 - DaMarcus Pickett ..... 211
Exhibit 9 - Cathy Price - Part I ..... 331
Exhibit 9 - Cathy Price - Part II ..... 447
Exhibit 10 - Rajesh Vora ..... 463
Exhibit 11 - Angela Wallace ..... 514
Exhibit 12 - Investigation Report ..... 551
Exhibit 13 - Apr. 27, 2016 Email fr Moppins to Price ..... 553
Exhibit 14 - May 23, 2016 Stmt fr Wallace ..... 555
Exhibit 15 - Cathy Price Notes ..... 557
Exhibit 16 - Investigation Questionnaire ..... 574
Exhibit 17 - Apr. 25, 2016 Email fr Price to Parker re "Recent Events" ..... 579
Exhibit 18 - May 12, 2016 Memorandum for Record re "Interaction between Evangeline Parker and Donte Jennings" ..... 580
Exhibit 19 - May 16, 2016 Stmt fr Carter ..... 581
Exhibit 20 - May 16, 2016 Written Warning re "Poor Management Performance" ..... 582
Exhibit 21 - May 16, 2016 Written Warning re "Failure to Follow Instructions" ..... 585
Exhibit 22 - May 18, 2016 Official Separation of Employment Notice ..... 587
Exhibit 23 - Sexual Harassment Policy Manual ..... 589
Exhibit 24 - Aug. 24, 2016 Charge of Discrimination ..... 596
Exhibit 25 - Reema Vora ..... 598
Exhibit 26 - Jan 22, 2016 Ltr of Employment Verification ..... 629
Exhibit 27 - Feb 15, 2016 Performance Eval ..... 630
Exhibit 28 - Kenton Birgans ..... 632
Exhibit 29 - Employee Handbook ..... 652
Exhibit 30 - May 17, 2016 Ltr fr Parker to Price ..... 703
Exhibit 31 - Apr 27, 2016 Email fr Price to Parker, Pickett, Moppins
Exhibit 32 - May 18, 2016 Email fr Parker to Price
Exhibit 33 - May 13, 2016 Email fr Moppins to Vora, Vora, Price ..... 706

Exhibit
1

REEMA
CONSULTING SERVICES, INC.

8106 Hallmark Place | Gaithersburg, MD 20879
Phone: (443)303-3630 | Fax: (410) 676-2304

November 26, 2014

Evangeline Parker
7259 Wood Hollow Terrace
Ft. Washington, MD 20744

Re: Official Offer Letter

Dear Ms. Parker,

Reema Consulting Services, Inc. (RCSI) is pleased to extend to you an offer of employment as a General Clerk II under contract number SAQMMA-12-C-0015 to support the Department of State, Office of Anti-Terrorism Assistance. You will be assigned to work at 45055 Underwood Lane, Suite 140, Sterling, VA 20166. This position is non-exempt under the Fair Labor Standard Act (FLSA) classification. You will be paid $16.24 per hour plus the health and welfare fringe benefit rate of $4.02 per hour worked under the Service Contract Act (SCA).

Your effective start date is December 1, 2014. Your initial reporting manager will be DaMarcus Pickett.

You will be paid nine (9) days after the end of each pay period (i.e., the 9th and 24th days of the month). As a reminder, within the first three days of employment, law requires that you provide verification of your employment eligibility. Newly hired employees are introductory employees for a period of six (6) months. Your employment with RCSI is at will and is not for a specified period of time and can be terminated by you or RCSI at any time, during or after the introductory period, with or without cause or advance notice.

We look forward to your employment with RCSI. Please acknowledge your acceptance of this position offer on the terms indicated by signing this letter and returning the original letter to me. If you have any questions or concerns, please do not hesitate to contact our HR Manager at (703) 657-0551. Thank you.

Sincerely,
Reema Consulting Services, Inc.

Rajesh S. Vora

Rajesh S. Vora
President

**Acceptance:**

Signature : Evangeline J Parker

Print Name: Evangeline J. Parker

Date Signed: 11-27-14

J.R. 000062

Exhibit 2

REEMA
CONSULTING SERVICES, INC.

8106 Hallmark Place | Gaithersburg, MD 20879
Phone: 443-303-3630 • Fax: 410-676-2304

**LETTER OF OFFER**
CURRENT EMPLOYEE—POSITION CHANGE
Promotion| Demotion| Lateral Transfer

March 16, 2015

Evangeline Parker
7259 Wood Hollow Terrace
Ft. Washington, MD 20744

Re: Official Offer of Promotion and Salary Increase

Dear Ms. Parker,

Reema Consulting Services, Inc. (RCSI) would like offer you an internal promotion to Receiving Supervisor (Material Coordinator) effective March 16, 2015 under contract number SAQMMA12C0015 supporting the Department of State, Office of Anti-Terrorism Assistance. Your proposed wage rate as determined by the Service Contract Act of 1965 (SCA) will be $22.03 per hour plus a $4.02 per hour health and welfare benefit. This position is nonexempt under the Fair Labor Standards Act (FLSA). You will be reporting to Tambeni Daughtry, Receiving Manager.

> **Addendum:** In support of your new role and responsibilities as a supervisor, you will be required to complete professional development courses within six (6) months as recommended by the Executive Program Manager in conjunction with Human Resources. You will be fully reimbursed for the satisfactory completion of all applicable courses. Your performance will then be reevaluated in 6 months for progress.

This offer was based upon the open position and additional duties and responsibilities plus your current performance. Please indicate your acceptance of this promotion with wage increase by signing below. If you have any questions, please do not hesitate to contact me. Thank you

Sincerely,
Reema Consulting Services, Inc.

Rajesh S. Vora

Rajesh S. Vora
President

**Position Change Acceptance**

I, Evangeline Parker, accept this promotion based upon successful contract award and funding to support the position that I am proposed for under contract no. SAQMMA12C0015.

[signature] 3-13-15
Signature Date

Evangeline Parker
Printed Name

Exhibit 3

REEMA
CONSULTING SERVICES, INC.

8106 Hallmark Place | Gaithersburg, MD 20879
Phone: 443-303-3630 • Fax: 410-676-2304

**LETTER OF OFFER**
CURRENT EMPLOYEE—POSITION CHANGE
Promotion| Demotion| Lateral Transfer

May 16, 2015

Evangeline Parker
7259 Wood Hollow Terrace
Ft. Washington, MD 20744
evangeline.parker@rsiata.com

Re: Official Offer of Promotion and Salary Increase

Dear Ms. Parker,

Reema Consulting Services, Inc. (RCSI) would like offer you an internal **promotion to Assistant Manager effective May 16, 2015** under contract number SAQMMA12C0015 supporting the Department of State, Office of Anti-Terrorism Assistance. **Your proposed new salary will be $53,000.00** *(an estimated $25.48 per hour)* **and a company-sponsored benefit(s) package of $ 7,400.00** *(e.g. covering healthcare and/or 401k retirement)* **equaling a Total Compensation package of $60,400.00.** This position is exempt under the Fair Labor Standards Act (FLSA). You will be reporting to Angela Wallace, Transportation/ Inventory Control Manager.

> **Addendum:** In support of your new role and responsibilities as a new member of management, you will be required to complete professional development courses within six (6) months as recommended by the Executive Program Manager in conjunction with Human Resources. You will be fully reimbursed for the satisfactory completion of all applicable courses. Your performance will then be evaluated in 6 months for progress.

This offer was based upon the open position and additional duties and responsibilities plus your current performance. Please indicate your acceptance of this promotion with wage increase by signing below. If you have any questions, please do not hesitate to contact me. Thank you

Sincerely,
Reema Consulting Services, Inc.

Rajesh S. Vora

Rajesh S. Vora
President

**Position Change Acceptance**

I, Evangeline Parker, accept this promotion based upon successful contract award and funding to support the position that I am proposed for under contract no. SAQMMA12C0015.

E Parker
Signature

5-21-15
Date

J.R. 000004

Exhibit 4

33

SS. NO:

RECEIVED
JUN 10 2016
CENTRAL OFFICE ADJUDICATION CENTER

REEMA CONSULTING SERVICES, INC.

8106 Hallmark Place | Gaithersburg, MD 20879
Phone: 443-303-3630 • Fax: 410-676-2304

MEMORANDUM

OFFICIAL NOTIFICATION

DATE: April 7, 2016

FROM: Reema Consulting Services, Inc. (RCSI)
Human Resources Office

TO: Evangeline J. Parker
5829 Fisher Rd. #12
Temple Hills, MD 20748
E.parker@rcsi-ata.com

RE: Reassignment/ Lateral Transfer of Job

Dear Ms. Parker,

As per the discussion your position as a Warehouse Assistant Manager, under contract number SAQMMA12C0015 supporting the Department of State, Anti-Terrorism Assistance program in Sterling, VA has been reassigned effective March 1, 2016, Your position Logistic Manager with the added responsibilities of Warehouse Assistant Manager under the Fair Labor Standards Act (FLSA) will be salaried exempt. Your new salary will be $69,365 annually ($XX.XX per hour). Plus, all elected benefits under Option 2 package will still apply. This will be effective March 1, 2016 *(any applicable retro payment will be applied).*

You are being reassigned to contract SAQMMA12C0015 to support the Department of State, Anti-Terrorism Assistance program in Sterling, Virginia. You will report to Shaun Reeves, Warehouse Operations Manager.

Please indicate your acceptance of this reassignment/ transfer within three (3) business days (April 11, 2016) from date of this offer and returning it to our human resources office. If you have any questions, please do not hesitate to contact me at 703-657-0551. Thank you.

Sincerely,
Reema Consulting Services, Inc.

Rajesh S. Vora

Rajesh S. Vora
President

**POSITION REASSIGNMENT ACCEPTANCE**

I, Evangeline Parker, accept this reassignment/lateral transfer of employment based upon successful contract award and funding to support the position that I am proposed for under contract no SAQMMA12C0015.

Signature ____ Date 4-7-16

Evangeline Parker
Printed Name

Promotion offer letter

2016195070001598

**Exhibit 5**

REEMA CONSULTING SERVICES, INC.

**Written Warning**

Employee: Evangeline Parker

Date: 9/1/2015

Supervisor: Angela Wallace

Location: On-Site

**The purpose of this written warning is to once again bring to your attention ongoing deficiencies in your conduct and/or performance. The intent is to define for you the seriousness of the situation so that you make take immediate corrective action. This written warning will be placed in your personnel file.**

**REASON FOR WARNING**: Ms. Parker, the reason for this counseling statement is for failure to obtain and instruct your team members on the proper process for verifying inventory for ESR's before they are processed.

At the request of Management, we were instructed last week to send the inventory back to our client and have them approve the items before shipping. Even if the ESR came with a PR or inventory list, we are still responsible for resubmitting it back to the client for final approval as items may change, inventory may have decreased or increased, or issues that affect the inventory may have occurred since the submission of the order but before we have a chance to process it.

**CORRECTIVE ACTION REQUIRED:** Failure to follow proper protocol will result in another write-up. If this happens the course of action will be determined by senior management.

**EMPLOYEE'S COMMENTS** I disagree with the contents of this counseling. With all due respect I don't manage by babysitting. Once my crew is instructed & trained on how to do something I have to allow them to do it. I feel this situation was unavoidable, and I'm always having to step in the middle of their work to pick up the slack and can't hold them accountable for their actions or lack of. This is one of the reasons I refuse to sign this counseling. Thank you

**The above has been discussed with me by my supervisor. I understand the contents and acknowledge and understand the corrective action required. I also acknowledge and understand the potential consequences of non-compliance.**

Employee's Signature ______________________ Date: ____________

PM's Signature [signature] Date: 9/1/15

Alt. PM's Signature [signature] Date: 9/1/15

Witness' (Optional) Signature Angela Wallace Date: 9/1/15

**Exhibit 6**

# Transcript of Evangeline J. Parker

**Date:** January 15, 2020
**Case:** Parker -v- Reema Consulting Services, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MARYLAND

- - - - - - - - - - - - - - -x
EVANGELINE J. PARKER :
Plaintiff, :
v. : Civil Action No.
REEMA CONSULTING : 8:17-CV-01648-TDC
SERVICES, INC., :
Defendant. :
- - - - - - - - - - - - - - -x

Deposition of EVANGELINE J. PARKER
Washington, D.C.
Wednesday, January 22, 2020
9:36 a.m.

Job No.: 281347
Pages: 1 - 320
Reported By: Roanna L. Ossege

2

Deposition of EVANGELINE J. PARKER, held at the offices of:

Fish & Richardson, PC
1000 Maine Avenue, Southwest
Suite 1000
Washington, D.C. 20024
202.783.5070

Pursuant to agreement, before Roanna L. Ossege, Stenographic Court Reporter and Notary Public in and for the District of Columbia.

3

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF PARKER:
JOANNA WASIK, ESQUIRE
Washington Lawyers' Committee
700 14th Street, Northwest
Suite 400
Washington, D.C. 20005
202.319.1010

ON BEHALF OF DEFENDANT REEMA CONSULTING SERVICES, INC.:
DONALD WALSH, ESQUIRE
Wright, Constable & Skeen, LLP
7 St. Paul Street
18th Floor
Baltimore, Maryland 21202
410.659.1300

4

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF PLAINTIFF PARKER:
JOSEPH V. COLAIANNI, JR., ESQUIRE
Fish & Richardson, PC
1000 Maine Avenue, Southwest
Suite 1000
Washington, D.C. 20024
202.783.5070

ALSO PRESENT:
Rajesh Vora, Reema Consulting
Tracea Rice, Fish & Richardson
Tristin Brown, Washington Lawyers' Committee

5

CONTENTS

| EXAMINATION BY: | PAGE |
|---|---|
| Mr. Walsh | 8 |
| Ms. Wasik | 310 |
| Mr. Walsh | 313 |

EXHIBITS

(Attached)

| PARKER DEPOSITION EXHIBITS: | | PAGE |
|---|---|---|
| Exhibit 1 | 11/20/14 letter RE: Contingent offer to Parker from Vora | 22 |
| Exhibit 2 | 11/26/14 letter RE: Official offer letter | 22 |
| Exhibit 3 | Employee handbook acknowledgement Of receipt | 22 |
| Exhibit 4 | 3/16/15 letter of offer | 36 |
| Exhibit 5 | 6/11/15 RE: Official notice of new compensation package for exempt employees | 42 |
| Exhibit 6 | 5/16/15 RE: Official offer of promotion and salary increase | 65 |

6

CONTENTS CONTINUED

| PARKER DEPOSITION EXHIBITS: | | PAGE |
|---|---|---|
| Exhibit 7 | 4/7/16 memo RE: Reassignment/ Lateral transfer of job | 65 |
| Exhibit 8 | Reema cellphone procedures memorandum | 69 |
| Exhibit 9 | 3/2/16 Angela Wallace statement Re: Robert Mathews | 87 |
| Exhibit 10 | 9/1/15 written warning to Parker | 96 |
| Exhibit 11 | 2/23/16 written counseling to Parker from Moppins | 109 |
| Exhibit 12 | 2/23/16 written counseling to Parker from Moppins | 110 |
| Exhibit 13 | Parker notes | 205 |
| Exhibit 14 | Harassment investigation form | 211 |
| Exhibit 15 | 4/25/16 email from Cathy Price to Parker | 226 |
| Exhibit 16 | 5/18/16 email thread | 227 |
| Exhibit 17 | 5/16/16 written warning from Moppins to Parker | 244 |
| Exhibit 18 | 5/16/16 written warning from Moppins to Parker | 244 |

7

CONTENTS CONTINUED

| PARKER DEPOSITION EXHIBITS: | | PAGE |
|---|---|---|
| Exhibit 19 | 5/16/16 Carlos Carter statement | 283 |
| Exhibit 20 | 5/18/16 Memo: Unauthorized Deletion Of Government Data on Company Provided Cell Phone by Evangeline Parker Upon Request for Return of Cell Phone | 295 |
| Exhibit 21 | 5/18/16 Official Separation of Employment Notice to Parker | 296 |
| Exhibit 22 | Parker EEOC Intake Questionnaire | 302 |

8

PROCEEDINGS

WHEREUPON,

EVANGELINE J. PARKER

called as a witness, and having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. WALSH:

Q Hi, Ms. Parker. My name is Donald Walsh, I represent RSCI/Reema in this particular case. Have you been deposed before?

**A No, I have not. Good morning.**

Q Good morning. Let me tell you a little bit about what the process is going to be. I'm going to ask you series of questions. I need you to answer to the best of your ability.

If I state something you don't understand, please let me know. I'm going to do my best to make sure that I can re-ask the question in a way so we have a clear understanding and that you're understanding the question I'm asking and I'm making sure you're answering the question that I'm asking. Want to make sure there's no misunderstandings.

If at any point in time you think that you want to take a break, please let me know, by all means.

This is not memory game. If you don't remember something, please tell me you don't remember something so that we can go from there.

And if at any point in time you feel that you need to talk to your counsel, I'm going to ask that you answer the question and then you're free to take a break and you can talk to counsel; is that okay?

**A Okay.**

Q Let's just start with some of the basics. Can you tell me what your current address is?

**A 4162 Suitland Road, Suitland, Maryland.**

Q Okay. And how long have you lived there?

**A Since September of last year.**

Q And prior to that, what was your address?

**A 5829 Brinkley Road.**

Q Where is that located?

**A Temple Hills, Maryland.**

Q How long have you lived there?

**A I was there a year.**

Q And prior to that?

**A 2989 Fisher Road. 2989 Fisher Road, Apartment 12, Temple Hills, Maryland.**

Q And how long were you there?

**A Three years.**

Q Okay. So take us back to the time you were at RSCI?

**A Okay. I was hired on --**

Q No, I'm sorry. Address; does that take us back to the time?

**A Yes.**

Q Okay. Perfect. Now we'll work your history -- your employment history. Who do you currently work for?

**A Monumental Concrete.**

Q And what do you do for Monumental Concrete?

**A I'm a concrete mixer operator.**

Q Okay. And how long have you been there?

**A Seven months.**

Q And where are they located?

**A 3 Dc Village Lane, Southwest, Washington.**

Q And prior to that, where were you working?

**A I was with National Express, contractor for MetroAccess.**

Q And what is that National Express did?

**A Provided paratransit service.**

Q And what type of work did you do for them?

**A I was an operations manager.**

Q What were the scope of your duties as an operations manager?

**A I was responsible for about 170 drivers dispatching routes out for service. I was responsible for about six dispatchers, their scheduling, discipline, and things of that nature.**

Q Okay. And so you were managing the dispatchers as well?

**A Yes.**

Q And how long were you at National Express?

**A I was at National Express for a year, but it was a transfer from another company on the same contract. So it was a transfer type of thing.**

Q All right. So if -- when did you last work at National Express? Work our way backwards.

**A I want to say May of 2018.**

Q And why did you leave in May of 2018?

**A Contract reasons. The contract only required a certain amount of operations managers, assistant managers, GMs. Layoff.**

Q Okay.

**A So, yeah.**

Q Okay. And that was in the May of 2018?

**A Yes, sir, if I'm not mistaken.**

Q If my math works out right, you didn't start working for Monumental Concrete until --

**A June.**

Q June of 2019?

**A '18. No. I'm sorry, what year --**

Q You said seven months.

**A I'm sorry, so --**

Q If it's easier, we can do it this way: Where did you go to work after National Express and how much of a gap was it between you --

**A There was D.C. Public Schools. I'm sorry, OSSE.**

Q And when did you work for the D.C. Public

Schools?
**A After leaving National Express, 2018.**
Q What were you doing at D.C. Public Schools?
**A School bus driver.**
Q And how long were you in that position?
**A From 2018 -- so June 2018 until June of 2019. So one year.**
Q Did you work during the summers as well?
**A Yes.**
Q And why did you leave that position?
**A Financial reasons, better position.**
Q All right. So let's go back to National Express; when did you start National Express?
**A I want to say April of 2017.**
Q Okay. And you said you were transferred from a previous contract?
**A First Transit, yes.**
Q And when did you first work for First Transit?
**A September 19th was my start date, 2016.**
Q And were you doing the same duties for First Transit as you did for National Express?

**A Correct.**
Q You were managing the same number of people?
**A It was a smaller garage, so there were not 170 drivers. May have been about 120, 130.**
Q Still about six dispatchers?
**A Yes.**
Q Okay. Prior to First Transit, where did you work?
**A I was unemployed for about five months.**
Q Okay. And were you collecting unemployment during that period of time?
**A Yes, I was.**
Q And how much were you making when you started at First Transit?
**A $55,000 a year.**
Q Plus benefits?
**A Yes.**
Q And what benefits were you receiving?
**A Medical benefits, 401k, excuse me, everything that comes with medical, I guess, dental, vision.**
Q Vacations?

**A Yes.**
Q Sick time?
**A Absolutely.**
Q And was the $55,000 you were making at First Transit more or less than you were making with Reema?
**A Less.**
Q And how much were you making at Reema when you left?
**A $69,365.**
Q Okay. Did your salary at First Transit increase?
**A No.**
Q When you transferred to National Express, did you make more than you made at First Transit?
**A Yes.**
Q And how much did you make at National Express?
**A $80,000 annual.**
Q Plus the same type of benefits?
**A Yes.**
Q Okay. Let's go back a little bit. Now I've got some of the employment history in there, leading up. What have you done to prepare for your deposition today?

**A I slept well, met with my attorneys.**
Q Okay. Did you review any documents?
**A I have.**
Q Okay. And what documents did you review?
**A I believe I've reviewed my rogs [sic], the interrogatories --**
Q Interrogatories.
**A The initial claim.**
Q Claim to the EEOC?
**A Yes.**
Q Okay. Anything else that you can recall reviewing?
**A Not at this moment, as far as the terms and things for it. But I reviewed some documents. So I just remember the rogs and the initial claim, the EEOC paperwork.**
Q Anything that you can recall other than those documents that you would have reviewed?
**A Just everything that occurred.**

17

Q Okay.
**A You know.**
Q Other than your attorneys, did you speak with anybody else in preparation for the deposition?
**A No.**
Q Okay. Let's go back then to when you first went to work at Reema; how did you find out about the position at Reema?
**A A friend of mine, Tambeni Daltry.**
Q And is it she or he?
**A She.**
Q What did she tell you?
**A She was an employee there. She informed me they were looking for an inventory control clerk.**
Q Had you done that kind of work before?
**A No.**
Q So what did you do to pursue that position?
**A I was already in transportation. Logistics offered the other side of transportation. It was an opportunity to build my résumé and give me a knowledge of the entire logistics business, not just with transportation but with shipping, receiving,**

18

**that type of thing. So I was interested.**
Q And what did you do to chase after that job to try to get that job?
**A I'm not sure I understand.**
Q Did you apply for the job?
**A Yes.**
Q When and how did you apply for the job?
MS. WASIK: Objection.
**A I turned in my résumé. Sent in a copy of my résumé, Ms. Daltry passed it over to HR or the hiring personnel with Reema.**
Q So you gave it to your friend to give to Reema?
**A Correct.**
Q Okay. Did you fill out an application or anything?
**A Yes.**
Q Okay. When did you fill out the application?
**A Ms. Cathy Price reached out to me. I'm not sure when, but she sent to me, via email, an application. Actually, I think we had an**

19

**over-the-phone interview or something like that first.**
Q Break that down. So you sent your résumé in, and you think you heard from Ms. Price either via email or via phone?
**A No. Ms. Price did reach out to me via phone call. We had an initial over-the-phone interview to see if I would move forward with the next step, and I believe I filled out the application and paperwork once I went in for the in-person interview; that was the next step.**
Q Okay. And who was present at the in-person interview?
**A Larry Moppins, Angela Wallace, and Demarcus Pickett.**
Q Where was that?
**A At the Sterling office.**
Q Do you recall how long that interview lasted?
**A No, I don't.**
Q Do you recall any of the questions anybody asked you during that?

20

**A It was, you know, the typical questions on an interview, during an interview. You know, what brings me to Reema; what do you feel, like, I can offer; what are my expectations. You know, things like that. You know, normal. My employment history, you know.**
Q Okay. And you've identified four different people: Ms. Price, Mr. Moppins, Ms. Wallace, and Mr. Pickett; did you know any of those individuals prior to that interview?
**A No.**
Q Had you met any of them prior to the interview?
**A No.**
Q Okay. You obviously talked with Ms. Price on the phone, but that was it?
**A Yes.**
Q And about how long did the interview last?
**A Again, I'm not sure.**
Q Okay. And what's the next step in that hiring process, that you recall?
**A The wait for the phone call to see if I had**

**gotten the position or not.**

Q Were there any additional documentation that you had to fill out? Any other forms or anything like that that you recall submitting?

**A Not until after I got the clear that I received the position.**

Q Okay. And how did you get the clear that you received the position?

**A Ms. Price gave me a phone call to congratulate me on receiving the position and informed me that she would send over some forms and things for me to sign via email.**

Q Okay. Do you have an understanding of what it was that Reema did at that time?

**A Yes.**

Q And what was your understanding of what Reema did?

**A I knew they were -- their client was the ATA with the State Department and that they were the warehouse that housed, shipped, and received inventory of all sorts from all commodities to all the 62 U.S. embassies across the globe for training**

**purposes.**

Q Did they give you a tour when you went there that time, if you remember?

**A I don't remember.**

Q Okay. And do you recall what paperwork Ms. Price sent you that needed to be completed?

**A The offer letter, receipt of the employee handbook, and I'm not sure if I got the tax forms, like the W-2s and things like that via email, I doubt it, but I don't remember so.**

MR. WALSH: Let's mark a few things. I'm going to mark Exhibits 1, 2 and 3.

(Exhibits 1, 2, and 3 were marked for identification and are attached to the transcript.)

Q Ms. Parker, if you could look at what we've marked as Deposition Exhibit No. 1.

**A Okay.**

Q I apologize, this is the best copy I could seem to find for this. Do you recall receiving this letter?

**A Yes.**

Q Okay. And this was that initial offer

letter, I assume, that was the sent, correct?

**A Yes.**

Q That's your signature on the bottom?

**A Yes.**

Q All right. And you sent that back to Ms. Price as well?

**A Correct.**

Q And Exhibit 2, if you turn to that, it's a few days later; and what was this letter? What was you understanding of what this letter was?

**A This is the offer letter explaining who I would report to, how much I'd be making, how often I'd get paid, things of that nature.**

Q Was there anything that was done in between the -- by you in between the two letters? One was November 20th and one was November 26th.

**A Yes. So now that I recall, this was a contingent offer, and it was pretty much based upon the criminal background check and a drug test, drug and alcohol.**

Q And you went and had those done during that period of time?

**A Yes.**

Q Obviously passed?

**A Yes.**

Q And then the letter on the 26th, do you recall whether it was emailed to you or whether it was hand-delivered to you? What do you recall?

MS. WASIK: Objection.

**A I don't recall if it was emailed. I don't recall.**

Q And that's your signature at the bottom of this document?

**A That is my signature.**

Q And if you turn to Exhibit 3, you just mentioned employee handbook acknowledgment receipt; was this one of the documents that was sent along as well, if you remember?

**A Yes, this was emailed to me.**

Q Did you get a copy of the handbook with this receipt as well?

**A No, sir.**

Q Is that your signature on this document?

**A Yes.**

25

Q Did you ever receive a copy of the handbook?
**A I got a copy of the handbook from Mr. Pickett. I'm not sure when. But it wasn't immediately when I was hired, no.**
Q Okay. But in the first paragraph that says: I have received a copy of the Reema Consulting Services Inc. employee handbook, version July 2013. If you hadn't received it at this time, why did you sign this?
**A I was asked to. I was sent the forms. I did get these forms via email. I was asked to sign, and once I got there I would receive.**
Q Okay. But you didn't strike that or indicate that you didn't believe that was accurate?
**A What do you mean?**
Q Well, the first paragraph, it says: I have received a copy of the Reema Consulting Services Inc's employee handbook, version June 2013.
And as I understand your testimony, you had not received a copy of the handbook?
**A Correct.**
Q So is there any particular reason why you

26

still signed this even though you hadn't received that?
**A I had no reason to doubt or not believe that I would receive a copy. And I did receive a copy.**
Q Okay.
**A It was just not right away.**
Q Okay. All right. Did you do anything with your copy of this particular document?
**A I may have placed it somewhere. I'm not sure where, but I don't remember.**
Q After you filled out the paperwork, sent it back to Ms. Parker, do you recall when you first started at Reema?
**A I sent it back to Ms. Price.**
Q I'm sorry, Ms. Price. I apologize.
**A I started -- my official start date was December 1st, 2014; and that was a Monday.**
Q Okay. And who did you report to?
**A Angela Wallace.**
Q What did the -- what did Reema do as orientation on that particular day?
MS. WASIK: Objection.

27

Q Do you recall?
**A I did not have an orientation.**
Q Okay. Other than -- you came that day, is the first person you met Ms. Wallace?
**A No. I'm not sure who the first person I met was. I remember Mr. Pickett being in the office and Ms. Daltry. Being as though Ms. Daltry was already in inventory control, she kind of showed me what I would be doing and what I would be responsible for until Ms. Wallace came in later on that day.**
Q And what was it that you were supposed to be doing?
**A I was responsible for accurate counts of the inventory that came in and went out of the warehouse. I was responsible for ensuring that all items were in a particular shipment before it was shipped out; communicating with the guys over at the State Department about the inventory.**
**We had -- right when I was hired, there was the annual inventory of all items. We had to account for every item in the warehouse so we were kind of in the middle of that so...**

28

Q And who did you report to? You said Ms. Wallace?
**A Yes.**
Q Was there anybody else that you reported to?
**A Demarcus Pickett and Larry Moppins were the two senior managers.**
Q Did you report directly to Mr. Pickett and Mr. Moppins?
**A Ms. Wallace was my immediate supervisor.**
Q Okay.
**A And if for whatever reason there was an issue and I needed to report to her, if she wasn't there, then, Demarcus Pickett would be the next in the chain of command, and then Larry Moppins.**
Q And did you work with any other employees?
**A Yes.**
Q And who was it that you regularly worked with during that time you were working under Ms. Wallace?
**A Yothin Phetsumpho, Jolene Grzechowiak, Arnel Ragunton.**
Q And were they all basically doing the same

task that you were doing?
A **Inventory control, correct.**
Q And how long were you doing those tasks?
A **Until February 2015.**
Q And what happened in February of 2015?
A **I received an email from Mr. Moppins pretty much asking where I saw myself in the company, things of that nature; and so I responded by sending him a copy of my five-year plan. He later that day called me into a meeting that included him and Mr. Pickett and asked how would I feel about the shipping supervisor position.**
Q And how did you respond?
A **I accepted. Are you kidding me?**
Q What was it that the shipping supervisor position did that was different from what you were doing before?
MS. WASIK: Objection.
A **Shipping was responsible for everything that went out of the warehouse. They were responsible for maintaining the order of what was stored in the warehouse; and it's a supervisor position.**

Q Would you be working the same hours?
A **Yes.**
Q Would you be working with the same people?
A **Everyone worked together as a team. But as far as the amount of people that was in shipping versus inventory control, no, there was only two at the time in shipping.**
Q And who were those two?
A **Andrew Lewis, who was current shipping supervisor who was being promoted from that position; and Jason Rogers.**
Q And what did Jason do?
A **Jason did a little bit of everything. He operated the equipment in the warehouse: The pallet jacks, the forklifts. He pretty much was the "go get it" guy. If you needed it, it was stored somewhere in the warehouse, he knew exactly where to go pull it. So he was pretty much that guy.**
Q You said you were the shipping supervisor then. Did it come with a pay increase, if you remember?
A **I don't remember.**

Q Okay. Were you supervising any particular individuals at that point?
A **Just Jason Rogers.**
Q Okay. And what did supervising Jason Rogers involve?
A **I wasn't sure. I was just offered the increase -- well, not the increase, the promotion, the new position and a chance to learn a different aspect of the job, you know.**
Q Did you have to evaluate him in any way?
A **No. I was only in that position for a short time before there was another change.**
Q Do you know if that was part of your duties were to manage or supervise him in some direct way?
A **I would assume so, yes. Because as a supervisor, if you were supervising, that part comes along with it; and I learned that later on once I got in the supervisor position in another department so...**
Q So let me ask it this way: Did you ever supervise what Jason did?
A **Not really. I didn't have to. Jason was very knowledgeable of his job and what it was he needed to do. So, micromanaging? No.**

Q Just so that I understand so we can keep this clear as we go through this later, you said "micromanaging. What is micromanaging?
A **To me, Jason had a long tenure there. He was well-versed on what he needed to do. I didn't feel as a supervisor coming in that I needed to instruct him pretty much to do anything. He kind of trained me on what the operations of the shipping department was so...**
Q So "micromanaging" would include instructing the individuals on what they had to do?
A **Unless there was a change -- if Mr. Moppins or Mr. Pickett pulled us to the side in meeting and said this is a new way of going about doing something, there was no need to adjust or make changes to what he was already doing, because what he was doing was acceptable or what was protocol for the company.**
Q Okay. Is there managing that's different than micromanaging, in your understanding?

**A Managing to me is, like, leading by example. There was nothing that I would ask of my employees that I wouldn't get in there and do myself. So to me, that's like -- that's managing, leading by example.**

**I believe -- like, micromanaging to me is pretty much interrupting something that was already there that's -- you know, "If it ain't broke, don't fix it, type of thing. There was -- like I said, there was no need to make any adjustments to the way Jason was going about his daily operation because it's what we're -- it's what the senior managers already had in place for him to do, things like that. So there was no reason for me to come in and make adjustments at that time.**

Q Understand. Okay. I still want to just stick with that one time period where you were moved to shipping supervisor for a second. We'll move on in a second. I just want a make sure I understand.

**A Okay.**

Q During that period of time, did you have to keep track of his hours for him?

**A No.**

Q Did you approve his time sheet in any way?

**A No.**

Q Was there a time clock that he would check in?

**A No. I forgot how we all punched in.**

Q Do you know if it was -- and only if you remember, was it punching in or was there a time sheet that you would fill out?

**A I don't recall.**

Q Okay. Was there any paperwork that Jason was required to turn in to you on regular basis?

**A No. I wasn't in this department long enough for any of those things to occur.**

Q How long were you in that position when you were a shipping supervisor?

**A Maybe three weeks.**

Q Okay. Probably explains things.

Off the record.

(Brief pause off the record.)

Q And during the time that you were shipping supervisor, who did you report to?

**A At that moment, Demarcus Pickett.**

Q And what was it that Mr. Pickett oversaw with respect to your role as the shipping supervisor?

**A Mr. Pickett was second in command in the warehouse, so he oversaw every aspect of the warehouse: shipping, receiving, inventory control, SPEAR. He was second in command.**

Q And so that we can make it clear for later, you said SPEAR; what is SPEAR?

**A It was another department within the State Department. I'm not sure what the acronyms mean. I want to say Special Program for Embassy Augmentation something. But it was -- the ATA was one thing and SPEAR was another thing even though it was all under the Department of State.**

MS. WASIK: Let's take a very short break.

(Off the record.)

Q Ms. Parker, before we took a quick break there we were just talking about SPEAR. Was that also part of the warehouse or functionality that Reema had in the SPEAR portion of the warehouse, if

you remember?

**A Yes, they were also located in the warehouse.**

Q And were Reema employees in the SPEAR side of the warehouse as well?

**A Yes.**

MR. WALSH: While we're -- let's mark this as the next exhibit.

(Exhibit 4 was marked for identification and is attached to the transcript.)

Q Ms. Parker, I'm showing you what we've marked as Deposition Exhibit No. 4. Take a second and look at that document for me.

MS. WASIK: Are you finished looking at it?

THE WITNESS: Yes.

Q You've seen this document before?

**A Yes.**

Q Is that your signature and printing on the bottom?

**A Yes.**

Q And this says that it dealt with your internal promotion to receiving supervisor?

**A Correct.**
Q Is that the position we were just talking about, shipping supervisor?
**A No.**
Q So this is another in addition to that other position we just talked about?
MS. WASIK: Objection.
**A Yes.**
Q So the shipping -- this is dated March of 2015. I take it the shipping supervisor was before this position?
MS. WASIK: Objection.
**A Correct.**
Q Okay. All right. And so you were in the shipping supervisor position for three months -- or three weeks, and then you were moved into another position. And what position were you moved in to at that point?
**A Receiving supervisor.**
Q And that's the one this letter is addressed to?
**A Correct.**

Q All right. And how was it that you became aware that you were being moved to the receiving supervisor position?
**A There was another meeting.**
Q With who?
**A Larry Moppins and Demarcus Pickett and Tambeni Daltry.**
Q What was Ms. Daltry's position at Reema at that time?
**A She was the receiving manager.**
Q And in this meeting -- do you recall when that meeting was?
**A I do not. It was shortly after being moved into shipping though.**
Q Okay. And these three individuals were present in that meeting with you. What did they tell you in that meeting?
MS. WASIK: Objection.
**A There were going to be some more changes. They wanted -- they wanted to try me -- or move me into receiving. They liked the job that I did with the inventory, the end-of-the-year inventory. They**

**gave me the weapons inventory to consolidate. They assumed it would take me few months, but I completed it within a week; and so I guess that was one of the reasons that they felt I was ready for the next thing.**
Q And what did they tell you the receiving supervisor position involved?
**A Pretty much supporting the manager. When new shipments would come in, we had a certain amount of time to get them -- have them broken down and received in; just maintaining the all around warehouse, the receiving department; the cleanliness of the warehouse; assigning the staff, the crew to different things. So that was pretty much.**
Q Okay. You said it was supporting the manager; who was manager of receiving at that time?
**A Tambeni Daltry.**
Q And did you report to Ms. Daltry during that period of time?
**A Yes.**
Q Did you report to anybody other than Ms. Daltry during that period of time?

**A Demarcus Pickett and Larry Moppins are first and second in command should -- for whatever. If Tambeni was not available, I would have to report directly to Mr. Pickett or Mr. Moppins.**
Q And were you supervising any employees during that period of time?
**A No.**
Q You said you were involved in assigning the crew?
**A Yes.**
Q What did that involve?
**A There were times we would have multiple shipments come in that were as equally important, one wasn't more important than the other. We would have a certain amount of time to get the boxes broken down, all the items removed and tagged and placed in the system, and then packed away for shipping to put away on the shelves or the racks within the warehouse.**
**So depending on our numbers, I had to look at what was more important and determine if we would need an all-hands situation, meaning help from other**

**departments within the warehouse, send the email and get it done.**
Q Okay. Did you have supervisory authority over any of these individuals?
**A As far as discipline or their scheduling or anything like that, no.**
Q And how long were you in that position?
**A I don't remember. But I remember it was a short period as well.**
Q Did it came with an increase in pay?
**A Yes.**
Q How much of an increase, if you recall?
**A If I may look at it?**
Q By all means.
**A So I had not -- I don't remember if I received an increase with shipping. I did not receive a letter, because, like I said, it was only three weeks. But I started at $16.24, and this came -- this position was $22.03 plus the $4 health and welfare benefit so...**
Q Okay. And as I understand it, then, there came a time that you moved again from the receiving

supervisor to another position?
**A Correct.**
Q Okay. And they're out of order in that statement package. Let me show you the next exhibit. Should be the last page if going chronologically.
(Exhibit 5 was marked for identification and is attached to the transcript.)
Q Ms. Parker, showing you what's been marked as Deposition Exhibit No. 5, and ask you to take a second and look at that. Have you seen this particular letter before?
**A Yes. But this is not the offer letter for the next position. This is the official notice of the new compensation packet.**
Q Okay. I have -- we'll get there a second. I understand. Thank you for clarifying.
**A Okay.**
Q Is that your signature and handwriting at the bottom of the page?
**A Yes.**
Q What is your understanding of why you

received this letter?
**A I became an exempt employee, so my pay grade went from hourly to salary.**
Q And do you know why you became an exempt employee?
**A I became a manager versus a supervisor. Or, I guess, a clerk.**
Q Okay. And this is dated June 11th, 2015. Was there a change from the previous position that you had just held in order to create this change in your status, your compensation status?
**A Yes.**
Q Okay. And what was the change?
**A If I remember the meeting with Mr. Moppins, inventory control was out of hand, there were some mistakes, among other things, going on in inventory control. Things weren't being done properly.**
**Mr. Moppins felt receiving was okay enough to move me to where my skills would benefit another department and kind of help get them back up to where those mistakes weren't being made.**
Q Was there a title for the position he was

moving you to?
**A Assistant inventory control manager.**
Q Was there an inventory control manager since you were an assistant at this point?
**A Yes.**
Q Who was the inventory control manager?
**A Angela Wallace.**
Q Okay. And so were you -- at that time, were you going to be reporting to Ms. Wallace?
**A Again, yes.**
Q And do you remember when that was?
**A It was -- I'm not sure when, but it was definitely in between March and June. I didn't receive this until after I had moved into the assistant manager position.**
Q And "this" being Exhibit 5?
**A Exhibit 5, correct.**
Q So it was some time around that switch -- strike that.
Let me ask it this way: Some time around the receipt of the letter in June of 2015, you had already moved into this new position as the

45

assistant inventory control manager?
**A I'm sorry, say that again, please.**
Q Sure. By the time you received this letter in June of 2015, you had already moved into the position of assistant inventory control manager?
**A Correct.**
Q And what were your duties as the assistant inventory control manager?
**A At this time I was directly responsible for two other employees.**
Q And who were they?
**A Harold Dillion and Yothin Phetsumpho.**
Q And what did that mean to be responsible for those two employees?
**A Their overall performance. Scheduling was not necessary. The warehouse -- there were only two shifts. Their discipline.**
Q Okay. Would you review their time in any way?
**A No, I don't recall having to review their time. There were only two shifts. There was either the early shift or the later shift. It was 7:00**

46

**until 3:00, or 10:00 until 6:00, I believe. So, yeah.**
Q And how long were you in this position as the assistant inventory control manager?
**A I don't remember exactly how many months or weeks, but it was a short time before being moved again.**
Q Okay. And just so I understand, did you -- during the period of time that you were in that position, did you have to discipline either of those employees?
**A No, I did not.**
Q Okay. Did you have to redirect them in any way, that you recall?
**A Yes.**
Q And what you would have to do to redirect them, that you recall?
**A Processes would change often. If the State decided that they wanted to go about things in a different way as far as verifying inventory before we ship it, then they would change the process.**
**I guess, Mr. Moppins would get an email; and**

47

**at that point we would have meetings amongst management and then there would be a new process in place, and I would have to communicate that with my team.**
Q Let me just pause you for a second. You said "meetings among management" who did you consider management at that time that was involved in these meetings?
**A Larry, Demarcus, Tambeni, Angela, myself, Jason, Carlos Carter; and sometimes Jolene Grzechowiak, because her position had changed as well.**
Q What was she now doing at this period of time?
**A I don't remember her title, but she was moved from inventory control. I believe she was placed in receiving for a short while before she was put in another position.**
Q Okay. And I just want to understand the people you identified, whether they were managing or supervising people underneath of them. Mr. Moppins, we already know he was at the top; and Mr. Pickett

48

was under him, correct?
**A Correct.**
Q And what about Ms. Daltry, was she supervising any individuals?
**A She was the receiving manager so when I was in receiving there was me, Eric Perkins, Kenton Birgans, Kathleen Davis, Manley Ferguson, Donte Jennings. There was another individual but he was terminated shortly after, and I don't remember his name. So, yeah.**
Q So she was supervising about six or seven people?
**A Correct.**
Q Ms. Wallace, how many people was she supervising during this period?
**A Is this period once I was in -- back in inventory control or --**
Q Yes, when you were -- during the period of time you said you were the assistant inventory control manager. You said that's when these meetings were occurring in management?
**A Meetings occurred from the moment I was**

49

**hired throughout. We always had meetings.**
Q Well, just so we're clear then, what I was focused on, you had mentioned the terms that there were meetings -- management meetings that occurred.
**A Right.**
Q And I asked you who was in the management meetings.
**A Okay.**
Q So that's what I'm just focused on, during that period of the management meetings you were talking about.
**A Okay. Anyone with a management title, and sometimes Jolene Grzechowiak.**
Q Right. So Ms. Wallace -- we're on Ms. Wallace for a second. So I'm just trying to think during that period of time that they were happening, how many people was she supervising?
**A Three.**
Q Put down the initials E.P.; is that right?
**A Eric Perkins.**
Q Eric, okay. And how many people was Eric supervising during that period?

50

**A Eric was not supervising anyone at that time. You asked me about Tambeni Daltry, how many people was she supervising, and he was one of the ones I named under her.**
Q But was he involved in the meetings, the management meetings?
**A Not until he became the receiving supervisor.**
Q You mentioned Jason. Was Jason supervising any individuals during the period of these meetings -- management meetings were taking place?
**A Yes.**
Q And how many people was he supervising?
**A Just one.**
Q Okay. And you said Carlos was also involved in these meetings?
**A Yes.**
Q How many people was he supervising?
**A I believe, two.**
Q And then Jolene?
**A Yes.**
Q How many people, if any, was she

51

supervising?
**A None.**
Q And then you were in these meetings; and you supervised two people?
**A Correct.**
Q Okay. Did you have any management training?
**A Prior to?**
Q Yes, ma'am.
**A Yes.**
Q And what was that management training?
**A The position I was in prior to Reema? I was the operation supervisor for PG County's TheBus transit.**
Q And what management training did you receive during that time?
**A There was a formal training held in Las Vegas. It was a supervisor training academy.**
Q Do you know the name of entity that put that on?
**A I do not. I don't remember.**
Q Do you recall, roughly, the time period that you took that?

52

**A I want to say it was January of 2014; and it was a week-long conference.**
Q In Vegas?
**A Yes.**
Q Other than that management training that you went to, was there any other management training that you had in the past?
**A There were classes and things that Reema required us to have, certain trainings. Not so much management trainings, but courses that allowed us to do our job as far as shipping, the shipping of certain sensitive items, things like that.**
**With Veolia, I took courses. There were online courses required for us to take when it came to supervising. It was a "true colors" type of course where you would have to know the different personalities of the people that you would be supervising and how to approach different types of personalities and things like that. So, yes.**
Q And that was at Veolia?
**A Veolia, correct. And they are now Transdev.**
Q And was that -- that was before Reema?

A Correct.
Q And do you recall when you took those classes?
A I became a supervisor with them September 2013. So it was throughout the year that I was there.
Q Okay. All right. So let me jump back forward again. Apologize for that. Go back to the time when you said that you had these annual meetings; you were the assistant inventory control manager?
A Correct.
Q How long were you in that position?
A Again, I'm not sure.
Q Approximately, how long?
A Maybe a month and a half.
Q Okay.
A No more than two.
Q Okay. Did you have to discipline any of the employees that you were supervising during that period of time?
A Nothing more than a verbal warning.

Q Do you recall what those verbal warnings were about?
A Just before they would send out an email if they weren't sure of the information that they were sending out to our client to send it to me or Angela and let us review it. We wanted to make sure the information we were sending our client was accurate. Just small mistakes, like maybe pulling an entire shipment of items where the State only required maybe the ballistics portion of the shipment. You know, things like that.
Q And how is it that you became aware of the fact there had been a problem with their performance?
A There wasn't really a problem with their performance. One individual would have preferred to not be in inventory control; however, due to the changes that were constantly happening in the warehouse, he had to be there. And so I just don't think he put his best foot forward when it came to doing his job. So there was just one -- there was one mistake that was made where I really had to say

something to him. So other than that --
Q And who was that individual?
A Harold Dillion.
Q Okay. After you were in the position as assistant inventory control manager, what's the next position you had at Reema?
A Mr. Moppins came to me -- and this was just a meeting between me, him, and Mr. Pickett. At the time, receiving was messing up, and I wasn't included in on those meetings between senior management and receiving. But by the time he pulled me to the side, he told me he wanted me to report directly to him as compliance quality control.
Q Do you recall approximately when that was?
A It was shortly after starting the assistant manager position in inventory control.
Q So some time in the summer of 2015?
A Correct.
Q And what were you to do as quality control?
A I was responsible for monitoring the reports of the other departments before they turned them in to Mr. Moppins. There were daily reports that

needed to be updated. I was responsible for making sure the shipments were received in -- in a certain amount of time. Just pretty much responsible for checking everyone's work --
Q Okay.
A -- before the day was over.
Q Did you have anybody that was reporting to you during that period of time?
A No one was reporting to me other than emailing me a copy of their daily reports.
Q Okay. And you were reporting directly to Mr. Moppins during that period of time?
A Correct.
Q Were you no longer reporting to Ms. Wallace?
A Correct.
Q Were you reporting to Mr. Pickett as well?
A No.
Q And how long -- strike that.
Did that change in position also come with a change in pay?
A No, it did not.
Q Okay. And how long were you in that

57

position?
A For a little while. Again, I'm not sure. Things were constantly changing.
Q All right. Are we talking months, a year, if you remember?
A Maybe a month, two months. No more than a couple of months.
Q And what's the next position you took after that?
A Compliance.
Q Different than the QC, the quality control?
A Correct. I was still doing the quality control, but got a new title added on to it.
Q Okay. What was the title, if you remember?
A I don't remember, but I was the "compliance officer, slash, slash."
Q Okay. And were you still reporting to Mr. Moppins directly?
A Yes.
Q Okay.
A Mr. Pickett, as well, during this time.
Q Okay. And no longer reporting to Ms.

58

Wallace?
A Correct.
Q Did you have anybody that you were supervising?
A No.
Q And was there any increase or change in pay?
A No.
Q And how long were you in that position?
A Pretty much until the end of my employment there.
Q And how did that position change from what you were doing before as quality control?
A There was a situation that occurred with one of our shipments that could have dinged us and got us in a lot of trouble, and that was the moment we found out that there was some things that we needed to change about our service and classifications on paperwork before we shipped it off.
So it was required for us to have a staff or someone on site that was certified to classify certain items before they were shipped, and this information had to be present on our packing slips.

59

And so there was a training held with -- through the Department of Commerce that Mr. Moppins, Ms. Wallace, Mr. Pickett, myself, and Reema attended.
Q And do you recall where that was?
A Virginia Beach.
Q Okay. And then any of you could provide certification that were necessary on this documentation?
MS. WASIK: Objection.
Q Do you know if that was the intent of that class?
A Mr. Moppins required myself and Mr. Pickett to attend this training because we would be directly responsible for making sure any items that went out of the warehouse, if they were Department of Commerce or ECCN sensitive or Department of State sensitive, it required a certain cert or a classification number to allow Customs to know exactly what was in those shipments; and so he asked for me to step into that position and told me that I would need to attend this training in order for there to be something in place making sure we cross

60

our T's and dot our I's.
Q And you said there were one, two, three, four, five of you that went to this Virginia Beach training?
A Correct.
Q Do you recall when that was?
A I do not.
Q And how long -- do you recall how long that was?
A It was a one-day thing. Yeah, it was just one day.
Q Okay.
A So we left. We stayed in Virginia Beach that night, went to the training that next day, and came back the next day.
Q And do you recall when that was?
A I do not. I don't remember. It was toward the end of the year 2015.
Q Okay. Where did you stay when you were there?
A In a hotel that was provided by the company.
Q And did the company -- did you-all travel to

61

Virginia Beach together?
**A Yes, the four of us. Reema traveled her own way.**
Q Who drove?
**A Mr. Moppins.**
Q Okay. And you stayed in the hotel. Did you guys get together the night before?
**A No.**
Q And obviously you drove back from Virginia Beach together?
**A Yes.**
Q And you said that you stayed in that particular position, you think, until the time that you left Reema?
**A I was still responsible for compliance.**
Q During that period of time between when you became in charge as the compliance officer slash whatever, until the time that you left, did your duties change during that period of time?
**A Yes.**
Q And how did your duties change?
**A Mr. Moppins pulled me into another meeting**

62

**to inform me that I would be moved to the warehouse as the assistant warehouse operations manager.**
Q This was during the same time you were compliance officer?
**A Correct.**
Q And what would you do as the assistant warehouse operator?
MS. WASIK: Objection.
**A As the assistant operations warehouse manager, I was responsible for not just receiving but shipping as well. So at this point shipping and receiving reported to myself and Shaun Reeves.**
Q Now when you say shipping and receiving reported to you and Mr. Reeves, what do you mean they reported to you?
**A Shaun was my immediate supervisor. He was the warehouse manager -- warehouse operations manager. So every aspect of the warehouse, Shaun was -- he was -- he was oversee for that. And I was his assistant.**
Q Okay. And where does Mr. Pickett and Mr. Moppins come into the hierarchy that you just talked

63

about?
**A They are still first and second in command, the overall.**
Q So you're reporting to Mr. Reeves, Mr. Reeves reports up to Mr. Pickett and then Mr. Moppins ultimately?
**A Correct.**
Q And when you said these were -- shipping and receiving reported to you, they were individuals reporting to you or the information would flow through you and Mr. Reeves?
MS. WASIK: Objection.
**A If Mr. Reeves was not available, of course, they would report directly to me with any issues or concerns going on in the warehouse; and also information that concerned the warehouse would come to me and Mr. Reeves.**
Q Okay.
**A Any changes or anything going on, shipments moving in and out of the warehouse.**
Q The operations side of things?
**A Pretty much.**

64

Q Okay. Well, what about the individuals, were the individuals reporting directly to you and Mr. Reeves?
**A Yes.**
Q Was that from an operational standpoint or from a discipline performance standpoint?
MS. WASIK: Objection.
**A From all of it.**
Q Okay.
**A Yeah.**
Q So you had the ability to move people from one project to another project during that period of time?
**A Correct.**
Q And you had the ability to discipline individuals who were not doing their job during that period of time?
**A Correct.**
Q Let's start with, when did that happen, if you recall?
**A I do not recall. I actually moved into the position before signing the offer letter so...**

Q Okay.
**A Yeah.**
MS. WASIK: And it's been a little over an hour. We'd like to take a break soon.
MR. WALSH: Sure. Let's just get us a little closer. Almost -- we'll do this for another 10, 15 minutes here.
(Exhibits 6 and 7 were marked for identification and are attached to the transcript.)
Q Ms. Parker, Exhibit 6 is dated May 16, 2015?
**A Correct.**
Q I haven't given you 7 yet. So we'll get to that. So the Exhibit 6, we'll start with the easy stuff.
**A Okay.**
Q Okay. And so Exhibit 6 was the letter that indicated you were being moved to assistant manager in May of 2015, correct?
**A Yes.**
Q And that's your signature at the bottom of that?
**A Yes.**

Q We talked about that already.
**A Yes.**
Q What I want to show you is what has been marked as Deposition Exhibit No. 7, which is a letter dated April 7, 2016.
**A Okay.**
Q Let's start with the easy stuff. So you're familiar with that letter?
**A Yes.**
Q And that's your signature and handwriting at the bottom of the letter?
**A Yes.**
Q This is dated April 7th, 2016. It talks about -- it says your position as warehouse assistant manager. So were you already the warehouse assistant manager as of April of 2016?
**A No. I want to say the day -- I'm not sure when. But we talked about it before, so I was already aware that this was taking place.**
Q Okay. But you were still in the compliance position up until right before this letter came in?
**A Correct.**

Q So somewhere around April 7th, 2016, within a day or a couple days of that date, tell me if that's fair -- you were advised that you were going to be moving into the warehouse assistant manager position?
**A Correct.**
Q It also says your position was logistic manager?
**A Is that what I --**
Q Yeah, like the third line down.
**A Okay. So that's what my official title was, "compliance, slash, slash." That's what it was.**
Q Just want to make sure. Okay.
So while you were compliance, you were logistics manager?
**A Correct.**
Q And then you moved into the position of warehouse assistant manager in April of 2016?
**A Correct.**
Q Okay. And that's the position in which you reported to Mr. Reeves?
**A Yes.**

Q And that was the last position you that held at Reema?
**A Correct.**
MR. WALSH: Let me take a break here.
(Off the record.)
BY MR. WALSH:
Q Ms. Parker, I just want to go back over a few things real quick, then we'll start in with some other exhibits. You had mentioned that you had a five-year plan that you provided to Mr. Moppins?
**A Correct.**
Q Do you still have that five-year plan?
**A It has changed because I'm no longer with Reema.**
Q Do you have a copy of the five-year plan that you provided to Mr. Moppins?
**A No. I sent it through email.**
Q Okay.
**A Through the company's email.**
Q Was it through the company's email address?
**A Correct.**
Q Was it from your company email address?

A Yes.
Q Okay. Thank you. One of the things that -- when you started at Reema, were you given a cellphone?
A No.
(Exhibit 8 was marked for identification and is attached to the transcript.)
Q Okay. I'm going to show you what we'll mark as Deposition Exhibit No. 8, give you a second to look at that document.
During the period of time that you were at Reema, were you ever given a cellphone?
A Yes.
Q Okay. When was that, just for frame of reference? Exhibit No. 8, the first page of that identifies July 8th, 2015.
A Yes. I was trying to think of the position that I was in when I was first issued the cellphone. I believe I was in inventory control. So, yeah, I was -- it wasn't until I got into -- back into inventory control as a manager when I was issued the cellphone.

Q Okay. And what was cellphone for, as you understood, at that time?
A The cellphone enabled me to respond to emails and alerts at any given moment whether I was at my desk -- or there were times we would get emails that needed a response and we may have been on lunch outside of the office or something, and they wanted to make sure that I could respond if there was information that I may have had that no one else had; and they wanted to make sure I could communicate at all times.
Q Was the cellphone also used for taking photos of different inventory?
A Yes.
Q When was the cellphone to be used to take pictures of inventory?
A Any time -- there were times when one of the State guys would request a photo, or maybe we had to go in the back and pull it so they could see it, and then we would have to send it through our email to email it to them or anything like that. There were a lot of items they didn't know what they looked

like.
All items required a photo to go in the system, but there were some items that were missed that were placed on the racks without a photo. So, you know.
Q So it would be part of the regular operating procedure, at least, to use the phone to take photos of inventory items?
A Correct.
Q Do you know what the use of those photos would be?
A No. The equipment belonged to the State Department, so whatever they needed the photo for, it was theirs so...
Q This particular document that we've identified as Exhibit No. 8, was this signed by you when Reema first gave you the phone?
A Yes.
Q That's your signature on there in the middle of the page?
A Yes.
Q And then that's your signature that you

returned the phone in October of 2015?
A Yes.
Q And do you recall why you returned the phone in October of 2015?
MS. WASIK: Objection.
A I believe I was issued a newer cellphone, if I recall. The original phone that I was given was someone else's. When the positions were moved around, I needed a cellphone. So I believe Mr. Moppins had that individual -- I believe, Yothin, to clear it and then give it to me. But I believe I had a newer cellphone later on, and I had to return the old one, if I'm not mistaken.
Q Okay. And did you use that phone for personal purposes? We'll start with the first phone.
A No. That was a work phone.
Q Okay. Did you carry on any personal conversations using that phone?
A No. I may have talked about lunch with a coworker, if that's considered personal. But, no, that was a work phone.

73

Q Okay. When you got the new phone at some time later than October 15 or somewhere around there -- I just want to understand. So the second page of Exhibit 8 identifies that you got another phone, looks like, April of 2016?
**A Correct.**
Q So was there a third phone that you got in April of 2016 or do you think that's when -- back up for a second. There's a gap in these documents, and I'm trying to understand whether you had three phones or two phones?
**A No, I never had three phones.**
Q But certainly -- did you get a new phone in April of 2016, that you recall?
**A Yes.**
Q And why did you get a new phone in April of 2016?
**A I'm not sure why Mr. Moppins assigned me a new phone, but I got a newer phone.**
Q And through out the time that you were there, were you always using the phone for the same purposes?

74

MS. WASIK: Objection.
**A Correct.**
Q Did you ever use the phone for personal purposes other than the lunch meeting that you mentioned?
**A No.**
Q Didn't text any friends?
**A I text the people that I work with that just so happened to be friends so...**
Q And who was -- other than, I believe, you mentioned Ms. Daltry. Other than Ms. Daltry, who was -- did you consider a friend at Reema that you -- that you consider friends?
**A Maddie Littleton and Romaine Thomson.**
Q Okay. And where did Ms. Littleton work?
**A Ms. Littleton was inventory control. And also Rachelle Lee.**
Q You said Ms. Littleton was in inventory control?
**A Correct.**
Q Was she there the entire time you were employed there?

75

**A No.**
Q Do you recall when she was there while you were employed there?
**A Ms. Littleton came toward the end of my employment there. I'm not sure exactly when. She had only been there, I want to say, maybe two months before I left.**
Q And were you responsible for getting her a job there?
**A I sat in on her interview, yes.**
Q Did you tell her about Reema?
**A No.**
Q So you became friends after she started?
**A No.**
Q You were friends before that?
**A Yes.**
Q So how is it -- do you know how she became aware of Reema or a position at Reema?
**A Tambeni Daltry is her cousin.**
Q And did you know she was coming to be interviewed?
**A Yes.**

76

Q And who else sat in on her interview with you?
**A Moppins, Pickett, and Wallace.**
Q Okay. And you said she was in inventory control?
**A Correct.**
Q Okay. The next person you identified was Ms. Romaine -- is it Thomson or Thomas?
**A Thomson.**
Q Ms. Thomson. And how did you know Ms. Thomson?
**A She's the sister of Tambeni Daltry.**
Q And how long had you known Ms. Thomson before you came to work at Reema?
**A Four, maybe five years.**
Q Okay. And was Ms. Thomson working at Reema when you were there?
**A Yes.**
Q Okay. Was she -- did she leave Reema while -- during the time you were there?
**A Yes.**
Q And do you recall when that was?

A I do not.

Q Okay. And was Ms. Thomson also dating Mr. Jennings?

MS. WASIK: Objection.

A I don't know what the nature of their relationship was. They were close.

Q Okay. And that was outside of the office?

A Yes.

Q The other person you mentioned was Ms. Lee?

A Yes.

Q How long did you know Ms. Lee before you went to work for Reema?

A Maybe 15-plus years.

Q And what position did Ms. Lee have at Reema?

A She initially came in as receiving -- a receiving clerk, but then she was moved to the SPEAR division as an administrative person. I don't remember what her title was but...

Q Did she leave during the period you were there?

A No.

Q And was she there when you started at Reema?

A No.

Q So she came after you?

A Yes.

Q Did you interview her?

A No.

Q Okay. Do you know how long she was at Reema during the period -- did she overlap with you?

A Are you asking me how long she was there after I left or during?

Q While she just overlapped with you?

A Maybe a couple of months, two to three months.

Q All right. And did you supervise any of those three individuals?

A I supervised Rachelle Lee.

Q And when did you supervise her?

A During the time I was the receiving -- I'm sorry, the warehouse manager -- assistant warehouse manager. When she came in, she came in as receiving, which fell under me. So whenever she got there until I left. Actually, no. She was moved before I left. So she was only under me a short

while, a few weeks before she was moved.

Q Okay. Did you know Mr. Jennings prior to coming to work at Reema?

A No.

Q Had you ever spoken with Mr. Jennings outside of work at Reema?

A No.

Q How about Mr. Pickett, did you know Mr. Pickett prior to coming to work for Reema?

A No.

Q Did you ever speak to Mr. Pickett outside of you time at Reema?

A Yes.

Q And when was that?

A A couple of times for kickball games.

Q Anything else, that you can recall?

A We all went out after work as a group to shoot pool.

Q Now when you say "we all," who is "we all"?

A Mr. Pickett, Ms. Thomson, Ms. Daltry, Mr. Jennings, Ms. Grzechowiak, Mr. Dillion. A lot of people, as a group after work just to let our hair down.

Q Other than the kickball and the pool, were there any other occasions you recall speaking to Mr. Pickett outside of work?

A Yes, there were conversations outside of work but about work. There were times we had to take work home on the weekend to get something done so...

Q So other than talking about work on some weekends, were there any other occasions you recall speaking with Mr. Pickett outside of the office?

A No.

Q Okay. How many times do you think you were speaking with him about playing kickball outside of work?

A Ms. Daltry, Ms. Littleton, and Ms. Thomson and I, we all played kickball on the same team. Mr. Pickett just wanted to come and support our games. So it wasn't just one occasion. He actually came through to see one of our games, I believe, so...

Q Do you recall when that was?

A I don't know. I don't. We play two

81

**different leagues. So different times of the year. So I don't recall.**
Q Do you recall whether it was fall or spring?
**A It was in the summer some time.**
Q Summer. Was there only one occasion he came?
**A Yes.**
Q Did you talk to him at that time?
**A Sure.**
Q Was he talking about work or was he talking about personal?
**A Talking about kickball.**
Q Did he play?
**A No.**
Q Okay. All right. You also mentioned there were times that you went to play pool outside of the office?
**A Just one.**
Q Just one time. Okay.
Other than those occasions, were there any other times you spoke to Mr. Pickett outside of the office?

82

**A There was the phone call that I got from Mr. Pickett about the conversation of the rumor.**
Q Okay. When was that?
**A Sometime in March of 2016.**
Q Okay. And Mr. Pickett called you; were you at home at the time?
**A No. I was en route home. I had actually left the office maybe 10, 15 -- I was already about 10 or 15 minutes into my commute going home.**
Q All right. Other than that occasion, are there any other occasions that you talked to Mr. Pickett outside of the office, that you can recall?
**A Not that I can recall.**
Q Would you have ever texted Mr. Pickett personally?
**A I have texted Mr. Pickett. Not from my personal phone though. From the work-related phone, or text.**
Q Was it personal conversations or was it conversations only about work?
**A Majority about work. There may have been a laughing emoji or something. I don't know if that's**

83

**considered personal, but if something was funny and there was no communication and we're sitting in a meeting, there may be a ha-ha emoji or something like that.**
Q Other than that, any personal texts that you can recall?
**A No.**
Q Did you ever go to Mr. Pickett's office and lock the door?
**A No.**
Q Do you know if Mr. Pickett ever locked the door while you were in there?
**A No.**
Q Did you have occasions to go to Mr. Pickett's office?
**A Yes.**
Q How often were you in Mr. Pickett's office?
**A For compliance, Mr. Pickett and I had to work together a lot. We were the two responsible for making sure certs were taken care of, classifications we're done.**
**We were also taking classes provided to us**

84

**by Reema for our job.**
**So Mr. Pickett's office was the office to be in. Like if we needed help or wanted something done, we were all in Mr. Pickett's office. So I was in Mr. Pickett's office a lot.**
Q Did he share an office with anybody?
**A No.**
Q Do you --
**A When Mr. Vora's son came in to help with compliance, he shared Mr. Pickett's office; but that was a short period of time.**
Q Was there a door in Mr. Pickett's office?
**A Yes.**
Q Did the door close automatically, or do you know if that was a door that would close when you would go into Mr. Pickett's office?
**A The door would only close if someone closed it.**
Q Do you recall ever being in there and closing the door?
**A Not alone, no.**
Q Do you recall if Mr. Pickett ever closed the

door when you were in there?
**A No.**
Q During the course that you were employed -- we talked about this earlier this morning. We were talking about whether you ever had any occasion to discipline any employees and you mentioned that there was one occasion that you had a verbal warning with one individual. Were there any other occasions in which you disciplined any employees?
**A No.**
Q Okay.
**A Actually, yes. I'm sorry.**
Q And who was that, and when was that?
**A The guy whose name I couldn't remember. There was an incident where he was caught on camera, a package was given to him to take and receive in and we couldn't find the item, and once we viewed the camera we saw him kind of toss it up into just a random tri-wall that we would store on one of the shelves. And so he needed to be written up. And, of course, I was his immediate supervisor so I had to do it. And he was terminated that day. But Mr.**

**Moppins came in because he got irate and so I had to call Mr. Moppins in on that meeting. So Mr. Moppins termed him.**
**And then there was Manley Ferguson. I had to write Manley Ferguson up. I don't remember why, but I just remember being advised by Mr. Moppins to write Mr. Ferguson up.**
Q But you don't remember what Mr. Ferguson did?
**A I'm not sure if it was him being late to work or failure to follow instructions, but Mr. Ferguson was written up, and I was the person who wrote him up.**
Q Okay. Do you recall when the timing of that was?
**A I don't.**
Q And you said Mr. Moppins told you to?
**A Well, Mr. Moppins instructed me. I actually went to him for advice on how to handle that situation.**
Q Okay. And did he tell you to write him up or he said, I suggest you write him up? I'm just

trying to -- you said you went to him to talk to him about the situation.
**A Yeah. Mr. Moppins advised me the best way to handle Manley was a paper trail, pretty much.**
Q Okay. And how is it that you know that Mr. Ferguson was late for work or didn't follow some instruction?
**A Mr. Ferguson and I weren't on the same shifts. Was it 6:00 to 3:00 and 10:00 to 6:00? We were the early shift, and so I would already be there and well into the work and then he would come in so...**
Q And was the other gentlemen, Mr. Mathews?
**A Possibly.**
(Exhibit 9 was marked for identification and is attached to the transcript.)
Q Ms. Parker, if you could just read Exhibit 9 for me for a second. Okay. In seeing this particular document can you say that refreshes your recollection as to whether this was the individual you disciplined?
**A Yes.**

Q So it was Mr. Mathews?
**A Robert Mathews.**
Q And this shows it happened on March 1st, 2016; does that sound about right to you in terms of the time frame?
**A Yes.**
Q And what was your position at that time, if you remember?
**A I was the assistant warehouse manager.**
Q Did you report to Ms. Wallace at that time, or Mr. Reeves?
**A Mr. Reeves.**
Q Okay. Do you know whether Ms. Wallace was present during this meeting that you had with Mr. Mathews?
**A Yes.**
Q Was there anybody other than you Mr. Mathews and Ms. Wallace in that meeting?
**A Not right at first.**
Q So tell me what happened in that meeting?
**A Ms. Wallace was asked to come in. Usually when discipline is issued, you need a witness**

**present. Ms. Wallace, peeked into her office to see if she was busy and if she had a moment she could sit in on discipline with me. She agreed.**
**She came in, and I began to speak to Mr. Mathews about the incident. He didn't want to hear it. He knew he was being written up. No one likes discipline. So he started getting loud and raising his voice and being disrespectful. So I went to get Mr. Moppins, and Mr. Moppins came in and sat in on the remainder of the meeting. But Mr. Mathews was pretty upset this day, so it turned into a back and forth match between him and Mr. Moppins.**
Q So let me back you up for a second. Do you remember why Mr. Mathews was being written up?
**A Like I said, we had him on camera tossing an item. He was supposed to have taken it from the SPEAR department down to the ATA receiving, receive it in, take a photo of it and find the right course that the item belonged to, have the tri-wall pulled and placed it there. But I guess he just didn't feel like doing it, so kind of had him walking down the aisles of the warehouse and kind of jump hooked**

**it over into just an open box and he kept going.**
Q How is it that you became the person that had to write him up?
**A I was his immediate supervisor.**
Q Because when we were talking about your supervisory position before, I didn't know there was anybody immediately reporting to you. Other than Mr. Mathews, was there anybody else during this time frame that immediately reported to you?
**A As the assistant warehouse manager there were several people reporting to me. Once I first moved into that position it was Donte Jennings, Manley Ferguson, Arnel Ragunton, Harold Dillion, Jason Rogers, Rachelle Lee, Brandy -- I don't remember Brandy's last name. Two young ladies, Brandy and another young lady, and Kenton Birgans. So I had a number of employees that I was directly responsible for.**
Q And other than Mr. Mathews and Mr. Ferguson, did you have to discipline any of those employees?
**A Not that I recall, no.**
Q Okay.

**A All right.**
Q Going back to the incident with Mr. Matthews, had you written him up prior to the point you were getting ready to discipline him or does the write-up come after the meeting?
MS. WASIK: Objection.
**A The write-up was typed up and put together, and then I took him in to have the conversation. I believe it was just a verbal write-up. Like, it was a documented verbal warning, if I'm not mistaken.**
**Mr. Matthews, I believe, prior to me coming into this position had been written up before by, I want to say, Tambeni Daltry or whoever the manager was before me.**
Q Okay. All right. And during this meeting you said Mr. Mathews wouldn't listen to you?
**A Correct.**
Q How long did it take before you went to get Mr. Moppins?
**A Immediately.**
Q Why is it that you went to get Mr. Moppins instead of Ms. Wallace?

**A Ms. Wallace was in there with me. He stood up, you know, and -- -**
Q He, being Mr. Mathews?
**A Yes. Mr. Matthews stood up and started yelling, and so at this point I'm going to go get the most senior person here, and it was Mr. Moppins.**
Q How long did it take for you to get Mr. Moppins to come talk to Mr. Mathews?
**A Just a matter of seconds. Mr. Moppins's office was like a good eight feet from the conference room where we were.**
Q And was Mr. Moppins immediately available to come into the meeting?
**A Yes.**
Q And did Mr. Mathews continue to speak loudly with Mr. Moppins in the room?
**A No, not right at first. Mr. Moppins came in, he sat down but he was still huffing and puffing.**
Q He, being?
**A Matthews.**
Q Okay. Thank you. And you continued with

93

the conversation, or Mr. Moppins did?
**A I'm not sure if Mr. Moppins said anything right away, but I continued. And then Mr. Mathews just continued to cut me off. He wasn't really trying to hear anything I was saying.**
**At that point, Mr. Moppins stepped in and asked him to allow me to finish, but he wasn't listening to Mr. Moppins either. And so he got loud with Mr. Moppins and he was asked to step out and cool down, calm down -- Mr. Matthews was asked to step out. But at that point, I think he was just done. He was over it.**
Q He, being?
**A Matthews.**
Q And how did the meeting end?
**A With Mr. Moppins asking him to leave.**
Q Leave the meeting?
**A Leave the premises.**
Q Did he fire him at that time?
**A He was terminated that day.**
Q Was he terminated by you or Mr. Moppins?
**A By Mr. Moppins.**

94

Q Was he terminated in that meeting when he wouldn't calm down?
**A I'm not sure at what point Mr. Moppins decided to make his decision, but he did ask me for any paperwork that I may have had for Mr. Mathews. Like I said, his file was full from the manager prior to me.**
Q What I'm trying to get a handle on is the way the conversation ended with Mr. Matthews in the room. So as I understood it, correct me if I'm wrong, he and Mr. Moppins are yelling back and forth at this time, correct?
**A Yes.**
Q And Mr. Moppins says it's time to leave, or something to that effect, makes him leave the room or leave the premises?
**A Mr. -- once Mr. Moppins started speaking to him, that was it for me. I had nothing else.**
Q Okay. But you stayed in the room?
**A Correct.**
Q Mr. Moppins didn't stay in that meeting with Mr. Mathews in the room that he was terminating him,

95

did he, if you remember?
**A Not with Mr. Matthews in the room, no.**
Q Okay. So it was after he left and Mr. Moppins was speaking with you, with Ms. Wallace in the room?
**A Pretty much he was done. He was done at that point.**
Q Okay. Did you have any further involvement with Mr. Matthews after that point in time?
**A I believe I had to write a witness account and I had to do his paperwork seeing as though I was his immediate supervisor.**
Q When you say "do his paperwork" what paperwork are you referring to?
**A I want to say there's an official form of some sort that was filled out once an employee was no longer with us so -- and I had to sign some things.**
Q Were you involved in conveying to him that he was terminated?
**A No.**
MS. WASIK: Objection.

96

THE WITNESS: Sorry.
(Exhibit 10 was marked for identification and is attached to the transcript.)
Q Ms. Parker, I want to give you a second to review what I've identified as Deposition Exhibit No. 10. Ms. Parker, do you recall this particular counseling?
**A Yes.**
Q And that's your handwriting in the middle of that page?
**A Yes.**
Q This particular written warning was given to you in August -- I'm sorry, September of 2015 by Ms. Wallace. She was your supervisor at that time?
**A Yes.**
Q And what was the position you were in at that time?
**A The assistant inventory control manager.**
Q And in this particular written warning it kind of talks about what's going on. You said you -- I'm looking at your handwriting. You said you refused to sign this particular counseling notice.

Was there a conversation about this counseling notice as well?
**A There was a conversation about this counseling.**
Q Who was that conversation with?
**A Mr. Moppins, Wallace, and Mr. Pickett.**
Q And you as well?
**A Yes.**
Q And what happened in that meeting?
**A I remember Mr. Moppins saying that they had** gotten a email from Granger (ph), one of the State Department guys. There was a shipment and the inventory wasn't verified, which is what the instructions were for my team. So I'm not -- I'm not even sure how much trouble we were in or if any, but Mr. Moppins didn't like to receive emails from our client that pretty much pointed the finger if we were doing something wrong.
So I wasn't in the initial meeting, I guess, between him, Mr. Pickett, and Ms. Wallace, but I was later called in and it started off as a conversation about the gentlemen that I was supervising, Harold

Dillion, making the error or making the mistake. And I was unaware until this was presented to me that the mistake had even occurred or even happened. And so, you know, I was surprised of course. "I'll go and I'll deal with Harold," but it's like, no, here this is for you. So I refused to sign this.
Q Because you felt it was Harold's fault?
**A Well, I felt once I had given my team a set of instructions via email, this is the process, this is what we need to do, then that was that. I was not allowed an opportunity to have a conversation with the person directly responsible for making the error. I was given this written warning.**
Q Okay. And in this particular conversation you said: I disagree with the contents of this counseling. With all due respect, I don't manage by babysitting.
**A Correct.**
Q Was the term "babysitting" used in this conversation at all?
**A Yes. Mr. Moppins -- it was friendly. He pretty much told me you're going to have to babysit**

**your team. If I had about six more of you, we wouldn't be doing this or going through this. But he told me to not take it as something negative, to take it as a learning experience or a learning tool to avoid something moving forward.**
**And so I disagreed with this.**
Q So you didn't want to babysit the employees as he had directed you?
MS. WASIK: Objection.
**A No. Like I said, when I give a set of instructions, this is the process moving forward, it's sort of an SOP, a temporary SOP until the next change and then something else will come supercede that. This is a process. You have a set of instructions. This is what -- this is what it is. I don't know that babysitting is a part of managing.**
Q So you disagreed with Mr. Moppins' suggestion of what you had to do?
**A Suggesting I babysit the team.**
Q Did he believe you should do something more than just simply send an email to your team?
**A No. That was protocol.**

Q And he thought that was enough?
**A It had been working up until that point.**
Q Well clearly it hadn't. That's why there was a mistake, right?
MS. WASIK: Objection.
**A It's how we've been communicating since I've been there.**
Q That's how you were communicating or the whole office?
**A The whole office. There were no SOPs in place. As a matter of fact, after this incident our departments were responsible for putting together our own respective SOPs because of this incident.**
Q Okay. And during this meeting, Mr. Moppins felt you needed to do more than send an email, correct?
**A I don't believe so, no.**
Q Well, you said he talked about you needed to babysit the employees for a while, correct?
**A Correct. But he never explained what he meant by babysitting. So to me babysitting means you're monitoring individuals that are incapable of**

101

**taking care of themselves or doing for themselves, children.**

Q And that's what he wanted you to do with the employees under you, right?

**A Correct.**

Q But you didn't want to do that?

**A Not that I didn't want to do it, but we're all adults. We have a job to do. We were hired to do a job. Once we received instructions on our job and how to do it -- my job as his manager was to make sure he had the tools and necessary things to get his job done, which I did. But to stand over his shoulder and walk him through each and every single step once I issue the responsibility, it was his responsibility to do his job; and if he couldn't, he has to make me aware, Ms. Parker, I need help or something. But that wasn't the case in this situation.**

Q And Mr. Moppins wanted you to do more than simply tell him and wait for him to come to you, correct?

**A I'm not sure what Mr. Moppins wanted more**

102

**from me. He just didn't want that email from our client.**

Q And he suggested you babysit the employees under you?

MS. WASIK: Objection; asked and answered.

Q Isn't that what he told you?

**A That's what he wanted me to do.**

Q And you didn't want to do that?

MS. WASIK: Objection; asked and answered.

**A I wanted to manage, not babysit.**

Q In this handwriting section that you have on here a little bit further down, you said: I feel this situation was unavoidable, and I'm always having to step in the middle of the work to pick up the slack and can't hold them accountable for their actions or lack of.

Why did you say that?

**A Mr. Moppins had a way of blaming us, his management team for pretty much everything, all the fires in the warehouse, if you will. There were several responsibilities that we had to make sure that things would get done. There were always new**

103

**processes and new things. And at one point the work was overwhelming for the amount of people we had. But everything was just as equally important and if this didn't get done because you were focusing on this, then Mr. Moppins had an issue. If you stopped focusing on this to do that, Mr. Moppins would have an issue.**

**So at one point we all felt overwhelmed and this was my way of communicating to him if I'm having to step in and do my subordinate's job and then I'm not able to do my job, you're going to be unhappy here. And so that's pretty much what that statement was.**

Q Well, wasn't one of your duties as manager to make sure your employees did what they were supposed to?

**A Absolutely. To make sure that they did what they were supposed to do, not to make sure I did what they were supposed to do.**

Q So during this period of time when you were picking up their slack, it was the employees under you picking up their slack, right?

104

**A Correct.**

Q Did you feel that was unfair that you had to do that?

**A I stated earlier, Mr. Dillion, he never wanted to be in my department. I felt like when Mr. Moppins was making adjustments, during that meeting he asked what I thought about Mr. Dillion coming to inventory control. I, you know, told him what I thought. I said, I don't think he's ready. He was great in shipping -- in the shipping department. But because of change, Mr. Moppins had to make necessary changes, and I would assume it was to make our client happy, to make them feel like we're doing our due diligence to make sure we were correcting whatever the issue was before this.**

**And so by moving people around, Mr. Dillion came there, and I could tell he wasn't happy, but at the end of the day we have a job to do and so I helped him as much as I could.**

**Yothin was his counter part. So I instructed Yothen to kind of like help him in the areas where he fell short. Yothen was mainly in**

**inventory control the entire time. Harold was new and he was just not happy in inventory control, and I suggested that to Mr. Moppins, but he was placed there anyway, so the errors and issues happened.**

Q Well, you also stated you can't hold them accountable for their actions or lack of. Who was it you were referring to that you wanted to hold them accountable but you couldn't?

**A During this meeting, I informed Mr. Moppins that I would discipline Harold once I found out what was going on. If you're writing me up and issuing me a written warning, then I needed to hold the person responsible accountable; and I was told no.**

Q And why not?

**A I'm not sure why not. I guess you would have to ask Mr. Moppins.**

Q He didn't give you an answer?

**A No.**

Q And other than that, was there anything else that made you think that you couldn't hold the employees accountable?

**A This particular situation, if I did what I**

**was supposed to do, I sent out the instructions for the process, this is what we're doing moving forward, and I have a subordinate employee who didn't follow instructions. I had to hold that individual accountable. Once I was told no, it was like, okay. So I wrote what I wrote and that was that.**

Q At the end of this meeting that you had dealing with this particular written warning, was there any other action that was taken?

**A No. Mr. Pickett and Ms. Wallace just kind of pulled me to the side to talked to me to let me know, you know, Mr. Moppins means well. He just has to make sure the client is happy whatever the case may be. And so we went on with our day.**

**You know, Mr. Moppins, he was cool. This was just kind of that -- and later on he told me -- excuse me -- Van, it's a written warning. I have to bring it to your attention and you have to be able to multitask. And, you know, he had a conversation with me. And so went -- just went on with our day.**

Q Was that conversation with Mr. Moppins later

that same day?

**A It was with Mr. Moppins and Ms. Wallace.**

Q You also said one with Mr. Pickett and Ms. --

**A Wallace. Right after this, once I walked out, they followed me to make sure everything was fine.**

Q "They" being Mr. Pickett and Ms. Wallace?

**A Correct.**

Q And when did Mr. Moppins have a conversation talking about this particular incident?

**A Later that day when I was leaving out of the office, out of the building. Mr. Moppins office is right at the exit entrance door.**

Q Other than that, was this particular incident brought up any other time?

**A No.**

Q Did you end up doing anything different in your management style as a result of this warning?

**A I think shortly after this I was moved into compliance where I was reporting directly to Larry.**

Q Did you manage the people reporting to you

after this incident any differently?

**A I did.**

Q Okay. And what did you do to manage them differently?

**A Not only did I send the process via email but I would type it up and have them sign and saying that they received and understood, because just because someone received instructions doesn't mean they understand.**

**So I met with individuals. Whenever there was a change in the process of how we went about doing things, I would meet with them and ask does everyone understand, you know. Let them know that, hey, everyone has to sign this saying that you've received, read, and understand whatever the new process was so...**

Q Anything other than that you can recall that you did differently after receiving this warning?

**A Just held more meetings. You know, daily pow-wows. Really, not daily. But tried to hold weekly pow-wows to make sure everyone was on the same page.**

109

Q Did you issue any disciplinary notices -- more disciplinary notices either verbal or written after this?
**A I want to say after this I had never issued a written or discipline action until after this, once I was moved to the warehouse.**
Q Did it influence you to write things up more or speak more when given those -- this particular incident?
**A It influenced me to pay more attention. I started having them -- before they would send anything to our client to send it to me first or Ms. Wallace and have us go over it and then let them know, hey, green light, go ahead and send this to the client, whatever the case may be.**
(Exhibit 11 was marked for identification and is attached to the transcript.)
Q Ms. Parker, I'll give you a second to look at what I've identified as Exhibit No. 11.
Ms. Parker, you recall this particular written counseling letter you received from Mr. Moppins, correct?

110

MS. WASIK: Objection.
**A I recall this probationary letter of concern.**
(Exhibit 12 was marked for identification and is attached to the transcript.)
Q And next I want to show you what's been marked as Deposition Exhibit No. 12, which appears to be a signed copy of what you have, what you just reviewed. I just want to make sure that the last page, is it -- is that your signature in your handwriting for the date?
**A Yes.**
Q And you reviewed this document on or about February 23, 2016?
**A Yes.**
Q And at that point February 23, 2016, Mr. Moppins was having problems with your performance, correct?
MS. WASIK: Objection.
**A No.**
Q He didn't have any problems with your performance?

111

**A No.**
Q Okay. All right. Did Mr. Moppins discuss this with you at all?
**A Yes.**
Q Okay. When did he first tell you he was going to give you this?
**A He met with myself and Mr. Pickett. Mr. Moppins told me I was pretty much the only manager in the warehouse, in his words, "not screwing up." I believe he had to write up everyone, including Ms. Wallace; and theirs was write-ups.**
Q Okay. And how do you know that?
**A Because Mr. Moppins told me.**
Q Okay. What did he tell you about writing up the other employees?
**A Mr. Moppins was initially going to move me into Ms. Wallace's position. There were some issues going on in our inventory control department receiving, which is why he moved me back into receiving. Mr. Pickett kind of started overseeing inventory control. So Mr. Moppins pretty much told me that he was going to put me in the warehouse and**

112

**he wanted me to understand what that came along with being the inventory -- the assistant manager behind Shaun; and so he came up with this to make sure that I knew what my responsibilities were going to be.**
Q Okay. I just want to focus a little bit then. I asked you question about why you said he said he was going to write everybody up. Did he tell you why he was writing everybody up?
**A That's exactly what he told me.**
Q He said he was giving them a verbal -- he was giving them a written warning?
**A He told me when he gave me this, don't worry, it is not a write-up. Everybody else is getting a write-up. Yours is more a description of what your job duties and responsibilities will be.**
Q Do you know if anybody else got a write up?
**A I don't. I didn't ask.**
Q Okay. What did he tell you about why you were getting a write-up?
**A He didn't say I was getting a write-up.**
Q I'm sorry. Why was giving you this written counseling probationary letter of concern?

113

**A He wanted to see how I handled this amount of responsibility. Like, this position, like it says, I would be in the direct scope of our client, anything coming in and out of that warehouse all of that, that was primarily my responsibility; the explosives, how long they sat in our warehouse; or you know, we had a sister warehouse where the explosives were housed. I was responsible for making sure that that stuff was being taken care of even though I was physically at the Sterling location. I had a lot of responsibilities, and he gave me this as a probationary period to see how I handled it before giving me the actual offer letter that I signed on May the 2nd.**

Q May 2nd of 2016?

**A Correct.**

Q Okay.

**A Or -- March or May, I'm not sure. But I signed it in 2016.**

Q Okay. Let's go back just to make sure we understand. I see one in April of 2016, it's Exhibit 7; is that the one?

114

**A That's the one I'm looking at but there's an actual offer letter.**

Q For that position?

**A For this position. I believe I signed it on March the 2nd.**

Q Have you seen a copy of that recently?

**A No, I haven't seen it since being there.**

Q All right. How was it that you recall it was March 2nd?

**A I remember him writing the numbers down on March the 1st, and like he wrote it on a post-it note or something, a little piece of paper to show me what the salary increase would be.**

Q Okay.

**A And so he talked to me about the position.**

Q And there was another letter, you believe, in -- around March 2nd -- around the March 2nd time frame?

**A It was March 2nd, correct.**

Q Do you know whether Mr. Pickett was also being written up during the period of time?

**A I don't believe so.**

115

Q Okay.

**A Mr. Pickett was in the meeting with me and Mr. Moppins when he was saying this so...**

Q Do you know if Ms. Wallace was actually written up?

**A I don't know.**

Q Okay. Do you have any knowledge whether any other employee was written up at the same time?

MS. WASIK: Objection; asked and answered.

**A I don't.**

Q Did you discuss with your friends that were there whether any of them had been written up during this period of time?

**A No.**

Q If you turn to the second page of this letter, the second to last paragraph, Mr. Moppins writes there: I'm officially notifying you that your work status as the date of this memorandum is probationary during the period of February 23, 2016, through April 24, 2016.

Do you recall having any discussion with him about being probationary during that period of time?

116

**A The day he issued this to me, he told me I'd be on probationary period.**

Q Did he tell you what probationary meant?

**A That I would be monitored pretty much on how I fall into and fit into this position, how I handled this position.**

Q Did he say who would be monitoring you?

**A He and Pickett.**

Q Okay. Anybody else?

**A No.**

Q Now, this also says it was during the period up through April 24th, 2016. Does that refresh your recollection as to whether this offer letter was March 2nd -- 1st or 2nd, or whether it was later than that?

**A I would have to see that official offer letter to recall.**

Q Do you recall if you signed that letter?

**A I did sign it.**

Q Okay. And what did you do after you signed it?

**A I have a -- I had a file drawer at my desk**

117

**where I would keep certain things. I had a copy of my evaluation done by Mr. Reeves. I had some papers in that drawer the day I was terminated that I was not allowed to retrieve.**
Q Do you recall what other papers might have been in that drawer?
**A Maybe some study material for the course I was taking. They provided those.**
Q Anything else that you can recall?
**A No, not right off.**
Q Okay. Did you discuss that probationary period with Mr. Moppins at any point after this February 23rd meeting?
**A No. I discussed it the day of just to make sure, because of the subject, how it's typed up, "Written Counseling Probationary Period Letter of Concern."**
Q Okay. Other than that. Did he say anything else to you after this meeting about this particular letter?
**A No.**
Q Did he have any other conversations with you

118

after the date of this letter about your position that was addressed in this letter?
**A No.**
Q And is your understanding that what he was identifying in here was the various tasks that you were going to be responsible for in this new position?
**A What he pretty much said is what I was already been doing. Just continue doing what I have already been doing, with the addition of a few things. The HAZMAT, there was some classes that were required for me to take in order to handle and deal with the hazardous material.**
Q Okay. Anything else that you can recall?
**A That was the one thing that stood out. But other than that, I was already responsible for just about everything else. I was already doing this stuff.**
Q Okay. The first item under number one talks about management of personnel and assets within your realm of responsibility as assistant operations manager.

119

**A Uh-huh.**
Q And it says, knowledgeable in the actions of your staff.
**A Uh-huh.**
Q Who was your staff at that time?
**A Donte Jennings, Manley Ferguson, Brandy, another young lady, Kathleen Davis, Kenton Birgans. And then there was the shipping department, Jason Rogers, Arnel Ragunton, and Harold Dillion was moved back to the shipping department.**
Q And did all of those individuals report directly to you or was there an interim somebody as a supervisor in between you and them?
**A They reported directly to me.**
Q Including Mr. Jennings?
**A Yes.**
Q Okay. And this was the position that you held until the time that you left Reema?
**A Correct. While continuing with compliance.**
Q Okay. Ms. Parker, let's go over a few things and go back to what we talked about before we sort of put a pin in things.

120

You said that some time in February of 2016, Mr. Moppins -- I'm sorry, Mr. Pickett called you out of the office to tell you about the rumors that were going around?
MS. WASIK: Objection; mischaracterizes testimony.
Q When did you first hear about the rumors, Ms. Parker?
**A Some time in March of 2016.**
Q And what did you hear about a rumor in March of 2016?
**A Ms. Thomson had visited the warehouse this day. She had already quit and left, but she came back. I guess that was just okay for old employees to come back and say hello or whatever. I left and went home.**
**Mr. Pickett called me to tell me that Ms. Thomson came into his office and did kind of like a school girl, "Ooh, I heard something about you." And once she informed him she heard that me and him had something going on, that's what he told me. And then he said, It's funny because that's not the**

121

**first time I heard it. Larry was in here the other day and asked if he was sure his wife wasn't divorcing him because he was fucking me.**
Q All right. So let's back up for a second. So where was Mr. Pickett when he called you?
**A He was still at the office.**
Q Okay. All right. And he said that Ms. Thomson told him that day?
**A Correct.**
Q Had Ms. Thomson said anything to you before that?
**A No.**
Q What did he tell you Ms. Thomson said?
**A I just stated he said that Ms. Thomson came in, like, real silly like, "Ooh, I heard something." And then she eventually told him that she heard that he and I had something going on.**
Q Okay. Other than hearing that you and he had something going on, did she say anything else?
MS. WASIK: Objection.
**A I don't know what else was discussed, but that's what he informed me.**

122

Q Okay.
**A That much of it.**
Q Okay. And did she say where she heard that from?
**A Donte.**
Q So she told Mr. Pickett she heard it from Donte?
**A (No verbal response.)**
Q That's a yes?
**A Yes.**
Q Thank you. Just to remind you, you have to give verbal responses. Thank you.
**A Understood.**
Q Did Mr. Pickett relate to you that she heard anything else from Mr. Jennings about that rumor?
MS. WASIK: Objection.
**A Not from Ms. Thomson, no.**
Q Then Mr. Pickett also told you that it's the second time he heard that, correct?
**A Correct.**
Q And he said he heard it a few days before?
**A Correct.**

123

Q And heard it from Mr. Moppins?
**A Correct.**
Q Did he tell you about the meeting with Mr. Moppins?
**A I'm sorry, which meeting?**
Q The meeting where he had that conversation with Mr. Moppins?
**A He just stated that Larry came into his office and pretty much asked him if his wife was divorcing him because he was fucking me.**
Q You keep saying pretty much asked me, so I'm trying to understand exactly what -- no, you're not doing anything wrong. It's part of the conversational tone of these things. I just want to make sure I understand exactly what Mr. Pickett told you Mr. Moppins said.
**A He stated that Mr. Moppins came into his office and asked him if his wife was divorcing him because he was fucking me.**
Q And did Mr. Pickett say how he responded to that?
**A No. I didn't ask him how he responded. My response was like, What?**

124

Q Did Mr. Pickett say anything about anything further about the conversation with Mr. Moppins?
**A Not that I recall. At that point I'm like, you know, trying to figure out why. Why are people saying this, you know. What's going on. And so...**
Q Did Mr. Pickett indicate that he responded in the negative in anyway to Mr. Moppins?
**A No, he didn't.**
Q Was Mr. Pickett going through a divorce at that time?
**A Not that I know of.**
Q Okay. Did you ask him at that time if he was going through a divorce?
**A No.**
Q Did you subsequently find out that Mr. Pickett was going through a divorce?
**A No.**
Q Did you find out that Mr. Pickett was separated from his wife?
**A No.**
Q Did Mr. Pickett ever indicate to you that he

125

was separated from his wife?
**A No.**
Q Did anybody indicate to you that Mr. Pickett was separated from his wife?
**A No.**
Q Okay. When was the last time you talked to Mr. Pickett?
**A Mr. Pickett contacted me a few days ago, maybe last week. Mr. Pickett, Ms. Daltry, Ms. Thomson, and Ms. Littleton, they all have a relationship outside of Reema. They all worked together prior to Reema.**
Q Why did Mr. Pickett contact you a few days ago?
**A You know, this stuff had made the press. Mr. Pickett doesn't like to see his name in any type of law forms, newspaper articles, and things like that. Mr. Pickett is still aware that this situation is going on. I'm contacted by a lot of people from Reema still.**
Q Well, we'll get to them in a second.
What did Mr. Pickett tell you in that

126

conversation?
**A Just pretty much that he's in contact with you. He no longer works for Reema. He just -- Mr. Pickett, he and I were friends on Facebook. He sends messages asking how I'm doing all the time. I use him as reference. Him and Ms. Wallace, they reach out to me all the time.**
Q Okay. Did he tell you anything else about what he would say?
**A No.**
Q Did he say anything about what he said to Reema?
**A No.**
Q Did he ask you to meet up with him?
**A No.**
Q The Facebook communications, you haven't produced them in this case. I'm going to ask that they be produced.
You still have access to all the communications you've had with Mr. Pickett since you've left Reema?
**A It's not like that type of communication.**

127

**Like, it's like a poke or something. Like, usually, those mean, hey, how are you.**
Q You said hr asked you how you were?
**A Yeah, via phone call.**
Q How often have you talked to him?
**A I don't talk to Mr. Pickett. I don't respond to phone calls. If he reaches out to me -- I know what's going on. I don't answer or respond to phone calls. When he called the other day, I didn't acknowledge or recognize the number because I don't have his number saved. So I did answer his phone call, like, hey, what's going on? How you been? That type of thing.**
Q How long did that conversation take place?
**A The conversation was maybe four or five minutes.**
Q And the communication with him on Facebook other than a poke --
**A That was prior to leaving Reema, the last time we had a conversation on Facebook. Everything that I have with anyone from Reema has been produced to my attorneys.**

128

Q Since leaving Reema, have you communicated with Mr. Pickett on Facebook?
**A Mr. Pickett is no longer on Facebook as far as I know. He still has a page and you can see when he's on it. But as far as making posts or anything like that, no.**
Q And did you communicate with Mr. Pickett via Facebook during the period of time you were employed at Reema?
**A Yes. I may I have sent him a "Happy Birthday." And that's how we all communicated, that were friends. I was friends with Manley Ferguson, Carlos Carter, Pickett, Wallace, Daltry. I'm still friends with Jolene. And that was what we did, "Happy Birthday, "Good Morning."**
**Or if it was a sports thing, there were some Redskin fans, Dallas fans, you know, that type of behavior, memes, jokes, things like that.**
Q And you --
MS. WASIK: We'd like to break for lunch sometime. Whenever is a good time.
Q And did you turn those communications over

129

to your counsel as well?
**A Everything that I have I was able to turn it over to my counsel.**
Q Have you looked on Facebook to find communications back and forth with these individuals?
**A I no longer have access to that Facebook, and I informed my counsel that as well.**
Q Okay.
**A Due to security reasons, someone trying to hack the account, the pass code was changed, and because I don't remember the pass code to the email address associated with that account.**
Q Okay.
**A So everything that I have, my attorneys have.**
Q Go back to this conversation you had with Mr. Pickett when he did call you, how long did that conversation last?
**A Four minutes.**
Q And I'm talking about the conversation when he called you while you were still employed with

130

Reema?
**A Oh.**
Q I'm sorry. We're going back to the conversation you had with Mr. Pickett while you were still employed by Reema.
**A Okay.**
Q When he told you about this rumor, how long did that conversation last?
**A Not really sure how long it lasted, but it was long enough for me to hear that that's what is being said. He did ask me to not say anything. I remember him saying, you know, don't say nothing, but Larry came into any office and said XYZ.**
Q He didn't want you to say anything to whom?
**A I guess to anyone. He just wanted me to know what was going on.**
Q But he didn't tell you what to do about it?
**A No.**
Q Did the two of you discuss what you would do about it?
**A No.**
Q Did he indicate he would take any action as

131

a result of that?
**A No. Not that I recall, no.**
Q Okay. Other than that, saying don't say anything to anybody, did he tell you to do anything else?
**A No. And I know he and Larry had a relationship. They were pretty close, like, buddies, if you will. I assume he didn't want me to say anything because he didn't want Larry to find out that he said something to me about it because that may stain their friendship.**
Q Okay. Did he say anything further about who Larry may have talked to about that comment or anything else?
**A No.**
Q As a result of that conversation, what did you do after you heard from Mr. Pickett about this rumor?
**A You know, I do remember during the conversation him saying -- hearing it or Romaine getting her information from Donte. And so I remember -- I don't know if it was the next day or a**

132

**few days after, but I remember going to work and Donte, once he came in, I remember having a conversation with him, you know, pretty much asking him or telling him, you know, if there's anything you'd like to know about my personal life, feel free to come and ask me. You know, I would prefer him to ask me versus spreading a false rumor. But I remember asking Donte -- or having that conversation with Donte.**
Q You didn't speak with anybody that evening about the rumor?
**A No.**
Q Did you talk to Romaine about it?
**A No.**
Q So the next morning, what time did you talk to Donte?
**A It was early before work started. He and I were both on the early shift. And so, yeah.**
Q Where was that conversation?
**A In the warehouse.**
Q And was it just the two of you there?
**A Correct.**

Q And what exactly did you say to Donte?

**A Good morning. Like, you know, if there's anything you would like to know about me and what I'm doing in my personal life, feel free to come and ask me.**

**He looked at me real weird, like, what are you talking about, and, I didn't say anything about you.**

**I'm just like, okay. That's cool. But just so you know, you can come ask me anything. I'm an open book.**

Q Were you angry after Demarcus told you about this rumor?

**A Naturally. Angry and a bit confused, because he did say -- as a matter of fact, he said, you know, when Romaine told him that Donte had asked him what does he need to do to be promoted or whatever, because I continue to get promoted. And so that was a conversation between Pickett and Donte -- this is a part of the phone call. And then for Romaine to say that to him after Larry said that to him.**

Q So let's go back now. So now you're saying there was another part of this conversation with Mr. Pickett. So he told you about Mr. Moppins asking him. He told you about Romaine coming in. And apparently he also told you Donte --

**A That there was a conversation between him and Donte?**

Q Okay. And what did Mr. Pickett tell you about that conversation between him and Donte?

**A Donte asked him what does he need to do to get a raise or management position.**

Q And what did Mr. Pickett say?

**A He didn't elaborate on what he said. He was just putting it all together for me for that rumor conversation. It was kind of like, hey, so, you know, Romaine just took her silly self out of my office talking about some ooh, whatever, whatever.**

**And then he's like, you know, Donte asked me XYZ about being promoted, and it's funny because Larry came in here a couple of days ago and asked me am I sure I'm not getting a divorce from my wife because I'm fucking you. So that conversation kind of went together.**

**And I'm sorry it's coming back to me like bits and pieces at a time but, you know.**

Q Well, you've written it down before, though, right? I mean, it's coming back to you now? It's been three years?

**A Yeah.**

Q Almost four years since it happened, right?

**A Yeah.**

Q And you've written it down several times before this, right?

**A Not every part of the conversation, just what I remember standing out to me the most. You know, there could have been a conversation about weather before any of that started. I'm just, like, whatever. But what I remember is someone stating that I'm being advanced or I'm sleeping with my supervisor, and that was completely false.**

Q See, now you're adding another element to it. You're adding the element of "I'm being advanced." Who said that?

MS. WASIK: Objection; mischaracterizes testimony.

Q Didn't you just say somebody said something about "I'm being advanced"?

**A That information came later on after this moment that you're asking me about.**

Q Okay. So that happened some point after the conversation with Mr. Pickett where he told you about Mr. Moppins and told you about Romaine? There was another conversation where somebody said something about you being advanced?

**A That conversation occurred with Romaine Thomson and I at a kickball game on Sunday; and that is in my statements, in my complaint.**

Q Okay. All right. So that wasn't in the conversation with Mr. Pickett?

**A No.**

Q But in this conversation with Mr. Pickett, he also said that Donte came to him asking about getting promoted?

**A Or what does he need to do to get promoted?**

Q Okay. And what did Mr. Pickett suggest that had to do with anything about the rumor?

A I'm going to assume nothing. I don't even know if he had that conversation with Donte before or after the conversation with Mr. Moppins, but it definitely was before the conversation with Ms. Thomson.
Q So why was Mr. Pickett telling you about what Donte told him?
A Because it all kind of fit and goes together.
Q How did it fit?
A If Romaine is telling Pickett that Donte is saying this, Mr. Pickett can go back to the conversation with Donte of, well, what do I need to do to get advanced or, you know, to be promoted or whatever. That was like, okay, so Donte is the one who said something to Romaine and now Larry -- I mean, Larry is saying something to me. You know, why would Donte be asking me how or what does he needs to do to get promoted.
Q So Mr. Pickett was connecting these dots?
A I'm assuming so, sir.
Q And presenting it to you that way?

A Yes, sir.
Q Did you ever confirm whether Mr. Jennings actually had that conversation with Mr. Pickett?
A How would I confirm?
Q Did you ever ask Mr. Jennings if he asked Mr. Pickett that?
A No.
Q Did you ask anybody whether Mr. Pickett was told that by Mr. Jennings?
A I had no reason to believe that Mr. Pickett would make that up.
Q Did you ever confirm that Mr. Moppins ever said that to Mr. Pickett?
A Yes.
Q And how did you find out Mr. Moppins said that to Mr. Pickett?
A Mr. Moppins stated it himself.
Q What did Mr. Moppins tell you?
A Mr. Moppins stated in a meeting he had a conversation between -- well, with his deputy program manager, and it didn't concern me. Whatever he decides to discuss or ask his deputy program

manager is between him and his deputy program manager. This was the day I filed the complaint with HR.
Q But did he tell you he said that to Mr. Pickett or just -- he just didn't confirm or deny it for you?
A He didn't deny it. Once I informed Mr. Moppins that I knew what his statement was as far as the rumor, he said what he said to me, very irate, and pretty much ended the meeting, and I got up and went to HR.
MS. WASIK: We'd like to break for lunch now.
MR. WALSH: You're not giving me a choice, so, okay, that's fine.
(Off the record.)
BY MR. WALSH:
Q Ms. Parker, just before we took a break, we were discussing this conversation that you had with Mr. Pickett. And the one thing that I think I want to just go back to and make sure I understand, after you got off the phone with Mr. Pickett -- strike

that. Let me ask it this way.
Is there anything else that you recollect about that conversation -- you've had a little time to reflect over lunch -- that you now recall?
A No. Just the part about Moppins, Romaine, and Donte.
Q He didn't mention any other individual in that conversation?
A No.
Q Okay. And that evening, you did not speak with Ms. Thomson that evening?
A No.
Q You didn't speak with any other employee that evening about the conversation you had with Mr. Pickett?
A No.
Q The next morning you indicated that you approached Donte and you had a conversation with him?
A Maybe not the next morning. I don't remember if it was the next morning or the morning after, but I did -- Donte was the first individual

141

**that I spoke to.**
Q And you don't -- so was it definitely in the morning that you had that conversation?
**A It was definitely in the morning before work started.**
Q You just don't remember if it was the next day or two days later?
**A Yeah.**
Q Okay. And did Donte indicate in that conversation that he understood what you were talking about?
**A No.**
Q Did anybody use any curse words in that conversation?
**A No.**
Q You didn't ask him, "If you want to know who I'm fucking, just ask me"?
**A No, I didn't.**
Q Did anybody else see you and Donte talking that you're aware of?
**A Not that I'm aware of.**
Q Other than talking to Donte that morning,

142

did you talk with anybody else that day about the rumor?
**A No.**
Q When is the next time you spoke to someone about the rumor?
**A I spoke with Maddie Littleton and Tambeni Daltry. I also spoke with Romaine Thomson. I'm not sure if I spoke with Ms. Thomson first and then the following work day I spoke with Maddie -- we call her Sheba, Tambeni. If I spoke to them first and then that following Sunday had a conversation with Romaine but they were the --**
Q Okay.
**A Yeah.**
Q You had a conversation with Romaine; was it on the phone or was it at kickball?
**A At kickball.**
Q And were the other ladies present at kickball as well?
**A No.**
Q And what did you say to Romaine in that conversation?

143

**A I asked her what was going on with the conversation that she had with Pickett and how come she didn't come and tell me or talk to me about it first, because that's my friend.**
**And she stated, you know, I didn't -- I just -- you weren't there. After I talked to Donte -- and, you know, she explained to me that Donte is, in fact, the person who told her that I was being pretty much advanced because I was sleeping with Pickett. And she just saw Demarcus and she was just -- like I heard you and Van had something going on. Like, what's up? Tell me what's going on. And so that was what she gave me.**
Q Okay.
**A But, yeah.**
Q Did she say anything else about the conversation at that time?
**A Not really. I mean, just the conversation just went more into, you know, you're my girl. You know, we're friends. Even if this is something that Donte did tell you, you as my friend should shut it down. You know, so the conversation kind of went**

144

**there.**
Q Okay. Did she ask you if it was true?
**A No. She didn't have to, because I told her it wasn't.**
Q Okay. So let's back up for a second. So you approached her at that time and you asked her about why she talked to Demarcus before talking to you, correct?
**A Correct. Well, I asked her, you know, what was the conversation with her and Demarcus about as far as me and him, and she told me.**
Q And somewhere in there you told her it wasn't true?
**A Yes.**
Q And she told you that Donte was the one that told her?
**A Yes.**
Q And did she say that Donte told her the day that she was there or was it another time he had told her that?
**A She didn't really say when he told her. She just said he told her.**

Q Did she say she talked about it with anybody else?
**A No.**
Q And then the conversation continued about why she basically didn't have your back?
**A Yes.**
Q Okay. And what did she say?
**A She kind of was like, you know, I didn't believe it, and I was just really -- I don't know. I just heard it from Donte and I wanted ask Demarcus about it.**
**Prior to Romaine, Demarcus, and Tambeni coming to work for Reema, they all worked for Andrews somewhere doing something else. Romaine informed me that back then she had a crush on Mr. Pickett. So as my friend it was like, okay, so I know how you felt about Demarcus, why would I do something like that? And why would you believe Donte before coming to talk to me to the point where you're going to have a conversation with someone other than me about this situation? So the conversation went more towards that you're my**

**friend, don't do that, you know. And she apologized eventually, like, I should have come and talked to you. But, you know.**
Q Did she indicate she was going to take any action as a result of that?
**A No. Ms. Thomson had just recently went through a situation at the company with her own complaint of harassment, and so my concern with her is if you just went through something like this why would you take part in putting me through it. So we talked, she apologized, told me I was right, and we went back to kickball.**
Q Did she say she was going to talk to Donte?
**A She did not.**
Q Did she say she was going to clear things up with Demarcus in any way?
**A No, she didn't.**
Q Did you try to take -- did you tell her you were going to do anything in light of the conversation you had with her?
**A No.**
Q Did you decide whether you were going to do

any action as a result of the conversation with her?
**A No, not at that point. No --**
Q Okay.
**A -- I hadn't.**
Q At some point later you decided you would do something?
**A Some other things went on. I knew the situation was what it was. I couldn't stop Donte from spreading the rumor. He felt the way he felt, so that was that. My concern was my reputation, my job, you know, and the damage that an ugly rumor like that could cause. So I was more concerned about that.**
**Knowing Donte the way that I knew him, I knew Romaine wasn't the only person that he may have said something like that to. Ms. Lee and Donte had a personal relationship. Ms. Lee said he tried to tell her something but she stopped him so -- but he never got a chance to say whatever it was like so...**
Q Okay. Let's go back then. You were talking about after you had the conversation with Mr. Pickett and we jumped up that you talked to

Romaine and you said there were two other ladies that you talked to?
**A Maddie and Sheba, Tambeni.**
Q Did you talk to them together or separate?
**A Together in the office.**
Q And when did that conversation take place, if you remember?
**A It was after an all-hands meeting.**
Q Okay. But you don't recall -- just so it's clear, you don't recall whether it was before or after the conversation with Romaine?
**A I believe -- it was after. It had it be after, because the all-hands meeting occurred after.**
Q So did you talk to those two women -- back up. Sorry, bad question.
When did you decide you wanted to talk to those two women?
**A The meeting took place some time in April. It was a mandatory meeting for all. I missed the first three minutes of the meeting due to a phone call. Mr. Pickett was -- he came to get me to let me know, hey, the meeting has started. As soon as**

149

we got to the conference door, it was closed and locked. He knocked on the door. Mr. Moppins opened the door. I could hear laughter and things going on. Mr. Moppins opened the door enough for Mr. Pickett to walk through and then closed the door on me and locked the door; and so I stood there thinking, okay, he's going to open the door, but once he never opened the door, I went to my office, got my things, sent Pickett a text to let him know, hey, I'm leaving for the day and I left.

Later that day I received a phone from Rachelle Lee, as well as Mr. Pickett to inform me that this rumor and other things were being discussed and it was pretty much about me, the meeting.

And after that is when I had a conversation with Maddie and Tambeni to ask them if they were involved in this rumor or did they know about it, did they hear about it, like, what's going on, because obviously I'm the only one here that didn't know there was something going on about me.

Q Okay. So I'm just trying to understand the

150

timeline. So Mr. Pickett first told you sometime in March?

A March.

Q You had a conversation with Donte and you had a conversation with Romaine; and then nothing else until after the meeting in which the door was closed?

A I kind of like went back to work, you know. It was there. I could tell things were being said but I couldn't prove it, and so you just kind of continue on with your day. Nothing occurred until about the time of this meeting when it resurfaced and this was what was discussed in the meeting that I should have been at but I wasn't allowed to be.

Q And do you recall when that meeting was?

A Some time in mid- to late-April.

Q Okay. So let's just stick to that time frame again. Mid- to late-April, you did not discuss the rumor with anybody else during that period of time from when Mr. Pickett first told you until that meeting?

A Correct.

151

Q Other than Ms. Thomson. I don't want to misquote you there.

Did you talk to Mr. Pickett about it anymore during that period of time?

A No.

Q And you said that you could tell that things were changed?

A Yeah.

Q What was changed?

A Certain employees, Mr. Ferguson and Mr. Jennings to be exact, would have little conversations and little kind of looking sessions with the laughter afterwards, and that went on until Mr. Jennings was moved from my department and placed in the SPEAR department.

Q You're going to have to describe that for me, if you can. Could you tell what they were saying in these conversations?

A I couldn't.

Q And you said that they were looking; what did you mean looking?

A Yeah, just looking in my general direction

152

or conversation. But then if I walk out or walk past, the conversation would stop. They would disburse and act as though they were working on individual projects.

Q Are there any other employees that were doing anything like that?

A No.

Q Okay. And did you confront either of those gentlemen about that?

A No. They were still working, you know. There was no harm talking while you work, you know.

Q And did you complain to anybody about those two doing that particular behavior during that period of time?

A No.

Q Did you complain to HR about their behavior?

A No.

Q Did you complain to HR about the rumor at this time?

A No, I didn't.

Q Okay. Other than those two employees doing that, did any other employee do anything that made

153

you feel that it was something based on the rumor that they were treating you differently?
**A No. Everyone was -- everyone did what they were supposed to do. You know, I really didn't have to say anything to anyone about not doing their job. You know, nothing wrong, like I said, with whistling while you work. Laughter and talk was permitted while they worked as long as it didn't interfere with the work. So they worked.**
Q Okay. And you didn't write anybody up during that period of time?
**A I believe I had to write Manley Ferguson up once. I'm not sure if it was before or after. But Mr. Ferguson, I did have to write him up once.**
Q And this was also during that period of time that you were in that position when you were the assistant warehouse manager?
**A Correct.**
Q And we saw earlier Mr. Mathews' write-up, which was in March. Was he engaging in any of this behavior where he was looking and talking or any of that kind of stuff?

154

**A No. I believe Mr. Matthews had already been gone, yeah, by this time.**
Q Okay. All right. Do you know if any of the employees were complaining about your management style during that period of time?
**A No.**
Q Did you get word of any of the employees complaining about you?
**A No.**
Q So the next time that the rumor came up was after this meeting, the closed door in your face meeting?
**A (No verbal response.)**
Q That's a yes?
**A Oh, yes.**
Q Thank you.
**A I'm sorry.**
Q Let's stick with -- what time was the meeting supposed to start?
**A I believe at 10:00 a.m.**
Q And you said that you were on the phone at that time?

155

**A Correct. Right before the meeting started, I had got two phone calls. One was personal. The other was from the client. I took the client call first, and that call ended up taking me beyond the meeting start time.**
Q Okay. And you took this client call first. Who was the client who called you, if you remember?
**A I don't remember if it was one of our freight -- our shipping companies. One of the companies that we use to ship our orders. I want to say it was -- I'm not sure if it was Sovana Global Logistics or if it was -- I'm not sure, but it was an important phone call in regards to a shipment.**
Q Okay. And you said you took that call first and then you took the personal call?
**A Correct.**
Q And when you took the personal call, you were sitting in your car outside at the time you took that?
**A No. I was never in my car. I was in front of the building.**
Q Okay. And who was that personal call?

156

**A My daughter.**
Q Okay. And that call took you over the -- past the time the meeting was supposed to start?
**A Correct.**
MS. WASIK: Objection.
Q And how long past the time the meeting was supposed to start did that call take you?
**A Three minutes.**
Q Why do you say it was three minutes?
**A Because when Mr. Pickett came out to get me he's like, yo, and I looked at my watch and it was 10:03.**
Q Did you immediately end the call and go with Mr. Pickett?
**A Yes.**
Q Okay. All right. So where was this meeting that was taking place?
**A In the conference room.**
Q And who was in that meeting?
**A Everyone in the warehouse except me.**
Q And you said it was an all-hands meeting?
**A They call it all hands, meaning all hands on**

157

deck.
Q And was there an agenda for the meeting?
A I don't know what the agenda for the meeting was. Mr. Moppins would call a meeting. We would usually not know what it was for.
Q And everybody was invited to the meeting?
A Correct.
Q You were invited to the meeting?
A Correct.
Q And Mr. Pickett was obviously invited to the meeting as well?
A Yes.
Q So when you got to the door with Mr. Pickett, you said Mr. Moppins let Mr. Pickett in and then closed the door and locked it?
A Correct.
Q Could you hear any of the conversations inside?
A I could not.
Q Do you have any personal knowledge of what was said in that room at the time? Did you hear anything that was said in that room?

158

A Other than the fact that the majority of the meeting was about me and the rumor.
Q Okay. And you were told that by somebody? When I say personal knowledge, what did you hear? That's all I'm looking for. Personally, what did you hear?
A I didn't hear anything.
Q Okay. Thank you. All right. So after that meeting, you went to your office or your desk, got your keys and left the building?
A After sending Mr. Pickett a text message to let him know, you know, I'm going to leave and go home.
Q Okay. Did you tell him why?
A He knew why.
Q Why did he know why?
A I just had the door slammed in my face and was locked out of a meeting in front of everyone.
Q Do you know if anybody saw that?
A Everyone that was inside that room saw that.
Q Why did you say everybody inside that room saw that?

159

A Mr. Moppins gave the meeting. He's the speaker. Mr. Moppins had to stop speaking to come over to the door and make that happen. I'm pretty sure all eyes were on him.
Q Okay. And could you see where people were sitting in the meeting?
A I could not.
Q But you think they saw you?
A Yes.
Q Okay. And do you know why you were excluded at that time?
A I don't know why.
Q Did Mr. Moppins say anything to you at that time?
A No.
Q Did he look at you at all?
A No.
Q Did he know you were there?
A I know he knew I was there.
Q How do you know he knew you were there?
A Once Mr. Pickett was able to go inside, the immediate way he closed and locked the door; and I

160

even knocked afterwards.
Q Okay. How did he close the door?
A As soon as Mr. Pickett's body slid – like he opened it enough for Pickett to get inside, and Mr. Pickett is fairly large guy. And as I went to advance, the door was slammed immediately –
Q Did it make a noise?
A – and locked, and then there was the laughter.
Q But you don't know what they were laughing about at the time?
A No.
Q Okay. Did you text anybody other than Mr. Pickett that you were going home?
A No.
Q Did you clock out?
A I didn't need to because I was salary so...
Q Didn't need to keep track of personal time?
A No.
Q Okay. Where did you go when you left?
A Home.
Q Okay. Did you call anybody while you were

161

at home?

A No.

Q Did anybody call you from the office while you were home?

A No. I'm sorry, did you ask did anyone call me from the office while I was at home?

Q Yes, ma'am.

A No.

Q Did anybody text you while you were at home?

A Not while they were in the office, no.

Q Did Mr. Pickett respond to your text?

A I didn't text Mr. --

Q You told --

A Oh, that I was leaving?

Q Yes, sir -- ma'am. I'm sorry.

A I don't remember. I don't remember.

Q But eventually somebody reached out to you from Reema and -- strike that and let me ask it this way: Later that day, did an employee from Reema reach out to you?

A Two.

Q Two employees?

162

A Yes.

Q What two employees reached out to you?

A Demarcus and Rachelle.

Q Okay. And how did Rachelle reach out to you?

A Via cellphone.

Q So she called you?

A Yes.

Q What time did she call you?

A I'm not sure what time it was. It was after her shift, but it was later on that day.

Q Okay. And what did she tell you on that call?

A Pretty much how they were trying to make me look bad in the meeting.

Q Anything else?

A Just pretty much how I'm a bad manager, how they feel like I use my sexuality to get to the top, things like that.

Q Anything else she told you they said?

A Just pretty much how it seemed that Larry was feeding into it and he kept asking questions in

163

regard to certain things. Instead of, I guess, ending the meeting, he allowed it to continue to go on.

Q Anything else that she told you?

A Not that I recall at this time other than us going off of the work subject and just having a homey conversation or girlfriend conversation. But, you know.

Q Did she say whether any work subjects were discussed in this meeting?

A She did say that Donte and Manley were the main two complaining about me, about how I'm really bossy, you know, things like that.

Q Okay. Was there anything -- any work subject that was discussed? Other than your management style or their perceptions of your management style, was there anything else that was discussed in this meeting?

A I don't know. This is the only information that I was given in regard to the meeting or what was being discussed in the meeting.

Q And you don't know why the meeting was

164

called?

A No.

Q And you were invited to the meeting?

A I was invited to the meeting.

Q And then you don't know whether the meeting was formed just to talk about you and your management style?

A I don't know why the meeting was called.

Q Do you know if there were any minutes of the meeting or any notes taken from that meeting?

A No. I wasn't there.

Q Okay. In that conversation that you had with Ms. Lee, did you mention anything about the rumor to her?

A I don't remember if we talked about the rumor. Like I said, Ms. Lee and Mr. Jennings had a friendly relationship outside of work. Ms. Lee had her own motives for why she was going to continue to have a friendly relationship with Mr. Jennings. But she was aware and she told me that, you know, to pretty much not feed into it, not pay any attention to it, just continue to do what I do, do my job.

165

You know, encouragement-type of thing.

Q When she said don't feed into it, was she talking about the rumor or just the fact that --

A Just that --

Q -- people were commenting on your management style?

A Just everything that was going on in that meeting. Just don't feed into any of it. Stay focused. Do what you do.

She did offer that, you know, there may be a jealousy issue, the fact I have advanced and they haven't. Mr. Ferguson had been there way longer than me and I ended up being his manager. He was disgruntled about that. And so that's just pretty much it.

Q Did she indicate that the rumor was discussed in that meeting?

A She told me that -- something of that nature. No one specifically said Pickett and I were involved, but it's just using my sexuality to get to the top type of thing. How things weren't fair how I got promoted and they didn't, you know; and my

166

management style.

Q And you said the other person you talked to about that meeting was Mr. Pickett?

A Yes.

Q Did he text you or call you?

A He called.

Q Okay. And when did he call you?

A That same day.

Q Was he still at work?

A No, he was, I believe, en route from work.

Q And did he call you on the company cellphone or personal cellphone?

A He called my personal cellphone.

Q When you texted him and said you were leaving for the day, was it on the company cellphone or personal cellphone?

A Company.

Q When would you choose to use the company cellphone versus personal cellphone to contact Mr. Pickett?

A My personal cellphone was used for social media. It was used for a lot of things. Just for

167

personal things like kickball or, you know, hey, we're going to meet at the pool hall, you know.

Q You still had the company cellphone with you at home, right?

A Yes.

Q But Mr. Pickett called your personal cellphone?

A Yes.

Q Do you know when he got your personal cellphone number?

A When I first started working there.

Q And when did he first start contacting you on your personal cellphone?

A When I first started working there.

Q Why was he contacting you on your personal cellphone?

A That was the only form of communication that they had for me. If they needed me to stay late, they would contact me via cellphone.

When I first started I was just an inventory control clerk but the assignment -- some of the assignments required communicating with them. There

168

were days in order to get the weapons inventory done and consolidated I had to communicate with them. They weren't there, so I would communicate with them through my personal cellphone.

Q Okay. So that day, the day of the meeting, what did -- Mr. Pickett called you; what did he tell you in that conversation?

A He just like you know, yo, you good? You okay? He did speak on Larry, how Larry responded to me, slamming the door in my face. He told me how he felt about that situation. But then again, "What can I do? That's just Larry."

Everyone knew how Mr. Moppins was. He was -- he did that -- stuff like that. It was just like he didn't give up too much detail but he's just like eventually it got to a point where they had to pull Jennings and Ferguson into the office to have a one-on-one with them because it was getting out of hand and everyone else was just kind of sitting around and looking like whoa, and so...

Q Did he tell you that in that conversation?

A Yes.

169

Q So let's go back for a second. So he asked if you were good? What did you respond to him?
**A I told him yes. I didn't appreciate being excluded from this meeting and having the door slammed in my face in front of everybody. It was embarrassing.**
**And he said how -- what he thought of it, like "That wasn't right, but that's just Larry."**
Q Did he say whether he spoke up on your behalf when Larry did that?
**A No, he didn't.**
Q Did he tell you what was said in that meeting?
**A Not so much of that meeting. But pretty much the meeting, once they pulled Ferguson and Jennings out of the all-hands meeting, I guess, that meeting was dismissed and they continued a meeting with the two of them in Mr. Moppins office.**
Q So the only way you know what happened in that meeting is based on what Ms. Lee told you?
**A And, you know, pretty much Mr. Pickett like, you know, those guys got a problem with you. Like,**

170

**for whatever reason, Manley and Donte got it in for you.**
Q So he told you that in that phone call?
**A He did.**
Q Okay. And did he say why?
**A That's when what occurred in the second meeting with the four of them came up. Like, they pretty much felt like I was a bad manager. I believe what Mr. Moppins said to me later on was Manley stated he heard I had been sleeping with him, Mr. Moppins, that's how I got all my promotions.**
**I think at that point Donte said, you know, he didn't feel like -- I don't -- what Mr. Pickett said Donte stated he felt like something had to have been going on for me to continuously get promoted and constantly move up.**
Q Do you recall anything else that Mr. Pickett told you about that conversation between Mr. Pickett, Mr. Moppins, Mr. Jennings, and Mr. Ferguson?
**A Donte stated, I don't care who she's sleeping with. She just can't treat us the way she**

171

**treats us. I don't want to be talked to like a child.**
**Those are most of the things that I can recall at this time.**
Q This may be semantics, but just because "most of the things," is there anything else that you can recall that you --
**A Like the main things that stand out are these things, and these are the reasons why I decided that I needed to have a conversation with Mr. Moppins.**
Q All right. Did Mr. Pickett say anything about whether the rumor was discussed in this meeting?
**A In so many words, the fact that me using my sexuality to get to the top came up and how that's not fair.**
Q Mr. Pickett told you that came up in the meeting?
**A Yes.**
Q Anything else that you can recall?
**A Not at this time.**

172

Q So after you talked to Mr. Pickett, how long did that conversation last?
**A A short while. I was done. Maybe a few minutes. No more than ten minutes. I had already made a decision tomorrow when I go in I'm going to speak to Larry.**
Q When did you make that decision that you were going to speak to Larry?
**A After talking to -- well, before the phone conversation ended with Pickett.**
Q Okay. And the next day, did you speak with Mr. Moppins?
**A Yes. Once I arrived at work, he wasn't there yet so I sent him an email requesting a meeting. I think he responded back and said he was just getting in, let him get situated or something to that effect.**
Q Did you tell him what you wanted to talk about?
**A No.**
Q Okay.
**A I think it was a few hours later and I still**

173

hadn't heard back from him so I gave him a phone call to see when his availability was -- would be to talk to me. And he kind of took a deep breath and said, Come see me in about ten minutes or so.

And so I remember waiting ten minutes, but in that time I was still working. I went -- I had to meet with Jolene Grzechowiak for some information, and she kind of offered, I'm sorry you're going through what you're going through. And then that's when she told me about her situation with Donte.

Q Okay. And what did she tell you about her situation with Donte?

A The day before they all went out to lunch she --

Q The day before -- the day of the meeting?

A The day of the meeting.

Q Okay. Thank you.

A I believe she said it was her, Donte, Manley, and I can't remember who else, but I remember her just like saying how rude Donte was, how annoying he is, and he's just so disrespectful.

174

He just kept flirting with her, and she's like, no, I'm good. And he was just being extra, is how she pretty much described it.

And I told her, I said, Well, you should say something, you know.

And she's like, I don't want to. I just want it to go away.

And I informed her, I'm a manager and you're telling me that you were disrespected by another employee. I have to say something about it. And I told her I was meeting with Larry, and I would probably say something. Well, she asked me not to but, you know, I told her that I was.

Q And why did you feel it was important that you say something?

A As a manager, if an employee comes and tells me that they were violated or disrespected or, you know, something like that, unwanted advances and things like that is occurring, I have to. It's -- you know.

Q When Mr. Pickett told you two months before about the fact that there may be a rumor about this,

175

do you feel he should have gone and talked to somebody?

A I absolutely did.

Q And did you have a problem with the fact that he didn't talk to anybody?

A I did have a problem, but I kind of understand that they had that bro code type of thing. Like, there was a relationship. They hung out as buddies. I guess, go fishing and things like that together. I knew he was telling me something that he probably shouldn't have been telling me because Moppins had that conversation with him probably as a bro, you know, whatever the code is.

And I know their work relationship was pretty much built on trust. Like, there were things that should probably be discussed amongst them that should have stayed among them. But, yeah, kind of feel like he knew he violated that by telling me, but he also wanted me to know this is what's going on.

Q Couldn't he have gone to HR if he wanted to?

A I don't know what he could have done. You

176

know, he could have probably done a few things. He probably could have stopped it right there in its tracks and it never made it out of that office, probably could have called Channel 7. I don't know. He could have done a few things. But I know what I was going to do at that point after talking to him on the phone that day of the meeting.

Q Okay. I'm going to go back before that.

A Uh-huh.

Q You knew instead of going to Mr. Moppins you could go to HR, right?

A I could have.

Q Okay. Why is you didn't go to the HR when Mr. Pickett first told you about the rumor?

A I wanted to give Mr. Moppins an opportunity to be the manager or the leader of this organization. It's kind of like going over his head without having a conversation with him first; and so that was the decision that I made to go to him first.

Q Okay. Well, as I understand it, you talked to Mr. Pickett first in March when you heard about

177

the rumor?

A Uh-huh.

Q And then this meeting happened some time middle to late of April?

A Uh-huh.

Q And during any of that period of time, did Mr. Moppins do anything that you know of that spread this rumor?

A That I know of?

Q Yes, ma'am.

A Other than the conversation with Pickett?

Q Well, that was what prompted Mr. Pickett --

A Right.

Q -- to first tell you, right?

A No.

Q Okay. Do you know if Mr. Moppins talked to anybody else about that rumor?

A Do I know?

Q Yes, ma'am.

A No.

Q So going back to the meeting with -- I forgot to ask you, you mentioned that Ms. Romaine

178

Thomson had her own harassment issue at Reema?

A Correct.

Q What was that?

A Something occurred in the SPEAR department with an employee that works directly for the State that was a former employee of Reema. Ms. Thomson was written up twice. Just based off of what she told me, there were some comments made by the employee for the State that were of a sexual nature and it was a whole bunch of laugher and things. Either way she felt uncomfortable. And then she was written up for an error or mistake that happened and she decided to go to HR; and then she did tell me she retracted all of this and ended up quitting.

Q Did she tell you what HR did as a result of that?

A No, she didn't. She really didn't want to talk about it and so I wasn't going to force her to talk about it.

Q Did she say whether the mistake that she was written up for was accurate or not?

A She said she was ultimately blamed for

179

something that wasn't her fault because she was responsible. She was responsible for it. I'm not sure of all the details but...

Q Okay. Go back to the meeting with Mr. Moppins, the next day after the meeting.

A Okay.

Q He said meet me in ten minutes. You went to talk to Jolene, and then you went to talk to Mr. Moppins?

A Correct.

Q Who else was present in the meeting with you and Mr. Moppins?

A Demarcus was in there first. I want to say he eventually sent for Angela.

Q He, being?

A Moppins.

Q Anybody else?

A No.

Q And where was this meeting?

A Moppins's office.

Q Okay. You said Mr. Moppins sent for Angela. Had the conversation already started and then he

180

sent for Angela or did he say, hold on, we're going to send for Angela and then the conversation started?

A I'm not sure at what point but eventually the four of us were in there. I'm not sure at what point did Demarcus get up and leave out and it was just Mr. Moppins, Angela, and myself. But the four of us were in there at one point when the meeting first started, and then later Demarcus had to leave out to go handle something going on in the warehouse and it was just myself, Angela, and Moppins.

Q How did the meeting start?

A You know, I pretty much started with him slamming the door in my face and me not being allowed in an all-hands meeting. If it was a mandatory meeting, I'm not understanding why I wasn't allowed in the meeting.

And then I told him I did find out what the meeting was about, and that's when we went into him not knowing what was going on but Manley and Donte started talking, and then he then told me that Arnel started talking about an issue, and he keep asking

181

them, What are you talking about, what are you talking about, to get more information.

And he said they came to his office with him and Pickett and told him that they had heard I was sleeping with him and Pickett at one point and just going on.

And then I asked Mr. Moppins, I said, Well, why was this allowed to go on in a meeting and a meeting where I wasn't there to even defend myself or clear up my name?

He then stated something along the line of he didn't know that's what was going to happen. He said they started telling -- saying things to me, so me and Pickett brought them in to find out what was going on.

And that's when I told him, you know, about Donte and the rumor and having a conversation with Thomson, and I told him at that point, you know, I asked Donte -- well, I told Donte if there's anything he wanted to know about me that he should ask me.

And then at that point Mr. Moppins accused

182

me of being the reason the rumor was in the warehouse and stated that because I asked him that now he can't do what he wanted to do for me as far as he had big things planned. The State was planning on adding an addition to the warehouse, another department and things like that, and he saw me being the person to run that, and now he can't do anything.

And at that moment I got angry because, what do you mean? Why is a rumor that's being surfaced about me and my advancements or promotions -- why does that that have anything to do with my work and me being able to be promoted based on my work?

And, you know, at that point he got upset. I don't remember exactly what I was even trying to say because the both of us were trying to get points across. He was angry as well.

I then tried to tell him about Jolene's situation with Donte, and I remember him saying, you know, I can't do anything about that. You know, Jolene ain't come and tell me. I can't do anything about that.

183

And I remember saying, I'm telling you. You know, he pretty much was blaming me.

Q That's how you felt at that time?

A That's exactly what it was. He was saying it's -- the rumor, like all of this is here in the warehouse because of you. You shouldn't have went and told Donte -- said nothing to Donte. Those were his exact words. Ms. Wallace did her best to try and neutralize the situation because she saw both of our tempers.

And so I left because I knew I needed to go and calm down because he's still my boss, and I don't want to get too out of line or out of pocket.

And so I remember Angela just like, everybody needs to calm down and get some air or something. And I remember leaving, leaving out of the office, and that was pretty much kind of that for the day.

Q You remember Angela telling you it's time to leave?

A Not time to leave, but just like everybody needs to calm down and pretty much go get some air.

184

That was like her thing, just take ten, calm down, meet back up. That kind of thing. I just remember leaving the office.

Q There was shouting at that point in time, wasn't there?

A On the both of our ends, absolutely.

Q And Ms. Wallace is the one that said that is enough, time to go out?

A Time to calm down, yeah.

Q And then she got you out of the meeting at that time?

A No. I left.

Q Did anybody suggest you leave the meeting?

A No.

Q Okay. All right. So let's go back. Let's break down everything you had to say for a second.

First thing you said, you told Mr. Moppins you were upset with the door being slammed in your face; what did Mr. Moppins say about that?

A Mr. Moppins said my meeting starts at 10 o'clock. You weren't there at 10:00, so you excused yourself from the meeting, or something to

that effect. Not excused yourself. But pretty much that's what I got from what he was saying. But he did say the meeting started at 10:00 -- my meeting started at 10:00 and you weren't there.

Then I offered I was on the phone with someone trying to get the -- we had a big shipment where we were shipping all the, I think, Iraq, everything that was in our Iraq course had to go or one of our courses. And so that was a big project and so that's what I was working on. But, of course, I wasn't given the opportunity to explain why I was tardy or late or anything.

Q You didn't tell him you were on the phone with your daughter, that's why you were late?

A No. That's -- I had two phone calls. I got both phone calls before the meeting started. The Iraq conversation probably took me beyond 10 o'clock because I was only on the phone with my daughter in that situation for about a minute and some change according to my cellphone?

Q When is the last time you looked at that?

A I looked at it that day. As soon as you hang up, it gives you a time. It was like a minute and 21 seconds.

Q And the reason you got off the phone call at that time was Mr. Pickett came to you?

A Correct.

Q But you didn't tell Mr. Moppins that at that time, did you?

A No. I wasn't given an opportunity to tell Mr. Moppins anything.

Q Well, you said you started the conversation --

A Yeah, until that day. Until the day of the meeting.

Q Even in that meeting you didn't tell him you were on the phone with your daughter?

A No. I told him I was on the phone dealing with the shipment.

Q But you left off the part that you then called your daughter and then talked to your daughter until Mr. Pickett came, right?

A Maybe, maybe not. I remember telling Mr. Pickett though.

Q So the next thing that happened in the conversation you said you had with Mr. Moppins, you were talking about what people were saying, the rumors that were going around. Did he say anything about there was a rumor that was being said about you and Mr. Pickett sleeping together?

A Mr. Moppins stated that he heard -- they were saying that I was sleeping with him.

Q With Mr. Moppins?

A With him. Yes, Mr. Moppins.

Q Okay.

A He said once that was said, he needed to speak to them in his office. So that, of course, let me know that there were other things being discussed in the all-hands meeting outside of just work-related issues, because once he said that, he's like I need to meet -- you all two come in my office. Everybody else go back to work or whatever.

Q And those two were Donte Jennings and Manley Ferguson?

A Manley -- right.

Q And just to make it clear, you were not sleeping with Mr. Moppins at that time?

A I was not sleeping with anyone at that time.

Q All right. And obviously Mr. Moppins knew that, as well, at that time?

A Correct.

Q Did Mr. Moppins say anything about any rumors that were being discussed about you sleeping with Mr. Pickett?

A After he said -- I think Manley said that he heard I was sleeping with Moppins, he said then Donte is saying you were sleeping with me and Pickett. So he wanted to get to the bottom of it, and so they had them come to the office. This is what Mr. Moppins is saying to me.

Q No, I understand. That's what I'm trying to get at, what happened in this meeting, what he said to you.

And did you get a chance to respond to that in any way?

A Yes. I remember asking Mr. Moppins how did he put an end to that situation, you know, if it's rumors and our employees, our staff is putting false

189

**rumors out there, how -- how, you know, did you have my back as your manager and someone that wasn't here. And I think that may have rubbed him the wrong way as well, because it's just like you're my manager on my behalf. I'm not here. You're the senior manager here. Did you just allow it to go on? Like, what happened, you know?**

Q How do you know that Mr. Moppins knew that was false at that time?

**A What do you mean?**

Q Well, you said you felt like Mr. Moppins didn't have your back, right?

**A Correct.**

Q You felt like why didn't he just shut it down at that point in time, right?

**A Right.**

Q Okay. Well, how did Mr. Moppins know that you were not sleeping with Mr. Pickett?

**A I would assume after he and Mr. Pickett had a conversation. Like, that's his friend. Like, whatever outside of asking him if he and his wife were getting divorced because he's screwing me, I'm**

190

**pretty sure Demarcus told him that was false or it wasn't true.**

**Mr. Moppins, as the senior manager, if whoever is sleeping with anyone, it's not work talk. You know, work -- that talk shouldn't be going on in the warehouse regardless of whoever is sleeping with whoever, or isn't. Work should be discussed in the workplace. And so that is one of the reasons why I looked at Moppins like, you know, you had all the power to call an all-hands meeting and shut any talk of anybody sleeping with anybody down.**

Q You would agree with me that if you find out that one employee is harassing another employee of a sexual nature that as a manager you have the obligation to report it, correct?

**A Harassment, absolutely.**

Q And you have the obligation to investigate whether there was any truth to the harassment claims, correct?

MS. WASIK: Objection.

Q Didn't you feel that was part of your duties as manager?

191

**A To report it and -- to the senior manager?**

Q Right.

**A Yes.**

Q So that they can investigate to get to the bottom of things, correct?

**A Yes.**

Q Okay.

**A Because unwanted sexual harassment creates a hostile environment. All of that is against the law.**

Q Correct. And so an employer has an obligation to do an investigation to find out when somebody comes forward and makes certain claims, correct?

MS. WASIK: Objection; calls for a legal conclusion.

Q I'm asking for your understanding as a manager.

**A As a manager, there's a protocol, a certain way you go about doing things to investigate and get to the bottom of things.**

Q But you're supposed to investigate, correct, you would agree, as a manager?

192

**A I would.**

Q Okay. Thank you. So at that point in time Mr. Moppins asks these gentlemen to come into his office to explain their comments, correct? That was your understanding of what he told you had happened?

**A After the meeting in which he continued to question these two in front of the entire staff, yes, he did, to my understanding.**

Q Okay. And did you not think that was part of his investigation?

**A No.**

Q Why not?

**A Mr. Moppins, I believe his reasoning was to exclude himself from anything or find out how much of his involvement everyone was aware of.**

Q I'm not following you.

**A Like to pull these two to the side and find out -- especially to hear that there's a possible rumor or something of the two of us, me and Mr. Moppins, like once that came out, okay, now let's go to my office and investigate.**

193

Q You don't think that was an investigation then?
**A I think it was being nosey, or CYA, covering his ass.**
Q That's why he brought Mr. Pickett in too?
**A Possibly. That was the homey, his friend. It's not like Ms. Wallace as a neutral party was brought in or even HR.**
Q So you don't think he was investigating claims. You think he was just trying to cover it up?
**A I think he was trying to find out how much he was involved or how much was out there -- that, you know, could implicate him or put him in the midst of it. That's what I think.**
Q Isn't that part of an investigation, find out how far the rumors go?
**A Possibly.**
Q But you don't think that's what he was doing?
**A No, not at all.**
Q And that's just based on your feelings for

194

what he was doing?
**A That's just based on observing how Mr. Moppins operates during my tenure at Reema.**
Q And Ms. Wallace was in this meeting with you and Mr. Moppins talking about this, correct?
**A That's the part where I was trying to remember if she was summoned after or before it started. But I'm trying to remember if she was there initially or if started me, Larry, and Pickett and then Wallace, and later Pickett left.**
Q Okay. So when Mr. Moppins called Jennings and Ferguson into his office and he was telling you about what happened, do you know -- did he tell you whether he told them not to talk about anything anymore? Did he tell you anything about that conversation?
**A Ask me that again.**
Q Sure. It was poorly asked on my part.
Did Mr. Moppins indicate to you what he told Mr. Ferguson and Jennings after they came to his office to make these complaints?
**A No.**

195

Q Did Mr. Moppins indicate to you anything else that Mr. Ferguson or Mr. Manley [sic] said in that meeting?
**A Outside of them not liking the way I talked to them and the rumors, not that I can recall.**
Q What did he tell you about them not liking the way you talked to them?
**A It was mainly Ferguson that felt I would escalate or elevate my voice when speaking to him. Mr. Ferguson felt this way about just about every female supervisor he had. I'm not sure why that day was the first time I had heard anything about it. If there had been a complaint or, you know, if it was a huge moment, if my management style was an issue, shouldn't that have been what was being addressed versus the rumor or trying to get to the bottom of whether or not I was sleeping with Moppins or Pickett?**
Q Did Mr. Moppins tell you what the inquires were of Mr. Jennings and Mr. Ferguson about your management style?
**A No. I remember he said Arnel said he felt**

196

**like a slave.**
Q Who is the "he"?
**A Arnel.**
Q Oh, Arnel felt like a slave?
**A Yeah.**
Q Okay.
**A But again, Arnel was not present in the meeting, yet the meeting was about my management style or how I managed.**
Q Arnel was not present in the all-hands meeting or --
**A He was present in the all-hands meeting.**
Q Do you know whether Arnel said that in that meeting?
**A According to Moppins during the next meeting -- the next day's meeting. That's what he told me.**
Q Okay. So did Mr. Moppins indicate to you that Mr. Ferguson and Mr. Jennings were asked about your management style when he brought them into his office?
**A No. The main topic was the rumors or whether or not I was sleeping with Moppins. That**

**was pretty much -- he did mention it, but it wasn't at the forefront, my conduct. It was the rumor.**

Q But in that meeting that you had with Mr. Moppins, Mr. Moppins told you that your management style was something that was being discussed?

**A During the meeting, the all-hands meeting?**

Q Yes, ma'am.

**A Yes.**

Q Okay. Did Ms. Wallace other than saying let's remain calm, let's breathe, whatever that was, did she say anything else substantive in that meeting?

**A I remember Angela saying I get your side of it, and I also see where Larry is coming from, but at this point because it's so heated we should cool down or calm down.**

Q And that was during the meeting?

**A That was during the meeting.**

Q Okay. And is that when you and Ms. Wallace left Mr. Moppins' office?

**A I'm not sure at what point Angela left. But I left first.**

Q Okay. You don't know whether Angela and Mr. Moppins had a further conversation after that?

**A No, I don't know.**

Q And where did you go when you left there?

**A Back to my office.**

Q And was that the end of the day for you? Did you go home after that?

**A No.**

Q Okay. Did you discuss with anybody during that day that meeting you just had with Mr. Moppins and Ms. Wallace?

**A No.**

MR. WALSH: Okay. That's fine. Let's take a break.

(Off the record.)

BY MR. WALSH:

Q Ms. Parker, going back to the meeting you had with Mr. Moppins, you finished the meeting, you went back -- at the end of it you went back to work. Did you talk to anybody else that day about the meeting you had with Mr. Moppins?

**A No.**

Q Did you talk with anybody about the all-hands meeting that happened the day before?

**A No.**

Q Okay. You told me that at some point you talked to two other ladies about that all-hands meeting?

**A Yes.**

Q When did you talk with them?

**A The morning of the meeting with Moppins.**

Q Okay. So you talked to Jolene and you talked to two other people that morning?

**A I didn't speak with Jolene until later. Maddie and Sheba were already there. So we were kind of like there at the same time. Jolene's report time was later. She was there later.**

Q But all three of these ladies were before you met with Mr. Moppins?

**A Yes.**

Q Let's talk about Maddie first. Did you meet with Maddie alone or did you meet with Maddie and Sheba together?

**A Sheba -- Maddie and Sheba together.**

Q And Sheba with a B?

**A Yes.**

Q Okay. Thank you. That's fine. Just want to make sure I keep it straight.

**A Right.**

Q What time did you meet with them?

**A I'm not sure. It was early. Like, just coming to work, still kind of kicking it, drinking coffee.**

Q And where did you meet with them?

**A In the inventory office. The inventory control office.**

Q And what did you say to them at that time?

**A I asked, Did you-all know anything about a rumor about me and Demarcus?**

Q What did they say to you?

**A Sheba was pretty much like not until the meeting, that she, you know, didn't know what was going on. Maddie was just kind of like, you know, she hear things and she heard things but she don't pay any attention to them. That's kind of who she is.**

Q Did she say when she heard things?
**A No.**
Q And she didn't say what she had heard?
**A No.**
Q All right.
**A But they assured me that they didn't have anything to do with it.**
Q Did they say who did?
**A No.**
Q Okay. Did they tell you anything else about the meeting?
**A Other than Sheba like it was just crazy, it was out of hand (demonstrating.) It was kind of like (demonstrating) did her hand like that and it was just like, you know.**
Q Just waived her hand about it?
**A Yeah, kind of like, it was just crazy. It was out of hand, too much.**
Q Did she tell you anything that was talked about in that meeting?
**A Other than the fact that she heard in the meeting what was going on, no, not details. She just pretty much like it was being talked -- like I heard it in the meeting.**

Q She heard the rumor in the meeting?
**A Yes.**
Q The rumor with Mr. Pickett or with Mr. Moppins or did she say not say?
**A Well, I asked her about the rumor with me and Demarcus, and she said she heard it in the meeting so...**
Q Did she say anything about what else was being said in that meeting?
**A No.**
Q She didn't tell you who said anything about the rumor in that meeting?
**A No. No.**
Q Okay. Did you -- did the three of you discuss Mr. Jennings at all then at the time that the three of you were talking?
**A Other than the fact that pretty much the same people, the same two people was doing all the talking, Donte and Manley, that's pretty much the only time Donte's name came up. But, yeah.**

Q And did they say anything specific as to what Donte or Manley were saying?
**A Not specific. But I specifically asked them about the rumor discussed with Pickett and myself, and that's when, you know, she was like I heard it in the meeting, you know.**
Q She indicated that was the first time she heard it?
**A According to her statement, yeah.**
Q Okay. Did she say what Mr. Moppins did in that meeting?
**A No.**
Q Did she tell you what Mr. Pickett did in that meeting?
**A No. Outside of them all going back to his office and, you know, everybody else went back to work, no.**
Q Did she tell you they went back to Mr. Moppins' office?
**A Yes.**
Q And --
**A Larry ended the meeting and they went to Larry's office. But I don't know, this is crazy.**

Q I understand.
But just to make it clear, when she said "they, who did she mean?
**A Larry, Ferguson, Jennings, and Pickett.**
Q Okay. Thank you. Did she say anything else about what that meeting was supposed to cover or discuss?
**A No.**
Q Okay. So let's jump forward again. So you leave the meeting with Mr. Wallace -- I'm sorry, Mr. Moppins and you go back to work. What's the next thing that you did with respect to your conversation with Mr. Moppins or anything about the rumor?
**A Documentation.**
Q Okay. And what did you do?
**A At that point, I started documenting conversations with myself and Mr. Moppins. Or, you know, just documenting things at that point.**
Q What kinds of things were you documenting?
**A I documented the events of that meeting. I documented the conversation with Jolene, and all**

205

**occurrences that started occurring there after.**
Q And where did you keep this documentation?
**A In my files.**
Q Okay. Handwritten? Was it typed up?
**A I typed it up.**
Q Okay. On your work computer there?
**A Yes.**
Q Okay.
**A On Word, yes.**
Q Okay. Let's mark this as the next exhibit.
(Exhibit 13 was marked for identification and is attached to the transcript.)
Q Ms. Parker, take a second and look at what I've given you as Deposition Exhibit No. 13. Ms. Parker, are you familiar with these documents?
**A Yes.**
Q And is this documentation you were maintaining?
**A Yes.**
Q And how is it that you have -- got a copy of this?
**A It's my document.**

206

Q You said it was maintained on your computer at work, that's what I'm trying to understand.
**A I emailed myself. I would email my personal email with the records that I was maintaining --**
Q Okay.
**A -- and my information.**
Q And this was all prepared on the day or near the days which are indicated on here?
**A The 21st, the 22nd. I'm sorry, the 21st was documented the day I left out of Larry's office.**
Q Okay.
**A So I recall the events of the 21st, but I didn't start this until the 22nd of April.**
Q Okay. All right. And then other than maintaining this documentation, you said this was the next thing you did after you left Mr. Moppins office. What did you do after that with respect to the rumors or with respect to Mr. Moppins' conduct?
**A The next business day after the meeting in Larry's office on the 22nd, I believe the weekend was there. That may have been on a Friday. So that Monday morning -- excuse me -- Larry requested my**

207

**presence in the conference room where he, Demarcus, and Angela were waiting. And he wanted to meet with me about my behavior during the meeting in his office. Mr. Moppins informed me that he should have fired me that day, but if I ever thought about talking to him like that again, my ass is going to be out of there so quick. Something like that.**
**Again, I apologized for my insubordination to Mr. Moppins in that meeting. And at that moment I alerted him that I knew of his involvement with, you know, the rumor as far as the conversation he had with Mr. Pickett. He was very upset about how I was talking to him during our meeting and that's what he wanted to address.**
**After apologizing, I then informed him why it was so easy for me to get angry. Because he was not only accusing me of starting or bringing the rumor or the shit into the workplace, it was like, you know, for you to say or ask Demarcus if he was getting a divorce because he was fucking me, that wasn't cool. And at that moment he got angry all over again. He didn't want to hear anymore. That's**

208

**when he told me, you know, I had a private conversation with my deputy program manager. That was between me and him, XYZ. You know, he was angry. He was yelling. And I just remember sitting there and just like, okay, I'm not going to get angry with him and go back and forth. I'm just going to wait until it's over and then I'm going to HR, and that's what I did.**
Q So did Mr. Pickett say anything during that meeting?
**A No one said anything except Mr. Moppins after that point after I informed him that I knew about the conversation with him and Pickett and the comment that he made.**
Q And you agreed with him at that point in time that you were insubordinate on Friday?
**A Me getting angry and allowing my emotions and frustrations to get the better of me, absolutely.**
Q And after you left then, how long was this meeting with Mr. Moppins?
**A On the 25th, that morning we met?**

209

Q Right.
**A It wasn't long at all, a few minutes.**
Q Okay.
**A Yeah.**
Q And you said Angela was in that meeting as well. Did she say anything at that time?
**A I don't recall.**
Q Okay. And then you made the decision while you were sitting in that meeting to go to HR?
**A When he started shouting and yelling and after he told me, you know, I should have fired you on Friday; and then even in that meeting on Friday to blame me for being the reason the rumor was in the warehouse and to tell me I can't advance you, I can't do anything for you because of this situation, yeah, it's -- I didn't see or feel like that meeting was for resolve. It was only going to get worse so...**
Q Did he say why he felt you brought the rumor to the warehouse?
**A Because I asked Donte if he had anything that he wanted to know about me to ask me**

210

**personally. He felt that was me or because I did that I was bringing the rumor or the situation to the warehouse.**
Q And Mr. Moppins told you that?
**A Correct.**
Q Okay. All right. So after you left that meeting with Mr. Moppins, what's the next thing you did with respect to the situation with Mr. Moppins?
**A I went to HR. I went to speak to Cathy.**
Q And that's Cathy Price?
**A Correct.**
Q Did you go right to her office? Did you go back to work for a while and then go see her, just timing-wise?
**A No. I went straight from the conference room right into her offices right next door.**
Q Did Mr. Moppins know you were going to HR at that time? Do you know if he knew?
**A No, I don't.**
Q Okay. You didn't say anything in that room, "I'm going to see HR"?
**A No.**

211

Q Okay. What did you tell Ms. Price at that time?
**A I told Ms. Cathy everything from the phone call that I received from Demarcus informing me about the rumor. I told her the conversation that I had with Romaine. I pretty much told her everything.**
Q Okay. And was she taking notes during this time?
**A Yes.**
MR. WALSH: Let's mark this as the next exhibit.
(Exhibit 14 was marked for identification and is attached to the transcript.)
Q Ms. Parker, this -- what I've given you is Exhibit No. 14. It's a Reema Consulting Services sexual and other unlawful harassment investigation questionnaire. First, I want to ask you, do you recall if you gave any documents to Ms. Price at that time?
**A No.**
Q Okay. Do you not recall or you didn't give

212

her any documents?
**A I did not give her any documents.**
Q Okay. All right. And this indicates that it was on Monday 4/25/2016, and it says it was a complaint against Larry Moppins. Is that what you were there to complain about?
**A I was there to complain about Larry Moppins, as well as Donte Jennings.**
Q Okay. And she indicates on here that it was -- a hostile work environment and retaliation are checked; is that what you complained about as well?
**A Definitely a hostile work environment. Definitely -- I guess she took the information that I gave her and determined retaliation because I told her that Mr. Moppins blamed me for the rumor and stated that he would no longer recommend me for promotions and advancements and things like that. So I guess that's a form of retaliation.**
Q Okay. If you go down to paragraph No. 2 here, it says: In addition, there's a rumor going around the workplace that she and Mr. Pickett are

allegedly having an affair. She was told by Mr. Pickett that Mr. Moppins made a comment to him, quote, Is that why your marriage and performance is suffering, because you were fucking Mr. Parker?
I guess it's supposed to be Ms. Parker.
**A Okay.**
Q And you recall telling that to Ms. Price as well?
**A I didn't mention anything about Mr. Pickett's performance.**
Q About Mr. Pickett's performance?
**A Yeah. "She was told by Mr. Pickett that Mr. Moppins made a comment to him saying, is that why your marriage and performance is suffering?"**
Q Okay.
**A So...**
Q You didn't say anything -- well, let me back up for a second. Did Mr. Pickett ever tell you that Mr. Moppins accused him of his performance suffering?
**A No.**
Q Okay. So you don't know where Ms. Price

came up with that comment?
**A No.**
Q Okay. Next thing it says: A general staff meeting was held on Friday, April 22nd. At the staffing meeting some employee complained about Ms. Parker's behavior. After the meeting, Mr. Moppins had a meeting with each of the individuals.
Did you tell Ms. Price that?
**A No, because I'm unaware of a general staff meeting held on Friday the 22nd. That's the day I met with Mr. Moppins about the staff meeting from the 21st.**
Q But there was a staff meeting that was held, it's your understanding that it was about the complaints about Ms. Parker's behavior?
**A I informed Ms. Price that on the 21st, the all-hands meeting, is where I got the information that not only was the rumor discussed but, I guess, how I'm making a couple of employees feel. So, yeah.**
Q Okay. And this continues, it says: Three employees Donte Jennings, Manley Ferguson, Arnel

Ragunton, told Mr. Moppins that Ms. Parker approached them and stated: If you want to know who I'm fucking, come ask me directly. This is a direct quote from Ms. Parker.
Did you tell Ms. Kathy that?
**A No, I didn't.**
Q You didn't tell Ms. Kathy that at that time?
**A No.**
**Are you asking me if I told Ms. Kathy that this is what I stated to these three employees?**
Q What I understand this to be is that you went and met with Ms. Kathy and she took notes, and this is a reflection of what her notes were of that meeting with you?
**A No, this is not accurate.**
Q Okay. So you didn't tell her that those employees said that?
**A No. Because I had no clue at this time that this is a statement that any one of these employees had said.**
Q Okay. Did you say that to any of those employees?

**A No. The only employee I said anything to in regard to the rumor was Donte when I let him know, you know, if there's anything you'd like to know about my personal life, feel free to come and ask me.**
Q Okay. Did you --
**A So that's exactly what I told Ms. Kathy I said.**
Q You did not say to Donte, If you want to know who I'm fucking, come ask me directly?
**A Correct. I did not.**
Q Okay. This continues on. There's the indented items there. Ms. Price says she admitted that she spoke disrespectfully to Mr. Moppins but she was trying to defend herself. She said that she apologized.
That's accurate?
**A I did get loud with Mr. Moppins, disrespectfully as far as getting loud and being combative, yes.**
Q Okay. And she admitted that she did approach the accusing employees but she did not use

the words that they claimed?
**A I only approached one, Donte Jennings.**
Q You didn't tell Ms. Price you approached the other two employees as well?
**A Correct.**
Q Then it goes: Mr. Parker feels that Mr. Jennings is the source of the rumor that got started. Ms. Parker feels that the male employees do not respect her or like her and that they are trying to get her removed or fired.
Was that accurate at the time you spoke with Ms. Price?
**A No. I felt like Donte Jennings and Mr. Manley Ferguson, for whatever reason, was kind of jealous of my advances and moving up in the company and they're kind of like still on the same level.**
Q But it was only those two employees? It wasn't the male employees?
**A If there were other employees, male, that felt a particular type of way, I was unaware; but I'm definitely am aware of Mr. Jennings and Mr. Ferguson's feelings.**

Q And I understand. What I'm trying to get at is what you might have told Ms. Price. So what I'm trying to understand is if you told Ms. Price that other male employees were trying to get you fired, or was it only about Donte and Manley?
**A It was Mr. Ferguson and Mr. Jennings.**
Q Okay. And then it continues in paragraph 4 there, it says: Because she felt unfairly treated, Ms. Parker decided to file this complaint with HR.
Why did you decide to go to HR?
**A The outcome of the second meeting with Mr. Moppins, especially once I revealed that now I'm aware of something that you said in regard to this rumor, walking away from that meeting, I didn't feel like we were going to come to any type of solution. So the next step, if I went to -- I went through the chain of command. I went to Mr. Moppins with my concerns, and now it's out there that he's a part of it. So nothing will get done at this point. Now the next step in the process is to go to HR.**
Q Had you gone to HR to complain about employees before?

**A No.**
Q Okay. It's -- paragraph 4 continues, it says: Ms. Parker then proceeded to share that others are hooking up in the warehouse such as Jason Rogers (supervisor) and former employee Kathleen Davis; Donte Jennings and former employee and supervisor Romaine Thomson.
Did you tell that Ms. Price about that?
**A No.**
Q You didn't tell her about any other employees hooking up?
**A Jason Rogers and Kathleen Davis, that's the first -- this is the first time I'm hearing about this. That is not true.**
**I knew about Mr. Jennings and Ms. Thomson having a personal relationship, because she is one of the employees who confirmed that Donte Jennings is the one who told her about the rumor. And so I did inform her that I know Donte told Romaine because I know they deal with each other.**
Q But you didn't tell Ms. Price anything about Mr. Rogers and Ms. Davis?

**A No.**
Q It also continues, it says: Ms. Parker also stated that last year around November/December prior to her promotion as assistant warehouse manager, she and the former employee and supervisor Romaine Thomson was flashed by Donte Jennings in the breakroom.
Did you tell her that?
**A No. Mr. Jennings also had a personal relationship with Ms. Lee and took a photo of his private area via cellphone and texted it to Ms. Lee while at work, and so that's how Mr. Jennings and his private area came into the situation discussed with Ms. Price. And I asked Ms. Lee did she want to do something about it, but she didn't.**
Q Why did you tell HR about Mr. Jennings doing that at that time?
**A Ms. Lee told me about it, and I was her supervisor.**
Q When did Ms. Lee tell you about it?
**A I'm not sure when, but that's the day I found out that she and Donte were even having a**

221

**personal conversation or they were dealing with each other personally.**

Q But she told you that well before all this came out up with Mr. Moppins, right?

**A Yeah.**

Q So why didn't you say something, you were a supervisor?

**A As far as that?**

Q Yeah. Why didn't you say something before?

**A Ms. Lee and Mr. Jennings had a personal -- they were an item, and Ms. Lee didn't want me to say anything to Ms. Kathy about it.**

Q So why say it now?

**A Everything was coming out. I wasn't trying to leave any stone unturned. "Ms. Kathy, this is what's been going on. This is what is going on." So I'm not going to leave that part -- why leave that part out when that was something that occurred? Mr. Jennings took that photo in the restroom on the job and even though he sent it to someone he was having a personal relationship with, I told Ms. Kathy everything.**

222

Q At the time you went to meet with Ms. Kathy you were trying to get Donte fired, weren't you?

MS. WASIK: Objection.

**A No.**

Q Did you want Donte fired at that time?

**A I wanted an end to all of this before it got even further out of hand. I wanted everything addressed and possibly fixed so that I could continue with my job.**

Q How would it be fixed? When you went in, how did you want it to be fixed?

**A I wanted to be able to effectively do my job without disgruntled employees feeling like they didn't have to listen to me for whatever reason, without Mr. Moppins and the uncomfortableness that was in the warehouse all because of this rumor. Whatever HR had to do to fix it, I was open for suggestions. I didn't know exactly how Ms. Kathy could fix it, but I'm telling her and I'm going to give her everything so that she can find a solution.**

Q Did you tell her you wanted Donte fired?

**A No.**

223

Q Is there a particular reason why you didn't write Donte up when you found out about the incident with Ms. Lee?

**A Again, Ms. Lee and Donte were in a consensual situation and so it was -- it wasn't like Jolene's situation where it was unwanted. Jolene did not want to be bothered by Donte's advancements and things like that. So -- and Ms. Lee was -- she was okay with Donte's behavior.**

Q Did you tell Ms. Price about what Jolene had told you?

**A I did.**

Q The rest of this memo talks about things that Ms. Price did?

MS. WASIK: Objection.

Q And I just want to ask you few questions about whether you know whether any of this happened or not.

Statement No. 1 on the bottom of second page here, it says: No witness saw the door slam in her face by Mr. Moppins.

We talked about that already. Do you have

224

any reason to believe that that's not true?

**A I know at least Mr. Pickett saw Mr. Moppins slam the door in my face, so that is not true.**

Q Okay. All right. Statement 2 says: See a statement by Mr. Moppins. We'll get to that in a second.

Statement 3: This was verified by interviewing Mr. Pickett and Ms. Wallace who were present during the meeting, the manager's meeting and the one-on-one with Ms. Parker and Mr. Moppins.

Do you know whether Ms. Price interviewed Mr. Pickett and Ms. Wallace about those meetings?

**A No, I don't know.**

Q It says Statement No. 4: HR further investigated this claim with Mr. Jennings who adamantly disagrees that the alleged event did not take place. Do you have any reason to believe that Ms. Price did not speak with Ms. Jennings?

**A That Ms. Price did not speak with Mr. Jennings?**

Q Yes ma'am.

**A I don't know whether Ms. Price spoke with**

him or not.
Q The last sentence there says: However, Mr. Jennings was given a verbal warning about RSCI's sexual harassment policy and zero tolerance for such behavior.
Do you have any reason to believe that Ms. Price did not do that?
**A We all were required to take a sexual harassment course. We were all given -- I don't want to call it a verbal warning, but it was something stating that it was mandatory and anyone who refused or didn't take it would be disciplined and that was kind of the verbal. So as far as this, I don't.**
Q You don't know whether she had a separate conversation with Mr. Jennings warning him?
**A No.**
Q After you met with Ms. Price, did she indicate to you what she was going to do?
**A That she would get back to me.**
Q She didn't say anything, what she was going to do to investigate or do with respect to the

information you gave her other than get back to you?
**A No.**
Q And did she get back to you?
**A The next communication I got from Ms. Price was an email for Mr. Moppins, Mr. Pickett, and myself to meet her in Mr. Moppins office, and come with an open mind or something. A willingness to change or something to that effect.**
(Exhibit 15 was marked for identification and is attached to the transcript.)
Q Ms. Parker, I'm going to show you Deposition Exhibit No. 15. Is this the email that you just referenced?
**A No. And I didn't see this email until later because she said it kept going to the wrong address. She kept sending it. For whatever reason, it wasn't coming to my email. So once it got to me -- was it before or after? No, no, this one was before. So, yeah, I didn't see this one until later.**
Q And what we're referencing here is the email, it looks like it's dated April 25th, 2016?
**A Yeah. But the one I'm referencing was on**

**another day when she asked to -- she requested to meet with myself, Mr. Pickett, and Mr. Moppins in Larry's office.**
Q Okay. And that was before this email?
**A I want to say it was after.**
(Exhibit 16 was marked for identification and is attached to the transcript.)
Q Ms. Parker, showing you another email which is identified as Exhibit 16, and this is on April 27th.
**A Okay.**
Q So it's after the other one so that's why I'm just trying to --
**A Yes.**
Q -- understand the chain of events here.
**A Yes.**
Q So if you go back to Exhibit 15, the first one it shows Monday April 25th, and it looks like it's sent from Ms. Price to you on that day at 2:23 in the afternoon?
**A Correct.**
Q And do you recall getting that?

**A I didn't see or get this email until later, and I think her reasoning was because she was sending it to -- I think I had two email addresses. There was something with my name and she still was sending emails to the other one before she realized, and that -- and that could be why I didn't actually get to see this one until later.**
Q So the one that's dated April 25th; do you recall when you saw that?
**A Maybe it was the next day or it was -- maybe it was the same day as that one. I'm not sure. I'm not sure.**
Q Okay.
**A But I remember seeing it. I'm just not sure when.**
Q Did you have a disagreement with anything that -- obviously you read the email that came from Ms. Price, correct?
**A Uh-huh.**
Q That's a yes?
**A Yes. Sorry.**
Q Thank you. Did you have a disagreement with

anything she said in her email, the one that's dated April 25th?
A And you asked, did I have an issue with --
Q Right, with anything she said there?
A No.
Q And was it appropriate what she said, in your estimation?
A I would agree it's appropriate.
Q After she sent this, do you know whether there was any further discussion at work about the gossip or rumors?
A No, not to my knowledge.
Q Okay. You said you recall that the other email, Deposition Exhibit 16, that was sent on April 27th, it looks like two days later, talks about a wrap-up meeting?
A Uh-huh.
Q And you recall getting that one?
A Yes.
Q And you recall going to Larry's office on that particular day?
A Yes.

Q The first thing I've got to ask is at the top of this. It shows it was sent to your Yahoo email address on May 18th at 12:11?
A Yes.
Q Why was that?
A The day I was terminated, I started trying to gather as many documents that I needed. I kind of knew once Ms. Price stopped responding or didn't respond to any emails or my request, because of the events that were going on in the warehouse, it kind of felt like I'm going to lose my job.
Q So what did you start doing as a result?
A I started sending myself information that I didn't have, meanwhile still taking care of my job, working. But I started gathering information and documents.
Q What other information and documents did you gather?
A Pretty much everything you have.
Q Okay. Anything other than that you provided?
A No.

Q Okay. When did you --
A I'm sorry, there were the items that I was not allowed to get once I was fired.
Q And what items were those?
A My -- there were some offer letters, my evaluations, a couple of awards from trainings and things that Mr. Mathews sent us all to. Just to name a few things I can remember.
Q When did Ms. Price ask you to return the phone to her?
A The day I was terminated.
Q Why did you reset the phone on that day?
MS. WASIK: Objection.
A The phone, when it's issued or given to you it's -- a hard reset is done. It's the way the phone was given to me, so I'm returning the phone the exact way it was given to me.
Q And what time did you do that?
A I'm not sure what time it was, but Mr. Carter, Mr. Reeves, as well as Mr. Moppins, they were all present and standing there as I was clearing my desk and trying to get all my things and

turning in my phone. I went to my computer because there were some pictures on the computer that I had as my screen saver, my little girl, and things like that; a copy of my résumé and some information for the classes that I was taking. So I was sending myself that information because I continued the classes. But Mr. Moppins informed me once I got on the computer that that was RCSI's property and I couldn't do whatever it was I was doing. But I informed him, hey, I've got pictures of my little girl on this computer and my resume, I need those things.
Q So when did you reset the phone?
A Before I started messing around with the computer.
Q Was it before you knew you were terminated?
A No. It was after.
Q Okay.
A The phone was in the office, in my office on the desk, but I was in the conference room with Reema, Cathy, and Larry being terminated. So I was given the opportunity to go to the back and clear my

**things up.**

Q And getting back to this email that's Exhibit 16, talks about a meeting that's going to take place -- excuse me -- on April 27th; was there a meeting that day?

**A Yes.**

Q Okay. I'm sorry, and who was present for that meeting?

**A Moppins, Pickett, myself, and Price.**

Q Okay. And it was in Larry's office. What time was the meeting?

**A Shortly after this email went out. I'm not sure exactly what time, but not too long after.**

Q And what happened in that meeting?

**A Ms. Kathy pretty much did most of the talking. She pretty much asked the three of us to acknowledge the roles that we played in the situation at hand. I was confused, but I allowed Ms. Kathy to speak. She encouraged all of us to apologize so that we can move forward. She started with me; and again, I apologized to Larry for being insubordinate during the meeting on the 22nd, you**

**know, to let him know, you know, that was unacceptable, it won't happen again.**

**You know, then she went on to Mr. Pickett and Mr. Pickett spoke his peace. I remember him apologizing to me for not handling the situation better and apologizing to Larry, I guess, for breaking a trust or something.**

**Then when it came around to Larry, Ms. Price asked him is there anything he would like to say, would he like to apologize -- oh, no, is there anything you would like to say, and I remember him like, "No." And she asked is there an apology or do you want to apologize, and I remember him repeating "Apology? Huh-uh. I already know what I'm going to do." And that was kind of like the end of that.**

**You know, Ms. Cathy, like, Well, I appreciate you-all. Thank you all for coming and taking the time.**

**Once that meeting wrapped up, I called Ms. Cathy outside the office, like, Ms. Cathy, am I going to be fired? Do I need to worry about my job?**

**She told me no. Like at this moment, it was**

**just like, No. You know, Larry's just like -- no, you're good.**

**And it was like, whew.**

Q How long was this meeting?

**A I don't remember but we were in there a little while. It was a little over a half hour, I would say. But it was a while. It was a little while.**

Q So what was discussed in the meeting other than the apologies? What else was discussed?

**A Ms. Kathy just -- pretty much just talking about, you know, character and morals and things of that nature. I remember her mentioning like, you know: You all are good, have good character. It doesn't matter what you believe in. You have to do some soul searching and acknowledge the roles that you played in the situation.**

**So Ms. Kathy did majority of the talking, and then kind of like opened the floor for us to speak our peace. But I disagreed with Ms. Kathy's accusing, like, the role that I played in the rumor. Like, but I did apologize for the insubordination**

**so...**

Q What role did she say you played in the rumor?

**A She didn't say specifically.**

Q Well, then why you were you bothered by what role she felt -- you said she felt -- strike that.

You indicated that you felt that she was inappropriate in the way in which she addressed you about your role in the rumor; what did she say about your role in the rumor?

**A She didn't say, and at that moment I wasn't going to ask. I just wanted a solution to the uncomfortableness that was in the warehouse because of it. And I apologized to Larry again hoping that this would at least be a start to some type of getting better.**

Q Did Ms. Price address the rumor at all in this meeting?

**A No.**

Q Did she say anything about rumors, gossip, impact, anything like that?

**A I don't remember. I don't remember**

237

everything in particular that Ms. Kathy was talking about. At one point it's like she was just talking and, like I said, she was just -- she was mainly talking about having morals and being the bigger person and just talking about getting back on the same page, a willingness to change, set examples. You know, it was just pretty much that. Ms. Kathy didn't, that I recall, address the rumor at all or bring up Mr. Jennings or anyone else. She was pretty much, the way I felt like, dealing with the behavior between Larry, myself, and the fact that Larry and Mr. Pickett's relationship was now strained or different.
Q So that's what you felt she was addressing towards?
A (No verbal response.)
Q That's a yes?
A Absolutely, yes.
Q Did you feel she could have done more to address the rumor?
A I do.
Q What do you feel she should have done?

238

A If Donte Jennings was the reason of the rumor, I do feel like some sort of discipline should have been in place. I feel like this is a meeting that probably should have included Mr. Jennings and not just myself, Mr. Pickett and Mr. Moppins.
Other than me going into her office to have that initial -- make that initial claim, I didn't hear anything else or know anything else. I don't know that Mr. Jennings was disciplined. I don't know that Mr. Moppins was disciplined for even making that statement to his deputy program manager. It's kind of like a green light for it to occur again. So the fact that nothing was done, you know.
Q Okay. Did you think it was wrong for Mr. Moppins to ask Mr. Pickett that question?
A To ask your deputy program manager at work if he and his wife are getting a divorce because he's fucking one of his subordinates is very inappropriate, because it's almost an accusing question versus, you know, are you -- is there something going on with you Parker, or even having an investigation or even coming to me and asking me.

239

It was accusing. It's -- you're saying this is what's going on and it's not. So, yeah, there is a problem with the way that Mr. Moppins went about that.
Q But he certainly had the right to ask the information, you just have a problem with the way he asked?
A Again, if Mr. Pickett's personal life, whatever he and his wife are dealing with, I don't see what that had to do with Larry or the job or anything. So, you know, it all depends on how you look at professional. If they were at the bar hanging out after work having a drink, then maybe that would have been more appropriate to ask him that way or whatever but...
Q Well, again, you're getting back to the way in which he asked the question. If there was -- did he have the right to ask his employees whether they were sleeping with a subordinate employee?
A No. Unless there was some sort of evidence or if we were giving him a reason for him to feel that way, but not based off of a rumor or something

240

that he heard.
Q You don't know why Mr. Moppins asked Mr. Pickett the question, right?
A Well, I'm only putting the information together based off of the meeting and what was going on in the meeting and him pulling Mr. Jennings and Mr. Ferguson to the side.
Q But that was all after?
A Yeah.
Q That was all after he approached Mr. Pickett, right?
A (No verbal response.)
Q It was months after he approached Mr. Pickett, right?
A I'm not sure when he first approached Mr. Pickett but it was after -- it was before I talked to Mr. Pickett. Before Mr. Pickett informed me.
Q Right. Back in February, right?
A Yes.
Q Okay. So if Mr. Moppins had some suspicions or some reason to think that somehow Mr. Pickett was sleeping with a subordinate employee, did he have

the right to ask Mr. Pickett whether that was happening?
**A I'm not sure.**
Q Why?
**A I don't know what Mr. Moppins's reasoning was. Me, knowing the type of individual that he is, he feeds off of information like that drama feel type of information. Mr. Moppins likes to be nosey. He likes to hear something and either repeat it or dig. So I don't really know what Mr. Moppins's reason for asking Mr. Pickett that question was other than the fact he heard this from someone else and he's just regurgitating what he heard.**
Q You're guessing that, though, right? You don't know what he heard. He could have seen you and Mr. Pickett in an office together, right?
**A Yeah. But he sees Mr. Pickett in the office with plenty of people. Why me?**
Q I don't know. You don't know either, do you?
**A No.**
Q So there's any number of reasons why Mr.

Moppins might have asked Mr. Pickett that answer -- that question. I just want to know why you think Mr. Moppins asked that question?
**A I don't know why Mr. Moppins decided to ask of all people me. Why not Angela, because Angela is in Demarcus's office just as much. Everyone -- he was just that manager. Mr. Moppins couldn't assist us with anything really so Mr. Pickett was that guy. Sheba was in Demarcus's office often. Jason. Why me? And why would Mr. Moppins feel the need to ask Demarcus specifically about me? So, no, I don't feel like he had the right to ask Demarcus that question.**
Q Well, let's say it was Sheba.
**A Okay.**
Q Let's say he went to Mr. Pickett and said, Are you sleeping with Sheba? Did he have the right to do that?
**A I don't -- no.**
Q You don't know, or no?
**A I don't believe so, no.**
Q Why not? He's a manager, right?

**A Demarcus and Larry?**
Q Right.
**A Yes.**
Q And it's wrong for a manager to sleep with their subordinate, correct?
**A Is it?**
Q I'm asking you, is it your understanding -- you were the manager.
**A Yes.**
Q Did you feel that was inappropriate?
**A For me, yes, it was inappropriate for the rumors and things to be spread about my advancements and how I got to the position that I was in by sleeping my way to the top.**
Q I understand. That's not what we're asking. My question very carefully, as a manager, is it right to -- is it wrong for a manager to sleep with their subordinate?
**A According to Reema's handbook, yes.**
Q Okay.
**A There could not be relationships between management and their staff.**

Q And then you personally agree with that as well, right?
**A Yes.**
Q So if Mr. Parker -- I'm sorry, if Mr. Moppins felt that Mr. Pickett was having a relationship with any one of his subordinates -- not necessarily you, could have been anybody -- did he have the right to make an inquiry as to whether that was happening or not?
**A Yes. According to Reema's handbook, yes.**
Q And according to your philosophy as well?
**A Yes.**
MR. WASIK: We should take as break now. It's been an hour.
(Off the record.)
(Exhibits 17 and 18 were marked for identification and are attached to the transcript.)
Q Ms. Parker, left off at that April 27th meeting with the apologies. You said that afterwards you went to talk Ms. Price outside of the meeting, asked about your job. Did -- what's the next thing you did with respect to the -- any of the

245

rumors or any of the situation with Mr. Moppins that had arisen?

**A I didn't do anything in regards to the rumors.**

Q Did you talk to any other employees about the rumors?

**A No.**

Q Did you talk to any employees about what had just happened with Mr. Moppins?

**A No.**

Q How about with Mr. Pickett; did you have any conversation with him about the rumors at that point in time?

**A No.**

Q Any conversation with Mr. Pickett about Mr. Moppins behavior any further?

**A No.**

Q You said that the -- there was sexual harassment training that took place as well?

**A Yes.**

Q Shortly after that meeting, I think it was May 2nd if I was -- if I remember correctly; does

246

that sound about right?

**A Possibly.**

Q Within a couple days of that meeting that you had with Ms. Price?

**A Correct.**

Q Who attended that sexual harassment training, if you know?

**A Everyone.**

Q Every -- all managers, or all employees?

**A All employees.**

Q And was that at the warehouse or was it someplace else?

**A At the warehouse.**

Q How was that conducted?

**A In the conference room.**

Q Was it an individual brought in to do training or did you watch a video?

**A We watched a video.**

Q Was there questions and answers as well?

**A Not that I recall. I really don't remember as far as questions and answers. I just remember the video and a certificate later on that day saying**

247

**that we successfully completed sexual harassment training.**

Q Was Mr. Moppins present for that?

**A I don't remember.**

Q Okay.

**A I don't remember.**

Q Was Mr. Pickett present?

**A I don't remember if Mr. Pickett was present either. I remember staff, and I remember the room being completely crowded, not enough chairs. Maybe they were. I don't remember.**

Q How about Ms. Wallace, do you remember whether she was there?

**A Yes, yes.**

Q And Ms. Price was there?

**A Yes. Ms. Price put the video on.**

Q Do you recall if there was any discussion at this meeting, as well, about harassment or coming forward with anything?

**A I remember Ms. Price doing a lot of talking. So, yeah, possible.**

Q Do you remember anybody asking questions at

248

all?

**A I remember I asked her when she was asking -- well, she was speaking on different forms of harassment, and I remember asking her, Does this include rumors?**

**And she elaborated and had said, Yes, that goes to -- unwanted rumors of a sexual nature is a form of harassment, sexual harassment.**

Q Any other conversation about rumors that you recall at that time?

**A No.**

Q Okay. And then as I understand it, you got a certificate. There was also questions and answers that you had to go through afterwards to demonstrate that you -- prove that you watched the video; do you recall that?

**A Or something we had to sign stating that we were given this or we -- yeah, something we watched a video or something. But there was something we had to sign stating that we attended a sexual harassment training.**

Q Do you recall if there was something that

249

you signed that you had to fill out, sort of questions and answers to see whether you actually paid attention to the video?
**A Possibly.**
Q But you just don't remember as you sit here today?
**A No.**
Q Do you remember whether Mr. Jennings was present for this?
**A Yes, he was.**
Q How about Mr. Ferguson?
**A Yes. Everyone in the warehouse was present that I remember. Except I don't remember about upper management.**
Q Okay. After that sexual harassment meeting, did you have any further meetings with Ms. Price about the rumors?
**A No. I believe that was the last meeting. Or after the sexual harassment training, that was it.**
Q Okay. Had you had any further interactions with Mr. Moppins about that meeting -- those two meetings you had with him?

250

**A No. No. I'm going to say no.**
Q Okay. And then you went on vacation for a week, as I understand it?
**A Yes. If the sexual harassment training was on the 2nd, I went on vacation on the 12th.**
Q Between the 2nd and 12th, did anything else happen in the office that you felt was harassment in any way?
**A Not harassment. Just hostility, uncomfortable situations.**
Q Who was that hostility with?
**A There were moments where I was singled out of meetings. I wasn't included in on meetings and things that would go on in the warehouse. There were emails that was sent to Mr. Moppins that went unanswered, things that he needed to approve and sign off on, especially when it came to spending money on cleaning supplies for the warehouse. There was a particular type of material we used to clean floors. We needed more in stock. Just sending him emails to have things looked over or verified. And just emails going unanswered, not being included in**

251

**on meetings about what was going on in the warehouse.**
Q Okay. How many meetings went on that you were not included in?
**A That I'm aware of, at least three.**
Q Who was involved in these meetings?
**A Carlos Carter, Angela Wallace, Shaun Reeves, and Mr. Moppins. Pretty much all the managers except myself.**
**And there were a few times where Mr. Pickett was the only manager available. He wasn't included in on the meetings, and so in order to get something signed off on or get anything done, I had to go to Mr. Pickett.**
Q So Mr. Pickett wasn't in those meetings either?
**A I would say at least a couple of them he wasn't. But then there were at least two where I went to see Mr. Moppins but he wasn't available. No one was available. And when I asked inventory control, hey, where is everyone? Oh, they're in the conference room. They are having a meeting. I**

252

**would look for Shaun, he's in the conference room as well. Mr. Carter, he's SPEAR division, but he was included in on these meetings, but I wasn't.**
Q Do you know what those meetings were about?
**A No.**
Q So you don't know why you were not included in the meeting?
**A No.**
Q Do you know whether the meetings discussed you in any way?
**A No.**
Q You just felt it was odd that you weren't in those meetings?
**A Yes.**
Q Did you think it was odd that Mr. Pickett wasn't in those meetings?
**A I did, yes. Mr. Pickett had his reasons for believing why he wasn't in the meetings. He stated the one time I asked, Hey, why aren't you in the meeting?**
**He said, I don't know. I guess Larry is still mad.**

253

A But, yeah, for the most part I wasn't in any of them.
Q Did Mr. Pickett say why you weren't in any of those meetings?
A No.
Q You said that there were other hostilities in the warehouse; what were those?
A My employees kind of like undermining -- undermining me, mainly when I came back from vacation.
Q We'll get to that in a second.
A Okay.
Q We'll just deal with before you went on vacation.
Was there anything else that happened before you went on vacation?
A The moral in the warehouse was just awfully low. You know, it was kind of like cliques, disgruntled employees. And so in an attempt to boost the moral, I met with Shaun and, you know, threw some ideas out there, and we met with our crew in an attempt to, you know, boost the moral. We

254

bought lunch. We kind of pretty much reiterated, you know, we're all here to do a job. We're a team. You know, come to us if you have an issue. Don't feel like you're out here by yourself. You know, just pretty much talking to our crew to let them know like, hey, everybody, we're in this together. Let's get the work done and go home. And all of that was before I went on vacation.
There was enough food left for the other departments in the warehouse so I remember just kind of going around and offering food to everyone like, hey, no one is dumb. Everyone knows what's going on. But let's figure out a way to get back to getting the work done.
Q And Mr. Moppins came to that lunch too?
A No, he did not come. I actually took him a plate of food to his office.
Q But he said having lunch and all that was a good idea?
A Yes.
Q You went and talked to him about it, this is what we're planning on doing?

255

A Yes.
Q And he didn't have any problems talking to you on that occasion, did he?
A No.
Q Was there other occasions you interacted with Mr. Moppins's before you went on vacation?
A There was an occasion where it was bring your kid to work day. I want to say that was the last meeting I attended with him, letting staff know to bring your kid to work day. Pretty much this is what they'll be allowed to do. They can't go in this area of the warehouse. And, you know, just that type of thing. But communication between Mr. Moppins and me was limited. It was whatever was going on with the shipment, like, hey, FYI, we've got this course coming in. I may need all-hands in the warehouse to get it received in. It was a five-day turnaround. We had to have all items received. And I would go to him -- well, I would send an email first, and if he didn't respond then I would go to his office with that communication.
Q He always responded to you when you came to

256

his office?
A Yes.
Q Okay. Just a couple emails he didn't respond to?
A There were a few emails.
Q And they were operational issues?
A Yes.
Q Do you know if the issues were resolved that you emailed him about?
A I do not know. I went on vacation. On the 11th -- the 11th was my last day. That's kind of the day -- it was my department. We were kind of doing our own thing. I wanted to make sure that the warehouse was neat, clean, because I knew I was going to be out for the next few days, and my second in command, I wasn't sure he would be able to take care of it, of certain things. So I kind of spent those last couple of days before I went out just making sure, tri-walls that were left in the middle of the floor were put away. You know, things like that.
And then we kind of like spent that day just

in the receiving department. It was about the receiving department. That was pretty much it. No communication really with Mr. Moppins before I left.

Q How about with Mr. Jennings, were you communicating with him during this time?

A No. He was in the SPEAR department. No longer in my department.

Q Okay. And you left for vacation on the 12th; and what day did you come back?

A The 17th.

Q Okay. When you came back on the 17th, did you -- when was the first time that you heard anything that there was a problem at work?

A There was a few shipments that SPEAR had that were hot, and so I had to get the classification done, but also had to make sure that the receiving department was all caught up on things while I was out.

Once I got -- took care of that, I grabbed the packing list and I walked to the back of the warehouse were SPEAR was located. Mr. Carter was walking up as I was walking back and he kind of

caught me and that's when he said: You know, you can't be back here.

Why? I need some information from you. I gotta go through the shipment to make sure that everything is straight.

And he was like, Yeah, I know, but Donte filed some type of claim or charge or said something, did something, and you can't be around Donte.

And so I'm like, I haven't even been here.

And he's like, I don't know. Larry -- that's what Larry said.

So I said, Well, could you come with me to have a conversation with Larry? And we went to Mr. Moppins's office.

Q Okay. And did Carlos tell you anything else in that conversation?

A No.

Q Did you see Donte at all?

A Not until later that day.

Q And when you were with Carlos, you went straight up to Larry's office?

A The two of us, yes.

Q And what did you do when you got to Larry's office?

A I asked him -- well, Good morning. Like, hey, Carlos just informed me that I can't be down in SPEAR. And Larry confirmed it. And he said pretty much, I don't know. Donte filed some type of claim for harassment, said that you have been harassing him. So until the investigation is complete, you can't go around Donte and Donte can't come around you.

Q How long did this last?

A I was terminated the next day.

Q So how long did the meeting last?

A Just -- it was quick. You know, I went in there, he said that, and I was like okay. Well, I remember asking him, like, harassment? Like, what do you mean? I haven't been here.

I don't know. He wrote a letter to Cathy Price and Cathy Price forwarded it to me and said the investigation is open and this is just how it's going to be. So I said, okay. 10-4.

Q Did he give you a copy of the letter?

A No.

Q Did it sound like he had even seen a copy of the letter at that point or you couldn't tell?

A I couldn't tell.

Q All right. What did you do after the meeting with Mr. Moppins and Mr. Carlos?

A I went back to work.

Q Did you go see Cathy to find out what was going on?

A No.

Q Is there a reason why?

A Ms. Kathy was not there yet.

Q Did you eventually approach Ms. Price about trying to find out what was going on?

A I made an attempt to go and see Ms. Price. Ms. Price stated that she was busy. So there was an attempt made.

Q Did you get any communication with her about what's going on with the charge or what's the charge about?

A No.

261

Q Did you make any other inquiries of any other employees trying to find out what was going on?

A No.

Q Did you see Donte?

A Yes. He came to work. I was in my office. Mr. Ferguson was working on receiving some things and -- and Donte made his rounds through my department, daps and hugs and high fives, and things of that nature. He got to Manley's section and Manley stopped working and they started to hold a conversation, and I remember looking up. And I gave it a minute, but then once it continued, that's when I went out there and said, you know, Hey, Manley, we've got to get that stuff received in. I need you to get back to work. I just kind of looked, and it was one of those, yeah, all right. All right.

Well, I'll holler at you later. And, Oh, yeah, don't forget. And the conversation continued. And so I just took a deep breath and I went back to work. Mr. Jennings made his way to SPEAR.

Shortly after, he came back through and

262

started to have a conversation with Mr. Gatling. At this point I'm out in the receiving area and I'm working with them, and I noticed it and I just looked up and I decided to go and speak with Shaun, who is my immediate supervisor. And I asked Shaun I said, Hey, if there's an investigation, if I'm not allowed in his side of the warehouse and he's not allowed down here, I need something to be done about him coming into our department, disrupting the work, disrupting the crew from doing what they need to do, just having meaningless conversations about watches and things of that nature.

Shaun said, Okay, I'm going to go talk to Larry.

Q Did Shaun then go and talk to Larry?

A I believe so, yes.

Q Do you know what he said to Larry?

A No.

Q When Shaun went to go talk to Larry, was Donte still down in the area down there?

A Yes.

Q Who was he talking to?

263

A Donald Gatling. And who was there? Was Arnel in that area? There was a couple of people. Usually when we have a lot of things that need to be scanned before they can go out, they line up the tr-wall. So there's usually two people working on different projects, because we had a lot that needed to get done. So he was still kind of in that middle in that shipping area talking and communicating with the crew that I was directly responsible for.

Q And was the crew getting their work done while they were talking to him?

A Mr. Gatling and Mr. Ferguson, for whatever reason, multitasking was maybe difficult for them to do, and so to have a conversation, they would stop working and have a conversation; and so that was an issue because the work, we got to get this done.

Q So his being there was impacting the work?

A Yes.

Q Okay. And Shaun went up to talk to Larry?

A Yes.

Q Did Shaun come back and tell you he talked to Larry?

264

A No. Shaun just came back. By this time, Donte had passed through. SPEAR had their own forklift and pallet jacks and equipment and tools that they had in their department, but for whatever reason Donte was in the ATA side, which was my department, using our forklift. And so at this point I'm like I don't know what he's up to. I don't know what's going on. I don't know what he's doing but I'm going to go and speak to Shaun again. But Shaun wasn't available. And I remember Carlos being in his department, and so I called him up like, Hey, Carlos, can I speak to you? And so I met up with Carlos and I'm like, Can you please get your employees out of the work area down here in ATA. And he looked and he said, Okay. I got you. We went back to work.

Mr. Jennings left and made his way back to my department again. He and Manley Ferguson are having a conversation again, and I remember asking Shaun like -- like I thought there was an investigation. Why am I not allowed down in SPEAR but Donte is allowed down here? And Shaun just kind

of gave me the, I don't know. I don't know. And I remember requesting a meeting with Ms. Cathy.

Q Did you do that via email? Did you call her?

A Yes.

Q Okay. And did -- was Donte, did he go back to SPEAR at that point in time?

A Yes. They had a lot of work that needed to be done down there as well. So I'm not sure if at this point Mr. Carter talked to him and said something but...

Q But he went back?

A He went back.

Q And Shaun didn't go down and do anything?

A No. Shaun went to his cyber cage and that was pretty much it for Shaun.

Q All right. And when was the next time that you had any interaction with Mr. Jennings?

A The next day, which was May the 18th, Mr. Jennings came to work again. Same thing, lingering in my department, communicating conversations with my crew, the staff; using the equipment that was

already available for him in his department. And at that point, I felt it was intentional, it was hostile, it was uncomfortable. For one because I was told that I was being charged with harassment or creating a hostile environment for this individual. Why does he continue to come around me?

And so I requested a meeting with Ms. Cathy. I went to look for Ms. Cathy. At that point Ms. Cathy, she told me she was busy. She would get back to me. She never responded to my email. I remember writing -- typing up the letter and taking it to her because she was so busy. She was in and out of Larry's office all that day. And I remember giving her the letter because she wasn't responding to emails and she never got back to me. She finally sent me an email at 3 o'clock that afternoon and told me to meet her, Reema, and Larry in the conference room at 3:15; and I requested for Demarcus to be in there, as well, because I was not comfortable with being in a meeting with Larry, and she told me, no, that it would just be her, Larry, and Reema. But before she responded or told me no,

I had already asked Demarcus, Hey, if you're not busy, do you mind sitting in as a witness to a meeting that I'm about to have with Larry, Cathy, and Reema.

Q And what did he say?

A He said, Sure, if that was cool.

Q Okay. Did you talk to him the day before about everything that was going on with Donte?

A I did. I did go to him, like, Hey, I've been told that I can't go into SPEAR. Because he was the only other person that did classifications so he had to do it.

Q Demarcus had to?

A Yes.

Q Okay.

A The two of us were responsible for classifying all items before they got shipped out.

Q Did he have anything to say about the complaint that Donte had filed?

A No. He didn't know anything about it either.

Q Okay. Did he -- did you complain to him

about the fact that Donte kept coming back down to your area?

A Yes.

Q And what did he say?

A He couldn't really say anything because I had already went to his boss. I had already went to Larry. Like, what's going on? And he's like, Until the investigation is over, he can't be there, you can't be there.

Q I'm sorry. That was a bad question on my part.

So I'm -- you said that you complained to Carlos, you complained to Shaun about why is Donte down here in my area throughout the day?

A Right.

Q During that period, after that occurred, did you talk to Demarcus, as well, about saying what's going on here? Why is this guy -- why is Donte still in my area?

A No.

Q So the next day, the letter that you sent, just to make it clear, if you -- Exhibit 13, which

you have there, it's the one, sort of your documentation. The letter that you said you gave to Ms. Cathy, is that the letter that's in here?

**A Yes.**

Q And you typed that up and gave to her? You didn't email it to her then?

**A Correct.**

Q Okay.

**A The email was sent on the 18th; and that's in Exhibit 15.**

Q That was going to be my next question. Thank you. We're getting into a rhythm here.

I just want to stick with this letter for a second. Just want to ask you, in this letter, fourth line down, about halfway over, it says: I feel like I'm being personally attacked by Mr. Jennings and Mr. Ferguson for the simple fact that I was given the position of assistant operations manager.

What was Mr. Ferguson doing that made you feel like you were being personally attacked?

**A Mr. Ferguson knew that when it was time to**

**go in and get the work done, we didn't have time for playing around, taking short quick breaks to conversate about watches or going fishing when the State Department wanted their equipment or whatever they wanted. That's what the task was, and we had to go in and go hard. Mr. Ferguson knew that.**

**And I had a conversation with Mr. Ferguson, because I had to do evaluations for each one of them, even Donte Jennings. When Manley is unbothered, he's a good employee. You know, when he's not distracted. Manley was one of the those employees that got distracted easily. You kind of had to stay on top of him and he would get back to doing his job. I knew he was disgruntled. Manley, when I first started would say, you know, little slick things like, Don't be surprised if somebody don't come in and take your position right from under you, you know, and stuff like that. You know, I'm new. I'm not paying him any attention. He's a disgruntled employee. But Manley felt entitled because he had the longest tenure. And so to find out that there was an opening for the position and**

**then I'm coming back here, it was kind of like -- you could tell -- you could tell he was bothered by it.**

Q Is there anything else that he did that made you feel personally attacked? That's what you told Ms. Price?

**A Other than intentionally not working, just it seemed like to get me to say something to him so he could probably have a reason to complain, no. I don't feel like outside of that and intentionally having conversations when he should have been working; and he knew that was just a problem because I just spoke to him about it. Yeah.**

Q Okay. And a little further down in your letter here, a couple lines down, the line starts: Stares at me, followed by smirks and laugher.

**A Uh-huh.**

Q Who was staring at you with smirks and laugher?

**A Mr. Jennings, Mr. Ferguson. Whatever their conversations were when I would walk past. There were times I would leave out of the warehouse and go**

**up to inventory control and when I would come back Jennings and Ferguson are standing there having conversations and then as soon as I walk in it's, oh shit, whatever that -- the mumbling, and then, oh,** you right, and (demonstrative noise) and then I'm walking past and I'm looking at them, they're looking at me. I'm walking. But it's just one of those, all right, then, dog. I'll just holler at you later.

You know.

Q When did that occur? Was it on that day that you came back from vacation or was it a continuous thing?

**A That was occurring before I went on vacation with Ferguson.**

Q How many times did you see that kind of thing?

**A More than enough for me. I mean, you know, I didn't like sit there like, oh, that's one time it happened. Oh, there's another time. It's just -- once I brought it to Shaun and management's attention like, hey, this guy is still down here.**

**He's doing this and XYZ -- after the last conversation I had with Shaun and Shaun stated that he didn't see it being a problem -- like, I don't see anything wrong with him being down here for two minutes just talking. It was just like, well, whatever. That's just what they're going to do. And so all that day that went on. On the 18th, pretty much that entire day.**

Q But Shaun didn't have a problem with it?

**A No.**

Q But you did?

**A I had a problem with it because it was stated that neither one of us could go into each other's respective departments while there was an open investigation. And so, yes, I had a problem with it.**

Q And when you met with Ms. Price back in April, did you tell her about Manley and Donte laughing and smirking at you?

**A I didn't really start paying that any attention until -- this was after that situation with Larry -- with Larry and I. After the meeting**

**with Mr. Moppins once I revealed to him like, hey, I know of your involvement in the rumor, that's when I started noticing Mr. Ferguson and Mr. Jenning's behavior toward me, you know.**

Q Okay. That's -- I'm just trying to get an understanding of the time frame when that happened. So it was in that one-week time period before you went on vacation and then when you came back from vacation?

**A The smirks and the little slick things started before I went on vacation. It was pretty much not too long after the second meeting with Mr. Moppins and after I went to HR.**

Q Right. And then it continued on the 17th and 18th when you came back from vacation?

**A Yes. It definitely started on the 17th and continued all day throughout the 17th and all day on the 18th.**

Q Okay. So on the 18th jumping forward to that, again, you came into this meeting that Ms. Price invited you to around 3:15, I think you said?

**A Yes. I'm listening.**

Q That's fine. And when you handed her -- did you hand her the letter or you just left that letter in her office earlier that day?

**A I kind of knocked on her door. She did open the door and told me she was busy, and I gave her the letter.**

Q Okay. All right. Did she say anything in response to the letter?

**A She would get back to me.**

Q And do you recall what time that was?

**A That was the 17th.**

Q I thought it was the 18th?

**A No. The 18th I sent her an email.**

Q So you gave her the letter on the 17th, not the 18th?

**A Correct. Correct.**

Q Okay.

**A I'm not sure what time when I gave her this letter. It was definitely early. Some time before lunchtime definitely.**

Q So an email on the 18th when you came in -- I'm just looking at your notes here that you had in

your documentation -- you said I noticed she had been in and out of Mr. Moppins's office all that day?

**A Yes.**

Q Why is you noticed that the Ms. Price was in and out of Mr. Moppins's office?

**A Because the times when I would go to see Ms. Price, she was not in her office, and I would ask like has anybody seen Ms. Price? Oh, she's in Larry's office. And I'm like, okay. The door is closed and he and Ms. Price are in their meeting. So I would try to catch her again because she had not responded to the email. When I would go back and then come up, she would be back in her office. I would knock on the door. No response. So I would go back, wait a while, come up, Ms. Price is back in Mr. Moppins's office. And so all day I had been trying to catch Ms. Cathy.**

Q Okay. So -- and you asked to have Demarcus in that meeting and Ms. Price told you no?

**A Correct.**

Q Did she tell you that in person or via

277

email?
**A I believe she told me that in person. I'm trying to think. The email -- if I'm not mistaken it was in person.**
Q What did she tell you the meeting was about at 3:15?
**A She didn't. She didn't tell me what it was about.**
Q Did she tell you to bring anything with you?
**A No. But, of course, I showed up with pen and paper for the meeting.**
Q And who was present at meeting?
**A Reema, Moppins, Price.**
Q Okay. And what were you told at that meeting?
**A I was told that they had enough information to terminate my employee -- employment with Reema, and at that moment I was presented with two write-ups, one for the May 12th harassment claim from Donte Jennings and another one based off of what they said was Manley Ferguson's and Arnel Ragunton's gripes about my management style. They**

278

**both were dated on May the 16th, and I was still out on vacation.**
Q We'll get to the -- I'll put those in front of you in a second. Who did the talking in this meeting?
**A Cathy Price.**
Q How long did the meeting last?
**A Long enough. I'm not sure as far as minutes but...**
Q Did anyone else -- did Mr. Moppins speak during the meeting?
**A I remember Mr. Moppins -- remember him saying something along the lines of it being his decision based off of the -- his investigation.**
Q Do you know what he meant?
**A Pretty much Moppins was firing me based off of a harassment complaint by an employee that I filed sexual harassment against and two other employees that I was directly responsible for.**
Q Okay. Did he say what his investigation was?
**A And that's what I asked him. And I began to**

279

**ask, you know, what investigation? I was never interviewed in regard to any of the information in these write-ups. I remember asking was the cameras reviewed? Was anyone else interviewed?**
**And then Ms. Price kind of like took over the conversation at that point. Reema did -- I forgot. Reema spoke, but I don't remember exactly what she said. I just remember looking at her like, what?**
Q And what did Ms. Price say when you said she took over the conversation? Did she --
**A Just pretty much you will have a chance to rebuttal or something, something to that effect. But just read over the documents. They were trying to get me to read over the documents and respond with a rebuttal or sign them. And I'm like Ms. Kathy, you know, I'm not signing these. And she's just like, offer a rebuttal. It may be in your best interests to offer a rebuttal.**
Q Let me mark them as exhibits and put them in front of you.
(Exhibits 17 and 18 were marked for identification and are attached to the transcript.)

280

Q Okay. Ms. Parker, let's start with Exhibit 17 first. This says written warning, May 16, 2016. Was this one of the documents they gave you on that day?
**A Yes.**
Q Okay. And this particular exhibit says: Ms. Parker, you were given specific instructions from the program manager of RSCI to not mistreat and not to visit the work areas of subordinate employees who you named in a harassment complaint that you filed with HR.
And then it continues, it says: You begin making inappropriate gestures and facial expressions about him for no apparent reason.
Did that occur?
**A No.**
Q Next thing says --
MS. WASIK: Can we take a break for a second?
MR. WALSH: Sure.
(Off the record.)

281

BY MR. WALSH:
Q Ms. Parker, we were on Exhibit 17.
**A Okay.**
Q And we were talking about the inappropriate gestures and facial expressions. Did you make inappropriate gestures or facial expressions toward Mr. Jennings or Mr. Ferguson?
**A No.**
Q Okay. This continues, the last paragraph right above corrective action: It says, Carlos Carter and I spoke with Mr. Birgans in regards to this encounter and he verified that you made inappropriate gestures and expressions to Mr. Jennings without any prior engagement or interaction by Mr. Jennings.
Is that an incorrect statement?
**A Mr. Birgans reached out to me after this and denied having anything to do with my termination or making statements or anything.**
Q When did Mr. Birgans tell you that?
**A Via Facebook messenger.**
Q Okay. When was that?

282

**A I'm not sure of the date but it was shortly after this.**
Q And do you still have that?
**A Everything that I had, I gave it to my attorneys.**
Q Have you looked for that particular Facebook communication with Mr. Birgans?
**A Not since providing that information to my attorneys.**
MR. WALSH: Okay. I've not seen that. So I'm going to ask that that be produced.
MS. WASIK: Okay.
Q Other than that communication with Mr. Birgans, did you have other communications with Mr. Birgans regarding that particular comment?
**A No.**
Q Okay. How about Mr. Carter, did you talk to Mr. Carter about whether that was true or not?
**A No.**
Q Has Mr. Carter indicated to you that it was false?
**A I spoke to Carlos one time after this**

283

**termination. I was at a bar outside of the city and Mr. Carter had been there with some friends. The only thing Mr. Carter said to me was the way that shit went down was wrong.**
Q That's all he said?
**A That's all he said.**
(Exhibit 19 was marked for identification and is attached to the transcript.)
Q Ms. Parker, showing you what we've marked as Deposition Exhibit 19; it's a signed statement by Mr. Carter on May 16, 2016. Do you have any reason to believe that Mr. Carter didn't sign this?
**A I wouldn't know if Carlos signed this or not. I'm not familiar with his signature.**
Q Do you have any reason to believe this particular statement is untrue?
**A Based on the conversation that I had had with Mr. Birgans after this, of course Mr. Birgans denied having said anything in a negative way or had any involvements with any statements or anything.**
Q Okay. And did Mr. Birgans indicate that he had conveyed a denial of this statement to Reema?

284

**A No. He just informed me that he didn't say any of that. And he's just like, believe me, it's not true.**
Q Did Mr. Carter also have a problem with you?
**A No.**
Q Do you have any reason to believe that Mr. Carter would not be truthful in a signed statement he provided to Reema?
**A I don't believe Mr. Carter is a bad person, dishonest person. Mr. Carter and Mr. Moppins were good friends. I worked with mostly military personnel, whether it was the Marines, the Army. Mr. Carter and Mr. Moppins had a friendship outside of work. But Mr. Carter at work never gave me a reason to believe that he was on any team. Like, on my team or Moppins's team or -- it was -- he was a neutral person.**
Q If Mr. Carter provided this to Reema as evidence of this conversation with Mr. Birgans, do you believe that Reema had the right to rely on that?
**A I would ask why wouldn't Mr. Birgans provide**

285

a statement and have it signed himself? Why would Mr. Carter need to sign a statement saying that Mr. Birgans said this is what happened? I mean, I don't know why Reema went about things the way they did.

Q But if this was accurate, you would agree with me that that was reasonable for Reema to rely on that?

A It's not accurate.

Q It's not accurate that Mr. Birgans said that to Mr. Carlos and Mr. Moppins?

A It's not accurate what is being stated that I did in this statement.

Q I understand you dispute that you did that.

A Right. And so I would ask what was the investigation? Why would Carlos sign something that Kenton allegedly said that wasn't true? So, I don't know.

Q Okay. But you would agree with me there's no reason looking at this to suspect that this is false in anyway?

MS. WASIK: Objection.

A I don't know.

286

Q Okay. The written statement, we were looking at Exhibit No. 17 -- I'm sorry, the written warning that was provided, and those are your handwritten comments on the bottom of the first page?

A Correct.

Q And you say all of the accusations in this written warning is completely false and I'm absolutely sure Mr. Birgans had none of those things to say?

A Yes.

Q And how did you know this at the time you signed this?

A Mr. Birgans was kind of like my supervisor and he would notice things that was going on and he would make little comments like, you know, after asking, Van, when are we going to get the stuff to clean the warehouse?

I'm like, I don't know. I'm still waiting for the email to be approved or responded to.

And he would shake his head, like, man, shit ain't right. And he would say things like that. He

287

had eyes. He could see. He saw the behavior from Mr. Jennings when I came back from vacation. He tried to steer clear from it. Donte would try to come and get him engaged in a conversation and Mr. Birgans would walk away and, you know, play it off but still do his job. It was clear he didn't want to be involved in any shenanigans or any games or anything that was going on.

So when I read this and it said, you know, Mr. Birgans had something to do with it, I just wasn't feeling that. I wasn't feeling it. I didn't believe it. That just wasn't Kent.

Q Okay. And in reading -- now that you've read the statement identified as Exhibit No. 19, does that change or influence your decision as to whether Mr. Birgans may have said any of those things?

A Again, this is a statement from someone other than Mr. Birgans. This is Mr. Carter.

Q I understand.

A Where is Mr. Birgans's statement? Because from what I know of Mr. Birgans, that goes against

288

his character. And based off of what he sent me, it's absolutely not true. So I had no reason to believe that Kenton would just flat out make up something to hurt anyone.

Q And you don't have any reason to believe that Mr. Carter would make something up, do you?

A I didn't. Thinking about it, Mr. Carter and Mr. Moppins are good buddies. I don't know.

Q Would the fact that they're just friends give him a reason to write something false that never occurred?

A I don't know what Mr. Carter is capable of.

Q And Exhibit 17, you wouldn't sign, as I understand it?

A Correct.

Q Okay. Exhibit 18, this was the other written warning. I believe it was given to you during that meeting?

A Uh-huh.

Q Did you read it at that time when they gave it to you?

A Yes.

Q And if we look on the second page there's some handwriting. Is that your handwriting?
**A Yes.**
Q And it says: Ms. Wallace was the only witness to the accusation that Mr. Moppins had stated in the counseling. There's a written comment from everyone but her. Mr. Pickett was also a witness to the majority of what transpired between Mr. Moppins and myself, yet there's no statement from him either. Majority of what I'm being accused of is false. I will not sign this counseling.
You say the majority of what you're being accused of is false?
**A Uh-huh.**
Q What's true in this?
**A On the second page: Immediately in our conversation, you started ranting about how I was wrong to allow the employees to talk about you like that in the meeting; that I did not have the managers' back; that I should have never spoken to the employees; and how Donte Jennings was wrong for talking about you. At that point, me informing**

**Moppins or saying to Moppins that he did not have my back, that's true.**
Q You did tell him that in the meeting?
**A In the meeting after the all-hands meeting.**
Q Okay.
**A I don't remember it being put in the exact words, but for him to allow the employees to hold a conversation about me and a rumor during an all-hands staff meeting, part of that is true.**
**The meeting ending because I was agitated, that's true.**
Q That's the only parts that are true?
**A Yes.**
Q On the first page of it this, it says, third paragraph down: Mr. Arnel Ragunton stated that you constantly remind him of who is in charge to the point that he feels he is a slave.
Is that true?
**A No. I was actually shocked or surprised to see Arnel's name on anything, because I was Arnel's supervisor in inventory control and I wasn't -- I was confused, like, Arnel stated that, you know.**

Q Was it true or was it not true?
**A It was not true.**
Q So Arnel did not state that?
**A Are you asking me if it's true that Arnel stated this or --**
Q Yes, ma'am.
**A -- is it true what the accusations are?**
Q My fault. We're a little confused here.
Is it true that Arnel said that to Reema, to management?
**A I don't know if Arnel said that or not.**
Q Okay. Do you feel that you constantly remind him of who was in charge?
**A No.**
Q The next paragraph says: Mr. Donald Gatling stated the same as Mr. Ragunton.
Is that true?
**A I don't know if it's true that he stated that. It is not true that I made Gatling feel like Arnel is stating that that's how I made him feel.**
Q Continue, it says: Mr. Manley Ferguson has stated similar concerns as well.

Is it true Mr. Ferguson stated similar concerns?
**A I can believe that this is something that was more of a statement from Manley Ferguson versus Arnel or even Donald. But, again, I don't know if they actually stated that. This is just based on what Moppins put in this write-up.**
Q Okay. And then it says: However, his main concern is that you approached him one morning stating that if you want to know who I'm fucking, ask me and I will tell you.
Did you approach Mr. Ferguson one morning to say that to him?
**A I didn't approach Mr. Ferguson at all.**
Q Okay. Next paragraph said after Mr. Pickett and I spoke to Mr. Jennings who initially had no comment, Mr. Jennings confirmed that you approached him one morning and asked the following: Good morning. If you want to know who I'm fucking, ask me and I will tell.
**A So pretty much I went around just asking everyone if they want to know who I'm fucking ask me**

293

**and I'll tell them? Because it said that that's what I asked Jennings, Ferguson, Littleton. And so that's what it's saying.**

Q Okay. And I'm asking you, was it true that Mr. Pickett said that -- I'm sorry, that Mr. Jennings said that to Mr. Pickett and Mr. Moppins?

MS. WASIK: Objection.

Q If you know?

**A It sounds like something Donte would make up. Sounds like something Manley would make up. Whether they said it or not, I don't know.**

Q The next paragraph said that he spoke with Ms. Littleton and she informed me that you also attempted to question her about the rumor of who you were sleeping with, and she immediately cut you off and informed you that she wanted -- that she knew nothing of what you were speaking about.

Did you approach Ms. Littleton to speak with her about that?

**A I had a conversation with Maddie Littleton, as I stated earlier, as well as Tambeni Daltry at the same time about the events of the meeting, the**

294

**rumor.**

Q Okay. And in the second page, I'm going to go to the third paragraph from the bottom, the one that says "upon attempting." At the end of that we were talking about this particular paragraph and this meeting that you had. Mr. Moppins said you were going to press charges of sexual harassment against me for spreading untrue rumors about you and Demarcus. You became so emotional that Ms. Wallace had to escort you from the conference room.

Did -- is that true?

**A That is not true.**

Q So either one of those meetings where Ms. Wallace was present, she didn't escort you?

**A No.**

Q And you refused to sign this written warning?

**A Correct.**

Q Were there any other warnings given to you during that meeting?

**A No.**

Q There was a warning that was issued -- there

295

was a memo that was written up about the cellphone; were you provided a copy of that?

**A I'm not sure. I would have to see it.**

(Exhibit 20 was marked for identification and is attached to the transcript.)

Q Okay. Ms, Parker, you just read through Exhibit 20. Were you given a copy of this notice at the time of your termination?

**A No.**

Q And I think you testified earlier, the cellphone, you didn't do a hard reset on the phone -- a factory reset on the phone until after you were terminated?

**A That is correct. I did a hard reset on the first phone that was assigned to me as well, but this notice is only talking about the second phone. This is my first time ever seeing this. Even according to the handbook, it's saying that I was expected to protect the equipment from loss, damage, or theft, which is what I did. Just curious to why this the last phone and not the first phone. I'm curious.**

296

Q Do you know if anybody at Reema knew of the fact you had reset -- hard reset of the first phone?

**A Yes.**

Q Who knew?

**A Management. Angela Wallace. I returned both phones in the condition and the order in which it was given to me.**

Q Okay. After at the end of this meeting, did you have any -- I assume you were terminated during this meeting.

**A Yes.**

Q Did Ms. Price give you any other paperwork?

**A Just the two write-ups.**

Q Okay.

**A And the termination notice.**

(Exhibit 21 was marked for identification and is attached to the transcript.)

Q Ms. Parker, I'm giving you Exhibit 21. Was this the separation notice that Ms. Price gave you? Was this the notice she provided you?

**A Yes.**

Q Did you sign a receipt or anything as a

result of getting this, if you recall?
**A No, not that I recall.**
Q Okay. Did Mr. Moppins have the ability to fire you?
**A Yes.**
Q How about Mr. Pickett?
**A Yes.**
Q Mr. Reeves?
**A I'm not sure if Mr. Reeves could terminate. I'm not sure.**
Q Okay. And why do you know, then, that Mr. Pickett and Mr. Moppins had the ability to fire you?
**A They did the hiring. Like, no one -- I don't think anyone has been fired by anyone other than Mr. Moppins.**
Q Okay. The letter is signed by Ms. Price, that's why I'm trying to understand who terminated you. Was it Ms. Price or Mr. Moppins or was it both?
**A Ms. Price did the dirty work, but Mr. Moppins initiated it.**
Q Okay. And in either of those written

warnings that were issued, did Mr. Moppins indicate that you were to be terminated?
**A Well, that's how the meeting started off.**
Q Okay. All right. And I think they do say termination of employment.
After you were terminated, did you speak with Mr. Pickett about the termination?
**A Mr. Pickett was coming out of his office as I was leaving out with my box of things and he asked -- he had the confused look on his face like where you going? What happened?**
**And I said, I was just fired. And I left out the door.**
Q Okay. Did you talk with him further about that?
**A No.**
Q Did he try to reach out to you to try to find out what happened?
**A Yes.**
Q When did that happen?
**A I had gotten a phone call from a few people that same day. That same evening, I should say.**

**Everyone was gathered into the break room while I cleaned out my stuff except Moppins, Carlos, and Shaun.**
Q And where were they?
**A They were all standing there as I was gathering my things and resetting the phone.**
Q Okay. All right. And did those individuals that called you indicate that anything was said to them about your termination?
**A They all pretty much stated that a meeting was called after I left. Angela specifically said, I noticed you weren't there, and Larry said it's against policy to communicate with any former employees of RSCI so it would be in their best interests to not communicate with anyone who no longer is employed with RSCI.**
Q Okay. Did he say anything else at that time that they conveyed to you?
**A I think at that point or after that brief meeting, that's what Angela found out they had fired me; and when she called me she was upset and she said a lot of people were upset.**

**And that's pretty much -- I spoke with her, I talked to Rachelle Lee, Demarcus, Tambeni, and Maddie.**
Q And did Ms. Wallace say anything else?
**A Just pretty much told me, you know, whatever I need I can call her. If I needed a reference or whatever, that I knew I was good with her you know.**
Q And what did Demarcus tell you?
**A Like, pretty much, like, Yo, you know, they keep me out of the loop around here anyway. I don't know what's going on. He just said the last thing he remembered is me requesting for him to be in my meeting and then he saw me packed up and walking out the door. He didn't know what was going on. So, you know.**
Q So other than that conversation and the conversation he had with you last week, have you talked with Mr. Pickett about this at all?
**A No.**
Q Did he indicate he would try to speak on your behalf, get your job back?
**A No.**

301

Q Did you ask him to?
**A No.**
Q Did you ask anybody to speak on your behalf to get the job back?
**A No.**
Q Did you speak with Mr. Jennings after that at all?
**A No.**
Q How about with Mr. Ferguson?
**A No.**
Q Okay. Did either of them try to reach out to you?
**A No. I immediately deleted Facebook friendships and things of that nature.**
Q All right. And what's the next thing you did with respect to your employment at Reema?
**A My next step was pretty much my finances, what I would do at this point to generate income. I filed unemployment.**
Q Okay.
**A So that was my first step. But as far as dealing with Reema or anything, at that moment,**

302

**like, my first concern was to be able to provide for my family.**
Q Okay. So you filed for unemployment. You also went to the EEOC?
**A Correct.**
Q And let's just make sure we got this.
(Exhibit 22 was marked for identification and is attached to the transcript.)
Q Ms. Parker, if you can just look at Exhibit 22, is this the intake questionnaire you filled out for -- at the EEOC?
**A Yes.**
Q That's your handwriting?
**A Yes.**
Q Okay. And that's also your signature then on the last page?
**A Yes.**
Q All right. And by the time you went to fill this out on the 23rd, you had already reached out to several different law firms?
**A Yes.**
Q Had you spoken with any law firms at that

303

time?
**A I did speak to someone. I'm not sure who.**
Q And I don't want you tell me the substance of what they might have said. I'm assuming that would be privileged.
Other than filing for unemployment, going to the EEOC, trying to find a law firm, did you do anything else with respect to Reema?
**A No.**
Q Did you reach out to any of the people that you worked with try to gather statements or information from them?
**A I had the conversation with Mr. Birgans, but I believe he sent me a wave or something on Facebook and that's how that conversation initiated. But that was it. Ms. Daltry came to see me and pretty much told me that if there was anything I needed that she had me. And Ms. Lee. So, no, I didn't reach out and ask for anything.**
Q Did Ms. Daltry or Ms. Lee provide you with anything?
**A No.**

304

Q Did you ask them to provide you with anything?
**A After speaking with my attorneys or before?**
Q Yes.
**A Yes.**
Q At any point in time?
**A Yes.**
Q What did you ask them to provide you?
**A After speaking with my attorneys -- but that was some time after filing with the EEOC.**
Q Okay. And what did you ask them for?
**A Statements.**
Q Okay. Statements about what?
**A Their account of the situation that occurred with me, what went down in their words, their version of how they saw things.**
Q Okay. And did they provide those to you?
**A I'm not sure. You would have to ask my attorneys if they provided them. But they didn't provide it to me, no.**
Q Is there anybody else other than Ms. Daltry and Ms. Lee that you requested to provide you

305

information?
**A Mr. Birgans, Ms. Wallace.**
Q Anybody else that you can think of?
**A Demarcus.**
Q Anybody else?
**A Not that I can think of right now.**
Q Okay. And did any of those three individuals provide you with anything?
**A No.**
Q Okay. Did any of those three refuse to provide you with anything?
**A No.**
MR. WALSH: Okay. Ms. Parker, if you just give me five minutes. Let me look through my notes. I think we're just about done.
(Off the record.)
BY MR. WALSH:
Q Ms. Parker, just a handful of questions to ask you.
When Manley Ferguson was having issues and you felt that he was being distracted by Mr. Jennings and not doing his job, is there a reason

306

you didn't write Mr. Ferguson up at that time?
**A I was just informed that I was -- someone had filed a complaint of harassment on me. I was kind of walking on eggshells. I really didn't know which direction to go in. So after saying something to Mr. Ferguson, Mr. Ferguson -- he would go back to work but then he would kind of like slack off or go the lazy way about doing it.**
Q So why not write him up?
**A It was kind of like a delicate situation. I was just informed that someone had filed harassment on me. I knew Manley was already disgruntled. I knew he didn't like me. I just wasn't sure which direction to go in. Just took it to my superiors, supervisors to ask them, you know, what direction should I go in? This is what's going on.**
Q Well, you had written Manley up before, right?
**A Yes.**
Q And you didn't have any hesitancy writing him up on other occasions?
**A I actually sought advice from Mr. Moppins on**

307

**how to deal with the Manley situation, and Mr. Moppins advised me to write Manley up.**
Q When was that?
**A I'm not sure when. I'm not sure when.**
Q Did you seek Mr. Moppins' authority on whether you should write Manley up on this occasion?
**A No.**
Q You just didn't know what to do, so you just didn't do it?
**A I knew Manley was doing that because of Donte Jennings. I know if Donte Jennings had not been over there conversating or distracting him, I don't believe Manley would have just walked away from his work and went down to talk to Donte so...**
Q Okay. Any other reason why you didn't write him up?
**A No.**
Q Other than this EEOC complaint, have you filed any other EEOC complaints?
**A Against RSCI?**
Q Against anybody?
**A Yes, I have in the past.**

308

Q Who have you filed against in the past?
**A Veolia Transportation.**
Q Anybody else?
**A No.**
Q Why did you file against them?
**A During a seminar -- the seminar in Vegas, a coworker -- we were all on the bus to head out. We just came into town, decided to hang out. A coworker took a picture of my breast area and showed it to our supervisor. The company -- actually my supervisor showed me on his cellphone the photo. His wife -- the supervisor's wife was there and kind of like made him. Like, do something, this is wrong, you know. And once he brought it to my attention, he informed me we were going to deal with it once he we got back.**
**For the most part, he did. But the company had a zero tolerance policy for stuff like that. And that was one of those things, they had the photo, they had the evidence, but the employee was still employed there, and I had to work alongside of him and I just didn't feel like that was right so...**

Q Did you file with the EEOC before or after you were terminated? I'm sorry, I assume you were terminated. You may not have been. Pure assumption on my part. I apologize. When your employment ended at Veolia, do you know whether they -- whether you filed with the EEOC before or after your employment ended?

**A I don't remember. I don't remember.**

Q Okay. Do you know if the employee was subsequently terminated?

**A With the Nice Group? I was not terminated. The client requested that I be moved from that particular contact, and because Nice had no other locations or no other contracts to place me on -- how did he explain it? He would keep me in the loop or I would be placed on hold for the next available Nice Group position that became available. I just found employment elsewhere with Reema.**

Q And as a result of your leaving Reema. When you left Reema and your termination there, did you seek any professional help -- I'm not talking about attorneys -- from a medical standpoint?

**A No.**

Q Did you see a therapist, a psychologist, a psychiatrist any of that kind of thing?

**A No I did not.**

MR. WALSH: With that being said, Mr. Parker, I have no other questions. Thank you.

MS. WASIK: I have just a few questions.

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MS. WASIK:

Q Ms. Parker, from the time you filed the HR complaint until the time you were terminated, what was your work relationship like with Mr. Moppins?

**A Cool. Larry was the first person who noticed my hard work and my efforts. And I remember** the director from the ATA, Quan (ph), coming down and the conversation we had. He's like, you know, you're doing a really good job. Any time Larry speaks highly of someone you must be doing good.

And so Larry included me in on meetings. You know, he created positions to where he's like I'm going to put her in it because, you know, you guys need to step up your game. Like, Larry and I

were cool.

Q And was that between the time when you filed your HR complaint and your termination, or was that earlier?

**A Oh, this was before the HR complaint. Afterwards -- I misunderstood your question.**

Q No problem.

**A After the second meeting with Mr. Moppins, once I informed him that Demarcus told me what he said to him, Mr. Moppins stopped communicating with me. My emails went unanswered. Like, being in the same room for too long. Mr. Moppins stopped visiting the warehouse as often. Just like cut off.**

**No invites to meetings that involved my department. I guess, because Shawn was the direct supervisor over the warehouse. But before then it would be Shawn and myself. So, yeah.**

Q And when you say meetings, were these -- these were work meetings, I presume?

**A Correct.**

Q You went over this a little bit but just so we're clear, after you returned from vacation --

**A Uh-huh.**

Q -- what was your work relationship like with Mr. Ferguson?

**A Once I returned from vacation?**

Q Yes.

**A Manley was kind of, you know, ho hum. He wasn't quick to get to the task that was asked of him. It's almost like he -- like, I'm not worried about you girl, bye. I'll get to it when I get to it. You know, kind of like that attitude.**

**He felt comfortable enough to continue to have conversations with Jennings as he came through. Whereas though before if I was to ask Manley, you know, hey, can you receive that inventory in, that shipment, it's just a short stack of things, can you take care of that real quick? And he would do it. He would get to it right away. Do what he needed to do. He would stay focused and he completed the task.**

**On the 17th, once I came back, he was just, whatever. You know, allowed Donte to come through. There was no effort in, you know, what, man, I don't**

want to get in trouble. I'll talk to you later. There was none of that.
Q Okay. In the meeting that Cathy Price held after you filed your HR complaint, you said, I believe, that Mr. Moppins said I already know what I'm going to do; is that right?
A Correct.
Q What do you think he meant by that?
MR. WALSH: Objection.
A I felt like I was going to lose my job, which is why asked Cathy Price afterwards, Am I going to lose my job? That's how I felt. I felt if not me, Demarcus or the both of us were going to be fired.
MS. WASIK: Okay. That's all my questions.
FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT
BY MR. WALSH:
Q You agree that Mr. Moppins could have fired you for insubordination, right?
A Mr. Moppins stated he should have fired me.
Q And you agree that was correct?
A I believe my insubordination was justified.

Was it right that I yelled at my senior manager? No. But why? My senior manager pretty much blamed me for an unwanted rumor about me and told me that he would not put in the necessary word or paperwork or whatever promotion request for me to continue to move forward in the company, so I got upset and I returned his temper. His -- he was upset and it wasn't right on either one of our parts. But, no, I don't think I should have been fired.
Q But you agree he could have fired you for insubordination at that time?
A He could have.
Q And he didn't, did he?
A Maybe, ultimately.
Q He didn't -- you agree that you were insubordinate to him?
A Correct.
Q You agree you had to apologize for that at a later point in time?
A Correct.
Q And you did apologize for that?
A (No verbal response.)

Q And you he still didn't fire you because you were insubordinate, right?
A He didn't, as far as I know.
Q So you believe that he created all this other stuff to fire you rather than just fire you for your insubordination?
MS. WASIK: Objection.
A Ultimately with Mr. Moppins, I believe I had what -- there were two other situations before me, two other women who were fired in similar manners. I had the nerve to speak up and actually fight back, and ultimately that's why I believe I was fired. All of it probably was bubbling and boiling over. I believe the moment I said something and the moment I filed something, he had already started concocting a plan.
Q So the moment you said something was in that meeting when you yelled at him?
A No.
Q It started before that?
A No. Once I informed Mr. Moppins that I'm aware of his involvement. What he said to Mr.

Pickett was after the meeting where I was insubordinate.
Q And that's when he started to concoct a plan?
A I believe so.
Q Those meetings you said you didn't go to, did it impact your job in any way?
A I was still able to take care of the receiving part of the job, shipping. There were certain things that he couldn't prevent from happening: ESRs, ETRs, you know, things like that, cycle counts. So everything that I had control of, I continued with.
Q Okay.
A Making sure the warehouse was clean.
Q Other than feeling slighted for not going to these meetings, was there any other thing that not going to the meetings did to impact your employment?
A You know, I'm not sure because I don't know what was going on in those meetings. I don't know if there were changes that were occurring and I was just still kind of falling in line with the old

**stuff. And there could have been a new process in place. So I don't know because I wasn't included.**

Q Did anybody come to you and say you're not doing it the right way, we agreed in a meeting to do it a different way?

**A I'm trying to think. There was a situation with Shawn, and I don't remember exactly what it was, and he was just -- and I'm like, hey, don't we still need to do something?**

**And he's like, Nah, we're not going to worry about that right now.**

**But it was weird because that was a hot project. And it's just like, Oh, okay, were not going to worry about it right now. I didn't know what was going on. But obviously they had met about it and decided it wasn't going to happen or I wasn't going to be involved or whatever, whatever the case maybe.**

Q You're assuming all of that, right, who met about it and when?

**A That day, they did, they came out of a meeting.**

Q Who is that?

**A Shawn, Angela, Carlos, Moppins, Sheba.**

Q Did they tell you what happened in that meeting?

**A No.**

Q So all you know is that a project was discussed at a meeting and they decided not to pursue anymore?

**A I'm going to assume, like I said, this project, because before it was a hot project. It was something that had to get done.**

Q Other than that, is there anything else that came out of those meetings that you were unaware of?

**A No. I don't know what these meetings were about?**

MR. WALSH: I have nothing further for you, Ms. Parker. Thank you.

Do you want to advise about read and sign?

MS. WASIK: Read and sign.

(Off the record at 6:16 p.m.)

ACKNOWLEDGEMENT OF DEPONENT

I, EVANGELINE J. PARKER, do hereby acknowledge I have read and examined the foregoing pages of testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any changes or corrections, if any, appear in the attached errata sheet signed by me.

__________________ ____________________________
Date EVANGELINE J. PARKER

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, Roanna L. Ossege, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 27th day of January, 2020. My commission expires: August 31, 2020.

ROANNA L. OSSEGE
Notary Public in and for the
District of Columbia

**A**
**ability**
8:15, 64:11, 64:15, 297:3, 297:12
**able**
103:11, 106:19, 129:2, 159:21, 182:13, 222:12, 256:16, 302:1, 316:8
**above**
281:10
**absolutely**
15:3, 103:17, 175:3, 184:6, 190:16, 208:19, 237:18, 286:9, 288:2
**academy**
51:17
**acceptable**
32:19
**accepted**
29:14
**access**
126:19, 129:7
**according**
185:20, 196:15, 203:9, 243:19, 244:10, 244:11, 295:18
**account**
27:21, 95:10, 129:11, 129:13, 304:14
**accountable**
102:15, 105:6, 105:8, 105:13, 105:21, 106:5
**accurate**
25:14, 27:13, 54:7, 178:21, 215:15, 216:17, 217:11, 285:5, 285:8, 285:9, 285:11
**accusation**
289:5
**accusations**
286:7, 291:7
**accused**
181:22, 213:19, 289:10, 289:13
**accusing**
207:17, 216:22, 235:21, 238:19, 239:1
**acknowledge**
127:10, 233:17, 235:16, 319:3
**acknowledgement**
5:15, 319:1
**acknowledgment**
24:14
**acronyms**
35:12
**across**
21:22, 182:17
**act**
152:3
**action**
1:7, 106:10, 109:5, 130:22, 146:5, 147:1, 281:10
**actions**
102:16, 105:6, 119:2
**actual**
113:13, 114:2
**actually**
18:22, 64:21, 78:21, 80:19, 82:7, 85:12, 86:18, 115:4, 138:3, 228:6, 249:2, 254:16, 290:19, 292:6, 306:22, 308:10, 315:11
**adamantly**
224:16
**added**
57:13
**adding**
135:19, 135:20, 182:5
**addition**
37:5, 118:10, 182:5, 212:21
**additional**
21:2
**address**
9:14, 9:18, 10:10, 68:20, 68:22, 129:13, 207:14, 226:15, 230:3, 236:17, 237:8, 237:20
**addressed**
37:20, 118:2, 195:16, 222:8, 236:8
**addresses**
228:3
**addressing**
237:14
**adjust**
32:17
**adjustments**
33:10, 33:15, 104:6
**administrative**
77:17
**admitted**
216:13, 216:21
**adults**
101:8
**advance**
160:6, 209:14
**advanced**
135:17, 135:21, 136:3, 136:10, 137:14, 143:9, 165:11
**advancements**
182:11, 212:18, 223:7, 243:12
**advances**
174:18, 217:15
**advice**
86:19, 306:22
**advise**
318:18
**advised**
67:3, 86:6, 87:3, 307:2
**affair**
213:1
**affixed**
320:14
**afternoon**
227:20, 266:16
**afterwards**
151:13, 160:1, 244:20, 248:14, 311:6, 313:11
**again**
20:19, 41:22, 44:10, 45:2, 46:7, 53:8, 53:14, 57:2, 150:18, 168:11, 194:17, 196:7, 204:10, 207:6, 207:8, 207:22, 223:4, 233:21, 234:2, 236:14, 238:13, 239:8, 239:16, 264:9, 264:18, 264:19, 265:20, 274:20, 276:12, 287:18, 292:5
**against**
191:9, 212:5, 278:18, 287:22, 294:8, 299:13, 307:20, 307:21, 308:1, 308:5
**agenda**
157:2, 157:3
**agitated**
290:10
**ago**
125:8, 125:14, 134:20
**agree**
190:12, 192:1, 229:8, 244:1,

285:5, 285:18, 313:18, 313:21, 314:10, 314:15, 314:18
**agreed**
89:3, 208:15, 317:4
**agreement**
2:14
**ahead**
109:14
**ain't**
33:8, 182:21, 286:22
**air**
183:15, 183:22
**aisles**
89:22
**alcohol**
23:20
**alerted**
207:10
**alerts**
70:4
**all-hands**
40:22, 148:8, 148:13, 156:21, 169:16, 180:15, 187:15, 190:10, 196:10, 196:12, 197:6, 199:2, 199:5, 214:17, 255:16, 290:4, 290:9
**alleged**
224:16
**allegedly**
213:1, 285:16
**allow**
59:18, 93:7, 189:6, 289:18, 290:7
**allowed**
52:10, 98:11, 117:4, 150:14, 163:2, 180:15, 180:17, 181:8, 231:3, 233:18, 255:11, 262:7, 262:8, 264:21, 264:22, 312:21
**allowing**
208:17
**almost**
65:6, 135:8, 238:19, 312:8
**alone**
84:21, 199:20
**along**
24:15, 31:17, 112:1, 181:11, 278:13
**alongside**
308:21
**already**
17:18, 27:7, 32:18, 33:7, 33:13, 44:22, 45:4, 47:22, 66:1, 66:15, 66:19, 82:8, 87:10, 118:9, 118:10, 118:16, 118:17, 120:13, 154:1, 172:4, 179:22, 199:13, 223:22, 234:14, 266:1, 267:1, 268:6, 302:19, 306:12, 313:5, 315:15
**also**
4:17, 35:21, 36:2, 50:15, 56:19, 63:15, 67:7, 70:12, 74:17, 77:2, 81:15, 83:22, 105:5, 107:3, 114:20, 116:11, 122:18, 134:5, 136:18, 142:7, 153:15, 175:19, 197:14, 220:2, 220:9, 248:13, 257:16, 284:4, 289:7, 293:13, 302:4, 302:15
**always**
49:1, 73:21, 102:13, 102:22, 255:22
**among**
43:16, 47:6, 175:17
**amongst**
47:1, 175:16
**amount**
12:4, 30:5, 39:9, 40:15, 56:3, 103:2, 113:1
**andrew**
30:9
**andrews**
145:14
**angela**
6:7, 19:14, 26:19, 44:7, 47:9, 54:5, 179:14, 179:21, 180:1, 180:2, 180:7, 180:11, 183:14, 183:19, 197:13, 197:21, 198:1, 207:2, 209:5, 242:5, 251:7, 296:5, 299:11, 299:20, 318:2
**angry**
133:12, 133:14, 182:9, 182:17, 207:16, 207:21, 208:4, 208:6, 208:17
**annoying**
173:22
**annual**
15:19, 27:20, 53:9
**another**
11:19, 31:12, 31:18, 35:11, 35:15, 37:5, 37:16, 38:4, 42:1, 43:19, 47:18, 48:8, 61:22, 64:12, 65:6, 73:4, 90:16, 114:16, 119:7, 134:2, 135:19, 136:9, 144:19, 174:9, 182:6, 190:13, 227:1, 227:8, 272:20, 277:20
**answer**
8:14, 9:9, 105:17, 127:8, 127:11, 242:1
**answered**
102:5, 102:9, 115:9
**answering**
8:21
**answers**
246:19, 246:21, 248:13, 249:2
**anybody**
17:4, 19:21, 28:4, 39:21, 56:7, 58:3, 84:6, 88:17, 90:7, 90:8, 112:16, 116:9, 125:3, 131:4, 132:10, 138:8, 141:13, 141:19, 142:1, 145:1, 150:19, 152:12, 153:10, 158:19, 160:13, 160:22, 161:3, 161:9, 175:5, 177:17, 179:17, 184:13, 190:11, 198:9, 198:20, 199:1, 244:7, 247:22, 276:9, 296:1, 301:3, 304:21, 305:3, 305:5,

307:21, 308:3, 317:3
**anymore**
151:3, 194:15, 207:22, 318:8
**anyone**
49:12, 50:1, 127:21, 130:15, 153:5, 161:5, 188:2, 190:4, 225:11, 237:9, 278:10, 279:4, 288:4, 297:14, 299:15
**anyway**
105:4, 124:8, 285:20, 300:10
**apartment**
10:4
**apologies**
235:10, 244:19
**apologize**
22:18, 26:15, 53:8, 233:20, 234:10, 234:13, 235:22, 309:4, 314:18, 314:21
**apologized**
146:1, 146:11, 207:8, 216:16, 233:21, 236:14
**apologizing**
207:15, 234:5, 234:6
**apology**
234:12, 234:14
**apparent**
280:15
**apparently**
134:5
**appear**
319:7
**appears**
110:7
**application**
18:15, 18:19, 18:22, 19:9
**apply**
18:5, 18:7
**appreciate**
169:3, 234:16
**approach**
52:18, 216:22, 260:14, 292:12, 292:14, 293:18
**approached**
140:18, 144:6, 215:2, 217:2, 217:3, 240:10, 240:13, 240:15, 292:9, 292:17
**appropriate**
229:6, 229:8, 239:14
**approve**
34:2, 250:16
**approved**
286:20
**approximately**
53:15, 55:14
**april**
13:14, 66:5, 66:13, 66:16, 67:1, 67:18, 73:5, 73:8, 73:14, 73:16, 113:21, 115:20, 116:12, 148:18, 177:4, 206:13, 214:4, 226:21, 227:9, 227:18, 228:8, 229:2, 229:14, 233:4, 244:18, 273:18
**area**
220:11, 220:13, 255:12, 262:2, 262:20, 263:2, 263:8, 264:14, 268:2, 268:14, 268:19, 308:9
**areas**
104:22, 280:10
**aren't**
252:19
**arisen**
245:2
**army**
284:12
**arnel**
28:20, 90:13, 119:9, 180:21, 195:22, 196:3, 196:4, 196:7, 196:10, 196:13, 214:22, 263:2, 277:21, 290:15, 290:22, 291:3, 291:4, 291:9, 291:11, 291:20, 292:5
**arnel's**
290:20
**around**
39:11, 44:18, 44:20, 67:1, 72:9, 73:2, 104:16, 114:17, 120:4, 168:20, 187:4, 212:22, 220:3, 232:14, 234:8, 254:11, 258:8, 259:10, 266:6, 270:2, 274:21, 292:21, 300:10
**arrived**
172:13
**articles**
125:17
**asked**
19:22, 25:10, 25:11, 29:11, 49:6, 50:2, 59:19, 88:21, 93:7, 93:9, 93:10, 102:5, 102:9, 104:7, 112:6, 115:9, 121:2, 123:9, 123:11, 123:18, 127:3, 133:16, 134:10, 134:18, 134:20, 138:5, 143:1, 144:6, 144:9, 169:1, 174:12, 181:7, 181:19, 182:2, 194:18, 196:18, 200:14, 202:7, 203:3, 209:21, 220:14, 227:1, 229:3, 233:16, 234:9, 234:12, 239:7, 239:17, 240:2, 242:1, 242:3, 244:21, 248:2, 251:20, 252:19, 259:4, 262:5, 267:1, 276:19, 278:22, 292:18, 293:2, 298:10, 312:7, 313:11
**asking**
8:20, 8:21, 29:7, 78:8, 93:16, 126:5, 132:3, 132:8, 134:3, 136:5, 136:18, 137:18, 162:22, 180:22, 188:20, 189:21, 191:17, 215:9, 238:22, 241:11, 243:7, 243:15, 247:22, 248:2, 248:4, 259:17, 264:19, 279:3, 286:17, 291:4, 292:21, 293:4
**asks**
192:4
**aspect**
31:9, 35:6, 62:18
**ass**
193:4, 207:6
**assets**
118:20
**assigned**
73:18, 295:15
**assigning**
39:13, 40:8

**assignment**
167:21
**assignments**
167:22
**assist**
242:7
**assistant**
12:5, 44:2, 44:4, 44:15, 45:1, 45:5, 45:7, 46:4, 48:19, 53:10, 55:5, 55:15, 62:2, 62:6, 62:9, 62:20, 65:17, 66:15, 66:16, 67:4, 67:18, 78:18, 88:9, 90:10, 96:18, 112:2, 118:21, 153:17, 220:4, 269:18
**associated**
129:13
**assume**
23:1, 31:15, 104:12, 131:8, 137:1, 189:19, 296:9, 309:2, 318:9
**assumed**
39:2
**assuming**
137:21, 303:4, 317:19
**assumption**
309:3
**assured**
201:6
**ata**
21:18, 35:14, 89:17, 264:5, 264:14, 310:15
**attached**
5:9, 22:14, 36:10, 42:8, 65:9, 69:7, 87:16, 96:3, 109:17, 110:5, 205:12, 211:14, 226:10, 227:7, 244:17, 280:1, 283:8, 295:5, 296:17, 302:8, 319:8
**attacked**
269:16, 269:21, 271:5
**attempt**
253:19, 253:22, 260:16, 260:18
**attempted**
293:14
**attempting**
294:4
**attend**
59:13, 59:21
**attended**
59:3, 246:6, 248:20, 255:9
**attention**
106:19, 109:10, 164:21, 200:21, 249:3, 270:19, 272:22, 273:21, 308:15
**attitude**
312:10
**attorneys**
16:4, 17:3, 127:22, 129:15, 282:5, 282:9, 304:3, 304:9, 304:19, 309:22
**augmentation**
35:13
**august**
96:13, 320:15
**authority**
41:3, 307:5
**automatically**
84:14
**availability**
173:2
**available**
40:3, 63:13, 92:12, 251:11, 251:19, 251:20, 264:10, 266:1, 309:16, 309:17
**avenue**
2:6, 4:5
**avoid**
99:5
**awards**
231:6
**aware**
38:2, 54:12, 66:19, 75:18, 101:16, 125:18, 141:20, 141:21, 164:20, 192:16, 217:21, 218:13, 251:5, 315:22
**away**
26:6, 40:17, 40:18, 93:3, 174:7, 218:14, 256:20, 287:5, 307:13, 312:17
**awfully**
253:17

B

**babysit**
98:22, 99:7, 99:19, 100:19, 102:3, 102:10
**babysitting**
98:17, 98:19, 99:16, 100:21
**background**
23:19
**backwards**
11:22
**bad**
148:15, 162:15, 162:17, 170:8, 268:10, 284:9
**ballistics**
54:10
**baltimore**
3:16
**bar**
239:12, 283:1
**based**
23:18, 153:1, 169:20, 178:7, 182:13, 193:22, 194:2, 239:22, 240:5, 277:20, 278:14, 278:16, 283:17, 288:1, 292:6
**basically**
28:22, 145:5
**basics**
9:13
**basis**
34:12
**beach**
59:5, 60:3, 60:13, 61:1, 61:10
**became**
38:1, 43:2, 43:4, 43:6, 50:7, 53:4, 54:12, 61:17, 75:13, 75:17, 90:2, 294:9, 309:17
**been**
8:4, 8:10, 10:19, 14:4, 42:9, 54:13, 65:3, 66:3, 70:6, 75:6, 82:21, 91:12, 100:2, 100:6, 100:7, 110:6, 115:12, 117:6, 118:9, 118:10, 127:13, 127:21, 135:6, 135:14, 150:14, 154:1, 165:12, 170:10, 170:15, 175:11, 195:13, 195:15, 206:21, 221:16, 238:3, 239:14, 244:7, 244:14, 258:10, 259:8,

259:18, 267:10, 271:11, 276:2, 276:17, 283:2, 297:14, 307:12, 309:3, 314:9, 317:1
**before**
2:14, 8:10, 17:15, 27:16, 29:17, 31:12, 35:19, 36:16, 37:10, 42:12, 46:6, 46:20, 47:17, 52:22, 54:3, 55:21, 56:6, 58:12, 58:18, 58:21, 61:7, 64:22, 66:18, 66:21, 75:7, 75:15, 76:14, 77:11, 78:22, 79:1, 90:6, 91:12, 91:14, 91:18, 104:15, 109:11, 113:13, 119:21, 121:10, 122:21, 132:17, 135:4, 135:11, 135:15, 137:2, 137:4, 139:18, 141:4, 144:7, 145:19, 148:10, 153:13, 155:1, 172:9, 173:14, 173:16, 174:21, 176:8, 185:16, 194:7, 199:2, 199:16, 218:22, 221:3, 221:9, 222:6, 226:18, 227:4, 228:5, 232:14, 232:16, 240:16, 240:17, 253:13, 253:15, 254:8, 255:6, 256:18, 257:3, 263:4, 266:22, 267:7, 267:17, 272:14, 274:7, 274:11, 275:19, 304:3, 306:17, 309:1, 309:6, 311:5, 311:16, 312:13, 315:9, 315:20, 318:10, 320:3
**began**
89:4, 278:22
**begin**
280:13
**behalf**
3:2, 3:10, 4:2, 169:10, 189:5, 300:21, 301:3
**behavior**
128:18, 152:13, 152:16, 153:21, 207:3, 214:6, 214:15, 223:9, 225:5, 237:11, 245:16, 274:4, 287:1
**behind**
112:2
**being**
27:6, 27:7, 30:10, 38:2, 38:13, 43:17, 43:21, 44:16, 46:6, 65:17, 84:19, 86:6, 86:10, 89:6, 89:8, 89:14, 92:3, 92:20, 93:13, 107:8, 112:2, 113:9, 114:7, 114:21, 115:22, 130:11, 134:19, 135:17, 135:20, 136:3, 136:10, 143:9, 149:13, 150:9, 163:21, 165:13, 169:3, 174:2, 179:15, 180:14, 182:1, 182:7, 182:10, 182:13, 184:18, 187:5, 187:14, 188:7, 193:3, 195:15, 197:5, 202:1, 202:11, 209:13, 216:19, 232:21, 233:21, 237:4, 247:10, 250:22, 263:17, 264:11, 266:4, 266:20, 269:16, 269:21, 273:3, 273:4, 278:13, 285:11, 289:10, 289:12, 290:6, 305:21, 310:5, 311:11
**believe**
16:8, 19:9, 25:14, 26:3, 33:6, 46:1, 47:16, 50:19, 69:19, 72:6, 72:9, 72:10, 72:11, 74:10, 80:20, 91:9, 91:11, 95:10, 99:20, 100:17, 111:10, 114:4, 114:16, 114:22, 138:10, 145:9, 145:18, 148:12, 153:12, 154:1, 154:20, 166:10, 170:9, 173:19, 192:14, 206:20, 224:1, 224:17, 225:6, 235:15, 242:21, 249:18, 262:16, 277:2, 283:12, 283:15, 284:2, 284:6, 284:9, 284:15, 284:20, 287:12, 288:3, 288:5, 288:17, 292:3, 303:14, 307:13, 313:5, 313:22, 315:4, 315:8, 315:12, 315:14, 316:5
**believing**
252:18
**belonged**
71:12, 89:19
**benefit**
41:20, 43:19
**benefits**
14:16, 14:18, 14:19, 15:20
**best**
8:15, 8:17, 22:18, 54:20, 87:3, 183:8, 279:18, 299:14
**better**
13:11, 208:18, 234:6, 236:16
**between**
12:19, 23:14, 23:15, 44:13, 55:8, 55:10, 61:16, 89:12, 97:20, 119:13, 133:19, 134:6, 134:9, 138:20, 139:1, 170:18, 208:3, 237:11, 243:21, 250:6, 255:13, 289:8, 311:2
**beyond**
155:4, 185:17
**big**
182:4, 185:6, 185:9
**bigger**
237:4
**birgans**
48:7, 90:16, 119:7, 281:11, 281:17, 281:20, 282:7, 282:14, 282:15, 283:18, 283:21, 284:19, 284:22, 285:3,

285:9, 286:9, 286:14, 287:5, 287:10, 287:16, 287:19, 287:22, 303:13, 305:2
**birgans's**
287:21
**birthday**
128:11, 128:15
**bit**
8:12, 15:22, 30:13, 102:12, 112:5, 133:14, 311:21
**bits**
135:3
**blame**
209:13
**blamed**
178:22, 212:16, 314:2
**blaming**
102:18, 183:2
**body**
160:3
**boiling**
315:13
**book**
133:11
**boost**
253:20, 253:22
**boss**
183:12, 268:6
**bossy**
163:13
**both**
132:18, 182:16, 183:9, 184:6, 185:16, 278:1, 296:6, 297:19, 313:13
**bothered**
223:7, 236:5, 271:2
**bottom**
23:3, 24:10, 36:19, 42:20, 65:20, 66:11, 188:12, 191:5, 191:21, 195:17, 223:19, 286:4, 294:3
**bought**
254:1
**box**
90:1, 298:9
**boxes**
40:15
**brandy**
90:14, 90:16, 119:6
**brandy's**
90:15
**break**
9:2, 9:10, 19:3, 35:17, 35:19, 65:4, 68:4, 128:20, 139:12, 139:18, 184:16, 198:14, 244:13, 280:19, 299:1
**breaking**
234:7
**breakroom**
220:7
**breaks**
270:2
**breast**
308:9
**breath**
173:3, 261:20
**breathe**
197:10
**brief**
34:20, 299:19
**bring**
106:19, 237:9, 255:7, 255:10, 277:9
**bringing**
207:17, 210:2
**brings**
20:3
**brinkley**
9:19
**bro**
175:7, 175:13
**broke**
33:8
**broken**
39:10, 40:16
**brought**
107:16, 181:14, 193:5, 193:8, 196:19, 209:19, 246:16, 272:21, 308:14
**brown**
4:20
**bubbling**
315:13
**buddies**
131:8, 175:9, 288:8
**build**
17:20
**building**
107:13, 155:21, 158:10
**built**
175:15
**bunch**
178:10
**bus**
13:4, 308:7
**business**
17:21, 206:19
**busy**
89:2, 260:17, 266:9, 266:12, 267:2, 275:5
**bye**
312:9

C

**cage**
265:15
**call**
19:7, 20:22, 21:9, 82:1, 86:2, 127:4, 127:12, 129:18, 133:20, 142:9, 148:21, 155:3, 155:4, 155:6, 155:13, 155:14, 155:15, 155:17, 155:22, 156:2, 156:7, 156:13, 156:22, 157:4, 160:22, 161:3, 161:5, 162:9, 162:13, 166:5, 166:7, 166:11, 170:3, 173:2, 186:3, 190:10, 211:4, 225:10, 265:3, 298:21, 300:6
**called**
8:4, 29:10, 82:5, 97:21, 120:2, 120:17, 121:5, 127:9, 129:22, 155:7, 162:7, 164:1, 164:8, 166:6, 166:13, 167:6, 168:6, 176:4, 186:19, 194:11, 234:19, 264:11, 299:8, 299:11, 299:21
**calls**
127:7, 127:9, 155:2, 185:15, 185:16, 191:15
**calm**
93:10, 94:2, 183:12, 183:15, 183:22, 184:1, 184:9, 197:10, 197:16
**came**
27:3, 27:10, 27:14, 41:10, 41:18, 41:22, 52:14, 54:20, 55:7, 60:15, 66:21, 75:4, 76:14, 77:15,

78:2, 78:19,
80:19, 81:6,
84:9, 86:1,
89:4, 89:9,
92:17, 104:17,
112:1, 112:3,
120:13, 120:18,
121:14, 123:8,
123:17, 130:13,
132:2, 134:20,
136:4, 136:18,
148:21, 154:10,
156:10, 170:7,
171:16, 171:18,
181:3, 186:4,
186:20, 192:21,
194:20, 202:22,
214:1, 220:13,
221:4, 228:17,
234:8, 250:17,
253:9, 254:15,
255:22, 257:11,
261:6, 261:22,
264:1, 265:20,
272:12, 274:8,
274:15, 274:20,
275:21, 287:2,
303:16, 308:8,
312:12, 312:20,
317:21, 318:13

**camera**
85:15, 85:18,
89:15

**cameras**
279:3

**can't**
102:15, 105:5,
170:22, 173:20,
182:3, 182:7,
182:20, 182:21,
209:14, 209:15,
255:11, 258:2,
258:8, 259:5,
259:10, 267:10,
268:8, 268:9

**capable**
288:12

**car**
155:18, 155:20

**care**
83:20, 101:1,
113:9, 170:21,
230:14, 256:17,
257:19, 312:16,
316:8

**carefully**
243:16

**carlos**
7:3, 47:10,
50:15, 128:13,
251:7, 258:16,
258:21, 259:5,
260:7, 264:10,
264:12, 264:13,
268:13, 281:10,
282:22, 283:13,
285:10, 285:15,
299:2, 318:2

**carry**
72:18

**carter**
7:3, 47:10,
128:13, 231:20,
251:7, 252:2,
257:21, 265:10,
281:11, 282:17,
282:18, 282:20,
283:2, 283:3,
283:11, 283:12,
284:4, 284:7,
284:9, 284:10,
284:13, 284:14,
284:18, 285:2,
287:19, 288:6,
288:7, 288:12

**case**
8:9, 101:17,
106:14, 109:15,
126:17, 317:17,
320:11

**catch**
276:12, 276:18

**cathy**
6:16, 18:20,
210:9, 210:10,
211:3, 232:21,
234:16, 234:20,

259:19, 259:20,
260:9, 265:2,
266:7, 266:8,
266:9, 267:3,
269:3, 276:18,
278:6, 313:3,
313:11

**caught**
85:15, 257:17,
258:1

**cause**
147:12

**cell**
7:6, 7:8

**cellphone**
6:5, 69:4,
69:12, 69:18,
69:22, 70:1,
70:3, 70:12,
70:15, 72:6,
72:9, 72:12,
162:6, 166:11,
166:12, 166:13,
166:15, 166:16,
166:19, 166:21,
167:3, 167:7,
167:10, 167:13,
167:16, 167:19,
168:4, 185:20,
220:11, 295:1,
295:11, 308:11

**cert**
59:17

**certain**
12:4, 39:9,
40:15, 52:9,
52:12, 56:2,
58:21, 59:17,
117:1, 151:10,
163:1, 191:13,
191:19, 256:17,
316:10

**certainly**
73:13, 239:5

**certificate**
246:22, 248:13,
320:1

**certification**
59:7

**certified**
58:20

**certify**
320:4

**certs**
83:20

**chain**
28:14, 218:17,
227:15

**chairs**
247:10

**chance**
31:8, 147:19,
188:18, 279:12

**change**
31:12, 32:14,
43:9, 43:10,
43:13, 46:18,
46:21, 56:19,
56:20, 58:6,
58:11, 58:17,
61:19, 61:21,
99:13, 104:11,
108:11, 185:19,
226:8, 237:6,
287:15

**changed**
47:11, 68:13,
129:11, 151:7,
151:9

**changes**
32:18, 38:19,
54:18, 63:19,
104:12, 316:21,
319:7

**changing**
57:3

**channel**
176:4

**character**
235:12, 235:14,
288:1

**charge**
61:17, 258:7,
260:20, 290:16,
291:13

**charged**
266:4

**charges**
294:7
**chase**
18:2
**check**
23:19, 34:4
**checked**
212:11
**checking**
56:4
**child**
171:2
**children**
101:2
**choice**
139:14
**choose**
166:18
**chronologically**
42:6
**city**
283:1
**civil**
1:7
**claim**
16:11, 16:12, 16:18, 224:15, 238:7, 258:7, 259:7, 277:19
**claimed**
217:1
**claims**
190:19, 191:13, 193:10
**clarifying**
42:17
**class**
59:11
**classes**
52:8, 53:3, 83:22, 118:11, 232:5, 232:7
**classification**
59:18, 257:16
**classifications**
58:17, 83:21, 267:11
**classify**
58:20
**classifying**
267:17
**clean**
250:19, 256:14, 286:18, 316:15
**cleaned**
299:2
**cleaning**
250:18
**cleanliness**
39:12
**clear**
8:19, 21:5, 21:7, 32:4, 35:9, 49:2, 72:11, 146:15, 148:10, 181:10, 187:22, 204:3, 232:22, 268:22, 287:3, 287:6, 311:22
**clearing**
231:22
**clearly**
100:3
**clerk**
17:14, 43:7, 77:16, 167:21
**client**
21:18, 54:5, 54:7, 97:17, 102:2, 104:13, 106:14, 109:12, 109:15, 113:3, 155:3, 155:6, 155:7, 309:12
**cliques**
253:18
**clock**
34:4, 160:16
**close**
77:6, 84:14, 84:15, 84:17, 131:7, 160:2
**closed**
84:17, 84:22, 149:1, 149:5, 150:7, 154:11, 157:15, 159:22, 276:11
**closer**
65:6
**closing**
84:20
**clue**
215:18
**code**
129:11, 129:12, 175:7, 175:13
**coffee**
200:9
**colaianni**
4:3
**collecting**
14:10
**colors**
52:15
**columbia**
2:16, 320:22
**combative**
216:20
**come**
30:20, 33:14, 39:9, 40:13, 56:19, 62:22, 63:16, 80:18, 87:11, 88:21, 91:5, 92:8, 92:13, 99:13, 101:20, 120:15, 132:6, 133:4, 133:10, 143:2, 143:3, 146:2, 159:2, 173:4, 182:21, 187:17, 188:13, 192:4, 215:3, 216:4, 216:10, 218:15, 226:6, 254:3, 254:16, 257:9, 258:13, 259:10, 263:21, 266:6, 270:17, 272:1, 276:14, 276:16, 287:4, 312:21, 317:3
**comes**
14:20, 31:16, 174:16, 191:13
**comfortable**
266:20, 312:11
**coming**
32:8, 75:20, 79:3, 79:9, 91:11, 104:7, 113:4, 134:4, 135:2, 135:5, 145:13, 145:19, 197:14, 200:8, 221:14, 226:17, 234:17, 238:22, 247:18, 255:16, 262:9, 268:1, 271:1, 298:8, 310:15
**command**
28:14, 35:5, 35:8, 40:2, 63:2, 218:17, 256:16
**comment**
131:13, 208:14, 213:2, 213:13, 214:1, 282:15, 289:6, 292:17
**commenting**
165:5
**comments**
178:8, 192:5, 286:4, 286:16
**commerce**
59:2, 59:16
**commission**
320:15
**committee**
3:4, 4:21
**commodities**
21:21
**communicate**
47:3, 70:11, 128:7, 168:2, 168:3, 299:13, 299:15
**communicated**
128:1, 128:11

**communicating**
27:17, 100:6, 100:8, 103:9, 167:22, 257:5, 263:8, 265:21, 311:10
**communication**
83:2, 126:22, 127:17, 167:17, 226:4, 255:13, 255:21, 257:3, 260:19, 282:7, 282:13
**communications**
126:16, 126:20, 128:22, 129:5, 282:14
**commute**
82:9
**companies**
155:9, 155:10
**company**
7:5, 11:19, 29:7, 32:20, 60:21, 60:22, 68:22, 146:7, 166:11, 166:15, 166:17, 166:18, 167:3, 217:15, 308:10, 308:17, 314:6
**company's**
68:19, 68:20
**compensation**
5:19, 42:15, 43:11
**complain**
152:12, 152:16, 152:18, 212:6, 212:7, 218:21, 267:22, 271:9
**complained**
212:11, 214:5, 268:12, 268:13
**complaining**
154:4, 154:8, 163:12
**complaint**
136:13, 139:2, 146:8, 195:13, 212:5, 218:9, 267:19, 278:17, 280:11, 306:3, 307:18, 310:11, 311:3, 311:5, 313:4
**complaints**
194:21, 214:15, 307:19
**complete**
259:9, 319:6
**completed**
22:6, 39:2, 247:1, 312:18
**completely**
135:18, 247:10, 286:8
**compliance**
55:13, 57:10, 57:15, 61:15, 61:17, 62:4, 66:20, 67:12, 67:14, 83:18, 84:10, 107:21, 119:19
**computer**
205:6, 206:1, 232:1, 232:2, 232:8, 232:11, 232:15
**concern**
110:3, 112:22, 117:17, 138:21, 146:8, 147:10, 292:9, 302:1
**concerned**
63:16, 147:12
**concerns**
63:15, 218:18, 291:22, 292:2
**conclusion**
191:16
**concoct**
316:3
**concocting**
315:15
**concrete**
10:16, 10:17, 10:18, 12:11
**condition**
296:6
**conduct**
197:2, 206:18
**conducted**
246:14
**conference**
52:2, 92:11, 149:1, 156:18, 207:1, 210:15, 232:20, 246:15, 251:22, 252:1, 266:18, 294:10
**confirm**
138:2, 138:4, 138:12, 139:5
**confirmed**
219:17, 259:6, 292:17
**confront**
152:8
**confused**
133:14, 233:18, 290:22, 291:8, 298:10
**congratulate**
21:10
**connecting**
137:20
**consensual**
223:5
**consider**
47:7, 74:12, 74:13
**considered**
72:21, 83:1
**consolidate**
39:1
**consolidated**
168:2
**constable**
3:13
**constantly**
54:18, 57:3, 170:16, 290:16, 291:12
**consulting**
1:8, 3:10, 4:18, 25:6, 25:17, 211:16
**contact**
125:13, 126:2, 166:19, 167:19, 309:13
**contacted**
125:8, 125:19
**contacting**
167:12, 167:15
**contents**
98:15
**contingent**
5:11, 23:18
**continue**
92:15, 118:9, 133:18, 150:11, 163:2, 164:18, 164:22, 222:9, 266:6, 291:21, 312:11, 314:5
**continued**
92:22, 93:3, 93:4, 145:4, 169:17, 192:7, 232:6, 261:13, 261:19, 274:14, 274:17, 316:13
**continues**
214:21, 216:12, 218:7, 219:2, 220:2, 280:13, 281:9
**continuing**
119:19
**continuous**
272:13
**continuously**
170:15
**contract**
11:20, 12:3, 13:16
**contractor**
11:2
**contracts**
309:14
**control**
17:14, 27:8,

29:2, 30:6, 35:7, 43:15, 43:17, 44:2, 44:3, 44:6, 45:1, 45:5, 45:8, 46:4, 47:16, 48:17, 48:20, 53:10, 54:17, 55:5, 55:13, 55:16, 55:19, 57:11, 57:13, 58:12, 69:19, 69:21, 74:16, 74:19, 76:5, 96:18, 104:8, 105:1, 105:2, 111:18, 111:21, 167:21, 200:12, 251:21, 272:1, 290:21, 316:12
**conversate**
270:3
**conversating**
307:12
**conversational**
123:14
**conversations**
72:19, 80:5, 82:19, 82:20, 117:22, 151:12, 151:18, 157:17, 204:18, 262:11, 265:21, 271:11, 271:21, 272:3, 312:12
**conveyed**
283:22, 299:18
**conveying**
95:19
**cool**
93:10, 106:16, 133:9, 197:15, 207:21, 267:6, 310:13, 311:1
**copy**
18:9, 22:18, 24:18, 25:1, 25:2, 25:6, 25:17, 25:20, 26:4, 26:8, 29:9, 56:10, 68:15, 110:8, 114:6, 117:1, 205:20, 232:4, 260:1, 260:3, 295:2, 295:7
**correcting**
104:14
**corrections**
319:7
**corrective**
281:10
**correctly**
245:22
**could**
22:15, 22:18, 58:14, 59:6, 70:8, 70:10, 70:19, 87:17, 89:2, 104:17, 104:19, 135:14, 147:12, 149:3, 150:9, 151:6, 151:17, 157:17, 157:19, 159:5, 159:7, 175:22, 176:1, 176:2, 176:4, 176:5, 176:11, 176:12, 193:14, 222:8, 222:19, 228:6, 237:19, 241:15, 243:21, 244:7, 258:13, 271:2, 271:9, 273:13, 287:1, 297:9, 313:18, 314:10, 314:12, 317:1
**couldn't**
85:14, 85:17, 101:16, 105:8, 105:20, 147:8, 150:10, 151:19, 175:21, 232:9, 242:7, 260:4, 260:5, 268:5, 316:10
**counsel**
8:6, 9:8, 9:10, 129:1, 129:3, 129:8, 310:8, 313:16, 320:10
**counseling**
6:10, 6:12, 96:7, 96:22, 97:1, 97:4, 98:16, 109:21, 112:22, 117:16, 289:6, 289:11
**counter**
104:20
**counts**
27:13, 316:12
**county's**
51:12
**couple**
57:7, 67:2, 78:11, 79:15, 134:20, 214:19, 231:6, 246:3, 251:17, 256:3, 256:18, 263:2, 271:15
**course**
52:16, 63:13, 85:3, 85:21, 89:18, 98:4, 117:7, 185:8, 185:11, 187:13, 225:9, 255:16, 277:10, 283:18
**courses**
52:10, 52:13, 52:14, 185:9
**court**
1:1, 2:15
**cousin**
75:19
**cover**
193:10, 204:7
**covering**
193:3
**coworker**
72:21, 308:7, 308:9
**crazy**
201:12, 201:17, 204:1
**create**
43:10
**created**
310:20, 315:4
**creates**
191:8
**creating**
266:5
**crew**
39:13, 40:9, 253:21, 254:5, 262:10, 263:9, 263:10, 265:22
**criminal**
23:19
**cross**
59:22
**crowded**
247:10
**crush**
145:15
**curious**
295:20, 295:22
**current**
9:14, 30:9
**currently**
10:14
**curse**
141:13
**customs**
59:18
**cut**
93:4, 293:15, 311:13
**cya**
193:3
**cyber**
265:15
**cycle**
316:12

**D**

**daily**
33:11, 55:22,

56:10, 108:19,
108:20
**dallas**
128:17
**daltry**
17:9, 18:10,
27:7, 38:7,
39:17, 39:18,
39:22, 48:3,
50:2, 74:11,
75:19, 76:12,
79:20, 80:16,
91:13, 125:9,
128:13, 142:7,
293:21, 303:16,
303:20, 304:21
**daltry's**
38:8
**damage**
147:11, 295:19
**daps**
261:9
**data**
7:5
**date**
13:20, 26:16,
67:2, 110:11,
115:18, 118:1,
282:1, 319:16
**dated**
37:9, 43:8,
65:10, 66:5,
66:13, 226:21,
228:8, 229:1,
278:1
**dating**
77:2
**daughter**
156:1, 185:14,
185:18, 186:15,
186:19, 186:20
**davis**
48:7, 119:7,
219:6, 219:12,
219:22
**day**
26:21, 27:3,
27:10, 29:9,

56:6, 60:11,
60:14, 60:15,
66:17, 67:2,
85:22, 89:11,
93:20, 104:18,
106:15, 106:21,
107:1, 107:12,
116:1, 117:3,
117:14, 120:13,
121:2, 121:8,
127:9, 131:22,
139:2, 141:7,
142:1, 142:9,
144:18, 149:10,
149:11, 150:11,
161:19, 162:11,
166:8, 166:15,
168:5, 172:11,
173:14, 173:16,
173:17, 176:7,
179:5, 183:18,
185:22, 186:12,
195:11, 198:6,
198:10, 198:20,
199:2, 206:7,
206:10, 206:19,
207:5, 214:10,
220:21, 227:1,
227:19, 228:10,
228:11, 229:21,
230:6, 231:11,
231:12, 233:5,
246:22, 255:8,
255:10, 256:11,
256:12, 256:22,
257:9, 258:20,
259:13, 265:19,
266:13, 267:7,
268:14, 268:21,
272:11, 273:7,
273:8, 274:17,
275:3, 276:3,
276:17, 280:5,
298:22, 317:21,
320:14
**day's**
196:16
**days**
23:9, 67:2,

122:21, 125:8,
125:13, 132:1,
134:20, 141:7,
168:1, 206:8,
229:15, 246:3,
256:15, 256:18
**dc**
10:22
**deal**
98:5, 118:13,
219:20, 253:13,
307:1, 308:15
**dealing**
106:9, 186:16,
221:1, 237:10,
239:9, 301:22
**dealt**
36:21
**december**
26:17, 220:3
**decide**
146:22, 148:16,
218:10
**decided**
46:19, 94:4,
147:5, 171:10,
178:13, 218:9,
242:4, 262:4,
308:8, 317:16,
318:7
**decides**
138:22
**decision**
94:4, 172:5,
172:7, 176:19,
209:8, 278:14,
287:15
**deck**
157:1
**deep**
173:3, 261:20
**defend**
181:9, 216:15
**defendant**
1:10, 3:10,
8:6, 313:16
**definitely**
44:13, 137:4,

141:2, 141:4,
212:13, 212:14,
217:21, 274:16,
275:19, 275:20
**deleted**
301:13
**deletion**
7:4
**delicate**
306:10
**demarcus**
19:14, 28:5,
28:13, 35:1,
38:6, 40:1,
47:9, 133:12,
143:10, 144:7,
144:10, 145:10,
145:12, 145:17,
146:16, 162:3,
179:13, 180:6,
180:9, 190:1,
200:15, 202:8,
207:1, 207:19,
211:4, 242:11,
242:12, 243:1,
266:19, 267:1,
267:13, 268:17,
276:19, 294:9,
300:2, 300:8,
305:4, 311:9,
313:13
**demarcus's**
242:6, 242:9
**demonstrate**
248:14
**demonstrating**
201:13, 201:14
**demonstrative**
272:5
**denial**
283:22
**denied**
281:18, 283:19
**dental**
14:20
**deny**
139:5, 139:7
**department**
21:19, 27:18,

31:18, 32:11, 34:13, 35:11, 35:12, 35:16, 39:12, 43:20, 59:2, 59:15, 59:16, 71:13, 89:17, 97:12, 104:5, 104:10, 111:18, 119:8, 119:10, 151:14, 151:15, 178:4, 182:6, 256:12, 257:1, 257:2, 257:6, 257:7, 257:17, 261:9, 262:9, 264:4, 264:6, 264:11, 264:18, 265:21, 266:1, 270:4, 311:15
**departments**
41:1, 55:21, 100:12, 254:10, 273:14
**depending**
40:20
**depends**
239:11
**deponent**
319:1
**deposed**
8:10
**deposition**
1:13, 2:1, 5:10, 6:2, 7:2, 16:3, 17:4, 22:16, 36:12, 42:10, 66:4, 69:9, 96:5, 110:7, 205:14, 226:11, 229:14, 283:10, 320:4
**deputy**
138:20, 138:22, 139:1, 208:2, 238:11, 238:16
**describe**
151:16
**described**
174:3
**description**
112:14
**desk**
70:5, 116:22, 158:9, 231:22, 232:20
**detail**
168:15
**details**
179:3, 201:22
**determine**
40:21
**determined**
212:15
**different**
20:7, 29:16, 31:8, 32:21, 39:14, 46:20, 52:16, 52:18, 57:11, 70:13, 81:1, 107:18, 237:13, 248:3, 263:6, 302:20, 317:5
**differently**
108:1, 108:4, 108:18, 153:2
**difficult**
263:13
**dig**
241:10
**diligence**
104:14
**dillion**
45:12, 55:3, 79:21, 90:13, 98:1, 104:4, 104:7, 104:16, 119:9
**dinged**
58:14
**direct**
31:14, 113:3, 215:3, 311:15
**directed**
99:8
**direction**
151:22, 306:5, 306:14, 306:15, 320:8
**directly**
28:7, 40:4, 45:9, 55:13, 56:11, 57:18, 59:13, 63:14, 64:2, 90:17, 98:12, 107:21, 119:12, 119:14, 178:5, 215:3, 216:10, 263:9, 278:19
**director**
310:15
**dirty**
297:20
**disagree**
98:15
**disagreed**
99:6, 99:17, 235:20
**disagreement**
228:16, 228:22
**disagrees**
224:16
**disburse**
152:3
**disciplinary**
109:1, 109:2
**discipline**
11:13, 41:5, 45:17, 46:10, 53:19, 64:6, 64:15, 85:6, 88:22, 89:3, 89:7, 90:20, 91:4, 105:10, 109:5, 238:2
**disciplined**
85:9, 87:21, 225:12, 238:9, 238:10
**discuss**
111:2, 115:11, 117:11, 130:19, 138:22, 150:19, 198:9, 202:17, 204:8
**discussed**
117:14, 121:21, 149:14, 150:13, 163:10, 163:15, 163:18, 163:21, 165:17, 171:13, 175:16, 187:15, 188:7, 190:7, 197:5, 203:4, 214:18, 220:13, 235:9, 235:10, 252:9, 318:7
**discussing**
139:19
**discussion**
115:21, 229:10, 247:17
**disgruntled**
165:14, 222:13, 253:19, 270:14, 270:20, 306:12
**dishonest**
284:10
**dismissed**
169:17
**dispatchers**
11:12, 11:15, 14:5
**dispatching**
11:11
**dispute**
285:13
**disrespected**
174:9, 174:17
**disrespectful**
89:8, 173:22
**disrespectfully**
216:14, 216:19
**disrupting**
262:9, 262:10
**distracted**
270:11, 270:12, 305:21
**distracting**
307:12

**district**
1:1, 1:3, 2:16, 320:22
**division**
77:17, 252:2
**divorce**
124:10, 124:14, 124:17, 134:21, 207:20, 238:17
**divorced**
189:22
**divorcing**
121:3, 123:10, 123:18
**document**
24:11, 24:21, 26:8, 36:13, 36:16, 69:10, 71:15, 87:19, 110:13, 205:22
**documentation**
21:2, 59:8, 204:15, 205:2, 205:17, 206:15, 269:2, 276:1
**documented**
91:10, 204:21, 204:22, 206:10
**documenting**
204:17, 204:19, 204:20
**documents**
16:5, 16:7, 16:17, 16:21, 24:15, 73:9, 205:15, 211:19, 212:1, 212:2, 230:7, 230:16, 230:17, 279:14, 279:15, 280:4
**dog**
272:8
**doing**
13:3, 13:21, 27:9, 27:12, 28:22, 29:1, 29:3, 29:17, 32:16, 32:18, 32:19, 47:13, 54:21, 57:12, 58:12, 64:16, 89:21, 97:18, 99:2, 101:1, 104:13, 106:2, 107:18, 108:12, 118:9, 118:10, 118:17, 123:13, 126:5, 133:4, 145:14, 152:6, 152:13, 152:21, 153:5, 191:20, 193:20, 194:1, 202:20, 220:16, 230:12, 232:9, 247:20, 254:22, 256:13, 262:10, 264:9, 269:20, 270:14, 273:1, 305:22, 306:8, 307:10, 310:17, 310:18, 317:4
**donald**
3:12, 8:8, 263:1, 291:15, 292:5
**done**
16:2, 17:15, 23:14, 23:21, 41:2, 43:17, 80:7, 83:21, 84:4, 93:12, 95:6, 101:12, 102:22, 103:4, 117:2, 168:1, 172:3, 175:22, 176:1, 176:5, 218:19, 231:15, 237:19, 237:22, 238:13, 251:13, 254:7, 254:14, 257:16, 262:8, 263:7, 263:10, 263:16, 265:9, 270:1, 305:15, 318:11
**donte's**
202:22, 223:7, 223:9
**door**
83:9, 83:12, 84:12, 84:14, 84:15, 84:17, 84:20, 85:1, 107:14, 149:1, 149:2, 149:3, 149:4, 149:5, 149:6, 149:7, 149:8, 150:6, 154:11, 157:13, 157:15, 158:17, 159:3, 159:22, 160:2, 160:6, 168:10, 169:4, 180:14, 184:18, 210:16, 223:20, 224:3, 275:4, 275:5, 276:10, 276:15, 298:13, 300:14
**dot**
60:1
**dots**
137:20
**doubt**
22:10, 26:3
**down**
19:3, 39:10, 40:16, 49:19, 67:10, 80:1, 89:17, 89:21, 92:18, 93:10, 94:2, 102:12, 114:10, 135:4, 135:10, 143:22, 183:12, 183:15, 183:22, 184:1, 184:9, 184:16, 189:15, 190:11, 197:16, 212:20, 259:5, 262:8, 262:20, 264:14, 264:21, 264:22, 265:9, 265:14, 268:1, 268:14, 269:15, 271:14, 271:15, 272:22, 273:4, 283:4, 290:15, 304:15, 307:14, 310:15
**drama**
241:7
**drawer**
116:22, 117:3, 117:6
**drink**
239:13
**drinking**
200:8
**driver**
13:4
**drivers**
11:10, 14:4
**drove**
61:4, 61:9
**drug**
23:19
**due**
54:17, 98:16, 104:14, 129:10, 148:20
**duly**
8:4
**dumb**
254:12
**during**
13:8, 14:11, 19:22, 20:2, 23:21, 28:18, 33:21, 34:21, 39:18, 39:22, 40:6, 46:9, 48:15, 48:18, 49:9, 49:16, 49:22, 50:10, 51:15, 53:20, 56:8, 56:12, 57:21, 61:16, 61:19, 62:3, 64:12, 64:16, 69:11, 76:20, 77:19, 78:7, 78:9, 78:17, 85:3, 88:14,

90:8, 91:15, 100:14, 103:20, 104:6, 105:9, 114:21, 115:12, 115:19, 115:22, 116:11, 128:8, 131:19, 150:19, 151:4, 152:13, 153:11, 153:15, 154:5, 177:6, 194:3, 196:15, 197:6, 197:17, 197:18, 198:9, 207:3, 207:13, 208:9, 211:8, 224:9, 233:22, 257:5, 268:16, 278:11, 288:18, 290:8, 294:20, 296:9, 308:6
**duties**
11:8, 13:21, 31:13, 45:7, 61:19, 61:21, 103:14, 112:15, 190:21

**E**

**each**
101:13, 214:7, 219:20, 221:1, 270:8, 273:13
**earlier**
85:4, 104:4, 153:19, 275:3, 293:21, 295:10, 311:4
**early**
45:22, 87:10, 132:17, 132:18, 200:7, 275:19
**easier**
12:17
**easily**
270:12
**easy**
65:13, 66:7, 207:16
**eccn**
59:16
**eeoc**
7:11, 16:12, 16:19, 302:4, 302:11, 303:7, 304:10, 307:18, 307:19, 309:1, 309:6
**effect**
94:15, 172:17, 185:1, 226:8, 279:13
**effectively**
222:12
**effort**
312:22
**efforts**
310:14
**eggshells**
306:4
**eight**
92:10
**either**
19:4, 45:21, 46:10, 93:8, 109:2, 152:8, 178:11, 241:9, 241:19, 247:9, 251:16, 267:21, 289:10, 294:13, 297:22, 301:11, 314:8
**elaborate**
134:13
**elaborated**
248:6
**element**
135:19, 135:20
**elevate**
195:9
**else**
16:14, 17:4, 28:4, 70:10, 76:1, 79:16, 90:8, 94:18, 99:13, 105:19, 112:13, 112:16, 116:9, 117:9, 117:19, 118:14, 118:17, 121:19, 121:21, 122:15, 126:8, 131:5, 131:14, 140:2, 141:19, 142:1, 143:16, 145:2, 145:14, 150:6, 150:19, 162:16, 162:20, 163:4, 163:17, 168:19, 170:17, 171:6, 171:21, 173:20, 177:17, 179:11, 179:17, 187:18, 195:2, 197:11, 198:20, 201:10, 202:10, 203:16, 204:6, 235:10, 237:9, 238:8, 241:12, 246:12, 250:6, 253:15, 258:16, 271:4, 278:10, 279:4, 299:17, 300:4, 303:8, 304:21, 305:3, 305:5, 308:3, 318:12
**else's**
72:8
**elsewhere**
309:18
**email**
6:16, 6:18, 18:21, 19:5, 21:12, 22:9, 25:11, 29:6, 41:1, 46:22, 54:3, 68:17, 68:19, 68:20, 68:22, 70:20, 70:21, 97:11, 98:9, 99:21, 100:15, 102:1, 108:5, 129:12, 172:14, 206:3, 206:4, 226:5, 226:12, 226:14, 226:17, 226:21, 227:4, 227:8, 228:1, 228:3, 228:17, 229:1, 229:14, 230:3, 233:2, 233:12, 255:20, 265:3, 266:10, 266:16, 269:6, 269:9, 275:13, 275:21, 276:13, 277:1, 277:3, 286:20
**emailed**
24:5, 24:8, 24:17, 206:3, 256:9
**emailing**
56:10
**emails**
70:4, 70:6, 97:16, 228:5, 230:9, 250:15, 250:21, 250:22, 256:3, 256:5, 266:15, 311:11
**embarrassing**
169:6
**embassies**
21:22
**embassy**
35:13
**emoji**
82:22, 83:3
**emotional**
294:9
**emotions**
208:17
**employed**
74:22, 75:3, 85:3, 128:8, 129:22, 130:5, 299:16, 308:21, 320:10
**employee**
5:15, 17:13, 22:7, 24:14, 25:7, 25:18,

43:2, 43:5, 95:16, 106:3, 115:8, 140:13, 152:22, 161:19, 174:10, 174:16, 178:5, 178:6, 178:9, 190:13, 214:5, 216:1, 219:5, 219:6, 220:5, 239:19, 240:22, 270:10, 270:20, 277:17, 278:17, 308:20, 309:9
**employees**
5:20, 28:15, 33:2, 36:4, 40:5, 45:10, 45:14, 46:11, 53:20, 85:6, 85:9, 90:17, 90:20, 99:7, 100:19, 101:4, 102:3, 103:15, 103:21, 105:21, 111:15, 120:14, 151:10, 152:5, 152:21, 154:4, 154:7, 161:22, 162:2, 188:22, 214:19, 214:22, 215:10, 215:17, 215:19, 215:22, 216:22, 217:4, 217:8, 217:17, 217:18, 217:19, 218:4, 218:22, 219:11, 219:17, 222:13, 239:18, 245:5, 245:8, 246:9, 246:10, 253:8, 253:19, 261:2, 264:14, 270:12, 278:19, 280:10, 289:18, 289:21, 290:7, 299:14
**employer**
191:11
**employment**
7:10, 10:14, 16:1, 20:5, 58:9, 75:5, 277:17, 298:5, 301:16, 309:4, 309:7, 309:18, 316:18
**en**
82:7, 166:10
**enabled**
70:3
**encounter**
281:12
**encouraged**
233:19
**encouragement-ty-pe**
165:1
**end**
58:9, 60:18, 75:4, 93:15, 104:18, 106:8, 107:18, 156:13, 188:21, 198:6, 198:19, 222:6, 234:15, 294:4, 296:8
**end-of-the-year**
38:22
**ended**
94:9, 139:10, 155:4, 165:13, 172:10, 178:14, 203:22, 309:5, 309:7
**ending**
163:2, 290:10
**ends**
184:6
**engaged**
287:4
**engagement**
281:14
**engaging**
153:20
**enough**
34:13, 43:18, 100:1, 130:10, 149:4, 160:4, 184:8, 247:10, 254:9, 272:18, 277:16, 278:8, 312:11
**ensuring**
27:15
**entire**
17:21, 54:8, 74:21, 105:1, 192:8, 273:8
**entitled**
270:20
**entity**
51:18
**entrance**
107:14
**environment**
191:9, 212:10, 212:13, 266:5
**equally**
40:13, 103:3
**equipment**
30:14, 71:12, 264:3, 265:22, 270:4, 295:19
**eric**
48:6, 49:20, 49:21, 50:1
**errata**
319:8
**error**
98:1, 98:13, 178:12
**errors**
105:4
**escalate**
195:9
**escort**
294:10, 294:14
**especially**
192:19, 218:12, 250:17
**esquire**
3:3, 3:12, 4:3
**esrs**
316:11
**estimation**
229:7
**etrs**
316:11
**evaluate**
31:10
**evaluation**
117:2
**evaluations**
231:6, 270:8
**evangeline**
1:5, 1:13, 2:1, 7:6, 8:3, 319:3, 319:16
**even**
26:1, 35:15, 97:15, 98:3, 113:10, 137:1, 143:20, 160:1, 181:9, 182:15, 186:14, 193:8, 209:12, 220:22, 221:20, 222:7, 238:10, 238:21, 238:22, 258:10, 260:3, 270:9, 292:5, 295:17
**evening**
132:10, 140:10, 140:11, 140:14, 298:22
**event**
224:16
**events**
204:21, 206:12, 227:15, 230:10, 293:22
**eventually**
121:16, 146:2, 161:17, 168:16, 179:14, 180:4, 260:14
**ever**
25:1, 31:20, 69:12, 74:3, 79:5, 79:11, 82:14, 83:8, 83:11, 84:19,

84:22, 85:5, 124:22, 138:2, 138:5, 138:12, 207:5, 213:18, 295:17
**every**
27:21, 35:6, 62:18, 101:13, 135:12, 195:10, 246:9
**everybody**
112:7, 112:8, 112:13, 157:6, 158:21, 169:5, 183:15, 183:21, 187:18, 203:16, 254:6
**everyone**
30:4, 108:13, 108:14, 108:21, 111:10, 153:3, 156:20, 158:18, 158:20, 168:13, 168:19, 192:16, 242:6, 246:8, 249:12, 251:21, 254:11, 254:12, 289:7, 292:22, 299:1
**everyone's**
56:4
**everything**
14:20, 16:22, 29:19, 30:13, 102:19, 103:3, 107:6, 118:17, 127:20, 129:2, 129:15, 165:7, 184:16, 185:8, 211:3, 211:7, 221:14, 221:22, 222:7, 222:20, 230:19, 237:1, 258:5, 267:8, 282:4, 316:12
**evidence**
239:20, 284:19, 308:20
**exact**
151:11, 183:8, 231:17, 290:6
**exactly**
30:17, 46:5, 59:19, 75:5, 112:9, 123:12, 123:15, 133:1, 182:15, 183:4, 216:7, 222:18, 233:13, 279:7, 317:7
**examination**
5:2, 8:6, 310:8, 313:16
**examined**
8:5, 319:4
**example**
33:1, 33:5
**examples**
237:6
**except**
156:20, 208:11, 249:13, 251:9, 299:2
**exclude**
192:15
**excluded**
159:10, 169:4
**excuse**
14:19, 106:18, 206:22, 233:4
**excused**
184:22, 185:1
**exempt**
5:19, 43:2, 43:4
**exhibit**
5:11, 5:13, 5:15, 5:17, 5:18, 5:21, 6:3, 6:5, 6:7, 6:9, 6:10, 6:12, 6:14, 6:15, 6:16, 6:18, 6:19, 6:21, 7:3, 7:4, 7:9, 7:11, 22:16, 23:8, 24:13, 36:8, 36:9, 36:12, 42:5, 42:7, 42:10, 44:16, 44:17, 65:10, 65:13, 65:16, 66:4, 69:6, 69:9, 69:15, 71:16, 73:4, 87:15, 87:17, 96:2, 96:5, 109:16, 109:19, 110:4, 110:7, 113:22, 205:10, 205:11, 205:14, 211:12, 211:13, 211:16, 226:9, 226:12, 227:6, 227:9, 227:17, 229:14, 233:3, 268:22, 269:10, 280:3, 280:7, 281:2, 283:7, 283:10, 286:2, 287:14, 288:13, 288:16, 295:4, 295:7, 296:16, 296:18, 302:7, 302:10
**exhibits**
5:10, 6:2, 7:2, 22:12, 22:13, 65:8, 68:9, 244:16, 279:20, 279:22
**exit**
107:14
**expectations**
20:4
**expected**
295:19
**experience**
99:4
**expires**
320:15
**explain**
185:11, 192:5, 309:15
**explained**
100:20, 143:7
**explaining**
23:11
**explains**
34:18
**explosives**
113:6, 113:8
**express**
11:2, 11:4, 11:17, 11:18, 11:22, 12:18, 13:2, 13:13, 13:22, 15:14, 15:18
**expressions**
280:14, 281:5, 281:6, 281:13
**extra**
174:2
**eyes**
159:4, 287:1

**F**

**face**
154:11, 158:17, 168:10, 169:5, 180:14, 184:19, 223:21, 224:3, 298:10
**facebook**
126:4, 126:16, 127:17, 127:20, 128:2, 128:3, 128:8, 129:4, 129:7, 281:21, 282:6, 301:13, 303:14
**facial**
280:14, 281:5, 281:6
**fact**
54:13, 100:11, 133:15, 143:8, 158:1, 165:3, 165:11, 171:15, 174:22, 175:4, 201:21, 202:19,

237:11, 238:13, 241:12, 268:1, 269:17, 288:9, 296:2
**factory**
295:12
**failure**
86:11
**fair**
67:3, 165:21, 171:17
**fairly**
160:5
**fall**
81:3, 116:5
**falling**
316:22
**false**
132:7, 135:18, 188:22, 189:9, 190:1, 282:21, 285:20, 286:8, 288:10, 289:11, 289:13
**familiar**
66:8, 205:15, 283:14
**family**
302:2
**fans**
128:17
**far**
16:16, 30:5, 41:5, 46:20, 52:11, 128:3, 128:5, 139:8, 144:11, 182:3, 193:17, 207:11, 216:19, 221:8, 225:13, 246:21, 278:8, 301:21, 315:3
**fault**
98:7, 179:1, 291:8
**february**
29:4, 29:5, 110:14, 110:16, 115:19, 117:13, 120:1, 240:18
**feed**
164:21, 165:2, 165:8
**feeding**
162:22
**feeds**
241:7
**feel**
9:7, 20:3, 29:11, 32:8, 89:21, 102:12, 104:2, 104:13, 132:5, 133:4, 153:1, 162:18, 170:13, 174:14, 175:1, 175:18, 190:21, 209:16, 214:19, 216:4, 218:14, 237:19, 237:22, 238:2, 238:3, 239:21, 241:7, 242:10, 242:12, 243:10, 254:4, 269:16, 269:21, 271:5, 271:10, 291:12, 291:19, 291:20, 308:22
**feeling**
222:13, 287:11, 316:16
**feelings**
193:22, 217:22
**feels**
217:6, 217:8, 290:17
**feet**
92:10
**fell**
78:20, 104:22
**felt**
39:4, 43:18, 98:7, 98:8, 100:15, 103:8, 104:5, 145:17, 147:9, 168:11, 170:8, 170:14, 178:11, 183:3, 189:11, 189:14, 195:8, 195:10, 195:22, 196:4, 209:19, 210:1, 217:13, 217:20, 218:8, 230:11, 236:6, 236:7, 237:10, 237:14, 244:5, 250:7, 252:12, 266:2, 270:20, 305:21, 312:11, 313:10, 313:12
**female**
195:11
**ferguson**
48:7, 86:4, 86:5, 86:7, 86:8, 86:12, 87:6, 87:8, 90:13, 90:19, 119:6, 128:12, 151:10, 153:12, 153:14, 165:12, 168:17, 169:15, 170:20, 187:20, 194:12, 194:20, 195:2, 195:8, 195:10, 195:20, 196:18, 204:5, 214:22, 217:14, 218:6, 240:7, 249:11, 261:7, 263:12, 264:18, 269:17, 269:20, 269:22, 270:6, 270:7, 271:20, 272:2, 272:15, 274:3, 281:7, 291:21, 292:1, 292:4, 292:12, 292:14, 293:2, 301:9, 305:20, 306:1, 306:6, 312:3
**ferguson's**
217:22, 277:21
**few**
22:11, 23:9, 39:2, 68:8, 79:1, 118:10, 119:20, 122:21, 125:8, 125:13, 132:1, 172:3, 172:22, 176:1, 176:5, 209:2, 223:16, 231:8, 251:10, 256:5, 256:15, 257:14, 298:21, 310:7
**fight**
315:11
**figure**
124:5, 254:13
**file**
94:6, 116:22, 218:9, 308:5, 309:1
**filed**
139:2, 258:7, 259:7, 267:19, 278:18, 280:12, 301:19, 302:3, 306:3, 306:11, 307:19, 308:1, 309:6, 310:10, 311:2, 313:4, 315:15
**files**
205:3
**filing**
303:6, 304:10
**fill**
18:15, 18:18, 21:3, 34:9, 249:1, 302:18
**filled**
19:9, 26:11, 95:16, 302:11
**finally**
266:15
**finances**
301:17
**financial**
13:11, 320:12

**find**
17:7, 22:19, 85:17, 89:18, 124:16, 124:19, 129:4, 131:9, 138:15, 180:18, 181:14, 190:12, 191:12, 192:15, 192:18, 193:12, 193:16, 222:20, 260:9, 260:15, 261:2, 270:21, 298:18, 303:7
**fine**
107:7, 139:15, 198:13, 200:3, 275:1
**finger**
97:17
**finish**
93:7
**finished**
36:14, 198:18
**fire**
93:19, 297:4, 297:12, 315:1, 315:5
**fired**
207:5, 209:11, 217:10, 218:4, 222:2, 222:5, 222:21, 231:3, 234:21, 297:14, 298:12, 299:20, 313:14, 313:18, 313:20, 314:9, 314:10, 315:10, 315:12
**fires**
102:20
**firing**
278:16
**firm**
303:7
**firms**
302:20, 302:22
**first**
8:4, 13:17, 13:18, 13:21, 14:7, 14:14, 15:4, 15:11, 15:15, 17:6, 19:2, 25:5, 25:16, 26:12, 27:4, 27:5, 40:1, 63:2, 69:15, 69:18, 71:17, 72:15, 88:19, 90:11, 92:17, 109:12, 111:5, 118:19, 120:7, 121:1, 140:22, 142:8, 142:10, 143:4, 148:20, 150:1, 150:20, 155:4, 155:6, 155:14, 167:11, 167:12, 167:14, 167:20, 176:14, 176:18, 176:20, 176:22, 177:14, 179:13, 180:9, 184:17, 195:12, 197:22, 199:19, 203:7, 211:18, 219:13, 227:17, 230:1, 240:15, 255:20, 257:12, 270:15, 280:3, 286:4, 290:14, 295:15, 295:17, 295:21, 296:2, 301:21, 302:1, 310:13
**fish**
2:5, 4:4, 4:19
**fisher**
10:3
**fishing**
175:9, 270:3
**fit**
116:5, 137:8, 137:10
**five**
14:9, 60:3, 76:15, 127:15, 305:14
**five-day**
255:18
**five-year**
29:9, 68:10, 68:12, 68:15
**fives**
261:9
**fix**
33:9, 222:17, 222:19
**fixed**
222:8, 222:10, 222:11
**flashed**
220:6
**flat**
288:3
**flirting**
174:1
**floor**
3:15, 235:19, 256:20
**floors**
250:20
**flow**
63:10
**focus**
112:5
**focused**
49:3, 49:9, 165:9, 312:18
**focusing**
103:4, 103:6
**follow**
86:11, 87:6, 106:4
**followed**
107:6, 271:16
**following**
142:9, 142:11, 192:17, 292:18
**follows**
8:5
**food**
254:9, 254:11, 254:17
**foot**
54:20
**force**
178:18
**forefront**
197:2
**foregoing**
319:4, 320:4, 320:5
**forget**
261:19
**forgot**
34:6, 177:22, 279:7
**forklift**
264:3, 264:6
**forklifts**
30:15
**form**
6:15, 95:15, 167:17, 212:19, 248:8
**formal**
51:16
**formed**
164:6
**former**
178:6, 219:5, 219:6, 220:5, 299:13
**forms**
21:3, 21:11, 22:8, 25:10, 25:11, 125:17, 248:3
**forth**
89:12, 94:11, 129:5, 208:6
**forward**
19:8, 53:8, 54:20, 99:5, 99:11, 106:3, 191:13, 204:10, 233:20, 247:19, 274:19, 314:6
**forwarded**
259:20
**found**
58:16, 105:10, 220:22, 223:2,

299:20, 309:18
**four**
20:7, 60:3, 61:2, 76:15, 127:15, 129:20, 135:8, 170:7, 180:5, 180:7
**fourth**
269:15
**frame**
69:14, 88:5, 90:9, 114:18, 150:18, 274:6
**free**
9:9, 132:5, 133:4, 216:4
**freight**
155:9
**friday**
206:21, 208:16, 209:12, 214:4, 214:10
**friend**
17:9, 18:12, 74:12, 143:4, 143:21, 145:16, 146:1, 189:20, 193:6
**friendly**
98:21, 164:17, 164:19
**friends**
74:7, 74:9, 74:13, 75:13, 75:15, 115:11, 126:4, 128:12, 128:14, 143:20, 283:2, 284:11, 288:9
**friendship**
131:11, 284:13
**friendships**
301:14
**front**
155:20, 158:18, 169:5, 192:8, 278:3, 279:21
**frustrations**
208:18
**fucking**
121:3, 123:10, 123:19, 134:22, 141:17, 207:20, 213:4, 215:3, 216:10, 238:18, 292:10, 292:19, 292:22
**full**
94:6
**functionality**
35:21
**funny**
83:1, 120:22, 134:19
**further**
95:8, 102:12, 124:3, 131:12, 198:2, 222:7, 224:14, 229:10, 245:16, 249:16, 249:20, 271:14, 298:14, 313:16, 318:16
**fyi**
255:15

**G**

**game**
9:4, 136:12, 310:22
**games**
79:15, 80:18, 80:20, 287:7
**gap**
12:19, 73:9
**garage**
14:3
**gather**
230:7, 230:18, 303:11
**gathered**
299:1
**gathering**
230:15, 299:6
**gatling**
262:1, 263:1, 263:12, 291:15, 291:19
**gave**
18:12, 21:9, 39:1, 71:17, 112:12, 113:12, 143:13, 159:1, 173:1, 211:19, 212:15, 226:1, 261:12, 265:1, 269:2, 269:5, 275:5, 275:14, 275:18, 280:5, 282:4, 284:14, 288:20, 296:19
**general**
151:22, 214:3, 214:9
**generate**
301:18
**gentlemen**
87:13, 97:22, 152:9, 192:4
**gestures**
280:14, 281:5, 281:6, 281:13
**getting**
75:8, 89:7, 91:4, 112:14, 112:19, 112:20, 131:21, 134:21, 136:19, 168:18, 172:16, 189:22, 207:20, 208:17, 216:19, 227:22, 229:18, 233:2, 236:16, 237:5, 238:17, 239:16, 254:14, 263:10, 269:12, 297:1
**girl**
120:19, 143:19, 232:3, 232:11, 312:9
**girlfriend**
163:7
**give**
17:20, 18:12, 22:2, 69:9, 72:11, 96:4, 99:10, 105:17, 109:18, 111:6, 122:12, 168:15, 176:15, 211:22, 212:2, 222:20, 260:1, 288:10, 296:12, 305:14
**given**
65:12, 69:3, 69:12, 70:4, 72:7, 85:16, 96:12, 98:8, 98:13, 109:8, 163:20, 185:11, 186:8, 205:14, 211:15, 225:3, 225:9, 231:14, 231:16, 231:17, 232:22, 248:18, 269:18, 280:8, 288:17, 294:19, 295:7, 296:7, 319:6, 320:6
**gives**
186:1
**giving**
112:10, 112:11, 112:21, 113:13, 139:14, 239:21, 266:13, 296:18
**global**
155:11
**globe**
21:22
**gms**
12:5
**goes**
137:8, 217:6, 248:7, 287:22
**gone**
154:2, 175:1, 175:21, 218:21
**good**
8:11, 8:12, 92:10, 128:15, 128:21, 133:2, 168:8, 169:2,

174:2, 235:2, 235:14, 254:19, 259:4, 270:10, 284:11, 288:8, 292:18, 300:7, 310:17, 310:18
**gossip**
229:11, 236:20
**gotta**
258:4
**gotten**
21:1, 97:11, 298:21
**government**
7:5
**grabbed**
257:19
**grade**
43:2
**granger**
97:11
**great**
104:10
**green**
109:14, 238:12
**gripes**
277:22
**group**
79:17, 79:22, 309:11, 309:17
**grzechowiak**
28:20, 47:11, 49:13, 79:21, 173:7
**guess**
14:20, 39:3, 43:7, 46:22, 89:20, 97:19, 105:15, 120:14, 130:15, 163:1, 169:16, 175:9, 212:14, 212:19, 213:5, 214:18, 234:6, 252:21, 311:15
**guessing**
241:14
**guy**
30:16, 30:18, 85:14, 160:5, 242:8, 268:18, 272:22
**guys**
27:17, 61:7, 70:18, 97:12, 169:22, 310:22

**H**

**ha-ha**
83:3
**hack**
129:11
**hair**
79:22
**half**
53:16, 235:6
**halfway**
269:15
**hall**
167:2
**hand**
43:15, 168:19, 201:13, 201:14, 201:16, 201:18, 222:7, 233:18, 275:2, 320:13
**hand-delivered**
24:6
**handbook**
5:15, 22:8, 24:14, 24:18, 25:1, 25:2, 25:7, 25:18, 25:20, 243:19, 244:10, 295:18
**handed**
275:1
**handful**
305:18
**handle**
86:19, 87:4, 94:8, 118:12, 180:10
**handled**
113:1, 113:13, 116:6
**handling**
234:5
**hands**
156:22
**handwriting**
42:19, 66:10, 96:9, 96:21, 102:11, 110:11, 289:2, 302:13
**handwritten**
205:4, 286:4
**hang**
186:1, 308:8
**hanging**
239:13
**happen**
64:19, 159:3, 181:12, 234:2, 250:7, 298:20, 317:16
**happened**
29:5, 74:9, 88:3, 88:20, 97:9, 98:3, 105:4, 135:8, 136:6, 169:19, 177:3, 178:12, 187:1, 188:16, 189:7, 192:6, 194:13, 199:2, 223:17, 233:14, 245:9, 253:15, 272:20, 274:6, 285:3, 298:11, 298:18, 318:3
**happening**
49:16, 54:18, 241:2, 244:9, 316:11
**happy**
104:13, 104:17, 105:2, 106:14, 128:10, 128:15
**harassing**
190:13, 259:8
**harassment**
6:15, 146:8, 178:1, 190:16, 190:18, 191:8, 211:17, 225:4, 225:9, 245:19, 246:6, 247:1, 247:18, 248:4, 248:8, 248:21, 249:15, 249:19, 250:4, 250:7, 250:9, 259:8, 259:17, 266:4, 277:19, 278:17, 278:18, 280:11, 294:7, 306:3, 306:11
**hard**
231:15, 270:6, 295:11, 295:14, 296:2, 310:14
**harm**
152:11
**harold**
45:12, 55:3, 90:13, 97:22, 98:5, 105:1, 105:10, 119:9
**harold's**
98:7
**hazardous**
118:13
**hazmat**
118:11
**head**
176:17, 286:21, 308:7
**health**
41:19
**hear**
89:5, 93:5, 120:7, 120:10, 130:10, 149:3, 149:19, 157:17, 157:21, 158:4, 158:6, 158:7, 192:19, 200:20, 207:22, 238:8, 241:9
**heard**
19:4, 120:19, 120:20, 121:1, 121:15, 121:16,

122:3, 122:6, 122:14, 122:19, 122:21, 123:1, 131:17, 143:11, 145:10, 170:10, 173:1, 176:22, 181:4, 187:7, 188:10, 195:12, 200:20, 201:1, 201:3, 201:21, 202:2, 202:3, 202:8, 203:5, 203:8, 240:1, 241:12, 241:13, 241:15, 257:12
**hearing**
121:18, 131:20, 219:13
**heated**
197:15
**held**
2:1, 43:10, 51:16, 59:1, 68:1, 108:19, 119:18, 214:4, 214:10, 214:13, 313:3
**hello**
120:15
**help**
40:22, 43:20, 84:3, 84:9, 101:17, 104:21, 309:21
**helped**
104:19
**here**
65:7, 68:4, 92:6, 98:6, 102:12, 103:12, 118:5, 121:1, 134:20, 149:20, 183:5, 189:3, 189:5, 189:6, 206:8, 212:9, 212:21, 223:20, 226:20, 227:15, 249:5, 254:2, 254:4, 258:2, 258:10, 259:18, 262:8, 264:14, 264:22, 268:14, 268:18, 269:3, 269:12, 271:1, 271:15, 272:22, 273:4, 275:22, 291:8, 300:10
**hereby**
319:3, 320:4
**hereunto**
320:13
**herself**
216:15
**hesitancy**
306:20
**hey**
108:14, 109:14, 127:2, 127:12, 134:15, 148:22, 149:10, 167:1, 232:10, 251:21, 252:19, 254:6, 254:12, 255:15, 259:5, 261:14, 262:6, 264:12, 267:1, 267:9, 272:22, 274:1, 312:14, 317:8
**hi**
8:8
**hierarchy**
62:22
**high**
261:9
**highly**
310:18
**hills**
9:21, 10:4
**himself**
138:17, 192:15, 285:1
**hired**
10:9, 25:4, 27:19, 49:1, 101:8
**hiring**
18:11, 20:21, 297:13
**history**
10:13, 10:14, 16:1, 20:6
**ho**
312:6
**hold**
102:15, 105:5, 105:7, 105:12, 105:20, 106:4, 108:20, 180:1, 261:11, 290:7, 309:16
**holler**
261:18, 272:8
**home**
80:7, 82:6, 82:7, 82:9, 120:16, 158:13, 160:14, 160:21, 161:1, 161:4, 161:6, 161:9, 167:4, 198:7, 254:7
**homey**
163:7, 193:6
**hooked**
89:22
**hooking**
219:4, 219:11
**hoping**
236:14
**hostile**
191:9, 212:10, 212:13, 266:3, 266:5
**hostilities**
253:6
**hostility**
250:9, 250:11
**hot**
257:15, 317:12, 318:10
**hotel**
60:21, 61:6
**hour**
65:4, 235:6, 244:14
**hourly**
43:3
**hours**
30:1, 33:22, 172:22
**housed**
21:20, 113:8
**however**
54:17, 225:2, 292:8
**hr**
18:10, 127:3, 139:3, 139:11, 152:16, 152:18, 175:21, 176:11, 176:13, 178:13, 178:15, 193:8, 208:8, 209:9, 210:9, 210:17, 210:21, 218:9, 218:10, 218:20, 218:21, 220:16, 222:17, 224:14, 274:13, 280:12, 310:10, 311:3, 311:5, 313:4
**huffing**
92:18
**huge**
195:14
**hugs**
261:9
**huh-uh**
234:14
**hum**
312:6
**hung**
175:8
**hurt**
288:4

I

**i's**
60:1
**idea**
254:19
**ideas**
253:21

**identification**
22:14, 36:9, 42:7, 65:9, 69:6, 87:15, 96:2, 109:16, 110:4, 205:11, 211:13, 226:9, 227:6, 244:17, 280:1, 283:7, 295:4, 296:16, 302:7
**identified**
20:7, 47:20, 71:16, 76:7, 96:5, 109:19, 227:9, 287:14
**identifies**
69:16, 73:4
**identifying**
118:5
**immediate**
28:9, 62:16, 85:21, 90:4, 95:12, 159:22, 262:5
**immediately**
25:4, 90:7, 90:9, 91:20, 92:12, 156:13, 160:6, 289:16, 293:15, 301:13
**impact**
236:21, 316:7, 316:18
**impacting**
263:17
**implicate**
193:14
**important**
40:13, 40:14, 40:21, 103:3, 155:13, 174:14
**in-person**
19:10, 19:12
**inappropriate**
236:8, 238:19, 243:10, 243:11, 280:14, 281:4, 281:6, 281:13
**inc**
1:9, 3:11, 25:7
**inc's**
25:18
**incapable**
100:22
**incident**
85:15, 89:5, 91:2, 100:11, 100:13, 107:11, 107:16, 108:1, 109:9, 223:2
**include**
32:12, 248:5
**included**
29:10, 55:10, 238:4, 250:13, 250:22, 251:4, 251:11, 252:3, 252:6, 310:19, 317:2
**including**
111:10, 119:15
**income**
301:18
**incorrect**
281:16
**increase**
5:22, 15:12, 30:20, 31:7, 41:10, 41:12, 41:16, 58:6, 114:13
**indented**
216:13
**indicate**
25:14, 124:7, 124:22, 125:3, 130:22, 141:9, 146:4, 165:16, 194:19, 195:1, 196:17, 225:19, 283:21, 298:1, 299:8, 300:20
**indicated**
65:17, 140:17, 203:7, 206:8, 236:7, 282:20
**indicates**
212:3, 212:9
**individual**
48:8, 54:16, 55:2, 72:10, 85:8, 87:20, 106:5, 140:7, 140:22, 152:4, 241:6, 246:16, 266:5
**individuals**
20:9, 31:2, 32:13, 38:15, 41:4, 48:4, 50:10, 63:9, 64:1, 64:2, 64:16, 78:14, 100:22, 108:10, 119:11, 129:6, 214:7, 299:7, 305:8
**influence**
109:7, 287:15
**influenced**
109:10
**inform**
62:1, 149:12, 219:19
**information**
54:4, 54:7, 58:22, 63:10, 63:16, 70:9, 131:21, 136:4, 163:19, 173:8, 181:2, 206:6, 212:14, 214:17, 226:1, 230:13, 230:15, 230:17, 232:4, 232:6, 239:6, 240:4, 241:7, 241:8, 258:3, 277:16, 279:2, 282:8, 303:12, 305:1
**informed**
17:13, 21:11, 105:9, 120:20, 121:22, 129:8, 139:7, 145:15, 174:8, 207:4, 207:15, 208:12, 214:16, 232:7, 232:10, 240:17, 259:5, 284:1, 293:13, 293:16, 306:2, 306:11, 308:15, 311:9, 315:21
**informing**
211:4, 289:22
**initial**
16:11, 16:18, 19:7, 22:22, 97:19, 238:7
**initially**
77:15, 111:16, 194:9, 292:16
**initials**
49:19
**initiated**
297:21, 303:15
**inquires**
195:19
**inquiries**
261:1
**inquiry**
244:8
**inside**
157:18, 158:20, 158:21, 159:21, 160:4
**instead**
91:22, 163:1, 176:10
**instruct**
32:9
**instructed**
86:18, 104:21
**instructing**
32:12
**instruction**
87:7
**instructions**
86:11, 97:14, 98:9, 99:11,

99:15, 101:9, 106:1, 106:4, 108:8, 280:8
**insubordinate**
208:16, 233:22, 314:16, 315:2, 316:2
**insubordination**
207:8, 235:22, 313:19, 313:22, 314:11, 315:6
**intake**
7:11, 302:10
**intent**
59:10
**intentional**
266:2
**intentionally**
271:7, 271:10
**interacted**
255:5
**interaction**
265:18, 281:14
**interactions**
249:20
**interest**
320:11
**interested**
18:1
**interests**
279:19, 299:15
**interfere**
153:8
**interim**
119:12
**internal**
36:22
**interrogatories**
16:9, 16:10
**interrupting**
33:7
**interview**
19:1, 19:7, 19:10, 19:13, 19:18, 20:2, 20:10, 20:13, 20:18, 75:10, 76:1, 78:4
**interviewed**
75:21, 224:11, 279:2, 279:4
**interviewing**
224:8
**inventory**
17:14, 21:21, 27:8, 27:14, 27:18, 27:20, 29:2, 30:6, 35:7, 38:22, 39:1, 43:15, 43:16, 44:2, 44:3, 44:6, 45:1, 45:5, 45:8, 46:4, 46:20, 47:16, 48:17, 48:19, 53:10, 54:17, 55:5, 55:16, 69:19, 69:21, 70:13, 70:16, 71:8, 74:16, 74:18, 76:4, 96:18, 97:13, 104:8, 105:1, 105:2, 111:18, 111:21, 112:2, 167:20, 168:1, 200:11, 251:20, 272:1, 290:21, 312:14
**investigate**
190:17, 191:4, 191:20, 191:22, 192:22, 225:22
**investigated**
224:15
**investigating**
193:9
**investigation**
6:15, 191:12, 192:11, 193:1, 193:16, 211:17, 238:22, 259:9, 259:21, 262:6, 264:21, 268:8, 273:15, 278:14, 278:20, 279:1, 285:15
**invited**
157:6, 157:8, 157:10, 164:3, 164:4, 274:21
**invites**
311:14
**involve**
31:5, 40:11
**involved**
39:7, 40:8, 47:7, 50:5, 50:15, 95:19, 149:18, 165:20, 193:13, 251:6, 287:7, 311:14, 317:17
**involvement**
95:8, 192:16, 207:10, 274:2, 315:22
**involvements**
283:20
**iraq**
185:7, 185:8, 185:17
**irate**
86:1, 139:9
**issue**
28:12, 101:14, 103:5, 103:7, 104:15, 109:1, 165:11, 178:1, 180:22, 195:15, 229:3, 254:3, 263:16
**issued**
69:18, 69:21, 72:6, 88:22, 109:4, 116:1, 231:14, 294:22, 298:1
**issues**
63:14, 105:4, 111:17, 187:16, 256:6, 256:8, 305:20
**issuing**
105:11
**item**
27:21, 85:17, 89:16, 89:19, 118:19, 221:11
**items**
27:16, 27:20, 40:16, 52:12, 54:9, 58:21, 59:14, 70:22, 71:2, 71:3, 71:8, 216:13, 231:2, 231:4, 255:18, 267:17

J

**jacks**
30:15, 264:3
**january**
1:15, 52:1, 320:15
**jason**
30:11, 30:12, 30:13, 31:3, 31:4, 31:21, 31:22, 32:6, 33:11, 34:11, 47:10, 50:9, 90:14, 119:8, 219:4, 219:12, 242:9
**jealous**
217:15
**jealousy**
165:11
**jenning's**
274:3
**jennings**
48:8, 77:3, 79:2, 79:5, 79:21, 90:12, 119:6, 119:15, 122:15, 138:2, 138:5, 138:9, 151:11, 151:14, 164:16, 164:19, 168:17, 169:16,

170:19, 187:19, 194:11, 194:20, 195:20, 196:18, 202:17, 204:5, 212:8, 214:22, 217:2, 217:7, 217:13, 217:21, 218:6, 219:6, 219:15, 219:17, 220:6, 220:9, 220:12, 220:16, 221:10, 221:19, 224:15, 224:18, 224:20, 225:3, 225:16, 237:9, 238:1, 238:4, 238:9, 240:6, 249:8, 257:4, 261:21, 264:17, 265:18, 265:20, 269:17, 270:9, 271:20, 272:2, 277:20, 281:7, 281:14, 281:15, 287:2, 289:21, 292:16, 292:17, 293:2, 293:6, 301:6, 305:22, 307:11, 312:12

**joanna**
3:3

**job**
1:20, 6:4, 18:2, 18:3, 18:5, 18:7, 31:9, 32:1, 38:21, 52:11, 54:21, 64:16, 75:9, 84:1, 101:8, 101:9, 101:10, 101:12, 101:15, 103:10, 103:11, 104:18, 112:15, 147:11, 153:5, 164:22, 221:20, 222:9, 222:12, 230:11, 230:14, 234:21, 239:10, 244:21, 254:2, 270:14, 287:6, 300:21, 301:4, 305:22, 310:17, 313:10, 313:12, 316:7, 316:9

**jokes**
128:18

**jolene**
28:20, 47:10, 49:13, 50:20, 128:14, 173:7, 179:8, 182:21, 199:10, 199:12, 204:22, 223:6, 223:10

**jolene's**
182:18, 199:14, 223:6

**joseph**
4:3

**jr**
4:3

**july**
25:7, 69:16

**jump**
53:7, 89:22, 204:10

**jumped**
147:22

**jumping**
274:19

**june**
12:12, 12:13, 13:6, 25:18, 43:8, 44:13, 44:21, 45:4

**justified**
313:22

**K**

**kathleen**
48:7, 119:7, 219:5, 219:12

**kathy**
215:5, 215:7, 215:9, 215:12, 216:7, 221:12, 221:15, 221:22, 222:1, 222:18, 233:15, 233:19, 235:11, 235:18, 237:1, 237:7, 260:13, 279:17

**kathy's**
235:20

**keep**
32:3, 33:22, 117:1, 123:11, 160:18, 180:22, 200:4, 205:2, 300:10, 309:15

**kent**
287:12

**kenton**
48:6, 90:16, 119:7, 285:16, 288:3

**kept**
90:1, 162:22, 174:1, 226:15, 226:16, 268:1

**keys**
158:10

**kickball**
79:15, 80:2, 80:14, 80:17, 81:12, 136:12, 142:16, 142:17, 142:19, 146:12, 167:1

**kicking**
200:8

**kid**
255:8, 255:10

**kidding**
29:14

**kind**
17:15, 27:8, 27:22, 32:9, 43:20, 85:18, 89:21, 89:22, 96:20, 104:21, 106:11, 106:17, 111:20, 120:18, 134:15, 134:22, 137:8, 143:22, 145:8, 150:8, 150:10, 151:12, 153:22, 168:19, 173:3, 173:8, 175:6, 175:17, 176:17, 183:17, 184:2, 199:14, 200:8, 200:19, 200:21, 201:13, 201:17, 217:14, 217:16, 225:13, 230:7, 230:10, 234:15, 235:19, 238:12, 253:8, 253:18, 254:1, 254:10, 256:11, 256:12, 256:17, 256:22, 257:22, 261:16, 263:7, 264:22, 270:12, 271:1, 272:16, 275:4, 279:5, 286:14, 306:4, 306:7, 306:10, 308:12, 310:3, 312:6, 312:10, 316:22

**kinds**
204:20

**knew**
21:18, 30:17, 89:6, 112:4, 139:8, 147:7, 147:14, 147:15, 158:15, 159:19, 159:20, 168:13, 175:10, 175:18, 176:10, 183:11, 188:3, 189:8, 207:10, 208:12, 210:18, 219:15, 230:8, 232:16, 256:14, 269:22, 270:6, 270:14, 271:12, 293:16, 296:1, 296:4,

300:7, 306:12, 306:13, 307:10
**knock**
276:15
**knocked**
149:2, 160:1, 275:4
**knowing**
147:14, 180:20, 241:6
**knowledge**
17:21, 115:7, 157:20, 158:4, 229:12
**knowledgeable**
32:1, 119:2
**known**
76:13
**knows**
254:12

**L**

**lack**
102:16, 105:6
**ladies**
90:15, 142:18, 148:1, 199:5, 199:16
**lady**
90:16, 119:7
**lane**
10:22
**large**
160:5
**larry**
19:14, 28:5, 28:14, 38:6, 40:1, 47:9, 107:21, 121:1, 123:8, 130:13, 131:6, 131:9, 131:13, 133:21, 134:20, 137:16, 137:17, 162:21, 168:9, 168:12, 169:8, 169:10, 172:6, 172:8, 174:11, 194:9, 197:14, 203:22, 204:5, 206:22, 212:5, 212:7, 232:21, 233:21, 234:6, 234:8, 236:14, 237:11, 237:12, 239:10, 243:1, 252:21, 258:11, 258:12, 258:14, 259:6, 262:14, 262:15, 262:17, 262:19, 263:19, 263:22, 266:17, 266:20, 266:21, 267:3, 268:7, 273:22, 299:12, 310:13, 310:17, 310:19, 310:22
**larry's**
204:1, 206:10, 206:20, 227:3, 229:20, 233:10, 235:1, 258:22, 259:2, 266:13, 276:10
**las**
51:16
**last**
9:17, 11:21, 20:18, 42:5, 68:1, 90:15, 110:9, 115:16, 125:6, 125:9, 127:19, 129:19, 130:8, 172:2, 185:21, 220:3, 225:2, 249:18, 255:9, 256:11, 256:18, 259:12, 259:14, 273:1, 278:7, 281:9, 295:21, 300:11, 300:17, 302:16
**lasted**
19:19, 130:9
**late**
86:10, 87:6, 167:18, 177:4, 185:12, 185:14
**late-april**
150:16, 150:18
**later**
23:9, 27:10, 29:9, 31:17, 32:4, 35:9, 45:22, 72:12, 73:2, 97:21, 106:17, 106:22, 107:12, 116:14, 136:4, 141:7, 147:5, 149:11, 161:19, 162:11, 170:9, 172:22, 180:9, 194:10, 199:12, 199:15, 226:14, 226:19, 228:1, 228:7, 229:15, 246:22, 258:20, 261:18, 272:9, 313:1, 314:19
**lateral**
6:4
**laugher**
178:10, 271:16, 271:19
**laughing**
82:22, 160:10, 273:19
**laughter**
149:3, 151:13, 153:7, 160:9
**law**
125:17, 191:10, 302:20, 302:22, 303:7
**lawyers**
3:4, 4:20
**layoff**
12:5
**lazy**
306:8
**leader**
176:16
**leading**
16:1, 33:1, 33:4
**leagues**
81:1
**learn**
31:8
**learned**
31:17
**learning**
99:4
**least**
71:7, 224:2, 236:15, 251:5, 251:17, 251:18
**leave**
12:2, 13:10, 76:19, 77:19, 93:16, 93:17, 93:18, 94:14, 94:15, 94:16, 158:12, 180:6, 180:9, 183:20, 183:21, 184:13, 204:11, 221:15, 221:17, 271:22
**leaving**
13:2, 107:12, 127:19, 128:1, 149:10, 161:14, 166:15, 183:16, 184:3, 298:9, 309:19
**lee**
74:17, 77:9, 77:11, 77:14, 78:15, 90:14, 147:16, 147:17, 149:12, 164:13, 164:16, 164:17, 169:20, 220:10, 220:11, 220:14, 220:18, 220:20, 221:10, 221:11, 223:3, 223:4, 223:8, 300:2, 303:18, 303:20, 304:22
**left**
15:9, 60:13,

61:14, 61:18, 75:7, 78:9, 78:21, 78:22, 82:8, 95:3, 119:18, 120:13, 120:15, 126:21, 149:10, 158:10, 160:20, 183:11, 184:12, 186:18, 194:10, 197:20, 197:21, 197:22, 198:4, 206:10, 206:16, 208:20, 210:6, 244:18, 254:9, 256:19, 257:3, 257:8, 264:17, 275:2, 298:12, 299:11, 309:20
**legal**
191:15
**less**
15:5, 15:7
**let's**
9:13, 13:12, 15:22, 17:6, 22:11, 35:17, 36:7, 64:19, 65:5, 66:7, 113:20, 119:20, 121:4, 134:1, 144:5, 147:20, 150:17, 154:18, 169:1, 184:15, 192:21, 197:10, 198:13, 199:19, 204:10, 205:10, 211:11, 242:14, 242:16, 254:7, 254:13, 280:2, 302:6
**letter**
5:11, 5:13, 5:14, 5:17, 22:7, 22:20, 23:1, 23:9, 23:10, 23:11, 24:4, 37:20, 41:17, 42:12, 42:13, 43:1, 44:21, 45:3, 64:22, 65:16, 66:5, 66:8, 66:11, 66:21, 109:21, 110:2, 112:22, 113:13, 114:2, 114:16, 115:16, 116:13, 116:17, 116:18, 117:16, 117:20, 118:1, 118:2, 259:19, 260:1, 260:4, 266:11, 266:14, 268:21, 269:2, 269:3, 269:13, 269:14, 271:15, 275:2, 275:6, 275:8, 275:14, 275:19, 297:16
**letters**
23:15, 231:5
**letting**
255:9
**level**
217:16
**lewis**
30:9
**life**
132:5, 133:4, 216:4, 239:8
**light**
109:14, 146:19, 238:12
**liked**
38:21
**likes**
89:6, 241:8, 241:9
**liking**
195:4, 195:6
**limited**
255:14
**line**
67:10, 181:11, 183:13, 263:4, 269:15, 271:15, 316:22
**lines**
271:15, 278:13
**lingering**
265:20
**list**
257:20
**listen**
91:16, 222:14
**listening**
93:8, 274:22
**little**
8:12, 15:22, 30:13, 57:2, 65:3, 65:6, 102:12, 112:5, 114:12, 140:3, 151:11, 151:12, 232:3, 232:10, 235:6, 235:7, 270:15, 271:14, 274:10, 286:16, 291:8, 311:21
**littleton**
74:14, 74:15, 74:16, 74:18, 75:4, 80:16, 125:10, 142:6, 293:2, 293:13, 293:18, 293:20
**lived**
9:16, 9:22
**llp**
3:13
**located**
9:20, 10:21, 36:2, 257:21
**location**
113:11
**locations**
309:14
**lock**
83:9
**locked**
83:11, 149:2, 149:6, 157:15, 158:18, 159:22, 160:8
**logistic**
67:7
**logistics**
17:18, 17:21, 67:15, 155:12
**long**
9:16, 9:22, 10:5, 10:19, 11:17, 13:5, 19:18, 20:18, 29:3, 32:6, 34:13, 34:15, 41:7, 46:3, 53:13, 53:15, 56:18, 56:22, 58:8, 60:8, 76:13, 77:11, 78:6, 78:8, 91:18, 92:7, 113:6, 127:14, 129:18, 130:7, 130:9, 130:10, 153:8, 156:6, 172:1, 208:20, 209:2, 233:13, 235:4, 259:12, 259:14, 274:12, 278:7, 278:8, 311:12
**longer**
56:14, 57:22, 68:13, 95:17, 126:3, 128:3, 129:7, 165:12, 212:17, 257:7, 299:16
**longest**
270:21
**look**
22:15, 36:13, 40:20, 41:13, 42:11, 69:10, 109:18, 159:16, 162:15, 205:13, 239:12, 252:1, 266:8, 289:1, 298:10, 302:9,

305:14
**looked**
70:22, 129:4, 133:6, 156:11, 185:21, 185:22, 190:9, 250:21, 261:16, 262:4, 264:15, 282:6
**looking**
17:14, 36:14, 96:21, 114:1, 151:12, 151:20, 151:21, 151:22, 153:21, 158:5, 168:20, 261:12, 272:6, 272:7, 275:22, 279:8, 285:19, 286:2
**looks**
73:5, 226:21, 227:18, 229:15
**loop**
300:10, 309:15
**lose**
230:11, 313:10, 313:12
**loss**
295:19
**lot**
58:15, 70:22, 79:21, 83:19, 84:5, 113:11, 125:19, 166:22, 247:20, 263:3, 263:6, 265:8, 299:22
**loud**
89:7, 93:8, 216:18, 216:19
**loudly**
92:15
**low**
253:18
**lunch**
70:7, 72:20, 74:4, 128:20, 139:12, 140:4, 173:14, 254:1, 254:15, 254:18
**lunchtime**
275:20

**M**

**ma'am**
51:8, 161:7, 161:15, 177:10, 177:19, 197:7, 224:21, 291:6
**mad**
252:22
**maddie**
74:14, 142:6, 142:9, 148:3, 149:17, 199:13, 199:19, 199:20, 199:22, 200:19, 293:20, 300:3
**made**
15:15, 43:21, 54:22, 105:20, 125:15, 152:22, 172:5, 176:3, 176:19, 178:8, 208:14, 209:8, 213:2, 213:13, 260:16, 260:18, 261:8, 261:21, 264:17, 269:20, 271:4, 281:12, 291:19, 291:20, 308:13
**main**
163:12, 171:8, 196:21, 292:8
**maine**
2:6, 4:5
**mainly**
104:22, 195:8, 237:3, 253:9
**maintained**
206:1
**maintaining**
29:21, 39:11, 205:18, 206:4, 206:15
**majority**
82:21, 158:1, 235:18, 289:8, 289:10, 289:12
**make**
8:17, 8:22, 15:15, 15:17, 32:17, 33:10, 33:15, 33:19, 35:9, 54:6, 67:13, 70:8, 70:10, 94:4, 101:11, 101:16, 102:21, 103:15, 103:17, 103:18, 104:11, 104:12, 104:13, 104:14, 106:14, 107:6, 108:21, 110:9, 112:3, 113:20, 117:14, 123:15, 138:11, 139:21, 159:3, 160:7, 162:14, 172:7, 187:22, 194:21, 200:4, 204:3, 238:7, 244:8, 256:13, 257:16, 258:4, 261:1, 268:22, 281:5, 286:16, 288:3, 288:6, 293:9, 293:10, 302:6
**makes**
94:15, 191:13
**making**
8:20, 14:13, 15:4, 15:5, 15:8, 23:12, 56:1, 59:14, 59:22, 83:20, 98:1, 98:12, 104:6, 113:9, 128:5, 214:19, 238:11, 256:19, 280:14, 281:19, 316:15
**male**
217:8, 217:18, 217:19, 218:4
**man**
286:21, 312:22
**manage**
31:14, 98:16, 102:10, 107:22, 108:3
**managed**
196:9
**management**
47:2, 47:6, 47:7, 48:21, 49:4, 49:6, 49:10, 49:12, 50:6, 50:11, 51:6, 51:10, 51:14, 52:5, 52:6, 52:10, 55:11, 102:19, 107:19, 118:20, 134:11, 154:4, 163:16, 163:17, 164:7, 165:5, 166:1, 195:14, 195:21, 196:8, 196:19, 197:4, 243:22, 249:14, 277:22, 291:10, 296:5
**management's**
272:21
**manager**
11:7, 11:9, 38:10, 39:8, 39:16, 43:6, 44:2, 44:3, 44:6, 44:15, 45:1, 45:5, 45:8, 46:4, 48:5, 48:20, 53:11, 55:5, 55:16, 62:2, 62:10, 62:17, 62:18, 65:17, 66:15, 66:16, 67:4, 67:8, 67:15, 67:18, 69:21, 78:18, 78:19, 88:9,

90:10, 91:13, 94:6, 96:18, 101:10, 103:14, 111:8, 112:2, 118:22, 138:21, 139:1, 139:2, 153:17, 162:17, 165:13, 170:8, 174:8, 174:16, 176:16, 189:2, 189:5, 189:6, 190:3, 190:14, 190:22, 191:1, 191:18, 191:19, 192:1, 208:2, 220:4, 238:11, 238:16, 242:7, 242:22, 243:4, 243:8, 243:16, 243:17, 251:11, 269:19, 280:9, 314:1, 314:2

**manager's**
224:9

**managers**
12:4, 12:5, 28:6, 33:12, 246:9, 251:8, 289:20

**managing**
11:14, 14:2, 32:21, 33:1, 33:4, 47:20, 99:16

**mandatory**
148:19, 180:16, 225:11

**manley**
48:7, 86:4, 86:5, 87:4, 90:13, 119:6, 128:12, 153:12, 163:11, 170:1, 170:10, 173:20, 180:20, 187:19, 187:21, 188:9, 195:2, 202:21, 203:2, 214:22, 217:14, 218:5, 261:11, 261:14, 264:18, 270:9, 270:11, 270:14, 270:20, 273:18, 277:21, 291:21, 292:4, 293:10, 305:20, 306:12, 306:17, 307:1, 307:2, 307:6, 307:10, 307:13, 312:6, 312:13

**manley's**
261:10

**manners**
315:10

**many**
46:5, 48:14, 49:17, 49:21, 50:2, 50:13, 50:18, 50:22, 80:13, 171:15, 230:7, 251:3, 272:16

**march**
37:9, 44:13, 82:4, 88:3, 113:18, 114:5, 114:9, 114:11, 114:17, 114:19, 116:14, 120:9, 120:10, 150:2, 150:3, 153:20, 176:22

**marines**
284:12

**mark**
22:11, 22:12, 36:7, 69:8, 205:10, 211:11, 279:20

**marked**
22:13, 22:16, 36:9, 36:12, 42:7, 42:9, 65:8, 66:4, 69:6, 87:15, 96:2, 109:16, 110:4, 110:7, 205:11, 211:13, 226:9, 227:6, 244:16, 279:22, 283:7, 283:9, 295:4, 296:16, 302:7

**marriage**
213:3, 213:14

**maryland**
1:3, 3:16, 9:15, 9:21, 10:4

**match**
89:12

**material**
117:7, 118:13, 250:19

**math**
12:10

**mathews**
6:8, 87:13, 88:1, 88:2, 88:15, 88:17, 89:5, 89:10, 89:14, 90:8, 90:19, 91:16, 92:3, 92:8, 92:15, 93:3, 94:5, 94:22, 153:19, 231:7

**matter**
92:9, 100:11, 133:15, 235:15

**matthews**
91:3, 91:11, 92:4, 92:21, 93:10, 93:14, 94:9, 95:2, 95:9, 154:1

**maybe**
34:17, 53:16, 54:8, 54:10, 57:6, 70:18, 75:6, 76:15, 77:13, 78:11, 82:8, 117:7, 125:9, 127:15, 140:20, 172:3, 186:21, 228:10, 239:13, 247:10, 263:13, 314:14, 317:18

**mean**
25:15, 35:12, 45:13, 62:14, 108:8, 127:2, 135:5, 137:17, 143:18, 151:21, 182:10, 189:10, 204:4, 259:18, 272:18, 285:3

**meaning**
40:22, 156:22

**meaningless**
262:11

**means**
9:3, 41:14, 100:21, 106:13

**meant**
100:21, 116:3, 278:15, 313:8

**meanwhile**
230:14

**media**
166:22

**medical**
14:19, 14:20, 309:22

**meet**
108:12, 126:14, 167:2, 173:7, 179:7, 184:2, 187:17, 199:19, 199:20, 200:6, 200:10, 207:2, 222:1, 226:6, 227:2, 266:17

**meetings**
47:1, 47:6, 47:8, 48:21, 48:22, 49:1, 49:4, 49:7, 49:10, 50:5, 50:6, 50:11, 50:16, 51:3, 53:10, 55:10,

108:19, 224:12, 249:16, 249:22, 250:13, 251:1, 251:3, 251:6, 251:12, 251:15, 252:3, 252:4, 252:9, 252:13, 252:16, 252:18, 253:4, 294:13, 310:19, 311:14, 311:18, 311:19, 316:6, 316:17, 316:18, 316:20, 318:13, 318:14
**memes**
128:18
**memo**
6:3, 7:4, 223:13, 295:1
**memorandum**
6:6, 115:18
**memory**
9:4
**mention**
140:7, 164:13, 197:1, 213:9
**mentioned**
24:14, 49:3, 50:9, 68:9, 74:5, 74:11, 77:9, 81:15, 85:6, 177:22
**mentioning**
235:13
**message**
158:11
**messages**
126:5
**messenger**
281:21
**messing**
55:9, 232:14
**met**
16:4, 20:12, 27:4, 27:5, 108:10, 111:7, 199:17, 208:22, 214:11, 215:12, 225:18, 253:20, 253:21, 264:12, 273:17, 317:15, 317:19
**metroaccess**
11:3
**micromanaging**
32:2, 32:5, 32:12, 32:22, 33:6
**mid**
150:16, 150:18
**middle**
27:22, 71:19, 96:9, 102:14, 177:4, 256:19, 263:7
**midst**
193:15
**might**
117:5, 218:2, 242:1, 303:4
**military**
284:11
**mind**
226:7, 267:2
**mine**
17:9
**minute**
185:19, 186:1, 261:13
**minutes**
65:7, 82:9, 127:16, 129:20, 148:20, 156:8, 156:9, 164:9, 172:4, 173:4, 173:5, 179:7, 209:2, 273:5, 278:8, 305:14
**mischaracterizes**
120:5, 135:22
**misquote**
151:2
**missed**
71:3, 148:19
**mistake**
54:22, 98:1, 98:3, 100:4, 178:12, 178:20
**mistaken**
12:9, 72:13, 91:10, 277:3
**mistakes**
43:16, 43:21, 54:8
**mistreat**
280:9
**misunderstandings**
8:22
**misunderstood**
311:6
**mixer**
10:18
**moment**
16:16, 35:1, 48:22, 58:15, 70:4, 89:2, 136:5, 182:9, 195:14, 207:9, 207:21, 234:22, 236:11, 277:18, 301:22, 315:14, 315:17
**moments**
250:12
**monday**
26:17, 206:22, 212:4, 227:18
**money**
250:18
**monitored**
116:4
**monitoring**
55:20, 100:22, 116:7
**month**
53:16, 57:6
**months**
10:20, 12:15, 14:9, 37:15, 39:2, 46:5, 57:4, 57:6, 57:7, 75:6, 78:11, 78:12, 174:21, 240:13
**monumental**
10:16, 10:17, 12:11
**moppins's**
92:9, 179:20, 241:5, 241:10, 255:6, 258:15, 276:2, 276:6, 276:17, 284:16
**moral**
253:17, 253:20, 253:22
**morals**
235:12, 237:4
**more**
15:5, 15:15, 38:19, 40:14, 40:21, 53:18, 53:22, 57:6, 99:1, 99:20, 100:15, 101:19, 101:22, 108:19, 109:2, 109:7, 109:8, 109:10, 112:14, 143:19, 145:22, 147:12, 172:4, 181:2, 237:19, 239:14, 250:20, 272:18, 292:4
**morning**
8:11, 8:12, 85:4, 128:15, 132:15, 133:2, 140:17, 140:20, 140:21, 141:3, 141:4, 141:22, 199:9, 199:11, 206:22, 208:22, 259:4, 292:9, 292:12, 292:18, 292:19
**most**
92:6, 135:13, 171:3, 171:6, 233:15, 253:1, 308:17
**mostly**
284:11

**motives**
164:18
**move**
19:8, 33:18, 38:20, 43:19, 64:11, 111:16, 170:16, 233:20, 314:6
**moved**
33:17, 37:16, 37:17, 38:2, 38:13, 41:22, 44:14, 44:22, 45:4, 46:6, 47:16, 62:1, 64:21, 65:17, 67:17, 72:8, 77:16, 78:21, 79:1, 90:12, 107:20, 109:6, 111:19, 119:9, 151:14, 309:12
**moving**
44:1, 63:20, 67:4, 99:5, 99:11, 104:16, 106:2, 217:15
**much**
12:19, 14:13, 15:8, 15:17, 23:12, 23:18, 29:7, 30:15, 30:18, 32:9, 33:7, 39:8, 39:14, 41:12, 52:9, 56:3, 58:9, 63:22, 87:4, 95:6, 97:15, 97:17, 98:22, 102:19, 103:12, 104:19, 111:8, 111:21, 116:4, 118:8, 122:2, 123:9, 123:11, 126:2, 132:3, 139:10, 143:9, 149:14, 162:14, 162:17, 162:21, 164:21, 165:15, 168:15, 169:14, 169:15, 169:21, 170:8, 174:3, 175:15, 180:13, 183:2, 183:17, 183:22, 185:1, 192:15, 193:12, 193:13, 197:1, 200:17, 201:18, 202:1, 202:19, 202:21, 211:6, 230:19, 233:15, 233:16, 235:11, 237:7, 237:10, 242:6, 251:8, 254:1, 254:5, 255:10, 257:2, 259:7, 265:16, 273:8, 274:12, 278:16, 279:12, 292:21, 299:10, 300:1, 300:5, 300:9, 301:17, 303:17, 314:2
**multiple**
40:12
**multitask**
106:20
**multitasking**
263:13
**mumbling**
272:4
**must**
310:18
**myself**
29:7, 33:3, 47:9, 59:3, 59:12, 62:12, 111:7, 180:7, 180:11, 181:9, 203:4, 204:18, 206:3, 226:6, 227:2, 230:13, 232:6, 233:9, 237:11, 238:5, 251:9, 289:9, 311:17

**N**

**nah**
317:10
**name**
8:8, 48:10, 51:18, 85:14, 90:15, 125:16, 181:10, 202:22, 228:4, 231:8, 290:20
**named**
50:4, 280:11
**national**
11:2, 11:4, 11:17, 11:18, 11:22, 12:18, 13:2, 13:12, 13:13, 13:22, 15:14, 15:17
**naturally**
133:14
**nature**
11:13, 23:13, 29:8, 77:5, 165:19, 178:9, 190:14, 235:13, 248:7, 261:10, 262:12, 301:14
**nd**
206:9, 206:13, 206:20, 214:4, 214:10, 233:22
**near**
206:7
**neat**
256:14
**necessarily**
244:7
**necessary**
45:16, 59:7, 101:11, 104:12, 314:4
**need**
8:14, 9:8, 32:17, 33:10, 40:22, 59:21, 88:22, 98:10, 101:17, 133:17, 134:10, 136:20, 137:13, 160:17, 160:18, 187:17, 232:11, 234:21, 242:10, 255:16, 258:3, 261:15, 262:8, 262:10, 263:3, 285:2, 300:6, 310:22, 317:9
**needed**
22:6, 28:12, 30:16, 32:2, 32:7, 32:8, 56:1, 58:16, 70:6, 71:13, 72:9, 84:3, 85:20, 100:15, 100:18, 105:12, 167:18, 171:10, 183:11, 187:12, 230:7, 250:16, 250:20, 263:6, 265:8, 300:6, 303:17, 312:17
**needs**
137:19, 183:15, 183:22
**negative**
99:3, 124:8, 283:19
**neither**
273:13, 320:10
**nerve**
315:11
**neutral**
193:7, 284:17
**neutralize**
183:9
**never**
73:12, 100:20, 104:4, 109:4, 147:19, 149:8, 155:20, 176:3, 266:10, 266:15, 279:1, 284:14,

288:11, 289:20
**new**
5:18, 31:8, 32:16, 39:9, 42:15, 44:22, 47:2, 57:13, 73:1, 73:13, 73:16, 73:19, 102:22, 103:1, 105:1, 108:15, 118:6, 270:19, 317:1
**newer**
72:6, 72:12, 73:19
**newspaper**
125:17
**next**
19:8, 19:11, 20:20, 28:13, 36:8, 39:4, 42:4, 42:14, 55:5, 57:8, 60:14, 60:15, 76:7, 99:12, 110:6, 131:22, 132:15, 140:17, 140:20, 140:21, 141:6, 142:4, 154:10, 172:11, 179:5, 187:1, 196:15, 196:16, 204:12, 205:10, 206:16, 206:19, 210:7, 210:16, 211:11, 214:3, 218:16, 218:20, 226:4, 228:10, 244:22, 256:15, 259:13, 265:17, 265:19, 268:21, 269:11, 280:18, 291:15, 292:15, 293:12, 301:15, 301:17, 309:16
**nice**
309:11, 309:13, 309:17
**night**
60:14, 61:7
**noise**
160:7, 272:5
**none**
51:2, 286:9, 313:2
**normal**
20:5
**northwest**
3:5
**nosey**
193:3, 241:8
**notarial**
320:14
**notary**
2:15, 320:21
**note**
114:12
**notes**
6:14, 164:10, 211:8, 215:12, 215:13, 275:22, 305:14
**nothing**
33:2, 53:22, 94:18, 130:12, 137:1, 150:5, 150:11, 153:6, 183:7, 218:19, 238:13, 293:17, 318:16
**notice**
5:18, 7:10, 42:14, 96:22, 97:2, 286:15, 295:7, 295:16, 296:15, 296:19, 296:20
**noticed**
262:3, 276:1, 276:5, 299:12, 310:14
**notices**
109:1, 109:2
**noticing**
274:3
**notifying**
115:17
**november**
23:16, 220:3
**number**
14:2, 59:18, 90:17, 118:19, 127:10, 127:11, 167:10, 241:22
**numbers**
40:20, 114:10

**O**

**o'clock**
184:21, 185:17, 266:16
**objection**
18:8, 24:7, 26:22, 29:18, 37:7, 37:12, 38:18, 59:9, 62:8, 63:12, 64:7, 72:5, 74:1, 77:4, 91:6, 95:22, 99:9, 100:5, 102:5, 102:9, 110:1, 110:19, 115:9, 120:5, 121:20, 122:16, 135:22, 156:5, 190:20, 191:15, 222:3, 223:15, 231:13, 285:21, 293:7, 313:9, 315:7
**obligation**
190:15, 190:17, 191:12
**observing**
194:2
**obviously**
20:15, 24:2, 61:9, 149:20, 157:10, 188:3, 228:17, 317:15
**occasion**
80:19, 81:5, 82:10, 85:5, 85:7, 255:3, 255:7, 307:6
**occasions**
80:3, 80:10, 81:20, 82:11, 83:14, 85:8, 255:5, 306:21
**occur**
34:14, 238:12, 272:11, 280:16
**occurred**
16:22, 48:22, 49:4, 58:13, 98:3, 136:11, 148:13, 150:11, 170:6, 178:4, 221:18, 268:16, 288:11, 304:14
**occurrences**
205:1
**occurring**
48:21, 174:19, 205:1, 272:14, 316:21
**october**
72:1, 72:4, 73:2
**odd**
252:12, 252:15
**offer**
5:12, 5:14, 5:17, 5:21, 20:4, 22:7, 22:22, 23:11, 23:18, 42:13, 64:22, 113:13, 114:2, 116:13, 116:16, 165:10, 231:5, 279:18, 279:19
**offered**
17:19, 31:6, 173:8, 185:5
**offering**
254:11
**office**
19:17, 27:6, 70:7, 77:7, 80:11, 81:17,

81:22, 82:8, 82:12, 83:8, 83:15, 83:17, 84:2, 84:4, 84:5, 84:6, 84:10, 84:12, 84:16, 89:1, 92:10, 100:9, 100:10, 107:13, 120:3, 120:18, 121:6, 123:9, 123:18, 130:13, 134:17, 148:5, 149:8, 158:9, 161:3, 161:6, 161:10, 168:17, 169:18, 176:3, 179:20, 181:3, 183:17, 184:3, 187:13, 187:18, 188:13, 192:5, 192:22, 194:12, 194:21, 196:20, 197:20, 198:5, 200:11, 200:12, 203:16, 203:19, 204:1, 206:10, 206:17, 206:20, 207:4, 210:12, 226:6, 227:3, 229:20, 232:19, 233:10, 234:20, 238:6, 241:16, 241:17, 242:6, 242:9, 250:7, 254:17, 255:21, 256:1, 258:15, 258:22, 259:3, 261:6, 266:13, 275:3, 276:2, 276:6, 276:8, 276:10, 276:14, 276:17, 298:8

**officer**
57:16, 61:17, 62:4, 320:3

**offices**
2:2, 210:16

**official**
5:13, 5:18, 5:21, 7:9, 26:16, 42:14, 67:11, 95:15, 116:16

**officially**
115:17

**often**
23:12, 46:18, 83:17, 127:5, 242:9, 311:13

**oh**
130:2, 154:15, 161:14, 196:4, 234:10, 251:21, 261:18, 272:3, 272:4, 272:19, 272:20, 276:9, 311:5, 317:13

**old**
72:13, 120:14, 316:22

**once**
19:10, 25:12, 31:17, 48:16, 85:17, 90:11, 94:17, 95:16, 98:8, 101:9, 101:14, 105:10, 106:5, 107:5, 109:6, 120:20, 132:2, 139:7, 149:8, 153:13, 153:14, 159:21, 169:15, 172:13, 187:12, 187:16, 192:21, 218:12, 226:17, 230:8, 231:3, 232:7, 234:19, 257:19, 261:13, 272:21, 274:1, 308:14, 308:16, 311:9, 312:4, 312:20, 315:21

**one**
13:7, 23:15, 23:16, 24:15, 33:17, 35:14, 37:20, 39:3, 40:14, 50:3, 50:14, 54:16, 54:21, 54:22, 56:9, 58:13, 60:2, 60:11, 64:12, 69:2, 70:10, 70:17, 72:13, 80:19, 80:20, 81:5, 81:18, 81:19, 85:7, 85:8, 85:19, 89:6, 97:11, 103:1, 103:8, 103:14, 107:3, 113:21, 113:22, 114:1, 118:15, 118:19, 137:15, 139:20, 144:15, 149:20, 155:2, 155:8, 155:9, 165:19, 180:8, 181:5, 184:7, 185:9, 190:8, 190:13, 208:11, 215:19, 217:2, 219:16, 219:18, 226:18, 226:19, 226:22, 227:12, 227:18, 228:5, 228:7, 228:8, 228:11, 229:1, 229:18, 237:2, 238:18, 244:6, 251:20, 252:19, 254:12, 261:17, 266:3, 269:1, 270:8, 270:11, 272:7, 272:19, 273:13, 277:19, 277:20, 280:4, 282:22, 292:9, 292:12, 292:18, 294:3, 294:13, 297:13, 308:19, 314:8

**one-day**
60:10

**one-on-one**
168:18, 224:10

**one-week**
274:7

**ones**
50:4

**online**
52:14

**only**
12:3, 30:6, 31:11, 34:7, 41:17, 45:16, 45:21, 54:9, 75:6, 78:22, 81:5, 82:20, 84:17, 108:5, 111:8, 147:15, 149:20, 163:19, 167:17, 169:19, 185:18, 202:22, 207:17, 209:17, 214:18, 216:1, 217:2, 217:17, 218:5, 240:4, 251:11, 267:11, 283:3, 289:4, 290:12, 295:16

**ooh**
120:19, 121:15, 134:17

**open**
90:1, 133:11, 149:7, 222:17, 226:7, 259:21, 273:15, 275:4

**opened**
149:2, 149:4, 149:8, 160:4, 235:19

**opening**
270:22

**operated**
30:14

**operates**
194:3

**operating**
71:6

**operation**
33:11, 51:12
**operational**
64:5, 256:6
**operations**
11:7, 11:9, 12:4, 32:10, 62:2, 62:9, 62:17, 63:21, 118:21, 269:18
**operator**
10:18, 62:7
**opportunity**
17:20, 98:11, 176:15, 185:11, 186:8, 232:22
**order**
29:21, 42:3, 43:10, 59:21, 118:12, 168:1, 251:12, 296:6
**orders**
155:10
**organization**
176:17
**orientation**
26:21, 27:2
**original**
72:7
**osse**
12:21
**ossege**
1:22, 2:14, 320:3, 320:20
**other's**
273:14
**others**
219:4
**otherwise**
320:12
**outcome**
218:11, 320:12
**outside**
70:7, 77:7, 79:6, 79:11, 80:4, 80:5, 80:11, 80:14, 81:16, 81:21, 82:12, 125:11, 155:18, 164:17, 187:15, 189:21, 195:4, 203:15, 234:20, 244:20, 271:10, 283:1, 284:13
**over**
18:10, 21:11, 27:17, 41:4, 56:6, 65:3, 68:7, 90:1, 93:12, 101:12, 109:13, 119:20, 128:22, 129:3, 140:4, 156:2, 159:3, 176:17, 207:22, 208:7, 235:6, 250:21, 268:8, 269:15, 279:5, 279:11, 279:14, 279:15, 307:12, 311:16, 311:21, 315:13
**over-the-phone**
19:1, 19:7
**overall**
45:15, 63:3
**overlap**
78:7
**overlapped**
78:10
**oversaw**
35:2, 35:6
**oversee**
62:19
**overseeing**
111:20
**overwhelmed**
103:8
**overwhelming**
103:2
**own**
61:2, 100:13, 146:7, 164:18, 178:1, 256:13, 264:2

**P**

**package**
5:19, 42:4, 85:16
**packed**
40:17, 300:13
**packet**
42:15
**packing**
58:22, 257:20
**page**
5:2, 5:10, 6:2, 7:2, 42:5, 42:20, 69:15, 71:20, 73:4, 96:10, 108:22, 110:10, 115:15, 128:4, 223:19, 237:6, 286:5, 289:1, 289:16, 290:14, 294:2, 302:16
**pages**
1:21, 319:4
**paid**
23:13, 249:3
**pallet**
30:14, 264:3
**paper**
87:4, 114:12, 277:11
**papers**
117:2, 117:5
**paperwork**
16:19, 19:9, 22:5, 26:11, 34:11, 58:18, 94:5, 95:11, 95:13, 95:14, 296:12, 314:4
**paragraph**
25:5, 25:16, 115:16, 212:20, 218:7, 219:2, 281:9, 290:15, 291:15, 292:15, 293:12, 294:3, 294:5
**paratransit**
11:5
**parker**
1:5, 1:13, 2:1, 3:2, 4:2, 5:10, 5:12, 6:2, 6:9, 6:11, 6:13, 6:14, 6:17, 6:20, 6:22, 7:2, 7:7, 7:10, 7:11, 8:3, 8:8, 22:15, 26:12, 35:19, 36:11, 42:9, 65:10, 68:7, 87:17, 96:4, 96:6, 101:16, 109:18, 109:20, 119:20, 120:8, 139:18, 198:17, 205:13, 205:15, 211:15, 213:4, 213:5, 215:1, 215:4, 217:6, 217:8, 218:9, 219:3, 220:2, 224:10, 226:11, 227:8, 238:21, 244:4, 244:18, 280:2, 280:8, 281:2, 283:9, 295:6, 296:18, 302:9, 305:13, 305:18, 310:6, 310:10, 318:17, 319:3, 319:16
**parker's**
214:6, 214:15
**part**
31:13, 31:16, 35:21, 71:6, 99:16, 104:20, 123:13, 133:20, 134:2, 135:12, 140:5, 146:10, 186:18, 190:21, 192:10, 193:16, 194:6, 194:18, 218:18, 221:17, 221:18, 253:1, 268:11, 290:9, 308:17, 309:4, 316:9

**particular**
8:9, 25:22, 26:8, 26:21, 27:16, 31:1, 42:12, 61:13, 71:15, 87:19, 96:6, 96:12, 96:19, 96:22, 98:14, 105:22, 106:9, 107:11, 107:15, 109:8, 109:20, 117:19, 152:13, 217:20, 223:1, 229:21, 237:1, 250:19, 280:7, 282:6, 282:15, 283:16, 294:5, 309:13
**parties**
320:11
**parts**
290:12, 314:8
**party**
193:7
**pass**
129:11, 129:12
**passed**
18:10, 24:2, 264:2
**past**
52:7, 152:2, 156:3, 156:6, 271:21, 272:6, 307:22, 308:1
**paul**
3:14
**pause**
34:20, 47:5
**pay**
30:20, 41:10, 43:2, 56:20, 58:6, 109:10, 164:21, 200:21
**paying**
270:19, 273:20
**pc**
2:5, 4:4
**peace**
234:4, 235:20
**peeked**
89:1
**pen**
277:10
**people**
14:2, 20:8, 30:3, 30:5, 47:20, 47:21, 48:12, 48:14, 49:17, 49:21, 50:3, 50:13, 50:18, 50:22, 51:4, 52:17, 64:11, 74:8, 79:22, 90:11, 103:2, 104:16, 107:22, 124:5, 125:20, 159:5, 165:5, 187:3, 199:11, 202:20, 241:18, 242:5, 263:2, 263:5, 298:21, 299:22, 303:10
**perceptions**
163:16
**perfect**
10:13
**performance**
45:15, 54:14, 54:16, 64:6, 110:17, 110:22, 213:3, 213:10, 213:11, 213:14, 213:19
**period**
14:11, 23:22, 33:17, 33:21, 39:19, 39:22, 40:6, 41:9, 46:9, 47:13, 48:15, 48:16, 48:18, 49:10, 49:16, 49:22, 50:10, 51:21, 53:21, 56:8, 56:12, 61:16, 61:19, 64:12, 64:17, 69:11, 77:19, 78:7, 84:11, 103:20, 113:12, 114:21, 115:13, 115:19, 115:22, 116:2, 116:11, 117:12, 117:16, 128:8, 150:20, 151:4, 152:14, 153:11, 153:15, 154:5, 177:6, 268:16, 274:7
**perkins**
48:6, 49:20
**permitted**
153:7
**person**
27:4, 27:5, 76:7, 77:9, 77:17, 86:12, 90:2, 92:6, 98:12, 105:13, 143:8, 147:15, 166:2, 182:7, 237:5, 267:11, 276:22, 277:2, 277:4, 284:9, 284:10, 284:17, 310:13
**personal**
72:15, 72:18, 72:21, 74:3, 81:11, 82:17, 82:19, 83:1, 83:5, 132:5, 133:4, 147:17, 155:2, 155:15, 155:17, 155:22, 157:20, 158:4, 160:18, 166:12, 166:13, 166:16, 166:19, 166:21, 167:1, 167:6, 167:9, 167:13, 167:15, 168:4, 206:3, 216:4, 219:16, 220:9, 221:1, 221:10, 221:21, 239:8
**personalities**
52:17, 52:19
**personally**
82:15, 158:5, 210:1, 221:2, 244:1, 269:16, 269:21, 271:5
**personnel**
18:11, 118:20, 284:12
**pg**
51:12
**ph**
97:11, 310:15
**phetsumpho**
28:20, 45:12
**philosophy**
244:11
**phone**
7:6, 7:8, 19:5, 19:6, 20:16, 20:22, 21:9, 71:7, 71:17, 72:1, 72:3, 72:7, 72:14, 72:16, 72:17, 72:19, 72:22, 73:1, 73:5, 73:7, 73:13, 73:16, 73:19, 73:21, 74:3, 82:1, 82:17, 127:4, 127:7, 127:9, 127:12, 133:20, 139:22, 142:16, 148:20, 149:11, 154:21, 155:2, 155:13, 170:3, 172:9, 173:1, 176:7, 185:5, 185:13, 185:15, 185:16, 185:18, 186:3, 186:15, 186:16, 211:3, 231:10, 231:12, 231:14,

231:16, 232:1, 232:13, 232:19, 295:11, 295:12, 295:15, 295:16, 295:21, 296:2, 298:21, 299:6
**phones**
73:11, 73:12, 296:6
**photo**
70:18, 71:2, 71:4, 71:13, 89:18, 220:10, 221:19, 308:11, 308:20
**photos**
70:13, 71:7, 71:10
**physically**
113:10
**pick**
102:14
**pickett's**
83:8, 83:15, 83:17, 84:2, 84:4, 84:5, 84:10, 84:12, 84:16, 160:3, 213:10, 213:11, 237:12, 239:8
**picking**
103:21, 103:22
**picture**
308:9
**pictures**
70:16, 232:2, 232:10
**piece**
114:12
**pieces**
135:3
**pin**
119:22
**place**
33:13, 47:3, 50:11, 59:22, 66:19, 100:11, 127:14, 148:6, 148:18, 156:17, 224:17, 233:4, 238:3, 245:19, 309:14, 317:2
**placed**
26:9, 40:17, 47:17, 71:4, 89:20, 105:3, 151:14, 309:16
**plaintiff**
1:6, 3:2, 4:2, 310:8
**plan**
29:9, 68:10, 68:12, 68:15, 315:16, 316:4
**planned**
182:4
**planning**
182:5, 254:22
**plate**
254:17
**play**
80:22, 81:13, 81:16, 287:5
**played**
80:17, 233:17, 235:17, 235:21, 236:2
**playing**
80:14, 270:2
**please**
8:17, 9:2, 9:5, 45:2, 264:13
**plenty**
241:18
**plus**
14:16, 15:20, 41:19, 77:13
**pocket**
183:13
**point**
9:1, 9:7, 31:2, 37:18, 44:4, 47:1, 62:11, 91:3, 92:5, 93:6, 93:11, 94:3, 95:7, 95:9, 100:2, 103:1, 103:8, 110:16, 117:12, 124:4, 136:6, 145:19, 147:2, 147:5, 168:16, 170:12, 176:6, 180:4, 180:6, 180:8, 181:5, 181:18, 181:22, 182:14, 184:4, 189:15, 192:3, 197:15, 197:21, 199:4, 204:17, 204:19, 208:12, 208:15, 218:19, 237:2, 245:12, 260:4, 262:2, 264:7, 265:7, 265:10, 266:2, 266:8, 279:6, 289:22, 290:17, 299:19, 301:18, 304:6, 314:19
**pointed**
97:17
**points**
182:16
**poke**
127:1, 127:18
**policy**
225:4, 299:13, 308:18
**pool**
79:18, 80:2, 81:16, 167:2
**poorly**
194:18
**portion**
35:22, 54:10
**position**
13:5, 13:10, 13:11, 17:8, 17:17, 21:1, 21:6, 21:8, 21:10, 29:12, 29:16, 29:22, 30:11, 31:8, 31:11, 31:18, 34:15, 37:2, 37:6, 37:11, 37:15, 37:17, 38:3, 38:8, 39:7, 41:7, 41:19, 42:1, 42:14, 43:9, 43:22, 44:15, 44:22, 45:5, 46:3, 46:10, 47:11, 47:18, 51:11, 53:13, 55:4, 55:6, 55:16, 56:19, 57:1, 57:8, 58:8, 58:11, 59:20, 61:13, 64:22, 66:14, 66:21, 67:5, 67:7, 67:17, 67:20, 68:1, 69:17, 75:18, 77:14, 88:7, 90:6, 90:12, 91:12, 96:16, 111:17, 113:2, 114:3, 114:4, 114:15, 116:5, 116:6, 118:1, 118:7, 119:17, 134:11, 153:16, 243:13, 269:18, 270:17, 270:22, 309:17
**positions**
72:8, 310:20
**possible**
192:19, 247:21
**possibly**
87:14, 193:6, 193:18, 222:8, 246:2, 249:4
**post-it**
114:11
**posts**
128:5
**pow-wows**
108:20, 108:21

**power**
190:10
**prefer**
132:6
**preferred**
54:16
**premises**
93:18, 94:16
**preparation**
17:4
**prepare**
16:2
**prepared**
206:7
**presence**
207:1
**present**
4:17, 19:12, 38:16, 58:22, 88:14, 89:1, 142:18, 179:11, 196:7, 196:10, 196:12, 224:9, 231:21, 233:7, 247:3, 247:7, 247:8, 249:9, 249:12, 277:12, 294:14
**presented**
98:2, 277:18
**presenting**
137:22
**press**
125:15, 294:7
**presume**
311:19
**pretty**
23:18, 29:6, 30:15, 30:18, 32:9, 33:7, 39:8, 39:14, 56:3, 58:9, 63:22, 87:4, 89:11, 95:6, 97:17, 98:22, 102:19, 103:12, 111:8, 111:21, 116:4, 118:8, 123:9, 123:11, 126:2, 131:7, 132:3, 139:10, 143:9, 149:14, 159:3, 162:14, 162:17, 162:21, 164:21, 165:14, 169:14, 169:21, 170:8, 174:3, 175:15, 180:13, 183:2, 183:17, 183:22, 185:1, 190:1, 197:1, 200:17, 202:1, 202:19, 202:21, 211:6, 230:19, 233:15, 233:16, 235:11, 237:7, 237:10, 251:8, 254:1, 254:5, 255:10, 257:2, 259:6, 265:16, 273:8, 274:11, 278:16, 279:12, 292:21, 299:10, 300:1, 300:5, 300:9, 301:17, 303:16, 314:2
**prevent**
316:10
**previous**
13:16, 43:9
**price**
6:16, 18:20, 19:4, 19:6, 20:8, 20:15, 21:9, 22:6, 23:6, 26:14, 26:15, 210:10, 211:1, 211:19, 213:7, 213:22, 214:8, 214:16, 216:13, 217:3, 217:12, 218:2, 218:3, 219:8, 219:21, 220:14, 223:10, 223:14, 224:11, 224:18, 224:19, 224:22, 225:7, 225:18, 226:4, 227:19, 228:18, 230:8, 231:9, 233:9, 234:8, 236:17, 244:20, 246:4, 247:15, 247:16, 247:20, 249:16, 259:20, 260:14, 260:16, 260:17, 271:6, 273:17, 274:21, 276:5, 276:8, 276:9, 276:11, 276:16, 276:20, 277:13, 278:6, 279:5, 279:10, 296:12, 296:19, 297:16, 297:18, 297:20, 313:3, 313:11
**primarily**
113:5
**printing**
36:18
**prior**
9:18, 10:2, 11:1, 14:7, 20:10, 20:12, 51:7, 51:11, 79:2, 79:9, 91:3, 91:11, 94:7, 125:12, 127:19, 145:12, 220:3, 281:14
**private**
208:1, 220:11, 220:13
**privileged**
303:5
**probably**
34:18, 174:12, 175:11, 175:13, 175:16, 176:1, 176:2, 176:4, 185:17, 238:4, 271:9, 315:13
**probationary**
110:2, 112:22, 113:12, 115:19, 115:22, 116:2, 116:3, 117:11, 117:16
**problem**
54:13, 54:15, 169:22, 175:4, 175:6, 239:3, 239:6, 257:13, 271:12, 273:3, 273:9, 273:12, 273:15, 284:4, 311:7
**problems**
110:17, 110:21, 255:2
**procedure**
71:7
**procedures**
6:5
**proceeded**
219:3
**process**
8:13, 20:21, 46:21, 47:2, 98:9, 99:11, 99:14, 106:2, 108:5, 108:11, 108:16, 218:20, 317:1
**processes**
46:18, 103:1
**produced**
126:17, 126:18, 127:21, 282:11
**professional**
239:12, 309:21
**program**
35:13, 138:21, 138:22, 139:1, 208:2, 238:11, 238:16, 280:9
**project**
64:12, 185:9, 317:13, 318:6, 318:10
**projects**
152:4, 263:6

**promoted**
30:10, 133:17, 133:18, 134:19, 136:19, 136:20, 137:14, 137:19, 165:22, 170:15, 182:13
**promotion**
5:22, 31:7, 36:22, 220:4, 314:5
**promotions**
170:11, 182:11, 212:18
**prompted**
177:12
**properly**
43:17
**property**
232:8
**protect**
295:19
**protocol**
32:19, 99:22, 191:19
**prove**
150:10, 248:15
**provide**
59:6, 284:22, 302:1, 303:20, 304:1, 304:8, 304:17, 304:20, 304:22, 305:8, 305:11
**provided**
7:6, 11:5, 60:21, 68:10, 68:16, 83:22, 117:8, 230:21, 284:8, 284:18, 286:3, 295:2, 296:20, 304:19
**providing**
282:8
**psychiatrist**
310:3
**psychologist**
310:2
**public**
2:15, 12:20, 12:22, 13:3, 320:1, 320:21
**puffing**
92:19
**pull**
30:18, 70:19, 168:16, 192:18
**pulled**
32:15, 55:11, 61:22, 89:19, 106:12, 169:15
**pulling**
54:8, 240:6
**punched**
34:6
**punching**
34:8
**pure**
309:3
**purposes**
22:1, 72:15, 73:22, 74:4
**pursuant**
2:14
**pursue**
17:17, 318:8
**put**
40:18, 47:18, 49:19, 51:18, 54:20, 91:7, 111:22, 119:22, 188:21, 193:14, 247:16, 256:20, 278:3, 279:20, 290:6, 292:7, 310:21, 314:4
**putting**
100:12, 134:14, 146:10, 188:22, 240:4

**Q**

**qc**
57:11
**quality**
55:13, 55:19, 57:11, 57:12, 58:12
**quan**
310:15
**question**
8:18, 8:20, 8:21, 9:9, 112:6, 148:15, 192:8, 238:15, 238:20, 239:17, 240:3, 241:11, 242:2, 242:3, 242:13, 243:16, 268:10, 269:11, 293:14, 311:6
**questionnaire**
7:11, 211:18, 302:10
**questions**
8:14, 19:21, 20:1, 162:22, 223:16, 246:19, 246:21, 247:22, 248:13, 249:2, 305:18, 310:6, 310:7, 313:15
**quick**
35:19, 68:8, 207:7, 259:15, 270:2, 312:7, 312:16
**quit**
120:13
**quitting**
178:14
**quote**
213:3, 215:4

**R**

**rachelle**
74:17, 78:15, 90:14, 149:12, 162:3, 162:4, 300:2
**racks**
40:18, 71:4
**ragunton**
28:21, 90:13, 119:9, 215:1, 290:15, 291:16
**ragunton's**
277:22
**raise**
134:11
**raising**
89:7
**rajesh**
4:18
**random**
85:19
**ranting**
289:17
**rather**
315:5
**rcsi's**
232:8
**rd**
117:13, 302:19
**re-ask**
8:18
**reach**
19:6, 126:7, 161:20, 162:4, 298:17, 301:11, 303:10, 303:19
**reached**
18:20, 161:17, 162:2, 281:17, 302:19
**reaches**
127:7
**read**
87:17, 108:15, 228:17, 279:14, 279:15, 287:9, 287:14, 288:20, 295:6, 318:18, 318:19, 319:4
**reading**
287:13, 320:9
**ready**
39:4, 91:4, 104:9
**real**
68:8, 121:15, 133:6, 312:16

**realized**
228:5
**really**
31:22, 54:15, 54:22, 93:4, 108:20, 130:9, 143:18, 144:21, 145:9, 153:4, 163:12, 178:17, 241:10, 242:8, 246:20, 257:3, 268:5, 273:20, 306:4, 310:17
**realm**
118:21
**reason**
25:22, 26:3, 28:11, 33:14, 138:10, 170:1, 182:1, 186:3, 209:13, 217:14, 222:14, 223:1, 224:1, 224:17, 225:6, 226:16, 238:1, 239:21, 240:21, 241:11, 260:12, 263:13, 264:5, 271:9, 280:15, 283:11, 283:15, 284:6, 284:15, 285:19, 288:2, 288:5, 288:10, 305:22, 307:15
**reasonable**
285:6
**reasoning**
192:14, 228:2, 241:5
**reasons**
12:3, 13:11, 39:4, 129:10, 171:9, 190:8, 241:22, 252:17
**reassignment**
6:3
**rebuttal**
279:13, 279:16, 279:18, 279:19
**recall**
16:14, 16:20, 19:18, 19:21, 20:21, 21:4, 22:5, 22:19, 23:17, 24:5, 24:6, 24:8, 24:9, 26:12, 27:1, 34:10, 38:11, 41:12, 45:20, 46:14, 46:17, 51:21, 53:2, 54:1, 55:14, 59:4, 60:6, 60:8, 60:16, 64:20, 64:21, 72:3, 72:7, 73:14, 75:2, 76:22, 79:16, 80:3, 80:10, 80:21, 81:2, 81:3, 82:12, 82:13, 83:6, 84:19, 84:22, 86:14, 90:21, 96:6, 108:17, 109:20, 110:2, 114:8, 115:21, 116:17, 116:18, 117:5, 117:9, 118:14, 124:4, 131:2, 140:4, 148:9, 148:10, 150:15, 163:5, 170:17, 171:4, 171:7, 171:21, 195:5, 206:12, 209:7, 211:19, 211:22, 213:7, 227:22, 228:9, 229:13, 229:18, 229:20, 237:8, 246:20, 247:17, 248:10, 248:16, 248:22, 275:10, 297:1, 297:2
**receipt**
5:16, 22:7, 24:14, 24:19, 44:21, 296:22
**receive**
25:1, 25:12, 26:4, 41:17, 44:14, 51:14, 85:16, 89:17, 97:16, 312:14
**received**
21:6, 21:8, 21:20, 25:6, 25:8, 25:17, 25:20, 26:1, 29:6, 39:11, 41:16, 43:1, 45:3, 56:2, 101:9, 108:7, 108:8, 108:15, 109:21, 149:11, 211:4, 255:17, 255:19, 261:15
**receiving**
14:18, 17:22, 21:10, 22:19, 35:7, 36:22, 37:19, 38:2, 38:10, 38:21, 39:6, 39:12, 39:16, 41:22, 43:18, 47:17, 48:5, 48:6, 50:7, 55:9, 55:11, 62:10, 62:12, 62:13, 63:9, 77:15, 77:16, 78:17, 78:20, 89:17, 108:18, 111:19, 111:20, 257:1, 257:2, 257:17, 261:7, 262:2, 316:9
**recently**
114:6, 146:6
**recognize**
127:10
**recollect**
140:2
**recollection**
87:20, 116:13
**recommend**
212:17
**record**
34:19, 34:20, 35:18, 68:5, 139:16, 198:15, 244:15, 280:22, 305:16, 318:20, 320:6
**records**
206:4
**redirect**
46:13, 46:16
**redskin**
128:17
**reduced**
320:8
**reema**
1:8, 3:10, 4:18, 6:5, 8:9, 15:6, 15:8, 17:7, 17:8, 18:11, 18:13, 20:3, 21:14, 21:17, 25:6, 25:17, 26:13, 26:20, 35:22, 36:4, 38:8, 51:11, 52:8, 52:22, 55:6, 59:3, 61:2, 61:14, 68:2, 68:14, 69:3, 69:12, 71:17, 74:12, 75:11, 75:18, 76:14, 76:16, 76:19, 77:12, 77:14, 77:22, 78:6, 79:3, 79:6, 79:9, 79:12, 84:1, 119:18, 125:11, 125:12, 125:20, 126:3,

126:12, 126:21, 127:19, 127:21, 128:1, 128:9, 130:1, 130:5, 145:13, 161:18, 161:19, 178:1, 178:6, 194:3, 211:16, 232:21, 266:17, 266:22, 267:4, 277:13, 277:17, 279:6, 279:7, 283:22, 284:8, 284:18, 284:20, 285:4, 285:6, 291:9, 296:1, 301:16, 301:22, 303:8, 309:18, 309:19, 309:20
**reema's**
243:19, 244:10
**reeves**
62:12, 62:14, 63:4, 63:5, 63:11, 63:13, 63:17, 64:3, 67:21, 88:11, 88:12, 117:2, 231:20, 251:7, 297:8, 297:9
**reference**
69:15, 126:6, 300:6
**referenced**
226:13
**referencing**
226:20, 226:22
**referring**
95:14, 105:7
**reflect**
140:4
**reflection**
215:13
**refresh**
116:12
**refreshes**
87:19
**refuse**
305:10
**refused**
96:22, 98:6, 225:12, 294:16
**regard**
163:1, 163:20, 216:2, 218:13, 279:2
**regarding**
282:15
**regardless**
190:6
**regards**
155:13, 245:3, 281:11
**regular**
34:12, 71:6
**regularly**
28:17
**regurgitating**
241:13
**reiterated**
254:1
**relate**
122:14
**related**
320:10
**relationship**
77:6, 125:11, 131:7, 147:17, 164:17, 164:19, 175:8, 175:14, 219:16, 220:10, 221:21, 237:12, 244:6, 310:12, 312:2
**relationships**
243:21
**rely**
284:20, 285:6
**remain**
197:10
**remainder**
89:10
**remembered**
300:12
**remind**
122:11, 290:16, 291:13
**removed**
40:16, 217:10
**repeat**
241:9
**repeating**
234:13
**report**
23:12, 26:18, 28:1, 28:7, 28:12, 34:22, 39:18, 39:21, 40:3, 55:12, 63:14, 88:10, 119:11, 190:15, 191:1, 199:15
**reported**
1:22, 28:4, 62:12, 62:14, 62:15, 63:9, 67:21, 90:9, 119:14
**reporter**
2:15
**reporter-notary**
320:1
**reporting**
44:9, 56:7, 56:9, 56:11, 56:14, 56:16, 57:17, 57:22, 63:4, 63:10, 64:2, 90:7, 90:11, 107:21, 107:22
**reports**
55:20, 55:22, 56:10, 63:5
**represent**
8:9
**reputation**
147:10
**request**
7:7, 70:18, 230:9, 314:5
**requested**
206:22, 227:1, 266:7, 266:18, 304:22, 309:12, 320:9
**requesting**
172:14, 265:2, 300:12
**required**
12:4, 34:12, 52:9, 52:14, 54:9, 58:19, 59:12, 59:17, 71:2, 118:12, 167:22, 225:8
**reset**
231:12, 231:15, 232:13, 295:11, 295:12, 295:14, 296:2
**resetting**
299:6
**resolve**
209:17
**resolved**
256:8
**respect**
35:3, 98:16, 204:13, 206:17, 206:18, 210:8, 217:9, 225:22, 244:22, 301:16, 303:8
**respective**
100:13, 273:14
**respond**
29:13, 70:3, 70:8, 127:7, 127:8, 161:11, 169:2, 188:18, 230:9, 255:20, 256:4, 279:15
**responded**
29:8, 123:20, 123:22, 124:7, 168:9, 172:15, 255:22, 266:10, 266:22, 276:13, 286:20
**responding**
230:8, 266:14
**response**
70:6, 122:8,

124:1, 154:13, 237:16, 240:12, 275:8, 276:15, 314:22
**responses**
122:12
**responsibilities**
102:21, 112:4, 112:15, 113:11
**responsibility**
101:14, 101:15, 113:2, 113:5, 118:21
**responsible**
11:10, 11:12, 27:9, 27:13, 27:15, 29:19, 29:20, 45:9, 45:13, 55:20, 56:1, 56:3, 59:14, 61:15, 62:10, 75:8, 83:19, 90:18, 98:12, 100:12, 105:13, 113:8, 118:6, 118:16, 179:2, 263:9, 267:16, 278:19
**rest**
223:13
**restroom**
221:19
**result**
107:19, 131:1, 131:16, 146:5, 147:1, 178:15, 230:12, 297:1, 309:19
**resume**
232:11
**resurfaced**
150:12
**retaliation**
212:10, 212:15, 212:19
**retracted**
178:14
**retrieve**
117:4
**return**
7:7, 72:12, 231:9
**returned**
72:1, 72:3, 296:5, 311:22, 312:4, 314:7
**returning**
231:16
**revealed**
218:12, 274:1
**review**
16:5, 16:7, 45:18, 45:20, 54:6, 96:5
**reviewed**
16:8, 16:17, 16:21, 110:9, 110:13, 279:4
**reviewing**
16:15
**rhythm**
269:12
**rice**
4:19
**richardson**
2:5, 4:4, 4:19
**road**
9:15, 9:19, 10:3
**roanna**
1:22, 2:14, 320:3, 320:20
**robert**
6:8, 88:2
**rogers**
30:11, 31:3, 31:4, 90:14, 119:9, 219:5, 219:12, 219:22
**rogs**
16:8, 16:18
**role**
35:3, 235:21, 236:2, 236:6, 236:9, 236:10
**roles**
233:17, 235:16
**romaine**
74:14, 76:8, 131:20, 132:13, 133:16, 133:21, 134:4, 134:16, 136:8, 136:11, 137:11, 137:16, 140:5, 142:7, 142:12, 142:15, 142:21, 145:12, 145:14, 147:15, 148:1, 148:11, 150:5, 177:22, 211:6, 219:7, 219:19, 220:5
**room**
92:11, 92:16, 94:10, 94:15, 94:19, 94:22, 95:2, 95:5, 156:18, 157:21, 157:22, 158:20, 158:21, 207:1, 210:16, 210:20, 232:20, 246:15, 247:9, 251:22, 252:1, 266:18, 294:10, 299:1, 311:12
**roughly**
51:21
**rounds**
261:8
**route**
82:7, 166:10
**routes**
11:11
**rsci**
8:9, 10:8, 280:9, 299:14, 299:16, 307:20
**rsci's**
225:3
**rubbed**
189:3
**rude**
173:21
**rumor**
82:2, 120:10, 122:15, 130:7, 131:18, 132:7, 132:11, 133:13, 134:14, 136:22, 139:9, 142:2, 142:5, 147:9, 147:11, 149:13, 149:18, 150:19, 152:18, 153:1, 154:10, 158:2, 164:14, 164:16, 165:3, 165:16, 171:13, 174:22, 176:14, 177:1, 177:8, 177:17, 181:17, 182:1, 182:10, 183:5, 187:5, 192:20, 195:16, 197:2, 200:15, 202:3, 202:5, 202:7, 202:14, 203:4, 204:14, 207:11, 207:18, 209:13, 209:19, 210:2, 211:5, 212:16, 212:21, 214:18, 216:2, 217:7, 218:14, 219:18, 222:16, 235:21, 236:3, 236:9, 236:10, 236:17, 237:8, 237:20, 238:2, 239:22, 274:2, 290:8, 293:14, 294:1, 314:3
**rumors**
120:3, 120:7, 187:4, 188:7, 188:22, 189:1, 193:17, 195:5, 196:21, 206:18, 229:11, 236:20, 243:12, 245:1, 245:4, 245:6, 245:12, 248:5, 248:7, 248:9,

249:17, 294:8
**run**
182:7
**résumé**
17:20, 18:9, 18:10, 19:3, 232:4

**S**

**salary**
5:22, 15:11, 43:3, 114:13, 160:17
**same**
11:19, 13:21, 14:2, 15:20, 28:22, 30:1, 30:3, 62:3, 73:21, 80:17, 87:8, 107:1, 108:22, 115:8, 166:8, 199:14, 202:20, 217:16, 228:11, 237:6, 265:20, 291:16, 293:22, 298:22, 311:12, 319:5
**sat**
75:10, 76:1, 89:9, 92:18, 113:6
**saved**
127:11
**saver**
232:3
**saw**
29:7, 85:18, 143:10, 153:19, 158:19, 158:20, 158:22, 159:8, 182:6, 183:9, 223:20, 224:2, 228:9, 287:1, 300:13, 304:16
**saying**
93:5, 97:10, 108:6, 108:14, 115:3, 123:11, 124:6, 130:12, 131:3, 131:20, 134:1, 137:12, 137:17, 151:18, 173:21, 181:13, 182:19, 183:1, 183:4, 185:2, 187:3, 187:8, 188:11, 188:14, 197:9, 197:13, 203:2, 213:13, 239:1, 246:22, 268:17, 278:13, 285:2, 290:1, 293:3, 295:18, 306:5
**says**
25:5, 25:16, 36:21, 66:14, 67:7, 94:14, 113:3, 116:11, 119:2, 212:4, 212:21, 214:3, 214:21, 216:13, 218:8, 219:3, 220:2, 223:20, 224:4, 224:14, 225:2, 269:15, 280:3, 280:7, 280:13, 280:18, 281:10, 289:4, 290:14, 291:15, 291:21, 292:8, 294:4
**scanned**
263:4
**scheduling**
11:13, 41:5, 45:15
**school**
13:4, 120:19
**schools**
12:20, 13:1, 13:3
**scope**
11:8, 113:3
**screen**
232:3
**screwing**
111:9, 189:22
**seal**
320:14
**searching**
235:16
**second**
33:18, 33:19, 35:5, 35:8, 36:12, 40:2, 42:11, 42:16, 47:5, 49:15, 63:2, 69:9, 73:3, 73:9, 87:18, 89:13, 96:4, 109:18, 115:15, 115:16, 121:4, 122:19, 125:21, 144:5, 169:1, 170:6, 184:16, 205:13, 213:18, 218:11, 223:19, 224:6, 253:11, 256:15, 269:14, 274:12, 278:4, 280:20, 289:1, 289:16, 294:2, 295:16, 311:8
**seconds**
92:9, 186:2
**section**
102:11, 261:10
**security**
129:10
**see**
19:8, 20:22, 70:19, 80:20, 89:1, 113:1, 113:12, 113:21, 116:16, 125:16, 128:4, 135:19, 141:19, 159:5, 173:2, 173:4, 197:14, 209:16, 210:13, 210:21, 224:4, 226:14, 226:19, 228:1, 228:7, 239:10, 249:2, 251:19, 258:19, 260:9, 260:16, 261:5, 272:16, 273:3, 273:4, 276:7, 287:1, 290:20, 295:3, 303:16, 310:2
**seeing**
87:18, 95:11, 228:14, 295:17
**seek**
307:5, 309:21
**seem**
22:19
**seemed**
162:21, 271:8
**seen**
36:16, 42:11, 114:6, 114:7, 241:15, 260:3, 276:9, 282:10
**sees**
241:17
**self**
134:16
**semantics**
171:5
**seminar**
308:6
**send**
21:11, 41:1, 54:3, 54:5, 70:20, 99:21, 100:15, 108:5, 109:11, 109:12, 109:14, 180:2, 255:20
**sending**
29:8, 54:5, 54:7, 158:11, 226:16, 228:3, 228:5, 230:13, 232:5, 250:20
**sends**
126:5
**senior**
28:6, 33:12,

55:10, 92:6, 189:6, 190:3, 191:1, 314:1, 314:2
**sensitive**
52:12, 59:16, 59:17
**sent**
18:9, 18:21, 19:3, 22:6, 23:1, 23:5, 24:15, 25:10, 26:11, 26:14, 68:17, 106:1, 128:10, 149:9, 172:14, 179:14, 179:21, 180:1, 221:20, 227:19, 229:9, 229:14, 230:2, 231:7, 250:15, 266:16, 268:21, 269:9, 275:13, 288:1, 303:14
**sentence**
225:2
**separate**
148:4, 225:15
**separated**
124:20, 125:1, 125:4
**separation**
7:9, 296:19
**september**
9:17, 13:20, 53:5, 96:13
**series**
8:14
**service**
11:5, 11:11, 58:17
**services**
1:9, 3:11, 25:7, 25:17, 211:16
**sessions**
151:12
**set**
98:8, 99:10, 99:14, 237:6, 320:13
**seven**
10:20, 12:15, 48:11
**several**
90:11, 102:21, 135:10, 302:20
**sexual**
178:9, 190:14, 191:8, 211:17, 225:4, 225:8, 245:18, 246:6, 247:1, 248:7, 248:8, 248:20, 249:15, 249:19, 250:4, 278:18, 294:7
**sexuality**
162:18, 165:20, 171:16
**shake**
286:21
**share**
84:6, 219:3
**shared**
84:10
**shaun**
62:12, 62:16, 62:18, 112:3, 251:7, 252:1, 253:20, 262:4, 262:5, 262:13, 262:15, 262:19, 263:19, 263:21, 264:1, 264:9, 264:10, 264:20, 264:22, 265:14, 265:15, 265:16, 268:13, 272:21, 273:2, 273:9, 299:3
**shawn**
311:15, 311:17, 317:7, 318:2
**sheba**
142:10, 148:3, 199:13, 199:21, 199:22, 200:1, 200:17, 201:12, 242:9, 242:14, 242:17, 318:2
**sheet**
34:2, 34:9, 319:8
**shelves**
40:18, 85:20
**shenanigans**
287:7
**shift**
45:22, 87:10, 132:18, 162:11
**shifts**
45:17, 45:21, 87:9
**ship**
46:21, 155:10
**shipment**
27:16, 54:9, 54:10, 97:12, 155:13, 185:6, 186:17, 255:15, 258:4, 312:15
**shipments**
39:9, 40:13, 56:2, 58:14, 59:19, 63:19, 257:14
**shipped**
21:20, 27:17, 58:18, 58:21, 267:17
**shipping**
17:22, 29:12, 29:15, 29:19, 30:5, 30:7, 30:9, 30:19, 32:10, 33:18, 34:16, 34:21, 35:3, 35:7, 37:3, 37:9, 37:10, 37:15, 38:14, 40:18, 41:16, 52:11, 62:11, 62:13, 63:8, 104:10, 119:8, 119:10, 155:9, 185:7, 263:8, 316:9
**shit**
207:18, 272:4, 283:4, 286:21
**shocked**
290:19
**shoot**
79:18
**short**
31:11, 35:17, 41:9, 46:6, 47:17, 78:22, 84:11, 104:22, 172:3, 270:2, 312:15
**shorthand**
320:1
**shortly**
38:13, 48:9, 55:15, 107:20, 233:12, 245:21, 261:22, 282:1
**should**
40:2, 42:5, 99:20, 143:21, 146:2, 150:14, 174:4, 175:1, 175:16, 175:17, 181:20, 190:7, 197:15, 207:4, 209:11, 237:22, 238:2, 238:4, 244:13, 271:11, 289:20, 298:22, 306:16, 307:6, 313:20, 314:9
**shoulder**
101:13
**shouldn't**
175:11, 183:6, 190:5, 195:15
**shouting**
184:4, 209:10
**show**
42:4, 66:3, 69:8, 110:6,

114:12, 226:11
**showed**
27:8, 277:10, 308:9, 308:11
**showing**
36:11, 42:9, 227:8, 283:9
**shows**
88:3, 227:18, 230:2
**shut**
143:21, 189:14, 190:10
**sic**
16:8, 195:2
**sick**
15:2
**side**
17:19, 32:15, 36:4, 55:12, 63:21, 106:12, 192:18, 197:13, 240:7, 262:7, 264:5
**sign**
21:12, 25:9, 25:11, 95:17, 96:22, 98:6, 108:6, 108:14, 116:19, 248:17, 248:20, 250:17, 279:16, 283:12, 285:2, 285:15, 288:13, 289:11, 294:16, 296:22, 318:18, 318:19
**signature**
23:3, 24:10, 24:12, 24:21, 36:18, 42:19, 65:20, 66:10, 71:19, 71:22, 110:10, 283:14, 302:15
**signature-1apgj**
320:18
**signed**
26:1, 71:16, 110:8, 113:14, 113:19, 114:4, 116:18, 116:20, 249:1, 251:13, 283:10, 283:13, 284:7, 285:1, 286:13, 297:16, 319:8
**signing**
64:22, 279:17, 320:9
**silly**
121:15, 134:16
**similar**
291:22, 292:1, 315:10
**simple**
269:17
**simply**
99:21, 101:20
**since**
9:17, 44:3, 100:6, 114:7, 126:20, 128:1, 135:8, 282:8
**single**
101:14
**singled**
250:12
**sir**
12:9, 24:20, 137:21, 138:1, 161:15
**sister**
76:12, 113:7
**sit**
89:3, 249:5, 272:19
**site**
58:20
**sitting**
83:2, 155:18, 159:6, 168:19, 208:4, 209:9, 267:2
**situated**
172:16
**situation**
40:22, 58:13, 86:20, 87:2, 101:18, 102:13, 105:22, 125:19, 145:21, 146:7, 147:8, 168:11, 173:10, 173:13, 182:19, 183:9, 185:19, 188:21, 209:15, 210:2, 210:8, 220:13, 223:5, 223:6, 233:18, 234:5, 235:17, 245:1, 273:21, 304:14, 306:10, 307:1, 317:6
**situations**
250:10, 315:9
**six**
11:12, 14:5, 48:11, 99:1
**skeen**
3:13
**skills**
43:19
**slack**
102:15, 103:21, 103:22, 306:7
**slam**
223:20, 224:3
**slammed**
158:17, 160:6, 169:5, 184:18
**slamming**
168:10, 180:14
**slash**
57:16, 61:17, 67:12
**slave**
196:1, 196:4, 290:17
**sleep**
243:4, 243:17
**sleeping**
135:17, 143:10, 170:10, 170:22, 181:5, 187:6, 187:8, 188:1, 188:2, 188:7, 188:10, 188:11, 189:18, 190:4, 190:6, 190:11, 195:17, 196:22, 239:19, 240:22, 242:17, 243:14, 293:15
**slept**
16:4
**slick**
270:16, 274:10
**slid**
160:3
**slighted**
316:16
**slips**
58:22
**small**
54:8
**smaller**
14:3
**smirking**
273:19
**smirks**
271:16, 271:18, 274:10
**social**
166:21
**solution**
218:15, 222:20, 236:12
**some**
9:13, 16:1, 16:17, 21:11, 31:14, 38:19, 43:15, 44:18, 44:20, 55:17, 58:16, 68:8, 71:3, 73:1, 80:9, 81:4, 87:6, 95:16, 95:17, 111:17, 117:2, 117:7, 118:11, 120:1, 120:9, 128:16, 134:17, 136:6, 147:5, 147:7,

148:18, 150:16, 167:21, 173:7, 177:3, 178:8, 183:15, 183:22, 185:19, 199:4, 214:5, 231:5, 232:2, 232:4, 235:16, 236:15, 238:2, 239:20, 240:20, 240:21, 253:21, 258:3, 258:7, 259:7, 261:7, 275:19, 283:2, 289:2, 304:10
**somebody**
119:12, 136:2, 136:9, 158:3, 161:17, 175:2, 191:13, 270:16
**somehow**
240:21
**someone**
58:20, 72:8, 84:17, 108:8, 129:10, 135:16, 142:4, 145:20, 185:6, 189:2, 221:20, 241:12, 287:18, 303:2, 306:2, 306:11, 310:18
**someplace**
246:12
**sometime**
82:4, 128:21, 150:1
**sometimes**
47:10, 49:13
**somewhere**
26:9, 30:17, 67:1, 73:2, 144:12, 145:14
**son**
84:9
**soon**
65:4, 148:22, 160:3, 185:22, 272:3
**sop**
99:12
**sops**
100:10, 100:13
**sorry**
10:10, 12:14, 12:16, 12:20, 26:15, 45:2, 78:18, 85:12, 96:1, 96:13, 112:21, 120:2, 123:5, 130:3, 135:2, 148:15, 154:17, 161:5, 161:15, 173:8, 204:11, 206:9, 228:21, 231:2, 233:7, 244:4, 268:10, 286:2, 293:5, 309:2
**sort**
95:16, 99:12, 119:22, 238:2, 239:20, 249:1, 269:1
**sorts**
21:21
**sought**
306:22
**soul**
235:16
**sound**
88:4, 246:1, 260:3
**sounds**
293:9, 293:10
**source**
217:7
**southwest**
2:6, 4:5, 10:22
**sovana**
155:11
**speak**
17:3, 79:11, 89:4, 92:15, 109:8, 132:10, 140:10, 140:13, 168:9, 172:6, 172:8, 172:11, 187:13, 199:12, 210:9, 224:18, 224:19, 233:19, 235:20, 262:4, 264:9, 264:12, 278:10, 293:18, 298:6, 300:20, 301:3, 301:6, 303:2, 315:11
**speaker**
159:2
**speaking**
80:3, 80:11, 80:14, 94:17, 95:4, 159:2, 195:9, 248:3, 293:17, 304:3, 304:9
**speaks**
310:18
**spear**
35:8, 35:10, 35:15, 35:20, 35:22, 36:4, 77:16, 89:17, 151:15, 178:4, 252:2, 257:6, 257:14, 257:21, 259:6, 261:21, 264:2, 264:21, 265:7, 267:10
**special**
35:13
**specific**
203:1, 203:3, 280:8
**specifically**
165:19, 203:3, 236:4, 242:11, 299:11
**spending**
250:17
**spent**
256:17, 256:22
**spoke**
81:21, 141:1, 142:4, 142:6, 142:7, 142:8, 142:9, 142:10, 169:9, 216:14, 217:11, 224:22, 234:4, 271:13, 279:7, 281:11, 282:22, 292:16, 293:12, 300:1
**spoken**
79:5, 289:20, 302:22
**sports**
128:16
**spread**
177:7, 243:12
**spreading**
132:7, 147:9, 294:8
**spring**
81:3
**st**
3:14, 206:9, 206:12, 214:12, 214:16
**stack**
312:15
**staff**
39:13, 58:19, 119:3, 119:5, 188:22, 192:8, 214:3, 214:9, 214:11, 214:13, 243:22, 247:9, 255:9, 265:22, 290:9
**staffing**
214:5
**stain**
131:11
**stand**
101:12, 171:8
**standing**
135:13, 231:21, 272:2, 299:5
**standpoint**
64:5, 64:6, 309:22

**stares**
271:16
**staring**
271:18
**start**
9:13, 12:10,
13:13, 13:20,
26:16, 64:19,
65:13, 66:7,
68:8, 72:15,
154:19, 155:5,
156:3, 156:7,
167:12, 180:12,
206:13, 230:12,
236:15, 273:20,
280:2
**started**
14:14, 26:13,
26:16, 41:18,
69:3, 75:13,
77:22, 89:7,
92:4, 94:17,
97:21, 109:11,
111:20, 132:17,
135:15, 141:5,
148:22, 155:1,
167:11, 167:14,
167:20, 179:22,
180:3, 180:9,
180:13, 180:21,
180:22, 181:13,
185:3, 185:4,
185:16, 186:10,
194:8, 194:9,
204:17, 205:1,
209:10, 217:8,
230:6, 230:13,
230:15, 232:14,
233:20, 261:11,
262:1, 270:15,
274:3, 274:11,
274:16, 289:17,
298:3, 315:15,
315:20, 316:3
**starting**
55:15, 207:17
**starts**
184:20, 271:15

**state**
8:16, 21:19,
27:18, 35:11,
35:16, 46:18,
54:9, 59:16,
70:18, 71:12,
97:11, 178:5,
178:9, 182:4,
270:4, 291:3
**stated**
104:4, 105:5,
121:14, 123:8,
123:17, 138:17,
138:19, 143:5,
170:10, 170:14,
170:21, 181:11,
182:2, 187:7,
212:17, 215:2,
215:10, 220:3,
252:18, 260:17,
273:2, 273:13,
285:11, 289:6,
290:15, 290:22,
291:5, 291:16,
291:18, 291:22,
292:1, 292:6,
293:21, 299:10,
313:20
**statement**
6:7, 7:3, 42:4,
103:13, 139:8,
203:9, 215:19,
223:19, 224:4,
224:5, 224:7,
224:14, 238:11,
281:16, 283:10,
283:16, 283:22,
284:7, 285:1,
285:2, 285:12,
286:1, 287:14,
287:18, 287:21,
289:9, 292:4
**statements**
136:13, 281:19,
283:20, 303:11,
304:12, 304:13
**states**
1:1

**stating**
135:16, 225:11,
248:17, 248:20,
291:20, 292:10
**status**
43:11, 115:18
**stay**
60:19, 94:21,
165:8, 167:18,
270:13, 312:18
**stayed**
60:13, 61:6,
61:12, 94:19,
175:17
**steer**
287:3
**stenographic**
2:15
**stenographically**
320:7
**step**
19:8, 19:11,
20:20, 59:20,
93:9, 93:11,
101:14, 102:14,
103:10, 218:16,
218:20, 301:17,
301:21, 310:22
**stepped**
93:6
**sterling**
19:17, 113:10
**stick**
33:17, 150:17,
154:18, 269:13
**still**
14:5, 26:1,
33:16, 57:12,
57:17, 61:15,
63:2, 66:20,
68:12, 92:18,
121:6, 125:18,
125:20, 126:19,
128:4, 128:13,
129:22, 130:5,
152:10, 166:9,
167:3, 172:22,
173:6, 183:12,

200:8, 217:16,
228:4, 230:14,
252:22, 262:20,
263:7, 268:19,
272:22, 278:1,
282:3, 286:19,
287:6, 308:21,
315:1, 316:8,
316:22, 317:9
**stock**
250:20
**stone**
221:15
**stood**
92:1, 92:4,
118:15, 149:6
**stop**
147:8, 152:2,
159:2, 263:14
**stopped**
103:5, 147:18,
176:2, 230:8,
261:11, 311:10,
311:12
**store**
85:19
**stored**
29:21, 30:16
**straight**
200:4, 210:15,
258:5, 258:22
**strained**
237:13
**street**
3:5, 3:14
**strike**
25:13, 44:19,
56:18, 139:22,
161:18, 236:6
**study**
117:7
**stuff**
65:14, 66:7,
113:9, 118:18,
125:15, 153:22,
168:14, 261:15,
270:18, 286:17,
299:2, 308:18,

315:5, 317:1
**style**
107:19, 154:5, 163:16, 163:17, 164:7, 165:6, 166:1, 195:14, 195:21, 196:9, 196:19, 197:5, 277:22
**subject**
117:15, 163:6, 163:15
**subjects**
163:9
**submitting**
21:4
**subordinate**
106:3, 239:19, 240:22, 243:5, 243:18, 280:10
**subordinate's**
103:10
**subordinates**
238:18, 244:6
**subsequently**
124:16, 309:10
**substance**
303:3
**substantive**
197:11
**successfully**
247:1
**suffering**
213:4, 213:14, 213:20
**suggest**
86:22, 136:21, 184:13
**suggested**
102:3, 105:3
**suggesting**
99:19
**suggestion**
99:18
**suggestions**
222:18
**suite**
2:7, 3:6, 4:6
**suitland**
9:15
**summer**
55:17, 81:4, 81:5
**summers**
13:8
**summoned**
194:7
**sunday**
136:12, 142:11
**supercede**
99:13
**superiors**
306:14
**supervise**
31:14, 31:21, 78:13, 78:16
**supervised**
51:4, 78:15
**supervising**
31:1, 31:4, 31:16, 40:5, 47:21, 48:4, 48:11, 48:15, 49:17, 49:22, 50:1, 50:3, 50:9, 50:13, 50:18, 51:1, 52:15, 52:18, 53:20, 58:4, 97:22
**supervisor**
28:9, 29:12, 29:15, 29:22, 30:10, 30:19, 31:16, 31:18, 32:8, 33:18, 34:16, 34:22, 35:4, 36:22, 37:3, 37:10, 37:15, 37:19, 38:3, 39:7, 42:1, 43:6, 50:8, 51:12, 51:17, 53:4, 62:16, 85:21, 90:4, 95:12, 96:14, 119:13, 135:18, 195:11, 219:5, 219:7, 220:5, 220:19, 221:7, 262:5, 286:14, 290:21, 308:10, 308:11, 311:16
**supervisor's**
308:12
**supervisors**
306:15
**supervisory**
41:3, 90:6
**supplies**
250:18
**support**
80:18
**supporting**
39:8, 39:15
**supposed**
27:11, 89:16, 103:16, 103:18, 103:19, 106:1, 153:4, 154:19, 156:3, 156:7, 191:22, 204:7, 213:5
**surfaced**
182:10
**surprised**
98:4, 270:16, 290:19
**suspect**
285:19
**suspicions**
240:20
**switch**
44:18
**sworn**
8:5
**system**
40:17, 71:3

**T**

**t's**
60:1
**tagged**
40:16
**take**
9:2, 9:10, 10:7, 10:10, 35:17, 36:12, 37:10, 39:2, 42:10, 52:14, 65:4, 68:4, 70:15, 71:7, 80:7, 85:16, 89:18, 91:18, 92:7, 99:3, 99:4, 118:12, 127:14, 130:22, 146:4, 146:10, 146:18, 148:6, 156:7, 184:1, 198:13, 205:13, 224:17, 225:8, 225:12, 233:4, 244:13, 256:16, 270:17, 280:19, 312:16, 316:8
**taken**
83:20, 89:16, 106:10, 113:9, 164:10, 320:4, 320:7
**taking**
50:11, 66:19, 70:12, 83:22, 101:1, 117:8, 155:4, 156:17, 211:8, 230:14, 232:5, 234:17, 266:11, 270:2
**talk**
9:8, 9:10, 81:8, 87:1, 92:8, 127:6, 132:13, 132:15, 142:1, 143:3, 145:19, 146:13, 148:4, 148:14, 148:16, 151:3, 153:7, 164:6, 172:18, 173:3, 175:5, 178:18, 178:19, 179:8,

190:4, 190:5, 190:10, 194:14, 198:20, 199:1, 199:8, 199:19, 244:20, 245:5, 245:8, 262:13, 262:15, 262:19, 263:19, 267:7, 268:17, 282:17, 289:18, 298:14, 307:14, 313:1
**talked**
20:15, 37:6, 62:22, 66:1, 66:18, 72:20, 82:11, 85:4, 100:18, 106:12, 114:15, 119:21, 125:6, 127:5, 131:13, 143:6, 144:7, 145:1, 146:2, 146:11, 147:22, 148:2, 164:15, 166:2, 171:1, 172:1, 175:1, 176:21, 177:16, 186:19, 195:4, 195:7, 199:5, 199:10, 199:11, 201:19, 202:1, 223:22, 240:16, 254:21, 263:21, 265:10, 300:2, 300:18
**talking**
35:20, 37:2, 49:11, 57:4, 80:9, 81:10, 81:12, 85:5, 90:5, 107:11, 129:21, 133:7, 134:17, 141:11, 141:19, 141:22, 144:7, 147:21, 152:11, 153:21, 165:3, 172:9, 176:6, 180:21, 180:22, 181:1, 181:2, 187:3, 194:5, 202:18, 202:21, 207:6, 207:13, 233:16, 235:11, 235:18, 237:1, 237:2, 237:4, 237:5, 247:20, 254:5, 255:2, 262:22, 263:8, 263:11, 273:5, 278:4, 281:4, 289:22, 294:5, 295:16, 309:21
**talks**
66:13, 96:20, 118:19, 223:13, 229:15, 233:3
**tambeni**
17:9, 38:7, 39:17, 40:3, 47:9, 50:2, 75:19, 76:12, 91:13, 142:6, 142:10, 145:12, 148:3, 149:17, 293:21, 300:2
**tardy**
185:12
**task**
29:1, 270:5, 312:7, 312:19
**tasks**
29:3, 118:5
**tax**
22:8
**team**
30:4, 47:4, 80:17, 97:14, 98:8, 99:1, 99:19, 99:21, 102:19, 254:2, 284:15, 284:16
**tell**
8:12, 9:5, 9:14, 17:12, 38:17, 39:6, 67:2, 75:11, 86:21, 88:20, 101:20, 104:17, 111:5, 111:14, 112:8, 112:18, 116:3, 120:3, 120:17, 121:13, 123:3, 125:22, 126:8, 130:17, 131:4, 134:8, 138:18, 139:4, 143:3, 143:12, 143:21, 146:18, 147:18, 150:9, 151:6, 151:17, 158:14, 162:12, 168:6, 168:21, 169:12, 172:18, 173:12, 177:14, 178:13, 178:15, 182:18, 182:21, 185:13, 186:6, 186:8, 186:14, 194:13, 194:15, 195:6, 195:19, 201:10, 201:19, 202:13, 203:13, 203:18, 209:14, 211:1, 213:18, 214:8, 215:5, 215:7, 215:16, 217:3, 219:8, 219:10, 219:21, 220:8, 220:16, 220:20, 222:21, 223:10, 258:16, 260:4, 260:5, 263:21, 271:2, 273:18, 276:22, 277:5, 277:7, 277:9, 281:20, 290:3, 292:11, 292:20, 293:1, 300:8, 303:3, 318:3
**telling**
132:4, 137:6, 137:11, 174:9, 175:10, 175:11, 175:18, 181:13, 183:1, 183:19, 186:21, 194:12, 213:7, 222:19
**tells**
174:16
**temper**
314:7
**tempers**
183:10
**temple**
9:21, 10:4
**temporary**
99:12
**ten**
172:4, 173:4, 173:5, 179:7, 184:1
**tenure**
32:6, 194:3, 270:21
**term**
98:19
**termed**
86:3
**terminate**
277:17, 297:9
**terminated**
48:9, 85:22, 93:20, 93:21, 94:1, 95:20, 117:3, 230:6, 231:11, 232:16, 232:21, 259:13, 295:13, 296:9, 297:17, 298:2, 298:6, 309:2, 309:3, 309:10, 309:11, 310:11
**terminating**
94:22
**termination**
281:18, 283:1, 295:8, 296:15, 298:5, 298:7, 299:9, 309:20, 311:3
**terms**
16:16, 49:3,

88:4
**test**
23:19
**testified**
8:5, 295:10
**testimony**
25:19, 120:6, 136:1, 319:5, 319:6, 320:6
**text**
74:7, 74:8, 82:18, 149:9, 158:11, 160:13, 161:9, 161:11, 161:12, 166:5
**texted**
82:14, 82:16, 166:14, 220:11
**texts**
83:5
**th**
3:5, 3:15, 13:20, 23:16, 24:4, 43:8, 116:12, 208:22, 226:21, 227:10, 227:18, 228:8, 229:2, 229:15, 230:3, 233:4, 244:18, 250:5, 250:6, 256:11, 257:9, 257:10, 257:11, 265:19, 269:9, 273:7, 274:14, 274:15, 274:16, 274:17, 274:18, 274:19, 275:11, 275:12, 275:13, 275:14, 275:15, 275:21, 277:19, 278:1, 312:20, 320:14
**thank**
42:17, 69:2, 92:22, 122:11, 122:12, 154:16, 158:8, 173:18, 192:3, 200:3, 204:6, 228:22, 234:17, 269:12, 310:6, 318:17
**thebus**
51:12
**theft**
295:20
**theirs**
71:14, 111:11
**themselves**
101:1
**therapist**
310:2
**thereafter**
320:7
**thing**
11:20, 18:1, 33:9, 35:14, 35:15, 39:5, 60:10, 118:15, 127:13, 128:16, 139:20, 165:1, 165:21, 175:8, 184:1, 184:2, 184:17, 187:1, 204:13, 206:16, 210:7, 214:3, 230:1, 244:22, 255:13, 256:13, 265:20, 272:13, 272:17, 280:18, 283:3, 300:11, 301:15, 310:3, 316:17
**think**
9:1, 18:22, 19:4, 49:15, 54:20, 61:13, 69:17, 73:8, 80:13, 93:11, 104:9, 105:20, 107:20, 139:20, 159:8, 170:12, 172:15, 172:22, 185:7, 188:9, 189:3, 192:10, 193:1, 193:3, 193:9, 193:10, 193:12, 193:15, 193:19, 228:2, 228:3, 238:14, 240:21, 242:2, 245:21, 252:15, 274:21, 277:3, 295:10, 297:14, 298:4, 299:19, 305:3, 305:6, 305:15, 313:8, 314:9, 317:6
**thinking**
149:7, 288:7
**third**
67:10, 73:7, 290:14, 294:3
**thomas**
76:8
**thomson**
74:14, 76:8, 76:9, 76:10, 76:11, 76:13, 76:16, 77:2, 79:20, 80:16, 120:12, 120:18, 121:8, 121:10, 121:13, 121:14, 122:17, 125:10, 136:12, 137:5, 140:11, 142:7, 142:8, 146:6, 151:1, 178:1, 178:6, 181:18, 219:7, 219:15, 220:6
**thought**
100:1, 104:7, 104:9, 169:7, 207:5, 264:20, 275:12
**thread**
6:18
**three**
10:6, 34:17, 37:15, 37:16, 38:15, 41:18, 49:18, 60:2, 73:10, 73:12, 78:11, 78:14, 135:6, 148:20, 156:8, 156:9, 199:16, 202:16, 202:18, 214:21, 215:10, 233:16, 251:5, 305:7, 305:10
**threw**
253:21
**through**
32:4, 59:1, 63:11, 68:17, 68:19, 68:20, 70:20, 73:20, 80:20, 99:2, 101:13, 115:20, 116:12, 124:10, 124:14, 124:17, 146:7, 146:9, 146:10, 149:5, 168:4, 173:9, 218:16, 248:14, 258:4, 261:8, 261:22, 264:2, 295:6, 305:14, 312:12, 312:21
**throughout**
49:1, 53:5, 268:14, 274:17
**timeline**
150:1
**times**
40:12, 70:5, 70:11, 70:17, 79:15, 80:6, 80:13, 81:1, 81:16, 81:21, 135:10, 251:10, 271:22, 272:16, 276:7
**timing**
86:14
**timing-wise**
210:14
**title**
43:22, 47:15, 49:12, 57:13,

57:14, 67:11, 77:18
**today**
16:3, 249:6
**together**
30:4, 61:1, 61:7, 61:10, 83:19, 91:7, 100:12, 125:12, 134:14, 135:1, 137:9, 148:4, 148:5, 175:10, 187:6, 199:21, 199:22, 240:5, 241:16, 254:6
**tolerance**
225:4, 308:18
**tomorrow**
172:5
**tone**
123:14
**took**
35:19, 51:22, 52:13, 53:2, 57:8, 91:8, 134:16, 139:18, 148:18, 155:3, 155:6, 155:14, 155:15, 155:17, 155:19, 156:2, 173:3, 185:17, 212:14, 215:12, 220:10, 221:19, 245:19, 254:16, 257:19, 261:20, 279:5, 279:11, 306:14, 308:9
**tool**
99:4
**tools**
101:11, 264:3
**top**
47:22, 162:18, 165:21, 171:16, 230:2, 243:14, 270:13
**topic**
196:21
**toss**
85:18
**tossing**
89:15
**tour**
22:2
**toward**
60:17, 75:4, 274:4, 281:6
**towards**
145:22, 237:15
**town**
308:8
**tr-wall**
263:5
**tracea**
4:19
**track**
33:22, 160:18
**tracks**
176:3
**trail**
87:4
**trained**
32:10
**training**
21:22, 51:6, 51:10, 51:14, 51:16, 51:17, 52:5, 52:6, 59:1, 59:13, 59:21, 60:4, 60:14, 245:19, 246:7, 246:17, 247:2, 248:21, 249:19, 250:4
**trainings**
52:9, 52:10, 231:6
**transcript**
22:14, 36:10, 42:8, 65:9, 69:7, 87:16, 96:3, 109:17, 110:5, 205:12, 211:14, 226:10, 227:7, 244:17, 280:1, 283:8, 295:5, 296:17, 302:8, 320:5
**transcription**
319:6
**transdev**
52:21
**transfer**
6:4, 11:19, 11:20
**transferred**
13:15, 15:14
**transit**
13:17, 13:19, 13:22, 14:7, 14:14, 15:5, 15:11, 15:15, 51:13
**transpired**
289:8
**transportation**
17:18, 17:19, 17:22, 308:2
**travel**
60:22
**traveled**
61:2
**treat**
170:22
**treated**
218:8
**treating**
153:2
**treats**
171:1
**tri-wall**
85:19, 89:19
**tri-walls**
256:19
**tried**
108:20, 147:17, 182:18, 287:3
**tristin**
4:20
**trouble**
58:15, 97:15, 313:1
**true**
52:15, 144:2, 144:13, 190:2, 219:14, 224:1, 224:3, 282:18, 284:3, 285:16, 288:2, 289:15, 290:2, 290:9, 290:11, 290:12, 290:18, 291:1, 291:2, 291:4, 291:7, 291:9, 291:17, 291:18, 291:19, 292:1, 293:4, 294:11, 294:12, 319:5, 320:5
**trust**
175:15, 234:7
**truth**
190:18
**truthful**
284:7
**try**
18:3, 38:20, 146:18, 183:8, 276:12, 287:3, 298:17, 300:20, 301:11, 303:11
**trying**
49:15, 69:17, 73:10, 87:1, 93:5, 94:8, 123:12, 124:5, 129:10, 149:22, 162:14, 182:15, 182:16, 185:6, 188:15, 193:10, 193:12, 194:6, 194:8, 195:16, 206:2, 216:15, 217:10, 218:1, 218:3, 218:4, 221:14, 222:2, 227:13, 230:6, 231:22, 260:15, 261:2, 274:5, 276:18, 277:3, 279:14, 297:17, 303:7, 317:6

**turn**
23:8, 24:13, 34:12, 115:15, 128:22, 129:2
**turnaround**
255:18
**turned**
18:9, 55:21, 89:11
**turning**
232:1
**twice**
178:7
**two**
23:15, 28:6, 30:6, 30:8, 45:10, 45:14, 45:16, 45:21, 50:19, 51:4, 53:18, 57:6, 60:2, 73:11, 75:6, 78:11, 80:22, 83:19, 90:15, 130:19, 132:21, 141:7, 148:1, 148:14, 148:17, 152:13, 152:21, 155:2, 161:21, 161:22, 162:2, 163:12, 169:18, 174:21, 185:15, 187:17, 187:19, 192:8, 192:18, 192:20, 199:5, 199:11, 202:20, 217:4, 217:17, 228:3, 229:15, 249:21, 251:18, 259:1, 263:5, 267:16, 273:4, 277:18, 278:18, 296:13, 315:9, 315:10
**type**
11:6, 11:20, 15:20, 18:1, 33:9, 52:15, 108:6, 125:16, 126:22, 127:13, 128:17, 165:21, 175:7, 217:20, 218:15, 236:15, 241:6, 241:8, 250:19, 255:13, 258:7, 259:7
**typed**
91:7, 117:15, 205:4, 205:5, 269:5
**types**
52:18
**typewriting**
320:8
**typical**
20:1
**typing**
266:11

**U**

**ugly**
147:11
**uh-huh**
119:1, 119:4, 176:9, 177:2, 177:5, 228:19, 229:17, 271:17, 288:19, 289:14, 312:1
**ultimately**
63:6, 178:22, 314:14, 315:8, 315:12
**unacceptable**
234:2
**unanswered**
250:16, 250:22, 311:11
**unauthorized**
7:4
**unavoidable**
102:13
**unaware**
98:2, 214:9, 217:20, 318:13
**unbothered**
270:10
**uncomfortable**
178:11, 250:10, 266:3
**uncomfortableness**
222:15, 236:13
**under**
28:18, 35:15, 48:1, 50:4, 78:20, 78:22, 101:4, 102:4, 103:21, 118:19, 270:18, 320:8
**undermining**
253:8, 253:9
**underneath**
47:21
**understand**
8:16, 18:4, 25:19, 32:3, 33:16, 33:19, 41:21, 42:17, 46:8, 47:19, 73:3, 73:10, 108:9, 108:13, 108:15, 112:1, 113:21, 123:12, 123:15, 139:21, 149:22, 175:7, 176:21, 188:15, 204:2, 206:2, 215:11, 218:1, 218:3, 227:15, 243:15, 248:12, 250:3, 285:13, 287:20, 288:14, 297:17
**understanding**
8:19, 8:20, 21:13, 21:16, 23:10, 32:22, 42:22, 118:4, 180:16, 191:17, 192:6, 192:9, 214:14, 243:7, 274:6
**understood**
70:2, 94:10, 108:7, 122:13, 141:10
**unemployed**
14:9
**unemployment**
14:10, 301:19, 302:3, 303:6
**unfair**
104:2
**unfairly**
218:8
**unhappy**
103:12
**united**
1:1
**unlawful**
211:17
**unless**
32:14, 239:20
**until**
12:11, 13:6, 21:5, 27:10, 29:4, 44:14, 46:1, 50:7, 58:9, 61:13, 61:18, 66:21, 69:20, 78:21, 98:2, 99:12, 100:2, 109:5, 119:18, 150:6, 150:11, 150:21, 151:13, 186:12, 186:20, 199:12, 200:17, 206:13, 208:7, 226:14, 226:19, 228:1, 228:7, 258:20, 259:9, 268:7, 273:21, 295:12, 310:11
**untrue**
283:16, 294:8
**unturned**
221:15
**unwanted**
174:18, 191:8, 223:6, 248:7, 314:3
**updated**
56:1

**upper**
249:14
**upset**
89:11, 182:14, 184:18, 207:12, 299:21, 299:22, 314:6, 314:7
**use**
71:7, 71:10, 72:14, 74:3, 126:6, 141:13, 155:10, 162:18, 166:18, 216:22
**using**
72:19, 73:21, 165:20, 171:15, 264:6, 265:22
**usually**
88:21, 127:1, 157:5, 263:3, 263:5

**V**

**vacation**
250:2, 250:5, 253:10, 253:14, 253:16, 254:8, 255:6, 256:10, 257:8, 272:12, 272:14, 274:8, 274:9, 274:11, 274:15, 278:2, 287:2, 311:22, 312:4
**vacations**
14:22
**van**
106:18, 143:11, 286:17
**various**
118:5
**vegas**
51:17, 52:3, 308:6
**veolia**
52:13, 52:20, 52:21, 308:2, 309:5
**verbal**
53:22, 54:1, 85:7, 91:9, 91:10, 109:2, 112:10, 122:8, 122:12, 154:13, 225:3, 225:10, 225:13, 237:16, 240:12, 314:22
**verified**
97:13, 224:7, 250:21, 281:12
**verifying**
46:20
**version**
25:7, 25:18, 304:16
**versus**
30:6, 43:6, 132:7, 166:19, 195:16, 238:20, 292:4
**via**
18:21, 19:5, 19:6, 21:12, 22:9, 25:11, 98:9, 108:5, 127:4, 128:7, 162:6, 167:19, 220:11, 265:3, 276:22, 281:21
**video**
246:17, 246:18, 246:22, 247:16, 248:15, 248:19, 249:3
**viewed**
85:17
**village**
10:22
**violated**
174:17, 175:18
**virginia**
59:5, 60:3, 60:13, 61:1, 61:9
**vision**
14:21
**visit**
280:10
**visited**
120:12
**visiting**
311:13
**voice**
89:8, 195:9
**vora**
4:18, 5:12
**vora's**
84:9

**W**

**w-2s**
22:9
**wait**
20:22, 101:20, 208:7, 276:16
**waiting**
173:5, 207:2, 286:19
**waived**
201:16
**walk**
101:13, 149:5, 152:1, 271:21, 272:3, 287:5
**walked**
107:5, 257:20, 307:13
**walking**
89:21, 218:14, 257:22, 272:6, 272:7, 300:13, 306:4
**wallace**
6:7, 19:14, 20:8, 26:19, 27:4, 27:10, 28:2, 28:9, 28:19, 44:7, 44:9, 48:14, 49:14, 49:15, 56:14, 58:1, 59:3, 76:3, 88:10, 88:13, 88:18, 88:21, 89:1, 91:22, 92:1, 95:4, 96:14, 97:6, 97:20, 106:11, 107:2, 107:5, 107:8, 109:13, 111:11, 115:4, 126:6, 128:13, 183:8, 184:7, 193:7, 194:4, 194:10, 197:9, 197:19, 198:11, 204:11, 224:8, 224:12, 247:12, 251:7, 289:4, 294:9, 294:14, 296:5, 300:4, 305:2
**wallace's**
111:17
**walsh**
3:12, 5:3, 5:5, 8:7, 8:8, 22:11, 36:7, 65:5, 68:4, 68:6, 139:14, 139:17, 198:13, 198:16, 211:11, 280:21, 281:1, 282:10, 305:13, 305:17, 310:5, 313:9, 313:17, 318:16
**want**
8:22, 9:2, 12:1, 13:14, 33:16, 33:19, 35:13, 47:19, 52:1, 66:3, 66:17, 67:13, 68:7, 73:3, 75:6, 89:5, 91:13, 95:15, 96:4, 99:7, 101:6, 101:7, 102:1, 102:8, 109:4, 110:6, 110:9, 112:5, 123:14, 130:14,

131:8, 131:9,
139:20, 141:16,
151:1, 155:10,
171:1, 174:6,
174:7, 178:17,
179:13, 183:13,
200:3, 207:22,
211:18, 215:2,
216:9, 220:14,
221:11, 222:5,
222:11, 223:7,
223:16, 225:10,
227:5, 234:13,
242:2, 255:8,
269:13, 269:14,
287:6, 292:10,
292:19, 292:22,
303:3, 313:1,
318:18
**wanted**
38:20, 46:19,
54:6, 55:12,
70:8, 70:10,
80:18, 84:3,
101:3, 101:19,
101:22, 102:7,
102:10, 104:5,
105:7, 112:1,
113:1, 130:15,
145:10, 148:16,
172:18, 175:19,
175:21, 176:15,
181:20, 182:3,
188:12, 207:2,
207:14, 209:22,
222:6, 222:7,
222:12, 222:21,
236:12, 256:13,
270:4, 270:5,
293:16
**warehouse**
21:20, 27:15,
27:21, 29:20,
29:22, 30:14,
30:17, 35:6,
35:7, 35:21,
35:22, 36:3,
36:5, 39:12,

39:13, 40:19,
41:1, 45:16,
54:19, 59:15,
62:1, 62:2,
62:7, 62:9,
62:17, 62:18,
63:15, 63:16,
63:20, 66:14,
66:16, 67:4,
67:18, 78:18,
88:9, 89:22,
90:10, 102:20,
109:6, 111:9,
111:22, 113:4,
113:6, 113:7,
120:12, 132:20,
153:17, 156:20,
180:10, 182:2,
182:5, 183:6,
190:6, 209:14,
209:20, 210:3,
219:4, 220:4,
222:16, 230:10,
236:13, 246:11,
246:13, 249:12,
250:14, 250:18,
251:2, 253:7,
253:17, 254:10,
255:12, 255:17,
256:14, 257:21,
262:7, 271:22,
286:18, 311:13,
311:16, 316:15
**warning**
6:9, 6:19,
6:21, 53:22,
85:7, 91:10,
96:12, 96:19,
98:13, 105:12,
106:9, 106:18,
107:19, 108:18,
112:11, 225:3,
225:10, 225:16,
280:3, 286:3,
286:8, 288:17,
294:17, 294:22
**warnings**
54:1, 294:19,

298:1
**washington**
1:14, 2:8, 3:4,
3:7, 4:7, 4:20,
10:22
**wasik**
3:3, 5:4, 18:8,
24:7, 26:22,
29:18, 35:17,
36:14, 37:7,
37:12, 38:18,
59:9, 62:8,
63:12, 64:7,
65:3, 72:5,
74:1, 77:4,
91:6, 95:22,
99:9, 100:5,
102:5, 102:9,
110:1, 110:19,
115:9, 120:5,
121:20, 122:16,
128:20, 135:22,
139:12, 156:5,
190:20, 191:15,
222:3, 223:15,
231:13, 244:13,
280:19, 282:12,
285:21, 293:7,
310:7, 310:9,
313:15, 315:7,
318:19
**watch**
156:11, 246:17
**watched**
246:18, 248:15,
248:18
**watches**
262:11, 270:3
**wave**
303:14
**way**
8:18, 11:22,
12:17, 31:10,
31:14, 31:20,
32:16, 33:10,
34:2, 44:20,
45:19, 46:14,
46:20, 61:3,

87:3, 94:9,
102:18, 103:9,
137:22, 140:1,
146:16, 147:9,
147:14, 159:22,
161:19, 165:12,
169:19, 170:22,
178:11, 188:19,
189:4, 191:20,
195:4, 195:7,
195:10, 217:20,
231:15, 231:17,
236:8, 237:10,
239:3, 239:6,
239:15, 239:16,
239:22, 243:14,
250:8, 252:10,
254:13, 261:21,
264:17, 283:3,
283:19, 285:4,
306:8, 316:7,
317:4, 317:5
**we'll**
10:13, 33:18,
42:16, 65:6,
65:12, 65:13,
68:8, 69:8,
72:15, 125:21,
224:5, 253:11,
253:13, 278:3
**we're**
33:12, 36:7,
49:2, 49:14,
83:2, 83:21,
101:7, 104:13,
106:2, 130:3,
143:20, 167:2,
180:1, 226:20,
243:15, 254:2,
254:6, 254:22,
269:12, 291:8,
305:15, 311:22,
317:10
**we've**
22:15, 36:11,
71:15, 100:6,
255:15, 261:15,
283:9

**weapons**
39:1, 168:1
**weather**
135:15
**wednesday**
1:15
**week**
39:3, 125:9, 250:3, 300:17
**week-long**
52:2
**weekend**
80:7, 206:20
**weekends**
80:10
**weekly**
108:21
**weeks**
34:17, 37:16, 41:18, 46:6, 79:1
**weird**
133:6, 317:12
**welfare**
41:20
**well-versed**
32:7
**went**
17:7, 19:10, 22:2, 23:21, 27:14, 29:20, 43:3, 52:6, 59:14, 60:3, 60:14, 77:12, 79:17, 81:16, 86:19, 87:1, 89:8, 91:18, 91:21, 106:15, 106:21, 108:11, 120:16, 135:1, 139:11, 143:19, 143:22, 145:22, 146:6, 146:9, 146:12, 147:7, 149:8, 150:8, 151:13, 158:9, 160:5, 173:6, 173:14, 179:7, 179:8, 180:19, 183:6, 198:19, 203:16, 203:18, 203:22, 210:9, 210:15, 215:12, 218:16, 218:17, 222:1, 222:10, 232:1, 233:12, 234:3, 239:3, 242:16, 244:20, 250:2, 250:5, 250:15, 251:3, 251:19, 253:13, 253:16, 254:8, 254:21, 255:6, 256:10, 256:18, 258:14, 258:21, 259:15, 260:8, 261:14, 261:20, 262:19, 263:19, 264:16, 265:12, 265:13, 265:15, 266:8, 268:6, 272:14, 273:7, 274:8, 274:11, 274:13, 283:4, 285:4, 292:21, 302:4, 302:18, 304:15, 307:14, 311:11, 311:21
**weren't**
43:17, 43:21, 54:4, 87:8, 143:6, 165:21, 168:3, 184:21, 185:4, 222:2, 252:12, 253:3, 299:12
**whatever**
28:11, 40:2, 61:18, 71:13, 104:15, 106:14, 108:15, 109:15, 120:15, 133:18, 134:17, 135:16, 137:15, 138:21, 147:19, 170:1, 175:13, 187:18, 189:21, 197:10, 217:14, 222:14, 222:17, 226:16, 232:9, 239:9, 239:15, 255:14, 263:12, 264:4, 270:4, 271:20, 272:4, 273:6, 300:5, 300:7, 312:21, 314:5, 317:17
**whenever**
78:20, 108:10, 128:21
**whereas**
312:13
**whereof**
320:13
**whereupon**
8:2
**whether**
24:5, 47:20, 70:4, 73:10, 81:3, 85:5, 87:20, 88:13, 114:20, 115:7, 115:12, 116:13, 116:14, 138:2, 138:8, 146:22, 148:10, 163:9, 164:5, 169:9, 171:13, 178:20, 190:18, 194:14, 195:17, 196:13, 196:22, 198:1, 223:17, 224:11, 224:22, 225:15, 229:9, 239:18, 241:1, 244:8, 247:13, 249:2, 249:8, 252:9, 282:18, 284:12, 287:16, 293:11, 307:6, 309:5
**whew**
235:3
**whistling**
153:6
**whoa**
168:20
**whoever**
91:13, 190:4, 190:6, 190:7
**whole**
100:9, 100:10, 178:10
**wife**
121:2, 123:9, 123:18, 124:20, 125:1, 125:4, 134:21, 189:21, 238:17, 239:9, 308:12
**willingness**
226:7, 237:6
**within**
35:11, 39:3, 40:19, 41:1, 67:1, 118:20, 246:3
**without**
71:4, 176:18, 222:13, 222:15, 281:14
**witness**
8:4, 36:15, 88:22, 95:10, 96:1, 223:20, 267:2, 289:5, 289:8, 320:13
**women**
148:14, 148:17, 315:10
**word**
154:7, 205:9, 314:4
**words**
111:9, 141:13, 171:15, 183:8, 217:1, 290:7, 304:15
**work-related**
82:17, 187:16
**worked**
28:17, 30:4, 125:11, 145:13,

153:8, 153:9, 284:11, 303:11
**working**
11:1, 12:11, 28:18, 30:1, 30:3, 76:16, 100:2, 152:3, 152:10, 167:11, 167:14, 173:6, 185:10, 230:15, 261:7, 261:11, 262:3, 263:5, 263:15, 271:7, 271:12
**workplace**
190:8, 207:18, 212:22
**works**
12:10, 126:3, 178:5
**worried**
312:8
**worry**
112:13, 234:21, 317:10, 317:14
**worse**
209:17
**wouldn't**
33:3, 91:16, 94:2, 99:2, 283:13, 284:22, 288:13
**wrap-up**
229:16
**wrapped**
234:19
**wright**
3:13
**write**
86:5, 86:7, 86:21, 86:22, 90:3, 95:10, 109:7, 111:10, 112:7, 112:16, 153:10, 153:12, 153:14, 223:2, 288:10, 306:1, 306:9, 307:2, 307:6, 307:15
**write-up**
91:5, 91:7, 91:9, 112:13, 112:14, 112:19, 112:20, 153:19, 292:7
**write-ups**
111:11, 277:19, 279:3, 296:13
**writes**
115:17
**writing**
105:11, 111:14, 112:8, 114:10, 266:11, 306:20
**written**
6:9, 6:10, 6:12, 6:19, 6:21, 85:20, 86:12, 89:6, 89:14, 91:3, 91:12, 96:12, 96:19, 98:13, 105:12, 106:9, 106:18, 109:2, 109:5, 109:21, 112:11, 112:21, 114:21, 115:5, 115:8, 115:12, 117:16, 135:4, 135:10, 178:7, 178:12, 178:21, 280:3, 286:1, 286:2, 286:8, 288:17, 289:6, 294:16, 295:1, 297:22, 306:17
**wrong**
94:11, 97:18, 123:13, 153:6, 189:4, 226:15, 238:14, 243:4, 243:17, 273:4, 283:4, 289:18, 289:21, 308:14
**wrote**
86:13, 106:6, 114:11, 259:19

**X**

**x**
1:4, 1:11
**xyz**
130:13, 134:19, 208:3, 273:1

**Y**

**yahoo**
230:2
**yeah**
12:7, 46:2, 48:10, 60:10, 64:10, 65:2, 67:10, 69:19, 87:3, 127:4, 132:18, 135:7, 135:9, 141:8, 142:14, 143:15, 151:8, 151:22, 154:2, 175:17, 184:9, 186:12, 196:5, 201:17, 202:22, 203:9, 209:4, 209:16, 213:12, 214:20, 221:5, 221:9, 226:19, 226:22, 239:2, 240:9, 241:17, 247:21, 248:18, 253:1, 258:6, 261:17, 261:19, 271:13, 311:17
**year**
9:17, 10:1, 11:18, 12:14, 13:7, 14:15, 53:5, 57:4, 60:18, 81:1, 220:3
**years**
10:6, 76:15, 77:13, 135:6, 135:8
**yelled**
314:1, 315:18
**yelling**
92:5, 94:11, 208:4, 209:10
**yo**
156:11, 168:8, 300:9
**yothen**
104:21, 104:22
**yothin**
28:20, 45:12, 72:10, 104:20
**you-all**
60:22, 200:14, 234:17
**young**
90:15, 90:16, 119:7
**yourself**
184:22, 185:1, 254:4

**Z**

**zero**
225:4, 308:18

**$**

**$16.24**
41:18
**$22.03**
41:19
**$4**
41:19
**$55,000**
14:15, 15:4
**$69,365**
15:10
**$80,000**
15:19

**.**

**.1010**
3:8
**.1300**
3:17
**.5070**
2:9, 4:8

**0**

**00**
45:22, 46:1,

87:9, 154:20, 184:21, 185:3, 185:4
**01648**
1:8
**03**
156:12

**1**

**10**
6:9, 46:1, 65:7, 82:8, 82:9, 87:9, 96:2, 96:6, 154:20, 156:12, 184:21, 185:3, 185:4, 185:17, 259:22
**1000**
2:6, 2:7, 4:5, 4:6
**109**
6:11
**11**
5:11, 5:13, 5:18, 6:10, 43:8, 109:16, 109:19, 230:3, 256:11
**110**
6:13
**12**
6:12, 10:4, 110:4, 110:7, 230:3, 250:5, 250:6, 257:9, 277:19
**120**
14:4
**13**
6:14, 205:11, 205:14, 268:22
**130**
14:4
**14**
3:5, 5:11, 5:13, 6:15, 211:13, 211:16
**15**
5:17, 5:18, 5:21, 6:16, 65:7, 73:2, 77:13, 82:8, 82:9, 226:9, 226:12, 227:17, 266:18, 269:10, 274:21, 277:6
**16**
5:17, 5:21, 6:10, 6:12, 6:16, 6:18, 6:19, 6:21, 7:3, 7:4, 7:9, 65:10, 227:6, 227:9, 229:14, 233:3, 278:1, 280:4, 283:11, 318:20
**17**
1:8, 6:19, 244:16, 257:10, 257:11, 274:14, 274:16, 274:17, 275:11, 275:14, 279:22, 280:3, 281:2, 286:2, 288:13, 312:20
**170**
11:10, 14:4
**18**
3:15, 6:18, 6:21, 7:4, 7:9, 12:14, 230:3, 244:16, 265:19, 269:9, 273:7, 274:15, 274:18, 274:19, 275:12, 275:13, 275:15, 275:21, 279:22, 288:16
**19**
7:3, 13:20, 283:7, 283:10, 287:14
**1st**
26:17, 88:3, 114:11, 116:14

**2**

**2**
227:19
**20**
5:11, 7:4, 23:16, 280:4, 283:11, 295:4, 295:7
**20005**
3:7
**20024**
2:8, 4:7
**2013**
25:7, 25:18, 53:5
**2014**
26:17, 52:1
**2015**
29:4, 29:5, 37:10, 43:8, 44:21, 45:4, 55:17, 60:18, 65:10, 65:18, 69:16, 72:1, 72:4, 96:13
**2016**
13:20, 66:5, 66:13, 66:16, 67:1, 67:18, 73:5, 73:8, 73:14, 73:17, 82:4, 88:4, 110:14, 110:16, 113:15, 113:19, 113:21, 115:19, 115:20, 116:12, 120:1, 120:9, 120:11, 212:4, 226:21, 280:4, 283:11
**2017**
13:14
**2018**
12:1, 12:2, 12:8, 13:2, 13:6
**2019**
12:13, 13:7
**202.319**
3:8
**202.783**
2:9, 4:8
**2020**
1:15, 320:15, 320:16
**205**
6:14
**21**
7:9, 186:2, 206:9, 206:12, 214:12, 214:16, 296:16, 296:18
**211**
6:15
**21202**
3:16
**22**
1:15, 5:12, 5:14, 5:16, 7:11, 206:9, 206:13, 206:20, 214:4, 214:10, 233:22, 302:7, 302:10
**226**
6:17
**227**
6:18
**23**
6:10, 6:12, 110:14, 110:16, 115:19, 117:13, 227:19, 302:19
**24**
115:20, 116:12
**244**
6:20, 6:22
**25**
6:16, 208:22, 212:4, 226:21, 227:18, 228:8, 229:2
**26**
5:13, 23:16, 24:4
**27**
227:10, 229:15,

233:4, 244:18, 320:14
**281347**
1:20
**283**
7:3
**295**
7:8
**296**
7:10
**2989**
10:3
**2nd**
113:14, 113:15, 114:5, 114:9, 114:17, 114:19, 116:14, 245:22, 250:5, 250:6

**3**

**3**
46:1, 87:9, 224:7, 274:21, 277:6
**3/2/16**
6:7
**302**
7:11
**31**
320:15
**310**
5:4
**313**
5:5
**320**
1:21
**36**
1:16, 5:17
**3:**
266:18

**4**

**4**
224:14, 259:22
**4/7/16**
6:3
**400**
3:6
**401**
14:19
**410.659**
3:17
**4162**
9:15
**42**
5:20

**5**

**5829**
9:19

**6**

**6**
46:1, 87:9, 318:20
**62**
21:22
**65**
5:22, 6:4
**69**
6:6

**7**

**7**
45:22, 113:22
**700**
3:5
**7th**
66:13, 67:1

**8**

**87**
6:8
**8:-cv--tdc**
1:8
**8th**
69:16

**9**

**9**
1:16
**9/1/15**
6:9
**96**
6:9

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

GREENBELT DIVISION

Civil Action No. 8:17-CV-01648-TDC

----------------------------------------------------

EVANGELINE J. PARKER,

Plaintiff,

v.

REEMA CONSULTING SERVICES, INC.,

Defendant.

----------------------------------------------------

TRANSCRIPT OF ZOOM VIDEOCONFERENCE

VOLUME I VIDEOTAPED DEPOSITION OF

LARRY MOPPINS

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before TAB PREWETT, a Registered Professional Reporter, a Certified LiveNote Reporter, and Certified Shorthand Reporter with all parties present via Zoom videoconference on Saturday, July 11, 2020, commencing at 9:08 a.m.

Page 2

A P P E A R A N C E S:

FISH & RICHARDSON, P.C.
BY: ANDREW R. KOPSIDAS, ESQ.
TRACEA L. RICE, ESQ.
1000 Main Avenue, Southwest
Washington, DC 20024
kopsidas@fr.com
trice@fr.com
202-626-7747
Attorneys for the Plaintiff

WRIGHT, CONSTABLE & SKEEN, LLP
BY: DONALD WALSH, ESQ.
7 Saint Paul Street, 18th Floor
Baltimore, Maryland 21202
dwalsh@wcslaw.com
410-659-1320
Attorneys for the Defendant

Page 3

Also Present:

Martin Sherrill, Videographer
US Legal Support

Rita Persichetty, Court Reporter
US Legal Support
Ms. Persichetty began the deposition, reported the videographer's opening statement, read the reporter statement for remote proceedings, swore in the witness, then left the proceedings.

Rajesh S. Vora, President
Reema Consulting Services, Inc.

Page 4

Larry Moppins

P R O C E E D I N G S

THE VIDEOGRAPHER: This is the videotaped deposition of Larry Moppins in the matter of Parker versus Reema Consulting Services, Inc.

This deposition is being held at US Legal Support, Inc., via remote video conferencing on July 11, 2020. My name is Martin Sherrill from US Legal Support, and I am the video specialist. The court reporter today is Rita Persichetty, also from US Legal Support.

We are going on the record at 9:09 a.m.

Counsel will now state their appearances for the record, starting with the taking attorney.

MR. KOPSIDAS: Andrew Kopsidas from Fish & Richardson on behalf of the plaintiff, Evangeline Parker.

MR. WALSH: Donald Walsh on behalf of Reema Consulting Services, Inc.

THE VIDEOGRAPHER: Would the court reporter please swear in the witness.

Page 5

Larry Moppins

MS. PERSICHETTY: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely. They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his testimony in this matter is under penalty of perjury. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting. Please indicate your agreement by stating your name and your agreement on the record.

MR. KOPSIDAS: I agree.

MR. WALSH: I agree.

(There was a discussion off the record.)

L A R R Y M O P P I N S,
having been sworn by Rita Persichetty, the remote notary public, to testify to the truth, the whole truth, and nothing but the truth, testified as follows:

(At this point, Ms. Persichetty left

Page 6

Larry Moppins

the proceedings, and Tab Prewett stenographically reported the rest of the deposition. The deposition resumed at 9:36 a.m.)

DIRECT EXAMINATION

BY MR. KOPSIDAS:

Q      Mr. Poppins, will you state your full name for the record, please?

A      Yes, Larry Moppins, Senior.

Q      And what is your current address?

A      10305 Lees Crossing Lane, Fredericksburg, Virginia  22408.

Q      And you are not currently represented by any counsel here today, correct?

A      Correct.

Q      Okay.  So you said before that you are -- you have never had your deposition taken.  So let me just explain what we are doing here today a little bit.

This is a routine fact-finding event that we do in all litigations.  And I -- I will be asking you questions today.  And you will be providing me answers.

Mr. Walsh may from time to time object

Page 7

Larry Moppins

to some of my questions.  But despite his objections, you still have to answer the questions. He merely states his objections for the record.  And then later, if necessary, we can take those objections in front of the judge.

Now, you -- you appreciate that you are under oath today?

A      Yes.

Q      And that means you have to tell the truth, right?

A      Yes.

Q      The whole truth and nothing but the truth?

A      Yes.

Q      Okay.  And you will do that today?

A      Yes.

Q      And you understand that the testimony you are going to give today is just as important as in we were in a court, and that's why you must be not only truthful, but complete and accurate with your testimony.

Do you understand that?

A      Correct, yes.

Q      Now, if -- if you don't understand any

Page 8

Larry Moppins

of my questions today, please just ask me to -- to rephrase it or explain it and I will be happy to do that.

Okay.

A      Okay.

Q      So if you answer a question, we will all understand that you understood it; is that fair?

A      Yes.

Q      Now, because it's important that your testimony be complete and accurate, if, at any time during the deposition today, you want to change or modify an answer that you have previously given, just let me know, and I will let you do that.

Okay?

A      Okay.

Q      I will try to take a break about once every hour or so.  But if you need a break sooner for any reason, you just let me know, and we will take a break.

Okay?

A      Okay.

Q      So we have a court reporter on the line today, and he is taking down everything that is being said.  So that means a couple of things.

Page 9

Larry Moppins

First of all, it's important that none of us speak over each other; so I will -- I'll wait for you to finish your answer before I ask my next question, and I ask that you wait for me to finish before you go ahead and answer, just because, when multiple people are speaking at the same time, it's very difficult for him to write down what everybody is saying accurately.

Okay?

A      Okay.

Q      You have a chance if you want to review the deposition transcript after today and make any changes to it that you feel are necessary. But -- but you need to know that, if you change your testimony later after the deposition in a substantive way or an important way, I have the right to tell the jury that you changed your -- your testimony after the fact.

You understand that?

A      Yes.

Q      So that's why, like I said before, it's important that you be truthful, complete, and accurate in answering my questions today.

Okay?

Larry Moppins
A Okay.
Q Is there any reason, medical or otherwise, that you cannot provide truthful, complete, and accurate testimony today?
A No.
Q All right. If that changes at any time during the deposition, you will tell me, right?
A Yes.
Q All right. And, lastly, I don't expect this will happen, but, if at any time during today's deposition, you feel I am acting in bad faith towards you or in a manner that unreasonably annoys, embarrasses, or oppresses you, you will let me know, right?
A Yes.
Q Now, so you said you have never testified in a litigation -- you have never testified in a deposition before, right?
A Correct.
Q Have you ever testified at a trial before?
A No.
Q All right. Now, I'm going to -- I'm going to put the first exhibit up, and the way we

Larry Moppins
are going to do the exhibits since we are doing this deposition remotely is I drag them into a common area called the "chat group."
But what I will also do is I will share my screen so that you can see what I am looking at.
So the first exhibit that I would like to mark is the "Subpoena to Testify at a Deposition in a Civil Action" directed to Mr. Larry Moppins. And you should be seeing that on the screen now.
A Okay.
Q Do you see it, sir?
A Yes.
Q Okay. Good.
MR. KOPSIDAS: So, Court Reporter, please mark this as Exhibit 1, Moppins 1.
(Exhibit No. Moppins 1, "Subpoena to Testify at a Deposition in a Civil Action" directed to Mr. Larry Moppins, Document is marked by the reporter for identification.)
THE REPORTER: Yes.
Q Now, you understand that you are here today to provide sworn testimony pursuant to this subpoena issued by the United States District Court

Larry Moppins
for the District of Maryland, right?
A Yes.
Q And you have had a chance to review the subpoena?
A Yes.
Q And you will see towards the bottom of the document, in fact, on the last page, there was this attachment A, "Request for Production."
Do you see that?
A Yes.
Q Okay. And let me fix this.
Okay. And you understand that these were three requests that we issued to you to see if you have any relevant documents for today's proceeding, correct?
A Correct.
Q And did you look for and find any documents in any of these three categories?
A I don't have any.
Q Okay. Did you do anything to prepare for today's deposition?
A No.
Q Have you had any communications with counsel for Reema Consulting Services, Mr. Currey or

Larry Moppins
Mr. Walsh?
A Yes.
Q Okay. What conversations were those?
A Just to let me know that -- when the court case was going to be, was I available, basically like that.
Q Okay. Did you talk at all about the substance of -- well, about Mrs. Parker -- Ms. Parker, the substance of any of her allegations?
A In what way are you talking about?
Q Well, did they ask you questions about your experience with Ms. Parker?
A I'm not sure because a couple of times he called me, I was at work, so I wasn't really -- to be honest with you, I wasn't really paying attention. So he -- they may have asked me questions. I don't remember.
Q Okay. And who was it who was talking to you?
A Some young -- young man, I forget what his name was.
Q Okay.
A Mr. Walsh called me once or twice later.

Page 14

Larry Moppins

Q    Right.  So what, if anything, can you remember about any of the conversations that you had concerning Ms. Parker?

A    With whom?

Q    With Mr. Currey or Mr. Walsh.

A    Mr. Currey had none really -- he was trying -- he called me, and he was basically rambling about something, about something.  I just told me, if he has -- if he needs to talk to me, send me something in writing so I know who he was, because I didn't know who he was and he didn't know who I was.

Q    And did he send you something in writing?

A    About a month later, a month or so later, I guess.

Q    And what was that?

A    Notice of -- about him, about this deposition.

Q    Okay.  So other than talking about logistics about this deposition, do you recall talking to him about anything else?

A    That gentleman, no.

Q    What about the other one, the younger

Page 15

Larry Moppins

one?

A    I don't know which one's the younger one.  Which one -- I don't know either one of them, so --

Q    Was it Mr. Currey?

A    Currey -- no, I'm sorry.  I don't know who Currey is.

Q    Okay.  All right.  Have you had any communications with any lawyers for Reema?

A    Mr. Walsh, yes.

Q    Okay.  Other than Mr. Walsh --

A    Yes.

Q    -- do you recall any other --

A    Someone say -- someone called me a couple of times saying he was a lawyer.  I didn't have no idea who they were, so I didn't talk to them.

Q    Okay.

A    Briefly.

Q    And over the last few months, have you had any conversations with anybody who worked at Reema?

A    No.

Q    When was the last time you spoke with

Page 16

Larry Moppins

Ms. Cathy Price?

A    I didn't actually physically -- you mean speak or E-Mail with?

Q    Either.

A    E-Mail, I -- about a year and a half ago, she E-Mailed me asking about talking to -- getting one of the former employees of RCSI to give her a call.

And actually physically talking to her, I haven't talked to her since July of 2017.

Q    And a year and a half ago, what -- what was she E-Mailing you about?

A    She was asking about a -- getting some communication to one of the ex-employees, to have him call her.

Q    Who was that?

A    I don't remember.

Q    Have you spoken with Ms. Reema Vora? When was the last time you talked to her?

A    I never spoke to Reema.  I texted with Reema once since 2017.  She was -- what was it -- she asked me -- she was asking about my availability.

That's when that first guy tried to

Page 17

Larry Moppins

call me and say he was -- he was some lawyer from blah, blah, blah.  She was intervening to say:

"Hey, this is our lawyer," blah, blah, because I didn't know who he was, and he was talking so fast -- I didn't know who he was.

Okay.  So I don't care to talk to people that I don't know.

Q    All right.  So what did you all text about, you and Ms. Vora?

A    Just availability.

Q    Did you know availability for what?

A    Yeah, because my wife had been telling me somebody -- some lady had kept coming by the office and -- to try to serve me a subpoena.  And it was from -- she told my wife what it was for, but she wouldn't give it to her.  So --

Q    Okay.  What about Mr. Pickett?  When was the last time you spoke with him?

A    May of twenty -- May of this year. Excuse me.

Q    And what was that about?

A    Work issues.

Q    Work at Reema or someplace else?

A    Someplace else.

Page 18

Larry Moppins

Q Do you still work with him?

A Excuse me.

Q Do you still work with Mr. Pickett?

A No.

Q Okay. And then what about Mr. Donte Jennings? When was the last time you spoke with him?

A I want to say April.

Q Of this year?

A Yeah.

Q What was that about?

A This proceeding.

Q And what did you talk about with regard to this proceeding?

A That he had got a check. He didn't know what to do with it. I was telling him the same thing. I got a check. I didn't know what to do with it.

Q Usually, you cash them.

A I don't cash checks I don't know what it's for.

Q Probably a good policy.

And just so I'm clear, do you have a personal relationship with Mr. Jennings?

Page 19

Larry Moppins

A Personal myself?

Q Yes.

A No.

Q Or anyone in your family?

A Excuse me.

Q Or anyone in your family?

A In one of my family, yes, my family, yes.

Q And what -- what relationship is that?

A He's the -- he's the father of my youngest granddaughter.

Q Okay. Okay. When did you start working at -- well, give me the time frame that you worked at Reema, starting with initially?

A Finish was July '17. I believe the start was February -- I believe it was -- February of '17. No, excuse me, February of '13. Excuse me.

Q February 2013 to July 2017?

A '17.

Q '17. Okay. And what was your position there?

A Subject matter expert.

(Reporter clarification.)

A Subject matter expert.

Page 20

Larry Moppins

Q And what does -- what does that mean in terms of what -- what were your job responsibilities?

A Job responsibilities, making sure to make sure that the needs of the client was met, providing over -- providing technical knowledge for -- well, what needed to be done.

Q Who was the client?

A The Department of State.

(There was a discussion off the record.)

Q How did you find out about the position?

A What position are you talking about?

Q For a "subject matter expert" at Reema.

A I worked there -- I had already worked there from the previous contractor.

Q Prior to 2013?

A Yeah, before the RCSI took over, there was another company there named Tessada -- Tessada, T-e-s-s-a-d-a -- Tessada Associates?

Q Okay. Do you know -- do you know Mr. Kwan, K-w-a-n, Chun, C-h-u-n?

Page 21

Larry Moppins

A Yes.

Q And who is he?

A He's the ITAR manager for the -- for the ATA portion of the DOS contract.

(Reporter clarification.)

A ITAR, I-T-A-R. It's National Traffic and Arms Regulations Manager.

MR. WALSH: If I could just jump in for one second, Mr. Moppins, if there comes a time that you are asked a question that is related to anything you believe is classified, please let me Mr. Kopsidas know or let me know so that we can address it correctly.

For the sake of the court reporter, it's a government contract, so there's going to be a lot of acronyms.

THE REPORTER: Okay.

MR. WALSH: We will help you when we take a break.

THE REPORTER: Thank you.

MR. KOPSIDAS: Yes, thanks, thanks for that note, Don.

Q So, yeah, Mr. Moppins, we have the ability to mark this transcript confidential today.

Page 22

Larry Moppins

So if there is any -- any information that -- that you need to give me in response to one of my questions that is of a confidential, either personal or business nature, just tell me that, and we can mark the transcript confidential. And what that means is that the public won't see it. Only -- only the lawyers here will see it.

Okay.

A     Okay.

Q     So, Mr. Chun, was he a Department of State employee?

A     No, contractor.

Q     I see. And did you know him before you got the job?

A     Which job?

Q     Before you got the job as a subject matter expert.

A     Yes.

Q     Okay. Did he get you that job?

A     I'm not sure how it went -- it went. I know Mr. Vora came in. He offered me a job when he came in the door, so that's -- yeah, that all I know. I don't know how it came about.

Q     Okay. Did he get you the job at the

Page 23

Larry Moppins

previous contractor, Tessada?

A     No, as a matter of fact, if I remember right, I wrote Mr. Vora a letter, I think, when I found out he was the -- I wrote him an E-Mail or a letter when he was -- found out he was the contractor -- he was going to be the new contractor coming in into the contract.

So that's -- that's how Mr. Vora knew me.

Q     Got it.

Did you ever have any -- sorry.

Did you have any personal relationship with Mr. Chun prior to taking the job at Reema?

A     Personal, how, other than work?

Q     Was he -- was he a friend or a relative or anything like that?

A     No, work relationship only.

Q     So a "subject matter expert" for Reema, I assume that was a management level position, correct?

A     As far as the operations goes, yes, but for as far as the people -- because it's a split -- you are asking a split question. It's two different things.

Page 24

Larry Moppins

The people who are -- were controlled by Mr. Vora -- the what -- the day-to-day operations, I -- I provided insight for Mr. Vora and his team for that.

Q     Is it -- is it accurate to say that you were the head manager, the top manager for operations?

MR. WALSH: Objection. You can answer, Mr. Moppins, to the extent you can.

A     For operational wise?

Q     Yes.

A     Getting the mission done, yes.

Q     Okay. When you say you weren't a manager as far as personnel, what exactly do you mean by that?

A     Any hiring, firing, anything like that, was strictly Mr. Vora's call. Usually, a manager does both.

Q     In your experience there at Reema, would Mr. Vora consult with you before hiring or firing somebody?

A     Yes, there have -- there have been occasions on that, yes. If a person was going to be brought in as a leader or anything like that, yes,

Page 25

Larry Moppins

specifically. Just the day-to-day warehouse workers, he pretty much let us deal with -- deal with those levels.

Q     Did you ever make recommendations to Mr. Vora to fire somebody?

A     Yes.

Q     About how many times would you say you did that?

A     I couldn't even -- I couldn't even guess that.

Q     More than a dozen?

A     Yes.

Q     Were you involved in the decisions to promote people, or were you consulted on those decisions?

A     Yes.

Q     Did you ever provide recommendations to Mr. Vora about who to promote?

A     Yes.

Q     Is it accurate to say that basically anybody in the warehouse there who was getting promoted had to have your approval?

A     Approval for what?

Q     That you would approve their

Page 26

Larry Moppins

promotion -- in other words, if you didn't agree with somebody getting promoted, they wouldn't get promoted?

A        No, that's not accurate.  Mr. Vora would do what he wanted to do.  I had no control over it.

Q        Okay.  But he did consult you on decisions whether to promote people?

A        Yes.

Q        Who did you report to at Reema?

A        Mr. Vora.

Q        And was Mr. Vora typically there on a daily basis in the warehouse?

A        Pretty much, yes, he was there regularly.

Q        How regular?

A        I'd say he probably was there 40 percent of the -- physically was there about 40, 45 percent of the time; and the other time he would call in, check in, stuff like that, see how things were going -- how things were going.

Q        And is it accurate to say that, at least during the time that Mr. Vora wasn't there, you as the -- the operations manager would oversee

Page 27

Larry Moppins

everything in the warehouse?

A        Yes.

Q        And make all management decisions?

A        Through Mr. Vora, yes.

Q        Were you authorized to take any disciplinary actions against employees?

A        Through Mr. Vora.

Q        When you say "through Mr. Vora," you mean that, if you wanted to take disciplinary action against an employee, you would have to get his approval?

A        He had all -- yes, he had anything for hiring.  Only -- only disciplinary we had was firing, and that was through Mr. Vora.  Anything else, suspensions or anything else, was through Mr. Vora.  He had to approve it.  He had to approve everything.

Q        Okay.  So including suspensions and demotions and things like that?

A        If we had something like that happen, yes.

Q        Okay.  What about just giving -- there was a system at Reema where employees would sometimes get a written warning for a disciplinary

Page 28

Larry Moppins

action, correct?

MR. WALSH:  Objection.

A        I'm sorry.  You lost me there --

Q        Sorry.  Let me -- let me --

A        A little system?

Q        Yeah, let me try to do better with that.

Was it procedure at Reema that employees who had done something wrong would sometimes get a written warning in their personnel file?

A        If it merited it.  Yes.

Q        Okay.  And did you have the responsibility to issue written warnings if they were needed?

A        Written warning, yes.

Q        Okay.  And did you have to get approval from Mr. Vora before you could give an employee a written warning?

A        It depends on how the -- how it was going to be enforced -- if it was going to be reinforced with a termination or anything like a suspension, it had to be -- to go through Mr. Vora first.

Page 29

Larry Moppins

Q        Okay.  But let's say it's an employee's first warning, and the -- the result is a termination; that's something you could do on your own?

MR. WALSH:  Objection.  You can answer.

A        No, no, I still -- I had to run it through Mr. Vora or sent -- write -- it would be written up.  It would be -- he would get the privilege to look at it.  And from there --

Q        Okay.  Can you.  Sorry, go ahead. Finish.

A        I'm sorry.  You're talking to me?

Q        Yeah.

A        No, I just say he -- he would get -- he would give approval if it could be issued or not.

Q        And in your experience did he review all written disciplinary warnings before they were issued?

A        Not all.  I would say probably about 80 -- 80 to 90 percent.

Q        And as part of your job as the head of operations, did you -- would you provide recommendations to Mr. Vora about who should be

Page 30

Larry Moppins

disciplined?

A       Yes.

Q       Is that something you did a lot or --

A       No.

Q       -- not very often?

A       No.  If it was one -- if it was one of the managers, that's basically the only way I'd get involved.  If it was -- if it was just one of the workers, one of the RCSI managers took care of that issue.

Q       I'm sorry.  I am not -- I'm not quite following the distinction.  There was some kind of people, certain types of employees you had authority to recommend disciplinary action against, but other times you didn't?

A       No, that's incorrect.  That's not what I said.

Q       Okay.  I'm sorry.  How did -- how did I get that wrong?

A       I said that the -- if it was the manager, then I would recommend something to Mr. Vora.  If it was one of the worker bees, one of the RCSI managers would handle the issues themselves.

Page 31

Larry Moppins

Q       Got it.  Okay.  Thank you.

Was there ever a time that you can recall where you recommended to Mr. Vora some disciplinary action, and he said no?

A       Yes.

Q       How many times would you say that happened?

A       I -- I can't tell you.  I don't -- I don't remember.  Quite -- it was quite often.

Q       Did you ever receive any discipline of any type while you were working at Reema?

A       No.

Q       Why did you leave -- why did your employment agreement end?

A       Contract was changing.

Q       Changing to a new contractor?

A       Yes.

Q       Was everybody at Reema let go when -- when the -- when the contract changed hands?

A       No.  Everybody -- everybody but the exception of, I believe, Angela Wallace.  They wasn't let go.  They had an option -- they had an option.  They had nowhere to go.  They had to go to the next -- next contract.

Page 32

Larry Moppins

Q       Okay.  So did most of the employees stay on?

A       After the contract changed over?

Q       Yeah.

A       No, just Angela Wallace as far as I know.

Q       All right.  All right.

Now, do you recall Ms. Evangeline Parker from the time of working at Reema?

A       Vaguely.

MR. KOPSIDAS:  I'm going to mark the next exhibit, Exhibit 2, is -- Exhibit 2 is a document bearing -- it's a one-page document bearing Bates No. REEMA -- R-E-E-M-A -- 000295.

(Exhibit No. Moppins 2, 11/26/14 Letter, Offer of Employment, to Ms. Evangeline Parker from Rajesh S. Vora, President of Reema, Bates No. REEMA 295, Document is marked by the reporter for identification.)

Q       Mr. Moppins, can you see the document that I am showing on the screen right now?

A       I see portions of it.

Q       Okay.

Page 33

Larry Moppins

A       Not the whole document.

Q       All right.  So this is the whole document.  I will show it to you.

So do you recall -- you can see this is a letter dated November 26, 2014, and it's basically a hiring letter.  And it's addressed to Ms. Parker and says here in the first line:

"Reema Consulting Services, Inc. (RCSI) is pleased to extend to you an offer of employment as a General Clerk II."

And then a little down below, it says:

"Your effective starting date is December 1, 2014."

Do you recall her starting on or around December 2014?

A       I can't -- I honestly don't know when she started.

Q       By the way you said you only "vaguely" recall Ms. Parker; is that right?

A       Yes.

Q       Any particular reason?

A       No.  Just she wasn't that memorable in my -- in my -- in my assump -- memory of her.

Q       Sorry.  Going back to what we talked

Page 34

Larry Moppins

about a minute ago, about how many people would you say during your -- your three years at Reema or four years at Reema, did you recommend firing?

A    25 or so.

Q    Okay.  What -- if you recall, what was a General Clerk II at Reema?

A    They handled basic -- basic administrative functions.  I'm not sure exactly what it was.

Q    In the warehouse?

A    I'm not sure.

Q    Is this a position that ult -- ultimately reported to you, albeit through some other managers?

A    No.

Q    Okay.  Who would have managed -- back in 2014, who would have been the manager of a General Clerk II?

A    One of the department managers or the deputy program manager, one of the two.

Q    And those folks didn't report to you?

A    Excuse me.

Q    Those folks didn't report to you?

A    They would -- for the guidance, yes.

Page 35

Larry Moppins

Q    I'm sorry.  I missed what you said there.  Can you repeat it?

A    For guidance, yes.

Q    Okay.  Do you recall, while she was a General Clerk II, interacting with Ms. Parker at all?

A    No.  The only thing I remember about Ms. Parker was she was good when we started.  She first started to -- she helped in the warehouse because we was doing an inventory, and she was instrumental -- not instrumental -- but she was a good worker, helping out with the moving of equipment through the inventory process.

Q    Did you ever get involved in any of her performance reviews?

A    I don't remember to tell you the truth.

Q    Do you recall her getting promoted to a shipping supervisor position?

A    Shipping?

Q    Yeah.

A    I don't remember her being in shipping.  No, I don't remember that.  I don't remember her being in shipping.

Page 36

Larry Moppins

Q    Okay.  By the way, were you ever involved in performance reviews for any of the employees?

A    The DPM, yes.

Q    And what was your involvement in performance reviews?

A    By the DPM?

Q    Sorry.  What is a DPM?

A    Oh, sorry.  "Deputy program manager."

Q    That's a -- that was a position at Reema?

A    Yes.

Q    And who held that position while you were there?

A    DaMarcus Pickett, DaMarcus Pickett, D-a-M-a-r-c-u-s, Pickett, P-i-c-k-e-t-t.

Q    Is that the only person at Reema that you were responsible for doing performance reviews for?

A    If I remember right, yes.  I can't remember that far back.  I'm sorry.  I don't remember.  I know I did his.  I can't remember about the rest of them.

Q    No problem.  This is not a -- you

Page 37

Larry Moppins

know, this isn't a test.  You know, so I am just -- I am just asking you -- asking for what you recall today.

So then I assume that Mr. Pickett would have done performance reviews for people that worked under him, correct?

MR. WALSH:  Objection.

A    I would say so, yes.

Q    Do you recall Ms. Parker then getting a promotion to Receiving Supervisor Material Coordinator?

A    Vaguely, yes, I do.  I think -- I think I do.  I'm not sure.

Q    Did you have any involvement in approving that promotion?

A    I probably agreed with it.

Q    Do you recall who was her manager when she was promoted to that position?

A    No -- I think it was DaMarcus Pickett -- I think it was.

Q    Do you recall her getting promoted to the position of assistant manager?

A    Yes.

Q    Did you approve that promotion?

Page 38

Larry Moppins

A        I concurred with it, yes.

Q        And do you remember who her -- her manager was once she got promoted to that position?

A        I think it was DaMarcus Pickett.

Q        And you wouldn't have had any involvement in her performance reviews when she was an assistant manager?

A        Only at the very end.

Q        What do you mean by that?  I'm sorry.

A        When there was an issue between her and Mr. Pickett and myself.  That was it.

Q        I see.  And then you recall her getting promoted to the position of Quality Compliance Control Logistics Manager?

A        I think that was a side job.  If I remember right, that was a side job along with that last one you're talking about.  It wasn't a position by itself.

Q        It was an added responsibility?

A        Yes.  Correct.

Q        Okay.  And did you concur in her getting that added responsibility?

A        Yes.

Q        Why did you concur in her getting that

Page 39

Larry Moppins

added responsibility?

A        Because we had -- we had warehouse off-site and done some train -- she was very adapt at identifying equipment that needed to be marked for international shipments and where it went off-site, and done some training at a seminar in -- I think Hampton -- I think Hampton, Virginia.  And she learned -- she learned it pretty good.

Q        Sorry.  Bear with me for one second while I get a little organized here.

MR. KOPSIDAS:  Okay.  The next exhibit I'm going to mark is the document bearing the Bates Nos. REEMA 000349 through 358, I believe.

(Exhibit No. Moppins 3, Employee Performance Evaluation, dated March 21, 2016, for Evangeline Parker, Bates Nos. REEMA 000349 through 358, Document is marked by the reporter for identification.)

Q        Okay.  Mr. Moppins, can you see the document that I have put up on the screen.

A        Yes.

Q        Okay.  This is Exhibit 3 to your deposition.  And it says at the top, "Employee

Page 40

Larry Moppins

Performance Evaluation."

Do you recall this kind of document generally?

A        No, I really don't remember this, the form itself, no.  I don't remember the form.

Q        You didn't use this kind of form when you were doing --

A        No, I didn't say I didn't -- I'm sorry.  Go ahead.  I'm sorry.  Go ahead.

Q        Sorry.  Let me -- let me just try to ask it again in a clearer way.

Is this the kind of form that you used to use when you were doing performance reviews for Mr. Pickett?

A        I don't remember the -- I don't know.  I don't remember to tell you the truth.  I don't.  It looks vaguely -- it looks familiar, but I'm not sure exactly what it was.

Q        Okay.  And do you recall reviewing these kinds of performance reviews while you were the head of operations?

A        I don't remember this form.  That's what I am saying.  I don't -- I may have; I may not.  I don't -- I don't remember to tell you.

Page 41

Larry Moppins

Q        Were -- were performance reviews of folks who worked in operations, were those typically run by you?

A        No, HR told us when the reviews were done, were due.

Q        So all the managers would just do their reviews and give them to HR?

A        Yes.  No, that's -- no, no, no, no.  Different story, different -- this is something different.

I said that the -- when the -- you asked the question about when they -- when they were due, who decided.  I said HR decided when the -- when it was -- when it was time to do someone's evaluation.

Q        I see.  Okay.  And then the managers would go ahead and do the evaluations for the employees that worked under them, right?

A        Correct.

Q        And would they ever run those evaluations by you or show them to you?

A        I really don't remember.

Q        Is there any reason why the managers did the performance evaluations for the employees in

Page 42

Larry Moppins

the warehouse and not you?

A The managers were the -- they were -- they were the managers of the personnel. I didn't work with the personnel on day-to-day. I didn't see 'em for two weeks -- I didn't see a warehouse person, warehouse per -- warehouse worker or a admin person up-front.

It may be days before I see one of them. So I didn't work with them on a daily basis. So why should I issue them performance reviews?

Q Got it. Okay. So the managers were closer to the employees?

A They worked with them on a day-to-day basis.

Q So it's accurate to say that the managers probably had the best overall view of how the employees were performing that worked under them?

MR. WALSH: Objection.

A In most cases, yes.

Q And how often would you say employee performance evaluations were done?

A I can't say. I don't know.

Q Was it like once a year or twice a

Page 43

Larry Moppins

year or something like that?

A I would be guessing if I did that. I don't -- I don't know.

Q Do you recall Ms. Parker generally -- generally receiving good and excellent performance reviews?

MR. WALSH: Objection.

A I don't -- I don't remember.

Q Did you ever get involved in the decision or were you ever consulted on the decision to whether to give an employee a merit increase or a bonus?

A I don't ever remember that happening at RCSI.

Q You don't remember a merit increase or bonus being given, or you being consulted for that?

A Neither. The con -- I'm sorry. Can I clarify?

Q Please do.

A The contract as a -- was a -- was working off of the wage determination scale. Whenever the WD changes -- WD, "wage determination scale" changed, then the employee got it -- if it went up -- excuse me -- if it went up, he or she got

Page 44

Larry Moppins

a raise.

Q Okay. So it was sort of out of your hands?

A Yes, it was basically the government's hands.

Q Okay.

MR. KOPSIDAS: We have been going about an hour. How are you doing? Do you need a break?

THE WITNESS: I prefer to get this over with, so let's go ahead.

Q All right. All right. So looking back at this document, Exhibit 3, I'm going to scroll down to page Reema 357; and this is a document entitled "Written Warning."

Do you see that at the top?

A Yes.

Q Okay. And it's addressed to Ms. Evangeline Parker.

A Can you enlarge this because I can't read it.

Q Sure can. How is that?

A A little more. Okay.

Q Okay. So this is a -- appears to be a

Page 45

Larry Moppins

written warning delivered to Ms. Parker on September 1, 2015, correct?

A Yes. That's what it -- the document says.

Q And if you scroll down, there is something that says "PM's signature." I assume that is "program manager"; and that's your signature next to it, correct?

A That's correct.

Q Okay. And then under that is "Alternate PM's signature"; and that looks like Mr. Pickett's signature, correct?

A Correct.

Q And then under that it says "Witness Optional Signature," and that looks like Ms. Wallace's signature?

A Correct.

Q And Ms. Wallace was -- well, strike that.

Do you recall what was the reason this warning -- this written warning was given to Ms. Parker?

A Without reading it, no.

Q Well, I can put it up --

Larry Moppins

A If you let me read it, I can maybe answer the question.
Q Yeah, please do. I will put it up on the screen here, the relevant part; and take as long as you'd like to read it.
A I can understand the gist of why it was -- she was given the counseling.
Q Okay. Do you recall this counseling being given to her?
A No.
Q Do you recall why it was given?
A By reading the subject of what -- of why, yes, the reasoning for it, for the warning, I see why.
Q Okay.
A At this point here, you would be -- you would be subjugating -- she would have cost RCSI money had the shipment -- equipment went out the door, and it had been the wrong -- sent to the wrong place.
RCSI had a contract or obligation to replenish or replace anything that went out the door in error.
Q So do you recall this -- do you recall

Larry Moppins

this --
A No.
Q -- this incident?
A This particular incident, no.
Q Do you recall it actually costing Reema any money?
A I don't remember. I just go by what the write-up says. If that is what happened, it could have cost money.
Q Okay. But reading this document, it doesn't appear that any bad shipment actually went out, correct?
A It looks like somebody stopped it. She didn't what she -- she didn't do a proper procedures to the shipment -- for the shipment. She should have checked before she shipped -- before she prepared the shipment out.
So someone on the line, someone probably in shipping probably said, "Hey, this" -- the courses were standard. A certain -- a certain course had certain things. People in the back, in the shipping department knew exactly what was what.
So they probably knew the material didn't go along with the course. And they probably

Larry Moppins

told Ms. Wallace, and Ms. Wallace stopped the whole shipment.
Q Do you recall being concerned about Ms. Parker's work performance after this?
A After -- I don't remember this counseling, so I know -- not at this point. I don't know at this point here. I just remember the last part, her last month or two there. That's all I remember about her, really.
Q Are you talking about at the time she got fired?
A Yes. This stuff here, I don't -- I don't really remember it.
Q How often would --
A Can I add?
Q Sorry. Go ahead.
A Yeah, noticing her comments right here, she says she's not to be -- she's not to be a baby -- she's not to be a baby-sitter.
That was part -- if that was the position she had -- her job not to baby-sit; her job is to make sure that everything was supposed to be done to prevent RCSI from being fined for a mis-shipment.

Larry Moppins

So, basically, she's saying in her statement here she didn't care, that she's not going to be a baby-sitter.
Q That's how you understand her response here?
A Yeah, yes.
Q Okay. About how often or -- strike that. Let me try it again.
These kinds of written warnings, how often were they given out to employees while you were at Reema?
MR. WALSH: Objection.
A I really don't know. In cases -- in cases like this here?
Q No, just in general.
A I don't -- I don't remember that. If I would remember that, I have to remember every person that was there. And I don't -- I do not.
Q No, I am just trying to get a sense of is this -- issuing these kinds of written warnings, was it rare, or was it some -- or were kind of written warnings issued pretty often?
A That warning would have been justified because, like I said, if you have one -- if -- you

Page 50

Larry Moppins

have devices -- was in that warehouse that was small -- i.e., look like a small desktop -- that ranged from $50,000 to $250,000.

So if she had shipped something out in that price range, RCSI would have been responsible to replace those -- that item, be it 50,000, $250,000 --

Q Right.

A -- each.

So they would have -- RCSI would have had to replace each one of them in a time -- a timely manner for the actual correct shipment.

So that kind of warning like that was justified.

Q Okay. I appreciate that. My question is a little different. I am just asking sort of generally, you know, for all of the employees at Reema, were there -- you know, were -- were written warnings common, or were those rare occurrences?

MR. WALSH: Objection.

A It all depended on the severity. If I remember right, it had to be the severity of what you were doing.

Something like this here, yes, written

Page 51

Larry Moppins

warning was justified. In my -- in my instance, if I had the authority just like this here, that would have been a termination; i.e., probably, Mr. Vora stopped it.

But that would have been termination for cause because you are showing -- you are put in a leadership position, and you are showing -- you are saying right there that you have no responsibility. You are not going to do the baby-sitting.

So why should I ou let you have responsibility over something that could cost me money down the road?

Like I say, there was nothing inexpensive in that warehouse. And there were things that -- as high as $750,000 for one robot, one; and we had many of them.

Q Right.

A So, obviously, she didn't care. I would have -- me, myself, I and I, I would have terminated her.

Q Okay. Now, her supervisor at the time was Angela Wallace, correct?

A Yes, that's what the document says.

Page 52

Larry Moppins

Q Do you see this part of the document that I am highlighting now that reads:

"The intent" of the written warning "is to define for you the seriousness of the situation so that you make" -- "so that you" may -- "you make [sic] take immediate corrective action."

Do you see that?

A Yes, sir.

Q Would you agree that in general that was the purpose of written warnings was -- at least the first written warning that an employee gets is -- was so that they can be corrected?

A The first warning would have probably been a verbal. But if it was something like this here, this merited -- once again, due to the severity of it, and whatever the items were, it merited a write-up, a written warning, because this could have been five robots.

That would have been two and a half, $3 million that Mr. Vora would have had to replenish, replenish it -- replenish it, so that merits a written write-up in my -- in my opinion.

And to say she had -- she had no responsibility, baby-sitting, she shouldn't have

Page 53

Larry Moppins

took the job if she didn't want it. She didn't want to baby-sit.

Management, supervisory, leadership, it's all about -- that's what it's all about. Call it what you want to call it. That's what it is. The job is to be there, to watch, observe, and be responsible for your actions.

Q All right. I would like to show you another document now, Mr. Moppins -- Moppins, sorry. Let me get this right.

MR. KOPSIDAS: So the next exhibit I'm marking is Exhibit 4, Moppins 4, a document bearing -- a one-page document bearing Bates No. REEMA 000220.

(Exhibit No. Moppins 4, 3/2/16 Letter from Angela Wallace to Cathy Price regarding a counseling session with Robert Matthews, Bates No. REEMA 220, Document is marked by the reporter for identification.)

Q Okay. Mr. Moppins, I would like to show you this. It's a letter or a document dated March 2, 2016. And it's addressed to Ms. Price. That's Ms. Cathy Price, I assume?

A Yes, I would presume so.

Page 54

Larry Moppins

Q    And it looks like it comes from Ms. Angela Wallace, the transportation manager.

Do you see that?

A    Yes.

Q    Now, this refers to a counseling session that Ms. Wallace was involved in for a Mr. Robert Matthews that took place on March 1, 2016.

Do you see that in the first line there?

A    Yes.

Q    Okay.  First of all, who if you recall was Mr. Robert Matthews?

A    Robert was -- I believe he was a warehouse -- he was a shipping-receiving clerk, I believe.

Q    And do you recall this counseling session that Ms. Wallace had to do with him, March 1, 2016?

A    Can you move it to the left a little bit, my left.  I can't quite see it.  Hold on.

Q    Let's see.

A    I am missing the right side of it.

Okay.

Page 55

Larry Moppins

Q    Okay.  So do you recall this counseling session?

A    Yes, I do.

Q    And how is it that you recall it?

A    Because of the gentleman, Matthews himself.

Q    He told you about it afterwards?

A    No, no, he's -- he's the type of person you are going to remember.

Q    Why do you say that?

A    Just that he would was the type of person you would remember.  Some people in life, you remember for the rest -- you remember all of your life.  He was one of them.

Q    Okay.  Did he work -- well, strike that.

At the time of this counseling, Ms. Parker was his supervisor, correct?

A    That's what this letter says.

Q    Okay.  And, apparently, according to the -- the parts that I've highlighted here, it says:

"Mr. Matthews was on the defense and confrontational with his superior."

Page 56

Larry Moppins

That would be Ms. Parker, right?

A    Yes.

Q    And that he -- Mr. Matthews is constantly cutting her off and then ultimately was asked to leave the premises.

Do you see that?

A    I see that.

Q    Okay.  Do you recall those incidents happening?

A    I believe I do.  I think -- I think so.

Q    Okay.  So it seems from this letter it's accurate to say that Mr. Matthews was being insubordinate to Ms. Parker?

A    I could not say that.  Robert was a different type person, Robert Matthews a different type person.  I can't say that he was being insubordinate to her.

Maybe it both -- it probably went both ways.  She was a very -- she could be sensitive herself at sometimes.

Q    Well, but this is written by Angela Wallace who was there, not Parker and --

A    Right.

Page 57

Larry Moppins

Q    -- Ms. Wallace says that Mr. Matthews was being confrontational with Ms. Parker.

A    Okay.  I wasn't there during the confrontation.  I was there at the point -- it says I was there at the point when we had been trying to get him -- give him a chance to talk.

So what happened in the actual meeting between them, I don't -- I don't remember.

Q    All right.  So let me -- let me step back a minute.

What do you recall from this counseling session, your -- your own involvement?

A    Yes, basically asking -- hey, telling -- asking -- telling Matthews to calm down a little bit, you know:

"Go outside.  Get a -- take a couple of minutes and come on -- collect yourself and come on back in."

Q    And did he do that?

A    I think he did.

Q    And then what happened after that?

A    According to this letter here, it says he was asked -- asked to come back and talk to HR, asked to leave and to come back and talk to HR.

Page 58

Larry Moppins

Excuse me.

Q       Do you recall Mr. Matthews getting a written warning because of this?

A       That I cannot say.  I don't know.

Q       You don't recall him getting one?

A       No, he may have.  I don't know.  I don't remember.  If you ask me to recite from memory, I don't -- I don't remember either way if he did or did not.

Q       Do you recall him getting terminated because of this incident?

A       I don't think so.  I -- I don't remember.  I don't think so.

Q       You don't think he was terminated?

A       Not because of that, I don't -- I don't remember.

Q       Okay.  Do you recall Mr. Matthews having any written warnings in his personnel file?

A       No, no.  Like I say, he was -- he was a character, and you remember him by -- by that.  But that -- that's --

Q       Yeah.

A       Getting the write-ups and anything like that, no, that would have been four or

Page 59

Larry Moppins

five years ago.  No.  Four years ago -- yeah -- no.

Q       During this counseling session, was Mr. Matthews given a chance to tell his side of the story?

A       I am trying to read it again.

If I was in the room, he would have been given a chance to tell his side of the story, yeah.  If I was in the room, yes, he would have been given the opportunity.

Q       Why do you say that?

A       Because that's -- that's how I am.  I won't take no one -- no one-sided conversation.  There's always two sides to every conversation.

Q       Okay.  All right.

MR. KOPSIDAS:  Why don't -- we have been going almost an hour and a half.  Why don't we take a five or ten-minute break.  I think people can use a restroom break, and the court reporter probably needs to take a short break.

So why don't we -- why don't we keep it short just so we get done as soon as possible; so let's say, you know, five, ten minutes max.

Page 60

Larry Moppins

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  We are going off the record at 10:52 a.m.

(There was a discussion off the record.)

(A break is taken.)

THE VIDEOGRAPHER:  Stand by, please.  We are back on the record at 11:03 a.m.

CONTINUED EXAMINATION

BY MR. KOPSIDAS:

Q       All right.  Okay.  Mr. Moppins, the next document I'm going to show you is -- I'm putting it in the chat room now.  It is a document bearing Bates Nos. REEMA 8 through 57.

(Exhibit No. Moppins 5, Reema Consulting Services, Inc., Employee Handbook, dated June 2013, Bates Nos. REEMA 8 to 57, Document is marked by the reporter for identification.)

Q       So, Mr. Moppins, you should be able to see this document on your screen now.  It is entitled "Reema Consulting Services Employee Handbook," dated two thousand -- June of 2013.

Are you familiar with this document?

Page 61

Larry Moppins

A       I have seen variations of it.  Yes.

Q       Were you ever involved in writing or editing it?

A       No.

Q       And what is this document basically?

A       It's the employee handbook for RCSI.

Q       And as the employee handbook, what is its purpose as you understand it?

A       To give the employees a -- guidelines of how to conduct themselves.

Q       Were you given a copy of this when you started employment at Reema?

MR. WALSH:  Objection.

A       I think I was.  Okay.  Once again, it was seven, eight years ago.  I don't remember if I did.  I think I was, but I'm not sure.

Q       Do you recall being required to read it?

A       If I was given it, I read it.

Q       But you don't specifically remember sitting down and reading it?

A       No.  If I read it, it would been the first day -- it would have been the first day of employment.  I would have read it and followed the

Page 62

Larry Moppins

way back from memory purposes.

Q    Do you know if all employees at Reema were given this?

A    I do believe -- I do remember that, yes. That part I do remember. All employees were given a copy of the handbook.

Q    In your time at Reema did the employees always follow procedures laid out in the handbook?

MR. WALSH: Objection.

A    As far as my knowledge, yes.

Q    Do you recall any incidents of any employees not following any procedures in this book?

A    And not being terminated, no, or counseled.

Q    So if an employee didn't follow one or more of the procedures in this book, they would be counseled or terminated?

MR. WALSH: Objection.

A    It depends on what the circumstances were.

Q    Why is that?

A    It could have been something where we had -- for instance, one time, one of the male

Page 63

Larry Moppins

employees had to go to the bathroom real fast and he ran into the female bathroom to go to the bathroom, relieve himself, and came -- came -- coming right back out. Is that a write-up offense? No, it's not a write-up offense. He had to go.

Q    All right. So I guess what you are saying is, yes, some of the -- some of the rules in this handbook are more serious than others; is that accurate?

MR. WALSH: Objection.

A    Yes, sir.

Q    I am going to scroll down in this document to page REEMA 18.

A    Please enlarge that, please. Thank you.

Q    Okay. So, specifically, I'm referring to section 206 entitled "Open Door Policy."

Do you see that?

A    Yes, I see it. I can read that.

Q    Take a minute and read it.

A    Got it. Read it.

Q    Okay. What was your understanding of the "open door policy" at Reema?

A    "Open door policy" you could talk

Page 64

Larry Moppins

to -- for myself or Mr. Vora, you mean?

Q    Well, what was -- what was your understanding? Yeah, what did it mean to you?

A    I could talk to him anytime about any -- anything I need to talk to him about.

Q    Okay. And what about the employees that worked under you?

A    Same thing.

Q    That they could talk to you anytime about anything they wanted to?

A    Provided tech -- provided whether it was -- not anytime -- let me rephrase that -- provided that the mission -- something mission-critical wasn't going on.

If something mission-critical was going on and it wasn't a life or death situation, you needed to wait until it was over because a lot of things we did were time-sensitive and we couldn't miss a shipment because someone needed to talk to me about something, what their kids did.

Q    Yes. Okay. So how generally -- generally, how did you apply the open door policy?

A    Just like I said, if it's critical, if it's mission-critical, get the mission done first,

Page 65

Larry Moppins

and then we talk about it. As soon as the first opportunity comes up, we talk about it.

"Come back -- always, come back to me. If I forget, come back; come back and talk to me."

But the job came first. Then we talk about it. And if it was life or death -- several times, some of the employees said, "hey" -- come -- come -- come -- come to me. You could see they were -- they were upset.

And it was just like:

"What's wrong?"

"Oh, my daughter is in the hospital. My sister had a car accident."

My only response:

"Go, bye, see ya. I will tell your boss. Go, go."

Q    Got it. Okay. But let's -- let's assume there wasn't something mission-critical going on at the time, and it wasn't a life-or-death matter.

Would you agree that, for you, the open door policy was about encouraging open communication, feedback, and discussion about any matter of importance to an employee?

MR. WALSH: Objection.

A That depends on what you are talking about. If it -- if it's something relevant to the job itself, yes; a lot of times what they was talking about was not relevant to the job.

It was just that their personal life was -- instead of putting their professional life first, front, forward, they put their personal life forward -- so just trying to balance that off.

Yeah:

"No, I hear what you are saying. I can't do anything about that. That's your personal life. You got a -- you got issues with whoever, a bill or whatever? I can't do anything about that."

Q Okay. But if it was work-related?

A If it was work-related, then -- and time permitted, yes, then we talked about it.

Q Okay. All right. And do you agree with the second sentence that I highlighted, that:

"If you" -- an employee -- "have a problem, a complaint, a suggestion, or an observation, your manager is committed to listening and responding to you"?

A Yes.

Q And would you say in general that that is what happened at Reema?

A Yes. Yes. A lot of times we were busy, fast-paced, and nothing else:

"Hey, go talk to Ms. Price. Let her -- let her -- let her talk to you right now. Maybe she would give you some insight on what you need to do.

Q Um-hum.

A Yeah, but a lot of times, also, they wanted to be hand-held. You know, if -- once again:

"You want to put your personal life in front of -- in front of the job. You know, because you got a bill or you got a garnishment came in the door, ain't nothing I can do about that."

Q Okay. Let me show you the next document I'm going to mark here. The next document I am marking here -- this will be Exhibit 6, I believe.

(Exhibit No. Moppins 6, Document entitled "Sexual Harassment Policy Manual for Reema Consulting Services, Inc.," Bates Nos. REEMA 59 through 114, Document is marked by the reporter for identification.)

MR. KOPSIDAS: I'll go ahead and share it. So this document -- for the record Exhibit 6 is a document entitled "Sexual" -- "Sexual Harassment Policy Manual for Reema Consulting Services, Inc.," and it bears Bates Nos. REEMA 59 through 114.

Q Mr. Moppins, do you recall Reema -- RCSI having a sexual harassment policy manual?

A Yes. I also remember asking Cathy Price to give -- give us guidance and instructions on that issue itself.

Q When was that?

A Several -- several -- several -- on several occasions including one when Ms. -- one -- I didn't tell her what happened, but I asked for her to give instruction when -- when Ms. Parker came to me and said -- telling me, basically:

"Hey, I will be your boot for your kind -- for the kind of money you make."

Q So you recall requesting guidance from Ms. Cathy Price on sexual harassment policy multiple times?

A Not guidance, but asking her to give out -- you know, talk to the staff about sexual

harassment.

Q And do you recall her doing that?

A Yes.

Q Other than Ms. Parker, do you recall any sexual harassment complaints getting filed while you were working at Reema?

MR. WALSH: Objection.

A No, just complaints about inappropriate dress.

Q Inappropriate dress among who?

A The staff.

Q Men or women or both?

A Both.

Q And what do you mean by "inappropriate dress"?

A I remember -- one occasion sticks out where I had to go get Ms. Price to talk to the young lady who was -- I forget what her name was -- she was there on a temporary basis.

And she -- I was in the back talking to one of the supervisors about something. And I turned around, and she was bending over into picking some items up. And her derriere was 75 percent exposed because she didn't have the proper pants on.

Page 70

Larry Moppins

So I went and got Ms. Price. Ms. Price observed it, and she corrected -- sent her home to be -- have her clothes changed.

Q Is this policy something you were given when you started working at Reema?

MR. WALSH: Objection.

A If it was, it was given to me at the very beginning, back in twenty -- twenty -- February -- January or February of 2013.

Q Do you specifically recall reading it?

A No, I don't.

Q Was this given to all employees when they started?

A I believe it was.

MR. WALSH: Objection.

A I'm sorry. I believe it was.

Q How often would you say that sexual harassment or harassment training was given to employees?

MR. WALSH: Objection.

A I would say at least once a year.

Q Was that required under the government contract?

A It was re -- I believe it came -- I

Page 71

Larry Moppins

can't remember -- I think it is, but also we just had it because of the number of -- the number of personnel we had in there, the cast of characters we had, and the -- and the -- and that, yes.

Q Would you say that there were a fair number of sexual harassment incidents at Reema?

MR. WALSH: Objection.

A Sexual harassment incidents, I only know of one. I only know of one that I can remember off -- offhand.

Q Let me rephrase that.

Would you say that it's accurate -- strike that.

Is it accurate to say that there was a fair number of times that violations of this sexual harassment policy happened at Reema?

MR. WALSH: Objection.

A I'm not sure what you are getting -- I'm not sure what you are asking.

Q Well, was it something that was very rare, or did it happen?

MR. WALSH: Objection.

A Sexual harassment?

Q Any violations of this policy, yes.

Page 72

Larry Moppins

MR. WALSH: Objection.

A The only one I know of was with Ms. Parker and Mr. Jennings and Ms. Parker and myself.

Q Well, but you mentioned several incidents regarding dress code.

A Well, dress code -- dress code violations, yes, that happened -- yeah, some people sitting -- be sitting down on the floor, you know, summertime -- they have shorts on. Shorts were too short. They're sitting down with their legs open.

I tell 'em:

"Hey, close your legs. Close -- go change clothes. Come back. Go -- hey, go change -- change clothes. Come on back to work."

It happened. Some people don't know -- don't -- don't know what the proper dress is. Because you wear it at home don't mean you can wear it up in here. We try to catch 'em at the front door, but, if you don't catch 'em, they slide in. And that's not -- not -- that's not appropriate.

Q What about incidents of just people making inappropriate sexual comments? Did you know

Page 73

Larry Moppins

that to happen at Reema?

MR. WALSH: Objection.

A Not to my knowledge. No.

Q What about inappropriate sexual gestures? Do you know that to have happened at Reema?

MR. WALSH: Objection.

A Not to my knowledge. Anything that -- anytime -- all I remember is that anytime we had anything that was inappropriate happen, talk to Mr. Vora about it and he -- and we would -- the issue would be talked to the staff in general.

And Cathy Price would have a meeting with everybody, and that would be the end of that.

Q If there were incidents like inappropriate sexual comments or gestures or anything like that, would you expect that those would be brought to you?

MR. WALSH: Objection.

A No, because most of the staff knew each other personally. They knew each other on a personal basis one-on-one; and they tended to deal with stuff between -- between themselves, like that, because if I -- everyone knew if I knew about it,

Page 74

Larry Moppins

Cathy Price was going to know about it.

Q    I see.  So rather than get you and HR involved, employees would just tend to deal with it themselves?

A    Yeah, because there was an incident one time where the -- DaMarcus Pickett told me about an incident that supposedly has happened off-site where -- what's that girl's name -- I can't remember the name.

Romaine Thompson said that she was sexually harassed off-site, but he didn't want me to do anything about it:

"I just want to let you know, just in case that problem comes up."

I said, "Oh, okay."

And I walked right out of his office -- right out of my office, right into Cathy Price's office.  And she dealt with it.

Q    How would she deal with it?  Do you know?

A    I'm not sure because it was not with another employee in the warehouse.  It was another -- it was a contract employee with the Department of State.

Page 75

Larry Moppins

Q    And what happened to Ms. Romaine Thompson?

A    What happened to her?

Q    Yes.

A    Nothing.  She was satisfied -- whatever -- whatever hap -- what transpired between her and Ms. Price, she was satisfied with it; and she continued her employment until she left.

Q    Do you remember who was accused of sexually harassing her?

A    No, I don't know offhand.  It was -- it was all off -- I wasn't even there.  It was an off-site thing.  We had -- sometimes we had to send employees down to -- I forgot -- what is the place called -- down -- I forget the name of the place.  It's 50 miles east of Fredericksburg at a training site, and it happened down there.

Q    Why -- why do you think that employees were reluctant to let you and Ms. Price know about sexual harassment incidents?

MR. WALSH:  Objection.

A    Because -- I mean, you want me to answer?

Q    Yes, you can answer.

Page 76

Larry Moppins

MR. WALSH:  Yes.

A    Because the issue was going to be dealt with.

Q    What do you mean by that?

A    If it was -- it was going to be investigated, and there was -- whoever was found to be at fault, they were going to get disciplinary action.  It was going to wind up at Mr. Vora's desk and everybody -- everybody knew it.

Q    Do you recall a -- do you recall a rumor that circulated around the warehouse about Ms. Parker and Mr. Pickett having an affair?

MR. WALSH:  Objection.

A    I don't recall a rumor.  I recall -- I recall that I asked Mr. Pickett directly about it.

Q    Um-hum.

A    It wasn't a rumor.  It was my observation.  His office was directly next door to mines.  There was only some dry sheet wall between the two of us, and I noticed on a daily basis that she was going to his office.

She was spending six hours or better a day in his office, laughing, joking, not doing her work.  You know, he even told me at one point his

Page 77

Larry Moppins

wife was mad at him because he -- he went from being 375 pounds down to 175 by another woman.

Q    Do you know that woman for a fact to have been Ms. Parker?

A    No, I don't know for a fact, no.  I asked him about it.

Q    And what did he say?

A    He denied it.  But I tell you after I -- after I addressed him with it, he stopped -- she stopped coming in the office, stopped spending -- stopped spending most of her day in there.

Q    Who else was aware of this rumor of them having a relationship?

A    Once again, it wasn't -- it wasn't a rumor in my opinion.  It was my -- it was my observation.  I seen it, and I asked -- I asked him about it.  That was it.

Q    All right.  Let me let me ask it a little differently.

Did anybody else know of it?

MR. WALSH:  Objection.

A    I can't -- I can't answer that.  I don't know.

Page 78

Larry Moppins

Q Okay. So you never heard anybody else discussing it other than you and Mr. Pickett?

A Correct. And she found out about it from him because he went -- he went back and told her.

Q Told her?

A That I asked him was he having an affair.

Q Did you discuss it with anybody besides Mr. Pickett?

A Just Mr. Pickett.

Q Did you ever mention it to anybody outside of work?

A Cathy Price.

Q When did you mention it to Cathy Price?

A I don't know. At that day or the next day, I don't remember.

Q And what was the purpose of you telling Ms. Price?

A Because it was the day that -- I told her the day that Van -- Ms. Parker came in my office and was belligerent. That's when I told Cathy Price about it.

Page 79

Larry Moppins

Q I see. When -- when -- when Ms. Parker brought it to you --

A Yes.

Q -- then you talked to Ms. Price?

A Yes.

Q Did you ever spend time outside of work with Mr. Pickett?

A Mr. Pickett, once, I believe, we -- I hired his wife, who is a -- who has a mobile massage therapy business, to come down to my wife -- my house in Fredericksburg to do massages for my wife on her birthday, for her birthday. It was once or twice. It could have been -- could have been twice. That was it.

Q And do you know if -- strike that.

Do you know if Mr. Pickett's wife was aware?

A Aware of what?

Q Aware of the -- of you having a discussion with him about having an affair.

A All I know is what he told me himself.

Q So there came a time that Ms. Parker came to you and was upset -- I think you said -- about you having that discussion with Mr. Pickett,

Page 80

Larry Moppins

correct?

A Not upset. I -- like I said, belligerent.

Q Belligerent, okay.

And as part of that conversation, she told you that others in the warehouse were talking about it, correct?

A That part I -- I don't remember that part. No.

Q Okay. Do you recall doing anything to make sure that nobody else knew or was talking about it?

A Right, I had a closed-door meeting with DaMarcus Pickett, and we -- and we discussed it. That was it.

There was no need for it to go any further than that. I asked him a direct -- I asked him a direct question. He denied it. He went back to the warehouse. He -- that day or the next day, whatever, he told her -- he presumed to tell her about it.

So as far as I was concerned, I did everything I could do. I talked to him behind closed doors. I made sure there was nobody in

Page 81

Larry Moppins

the -- in the adjoining office, which was his office. And we talked about it.

Now, I never repeated a word -- never said a word about it again until she came up in my office huffing and puffing.

Q Do you recall her complaining to you that Mr. Donte Jennings was telling people in the warehouse that she was having an affair with Mr. Pickett?

A She complained about Donte on the regular -- because she had a -- basically had a -- directions -- I don't know if it was myself or Cathy Price or whatever -- to stay away from Donte.

She just stayed up under -- she constantly stayed up under him. She couldn't -- couldn't leave him alone, couldn't stay away from him.

And it was just issues everyday -- every -- like every Monday or Tuesday, there was something between the two of them. She just -- she just -- she just couldn't leave the man alone for whatever reason.

And he even -- Donte's manager wrote a -- wrote a letter, I believe, if I remember

Larry Moppins

right -- wrote a letter saying that, you know, he even told her:

"Stay out of -- stay out of my section," which was a separate part of the warehouse.

She came over there aggravating the man.

Q Did you ever investigate whether Mr. Jennings was, in fact, telling people that Ms. Parker was having an affair with Mr. Pickett?

A No, because that would have been trying -- that would have been -- that would have been spreading the word myself, spreading the gossip myself.

Q Well, I am not saying spreading it. I am just saying:

Did you ever look into the matter?

A With whom?

Q Investigate it.

A No -- I -- Cathy Price, that was it. That was -- as far as I know Cathy Price handled it from there.

Q Do you know if she ever investigated Ms. Parker's concern that Mr. Jennings was telling

Larry Moppins

people in the warehouse that she was having an affair with Mr. Pickett?

A Yeah, there was a meeting between -- between the three of us or four, I think, annual -- if I remember right -- maybe -- I think Angela Wallace was there -- leaving it that -- to have another female in the room with her to say:

"Hey, nothing, this -- where is this coming from?"

Nobody knew about it but her. Nobody knew about it but her. She started her own rumor.

Q Why do you believe she started her own rumor?

A She was just that type of person at the end. Evangeline -- if you want clarification, Evangeline was trying to move -- Tambeni's daughter, we call her Sheba -- brought her in there. At the point -- it got to the point where she was trying to -- she was trying to move up and move up and move up by -- she was stabbing Tambeni in the back. So she was subject to do anything.

Q Can you remember any examples of her doing that?

A Anything she thought she could pin

Larry Moppins

on -- on Tambeni, she would bring it to my -- she would bring it to my attention -- she would go around her boss and bring it straight to me.

That's why I knew. She came -- it was done regular. That's why I knew something -- something wasn't right. I would ask Tambeni about it.

She's like:

"No, Larry, I didn't do that."

Tambeni had her own -- had her own issues, but she was -- she was reliable -- she was reliable to do certain things. You knew exactly what she was going to do when she was --

Q How do you spell her name?

A Tambeni?

Q Yes.

A T-a-m-b-e-n-i, I believe. Last name, D-a-u-g-h-t-e-r-t-y [sic], Daugherty.

Q So there were times where Ms. Parker came and complained to you about Ms. Tambeni?

A About her work, yes, about her work -- her work and her -- her -- her -- her attire that she had on for the day.

Her attitude was -- she had a wig on.

Larry Moppins

She had a wig on sideways. That's how petty she was.

Q Do you recall an incident where -- excuse me -- do you recall an incident where Mr. Donte Jennings flashed Ms. Parker and Ms. Romaine Thompson?

A No, no, I don't know. That I don't know about.

Q Do you know if Mr. -- do you ever -- do you ever recall Mr. Donte Jennings getting any written warnings?

A Yes.

Q How many?

A I have no idea -- work -- work-related, whatever he -- something about -- something wasn't done right in the back there, in the SPEAR area of the warehouse.

Q Do you recall him getting more than, say, three write-ups?

A No. It was one or two.

Q Was Mr. Jennings ever terminated because of those warnings?

A I think he quit if I remember right. I don't -- I don't remember if he quit or if he

Page 86

Larry Moppins

terminated. I don't remember. Sorry, I don't remember.

Q      Do you recall anybody ever asking Mr. Jennings whether he was telling people in the warehouse that Ms. Parker was having an affair with Mr. Pickett?

A      He was constantly telling Cathy Price. I know that. I remember that part. And he was telling his super -- his manager, Carlos Carter.

Q      Okay.

A      Yeah, he was telling them constantly about it. Someone -- I think Cathy Price gave her instructions to stay away from him:

"Just stay away from him in the warehouse."

But she just couldn't do it.

Q      Do you recall a manager's meeting that you held -- I believe sometimes it's called an "all-hands meeting" -- on Thursday, April 21, 2016?

A      Date and time, no. And those are two different things. A managers meeting is just that, just the managers. All-hands is -- is everyone.

Q      Got it. Okay. Let me -- let me show you a document just to try to clarify that.

Page 87

Larry Moppins

Mr. Moppins, I am showing you a document --

A      Enlarge, please. Enlarge, please.

Q      I will. One second, let me just state on the record what it is.

(Exhibit No. Moppins 7, Reema Consulting Services, Inc., Sexual and Other Unlawful Harassment Investigation Questionnaire, Interview with Evangeline Parker, Interview date 4/25/16, Bates Nos. REEMA 1 to 5, Document is marked by the reporter for identification.)

Q      It's being marked as Exhibit 7, a document bearing Bates Nos. REEMA 1 to REEMA 5.

A      I don't see -- how many documents is it? Did you say five?

Q      It's a five-page document.

A      Okay. Okay.

Q      So are you familiar with this type of document, a "RCSI Sexual Or Other Unlawful Investigation Questionnaire"?

A      No, I've never seen that before.

Q      You were never involved in filling one of these out or signing one?

Page 88

Larry Moppins

A      Not to the -- my best -- no, the best I can remember, no -- my recollection, no.

Q      Do you recall one of these ever being filed against you?

A      Let me read it.

Sorry, oh, I see the part you've got highlighted please.

Q      Sorry. I don't have anything highlighted. Which part was that?

A      There was some verbiage, the paragraph below this -- there, right there, there you go.

That -- I remember Ms. Price talking to me about that, and that's inaccurate. That was -- all-hands meeting was held -- I don't know the date. I don't know if the day is correct -- the date is correct or not.

And she refused to come into the meeting because she had to make a phone call that she said was an emergency.

She was at work. And the place of duty was -- was at that -- was at that meeting. So we had to get something -- there was something we had to get -- time-sensitive -- we had -- I forget exactly what it was, but something we had to get

Page 89

Larry Moppins

done on a timely manner. We didn't have time to wait for her.

We put everybody -- I put everybody in the conference room, told them what we had to do, how we had to do it, and we did it.

And that's -- that's according to your paragraph one there. You want me to read the rest of it?

Q      Well, let's just stick on this for a second.

Do you recall her trying to get into the meeting at all?

A      The meeting was just about over at that point, sir.

MR. WALSH: I'm sorry. Could we just clarify who "her" is.

Q      Yes. All right. Let me -- let me ask that.

A      Evangeline Parker.

Q      Let me ask it -- let me ask it better.

Do you recall during this meeting there was a point where Ms. Parker tried to get in?

A      Yeah. It was the -- the meeting was less than five minutes. And the last 20 -- 20,

Page 90

Larry Moppins

30 seconds, she tried to come into the meeting. The door was closed.

Q    Do you recall Mr. Pickett also being late for this meeting?

A    No, sir. Mr. Pickett was -- was front and center.

Q    Why do you remember this meeting so vividly?

A    That meeting, I remember what she did because she was outside. You could see her from the -- it was in what's -- what was lastly called the transportation office.

You could see her through the -- while I was talking, I was facing the front of the building. You could see her outside on the telephone walking back and forth. That's why I remember.

Q    Do you know what the nature was of the emergency phone call she had?

A    I have -- I have no idea, sir.

Q    Do you recall seeing this document before today?

A    No, not -- not that I can remember. No. I may have. I don't remember.

Page 91

Larry Moppins

Q    So I suppose that -- well, strike that.

Do you recall Ms. Cathy Price doing an investigation?

A    Yes -- about what?

Q    Well, as part of writing up this document.

A    That document is jumping around so much.

She did an investigation about -- yes, did I talk to DaMarcus about Ms. Parker, him and Ms. Parker? Yes, she did an investigation about that. Yes.

Did she talk to Ms. Parker about -- did -- she did an investigation about Ms. Parker and Mr. -- Mr. Jennings? Yes, she did an investigation about both of those.

Q    Okay.

A    Several times, that was several times on that one.

Q    Okay. I have scrolled down here to paragraph three, and you see the highlighted part where it says:

"Ms. Parker feels that Mr. Jennings is

Page 92

Larry Moppins

the source of the rumor that got started."

Do you see that?

A    Yeah, I see it.

Q    And then she states:

"Ms. Parker feels that the male employees do not respect or like her and that they are trying to get her removed or fired."

Do you see that part?

A    I see it, yes.

Q    Okay. You knew that -- did you know that Ms. Parker had these concerns?

A    I knew -- I knew the issues between her and Donte -- yes -- Mr. Jennings, yes.

Q    And did you ever do any investigation on your own regarding those -- those matters?

A    Yes.

Q    And what did you do?

A    I talked to a couple of the workers in the back, a couple of the managers in the back; and they said no, basically, she was harassing him. She wouldn't leave him alone.

Q    Yeah. Who are these workers that you talked to?

A    Carlos Carter, he was the manager for

Page 93

Larry Moppins

the SPEAR side. What is his name? I can see it in my head, but I can't think of his name.

Q    Okay. Was it -- was it Kenton Birgans?

A    Yes, there you go, yes. Yes.

Q    Okay. Anybody else?

A    That was it. And Cathy Price.

Q    Okay. And then after you talked to Mr. Carter and Mr. Birgans, what did you tell Ms. Price?

A    That -- what they had said, basically, no, she was harassing him. She wouldn't leave him alone. You know, the instructions were -- okay -- if you walk in the warehouse, before the left-hand corner, before the left back hand corner of the warehouse, basically, 10,000 square feet, was a separate warehouse that was designated for the SPEAR section. That's where Donte, Carlos, all of them worked back there.

If you walked into the rear -- you first walked into the warehouse, the large part was where Ms. Parker worked at. Ms. Parker had instructions to stay away from the back end over there. She wouldn't do that.

Page 94

Larry Moppins

To allow him to come in and to travel his distance to the back -- and I have reports she wouldn't allow him to do that. As soon as she seen him, she would start her agitating. She had to get her point in on a regular -- I was told -- she had to get her point in.

And I ask her:

"Why you just can't heave him alone?"

You know, "I am going to get the bottom of this."

And it get to the point where I think -- what is his name -- Manley Ferguson, she even asked him one day, talking about:

"You want to know who the hell -- who the hell I'm F'ing, ask me -- ask me and I'll tell you" -- something, something, something like that.

Manley Ferguson and Ragu -- forget what his name is -- talking about --

Q    So when you say she wanted to get to the bottom of this, by that you mean the -- the rumor that she was having an affair with Mr. Pickett?

A    No, no, no. It was totally -- it was totally -- it was totally separate. It was stuff

Page 95

Larry Moppins

between her and Donte.

Q    Yes. So what was she trying to get to the bottom of?

A    Get to the bottom of saying who she's -- who she is sleeping with.

Q    Did you ever ask Mr. Carlos Carter or Mr. Kenton Birgans if anybody had ever talked to them about Ms. Parker having an affair with Mr. Pickett?

A    No, I didn't. No.

Q    Did Cathy Price?

A    I don't know.

Q    And you never talked to Mr. Jennings, Mr. Donte Jennings, about whether he was telling people that Ms. Parker was having an affair with Mr. Pickett, right?

A    That's correct.

Q    And -- and you don't know if Ms. Cathy Price did either, correct?

A    I don't know. I can't say for sure if she did or not.

Well, she -- I mean, she had a conversation with her about it because she -- she came in the office upset about it. So she had to

Page 96

Larry Moppins

have a conversation with her about it, yes.

Q    You mean Ms. Parker came into Ms. Price's office and --

A    My off -- no -- no, no, sir, my office.

Q    Oh, she -- Ms. Parker came into your office and had a conversation with you about it?

A    Not a conversation, a yelling match, one-sided yelling match about it.

Q    Is it accurate to say that, when she came into your office, Ms. Parker was angry about this rumor?

MR. WALSH: Objection.

A    She was -- you could tell she was agitated about something; but I was doing some paperwork at the time -- I was doing something on the computer that I had to get done for the -- for the client.

And I told her, "Give me -- give me a few minutes. I have got to finish this paperwork."

And like I stated earlier, the job comes first.

So I say:

"Give me 15, 30 minutes. Let me

Page 97

Larry Moppins

finish this paperwork, and I'll talk to you."

She jumped up, huffed, left, came back. She was still agitated.

And I -- she said "okay"; so I said, "Hold on a minute."

I called Angela Wallace in there to be -- to witness this conversation. And when I got -- she just -- she lost it from there.

Q    Ms. Parker did?

A    Yes, sir.

Q    What do you mean by "lost it"?

A    Started ranting and raving about who she is sleeping with is nobody's business, who she is doing this with. I am like -- I -- she was -- she was -- she got sort of disrespectful.

Angela asked her to step outside. Angela Wallace asked her to step outside and had to ask her three or -- two or three times to step outside.

Q    And then did you and Ms. Price have a conversation about it while she was out of the room?

A    No. I don't believe Cathy was even there at that -- at that -- that time.

Q    Oh, it just you and her when you asked

Page 98

Larry Moppins

her to leave?

A    Me, her, and Angela Wallace, the three of us.

Q    Oh, I'm sorry.  I got the names confused.  Let me try this again.

Did you and Ms. Wallace have a conversation about it after Ms. Parker left the room?

A    No, Ms. Wallace watched outside, kind of watched out -- went outside with her, I think, if I remember right.

Q    Do you recall Ms. Wallace doing any investigation of whether there was, in fact, a rumor circulating?

A    I have no idea.

Q    Let's go back to the other break room incident that I mentioned a while ago.  If you look here at the exhibit in paragraph four, why don't you take a -- take a moment to read that.

A    Okay.  I read it.

Q    So this refers to the break room flashing incident alleged against Mr. Donte Jennings.

You have no recollection of this?

Page 99

Larry Moppins

A    None -- I would say that I am pretty sure that, if that occurred, Romaine Thompson would have said something to me about it.

Q    Why is that?

A    Romaine ain't one to -- change -- change -- ain't one to mince words.

Q    Do you know if her or Ms. Parker ever reported this to Ms. Price?

A    I have no idea.

Q    Do you recall anybody ever asking Mr. Jennings about this?

A    No, I don't.

Q    Okay.  And just to be clear, you don't recall seeing this document ever before today, right?

I'll Zoom out a little so you can see more of it.

A    I just can't -- show -- I -- I -- I don't -- I don't remember.  I don't know.  I see a lot of paperwork.  I don't remember seeing -- she asked me about it -- I know she asked me about it.  Yes.  Cathy -- she being Cathy Price -- yes.

Q    When you say she asked you about "it," you mean about Ms. Parker's concerns?

Page 100

Larry Moppins

A    Yes.

Q    Okay.  But not about this document?

A    That I don't remember.

Q    Okay.  I'm going to scroll through and see if I have got anything else I want to ask you about.

And you don't know who did the investigation for this report?

A    Cathy Price.

Q    Okay.  How do you know that?

A    Because she mentioned it to me, she talked to me about it -- the first part, not the -- that second part.  But I don't know about -- the break room issue, no, I don't remember that issue.

Q    I see.  I see.  So she talked to you about --

A    Paragraph one.

Q    -- paragraph one.

A    Yeah.  No, no, no, no, nope.  Scroll down -- no, not that.  Nope.

Q    Keep going?

A    The part where we hit -- where me and Ms. -- Ms. Jenn -- what's her name -- Parker was upset because I had talked to DaMarcus.  She talked

Page 101

Larry Moppins

to me about that and talked to me about the part where Ms. Parker was harassing Mister -- Mr. Jennings.

Q    Do you know if that part where you say Ms. Parker was harassing Mr. Jennings, do you know if that came before or after this investigation was done?

A    I don't remember.

Q    Now, the meeting where Ms. Parker came into your office, at first you were busy, and you asked her to come back, correct?

A    That's correct.

Q    And then when she came back, you went and got Ms. Angela Wallace to also participate, correct?

A    I call for Angela Wallace to come over on the telephone -- in the conference.

Q    And she came in person, Ms. Wallace, right?

A    That's correct.

Q    All right.  And it was just the three of you in that meeting, right?

A    Yes.

Q    And how long would you say it lasted?

Larry Moppins

A Seven minutes tops.
Q Why so short?
A Because Ms. -- because Ms. Parker did -- got extremely agitated. She couldn't compose herself, and Ms. Wallace asked her to leave out.
Q Was there ever a follow-up meeting to finish the conversation?
A I think she brought her back. I think -- I'm not sure -- when I say I'm not sure -- I think she brought her back in there again, and it just didn't go nowhere. It just wasn't -- she couldn't come -- she couldn't compose herself enough to have a constructive conversation.
Q Was there ever -- did you ever schedule then a follow-up meeting on a -- on another day later?
A No, because she went to Ms. Price about it. And then the last conversation I remember having about it was talking to Cathy Price about it.
Q And that was right before Ms. Parker was terminated?
A I think so.
Q Okay. Do you know if, as part of RCSI's policy, if anybody looks at these sexual or

Larry Moppins

other harassment investigation questionnaires besides Ms. Price?
A Probably just Mr. Vora and Reema.
Q Do you know for a fact that that happens, or are you just assuming?
A I am assuming assume. No, Cathy Price was pretty -- she's pretty rigid about that kind of stuff. No, she's not going to let -- let you see stuff.
Q Why is that?
A Because that's the way she is. She takes her job very serious -- from what I remember she takes her very -- job very serious, extremely serious -- extremely serious.
Q Right. What was Mr. Jennings's job at Reema?
A Warehouse specialist. I believe warehouse specialist or ship -- or shipping and receiving clerk, one of the two.
Q Did he manage any people in that position?
A No, those are the lowest positions in the warehouse.
Q Was there ever a time that -- well, do

Larry Moppins

you recall who he reported to?
A In SPEAR, he reported to Carlos Carter.
Q Okay. And was that the case until the end of the contract?
A That was the case for as long as he was employed there. I don't know -- can't remember when he left there; so, as long as he was there, he worked for -- he worked for SPEAR.
Q Did there ever come a time where he and Ms. Parker worked together?
A Initially, I believe -- I believe he was -- he started off in the receiving section, I -- I think; so they would have worked together there at the very beginning -- receiving section of the ATHI side of the contract.
Q Was he working -- was Mr. Jennings working at Reema before Ms. Parker was hired?
A I don't remember.
Q You don't remember who got hired first?
A No.
Q And Mr. Jennings was never promoted?
A I don't remember. If he -- if he

Larry Moppins

started on our A team side, he probably started off as a -- as a shipping and receiving clerk; and then the SPEAR side of the contract opened up, and he would have moved to -- he would have got elevated to a warehouse specialist.
Q But he never managed anybody, right?
A No, no, no.
Q Let me ask you a question:
Going back to that meeting for a minute that we were talking about, the one where Ms. Parker was on the phone, do you recall the meeting we are talking about, the all-hands meeting?
A Yes.
Q Okay. What was the subject of that meeting?
A I can't remember, something we needed to get done for the client. That's all I can remember.
Q So it was something sort of mission-critical related?
A Yes.
Q Sorry. Bear with me for a minute. I am just sort of getting organized here.
Okay. I'm going to show you another

Page 106

Larry Moppins

exhibit now, Mr. Moppins. This is a -- this will be Exhibit 8, I believe.

(Exhibit No. Moppins 8, 4/25/16 E-Mail from Cathy Price to Evangeline Parker and others; Subject: Recent Events, Bates No. REEMA 176, Document is marked by the reporter for identification.)

Q     It's a one-page document bearing Bates No. REEMA 000176.

A     The boat --

Q     Let me just state for the record, Mr. Moppins, this appears to be an E-Mail --

A     Sir, sir, I see a boat with two kids on the dock.

Q     Oh, sorry. I am sharing the wrong screen.

MR. WALSH: It looked lovely for the record.

MR. KOPSIDAS: For the record that's my daughter and her cousin. Yes.

Q     Let's see. Did I do it right this time?

A     You have got an E-Mail.

Q     Yes. So this is an E-Mail. It looks

Page 107

Larry Moppins

like it was sent from Cathy Price to several individuals, including you, on Monday April 25, 2016.

Do you see that?

A     Yes.

Q     Okay. And this was your work E-Mail at the time you worked at Reema, correct?

A     Correct.

Q     All right. And you will see that what she -- what Ms. Price is instructing you and the other recipients to do is to -- she is saying in the first line there:

"I am advising all parties on this E-Mail to cease having or entertaining this subject outside of HR."

Do you see that?

A     Yes, what was the subject again? What is the subject line?

Q     Sorry.

A     "Recent events."

Q     Go ahead and take a look at the whole thing, and then I'll ask you a question.

A     I can't see the right side of it because the screen is cut off. Can you lower it

Page 108

Larry Moppins

down a bit -- a little more -- no, no, no, I mean the -- the left from right -- I can't see the right-hand side -- like sexual harass, I see -- h-a-r-a-s-s, that's all I see.

MR. WALSH: Make the size smaller. I think it will work.

A     There you go. There you go. I will use my bifocals.

Okay.

Q     All right. So do you recall receiving this E-Mail?

A     No.

Q     All right. Now, you see in the first line there, Ms. Price writes that:

"Due to recent events that have brought HR's attention in regards to workplace gossip and rumors."

Do you see that?

A     Yes.

Q     And you understand that to be the -- the rumor that Ms. Parker was complaining about, about her having an affair with Mr. Pickett, right?

A     No, it's not.

Q     Okay. What do you understand that

Page 109

Larry Moppins

to -- that "workplace gossip and rumors," what do you refer -- what do you understand that to refer to?

A     I refer to this as being between he and her and Donte.

Q     Were there --

A     I don't see no mention about Mr. Pickett or Mr. Pickett -- my talking to Mr. Pickett about anything. I don't see anything about that.

I see her talking about gossip, which Van had plenty of -- she had plenty of problems in there. So I don't see that in there.

Q     Well, but what do you understand the gossip and rumors to have been? Do you know this subject that she was talking about?

A     I assume at this point what the subject is talking about, Van and Donte.

Q     Just to be clear, there was no rumor about Ms. Parker and Mr. Jennings, correct?

A     Yes, there were.

Q     What was that rumor?

A     That she was trying to entice him to have sex with her.

Page 110

Larry Moppins

Q    Mr. Jennings?

A    Yes, and he refused her.

Q    Where did you hear that?

A    Warehouse.

Q    Who in the warehouse told you that?

A    I can't tell you who it was.

Q    More than one person?

A    Probably about two or three.

Q    So two or three men in the warehouse told you --

A    Men or women, men or women, I can't remember when it -- what it was.

Q    Sorry.  Say that again.

A    Men or women.  I can't remember what their sexual orientation was.

Q    So two or three people in the warehouse told you that Ms. Parker --

A    Was --

Q    -- was trying to have an affair with Mr. Jennings; is that right?

MR. WALSH:  Objection.

A    Yes.

Q    When was that?  Do you recall?

A    No, that was -- I don't -- I don't

Page 111

Larry Moppins

even remember.  No.  Time frame, I can't get it, no.

Q    Okay.  And were others aware of this besides --

A    I have no idea.

Q    Now, you see, in the first line here, Ms. Price is telling the recipients to this E-Mail:

"I am advising all parties on this E-Mail to cease having or entertaining this subject outside of human resources."

Do you see that?

A    Yes.

Q    So she was basically telling the people who were getting this E-Mail to stop talking about this rumor, correct?

MR. WALSH:  Objection.

A    I would say she is telling everybody to stop talking about the rumor, and she is just -- and me being the cc, cc is just letting me know that she talked to everybody about it.

Q    Right.

A    It's not directed -- it's not directed at me.  It's directed at those people in that "to" line, to let them know to stop talking about it.

Q    Right.  And just for the record, so we

Page 112

Larry Moppins

are clear, the people she was directing this to on the "to" line of the E-Mail are DaMarcus Pickett, Evangeline Parker, and Angela Wallace, right?

A    That's correct.

Q    Okay.  And Mr. Jennings was not sent this E-Mail according to this, right?

A    No.  It looks like -- looked like she was addressing it to members of management.

Q    Right.

Now, you will see the second sentence that I have highlighted here, Ms. Price writes:

"Gossip is an ugly thing that can cause defamation of one's character and can create a hostile work environment."

Do you see that?

A    I see it.

Q    Do you agree with that?

MR. WALSH:  Objection.

A    Sure.  Yes.

Q    And then, lastly, Ms. Price writes:

"... there will be no discussion of this issue outside of HR."

Do you see that?

A    Yes.

Page 113

Larry Moppins

Q    And do you understand that that is what happened, in fact?

MR. WALSH:  Objection.

A    No, I don't.

Q    Why do you say that?

A    Because I don't remember this conversation.

Q    So you just don't recall one way or the other?

A    No.  You have to understand I got 200 or 300 E-Mails a day, so this would have been -- just been something I would have threw aside.  I probably would have scanned over it, and that would -- that would have been it and move on to the next thing.

My goal was the mission, get the job done.  This here would have been something -- well, I probably would have seen it, scanned it, and filed it away in the back of my mind.  That's it.

Q    All right.  All right.  Let's do one more document; then we will take a break.

The next exhibit, Exhibit 9, is a document bearing Bates Nos. REEMA 194 through 195.

(Exhibit No. Moppins 9, 4/27/16 E-Mail

Page 114

Larry Moppins

chain, top E-Mail from Larry Moppins, Sr., to Cathy Price; Subject: Request, Bates No REEMA 194 to 195, Document is marked by the reporter for identification.)

Q        So this, Mr. Moppins, appears to be an E-Mail that you sent to Ms. Cathy Price on April 27, 2016, entitled, "Subject regarding request."

Do you recall -- excuse me. Do you recall sending this E-Mail?

A        Yes.

Q        Why did you send it?

A        Because Cathy Price had asked me to send -- to give my -- I forget exactly why I sent it. Some -- I forget exactly why. That's my E-Mail. Yes -- because I wanted -- I wanted to make sure that she got my -- she understood why, why I did what I did.

Q        Right. Okay. Now, do you see -- so you drafted this yourself, I assume, right?

A        If I wrote it, I -- I drafted it.

Q        Okay. Do you see the part where you wrote -- I have it highlighted here. You wrote:

"We did not speak on this matter again until the week of April 18th through April 22nd when

Page 115

Larry Moppins

Mr. Ferguson informed me and Mr. Pickett of the rumor within the warehouse of a personal relationship between Ms. Parker and/or Mr. Pickett, or myself."

Do you see that?

A        Yes. Yes.

Q        Okay. Who is Mr. Ferguson?

A        He is -- at that time he would -- let's see. I don't remember. Manley Ferguson would have been a -- I'm not sure -- warehouse specialist, maybe a material coordinator at the time. I'm not sure.

Q        Did he report to Ms. Parker?

A        If he was in the -- at some point, he probably did. Yes. I would think so. Yes.

Q        Okay. So apparently during the week of April 18th through April 22nd -- I assume that's in 2016 -- Mr. Ferguson told you, informed you and Mr. Pickett of the rumor within the warehouse, correct?

A        That's what it says.

Q        Okay. And what did you do when he told you that?

A        I cannot remember.

Page 116

Larry Moppins

Q        You don't remember doing any investigation?

A        I don't remember.

Q        You don't remember if you told Ms. Price at that time?

A        I don't remember. Evidently, I told her because I composed this letter. I composed this E-Mail.

Q        Right.

A        What specifically I did, I don't know.

Q        Okay. So you see at the bottom here of the E-Mail that I have highlighted, you say you -- you say:

"I attempted to try and explain to Ms. Parker that, as I am Mr. Pickett's immediate supervisor and that I had reason for concern, I asked Mr. Pickett if he was having a relationship with her."

Do you see that?

A        I see it. Yes.

Q        Right. And then you go on to state:

"At which point the conversation became completely disrupted by Ms. Parker's agitated state."

Page 117

Larry Moppins

Right?

A        Correct.

Q        Right. So you told her that you had that conversation with Mr. Pickett and she was agitated?

A        No, no, I did not tell her anything, sir. She came and told me about that Mr. Pickett had told her about it.

Q        Yeah.

A        I didn't go to her and tell her nothing. She came back to me and told me, and I verified, yes, I did have the conversation with -- no need to lie about it.

Q        Okay. And then that's the point you say she became --

A        -- belligerent and had to be asked to walk out, go outside and get some fresh air.

Q        You state here she was in an "agitated state"; that's your recollection?

A        Yes.

Q        Did you ever ask Ms. Parker or Mr. Pickett why Ms. Parker was spending so much time in his office?

A        Yeah, because that was part of the

Page 118

Larry Moppins

conversation. It started off that:

"Why is she spending so much time in the office?"

He couldn't give me -- get an answer.

Q He didn't give you an acceptable answer?

A No, I asked him.

I say:

"No -- nobody -- nobody is in your office that much that -- that often without something's going on. Y'all laughing and joking."

Like I say, it was like paper-thin walls. You can hear right through the walls. They're laughing, joking -- hee-hee, hee-hee-hee, hey, everyday, this is five, six, seven hours a day, five days a week.

His work performance was suffering. Even the client noticed. Hey, he couldn't get his act together:

"Hey, what is -- what is the problem with you?"

Q Who is the client who noticed?

A The client was the contractors for the State Department.

Page 119

Larry Moppins

Q Yeah. Do you remember who specifically, the person's name?

A Kwan Chun, Cecil Grainger -- I forget who all -- whoever else was up there. I forget at that time.

Q Did you ever ask Ms. Parker why she was spending so much time in Mr. Pickett's office?

A No, I did not, sir.

Q Do you know if Ms. Cathy Price did?

A I have no idea.

Q And just to be clear, Ms. Price asked you to draft this E-Mail after Ms. Parker made her complaint?

A No, no, I would say -- I would say it sounds like I wanted to make sure that she understood where I was coming from, because it says:

"In regards to your meeting today, I would like to interject the following statement."

So I wanted to make sure that she understood where I was coming from. I can't say that she asked me to write that. I would say I wanted to make sure that she understood where I was coming from.

Q I see. So this was more you

Page 120

Larry Moppins

volunteering your side of the story?

A Yes.

Q Okay. All right.

MR. KOPSIDAS: All right. We have been going about an hour and a half. Why don't we take a short break.

THE VIDEOGRAPHER: We are going off the record at 12:28 p.m.

(There was a break off the record.)

THE VIDEOGRAPHER: We are back on the record at 12:43 p.m.

MR. KOPSIDAS: All right. Mr. Moppins, I'm going to show you now another document, REEMA 191. For the record, this is -- Exhibit 10 is a one-page document bearing Bates No. REEMA 191.

(Exhibit No. Moppins 10, 5/12/16 Memorandum; Subject: Notification of Hostile Work Environment; Re: Interaction between Evangeline Parker and Donte Jennings, from Donte Jennings, Bates No. REEMA 191, Document is marked by the reporter for identification.)

Q Can you see the document, Mr. Moppins?

A I see portions of it.

Page 121

Larry Moppins

Q Okay. You see the top, that's your GMail address, correct?

A Yes.

Q I assume that means that this document was either sent to you or you sent it to somebody by E-Mail, correct?

A That was sent to me by somebody. I don't know who it was. I didn't know who the E-Mail -- if I remember right, I didn't know who the E-Mail was or anything.

Q Do you remember when this was sent to you?

A I guess that date, I guess, on there. I have no recollection. I don't know.

Q You are talking about this date of May 12, 2016?

A That's correct. That's correct.

Q And it says:

"Memorandum for the record; date, May 12, 2016; subject: Notification of hostile work environment."

And you will see at the bottom that it is signed by Mr. Donte Jennings, correct?

A Um-hum, correct.

Q All right. So if I understand your testimony correct, you under -- it's your recollection that somebody -- you don't know who -- E-Mailed you this on or around May 12, 2016?

A Correct, the E-Mail -- the E-Mail address wasn't his E-Mail. I remember that part. It was some other -- it was some unknown E-Mail address.

Q It wasn't Mr. Jennings's E-Mail?

A It could have been his, but it wasn't addressed with his name on it. It was -- it was some kind of something.

Q So the first question I have is this seems to be work-related; you would agree?

A I didn't read it.

Q Oh, I'm sorry, here, let me --

A The screen is cut off.

Q Let me scroll down a little. Can you see it now?

A No, the right-hand side of the screen seems to be cut off.

Q Yeah, that seems to be a problem with the document.

MR. KOPSIDAS: I don't know.

Mister -- Mr. Walsh, if you have a better copy of this document, I would like to get it because I agree the last couple of words seem to be cut off.

MR. WALSH: I think -- I know we have seen one that has the whole thing. I can look. I mean, if you want to continue, I can look and see if I can find one while we are -- while we're talking.

MR. KOPSIDAS: Yes, I don't expect I'm going to be on this very long just, but just so we have a clean copy I would request that.

(Clean copy of Moppins 10 requested.)

A You want me to read it.

Q Just give it a skim. I'm going to ask you about a couple of parts of it, but, yeah, go ahead and familiarize yourself with it.

A Okay.

Q Okay. So you will agree with me that this seems to be work-related; is that correct?

A That's correct.

Q So whoever sent you this, why did they send it to your GMail account and not your work account?

A I have no idea. You'll have to ask him that.

Q Okay. What did you do upon receiving this?

A I believe I gave it to Cathy Price, I believe.

Q Okay. Did you ever follow up with Mr. Jennings about this?

A I don't remember. I only remember the thing because it was something -- it was some kind of weird E-Mail. I was thinking:

"Well, should I open this or not," because it was some weird address off it. And I finally opened it up, and that -- that was this here.

Q You don't remember what the address was?

A No.

Q And you say you provided this to Ms. Price?

A I think so. Yeah. She -- she had it. Yes, I must have given it to her.

Q Okay. And you didn't do any other investigation of this incident that he reports

about, correct?

A Because I didn't know if this thing was true or not.

Q Right. So I see that this is signed by Mr. Jennings.

Do you know who wrote it?

A I have no idea. I wouldn't say he wrote it.

Q Why is that?

A The verbiage.

Q Yes. Okay. All right. Let me move to another document now.

(Exhibit No. Moppins 11, 5/16/16 Memorandum from Carlos Carter, Sr., Bates No. REEMA 231, Document is marked by the reporter for identification.)

Q The next one is going to be Exhibit 11. It's a one-page document bearing Bates No. REEMA 231. So I will put it up on the screen here, sir, for you to take a look at. And then I'm going to ask you a question about it.

(There was a discussion off the record regarding the Zoom technology.)

All right. Hold on. I will put it

Larry Moppins

right back in a second for you, Mr. Moppins.

MR. WALSH: I got it.

Q Okay. Have you ever seen this document before, sir?

A I think so.

Q When did you see it, if you recall?

A I guess the day it was written, I guess, the date on there, I guess.

Q Do you recall who showed it to you?

A Carlos Carter, I would imagine.

Q Do you know why he was showing this to you?

A Exactly why. No. No, he probably -- no, I can assume, but that's all.

Q Now, this is the type of document that should go to Ms. Cathy Price, correct?

A Yes. But Cathy Price had fluctuating hours, so maybe he gave it to me to give to her since he was -- he was all the way -- he was in the back of the warehouse. He may have given it to me to give to her to turn in when she did come in.

Q Right. Now, this document generally refers to an alleged incident between Ms. Parker and Mr. Jennings, correct?

Larry Moppins

A Yes.

Q But -- and it refers to an incident, not that Mr. Jennings saw, but that Mr. Kenton Birgans allegedly saw, right?

A Yes.

Q But, yet, the statement is written and signed by Carlos Carter, Senior, correct?

A Correct.

Q And according to this it doesn't seem that Mr. Carter was there when this incident happened; would you agree?

A I agree.

Q Right. So any idea why Mr. Birgans didn't write this statement?

A Because the warehouse was full of people that they will tell you one thing, but they don't want to get involved. They'll tell you about it, but they don't want to get involved officially.

Q Okay. So, instead, Mr. Carter, who wasn't there, writes this statement and sent it to you?

A I guess.

Q And you didn't personally incident -- witness this incident either, right?

Larry Moppins

A According to this statement, it was just Kenton, Van, and Donte there.

Q Do you know if this statement was put into Ms. Parker's personnel file?

A I have no idea.

Q Do you know if this statement was relied on to issue Ms. Parker a warning or a termination?

A I have no idea.

Q Do you know what, if anything, it was used for?

A When it went to the HR world, I was out of it; so I can't -- I can't tell you that part.

Q Sorry.

A I don't -- Mr. Vora -- that was between Mr. Vora, Cathy Price, and Reema Vora at that point.

Q Did you see to it that this was delivered to Ms. Price?

A If it was given to me, I gave it to Cathy. I'm not even sure if it was given to me. I know I have seen it -- I have seen it before.

Q Right.

A I have seen it -- but I have seen it.

Larry Moppins

Q Right. But you don't know -- you are not -- you don't recall who gave it to you to see?

A No, I do not.

Q And did you see it after it was signed or when it was still a draft?

A I have no idea.

Q Okay. The next document I would like to show you, sir, is -- let's see -- it's a document bearing Bates Nos. REEMA 171 through 175.

(Exhibit No. Moppins 12, Reema Consulting Services, Inc., Written Warning, dated 5/16/16, Employee: Evangeline Parker, Supervisor: Larry Moppins, signed by Mr. Moppins on 5/18/16, Bates Nos. REEMA 171 to 175, Document is marked by the reporter for identification.)

Q So this is a multi-page document, Mr. Moppins, and I will refer you onto it. But this first page is the written warning issued May 16, 2016, from you to Ms. Parker, correct?

A I can't -- if I read the whole thing, I could tell you that. It has my name on it.

Q Right. Well, so let me point you to the "reason for the warning" here is:

Page 130

Larry Moppins

"Poor management performance, abuse of managerial authority, explicit use of profanity when questioning employees, insubordination, and workplace misconduct."

Do you see that?

A      Yes, sir.

Q      And then I am going come back to these highlighted parts, but on page REEMA 173, that's your signature, correct?

A      Yes.

Q      Dated May 18, 2016?

A      Yes.

Q      And you are the only one who signed this document, right?

A      Yes.

Q      Was it common for a written warning to be issued with only one signature on it?

MR. WALSH:  Objection.

A      Probably she refused to sign it. That -- those -- that -- that is her -- if you look at the page two there, that written comment, that is probably only -- I'm not sure whose hand -- whose handwriting that is.

Q      Well, I think it's safe to assume it

Page 131

Larry Moppins

is Ms. Parker's.  But my question really is there is no other -- there is no alternative -- alternate program manager or witness signature on this, right?

A      There is no require -- there is no -- as far as I remember, there is no requirement or that.  It's just a safety net if you needed it.

Q      Okay.  So let me get to the gist of it.  This is again about the meeting that we have spoken about, and you state in the first highlighted portion here on page REEMA 172 -- you state:

"Immediately in our conversation you" -- meaning Ms. Parker -- "started ranting about how I was wrong to wrong to allow the employees to talk about you like that in the meeting."

Do you see that?

A      Yes, sir.

Q      And that's your recollection of what happened?

A      I remember -- I remember that, yes.

Q      Yeah.  Do you remember writing that?

A      Yes.  You want to know why?

Q      Sure.

A      Because Ms. Parker was under the assumption that I was not supposed to listen to

Page 132

Larry Moppins

anyone but her.  I was supposed to listen to one side of the conversation, her con -- her side and nobody else's.

Now, I believe I said somewhere in there that I had to listen -- I had to listen to both sides of the conversation.

Q      Right.

A      But she didn't want -- she didn't want that, just take her word and go for it.

Q      Okay.  Then you go on to say in the next paragraph:

"This meeting ended abruptly as it started, because you were in such agitated state, you were not hearing anything I had to say."

Right?

A      Yes, sir.

Q      That's your recollection of how the meeting went?

A      Yes, sir.

Q      Okay.  And then in the next -- in the next paragraph, you state you were attempting to counsel her?

A      Yes -- where are you at now?

Q      Sorry.  Let me point here with the

Page 133

Larry Moppins

cursor.  The paragraph that starts:

"Upon attempting to counsel you again on Monday" -- do you see that?

A      Yes.

Q      And you state:

"You once again" -- "You once again began ranting about how I allowed the employees to talk about you and that I was wrong for asking DaMarcus to disclose if he was having an affair with you."

Do you see that?

A      Yes.

Q      And that is -- and that's your accurate recollection of what happened?

A      Yes, yes.

Q      Okay.  And then you state that she -- you state to her, quote:

"You became so emotional that Ms. Wallace had to escort you from the conference room."

Do you see that?

A      Yes, correct.

Q      And that is your recollection of what happened?

Page 134

Larry Moppins

A Yes, sir.

Q Okay. And then, "Corrective action required," you write "termination of employment" and then --

A I'm not sure that part was not a part -- it was part of a template of that -- of that form, because in bold -- like it's in bold writing. It looks to be a part of that form. I'm not sure if I wrote that or not.

Q What, the "termination of employment" part?

A Yes.

Q Okay. Well, I will point out that the last sentence there, you write under "corrective action":

"The disrespect that you show when you address a supervisor cannot and will not be tolerated."

Do you see that?

A Yes.

Q So does that give you any recollection about whether you were recommending that she be terminated?

A Yes.

Page 135

Larry Moppins

Q And that is, you were, in fact, recommending that she be terminated with this, right?

A If I remember correctly, yes.

Q Did you ever -- instead of termination did you ever consider suspending or demoting her instead?

A No.

Q Why?

A Because of Ms. Parker's demeanor at that time.

Q Her insubordination to you, you mean?

A To everyone.

Q Okay. Let me go down then to the next one. On page REEMA 174, you will see that this is another written warning to Ms. Parker from you; and it is also dated May 16, 2016.

Do you see that?

A Yes.

Q Okay. Which was the date of the first one we looked at, right?

A Yes.

Q Okay. So you issued her both of these written warnings on the same day, correct?

Page 136

Larry Moppins

A They were done the same day. If they were issued the same day, I can't say.

Q Okay.

A It could have been one day, the next day with the next one. I don't know.

Q Okay. Now, this one also is signed only by you. Correct?

A Yes.

Q And it's signed on May 18, 2016?

A Yes.

Q Why is the -- why are the warnings themselves dated May 16, 2016, but you didn't sign them until two days later?

A I was composing them, taking my time. Like I said in the beginning, it probably was mission requirement. I had something -- something going on mission-wise I had to deal with first. Then I deal with that.

Q Okay. Fair enough. Do you know whether they were given to Ms. Parker on the 16th of May?

A I cannot say, sir.

Q Okay.

A I can't remember that far back.

Page 137

Larry Moppins

Q Did you personally give that to her?

A Probably. Yes. Probably. I would say so.

Q You don't recall specifically?

A If I wrote -- if I wrote them, I gave them.

Q Okay. Now, this second one that we are looking at here, you state:

The "reason for the warning" is, quote, "Failure to follow instructions from the Program Manager."

Right?

A Yeah.

Q And that's you, the program manager?

A Yes.

Q Okay. And then, apparently, the reason you give underneath that is that she was given specific instructions from you to not mistreat or visit the work area of subordinate employees, and she failed to do that.

Right?

A Yes.

Q And this -- specifically, the "subordinate" employee referenced here is Donte

Larry Moppins

Jennings, right?

A I'm not -- no, I think there were other employees at the time. I am pretty sure there were others than Donte Jennings.

Q Well, if we look at the next paragraph, you go on to state that:

"On May 12, 2016," you "received a letter from Donte Jennings stating that you had been acting in an unprofessional manner towards him."

Do you see that?

A Right, and there was another -- there was another person there, too. There was somebody -- should have been somebody, Arnel Ragunton. She told him -- she told him he was -- he was her slave or something like that, something to that effect.

Q Do you recall that person ever submitting a written complaint?

A No. He wouldn't -- once again:

"My name, well, I ain't in it. I -- I'll tell you verbally, but I ain't gonna put it in writing."

Q Right. So regarding these -- regarding this complaint of Mr. Jennings about being

Larry Moppins

harassed by Ms. Parker, really, the -- what we -- all we have to go on there is that statement that Mr. Jennings made, correct, that we looked at, that he E-Mailed to your GMail?

MR. WALSH: Objection.

A What you mean, written proof?

Q Yeah.

A I have no idea other than, you know, what HR had.

Q All right. And then for this one you are recommending -- your "corrective action required," you wrote:

"Termination of" employer "of employment. Ms. Parker, this type behavior on your behalf is unprofessional and not condoned by Reema Consulting Services, Inc."

Right?

A Yes, sir.

Q And you wrote that?

A I believe so, unless it was added to the document after I turned it in.

Q And who did you turn this in -- these written warnings into?

A It would have been HR.

Larry Moppins

Q Now, who was Ms. Parker reporting to at the time?

A DaMarcus Pickett.

Q Okay. Why didn't DaMarcus Pickett then as her supervisor write the written warnings?

A He couldn't bring himself to do it, sir.

Q Do you know why?

A No, I don't.

Q So did you volunteer to write these, or did somebody ask you to?

A No, I wrote them because he wouldn't write them.

Q Okay. "He" being Mr. Pickett?

A Correct.

Q Just so I'm clear, Ms. Wallace was not -- was no longer Ms. Parker's supervisor at the time these written warnings were given, correct?

A I don't know. I can't remember that far back. I'm sorry. I don't know.

Q Okay. When you state here that -- you write, quote:

"Ms. Parker, you were given specific instructions from the program manager of RCSI to not

Larry Moppins

mistreat and not to visit the work areas of subordinate employees, who you named in a harassment complaint that you filed with HR."

You are the one that gave her those specific instructions, correct?

A Yes. No, I think I gave them to her, and HR -- I gave it to her, and HR gave it to her, too.

Q Okay. And those were verbal instructions given, not written, correct?

A I don't remember.

Q You don't remember those instructions being written down anywhere and given to her, right?

A I don't, no.

Q Do you recall Mr. Jennings being given any warnings to not visit Ms. Parker's work area?

A I don't remember that being an issue with him going over there. He's -- he was in the SPEAR. Like I said, he was in another area of the warehouse, so he stayed to his area of the warehouse until lunchtime or break time came around.

So it was no need to give him anything in writing.

Q Or verbally either, right?

Page 142

Larry Moppins

A        Or verbally, either -- either way.

Q        So he was free to go into her work area and be --

A        No, sir.  No, he would not have been.  As a -- as a warehouse worker, he would have been obligated to stay in his area where he was -- where he was -- his side work area.

She had freedom -- as a system manager, she had freedom to roam the warehouse.  He did not.

Q        Okay.  Thanks.  Thank you for clarifying that.  I want to go back up to the first written warning for a minute.  You state here that there was -- there was this meeting that you had where she was -- you write in an "agitated state."

And then you write here:

"Upon attempting to counsel you again on Monday...."

So was -- was there another meeting, a second meeting, or at least an attempted meeting between you and Ms. Parker after the first one?

A        That was -- I guess -- the way it reads to me, there was one the week -- the week before we tried to talk to her.  And then it came

Page 143

Larry Moppins

around Monday morning, tried to finish the conversation up, and it still was in the same -- she was in still the same state.

Q        Okay.  And by "state," you mean basically too emotional to talk, in your opinion?

A        Could not conduct herself in a professional manner.

Q        Why?

A        Because whatever she had been told sent her into a rant -- a rant and raving posture, and she couldn't compose herself.

Q        By the way, did you ever talk to Mr. Jennings about his complaint against Ms. Parker?

A        Yes.

Q        Okay.  And what was his state when he was making his complaint against Ms. Parker?

A        His -- his -- his state of mind?

Q        Yes.

MR. WALSH:  Objection.

A        He was pretty -- he -- he could compose what he was saying.  Yeah, he was like:

"Hey, I am -- I'm -- I'm getting tired of her having to talk about this.  Why can't she just leave me alone."

Page 144

Larry Moppins

Q        Was he agitated or so emotional that he couldn't --

A        He was not -- he was not so -- not so bad he couldn't -- he couldn't talk --

Q        Okay.

A        -- to the state -- to the state where he was disrespectful.

Q        So I take it he wasn't ranting, right?

A        Correct.

Q        Did you ever check or anything or have anybody check to make sure that Mr. Jennings was not going into Ms. Parker's work area?

A        No, sir, because the person who he worked for, Carlos Carter, would not allow him to go outside of his work area.  They had a small work force of three to four people, and they had a mission to get done.

Carlos Carter was not the type to allow anyone to roam free.  You gonna get your work -- you gonna get your work done, and that's it.  There was no need to check, was he in the warehouse.  Everybody know -- everybody in the warehouse knew one thing:  You work for Carlos Carter, you will get your job done, by one way or another.

Page 145

Larry Moppins

Q        So after writing up those written warnings, did you go to Mr. Vora and recommend termination of Ms. Parker?

A        I don't think I went directly to Mr. Vora.  I probably went -- I think I went to Ms. Price.  I dealt with Ms. Price, because we had a lot going on at the time, and Mr. Vora had other things going on -- he wasn't -- he wasn't there everyday.  Ms. Price was there everyday.  So I probably deal with her, more -- more -- more directly with her.

Q        So who actually made the decision to fire her?

A        There was a conversation between Mr. Vora, Reema Vora, and Ms. Price, and myself.  The final decision was actually made between the three of them after they left my office.

Q        Was anybody in disagreement with you about terminating her?

A        As far as I -- I can't remember.

Q        And it was at that meeting with Mr. Vora, Mrs. Vora, and Cathy Price that you -- at that meeting you recommended that Ms. Parker be terminated, correct?

Page 146

Larry Moppins

A    Yes.

Q    And did Mr. Vora disagree with you at all?

A    I don't remember.

Q    You don't recall him, Mr. Vora, disagreeing with you?

A    I don't know if he agreed or disagreed. I can't remember if he disagreed or dis -- agreed at the moment.

Q    Okay. When was this meeting held between the four of you?

A    What day, I can't tell you that. I don't know.

Q    It was -- it would have been after you wrote those -- after you -- strike that.

Let me -- let me start over again.

This meeting between you and Ms. Price and Mr. Vora and Ms. Vora where you decided to terminate Ms. Parker, was it after or before you wrote those two written warnings?

A    It would have been after the confrontation me and -- her and I had.

Q    Okay. But before you wrote the written warnings?

Page 147

Larry Moppins

A    I don't know. I don't know the date time frame. I can't say which one -- which -- which occurred first, I don't remember.

Q    Is there any other reason that you recommended terminating Ms. Parker other than what is written in those two written warnings?

A    No.

Q    Did the fact that she filed a harassment complaint, was that a factor in why she was fired?

A    Not on my behalf.

Q    Was it -- was her complaint discussed at the meeting?

A    I don't remember.

Q    How -- how soon before she was actually fired was there this meeting between the four of you?

A    I can't -- I don't remember. I don't remember that.

Q    Was it a matter of -- after you guys had the meeting, you, Ms. Price, and Mr. and Mrs. Vora --

A    It was a time -- Mr. Vora wanted to table -- Mr. Vora wanted to talk more about it.

Page 148

Larry Moppins

He's a very easy-going guy, so he wanted to talk more about it. So I know that.

It wasn't -- it wasn't immediately after the meeting, no. How much time elapsed -- elapsed between her termination and the meeting with me, I can't rightfully say.

Q    Would you say it was more than a week?

A    I have no idea.

Q    And just so I'm clear, we talked about this earlier, but you did not -- strike that.

Let me -- let me start over again.

When Ms. Parker came to you complaining about this rumor, you did not do any investigation; you didn't conduct any investigation with the employees about the rumor or inquire of any employees or supervisors about it, right?

A    No. She came to me. It was not an allegation of a rumor. It was exactly what she heard from DaMarcus. She told me word-for-word what she -- she said what she had heard from DaMarcus.

So it wasn't a rumor. It was straight from him. There was no other people involved. It was me talking to him, him supposedly telling her whatever he said to her. I have no idea.

Page 149

Larry Moppins

She said that -- he told me -- he told her that I asked him were they having an affair. That was it.

There was no reason to have an investigation because there was no other people involved.

Q    Well, but you understand that her complaint was that Mr. Jennings and others were spreading this rumor, right; you understand that?

A    I have no knowledge of that.

Q    Okay. And you didn't investigate that, correct?

A    I can't investigate I don't know -- what I don't know about, sir.

Q    Okay. Sorry. Bear with me for a minute. I am just checking my -- to see what else I have got.

Do you ever remember -- do you ever recall Mr. Pickett contacting the client and disparaging Mr. Jennings to the client?

A    That I don't know anything about, no.

Q    Did Mr. Moppins ever contact your wife about this incident?

A    Huh?

Page 150

Larry Moppins

Q    I'm sorry.  It sounds like a strange question.  But did Mr. Moppins -- I'm sorry.

Did Mr. Pickett ever contact your wife about this alleged affair?

A    He called my wife that same day, later that day, yes.

Q    Which day?  I'm sorry.

A    The day I questioned him, yes.

Q    I see.

And do you know what they talked about?

A    I know what she told me.

Q    What's that?

A    Told him that he was -- he was trying to explain -- he was trying to explain his side of the story.  And basically -- and basically I didn't believe what he was saying.

Q    So he thought he would go through your wife?

A    I had the same thought.  Yeah, so he decided to call my wife.

Q    Okay.

A    I should have called his wife.

Q    And, again, this was about you asking

Page 151

Larry Moppins

him whether he was having an affair with Ms. Parker?

A    Correct.  He -- he didn't tell my wife exactly what it was about, but he told her that part.

Q    Do you recall -- we looked at that complaint that Mr. Jennings filed against Ms. Parker.  Do you recall Ms. Price instructing him to do that?

A    To do what?

Q    To file that complaint against Ms. Parker?

A    No.  I don't.

Q    Do you recall at the same time Ms. Parker was terminated that Mr. DaMarcus Pickett was demoted?

A    No, he was never demoted.

Q    Okay.  Let me --

A    He was given a counseling statement. He wasn't demoted.

Q    Okay.  Let me just have you look at something.

MR. KOPSIDAS:  The next exhibit is a document bearing Bates Nos. REEMA 6 and 7.

(Exhibit No. Moppins 13, Reema

Page 152

Larry Moppins

Consulting Services, Inc., Sexual and Other Unlawful Harassment Investigation Report, Dates 4/18/16 through 5/17/16, Bates Nos. REEMA 6 and 7, Document is marked by the reporter for identification.)

MR. KOPSIDAS:  Exhibit 14 [sic].

(There was a discussion off the record regarding the exhibit number.  The exhibit is Moppins 13.)

Q    Can you see this document that I am showing you, sir?

A    Yes.

Q    Okay.  So you will see this is entitled:

"Reema Consulting Services, Inc., Sexual and Other Unlawful Harassment Investigation Report."

Right?

A    Yes.

Q    And it covers, basically, the period we have been talking of, April 18, 2016, through May 17, 2016.

Do you see that?

A    Yes.

Page 153

Larry Moppins

Q    Okay.  And it was -- it says the participants in this investigation were Ms. Parker, Mr. Pickett, and you.

Do you recall that?

A    This -- are you asking me, do I recall seeing this document before, or are you asking me that?

Q    Well, okay.  Let's do that one:

Have you seen this document before?

A    No.

Q    Okay.  But you recall participating in an investigation by Ms. Price, correct?

A    Yes.  Yes.

Q    All right.  And -- okay.  Here -- do you see at the bottom here it says, "Recommendations."

Number one:  "Termination of employment for Evangeline Parker due to inappropriate behavior and misconduct (insubordination with superior)."

That was -- that superior is you, right?

A    Yes.

Q    And this was your recollection of what

Page 154

Larry Moppins

the recommendation was, correct?

A    Yes.

Q    Okay.  And then you will see the second recommendation is:

"Demotion of DaMarcus Pickett under a performance improvement plan"?

A    That's -- that's mis -- that's misleading.

Q    Okay.

A    DaMarcus -- the most of DaMarcus Pickett on that performance improvement plan -- he was put on performance improvement plan -- he was put on a performance improvement plan.  However, he did successfully achieve his goals, so he was never demoted.

Q    Okay.  Whose decision was that whether to demote him or not?

A    He was never demoted.

Q    Well, okay.  So let me back up here. Maybe I am misunderstanding this.

But the -- Ms. Price recommends in this document that Mr. Pickett be demoted, but he wasn't actually demoted.

So who intervened there?

Page 155

Larry Moppins

A    I don't know.  He was put on a performance improvement plan.  Had he not successfully completed that performance improvement plan in the time frame that he was allotted -- I forget what the time frame was -- he would have -- he would have been demoted.

But he did successfully improve his work -- work performance.  So he was not demoted.

Q    Okay.  Got it.  Did you request a meeting with Mr. Vora to discuss terminating Ms. Parker?

A    I don't remember.

Q    Do you remember who requested the meeting that you participated in where there was you and Ms. Price and Mr. Vora and Mrs. Vora?

A    No, I don't.

Q    Okay.  I would like to back up, and I -- I appreciate you bearing with me.  I am actually almost done.  So let me just ask you:

Since -- after you worked for RCSI, were you employed after that?

A    Yes.

Q    Where?

A    Olgoonik Federal LLC, O-l-g-o-o-n-i-k.

Page 156

Larry Moppins

Q    Are you still with them?

A    No.

Q    Are you currently employed?

A    Yes.

Q    Where at?

A    LT Business Solutions.

Q    Did you have any other employers between Olgoonik and LT?

A    No.

Q    What are the dates of your employment with Olgoonik?

MR. WALSH:  Objection.

A    June -- no -- July -- July 10, 2017, to May 20th -- May 20, 2020.

Q    Okay.  And then I take it you have been -- well, when did you start working at LT Business Solutions?

A    1 June, 1 June.

Q    And let's work backwards a little bit from your time at Reema.  Who was your employer immediately before you went to Reema?

A    Tessada and Associates.

Q    And what are the dates you worked there?

Page 157

Larry Moppins

A    August 2007 to January or February of 2013.  It was all the same contract.

Q    Right.  Okay.  And before Tessada, where did you work at?

A    Global Service and Trade.  Global Service and Trade.

Q    What are the dates that you worked there?

A    April 2004 to, I think, June or July, 2007.

Q    Okay.  Have you ever been disciplined at any of these other employments?

MR. WALSH:  Objection.

A    What, written counseling or something like that -- you mean like that?

Q    Yes.

A    No.

Q    Have you ever been fired from any of these previous employments?

MR. WALSH:  Objection.

A    Yes.

Q    Which one?

A    Olgoonik.

Q    Is that the only one?

Page 158

Larry Moppins

A    Yes.

Q    At any of these other employments, have you ever had any -- any harassment complaint filed against you?

MR. WALSH:  Objection.

A    No.

Q    Why were you fired from Olgoonik?

MR. WALSH:  Objection.

A    I don't know.  I'm sorry.  My bad.

MR. WALSH:  That's okay.

A    I don't know.

Q    You don't know why you were fired from them?

A    No, I received a letter saying that your employment was terminated.  It did not state why.

Q    Did you ever ask anyone?

MR. WALSH:  Objection.

A    I asked.  I was never told.

Q    You just received no answer at all?

A    No answer at all.

Q    And you received no disciplinary actions or written warnings or complaints or anything during your time at Olgoonik?

Page 159

Larry Moppins

MR. WALSH:  Objection.

A    No.  Sorry, my bad.  No.

Q    What were your job responsibilities at Olgoonik?

MR. WALSH:  Objection.

A    My -- I was the program manager.

Q    Of what program?

A    The Department of State Anti-Terrorism Warehouse Program.

Q    Did you supervise employees there?

MR. WALSH:  Objection.

A    Yes.

Q    About how many?

A    35.

MR. KOPSIDAS:  All right.  I would like to take a quick five-minute break just to check my notes and see if I have got anything else.  I think I'm done, but just -- I just need a couple of minutes to make sure.  So why don't we just take a five-minute break, and then I will wrap it up.

MR. WALSH:  That's fine.  And just for Mr. Moppins's benefit, Mr. Moppins, I have maybe ten minutes of questions just to clarify

Page 160

Larry Moppins

things.  I promise, assuming Mr. Kopsidas comes back quick, we will be -- get you done here by 2 o'clock.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  We are going off the record at 1:42 p.m.

(A break is taken.)

THE VIDEOGRAPHER:  We are back on the record at 1:47 p.m.

MR. KOPSIDAS:  Okay.  Mr. Moppins, thank you for your time.  I don't have have any other questions.  Mr. Walsh is going to get a chance to ask you a few questions right now.  It's -- it's possible that I may have a follow-up question or two, depending on what he says.

But with that, I will pass the witness and thank you for your time.

(There was a discussion off the record after which the cross examination of Larry Moppins began.)

CROSS EXAMINATION

BY MR. WALSH:

Q    Thank you, Mr. Moppins.  Just a couple

Page 161

Larry Moppins

of quick clarifying questions:

Do you know -- were you an employee of Reema, or were you a contractor to Reema?

A    Contractor.

Q    Okay.  So you were not actually an employee of Reema at all?

A    Correct.

Q    Okay.  The all-hands meeting that was called -- and, actually, it's probably easier if I put a document in front of you.  I'm not sure exactly whether I have the capability to do this or not.

(There is no Exhibit 14.  References to Exhibit 14 refer to Exhibit 13.)

Q    It might be easier if I just put that exhibit in front of you.  What I am looking -- the last exhibit that we had -- Exhibit 14 [sic] is the one that I just want to put in front of you.

Let me -- I guess I have just got to share my screen.

All right.  So this was -- let me make it a little smaller here.

I believe this was the investigation report that was identified as Exhibit 14 [sic].  And

Larry Moppins
what I want to refer you to is down here in this paragraph two. And this says:
"An employee staffing meeting was held on Friday, April 22, 2016, where Mr. Larry Moppins allowed the employees to voice any concerns they had."
Is that the meeting where Ms. -- where Ms. Parker was outside on the telephone?
A I -- I couldn't say.
Q Okay. But the meeting where you observed Ms. Parker outside on the telephone, did she try to come into the meeting eventually after she got off the phone?
A At the very end -- at the very end of the meeting.
Q And did she come into the meeting?
A After we had finished, yes.
Q Okay. Did anybody block her from coming into that meeting?
A No, the door was -- the door was -- I guess the door was locked, and they came -- we closed the door.
Q Okay.
A And at that point, nobody locked it on

Larry Moppins
purpose. It just got -- it locked.
Q Okay. Do you know if she knocked or attempted to come in and nobody --
A She did not knock, no.
Q Okay. All right. Going back to this exhibit, again, this all-hands meeting, it said you allowed the employees to voice any concerns and said:
"Employees mentioned the inappropriate conduct of supervisors (in general), and then after the meeting Mr. Moppins followed up individually with each employee."
Do you recall following up with individual employees?
A Yes.
Q Okay. And what -- if I could, let me share with you -- I want to share with you another document that I don't believe was marked as an exhibit, so I'm going to have to pop it into the -- into the -- this was -- I'm not real good at sharing in the group chat.
Let me -- let me share the document, and we will figure that out, so we keep you going and try to get you out of here.

Larry Moppins
The document I want to show you -- let me make it a little smaller. I can see the whole thing. This document was identified as Exhibit 20 during Cathy Price's deposition?
(Previously Marked Exhibit No. Price 20, 5/13/16 E-Mail from Mr. Moppins to Mr. Vora, Bates Nos. REEMA 196 TO 197 is introduced into the proceedings.)
Q And this document appears to be an E-Mail from you, Mr. Moppins, to Mr. Vora, Ms. Price, and Mrs. Vora, on May 13th.
And in here it talks about -- I want to refer you right here -- this section right here, it says:
"When attempting to counsel her on her inappropriate behavior with her subordinates in the warehouse, she became irate and disrespectful in the presence of DaMarcus Pickett and Angela Wallace to the point that Angela had to escort her out of the conference room."
Was that correct? Did that happen?
A I believe so.
Q All right. Then you -- you mention here -- you have Manley Ferguson. And it is an e-y.

Larry Moppins
It says:
"Complaint of her constant harping where she is in-charging [sic] and asking him," quote, "`If you want to know who I'm F'ing, ask me, and I might tell you.'" Quote.
Did Mr. Ferguson tell you that?
A Yes, sir.
Q When did he tell you that?
A A couple of days before this meeting.
Q Okay. All right. And then there is the Arnel Ragunton -- I think that was the gentleman that you mentioned before -- it says:
"Complained of being treated like a slave and constantly having to hear," quote, "`I am in charge,'" end quote.
A Yes, sir.
Q And when did you speak with Mr. Ragunton?
A A couple of couple of days before that, yes.
Q And the person he's complaining about, was that Ms. Parker?
A Ms. Parker, that's correct.
Q Okay. All right. And I want to refer

Page 166

Larry Moppins

you back to another exhibit. If I could just show you one of the exhibits that we used a second ago -- hang on for a second. It's Exhibit Number 9 that Mr. Kopsidas had asked you about.

Let me just make sure I get the right Bates stamp number, so I can get it. This was Exhibit 9 that you were shown earlier. That's this memo that you -- or E-Mail -- I'm sorry -- that you sent on April 27th to Ms. Price.

What I want to refer you to is down here, this section -- I'm sorry -- this paragraph right here. It says:

"We did not speak on this matter again until the week of April 18th through 22nd when Mr. Ferguson informed me and Mr. Pickett of the rumor within the warehouse of a personal relationship between Ms. Parker and/or Mr. Pickett or myself."

Was there a rumor that Ms. Parker was involved in a relationship with you?

I'm not sure of the grammar here.

A No, it just meant between THEM -- those two.

Q Okay. Okay. And do you recall what

Page 167

Larry Moppins

Mr. Ferguson told you at that time about that rumor?

A It was just telling us that the rumor going around to that effect, that there was a -- there was a relationship between Van, Ms. Parker, and Mr. Pickett.

Q Okay. And did you tell Ms. Price that Mr. Ferguson had said that?

A Yes.

Q Okay. And in the next paragraph, it says:

"Mr. Ferguson also advised me that Ms. Parker walked in one morning and after greeting him stated that," quote, "`If you want to know who I am fucking, ask me directly, and I will tell you.'"

End quote.

Is that what Mr. Ferguson said to you?

A Yes, sir.

Q Okay. He said:

"He also informed me that Ms. Parker had approached Donte Jennings and Mattie Littleton" -- I think it's supposed to be "Littleton"; it seems to be cut off.

A That's correct. Littleton.

Q Okay.

Page 168

Larry Moppins

"... about rumors circulating with the warehouse about whom she was sleeping with. I asked Mr. Pickett to bring Mr. Jennings to my office so this issue could be discussed to determine if human resources needed to be informed."

Was there a meeting with you, Mr. Pickett, and Mr. Jennings about this, this particular incident?

A Yes.

Q Okay. And Mr. Pickett was present for that?

A Yes, sir.

Q Okay. And in that you reflect here -- you said:

"Mr. Jennings was reluctant to say anything until after I constantly urged him that now was the time to speak up if he had anything to say."

Was that -- was that true that Mr. Jennings didn't want to say anything?

A That's correct, sir.

Q Okay. How long did it last before he finally said something about what his issue was?

A After I talked -- something to the effect where I said:

Page 169

Larry Moppins

"Hey, keep running back -- no, tell me now, or don't tell me at all."

Q Okay. All right.

A About two -- two incidents of that, and he told me.

Q Okay. And -- and then it looks like you said -- and then Mr. Jennings:

"He stated in front of both Mr. Pickett and myself that Ms. Parker approached him one morning upon entering the building and stated that," quote, "`If you want to know who I am fucking, ask me and I will tell you.'" End quote.

"In addition, he stated that he had no idea of what she was talking about and ended the conversation."

Is that what Mr. Jennings shared with you?

A Yes, sir.

Q You said -- you continued in this. You said you also asked Mr. Pickett to bring in Ms. Littleton and Ms. Wallace.

A Yes.

Q Did you end up having a conversation with Ms. Littleton as well?

Larry Moppins

A Yes.

Q And who was present when you spoke with Ms. Littleton?

A Ms. Wallace.

Q Was Mr. Pickett also in the room at that time?

A I think he was, yes, sir.

Q Okay. And did Ms. Littleton -- it says:

"Ms. Littleton stated that Ms. Parker confronted her about the rumor of whom she was sleeping with, and she stated that she, Ms. Littleton, promptly stopped her and informed her that she had no time for this type of issue in the work place and would not engage in further conversation on the subject."

Was that -- is that what Ms. Littleton told you?

A Yes, sir.

Q Was Ms. Littleton aware of any other rumor or anything like that, if she conveyed --

A Any other rumors, I don't know about that.

Q Okay. All right. All right. So

Larry Moppins

thank you there.

One other exhibit that was just shared with you, I believe, was Exhibit Number 11. This was -- that's that letter that Mr. Carter signed that you said you had seen at some point in time; you just weren't familiar with when.

In this particular letter that was signed by Mr. Carter, this statement that was signed by Mr. Carter, it says:

"Mr. Moppins asked Mr. Birgans, had he witnessed an incident between Donte Jennings and Evangeline Parker."

Do you recall having that conversation with Mr. Birgans?

A Yeah, because Donte said a couple -- something that -- uh -- something about that effect -- yes, I do. Yes.

Q Okay. And -- and what is reflected here, it says:

"Mr. Birgans did not want to say anything about the situation. He wanted to stay out of the situation."

Is that what Mr. Birgans told you at that time?

Larry Moppins

A That was the constant reply. Yes.

Q Okay. Then it said that:

"Mr. Birgans said that he and Van were standing in the receiving area when Donte came up to thank Mr. Birgans for finishing a task that he asked him (Kenton) to assist him with. Kenton said that, as Donte was walking away, when Van made negative facial expressions and body movements towards Donte."

Did Mr. Birgans convey that to you?

A Yes, sir. It was -- what happened -- it was -- a mission we had to get done in the SPEAR -- excuse me -- in the SPEAR section. And then they had a match column -- so they asked for help --

(There was a discussion off the record. Reporter clarification.)

A Then they had a mission in the SPEAR section to get done -- then they had -- in a timely manner. Then they had a work demand pile to get done.

So he asked people -- he asked Kenton and a couple of more people to give him a hand to get it done.

Larry Moppins

MR. KOPSIDAS: Note my objection to the form, please.

Q And did -- did Kenton indicate to you that he saw the facial expressions and movements by Ms. Parker towards Donte?

A Verbally, yes.

MR. KOPSIDAS: Same objection.

MR. WALSH: Okay. Thank you, Mr. Moppins. I don't have any other questions for you at all.

MR. KOPSIDAS: Okay. Neither do I. Thank you, again.

THE WITNESS: Okay.

MR. WALSH: Mr. Moppins, just -- I'll just advise you on your rights to read and sign. So you will have the opportunity to get a complete copy of the transcript and to review it and sign, and, as Mr. Kopsidas mentioned, you can make changes to it as you feel are appropriate.

That right is entirely yours. It's entirely your right to say whether you want to review and sign or not.

Generally, court reporters are pretty

Page 174

Larry Moppins

good at taking things down, but, in this new Zoom technology, I recognize that not everybody is always so trusting.

So you just have to let the court reporter know on the record whether you prefer to read and sign or whether you are just happy with the transcript.

THE WITNESS: I will be happy with the transcript answer. That's fine.

MR. WALSH: Okay. Thank you.

With that, Mr. Moppins, I believe that we are done. Let's just wait for the reporter.

THE VIDEOGRAPHER: We are going off the record at 2:01 p.m.

This ends today's deposition.

(Deposition concluded, 2:01 p.m.)

Page 175

J U R A T

I DO HEREBY CERTIFY that I have read the foregoing transcript of my deposition testimony.

SWORN TO AND SUBSCRIBED
BEFORE ME THIS
DAY OF 2020

_ _ _ _ _ _ _ _ _ _ _

Page 176

I N D E X

| WITNESS | DIRECT | CROSS |
|---|---|---|
| LARRY MOPPINS | | |
| BY MR. KOPSIDAS | 6 | |
| BY MR. WALSH | | 160 |

Page 177

E X H I B I T S
DOCUMENT REQUESTS
INSTRUCTIONS NOT TO ANSWER

| NUMBER | DOCUMENT | PAGE |
|---|---|---|
| Exhibit No. Moppins 1, "Subpoena to Testify at a Deposition in a Civil Action" directed to Mr. Larry Moppins, Document | | 11 |
| Exhibit No. Moppins 2, 11/26/14 Letter, Offer of Employment, to Ms. Evangeline Parker from Rajesh S. Vora, President of Reema, Bates No. REEMA 295, Document | | 32 |
| Exhibit No. Moppins 3, Employee Performance Evaluation, dated March 21, 2016, for Evangeline Parker, Bates Nos. REEMA 000349 through 358, Document | | 39 |
| Exhibit No. Moppins 4, 3/2/16 Letter from Angela Wallace to Cathy Price regarding a counseling session with Robert Matthews, Bates No. REEMA 220, Document | | 53 |
| Exhibit No. Moppins 5, Reema Consulting Services, Inc., Employee Handbook, dated June 2013, Bates Nos. REEMA 8 to 57, Document | | 60 |
| Exhibit No. Moppins 6, Document entitled "Sexual Harassment Policy Manual for Reema Consulting Services, Inc.," Bates Nos. REEMA 59 through 114, Document | | 67 |

Exhibit No. Moppins 7, Reema Consulting Services, Inc., Sexual and Other Unlawful Harassment Investigation Questionnaire, Interview with Evangeline Parker, Interview date 4/25/16, Bates Nos. REEMA 1 to 5, Document 87

Exhibit No. Moppins 8, 4/25/16 E-Mail from Cathy Price to Evangeline Parker and others; Subject: Recent Events, Bates No. REEMA 176, Document 106

Exhibit No. Moppins 9, 4/27/16 E-Mail chain, top E-Mail from Larry Moppins, Sr., to Cathy Price; Subject: Request, Bates No REEMA 194 to 195, Document 113

Exhibit No. Moppins 10, 5/12/16 Memorandum; Subject: Notification of Hostile Work Environment; Re: Interaction between Evangeline Parker and Donte Jennings, from Donte Jennings, Bates No. REEMA 191, Document 120

Exhibit No. Moppins 11, 5/16/16 Memorandum from Carlos Carter, Sr., Bates No. REEMA 231, Document 125

Exhibit No. Moppins 12, Reema Consulting Services, Inc., Written Warning, dated 5/16/16, Employee: Evangeline Parker, Supervisor: Larry Moppins, signed by Mr. Moppins on 5/18/16, Bates Nos. REEMA 171 to 175, Document 129

Exhibit No. Moppins 13, Reema Consulting Services, Inc., Sexual and Other Unlawful Harassment Investigation Report, Dates 4/18/16 through 5/17/16, Bates Nos. REEMA 6 and 7, Document 151

Previously Marked Exhibit No. Price 20, 5/13/16 E-Mail from Mr. Moppins to Mr. Vora, Bates Nos. REEMA 196 TO 197 164

There was no Exhibit Moppins 14 marked.

Clean copy of Moppins 10 requested 123

CERTIFICATE

I, TAB PREWETT, A Registered Professional Reporter, Notary Public, Certified LiveNote Reporter, and Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination Larry Moppins was sworn remotely via Zoom videoconference by Rita Persichetty, remote notary public, to testify to the truth, the whole truth, and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

________________________________________

Notary Public

Dated: July 15, 2020

My Commission expires February 9, 2024

Exhibits

**EX 0001 Larry Moppins 071120** 11:17,18 177:8
**EX 0002 Larry Moppins 071120** 32:13,17 177:10
**EX 0003 Larry Moppins 071120** 39:16,24 44:14 177:13
**EX 0004 Larry Moppins 071120** 53:13,16 177:15
**EX 0005 Larry Moppins 071120** 60:16 177:18
**EX 0006 Larry Moppins 071120** 67:19,21 68:4 177:20
**EX 0007 Larry Moppins 071120** 87:7,14 178:3
**EX 0008 Larry Moppins 071120** 106:3,4 178:6
**EX 0009 Larry Moppins 071120** 113:23,25 166:4,8 178:9
**EX 0010 Larry Moppins 071120** 120:16,18 123:14 178:11 179:9
**EX 0011 Larry Moppins 071120** 125:14,19 171:4 178:15
**EX 0012 Larry Moppins 071120** 129:11 178:17
**EX 0013 Larry Moppins 071120** 151:25 152:10 161:15 179:3

$

**$250,000** 50:4,8
**$3** 52:21
**$50,000** 50:4
**$750,000** 51:17

0

**000176** 106:10
**000220** 53:15
**000295** 32:16
**000349** 39:14,18 177:14

1

**1** 11:17,18 33:14 45:3 54:8,20 87:12,15 156:19 177:8
**10** 120:16,18 123:14 156:14 178:11
**10,000** 93:17
**10305** 6:12
**106** 178:6
**10:52** 60:4
**11** 4:9 125:14,19 171:4 177:8 178:15
**11/26/14** 32:17 177:10
**113** 178:9
**114** 67:24 68:7 177:22
**11:03** 60:9
**12** 121:17,21 122:5 129:11 138:8 178:17
**120** 178:11
**125** 178:15
**129** 178:17
**12:28** 120:9
**12:43** 120:12
**13** 19:18 151:25 152:10 161:15
**13th** 164:12
**14** 152:7 161:14,15, 18,25
**15** 96:25
**16** 129:20 135:18 136:13
**160** 176:14
**16th** 136:21
**17** 19:16,18,20,21 152:23
**171** 129:10,15
**172** 131:11
**173** 130:9
**174** 135:16
**175** 77:3 129:10,16 178:19
**176** 106:7 178:8
**18** 63:14 130:12 136:10 152:22
**18th** 114:25 115:18 166:15
**191** 120:15,17,22 178:14
**194** 113:24 114:4 178:10
**195** 113:24 114:4 178:10
**196** 164:8
**197** 164:8
**1:42** 160:7
**1:47** 160:10

2

**2** 32:13,17 53:23 160:4 177:10
**20** 89:25 156:15 164:4,7
**200** 113:11
**2004** 157:10
**2007** 157:2,11
**2013** 19:19 20:20 60:18,24 70:10 157:3 177:19
**2014** 33:6,14,16 34:18
**2015** 45:3
**2016** 39:17 53:23 54:9,20 86:20 107:4 114:8 115:19 121:17, 21 122:5 129:21 130:12 135:18 136:10,13 138:8 152:22,23 162:5 177:14
**2017** 16:11,22 19:19 156:14
**2020** 4:9 156:15 175:12
**206** 63:18
**20th** 156:15
**21** 39:17 86:20 177:13
**22** 162:5
**220** 53:19 177:17
**22408** 6:13
**22nd** 114:25 115:18 166:15
**231** 125:16,20 178:16
**25** 34:5 107:3
**26** 33:6
**27** 114:7

**27th** 166:10
**295** 32:20 177:12
**2:01** 174:16,18

3

**3** 39:16,24 44:14 177:13
**3/2/16** 53:16 177:15
**30** 90:2 96:25
**300** 113:12
**32** 177:10
**35** 159:15
**357** 44:15
**358** 39:14,19 177:14
**375** 77:3
**39** 177:13

4

**4** 53:13,16 177:15
**4/18/16** 152:4
**4/25/16** 87:11 106:4 178:5,6
**4/27/16** 113:25 178:9
**40** 26:19
**45** 26:20

5

**5** 60:16 87:12,15 177:18 178:5
**5/12/16** 120:18 178:11
**5/13/16** 164:7
**5/16/16** 125:14 129:13 178:15,18
**5/17/16** 152:4
**5/18/16** 129:15 178:19
**50** 75:17
**50,000** 50:7
**53** 177:15
**57** 60:15,18 177:19
**59** 67:24 68:7 177:22

6

**6** 67:19,21 68:4 151:24 152:5 176:11 177:20
**60** 177:18
**67** 177:20

7

**7** 87:7,14 151:24 152:5 178:3
**75** 69:24

8

**8** 60:15,18 106:3,4 177:19 178:6
**80** 29:22
**87** 178:3

9

**9** 113:23,25 166:4,8 178:9
**90** 29:22
**9:09** 4:15
**9:36** 6:5

A

**a.m.** 4:15 6:5 60:4,9
**ability** 21:25
**abruptly** 132:13
**abuse** 130:2
**acceptable** 118:6
**accident** 65:14
**account** 123:24,25
**accurate** 7:21 8:11 9:24 10:5 24:6 25:21 26:5,23 42:16 56:14 63:10 71:13,15 96:11 133:15
**accurately** 9:9
**accused** 75:10
**achieve** 154:15
**acknowledge** 5:3,7
**acronyms** 21:17
**act** 118:20
**acting** 10:12 138:10
**action** 11:10,19 27:10 28:2 30:15 31:5 52:7 76:9 134:3,16 139:12 177:9
**actions** 27:7 53:8 158:24
**actual** 50:13 57:8
**adapt** 39:4
**add** 48:16
**added** 38:20,23 39:2 139:21
**addition** 169:14
**address** 6:11 21:14 121:3 122:7,9 124:14,17 134:18
**addressed** 33:7 44:19 53:23 77:10 122:12
**addressing** 112:9
**adjoining** 81:2
**admin** 42:7
**administered** 5:8
**administrative** 34:9
**advise** 173:16
**advised** 167:12
**advising** 107:14 111:8
**affair** 76:13 78:9 79:21 81:9 82:11 83:3 86:6 94:22 95:9,16 108:23 110:20 133:10 149:3 150:5 151:2
**aggravating** 82:7
**agitated** 96:16 97:4 102:5 116:24 117:6,19 132:14 142:16 144:2
**agitating** 94:5
**agree** 5:16,17 26:2 52:10 65:22 66:19 112:18 122:15 123:4,20 127:12,13
**agreed** 37:17 146:8,10
**agreement** 5:13,14 31:15
**ahead** 9:6 29:12 40:10 41:18 44:12 48:17 68:2 107:22 123:18
**air** 117:18
**albeit** 34:14
**all-hands** 86:20,23 88:15 105:13 161:9 163:7
**allegation** 148:19
**allegations** 13:10

**alleged** 98:23 126:24 150:5
**allegedly** 127:5
**allotted** 155:5
**allowed** 133:8 162:6 163:8
**alternate** 45:12 131:3
**alternative** 131:3
**and/or** 115:4 166:18
**Andrew** 4:19
**Angela** 31:22 32:6 51:24 53:17 54:3 56:23 83:6 97:7,17, 18 98:3 101:15,17 112:4 164:19,20 177:16
**angry** 96:12
**annoys** 10:14
**annual** 83:5
**answering** 9:24
**answers** 6:24
**Anti-terrorism** 159:9
**anytime** 64:5,10,13 73:10
**apparently** 55:21 115:17 137:17
**appearances** 4:17
**appears** 44:25 106:13 114:6 164:10
**apply** 64:23
**approached** 167:21 169:10
**approval** 25:23,24 27:12 28:19 29:17
**approve** 25:25 27:17 37:25
**approving** 37:16
**April** 18:9 86:20 107:3 114:7,25 115:18 152:22 157:10 162:5 166:10,15
**area** 11:4 85:18 137:20 141:17,20,21 142:4,7,8 144:13,16 172:5
**areas** 141:2
**Arms** 21:8
**Arnel** 138:15 165:12
**arrangement** 5:11
**assist** 172:7
**assistant** 37:23 38:8
**Associates** 20:23 156:23
**assume** 23:20 37:5 45:7 53:24 65:19 103:7 109:18 114:20 115:18 121:5 126:15 130:25
**assuming** 103:6,7 160:2
**assump** 33:24
**assumption** 131:25
**ATA** 21:5
**ATHI** 104:16
**attachment** 12:9
**attempted** 116:15 142:21 163:4
**attempting** 132:22 133:3 142:18 164:16
**attention** 13:17 84:3 108:17
**attire** 84:23
**attitude** 84:25
**attorney** 4:18
**attorneys** 5:2
**August** 157:2
**authority** 30:14 51:3 130:3
**authorized** 27:6
**availability** 16:24 17:11,12
**aware** 77:14 79:18,19, 20 111:3 170:21

**B**

**baby** 48:20
**baby-sit** 48:22 53:3
**baby-sitter** 48:20 49:4
**baby-sitting** 51:11 52:25
**back** 33:25 34:18 36:22 44:14 47:22 57:11,19,24,25 60:9 62:2 63:5 65:4,5 69:21 70:9 72:15,16 78:5 80:19 83:21 85:17 90:17 92:20 93:16,20,24 94:3 97:4 98:17 101:12,14 102:9,11 105:10 113:20 117:12 120:11 126:2,21 130:8 136:25 140:21 142:13 154:20 155:18 160:3, 9 163:6 166:2 169:2
**backwards** 156:20
**bad** 10:12 47:12 144:5 158:10 159:3
**balance** 66:10
**basic** 34:8
**basically** 13:7 14:8 25:21 30:8 33:7 44:5 49:2 57:14 61:6 68:18 81:12 92:21 93:12,17 111:13 143:6 150:17 152:21
**basis** 26:14 42:10,15 69:20 73:23 76:21
**Bates** 32:15,20 39:14, 18 53:14,18 60:15,18 67:23 68:6 87:11,15 106:6,9 113:24 114:3 120:17,22 125:15,19 129:10,15 151:24 152:4 164:8 166:7 177:12,14,17,19,21 178:5,7,10,14,15,19
**bathroom** 63:2,3
**Bear** 39:10 105:23 149:16
**bearing** 32:14,15 39:13 53:14 60:15 87:15 106:9 113:24 120:17 125:19 129:10 151:24 155:19
**bears** 68:6
**bees** 30:23
**began** 133:8 160:22
**beginning** 70:9 104:16 136:16
**behalf** 4:20,22 139:16 147:12
**behavior** 139:15 153:20 164:17
**belligerent** 78:24 80:4,5 117:17
**bending** 69:23
**benefit** 159:24
**bifocals** 108:9
**bill** 66:15 67:15

**Birgans** 93:5,10 95:8 127:5,14 171:11,15, 21,24 172:4,6,11
**birthday** 79:13
**bit** 6:20 54:22 57:16 108:2 156:20
**blah** 17:3,4
**block** 162:19
**boat** 106:11,14
**body** 172:9
**bold** 134:8
**bonus** 43:13,17
**book** 62:14,18
**boot** 68:19
**boss** 65:17 84:4
**bottom** 12:7 94:11,21 95:4,5 116:12 121:23 153:16
**break** 8:17,18,20 21:20 44:10 59:18, 19,21 60:7 98:17,22 100:15 113:22 120:7, 10 141:22 159:17,21 160:8
**Briefly** 15:20
**bring** 84:2,3,4 140:7 168:4 169:21
**brought** 24:25 73:19 79:3 83:18 102:9,11 108:17
**building** 90:16 169:11
**business** 22:5 79:11 97:14 156:7,18
**busy** 67:5 101:11
**bye** 65:16

**C**

**C-H-U-N** 20:25
**call** 16:9,16 17:2 24:18 26:21 53:5,6 83:18 88:19 90:20 101:17 150:22
**called** 11:4 13:15,24 14:8 15:15 75:16 86:19 90:12 97:7 150:6,24 161:10
**calm** 57:15
**capability** 161:12
**car** 65:14
**care** 17:7 30:10 49:3 51:20
**Carlos** 86:10 92:25 93:19 95:7 104:3 125:15 126:11 127:8 144:15,19,24 178:15
**Carter** 86:10 92:25 93:10 95:7 104:4 125:15 126:11 127:8, 11,20 144:15,19,24 171:5,9,10 178:15
**case** 13:6 74:15 104:5,7
**cases** 42:21 49:14,15
**cash** 18:20,21
**cast** 71:4
**catch** 72:20,21
**categories** 12:19
**Cathy** 16:2 53:17,24 68:10,22 73:14 74:2, 18 78:15,16,24 81:13 82:21,22 86:8,13 91:4 93:8 95:12,19 97:23 99:23 100:10 102:20 103:7 106:5 107:2 114:3,7,13 119:10 124:6 126:17, 18 128:17,22 145:23 164:5 177:16 178:7, 10
**cease** 107:15 111:9
**Cecil** 119:4
**center** 90:7
**CERTIFY** 175:4
**chain** 114:2 178:9
**chance** 9:12 12:4 57:7 59:4,8 160:14
**change** 8:12 9:15 72:15,16 99:6,7
**changed** 9:18 31:20 32:4 43:24 70:4
**changing** 31:16,17
**character** 58:21 112:14
**characters** 71:4
**charge,'** 165:16
**chat** 11:4 60:14 163:22
**check** 18:16,18 26:21 144:11,12,22 159:18
**checked** 47:17
**checking** 149:17
**checks** 18:21
**Chun** 20:25 22:11 23:14 119:4
**circulated** 76:12
**circulating** 98:15 168:2
**circumstances** 62:21
**Civil** 11:10,19 177:8
**clarification** 19:24 21:6 83:16 172:18
**clarify** 43:19 86:25 89:17 159:25
**clarifying** 142:13 161:2
**classified** 21:12
**clean** 123:13,14
**clear** 18:24 99:14 109:20 112:2 119:12 140:17 148:10
**clearer** 40:12
**clerk** 33:11 34:7,19 35:6 54:16 103:20 105:3
**client** 20:6,9 96:19 105:18 118:19,23,24 149:20,21
**close** 72:14
**closed** 80:25 90:3 162:23
**closed-door** 80:14
**closer** 42:13
**clothes** 70:4 72:15,16
**code** 72:7,8
**collect** 57:18
**column** 172:15
**comment** 130:22
**comments** 48:18 72:25 73:17
**committed** 66:23
**common** 11:3 50:20 130:17
**communication** 16:15 65:24
**communications** 12:24 15:10
**company** 20:22
**complained** 81:11 84:21 165:14

**complaining** 81:7 108:22 148:14 165:22
**complaint** 66:22 119:14 138:19,25 141:4 143:14,17 147:10,13 149:9 151:7,11 158:4 165:3
**complaints** 69:6,9 158:24
**complete** 7:21 8:11 9:23 10:5 173:18
**completed** 155:4
**completely** 116:24
**Compliance** 38:15
**compose** 102:5,13 143:12,22
**composed** 116:8
**composing** 136:15
**computer** 96:18
**con** 43:18 132:3
**concern** 82:25 116:17
**concerned** 48:4 80:23
**concerns** 92:12 99:25 162:6 163:8
**concluded** 174:18
**concur** 38:22,25
**concurred** 38:2
**condoned** 139:16
**conduct** 61:11 143:7 148:15 163:11
**conference** 89:5 101:18 133:20 164:21
**conferencing** 4:9
**confidential** 21:25 22:4,6
**confrontation** 57:5 146:23
**confrontational** 55:25 57:3
**confronted** 170:12
**confused** 98:6
**consent** 5:11
**constant** 165:3 172:2
**constantly** 56:5 81:16 86:8,12 165:15 168:17
**constructive** 102:14
**consult** 24:21 26:8
**consulted** 25:15 43:11,17
**Consulting** 4:5,23 12:25 33:9 60:17,23 67:23 68:6 87:8 129:12 139:17 152:2,16 177:18,21 178:3,17
**contact** 149:23 150:4
**contacting** 149:20
**continue** 123:8
**continued** 60:10 75:9 169:20
**contract** 21:5,16 23:8 31:16,20,25 32:4 43:21 46:22 70:24 74:24 104:6,17 105:4 157:3
**contractor** 20:19 22:13 23:2,7 31:17 161:4,5
**contractors** 118:24
**control** 26:6 38:15
**controlled** 24:2
**conversation** 59:13,14 80:6 95:24 96:2,8,9 97:8,22 98:8 102:8,14,19 113:8 116:23 117:5,13 118:2 131:12 132:3,7 143:3 145:15 169:16,24 170:17 171:14
**conversations** 13:4 14:3 15:22
**convey** 172:11
**conveyed** 170:22
**coordinator** 37:12 115:12
**copy** 61:12 62:7 123:2,13,14 173:18
**corner** 93:16
**correct** 6:15,16 7:24 10:20 12:16,17 23:21 28:2 37:7 38:21 41:20 45:3,9,10,13,14,18 47:13 50:13 51:24 55:19 78:4 80:2,8 88:16,17 95:18,20 101:12,13,16,21 107:8,9 109:21 111:15 112:5 115:21 117:3 121:3,7,18,24,25 122:3,6 123:21,22 125:2 126:17,25 127:8,9 129:21 130:10 133:23 135:25 136:8 139:4 140:16,19 141:6,11 144:10 145:25 149:13 151:3 153:13 154:2 161:8 164:22 165:24 167:24 168:21
**corrected** 52:13 70:3
**corrective** 52:7 134:3,15 139:12
**correctly** 21:14 135:5
**cost** 46:18 47:10 51:13
**costing** 47:6
**counsel** 4:16 5:11 6:15 12:25 132:23 133:3 142:18 164:16
**counseled** 62:16,19
**counseling** 46:8,9 48:7 53:18 54:6,18 55:3,18 57:13 59:3 151:19 157:15 177:16
**couple** 8:25 13:14 15:16 57:17 92:19,20 123:4,17 159:20 160:25 165:10,20 171:16 172:24
**courses** 47:21
**court** 4:11,24 7:20 8:23 11:16,25 13:6 21:15 59:20 173:25 174:5
**cousin** 106:21
**covers** 152:21
**create** 112:14
**critical** 64:24
**cross** 160:21,23 176:5
**Crossing** 6:12
**current** 6:11
**Currey** 12:25 14:6,7 15:6,7,8
**cursor** 133:2
**cut** 107:25 122:18,22 123:5 167:23
**cutting** 56:5

**D**

**D-A-M-A-R-C-U-S** 36:17

**D-A-U-G-H-T-E-R-T-Y** 84:19
**daily** 26:14 42:10 76:21
**Damarcus** 36:16 37:20 38:5 74:7 80:15 91:12 100:25 112:3 133:10 140:4,5 148:20,21 151:15 154:6,11 164:19
**date** 33:13 86:21 87:11 88:16,17 121:14,16,20 126:9 135:21 147:2 178:5
**dated** 33:6 39:17 53:22 60:18,24 129:13 130:12 135:18 136:13 177:13,18 178:17
**dates** 152:4 156:11,24 157:8
**Daugherty** 84:19
**daughter** 65:13 83:17 106:21
**day** 61:24 76:24 77:12 78:18,19,22,23 80:20 84:24 88:16 94:14 102:17 113:12 118:16 126:8 135:25 136:2,3,5,6 146:13 150:6,7,8,9 175:12
**day-to-day** 24:3 25:2 42:5,14
**days** 42:9 118:17 136:14 165:10,20
**deal** 25:3 73:23 74:4,20 136:18,19 145:11
**dealt** 74:19 76:4 145:7
**death** 64:17 65:7
**December** 33:14,16
**decided** 41:14 146:19 150:22
**decision** 43:11 145:13,17 154:17
**decisions** 25:14,16 26:9 27:4
**declare** 5:9
**defamation** 112:14
**defense** 55:24
**define** 52:5
**delivered** 45:2 128:20
**demand** 172:21
**demeanor** 135:11
**demote** 154:18
**demoted** 151:16,17,20 154:16,19,23,24 155:7,9
**demoting** 135:7
**Demotion** 154:6
**demotions** 27:20
**denied** 77:9 80:19
**department** 20:10 22:11 34:20 47:23 74:25 118:25 159:9
**depended** 50:22
**depending** 160:16
**depends** 28:21 62:21 66:3
**deposition** 4:4,7 5:3,5,6 6:4,18 8:12 9:13,16 10:8,12,19 11:3,9,19 12:22 14:20,22 39:25 164:5 174:17,18 175:5 177:8
**deputy** 34:21 36:10
**derriere** 69:24
**designated** 93:18
**desk** 76:9
**desktop** 50:3
**determination** 43:22,23
**determine** 168:5
**devices** 50:2
**differently** 77:21
**difficult** 9:8
**direct** 6:6 80:18,19 176:5
**directed** 11:10,20 111:22,23 177:9
**directing** 112:2
**directions** 81:13
**directly** 76:16,19 145:5,12 167:15
**dis** 146:10
**disagree** 146:3
**disagreed** 146:9
**disagreeing** 146:7
**disagreement** 145:19
**disciplinary** 27:7,10,14,25 29:19 30:15 31:5 76:8 158:23
**discipline** 31:11
**disciplined** 30:2 157:12
**disclose** 133:10
**discuss** 78:10 155:11
**discussed** 80:15 147:13 168:5
**discussing** 78:3
**discussion** 5:18 20:11 60:5 65:24 79:21,25 112:22 125:23 152:8 160:20 172:17
**disparaging** 149:21
**disrespect** 134:17
**disrespectful** 97:16 144:8 164:18
**disrupted** 116:24
**distance** 94:3
**distinction** 30:13
**District** 11:25 12:2
**dock** 106:15
**document** 11:20 12:8 32:14,20,22 33:2,4 39:13,19,22 40:3 44:14,16 45:4 47:11 51:25 52:2 53:10,13,14,19,22 60:13,14,19,22,25 61:6 63:14 67:18,21,24 68:3,4 86:25 87:3,12,15,18,21 90:22 91:8,9 99:15 100:3 106:7,9 113:22,24 114:4 120:15,16,22,24 121:5 122:24 123:3 125:13,16,19 126:5,16,23 129:8,9,16,18 130:15 139:22 151:24 152:5,11 153:7,10 154:23 161:11 163:19,23 164:2,4,10 177:3,6,9,12,14,17,19,20,22 178:5,8,10,14,16,19
**documents** 12:15,19 87:16
**Don** 21:23
**Donald** 4:22

**Donte** 18:6 81:8,11,14
85:6,11 92:14 93:19
95:2,15 98:23 109:6,
19 120:21,22 121:24
128:3 137:25 138:5,9
167:21 171:12,16
172:5,8,10 173:6
178:13
**Donte's** 81:24
**door** 22:23 46:20,23
63:18,24,25 64:23
65:23 67:16 72:21
76:19 90:3 162:21,
22,23
**doors** 80:25
**DOS** 21:5
**dozen** 25:12
**DPM** 36:5,8,9
**draft** 119:13 129:6
**drafted** 114:20,21
**drag** 11:3
**dress** 69:10,11,16
72:7,8,18
**dry** 76:20
**due** 41:6,14 52:16
108:16 153:19
**duty** 88:22

**E**

**E-MAIL** 16:4,6 23:5
106:4,13,24,25
107:7,15 108:12
111:7,9,14 112:3,7
113:25 114:2,7,10,16
116:9,13 119:13
121:7,10,11 122:6,7,
8,10 124:12 164:7,11
166:9 178:6,9
**E-MAILED** 16:7 122:5
139:5
**E-MAILING** 16:13
**E-MAILS** 113:12
**e-y** 164:25
**earlier** 96:22 148:11
166:8
**easier** 161:10,16
**east** 75:17
**easy-going** 148:2
**editing** 61:4

**effect** 138:17 167:4
168:25 171:18
**effective** 33:13
**elapsed** 148:5,6
**elevated** 105:5
**else's** 132:4
**em** 42:6 72:13,20,21
**embarrasses** 10:14
**emergency** 88:20 90:20
**emotional** 133:19
143:6 144:2
**employed** 104:8 155:22
156:4
**employee** 22:12 27:11
28:20 39:16,25 42:22
43:12,24 52:12
60:17,23 61:7,8
62:17 65:25 66:21
74:23,24 129:13
137:25 161:3,7 162:4
163:13 177:13,18
178:18
**employee's** 29:3
**employees** 16:8 27:7,
24 28:10 30:14 32:2
36:4 41:19,25 42:13,
18 49:11 50:18 61:10
62:3,6,9,14 63:2
64:7 65:8 70:13,20
74:4 75:15,19 92:7
130:4 131:14 133:8
137:20 138:4 141:3
148:16,17 159:11
162:6 163:8,10,15
**employer** 139:14
156:21
**employers** 156:8
**employment** 31:15
32:18 33:11 61:13,25
75:9 134:4,11 139:15
153:19 156:11 158:16
177:11
**employments** 157:13,20
158:3
**encouraging** 65:23
**end** 31:15 38:9 73:15
83:16 93:24 104:6
162:15 165:16 167:16
169:13,24
**ended** 132:13 169:15
**ends** 174:17

**enforced** 28:22
**engage** 170:16
**enlarge** 44:21 63:15
87:4
**entering** 169:11
**entertaining** 107:15
111:9
**entice** 109:24
**entitled** 44:16 60:23
63:18 67:22 68:4
114:8 152:15 177:20
**environment** 112:15
120:20 121:22 178:12
**equipment** 35:14 39:5
46:19
**error** 46:24
**escort** 133:20 164:20
**evaluation** 39:17 40:2
41:16 177:13
**evaluations** 41:18,22,
25 42:23
**Evangeline** 4:21 32:9,
18 39:18 44:20
83:16,17 87:10 89:20
106:5 112:4 120:21
129:13 153:19 171:13
177:11,14 178:4,7,
13,18
**event** 6:21
**events** 106:6 107:21
108:16 178:7
**eventually** 162:13
**everyday** 81:19 118:16
145:10
**Evidently** 116:7
**ex-employees** 16:15
**examination** 6:6 60:10
160:21,23
**examples** 83:23
**excellent** 43:6
**exception** 31:22
**excuse** 17:21 18:3
19:6,18 34:23 43:25
58:2 85:5 114:9
172:14
**exhibit** 10:25 11:8,
17,18 32:13,17
39:12,16,24 44:14
53:12,13,16 60:16
67:19,21 68:4 87:7,
14 98:19 106:2,3,4

113:23,25 120:16,18 125:14,19 129:11 151:23,25 152:7,9 161:14,15,17,18,25 163:7,20 164:4,6 166:2,4,8 171:3,4 177:8,10,13,15,18,20 178:3,6,9,11,15,17
**exhibits** 11:2 166:3
**expect** 10:11 73:18 123:11
**experience** 13:13 24:20 29:18
**expert** 19:23,25 20:16 22:18 23:19
**explain** 6:19 8:3 116:15 150:16
**explicit** 130:3
**exposed** 69:25
**expressions** 172:9 173:5
**extend** 33:10
**extent** 24:10
**extremely** 102:5 103:14,15

**F**

**F'ING** 94:16 165:5
**facial** 172:9 173:5
**facing** 90:15
**fact** 9:19 12:8 23:3 77:4,6 82:10 98:14 103:5 113:3 135:2 147:9
**fact-finding** 6:21
**factor** 147:10
**failed** 137:21
**Failure** 137:11
**fair** 8:8 71:6,16 136:20
**faith** 10:13
**familiar** 40:18 60:25 87:20 171:7
**familiarize** 123:18
**family** 19:5,7,8
**fast** 17:6 63:2
**fast-paced** 67:5
**father** 19:11
**fault** 76:8
**February** 19:17,18,19 70:10 157:2
**Federal** 155:25
**feedback** 65:24
**feel** 9:14 10:12 173:21
**feels** 91:25 92:6
**feet** 93:17
**female** 63:3 83:8
**Ferguson** 94:13,18 115:2,8,10,19 164:25 165:7 166:16 167:2, 8,12,17
**figure** 163:24
**file** 28:12 58:19 128:5 151:11
**filed** 69:6 88:5 113:19 141:4 147:9 151:7 158:5
**filling** 87:24
**final** 145:17
**finally** 124:15 168:23
**find** 12:18 20:13 123:9
**fine** 159:23 174:10
**fined** 48:24
**finish** 9:4,5 19:16 29:13 96:21 97:2 102:8 143:2
**finished** 162:18
**finishing** 172:6
**fire** 25:6 145:14
**fired** 48:12 92:8 147:11,17 157:19 158:8,13
**firing** 24:17,22 27:15 34:4
**Fish** 4:20
**five-minute** 159:17,21
**five-page** 87:18
**fix** 12:12
**flashed** 85:6
**flashing** 98:23
**floor** 72:10
**fluctuating** 126:18
**folks** 34:22,24 41:3
**follow** 62:9,17 124:8 137:11
**follow-up** 102:7,16 160:16
**force** 144:17
**foregoing** 175:5
**forget** 13:21 65:5 69:19 75:16 88:24 94:18 114:14,15 119:4,5 155:6
**forgot** 75:15
**form** 40:6,7,13,23 134:8,9 173:3
**forward** 66:9,10
**found** 23:5,6 76:7 78:4
**frame** 19:14 111:2 147:3 155:5,6
**Fredericksburg** 6:13 75:17 79:12
**free** 142:3 144:20
**freedom** 142:9,10
**fresh** 117:18
**Friday** 162:5
**friend** 23:16
**front** 7:6 66:9 67:14 72:21 90:6,15 161:11,17,19 169:9
**fucking** 167:15 169:13
**full** 6:8 127:16
**functions** 34:9

**G**

**garnishment** 67:15
**gave** 86:13 124:6 126:19 128:21 129:3 137:6 141:5,7,8
**general** 33:11 34:7,19 35:6 49:16 52:10 67:2 73:13 163:11
**generally** 40:4 43:5,6 50:18 64:22,23 126:23 173:25
**gentleman** 14:24 55:6 165:12
**gestures** 73:6,17
**girl's** 74:9
**gist** 46:7 131:8
**give** 7:19 16:8 17:17 19:14 22:3 28:19 29:17 41:8 43:12

57:7 61:10 67:8
68:11,17,24 96:20,25
114:14 118:5,6
123:16 126:19,22
134:22 137:2,18
141:23 172:24
**giving**  27:23
**Global**  157:6
**GMAIL**  121:3 123:24
139:5
**goal**  113:17
**goals**  154:15
**good**  11:15 18:23
35:9,13 39:9 43:6
163:21 174:2
**gossip**  82:14 108:18
109:2,12,16 112:13
**government**  21:16
70:23
**government's**  44:5
**Grainger**  119:4
**grammar**  166:22
**granddaughter**  19:12
**greeting**  167:13
**group**  11:4 163:22
**guess**  14:17 25:11
63:7 121:14 126:8,9
127:23 142:23 161:20
162:22
**guessing**  43:3
**guidance**  34:25 35:4
68:11,21,24
**guidelines**  61:10
**guy**  16:25 148:2
**guys**  147:21

**H**

**h-a-r-a-s-s**  108:5
**half**  16:6,12 52:20
59:17 120:6
**Hampton**  39:8
**hand**  93:16 130:23
172:24
**hand-held**  67:12
**handbook**  60:17,24
61:7,8 62:7,10 63:9
177:18
**handle**  30:24

**handled**  34:8 82:22
**hands**  31:20 44:4,6
**handwriting**  130:24
**hang**  166:4
**hap**  75:7
**happen**  10:11 27:21
71:22 73:2,11 164:22
**happened**  31:8 47:9
57:8,22 67:3 68:16
71:17 72:9,17 73:6
74:8 75:2,4,18 113:3
127:12 131:19
133:15,25 172:12
**happening**  43:14 56:10
**happy**  8:3 174:7,9
**harass**  108:4
**harassed**  74:12 139:2
**harassing**  75:11 92:21
93:13 101:3,6
**harassment**  67:22
68:5,9,22 69:2,6
70:19 71:7,9,17,24
75:21 87:9 103:2
141:3 147:10 152:3,
17 158:4 177:21
178:4
**harping**  165:3
**head**  24:7 29:23 40:22
93:3
**hear**  66:12 110:4
118:14 165:15
**heard**  78:2 148:20,21
**hearing**  132:15
**heave**  94:9
**hee-hee**  118:15
**hee-hee-hee**  118:15
**held**  4:7 36:14 86:19
88:15 146:11 162:4
**hell**  94:15,16
**helped**  35:10
**helping**  35:13
**hey**  17:4 47:20 57:14
65:8 67:6 68:19
72:14,15 83:9
118:16,19,21 143:23
169:2
**high**  51:17
**highlighted**  55:22
66:20 88:8,10 91:23
112:12 114:23 116:13
130:9 131:10

**highlighting**  52:3
**hired**  79:10 104:19,21
**hiring**  24:17,21 27:14
33:7
**hit**  100:23
**Hold**  54:22 97:6
125:25
**home**  70:4 72:19
**honest**  13:16
**honestly**  33:17
**hospital**  65:13
**hostile**  112:15 120:19
121:21 178:12
**hour**  8:18 44:9 59:17
120:6
**hours**  76:23 118:16
126:19
**house**  79:12
**HR**  41:5,8,14 57:24,25
74:3 107:16 112:23
128:13 139:10,25
141:4,8
**HR's**  108:17
**huffed**  97:3
**huffing**  81:6
**human**  111:10 168:5

**I**

**I-T-A-R**  21:7
**i.e.**  50:3 51:4
**idea**  15:17 85:15
90:21 98:16 99:10
111:5 119:11 124:2
125:8 127:14 128:6,
10 129:7 139:9
148:9,25 169:15
**identification**  11:21
32:21 39:20 53:20
60:20 67:25 87:13
106:8 114:5 120:23
125:17 129:17 152:6
**identified**  161:25
164:4
**identifying**  39:5
**II**  33:11 34:7,19 35:6
**imagine**  126:11
**immediately**  131:12
148:4 156:22
**importance**  65:25

**important** 7:19 8:10 9:2,17,23
**improve** 155:8
**improvement** 154:7,12, 13,14 155:3,4
**in-charging** 165:4
**inaccurate** 88:14
**inappropriate** 69:10, 11,15 72:25 73:5,11, 17 153:20 163:10 164:17
**incident** 47:4,5 58:12 74:6,8 85:4,5 98:18, 23 124:25 126:24 127:3,11,24,25 149:24 168:9 171:12
**incidents** 56:9 62:13 71:7,9 72:7,24 73:16 75:21 169:5
**including** 27:19 68:15 107:3
**incorrect** 30:17
**increase** 43:12,16
**individual** 163:15
**individually** 163:12
**individuals** 107:3
**inexpensive** 51:16
**information** 22:2
**informed** 115:2,19 166:16 167:20 168:6 170:14
**initially** 19:15 104:13
**inquire** 148:16
**insight** 24:4 67:8
**instance** 51:2 62:25
**instructing** 107:11 151:8
**instruction** 68:17
**instructions** 68:11 86:14 93:14,24 137:11,19 140:25 141:6,11,13 177:4
**instrumental** 35:12
**insubordinate** 56:15, 19
**insubordination** 130:4 135:13 153:21
**intent** 52:4
**interacting** 35:6

**Interaction** 120:20 178:13
**interject** 119:19
**international** 39:6
**intervened** 154:25
**intervening** 17:3
**Interview** 87:10,11 178:4,5
**introduced** 164:9
**inventory** 35:11,14
**investigate** 82:9,20 149:12,14
**investigated** 76:7 82:24
**investigation** 87:9,22 91:5,11,13,16,17 92:15 98:14 100:9 101:7 103:2 116:3 124:25 148:15 149:6 152:3,17 153:3,13 161:24 178:4
**involved** 25:14 30:9 35:15 36:3 43:10 54:7 61:3 74:4 87:24 127:18,19 148:23 149:7 166:21
**involvement** 36:6 37:15 38:7 57:13
**irate** 164:18
**issue** 28:15 30:11 38:11 42:11 68:12 73:13 76:3 100:15 112:23 128:8 141:18 168:5,23 170:15
**issued** 11:25 12:14 29:17,20 49:23 129:20 130:18 135:24 136:3
**issues** 17:23 30:24 66:14 81:19 84:12 92:13
**issuing** 49:21
**ITAR** 21:4,7
**item** 50:7
**items** 52:17 69:24

**J**

**January** 70:10 157:2
**Jenn** 100:24

**Jennings** 18:7,25 72:4 81:8 82:10,25 85:6, 11,22 86:5 91:17,25 92:14 95:14,15 98:24 99:12 101:4,6 104:18,24 109:21 110:2,21 112:6 120:21,22 121:24 124:9 125:6 126:25 127:4 138:2,5,9,25 139:4 141:16 143:14 144:12 149:9,21 151:7 167:21 168:4, 8,16,20 169:8,17 171:12 178:13
**Jennings's** 103:16 122:10
**job** 20:3,5 22:15,16, 17,20,22,25 23:14 29:23 38:16,17 48:22 53:2,7 65:6 66:5,6 67:14 96:22 103:13, 14,16 113:17 144:25 159:4
**joking** 76:24 118:12, 15
**judge** 7:6
**July** 4:9 16:11 19:16, 19 156:14 157:10
**jump** 21:9
**jumped** 97:3
**jumping** 91:9
**June** 60:18,24 156:14, 19 157:10 177:19
**jury** 9:18
**justified** 49:24 50:15 51:2

**K**

**K-W-A-N** 20:25
**Kenton** 93:4 95:8 127:4 128:3 172:7,23 173:4
**kids** 64:21 106:14
**kind** 30:13 40:3,7,13 49:22 50:14 68:20 98:10 103:8 122:13 124:11
**kinds** 40:21 49:10,21
**knew** 23:9 47:23,24 73:21,22,25 76:10

80:12 83:11,12 84:5, 6,13 92:11,13 144:23
**knock** 163:5
**knocked** 163:3
**knowledge** 20:7 62:12 73:4,9 149:11
**Kopsidas** 4:19 5:16 6:7 11:16 21:13,22 32:12 39:12 44:8 53:12 59:16 60:11 68:2 106:20 120:5,13 122:25 123:11 151:23 152:7 159:16 160:2, 11 166:5 173:2,8,12, 19 176:11
**Kwan** 20:25 119:4

L

**lady** 17:14 69:19
**laid** 62:9
**Lane** 6:12
**large** 93:22
**Larry** 4:1,4 5:1 6:1, 10 7:1 8:1 9:1 10:1 11:1,10,20 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1,10 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1,2 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1,14 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1,21 161:1 162:1,5 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 176:8 177:9 178:9,18
**lasted** 101:25
**lastly** 10:10 90:12 112:21
**late** 90:5
**laughing** 76:24 118:12,15
**lawyer** 15:16 17:2,4
**lawyers** 15:10 22:8
**leader** 24:25
**leadership** 51:8 53:4
**learned** 39:9
**leave** 31:14 56:6 57:25 81:17,22 92:22 93:13 98:2 102:6 143:25
**leaving** 83:7
**Lees** 6:12
**left** 5:25 54:21,22 75:9 93:16 97:3 98:8 104:9 108:3 145:18
**left-hand** 93:15
**Legal** 4:8,10,12
**legs** 72:12,14
**letter** 23:4,6 32:18 33:6,7 53:16,22 55:20 56:13 57:23 81:25 82:2 116:8 138:9 158:15 171:5,8 177:10,15
**letting** 111:19
**level** 23:20
**levels** 25:4
**lie** 117:14
**lieu** 5:7
**life** 55:13,15 64:17 65:7 66:7,8,9,14 67:13
**life-or-death** 65:20
**listen** 131:25 132:2,6
**listening** 66:23
**litigation** 10:18
**litigations** 6:22
**Littleton** 167:22,23, 24 169:22,25 170:4, 9,11,14,18,21
**LLC** 155:25
**locked** 162:22,25 163:2
**logistics** 14:22 38:15
**long** 46:5 101:25 104:7,9 123:12 168:22
**longer** 140:18
**looked** 106:18 112:8 135:22 139:4 151:6
**lost** 28:4 97:9,12
**lot** 21:17 30:4 64:18 66:5 67:4,11 99:21 145:8
**lovely** 106:18
**lower** 107:25
**lowest** 103:23
**LT** 156:7,9,17
**lunchtime** 141:22

M

**mad** 77:2
**made** 80:25 119:13 139:4 145:13,17 172:8
**make** 9:14 20:6 25:5 27:4 48:23 52:6,7 68:20 80:12 88:19 108:6 114:16 119:16, 20,23 144:12 159:20 161:22 164:3 166:6 173:20

**making** 20:5 72:25
143:17
**male** 62:25 92:6
**man** 13:21 81:22 82:8
**manage** 103:21
**managed** 34:17 105:7
**management** 23:20 27:4
53:4 112:9 130:2
**manager** 21:4,8 24:7,
15,19 26:25 30:22
34:18,21 36:10
37:18,23 38:4,8,15
45:8 54:3 66:23
81:24 86:10 92:25
131:4 137:12,15
140:25 142:10 159:7
**manager's** 86:18
**managerial** 130:3
**managers** 30:8,10,24
34:15,20 41:7,17,24
42:3,4,12,17 86:22,
23 92:20
**Manley** 94:13,18
115:10 164:25
**manner** 5:12 10:13
50:13 89:2 138:10
143:8 172:21
**manual** 67:22 68:5,9
177:21
**March** 39:17 53:23
54:8,20 177:13
**mark** 11:9,17 21:25
22:6 32:12 39:13
67:18
**marked** 11:21 32:20
39:5,19 53:19 60:19
67:24 87:12,14 106:7
114:4 120:23 125:16
129:16 152:5 163:19
164:6
**marking** 53:13 67:19
**Martin** 4:10
**Maryland** 12:2
**massage** 79:10
**massages** 79:12
**match** 96:9,10 172:15
**material** 37:11 47:24
115:12
**matter** 4:5 5:9 19:23,
25 20:16 22:18 23:3,
19 65:21,25 82:18

114:24 147:21 166:14
**matters** 92:16
**Matthews** 53:18 54:8,
14 55:6,24 56:4,14,
17 57:2,15 58:3,18
59:4 177:16
**Mattie** 167:21
**max** 59:25
**meaning** 131:13
**means** 7:10 8:25 22:7
121:5
**meant** 166:23
**medical** 10:3
**meeting** 57:8 73:14
80:14 83:4 86:18,20,
22 88:15,19,22
89:13,14,22,24 90:2,
5,8,10 101:10,23
102:7,16 105:10,13,
16 119:18 131:9,15
132:13,19 142:15,20,
21 145:22,24 146:11,
18 147:14,17,22
148:5,6 155:11,15
161:9 162:4,8,11,13,
16,17,20 163:7,12
165:10 168:7
**members** 112:9
**memo** 166:9
**memorable** 33:23
**Memorandum** 120:19
121:20 125:15
178:12,15
**memory** 33:24 58:9
62:2
**men** 69:13 110:10,12,
15
**mention** 78:13,16
109:8 164:24
**mentioned** 72:6 98:18
100:12 163:10 165:13
173:20
**merit** 43:12,16
**merited** 28:13 52:16,
18
**merits** 52:23
**met** 20:6
**miles** 75:17
**million** 52:21
**mince** 99:7

**mind** 113:20 143:18
**mines** 76:20
**minute** 34:2 57:11
63:21 97:6 105:11,23
142:14 149:17
**minutes** 57:18 59:25
89:25 96:21,25 102:2
159:20,25
**mis** 154:8
**mis-shipment** 48:25
**misconduct** 130:5
153:20
**misleading** 154:9
**missed** 35:2
**missing** 54:24
**mission** 24:13 64:14,
25 113:17 136:17
144:18 172:13,19
**mission-critical**
64:15,16,25 65:19
105:21
**mission-wise** 136:18
**Mister** 101:3 123:2
**mistreat** 137:19 141:2
**misunderstanding**
154:21
**mobile** 79:10
**modify** 8:13
**moment** 98:20 146:10
**Monday** 81:20 107:3
133:4 142:19 143:2
**money** 46:19 47:7,10
51:14 68:20
**month** 14:16 48:9
**months** 15:21
**Moppins** 4:1,4 5:1
6:1,10 7:1 8:1 9:1
10:1 11:1,10,17,18,
20 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1,10,24
22:1 23:1 24:1,10
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1,
17,22 33:1 34:1 35:1
36:1 37:1 38:1 39:1,
16,21 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1,10,
13,16,21 54:1 55:1

56:1 57:1 58:1 59:1 60:1,12,16,21 61:1 62:1 63:1 64:1 65:1 66:1 67:1,21 68:1,8 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1,2,7 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1,2,4,13 107:1 108:1 109:1 110:1 111:1 112:1 113:1,25 114:1,2,6 115:1 116:1 117:1 118:1 119:1 120:1,14,18,24 121:1 122:1 123:1,14 124:1 125:1,14 126:1,2 127:1 128:1 129:1,11,14,15,19 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1,23 150:1,3 151:1,25 152:1,10 153:1 154:1 155:1 156:1 157:1 158:1 159:1,24 160:1,11,22,25 161:1 162:1,5 163:1,12 164:1,7,11 165:1 166:1 167:1 168:1 169:1 170:1 171:1,11 172:1 173:1,10,15 174:1,12 176:8 177:8,9,10,13,15,18, 20 178:3,6,9,11,15, 17,18,19
**Moppins's** 159:24
**morning** 143:2 167:13 169:11
**move** 54:21 83:17,20 113:15 125:12
**moved** 105:5
**movements** 172:9 173:5
**moving** 35:13
**multi-page** 129:18
**multiple** 9:7 68:22

**N**

**named** 20:22 141:3
**names** 98:5
**National** 21:7
**nature** 22:5 90:19
**needed** 20:8 28:16 39:5 64:18,20 105:17 131:7 168:6
**negative** 172:8
**net** 131:7
**nobody's** 97:14
**Nos** 39:14,18 60:15,18 67:23 68:7 87:11,15 113:24 129:10,15 151:24 152:4 164:8 177:14,19,22 178:5, 19
**notary** 5:22
**note** 21:23 173:2
**notes** 159:18
**Notice** 14:19
**noticed** 76:21 118:19, 23
**noticing** 48:18
**Notification** 120:19 121:21 178:12
**November** 33:6
**number** 71:3,7,16 152:9 153:18 166:4,7 171:4 177:6

**O**

**O-L-G-O-O-N-I-K** 155:25
**oath** 5:7 7:8
**object** 6:25
**objection** 24:9 28:3 29:6 37:8 42:20 43:8 49:13 50:21 61:14 62:11,20 63:11 66:2 69:8 70:7,16,21 71:8,18,23 72:2 73:3,8,20 75:22 76:14 77:23 96:14 110:22 111:16 112:19 113:4 130:19 139:6 143:20 156:13 157:14,21 158:6,9,19 159:2,6,12 173:2,8
**objections** 5:12 7:3, 4,6
**obligated** 142:7
**obligation** 46:22
**observation** 66:23 76:19 77:18
**observe** 53:7
**observed** 70:3 162:12
**occasion** 69:17
**occasions** 24:24 68:15
**occurred** 99:3 147:4
**occurrences** 50:20
**off-site** 39:4,7 74:8, 12 75:14
**offense** 63:5,6
**offer** 32:18 33:10 177:11
**offered** 22:22
**offhand** 71:11 75:12
**office** 17:15 74:18,19 76:19,22,24 77:11 78:23 81:2,3,6 90:13 95:25 96:4,6,8,12 101:11 117:24 118:4, 11 119:8 145:18 168:4
**officially** 127:19
**Olgoonik** 155:25 156:9,12 157:24 158:8,25 159:5
**one's** 15:3 112:14
**one-on-one** 73:23
**one-page** 32:14 53:14 106:9 120:16 125:19
**one-sided** 59:13 96:10
**open** 63:18,24,25 64:23 65:23 72:12 124:13
**opened** 105:4 124:15
**operational** 24:11
**operations** 23:22 24:4,8 26:25 29:24 40:22 41:3
**opinion** 52:23 77:17 143:6

**opportunity** 59:10 65:3 173:17
**oppresses** 10:14
**option** 31:23,24
**Optional** 45:16
**organized** 39:11 105:24
**orientation** 110:16
**ou** 51:12
**oversee** 26:25

**P**

**P-I-C-K-E-T-T** 36:17
**p.m.** 120:9,12 160:7, 10 174:16,18
**pants** 69:25
**paper-thin** 118:13
**paperwork** 96:17,21 97:2 99:21
**paragraph** 88:11 89:8 91:23 98:19 100:18, 19 132:12,22 133:2 138:7 162:3 166:12 167:10
**Parker** 4:5,21 13:9, 10,13 14:4 32:10,19 33:8,20 35:6,9 37:10 39:18 43:5 44:20 45:2,23 55:19 56:2, 15,24 57:3 68:17 69:5 72:4 76:13 77:5 78:23 79:3,23 82:11 84:20 85:6 86:6 87:11 89:20,23 91:12,13,15,16,25 92:6,12 93:23 95:9, 16 96:3,7,12 97:10 98:8 99:8 100:24 101:3,6,10 102:4,21 104:12,19 105:12 106:5 108:22 109:21 110:18 112:4 115:4, 14 116:16 117:22,23 119:7,13 120:21 126:24 128:8 129:13, 21 131:13,24 135:17 136:21 139:2,15 140:2,24 142:22 143:14,17 145:4,24 146:20 147:6 148:13 151:2,8,12,15 153:3, 19 155:12 162:9,12 165:23,24 166:18,20 167:5,13,20 169:10 170:11 171:13 173:6 177:11,14 178:4,7, 13,18
**Parker's** 48:5 82:25 99:25 116:24 128:5 131:2 135:11 140:18 141:17 144:13
**part** 29:23 46:5 48:9, 21 52:2 62:6 80:6,9, 10 82:5 86:9 88:7,10 91:7,23 92:9 93:22 100:13,14,23 101:2,5 102:24 114:22 117:25 122:7 128:14 134:6, 7,9,12 151:5
**participants** 153:3
**participate** 101:15
**participated** 155:15
**participating** 5:3 153:12
**parties** 5:10 107:14 111:8
**parts** 55:22 123:17 130:9
**pass** 160:18
**paying** 13:16
**penalty** 5:10
**people** 9:7 17:8 23:23 24:2 25:15 26:9 30:14 34:2 37:6 47:22 55:13 59:19 72:9,17,24 81:8 82:10 83:2 86:5 95:16 103:21 110:17 111:14,23 112:2 127:17 144:17 148:23 149:6 172:23,24
**percent** 26:19,20 29:22 69:24
**performance** 35:16 36:3,7,19 37:6 38:7 39:17 40:2,14,21 41:2,25 42:11,23 43:6 48:5 118:18 130:2 154:7,12,13,14 155:3,4,9 177:13
**performing** 42:18
**period** 152:21
**perjury** 5:10
**permitted** 66:18
**Persichetty** 4:12 5:2, 21,25
**person** 5:8 24:24 36:18 42:7,8 49:19 55:10,13 56:17,18 83:15 101:19 110:8 138:13,18 144:14 165:22
**person's** 119:3
**personal** 18:25 19:2 22:4 23:13,15 66:7, 9,13 67:13 73:23 115:3 166:17
**personally** 73:22 127:24 137:2
**personnel** 24:15 28:11 42:4,5 58:19 71:4 128:5
**petty** 85:2
**phone** 88:19 90:20 105:12 162:14
**physically** 5:4 16:3, 10 26:19
**Pickett** 17:18 18:4 36:16,17 37:5,21 38:5,12 40:15 74:7 76:13,16 78:3,11,12 79:8,9,25 80:15 81:10 82:11 83:3 86:7 90:4,6 94:23 95:10,17 108:23 109:9,10 112:3 115:2,4,20 116:18 117:5,8,23 140:4,5, 15 149:20 150:4 151:15 153:4 154:6, 12,23 164:19 166:16, 18 167:6 168:4,8,11 169:10,21 170:6
**Pickett's** 45:13 79:17 116:16 119:8
**picking** 69:23
**pile** 172:21
**pin** 83:25
**place** 46:21 54:8 75:15,16 88:21 170:16
**plaintiff** 4:20
**plan** 154:7,12,13,14 155:3,5

**pleased** 33:10
**plenty** 109:13
**PM's** 45:7,12
**point** 5:25 46:17 48:7,8 57:5,6 76:25 83:19 89:15,23 94:6, 7,12 109:18 115:15 116:23 117:15 128:18 129:24 132:25 134:14 162:25 164:20 171:6
**policy** 18:23 63:18, 24,25 64:23 65:23 67:22 68:5,9,22 70:5 71:17,25 102:25 177:21
**Poor** 130:2
**pop** 163:20
**Poppins** 6:8
**portion** 21:5 131:11
**portions** 32:24 120:25
**position** 19:22 20:14, 15 23:21 34:13 35:20 36:11,14 37:19,23 38:4,14,18 48:22 51:8 103:22
**positions** 103:23
**posture** 143:11
**pounds** 77:3
**prefer** 44:11 174:6
**premises** 56:6
**prepare** 12:21
**prepared** 47:18
**presence** 164:19
**present** 5:4 168:11 170:3
**President** 32:19 177:11
**presume** 53:25
**presumed** 80:21
**pretty** 25:3 26:15 39:9 49:23 99:2 103:8 138:4 143:21 173:25
**prevent** 48:24
**previous** 20:19 23:2 157:20
**previously** 8:13 164:6
**Prewett** 6:2
**price** 16:2 50:6 53:17,23,24 67:6 68:11,22 69:18 70:2, 3 73:14 74:2 75:8,20 78:15,17,21,24 79:5 81:14 82:21,22 86:8, 13 88:13 91:4 93:8, 11 95:12,20 97:21 99:9,23 100:10 102:18,20 103:3,7 106:5 107:2,11 108:15 111:7 112:12, 21 114:3,7,13 116:6 119:10,12 124:6,21 126:17,18 128:17,20 145:7,10,16,23 146:18 147:22 151:8 153:13 154:22 155:16 164:6,12 166:10 167:7 177:16 178:7, 10
**Price's** 74:19 96:4 164:5
**prior** 20:20 23:14
**privilege** 29:11
**problem** 36:25 66:22 74:15 118:21 122:23
**problems** 109:13
**procedure** 28:9
**procedures** 47:16 62:9,14,18
**proceeding** 12:16 18:13,15
**proceedings** 6:2 164:9
**process** 35:14
**Production** 12:9
**profanity** 130:3
**professional** 66:8 143:8
**program** 34:21 36:10 45:8 131:4 137:12,15 140:25 159:7,8,10
**promise** 160:2
**promote** 25:15,19 26:9
**promoted** 25:23 26:3,4 35:19 37:19,22 38:4, 14 104:24
**promotion** 26:2 37:11, 16,25
**promptly** 170:14
**proof** 139:7
**proper** 47:15 69:25 72:18
**provide** 10:4 11:24 25:18 29:24
**provided** 24:4 64:12, 14 124:20
**providing** 6:24 20:7
**public** 5:22 22:7
**puffing** 81:6
**purpose** 52:11 61:9 78:20 163:2
**purposes** 62:2
**pursuant** 11:24
**put** 10:25 39:22 45:25 46:4 51:7 66:9 67:13 89:4 125:20,25 128:4 138:22 154:13,14 155:2 161:11,16,19
**putting** 60:14 66:8

**Q**

**Quality** 38:14
**question** 8:7 9:5 21:11 23:24 41:13 46:3 50:16 80:19 105:9 107:23 122:14 125:22 131:2 150:3 160:16
**questioned** 150:9
**questioning** 130:4
**Questionnaire** 87:10, 22 178:4
**questionnaires** 103:2
**questions** 6:23 7:2,3 8:2 9:24 13:12,18 22:4 159:25 160:13, 14 161:2 173:10
**quick** 159:17 160:3 161:2
**quit** 85:24,25
**quote** 133:18 137:11 140:23 165:5,6,15,16 167:14,16 169:12,13

**R**

**R-E-E-M-A** 32:15
**Ragu** 94:18
**Ragunton** 138:15 165:12,19
**raise** 44:2

**Rajesh** 32:19 177:11
**rambling** 14:9
**ran** 63:3
**range** 50:6
**ranged** 50:4
**rant** 143:11
**ranting** 97:13 131:13 133:8 144:9
**rare** 49:22 50:20 71:22
**raving** 97:13 143:11
**RCSI** 16:8 20:21 30:10,24 33:10 43:15 46:18,22 48:24 50:6, 11 61:7 68:9 87:21 140:25 155:21
**RCSI's** 102:25
**read** 44:22 46:2,6 59:6 61:18,20,23,25 63:20,21,22 88:6 89:8 98:20,21 122:16 123:15 129:22 173:16 174:7 175:4
**reading** 45:24 46:13 47:11 61:22 70:11
**reads** 52:3 142:24
**real** 63:2 163:21
**rear** 93:21
**reason** 8:19 10:3 33:22 41:24 45:21 81:23 116:17 129:25 137:10,18 147:5 149:5
**reasoning** 46:14
**recall** 14:22 15:14 31:4 32:9 33:5,15,20 34:6 35:5,19 37:3, 10,18,22 38:13 40:3, 20 43:5 45:21 46:9, 12,25 47:6 48:4 54:13,18 55:2,5 56:9 57:12 58:3,6,11,18 61:18 62:13 68:8,21 69:3,5 70:11 76:11, 15,16 80:11 81:7 85:4,5,11,19 86:4,18 88:4 89:12,22 90:4, 22 91:4 98:13 99:11, 15 104:2 105:12 108:11 110:24 113:9 114:9,10 126:7,10 129:3 137:5 138:18 141:16 146:6 149:20 151:6,8,14 153:5,6, 12 163:14 166:25 171:14
**receive** 31:11
**received** 138:8 158:15,21,23
**receiving** 37:11 43:6 103:20 104:14,16 105:3 108:11 124:4 172:5
**recent** 106:6 107:21 108:16 178:7
**recipients** 107:12 111:7
**recite** 58:8
**recognize** 174:3
**recollection** 88:3 98:25 117:20 121:15 122:4 131:18 132:18 133:15,24 134:22 153:25
**recommend** 30:15,22 34:4 145:3
**recommendation** 154:2, 5
**recommendations** 25:5, 18 29:25 153:17
**recommended** 31:4 145:24 147:6
**recommending** 134:23 135:3 139:12
**recommends** 154:22
**record** 4:14,17 5:15, 19 6:9 7:4 20:12 60:4,6,9 68:3 87:6 106:12,19,20 111:25 120:9,10,12,15 121:20 125:23 152:8 160:7,10,20 172:18 174:6,16
**Reema** 4:5,23 12:25 15:10,23 16:19,21,22 17:24 19:15 20:17 23:14,20 24:20 26:11 27:24 28:9 31:12,19 32:10,15,20 33:9 34:3,4,7 36:12,18 39:14,18 44:15 47:7 49:12 50:19 53:15,19 60:15,16,18,23 61:13 62:3,8 63:14,24 67:3,23,24 68:5,7,8 69:7 70:6 71:7,17 73:2,7 87:7,12,15 103:4,17 104:19 106:7,10 107:8 113:24 114:3 120:15, 17,22 125:16,20 128:17 129:10,11,15 130:9 131:11 135:16 139:16 145:16 151:24,25 152:5,16 156:21,22 161:4,7 164:8 177:12,14,17, 18,19,21,22 178:3,5, 8,10,14,16,17,19
**refer** 109:3,5 129:19 161:15 162:2 164:14 165:25 166:11
**referenced** 137:25
**References** 161:14
**referring** 63:17
**refers** 54:6 98:22 126:24 127:3
**reflect** 168:14
**reflected** 171:19
**refused** 88:18 110:3 130:20
**regard** 18:15
**regular** 26:17 81:12 84:6 94:6
**regularly** 26:16
**Regulations** 21:8
**reinforced** 28:23
**related** 21:12 105:21
**relationship** 18:25 19:10 23:13,18 77:15 115:4 116:18 166:18, 21 167:5
**relative** 23:17
**relevant** 12:15 46:5 66:4,6
**reliable** 84:12,13
**relied** 128:8
**relieve** 63:4
**reluctant** 75:20 168:16
**remember** 13:18 14:3 16:18 23:3 31:10 35:8,17,23,24,25 36:21,22,23 38:3,17 40:5,6,16,17,23,25

41:23 43:9,14,16 47:8 48:6,8,10,14 49:17,18 50:23 55:10,13,14 57:9 58:8,9,14,17,21 61:16,21 62:5,6 68:10 69:17 71:2,10 73:10 74:9 75:10 78:19 80:9 81:25 83:6,23 85:24,25 86:2,3,9 88:3,13 90:8,10,18,24,25 98:12 99:20,21 100:4,15 101:9 102:19 103:13 104:8, 20,21,25 105:17,19 110:13,15 111:2 113:7 115:10,25 116:2,4,5,7 119:2 121:10,12 122:7 124:10,17 131:6,20, 21 135:5 136:25 140:20 141:12,13,18 145:21 146:5,9 147:4,15,19,20 149:19 155:13,14
**remote** 4:8 5:21
**remotely** 5:6 11:3
**removed** 92:8
**repeat** 35:3
**repeated** 81:4
**rephrase** 8:3 64:13 71:12
**replace** 46:23 50:7,12
**replenish** 46:23 52:22
**reply** 172:2
**report** 26:11 34:22,24 100:9 115:14 152:3, 18 161:25
**reported** 6:3 34:14 99:9 104:2,3
**reporter** 4:11,25 8:23 11:16,21,22 19:24 21:6,15,18,21 32:21 39:20 53:20 59:20 60:19 67:25 87:13 106:7 114:4 120:23 125:16 129:16 152:6 172:18 174:6,14
**reporters** 173:25
**reporting** 5:5,13 140:2
**reports** 94:3 124:25
**represented** 6:14
**request** 12:9 114:3,8 123:13 155:10 178:10
**requested** 123:14 155:14
**requesting** 68:21
**requests** 12:14 177:3
**require** 131:5
**required** 61:18 70:23 134:4 139:13
**requirement** 131:6 136:17
**resources** 111:10 168:6
**respect** 92:7
**responding** 66:24
**response** 22:3 49:5 65:15
**responsibilities** 20:4,5 159:4
**responsibility** 28:15 38:20,23 39:2 51:10, 13 52:25
**responsible** 36:19 50:6 53:8
**rest** 6:3 36:24 55:14 89:8
**restroom** 59:19
**result** 29:3
**resumed** 6:4
**review** 9:13 12:4 29:18 173:19,24
**reviewing** 40:20
**reviews** 35:16 36:3,7, 19 37:6 38:7 40:14, 21 41:2,5,8 42:11 43:7
**Richardson** 4:20
**right-hand** 108:4 122:21
**rightfully** 148:7
**rights** 173:16
**rigid** 103:8
**Rita** 4:12 5:21
**road** 51:14
**roam** 142:10 144:20
**Robert** 53:18 54:8,14, 15 56:16,17 177:16
**robot** 51:17
**robots** 52:19
**Romaine** 74:11 75:2 85:7 99:3,6
**room** 5:5 59:7,9 60:14 83:8 89:5 97:22 98:9,17,22 100:15 133:21 164:21 170:6
**routine** 6:21
**rules** 63:8
**rumor** 76:12,15,18 77:14,17 83:12,14 92:2 94:22 96:13 98:14 108:22 109:20, 23 111:15,18 115:3, 20 148:14,16,19,22 149:10 166:17,20 167:2,3 170:12,22
**rumors** 108:18 109:2, 16 168:2 170:23
**run** 29:8 41:4,21
**running** 169:2

## S

**safe** 130:25
**safety** 131:7
**sake** 21:15
**satisfied** 75:6,8
**scale** 43:22,24
**scanned** 113:14,19
**schedule** 102:16
**screen** 11:6,11 32:23 39:22 46:5 60:22 106:17 107:25 122:18,21 125:20 161:21
**scroll** 44:15 45:6 63:13 100:5,20 122:19
**scrolled** 91:22
**seconds** 90:2
**section** 63:18 82:5 93:19 104:14,16 164:14 166:12 172:14,20
**seminar** 39:7
**send** 14:11,14 75:14 114:12,14 123:24
**sending** 114:10

**Senior**  6:10 127:8
**sense**  49:20
**sensitive**  56:21
**sentence**  66:20 112:11
  134:15
**separate**  82:5 93:18
  94:25
**September**  45:3
**seriousness**  52:5
**serve**  17:15
**Service**  157:6,7
**Services**  4:6,23 12:25
  33:9 60:17,23 67:23
  68:6 87:8 129:12
  139:17 152:2,16
  177:18,21 178:3,17
**session**  53:18 54:7,19
  55:3 57:13 59:3
  177:16
**severity**  50:22,23
  52:17
**sex**  109:25
**sexual**  67:22 68:4,5,
  9,22,25 69:6 70:18
  71:7,9,16,24 72:25
  73:5,17 75:21 87:8,
  21 102:25 108:4
  110:16 152:2,17
  177:21 178:3
**sexually**  74:12 75:11
**share**  11:6 68:2
  161:21 163:18,23
**shared**  169:17 171:3
**sharing**  106:16 163:21
**Sheba**  83:18
**sheet**  76:20
**Sherrill**  4:10
**ship**  103:19
**shipment**  46:19 47:12,
  16,18 48:3 50:13
  64:20
**shipments**  39:6
**shipped**  47:17 50:5
**shipping**  35:20,21,24,
  25 47:20,23 103:19
  105:3
**shipping-receiving**
  54:16
**short**  59:20,23 72:12
  102:3 120:7

**shorts**  72:11
**show**  33:4 41:22 53:9,
  22 60:13 67:17 86:24
  99:19 105:25 120:14
  129:9 134:17 164:2
  166:2
**showed**  126:10
**showing**  32:23 51:7,8
  87:2 126:12 152:12
**shown**  166:8
**sic**  52:7 84:19 152:7
  161:18,25 165:4
**side**  38:16,17 54:24
  59:4,8 93:2 104:17
  105:2,4 107:24 108:4
  120:2 122:21 132:3
  142:8 150:16
**sides**  59:14 132:7
**sideways**  85:2
**sign**  130:20 136:13
  173:17,19,24 174:7
**signature**  45:7,8,12,
  13,16,17 130:10,18
  131:4
**signed**  121:24 125:5
  127:8 129:5,14
  130:14 136:7,10
  171:5,9 178:18
**signing**  87:25
**sir**  11:13 52:9 63:12
  89:15 90:6,21 96:5
  97:11 106:14 117:8
  119:9 125:21 126:5
  129:9 130:7 131:17
  132:17,20 134:2
  136:23 139:19 140:8
  142:5 144:14 149:15
  152:12 165:8,17
  167:18 168:13,21
  169:19 170:8,20
  172:12
**sister**  65:14
**site**  75:18
**sitting**  61:22 72:10,
  12
**situation**  52:6 64:17
  171:22,23
**size**  108:6
**skim**  123:16
**slave**  138:16 165:15
**sleeping**  95:6 97:14

  168:3 170:13
**slide**  72:21
**small**  50:3 144:16
**smaller**  108:6 161:23
  164:3
**Solutions**  156:7,18
**someone's**  41:15
**someplace**  17:24,25
**something's**  118:12
**sooner**  8:18
**sort**  44:3 50:17 97:16
  105:20,24
**sounds**  119:16 150:2
**source**  92:2
**speak**  9:3 16:4 114:24
  165:18 166:14 168:18
**speaking**  9:7
**SPEAR**  85:18 93:2,18
  104:3,10 105:4
  141:20 172:14,19
**specialist**  4:11
  103:18,19 105:6
  115:11
**specific**  137:19
  140:24 141:6
**specifically**  25:2
  61:21 63:17 70:11
  116:11 119:3 137:5,
  24
**spell**  84:15
**spend**  79:7
**spending**  76:23 77:12
  117:23 118:3 119:8
**split**  23:24
**spoke**  15:25 16:21
  17:19 18:7 170:3
**spoken**  16:19 131:10
**spreading**  82:14,16
  149:10
**square**  93:17
**Sr**  114:2 125:15
  178:10,15
**stabbing**  83:21
**staff**  68:25 69:12
  73:13,21
**staffing**  162:4
**stamp**  166:7
**Stand**  60:8
**standard**  47:21

**standing** 172:5
**start** 19:13,17 94:5 146:17 148:12 156:17
**started** 33:18 35:9,10 61:13 70:6,14 83:12, 13 92:2 97:13 104:14 105:2 118:2 131:13 132:14
**starting** 4:17 19:15 33:13,15
**starts** 133:2
**state** 4:16 6:8 20:10 22:12 74:25 87:5 106:12 116:22,25 117:19,20 118:25 131:10,11 132:14,22 133:6,17,18 137:9 138:7 140:22 142:14, 16 143:4,5,16,18 144:7 158:16 159:9
**stated** 96:22 167:14 169:9,12,14 170:11, 13
**statement** 49:3 119:19 127:7,15,21 128:2,4, 7 139:3 151:19 171:9
**states** 7:4 11:25 92:5
**stating** 5:14 138:9
**stay** 32:3 81:14,17 82:4 86:14,15 93:24 142:7 171:22
**stayed** 81:15,16 141:21
**stenographically** 6:3
**step** 57:10 97:17,18, 19
**stick** 89:10
**sticks** 69:17
**stop** 111:14,18,24
**stopped** 47:14 48:2 51:5 77:10,11,12 170:14
**story** 41:10 59:5,8 120:2 150:17
**straight** 84:4 148:22
**strange** 150:2
**strictly** 24:18
**strike** 45:19 49:8 55:16 71:14 79:16 91:2 146:16 148:11
**stuff** 26:21 48:13 73:24 94:25 103:9,10
**subject** 19:23,25 20:16 22:17 23:19 46:13 83:22 105:15 106:6 107:15,18,19 109:17,19 111:9 114:3,8 120:19 121:21 170:17 178:7, 10,12
**subjugating** 46:18
**submitting** 138:19
**subordinate** 137:20,25 141:3
**subordinates** 164:17
**subpoena** 11:9,18,25 12:5 17:15 177:8
**SUBSCRIBED** 175:10
**substance** 13:9,10
**substantive** 9:17
**successfully** 154:15 155:4,8
**suffering** 118:18
**suggestion** 66:22
**summertime** 72:11
**super** 86:10
**superior** 55:25 153:21,22
**supervise** 159:11
**supervisor** 35:20 37:11 51:23 55:19 116:17 129:14 134:18 140:6,18 178:18
**supervisors** 69:22 148:17 163:11
**supervisory** 53:4
**Support** 4:8,10,13
**suppose** 91:2
**supposed** 48:23 131:25 132:2 167:22
**supposedly** 74:8 148:24
**suspending** 135:7
**suspension** 28:24
**suspensions** 27:16,19
**swear** 4:25
**sworn** 5:21 11:24 175:10
**system** 27:24 28:6 142:9

**T**

**T-A-M-B-E-N-I** 84:18
**T-E-S-S-A-D-A** 20:23
**Tab** 6:2
**table** 147:25
**takes** 103:13,14
**taking** 4:18 8:24 23:14 136:15 174:2
**talk** 13:8 14:10 15:17 17:7 18:14 57:7,24, 25 63:25 64:5,6,10, 20 65:2,3,5,6 67:6,7 68:25 69:18 73:11 91:12,15 97:2 131:15 133:9 142:25 143:6, 13,24 144:5 147:25 148:2
**talked** 16:11,20 33:25 66:18 73:13 79:5 80:24 81:3 92:19,24 93:9 95:8,14 100:13, 16,25 101:2 111:20 148:10 150:11 168:24
**talking** 13:11,19 14:21,23 16:7,10 17:5 20:15 29:14 38:18 48:11 66:3,6 69:21 80:7,12 88:13 90:15 94:14,19 102:20 105:11,13 109:9,12,17,19 111:14,18,24 121:16 123:10 148:24 152:22 169:15
**talks** 164:13
**Tambeni** 83:21 84:2,7, 11,16,21
**Tambeni's** 83:17
**task** 172:6
**team** 24:5 105:2
**tech** 64:12
**technical** 20:7
**technology** 125:24 174:3
**telephone** 90:17 101:18 162:9,12
**telling** 17:13 18:17 57:15 68:18 78:21 81:8 82:10,25 86:5,

8,10,12 95:15 111:7, 13,17 148:24 167:3
**template** 134:7
**temporary** 69:20
**ten** 59:25 159:25
**ten-minute** 59:18
**tend** 74:4
**tended** 73:23
**terminate** 146:20
**terminated** 51:22 58:11,15 62:15,19 85:22 86:2 102:22 134:24 135:3 145:25 151:15 158:16
**terminating** 145:20 147:6 155:11
**termination** 28:23 29:4 51:4,6 128:9 134:4,11 135:6 139:14 145:4 148:6 153:18
**terms** 20:3
**Tessada** 20:22,23 23:2 156:23 157:4
**test** 37:2
**testified** 5:23 10:18, 19,21
**testify** 5:22 11:9,19 177:8
**testimony** 5:9 7:18,22 8:11 9:16,19 10:5 11:24 122:3 175:5
**text** 17:9
**texted** 16:21
**therapy** 79:11
**thing** 18:18 35:8 64:9 75:14 107:23 112:13 113:16 123:7 124:11 125:3 127:17 129:22 144:24 164:4
**things** 8:25 23:25 26:21,22 27:20 47:22 51:17 64:19 84:13 86:22 145:9 160:2 174:2
**thinking** 124:12
**Thompson** 74:11 75:3 85:7 99:3
**thought** 83:25 150:19, 21
**thousand** 60:24
**threw** 113:13
**Thursday** 86:20
**time** 6:25 8:11 9:7 10:8,11 15:25 16:20 17:19 18:7 19:14 21:11 26:20,24 31:3 32:10 41:15 48:11 50:12 51:23 55:18 62:8,25 65:20 66:18 74:7 79:7,23 86:21 89:2 96:17 97:24 103:25 104:11 106:23 107:8 111:2 115:9,12 116:6 117:23 118:3 119:6,8 135:12 136:15 138:4 140:3, 19 141:22 145:8 147:3,24 148:5 151:14 155:5,6 156:21 158:25 160:12,19 167:2 168:18 170:7,15 171:6,25
**time-sensitive** 64:19 88:24
**timely** 50:13 89:2 172:20
**times** 13:14 15:16 25:8 30:16 31:7 65:8 66:5 67:4,11 68:23 71:16 84:20 91:20 97:19
**tired** 143:23
**today** 4:12 6:15,19,23 7:8,16,19 8:2,12,24 9:13,24 10:5 11:24 21:25 37:4 90:23 99:15 119:18
**today's** 10:12 12:15, 22 174:17
**told** 14:10 17:16 41:5 48:2 55:8 74:7 76:25 78:5,7,22,24 79:22 80:7,21 82:3 89:5 94:6 96:20 110:6,11, 18 115:19,24 116:5,7 117:4,8,9,12 138:15 143:10 148:20 149:2 150:13,15 151:4 158:20 167:2 169:6 170:19 171:24
**tolerated** 134:19
**top** 24:7 39:25 44:17 114:2 121:2 178:9
**tops** 102:2
**totally** 94:24,25
**Trade** 157:6,7
**Traffic** 21:7
**train** 39:4
**training** 39:7 70:19 75:17
**transcript** 9:13 21:25 22:6 173:18 174:8,10 175:5
**transpired** 75:7
**transportation** 54:3 90:13
**travel** 94:2
**treated** 165:14
**trial** 10:21
**true** 125:4 168:19
**trusting** 174:4
**truth** 5:22,23 7:11, 13,14 35:18 40:17
**truthful** 7:21 9:23 10:4
**Tuesday** 81:20
**turn** 126:22 139:23
**turned** 69:23 139:22
**twenty** 17:20 70:9
**type** 31:12 55:9,12 56:17,18 83:15 87:20 126:16 139:15 144:19 170:15
**types** 30:14
**typically** 26:13 41:3

**U**

**ugly** 112:13
**ult** 34:13
**ultimately** 34:14 56:5
**Um-hum** 67:10 76:17 121:25
**underneath** 137:18
**understand** 7:18,23,25 8:8 9:20 11:23 12:13 46:7 49:5 61:9 108:21,25 109:3,15 113:2,11 122:2 149:8,10

**understanding** 63:23 64:4
**understood** 8:8 114:17 119:17,21,23
**United** 11:25
**unknown** 122:8
**Unlawful** 87:9,21 152:3,17 178:3
**unprofessional** 138:10 139:16
**unreasonably** 10:13
**up-front** 42:8
**upset** 65:10 79:24 80:3 95:25 100:25
**urged** 168:17

**V**

**vaguely** 32:11 33:19 37:13 40:18
**Van** 78:23 109:13,19 128:3 167:5 172:4,8
**variations** 61:2
**verbal** 52:15 141:10
**verbally** 5:9 138:22 141:25 142:2 173:7
**verbiage** 88:11 125:11
**verified** 117:13
**versus** 4:5
**video** 4:8,11
**view** 42:17
**violations** 71:16,25 72:9
**Virginia** 6:13 39:8
**visit** 137:20 141:2,17
**vividly** 90:9
**voice** 162:6 163:8
**volunteer** 140:11
**volunteering** 120:2
**Vora** 16:19 17:10 22:22 23:4,9 24:3,4, 21 25:6,19 26:5,12, 13,24 27:5,8,9,15,17 28:19,24 29:9,25 30:23 31:4 32:19 51:4 52:21 64:2 73:12 103:4 128:16, 17 145:3,6,8,16,23 146:3,6,19 147:23, 24,25 155:11,16 164:8,11,12 177:11
**Vora's** 24:18 76:9

**W**

**wage** 43:22,23
**wait** 9:3,5 64:18 89:3 174:13
**waive** 5:12
**walk** 93:15 117:18
**walked** 74:17 93:21,22 167:13
**walking** 90:17 172:8
**wall** 76:20
**Wallace** 31:22 32:6 45:19 48:2 51:24 53:17 54:3,7,19 56:24 57:2 83:7 97:7,18 98:3,7,10,13 101:15,17,19 102:6 112:4 133:20 140:17 164:19 169:22 170:5 177:16
**Wallace's** 45:17
**walls** 118:14
**Walsh** 4:22 5:17 6:25 13:2,24 14:6 15:11, 12 21:9,19 24:9 28:3 29:6 37:8 42:20 43:8 49:13 50:21 61:14 62:11,20 63:11 66:2 69:8 70:7,16,21 71:8,18,23 72:2 73:3,8,20 75:22 76:2,14 77:23 89:16 96:14 106:18 108:6 110:22 111:16 112:19 113:4 123:2,6 126:3 130:19 139:6 143:20 156:13 157:14,21 158:6,9,11,19 159:2, 6,12,23 160:13,24 173:9,15 174:11 176:14
**wanted** 26:6 27:10 64:11 67:12 94:20 114:16 119:16,20,23 147:24,25 148:2 171:22
**warehouse** 25:2,22 26:14 27:2 34:11 35:10 39:3 42:2,6,7 50:2 51:16 54:16 74:23 76:12 80:7,20 81:9 82:6 83:2 85:18 86:6,16 93:15,17,18, 22 103:18,19,24 105:6 110:5,6,10,18 115:3,11,20 126:21 127:16 141:21 142:6, 10 144:22,23 159:10 164:18 166:17 168:3
**warning** 27:25 28:11, 17,20 29:3 44:16 45:2,22 46:14 49:24 50:14 51:2 52:4,12, 14,18 58:4 128:8 129:12,20,25 130:17 135:17 137:10 142:14 178:17
**warnings** 28:15 29:19 49:10,21,23 50:20 52:11 58:19 85:12,23 135:25 136:12 139:24 140:6,19 141:17 145:3 146:21,25 147:7 158:24
**watch** 53:7
**watched** 98:10,11
**ways** 56:21
**WD** 43:23
**wear** 72:19,20
**week** 114:25 115:17 118:17 142:24 148:8 166:15
**weeks** 42:6
**weird** 124:12,14
**wife** 17:13,16 77:2 79:10,11,12,17 149:23 150:4,6,20, 22,24 151:3
**wig** 84:25 85:2
**wind** 76:9
**wise** 24:11
**witnessed** 171:12
**woman** 77:3,4
**women** 69:13 110:12,15
**word** 81:4,5 82:14 132:10
**word-for-word** 148:20
**words** 26:2 99:7 123:4
**work** 13:15 17:23,24 18:2,4 23:15,18

42:5,10 48:5 55:16 72:16 76:25 78:14 79:8 84:22,23 85:15 88:21 107:7 108:7 112:15 118:18 120:20 121:21 123:24 137:20 141:2,17 142:3,8 144:13,16,21,24 155:9 156:20 157:5 170:16 172:21 178:12

**work-related** 66:16,17 85:16 122:15 123:21

**worked** 15:22 19:15 20:18 37:7 41:3,19 42:14,18 64:8 93:20, 23 104:10,12,15 107:8 144:15 155:21 156:24 157:8

**worker** 30:23 35:13 42:7 142:6

**workers** 25:3 30:10 92:19,23

**working** 19:14 31:12 32:10 43:22 69:7 70:6 104:18,19 156:17

**workplace** 108:17 109:2 130:5

**world** 128:13

**wrap** 159:22

**write** 9:8 29:9 119:22 127:15 134:4,15 140:6,11,14,23 142:16,17

**write-up** 47:9 52:18, 23 63:5,6

**write-ups** 58:24 85:20

**writes** 108:15 112:12, 21 127:21

**writing** 14:11,15 61:3 91:7 131:21 134:8 138:23 141:24 145:2

**written** 27:25 28:11, 15,17,20 29:10,19 44:16 45:2,22 49:10, 21,23 50:19,25 52:4, 11,12,18,23 56:23 58:4,19 85:12 126:8 127:7 129:12,20 130:17,22 135:17,25 138:19 139:7,24 140:6,19 141:11,14 142:14 145:2 146:21, 25 147:7 157:15 158:24 178:17

**wrong** 28:10 30:20 46:20 65:12 106:16 131:14 133:9

**wrote** 23:4,5 81:24,25 82:2 114:21,23 125:7,9 134:10 137:6 139:13,20 140:13 146:16,21,24

## Y

**Y'ALL** 118:12

**ya** 65:16

**year** 16:6,12 17:20 18:10 42:25 43:2 70:22

**years** 34:3,4 59:2 61:16

**yelling** 96:9,10

**you.'** 165:6 167:15 169:13

**young** 13:21 69:18

**younger** 14:25 15:3

**youngest** 19:12

## Z

**Zoom** 99:17 125:24 174:3



Exhibit 8

pd
Planet Depos
We Make It Happen

# Transcript of DaMarcus L. Pickett

**Date:** July 14, 2020
**Case:** Parker -v- Reema Consulting Services, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MARYLAND

________________________X

EVANGELINE J. PARKER :

Plaintiff, :

v. : CIVIL ACTION NO.:

REEMA CONSULTING : 8:17-CV-01648-TDC

SERVICES, INC. :

Defendant

________________________X

Deposition of DaMARCUS L. PICKETT

Baltimore, Maryland 21202

Tuesday, July 14, 2020

9:45 p.m.

Job No.: 304766

Pages 1 - 279

Reported by: Sharon O'Neill, RMR

Deposition of DaMARCUS L. PICKETT, held at the Law Offices of:

WRIGHT, CONSTABLE & SKEEN, LLP

7 St. Paul Street

18th Floor

Baltimore, Maryland 21202

(410) 659-1300

Pursuant to subpoena, before Sharon O'Neill, RMR, Notary Public in and for the State of Maryland.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF

TAYLOR CALDWELL, ESQUIRE

FISH & RICHARDSON

1000 Maine Avenue, S.W.

Suite 1000

Washington, D.C. 20024

(202) 783-5070

ON BEHALF OF THE DEFENDANT

DONALD J. WALSH, ESQUIRE

WRIGHT, CONSTABLE & SKEEN

7 St. Paul Street

18th Floor

Baltimore, Maryland 21202

(410) 659-1320

I N D E X

| EXAMINATION OF DaMARCUS L. PICKETT | PAGE |
|---|---|
| By Mr. Walsh | 5 |
| By Ms. Caldwell | 172 |
| By Mr. Walsh | 261 |

E X H I B I T S

(Attached to the Transcript)

PICKETT DEPOSITION EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 1 | 6/25/2020 letter | 12 |
| Exhibit 2 | T Mobile records | 24 |
| Exhibit 3 | T Mobile records | 34 |
| Exhibit 4 | Interrogatories | 40 |
| Exhibit 5 | Drawing | 77 |
| Exhibit 6 | Email 4/27/2016 | 117 |
| Exhibit 7 | Email 5/13/2016 | 117 |
| Exhibit 8 | Investigation Report | 140 |
| Exhibit 9 | Written Warning | 162 |

5

PROCEEDINGS

DaMARCUS L. PICKETT

being first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows:

EXAMINATION BY COUNSEL FOR THE DEFENDANT

BY MR. WALSH:

Q Good morning, Mr. Pickett.

**A Good morning.**

Q My name is Don Walsh. I represent REEMA Consulting Services, Inc. I'm going to take your deposition in this case. Have you ever had your deposition taken before?

**A No.**

Q Let me tell you a little bit about the process. The way that this work is basically I'm going to ask you a series of questions. I have some documents to show you as well, and I'm looking to try and get from you the best answers that you can, to the bet of your memory, what you remember, what you don't remember, about a variety of different topic and a variety of different

6

things. I'll show you some documents. If at any point during the deposition there's a question that I ask that you want me to rephrase, you don't understand what I'm saying, please let me know. I'll do my best to rephrase the question. I'll do my best that it's something, that we have a clear record, that you have an understanding of what I'm saying and what I am asking and I have on a clear understanding of what it is that your answer is.

Mr. Pickett, one of the other things that I have to remind you about is that when you give me an answer, please try to make sure that it's a verbal answer. Nods of the head, uh-huh, na-uns, never come across well when we're trying to make sure that when we read the record later and try and understand what transpired.

And, certainly, we're going to have to do the best we can to talk through masks. This is a new experience for all of us, in teams of trying to make sure that we can accomplish that. So, to the extent that you can, feel free to keep your voice up.

7

**A All right.**

Q Ask me to rephrase or speak louder, if you need to. Is that okay?

**A Yep. Okay.**

Q Mr. Pickett, what did you do to prepare for your deposition today?

**A I don't know. Nothing, really.**

Q Did you talk to anybody?

**A I had a conversation with -- I had a conversation with Ms. Parker, actually. That was a while ago. She called me on behalf of the lawyers, I guess. They had been trying to reach me, and I didn't really reach back to them.**

**This whole case, if you will, just kind of something -- I just, kind of like, thought it was an unfortunate event, but.**

**So, I had a conversation with her, and it was more like "Hey, do you want to give my lawyers a call. They're trying to reach out to you. I know you don't want to be in this position but at least they want to talk to you."**

**And I said "Well, I'll talk to them," so**

8

**I called Mr. Tishman, and outside of talking to Mr. Tishman about schedules, the arrangement, things like that, I haven't done anything to prepare for this deposition. It is what it is, the facts are what they are in terms of my perspective, so I don't prepare for it. Just come here and answer your questions.**

Q Okay. Did Ms. Parker tell you anything about what the questions would be?

**A No.**

Q Did she tell you anything about what the topics would be?

**A No.**

Q Did Mr. Tishman tell you anything else, other than talk about scheduling?

**A No.**

Q Okay. Did he ask you any questions about what you remember, what you don't remember?

**A He -- he told me that there would be things that, you know, I would are to answer. And I told him well, I can answer anything that I know, but some things I didn't know. So, I mean,**

9

**no, not in term of like "Here's a question." No.**
Q Okay. All right. Other than speaking with Ms. Parker, did you talk to anybody else about your deposition today?
**A Not my deposition today, no. My coworkers know I had to come to it today, but, you know, my wife, obviously knows, like.**
Q Okay. Did you look at any documents in any way?
**A I looked at the documents that you guys submitted, some of them. I looked at the motion or the subpoena for, like, my subpoena, the subpoena for T Mobile for my phone records. I looked at that kind of stuff, but not too much.**
Q Okay. Anything other than that?
**A I can't recall if there was anything other than that.**
Q Okay. All right. Did Ms. Parker give you any documents about this case?
**A No.**
Q Did she tell you where to look to find copies of any documents?

10

**A No.**
Q Did anybody send you any documents about this case?
**A I got a document for an -- I can't remember what it was for. It was for something. It was, I think, a subpoena document, actually from 4 OF, for something from my company.**
Q Okay.
**A Yeah. I seen that.**
Q Okay. And do you recall what that was?
**A No, not in it's entirety.**
Q Do you remember the basic substance of that document?
**A It just -- I don't even think it was a document, just more of a -- it's kind of tricky, because what happened was I, where I work, Mr. Moppins used to worked. I have to have access to his old email, so an email came across from, I want to say might you to Mr. Moppins email that came across.**
**So, I didn't look at it but, like for a second, like, what is this, and then that was it.**

11

**So, outside of that, no.**
Q Do you recall what the documents were that were in there?
**A I don't.**
Q Okay. All right. Now, how is it that you found out about the T Mobile subpoena?
**A I want to say it came -- it came -- I don't know. I don't recall. I get paperwork, I got paperwork sent to my house. I get some stuff through email. I think Mr. Tishman sent me something, so, that's how I got it.**
**But, I'm also kind of savvy, because I was in a bankruptcy a long time ago, so I have access to the court records, and I know how to look up court records. It's public knowledge, so I've seen it.**
Q So, did you look up the docket relative to this case in any way?
**A I looked at some of the docket, because I filed a motion, so trying to track my motion, I looked for and, actually, I haven't seen it, whether it came across or not, but ...**

12

Q Okay. Other than looking at the document relative to your motion, was there anything else that you looked in the docket?
**A I'm not really sure. I didn't look at too much stuff. I tried to check -- it says something. I looked at one document, but it was a recent document. I'm not sure what number, it may be 99, 96, something like that. It was something at the bottom, because I'm trying to figure out what's going on with my stuff. But outside of that, no.**
Q Okay. All right. Now, that motion that you filed -- let me just get that out. If you could mark this as Deposition Exhibit 1.
(Pickett Deposition Exhibit 1 was marked for identification and attached to the transcript.)
Q Mr. Pickett, I want to show you what we've marked as Deposition Exhibit 1. This is the first page of your motion?
**A Yep.**
Q I've not seen the second page. Was

there more than one page?
**A Yeah. Yeah, a little bit more than this, because I had a signature down there and everything. So, if haven't seen the rest of it, it's another page.**
Q Okay. And did you get correspondence from the court?
**A I do not.**
Q Okay. So your motion was denied and returned to you by the court?
**A Yeah. I don't get it.**
Q Okay. Did anybody assist you in doing this?
**A No.**
Q Okay. And why is it that you filed this?
**A It says in the motion.**
Q Okay. Well, how did you get a copy of the T Mobile subpoena to know that that was even pending?
**A Again, I don't know I came across the T Mobile. I think you asked me that already. I'm**

**not sure how I came on cross it. But I came across it and I thought it was kind of like -- well, obviously, it's in the motion, how I felt about it.**
Q Okay. Did Ms. Parker send you a copy of the T Mobile?
**A No. I had already said Ms. Parker didn't send me any documents about this case as well.**
Q Okay. I just had some questions about? This.
**A Okay.**
Q In the third paragraph there, you say "I assert that the information sought is not relevant to this case."
**A Yeah.**
Q What do you think this case is about?
**A I don't know what that case is about. I know it's about Ms. Parker's wrongful termination. It's a wrongful termination suit, I do know that.**
Q Okay. Well, then, why did you say it wasn't relevant to this case?

**A Because what does it have to do with her case against her getting fired?**
Q Okay. Did you talk to anybody about whether it was relevant, whether your records were relevant to this case?
**A This is a personal – it's my personal phone records, so I'm speaking from a personnel standpoint.**
Q Okay. You agree with me that you texted Ms. Parker using that personal cell phone, right?
**A Yeah, sure. I texted a lot of people using that cell phone.**
Q Sure. And you chatted with her using that personal cell phone?
**A Of course.**
Q Okay. And you've done that continuously, pretty much since she first was employed by RCSI, right?
**A What do you mean, since continuously since she was employed?**
Q Well, when -- when did you first start texting her?

**A Probably when she got employed.**
Q Okay.
**A But I text a lot of people. Again, we all come from PG County so, we like car pooled. We developed friendships. We worked together. So, yeah, it's not just Ms. Parker that I text. I text Romaine, I text Sheba, Ms. Wallace, Larry.**
**I mean, I'm a program manager on a contract, so I talk to a lot of people, Kendrick, Brandy, Kenton, you name it, Rufus, Mr. Alan, all my employees. And a lot of my employees are kind of like friends. I'm not from this area, so when I meet people, I usually meet them from work.**
**So, because we spend so much time together, we become friends. So, yeah, I text a lot of people. But I know these people -- like this is singled out against Ms. Parker.**
Q Uh-huh.
**A And that's that the part that I don't understand. So you want my records to see how much I was I talking to Ms. Parker? What's the point in that? What does that have to do with her**

17

getting fired?
Q Well, that's what we're trying to get to the bottom.
A Yeah. Yeah. Okay.
Q Okay. And you agree with me, you've been texting her even after the time that she's been terminated from RCSI, right?
A Actually, not that much, actually. I didn't like the way this situation happened. Ms. Parker knows that. Again, that's why she reached out to me like, "I know you don't like what happened."
Q Uh-huh.
A So, but we haven't maintained a study communication at all.
Q Okay. How do you define a study communication?
A Like -- like it was when she was employed there, because now we don't have as much to talk about. We're not employed together. She would text me about work, a lot of stuff.
Q Okay.

18

A So, once she's not there no longer, it's like well, I don't really have, not say a lot to talk about but, again, I didn't like the way the station way, so, but I was like "Man." But then at one time REEMA --
Q REEMA, R E E M A.
A The company. I'm saying -- when I say REEMA, I have to be more mindful to define it, because Reema is a person as well as the company. So, from a standpoint I'm speaking right now from a company standpoint. That supposedly came down and Larry told all of us at the building, basically in a meeting, "You couldn't talk to Ms. Parker about work. Okay." Too easy
Q And did you do that?
A No.
Q You continued to talk to her?
A No. I thought you said did I talk to her. No, I don't talk to her. But, yeah, so I didn't talk to her no more about work.
Q Okay.
A So, maybe like seven months went by.

19

Maybe she reached out "Hey, what's going on?" You know, actually the first time I talked to her was the day she got fired. She talked to me later that day. But, obviously, the rule the "Don't talk to her," wasn't in effect or anything like that. Not that I have to -- I have to oblige to that, like. But, either way, it came down.
I didn't like it. We didn't talk that much after. So, periodically, again, we're kind of like in the same neighborhood, so Sheba is still her friend. She was still there. Sheba's around, Romaine's around. So, periodically, again, but it wasn't about work.
Q Did you remain friends with her after she left REEMA?
A Yes. But, again, it ways like friends. I know her, you know what I'm saying. So you could have a friend that you don't talk to for years or whatever. So, do I still consider her a friend, I do. I don't have anything personally against her.
Q But you talked to her in 2018, right?

20

A In 2018, I'm not sure.
Q 2019, you talked to her?
A Maybe once, maybe twice.
Q 2020, this year, you talked to her?
A Yeah. I talked to her about this case.
Q Okay.
A About her telling me to talk to her lawyers, so I talked to her.
Q Okay. Did you talk to her about anything other than talking to her lawyers?
A On occasion, it'd be just like "Yo, how you doing? Everything is good. How's your son doing? He's doing well." You know what I mean, stuff like that.
Q Anything other than that?
A No.
Q And how did you know to get a hold of her?
A I didn't -- her number is still the same.
Q Oh, her number's still the same?
A As far as I know.

Q So you were texting on her personal cell phone number?

**A That's all I have for her, her personal cell phone number.**

Q She had a work cell phone number at one point, didn't she?

**A Probably, but I don't think she used it for -- like, so as a manager of the building, they gave you a cell phone.**

Q Uh-huh.

**A A lot of people had work cell phones, but that don't mean that they used them for, like, just communicating, like "Text me from you work cell," stuff like that.**

Q Right.

**A Most people don't even know how to use a work cell phone. You know, they get it and it's like "Oh, I got a work cell phone," but what do you do with it now.**

Q Well, the work cell phone was used to take pictures of different product and different things that were going on in the warehouse,

correct?

**A At times, depending on where you worked. There's a camera in the warehouse that takes pictures of the product.**

Q Okay. Would Ms. -- during the period of time that Ms. Parker was there, would she have used the work cell phone to take pictures of product, or different issues that were happening in the warehouse?

**A I don't know.**

Q Okay. Do you know what use of the work cell phone she would have made while she was in the warehouse?

**A I don't know. She had it. I couldn't speculate as to what she did with her work cell phone. I have no idea.**

Q Okay. But you texted her and talked to her on her personal cell phone?

**A Right.**

Q Okay. And it's still got the same number that she had when she worked at RCSI?

**A I couldn't necessarily confirm that.**

**Maybe. I don't know.**

Q Okay. Well, you got your cell phone there with you.

**A Yeah.**

Q So can you take a look and see what her cell phone number is?

**A Yeah, I can look, see what it is. I have a -- Oh, you got to write it down, so you don't have her number?**

Q Well, that's what I'm asking you. You got your cell phone --

**A I'm not giving it to you.**

Q You don't want -- you're not going to give me the cell phone number?

**A No, I'm not going to give it to you.**

Q And why is that?

**A Because you should already have it.**

Q Well, I don't, because Ms. Parker said that she never texted you using her personal cell phone number.

**A Well, I don't know. Well, you got to find out.**

Q Okay. Do you still have the texts that you had with Ms. Parker?

**A No, I don't. That was years ago.**

Q Okay. How about the chats? Do you still have the chats with her?

**A A text -- the chat is the text.**

Q Okay. Well, there's a text and there's also a chart feature that went back and forth with her as well, right?

**A What kind of chat feature? No. What chat feature?**

Q Okay. So it's just texts, texts and telephone calls that you did with her?

**A Yeah. I don't know what kind of chat, like, you're taking about.**

Q Okay. All right. Let's do this, since you seem a little confused here.

(Pickett Deposition Exhibit 2 was marked for identification and attached to the transcript.)

Q Mr. Pickett, I'm going to mark the next exhibit here. We'll mark this as Deposition

Exhibit 2. Mr. Pickett, I want to show you the document that you received from T Mobile, or some information we received from T Mobile.
**A Okay.**
Q See that phone number on there?
**A Yes. So -- Okay. Yeah.**
Q Under the dialed number, the 202-460-2784?
**A Yeah.**
Q Okay. Is that Ms. Parker's cell phone number?
**A I don't know whose number that is.**
Q You don't know who that is?
**A No.**
Q Okay. So, what's her cell phone number?
**A I don't know. I don't know whose number that is.**
MS. CALDWELL: I'm sorry. Which number are we on?
MR. WALSH: Well, we're on the column that says "Called Number."
MS. CALDWELL: Okay.

**A 0275?**
Q How about the number 202-425-0824?
**A That might be Ms. Parker's number.**
Q That's Ms. Parker's number?
**A That might be.**
Q Okay.
**A But I don't know whose number that is. That might be Ms. Parker's number up here, 2784.**
Q Uh-huh.
**A Might be.**
Q Well, this shows that you started having -- looks like you had some texts back to that number 202-425-0824, beginning in January of 2019?
**A Of 2019?**
Q Sure.
**A Okay.**
Q You had some texts there. Were you texting Ms. Parker in January of 2019?
**A Don't know. May be.**
Q Do you have any of the texts that you've had with Ms. Parker?
**A No, actually, I don't.**

Q Okay. How about any of the telephone calls? You got any of the logs of when you would have spoken to her?
**A No. You got a log right here from T Mobile. Obviously, you did the subpoena, right, so you have everything that I would have in terms of talking to Ms. Parker or whoever else.**
Q Okay. But you don't have a log of when you talked to her?
**A I don't. It's T Mobile. T Mobile keeps the log. I don't keep a log. I don't know where I would log it.**
Q Okay. Do you remember texting Ms. Parker in January of 2019?
**A Again, I told you, Ms. Parker reached out to me, says hello from time to time. Sometimes I reach out to her, see how she's doing, like, so I have said that.**
Q Okay. So, that's all that you were texting about in January of 2019, was how she was?
**A Yeah.**
Q And that's what she texted you back on

the 10th, the 11th, the 31st of that month?
**A Possibly so. Ms. Parker also asked me some advice about business and things like that. Like, so, I mean, like, I'm not saying I didn't talk to Ms. Parker or haven't talked to Ms. Parker, but in relation to this case, I haven't talked to her about it.**
Q Well, I understand you said in relation to this case. I'm trying to figure what it is that you talked to her about.
**A All kind of stuff. She's a friend of mine.**
Q Well, what other kind of stuff --
**A So, you got a friend, right. She's a football fan, right. So football season comes around, maybe you talking about something that happened with her team, "Damn, Dallas sucks," something like that. You know, you have friends like, so, it's just friendly conversation, so.**
Q Okay. Well, all right. So you talk to her about football, you talk to her about business. You said you asked her about her son.

What else do you recall talking to her about?
A I don't know, sir. I mean, no clue. All kind of things. It could be anything. She could might call me and ask me did I read a book. I'm like "No, I hadn't heard about that book yet." It could be anything.
Q Okay. Did you -- your wife is expecting, correct?
A No, my wife is not expecting.
Q Okay. Did she just have a baby?
A Yes, we did just have a baby.
Q Congratulations, sir.
A Thank you, sir.
Q Did you talk to Ms. Parker about the pregnancy of your wife?
A I talked to her -- yeah, actually, I did, not too long ago, and I told her "Yeah. Hey, I also had a kid." So, yeah, I talked to Ms. Parker about that too.
Q Okay. Did you talk to Ms. Parker about Mr. Moppins?
A No, I didn't talk to her about Mr.

Moppins.
Q Other than just having this occasional conversation you said with Ms. Parker in January of 2019, do you recall any other specifics of any conversations that you had with Ms. Parker?
A No.
Q Did you -- other than occasionally talking to her or texting her since she left RCSI, have you had any other relationship with her since then?
A It's the same relationship that I've also had. Again, it's just because now she doesn't there, it's minimalized. So, I mean, it's different when you're going to work with somebody every day, you're talking about work stuff, you're engaged in work. We carpooled at one time.
So, like, once that -- once you don't no longer work there. And the, like, again, Reema warned us not to talk to her about stuff that was happening, I've never -- actually, that came down later, when I guess they found out she was going to sue them, so, then, that's when that word came

down. So, outside of that, I talked to her just like normal friends talk.
Q Okay. Did you ever meet up with her outside of the workplace?
A Never. Actually, we all went out one time to a place, two times, actually. One time we went to a pool hall, and it was a bunch of us from work that went.
And then there was another time I went to a kickball games of theirs. Again, that was with three other ladies that worked with her. They're all kind of friends. That's how they all -- that's how they got there.
So, Romaine, Sheba, Mattie and Ms. Parker, they all played kickball. So I went to one of their kickball games, but it rained out, so, but I left. So, outside of that, never hung out with Ms. Parker.
Q Okay. You've never seen her outside of the office other than those two occasions?
A Yep. For work, picking up for work and dropping them off, that's about the extent of it.

Q All right. When's the last time you picked her up for work?
A I don't know, sir. When she was working at REEMA.
Q And when's the last time you dropped her off after work?
A When she was working for REEMA, the carpool. It was a carpool.
Q Who else was in the carpool?
A Romaine, Tambeni Daughtry.
Q And Ms. Parker and you?
A Ms. Parker and I.
Q Okay. Anybody else?
A Then we had a carpool, it was me, Ms. Thompson, Daughtry, Tambeni Daughtry, Jonathan Coakley (phonetic), then we carpooled.
Then me and Mr. Alan, Dennis Alan -- God bless the day, he's dead now, but Mr. Alan, Rufus Moon, carpooled. So, we work in P.G. County, we live in P.G. County, we work in Sterling, Virginia, so we carpooled. That's what we did.
Q Okay. Getting back to this T Mobile

listing here for this phone number. So, we talked about January of 2019. There are also some texts in February of 2019?
**A Okay.**
Q And then it looks like you --
**A I want to feel like -- I want to say Ms. Parker's birthday may be in February.**
Q Okay.
**A So I probably texted her, "Hey, Happy Birthday," something like that.**
Q Okay. And, then, it looks like you actually called her in February of 2019?
**A Okay.**
Q And do you recall what that conversation what about?
**A I don't.**
Q Looks like in March of 2019, there's these IMCHATS.
**A I don't know what an IMCHAT is.**
Q Do you recall texting her in March of 2019?
**A Maybe. I don't know how that comes over**

**as an IMCHAT. I don't know the definition of how this actually works so, but, no, I don't.**
MR. WALSH: So that I don't misrepresent anything, why don't we -- we'll mark this as the next exhibit, just so we it in front of us.
(Picket Deposition Exhibit 3 was marked for identification and attached to the transcript.)
Q I want to show you one of other documents that T Mobile gave us when they produced these documents, and it explains their call logs, how you can read their call logs and what they say. And under "Call Type," in the column name under "Call Type," the last line there, in the second column, it says "RCS-IMChat equals rich content message, multimedia and text."
**A Okay.**
Q So, that's what the RCS-IMChat means in the T Mobile world?
**A Multimedia and text. Okay, so like if I send her like a meme or something, a screen shot or something like that.**

Q Could be.
**A Okay. All right.**
Q All right. Do you recall sending any of that information to her then?
**A Possibly so. Again, we shared like books and stuff like that, so that's possible, but, I mean.**
Q That was it?
**A Yeah.**
Q Okay. And then looks like you also continued conversation in April of 2019, texted back own forth with her?
**A Okay.**
Q Looks like you also called her in February of 2019. Any idea why you would have called her in February 2019?
**A Again, I think Ms. Parker has a birthday in February, so it was probably like "Yo, Happy Birthday, kid. You still making it." Something like that.**
Q Well, this is in April, two months after.

**A You said February.**
Q I apologize. April. Looks like you called her in April of the 2019. Any idea why you called her in April of 2019?
**A Probably just to see how she was doing. Again, she was a friend of mine. So we're talking about conversations, maybe like once a month. And I'm not sure where you're trying to go with that. So, I mean, I already have said I have talked to Ms. Parker. I don't know what more you want me to say.**
Q Well, I'm trying to make sure I understand the frequency of how often you talk to her.
**A ,Well you have the frequency.**
Q Okay. Well, did you ever talk to her on the phone, other than your cell phone?
**A No.**
Q Only on your cell phone?
**A Yeah.**
Q And you never met up with her to talk to her in person after she left RCSI?

37

**A I haven't seen Ms. Parker since the day she left RCSI.**

Q Okay. And if I look at this T Mobile chart, it continues, it looks like in September of 2019 there were conversations?

**A You talking about from, let me see, September. So, I talked to her April, and then again in September.**

Q Right.

**A And that's an issue because?**

Q Did you talk to her?

**A Yeah. Clearly, I talked to her, but I'm saying, like, what is, like, okay, I talked to her in September, I talked to her in April and then I talked to her in September, like, I don't know, what is that, five months later, something like that, see how her friends doing. Like, yeah. Your record is there, so I understand.**

Q Do you remember what you talked to her about?

**A Probably just catching up, "Yo, what's going on with you, anything good? Yeah, things**

38

**good." Like you know how do you with a friend. Again, nothing...**

Q Did you ask her about the case?

**A No. Ms. Parker doesn't want to talk about this case. She knows not to talk to me about this case, because I don't want to deal with it. I never want to deal with. That's why she had to reach out tome again, on behalf of her lawyer, "Yo, could you talk about this case." I didn't want to. So we never talked about the case.**

Q Okay. And let me just finish getting through this. So, if I go to January of 2020, it also shows in here that you continued to, in January 2020, you were texting her back and forth then as well; in February of 2020, you were texting her back and forth; March of 2020, you were texting her back and forth. You were doing all that, right?

**A Okay.**

Q And, then, it looks like this goes as far forward. It looks like in April, May and June

39

of 2020, so the first six months of 2020 you were chatting with Ms. Parker?

**A Yeah. How much, though? We was probably talking but, again, I'm not sure what you're trying to get at.**

Q Well, I'm just trying to understand what you guys talked about. You said just occasionally catching up and I'm looking like in May 20th, you guys were talking. There's a long duration for the calls May 20th, and then again on June 3rd.

**A Okay.**

Q Do you recall what you talked with her about then?

**A I don't know if we talked about, like, guns and things, and just like thing that are happening in the world, stuff like that, so probably along those lines. Again, just like conversations that you have with your friends.**

Q Just personal conversational, small talk?

**A Small talk, really, you know what I'm saying. Like, if I text her a couple times that**

40

**day and she text me back, and then it's -- it's like nothing else to it. It's just do with your friends.**

**Like, I know you guys singled her out, but if you look at all the records, you have, like this, all Ms. Parker's records, but if you go through my records and you look at other person, like Romaine Thompson and, you know, people I used to work with, or people that I currently work with, it's the same conversations that I would have with them.**

**It's just normal conversations of life and how things are going. Like, it's not a big deal. It's not a big deal to me, and I understand your position to make it a big deal, but it's not a big deal for me.**

Q I got you, Mr. Picket. Well, maybe I can explain some of my confusion, because what I also have -- and I might as well put this in front of you. I'll mark this as an exhibit. Mark this as Exhibit 4.

(Pickett Deposition Exhibit 4 was marked

for identification and attached to the transcript.)
Q And I'm going to put in front of you, Mr. Pickett, Answers to Interrogatories number -- they're identified as Exhibit Number 4 that were completed by Ms. Parker, and we asked her about conversations that she had had with former employees, and you're identified on here, and if you go to paragraph seven.
**A Which page? Paragraph seven?**
Q I'm sorry, page seven. I apologize. We asked Ms. Parker about communication you've had with any person other than counsel related to the litigation, identify the individual with whom you communicated, the date and time of communication, the substance of the communication and the topics discuss.
And you're identified, right there, in March of 2019, she said, "DeMarcus Pickett contacted Plaintiff to indicate Cathy Price contacted him about this case and to express his support for Plaintiff. Plaintiff did not discuss

any other details of this litigation." Do you recall that conversation?
**A I don't know.**
Q Do you recall Cathy Price contacting you?
**A I kind of do. I remember, I think she emailed me or something like that.**
Q And what did she say to you?
**A I don't remember. Probably something along the lines like "Hey, lawyer wants to talk to you." Same thing that Ms. Parker did for her lawyers,like something along those lines though.**
Q So, why did you tell Ms. Parker that Cathy Price contacted you?
**A I don't know.**
Q Well, you were trying to help Ms. Parker, right?
**A I don't know if I'm trying to help her. Again, I didn't agree with how the situation went down, so I'm not going to say that I tried to help her. I tried to not be involved in this, period.**
Q Okay. So, what did you say to Ms.

Price when she contacted you?
**A I didn't say anything.**
Q So, you didn't respond to Ms. Price, but you called to Ms. Parker to say that Ms. Price reached out to you.
**A I don't know that it was like "Oh, I got a email," and then I called Ms. Price or Ms. Parker. No, it probably didn't go like that. I might have just said it in conversation.**
**But, you know, she also knew my disdain for the case, like it's not something I want to be part of, Ms. Parker did, is who I'm referring to.**
**So, Ms. Price, maybe she got the same idea, maybe Reema got the same idea, maybe Rajesh got the same idea, Larry had the same idea, because I still worked with Larry.**
**So, everybody knew I don't want to deal with this case, whether it was said or just implied or just my lack of response or attention to it, I tried not to give it any attention with anybody.**
Q You didn't want to deal with the case,

but told Ms. Parker that Ms. Price called you, right?
**A Yeah, but that's not like dealing with the case. That's just like "I don't want to deal with this case."**
Q I agree. Well, and if you turn the page Ms. Parker also commented, in August of 2019, "DeMarcus Pickett contacted Plaintiff to inquire whether Plaintiff's case was still pending. Plaintiff did not response or discuss any other details of this litigation."
**A Uh-huh.**
Q Do you recall that conversation with Ms. Parker?
**A Maybe so, because, you know, again, I work with Larry, so if Larry saying something to me about the case. I'm like "Oh, is that shit still pending?" Could be then. I don't want to deal with it, so I don't know what's happening on this whole legal front of her case.**
Q But you don't recall contacting her in August 2019 and asking her about whether the case

was still pending?
**A I don't recall that.**
Q Okay. Then she's got March through June 2020.
**A Yeah.**
Q Says "Plaintiff contacted DeMarcus Pickett to inform him that Plaintiff's attorneys would be in contact with him. On at least one instance DeMarcus Pickett and Plaintiff discussed Larry Moppins' involvement in Plaintiff's termination." Do you recall that conversation?
**A I don't.**
Q Do you recall talking with Ms. Parker about Mr. Moppins?
**A No.**
Q So, is that accurate, what Ms. Parker had written there?
**A Not per se. I think -- I don't know if -- I don't know if somebody -- I don't know if somebody told her what happened to Larry and she kind of brought it up or something like that. I really don't really remember, but that's been a**

**touchy situation I never wanted to discuss with anybody either. So she may have brought it up to me, but I don't recall having, like, a conversation about it.**
Q Well, did that start in March? Was Larry let go in March?
**A No.**
Q Was Larry let go in April?
**A No.**
Q Would you have been -- what would you have been talking with Ms. Parker about in March and April of 2020, about Larry?
**A I didn't say I was talking to her in March of 2020. I don't say that. You said did he get terminated in March, he did not get terminated in March.**
Q When did he get terminated?
**A I don't know when he get terminated.**
Q Well, what I'm trying to understand is what conversations you had with Ms. Pickett (sic) in March -- in April 2020 about Mr. Moppins?
**A Ms. Pickett?**

Q I'm sorry, Ms. Parker.
**A I didn't have a conversation in March or April about Mr. Moppins to Ms. Parker.**
Q Do you have any conversations in May or June of 2020 with Ms. Parker?
**A Again, I said that she may have mentioned something to me, so I think she knew about it. How she knew about it, I did not know.**
**But, again, for me, I didn't want to discuss it because I still work for a company that has that dealings. So, it's not my place.**
**I don't know where she got the information from. Again, she may have mentioned it to me, but what I said back to her was not anything like "Yeah, this happened," none of that. So I think she knew, and how she knew, I don't know.**
Q Well, this says that "DeMarcus Pickett and Plaintiff discussed Larry Moppins' involvement in Plaintiff's termination?
**A Uh-huh.**
Q So what conversations did you have with

Ms. Parker in March through June of 2020 about Larry --
**A About her termination?**
Q Yes. Yes, sir?
**A About her termination?**
Q And Larry's involvement in that?
**A I don't know. I don't recall that.**
Q You don't recall having those conversations with her?
**A I do not.**
Q Do you recall having any conversations with her where you would have talked about Larry?
**A Only in the sense of this is some bullshit that happened. But, again, I also felt that she played a part in this situation.**
Q Uh-huh.
**A So, it was kind of the both of them. So, I mean, I didn't want to -- I don't know. I don't recall having a specific conversation with her, but she knew how I felt about it.**
Q Okay. When is it that you discussed with her the fact that you felt they both played a

role in that termination?
A I don't know. This might have happened maybe March, maybe June. I don't know. I don't recall when I had a conversation with her, but that might have happened when she got fired, actually, actually, when she got fired, the day she got fired.
Q Okay. And you talked to her on that day?
A The day she got fired, yeah.
Q And what did you talk to her on that day about?
A I didn't know she got fired.
Q Okay. Other than that, what did you talk to her about on that day?
A I just remember not knowing that she got fired. She said she requested my presents in a meeting, and they didn't want to let her -- they didn't want to let her come and get me, and they fired her.
I was like? Damn. So, what happened?" She's like "Well, Larry give me some write-ups,

walked me out, whatever." Something like -- basically how she got fired, but.
So, I'm like "Well, what did you say?" I think I asked her what she said, something, because I'm shocked that she got fired. I actually was shocked. But outside of that, I don't remember having a conversation about her termination with Larry in March through June, like not really sure about that.
Q The other thing you just mentioned a minute ago was you felt that they both had a role in that termination.
A I did.
Q And you did tell Ms. Parker that?
A I told her that a long time ago.
Q And what did you tell her about her role in that termination?
A 'Cause I felt like she didn't have to handle the situation how she handled it. Ms. Parker is a very lively kind of person, kind of like -- I don't know.
She's opinionated and very, outspoken,

if you will. So, if she feels like she's being done wrong, she speaks about it right then, without taking kind of cooling off. So, Larry is kind of a hot head hisself. So get a hot head and you get somebody like Ms. Parker that's being assertive about how she feels about how she's being treated, and it we coming a piss contest, and that's how I felt it went.
It was a piss contest, and he was in charge and could basically get her terminated. She wasn't going to win that. She wasn't going to win that contest, and she didn't.
Q And what was it that you believe that Ms. Parker did in those confrontations was Larry?
A Instead of just taking a moment to just listen and have a conversation and just willing to be part of a conversation, she was very upbeat and very emotional about how she felt like she was being treated.
So, I just felt like, hey, if you had just been a little more calm, then maybe it didn't have to go the way that it went. Just had to be a

little bit more calmer.
But that was things that, again, like, I worked with these guys for -- we work real close in a very stressful environment, and I talk to a lot of people. A lot of people come to me, a lot of people confide in me. So one of the things Ms. Parker used to confide in me about is her, you know, obviously, her work.
But I remember one time she got promoted. She got promoted and her title was Assistant -- I want to say it was Assistant Operations Manager, and she wasn't -- she didn't like the fact that it was Assistant. She thought that she worked hard enough to be the Ops Manager. And I said, like, you can't be upset about that, you know what I mean.
So, just to say, like, that's kind of how assertive she was. She was really upset about it. And I was like, hey, you got to calm down. You got to just let things happen. Like, one day you'll get to that level, but take the steps.
But, again, Ms. Parker is very

53

**headstrong. So that's just an example of when I'm saying she's like passionate about her work and assertive about her work and she really wants to do a good job and when she feels like she's being mistreated or something, you make her upset.**

Q Okay. I'm just curious about something. If you go back to page 6 in Exhibit Number 4, in the middle of the page there, Ms. Parker was also was asked to identify people that she had talked with about her termination, and she's got that she talked to you on May 18, 2016?

**A I feel like that's probably when she got fired. Maybe that might have been the day she got fired.**

Q Okay.

**A I'm not sure. I mean, that's a long time ago to kind of refer to, but**

Q I understand. Okay. In this note from Ms. Parker and her Answers to Interrogatories, she says "Plaintiff and DeMarcus Pickett discussed Plaintiff's termination of employment with RCSI, including the substance of the written warnings

54

cited as the basis for her termination." Did she tell you about the written warnings, what was in them?

**A Yes, because I think she was trying to tell me about how she fired. I was like "What's you get fired for?" I didn't know. I never saw the written warnings. I never saw any of that, because I wasn't involved in that process, so I don't know anything about it.**

Q Have you ever seen the written warnings for her termination?

**A Nah.**

Q Okay. And it said "Plaintiff's belief that the termination was retaliatory in response to her filing a complaint with human resources against Larry Moppins." Do you recall what Ms. Parker told you about that?

**A I think we were all at the job then. I remember she made a complaint and I remember said she was going to make a complaint. I don't know that she actually made a complaint.**

Q What did she say she was going to make

55

the complaint for?

**A I'm not really sure what the basis of her complaint was. I'm not really sure. I really couldn't tell you that. I wasn't party to that. Was not privy to that.**

Q Okay. Did you ever see Larry treat her inappropriately?

**A Yeah. But, I mean, at the same time, also because of how this rumor came out and how Ms. Parker took it, I didn't have any -- I didn't talk to Larry.**

**I didn't see a lot. Larry stopped talking to me, so it was like a very much a hostile work environment for me as well. I'm not getting invited to meetings. I'm not on emails. He's having meetings without me, and that went on ever since the moment that the rumor came out for months.**

**And I'm not sure exactly when it ended. But, so, I wasn't involved in a lot of things. I was just kind of shunned and pushed to the side because of how this situation had played out.**

56

Q Okay. Well, what I'm trying to understand is what did Larry -- did you ever see Larry treat her appropriately?

**A Again, I'm saying, like, I wasn't part of that, so everything was fine up until the moment that little rumor came out and she had, you know, said what she said to him about, because I told her about it.**

**Ever since that moment, I was already being mistreated, so it's kind of hard to see who else is being mistreated when you're being shunned on your own, you know what I mean.**

**Like, I think we had a meeting and I think he -- he closed the door on her from a meeting. But she was having a -- I think she was having an emotional like breakdown. She was crying in a room next to where the conference room was.**

**And I was standing there at the door, so there's a door here, there's a door here. She's -- we're standing right here in the door. She's crying. I'm like, "Just calm down." Like,**

what's going on? And I don't remember why she was crying, but she was feeling some type of way.
And I remember going into the room, then he closed the door behind me. She was almost like about to come. I mean, it's the door was like a step and half into this doorway, and I remember hearing him closing the door.
But, he said we were late, but I got in. I don't know if he just didn't feel like he was going to push the door on me or what, 'cause I'm kind of almost standing already in the door. But he shut the door. But outside of that, I didn't have very much interaction with him, you know.
He was very standoffish, didn't talk to me, was in his office. So wherever he was at, doing whatever he was doing, and I was kind of basically just huddled in my office most of the time, with basically nothing to do. Well, I still talk to people, but he wasn't talking to me.
Q Okay. All right. And this continues and says "and DeMarcus Pickett's assertion that Plaintiff was wrongfully terminated."

A Uh-huh.
Q So I just want to ask you about that. What did you tell her about why you believed she was wrongfully terminated?
A I'm not sure what was on her write-ups, but whatever she said, I might have told her that it didn't make sense. But I also known Larry, or I have Larry, if he wants you to get fired, he will fire.
He'll come into a meeting. We'll be having meetings where he'll walk in and say "Hey, man, which one of you motherfuckers don't think I can get you fired today if I want to?" So, he's fired a lot of people.
I know how he fires people. He may, for getting -- you may leave this cup here and he be like "I told you, don't leave cups and it's not a spill proof container, so I'm going to write you up for it." Then you might be a minute late the next day, he'll write you up for it, then he'll use that. He'll get another write-up for something else and then turn it in and say "Three

write-ups, hey, man, you're fired."
So, he just gets you gone. So, I've seen a lot of people wrongfully terminated, if you ask me, a lot of people.
Q Why do you say wrongfully terminated?
A Because, those are people that don't deserve to be fired over things like that, you know what I mean. You come to a good job, you want to do a job, you try and do a good job.
Some people wanted to work. Not everybody came to work, not everybody did. And, you know, that's just people. You know, some people just passing on through. You don't want those kind of people in your organization. I understand.
But some people were really working and really trying. But once he felt like he didn't want you there, for whatever reason, could be professional, could be personal, could be whatever. He might just not like something, he could get you out of there.
Q So, why do you feel she was wrongfully

terminated?
A Because I didn't see anything wrong with her work.
Q Okay.
A She had noting wrong with her work.
Q Anything other than that?
A No. I. -- again, I don't think that her attitude, she could have did better with her attitude part of it, because I don't feel like maybe if her attitude wasn't what it was, that he wouldn't have felt the position or need to be like, you know what, I'm really -- I'm going to get you out of here. That's how I felt about it.
Q Okay. Let me go back to the beginning and try kind of -- we got a little sidetracked there. Let me kind of bring us a little bit of forward in terms of trying to make sure I got the whole story here in terms of what happened.
Mr. Pickett, one of the things I want to understand is what was your role -- Let me strike this. When you can start at RCSI?
A When they took the contract over, I want

61

**to say it was, I don't know if it was the summer of 2012, something like that that they took the contract over.**

Q Okay. And what was your role at that time?

**A At that time, I can't remember what my role was. I might have been a material coordinator at the time, I'm not sure. I can't remember.**

Q Okay. And at some point you moved out of the position of material coordinator?

**A Into Deputy Program Manager, yeah.**

Q Okay. And do you recall when you became Deputy Program Manager?

**A No, not really.**

Q Okay. At the time that the contract ended, do you remember when the contract ended.

**A September 2017, I want to say.**

Q Okay. Do you recall about how long you were in the position of Deputy Program Manager?

**A Probably from maybe 2013 -- not 2013, I'm sorry. May have been end of 2013. I'm not**

62

**sure. I really don't recall.**

Q Okay.

**A I really don't.**

Q So, more than three years you were Deputy Program Manager, is that fair to say?

**A Yeah, roughly about three years. If they had the contract for five, then roughly three years, three and a half, maybe four.**

Q And what was your responsibilities as the DPM?

**A My responsibility was to make sure the operational aspects of the warehouse work, receiving department, shipping department, inventory control, so just making sure that all those things flow fluidly.**

**That was supposed to -- you know, receiving had a -- we've changed so many hats. The hats change. You know, you have an Ops manager out back, and then you have a cyber manager. So the rolls blended, and what your responsibility was shifted constantly in there for the needs, you know, if a project was coming down**

63

**and we need somebody to take of that, then maybe you did that, you know.**

**Maybe it was added to your responsibility. So, I did the vault, you know, weapons vault, making sure the inventory was straight on that. So, it was a various amount of responsibility.**

Q Okay. And did you -- who did you report to?

**A To Larry.**

Q Okay. Was Larry an employee or a contractor of REEMA, if you know?

**A From my understanding, he was a contractor, from my understand.**

Q Okay. Did Larry have the authority that he could fire you, if he liked?

**A Yes.**

Q Okay. And could he do that without talking with anyone else?

**A Yes.**

Q Okay. And why is it that you believe that?

64

**A Because he was the PM, the PM, but, I think -- again, I think it was kind of blurred, but he had the authority. I mean, he was the only one who had the authority to hire and fire people.**

Q Okay. Did Rajesh Vora have that authority?

**A Probably so. As the president of the company, I'm pretty sure you walk down and say "Hey, man, I don't want you here on my company." I mean, like, why wouldn't he.**

Q Okay. And do you who whether Larry would have needed Rajesh's authority in order to fire you, if he wanted to do that?

**A To fire me specifically, is that what you mean?**

Q Yes, sir.

**A I don't know.**

Q Okay.

**A To be honest you with, I have no clue.**

Q Okay. What about Cathy Price, did she have the ability to fire you?

**A I don't know. She's human resources. I**

think her hands were kind of tied, if you ask me.
Q Okay.
A I don't really what -- I mean, when I was going through the hostile work environment, I said something to her and she told me she couldn't do nothing about it because he was wrote into the contract, when we were talking about Mr. Larry.
Q Okay. So what did Cathy tell you about Larry and the hostile work environment?
A So, again, as that situation was happening, I'm telling her, hey, this can't be right. This guy's not talking to me. He's excluding me from meetings. He's not putting me on emails.
Like, this is a lot of, you know -- I told her some BS that's happening around here right now, and I'm not sure -- I'm not sure how she put it, but she said well, there was nothing that she could do, because he was wrote into the contract, and I use that term, something to that effect.
Q That he was wrote into -- okay.

A Something like that. So, I'm not sure what she meant by that. I'm not sure of the game, when you asking me if he's a contractor or an employee of RCSI, I don't really know. But, that makes it seem like he's not, maybe. I don't know.
Q Okay. We'll come back to that hostile work environment in a second. I just want to make sure I get the background clear. Would Ms. Parker have reported ultimately to you as the DPM?
A Depending on what role she was in. Again, she had got promoted a couple times. I'm not sure how many times, but she got promoted a couple times.
So, depending on what level she was at means whether or not she reported directly to me. She's reported to Shaun, Shaun Reeves, at one time, because he was the receiving manager, or assistant operations -- I think he was the operations manager, and I think she was assistant operations manager, so it means she would have reported to him. But, so, it depends on what, again, what job title she was at.

Q Okay. And would her supervisors then have reported to you?
A Yes.
Q Okay. So, ultimately she was underneath of you?
A In the grand scheme of things, I guess, yeah.
Q Okay.
A To an extent.
Q You did observe her work or criticize --
A I did.
Q You did. Okay. Did you ever have an occasion to do any performance evaluation of her?
A Did I do an eval for Ms. Parker? I don't recall. It would have been Shaun, again, depending on which role she was in. So I may have done an eval on her, but not really sure.
Q Okay.
A I don't recall doing one but, I mean, I do a lot of evals, sure I'm not sure if I give her one or not.
Q Okay.

A Feel like her tenure was kind of short, so I don't actually know if I ever actually got to write one.
Q And would that also be because she would not have been one of you're direct reports?
A Yes.
Q Okay. You mentioned Shaun was her supervisor for some period of time. Would you have evaluated Shaun then? Would he been a direct report?
A Yes, probably at that time.
Q All right. Do you recall -- when you were working at RCSI, do you recall what positions Ms. Parker did have?
A I think she came in as a -- I want to say she came in as a warehouse specialist, as a temp, if I'm not.
We do inventory. It's a lot of equipment in the warehouse, so we would hire temps to come in and basically like kind of be like box handlers, and I believe that's where she started.
From there, she probably became -- she

**probably got a full time position because of her work during inventory. Now, everybody could see Ms. Parker, because we're all in this -- we're in a warehouse, so we're all there in a condensed area, inventorying probably, what, 30 million** dollars of equipment and drywalls (phonetic).

So, Ms. Parker was like one of the first ones back from brakes. She was like -- she had a back brace, her gloves. She always was ready to work, and she out-worked basically everybody who was out there. So that's what got her her, probably her full-time warehouse specialist position.

Again, from there, I don't know if she -- I don't know -- I don't know where it went from there. I don't know what the next title was, because sometimes titles also change. So, if you, know Larry decided that he wanted to have five people in receiving and only three people in shipping, then he could move a title and call this person a title and justify having that person there. So, what her actual roles were, I'm not

really sure. I could recall the assistant operations manager, because I remember she was upset about it.

So, I know she didn't go from warehouse specialist to assistant operations manager. I don't think she did but, you know, again, I'm not sure what the actual titles were.

Q Okay. When she was the assistant operations manager, do you know who she reported to then?

**A Shaun Reeves, because he would have been the operations manager.**

Q Do you know if she worked under Ms. Wallace during any period of time.

**A For a period of time -- what did she do for Ms. Wallace? Did she actually work for Ms. Wallace, because Ms. Wallace ran transportation, and I don't ever feel like I recall her being in the transportation department. I don't recall that.**

**I remember she did -- she was in, I want to say inventory control. Now, maybe Ms. Wallace,**

**in charge of transportation, had transportation and inventory control under her guidance, because I know at one time we were doing classifications, and they sent us to this course -- I forgot the name of the course. It's like a -- it's like an export compliance course.**

**And they liked her work so much that she ended up taking part of that. She was very intense in that. And, again, that's probably like, a lot of her -- "Hey, I found this, this ECCN," and, you know, it was almost a challenge for her.**

**So, I didn't really recall what her title and where she worked, though. But it's hard to say. I'd have to look at some records or something, show me. It will stick out to me, but right now, just off the top of my head, I don't remember.**

Q Okay. Did she ever work directly under you?

**A I don't know if she work directly underneath me. I don't think she made it to work**

**directly underneath me. We did work together again on this export compliance stuff. But, in terms of working directly for me, I don't think she had.**

Q Okay. And that export compliance, did that also involve going to that ITAR seminar in Virginia Beach?

**A Yeah.**

Q Okay. ITAR is I T A R. And do you recall how you got to that Virginia Beach conference?

**A Larry dove. Larry drove us all there, I think.**

Q Do you know who went?

**A Me, Larry, Angie and Ms. Parker.**

Q Angie, Angela Wallace?

**A Angela Wallace, yes.**

Q Thank you. How long was that for?

**A We went down -- how did I go? I want to say we went down that day and -- did we go the night before? I think we went the night before, because I remember the hotel being like this very**

**old, kind of like hotel, something like that.**
**So, I think we went down there the night before, went to the class that day and then came back, something like that, or it was two days, something like that.**
Q Okay. While you guys were at the -- Sorry, apologize for "guys." While all you were at the seminar, did you do any -- any activities together, other than go to the class?
**A We went out to eat, all of us went out to eat.**
Q Okay.
**A Went to some seafood restaurant. So, that's why I felt like it was only a night, because we went to the seafood restaurant and we didn't stay the next night. We went -- the class was one day, we stayed the night, went to class the next day and then we all came back.**
Q Okay. Other than going out to eat, to dinner, did anybody do anything together after that?
**A No.**

Q Now, I understand in the warehouse there was also a section that dealt with the SPEAR portion of the contract?
**A Correct.**
Q And when was that located in the warehouse?
**A So, if you could imagine this being the warehouse, if you will, so, and it was actually long like this. It went this way, so you come in the front door, this is the front area here. You go through the warehouse door and you go all the way to the back.**
**In that back corner back there would be the SPEAR, and they had their own caged off area, so it's way in the back of the warehouse.**
Q Okay. Now, would employees who worked in the SPEAR area also work in the general warehouse?
**A Not typically, no.**
Q Okay. Let me, since this is -- we're just saying things, it's probably easier if you draw a picture, if you don't mind -- and I

understand it's not to scale, just what the warehouse looked like and where the SPEAR area was.
**A So, this is the warehouse door right here.**
Q If you could just write "door," because we won't understand things when we get back later.
**A Okay. Now, this is just the warehouse aspect of it.**
Q Okay.
**A So, there's some huts here. This is the receiving area, there's some table here. That is the receiving area and there's racks that go like this.**
Q Okay. And just write "SPEAR" where the SPEAR area is.
**A (Complying.)**
Q Okay. Now, would the employees who worked in the SPEAR area stay in the SPEAR area?
**A Yeah, because all their work was in the SPEAR area. Now, from time to time, there's a -- I think there was a hose right here and they would**

**have to -- no, actually the hose is over here.**
Q The hose is near the front door.
**A Front door, because there's a utility closer right here. There's a, you know, with a boiler room and there's a sink right here, and they would run the hose out here to charge the forklift up.**
Q Okay.
**A So, they'd be out for forklift charging. But outside of that, they have to come through, because there's some doors right here, but they're like just boarded up, so you kind of have to walk this way to go to SPEAR, or back this way to go to SPEAR, or something like that. So, at break times, obviously, they would walk through, lunch, things like that.**
**There's no bathroom down here, so you had to come down here to use the bathroom. So it was not like -- like SPEAR is off in the corner**
Q Okay. But the SPEAR work stayed within the SPEAR area?
**A Yes. That's the reason they have a**

77

**cage. It has to be caged up. There's no comingling of these two contracts.**
Q Gotcha. And were there comingling of the employees?
**A Yes. Again, because they have to walk kind of through.**
Q Okay. Well, other than walking through or filling up the forklift, would they be working side by side at any point in time?
**A Not usually. Like, say something was important and we needed to get some spare bodies, maybe, but it wasn't common for that to happen.**
**SPEAR had their own work. We had our own work, so not typically. But there was times that we did.**
Q And Ms. Parker ever work in the SPEAR area?
**A Not that I recall, no.**
MR. WALSH: Okay. I'm just going to mark this as Deposition Exhibit 5, I think. Just so we have that.
(Pickett Deposition Exhibit 5 was marked

78

for identification and attached to the transcript.)
Q Hang on to it for now, just in case we need it. I appreciate that. Do you recall when Ms. Parker first came to work at RCSI?
**A Yeah, it was an inventory room.**
Q Okay. And you mentioned what her positions were. I'm just wondering, do you recall when you first started talking to her about personal things?
**A Well, I think we ended up -- we started carpooling very early, so it was like, you know, Sheba is who brought Ms. Parker into the warehouse, if I remember correctly.**
**Now, Sheba and Romaine and I, along with Dennis Alan, Rufus Moon, we all worked on a contract on the base previous to that, so we've already established a friendship, a rapport, things like that. So, now, Ms. Parker works with us.**
**So, now, obviously, I'm having a rapport with them and she just kind of almost is fitting**

79

**right in. Like, you know, like "Oh, man, somebody I know." You know, she's very familiar in terms of like her -- her -- her, like, the friendship aspect, because she's friends with Sheba.**
**You know, she had stories that she know of Sheba that I kind of knew. It's just kind of like -- it just almost just clicked, like it was just natural. So it was almost immediate that we just started kind of of talking and just whatever.**
Q Okay. And, just the record's clear, what's Sheba's real name?
**A Tambeni Daughtry.**
Q Thank you.
**A Yeah. Tambeni Daughtry is the sister of Romaine Thompson.**
Q Okay.
**A At one time there -- one of their sons worked with us, one of their cousins worked with us, Mattie Littleton. I don't know if she's anywhere in this paperwork, but maybe she is.**
Q Yeah. I think she's been identified in there as well.

80

**A Yeah. Rachelle, Rachelle Lee, I think they brought here in too, you know, clique. I talked to Rachelle, or Rashelle, I'm sorry, Rashelle. Yeah. So, they was all friends, you know. So ...**
Q Okay. Now another name that you haven't mentioned yet is Donte Jennings.
**A Okay.**
Q Was Mr. Jennings part of that crowd as well?
**A Not -- well, no, because he's a different -- like, he worked there. But, I've known, again, Sheba and Romaine probably since 2003, so you got to figure, this is 2016. I've known them over ten years.**
**So, we worked together. Again, we have a rapport. I know her kids. We been to Christmas parties together, with previous companies, like. So, I already know them. So, if they bring one of their friends in, that has nothing to do with Mr. Jennings.**
**Mr. Jennings is somebody else that**

**worked at the warehouse. You know, he's fairly new when he first got there too, so I'm not sure when he started. It had to be probably 2016 too, maybe end of 2015, something like that.**
Q Okay. Do you know whether Mr. Jennings had a personal relationship with those people you identified as well?
**A I can't speak on that relationship.**
Q Okay.
**A I think him and Romaine was cool, but, I mean, in term of how personal they have or got, I don't know.**
Q Do you know if Mr. Jennings dated any of those ladies?
**A Not that I -- not that I know of. At one time there was conversation that he kind of liked Rachelle, or something like that.**
**But, again, I really don't know. I don't know what Mr. Jennings did or anything like that. I couldn't speculate to who he was talking to, what he did after hours. I have no idea.**
Q Okay. Do you know whether Mr. Jennings

played kickball with that group?
**A I never heard that he played kickball with them. Again, I went to one of their games. I didn't see him there.**
Q Okay. Who did you see there when you went to that kickball game?
**A Actually, nobody, because, again, it rained out, so by the time I got there it was raining. Everybody was leaving, so I didn't actually see anybody at the game.**
Q Okay.
**A The people was like leaving, because it start thundering and stuff, and it was almost like people scattering, get to their cars. So I got "Oh, kickball game."**
Q Okay. Did you talk to anybody when you went to the kickball game?
**A No. I think I text Sheba like hey, I'm going try -- maybe I text Ms. Parker, hey we was going to come to the game, but it rained out, something like that.**
Q Okay. But you don't actually talk to

anybody at the game?
**A No. Never even got out the car.**
Q Okay. Did you ever see Mr. Jennings and Ms. Parker have any negative interactions?
**A I did not.**
Q Did you ever see Mr. Jennings have negative interactions with anybody in the warehouse?
**A On occasion.**
Q And who did he have negative interactions with?
**A He had a negative interaction with Carlos Carter one time, and another time with Shaun Reeves.**
Q Anybody else that you recall?
**A Not specifically. I just remember those two because it came up across my desk and we had to have a conversation about it. So, anything after that, no.**
Q Okay. And when he had the conversation with those two gentlemen, were they his supervisors?

**A Yeah, I think in both capacities. I don't know if Shaun was his actual supervisor when they had -- when they had whatever issue that they had. I don't remember.**
Q Okay.
**A People moved around a lot. I'm sorry. Just, you know.**
Q Gotcha. Do you know whether Mr. Jennings worked in the SPEAR area or whether he worked in the general warehouse?
**A Mr. Jennings, from what I recall, have -- I want to say he's always worked in the SPEAR area. But, that might be wrong. I might be wrong about that.**
**I just don't remember him being -- I didn't remember. He might have worked in ATA side and then maybe got into an issue with Shaun and then he went to SPEAR area, to kind of keep them apart, or something like that.**
**But if he was down in ATA side, it wasn't for long. He worked the majority in the SPEAR area.**

85

Q Okay. Thank you. Did you ever hear of Mr. Jennings and Ms. Parker having any negative interactions?
**A I did hear about it.**
Q And what did you hear?
**A Just that she said something to him as he was walking by one day.**
Q Do you recall when that -- when you heard about that?
**A Probably later that day.**
Q That day being?
**A Later that day that whatever that thing happened.**
Q Oh, whenever that -- okay.
**A Yeah.**
Q But you don't recall the time frame, 2014, '15, '16, '17?
**A No, I don't.**
Q Okay.
**A It was probably 2016, though, because I think that's maybe how this whole thing started, actually.**

86

Q Okay. What is it that you heard time?
**A So, and this is second hand. I just heard that Ms. Parker said something to -- like him and Manley was walking by and she said something to him to the effect, like "If you want to know who I'm sleeping with, you should ask me," or something like that.**
**And I think he was like "What?" and then they just had this back and forth, or something like that. But I wasn't there, so, again --**
Q Okay.
**A -- what do I know.**
Q Who did you hear it from?
**A I want to say I heard it from Manley initially, because Manley was with him, and he's kind of like "What?" or something. So, you know, it's just warehouse stuff. I didn't think it to be like, you know, this big deal or anything like that, but I know it happened.**
Q Okay. You say you know it happened?
**A Yeah.**
Q What do you mean --

87

**A No. I mean, I know that -- well, they told me that it happened.**
Q Okay. But you don't see it?
**A No. I wasn't there.**
Q All right. I understand. Okay. Let me kind of jump forward to some time in 2016. As I understand it, Mr. Moppins asked you whether you were having a relationship with Ms. Parker, correct?
**A Uh-huh.**
Q And, it's yes?
**A I'm sorry. I remember, yes, she said something to me about that. But not that -- he didn't say it, like, he wasn't asking me like, you know, you and Ms. Parker, no. He said something to me in a joking manner. And he said it to me, it was actually in private when he said it to me.**
Q Okay. So, that's what I just want to ask you about. Do you recall when that considering occurred?
**A I don't recall when specifically occurred. I do not.**

88

Q Okay. And you said it was in private. Where was the conversation?
**A It was in his office.**
Q Okay. And do you recall why it was that you were in his office at that time?
**A I don't recall why I was in there. He was my boss, so I'd go in there a lot. He'd call me in there a lot. We'd close the door, have meetings, talk about stuff. So, I don't remember why specifically I was in there, and I don't if I was telling him I needed to, like, take a day off or something. Maybe I had mentioned something about my wife to him or something. He made it in a joke .when he made that statement, he made it in a joke, but I was, like, I said "Really? What the hell."**
Q Okay. All right. So, what is it that you recall Mr. Moppins saying to you?
**A He said you and your wife getting divorced, because you fucking with Ms. Parker, or some shit like that, you fucking Parker? It was something along those lines. I was just kind of of**

89

like, what kind of shit is that? No. What the fuck you talking about?
Q Okay.
A That's my reaction to it.
Q Okay. Do you recall what you said to him?
A I just told you, that's what I said.
Q Oh, okay.
A Yeah.
Q And, was there anything else said in that conversation about it?
A No. I think I left. I think I probably just rolled out of there after that. But there was no more conversation about it. Again, he was trying to be funny, and at the moment I was just kind of like, come on, man. Like, you serious right now.
Q Okay. Now, when Mr. Moppins said that to you, had you also lost a of weight?
A At the time that he said it to me? I'm not sure. I'm not sure at that time when he said that if I had lost a lot of weight by then. I was

90

losing weight, so, you know.
Q Okay.
A Not really sure.
Q Do you know if -- did Mr. Moppins comment at all about your physical appearance in that, if you recall?
A They have always comment on my physical appearance.
Q Okay.
A Almost, you know what I'm saying. Like, you know, they mess with me all the time about, you know, when I got hired, the day I got hired, not knowing anybody.
They're like "Hey, man, we going to bring you in. You going to be like our human forklift." You know what I'm saying. So it has always been something that they have made jokes and reference, you know.
I'm a big dude, you know what I mean. And, so, I did lose some weight. I want to say that was -- I really don't remember, but they used to mess with me because I was on like this apple

91

diet. All I ate was apples for like a week, and it was crazy.
So, they -- yeah, they talked about it all the time, but I don't recall when he made that statement if I was, you know, I probably was in between some weights. Not really sure.
Q Okay. All right. And I don't want to get into the substance, but at the time were you and Mr. Moppins at least something discussing something about your personal life?
A No. At that time, no.
Q Okay.
A We were probably discussing business but, you know, flow. You know, he's my boss, so if I'm telling him something or, you know, and I actually knew Larry before he became the PM, so he knows my family.
My wife has been to his house doing massages. Like, he knows my family. So, you know, at that point I was comfortable talking to him to a degree about things that, you know, that I may have been going through.

92

Like, one time me and my wife were having an argument. He made a joke -- he makes jokes about this. And we're having an argument and I ended up sleeping in the car. So, you know, I might have went to work the next day and he's like "Man, what's wrong with you?" It was like "Man, I slept in the car last night. Me and Jasmine's having a problem."
And, you know, that's probably early on. But, so, I'm just saying like the nature of our relationship, like it was kind of like I could speak freely about it. You know, we were warehouse full of guys at the time. When we first -- when I first got there, it was a ware house full of guys almost.
So, I'm just saying, like, to say that he knew things about my personal life with my wife, you know, to an extent, again. So, I don't know -- I don't think we were having a personal conversation when he made that statement.
I may have said something to him about, hey, needing a day off, or maybe something about

93

Jas or something. I don't really recall. But I remember he made the statement and it just kind of was like "Damn. Where the hell did that come from?" That's the first time he ever said something like that to me, so I was like, the hell that came from? What the fuck is that about?
Q Did you ask him where that came from?
A Yeah. That's what I'm -- but he didn't say nothing. He just kind of like -- it was like a joke, again. I think he was trying to be funny, you know what I'm saying. But, so I really didn't pay no attention. But he said it, and I was just like, you know, again, somebody says something to you, you kind of shocked. You just kind of like "What?" Where did that come from?
And then, you know, I was like that's some bullshit or something like that. And I left out. But, again, he thought it was a joke, so I didn't like rah, rah with him. I just let him have his little joke and then kept it moving.
Q Okay. Do you know if you were having any performance issues at that time with work?

94

A No, not that I was aware of, had none.
Q Okay.
A Not that I know of.
Q Larry didn't say anything to you about any performance issues?
A No, not at that time, he did not.
Q Okay. Did Larry eventually anything to you about performance issues?
A After about the two, three months of him not wanting to talk to me, or not talking to me at all, all of the sudden I get this performance improvement plan that comes down.
Q Okay. And do you know why you got that?
A Again, I told Rajesh, I told Ms. Price, I told him. We were all in the meeting. Reema was there. I told him I felt it was -- he felt personal about the situation that happened with Ms. Parker. And, again, he hadn't talked to me about it. He hadn't said nothing to me about it, and it was just like one day "Here you go, man. You not going that good of a job in these areas," or whatever.

95

And, again, I've watched Mr. Moppins fire a lot of people. I know what it was about, and I told all of them, this was personal. This has nothing with me doing my job. This is a very personal attack. So, that's how I felt about it.
Q Okay. And we'll get to that, that that warning in a little while, just to kind of keep things going where we are.
After that one conversation you had with Mr. Moppins, where he made that comment to you, did he ever say anything else to you about Ms. Parker?
A No.
Q Okay.
A Well, up until there was the issue with Ms. Parker and Donte and Manley.
Q Okay. Do you recall about how much time transpired between when Mr. Moppins first said that and when those issues started to arise?
A No.
Q Okay. Do you recall whether it was a year, whether it was a couple months?

96

A I really don't recall. I really don't, and I hate to speculate.
Q No. I don't want you to speculate either. I appreciate that. After you left that meeting, did you talk to anybody about Mr. Moppins' comments.
A Actually, I did, and it wasn't when I left that meeting. It wasn't when I left that meeting. It was like later -- I want to say the next day. I don't know if it was later that day or the next day.
Q Okay. And who did you talk to?
A Well, what happened was Romaine had said something to me about the same thing. She said something to me, and I want to say it was -- you know, she tried not to implicate Mr. Jennings, but basically said "Yeah. Mr. Jennings," you know, Donte, you know, whatever, had made a statement to her about he thought that I was messing with Ms. Parker, something along those lines.
So, now, when she said that to me, and, again, I think it was the next day. So, when she

said it to me it was just like "Hum." What clicked in my mind was what Larry said to me the day before.

So, I said, well Larry just made a joke to me about that the day before, and now you're saying this about Donte, and like "Hum." That's not cool.

So, now, this is like seeming a little strange to me. So I said something to Ms. Parker.

Q Okay. Well, wait a minute. Before we go to Ms. Parker, what did you say to Romaine in that conversation?

A I don't recall what I said to her. I just kind of like Yo, that's crazy. You know, just, like, really. And, you know, but, again, me and Romaine are friends too. I think she called me on the phone. I don't know what we were talking about.

But, so, she had mentioned it. And I tried not to really pay as much attention, just kind of like. But in the back of my mind I'm thinking about what was said the day before. I'm

just like, that's really strange, why -- why you just said that to me. And I didn't tell her what I was thinking, but that's what I was thinking.

Q Okay. But you told her no, that wasn't true?

A Yes.

Q Okay. And did she say to you that that came from Donte, or did you just kind of put those pieces together?

A I just feel like I put those pieces together, because I asked her where she got it from. She was like "You know warehouse be talking." You know, just something crazy. You know, she was trying to not.

But, you know, I know she talks to Donte. I knew she talked to Donte. I know she talks to him a lot. I think Donte, me and her, like I think they may still talk now.

Actually, because Romaine used to work with me out here where we work now and I remember them video chatting, so I still think they talk right now. They were pretty cool.

Q Okay. All right. And other than her saying that, you said then you talked to Ms. Parker?

A Yeah.

Q Okay. And how long between this conversation where Romaine came in and when you talked to Ms. Parker?

A I think it was -- I feel like it was the same day.

Q Okay. And what did you tell Ms. Parker?

A I said Yo, this is strange, and I told her, I said, you know, this is strange. Romaine just -- I just -- I think I hung up Romaine and then called her. Like, Yo, because I want her -- I don't know if she's hearing the same thing.

And, like, I want you to be aware that this is the second time I heard that. She's like "What you mean, the second time?" Because I was telling her about Romaine.

I said the reason only I'm saying is this is the second time I heard it. She's like "What you mean?" I said well, Larry made a joke

to me about it yesterday and I told her what he had said.

So, from there, I told her, I was like "Yo, I just want you to be aware of that somebody is saying that." So just so you don't fly off the handle if you hear it. Because, again, I know Ms. Parker. I'm like "I don't want you to trip about the situation. I just want you to be aware of the situation."

And that was basically it. But I think that's what prompted her to say whatever she said to Manley, Donte, whatever. She was upset about the fact that those guys had -- or that he had mentioned that, or whatever the joke was or whatever. She was a little offended about it.

Q Okay. Did she tell you she was going to do anything as a result of this?

A No. Actually, she told me she wasn't. I just told her, I said I just want you to be aware. Because, again, we're at work. I don't need that kind of drama at work. I don't like that kind of drama, you know what I'm saying.

101

Like, people come to work for different reasons. I'm out here. I been doing logistics at that time, you know, 12, 14 years, something like that. Like, I don't want to play those games at work, you know what I'm saying. I'm not here for that, you know. I do a good job. I'm a kind of a calm dude, if you will.

I'm just -- I didn't want that kind of drama. We don't need that. So, I wanted to make her aware so it doesn't just catch her off guard, because I heard it twice and I thought it was strange, so.

Q But she didn't indicate that she was going to go to HR?

A No.

Q Did she indicate she was going to talk to anybody?

A No.

Q She just indicated she wasn't going to do anything?

A She didn't -- she didn't say anything. She was just like, well, that's crazy. Okay. You

102

know, I say don't -- don't say nothing. Don't do nothing. I just wanted you to be aware and that's how I thought she was going to leave it, and she didn't. She felt some kind of way about it.

Q Okay. Well, let's just talk about you for a second. So, as a result of -- after you told Ms. Parker, did you indicate to her that you were going to do anything to deal with I?

A No, not at that moment, you know what I'm saying. I didn't say anything. I had any, you know, thought again, it was just coming to me. So I hadn't like decided I was going to do something about it, or address it or any of that.

I just was telling her how it came across to me. This is what came across to me.

Q Okay. Did you consider talking to Cathy Price about it?

A No, because it's -- it was like a BS rumor. It was like why -- why am I giving it any attention? Why entertain it, you know what I'm saying. So, no, I never talked to Cathy Price about it.

103

But, at the same time, I wouldn't have been actually very comfortable talking to Cathy Price abut it either, you know what I'm saying. Like, just not -- didn't have that kind of HR faith in her, if you will.

Q Okay. Well, why is that?

A Just from interactions, things I've seen. Just didn't, really, you know, I guess she was okay with what she did or whatever. But, you know, she's not really -- I think Ms. Price mixed business and pleasure, if you will.

Q Any other reason why you didn't talk to her?

A For that reason alone, because I just think that she mixed business and pleasure. When you start going to lunch with people, you know what I'm saying, the employees and stuff like that.

She was on site HR, so that made it kind of a little bit different, you know. She's got like, they little sister girl of like vibe going, and they would go to lunch and stuff like that.

104

Like, I think you too close to the people at that point as an HR representative.

Q Gotcha. Did you consider going to Reema?

A No, because, again, it wasn't that big a deal.

Q Okay.

A I didn't think it was -- you know, I'm shocked that it got to the magnitude of all this. I feel like that was the spark for all of this. So, now, at that time, though. I didn't think it was a big deal.

Q Okay.

A Retrospect, maybe I would have, I don't know, said something. I don't know. It was kind of -- it was small, just like people talk. People talk at the warehouse a lot. Like, there are a lot of things that people say.

As a matter of fact, Ms. Price was part of a rumor about two other employees that wasn't true. Now, this is coming from HR, so it's just normal. I go in there, try and do my job and get

105

out of there, you know what I'm saying.

Like I'd been doing it already at that time, let's see, I think 2009 I started on that contract. It was with another company prior to that. So, here it is 2015, 2016. I've been there a couple years. I'm just working, man. I'm just trying to do a good job, put out a good product and go home. So I don't really get involved in little, small stuff that people say.

Q When is the next time that you in heard anything about that rumor?

A The next time I heard about that rumor was, and I don't know how long ago -- how long the span of time was, but we were having -- I don't know.

Larry and I, because I remember him sitting in his office and we were having a consideration about something. Again, I think it might have been the situation about her saying something to Donte as they walked by, because I think people's emotions may have been up.

Or it might have been something

106

different, I don't remember. But somebody said something about it in a meeting, I want to say Manley, Larry, Manley and I think -- how did this go, man? It's been so long ago.

I think Manley and Arnel may have been getting a -- I don't know if it was a verbal counseling, or counseling, or something like that, and Manley alluded to the fact that in this meeting, like "She's only mad because she thinks I had something to do with that rumor, or something like that." He felt like I think he was getting picked on by her, something like that.

Because she thinks that he was part of this rumor, whatever the case may have been. So, then, the rumor came up again in that sense in front of Larry. So, now, Larry's like "Whoa, well, what rumor?" And then he's like "Oh, that she's fucking Pickett," or something like that, something along those lines.

And he wanted to dive into the rumor at that time. And it became an issue, and then I think when they end up, I want to say Ms. Wallace,

107

Ms. Parker, myself and Larry was in a meeting and he was trying to talk to her about, you know, how she was approaching the guys, or something.

And then she alluded -- she had said to him "Well, you're also part of this rumor," and at that point he was like "What are you talking about?" Because at that time he didn't know that I had told about what he had said to me, and I didn't think it was -- I didn't think she was?

So, that kind of pissed him off, because going to be like "Aha, you told DeMarcus that." So that kind of pissed him off, because now I guess maybe he felt threatened, like oh, well, you're part of the rumor, you're just as bad and, you know, you ain't helping de-escalating the situation.

So he kind of got in a defensive standpoint. And, again, it was a rah rah kind of conversation for a second like, then she came out. He didn't talk to me. I think that was might be the day that he stopped talking to me. Might have been, probably, I think. I'm pretty sure it was.

108

So that was the next time I heard about the rumor, though.

Q Okay. Okay. You got a lot you said there without a break.

A Yeah. Well, I'm sorry. Well, you asked me one question.

Q That's quite all right.

MR. WALSH: If we can, if we can go off the record for a minute. If we can just take a quick break. We've been going for about an hour and a half. Just take a comfort break, run to the bathroom, you need something else to drink, whatever it is, and then we'll start up again. And we'll try to unpack everything you said and put it in a better way for you.

(A break was taken.)

MR. WALSH: Mr. Pickett, we're going to go back on the record.

Q I want to try and unpack a little bit of what you had to say, and kind of go from there. You were talk a little bit about a meeting where Manley raised they issues.

A Un-huh.
Q Do you recall, was that in the meeting, the all hands meeting that occurred?
A The concern that he raised, or what have you, it was not in the meeting.
Q Okay.
A It was in an office. Now, I think we may have -- because I think we may have had an all hands meeting, and then the smaller meetings kind of resulted from that larger meeting.
So, now that I think about it, so whenever that first rumor came out and she had that interaction with Donte and Manley, it wasn't immediate. You know, I think it may have been like a couple weeks later. Because, actually, I don't even think about, you know, the rumor and stuff until it came out again in that meeting with Manley. And I was like "Oh, wow, that came back up. That was crazy."
Q Okay.
A So, it was a little while. It was a little space in between there.

Q Okay. All right. Let me ask you a little bit, just if I can, about this all hands meeting. Do you recall there being an all hands meeting where Ms. Parker did hot get into the meeting? We talked about it a little earlier this morning?
A Yes.
Q And do you recall why it was that she didn't get into the meeting?
A Because Larry said she was late to the meeting.
Q Okay. All right. And was she late to the meeting?
A No, I can't -- if -- if, like, say the meeting started at 12:00 and it's 12:00, he's going to shut the door. So you might have been late, but if that clock hit 12:00 and, you know, again I filtered into the same meeting, because we were both standing right at, kind of at the door, so he knew we were there. But, like, late, like three, four minutes, no.
Q You're not coming into the meeting?

A Yeah. No. I'm saying that day she wasn't like three or four minutes late.
Q Oh, oh. Okay.
A It was like right there on time, because as everybody is -- everybody's like kind of filtering in, it's like a little, you know, it's a hallway, so people kind of filter, and her I and was the last two to filter in.
Well, I filtered in, the door got shut on her on that particular meeting.
Q Okay. Do you know whether Larry saw her and shut the door?
A I'm pretty sure he saw her.
Q Okay. And why did you say that?
A I'm pretty -- because he looked -- you got to look out at that door.
Q Okay. Do you know --
A And I know he -- because I just came in the door. So I know he's probably like, he's probably counting people as he's coming in or noticing who's standing out there. But, I mean, I couldn't say for certain that he saw her. Can't

say for certain. I'm not going to say that.
Q Okay. Do you recall whether she was late for the meeting because she was on a personal phone call?
A I don't. I don't really remember. I thought she was having an issue that day, and maybe that might be a different -- that might be a different meeting. Like, there's a lot of -- there's a lot of times that the employees at RCSI did not necessarily appreciate some of Larry's kind of antics in the way he did things.
So, often times he kept a box of like tissue on his desk because, you know, some of the women get emotional and they cry in the meetings and stuff like that, or cry after the meeting or whatever.
Larry is definitely a military minded individual, and one of the things that he's kind of took from -- and so, like, these people are civilians, so the way you're going about something, they have no idea, and they take it really emotional, because it's like well, who

treats people that way. And he's got this, you know, old military mindset, kind of a command and control kind of mindset. So it was frequent that people would talk to me, or be in an emotional state at the warehouse.

Q Okay.

A So, when I say I don't know if it was that meeting that she -- I just -- I remember one meeting were we getting ready to go into, she had to get gather herself, because she was really upset about something that he had said to her or did to her, something, I'm not really sure.

But I don't know if it was that same meeting. I'm just kind of drawing a blank, because we have kind of -- we had meetings often, all hands meeting. So, it's not, you know, nothing new.

And depending on what kind of mood he's in will he let you in if you're a few minutes late. If he's upset, he's not going to let you in. If he's okay that day, you know, maybe he'll let you in. So, you never know what you're going

to get in terms of that. So, it's just kind of hard to say.

Q Okay. But there were times where he would exclude other people from the meeting, not just Ms. Parker?

A I'm trying to think if I, or do I recall anybody else getting excluded. I feel like he's closed the door on a couple meeting. He's probably closed the door on -- let me see -- I feel like -- it's hard to say, but he may close the door the minute the meeting starts, but he also may need you in the meeting.

So if he closed the door initially to say "Hey, I got the power to close this door and not let you," and then he might open the door a minute, two minutes later, and like "Get in here." You know, so, yeah, it was common for people not to be, or to get the door shut on them. It's not uncommon, no.

Q Okay. He didn't single people out that he did that to?

A No, man. I'm tell you, man, and me

personal, I feel like Larry's always been kind of like an equal opportunity asshole, if you will. Yeah, he's equal opportunity in that regard.

Q Okay. So, do you recall there being an all hands meeting where the staff talked about Ms. Parker?

A I don't recall a meeting like that, specific about Ms. Parker?

Q Uh-huh?

A I don't, no.

Q Okay. That's fine. That's fair. That's what I'm trying to get at. So, the meeting that you mentioned that had -- that Manley was present at, and you said you thought it was maybe in Larry's office, is that fair?

A Yeah.

Q Okay. And who else was present at that time?

A Initially, it was Larry, Manley and myself, I want to say. I don't think anybody else was there.

Q And why was it that you guys were having

that meeting?

A Again, so, I think what happened was, again, so when that first conversation with Donte and Manley happened with Ms. Parker saying about, you know, ask her who she's dealing with, or whatever, if they have any questions.

From that point, Ms. Parker works in receiving, Manley works in receiving. At that time, I'm not sure, maybe Arnel, trying to think of all the people we talked to that day. It was all kind of like -- I think from -- whatever from that day, I think she was kind of holding a grudge maybe against Manley in a sense, or least that's how he felt about I. I wasn't back there. I didn't witness. I don't know how he was being treated. I don't know.

So, I think what was happening was there was were some problems in the defendant, and then we started having like, hey, what going on in your department. And then that's how the rumor came back again. Manley's like "Well, she thinks I'm part of this rumor, and she's has been treating me

117

**unfairly," and staff like that. So that's how it came out again.**

Q Okay.

**A I'm not really sure if there was a meeting that they had about her specifically, but I know that's what was said in that meeting.**

Q Let me do this. There's a couple documents I'll put in front of you that maybe we will us put this timeline together a little bit more.

(Pickett Deposition Exhibits 6 and 7 were marked for identification and attached to the transcript.)

(Discussion off the record.)

Q All right, Mr. Pickett. I just want to -- you read Exhibit 6.

**A I read that one.**

Q Okay. I'll give you a second. Go ahead and read Exhibit 7. I'm going to ask you about all this, but if this helps put this in a frame of reference, I want to make sure you have an opportunity.

118

**A Okay.**

Q Giving you a chance to look at Exhibits 6 and 7. What I'm trying to do is maybe put some of the timing, where you were and put some of the timing together by looking at these two emails. Do these emails help you refresh your recollection as to what was happening during this timeframe?

**A Yeah. I guess in time, because, again that meeting, obviously, when he said that joke to me, what you are saying, is in February.**

Q Does that sound about right, that it was in February that that happened? Does that help you remember whether it was February?

**A Like I say, it's kind of -- I mean, if that's what he said. But this part about regards to his lackluster work performance over the previous month or so, is completely false. That's him trying to build a case in April, after he's already mad about this incident.**

**He did not come to me in February about anything in regard to my performance. And if that was the case, then you're telling me in May and**

119

**April you decide now you want to do something, that's completely false.**

**But, I mean, it puts it in perspective. But I definitely remember his saying that. If it was in February, then, again, I thought the rumor had died. I was surprised that it came back up, so if it came back in April because of issues he was having, that may sound about right.**

Q Okay. All right. Let me just break down a little bit there. In the second sentence, where you talked, you underlined the idea about lackluster work performance --

**A Yeah.**

Q -- which was also noticed by our client at DOS/ATA.

**A Uh-huh.**

Q Do you recall having any conversations with clients around that timeframe about your performance?

**A No.**

Q Okay.

**A No. But, Larry's the kind of guy who manipulates information. He manipulates things to his benefit. So, if the client said "Hey, DeMarcus uses his phone at lot," right, if the just said that.**

**You know, if later on he's got a problem with me, then he'll be like "Oh, the client said that they was having a problem with your work." And it be like "No, that's not what they said. They said they felt like I was on my phone a lot," or something like that.**

**But that's how he manipulates information. So, no, I didn't have a direct conversation with the client. I know they asked, one time I just recall them saying "Hey," they asked "do you know what DeMarcus does?" And they're like "No, I don't know what he does."**

**That's not -- it wasn't really for them to know, but as an operations or deputy program manager, my job is to make things go smoothly, so if my receiving team has an issue with something and I help them fix their issue or guide them along the way, that was kind of what my role was.**

**So, I mean, I have been the figurehead, or the front person that you see, but I'm the guy behind the scenes who makes it happen, to make sure you get a good product.**

**So, when they asked that question, I know for a long time they were like, you know it was joke, basically. We don't know what he does, you know, but, obviously, I was doing what I needed to do. I kept my job and the only time I had an issue is now, because of this issue. This is the first time that it comes out in April, because of this issue.**

**He was mad because of what he felt I guess a betrayal of trust, what I told Ms. Parker because, again, she went into his office and said you're part of this. So, from that moment, he was against me.**

Q Okay. All right. Well, that's what I want to try and break down, the timeframe. So, in this particular email that we've got as Exhibit 6, said "We did not speak on this matter again until the week of April 18th when Mr. Ferguson

informed me and Mr. Pickett of the rumor within the warehouse of a personal relationship between Ms. Parker and and Mr. Pickett, or it says and/or Mr. Pickett are myself."

And that was what the meeting you just testified a little while ago where you remembered that Manley said something about this rumor.

**A Yeah. He said that that's -- well, what he said was that -- I guess what was happening, they were having a problem with Ms. Parker, some of the people that reported to her, and he was saying that that's the reason why he believed that him and her had and issue.**

**And he's like "I ain't have nothing to do with it, but she feels like I do," so now there's that tension between the two of t hem.**

**Not that -- not of the rumor of the personal relation -- or a personal. You know, he's -- this is kind of convoluted. So he brought that up as to say she's giving me because she thinks I had something to do with the rumor.**

Q Okay. And then it says "Mr. Ferguson

advised me that Ms. Parker walked in one morning and after greeting him, stated that if you want to know who I'm fucking, ask me directly and I will tell you." Mr. Ferguson said that in that meeting?

**A Yes.**

Q Okay. And he also informed you -- "He also informed me that Ms. Parker had approached Donte Jennings and Matthew Littleton." Did Manley say that in that meeting as well?

**A I think -- well, I know he said something about Donte, because I feel like him and Donte were walking together. I feel like that's how the story went, but, again I wasn't there, so I don't really know.**

**But if I recall correctly, that's how it came out. They were walking together, like Manley and Donte were cool, like -- like we all have, like buy watches and stuff, so they were talking about watches and things like that, and they were fairly cool, you know what I mean. So, you know, it's not uncommon that they would be walking**

**together. So, I guess when Ms. Parker said that -- I don't know. I think she may have been maybe -- I really don't know. I don't know if she really thought Manley was part of it. I really don't know. I don't know..**

Q Okay. That's fine. And then this continued, "I asked," meaning Larry "asked Mr. Pickett to bring Mr. Jennings to the office." Did Larry ask you to go get Mr. Jennings at that point?

**A Yeah. I might have radioed for him, or called down there, or something like that, but we didn't just -- I feel like we didn't just talk to -- I don't feel like we called Donte Immediately.**

**I think Arnel's name may have came up, because it was kind of -- it started into what's going on with Ms. Parker. So, actually, we may have had Arnel first, and than Manley, and we were maybe going to talk to somebody else, but because of what Manley said, then he wanted to talk to Donte.**

125

Q Okay. Do you remember what Arnel said?
**A I don't. I really don't. You know, employees, you know, sometimes they complain. Sometimes they have valid concerns. So, I don't really remember what it was, but I know they were saying that they weren't happy with Ms. Parker as a boss.**
**And I know Ms. Parker is, a little -- again, she can be very assertive or aggressive in her tone or talk, you know. So I guess they were just expressing that to Larry and I at that moment.**
Q Okay. And do you recall a conversation with Donte in Mr. Moppins' office as well?
**A Slightly. Kind of. I think he agreed about what he was saying about the -- that she approached him, but he said that he didn't have anything. He didn't start that rumor is what his -- what he felt. You know, he say he didn't have nothing to do with it.**
Q And, then the next paragraph talks about Ms. Littleton, you went to get Ms. Littleton. Do

126

you remember talking with her about this rumor?
**A In that I really don't remember talking to Mattie about it.**
Q And I don't know whether you were in the conversation -- that's part of it, whether you were in the room or not. It says "I asked Mr. Pickett to bring in Ms. Littleton, and her manager, Angela Wallace, to discuss this issue."
**A I'm not really sure. I don't recall actually sitting there with her.**
Q Okay. Okay. Well, other than Manley, Donte and Arnel, do you recall anybody else where you were present when they were discussing Ms. Parker's treatment?
**A At one point he talks -- I was there when Ms. Parker was in there. It was me, Ms. Parker, and Ms. Wallace.**
Q Okay. And tell me about that. How did that meeting come about?
**A So, I think that meeting came about, because, again, Larry wanted to talk to her about her work and, I guess, how she's treating her**

127

**employees, I think, to an extent. And I don't think she was -- she wasn't in agreement with what he was saying, and she did get a little upset and then, again, asserted to the fact that "Well, hell, you was part of this rumor."**
**And, you throw, I was kind of taken aback because I was like, no, I don't think he was necessarily part of the rumor, you know. Because I remember what I told her and I know he told me that in private, but I was like why would you say that? Like, that's not a rumor. Maybe he heard the rumor and he asked me.**
**Donte and Larry's relationship didn't unfold until later on. So, but at the time I just didn't agree that he was part of the rumor. He asked me something directly and I happened to share that with her and she used it in that like, you're part of it, and that's how she felt about it.**
Q Okay. But in that meeting was Larry talking about the rumor with --
**A Ms. Wallace?**

128

Q -- Ms. Parker and with Ms. Wallace and with you?
**A I think initially it was more about him trying to talk to her about workplace and the environment for her guys, I think. Initially, I think that that's what the conversation was about.**
Q Okay.
**A And I think it just flipped into that, because she was like "Well, you're part of it. Like you're doing anything about this rumor and these guys having this rumor about me, and you're part of it, so how do you expect me to feel?" And I think that's what made her so agitated about the situation.**
Q And do you remember Ms. Wallace taking her out of the room to try and calm her down?
**A I don't remember -- I don't think that that was -- I don't know if that was that meeting or not. I felt like there was two meetings with the four of us was involved in the meeting. And I remember one time that happened, but I don't know if it was this initial one. It might have been**

another meeting that happened after that.
Q Okay. The initial meeting where this happened, what was Mr. Moppins' response when Ms. Parker said he had raised this rumor, or was part of the rumor?
A I think his first initial response was kind of like "What are you talking about?" but then when she repeated what he had said to me, then he basically -- he got upset, and I don't really remember if the meeting ended at that moment.
It was kind of starting to become like this back and forth between the two of them, and I'm not really sure how that really kind of ended. I thing I had to be like "Hey, whoa, whoa, whoa, whoa," like, you know calm down.
Again, that may have been -- that may have been where Ms. Wallace took her out, but I really don't remember. Again, it was another meeting we had, and I felt like on the second meeting things was kind of starting to die down. But I think Ms. Parker was also still just kind of

agitated about the whole situation, and she still was still agitated about the whole thing.
I don't think she think that her voice was being heard. She kind of expression that, like how come he can be, you know, part of this rumor and take their side basically, when this is some BS, because they're spreading this rumor or something like that. And it doesn't -- they just seemed to not have clicked after that moment, and that was kind of the last time I ever seen them interacting, really.
Q Okay. And in that conversation, was Mr. Moppins talking more about the rumor or was he talking about the complaints that the employees were making about her performance?
A I think he was talking about the complaint, but her thing was the rumor, so I think she was the one pushing the rumor aspect.
Q Okay. And did she acknowledge any of the issues that he was raising relative it to problems that the employees were raising?
A I really couldn't say. I don't knowing

if she was using the justification of the rumor to kind of -- I really don't remember if she really like addressed it, you know, like "Oh, no." You know, I don't if she said -- I really don't remember. I don't want to -- you know, I don't remember how that went, really.
Q Okay.
A I know she didn't agree. She felt like it originated from the rumor part of it in terms of, like, her whole demeanor was like you're not doing anything about this rumor. Like, I don't eve think she was even listening to the work part of it.
Q Okay. And you listened to the employees that were complaining about her performance. Did you think there was any validity to what they were saying?
A I hadn't really got a chance to really investigate it, you know what I'm saying. Like, things happened fast. It didn't -- it wasn't like "Oh, let's go back here and figure out what's going on." It didn't really happen that way.

Q Okay. Now, after -- as that night meeting ended, you said there was a second meeting where she got irritated and you think she may have walked out with Ms. Wallace. Do you recall what the timeframe was between those two meetings?
A No. And it's longer -- it may actually be that same meeting and it may have been Ms. Wallace walking her out and then bringing her back and a continuation thereof. It may have been that.
Now, I remember having a conversation with Ms. Price and Larry, I think, and maybe Ms. Wallace. I'm not really -- I really don't really recall, but...
Q After that initial meeting?
A It might have been that day.
Q Okay. And do you recall what was discussed in that meeting?
A I think Larry was basically saying that he was not happy with Ms. Parker at that moment, about what's going on and stuff like that. I don't have the specifics, but she's and on site

**HR, so I think, if I'm not mistaken, I want to say she initiated some type of HR action or something like that.**

Q Ms. Price did?

**A Yeah, I think so. And I think maybe that's why he started writing this up and, you know, whatever.**

Q Okay. So, let's get to the second email, this Exhibit 7, which on May 13th. And the first think in there, point number 1 that Larry wrote. He said "When attempting to counsel her on her inappropriate behavior with her subordinates in the warehouse, she became irate and disrespectful in the presence of DeMarcus Pickett and Angela Wallace to the point that Angela had to escort her out of the conference room." You remember that happening at least once?

**A I do remember that happening.**

Q Okay. Then he has "a. Manley Ferguson, Manley complained of her constant harping on she is in charging and asking him if you want to know who I'm fucking, ask me and I might tell you."

And you remember Manley complaining about that?

**A Not that he complained about it. Again harping that she in charge, that's after -- this only happened once.**

Q Okay.

**A If you want to know who I'm fucking, that happened one time. So after this is what he's saying, now she's harping on him. Again, that's why he felt that she was harping on him.**

Q I gotcha.

**A Because she said that same to him. So it wasn't like, you now, continuous thing. It was that one time she said it, and then from that moment, I guess that was how he felt, like anything that she said was because he felt she thought he was part of it.**

Q Okay. And then this has "Arnel Ragunton complained of being threated like a slave and constantly having to hear "I'm in charge." Do you remember Arnel saying that?

**A Not specifically to me.**

Q Okay.

**A And, again, I think we had a meeting with him that day, and he might have said that, like, you know, she's hard on them. But, Ms. Parker, again, she worked hard. She expected a lot from her team. So if he felt like he was a slave, that's funny, but I've never heard her say "I'm in charge," but if he's saying it, then, you know, I mean, I wasn't there so I couldn't, you know, I couldn't say that he wasn't telling the truth or anything.**

Q No. I understand that. Do you remember Arnel saying that she said that?

**A No, I don't recall him actually saying that she said it. I don't recall.**

Q Okay. All right. And then 2, he said "She has threatened to file sexual harassment charge on me for supposedly starting rumors about her relationship with the Deputy PM." Do you recall Ms. Parker indicating that she was going to file sexual harassment charges against Mr. Moppins?

**A I can't say that I do, you know, but**

**that might have been in one of those times where they're arguing maybe back and forth, and if she said that to him, I don't know. Maybe she did. I don't know.**

Q Okay. I'm just trying to remember what you recall. That's all --

**A I don't really recall her specifically saying "I'm going to file sexual harassment charge." No, I don't.**

Q Okay. Number 3 here, it says "Ms. Cathy has advised all parties involved in her investigation to refrain from speaking of these issues, and treat them all with due respect at all times." Do you remember Ms. Price having that conversation?

**A Not that I'm aware of.**

Q Okay. Do you remember having a meeting with Ms. Parker, Ms. Price and Mr. Moppins?

**A Not sure.**

Q Okay.

**A I don't recall that. I feel like Ms. Wallace may have been in one of those meeting, but**

137

**I'm not sure if I had one with Ms. Parker, Larry and Ms. Price.**
Q Okay. Do you recall if there was a meeting where Ms. Price express to everybody that they all -- everybody apologize to each other for the way in which the treatment has been handled?
**A I felt like I kind of do remember something like that, because I felt like, again, like that might have been the moment where things could have just been easy.**
**But, again, I don't think Ms. Parker was happy with the way things were going. I don't think she was. I think she felt something type of way about it, because I was like, well, you know, this could have been just like, hey, this happened.**
**I think that Donte maybe had -- I don't know if -- see, I wasn't there for everything, but I kind of remember her trying to, like, from after Ms. Price's investigation, just say hey, people got emotional, things were said, and let's move forward, and I don't think Ms. Parker was really**

138

**ready or wanted to move forward.**
Q Okay. All right. This continues on Mr. Moppet's email. He talked about a conversation that he had with Kent Birgans?
**A Yeah. I didn't know nothing about that.**
Q Okay. That's what I was going to ask, whether you were present when that conversation took place.
**A No. Again, I stopped -- again, he stopped inviting me to meeting and he was just doing his own thing, so anything outside of this, I've no knowledge of or anything like that.**
Q Okay. Did you ever see Ms. Parker treat Mr. Jennings or Mr. Ferguson inappropriately?
**A I've never seen it.**
Q Okay. Did you ever --
**A Again, they worked back in the warehouse, I work in the front of the warehouse. So, no, I didn't see anything like that.**
Q Okay. And we did this little map before and you said that Mr. Jennings would have worked in SPEAR, all the way in the back?

139

**A Uh-huh.**
Q Did Mr. Ferguson also work back there?
**A Mr. Ferguson worked here, in receiving.**
Q Okay. So he was up in the front of the warehouse?
**A Yes.**
Q All right. Would there ever have been an occasion that Ms. Parker would have had to go back and be in SPEAR with Mr. Jennings?
**A So, again, these are racks in the warehouse.**
Q Uh-huh.
**A So, I mean, these are HA racks. SPEAR has their own racks inside of this warehouse, but one of the racks is cut by the cage and it continues into SPEAR, so it's essentially a SPEAR rack.**
**So, you could be right here. We had a hazmat area right here, that's on the way to SPEAR. There was a shipping area, forklift charging areas, stuff here. So, not that she would have to be in SPEAR to talk to him, but she**

140

**could have definitely been in this vicinity, because all of this is ATA vicinity. I mean, it's a chain link fence so if you're on this side of the rack, you can see the people on the other side of you. You could at least talk to them, you know, whatever.**
**So, to be inside of SPEAR, no. I don't think that there would be any reason for that.**
(Pickett Deposition Exhibit 8 was marked for identification and attached to the transcript.)
Q Okay. Mr. Pickett, I just want to show you what we've marked as Deposition Exhibit 8. This has previously been marked as Deposition Exhibit 14 during Ms. Price's deposition, and this was -- she testified to how she came about doing this. Just specific things in here I want to ask you about.
Number 3, paragraph 3, it says "In speaking with Mr. DeMarcus Pickett." Do you recall talking to Ms. Cathy Price during her investigation about what was going on?

**A I do believe I talked to her, yes, I do.**
Q All right. And she said "Mr. Pickett agreed that they had come to him and he thought that he had handled the situation, therefore he felt no need to tell Mr. Moppins nor HR."
**A That's not true.**
Q Okay. Let me back up for a second. So, who had come to you?
**A This is not true. Nobody came to me.**
Q Okay. Did anybody tell you about the rumor, other than Romaine, you mentioned that?
**A No. Other than, Larry back February, something like that, and then Romaine, but outside of that, no.**
Q Okay. All right. And at the time you didn't feel -- you didn't think it was time to go to HR either at that time?
**A No, because, again, it was a silly -- it was a warehouse rumor and unbeknownst to me, if they're having issues in that department because of it, I wasn't aware of it. So when they say he agreed they had came to him, he thought he handled**

**the situation. I didn't think I handled the situation. As a matter of fact, they were talking junk, because they're like "Oh, you did not handle the situation, and you should have said something or addressed it, or something."**
**And I was like, it was a rumor, man. I didn't think it was that big of a deal. I'm surprised it got out of hand. Like, I think -- I know Donte Jennings. Donte Jennings is, you know, he thinks he's a funny guy. I don't think he even meant any -- you know, I think he was just talking junk and not, you know, really saying it, but just talking junk.**
**And, again, I didn't really want to pay no attention. I'm just like "Oh, that's really some BS."**
Q Okay.
**A So, I didn't talk to anybody about their treatment. They never came to me and said "Hey Yo, DeMarcus, Yo, Van's giving us this treatment." So, I don't know what she's talking about when she says "they," they came to him and thought he**

**handled the situation. No, I never had that conversation with Ms. Price at all.**
Q Okay. But you certainly, at least two people came to you, Mr. Moppins and Romaine. That was the only two people you recall?
**A About the rumor.**
Q Yes, sir.
**A But this seems to be about work.**
Q Well, look, and I don't want to misrepresent anything to you, so if you want to take a minute and read through what she has here, that's fine. I don't want to misrepresent she may or may have not have said in this memo.
**A Because, what she talking about in bullet point 2 is about a staff meeting that they had and that from the staff meeting how they started talking about Ms. Parker.**
Q And that's consistent with what you've told me so far. You said that's when Manley came forward and you had to get Donte. And you think you maybe got --
**A Right. Right. Right. So, again, that**

**was, you know, this is coming from a staff meeting. So now at number 3 they're saying oh, I knew about it and didn't talk to anybody. That's not true. It came out in the staff meeting that she -- they felt that she was treating her some type of was because of it. I didn't know anything about that. I wasn't aware of it.**
Q Gotcha. Okay. That's fine. I'm with you.
**A Yeah. Yeah.**
Q I'm just trying to understand.
**A I'm just going back to the document, looking at it like, nah, that's not the case. I didn't tell Ms. Price that at all.**
Q Okay. All right. But did you tell her during her investigation that Larry had said something to you and that Romaine had said something to you?
**A I'm not sure. I believe, maybe. I don't know if I -- I think I told her that.**
Q Okay.
**A Obviously, she was investigating, so I**

145

probably did tell her that.
Q Okay. Okay. That fine. So, down to paragraph 6. Mr. Pickett, in paragraph 6 it says "During this investigation, it became apparent that the rumor actually started when Ms. Evangeline Parker, sharing with another employee, Angela Wallace, that she had feeling for her boss, DeMarcus Pickett." Did anybody ever convey that Ms. Parker felt she had feelings for you?
A **No, they didn't. I found that out later.**
Q Okay. Did Ms. Parker eventually say something to you about that?
A **No. Well, actually, she was like -- yeah, actually, I think she did, because she was like "Everybody loves you, DeMarcus." Like, I think she was trying to say that they was taking it out of context. So, I don't know if, again, like right here, it was told to Donte Jennings, who asked DeMarcus, and then Romaine, who asked DeMarcus. Donte Jennings never discussed anybody with me. He never said anything about it to me at**

146

**all, as a matter of fact.**
Q Okay.
A **So, this is just, again, this is just convoluted testimony to fit the bill for what they wanted to do. This is not -- that's not true.**
Q Okay. But you --
A **I've never seen this, actually, ever.**
Q No. I get you. I understand this was Ms. Price's investigation.
A **Right, from a convoluted -- from a HR representative who was buddy, buddy, who goes to lunch with these people. So that's the problem that I have is Larry, Ms. Price, they gossip, and that's what they like to do, and this sounds very strange and it's funny reading this.**
Q Why do you say Ms. Price and Larry like to gossip?
A **Because they do.**
Q Well, how do you know that?
A **I know it, because I've heard of stories of they go out and they go to lunch with these employees. I've seen Donte Jennings whispering in**

147

**her ear in the break room at work. Like, they just like this.**
**I know Ms. Price started a rumor about two other employees, and then the employee confronted her and said "Why would you could say something like that?" "Oh, it was taken out of context."**
**So, when you have HR on site and she's engaged in that kind of behavior, then shit like this gets out of hand, because she's also part of the problem. So, that's why I feel like that happened.**
Q Do you remember having a meeting, telling every not to talk about rumors?
A **I think after the whole ordeal happened, yeah. They came out, said something like that.**
Q Okay. And, just, we're on paragraph 6 just going through it. It says "In addition, Ms. Parker had told her close friend and former employer, Romaine Thompson. Did Romaine ever tell you that Ms. Parker confessed that she had feelings for you?

148

A **No.**
Q Did Romaine ever say anything about Ms. Parker's feelings toward you?
A **No.**
Q Okay. Did anything tell you about that Ms. Parker had --
A **No.**
Q Hold on. Let me just finish my question. That Ms. Parker had feelings toward you?
A **No.**
Q Okay. Do you know if Romaine told t hat to Ms. Prince?
A **I don't know.**
Q Do you know whether Ms. wallace told that to Ms. Price?
A **I don't know.**
Q Okay.
A **May have been.**
Q All right.
A **May have been. Again, they went out to lunch of together. Actually, somebody -- I felt**

149

like somebody said that that's -- that's when they -- that it was on a lunch trip that that happened, or something like that, if I recall correctly.
Q Okay. And who would have told you that?
A I think Brandy Winston told me that.
Q And what did Brandy tell you?
A That they were at lunch, having lunch, and that --
Q Who's they? Who was at the lunch?
A Ms. Price, Ms. Daughtry, Ms. Wallace, and I want to say at the time there was a HR clerk, Tisha. Now, Tisha is Larry's niece. Donte is Larry's daughter's baby father.
Q Uh-huh.
A So, I don't know. I guess they go out and hang out or whatever. So, I mean, so I guess that's when they come up with this kind of stuff, or whatever.
Q Okay. But do you know what happened at that lunch meeting that you just told me --
A I wasn't there, so, from my

150

understanding, that's when Angie said something to Ms. Price about Ms. Parker saying that she loved me, or loved my work, something to that affect, and then that's probably where this whole started. I knew that after the fact, but, yeah, because Tisha, who was also present at that meeting, told Brandy that. So that's how I caught that.
Q Okay. And Brandy told you that?
A Yes.
Q Okay. All right. Now, in number 7, it says "Mr. Pickett took it upon himself to contact the client and inform him of was had been transpiring in the past few weeks.
A That's not true.
Q That's not true, you didn't speak to the client about it at all?
A No. I mean, I didn't it upon myself to contact them. Larry and the client discuss things all the time and the client reached out to me.
Q Who was the client?
A Actually, at the time that would have been Mr. Chun.

151

Q And what did Mr. Chun say to you?
A He just asked me what's going on. I said, well, you know, your guys over here, he's not talking to me. He's upset. He thinks that I have a part in this rumor, or that he's upset because I told Ms. Parker something that he said, and he's not talking to me, because he's obviously like, you know, what's going on down there basically.
So, he reached out to me and asked me and I told him, you know, this rumor is probably of Mr. Jennings. At the time I definitely thought it was Donte, and that's how I got it from Romaine. So, he said I proceed to defame Mr. Jennings as the source. I didn't defame him.
Q You clearly said Mr. Jennings was the source of the issue?
A Yes.
Q Okay. Did Mr. Chun ask you about why you don't report to this Mr. Moppins or HR?
A I think he asked me about it, and just was like, well, it was a rumor. Like, I asked him

152

do you think that I had time to address every rumor that occurs in the workplace, and nobody has time for that. If that was the case then we'd be talking all day and not doing no work.
So, yeah, I said, yeah, I heard of it, but I didn't think it was that big of a deal. I told him straight out.
And then it says in addition, Mr. Pickett also contacted Mr. Moppins' spouse (laughing) --
THE COURT REPORTER: I'm sorry?
A I'm sorry. I was just reading this. Mr. Pickett also contacted Mr. Moppins' spouse to complain. That's kind of funny too.
Q Did you call Mr. Moppins' spouse to complain?
A So, just as a backdrop, again, I've known Larry, at that time, you know, quite a few years. Like, he knows my wife. He's called my wife about stuff. I know his wife.
I clearly had her number. So, what I was "Hey, Ms. Moppins," her name is Ms. Theresa.

**She's a sweet lady. And I just said "Hey, you know, Larry's not talking to me. He's got a problem. He's got a problem with me, and I'm not sure, you know, why."**

**I'm trying to explain stuff to him, but he doesn't even want to talk, so, if you would, just make sure you let him know, like, he should probably want to maybe just talk, like, because he's ignoring me at that time.**

**So I just was like, it's unnecessary. I thought it was unnecessary for him to be ignoring me and for him to be so upset that now he walks in the building, doesn't say nothing. Doesn't invite me to a meeting.**

**He has meetings with the whole staff without me, doesn't even tell me about it. Like, doesn't, like, you know. I was a little -- again, I've know him for a long time, so I was a little kind of personally hurt about that. Like, you know, that's not my character. He knows I don't really deal with no BS. We've never had an issue up until this moment.**

**So, I just didn't appreciate the treatment and, again, it was becoming very hostile to come to work every day. So, yeah, I reached out to her, I did call her.**

Q And did you say anything about the rumor in that conversation with her?

**A I don't recall. It was, again, it's not about the rumor for me. You know, it was like there's like the treatment, like the treatment. You know, the rumor part I could get past. Again, for me, it wasn't a big deal.**

**You know, it's not the worst that people said of me. You know, it's like it's not a big deal to me, but the way I was being treated was a big deal to me.**

Q And, I think you testified to this, the reason that you think Larry was treating you that way was because Ms. Parker said that you had revealed a private conversation between Larry and you to Ms. Parker, right?

**A Correct.**

Q So, all of that after that came out at

that meeting where she was getting very upset?

**A Uh-huh.**

Q And it's from that point forward is where Mr. Moppins started treating differently, you think?

**A Yeah, basically, yeah.**

Q Okay.

**A That was the catalyst.**

Q Okay. All right. Did you talk to Larry's wife at any other time about any of this?

**A No.**

Q Okay.

**A I've been to his house after that.**

Q We talked about Ms. Parker's termination, and you said that you didn't have any awareness that that was coming?

**A No.**

Q Okay. And you didn't -- nobody asked you whether she could be terminated, should be terminad, any of that kind of stuff?

**A No.**

Q Okay. And how do you find out about her

termination?

**A Because she said something to me about having a meeting, and she asked if I could be present for the meeting. She was like I'm going to ask can you be present during this meeting, because I don't trust Larry and I don't trust Cathy right now.**

Q Okay.

**A And from where I understand, I said that's fine. I'll participate in the meeting, if you want me there, you know. It's my job. I mean, I'll go to the meeting. And she didn't have -- I guess they had to meeting. They told her no, you can't bring anybody to the meeting and, basically, fired her at the meeting.**

Q Do you know who was present at that meeting?

**A I think it was just Larry and Ms. Price.**

Q Okay. Do you know whether Reema was present for that?

**A I don't recall if Reema was present.**

Q Okay. And do you know whether Rajesh

157

was present for that?

**A I don't recall that either.**

Q Okay. Do you know where that meeting took place?

**A It was at the warehouse.**

Q Okay. Do you how long that meeting took place.

**A No, I don't. I don't know when it started, don't know when it ended. I know when it ended because I saw her getting escorted to the back to get her things and she went out the front door with her stuff.**

Q So, who was escorting her to the back?

**A I don't recall. I don't know if it was Carlos Carter. I feel like -- I think Carlos escorted her. Carlos and Shaun, I think.**

Q Okay. Okay. And did you see them escort her to the front door?

**A Yes, to the front door.**

Q Okay.

**A So, where my office was at the time, I could see down the hall, so I kind of feel like I**

158

**seen them. They came up. She went to the back to get her stuff, so then they go down the hallway so I can't see.**

**And then a few minutes later they came back out and she went out the front door and they went back and they just kind of give me this look in my office, kind of like, basically, like "Yo, what happened? You just went down."**

Q Okay.

**A So I was like "Holy shit. What happened?"**

Q Did they say something to you at that time?

**A I think Carlos was like "Man, he just gave Van the can," something like that, something to that effect. I was like "Holy shit. Really." But, again, at this point who am I going to -- you know, I'm not talking to Larry. You know, he's not talking to me, so what are you going to do? You know, they gave her the ax.**

**I don't know why they gave her the ax. Again, I wasn't involved in that. I don's know**

159

**what her paperwork says or any of that. I wasn't involved in it.**

Q Okay. So, did Shaun say anything to you at that time about her termination?

**A I don't think so, not at that time. I don't think so.**

Q Okay. And when did you find out for sure from her then that she had been terminated.

**A She called me, I think later that evening. She knew what time we got off and stuff like that. I don't know if she reached out to somebody else.**

**But she called me, told me "Yeah, they fired me." I was like "Really." Then, again, she told me why. You know, she felt it was BS. It was just, really, obviously, she was got terminated, so she was really agitated.**

**So, I mean, she -- I don't know if she actually me why, but all I know is she got fired and she definitely didn't feel like she deserved to be fired.**

Q Okay. Do you know if she had a contract

160

of employment, whether she was at will? You don't know?

**A Don't have a clue. I don't know -- you know, contract? We don't usually get like a contract. You know, you get hired. You get an offer letter.**

Q Okay. Do you know whether there's any guarantee of employment?

**A No. I doubt there's a guarantee of employment, you know what I mean.**

Q Do you know if there were any reasons why it would have to be given as to why she was terminated?

**A Do I know if there should be reasons why? I'm not sure --**

Q Yeah. Do they have to give a reason to why she was terminated?

**A I don't know. I know there's a certain at will. You know, we work in Virginia, the company's out of Maryland. I know Virginia's an at will state, I think.**

Q I'm not looking for your legal

161

interpretation.
A Yeah. Yeah.
Q That's an unfair question.
A Yeah. So, I don't know.
Q No, that's fine. That's not what I'm looking for. You fired people from REEMA before, right?
A No, I haven't.
Q Oh, you never had to fire anybody.
A No. I've sat in on people getting fired, but people firing is like, that's Larry's responsibility is hiring and firing. And, obviously, he's got mangers and we give input. If something happens, you can say, obviously, you could say "Hey, yeah, this happened. This person did this." Or "I witnessed this." And, you know, we can write people up, but in terms of firing people, that was Larry. He fired people if he decided that he was going to fire somebody.
Q And do you know whether Larry had the authority to fire, whether it had to be --
o: No, I'm not. He had authority to

162

fire people.
Q Okay. And do you know why -- why do you say that?
A Why do I say that?
Q Yeah, why do you say Larry --
A Why he fired people.
Q Larry --
A Because I watched him fire people.
Q Okay. And do you know whether Larry had to consult with Mr. Vora before he made those terminations?
A I can't say that I've ever witnessed him having to consult with Mr. Vora. If he did, I am not aware of it. I don't know it. I have no idea.
(Pickett Deposition Exhibit 9 was marked for identification and attached to the transcript.)
Q Okay. Let me show you what I hope to be the last exhibit that we go through today. Mr. Pickett, I want to show you what has been marked as Deposition Exhibit 9.

163

A Okay.
Q Okay. Mr. Pickett, first question is have you ever seen -- have you ever received a written warning from Reema?
A No, and I never have seen this document, ever.
Q Okay. Did you receive a written warning from Reema at any point in time.
A No, I didn't. I remember receiving a PIP.
Q Okay. And do you recall what was in your PIP?
A I really don't recall what was in the PIP. I was really upset that I was getting the PIP. I've never had a problem wit workplace performance ever in my whole life, so.
I mean, outside when I was in the Army, you know. I was a little. I was about 18. I was a little helter skelter, if you will. But, in terms of my professional, outside being -- never, so I was upset about the PIP and I was like, again, this isn't about workplace performance.

164

And I told Mr. Vora that, I told Reema that, I told Price that and I said that in front of Larry. I said this is personal, because you felt some kind of way because I told Ms. Parker about what you said to me.
And I was very adamant about that day, in the meeting with them, when they were all sitting there, we all sat there. So, outside of that, no, I did not.
Q So, let me just ask you about the PIP then, because I haven't seen the PIP. What was in the PIP? What did you have in the PIP?
A I don't really recall what was in the PIP. Again, I thought the whole thing was BS so, you know, I kind of looked through it when they gave it to me and I kind of kicked it back to them like "You serious right now?" Like this is what we're doing?
And it was conveniently right at this time, you know what I'm saying. It was like -- it was like, to me, it was a no brainer. But they didn't feel that way.

The sided with Larry and Ms. Price and they were like, "Yeah, you're having this issue." And I'm like "No, I'm not having any issues."

So I don't -- they didn't have any proof of having issues, all speculative, something that Larry manipulted.

Q   Do you recall what the issues were that were identified?

A   No.  Again, I don't, because I thought they was bullshit, so I don't really recall what was in it specifically, but it was very wordy. Like, I'm looking at this, this is the first time I've seen this.  This is very wordy too.

And who knows, you obviously don't have this as a signed copy because he couldn't present this to me because it's bullshit.  I didn't talk to the client first, he did.  He talked to the client damn near daily.  So when he says I divulged information, the guy called me from out of the -- actually he was out of the country at one point in time during this whole ordeal, because of something Larry said to him.

So he was checking on me, like, what's going on?  So, I mean, he already knew, because he wants to see my side of it.  But I was told that they was trying to fire me over whole thing.  They wanted to terminate me.  They wanted to demote me to something.  I can't remember what it was. but, I mean, yeah, this was -- it was a hostile work environment.  I was felling the wrath of Mr. Moppins at the same time, so. ..

Q   Okay.  And, if you recall, did the PIP deal the issue of contacting the customer?

A   No.

Q   Okay.  But you --

A   I know that -- I know that wasn't in there, because I would have said, I mean I'm a deputy program manager on a contract, like the client, like, I talk to them just like he talks to them, so there's no, like, "Oh, you should never talk to them," you know what I mean, like, and the guy reached out to me.  I didn't reach out to him. I didn't pick up the phone and say "Hey, man, this is what's going on."  Larry did that.

Q   Okay.  Now, do you know whether the terms of the PIP were ultimately fulfilled?

A   I tell you what, I never got, you know -- are you familiar with PIPs?

Q   I am.

A   Okay.  So you know you a PIP and then you get a review period.

Q   Uh-huh.

A   So, usually, it's like if your PIP is 90 days, then 30, 60, 90 day review on your PIP.  I never got a review on the PIP.  It just kind of went away, actually.

Q   Okay.  And that's what my question was going to be.  Did you ever get anything back from Mr. Moppins or Reema in any way that suggested that the PIP had been successful or accomplished or completed or withdrawn?

A   Not ever.

Q   Okay.  All right.  And did you continue to work with Larry after this?

A   Yes.

Q   Okay.  Did Larry's behavior change at any point after this?

A   Eventually.  Eventually, he started to me again, eventually.  I'm not even sure how it came about.  It started small, I will say that. It started kind of like, you know "Good morning." Again, because he wasn't even saying good morning, you know.

And I still went in.  If he beat me to the office, his office is the first one by the front door.  Soon as you walk into the office, I see him sitting there.  I'm still a respectful man, and when I saw  him I would speak to him.  If he didn't speak back, he wouldn't.

And then one day I think he just started kind of like speaking back, like at least just like saying good morning.  And then -- then I, you know, started like hey, we having a meeting about this.  So he sent an email, actually, I think, about a meeting.

I was like "Holy shit.  I got an email about a meeting."  So I guess I fucking go to the meeting.  Hadn't been going to them.  You know, I

**been doing my job from the back corner and just helping the people out but, you know, no interaction with him. So I started going back to the meetings and things like that and it just kind of, if you will, kind of went back to a normal, if you will.**

**So, no, but, again, in terms of the PIP, we didn't have any discussions, no documentation. There was no "Hey, did you close that? Hey, you check this box." Again, it was BS to me, so, no, it just kind of dissipated and went away.**

Q Do you recall whether you signed a PIP?

**A I do remember signing it. I was under duress that day. I remember being really emotional that day. I was really upset that I'm trying to explain to them why this has come about.**

**And I remember, I think I was like really emotional because I feel like I worked really hard to get where I was and for something like a rumor like that and for it to come out the way it did.**

**For now, one man to now discredit me**

**because he felt personally, it really bothered me. So I signed it under duress because, you know, I have a wife and kids at home. So, I'm going to tell him, no, I'm not going to sign it. I felt like they were going to try and fire me. That's what I thought, so I signed it.**

**But, you know, in retrospect, I probably would have just took that firing and maybe been on a different path, but I did sign it under duress.**

Q And you ended up working with Larry until he left Olgoonik (phonetic) in May of this year, correct?

**A Yeah, something like that, May, was it May, June, maybe the beginning of June, something like that.**

MR. WALSH: Mr. Pickett, right now I don't believe I have any more questions for you. I know Ms. Taylor probably does, and in light of her questions, I may have some more things to ask you.

THE WITNESS: Okay.

MR. WALSH: Thank you.

MS. CALDWELL: All right. Can we take a quick break.

(A break was taken.)

MS. CALDWELL: Okay. So, first I'd like to start of with marking the record as confidential. Is that all right?

MR. WALSH: Well, the question is why.

MS. CALDWELL: So you, I mean, technically you used Exhibit 4 which was our Interrogatory responses, which was technically marked as confidential. We can go back and if you have objections to like de-designate of the deposition transcript, that's fine. We can take about that later, but we just wanted to mark that as confidential, just due to the confidentiality of the Rog responses.

MR. WALSH: Okay. Well, then I guess what we'll do is you certainly put that at this point that it's confidential, but at some point we're going to have to deal with it because I'm still at a loss as to why the Answers to Interrogatories --

MS. CALDWELL: Okay.

MR. WALSH: -- are marked confidential, because there's nothing in them that's confidential.

MS. CALDWELL: Sure. I mean, we can discuss that off the record.

MR. WALSH: That's fine.

MS. CALDWELL: I think that that's something we can handle later, and we're definitely open to de-designating whatever parts of the records you feel are not confidential.

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MS. CALDWELL:

Q Okay. So, I'm going to try, Mr. Pickett, I'm going to try and keep my questions pretty brief. You know, we had quite an extensive discussion with Mr. Walsh, so I'll do my best to be brief and to not have questions that we've already discussed, but I may ask some clarification questions, if that's okay.

**A Okay.**

Q There's a few other preliminary points

173

that I wanted to quickly discuss. If there's a question, and if there's anything you don't understand that I am asking you, I know Don said something similar, just let me know and I'm do my best to clarify.

**A Okay.**

Q Also, as you've noticed, we've taken periodic breaks throughout the deposition, but if you would like to take a break for any reason, just let me know and I'll do my best to accommodate.

The only thing I ask is if the question is pending, if I just asked you a question --

**A Okay.**

Q -- I ask that you answer it, and then we break?

**A Okay.**

Q Is that okay.

**A Yeah. No problem.**

Q And do you have any questions for me, or anyone else before we get started?

**A I don't.**

174

Q All right. So, you mentioned before that you were at REEMA for quite a while, correct?

**A Correct.**

Q In any of these roles, were you directly responsible for decisions to promote personnel?

**A Not directly responsible. Again, in my role I just advised, again, like what my opinion was, but I didn't have the authority to be like "Hey, I'm promoting you." No, I didn't have that authority.**

Q Okay. And when you said you would advise, who would you give that --

**A So --**

Q -- the recommendations to?

**A To Larry, mostly.**

Q Okay.

**A So, sometimes it would come down and maybe we'd have a managers meeting, and then in that managers meeting we'd discuss employees and who is doing, like, really well, and things like that. So, as a consensus, we would come to a consensus, if there was a slot open that, you**

175

**know, maybe wanted to get somebody promoted into. So, we would all have some type of input, but ultimately, Larry's call.**

**If he did not agree, or if he did not want to promote someone, he didn't.**

Q Okay.

**A So, you know, again, so when I say I have the input, I can be only advise what I see from an employee, and it went to him and he makes the decision basically.**

Q Okay. You said, briefly, just quickly, talked about a managers meeting. How far down the chain of commend would that include, right? So, if you don't mind, I'm going to give you brief example. You said something about Shaun Reeves was the manager directly underneath you.

**A Uh-huh.**

Q Would he have been included in those meetings --

**A Yes.**

Q -- or was it --

**A Yes. Yes.**

176

Q Okay. He would have.

**A Yes.**

Q Did -- In any of those meetings, did Shaun -- Let me go back. You said previously that Shaun Reeves was at one point Ms. Parker's direct supervisor, is that correct?

**A Yes.**

Q In any of the managers meeting did he ever recommend that Ms. Parker be promoted when a slot was opened up?

**A Yes.**

Q And for what reason, if you can remember?

**A Because of her work performance. Any time she got promoted it was because she was really out-working a lot of people in the warehouse. I mean, it was actually, like, easy to tell.**

Q And, but, could you give me an example of --

**A For instance, say we're doing receiving, right. We have a try-wall. A try-wall is just**

177

this big Gaylord box. It's like, I don't know, 36x48, you know. It's a big box.
Q Uh-huh.
A So, if you're -- and we were having -- this is the process. You go through a receiving process and equipment comes in the door, and you basically, you know, check, verify that it's the right thing. You scan it into a try-wall.
So, for instance, Ms. Parker may do 5 try-walls in an hour, whereas somebody else may only do two try-walls in an hour, the same type of magnitude of equipment.
So, she's really like out-working people, and it's kind of showing. So, again, when she started as a temp we were doing inventory of these same try-walls. So this material goes into these try-walls and it gets stored into a rack location.
Q Uh-huh.
A So during inventory we pull out all the try-walls and go through all of that. So, again, that's how she made full time, because she really

178

out-worked everybody out there on the inventory floor.
Q Okay. Was there any other reason that Shaun cited that would have, you know, led to her promotion?
A I can't say that there's any other reason specifically that I recall at this moment, you know.
Q Okay.
A We have a lot of those kind of meetings. Positions get -- you know, it's a government contract, so if you have, say, five positions and they're all management positions, you want to fill the management position in order for the contractor, the company, to bill the client for that position being filled.
Q Right.
A So, we fill positions often. I'm saying it for that reason. So, we don't really like to lull where there's nobody in that position, because now the company can't bill the government for it. So, it was a lot of those meeting, you

179

know, that happened. A lot of people came and gone at the warehouse, to be honest with you. So, you know, it was kind of a regular kind of thing almost, if you will.
Q Okay. Did you ever specifically recommend for Ms. Parker to be promoted?
A I don't know if I specifically recommended for her to be -- I know I spoke a lot about her tenacity in how she approached the job.
Q Sure.
A And that was one of the things I really liked about Ms. Parker, because she came from a background of logistics in a different sense. She used to drive trucks and buses, if I'm not mistaken, something like that.
So, she comes to the warehouse as a temp, starts -- starts, you know, doing her thing. She gets made full-time, so now she's like "Oh, my God, I could be here for a while," and she's really excited about the opportunity to learn about a different aspect of logistics.
So she was really all in on the job and

180

she really worked hard. She asked a lot of questions. She took on projects that just seemed -- it really seemed like she was having a lot of fun just learning about what we did at the warehouse. So, again, she was just kind of one of those employees. Like, not all employees come to work, again, to work.
Some just come to be like "I'm here to get a check." And I felt like she was one that was there to really be an asset to the organization. So, I have recommended or said "Hey, she doing an awesome job." Definitely.
Q Okay. Was it -- when you made a recommendation, was it you explicitly saying "Hey, I think Ms. Parker should get this job," or was it more of like Shaun said I think Ms. Parker should get this job and you would say "Yeah, I second that."
A Yeah, along though lines. And, you know, and sometimes Mr. Moppins was the one, "Hey, Ms. Parker is really doing awesome."
Q Oh. So Ms. Parker -- or Mr. Moppins

would also agree that she was going a good job?
A Oh, yeah.
Q Okay.
A Yeah. And, again, this is a -- you know, it may be a group conversation. We may have had a group conversation. I think if she was going to a manager type of role, it would have been a group conversation.
Q Sure.
A And if it wasn't, if it was more like, hey, full-time, then it would have been not as, you know, an official kind of meeting. It's more like just having a conversation. It's things like that.
Q Would anyone outside of the managers have been included that meeting?
A No, but people outside have definitely viewed her work ethic.
Q Sure.
A Like, again, when do the inventory, the client is on site. So even the client was very impressed with her work ethic. And actually he

was really boasting. He's actually a -- and I'm talking about Quan here. He's a Red Skins fan, but the two ladies, which was Ms. Parker and Ms. Romaine Thompson, they were on his team.
So we actually got spread out by teams and he had them on his team, and he was really ecstatic. He kept calling them his running backs --
Q Uh-huh.
A -- because they was really going well. He makes a lot of football references.
Q Sure.
A So he called them "Where my running backs," and they be ready to go. And so even he saw how well she worked. So, not that he was in a meeting or recommended her for promotion, but he was definitely aware of her ability and, you know, he appreciated her hard work, so.
Q And just to clarify, Quan is who?
A He works -- he's actually a contractor with the Department of State. They actually, you know, but when they say the client, that's who

they're talking about.
Q The client.
A Yeah. He's got a core. We have a core, but usually things run through Quan a lot, you know, because he's in charge of the warehouse on his side, the rest is for his responsibilities.
THE COURT REPORTER: I'm sorry. I didn't hear the last part of your answer.
A He's, on the client's side, we have a contracting officer representative that Quan works directly for, but he handles a lot of the logistical and the informational aspects from the State Department directly to the warehouse.
Q So, does he work for State Department?
A He's a contractor for the State Department, just like we're a contractor for the State Department.
Q Oh, so he's like --
A So he's not a government --
Q -- a hired middle-man from the government who worked with you guys?
A Right.

Q Okay. And by "you guys," I mean REEMA.
A Yeah. To a degree, yes.
Q Okay. So sometimes the structure of things gets a little confusing, so bear with me.
A No problem.
Q Okay. Was there any other instance that you can remember in a managers meeting where someone said something positive about Ms. Parker's work performance?
A When Ms. Parker first got there, there was a lot of positive things. I mean, I don't remember them all but, you know, obviously, she escalated pretty quickly. And I don't really recall every conversation or every time.
Q Sure.
A You know, it was kind of like, you know, roll over, kind of like "Yeah, Ms. Parker's doing awesome," Like, you know, so I don't know how many times she actually got promoted, so not really sure how many times that conversation actually came up.
Q But it was more than one?

**A Yeah, because I know it was more than once because she had to go full-time initially.**
Q Uh-huh.
**A And then I know she promoted one time for sure to Assistant Operations Manager. That's the one that sticks out in my mind, again, because --**
Q Right.
**A -- she's upstate because she's like "I want to be the Operations Manager." I'm like "Calm down. You'll get there."**
Q Eager, to say the left.
**A Right.**
Q So, sorry if I already asked this, but just to confirm again, the person ultimately responsible for, person or people ultimately responsible for the hiring, or for the promotion decisions, was who again?
MR. WALSH: Objection. You can answer.
Q Yeah. No --
**A It's -- it's ultimately Larry's decision on who gets promoted.**

Q Okay.
MR. WALSH: Just clarify for you Mr. Pickett. From time to time I may make a deposition, Ms. Taylor may make a deposition. Unless we tell you otherwise, you can answer the question.
THE WITNESS: Roger.
MR. WALSH: We have to preserve the record for court later.
THE COURT: Correct. So that you can take it out later if you -- the judge says "Yes, I agree we that."
MR. WALSH: That's correct.
Q You're a quick learner.
**A Well, yes.**
Q Okay. I know we briefly discussed this earlier, but were you directly responsible for hiring and/or firing any personnel?
**A No.**
Q Okay. And who was?
**A Larry Moppins.**
Q And was there any over site over his

decisions?
**A He asked me that earlier. I'm not sure what over site was given to him in terms of, you know, was Rajesh blessing off on people getting fired, was he blessing on people getting hired, not that I'm aware of. I don't recall any interaction with him in terms of hey, I want to do this, you know. But, again, I don't know.**
Q Sure.
**A Yeah.**
Q And that's fine.
**A Yeah. Yeah. Through my whole time being there, I have never seen it.**
Q Right.
**A So I'm not sure.**
Q I don't want you to say anything that you don't know. Absolutely not. In your opinion, did you feel like -- Well, I'll ask you this question. You're understanding was that Mr. Moppins was in control of the hiring and firing decisions, correct?
**A Correct.**

Q In your opinion did anyone else at the warehouse feel the same?
MR. WALSH: Objection.
**A Everybody felt the same.**
Q And why?
**A Just because of how it goes. I'm not sure how many people got fired under Larry's tutelage, but we've all seen Larry fire people. We've all been witness to it. Sometimes when he fires people he brings you into the office.**
**I've been called into the office and didn't know somebody was about to get fired, and I'm sitting there and it's like, okay, yeah. And then all of the sudden, and here's the paperwork, you sign this, you sign that, and thanks for coming. See you later. And boom, they're out.**
**You come in and you're like "Okay. Well, damn, I didn't know that was going to happen. Let me know next time."**
**So he definitely had the perception that it was his way.**
Q Okay. Did you ever recommend for Ms.

Parker to be fired?
**A Never. I never even thought about it.**
Q If someone had asked you whether she should have been fired, would you have said yes or no?
MR. WALSH: Objection.
**A I would have said no.**
Q And why?
**A Because I don't know what she did to warrant her getting fired. Again, I know they give her some write-ups. I don't know what they said.**
Q Uh-huh.
**A I don't think that this situation was enough to be, you know, get fired over.**
Q Okay.
**A That's just my opinion.**
Q Sure. To clarify, you are not still working at REEMA, correct?
**A Correct.**
Q And when did you leave?
**A The contract ended September 2017.**

Q Okay. And why did you leave?
**A The contract end.**
Q Okay. So, if the contract ends with one company, do you just move to wherever the contract lands with a new company?
**A At times. It's government contracting, so they have what they call first right of refusal, so if a new contractor comes in, you could imagine that if you're a new company coming in, you want the people that have already been doing the job to continue to do the job.**
Q Uh-huh.
**A So, I've been through three different contracting companies, and I have never seen it where it was like "Hey, we're going to take some of you and not the rest of you," you know, anything like that. So, usually, yeah you just roll on with the contract.**
Q Okay. Thank you for clarifying. Okay. Now, we're going to quickly turn to your interactions with Ms. Parker, if that's okay.
**A Okay.**

Q What was your first impression when you met Ms. Parker, when she was hired?
**A First impression in terms of?**
Q Any impression.
**A I really don't know in terms of when she first got started.**
Q Okay.
**A But, the very first that she started working, it was like "oh, wow. She's really good to work," and she was working hard.**
Q Okay. So it was clear right from the jump that she was a hard worker?
**A From the jump, from the day she started. She didn't come in and kind of like was shy. Again, she knew people that was already there. So I'm pretty sure they had some kind of conversations, telling her about how the job goes and things like that, which was maybe beneficial to her, but she hit the ground running.**
Q Did you ever observe her interact with other employees?
**A Yeah.**

Q And can you describe for me generally her -- how she -- her demeanor when she interacted with those employees?
MR. WALSH: Objection.
**A Kind of normal to me, I guess. I would just describe it as normal. Like, you know, it's a warehouse environment. People joke and play and, you know, they make jokes, but when she first started, obviously, you know, she's trying to, you know, make sure she, you know, has a very good reputation out here, and everything like that.**
Q Uh-huh.
**A So, I didn't see anything like that was a flag, so it just seems normal to me. You know, I've seen a lot of people come and go and it's just like, okay, well, you know. But in terms of work, she was great.**
**I really couldn't say, you know, what her interaction with other people was. It seems to be just normal interaction, like, you know, employees, like.**
Q Sure. Would you ever have characterized

193

Ms. Parker's interaction with her coworkers as hostile?
MR. WALSH: Objection.
**A Not that I saw.**
Q Okay. Are you aware of any instance where Ms. Parker confronted another employee in a hostile way?
**A Only the incident with Mr. Jennings and Donte, where Donte, Jennings, and I don't even know that I heard that Manley was there. I guess, you know, Manley was either close by and in proximity and maybe he took it that way, but outside of that, no.**
Q And are you aware of any complaints that were ever lodged against Ms. Parker?
**A After that meeting, I was aware of those complaints at that the moment. And, again, I can't really say it was a complaint, like her -- again, for Manley to feel like she had something against him because of that, that was the kind of complaint that came out. Then Arnel said something like, you know, she keeps saying that**

194

**"I'm the boss," or she's the boss, or something like that.**
**I think Ms. Parker is really -- I would describe her, she's, I would say pro Black, but also she's pro woman as well, so she was a very strong minded individual when it came to those two particular issues, really. So, I don't know if sometimes maybe people just misunderstood her or anything like that. That's definitely a possibility. But, I mean, I think she dealt with people fair and everything like that, from what I experienced.**
Q Sure. And just to confirming, you weren't there when the alleged confrontation between Manley and her?
**A No, wasn't there.**
Q You said earlier that she was assertive in her tone, is that correct?
**A Uh-huh.**
Q Was she ever disrespectful that you were aware of?
**A I've never heard anything disrespectful.**

195

Q How often did you and Ms. Parker interaction while you were at work?
**A Often. But, just like anybody else, I interact with almost everybody daily. And, even so, like, for instance, again, when I say Ms. Parker was really into the job and things like, she would text me after work and be like "Yo, tell me about this."**
**And, you know, we would go through stuff and I would just be like, man. But I didn't mind it, you know what I'm saying. I mean, I'm there to help people. She's not the only one that I helped in that way. So we communicated a good bit, I guess.**
**But in relation to somebody else, it's kind of the same, you know what I'm saying. Like, I had had a lot of communication with a lot of people. Even right now, my phone is probably going off right now for people at work who like need something.**
Q Sure.
**A So, I'm kind of like a fix-it guy. So,**

196

**people always reach out to me, especially in times where they couldn't feel like they could reach out to anybody else.**
Q Sure. That makes sense. You said "often". In terms of time, would you be able to quantify how many minute, hours, seconds during the day, right, on average, would you spend with her?
**A So, I think it's different. It was different, again, because of whatever role she was in at the time, you know what I mean.**
Q Right.
**A So, as she worked back there in the receiving warehouse as a receiver, maybe it wasn't as much. But then, again, when they start doing export compliance, I did export compliance, and it was like Larry had her and I on a team, so we had to communicate a lot at that point, because now we're trying to classify products for shipping them overseas and stuff like that.**
**So then it became a lot more frequent at that time, when she was doing that. And I want to**

**say she was doing that up until the moment that she left, so.**
Q Okay. And when did that start again, do you remember?
**A Man, I really don't remember when that started.**
Q Would it be correct to say that she was in your office 5 hours a day?
**A Oh, no. Five hours a day is way too much. Yeah, way too much.**
Q Okay. So less than 5?
**A Yeah, probably less than 5, I mean, because she had her own office and she had a phone in her office, so she'd call me from the phone. Sometimes she'd come up.**
**Again, I worked -- my office was in the front, and I'm trying to think did she ever have an office in the front, or did she have one in the back. I this she may have had an office in the front, may have been a shared office or something like that.**
**But my office was a place that a lot of**

**employees came. You know, if they wanted to sit down and discuss something, they'd come in, they'd close the door, you know, and they sit down and just, whatever it was.**
**So, I mean, that was, again, one of the roles I did at the company. So, when people say what did you do, I mean, I did a lot, really, you know. Just hard to really quantify that to other people sometimes, but.**
Q So would you say that you were someone that people would go to guidance for?
**A Oh, yeah, most definitely.**
Q Okay. So, back to the time, less than 5, less than 4 hours a day?
**A Probably less than -- yeah, maybe 3 to 4 hours a day, maybe, something like that, maybe, if it was that much. I feel like that's extreme, when I start thinking about it. You know, because it's chopped up. You know, it's not like she comes in and she sits there for 2 hours --**
Q Sure.
**A -- and we're just sitting in there for 2**

**hours. Like, that didn't happen like that. But periodically, you know.**
Q For how long at a time, do you think?
**A Sometimes it was the stand in doorway and say something and then, you know, go about. Then, again, we were all there if we carpooled that day. Now, somebody has to go get lunch for all the people who, you know --**
Q Sure.
**A -- carpooled, then, you know, you're stuck at work. You know, she drove and like, man, I don't have a ride to go get something to eat. So, you know, they might come and talk to me about lunch, you know. So it just varies.**
Q For most of the time, or what portion of that time would you say you were doing work related things?
**A All of it.**
Q Okay.
**A Majority. I mean, again, for lunch and stuff like that. And then you have moments where people start talking about different things, you**

**know what I mean. Me and Ms. Parker, we were reading the same book, just so happened we found out we were reading the same book. So at times she was like "Did you read it?" I'm like "Yeah. I didn't catch up to that part yet." stuff like that.**
**People talk about TV shows that they watch. So, I mean, it's hard to quantify what was business versus when did it kind of go over into something personal, because it was fluid like that in the warehouse environment, as you could imagine.**
Q Sure. So would you say that -- So, I'm now going to turn to quickly discuss the rumor. And I understand that, obviously, the subject matter of the rumor is something that is not favorable to anyone in this situation, so I'm going to try and be as sensitive as possible. To confirm, is the rumor that you and Ms. Parker were sleeping together true?
**A To confirm that it was true?**
Q I'm asking you, was it true our not?

201

**A No, it's not true.**
Q Okay. Did you all have any type of relationship beyond friendship?
**A No.**
Q And, again, I'm not insinuating that you did.
**A No. No. I understand.**
Q We know, or based on your earlier testimony, you said that you told Ms. Parker about the rumor, or what you had heard about the rumor. Did you tell anyone else outside of Ms. Parker about the rumor?
**A I didn't.**
Q Okay.
**A I also kind of felt like if you give fuel to that kind of fire, it gets out of the hand, so that was kind of my take on it. I'm just like, it's just some BS, you know.**
**There were other rumors, again, that happened at the warehouse, but nobody paid attention to and they never got this kind of treatment, if you will.**

202

Q Sure. You said earlier -- I mean, we'll take a quick sidetrack. You said earlier that Ms. Price was involved in some other rumors, that you just mentioned some other rumors.
Could you elaborate a bait more about that?
**A Again, Ms. Price said that Kenton's Birgans and Brandy Winston were having a sexual relationship, and that Kenton's wife found out about it, and now Kenton, his wife was bringing him to work.**
**She actually worked at a hospital not too far from us. So she made that -- she made that rumor, and she made it to her HR clerk, who happens to be best friend with Brandy. So she was like "Oh, Yo, Ms. Price just said this about you," and it was absolutely ridiculous and Brandy confronted her about it and she was like "Oh, no. I didn't mean it that way," or something like.**
**You know, I wasn't there during the confrontation, but Brandy was pretty pissed off that Ms. Price, the HR lady, is gossiping and**

203

**starting rumors at the warehouse.**
Q Sure.
**A And it was kind of ridiculous.**
Q Was there ever an investigation about this rumor?
**A No. She apologized for whatever she said. In terms of what I know, nobody asked me about it directly, but I knew Brandy confronted her about it.**
Q Did Brandy ever lodge a formal complaint?
**A I don't think that she did, but I don't know.**
Q Did anyone else know about this rumor in the warehouse?
**A Kenton knew about it, obviously, because he was also subject to the rumor and, you know, his wife is bringing him to work every day. I know he was having car problems at one point in time and I think that maybe they were just carpooling. I don't know. But, so how many people actually knew about it, I don't know.**

204

Q Did Mr. Moppins know about it?
**A I don't know.**
Q Okay. Were there any other rumors like this that were circulated while you were at REEMA that you were aware of?
**A They had a rumor of Donte one time, about him taking a picture of his butt in a mirror and sending it to this lady, Rochelle. You know, I don't know the facts on that or anything like that.**
**Just, you know, again, like some people treat the place like high school, you know what I mean. They just saying stuff and you don't know what's true, what's not true. But, you know, again, if you start diving into that, then you start not paying attention to the work, you know, and if you're caught up in it. So that's why I don't like rumors. I don't like to deal with them.**
Q Was there ever an investigation into the text rumor?
**A Which text rumor.**

Q The one that you mentioned about Donte taking a picture?
**A Oh. I have no idea. Nobody asked me about it, I can tell you that.**
Q And how did you hear about the Birgans/Winston rumor?
**A From Brandy directly.**
Q And the Donte rumor?
**A How I did I hear about that? I think there was a group of -- I feel like there was a group of ladies maybe kind of discussing it. I think I kind of walked up on it. I was like "Oh. Okay." And then I kept walking. I'm like, yeah, I'm out of here. I don't want to know about his booty, pictures to you and none of that.**
Q Sure. In your opinion, did Mr. Moppins ever let personal feeling about employees affect his personnel decisions?
MR. WALSH: Objection.
**A Yes.**
Q Why?
**A Because I've seen them. I've seen him**

**become irate at something that he shouldn't become irate at, and it's, you know, unfortunate, but that's kind of how he ran his shop.**
Q Could you give ma an example?
**A I'm just going to speak from my personal experiences, this whole situation and how he treated me about it. He was personally mad and then he tried to flip it into work. Like, again, with one of these exhibits. I'm sorry --**
Q Take your time.
**A One of these exhibits. It's crazy. Exhibits 9, this counseling. And, again, you know, you guys don't have the PIP, I guess, here in front of you. Again, he was ex-military and command and control was one of his things.**
**Like, he was more of a lead by fear than, you know, lead by just leading people. I can't even say, like, what kind of style that is, but it was more of a fear based thing, it's more like a military operation, so.**
Q And would you say you were the only one that felt that way?

MR. WALSH: Objection.
**A I'm sorry?**
Q Would you say you were the only one that felt that way?
**A No, not the only one that felt that way. Again, people, employees, would come talk to me about some of the things that happened or some of the things that he would say.**
**And I think that probably -- like, they used to call me a big teddy bear, like "Oh, you're always hugging the people," and I'm like, huh, hugging, it's not hugging physically but, like, they say you're a hugger, like, if somebody has an issue, you hug them instead of giving them this rah, rah, rah kind of counseling, or a situation.**
**And he was the rah rah kind of guy. So, people, obviously, started being like well, I can't talk to him about certain things. I'm going to come talk to you, and that was the position I had. And he always said well, you know, it's good that you're here because I'm this was and you're that way, so it work. And it was like he always**

**felt like it work for that environment.**
**So I had a lot of employees confide in me. As a matter of fact, I think sometimes he was to a degree jealous that people would rather talk to me than talk to him.**
Q Uh-huh.
**A So, I don't think he really liked it that much.**
Q Okay. You said employees would come and talk to you about things he had said. Could you give me some examples.
**A Again, for instance, we're in a manager meeting and he walks into the manager meeting. He was upset about something. I don't even recall what he was upset about. But the first thing he said when he got to the meeting is "Which one of you motherfuckers don't think I could fire you today if want to?"**
**So, after the meeting Ms. Wallace, Ms. Daughtry, and I'm not sure if, I don't know, but I felt like Van might have been part of that meeting, I'm not really sure. But either one,**

they would come to me and be like "Hell, man. What kind of shit is that? Like, you know, why would he say something like that?" You know, they just be really beat up. You know, because is there to do a good job.

So, when you start talking to people like that, it makes them feel some type of way, it makes them feel undervalued, and as employees when they start feeling undervalued, their work is going to suffer.

So, now, for me, my thing is, hey, like, don't mind it. You know, he was just angry, you know, I'm just downplaying, you know, his think. And I guess it probably maybe not have been thing. I should have maybe -- you know, again, I didn't feel like HR was going to do anything about it, but, still, I usually talked employees off the ledge for, you know, small little things like that.

Like, don't let that bother you. Stay focused. Keep doing your job. Don't just quit and run out and because of his antics. You know,

don't let him run you off, basically. You know, you got a good opportunity here. So, I mean, I've had that conversation, I don't know how many times with people, a lot of employees.

Q    Is there any other examples that you can give me?

A    Of him just being irate or?

Q    Sure.

A    So, I'm trying to keep things REEMA, REEMA oriented. Obviously, we still had a working relationship after REEMA, so, but --

Q    Well, either site.

MR. WALSH: I'll object to anything that happened at his new employer, but.

A    Okay. So, and just continuity sake, I will try to keep it REEMA related. I'm trying to think of the some of the instances that he's had with people.

You can look at some of the records of his firings. He's got a lot of firings. And that was one of the things he kind of was proud of.

Q    What do you mean by he had a lot of

firings? Sorry to interrupt you.

A    I'm just saying that he fired a lot of people --

Q    Oh, okay.

A    -- at our time at REEMA, there was a lot of people that got fired. And not everything was all justifiable, again, to me. But, again, the decision is his, it's not mine. So if he felt like something that he didn't like or, you know, you start telling people you're two minutes late and you're going to get fired, or you're two minutes late.

We had a time clock at one time and if you didn't use the time clock, you know, he was a stickler for almost anything, and almost anything could set him off, you know what I mean.

So, we had an instance where people were doing, you know, we're warehouse workers, but we're running computer wire, CAT- CAT5 cable around the warehouse. And, then, like say if you ran a CAT5 cable to a printer and then the printer goes on the network, he was upset at the team

because he felt like they were messing up the network. But only he, I ad Shaun had administrative rights to add a computer to a network, or a printer to a network.

But he would just go off on everybody about it and everybody's like "Yo, what's that about? We don't even have the ability to do that."

So, I don't know if it was just a show of force or what it was with him but, I mean, it happened all the time. It's really hard to point out incidents when they're just kind of common. You know, I got to the point where I just became kind of numb to it. It's just like, oh, he's gone off again.

Q    Did you ever feel like there was an instance where he personally attacked people similar to the way that you're saying he responded to your and his situation?

MR. WALSH: Objection.

A    I really couldn't say because, you know, if something came out to him -- again, his

213

**relationship with Donte came out later. I know he -- I know Donte, like, for instance, Donte threaten Shaun one day about going into the parking lot, all right. Now, if anybody else had done that, it would have been like "Oh, you're terminated." But Mr. Jennings didn't get terminated.**

Q Why not?

**A I feel like now it's because he was looking out for him, Larry was looking out for him.**

Q Why?

**A Because he's his step-daughter's ear baby father, so they have a relationship. So I feel like at some point him and Donte kind of talk about what's going on at the warehouse. He gets his information -- he's like a warehouse rat. Everybody's like, oh, there's a rat here and stuff like that.**

**Sometimes this between the client as well. Like, who's telling the client stuff? He didn't want people to talk to the client. He**

214

**wanted to control the information that came out of the building, and, obviously, you know, he's the PM. It's under his tutelage. So, I mean, I could get that. But, you know, again, I think him and Donte's relationship allowed Donte to get away with things that people shouldn't have gotten away with at that warehouse.**

Q Okay. So would you say that he favored Donte?

MR. WALSH: Objection.

**A To a degree, yes. I'm sorry.**

Q You can answer.

**A Definitely. Because, again, like I said, if you threaten somebody to fight somebody at the warehouse and nothing happens to you, you know, that's crazy, but other people, somebody else got fired over it, I know that.**

Q Who?

**A Who got fired over that? I want to say -- well, see, and this is mixing contracts. So, I know Hunter, there's a kid named Hunter Mullins that got fired. That's the current**

215

**employer right now.**

Q As a result of this situation?

**A No, not as a result of that situation.**

Q Oh.

**A But what I am saying is, like, that's something that's not tolerated. You can't be at a warehouse and make a physical threat to somebody.**

Q I see what you're saying.

**A Yeah. But, I'm saying, when it happened with Donte, Donte didn't get fired for it.**

Q Did anyone else get fired as a result of the Donte situation?

**A Not that I'm aware of, not directly related to Donte, no.**

Q Okay. And are you aware of whether there was an investigation into that incident?

**A Into which incident?**

Q Was there an HR investigation into the Donte/Shaun incident, physical altercation?

**A Yeah, actually, it was. And it came down to just being a conversation and, you know, having the two guys sitting in the room and just**

216

**kind of apologize is what happened. He kind of apologized for that, saying that he, you know, telling him -- I think he was like he invited him outside and it was kind of like "Yeah. You want to see me outside, I'll show you what's up" kind of thing. So, something like that. But only thing came out of that was an apology.**

Q And was Ms. Price involved in that investigation?

**A She was.**

Q Okay. And who else?

**A I feel like Larry was involved. Shaun Reeves was involved, because he made the statement to Shaun Reeves.**

Q Sure.

**A I was involved, and I'm not sure if Carlos Carter was involved in that or not, because I feel like Donte worked down in SPEAR and Carlos was the manager for SPEAR.**

Q Right.

**A So I think that he was also involved in that.**

Q I'm going to go back to some things that you had said when Mr. Walsh was asking some questions. You said earlier that -- is it correct that you said earlier that Mr. Moppins would have tissues on his desk?
**A Yes.**
Q For what reason?
**A He used to say because "I make you cry," like, you know, he makes people cry. He was aware that he made people cry and he kept tissue on the edge of his desk for that very reason.**
Q So he said that directly to you?
**A Not only to me. I'm pretty sure he said it to a couple people.**
Q And what was his tone when he said that, in your opinion?
**A Kind of like a "Yeah. You know me. I'm kind of like, you know, I don't care. I keep tissues on my desk, just in case they cry." Like, you know, just kind of a bravado, if you will, like "I'm that guy that makes people cry." Like, so, just kind of talking junk kind of.**

Q Would you say he was proud of that fact?
THE COURT REPORTER: I'm sorry?
MR. WALSH: Objection.
Q Would you say he was proud of that fact?
MR. WALSH: Objection.
**A Yeah, he seemed to kind of relish in the fact they had that ability to make people that emotionally charged.**
Q Okay. Did he make any other comments of that nature to you?
**A In reference to making employees cry, no. But he made reference to the amount of people that he's fired over the years, definitely.**
Q In a similar tone?
**A Yeah.**
Q Do he ever make any sexual comments to you?
MR. WALSH: Objection.
**A Could you kind of clarify that question, sexual comments to me?**
Q Not about you.
**A Just want to make sure we all on the**

**same page. Like, no.**
Q Thank you for clarifying. About anyone else to you?
MR. WALSH: Objection.
**A I want to say that he had an affinity for Ms. Wallace to a degree.**
Q What do you mean by affinity for?
**A Because, you know, he used to talk to her about, you know, her man or, you know, her boyfriend or whatever. You know, what is doing for you? What kind of man do you like? You know, stuff like that.**
**But in terms of sexually, like, "Yo, I want to hit that," I couldn't say that he said anything like that to me.**
**But, again, I know he had a thing for Ms. Wallace to a degree and to the point where it made her uncomfortable.**
Q Why? Why do you say that?
**A So, we move contracts in. She didn't want to come to the other side with us as long as he was in charge. A lot of stress involved for**

**her. I forgot what happened. She had a medical condition where her face is kind of -- I forgot what the term is called, but it's almost like losing the feeling inside of your face.**
Q Uh-huh.
**A So, like her mouth is drooping and stuff like that. But, so I think it was as a result of all the stress and everything that was going on in the job and she did not -- you know, he thinks it's because its in Winchester, but in reality, she was like "I'm never going to work with that guy again." So --**
Q And was it because of these sexual comments?
**A Yeah. Not just the sexual comments, but just him as a boss, the way he handled business. Like, people, again, they're civilians and the have -- they're not really thinking about that. They're just thinking -- you know, I mean, he was in the military a long time ago.**
Q Uh-huh.
**A And you got to think now it's 2020 and,**

221

well, how progressive things have gotten and different and people are like, Yo, like why are we dealing with that kind of shit. So she didn't want to come to the new side.
Q And she said that to you?
A Yeah.
Q Okay. Did you ever hear any other sexual comments made by Mr. Moppins made to anybody else?
A I've heard some things. You know, there's this thing about this lobster and, you know, somebody said that not too long ago. There's a joke where at 4:00, we're like you got off the clock like 4:30, he can invite you to lobster, which is a sexual reference to the genitals and shit like that, so.
Q Okay. Who did he say that to?
A He would just say it, just randomly. Like Manley used to get it. Kenton, I think, has heard it a couple times. Like "I'm serving lobster at 4:31. I'll meet you in the parking lot." You know, things like that. So.

222

Q Okay. So he would -- did he ever say it to women?
A I'm not really sure. I couldn't say specifically. You know, it was a joke. You know, he was joking, so I couldn't necessarily say if he said it to a woman.
And if he did, he didn't say you known "I'll invite you to my lobster." He might just say "Hey, let's have a conversation at 4:31," or something like that, you know.
Q Okay. But was there an implication to that?
MR. WALSH: Objection.
A I think because I know the implication, then I know it was. They may have been naive to the statement or what it truly entailed, but, and then, again, I can't say I know what his intent was, but I know what the intent at 4:31. I've heard it a lot of times, so I would just automatically assume you're talking about inviting somebody to your lobster at 4:31.
Q Got it. Going back to, you said

223

something that earlier that you felt that HR wasn't going to do anything?
A Right.
Q Could you explain more why you felt that way?
A Again, because Ms. Price was an on site HR, and not to say that she didn't do her HR thing correctly or anything like that. However, when you start engaging with employees in the manner that you do at the job. You know, she's also quick to say "I put my HR hat on," but how can you put your HR hat on when you're engaged in the same type of behavior with the employees, like gossiping at the warehouse, or about what's going on at the warehouse.
That doesn't make sense. As HR, you should have no part of that. You should actually be like "Hey, like cut that out. Don't do that." But she didn't and she's party to it.
So, I don't trust her as HR. I never have.
Q Did anyone else at the warehouse express

224

the same sentiment to you?
A I know Brandy did when that rumor came out about Brandy. And, again, I've walked into a break room and Donte's whispering in her ear and she's giggling and it's like, I don't know what's going on. I'm not going to assume that I know what's going on.
But it was awkward for me to walk in and see that. You know, especially when you're HR. Like you should be -- well, I have this -- I guess people have this idea and this is the first time I've ever seen HR in a building with the employees. Never seen it like that. So, maybe it was just my opinion on how I perceive HR to be.
I don't know. You know, maybe she can flip the switch but I didn't trust it.
Q Would you say that Donte and Ms. Price had a close relationship?
MR. WALSH: Objection.
A I couldn't speculate, but I would imagine so. Anytime that you're close enough to whisper in somebody's ear, you got to be kind of,

**I guess, close. I don't know.**

**I don't begin to assume the nature of their relationship. I don't know. I really don't. But if you're at work and you're doing that, then maybe so.**

Q How would you characterize their relationship?

**A I really couldn't. I really couldn't characterize it.**

Q Okay. That's fine. How would you characterize the relationship between Ms. Price and Mr. Moppins?

**A I think they were kind of like very cool. I think they understood each other. They were both from the south. At one time Ms. Moppins was doing -- she was doing like coaching of small business. So I know that Larry and Ms. Price had dealings outside of work, because also part of that little thing.**

**My wife and I went one time and she was there. So, I really can't speculate to the extent of their relationship, but I think that they were**

**friends, if you will, to a degree.**

Q Outside of work?

**A I believe so. And if not necessarily directly with Larry, then probably more so maybe with Ms. Moppins, maybe, but I really don't know.**

Q But you're aware of them -- or did they ever hang out outside of work?

**A I don't know about that.**

Q Okay. So back to our -- sorry to have gotten a little sidetracked.

**A Yeah. No problem.**

Q Back to our discussion about the rumor. I think Exhibit 8 is the investigation report that Ms. Price put together. Were you aware of an investigation that Ms. Price was conducting about the rumor?

**A And, again, no. I thought the investigation was more so along the lines of Ms. Parker and her employees, and the treatment of the employees. So, again, I have never seen this document. I didn't see this counseling. So, what they did behind the scenes was something else.**

Q Were you aware of the procedures that HR used to investigate?

**A I just know that she would come. She would talk to people. She would take her little notes and things like that.**

Q Uh-huh.

**A That's the most I know about that to the extent of it.**

Q You were ever interview?

**A I was interviewed.**

Q Okay. And what did you say?

**A I don't really remember what I said to her during the investigation. I know she asked me about the rumor, and I told her I didn't really pay no mind. I don't think it was that big of a deal.**

**And it wasn't really -- it wasn't really like a whole lot, you know, because, again, I'm not also involved in the situation between Ms. Parker and the people in the back.**

**So when they came and asked me about the rumor, I don't really have a whole lot to say.**

**I'm just like, yeah, I heard it, but I didn't pay attention to it. Like, I mean, I didn't feel the need to pay any attention to it.**

**So that was, I feel like the extent of my participation within that investigation.**

Q Okay. Quickly going to Exhibit 9. Just wanted to get one point of clarification. It's the written warning.

**A Right.**

Q About halfway through the page, it says you told client, you being Mr. Pickett, told the client representative that the SME was upset with you. Who's the SME?

**A SME is Larry Moppins.**

Q Okay. He was upset with you because, and then it lists three reasons. I'm going to just go through them one by one.

You informed Ms. -- you being Mr. Pickett, that the SME had requested disclosure of a personal relationship and Ms. Parker, if one existed, to avoid a conflict of interest.

Did Mr. Moppins ever mention a conflict

229

of interest when he asked you that question?
A Never. Something he drummed up later. He's a manipulator, so he's manipulating the situation. He never said it was a conflict of interest. And if that's that case, then there should be something that I signed in terms of "Hey, you can have these discussions," and, you know whatnot. It was none of that.
Q And it goes on to say requested an explanation for your decline in work performance. Did he ever mention a decline in work performance?
A No, I don't think he did. And, again, he's saying that. I don't recall that. If he said "Hey, man, everything all right?" And I said "Yeah, man. You know, shit. Maybe I'm having a problem." Maybe I said "Man, shit. Me and Jasmine arguing a lot."
If he just asked me if everything's all right, that's not saying that there's a workplace issue, you know what I'm saying. That's you asking me if everything's okay and I'm under that, because you know me for a long time.

230

Maybe you saw something. Maybe I can in that day and you was like "Oh, what's wrong with you? You all right?"
Q Sure.
A So, no. It never came down to hey, this is an issue that I have with your work performance. No, we didn't have that conversation.
Q Okay. Go on to number 2, that the SME would not allow you to explain your actions. Did you ever convey that to the client representative?
A I don't know that I explained that. But, again, where did he get that from? He had to be talking to the client too, right? So he probably got that from the client. So, if I'm talking to Quan, I'm saying "Hey, Larry ain't talking to me." It is what it is, you know.
If you ask me about business, I may not know about business, because at the same time, again, I have seen Larry do this to people and get them out of there. So I probably called him, said "Hey, man, just so you know" -- No. Actually, he

231

called me initially, but just so you know what the situation is down here, if you ask me about X,Y,Z, I may not know about it because he's not telling me.
So, if you're talking to him, he's telling you "Get this done," and you think I'm going to get it done, I may not get it done, because I don't know about it.
So I need -- so, you know, I had a relationship with him as well.
Q Uh-huh.
A So, again, I want him to know what's going on, just in case something comes down, I'm not being talked to. Just, you know, so you know.
Q So, did the client reach out to you or did reach out to the client?
A I feel like Quan called me, because he, again, he was out of the country, so there was no way for me to contact him. He called me from -- I think he was in -- I don't know if he was in Georgia, country Georgia.
Q Thank you. And, then, the last one,

232

says that you asked the client to mediate a meeting between you and the SME, or Larry. Is that true?
A Negative. I never asked him to facilitate a meeting. I want him to know what's going on, not "Hey, could you set up a meeting so we could talk." No, did not do that.
Q Okay. Back to the rumor, or the investigation of the rumor. Were you aware of anyone else that was interviewed as part of Ms. Price's investigation?
A I think everybody that worked for Ms. Parker, including Ms. Parker. So, Ms. Parker, I think Manley. I believe Donte. Not sure if Romaine got talked to. Clearly, I think they talked to Angie, maybe Ms. Littleton. Outside of that, I'm not really sure of everybody that she talked to in regards to that. No, I'm not.
Q Okay. And you said earlier that you had never seen this investigation report, Exhibits 8.
A Yeah. I don't think -- I don't think I ever seen that one.

Q Were you aware of the result of Ms. Price's investigation through any other means?

**A Yeah. Because we had a meeting, and I felt like the result was just "Hey, everybody, we just need to not discuss rumors and not participate in rumors, and let's just move forward without addressing the, you know, the rumor mill type thing." So, that kind of was basically my understanding of how it ended.**

Q Uh-huh.

**A But, again, I'm not being talked to, so I don't know if, you now, like, this report. I never seen that report.**

Q So you weren't aware of any of the specifics?

**A No, because I would have said something about this to her at the time, like, I don' think that that's how this went, some of the stuff in here.**

Q Okay. Some, what would you have changed in Exhibit 8 that you felt was inaccurate? You can take your time.

MR. WALSH: Objection.

**A Number 3, for them to say that they came to me. I guess that's the end of number 2. They said that DeMarcus Pickett knew about the incident.**

**And, then, number 3, in speaking with DeMarcus, he agreed that they had came to him and thought that he had handled the situation. Therefore, he felt no need to tell Mr. Moppins nor HR. That makes it sound like I was trying to hide something or anything like that, and that's not the case.**

**They didn't come to me and talk to me about that rumor at all.**

Q Okay.

**A Or not about their -- about Ms. Parker treating a certain type of way. Again, the next time I heard about it was in that meeting.**

Q So you're saying, just for clarification, was the first time that you heard about Mr. Ferguson's complaint, or anyone's complaint, after the employee staffing meeting

held on the 22nd. So no one had come to you to make a complaint about Ms. Parker before then?

**A Nope.**

Q Okay.

**A Yeah. Some of this stuff, I mean, I'm not even aware of, so. no.**

Q Yeah. Sure. Anything that you're not aware of, that's fine, but anything explicitly that you felt was incorrect.

**A I feel like 8 is where it kind of stopped for me.**

Q Okay.

**A And, again, number 7, I didn't contact the client. The client contacted me --**

Q Uh-huh.

**A -- from out of the country, so. And I definitely didn't defame Mr. Jennings. I said that Mr. Jennings, I think at the time, was the reason why that rumor started.**

**So it wasn't a defamation. That's what my understanding was.**

Q Is there, just to quickly take an aside,

is there a reason why you felt like it was Mr. Jennings?

**A Because of how Romaine gave me the information. She was trying to be kind like secretive, just asked me, you know, but she did it in a round about way. and I was like "Where you get that from? Who you been talking to?"**

Q Did you ask her?

**A And I think I said that sounds like some BS, and I know who usually does a lot of BS talking. Because Donte's like, he's one of the guys that comes to work and he kind of like -- you know, again, I don't feel like he's there to work.**

**He's more of the social butterfly. He likes the social aspect of being at work. So, I already knew that about him. Already know that he's already been involved in other things. There was another lady, Mary Ing, that something may have transpired with them.**

Q What did you mean by that?

**A Something with Ms. Ing. I don't really know if it was a rumor. I just know that there**

237

was a disagreement between the two of them at one time.

There was a disagreement between him and a Jolene. Man, you thought Ragunton was bad. Jolene is -- I want to say Johaviac --

Q Does it start with a J?

A Starts with a J.

Q Okay. We'll just call her Jolene.

A Yeah, Jolene J. They had an issue about something when they went to lunch and maybe --

Q Do you know what the issue was about?

A I feel like they were riding in the car together. They all went to lunch and maybe Jolene was in the back seat with Donte. He made some kind of reference about touching her in the car, or something like that.

Q Like a sexual reference?

A Yeah.

Q Did she ever complain about that?

A She only told -- I want to say she told one of her supervisors and it got back to me, but she didn't want to make an official complaint.

238

Q Why not?

A I'm not really sure why she didn't. I couldn't answer that question, so.

Q Did Ms. Ing ever make a complaint, do you know?

A A formal complaint, I don't think so.

Q Do you know if anyone ever made a complaint, a formal complaint against Mr. Jennings?

A No. Again, I wasn't privy to that kind of information. If they did, I'm not privy to it, so.

Q Okay. But nothing else in here?

A I know for number 9, about Ms. Parker being in the SPEAR area. I don't know anything about that, but I know that Mr. Jennings has to come through the ATA side.

So, again, I wasn't part of any of these discussions in terms of how they put or anything. I wasn't involved in a lot of things after this whole thing went down. But from my understanding that they were told to not have any involvement

239

with each other.

Q Uh-huh.

A So, obviously, you have to kind of come in Ms. Parker's area to get down to the SPEAR area. Now, you don't necessarily have to, because you can come out the door. You can come out this door, take this left and come down here and get to your area.

Q Okay.

A But Mr.Jennings made it his point to always come through this area right here.

Q Always?

A Fairly frequently, he did. Fairly frequently. And I think he only did that to antagonize Ms. Parker, because now he has friends that are in the building and they work in this area.

Q Okay.

A So now he may not be saying anything to Ms. Parker, but he may be across the room talking, you know, maybe she's in the -- this is a hut here and these are tables here. So he may be over here

240

having a conversation with somebody, but looking her way, something like that.

Q And by looking her way, what do you mean?

A Just like, you know, "I'm in your area." like, here I am. I'm here.

Q Staring at her?

A Yeah. Just kind of staring at her. I seen that happen one time, because I was in the receiving area, so when I'm walking to the front, I could see him staring at her.

So I know he was trying to be antagonistic about the whole thing, because that's the kind of dude he was.

Q Was this after --

A That they were told to not --

Q -- the confrontation?

A Yes.

Q Okay. So you saw him standing in her area after the confrontation, and they were told not to --

A But, again, he wasn't talking to her.

241

**He was talking to somebody else. I don't know who he was standing there talking to. I kind of feel like it may have been Manley that he was standing there talking to.**
Q Okay.
**A So he's just standing there, talking to Manley, you know, first thing in the morning. He's on his way to his area, but instead of just going to his area, to not see Ms. Parker, to alleviate the conflict --**
Q Uh-huh.
**A -- he's antagonizing it a little bit.**
Q What made you think that?
**A Just because of the way he was looking. You know, he's got his head down, but he's looking like this. You now, just kind of like leering over at her. It's like, you know, that's unnecessary.**
Q Would it be fair to say that it was an intimidation?
MR. WALSH: Objection.
**A I would assume so. I wouldn't -- I**

242

**don't then if intimidation would be the word. I think antagonizing is, again, the better word.**
Q Okay.
**A But, most certainly --**
Q Oh, yeah. Absolutely. Correct me if I say something that you don't agree with.
Was that the only incident that you saw of him standing in her area?
**A That was the only time I actually witnessed it.**
Q Were you aware, or did you hear of any other time?
**A The fact that they're not -- Well, I heard of the fact they're not supposed to be around each other.**
Q Sure.
**A But I can't remember. I don't recall or hearing any other incidents where they got together and actually said anything to each other, or anything like that. No, I am not aware of anything like that.**
Q Okay. But you actually witnessed him

243

standing in her area?
**A Yeah.**
Q Okay. I want to quickly jump to the all hands meeting that we discussed earlier. Before I do, do you need a break? Okay.
You mentioned earlier that Mr. Moppins allowed you into that meeting but shut the door on Ms. Parker, is that correct?
**A Yes.**
Q Do you know why he would let you in but not her?
**A No.**
Q No. Okay. I'm just going to jump to -- I know it seems really compartmentalized, but I don't want to overlap questions too much.
Your interactions with Mr. Moppins while at REEMA. When did you first meet Mr. Moppins?
**A At my interview for -- back then the company was called Tasada and Associates.**
Q Was that the one just before REEMA?
**A Yeah.**
Q Okay.

244

**A So I met him September -- I want to say September of 2009, I want to say. The first time I actually met at an interview.**
Q Sure. And I'm assuming that was at Tasada's workplace?
**A That was at the warehouse, yeah. Same warehouse.**
Q Same warehouse?
**A Yeah. Same building.**
Q Okay. Does the building stay the same between all the different contractors?
**A For the most part. At one point this building was a lot longer, and they put a wall up and a moving company moved into this end of the building.**
Q Okay.
**A So, at one time we had the entire building. And, again, like I said, they put a wall up, so it reduced our footprint.**
Q Okay, but one company went out and another came in, REEMA came in?
**A Yes. Yes.**

Q What was his role at REEMA at the time that you met him?
**A His role at Tasada at the time.**
Q Tasada.
**A He was not the SME. He was not the PM. He was a -- I want to say he was a supply tech, and ran the inventory control section.**
Q Okay.
**A Might have been inventory control and receiving, might have been.**
Q Okay. So when did REEMA take over the contract?
**A 2012, I think October of 2012, I feel like.**
Q Okay. And upon that change in control, what was Mr. Moppins title or role?
**A Initially he was -- I really don't know how it really went. So, obviously, companies, they bid on contracts and they say hey, you know, I can one PM, two deputies, whatever the case.**
**You know, they kind of configure it for them to figure out how best for them to support**

**the client and the needs, you know, financially everything.**
**I'm not really sure what his role was when RCSI took over. I don't know -- I feel like for a period of time we had an old PM named Gary** Blougher (phonetic). He was there for a little while, but somewhere in the beginning something changed.
Q Okay.
**A And he was no longer in, and I feel like -- I feel like Larry may have maybe have at one time said that he was going to kind of like leave, walk away, or something like that and, you know, go to something else. And maybe he kind of -- I don't know. Some people think that he orchestrated the firing of the old PM so that he could get the job.**
**So, he was the PM for a period of time when we first started with RCSI. From my understanding and, again, I don't know the backgrounds -- I don't know what his offers is. I don't know his contracts or anything.**

**Like I say, I don't know. And then at some point he -- it wasn't PM any more. It was SME and I don't know what the change or anything like that. I don't know how that happened.**
Q Sure.
**A I couldn't speak to that.**
Q What made you think that he orchestrated?
**A People said that.**
MR. WALSH: Objection.
**A Again, they thought that -- I don't know. It's just, you know, people talk. Again, it's a warehouse. So, you know, people think that Mr. Gary is a little bit older.**
Q Okay.
**A He used to drive from like Virginia Beach and stuff. He actually lived in Virginia Beach, but he spent a lot of time, like, at the warehouse. So instead of driving home all week, I think at one time he had a place that he rented. But some mornings he'd be there really early, like showering and stuff.**

Q Okay.
**A And, you know, so I don't really know the dynamics of how that went either, but people really felt like Larry really wanted to take his job, and that's kind of how they was like, oh, Larry kind of pushed him out. I don't know that to be true, but.**
Q Sure.
**A Again, that's kind of how, you know, the thought process was of some people at the warehouse.**
Q Okay. And I think you testified earlier, correct me if I'm wrong, that your understanding was that was written into the contract, is that correct?
**A That's how HR put it to me.**
Q HR being?
**A Cathy Price.**
Q Okay.
**A I had that conversation with her the day that they give me PIP.**
Q And what else was part of that

249

conversation?

A   Just me expressing how frustrated I was at the whole situation and how he's treating me and now all of the sudden is this PIP.

And I'm like he hasn't talked to me for weeks and all of the sudden this PIP comes out and she's like, well, you know, DeMarcus, I can't do anything about it. He's written into the contract, and that's exactly what she said.

So, from that point, it just kind of solidified, I feel like, for me, all the things I already felt, like you're not really able to do anything for us here.

Q   Do you know what that the means, written into the contract?

A   I really don't know what that means. I mean, I could make speculation, but I don't want to try to speculate.

Q   That's okay.

A   I really don't know what that meant.

Q   Sure.

A   But she's basically saying "Hey, man,

250

you're on your own. There's nothing I can do. He's written. He's here, so he's here to stay," I think she said something like that too, like he's going to be here. He's here to stay.

Q   Okay.

A   So, it was kind of like, you might just want to just adhere to whatever's going on here. He's kind of here to stay. Like, you know, so just hands tied. There's nothing I can do.

Q   Did you felt like it was either you or him that would stay --

MR. WALSH: Objection.

Q   -- if there was a conflicts?

MR. WALSH: Objection.

A   Yes, definitely.

Q   Why?

A   Because I watched him fire a lot of people ahead of me.

Q   Okay. Did anybody make any complaints against Mr. Moppins?

A   If they did, again, I'm not -- I mean, to me people complained, but sometime it was just

251

kind of little things and, again, like, is it going to be big enough for you to get him out of here, because he said oh -- again, for like for example, in that managers meeting, because he said "I'll get you fired if I want to." Do I think that something was going to happen to him? No.

So, yeah, people made complaints. People didn't like the way he did things. He was a very aggressive kind of talker and stuff. And, you know, when he got upset, you knew he was upset. The whole warehouse knew if he was upset.

He'd yell at you in front of everybody, tell people he was going to fire them. "Oh, you don't want to do the job? I'll get him to do it and I'll get rid of your ass."

You know, stuff like that. And he did that in front of anybody, from the highest level to the lowest level.

Q   Was -- when you say highest level, what do you mean?

A   I mean from being me being the DPM to a warehouse specialist or a shipping and receiving

252

clerk. Like, he didn't care.

Q   Was anyone above him aware of -- did he ever make those comments in front of anyone --

A   No. I doubt it. I don't think he -- I think he was pretty smart not to do it in front of the people like that.

Q   Do you know --

A   The only person would be Mr. Vora.

Q   Do you know if Mr. Vora was aware?

A   I'm not sure what Mr. Vora is aware of.

Q   Okay. Did you know if there was formal complaints issued to HR about Mr. Moppins?

A   Not that I'm aware of. I know I think Van said she was going to bring one, you know, but outside of that, can't say.

Q   Okay. So, then, I'm just going back to the time line. REEMA takes over in the 2012. Mr. Moppins at some point becomes the SME, is that correct?

A   At some point, yes.

Q   Okay. How would you describe your relationship with Mr. Moppins during your

253

overlapping time at REEMA?

A   Well, when you say overlapping time at REEMA, what do you mean?

Q   While you were both at REEMA?

A   Oh, when we were both at REEMA.  For the most part to the okay.  Again, he liked things a certain way.  At the end of the day, I think we were both very mission oriented.  We both wanted to get the job done.

So, you know, we had a comradery, I felt like, for years, obviously, because we were already doing the job prior to him now taking over as the boss.

Q   Sure.

A   I worked underneath him when he was in the supply tech role, before he got promoted.  So, yeah, we had a good relationship, I felt like.  I mean, I knew what his antics were.  I kind of accept people for who they are.  You know, I can't change him.  He's a grown man.  He's already well into -- set into his ways.  So I understood that.  I'm also ex-military, so I understood his logic on

254

a lot of things.

Q   Uh-huh.

A   And, you know, for some people who were never in the military, never understood certain things, and for me it was just kind of like, I understand it.  You know, I could relate.

Not to say that it was legal or ethical some of the things that he said or did, but I understood it because of military.  In the military, there's a lot of things that happen in the military that people, you know, be like "Damn, that happen in the military."

Q   Uh-huh.

A   So that was kind of the culture that he kind of we went from.  So, when we were at Tasada, all of the people that my ex-PM, Mr. Blaugher, hired were all Army vets or veterans of the service.

Q   Okay.

A   So it made it real easy for that kind of mindset to, you know, just work.  You know, you follow the chain of command, things like that.

255

So, everybody's ex-military.  We all know that that schematic and that kind of scenario.  When REEMA took over, Larry took over, he no longer had to just hire vets, you know what I'm saying.

He started hiring just different people.  So, again, people are who have never been exposed to that type of leadership style are like "What the hell was that?"

Q   Sure.

A   So, again, that's where it comes in, when I'm talking to people, like, you just got to understand.  Like, you know, don't take it personal.  A lot of times things weren't, you know, very personal for people, or they felt very personal, or personally attacked by him.

And it's like he's just trying to get a job done, but I understand how you feel, but used to tell them stay low, keep firing.  Just, like, keep your head down.  Just keep working.  That's all we trying to do is just work.

So that was, in terms of our

256

relationship, though, again, we worked together.  He was my supervisor, but it was -- we worked in a cube, probably about this distance apart.  It was a four man cube.

So, you got to imagine, when you spend that kind of time with people, you get to know them personally and stuff like that.  And, you know, we had these jokes.  One time where, you know, he was talking about something with my mom and then I did a joke where I had talked to his daughter and called her when him, you know, he's right there and I'm talking to his daughter on speaker phone.

Q   Uh-huh.

A   It was a joke and, you know, so we had a good relationship, I felt like.

Q   Okay.

A   So, at REEMA, even still.  You know, again, the moment this incident happened, that's the moment where everything changed.

Q   Okay.

A   Yeah.  It just changed after that.

Q Did you felt threaten by him at all after the change?

MR. WALSH: Objection.

**A I did. I felt threatened because I felt like he was taking it so personal that he was going to eventually try to get me fired, and that's how I felt, like this guy wants to fire me. You know, you walk into work, a place that you've been coming for, at that point, maybe six years or seven years, and you walk in and the tension, you could just feel it.**

**And everybody's like "Are you all right?" I'm like "Yeah, I'm good," and them noticing I'm not in the meetings and things like that. So everybody's like "You sure you're straight, man? This is crazy. I know you always stick up for us, but we're worried about you." You know what I mean.**

Q Right.

**A So, you know, it was a little disheartening, a little, you know, on edge for me, because I'm like I could walk in and be my last**

**day. And, you know, I got a wife and kids and things like that. So, I definitely felt threatened by him because I've seen him fire, again, a lot of people.**

Q Okay. Thank you. Okay. So you said earlier, we discussed earlier the familial-ish relationship between Larry and Donte, that his daughter, step-daughter, was Donte's baby's mother, is that correct?

**A Uh-huh.**

Q Was there any other familial relationships with any other employees between Mr. Moppins -- with Mr. Moppins?

**A The HR clerk, the lady what worked for Ms. Price, is his wife's niece. At one point he had his nephew in there working.**

Q Okay. What was his -- do you remember his wife's niece, or the HR clerk's name?

**A Letisha Washington.**

Q And she was involved in that -- or was she involved in the investigation with Brandy?

**A Again, I don't think it was an**

**investigation. I think it came out. She told Brandy about it and Brandy went right to HR. Of course, how do you investigate yourself?**

Q Fair enough. Okay. So, we discussed earlier that you and Mr. Moppins worked together after leaving REEMA, is that correct?

**A Yes.**

Q Did he serve in the same role there?

**A When he got to the new company?**

Q Yes.

**A Yes.**

Q And did you continue on with your same role as assistant -- -

**A Yes, deputy program manager.**

Q I'm sorry. You said assistant so many times.

**A Assistant, was Assistant Operations, Ms. Parker. Yeah. Yeah. Yeah.**

Q Deputy. Deputy.

**A I never was his assistant.**

Q So you were the Deputy Program Manager there.

**A Yes, ma'am.**

Q And that's at Olgoonik. And we briefly touched on this, but Mr. Moppins was recently let go from Olgoonik?

**A Yeah. Can I talk about that? I feel kind of line --**

MR. WALSH: Well, we're about to get into a big fight over it, but you can at least answer that part of the question.

**A Yes.**

Q And do you know why he was let go?

**A The specifics, no.**

Q Okay. What do you mean by that?

**A They conducted an investigation and he went on admin leave. They were conducting an investigation. I'm not privy to everything that everybody said --**

Q Sure.

**A -- in items of their interaction with Larry. So, again, like this, like the investigation report, never saw one from Olgoonik, like --**

Q Sure.
**A -- so I'm not privy to that information. So, what their final grounds were for dismissing him, I don't know.**
Q Do you know what the investigation was for?
MR. WALSH: Objection.
**A Yeah. I don't know what kicked off the investigation. I don't know.**
Q Okay.
**A I'm not really sure, so I can't say for certain.**
MS. CALDWELL: Okay. I'm going to pause for now and review my notes. Go off the record, take a break and then we can pop back on and if I have nothing else, then you're good to go.
(A break was taken.)
MS. CALDWELL: I don't have any further questions. Turn the floor back over to Mr. Walsh. Thank you, Mr. Pickett.
EXAMINATION BY COUNSEL FOR THE DEFENDANT
BY MR. WALSH:

Q Mr. Pickett, I'm going to try to make this quick, to the extent that I can.
Is it -- you talked a lot about Larry Moppins management style, and you've seen that management style in the military, correct?
**A Correct.**
Q And I think you said that Larry's style was very much like a military style in the way he dealt with things?
**A That's correct.**
Q And you knew how to deal with it because you'd been in the military, right?
**A Correct.**
Q And a lot of other people probably could not have dealt with it because they were not in the military, were unfamiliar with that, correct?
**A Yes. And, well, because it was military doesn't necessarily mean it was right, you know what I mean. Like, in the military you're under a different set of rules, if you will.**
**Like, my boss in the military could make me go outside and trim grass with a pair of**

**scissors. Like, it's a lawful order.**
**So, you have a lawful order and as long as you're complying with lawful orders, then you're okay in the military. But that doesn't necessarily mean that everything is correct in how they did things.**
**But definitely familiar with it and I know how to adapt and move through that channel, yes.**
Q Okay. And you said that Larry fired a lot of people?
**A That's true.**
Q And he fired men, he fired women. He filed a lot --
**A Correct.**
Q Okay. And his style was the same whether it was a man or it was a woman, correct?
**A That is correct.**
Q Okay. One of the other things that you had mentioned during your commenting, or your discussions with Ms. Taylor there, was you said that you're talking about people talking outside

of the office. You take to a lot of people outside of the office, right?
**A Yes.**
Q Okay. You carpooled with some of them?
**A Yes.**
Q You still to this day talk with some of those people?
**A Yes.**
Q And there's nothing improper about talking to people outside of the office?
**A Correct.**
Q And there's nothing wrong with having those familial relationships with anybody outside of the office, right?
**A I don't think so.**
Q Okay. Now, in Exhibit 9, which was that disciplinary warning --
**A Uh-huh.**
Q -- the PIP thing that we were talking about, at one point it talked about a conflict of interest.?
**A Okay.**

265

Q And would you agree with me that it would be a conflict of interest to manage somebody that you have a relationship with?

**A Directly, no, because how your relationship evolves. A lot of times it's from that kind of perspective. So, if I have an employee who, we're cool and we're familiar with each other, when it comes to work, it's about work.**

**So, now, we may be talking about after work, but I'm still managing you, so I'm trying to help you, guide you along in terms of that, you know, so that you're becoming a better employee, so that the company gets a good employee who is willing to do whatever, or learn something knew.**

**Like, I talk to people sometimes, like "Hey, man, you need to take a writing class." You know, if I suggest somebody take a writing class because when they send an email, it looks choppy and the comma's not in the right place, things like that.**

**So, even in the friendship way, I can**

266

**still tell you things to benefit you in terms of work, and not just work here but work forever, put a tool in your tool set.**

**So, I don't see anything wrong with that. I don't think that's a conflict of interest at all.**

Q Okay. And I'm not suggesting that there was, but if there was as romantic relationship between you and somebody who reported to you, would that be a conflict of interest?

**A I don't know. I never been in that situation. So, I still think that the same things could apply, you know. I still think that even if you were having, you know, a relationship with somebody that you work with, as long as you're attending to the work aspect of things, then, what is it -- I don't know. I don't see a conflict of interest in that way.**

**I see a conflict of interest in, like, you work for a company and I work for a company that has the same dealings and now we're talking about our companies.**

267

**Now, that's a conflict of interest, because my company, obviously, doesn't want me sharing either information, proprietary or otherwise, with somebody else. So, in that sense it would be a conflict of interest.**

**But, as long as its work related and you're trying to get a mission accomplished at work, then I wouldn't see anything wrong with that either.**

Q Okay. So, as I then what you just testified to then, the simple fact that people have relationships outside of the workplace doesn't necessarily mean that it's compromising any of work that they're doing?

**A That is correct. I definitely could say that.**

Q Okay. I want to -- these manager meetings that you mentioned, do you know, were there any female managers?

**A Yeah. Ms. Wallace was a female manager, Tambeni Daughtry at one point was a female manager.**

268

Q Reema, I assume, was a female manager?

**A Reema?**

Q Reema Vora.

**A No. No. No. She was legal counsel.**

Q Okay.

**A She was, you know, the owner's daughter. I knew she was the lawyer, but outside of that, I'm not sure what other role she played for the company. I'm not privy to that either, so.**

Q And Ms. Price, obviously, would you including her as one of those managers?

**A Yeah, HR manager, I guess.**

Q Okay. Any other female managers you can think of?

**A No. I think that was it.**

Q Okay. And you didn't see anything where Mr. Moppins treated those female managers different than the other managers, did you?

**A I can't say that he, in terms of saying because they're like -- because they're a woman?**

Q Yes, sir.

**A No, I can't that he treated them**

different. I definitely will not say -- I will say that Larry was, like, he was, again, I said this early, he was an equal opportunity asshole.

So, man or woman, I'm not taking that from him. He was who he was, and I always said that, you know, for people to be able to be exactly who they want to be at that level of life, I kind of envy it, because you don't -- you may not have cut corners.

You're just like "Hey, man, I'm straight ahead, like this." And I think that awesome to have that level of freedom, actually.

Q Okay. Thank you. You were there present when Ms. Parker and Larry were getting into the, I think as you put it, Ms. Parker's agitation over the discussion that was going back then, and Ms. Wallace had to take her out. Would you would have considered that insubordination?

A No.

Q Why not?

A Because sometimes when you're having a conversation and it gets heated, the best thing to

do is kind of step away, just step away, gather yourself. I think that communication is the reason why wars get started, so make sure you're saying what you want to say, but you should be conveying in a way that somebody's able to receive it as well.

So, again, once you start elevating your voice and your tone, I mean, again that was on both sides, then other sides, people tend to stop listening and all they can see is the aggression.

So, I think it's good to step away then come back and revisit it on cooler heads.

Q Okay. But you would consider Ms. Parker's elevating her voice and being agitated with Mr. Moppins as insubordination?

A Not necessarily, and because of the way the conversation was going. Again, she asked him a question and implicated him being a part of it, so that made him agitated.

So, now, he's agitated and now she's getting agitated because he's raising his voice and she's like "Nah. You part of this." So it

was just unfortunate. I wouldn't way either one of them at fault. They're both emotional. Everybody's emotional at that moment. So, again, I think that was best, take it out, cool off, come back to it.

Q The -- did anybody not want Ms. Parker to be elevated to any of the manager positions that she was elevated to?

A I don't recall any objections. I don't recall any and if there were, I just don't recall them. I can't say that there weren't any. I just don't recall them.

Q Okay. When you had your conversations with Manley, with Arnel, with Donte, when they were explaining about what had happened, their interactions with Ms. Parker, did any of those gentlemen appear to be exaggerating or not genuine in what they were saying?

A I don't think, in terms of Manley, I don't think he was exaggerating. I think he felt that whatever their disagreement was was because of the rumor. But, again, I still felt like that

could have been fixed, that relationship could have been salvaged, because it wasn't that big of a deal, because he could have just simply said to her "Hey, listen, I'm not part of that." and then it could have just been on air.

In terms of Arnel, is he exaggerating if she's ever said that she's his boss, I think that's an exaggeration. She might have said it, but it was true, she was his boss.

But to feel like a slave, I don't really know what he meant, and I'm only going off of what's provided here, because I don't recall actually him saying that, those words that way, but, so I don't really know. You know, I couldn't really say on that.

Q Well, in that conversation did Arnel seem genuine, that he was upset with Ms. Parker's treatment of him?

A Yeah. I don't think so. I think sometimes -- I think sometimes you get put in a position to now have to answer questions that maybe you would not have, you know what I'm

**saying. Like, if I had an issue with somebody, maybe I wouldn't have brought it up. But, because now you're asking me, you're kind of putting me in the hot seat, I have to come up with something to say, because you're putting me in the hot seat over it.**

**So, whether he was genuine or not, I couldn't say. I really couldn't say.**

Q All right. And when you saw Donte, you said staring at Ms. Parker, in the one incident in the warehouse you mentioned, was he anywhere near her at that time?

**A No. So, I was walking and I just kind of -- it wasn't like I kept looking at him and then, you know, like looking at her but I don't think that they were -- like they're not this close or anything like that.**

**They're probably a little bit further away, maybe from here to that door, kind of. You know, it's a fairly large area right there. But close enough that you could make eye contact and, you know, like that, but not -- you know, they**

**weren't up on each other or anything like that.**

Q And did you say anything to him at that time?

**A No. I just kept walking out.**

Q Okay. Is there a particular reason why you didn't say anything to him?

**A Nope. I just kept walking, because I already knew -- I already kind of knew what it was, but I'm already now in a position where it's like ain't nobody trying to hear what I got to say anyway, so.**

Q Okay. And do you know whether she also did the same thing to him down in the SPEAR area?

**A I didn't witness it.**

Q Okay. Did you ever see her stare at him?

**A Never saw her, never heard anything that she said to him, nothing like that. Everything I heard was from somebody else. Never was present for that.**

Q Okay. And were you aware of the fact that Donte had complained about her?

**A No.**

Q So you said you heard at some point that they were supposed to stay away from each other?

**A Yes.**

Q And do you know why that was?

**A No.**

Q And how did you find out about that?

**A Larry, I think, had a meeting with some of the managers and said "Hey, those two are not to be in the same area."**

Q And did he say why?

**A No, he didn't go into why, and if he did, I don't recall.**

Q Okay. Do you recall who else might have been in that meeting?

**A I want to say myself, Shaun and Carlos, I kind of feel like, because Carlos was Donte's manager. Shaun was her manager. So it was like "Hey, managers, make sure that they don't have that interaction."**

Q Okay. Another quick question. You mentioned Hunter. Hunter was not an employee at

REEMA, was he?

**A No.**

MR. WALSH: Okay. Thank you. I just wanted to make sure I had that clear. Mr. Pickett, I don't think I have any other questions.

MS. CALDWELL: I am also fine.

MR. WALSH: Mr. Pickett, you have the right to review a copy of the transcript to make sure that everything that's been said has been taken down accurately and completely.

THE WITNESS: Okay.

MR. WALSH: It is solely your right. You have to let the court reporter know on the record whether you want to review that, make any changes you feel may have been necessary to the testimony. It's entirely your right. Generally stenographers are wonderful about taking things down. Unfortunately, we're living in this mask world.

THE WITNESS: Yep.

MR. WALSH: Where I don't fault her at all, but I can imagine how mistakes may happen.

So you just need to let her know whether you want to review that transcript and sign off on it or not.

THE WITNESS: Yeah. When, right now?

THE COURT REPORTER: No.

THE WITNESS: Oh, but, yes, I would like to.

(Off the record discussion.)

(Off the record at 3:45 p.m.)

CERTIFICATE OF DEPONENT

I, DeMARCUS PICKETT, hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

____________________ ______________________

(Date) DeMARCUS PICKETT

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, SHARON O'NEILL, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given, that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction, that reading and signing was requested, and that I am neither counsel for, related to, nor employed by any of the parties to the case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 24th day of July, 2020.

Sharon O'Neill

SHARON O'NEILL, RMR

NOTARY PUBLIC

My Commission Expires: 12/23/2023.

**A**
**aback**
127:7
**ability**
64:21, 182:17, 212:7, 218:7
**able**
196:5, 249:12, 269:6, 270:5
**above**
252:2
**absolutely**
187:17, 202:17, 242:5
**abut**
103:3
**accept**
253:19
**access**
10:17, 11:14
**accommodate**
173:11
**accomplish**
6:20
**accomplished**
167:16, 267:7
**accurate**
45:16
**accurately**
276:10
**acknowledge**
130:19, 278:2
**across**
6:14, 10:18, 10:20, 11:22, 13:21, 14:2, 83:17, 102:15, 239:20
**action**
1:7, 133:2
**actions**
230:10
**activities**
73:8
**actual**
69:22, 70:7, 84:2
**actually**
7:10, 10:6, 11:21, 17:8, 19:2, 26:22, 29:16, 30:20, 31:5, 31:6, 33:12, 34:2, 49:6, 50:6, 54:21, 68:2, 70:16, 74:8, 76:1, 82:7, 82:10, 82:22, 85:22, 87:17, 91:16, 96:7, 98:19, 100:18, 103:2, 109:15, 124:18, 126:10, 132:6, 135:13, 145:5, 145:14, 145:15, 146:7, 148:22, 150:21, 159:19, 165:20, 167:12, 168:18, 176:17, 181:22, 182:1, 182:5, 182:20, 182:21, 184:19, 184:21, 202:12, 203:22, 215:20, 223:17, 230:22, 242:9, 242:19, 242:22, 244:3, 247:17, 269:12, 272:13
**ad**
212:2
**adamant**
164:6
**adapt**
263:8
**add**
212:3
**added**
63:3
**addition**
147:18, 152:8
**address**
102:13, 152:1
**addressed**
131:3, 142:5
**addressing**
233:7
**adhere**
250:7
**admin**
260:15
**administrative**
212:3
**advice**
28:3
**advise**
174:12, 175:8
**advised**
123:1, 136:11, 174:7
**affect**
150:3, 205:17
**affinity**
219:5, 219:7
**affixed**
279:14
**after**
17:6, 19:9, 19:14, 32:6, 35:22, 36:22, 73:20, 81:21, 83:19, 89:13, 94:9, 95:9, 96:4, 102:6, 112:15, 118:18, 123:2, 129:1, 130:9, 132:1, 132:15, 134:3, 134:7, 137:19, 147:15, 150:5, 154:22, 155:13, 167:20, 168:1, 193:16, 195:7, 208:19, 210:11, 234:22, 238:20, 240:15, 240:20, 256:22, 257:2, 259:6, 265:10
**against**
15:2, 16:17, 19:21, 54:16, 116:13, 121:17, 135:20, 193:15, 193:20, 238:8, 250:20
**aggression**
270:10
**aggressive**
125:9, 251:9
**agitated**
128:13, 130:1, 130:2, 159:17, 270:14, 270:19, 270:20, 270:21
**agitation**
269:16
**ago**
7:11, 11:13, 24:3, 29:17, 50:11, 50:15, 53:17, 105:13, 106:4, 122:6, 220:20, 221:12
**agree**
15:9, 17:5, 42:19, 44:6, 127:15, 131:8, 175:4, 181:1, 186:12, 242:6, 265:1
**agreed**
125:15, 141:3, 141:22, 234:7
**agreement**
127:2
**aha**
107:11
**ahead**
117:18, 250:18, 269:11
**ain't**
107:15, 122:14, 230:16, 274:10
**air**
272:5
**alan**
16:10, 32:17, 32:18, 78:16
**alleged**
194:14
**alleviate**
241:10

**allow**
230:10
**allowed**
214:5, 243:7
**alluded**
106:8, 107:4
**almost**
57:4, 57:11, 71:11, 78:22, 79:7, 79:8, 82:13, 90:10, 92:15, 179:4, 195:4, 211:15, 220:3
**alone**
103:14
**along**
39:17, 42:10, 42:12, 78:15, 88:22, 96:20, 106:19, 120:22, 180:19, 226:18, 265:12
**already**
13:22, 14:7, 23:17, 36:9, 56:9, 57:11, 78:18, 80:19, 105:2, 118:19, 166:2, 172:19, 185:14, 190:10, 191:15, 236:16, 236:17, 249:12, 253:12, 253:20, 274:8, 274:9
**also**
11:12, 24:8, 28:2, 29:18, 30:12, 33:2, 35:10, 35:14, 38:14, 40:19, 43:10, 44:7, 48:14, 53:8, 55:9, 58:7, 68:4, 69:17, 72:6, 74:2, 74:17, 89:19, 107:5, 114:12, 119:14, 123:7, 123:8, 129:22, 139:2, 147:10, 150:6, 152:9, 152:13, 173:7, 181:1, 194:5, 201:15, 203:17, 216:21, 223:10, 225:18, 227:19, 253:22, 274:12, 276:6
**altercation**
215:19
**always**
69:9, 84:12, 90:7, 90:17, 115:1, 196:1, 207:11, 207:20, 207:22, 239:11, 239:12, 257:16, 269:5
**amount**
63:6, 218:12
**angela**
72:16, 72:17, 126:8, 133:15, 145:7
**angie**
72:15, 72:16, 150:1, 232:16
**angry**
209:12
**another**
13:5, 31:9, 58:21, 80:6, 83:13, 105:4, 129:1, 129:19, 145:6, 193:6, 236:18, 244:21, 275:21
**answer**
6:9, 6:12, 6:13, 8:7, 8:20, 8:21, 173:15, 183:8, 185:19, 186:5, 214:12, 238:3, 260:9, 272:21
**answers**
5:19, 41:4, 53:19, 171:21
**antagonistic**
240:13
**antagonize**
239:15
**antagonizing**
241:12, 242:2
**antics**
112:11, 209:22, 253:18
**anybody**
7:8, 9:3, 10:2, 13:12, 15:3, 32:13, 43:21, 46:2, 73:20, 82:10, 82:16, 83:1, 83:7, 83:15, 90:13, 96:5, 101:17, 114:7, 115:20, 126:12, 141:10, 142:18, 144:3, 145:8, 145:21, 156:14, 161:9, 195:3, 196:3, 213:4, 221:9, 250:19, 251:17, 264:13, 271:6
**anyone**
63:19, 173:21, 181:15, 188:1, 200:17, 201:11, 203:14, 215:11, 219:2, 223:22, 232:10, 238:7, 252:2, 252:3
**anyone's**
234:21
**anything**
8:3, 8:8, 8:11, 8:14, 8:21, 9:15, 9:16, 12:3, 19:5, 19:20, 20:10, 20:15, 29:3, 29:6, 34:4, 37:22, 43:2, 47:15, 54:9, 60:2, 60:6, 73:20, 81:19, 83:18, 86:18, 89:10, 94:4, 94:7, 95:11, 100:17, 101:20, 101:21, 102:8, 102:10, 105:11, 118:21, 125:18, 128:10, 131:11, 134:15, 135:10, 138:11, 138:12, 138:19, 143:10, 144:6, 145:22, 148:2, 148:5, 154:5, 159:3, 167:14, 173:2, 187:16, 190:17, 192:13, 194:9, 194:22, 204:9, 209:16, 210:13, 211:15, 219:15, 223:2, 223:8, 234:11, 235:7, 235:8, 238:15, 238:19, 239:19, 242:19, 242:20, 242:21, 246:22, 247:3, 249:8, 249:13, 266:4, 267:8, 268:16, 273:17, 274:1, 274:2, 274:6, 274:17
**anytime**
224:21
**anyway**
274:11
**anywhere**
79:20, 273:11
**apart**
84:19, 256:3
**apologize**
36:2, 41:11, 73:7, 137:5, 216:1

**apologized**
203:6, 216:2
**apology**
216:7
**apparent**
145:4
**appear**
271:17, 278:6
**appearance**
90:5, 90:8
**apple**
90:22
**apples**
91:1
**apply**
266:13
**appreciate**
78:4, 96:4, 112:10, 154:1
**appreciated**
182:18
**approached**
123:8, 125:17, 179:9
**approaching**
107:3
**appropriately**
56:3
**april**
35:11, 35:21, 36:2, 36:3, 36:4, 37:7, 37:14, 38:22, 46:8, 46:12, 46:21, 47:3, 118:18, 119:1, 119:7, 121:11, 121:22
**area**
16:12, 69:5, 74:10, 74:14, 74:17, 75:2, 75:12, 75:13, 75:16, 75:19, 75:21, 76:21, 77:17, 84:9, 84:13, 84:18, 84:22, 139:19, 139:20, 238:15, 239:4, 239:5, 239:8, 239:11, 239:17, 240:5, 240:10, 240:20, 241:8, 241:9, 242:8, 243:1, 273:20, 274:13, 275:10
**areas**
94:21, 139:21
**arguing**
136:2, 229:17
**argument**
92:2, 92:3
**arise**
95:19
**army**
163:17, 254:17
**arnel**
106:5, 116:9, 124:19, 125:1, 126:12, 134:17, 134:20, 135:12, 193:21, 271:14, 272:6, 272:16
**arnel's**
124:16
**around**
19:12, 28:16, 65:16, 84:6, 119:18, 211:20, 242:15
**arrangement**
8:2
**aside**
235:22
**asked**
13:22, 28:2, 28:22, 41:6, 41:12, 50:4, 53:9, 87:7, 98:11, 108:5, 120:13, 120:15, 121:5, 124:7, 126:6, 127:12, 127:16, 145:20, 151:2, 151:10, 151:21, 151:22, 155:18, 156:3, 173:13, 180:1, 185:14, 187:2, 189:3, 203:7, 205:3, 227:13, 227:21, 229:1, 229:18, 232:1, 232:4, 236:5, 270:17
**asking**
6:8, 23:10, 44:22, 66:3, 87:14, 133:21, 173:3, 200:22, 217:2, 229:21, 273:3
**aspect**
75:9, 79:4, 130:18, 179:21, 236:15, 266:16
**aspects**
62:12, 183:12
**ass**
251:15
**assert**
14:14
**asserted**
127:4
**assertion**
57:21
**assertive**
51:6, 52:18, 53:3, 125:9, 194:17
**asset**
180:10
**asshole**
115:2, 269:3
**assist**
13:12
**assistant**
52:11, 52:13, 66:18, 66:19, 70:1, 70:5, 70:8, 185:5, 259:13, 259:15, 259:17, 259:20
**associates**
243:19
**assume**
222:20, 224:6, 225:2, 241:22, 268:1
**assuming**
244:4
**ata**
84:16, 84:20, 119:15, 140:2, 238:17
**ate**
91:1
**attached**
4:8, 12:16, 24:19, 34:7, 41:1, 78:1, 117:12, 140:10, 162:17, 278:6
**attack**
95:5
**attacked**
212:17, 255:16
**attempting**
133:11
**attending**
266:16
**attention**
43:19, 43:20, 93:12, 97:20, 102:20, 142:15, 201:21, 204:16, 228:2, 228:3
**attitude**
60:8, 60:9, 60:10
**attorneys**
45:7
**august**
44:7, 44:22
**authority**
63:15, 64:3, 64:4, 64:6, 64:12, 161:21, 161:22, 174:8, 174:10
**automatically**
222:20

**avenue**
3:5
**average**
196:7
**avoid**
228:21
**aware**
94:1, 99:16,
100:4, 100:8,
100:20, 101:10,
102:2, 136:16,
141:21, 144:7,
162:14, 182:17,
187:6, 193:5,
193:14, 193:16,
194:21, 204:5,
215:13, 215:15,
217:9, 226:6,
226:14, 227:1,
232:9, 233:1,
233:14, 235:6,
235:8, 242:11,
242:20, 252:2,
252:9, 252:10,
252:13, 274:21
**awareness**
155:16
**away**
167:12, 169:11,
214:5, 214:6,
246:13, 270:1,
270:11, 273:19,
275:3
**awesome**
180:12, 180:21,
184:18, 269:11
**awkward**
224:8
**ax**
158:20, 158:21

**B**

**baby**
29:10, 29:11,
149:14, 213:14
**baby's**
258:8
**back**
7:13, 24:8,

26:12, 27:22,
32:22, 35:12,
38:15, 38:17,
38:18, 40:1,
47:14, 53:7,
60:14, 62:19,
66:6, 69:8,
69:9, 73:4,
73:18, 74:12,
74:13, 74:15,
75:7, 76:13,
86:9, 97:21,
108:18, 109:18,
116:14, 116:21,
119:6, 119:7,
129:13, 131:21,
132:8, 136:2,
138:17, 138:22,
139:2, 139:9,
141:7, 141:12,
144:12, 157:11,
157:13, 158:1,
158:5, 158:6,
164:16, 167:14,
168:13, 168:15,
169:1, 169:3,
169:5, 171:11,
176:4, 196:13,
197:19, 198:13,
217:1, 222:22,
226:9, 226:12,
227:20, 232:8,
237:14, 237:21,
243:18, 252:16,
261:15, 261:19,
269:16, 270:12,
271:5
**backdrop**
152:17
**background**
66:8, 179:13
**backgrounds**
246:21
**backs**
182:8, 182:14
**bad**
107:14, 237:4
**bait**
202:5

**baltimore**
1:14, 2:6, 3:15
**bankruptcy**
11:13
**base**
78:17
**based**
201:8, 206:19
**basic**
10:12
**basically**
5:16, 18:13,
50:2, 51:10,
57:17, 57:18,
68:20, 69:10,
96:17, 100:10,
121:7, 129:9,
130:6, 132:19,
151:9, 155:6,
156:14, 158:7,
175:10, 177:7,
210:1, 233:8,
249:22
**basis**
54:1, 55:2
**bathroom**
76:17, 76:18,
108:12
**beach**
72:7, 72:10,
247:17, 247:18
**bear**
184:4, 207:10
**beat**
168:8, 209:4
**became**
61:13, 68:22,
91:16, 106:21,
133:13, 145:4,
196:21, 212:13
**become**
16:15, 129:12,
206:1
**becomes**
252:18
**becoming**
154:2, 265:13
**been**
7:12, 17:6,

17:7, 45:22,
46:10, 46:11,
51:21, 53:13,
61:7, 61:22,
67:15, 68:5,
68:9, 70:11,
79:21, 80:17,
90:17, 91:18,
91:22, 101:2,
103:2, 105:2,
105:5, 105:19,
105:21, 105:22,
106:4, 106:5,
106:14, 107:22,
108:10, 109:14,
110:16, 115:1,
116:22, 121:1,
124:2, 128:22,
129:17, 129:18,
132:7, 132:9,
132:16, 136:1,
136:22, 137:6,
137:9, 137:10,
137:15, 139:7,
140:1, 140:14,
148:19, 148:21,
150:12, 150:22,
155:13, 159:8,
162:21, 167:16,
168:22, 169:1,
170:8, 175:18,
181:8, 181:11,
181:16, 188:9,
188:11, 189:4,
190:10, 190:13,
197:20, 208:21,
209:14, 213:5,
222:15, 236:7,
236:17, 241:3,
245:9, 245:10,
255:7, 257:9,
262:12, 266:11,
272:1, 272:2,
272:5, 275:15,
276:9, 276:15
**before**
2:18, 5:13,
72:21, 73:3,

91:16, 97:3, 97:5, 97:10, 97:22, 138:20, 161:6, 162:10, 173:21, 174:1, 235:2, 243:4, 243:20, 253:16, 279:2
**begin**
225:2
**beginning**
26:13, 60:14, 170:14, 246:7
**behalf**
3:2, 3:10, 7:11, 38:8
**behavior**
133:12, 147:9, 167:22, 223:13
**behind**
57:4, 121:3, 226:22
**being**
5:3, 51:1, 51:5, 51:7, 51:19, 53:4, 56:10, 56:11, 70:18, 72:22, 74:7, 84:15, 85:11, 110:3, 115:4, 116:15, 130:4, 134:18, 154:14, 163:20, 169:14, 178:16, 187:13, 207:17, 210:7, 215:21, 228:11, 228:18, 231:14, 233:11, 236:15, 238:15, 248:17, 251:21, 270:14, 270:18
**belief**
54:13
**believe**
51:13, 63:21, 68:21, 141:1, 144:19, 170:17, 226:3, 232:14
**believed**
58:3, 122:12
**beneficial**
191:18
**benefit**
120:2, 266:1
**best**
5:19, 6:5, 6:6, 6:18, 172:17, 173:5, 173:10, 202:15, 245:22, 269:22, 271:4
**bet**
5:20
**betrayal**
121:14
**better**
60:8, 108:15, 242:2, 265:13
**between**
91:6, 95:18, 99:5, 109:22, 122:2, 122:16, 129:13, 132:5, 154:19, 194:15, 213:20, 225:11, 227:19, 232:2, 237:1, 237:3, 244:11, 258:7, 258:12, 266:9
**beyond**
201:3
**bid**
245:19
**big**
40:13, 40:14, 40:15, 40:16, 86:18, 90:19, 104:5, 104:12, 142:7, 152:6, 154:11, 154:13, 154:15, 177:1, 177:2, 207:10, 227:15, 251:2, 260:8, 272:2
**bill**
146:4, 178:15, 178:21
**birgans**
138:4, 202:8, 205:6
**birthday**
33:7, 33:10, 35:17, 35:19
**bit**
5:15, 13:2, 52:1, 60:16, 103:20, 108:19, 108:21, 110:2, 117:9, 119:10, 195:14, 241:12, 247:14, 273:18
**black**
194:4
**blank**
113:14
**blaugher**
254:16
**blended**
62:20
**bless**
32:18
**blessing**
187:4, 187:5
**blougher**
246:6
**blurred**
64:2
**boarded**
76:12
**boasting**
182:1
**bodies**
77:11
**boiler**
76:5
**book**
29:4, 29:5, 200:2, 200:3
**books**
35:6
**boom**
188:16
**booty**
205:15
**boss**
88:7, 91:14, 125:7, 145:7, 194:1, 220:16, 253:13, 262:21, 272:7, 272:9
**both**
48:17, 48:22, 50:11, 84:1, 110:19, 225:15, 253:4, 253:5, 253:8, 270:9, 271:2
**bother**
209:20
**bothered**
170:1
**bottom**
12:9, 17:3
**box**
68:20, 112:12, 169:10, 177:1, 177:2
**boyfriend**
219:10
**brace**
69:9
**brainer**
164:21
**brakes**
69:8
**brandy**
16:10, 149:6, 149:7, 150:7, 150:8, 202:8, 202:15, 202:17, 202:21, 203:8, 203:10, 205:7, 224:2, 224:3, 258:21, 259:2
**bravado**
217:20
**break**
76:14, 108:4, 108:10, 108:11, 108:16, 119:9, 121:19, 147:1, 171:2, 171:3, 173:9, 173:16, 224:4, 243:5,

261:15, 261:17
**breakdown**
56:16
**breaks**
173:8
**brief**
172:16, 172:18, 175:14
**briefly**
175:11, 186:16, 260:2
**bring**
60:16, 80:19, 90:15, 124:8, 126:7, 156:14, 252:14
**bringing**
132:8, 202:10, 203:18
**brings**
188:10
**brought**
45:21, 46:2, 78:13, 80:2, 122:19, 273:2
**bs**
65:16, 102:18, 130:7, 142:16, 153:21, 159:15, 164:14, 169:10, 201:18, 236:10
**buddy**
146:11
**build**
118:18
**building**
18:12, 21:8, 153:13, 214:2, 224:12, 239:16, 244:9, 244:10, 244:13, 244:15, 244:18
**bullet**
143:15
**bullshit**
48:14, 93:17, 165:10, 165:16
**bunch**
31:7
**buses**
179:14
**business**
28:3, 28:22, 91:13, 103:11, 103:15, 200:9, 220:16, 225:17, 230:18, 230:19
**butt**
204:7
**butterfly**
236:14
**buy**
123:19

**C**

**cable**
211:19, 211:21
**cage**
77:1, 139:15
**caged**
74:14, 77:1
**caldwell**
3:3, 4:4, 25:18, 25:22, 171:1, 171:4, 171:8, 172:1, 172:5, 172:8, 172:13, 261:13, 261:18, 276:6
**call**
7:19, 29:4, 34:11, 34:12, 34:13, 34:14, 69:20, 88:7, 112:4, 152:15, 154:4, 175:3, 190:7, 197:14, 207:10, 237:8
**called**
7:11, 8:1, 25:21, 33:12, 35:14, 35:16, 36:3, 36:4, 43:4, 43:7, 44:1, 97:16, 99:14, 124:12, 124:14, 152:19, 159:9, 159:13, 165:19, 182:13, 188:11, 220:3, 230:21, 231:1, 231:17, 231:19, 243:19, 256:11
**calling**
182:7
**calls**
24:13, 27:2, 39:10
**calm**
51:21, 52:19, 56:22, 101:7, 128:16, 129:16, 185:11
**calmer**
52:1
**came**
10:18, 10:20, 11:7, 11:22, 13:21, 14:1, 18:11, 19:7, 30:20, 30:22, 55:9, 55:17, 56:6, 59:11, 68:15, 68:16, 73:3, 73:18, 78:5, 83:17, 93:6, 93:7, 98:8, 99:6, 102:14, 102:15, 106:15, 107:19, 109:12, 109:17, 109:18, 111:18, 116:20, 117:2, 119:6, 119:7, 123:17, 124:16, 126:20, 140:16, 141:9, 141:22, 142:19, 142:22, 143:4, 143:19, 144:4, 147:16, 154:22, 158:1, 158:4, 168:4, 179:1, 179:12, 184:21, 193:21, 194:6, 198:1, 212:22, 213:1, 214:1, 215:20, 216:7, 224:2, 227:21, 230:5, 234:2, 234:7, 244:21, 259:1
**camera**
22:3
**can't**
9:16, 10:4, 52:15, 61:6, 61:8, 65:11, 81:8, 110:14, 111:22, 135:22, 156:14, 158:3, 162:12, 166:6, 178:6, 178:21, 193:18, 206:18, 207:18, 215:6, 222:17, 225:21, 242:17, 249:7, 252:15, 253:19, 261:11, 268:19, 268:22, 271:11
**capacities**
84:1
**car**
16:4, 83:2, 92:4, 92:7, 203:19, 237:12, 237:15
**care**
217:18, 252:1
**carlos**
83:13, 157:15, 157:16, 158:14, 216:17, 216:18, 275:16, 275:17
**carpool**
32:8, 32:9, 32:14
**carpooled**
30:16, 32:16, 32:19, 32:21, 199:6, 199:10, 264:4
**carpooling**
78:12, 203:21

**cars**
82:14
**carter**
83:13, 157:15, 216:17
**case**
5:12, 7:14, 9:19, 10:3, 11:18, 14:8, 14:15, 14:17, 14:18, 14:22, 15:2, 15:5, 20:5, 28:6, 28:9, 38:3, 38:5, 38:6, 38:9, 38:11, 41:21, 43:11, 43:18, 43:22, 44:4, 44:5, 44:9, 44:17, 44:20, 44:22, 78:3, 106:14, 118:18, 118:22, 144:13, 152:3, 217:19, 229:5, 231:13, 234:12, 245:20, 279:10
**cat**
211:19
**cat5**
211:19, 211:21
**catalyst**
155:8
**catch**
101:10, 200:5
**catching**
37:21, 39:8
**cathy**
41:20, 42:4, 42:14, 64:20, 65:8, 102:16, 102:21, 103:2, 136:10, 140:21, 156:7, 248:18
**caught**
150:7, 204:17
**cause**
50:18, 57:10

**cell**
15:10, 15:12, 15:14, 21:1, 21:4, 21:5, 21:9, 21:11, 21:14, 21:17, 21:18, 21:20, 22:7, 22:12, 22:15, 22:18, 23:2, 23:6, 23:11, 23:14, 23:19, 25:10, 25:15, 36:17, 36:19
**certain**
111:22, 112:1, 160:18, 207:18, 234:17, 253:7, 254:4, 261:12
**certainly**
6:17, 143:3, 171:18, 242:4
**certificate**
278:1, 279:1
**certify**
279:4
**chain**
140:3, 175:13, 254:22
**challenge**
71:11
**chance**
118:2, 131:18
**change**
62:18, 69:17, 167:22, 245:15, 247:3, 253:20, 257:2
**changed**
62:17, 233:20, 246:8, 256:20, 256:22
**changes**
276:15
**channel**
263:8
**character**
153:20

**characterize**
225:6, 225:9, 225:11
**characterized**
192:22
**charge**
51:10, 71:1, 76:6, 134:3, 134:19, 135:7, 135:17, 136:9, 183:5, 219:22
**charged**
218:8
**charges**
135:20
**charging**
76:9, 133:21, 139:21
**chart**
24:8, 37:4
**chat**
24:6, 24:10, 24:11, 24:14
**chats**
24:4, 24:5
**chatted**
15:13
**chatting**
39:2, 98:21
**check**
12:5, 169:10, 177:7, 180:9
**checking**
166:1
**chopped**
198:19
**choppy**
265:19
**christmas**
80:17
**chun**
150:22, 151:1, 151:19
**circulated**
204:4
**cited**
54:1, 178:4
**civil**
1:7

**civilians**
112:20, 220:17
**clarification**
172:20, 228:7, 234:20
**clarify**
173:5, 182:19, 186:2, 189:18, 218:19
**clarifying**
190:19, 219:2
**class**
73:3, 73:9, 73:16, 73:17, 265:17, 265:18
**classifications**
71:3
**classify**
196:19
**clear**
6:6, 6:8, 66:8, 79:10, 191:11, 276:4
**clearly**
37:12, 151:16, 152:21, 232:15
**clerk**
149:13, 202:14, 252:1, 258:14
**clerk's**
258:18
**clicked**
79:7, 97:2, 130:9
**client**
119:14, 120:2, 120:6, 120:13, 150:12, 150:16, 150:18, 150:19, 150:20, 165:17, 165:18, 166:17, 178:15, 181:21, 182:22, 183:2, 213:20, 213:21, 213:22, 228:11, 228:12, 230:11, 230:14, 230:15, 231:15, 231:16,

232:1, 235:14,
246:1
**client's**
183:9
**clients**
119:18
**clique**
80:2
**clock**
110:17, 211:13,
211:14, 221:14
**close**
52:3, 88:8,
104:1, 114:10,
114:14, 147:19,
169:9, 193:11,
198:3, 224:18,
224:21, 225:1,
273:17, 273:21
**closed**
56:14, 57:4,
114:8, 114:9,
114:13
**closer**
76:4
**closing**
57:7
**clue**
29:2, 64:19,
160:3
**coaching**
225:16
**coakley**
32:16
**column**
25:20, 34:13,
34:15
**come**
6:14, 8:6, 9:6,
16:4, 49:19,
52:5, 57:5,
58:10, 59:8,
66:6, 68:20,
74:9, 76:10,
76:18, 82:20,
89:16, 93:3,
93:15, 101:1,
118:20, 126:19,

130:5, 141:3,
141:8, 149:18,
154:3, 169:16,
169:20, 174:17,
174:21, 180:6,
180:8, 188:17,
191:14, 192:15,
197:15, 198:2,
199:13, 207:6,
207:19, 208:9,
209:1, 219:21,
221:4, 227:3,
234:13, 235:1,
238:17, 239:3,
239:6, 239:7,
239:11, 270:12,
271:4, 273:4
**comes**
28:15, 33:22,
94:12, 121:11,
177:6, 179:16,
190:8, 198:20,
231:13, 236:12,
249:6, 255:11,
265:8
**comfort**
108:11
**comfortable**
91:20, 103:2
**coming**
51:7, 62:22,
102:11, 104:21,
110:22, 111:20,
144:1, 155:16,
188:16, 190:9,
257:9
**comingling**
77:2, 77:3
**comma's**
265:20
**command**
113:2, 206:15,
254:22
**commend**
175:13
**comment**
90:5, 90:7,
95:10

**commented**
44:7
**commenting**
263:20
**comments**
96:6, 218:9,
218:16, 218:20,
220:14, 220:15,
221:8, 252:3
**commission**
279:20
**common**
77:12, 114:17,
212:12
**communicate**
196:18
**communicated**
41:15, 195:13
**communicating**
21:13
**communication**
17:15, 17:17,
41:12, 41:15,
41:16, 195:17,
270:2
**companies**
80:18, 190:14,
245:18, 266:22
**company**
10:7, 18:7,
18:9, 18:11,
47:10, 64:8,
64:9, 105:4,
178:15, 178:21,
190:4, 190:5,
190:9, 198:6,
243:19, 244:14,
244:20, 259:9,
265:14, 266:20,
267:2, 268:9
**company's**
160:20
**compartmentalized**
243:14
**complain**
125:3, 152:14,
152:16, 237:19
**complained**
133:20, 134:2,

134:18, 250:22,
274:22
**complaining**
131:15, 134:1
**complaint**
54:15, 54:19,
54:20, 54:21,
55:1, 55:3,
130:17, 193:18,
193:21, 203:11,
234:21, 234:22,
235:2, 237:22,
238:4, 238:6,
238:8
**complaints**
130:14, 193:14,
193:17, 250:19,
251:7, 252:12
**complete**
278:5
**completed**
41:6, 167:17
**completely**
118:17, 119:2,
276:10
**compliance**
71:6, 72:2,
72:5, 196:16
**complying**
75:17, 263:3
**compromising**
267:13
**computer**
211:19, 212:3
**comradery**
253:10
**concern**
109:4
**concerns**
125:4
**condensed**
69:4
**condition**
220:2
**conducted**
260:14
**conducting**
226:15, 260:15

**conference**
56:17, 72:11, 133:16
**confessed**
147:21
**confide**
52:6, 52:7, 208:2
**confidential**
171:6, 171:11, 171:15, 171:19, 172:2, 172:4, 172:11
**confidentiality**
171:15
**configure**
245:21
**confirm**
22:22, 185:15, 200:19, 200:21
**confirming**
194:13
**conflict**
228:21, 228:22, 229:4, 241:10, 264:20, 265:2, 266:5, 266:10, 266:17, 266:19, 267:1, 267:5
**conflicts**
250:13
**confrontation**
194:14, 202:21, 240:17, 240:20
**confrontations**
51:14
**confronted**
147:5, 193:6, 202:18, 203:8
**confused**
24:17
**confusing**
184:4
**confusion**
40:18
**congratulations**
29:12
**consensus**
174:21, 174:22
**consider**
19:19, 102:16, 104:3, 270:13
**consideration**
105:18
**considered**
269:18
**considering**
87:20
**consistent**
143:18
**constable**
2:3, 3:12
**constant**
133:20
**constantly**
62:21, 134:19
**consult**
162:10, 162:13
**consulting**
1:8, 5:11
**contact**
45:8, 150:11, 150:18, 231:19, 235:13, 273:21
**contacted**
41:20, 41:21, 42:14, 43:1, 44:8, 45:6, 152:9, 152:13, 235:14
**contacting**
42:4, 44:21, 166:11
**container**
58:18
**content**
34:16
**contest**
51:7, 51:9, 51:12
**context**
145:18, 147:7
**continuation**
132:9
**continue**
167:19, 190:11, 259:12
**continued**
18:17, 35:11, 38:14, 124:7
**continues**
37:4, 57:20, 138:2, 139:16
**continuity**
210:15
**continuous**
134:12
**continuously**
15:17, 15:19
**contract**
16:9, 60:22, 61:3, 61:16, 61:17, 62:7, 65:7, 65:20, 74:3, 78:17, 105:4, 159:22, 160:4, 160:5, 166:16, 178:12, 189:22, 190:2, 190:3, 190:4, 190:18, 245:12, 248:15, 249:9, 249:15
**contracting**
183:10, 190:6, 190:14
**contractor**
63:12, 63:14, 66:3, 178:15, 182:20, 183:15, 183:16, 190:8
**contractors**
244:11
**contracts**
77:2, 214:20, 219:20, 245:19, 246:22
**control**
62:14, 70:22, 71:2, 113:3, 187:20, 206:15, 214:1, 245:7, 245:9, 245:15
**conveniently**
164:19
**conversation**
7:9, 7:10, 7:17, 28:19, 30:3, 33:14, 35:11, 42:2, 43:9, 44:13, 45:11, 46:4, 47:2, 48:19, 49:4, 50:7, 51:16, 51:17, 81:16, 83:18, 83:20, 88:2, 89:11, 89:14, 92:20, 95:9, 97:12, 99:6, 107:19, 116:3, 120:13, 125:13, 126:5, 128:6, 130:12, 132:11, 136:15, 138:3, 138:7, 143:2, 154:6, 154:19, 181:5, 181:6, 181:8, 181:13, 184:14, 184:20, 210:3, 215:21, 222:9, 230:8, 240:1, 248:20, 249:1, 269:22, 270:17, 272:16
**conversational**
39:19
**conversations**
30:5, 36:7, 37:5, 39:18, 40:10, 40:12, 41:7, 46:20, 47:4, 47:22, 48:9, 48:11, 119:17, 191:17, 271:13
**convey**
145:8, 230:11
**conveying**
270:5
**convoluted**
122:19, 146:4, 146:10

**cool**
81:10, 97:7, 98:22, 123:18, 123:21, 225:14, 265:7, 271:4
**cooler**
270:12
**cooling**
51:3
**coordinator**
61:8, 61:11
**copies**
9:22
**copy**
13:18, 14:5, 165:15, 276:8
**core**
183:3
**corner**
74:13, 76:19, 169:1
**corners**
269:9
**correct**
22:1, 29:8, 74:4, 87:9, 154:21, 170:12, 174:2, 174:3, 176:6, 186:10, 186:13, 187:21, 187:22, 189:19, 189:20, 194:18, 197:7, 217:3, 242:5, 243:8, 248:13, 248:15, 252:19, 258:9, 259:6, 262:5, 262:6, 262:10, 262:13, 262:16, 263:5, 263:15, 263:17, 263:18, 264:11, 267:15, 278:4, 279:5
**corrections**
278:6
**correctly**
78:14, 123:16, 149:4, 223:8
**correspondence**
13:6
**could**
12:14, 19:18, 29:3, 29:4, 29:6, 35:1, 38:9, 44:18, 51:10, 59:18, 59:19, 59:21, 60:8, 63:16, 63:18, 65:19, 69:2, 69:20, 70:1, 74:7, 75:6, 92:11, 137:10, 137:15, 139:18, 140:1, 140:5, 147:5, 154:10, 155:19, 156:3, 157:22, 161:15, 176:19, 179:19, 190:9, 196:2, 200:11, 202:5, 206:4, 208:10, 208:17, 211:16, 214:3, 218:19, 223:4, 232:6, 232:7, 240:11, 246:17, 249:17, 254:6, 257:11, 257:22, 262:14, 262:21, 266:13, 267:15, 272:1, 272:3, 272:5, 273:21
**couldn't**
18:13, 22:14, 22:22, 55:4, 65:5, 81:20, 111:22, 130:22, 135:8, 135:9, 165:15, 192:18, 196:2, 212:21, 219:14, 222:3, 222:5, 224:20, 225:8, 238:3, 247:6, 272:14, 273:8
**counsel**
5:6, 41:13, 133:11, 172:12, 261:21, 268:4, 279:9
**counseling**
106:7, 206:12, 207:15, 226:21
**counting**
111:20
**country**
165:20, 231:18, 231:21, 235:16
**county**
16:4, 32:19, 32:20
**couple**
39:22, 66:11, 66:13, 95:22, 105:6, 109:15, 114:8, 117:7, 217:14, 221:20
**course**
15:15, 71:4, 71:5, 71:6, 259:3
**court**
1:1, 11:14, 11:15, 13:7, 13:10, 152:11, 183:7, 186:9, 186:10, 218:2, 276:13, 277:5
**cousins**
79:18
**coworkers**
9:6, 193:1
**crazy**
91:2, 97:14, 98:13, 101:22, 109:19, 206:11, 214:16, 257:16
**criticize**
67:10
**cross**
14:1
**crowd**
80:9
**cry**
112:14, 112:15, 217:8, 217:9, 217:10, 217:19, 217:21, 218:11
**crying**
56:17, 56:22, 57:2
**cube**
256:3, 256:4
**culture**
254:14
**cup**
58:16
**cups**
58:17
**curious**
53:6
**current**
214:22
**currently**
40:9
**customer**
166:11
**cut**
139:15, 223:18, 269:9
**cyber**
62:19

D

**daily**
165:18, 195:4
**dallas**
28:17
**damarcus**
1:13, 2:1, 4:2, 5:2
**damn**
28:17, 49:21, 93:3, 165:18, 188:18, 254:11
**date**
41:15, 278:11
**dated**
81:13
**daughter**
256:11, 256:12, 258:8, 268:6
**daughter's**
149:14

**daughtry**
32:10, 32:15, 79:12, 79:14, 149:11, 208:20, 267:21
**day**
19:3, 19:4, 30:15, 32:18, 37:1, 40:1, 49:6, 49:9, 49:10, 49:12, 49:15, 52:20, 53:13, 58:20, 72:20, 73:3, 73:17, 73:18, 85:7, 85:10, 85:11, 85:12, 88:11, 90:12, 92:5, 92:22, 94:20, 96:10, 96:11, 96:22, 97:3, 97:5, 97:22, 99:9, 107:21, 111:1, 112:6, 113:21, 116:10, 116:12, 132:16, 135:2, 152:4, 154:3, 164:6, 167:10, 168:14, 169:14, 169:15, 191:13, 196:7, 197:8, 197:9, 198:14, 198:16, 199:7, 203:18, 213:3, 230:2, 248:20, 253:7, 258:1, 264:6, 279:14
**days**
73:4, 167:10
**de-designate**
171:12
**de-designating**
172:10
**de-escalating**
107:15
**dead**
32:18
**deal**
38:6, 38:7, 40:14, 40:15, 40:16, 43:17, 43:22, 44:4, 44:19, 86:18, 102:8, 104:6, 104:12, 142:7, 152:6, 153:21, 154:11, 154:14, 154:15, 166:11, 171:20, 204:18, 227:16, 262:11, 272:3
**dealing**
44:3, 116:5, 221:3
**dealings**
47:11, 225:18, 266:21
**dealt**
74:2, 194:10, 262:9, 262:15
**decide**
119:1
**decided**
69:18, 102:12, 161:19
**decision**
175:10, 185:21, 211:8
**decisions**
174:5, 185:18, 187:1, 187:21, 205:18
**decline**
229:10, 229:11
**defamation**
235:20
**defame**
151:14, 151:15, 235:17
**defendant**
1:10, 3:10, 5:6, 116:18, 261:21
**defensive**
107:17
**define**
17:16, 18:8
**definitely**
112:17, 119:4, 140:1, 151:12, 159:20, 172:10, 180:12, 181:17, 182:17, 188:20, 194:9, 198:12, 214:13, 218:13, 235:17, 250:15, 258:2, 263:7, 267:15, 269:1
**definition**
34:1
**degree**
91:21, 184:2, 208:4, 214:11, 219:6, 219:17, 226:1
**demarcus**
41:19, 44:8, 45:6, 45:9, 47:18, 53:20, 57:21, 107:11, 120:3, 120:15, 133:14, 140:20, 142:20, 145:8, 145:16, 145:20, 145:21, 234:4, 234:7, 249:7, 278:2, 278:11
**demeanor**
131:10, 192:2
**demote**
166:5
**denied**
13:9
**dennis**
32:17, 78:16
**department**
62:13, 70:19, 116:20, 141:20, 182:21, 183:13, 183:14, 183:16, 183:17
**depending**
22:2, 66:10, 66:14, 67:16, 113:18
**depends**
66:21
**deponent**
278:1
**deposition**
1:13, 2:1, 4:9, 5:12, 5:13, 6:2, 7:6, 8:4, 9:4, 9:5, 12:14, 12:15, 12:19, 24:18, 24:22, 34:6, 40:22, 77:20, 77:22, 117:11, 140:9, 140:13, 140:14, 140:15, 162:16, 162:22, 171:13, 173:8, 186:4, 279:3
**deputies**
245:20
**deputy**
61:12, 61:14, 61:20, 62:5, 120:18, 135:18, 166:16, 259:14, 259:19, 259:21
**describe**
192:1, 192:6, 194:4, 252:21
**deserve**
59:7
**deserved**
159:20
**desk**
83:17, 112:13, 217:5, 217:11, 217:19
**details**
42:1, 44:11
**developed**
16:5
**dialed**
25:7
**die**
129:21

**died**
119:6
**diet**
91:1
**different**
5:22, 21:21, 22:8, 30:14, 80:12, 101:1, 103:20, 106:1, 112:7, 112:8, 170:9, 179:13, 179:21, 190:13, 196:9, 196:10, 199:22, 221:2, 244:11, 255:6, 262:20, 268:18, 269:1
**differently**
155:4
**dinner**
73:20
**direct**
68:5, 68:9, 120:12, 176:5
**direction**
279:8
**directly**
66:15, 71:19, 71:21, 72:1, 72:3, 123:3, 127:16, 174:4, 174:6, 175:16, 183:11, 183:13, 186:17, 203:8, 205:7, 215:13, 217:12, 226:4, 265:4
**disagreement**
237:1, 237:3, 271:21
**disciplinary**
264:17
**disclosure**
228:19
**discredit**
169:22
**discuss**
41:17, 41:22, 44:10, 46:1, 47:10, 126:8, 150:18, 172:6, 173:1, 174:19, 198:2, 200:14, 233:5
**discussed**
45:9, 47:19, 48:21, 53:20, 132:18, 145:21, 172:19, 186:16, 243:4, 258:6, 259:4
**discussing**
91:9, 91:13, 126:13, 205:11
**discussion**
117:14, 172:17, 226:12, 269:16, 277:8
**discussions**
169:8, 229:7, 238:19, 263:21
**disdain**
43:10
**disheartening**
257:21
**dismissing**
261:3
**disrespectful**
133:14, 194:20, 194:22
**dissipated**
169:11
**distance**
256:3
**district**
1:1, 1:3
**dive**
106:20
**diving**
204:15
**divorced**
88:20
**divulged**
165:19
**docket**
11:17, 11:19, 12:3
**document**
10:4, 10:6, 10:13, 10:15, 12:2, 12:6, 12:7, 25:2, 144:12, 163:5, 226:21
**documentation**
169:8
**documents**
5:18, 6:1, 9:8, 9:10, 9:19, 9:22, 10:2, 11:2, 14:8, 34:10, 34:11, 117:8
**doing**
13:12, 20:12, 20:13, 27:17, 36:5, 37:17, 38:18, 57:16, 67:19, 71:3, 91:18, 95:4, 101:2, 105:2, 121:8, 128:10, 131:11, 138:11, 140:16, 152:4, 164:18, 169:1, 174:20, 176:21, 177:15, 179:17, 180:12, 180:21, 184:17, 190:11, 196:15, 196:22, 197:1, 199:16, 209:21, 211:18, 219:10, 225:4, 225:16, 253:12, 267:14
**dollars**
69:6
**don**
5:10, 173:3, 233:17
**don's**
158:22
**donald**
3:11
**done**
8:3, 15:16, 51:2, 67:17, 213:5, 231:6, 231:7, 253:9, 255:18
**donte**
80:7, 95:16, 96:18, 97:6, 98:8, 98:16, 98:17, 100:12, 105:20, 109:13, 116:3, 123:9, 123:12, 123:13, 123:18, 124:14, 124:22, 125:14, 126:12, 127:13, 137:17, 142:9, 143:20, 145:19, 145:21, 146:22, 149:13, 151:13, 193:9, 204:6, 205:1, 205:8, 213:1, 213:2, 213:15, 214:5, 214:9, 215:10, 215:12, 215:14, 215:19, 216:18, 224:17, 232:14, 237:14, 258:7, 271:14, 273:9, 274:22
**donte's**
214:5, 224:4, 236:11, 258:8, 275:17
**door**
56:14, 56:19, 56:20, 56:21, 57:4, 57:5, 57:7, 57:10, 57:11, 57:12, 74:10, 74:11, 75:4, 75:6, 76:2, 76:3, 88:8, 110:16, 110:19, 111:9, 111:12, 111:16,

111:19, 114:8, 114:9, 114:11, 114:13, 114:14, 114:15, 114:18, 157:12, 157:18, 157:19, 158:5, 168:10, 177:6, 198:3, 239:6, 239:7, 243:7, 273:19
**doors**
76:11
**doorway**
57:6, 199:4
**dos**
119:15
**doubt**
160:9, 252:4
**dove**
72:12
**down**
13:3, 18:11, 19:7, 23:8, 30:20, 31:1, 42:20, 52:19, 56:22, 62:22, 64:8, 72:19, 72:20, 73:2, 76:17, 76:18, 84:20, 94:12, 119:10, 121:19, 124:12, 128:16, 129:16, 129:21, 145:2, 151:8, 157:22, 158:2, 158:8, 174:17, 175:12, 185:11, 198:2, 198:3, 215:21, 216:18, 230:5, 231:2, 231:13, 238:21, 239:4, 239:7, 241:15, 255:20, 274:13, 276:10, 276:18
**downplaying**
209:13
**dpm**
62:10, 66:9, 251:21
**drama**
100:21, 100:22, 101:9
**draw**
74:22
**drawing**
4:14, 113:14
**drink**
108:12
**drive**
179:14, 247:16
**driving**
247:19
**drooping**
220:6
**dropped**
32:5
**dropping**
31:22
**drove**
72:12, 199:11
**drummed**
229:2
**drywalls**
69:6
**dude**
90:19, 101:7, 240:14
**due**
136:13, 171:15
**duly**
5:3
**duration**
39:9
**duress**
169:14, 170:2, 170:9
**during**
6:2, 22:5, 69:2, 70:14, 118:7, 140:15, 140:21, 144:16, 145:4, 156:5, 165:21, 177:20, 196:6, 202:20, 227:13, 252:22, 263:20
**dynamics**
248:3

**E**

**each**
137:5, 225:14, 239:1, 242:15, 242:19, 265:8, 274:1, 275:3
**eager**
185:12
**ear**
147:1, 213:13, 224:4, 224:22
**earlier**
110:5, 186:17, 187:2, 194:17, 201:8, 202:1, 202:2, 217:3, 217:4, 223:1, 232:19, 243:4, 243:6, 248:13, 258:6, 259:5
**early**
78:12, 92:9, 247:21, 269:3
**easier**
74:21
**easy**
18:14, 137:10, 176:17, 254:20
**eat**
73:10, 73:11, 73:19, 199:12
**eccn**
71:11
**ecstatic**
182:7
**edge**
217:11, 257:21
**effect**
19:5, 65:21, 86:5, 158:16
**either**
19:7, 46:2, 96:4, 103:3, 141:17, 157:2, 193:11, 208:22, 210:12, 248:3, 250:10, 267:3, 267:9, 268:9, 271:1
**elaborate**
202:5
**elevated**
271:7, 271:8
**elevating**
270:7, 270:14
**else**
8:14, 9:3, 12:3, 27:7, 29:1, 32:9, 32:13, 40:2, 56:11, 58:22, 63:19, 80:22, 83:15, 89:10, 95:11, 108:12, 114:7, 115:17, 115:20, 124:20, 126:12, 159:12, 173:21, 177:10, 188:1, 195:3, 195:15, 196:3, 201:11, 203:14, 213:4, 214:17, 215:11, 216:11, 219:3, 221:9, 223:22, 226:22, 232:10, 238:13, 241:1, 246:14, 248:22, 261:16, 267:4, 274:19, 275:14
**email**
4:15, 4:16, 10:18, 10:19, 11:10, 43:7, 121:20, 133:9, 138:3, 168:18, 168:20, 265:19
**emailed**
42:7
**emails**
55:15, 65:14, 118:5, 118:6
**emotional**
51:18, 56:16,

112:14, 112:22, 113:4, 137:21, 169:15, 169:18, 271:2, 271:3
**emotionally**
218:8
**emotions**
105:21
**employed**
15:18, 15:20, 16:1, 17:19, 17:20, 279:10
**employee**
63:11, 66:4, 145:6, 147:4, 175:9, 193:6, 234:22, 265:7, 265:13, 265:14, 275:22
**employees**
16:11, 41:8, 74:16, 75:18, 77:4, 103:17, 104:20, 112:9, 125:3, 127:1, 130:14, 130:21, 131:14, 146:22, 147:4, 174:19, 180:6, 191:21, 192:3, 192:21, 198:1, 205:17, 207:6, 208:2, 208:9, 209:8, 209:17, 210:4, 218:11, 223:9, 223:13, 224:13, 226:19, 226:20, 258:12
**employer**
147:20, 210:14, 215:1
**employment**
53:21, 160:1, 160:8, 160:10
**end**
61:22, 81:4, 106:22, 190:2, 234:3, 244:14, 253:7
**ended**
55:19, 61:17, 71:8, 78:11, 92:4, 129:10, 129:14, 132:2, 157:9, 157:10, 170:10, 189:22, 233:9
**ends**
190:3
**engaged**
30:16, 147:9, 223:12
**engaging**
223:9
**enough**
52:14, 189:15, 224:21, 251:2, 259:4, 273:21
**entailed**
222:16
**entertain**
102:20
**entire**
244:17
**entirely**
276:16
**entirety**
10:11
**environment**
52:4, 55:14, 65:4, 65:9, 66:7, 128:5, 166:8, 192:7, 200:11, 208:1
**envy**
269:8
**equal**
115:2, 115:3, 269:3
**equals**
34:15
**equipment**
68:19, 69:6, 177:6, 177:12
**errata**
278:7
**escalated**
184:13
**escort**
133:16, 157:18
**escorted**
157:10, 157:16
**escorting**
157:13
**especially**
196:1, 224:9
**esquire**
3:3, 3:11
**essentially**
139:16
**established**
78:18
**ethic**
181:18, 181:22
**ethical**
254:7
**eval**
67:14, 67:17
**evals**
67:20
**evaluated**
68:9
**evaluation**
67:13
**evangeline**
1:5, 145:6
**eve**
131:12
**even**
10:14, 13:19, 17:6, 21:16, 83:2, 109:16, 131:12, 142:10, 153:6, 153:16, 168:3, 168:6, 181:21, 182:14, 189:2, 193:9, 195:4, 195:18, 206:18, 208:14, 212:7, 235:6, 256:18, 265:22, 266:13
**evening**
159:10
**event**
7:16
**eventually**
94:7, 145:12, 168:2, 168:3, 257:6
**ever**
5:12, 31:3, 36:16, 54:10, 55:6, 55:17, 56:2, 56:9, 67:12, 68:2, 70:18, 71:19, 77:16, 83:3, 83:6, 85:1, 93:4, 95:11, 130:10, 138:13, 138:16, 139:7, 145:8, 146:7, 147:20, 148:2, 162:12, 163:3, 163:6, 163:16, 167:14, 167:18, 176:9, 179:5, 188:22, 191:20, 192:22, 193:15, 194:20, 197:17, 203:4, 203:10, 204:20, 205:17, 212:16, 218:16, 221:7, 222:1, 224:12, 226:7, 227:9, 228:22, 229:11, 230:11, 232:22, 237:19, 238:4, 238:7, 252:3, 272:7, 274:15
**every**
30:15, 147:14, 152:1, 154:3, 184:14, 203:18
**everybody**
43:17, 59:11, 69:2, 69:10, 82:9, 111:5, 137:4, 137:5, 145:16, 178:1,

188:4, 195:4, 212:5, 232:12, 232:17, 233:4, 251:12, 260:17
**everybody's**
111:5, 212:6, 213:18, 255:1, 257:12, 257:15, 271:3
**everything**
13:4, 20:12, 27:6, 56:5, 108:14, 137:18, 192:11, 194:11, 211:6, 220:8, 229:14, 246:2, 256:20, 260:16, 263:5, 274:18, 276:9
**everything's**
229:18, 229:21
**evolves**
265:5
**ex-military**
206:14, 253:22, 255:1
**ex-pm**
254:16
**exactly**
55:19, 249:9, 269:7
**exaggerating**
271:17, 271:20, 272:6
**exaggeration**
272:8
**examination**
4:2, 5:6, 172:12, 261:21
**examined**
278:3
**example**
53:1, 175:15, 176:19, 206:4, 251:4
**examples**
208:11, 210:5
**excited**
179:20
**exclude**
114:4
**excluded**
114:7
**excluding**
65:13
**exhibit**
4:10, 4:11, 4:12, 4:13, 4:14, 4:15, 4:16, 4:17, 4:18, 12:14, 12:15, 12:19, 24:18, 24:22, 25:1, 34:5, 34:6, 40:20, 40:21, 40:22, 41:5, 53:7, 77:20, 77:22, 117:16, 117:19, 121:20, 133:9, 140:9, 140:13, 140:15, 162:16, 162:20, 162:22, 171:9, 226:13, 228:6, 233:21, 264:16
**exhibits**
4:9, 117:11, 118:2, 206:9, 206:11, 206:12, 232:20
**existed**
228:21
**expect**
128:12
**expected**
135:4
**expecting**
29:8, 29:9
**experience**
6:19
**experienced**
194:12
**experiences**
206:6
**expires**
279:20
**explain**
40:18, 153:5, 169:16, 223:4, 230:10
**explained**
230:12
**explaining**
271:15
**explains**
34:11
**explanation**
229:10
**explicitly**
180:14, 235:8
**export**
71:6, 72:2, 72:5, 196:16
**exposed**
255:7
**express**
41:21, 137:4, 223:22
**expressing**
125:11, 249:2
**expression**
130:4
**extensive**
172:16
**extent**
6:21, 31:22, 67:9, 92:18, 127:1, 225:21, 227:8, 228:4, 262:2
**extreme**
198:17
**eye**
273:21

**F**

**face**
220:2, 220:4
**facilitate**
232:5
**fact**
48:22, 52:13, 100:13, 104:19, 106:8, 127:4, 142:2, 146:1, 150:5, 208:3, 218:1, 218:4, 218:7, 242:13, 242:14, 267:11, 274:21
**facts**
8:5, 204:9
**fair**
62:5, 115:11, 115:15, 194:11, 241:19, 259:4
**fairly**
81:1, 123:21, 239:13, 273:20
**faith**
103:5
**false**
118:17, 119:2
**familial**
258:11, 264:13
**familial-ish**
258:6
**familiar**
79:2, 167:4, 263:7, 265:7
**family**
91:17, 91:19
**fan**
28:15, 182:2
**far**
20:22, 38:22, 143:19, 175:12, 202:13
**fast**
131:20
**father**
149:14, 213:14
**fault**
271:2, 276:21
**favorable**
200:17
**favored**
214:8
**fear**
206:16, 206:19
**feature**
24:8, 24:10,

24:11
**february**
33:3, 33:7, 33:12, 35:15, 35:16, 35:18, 36:1, 38:16, 118:10, 118:12, 118:13, 118:20, 119:5, 141:12
**feel**
6:21, 33:6, 53:12, 57:9, 59:22, 60:9, 68:1, 70:18, 98:10, 99:8, 104:10, 114:7, 114:10, 115:1, 123:12, 123:13, 124:13, 124:14, 128:12, 136:21, 141:16, 147:11, 157:15, 157:22, 159:20, 164:22, 169:18, 172:11, 187:18, 188:2, 193:19, 196:2, 198:17, 205:10, 209:7, 209:8, 209:16, 212:16, 213:9, 213:15, 216:12, 216:18, 228:2, 228:4, 231:17, 235:10, 236:13, 237:12, 241:2, 245:13, 246:4, 246:10, 246:11, 249:11, 255:18, 257:11, 260:5, 272:10, 275:17, 276:15
**feeling**
57:2, 145:7, 205:17, 209:9, 220:4
**feelings**
145:9, 147:22, 148:3, 148:9
**feels**
51:1, 51:6, 53:4, 122:15
**felling**
166:8
**felt**
14:3, 48:14, 48:20, 48:22, 50:11, 50:18, 51:8, 51:18, 51:20, 59:17, 60:11, 60:13, 73:14, 94:16, 95:5, 102:4, 106:11, 107:13, 116:14, 120:9, 121:13, 125:19, 127:18, 128:19, 129:20, 131:8, 134:9, 134:14, 134:15, 135:5, 137:7, 137:8, 137:13, 141:5, 144:5, 145:9, 148:22, 159:15, 164:4, 170:1, 170:4, 180:9, 188:4, 201:15, 206:22, 207:4, 207:5, 208:1, 208:21, 211:8, 212:1, 223:1, 223:4, 233:4, 233:21, 234:9, 235:9, 236:1, 248:4, 249:12, 250:10, 253:10, 253:17, 255:15, 256:16, 257:1, 257:4, 257:7, 258:2, 271:20, 271:22
**female**
267:19, 267:20, 267:21, 268:1, 268:13, 268:17
**fence**
140:3
**ferguson**
121:22, 122:22, 123:4, 133:19, 138:14, 139:2, 139:3
**ferguson's**
234:21
**few**
113:19, 150:13, 152:18, 158:4, 172:22
**fight**
214:14, 260:8
**figure**
12:9, 28:9, 80:14, 131:21, 245:22
**figurehead**
121:1
**file**
135:16, 135:20, 136:8
**filed**
11:20, 12:13, 13:15, 263:14
**filing**
54:15
**fill**
178:13, 178:18
**filled**
178:16
**filling**
77:8
**filter**
111:7, 111:8
**filtered**
110:18, 111:9
**filtering**
111:6
**final**
261:3
**financial**
279:11
**financially**
246:1
**find**
9:21, 23:22, 155:22, 159:7, 275:7
**fine**
56:5, 115:11, 124:6, 143:12, 144:8, 145:2, 156:10, 161:5, 171:13, 172:7, 187:11, 225:10, 235:8, 276:6
**finish**
38:12, 148:8
**fire**
58:9, 63:16, 64:4, 64:13, 64:14, 64:21, 95:2, 161:9, 161:19, 161:21, 162:1, 162:8, 166:4, 170:5, 188:8, 201:16, 208:17, 250:17, 251:13, 257:7, 258:3
**fired**
15:2, 17:1, 19:3, 49:5, 49:6, 49:7, 49:10, 49:13, 49:17, 49:20, 50:2, 50:5, 53:13, 53:14, 54:5, 54:6, 58:8, 58:13, 58:14, 59:1, 59:7, 156:15, 159:14, 159:19, 159:21, 161:6, 161:11, 161:18, 162:6, 187:5, 188:7, 188:12, 189:1, 189:4, 189:10, 189:15, 211:2, 211:6, 211:11, 214:17, 214:19, 214:22, 215:10, 215:11, 218:13, 251:5, 257:6, 263:10, 263:13
**fires**
58:15, 188:10

**firing**
161:11, 161:12, 161:17, 170:8, 186:18, 187:20, 246:16, 255:19
**firings**
210:20, 211:1
**first**
5:3, 12:20, 15:17, 15:21, 19:2, 39:1, 69:7, 78:5, 78:9, 81:2, 92:14, 93:4, 95:18, 109:12, 116:3, 121:11, 124:19, 129:6, 133:10, 163:2, 165:12, 165:17, 168:9, 171:4, 184:10, 190:7, 191:1, 191:3, 191:6, 191:8, 192:8, 208:15, 224:11, 234:20, 241:7, 243:17, 244:2, 246:19
**fish**
3:4
**fit**
146:4
**fitting**
78:22
**five**
37:16, 62:7, 69:18, 178:12, 197:9
**fix**
120:21
**fix-it**
195:22
**fixed**
272:1
**flag**
192:14
**flip**
206:8, 224:16
**flipped**
128:8
**floor**
2:5, 3:14, 178:2, 261:19
**flow**
62:15, 91:14
**fluid**
200:10
**fluidly**
62:15
**fly**
100:5
**focused**
209:21
**follow**
254:22
**follows**
5:5
**football**
28:15, 28:21, 182:11
**footprint**
244:19
**force**
212:10
**foregoing**
278:3, 279:3, 279:4
**forever**
266:2
**forgot**
71:4, 220:1, 220:2
**forklift**
76:7, 76:9, 77:8, 90:16, 139:20
**formal**
203:10, 238:6, 238:8, 252:11
**former**
41:7, 147:19
**forth**
24:8, 35:12, 38:15, 38:17, 38:18, 86:9, 129:13, 136:2
**forward**
38:22, 60:17, 87:6, 137:22, 138:1, 143:20, 155:3, 233:6
**found**
11:6, 30:21, 71:10, 145:10, 200:2, 202:9
**four**
62:8, 110:21, 111:2, 128:20, 256:4
**frame**
85:16, 117:20
**free**
6:21
**freedom**
269:12
**freely**
92:12
**frequency**
36:13, 36:15
**frequent**
113:3, 196:21
**frequently**
239:13, 239:14
**friend**
19:11, 19:18, 19:20, 28:11, 28:14, 36:6, 38:1, 147:19, 202:15
**friendly**
28:19
**friends**
16:12, 16:15, 19:14, 19:16, 28:18, 31:2, 31:12, 37:17, 39:18, 40:3, 79:4, 80:4, 80:20, 97:16, 226:1, 239:15
**friendship**
78:18, 79:3, 201:3, 265:22
**friendships**
16:5
**front**
34:5, 40:19, 41:3, 44:20, 74:10, 76:2, 76:3, 106:16, 117:8, 121:2, 138:18, 139:4, 157:11, 157:18, 157:19, 158:5, 164:2, 168:10, 197:17, 197:18, 197:20, 206:14, 240:10, 251:12, 251:17, 252:3, 252:5
**frustrated**
249:2
**fuck**
89:2, 93:6
**fucking**
88:20, 88:21, 106:18, 123:3, 133:22, 134:6, 168:21
**fuel**
201:16
**fulfilled**
167:2
**full**
69:1, 92:13, 92:15, 177:22
**full-time**
69:12, 179:18, 181:11, 185:2
**fun**
180:4
**funny**
89:15, 93:10, 135:6, 142:10, 146:15, 152:14
**further**
261:18, 273:18

G

**game**
66:2, 82:6, 82:10, 82:15, 82:17, 82:20, 83:1
**games**
31:10, 31:16,

82:3, 101:4
**gary**
246:5, 247:14
**gather**
113:10, 270:1
**gave**
21:9, 34:10, 158:15, 158:20, 158:21, 164:16, 236:3
**gaylord**
177:1
**general**
74:17, 84:10
**generally**
192:1, 276:16
**genitals**
221:16
**gentlemen**
83:21, 271:17
**genuine**
271:17, 272:17, 273:7
**georgia**
231:21
**getting**
15:2, 17:1, 32:22, 38:12, 55:15, 58:16, 88:19, 106:6, 106:11, 113:9, 114:7, 155:1, 157:10, 161:10, 163:14, 187:4, 187:5, 189:10, 269:14, 270:21
**giggling**
224:5
**girl**
103:21
**give**
6:12, 7:18, 9:18, 23:14, 23:15, 43:20, 49:22, 67:20, 117:18, 158:6, 160:16, 161:13, 174:12, 175:14, 176:19, 189:11, 201:15, 206:4, 208:11, 210:6, 248:21
**given**
160:12, 187:3, 278:5, 279:5
**giving**
23:12, 102:19, 118:2, 122:20, 142:20, 207:14
**gloves**
69:9
**go**
36:8, 38:13, 40:6, 41:9, 43:8, 46:6, 46:8, 51:22, 53:7, 60:14, 70:4, 72:19, 72:20, 73:9, 74:11, 75:13, 76:13, 88:7, 94:20, 97:11, 101:14, 103:22, 104:22, 105:8, 106:4, 108:8, 108:18, 108:20, 113:9, 117:18, 120:19, 124:9, 131:21, 139:8, 141:16, 146:21, 149:16, 156:12, 158:2, 162:20, 168:21, 171:11, 176:4, 177:5, 177:21, 182:14, 185:2, 192:15, 195:9, 198:11, 199:5, 199:7, 199:12, 200:9, 212:5, 217:1, 228:17, 230:9, 246:14, 260:4, 260:11, 261:14, 261:16, 262:22, 275:12
**god**
32:17, 179:19
**goes**
38:21, 146:11, 177:16, 188:6, 191:17, 211:22, 229:9
**gone**
59:2, 179:2, 212:14
**good**
5:8, 5:9, 20:12, 37:22, 38:1, 53:4, 59:8, 59:9, 94:21, 101:6, 105:7, 121:4, 168:5, 168:6, 168:16, 181:1, 191:9, 192:10, 195:13, 207:20, 209:5, 210:2, 253:17, 256:16, 257:13, 261:16, 265:14, 270:11
**gossip**
146:13, 146:17
**gossiping**
202:22, 223:14
**gotcha**
77:3, 84:8, 104:3, 134:10, 144:8
**gotten**
214:6, 221:1, 226:10
**government**
178:11, 178:21, 183:19, 183:21, 190:6
**grand**
67:6
**grass**
262:22
**great**
192:17
**greeting**
123:2
**ground**
191:19
**grounds**
261:3
**group**
82:1, 181:5, 181:6, 181:8, 205:10, 205:11
**grown**
253:20
**grudge**
116:12
**guarantee**
160:8, 160:9
**guard**
101:10
**guess**
7:12, 30:21, 67:6, 103:8, 107:13, 118:8, 121:14, 122:9, 124:1, 125:10, 126:22, 134:14, 149:16, 149:17, 156:13, 168:21, 171:17, 192:5, 193:10, 195:14, 206:13, 209:14, 224:10, 225:1, 234:3, 268:12
**guidance**
71:2, 198:11
**guide**
120:21, 265:12
**guns**
39:15
**guy**
119:22, 121:2, 142:10, 165:19, 166:20, 195:22, 207:16, 217:21, 220:12, 257:7
**guy's**
65:12
**guys**
9:10, 39:7, 39:9, 40:4, 52:3, 73:6, 73:7, 92:13, 92:15, 100:13,

107:3, 115:22, 128:5, 128:11, 151:3, 183:21, 184:1, 206:13, 215:22, 236:12

**H**

**ha**
139:13
**half**
57:6, 62:8, 108:11
**halfway**
228:10
**hall**
31:7, 157:22
**hallway**
111:7, 158:2
**hand**
86:2, 142:8, 147:10, 201:17, 279:14
**handle**
50:19, 100:6, 142:3, 172:9
**handled**
50:19, 137:6, 141:4, 141:22, 142:1, 143:1, 220:16, 234:8
**handlers**
68:21
**handles**
183:11
**hands**
65:1, 109:3, 109:9, 110:2, 110:3, 113:16, 115:5, 243:4, 250:9
**hang**
78:3, 149:17, 226:7
**happen**
52:20, 77:12, 121:3, 131:22, 188:19, 199:1, 240:9, 251:6, 254:10, 254:12, 276:22
**happened**
10:16, 17:9, 17:12, 28:17, 45:20, 47:15, 48:14, 49:2, 49:5, 49:21, 60:18, 85:13, 86:19, 86:20, 87:2, 94:17, 96:13, 116:2, 116:4, 118:12, 127:16, 128:21, 129:1, 129:3, 131:20, 134:4, 134:7, 137:16, 147:12, 147:15, 149:3, 149:20, 158:8, 158:11, 161:15, 179:1, 200:2, 201:20, 207:7, 210:14, 212:11, 215:9, 216:1, 220:1, 247:4, 256:19, 271:15
**happening**
22:8, 30:20, 39:16, 44:19, 65:11, 65:16, 116:17, 118:7, 122:9, 133:17, 133:18
**happens**
161:14, 202:15, 214:15
**happy**
33:9, 35:18, 125:6, 132:20, 137:12
**harassment**
135:16, 135:20, 136:8
**hard**
52:14, 56:10, 71:14, 114:2, 114:10, 135:3, 135:4, 169:19, 180:1, 182:18, 191:10, 191:12, 198:8, 200:8, 212:11
**harping**
133:20, 134:3, 134:8, 134:9
**hat**
148:12, 223:11, 223:12
**hate**
96:2
**hats**
62:17, 62:18
**hazmat**
139:19
**he'll**
58:10, 58:11, 58:20, 58:21, 113:21, 120:6
**head**
6:13, 51:4, 71:17, 241:15, 255:20
**heads**
270:12
**headstrong**
53:1
**hear**
85:1, 85:4, 85:5, 86:13, 100:6, 134:19, 183:8, 205:5, 205:9, 221:7, 242:11, 274:10
**heard**
29:5, 82:2, 85:9, 86:1, 86:3, 86:14, 99:17, 99:21, 101:11, 105:10, 105:12, 108:1, 127:11, 130:4, 135:6, 146:20, 152:5, 193:10, 194:22, 201:10, 221:10, 221:20, 222:19, 228:1, 234:18, 234:20, 242:14, 274:17, 274:19, 275:2
**hearing**
57:7, 99:15, 242:18
**heated**
269:22
**held**
2:2, 235:1
**hell**
88:16, 93:3, 93:5, 127:5, 209:1, 255:9
**hello**
27:16
**help**
42:16, 42:18, 42:20, 118:6, 118:12, 120:21, 195:12, 265:12
**helped**
195:13
**helping**
107:15, 169:2
**helps**
117:20
**helter**
163:19
**hem**
122:16
**here**
8:7, 24:17, 24:22, 26:8, 27:4, 33:1, 38:14, 41:8, 56:20, 56:21, 58:16, 60:13, 60:18, 64:9, 65:16, 74:10, 75:5, 75:11, 75:12, 75:22, 76:1, 76:4, 76:5, 76:6, 76:11, 76:17, 76:18, 80:2, 94:20, 98:20,

101:2, 101:5, 105:5, 114:16, 131:21, 136:10, 139:3, 139:18, 139:19, 139:21, 140:17, 143:11, 145:19, 151:3, 179:19, 180:8, 182:2, 192:11, 205:14, 206:13, 207:21, 210:2, 213:18, 231:2, 233:19, 238:13, 239:7, 239:11, 239:21, 239:22, 240:6, 249:13, 250:2, 250:4, 250:7, 250:8, 251:3, 266:2, 272:12, 273:19
**here's**
9:1, 188:14
**hereby**
278:2, 279:3
**hereunto**
279:13
**herself**
113:10
**hey**
7:18, 19:1, 29:17, 33:9, 42:10, 51:20, 52:19, 58:11, 59:1, 64:9, 65:11, 71:10, 82:18, 82:19, 90:14, 92:22, 114:14, 116:19, 120:2, 120:14, 129:15, 137:15, 137:20, 142:19, 152:22, 153:1, 161:15, 166:21, 168:17, 169:9, 174:9, 180:12, 180:14, 180:20, 181:11, 187:7, 190:15, 209:11, 222:9, 223:18, 229:7, 229:14, 230:5, 230:16, 230:22, 232:6, 233:4, 245:19, 249:22, 265:17, 269:10, 272:4, 275:9, 275:19
**hide**
234:10
**high**
204:12
**highest**
251:17, 251:19
**himself**
150:11
**hire**
64:4, 68:19, 255:4
**hired**
90:12, 160:5, 183:20, 187:5, 191:2, 254:17
**hiring**
161:12, 185:17, 186:18, 187:20, 255:6
**hisself**
51:4
**hit**
110:17, 191:19, 219:14
**hold**
20:17, 148:8
**holding**
116:12
**holy**
158:10, 158:16, 168:20
**home**
105:8, 170:3, 247:19
**honest**
64:19, 179:2
**hope**
162:19
**hose**
75:22, 76:1, 76:2, 76:6
**hospital**
202:12
**hostile**
55:14, 65:4, 65:9, 66:6, 154:2, 166:7, 193:2, 193:7
**hot**
51:4, 110:4, 273:4, 273:5
**hotel**
72:22, 73:1
**hour**
108:10, 177:10, 177:11
**hours**
81:21, 196:6, 197:8, 197:9, 198:14, 198:16, 198:20, 199:1
**house**
11:9, 91:18, 92:15, 155:13
**how's**
20:12
**however**
223:8
**hr**
101:14, 103:4, 103:19, 104:2, 104:21, 133:1, 133:2, 141:5, 141:17, 146:10, 147:8, 149:12, 151:20, 202:14, 202:22, 209:16, 215:18, 223:1, 223:7, 223:11, 223:12, 223:16, 223:20, 224:9, 224:12, 224:14, 227:1, 234:10, 248:16, 248:17, 252:12, 258:14, 258:18, 259:2, 268:12
**huddled**
57:17
**hug**
207:14
**hugger**
207:13
**hugging**
207:11, 207:12
**huh**
207:11
**hum**
97:1, 97:6
**human**
54:15, 64:22, 90:15
**hung**
31:17, 99:13
**hunter**
214:21, 275:22
**hurt**
153:19
**hut**
239:21
**huts**
75:11

**I**

**idea**
22:16, 35:15, 36:3, 43:14, 43:15, 81:21, 112:21, 119:11, 162:15, 205:3, 224:11
**identification**
12:16, 24:19, 34:7, 41:1, 78:1, 117:12, 140:10, 162:17
**identified**
41:5, 41:8, 41:18, 79:21, 81:7, 165:8
**identify**
41:14, 53:9
**ignoring**
153:9, 153:11
**imagine**
74:7, 190:9, 200:12, 224:21,

256:5, 276:22
**imchat**
33:19, 34:1
**imchats**
33:18
**immediate**
79:8, 109:14
**immediately**
124:15
**implicate**
96:16
**implicated**
270:18
**implication**
222:11, 222:14
**implied**
43:19
**important**
77:11
**impressed**
181:22
**impression**
191:1, 191:3, 191:4
**improper**
264:9
**improvement**
94:12
**inaccurate**
233:21
**inappropriate**
133:12
**inappropriately**
55:7, 138:14
**inc**
1:9, 5:11
**incident**
118:19, 193:8, 215:16, 215:17, 215:19, 234:5, 242:7, 256:19, 273:10
**incidents**
212:12, 242:18
**include**
175:13
**included**
175:18, 181:16
**including**
53:22, 232:13, 268:11
**incorrect**
235:9
**indicate**
41:20, 101:13, 101:16, 102:7
**indicated**
101:19
**indicating**
135:19
**individual**
41:14, 112:18, 194:6
**inform**
45:7, 150:12
**information**
14:14, 25:3, 35:4, 47:13, 120:1, 120:12, 165:19, 213:17, 214:1, 236:4, 238:11, 261:2, 267:3
**informational**
183:12
**informed**
122:1, 123:7, 123:8, 228:18
**ing**
236:18, 236:21, 238:4
**initial**
128:22, 129:2, 129:6, 132:15
**initially**
86:15, 114:13, 115:19, 128:3, 128:5, 185:2, 231:1, 245:17
**initiated**
133:2
**input**
161:13, 175:2, 175:8
**inquire**
44:8
**inside**
139:14, 140:7, 220:4
**insinuating**
201:5
**instance**
45:9, 176:21, 177:9, 184:6, 193:5, 195:5, 208:12, 211:17, 212:17, 213:2
**instances**
210:17
**instead**
51:15, 207:14, 241:8, 247:19
**insubordination**
269:18, 270:15
**intense**
71:9
**intent**
222:17, 222:18
**interact**
191:20, 195:4
**interacted**
192:2
**interacting**
130:11
**interaction**
57:13, 83:12, 109:13, 169:3, 187:7, 192:19, 192:20, 193:1, 195:2, 260:19, 275:20
**interactions**
83:4, 83:7, 83:11, 85:3, 103:7, 190:21, 243:16, 271:16
**interest**
228:21, 229:1, 229:5, 264:21, 265:2, 266:5, 266:10, 266:18, 266:19, 267:1, 267:5, 279:11
**interpretation**
161:1
**interrogatories**
4:13, 41:4, 53:19, 171:22
**interrogatory**
171:10
**interrupt**
211:1
**interview**
227:9, 243:18, 244:3
**interviewed**
227:10, 232:10
**intimidation**
241:20, 242:1
**inventory**
62:14, 63:5, 68:18, 69:2, 70:22, 71:2, 78:6, 177:15, 177:20, 178:1, 181:20, 245:7, 245:9
**inventorying**
69:5
**investigate**
131:19, 227:2, 259:3
**investigating**
144:22
**investigation**
4:17, 136:12, 137:20, 140:22, 144:16, 145:4, 146:9, 203:4, 204:20, 215:16, 215:18, 216:9, 226:13, 226:15, 226:18, 227:13, 228:5, 232:9, 232:11, 232:20, 233:2, 258:21, 259:1, 260:14, 260:16, 260:21, 261:5, 261:9
**invite**
153:14, 221:14, 222:8
**invited**
55:15, 216:3

**inviting**
138:10, 222:20
**involve**
72:6
**involved**
42:21, 54:8, 55:20, 105:8, 128:20, 136:11, 158:22, 159:2, 202:3, 216:8, 216:12, 216:13, 216:16, 216:17, 216:21, 219:22, 227:19, 236:17, 238:20, 258:20, 258:21
**involvement**
45:10, 47:19, 48:6, 238:22
**irate**
133:13, 206:1, 206:2, 210:7
**irritated**
132:3
**issue**
37:10, 84:3, 84:17, 95:15, 106:21, 112:6, 120:20, 120:21, 121:10, 121:12, 122:13, 126:8, 151:17, 153:21, 165:2, 166:11, 207:14, 229:20, 230:6, 237:9, 237:11, 273:1
**issued**
252:12
**issues**
22:8, 93:22, 94:5, 94:8, 95:19, 108:22, 119:7, 130:20, 136:13, 141:20, 165:3, 165:5, 165:7, 194:7
**it'd**
20:11
**itar**
72:6, 72:9
**items**
260:19

**J**

**january**
26:13, 26:18, 27:14, 27:20, 30:3, 33:2, 38:13, 38:15
**jas**
93:1
**jasmine**
229:17
**jasmine's**
92:8
**jealous**
208:4
**jennings**
80:7, 80:9, 80:21, 80:22, 81:5, 81:13, 81:19, 81:22, 83:3, 83:6, 84:9, 84:11, 85:2, 96:16, 96:17, 123:9, 124:8, 124:9, 138:14, 138:21, 139:9, 142:9, 145:19, 145:21, 146:22, 151:12, 151:15, 151:16, 193:8, 193:9, 213:6, 235:17, 235:18, 236:2, 238:9, 238:16, 239:10
**job**
1:20, 53:4, 54:18, 59:8, 59:9, 66:22, 94:21, 95:4, 101:6, 104:22, 105:7, 120:19, 121:9, 156:11, 169:1, 179:9, 179:22, 180:12, 180:15, 180:17, 181:1, 190:11, 191:17, 195:6, 209:5, 209:21, 220:9, 223:10, 246:17, 248:5, 251:14, 253:9, 253:12, 255:18
**johaviac**
237:5
**joke**
88:14, 88:15, 92:2, 93:10, 93:18, 93:20, 97:4, 99:22, 100:14, 118:9, 121:7, 192:7, 221:13, 222:4, 256:10, 256:15
**jokes**
90:17, 92:3, 192:8, 256:8
**joking**
87:16, 222:5
**jolene**
237:4, 237:5, 237:8, 237:9, 237:13
**jonathan**
32:15
**judge**
186:11
**july**
1:15, 279:15
**jump**
87:6, 191:12, 191:13, 243:3, 243:13
**june**
38:22, 39:10, 45:3, 47:5, 48:1, 49:3, 50:8, 170:14
**junk**
142:3, 142:12, 142:13, 217:22
**justifiable**
211:7
**justification**
131:1
**justify**
69:21

**K**

**keep**
6:21, 27:11, 84:18, 95:7, 172:15, 209:21, 210:9, 210:16, 217:18, 255:19, 255:20
**keeps**
27:10, 193:22
**kendrick**
16:9
**kent**
138:4
**kenton**
16:10, 202:10, 203:16, 221:19
**kenton's**
202:7, 202:9
**kept**
93:20, 112:12, 121:9, 182:7, 205:13, 217:10, 273:14, 274:4, 274:7
**kickball**
31:10, 31:15, 31:16, 82:1, 82:2, 82:6, 82:15, 82:17
**kicked**
164:16, 261:8
**kid**
29:18, 35:19, 214:21
**kids**
80:17, 170:3, 258:1
**kin**
270:1
**knew**
43:10, 43:17, 47:7, 47:8,

47:16, 48:20, 79:6, 91:16, 92:17, 98:16, 110:20, 144:3, 150:5, 159:10, 166:2, 191:15, 203:8, 203:16, 203:22, 234:4, 236:16, 251:10, 251:11, 253:18, 262:11, 265:15, 268:7, 274:8
**knowing**
49:16, 90:13, 130:22
**knowledge**
11:15, 138:12
**known**
58:7, 80:13, 80:15, 152:18, 222:7
**knows**
9:7, 17:10, 38:5, 91:17, 91:19, 152:19, 153:20, 165:14

**L**

**lack**
43:19
**lackluster**
118:16, 119:12
**ladies**
31:11, 81:14, 182:3, 205:11
**lady**
153:1, 202:22, 204:8, 236:18, 258:14
**lands**
190:5
**large**
273:20
**larger**
109:10
**larry's**
48:6, 106:16, 112:10, 115:1, 115:15, 119:22, 127:13, 149:13, 149:14, 153:2, 155:10, 161:11, 167:22, 175:3, 185:21, 188:7, 262:7
**last**
32:1, 32:5, 34:14, 92:7, 111:8, 130:10, 162:20, 183:8, 231:22, 257:22
**late**
57:8, 58:19, 110:10, 110:12, 110:17, 110:20, 111:2, 112:3, 113:20, 211:10, 211:12
**later**
6:15, 19:3, 30:21, 37:16, 75:7, 85:10, 85:12, 96:9, 96:10, 109:15, 114:16, 120:5, 127:14, 145:11, 158:4, 159:9, 171:14, 172:9, 186:9, 186:11, 188:16, 213:1, 229:2
**laughing**
152:10
**law**
2:2
**lawful**
263:1, 263:2, 263:3
**lawyer**
38:9, 42:10, 268:7
**lawyers**
7:12, 7:19, 20:8, 20:10, 42:12
**lead**
206:16, 206:17
**leadership**
255:8
**leading**
206:17
**learn**
179:20, 265:15
**learner**
186:14
**learning**
180:4
**least**
7:21, 45:8, 91:9, 116:13, 133:17, 140:5, 143:3, 168:15, 260:8
**leave**
58:16, 58:17, 102:3, 189:21, 190:1, 246:13, 260:15
**leaving**
82:9, 82:12, 259:6
**led**
178:4
**ledge**
209:18
**lee**
80:1
**leering**
241:16
**left**
19:15, 30:8, 31:17, 36:22, 37:2, 89:12, 93:17, 96:4, 96:8, 170:11, 185:12, 197:2, 239:7
**legal**
44:20, 160:22, 254:7, 268:4
**less**
197:11, 197:12, 198:13, 198:14, 198:15
**let's**
24:16, 102:5, 105:3, 131:21, 133:8, 137:21, 222:9, 233:6
**letisha**
258:19
**letter**
4:10, 160:6
**level**
52:21, 66:14, 251:17, 251:18, 251:19, 269:7, 269:12
**life**
40:12, 91:10, 92:17, 163:16, 269:7
**light**
170:18
**liked**
63:16, 71:7, 81:17, 179:12, 208:7, 253:6
**likes**
236:15
**line**
34:14, 252:17, 260:6
**lines**
39:17, 42:10, 42:12, 88:22, 96:20, 106:19, 180:19, 226:18
**link**
140:3
**listen**
51:16, 272:4
**listened**
131:14
**listening**
131:12, 270:10
**listing**
33:1
**lists**
228:16
**litigation**
41:14, 42:1, 44:11
**little**
5:15, 13:2,

24:17, 51:21, 52:1, 56:6, 60:15, 60:16, 93:20, 95:7, 97:8, 100:15, 103:20, 103:21, 105:9, 108:19, 108:21, 109:21, 109:22, 110:2, 110:5, 111:6, 117:9, 119:10, 122:6, 125:8, 127:3, 138:20, 153:17, 153:18, 163:18, 163:19, 184:4, 209:18, 225:19, 226:10, 227:4, 241:12, 246:6, 247:14, 251:1, 257:20, 257:21, 273:18
**littleton**
79:19, 123:9, 125:22, 126:7, 232:16
**live**
32:20
**lived**
247:17
**lively**
50:20
**living**
276:18
**llp**
2:3
**lobster**
221:11, 221:15, 221:21, 222:8, 222:21
**located**
74:5
**location**
177:18
**lodge**
203:10
**lodged**
193:15
**log**
27:4, 27:8, 27:11, 27:12
**logic**
253:22
**logistical**
183:12
**logistics**
101:2, 179:13, 179:21
**logs**
27:2, 34:11, 34:12
**long**
11:13, 29:17, 39:9, 50:15, 53:16, 61:19, 72:18, 74:9, 84:21, 99:5, 105:13, 106:4, 121:6, 153:18, 157:6, 199:3, 219:21, 220:20, 221:12, 229:22, 263:2, 266:15, 267:6
**longer**
18:1, 30:18, 132:6, 244:13, 246:10, 255:4
**look**
9:8, 9:21, 10:21, 11:15, 11:17, 12:4, 23:5, 23:7, 37:3, 40:5, 40:7, 71:15, 111:16, 118:2, 143:9, 158:6, 210:19
**looked**
9:10, 9:11, 9:14, 11:19, 11:21, 12:3, 12:6, 75:2, 111:15, 164:15
**looking**
5:19, 12:1, 39:8, 118:5, 144:13, 160:22, 161:6, 165:12, 213:10, 240:1, 240:3, 241:14, 241:15, 273:14, 273:15
**looks**
26:12, 33:5, 33:11, 33:17, 35:10, 35:14, 36:2, 37:4, 38:21, 38:22, 265:19
**lose**
90:20
**losing**
90:1, 220:4
**loss**
171:21
**lost**
89:19, 89:22
**lot**
15:11, 16:3, 16:9, 16:11, 16:16, 17:21, 18:2, 21:11, 52:5, 55:12, 55:20, 58:14, 59:3, 59:4, 65:15, 67:20, 68:18, 71:10, 84:6, 88:7, 88:8, 89:22, 95:2, 98:17, 104:17, 104:18, 108:3, 112:8, 112:9, 120:3, 120:9, 135:5, 176:16, 178:10, 178:22, 179:1, 179:8, 180:1, 180:4, 182:11, 183:4, 183:11, 184:11, 192:15, 195:17, 196:18, 196:21, 197:22, 198:7, 208:2, 210:4, 210:20, 210:22, 211:2, 211:5, 213:4, 219:22, 221:22, 222:19, 227:18, 227:22, 229:17, 236:10, 238:20, 244:13, 247:18, 250:17, 254:1, 254:10, 255:14, 258:4, 262:3, 262:14, 263:11, 263:14, 264:1, 265:5
**louder**
7:2
**loved**
150:2, 150:3
**loves**
145:16
**low**
255:19
**lowest**
251:18
**lull**
178:20
**lunch**
76:15, 103:16, 103:22, 146:12, 146:21, 148:22, 149:2, 149:8, 149:10, 149:21, 199:7, 199:14, 199:20, 237:10, 237:13

**M**

**ma**
206:4
**ma'am**
260:1
**mad**
106:9, 118:19, 121:13, 206:7
**made**
22:12, 54:19, 54:21, 71:22, 88:13, 88:14, 90:17, 91:4, 92:2, 92:20,

93:2, 95:10, 96:18, 97:4, 99:22, 103:19, 128:13, 162:10, 177:22, 179:18, 180:13, 202:13, 202:14, 216:13, 217:10, 218:12, 219:18, 221:8, 237:14, 238:7, 239:10, 241:13, 247:7, 251:7, 254:20, 270:19
**magnitude**
104:9, 177:12
**maine**
3:5
**maintained**
17:14
**majority**
84:21, 199:20
**make**
6:12, 6:15, 6:20, 36:12, 40:15, 53:5, 54:20, 54:22, 58:7, 60:17, 62:11, 66:7, 101:9, 117:21, 120:19, 121:3, 153:7, 186:3, 186:4, 192:8, 192:10, 215:7, 217:8, 218:7, 218:9, 218:16, 218:22, 223:16, 235:2, 237:22, 238:4, 249:17, 250:19, 252:3, 262:1, 262:21, 270:3, 273:21, 275:19, 276:4, 276:8, 276:14
**makes**
66:5, 92:2, 121:3, 175:9, 182:11, 196:4, 209:7, 209:8, 217:9, 217:21, 234:10
**making**
35:19, 62:14, 63:5, 130:15, 218:11
**man**
18:4, 58:12, 59:1, 64:9, 79:1, 89:16, 90:14, 92:6, 92:7, 94:20, 105:6, 106:4, 114:22, 142:6, 158:14, 166:21, 168:12, 169:22, 195:10, 197:5, 199:11, 209:1, 219:9, 219:11, 229:14, 229:15, 229:16, 230:22, 237:4, 249:22, 253:20, 256:4, 257:16, 263:17, 265:17, 269:4, 269:10
**manage**
265:2
**management**
178:13, 178:14, 262:4, 262:5
**manager**
16:8, 21:8, 52:12, 52:14, 61:12, 61:14, 61:20, 62:5, 62:19, 62:20, 66:17, 66:19, 66:20, 70:2, 70:5, 70:9, 70:12, 120:19, 126:8, 166:16, 175:16, 181:7, 185:5, 185:10, 208:12, 208:13, 216:19, 259:14, 259:21, 267:17, 267:20, 267:22, 268:1, 268:12, 271:7, 275:18
**managers**
174:18, 174:19, 175:12, 176:8, 181:15, 184:7, 251:4, 267:19, 268:11, 268:13, 268:17, 268:18, 275:9, 275:19
**managing**
265:11
**mangers**
161:13
**manipulates**
120:1, 120:11
**manipulating**
229:3
**manipulator**
229:3
**manipulted**
165:6
**manley**
86:4, 86:14, 86:15, 95:16, 100:12, 106:3, 106:5, 106:8, 108:22, 109:13, 109:18, 115:13, 115:19, 116:4, 116:8, 116:13, 122:7, 123:9, 123:17, 124:4, 124:19, 124:21, 126:11, 133:19, 133:20, 134:1, 143:19, 193:10, 193:11, 193:19, 194:15, 221:19, 232:14, 241:3, 241:7, 271:14, 271:19
**manley's**
116:21
**manner**
87:16, 223:9
**many**
62:17, 66:12, 184:19, 184:20, 188:7, 196:6, 203:21, 210:3, 259:15
**map**
138:20
**march**
33:17, 33:20, 38:17, 41:19, 45:3, 46:5, 46:6, 46:11, 46:14, 46:15, 46:16, 46:21, 47:2, 48:1, 49:3, 50:8
**mark**
12:14, 24:21, 24:22, 34:4, 40:20, 77:20, 171:14
**marked**
12:15, 12:19, 24:19, 34:6, 40:22, 77:22, 117:12, 140:9, 140:13, 140:14, 162:16, 162:21, 171:11, 172:2
**marking**
171:5
**mary**
236:18
**maryland**
1:3, 1:14, 2:6, 2:20, 3:15, 160:20
**mask**
276:18
**masks**
6:18
**massages**
91:19
**material**
61:7, 61:11, 177:16
**matter**
104:19, 121:21, 142:2, 146:1,

200:16, 208:3
**matthew**
123:9
**mattie**
31:14, 79:19, 126:3
**maybe**
18:22, 19:1, 20:3, 23:1, 28:16, 33:22, 36:7, 40:17, 43:13, 43:14, 44:15, 49:3, 51:21, 53:13, 60:10, 61:21, 62:8, 63:1, 63:3, 66:5, 70:22, 77:12, 79:20, 81:4, 82:19, 84:17, 85:21, 88:12, 92:22, 104:14, 107:13, 112:7, 113:21, 115:14, 116:9, 116:13, 117:8, 118:3, 124:3, 124:20, 127:11, 132:12, 133:5, 136:2, 136:3, 137:17, 143:21, 144:19, 153:8, 170:8, 170:14, 174:18, 175:1, 191:18, 193:12, 194:8, 196:14, 198:15, 198:16, 203:20, 205:11, 209:14, 209:15, 224:13, 224:15, 225:5, 226:4, 226:5, 229:15, 229:16, 230:1, 232:16, 237:10, 237:13, 239:21, 246:11, 246:14, 257:9, 272:22, 273:2, 273:19
**mean**
8:22, 15:19, 16:8, 20:13, 21:12, 28:4, 29:2, 30:13, 35:7, 36:9, 48:18, 52:16, 53:16, 55:8, 56:12, 57:5, 59:8, 64:3, 64:10, 64:15, 65:3, 67:19, 81:11, 86:22, 87:1, 90:19, 99:18, 99:22, 111:21, 118:14, 119:3, 121:1, 123:21, 135:8, 139:13, 140:2, 149:17, 150:17, 156:11, 159:18, 160:10, 163:17, 166:2, 166:7, 166:15, 166:19, 171:8, 172:5, 176:17, 184:1, 184:11, 194:10, 195:11, 196:11, 197:12, 198:5, 198:7, 199:20, 200:1, 200:8, 202:1, 202:19, 204:13, 210:2, 210:22, 211:16, 212:10, 214:3, 219:7, 220:19, 228:2, 235:5, 236:20, 240:4, 249:17, 250:21, 251:20, 251:21, 253:3, 253:18, 257:18, 260:13, 262:18, 262:19, 263:5, 267:13, 270:8
**meaning**
124:7
**means**
34:18, 66:15, 66:20, 233:2, 249:14, 249:16
**meant**
66:2, 142:11, 249:20, 272:11
**mediate**
232:1
**medical**
220:1
**meet**
16:13, 31:3, 221:21, 243:17
**meetings**
55:15, 55:16, 58:11, 65:13, 88:9, 109:9, 112:14, 113:15, 128:19, 132:5, 153:15, 169:4, 175:19, 176:3, 178:10, 257:14, 267:18
**meme**
34:21
**memo**
143:13
**memory**
5:20
**men**
263:13
**mention**
228:22, 229:11
**mentioned**
47:7, 47:13, 50:10, 68:7, 78:7, 80:7, 88:12, 97:19, 100:14, 115:13, 141:11, 174:1, 202:4, 205:1, 243:6, 263:20, 267:18, 273:11, 275:22
**mess**
90:11, 90:22
**message**
34:16
**messing**
96:19, 212:1
**met**
36:21, 191:2, 244:1, 244:3, 245:2
**middle**
53:8
**middle-man**
183:20
**might**
10:19, 26:3, 26:5, 26:8, 26:10, 29:4, 40:19, 43:9, 49:2, 49:5, 53:13, 58:6, 58:19, 59:20, 61:7, 84:13, 84:16, 92:5, 105:19, 105:22, 107:20, 107:21, 110:16, 112:7, 114:15, 124:11, 128:22, 132:16, 133:22, 135:2, 136:1, 137:9, 199:13, 208:21, 222:8, 245:9, 245:10, 250:6, 272:8, 275:14
**military**
112:17, 113:2, 206:20, 220:20, 254:4, 254:9, 254:10, 254:11, 254:12, 262:5, 262:8, 262:12, 262:16, 262:17, 262:19, 262:21, 263:4
**mill**
233:7
**million**
69:5
**mind**
74:22, 97:2, 97:21, 175:14, 185:6, 195:10, 209:12, 227:15

**minded**
112:17, 194:6
**mindful**
18:8
**mindset**
113:2, 113:3, 254:21
**mine**
28:12, 36:6, 211:8
**minimalized**
30:13
**minute**
50:11, 58:19, 97:10, 108:9, 114:11, 114:16, 143:11, 196:6
**minutes**
110:21, 111:2, 113:19, 114:16, 158:4, 211:10, 211:12
**mirror**
204:7
**misrepresent**
34:3, 143:10, 143:12
**mission**
253:8, 267:7
**mistaken**
133:1, 179:15
**mistakes**
276:22
**mistreated**
53:5, 56:10, 56:11
**misunderstood**
194:8
**mixed**
103:10, 103:15
**mixing**
214:20
**mobile**
4:11, 4:12, 9:13, 11:6, 13:19, 13:22, 14:6, 25:2, 25:3, 27:5, 27:10, 32:22, 34:10, 34:19, 37:3
**mom**
256:9
**moment**
51:15, 55:17, 56:6, 56:9, 89:15, 102:9, 121:16, 125:12, 129:11, 130:9, 132:20, 134:14, 137:9, 153:22, 178:7, 193:17, 197:1, 256:19, 256:20, 271:3
**moments**
199:21
**month**
28:1, 36:7, 118:17
**months**
18:22, 35:21, 37:16, 39:1, 55:18, 94:9, 95:22
**mood**
113:18
**moon**
32:19, 78:16
**moppet's**
138:3
**moppins**
10:17, 10:19, 29:21, 30:1, 45:10, 45:14, 46:21, 47:3, 47:19, 54:16, 87:7, 88:18, 89:18, 90:4, 91:9, 95:1, 95:10, 95:18, 96:6, 125:14, 129:3, 130:13, 135:21, 136:18, 141:5, 143:4, 151:20, 152:9, 152:13, 152:15, 152:22, 155:4, 166:9, 167:15, 180:20, 180:22, 186:21, 187:20, 204:1, 205:16, 217:4, 221:8, 225:12, 225:15, 226:5, 228:14, 228:22, 234:9, 243:6, 243:16, 243:17, 245:16, 250:20, 252:12, 252:18, 252:22, 258:13, 259:5, 260:3, 262:4, 268:17, 270:15
**more**
7:18, 10:15, 13:1, 13:2, 18:8, 18:20, 36:10, 51:21, 52:1, 62:4, 89:14, 117:10, 128:3, 130:13, 170:17, 170:19, 180:16, 181:10, 181:12, 184:22, 185:1, 196:21, 202:5, 206:16, 206:19, 223:4, 226:4, 226:18, 236:14, 247:2
**morning**
5:8, 5:9, 110:6, 123:1, 168:5, 168:6, 168:16, 241:7
**mornings**
247:21
**most**
21:16, 57:17, 198:12, 199:15, 227:7, 242:4, 244:12, 253:6
**mostly**
174:15
**mother**
258:9
**motherfuckers**
58:12, 208:17
**motion**
9:11, 11:20, 12:2, 12:12, 12:20, 13:9, 13:17, 14:3
**mouth**
220:6
**move**
69:20, 137:21, 138:1, 190:4, 219:20, 233:6, 263:8
**moved**
61:10, 84:6, 244:14
**moving**
93:20, 244:14
**much**
9:14, 12:5, 15:17, 16:14, 16:21, 17:8, 17:19, 19:9, 39:3, 55:13, 57:13, 71:7, 95:17, 97:20, 196:15, 197:10, 198:17, 208:8, 243:15, 262:8
**mullins**
214:22
**multimedia**
34:16, 34:20
**myself**
107:1, 115:20, 122:4, 150:17, 275:16

**N**

**na-uns**
6:14
**nah**
54:12, 144:13, 270:22
**naive**
222:15
**name**
5:10, 16:10,

34:13, 71:5, 79:11, 80:6, 124:16, 152:22, 258:18
**named** 214:21, 246:5
**natural** 79:8
**nature** 92:10, 218:10, 225:2
**nd** 235:1
**near** 76:2, 165:18, 273:11
**necessarily** 22:22, 112:10, 127:8, 222:5, 226:3, 239:5, 262:18, 263:5, 267:13, 270:16
**necessary** 276:15
**need** 7:3, 60:11, 63:1, 78:4, 100:21, 101:9, 108:12, 114:12, 141:5, 195:20, 228:3, 231:9, 233:5, 234:9, 243:5, 265:17, 277:1
**needed** 64:12, 77:11, 88:11, 121:9
**needing** 92:22
**needs** 62:22, 246:1
**negative** 83:4, 83:7, 83:10, 83:12, 85:2, 232:4
**neighborhood** 19:10
**neither** 279:9
**nephew** 258:16
**network** 211:22, 212:2, 212:4
**never** 6:14, 23:19, 30:20, 31:5, 31:17, 31:19, 36:21, 38:7, 38:10, 46:1, 54:6, 54:7, 82:2, 83:2, 102:21, 113:22, 135:6, 138:15, 142:19, 143:1, 145:21, 145:22, 146:7, 153:21, 161:9, 163:5, 163:15, 163:20, 166:18, 167:3, 167:11, 187:13, 189:2, 190:14, 194:22, 201:21, 220:11, 223:20, 224:13, 226:20, 229:2, 229:4, 230:5, 232:4, 232:20, 233:13, 254:4, 255:7, 259:20, 260:21, 266:11, 274:17, 274:19
**new** 6:19, 81:2, 113:17, 190:5, 190:8, 190:9, 210:14, 221:4, 259:9
**next** 24:21, 34:5, 56:17, 58:20, 69:16, 73:16, 73:18, 92:5, 96:10, 96:11, 96:22, 105:10, 105:12, 108:1, 125:21, 188:19, 234:17
**niece** 149:13, 258:15, 258:18
**night** 72:21, 73:2, 73:14, 73:16, 73:17, 92:7, 132:1
**nobody** 82:7, 141:9, 152:2, 155:18, 178:20, 201:20, 203:7, 205:3, 274:10
**nods** 6:13
**none** 47:15, 94:1, 205:15, 229:8
**nope** 235:3, 274:7
**normal** 31:2, 40:12, 104:22, 169:5, 192:5, 192:6, 192:14, 192:20
**notarial** 279:14
**notary** 2:19, 279:19
**note** 53:18
**notes** 227:5, 261:14
**nothing** 5:4, 7:7, 38:2, 40:2, 57:18, 65:6, 65:18, 80:20, 93:9, 94:19, 95:4, 102:1, 102:2, 113:17, 122:14, 125:20, 138:5, 153:13, 172:3, 214:15, 238:13, 250:1, 250:9, 261:16, 264:9, 264:12, 274:18
**noticed** 119:14, 173:7
**noticing** 111:21, 257:14
**noting** 60:5
**numb** 212:14
**number** 12:7, 20:19, 21:2, 21:4, 21:5, 22:21, 23:6, 23:9, 23:14, 23:20, 25:5, 25:7, 25:11, 25:12, 25:15, 25:16, 25:18, 25:21, 26:2, 26:3, 26:4, 26:7, 26:8, 26:13, 33:1, 41:4, 41:5, 53:7, 133:10, 136:10, 140:19, 144:2, 150:10, 152:21, 230:9, 234:2, 234:3, 234:6, 235:13, 238:14
**number's** 20:21

O

**o** 161:22
**o'neill** 1:22, 2:19, 279:2, 279:18
**object** 210:13
**objection** 185:19, 188:3, 189:6, 192:4, 193:3, 205:19, 207:1, 212:20, 214:10, 218:3, 218:5, 218:18,

219:4, 222:13,
224:19, 234:1,
241:21, 247:10,
250:12, 250:14,
257:3, 261:7
**objections**
171:12, 271:9
**oblige**
19:6
**observe**
67:10, 191:20
**obviously**
9:7, 14:3,
19:4, 27:5,
52:8, 76:15,
78:21, 118:9,
121:8, 144:22,
151:7, 159:16,
161:13, 161:14,
165:14, 184:12,
192:9, 200:15,
203:16, 207:17,
210:10, 214:2,
239:3, 245:18,
253:11, 267:2,
268:10
**occasion**
20:11, 67:13,
83:9, 139:8
**occasional**
30:2
**occasionally**
30:7, 39:7
**occasions**
31:20
**occurred**
87:20, 87:22,
109:3
**occurs**
152:2
**october**
245:13
**offended**
100:15
**offer**
160:6
**offers**
246:21

**office**
31:20, 57:15,
57:17, 88:3,
88:5, 105:17,
109:7, 115:15,
121:15, 124:8,
125:14, 157:21,
158:7, 168:9,
168:10, 188:10,
188:11, 197:8,
197:13, 197:14,
197:16, 197:18,
197:19, 197:20,
197:22, 264:1,
264:2, 264:10,
264:14
**officer**
183:10, 279:2
**offices**
2:2
**official**
181:12, 237:22
**often**
36:13, 112:12,
113:15, 178:18,
195:1, 195:3,
196:5
**oh**
20:21, 21:18,
23:8, 43:6,
44:17, 79:1,
82:15, 85:14,
89:8, 106:17,
107:13, 109:18,
111:3, 120:6,
131:3, 131:21,
142:3, 142:15,
144:2, 147:6,
161:9, 166:18,
179:18, 180:22,
181:2, 183:18,
191:9, 197:9,
198:12, 202:16,
202:18, 205:3,
205:12, 207:10,
211:4, 212:14,
213:5, 213:18,
215:4, 230:2,

242:5, 248:5,
251:3, 251:13,
253:5, 277:6
**old**
10:18, 73:1,
113:2, 246:5,
246:16
**older**
247:14
**olgoonik**
170:11, 260:2,
260:4, 260:21
**once**
18:1, 20:3,
30:17, 36:7,
59:17, 133:17,
134:4, 185:2,
270:7
**ones**
69:8
**only**
36:19, 48:13,
64:3, 69:19,
73:14, 99:20,
106:9, 121:9,
134:4, 143:5,
173:12, 175:8,
177:11, 193:8,
195:12, 206:21,
207:3, 207:5,
212:2, 216:6,
217:13, 237:20,
239:14, 242:7,
242:9, 252:8,
272:11
**open**
114:15, 172:10,
174:22
**opened**
176:10
**operation**
206:20
**operational**
62:12
**operations**
52:12, 66:18,
66:19, 66:20,
70:2, 70:5,

70:9, 70:12,
120:18, 185:5,
185:10, 259:17
**opinion**
174:7, 187:17,
188:1, 189:17,
205:16, 217:16,
224:14
**opinionated**
50:22
**opportunity**
115:2, 115:3,
117:22, 179:20,
210:2, 269:3
**ops**
52:14, 62:18
**orchestrated**
246:16, 247:8
**ordeal**
147:15, 165:21
**order**
64:12, 178:14,
263:1, 263:2
**orders**
263:3
**organization**
59:14, 180:11
**oriented**
210:10, 253:8
**originated**
131:9
**other**
6:10, 8:15,
9:2, 9:15, 9:17,
12:1, 20:10,
20:15, 28:13,
30:2, 30:4,
30:7, 30:9,
31:11, 31:20,
34:9, 36:17,
40:7, 41:13,
42:1, 44:10,
49:14, 50:10,
60:6, 73:9,
73:19, 77:7,
99:1, 103:12,
104:20, 114:4,
126:11, 137:5,

140:4, 141:11, 141:12, 147:4, 155:10, 172:22, 178:3, 178:6, 184:6, 191:21, 192:19, 198:8, 201:19, 202:3, 202:4, 204:3, 210:5, 214:16, 218:9, 219:21, 221:7, 225:14, 233:2, 236:17, 239:1, 242:12, 242:15, 242:18, 242:19, 258:11, 258:12, 262:14, 263:19, 265:8, 268:8, 268:13, 268:18, 270:9, 274:1, 275:3, 276:5
**otherwise**
186:5, 267:4, 279:11
**out-worked**
69:10, 178:1
**out-working**
176:16, 177:13
**outcome**
279:12
**outside**
8:1, 11:1, 12:10, 31:1, 31:4, 31:17, 31:19, 50:6, 57:12, 76:10, 138:11, 141:13, 163:17, 163:20, 164:8, 181:15, 181:17, 193:13, 201:11, 216:4, 216:5, 225:18, 226:2, 226:7, 232:16, 252:15, 262:22, 263:22, 264:2, 264:10, 264:13, 267:12, 268:7
**outspoken**
50:22
**over**
33:22, 59:7, 60:22, 61:3, 76:1, 80:15, 118:16, 151:3, 166:4, 184:17, 186:22, 187:3, 189:15, 200:9, 214:17, 214:19, 218:13, 239:22, 241:17, 245:11, 246:4, 252:17, 253:12, 255:3, 260:8, 261:19, 269:16, 273:6
**overlap**
243:15
**overlapping**
253:1, 253:2
**overseas**
196:20
**own**
35:12, 56:12, 74:14, 77:13, 77:14, 138:11, 139:14, 197:13, 250:1
**owner's**
268:6

**P**

**page**
4:2, 12:20, 12:22, 13:1, 13:5, 41:10, 41:11, 44:6, 53:7, 53:8, 219:1, 228:10
**pages**
1:21
**paid**
201:20
**pair**
262:22
**paperwork**
11:8, 11:9, 79:20, 159:1, 188:14
**paragraph**
14:13, 41:9, 41:10, 125:21, 140:19, 145:3, 147:17
**parker's**
14:19, 25:10, 26:3, 26:4, 26:8, 33:7, 40:6, 126:14, 148:3, 155:14, 176:5, 184:8, 184:17, 193:1, 239:4, 269:15, 270:14, 272:17
**parking**
213:4, 221:21
**part**
16:19, 43:12, 48:15, 51:17, 56:4, 60:9, 71:8, 80:9, 104:19, 106:13, 107:5, 107:14, 116:22, 118:15, 121:16, 124:4, 126:5, 127:5, 127:8, 127:15, 127:18, 128:9, 128:12, 129:4, 130:5, 131:9, 131:12, 134:16, 147:10, 151:5, 154:10, 183:8, 200:5, 208:21, 223:17, 225:18, 232:10, 238:18, 244:12, 248:22, 253:6, 260:9, 270:18, 270:22, 272:4
**participate**
156:10, 233:6
**participation**
228:5
**particular**
111:10, 121:20, 194:7, 274:5
**parties**
80:18, 136:11, 279:10
**parts**
172:10
**party**
55:4, 223:19
**passing**
59:13
**passionate**
53:2
**past**
150:13, 154:10
**path**
170:9
**paul**
2:4, 3:13
**pause**
261:13
**pay**
93:12, 97:20, 142:14, 227:15, 228:1, 228:3
**paying**
204:16
**pending**
13:20, 44:9, 44:18, 45:1, 173:13
**people's**
105:21
**perceive**
224:14
**perception**
188:20
**performance**
67:13, 93:22, 94:5, 94:8, 94:11, 118:16, 118:21, 119:12, 119:19, 130:15, 131:15, 163:16, 163:22, 176:14, 184:9, 229:10, 229:11, 230:7
**period**
22:5, 42:21,

68:8, 70:14, 70:15, 167:7, 246:5, 246:18
**periodic**
173:8
**periodically**
19:9, 19:12, 199:2
**person**
18:9, 36:22, 40:7, 41:13, 50:20, 69:21, 121:2, 161:15, 185:15, 185:16, 252:8
**personal**
15:6, 15:10, 15:14, 21:1, 21:3, 22:18, 23:19, 39:19, 59:19, 78:10, 81:6, 81:11, 91:10, 92:17, 92:19, 94:17, 95:3, 95:5, 112:3, 115:1, 122:2, 122:18, 164:3, 200:10, 205:17, 206:5, 228:20, 255:14, 255:15, 255:16, 257:5
**personally**
19:20, 153:19, 170:1, 206:7, 212:17, 255:16, 256:7
**personnel**
15:7, 174:5, 186:18, 205:18
**perspective**
8:6, 119:3, 265:6
**pg**
16:4
**phone**
9:13, 15:7, 15:10, 15:12, 15:14, 21:2, 21:4, 21:5, 21:9, 21:17, 21:18, 21:20, 22:7, 22:12, 22:16, 22:18, 23:2, 23:6, 23:11, 23:14, 23:20, 25:5, 25:10, 25:15, 33:1, 36:17, 36:19, 97:17, 112:4, 120:3, 120:9, 166:21, 195:18, 197:13, 197:14, 256:13
**phones**
21:11
**phonetic**
32:16, 69:6, 170:11, 246:6
**physical**
90:5, 90:7, 215:7, 215:19
**physically**
207:12
**pick**
166:21
**picked**
32:2, 106:12
**picket**
34:6, 40:17
**pickett**
1:13, 2:1, 4:2, 4:9, 5:2, 5:8, 6:10, 7:5, 12:15, 12:18, 24:18, 24:21, 25:1, 40:22, 41:4, 41:19, 44:8, 45:7, 45:9, 46:20, 46:22, 47:18, 53:20, 60:19, 77:22, 106:18, 108:17, 117:11, 117:15, 122:1, 122:3, 122:4, 124:8, 126:7, 133:14, 140:9, 140:12, 140:20, 141:2, 145:3, 145:8, 150:11, 152:9, 152:13, 162:16, 162:21, 163:2, 170:16, 172:15, 186:3, 228:11, 228:19, 234:4, 261:20, 262:1, 276:5, 276:7, 278:2, 278:11
**pickett's**
57:21
**picking**
31:21
**picture**
74:22, 204:7, 205:2
**pictures**
21:21, 22:4, 22:7, 205:15
**pieces**
98:9, 98:10
**pip**
163:10, 163:12, 163:14, 163:15, 163:21, 164:10, 164:11, 164:12, 164:14, 166:10, 167:2, 167:6, 167:9, 167:10, 167:11, 167:16, 169:7, 169:12, 206:13, 248:21, 249:4, 249:6, 264:19
**pips**
167:4
**piss**
51:7, 51:9
**pissed**
107:10, 107:12, 202:21
**place**
31:6, 47:11, 138:8, 157:4, 157:7, 197:22, 204:12, 247:20, 257:8, 265:20
**plaintiff**
1:6, 3:2, 41:20, 41:22, 44:8, 44:10, 45:6, 45:9, 47:19, 53:20, 57:22, 172:12
**plaintiff's**
44:9, 45:7, 45:10, 47:20, 53:21, 54:13
**plan**
94:12
**play**
101:4, 192:7
**played**
31:15, 48:15, 48:22, 55:22, 82:1, 82:2, 268:8
**please**
6:4, 6:12
**pleasure**
103:11, 103:15
**pm**
64:1, 91:16, 135:18, 214:3, 245:5, 245:20, 246:5, 246:16, 246:18, 247:2
**point**
6:2, 16:22, 21:6, 61:10, 77:9, 91:20, 104:2, 107:6, 116:7, 124:10, 126:15, 133:10, 133:15, 143:15, 155:3, 158:17, 163:8, 165:21, 168:1, 171:19, 176:5, 196:18, 203:19, 212:11, 212:13, 213:15,

219:17, 228:7, 239:10, 244:12, 247:2, 249:10, 252:18, 252:20, 257:9, 258:15, 264:20, 267:21, 275:2
**points**
172:22
**pool**
31:7
**pooled**
16:4
**pop**
261:15
**portion**
74:3, 199:15
**position**
7:20, 40:15, 60:11, 61:11, 61:20, 69:1, 69:13, 178:14, 178:16, 178:20, 207:19, 272:21, 274:9
**positions**
68:13, 78:8, 178:11, 178:12, 178:13, 178:18, 271:7
**positive**
184:8, 184:11
**possibility**
194:10
**possible**
35:6, 200:18
**possibly**
28:2, 35:5
**power**
114:14
**pregnancy**
29:15
**preliminary**
172:22
**prepare**
7:5, 8:4, 8:6
**presence**
133:14
**present**
115:14, 115:17, 126:13, 138:7, 150:6, 156:4, 156:5, 156:16, 156:20, 156:21, 157:1, 165:15, 269:14, 274:19
**presents**
49:17
**preserve**
186:8
**president**
64:7
**pretty**
15:17, 64:8, 98:22, 107:22, 111:13, 111:15, 172:16, 184:13, 191:16, 202:21, 217:13, 252:5
**previous**
78:17, 80:18, 118:17
**previously**
140:14, 176:4
**price**
41:20, 42:4, 42:14, 43:1, 43:3, 43:4, 43:7, 43:13, 44:1, 64:20, 94:14, 102:17, 102:21, 103:3, 103:10, 104:19, 132:12, 133:4, 136:14, 136:18, 137:2, 137:4, 140:21, 143:2, 144:14, 146:13, 146:16, 147:3, 148:16, 149:11, 150:2, 156:18, 164:2, 165:1, 202:3, 202:7, 202:16, 202:22, 216:8, 223:6, 224:17, 225:11, 225:17, 226:14, 226:15, 248:18, 258:15, 268:10
**price's**
137:20, 140:15, 146:9, 232:11, 233:2
**prince**
148:13
**printer**
211:21, 212:4
**prior**
105:4, 253:12
**private**
87:17, 88:1, 127:10, 154:19
**privy**
55:5, 238:10, 238:11, 260:16, 261:2, 268:9
**pro**
194:4, 194:5
**probably**
16:1, 21:7, 33:9, 35:18, 36:5, 37:21, 39:4, 39:17, 42:9, 43:8, 53:12, 61:21, 64:7, 68:11, 68:22, 69:1, 69:5, 69:12, 71:9, 74:21, 80:13, 81:3, 85:10, 85:20, 89:12, 91:5, 91:13, 92:9, 107:22, 111:19, 111:20, 114:9, 145:1, 150:4, 151:11, 153:8, 170:7, 170:18, 195:18, 197:12, 198:15, 207:9, 209:14, 226:4, 230:15, 230:21, 256:3, 262:14, 273:18
**problem**
92:8, 120:5, 120:7, 122:10, 146:12, 147:11, 153:3, 163:15, 173:19, 184:5, 226:11, 229:16
**problems**
116:18, 130:21, 203:19
**procedures**
227:1
**proceed**
151:14
**process**
5:16, 54:8, 177:5, 177:6, 248:10
**produced**
34:10
**product**
21:21, 22:4, 22:8, 105:7, 121:4
**products**
196:19
**professional**
59:19, 163:20
**program**
16:8, 61:12, 61:14, 61:20, 62:5, 120:18, 166:16, 259:14, 259:21
**progressive**
221:1
**project**
62:22
**projects**
180:2
**promote**
174:5, 175:5
**promoted**
52:10, 66:11, 66:12, 175:1, 176:9, 176:15, 179:6, 184:19, 185:4, 185:22,

253:16
**promoting**
174:9
**promotion**
178:5, 182:16, 185:17
**prompted**
100:11
**proof**
58:18, 165:4
**proprietary**
267:3
**proud**
210:21, 218:1, 218:4
**provided**
272:12
**proximity**
193:12
**public**
2:19, 11:15, 279:1, 279:19
**pull**
177:20
**pursuant**
2:18
**push**
57:10
**pushed**
55:21, 248:6
**pushing**
130:18
**put**
40:19, 41:3, 65:18, 98:8, 98:10, 105:7, 108:15, 117:8, 117:9, 117:20, 118:3, 118:4, 171:18, 223:11, 223:12, 226:14, 238:19, 244:13, 244:18, 248:16, 266:2, 269:15, 272:20
**puts**
119:3
**putting**
65:13, 273:3, 273:5

**Q**

**quan**
182:2, 182:19, 183:4, 183:10, 230:16, 231:17
**quantify**
196:6, 198:8, 200:8
**question**
6:2, 6:5, 9:1, 108:6, 121:5, 148:9, 161:3, 163:2, 167:13, 171:7, 173:2, 173:12, 173:13, 186:6, 187:19, 218:19, 229:1, 238:3, 260:9, 270:18, 275:21
**questions**
5:17, 8:7, 8:9, 8:17, 14:10, 116:6, 170:17, 170:19, 172:15, 172:18, 172:20, 173:20, 180:2, 217:3, 243:15, 261:19, 272:21, 276:5
**quick**
108:10, 171:2, 186:14, 202:2, 223:11, 262:2, 275:21
**quickly**
173:1, 175:11, 184:13, 190:20, 200:14, 228:6, 235:22, 243:3
**quit**
209:21
**quite**
108:7, 152:18, 172:16, 174:2

**R**

**rachelle**
80:1, 80:3, 81:17
**rack**
139:17, 140:4, 177:17
**racks**
75:13, 139:10, 139:13, 139:14, 139:15
**radioed**
124:11
**ragunton**
134:17, 237:4
**rah**
93:19, 107:18, 207:15, 207:16
**rained**
31:16, 82:8, 82:20
**raining**
82:9
**raised**
108:22, 109:4, 129:4
**raising**
130:20, 130:21, 270:21
**rajesh**
43:14, 64:5, 94:14, 156:22, 187:4
**rajesh's**
64:12
**ran**
70:17, 206:3, 211:21, 245:7
**randomly**
221:18
**rapport**
78:18, 78:21, 80:17
**rashelle**
80:3, 80:4
**rat**
213:17, 213:18
**rather**
208:4
**rcs-imchat**
34:15, 34:18
**rcsi**
15:18, 17:7, 22:21, 30:8, 36:22, 37:2, 53:21, 60:21, 66:4, 68:13, 78:5, 112:9, 246:4, 246:19
**reach**
7:12, 7:13, 7:19, 27:17, 38:8, 166:20, 196:1, 196:2, 231:15, 231:16
**reached**
17:10, 19:1, 27:15, 43:5, 150:19, 151:10, 154:3, 159:11, 166:20
**reaction**
89:4
**read**
6:15, 29:4, 34:12, 117:16, 117:17, 117:19, 143:11, 200:4, 278:3
**reading**
146:15, 152:12, 200:2, 200:3, 279:8
**ready**
69:9, 113:9, 138:1, 182:14
**real**
52:3, 79:11, 254:20
**reality**
220:10
**reason**
59:18, 76:22, 99:20, 103:12, 103:14, 122:12, 140:8, 154:17, 160:16, 173:9, 176:12, 178:3, 178:7, 178:19,

217:7, 217:11, 235:19, 236:1, 270:3, 274:5
**reasons**
101:2, 160:11, 160:14, 228:16
**receive**
163:7, 270:5
**received**
25:2, 25:3, 163:3
**receiver**
196:14
**receiving**
62:13, 62:17, 66:17, 69:19, 75:12, 75:13, 116:8, 120:20, 139:3, 163:9, 176:21, 177:5, 196:14, 240:10, 245:10, 251:22
**recent**
12:7
**recently**
260:3
**recollection**
118:6
**recommend**
176:9, 179:6, 188:22
**recommendation**
180:14
**recommendations**
174:14
**recommended**
179:8, 180:11, 182:16
**record**
6:7, 6:15, 37:18, 108:9, 108:18, 117:14, 171:5, 172:6, 186:9, 261:14, 276:14, 277:8, 277:9, 279:5
**record's**
79:10
**records**
4:11, 4:12, 9:13, 11:14, 11:15, 15:4, 15:7, 16:20, 40:5, 40:6, 40:7, 71:15, 172:11, 210:19
**red**
182:2
**reduced**
244:19, 279:7
**reema**
1:8, 5:10, 18:5, 18:6, 18:8, 18:9, 19:15, 30:18, 32:4, 32:7, 43:14, 63:12, 94:15, 104:4, 156:19, 156:21, 161:6, 163:4, 163:8, 164:1, 167:15, 174:2, 184:1, 189:19, 204:4, 210:9, 210:10, 210:11, 210:16, 211:5, 243:17, 243:20, 244:21, 245:1, 245:11, 252:17, 253:1, 253:3, 253:4, 253:5, 255:3, 256:18, 259:6, 268:1, 268:2, 268:3, 276:1
**reeves**
66:16, 70:11, 83:14, 175:15, 176:5, 216:13, 216:14
**refer**
53:17
**reference**
90:18, 117:21, 218:11, 218:12, 221:15, 237:15, 237:17
**references**
182:11
**referring**
43:12
**refrain**
136:12
**refresh**
118:6
**refusal**
190:8
**regard**
115:3, 118:21
**regards**
118:15, 232:18
**regular**
179:3
**relate**
254:6
**related**
41:13, 199:17, 210:16, 215:14, 267:6, 279:9
**relation**
28:6, 28:8, 122:18, 195:15
**relationship**
30:9, 30:11, 81:6, 81:8, 87:8, 92:11, 122:2, 127:13, 135:18, 201:3, 202:9, 210:11, 213:1, 213:14, 214:5, 224:18, 225:3, 225:7, 225:11, 225:22, 228:20, 231:10, 252:22, 253:17, 256:1, 256:16, 258:7, 265:3, 265:5, 266:8, 266:14, 272:1
**relationships**
258:12, 264:13, 267:12
**relative**
11:17, 12:2, 130:20
**relevant**
14:15, 14:22, 15:4, 15:5
**relish**
218:6
**remain**
19:14
**remember**
5:21, 8:18, 10:5, 10:12, 27:13, 37:19, 42:6, 42:9, 45:22, 49:16, 50:7, 52:9, 54:19, 57:1, 57:3, 57:6, 61:6, 61:9, 61:17, 70:2, 70:21, 71:18, 72:22, 78:14, 83:16, 84:4, 84:15, 84:16, 87:12, 88:9, 90:21, 93:2, 98:20, 105:16, 106:1, 112:5, 113:8, 118:13, 119:4, 125:1, 125:5, 126:1, 126:2, 127:9, 128:15, 128:17, 128:21, 129:10, 129:19, 131:2, 131:5, 131:6, 132:11, 133:17, 133:18, 134:1, 134:20, 135:11, 136:5, 136:14, 136:17, 137:7, 137:19, 147:13, 163:9, 166:6, 169:13, 169:14, 169:17, 176:13, 184:7, 184:12, 197:4, 197:5, 227:12, 242:17, 258:17

**remembered**
122:6
**remind**
6:11
**rented**
247:20
**repeated**
129:8
**rephrase**
6:3, 6:5, 7:2
**report**
4:17, 63:8, 68:10, 151:20, 226:13, 232:20, 233:12, 233:13, 260:21
**reported**
1:22, 66:9, 66:15, 66:16, 66:21, 67:2, 70:9, 122:11, 266:9
**reporter**
152:11, 183:7, 218:2, 276:13, 277:5
**reporter-notary**
279:1
**reports**
68:5
**represent**
5:10
**representative**
104:2, 146:11, 183:10, 228:12, 230:11
**reputation**
192:11
**requested**
49:17, 228:19, 229:9, 279:8
**resources**
54:15, 64:22
**respect**
136:13
**respectful**
168:11
**respond**
43:3
**responded**
212:18
**response**
43:19, 44:10, 54:14, 129:3, 129:6
**responses**
171:10, 171:16
**responsibilities**
62:9, 183:6
**responsibility**
62:11, 62:21, 63:4, 63:7, 161:12
**responsible**
174:5, 174:6, 185:16, 185:17, 186:17
**rest**
13:4, 183:6, 190:16
**restaurant**
73:13, 73:15
**result**
100:17, 102:6, 215:2, 215:3, 215:11, 220:7, 233:1, 233:4
**resulted**
109:10
**retaliatory**
54:14
**retrospect**
104:14, 170:7
**returned**
13:10
**revealed**
154:19
**review**
167:7, 167:10, 167:11, 261:14, 276:8, 276:14, 277:2
**revisit**
270:12
**rich**
34:15
**richardson**
3:4
**rid**
251:15
**ride**
199:12
**ridiculous**
202:17, 203:3
**riding**
237:12
**rights**
212:3
**rmr**
1:22, 2:19, 279:18
**rochelle**
204:8
**rog**
171:16
**roger**
186:7
**role**
49:1, 50:11, 50:16, 60:20, 61:4, 61:7, 66:10, 67:16, 120:22, 174:7, 181:7, 196:10, 245:1, 245:3, 245:16, 246:3, 253:16, 259:8, 259:13, 268:8
**roles**
69:22, 174:4, 198:6
**roll**
184:17, 190:18
**rolled**
89:13
**rolls**
62:20
**romaine**
16:7, 31:14, 32:10, 40:8, 78:15, 79:15, 80:13, 81:10, 96:13, 97:11, 97:16, 98:19, 99:6, 99:12, 99:13, 99:19, 141:11, 141:13, 143:4, 144:17, 145:20, 147:20, 148:2, 148:12, 151:14, 182:4, 232:15, 236:3
**romaine's**
19:12
**romantic**
266:8
**room**
56:17, 57:3, 76:5, 78:6, 126:6, 128:16, 133:16, 147:1, 215:22, 224:4, 239:20
**roughly**
62:6, 62:7
**round**
236:6
**rufus**
16:10, 32:18, 78:16
**rule**
19:4
**rules**
262:20
**rumor**
55:9, 55:17, 56:6, 102:19, 104:20, 105:11, 105:12, 106:10, 106:14, 106:15, 106:17, 106:20, 107:5, 107:14, 108:1, 109:12, 109:16, 116:20, 116:22, 119:5, 122:1, 122:7, 122:17, 122:21, 125:18, 126:1, 127:5, 127:8, 127:11, 127:12, 127:15, 127:21, 128:10, 128:11, 129:4, 129:5, 130:6, 130:7,

130:13, 130:17, 130:18, 131:1, 131:9, 131:11, 141:11, 141:19, 142:6, 143:6, 145:5, 147:3, 151:5, 151:11, 151:22, 152:2, 154:5, 154:8, 154:10, 169:20, 200:14, 200:16, 200:19, 201:10, 201:12, 202:14, 203:5, 203:14, 203:17, 204:6, 204:21, 204:22, 205:6, 205:8, 224:2, 226:12, 226:16, 227:14, 227:22, 232:8, 232:9, 233:7, 234:14, 235:19, 236:22, 271:22
**rumors**
135:17, 147:14, 201:19, 202:3, 202:4, 203:1, 204:3, 204:18, 233:5, 233:6
**run**
76:6, 108:11, 183:4, 209:22, 210:1
**running**
182:7, 182:13, 191:19, 211:19

S

**sake**
210:15
**salvaged**
272:2
**same**
19:10, 20:20, 20:21, 22:20, 30:11, 40:10, 42:11, 43:13, 43:14, 43:15, 55:8, 96:14, 99:9, 99:15, 103:1, 110:18, 113:13, 132:7, 134:11, 166:9, 177:11, 177:16, 188:2, 188:4, 195:16, 200:2, 200:3, 219:1, 223:12, 224:1, 230:19, 244:6, 244:8, 244:9, 244:10, 259:8, 259:12, 263:16, 266:12, 266:21, 274:13, 275:10, 278:4
**sat**
161:10, 164:8
**savvy**
11:12
**saw**
54:6, 54:7, 111:11, 111:13, 111:22, 157:10, 168:12, 182:15, 193:4, 230:1, 240:19, 242:7, 260:21, 273:9, 274:17
**saying**
6:4, 6:8, 18:7, 19:17, 28:4, 37:13, 39:22, 44:16, 53:2, 56:4, 74:21, 88:18, 90:10, 90:16, 92:10, 92:16, 93:11, 97:6, 99:2, 99:20, 100:5, 100:22, 101:5, 102:10, 102:21, 103:3, 103:17, 105:1, 105:19, 111:1, 116:4, 118:10, 119:4, 120:14, 122:12, 125:6, 125:16, 127:3, 131:17, 131:19, 132:19, 134:8, 134:20, 135:7, 135:12, 135:13, 136:8, 142:12, 144:2, 150:2, 164:20, 168:6, 168:16, 178:18, 180:14, 193:22, 195:11, 195:16, 204:13, 211:2, 212:18, 215:5, 215:8, 215:9, 216:2, 229:13, 229:19, 229:20, 230:16, 234:19, 239:19, 249:22, 255:5, 268:19, 270:4, 271:18, 272:13, 273:1
**says**
12:5, 13:17, 25:21, 27:16, 34:15, 45:6, 47:18, 53:20, 57:21, 93:13, 122:3, 122:22, 126:6, 136:10, 140:19, 142:22, 145:3, 147:18, 150:11, 152:8, 159:1, 165:18, 186:11, 228:10, 232:1
**scale**
75:1
**scan**
177:8
**scattering**
82:14
**scenario**
255:3
**scenes**
121:3, 226:22
**schedules**
8:2
**scheduling**
8:15
**schematic**
255:2
**scheme**
67:6
**school**
204:12
**scissors**
263:1
**screen**
34:21
**se**
45:18
**seafood**
73:13, 73:15
**seal**
279:14
**season**
28:15
**seat**
237:14, 273:4, 273:5
**second**
10:22, 12:22, 34:15, 66:7, 86:2, 99:17, 99:18, 99:21, 102:6, 107:19, 117:18, 119:10, 129:20, 132:2, 133:8, 141:7, 180:17
**seconds**
196:6
**secretive**
236:5
**section**
74:2, 245:7
**see**
16:20, 23:5, 23:7, 25:5, 27:17, 36:5, 37:6, 37:17, 55:6, 55:12, 56:2, 56:10, 60:2, 69:2, 82:4, 82:5,

82:10, 83:3, 83:6, 87:3, 105:3, 114:9, 121:2, 137:18, 138:13, 138:19, 140:4, 157:17, 157:22, 158:3, 166:3, 168:11, 175:8, 188:16, 192:13, 214:20, 215:8, 216:5, 224:9, 226:21, 240:11, 241:9, 266:4, 266:17, 266:19, 267:8, 268:16, 270:10, 274:15
**seem**
24:17, 66:5, 272:17
**seemed**
130:9, 180:3, 218:6
**seeming**
97:8
**seems**
143:8, 192:14, 192:19, 243:14
**seen**
10:9, 11:16, 11:21, 12:22, 13:4, 31:19, 37:1, 54:10, 59:3, 103:8, 130:10, 138:15, 146:7, 146:22, 158:1, 163:3, 163:5, 164:11, 165:13, 187:13, 188:8, 190:14, 192:15, 205:22, 224:12, 224:13, 226:20, 230:20, 232:20, 232:22, 233:13, 240:9, 258:3, 262:4
**seminar**
72:6, 73:8
**send**
10:2, 14:5, 14:8, 34:21, 265:19
**sending**
35:3, 204:8
**sense**
48:13, 58:7, 106:15, 116:13, 179:13, 196:4, 223:16, 267:4
**sensitive**
200:18
**sent**
11:9, 11:10, 71:4, 168:18
**sentence**
119:10
**sentiment**
224:1
**september**
37:4, 37:7, 37:8, 37:14, 37:15, 61:18, 189:22, 244:1, 244:2
**series**
5:17
**serious**
89:16, 164:17
**serve**
259:8
**service**
254:18
**services**
1:9, 5:11
**serving**
221:20
**set**
211:16, 232:6, 253:21, 262:20, 266:3, 279:13
**seven**
18:22, 41:9, 41:10, 41:11, 257:10
**sexual**
135:16, 135:20, 136:8, 202:8, 218:16, 218:20, 220:13, 220:15, 221:8, 221:15, 237:17
**sexually**
219:13
**share**
127:17
**shared**
35:5, 197:20
**sharing**
145:6, 267:3
**sharon**
1:22, 2:18, 279:2, 279:18
**shaun**
66:16, 67:15, 68:7, 68:9, 70:11, 83:14, 84:2, 84:17, 157:16, 159:3, 175:15, 176:4, 176:5, 178:4, 180:16, 212:2, 213:3, 215:19, 216:12, 216:14, 275:16, 275:18
**she'd**
197:14, 197:15
**sheba**
16:7, 19:10, 31:14, 78:13, 78:15, 79:4, 79:6, 80:13, 82:18
**sheba's**
19:11, 79:11
**sheet**
278:7
**shifted**
62:21
**shipping**
62:13, 69:20, 139:20, 196:19, 251:22
**shit**
44:17, 88:21, 89:1, 147:9, 158:10, 158:16, 168:20, 209:2, 221:3, 221:16, 229:15, 229:16
**shocked**
50:5, 50:6, 93:14, 104:9
**shop**
206:3
**short**
68:1
**shorthand**
279:1
**shot**
34:21
**should**
23:17, 86:6, 142:4, 153:7, 155:19, 160:14, 166:18, 180:15, 180:16, 189:4, 209:15, 223:17, 224:10, 229:6, 270:4
**shouldn't**
206:1, 214:6
**show**
5:18, 6:1, 12:18, 25:1, 34:9, 71:16, 140:12, 162:19, 162:21, 212:9, 216:5
**showering**
247:22
**showing**
177:14
**shows**
26:11, 38:14, 200:7
**shunned**
55:21, 56:11
**shut**
57:12, 110:16, 111:9, 111:12, 114:18, 243:7
**shy**
191:14

**sic**
46:20
**side**
55:21, 77:9, 84:16, 84:20, 130:6, 140:3, 140:4, 166:3, 183:6, 183:9, 219:21, 221:4, 238:17
**sided**
165:1
**sides**
270:9
**sidetrack**
202:2
**sidetracked**
60:15, 226:10
**sign**
170:4, 170:9, 188:15, 277:2
**signature**
13:3
**signature-nty8k**
279:16
**signed**
165:15, 169:12, 170:2, 170:6, 229:6, 278:7
**signing**
169:13, 279:8
**silly**
141:18
**similar**
173:4, 212:18, 218:14
**simple**
267:11
**simply**
272:3
**since**
15:17, 15:19, 15:20, 24:16, 30:8, 30:9, 37:1, 55:17, 56:9, 74:20, 80:13
**single**
114:20
**singled**
16:17, 40:4
**sink**
76:5
**sir**
29:2, 29:12, 29:13, 32:3, 48:4, 64:16, 143:7, 268:21
**sister**
79:14, 103:21
**sit**
198:1, 198:3
**site**
103:19, 132:22, 147:8, 181:21, 186:22, 187:3, 210:12, 223:6
**sits**
198:20
**sitting**
105:17, 126:10, 164:8, 168:11, 188:13, 198:22, 215:22
**situation**
17:9, 42:19, 46:1, 48:15, 50:19, 55:22, 65:10, 94:17, 100:8, 100:9, 105:19, 107:16, 128:14, 130:1, 141:4, 142:1, 142:2, 142:4, 143:1, 189:14, 200:17, 206:6, 207:15, 212:19, 215:2, 215:3, 215:12, 227:19, 229:4, 231:2, 234:8, 249:3, 266:12
**six**
39:1, 257:9
**skeen**
2:3, 3:12
**skelter**
163:19
**skins**
182:2
**slave**
134:18, 135:6, 272:10
**sleeping**
86:6, 92:4, 200:20
**slept**
92:7
**slightly**
125:15
**slot**
174:22, 176:10
**small**
39:19, 39:21, 104:16, 105:9, 168:4, 209:18, 225:16
**smaller**
109:9
**smart**
252:5
**sme**
228:12, 228:13, 228:14, 228:19, 230:9, 232:2, 245:5, 247:3, 252:18
**smoothly**
120:19
**social**
236:14, 236:15
**solely**
276:12
**solidified**
249:11
**some**
5:18, 6:1, 8:22, 9:11, 11:9, 11:19, 14:10, 25:2, 26:12, 26:17, 28:3, 33:2, 40:18, 48:13, 49:22, 57:2, 59:10, 59:12, 59:16, 61:10, 65:16, 68:8, 71:15, 73:13, 75:11, 75:12, 76:11, 77:11, 87:6, 88:21, 90:20, 91:6, 93:17, 102:4, 112:10, 112:13, 116:18, 118:3, 118:4, 122:10, 130:7, 133:2, 142:16, 144:5, 164:4, 170:19, 171:19, 172:19, 175:2, 180:8, 189:11, 190:15, 191:16, 201:18, 202:3, 202:4, 204:11, 207:7, 208:11, 209:7, 210:17, 210:19, 213:15, 217:1, 217:2, 221:10, 233:18, 233:20, 235:5, 236:9, 237:14, 246:15, 247:2, 247:21, 248:10, 252:18, 252:20, 254:3, 254:8, 264:4, 264:6, 275:2, 275:8
**somebody**
30:14, 45:19, 45:20, 51:5, 63:1, 79:1, 80:22, 93:13, 100:4, 106:1, 124:20, 148:22, 149:1, 159:12, 161:19, 175:1, 177:10, 188:12, 195:15, 199:7, 207:13, 214:14, 214:16, 215:7, 221:12, 222:21, 240:1, 241:1, 265:2, 265:18,

266:9, 266:15, 267:4, 273:1, 274:19
**somebody's** 224:22, 270:5
**someone** 175:5, 184:8, 189:3, 198:10
**sometime** 250:22
**sometimes** 27:17, 69:17, 125:3, 125:4, 174:17, 180:20, 184:3, 188:9, 194:8, 197:15, 198:9, 199:4, 208:3, 213:20, 265:16, 269:21, 272:20
**somewhere** 246:7
**son** 20:12, 28:22
**sons** 79:17
**soon** 168:10
**sorry** 25:18, 41:11, 47:1, 61:22, 73:7, 80:3, 84:6, 87:12, 108:5, 152:11, 152:12, 183:7, 185:14, 206:9, 207:2, 211:1, 214:11, 218:2, 226:9, 259:15
**sought** 14:14
**sound** 118:11, 119:8, 234:10
**sounds** 146:14, 236:9
**source** 151:15, 151:17

**south** 225:15
**space** 109:22
**span** 105:14
**spare** 77:11
**spark** 104:10
**speak** 7:2, 81:8, 92:12, 121:21, 150:15, 168:12, 168:13, 206:5, 247:6
**speaker** 256:13
**speaking** 9:2, 15:7, 18:10, 136:12, 140:20, 168:15, 234:6
**speaks** 51:2
**spear** 74:2, 74:14, 74:17, 75:2, 75:15, 75:16, 75:19, 75:21, 76:13, 76:14, 76:19, 76:20, 76:21, 77:13, 77:16, 84:9, 84:13, 84:18, 84:22, 138:22, 139:9, 139:13, 139:16, 139:20, 139:22, 140:7, 216:18, 216:19, 238:15, 239:4, 274:13
**specialist** 68:16, 69:12, 70:5, 251:22
**specific** 48:19, 115:8, 140:17

**specifically** 64:14, 83:16, 87:21, 88:10, 117:5, 134:21, 136:7, 165:11, 178:7, 179:5, 179:7, 222:4
**specifics** 30:4, 132:22, 233:15, 260:12
**speculate** 22:15, 81:20, 96:2, 96:3, 224:20, 225:21, 249:18
**speculation** 249:17
**speculative** 165:5
**spend** 16:14, 196:7, 256:5
**spent** 247:18
**spill** 58:18
**spoke** 179:8
**spoken** 27:3
**spouse** 152:9, 152:13, 152:15
**spread** 182:5
**spreading** 130:7
**st** 2:4, 3:13, 28:1
**staff** 115:5, 117:1, 143:15, 143:16, 144:1, 144:4, 153:15
**staffing** 234:22
**stand** 199:4

**standing** 56:19, 56:21, 57:11, 110:19, 111:21, 240:19, 241:2, 241:3, 241:6, 242:8, 243:1
**standoffish** 57:14
**standpoint** 15:8, 18:10, 18:11, 107:18
**stare** 274:15
**staring** 240:7, 240:8, 240:11, 273:10
**start** 15:21, 46:5, 60:21, 82:13, 103:16, 108:13, 125:18, 171:5, 196:15, 197:3, 198:18, 199:22, 204:15, 204:16, 209:6, 209:9, 211:10, 223:9, 237:6, 270:7
**started** 26:11, 68:21, 78:9, 78:11, 79:9, 81:3, 85:21, 95:19, 105:3, 110:15, 116:19, 124:17, 133:6, 143:17, 145:5, 147:3, 150:4, 155:4, 157:9, 168:2, 168:4, 168:5, 168:14, 168:17, 169:3, 173:21, 177:15, 191:6, 191:8, 191:13, 192:9, 197:6, 207:17, 235:19, 246:19, 255:6, 270:3

**starting**
129:12, 129:21, 135:17, 203:1
**starts**
114:11, 179:17, 237:7
**state**
2:19, 113:5, 160:21, 182:21, 183:13, 183:14, 183:15, 183:17
**stated**
123:2
**statement**
88:14, 91:5, 92:20, 93:2, 96:18, 216:13, 222:16
**states**
1:1
**station**
18:4
**stay**
73:16, 75:19, 209:20, 244:10, 250:2, 250:4, 250:8, 250:11, 255:19, 275:3
**stayed**
73:17, 76:20
**stenographers**
276:17
**stenographically**
279:6
**step**
57:6, 270:1, 270:11
**step-daughter**
258:8
**step-daughter's**
213:13
**steps**
52:21
**sterling**
32:20
**stick**
71:16, 257:17
**stickler**
211:15
**sticks**
185:6
**still**
19:11, 19:19, 20:19, 20:21, 22:20, 24:1, 24:5, 35:19, 43:16, 44:9, 44:18, 45:1, 47:10, 57:18, 98:18, 98:21, 129:22, 130:1, 130:2, 168:8, 168:11, 171:21, 189:18, 209:17, 210:10, 256:18, 264:6, 265:11, 266:1, 266:12, 266:13, 271:22
**stop**
270:9
**stopped**
55:12, 107:21, 138:9, 138:10, 235:11
**stored**
177:17
**stories**
79:5, 146:20
**story**
60:18, 123:14
**straight**
63:6, 152:7, 257:16, 269:10
**strange**
97:9, 98:1, 99:11, 99:12, 101:12, 146:15
**street**
2:4, 3:13
**stress**
219:22, 220:8
**stressful**
52:4
**strike**
60:20
**strong**
194:6
**structure**
184:3
**stuck**
199:11
**study**
17:14, 17:16
**stuff**
9:14, 11:9, 12:5, 12:10, 17:21, 20:14, 21:14, 28:11, 28:13, 30:15, 30:19, 35:6, 39:16, 72:2, 82:13, 86:17, 88:9, 103:17, 103:22, 105:9, 109:17, 112:15, 123:19, 132:21, 139:21, 149:18, 152:20, 153:5, 155:20, 157:12, 158:2, 159:10, 195:9, 196:20, 199:21, 200:5, 204:13, 213:18, 213:21, 219:12, 220:6, 233:18, 235:5, 247:17, 247:22, 251:9, 251:16, 256:7
**style**
206:18, 255:8, 262:4, 262:5, 262:7, 262:8, 263:16
**subject**
200:15, 203:17
**submitted**
9:11
**subordinates**
133:12
**subpoena**
2:18, 9:12, 9:13, 10:6, 11:6, 13:19, 27:5
**substance**
10:12, 41:16, 53:22, 91:8
**successful**
167:16
**sucks**
28:17
**sudden**
94:11, 188:14, 249:4, 249:6
**sue**
30:22
**suffer**
209:10
**suggest**
265:18
**suggested**
167:15
**suggesting**
266:7
**suit**
14:20
**suite**
3:6
**summer**
61:1
**supervisor**
68:8, 84:2, 176:6, 256:2
**supervisors**
67:1, 83:22, 237:21
**supply**
245:6, 253:16
**support**
41:22, 245:22
**supposed**
62:16, 242:14, 275:3
**supposedly**
18:11, 135:17
**surprised**
119:6, 142:8
**sweet**
153:1
**switch**
224:16
**sworn**
5:3

**T**

**table**
75:12

**tables**
239:22
**take**
5:11, 21:21, 22:7, 23:5, 52:21, 63:1, 88:11, 108:9, 108:11, 112:21, 130:6, 143:11, 171:1, 171:13, 173:9, 186:11, 190:15, 201:17, 202:2, 206:10, 227:4, 233:22, 235:22, 239:7, 245:11, 248:4, 255:13, 261:15, 264:1, 265:17, 265:18, 269:17, 271:4
**taken**
5:13, 108:16, 127:6, 147:6, 171:3, 173:7, 261:17, 276:10, 279:3, 279:6
**takes**
22:3, 252:17
**taking**
24:15, 51:3, 51:15, 71:8, 128:15, 145:17, 204:7, 205:2, 253:12, 257:5, 269:4, 276:17
**talk**
6:18, 7:8, 7:21, 7:22, 8:15, 9:3, 15:3, 16:9, 17:20, 18:3, 18:13, 18:17, 18:18, 18:19, 18:20, 19:5, 19:8, 19:18, 20:7, 20:9, 28:5, 28:20, 28:21, 29:14, 29:20, 29:22, 30:19, 31:2, 36:13, 36:16, 36:21, 37:11, 38:4, 38:5, 38:9, 39:20, 39:21, 42:10, 49:11, 49:15, 52:4, 55:11, 57:14, 57:19, 82:16, 82:22, 88:9, 94:10, 96:5, 96:12, 98:18, 98:21, 101:16, 102:5, 103:12, 104:16, 104:17, 107:2, 107:20, 108:21, 113:4, 124:13, 124:20, 124:21, 125:10, 126:21, 128:4, 139:22, 140:5, 142:18, 144:3, 147:14, 153:6, 153:8, 155:9, 165:16, 166:17, 166:19, 199:13, 200:7, 207:6, 207:18, 207:19, 208:4, 208:5, 208:10, 213:15, 213:22, 219:8, 227:4, 232:7, 234:13, 247:12, 260:5, 264:6, 265:16
**talked**
19:2, 19:3, 19:22, 20:2, 20:4, 20:5, 20:8, 22:17, 27:9, 28:5, 28:7, 28:10, 29:16, 29:18, 31:1, 33:1, 36:9, 37:7, 37:12, 37:13, 37:14, 37:15, 37:19, 38:10, 39:7, 39:12, 39:14, 48:12, 49:8, 53:9, 53:11, 80:3, 91:3, 94:18, 98:16, 99:2, 99:7, 102:21, 110:5, 115:5, 116:10, 119:11, 138:3, 141:1, 155:14, 165:17, 175:12, 209:17, 231:14, 232:15, 232:16, 232:18, 233:11, 249:5, 256:10, 262:3, 264:20
**talker**
251:9
**talking**
8:1, 16:21, 20:10, 27:7, 28:16, 29:1, 30:8, 30:15, 36:6, 37:6, 39:4, 39:9, 45:13, 46:11, 46:13, 55:13, 57:19, 63:19, 65:7, 65:12, 78:9, 79:9, 81:20, 89:2, 91:20, 94:10, 97:18, 98:13, 102:16, 103:2, 107:6, 107:21, 123:19, 126:1, 126:2, 127:21, 129:7, 130:13, 130:14, 130:16, 140:21, 142:2, 142:11, 142:13, 142:21, 143:14, 143:17, 151:4, 151:7, 152:4, 153:2, 158:18, 158:19, 182:2, 183:1, 199:22, 209:6, 217:22, 222:20, 230:14, 230:16, 230:17, 231:5, 236:7, 236:11, 239:20, 240:22, 241:1, 241:2, 241:4, 241:6, 255:12, 256:9, 256:12, 263:22, 264:10, 264:19, 265:10, 266:21
**talks**
98:15, 98:17, 125:21, 126:15, 166:17
**tambeni**
32:10, 32:15, 79:12, 79:14, 267:21
**tasada**
243:19, 245:3, 245:4, 254:15
**tasada's**
244:5
**taylor**
3:3, 170:18, 186:4, 263:21
**team**
28:17, 120:20, 135:5, 182:4, 182:6, 196:17, 211:22
**teams**
6:19, 182:5
**tech**
245:6, 253:16
**technically**
171:9, 171:10
**teddy**
207:10
**telephone**
24:13, 27:1
**tell**
5:3, 5:15, 8:8, 8:11, 8:14, 9:21, 42:13,

50:14, 50:16,
54:2, 54:5,
55:4, 58:3,
65:8, 98:2,
99:10, 100:16,
114:22, 123:4,
126:18, 133:22,
141:5, 141:10,
144:14, 144:15,
145:1, 147:20,
148:5, 149:7,
153:16, 167:3,
170:4, 176:18,
186:5, 195:7,
201:11, 205:4,
234:9, 251:13,
255:19, 266:1

**telling**
20:7, 65:11,
88:11, 91:15,
99:19, 102:14,
118:22, 135:9,
147:14, 191:17,
211:10, 213:21,
216:3, 231:3,
231:6

**temp**
68:17, 177:15,
179:17

**temps**
68:19

**ten**
80:15

**tenacity**
179:9

**tend**
270:9

**tension**
122:16, 257:10

**tenure**
68:1

**term**
9:1, 65:20,
81:11, 220:3

**terminad**
155:20

**terminate**
166:5

**terminated**
17:7, 46:15,
46:17, 46:18,
51:10, 57:22,
58:4, 59:3,
59:5, 60:1,
155:19, 159:8,
159:17, 160:13,
160:17, 213:6,
213:7

**termination**
14:19, 14:20,
45:11, 47:20,
48:3, 48:5,
49:1, 50:8,
50:12, 50:17,
53:10, 53:21,
54:1, 54:11,
54:14, 155:15,
156:1, 159:4

**terminations**
162:11

**terms**
8:5, 27:6,
60:17, 60:18,
72:3, 79:2,
114:1, 131:9,
161:17, 163:20,
167:2, 169:7,
187:3, 187:7,
191:3, 191:5,
192:16, 196:5,
203:7, 219:13,
229:6, 238:19,
255:22, 265:12,
266:1, 268:19,
271:19, 272:6

**testified**
5:4, 122:6,
140:16, 154:16,
248:12, 267:11

**testimony**
146:4, 201:9,
276:16, 278:4,
278:5, 279:5,
279:6

**text**
16:3, 16:6,

16:7, 16:15,
17:21, 21:13,
24:6, 24:7,
34:16, 34:20,
39:22, 40:1,
82:18, 82:19,
195:7, 204:21,
204:22

**texted**
15:9, 15:11,
22:17, 23:19,
27:22, 33:9,
35:11

**texting**
15:22, 17:6,
21:1, 26:18,
27:13, 27:20,
30:8, 33:20,
38:15, 38:17,
38:18

**texts**
24:1, 24:12,
26:12, 26:17,
26:20, 33:2

**th**
2:5, 3:14,
28:1, 39:8,
39:10, 121:22,
133:9, 279:14

**thank**
29:13, 72:18,
79:13, 85:1,
170:22, 190:19,
219:2, 231:22,
258:5, 261:20,
269:13, 276:3

**thanks**
188:15

**theirs**
31:10

**thereafter**
279:7

**therefore**
141:4, 234:9

**thereof**
132:9

**theresa**
152:22

**they'd**
76:9, 198:2

**thing**
39:15, 42:11,
50:10, 85:12,
85:21, 96:14,
99:15, 129:15,
130:2, 130:17,
134:12, 138:11,
164:14, 166:4,
173:12, 177:8,
179:3, 179:17,
206:19, 208:15,
209:11, 209:14,
216:6, 216:7,
219:16, 221:11,
223:7, 225:19,
233:8, 238:21,
240:13, 241:7,
264:19, 269:22,
274:13

**things**
6:1, 6:10, 8:3,
8:20, 8:22,
21:22, 28:3,
29:3, 37:22,
39:15, 40:13,
52:2, 52:6,
52:20, 55:20,
59:7, 60:19,
62:15, 67:6,
74:21, 75:7,
76:16, 78:10,
78:19, 91:21,
92:17, 95:8,
103:7, 104:18,
112:11, 112:18,
120:1, 120:19,
123:20, 129:21,
131:20, 137:9,
137:12, 137:21,
140:17, 150:18,
157:11, 169:4,
170:19, 174:20,
179:11, 181:13,
183:4, 184:4,
184:11, 191:18,
195:6, 199:17,

199:22, 206:15, 207:7, 207:8, 207:18, 208:10, 209:18, 210:9, 210:21, 214:6, 217:1, 221:1, 221:10, 221:22, 227:5, 236:17, 238:20, 249:11, 251:1, 251:8, 253:6, 254:1, 254:5, 254:8, 254:10, 254:22, 255:14, 257:14, 258:2, 262:9, 263:6, 263:19, 265:20, 266:1, 266:12, 266:16, 276:17
**thinking**
97:22, 98:3, 198:18, 220:18, 220:19
**thinks**
106:9, 106:13, 116:21, 122:21, 142:10, 151:4, 220:9
**third**
14:13
**thompson**
32:15, 40:8, 79:15, 147:20, 182:4
**thought**
7:15, 14:2, 18:18, 52:13, 93:18, 96:19, 101:11, 102:3, 102:11, 112:6, 115:14, 119:5, 124:4, 134:16, 141:3, 141:22, 142:22, 151:12, 153:11, 164:14, 165:9, 170:6, 189:2, 226:17, 234:8, 237:4, 247:11, 248:10
**threat**
215:7
**threated**
134:18
**threaten**
213:3, 214:14, 257:1
**threatened**
107:13, 135:16, 257:4, 258:3
**three**
31:11, 58:22, 62:4, 62:6, 62:7, 62:8, 69:19, 94:9, 110:21, 111:2, 190:13, 228:16
**through**
6:18, 11:10, 38:13, 40:7, 45:3, 48:1, 50:8, 59:13, 65:4, 74:11, 76:10, 76:15, 77:6, 77:7, 91:22, 143:11, 147:18, 162:20, 164:15, 177:5, 177:21, 183:4, 187:12, 190:13, 195:9, 228:10, 228:17, 233:2, 238:17, 239:11, 263:8
**throughout**
173:8
**throw**
127:6
**thundering**
82:13
**tied**
65:1, 250:9
**timeframe**
118:7, 119:18, 121:19, 132:5
**timeline**
117:9
**times**
22:2, 31:6, 39:22, 66:11, 66:12, 66:13, 76:15, 77:14, 112:9, 112:12, 114:3, 136:1, 136:14, 184:19, 184:20, 190:6, 196:1, 200:3, 210:3, 221:20, 222:19, 255:14, 259:16, 265:5
**timing**
118:4, 118:5
**tisha**
149:13, 150:6
**tishman**
8:1, 8:2, 8:14, 11:10
**tissue**
112:13, 217:10
**tissues**
217:5, 217:19
**title**
52:10, 66:22, 69:16, 69:20, 69:21, 71:14, 245:16
**titles**
69:17, 70:7
**today**
7:6, 9:4, 9:5, 9:6, 58:13, 162:20, 208:18
**together**
16:5, 16:15, 17:20, 72:1, 73:9, 73:20, 80:16, 80:18, 98:9, 98:11, 117:9, 118:5, 123:13, 123:17, 124:1, 148:22, 200:20, 226:14, 237:13, 242:19, 256:1, 259:5
**told**
8:19, 8:21, 18:12, 27:15, 29:17, 44:1, 45:20, 50:15, 54:17, 56:8, 58:6, 58:17, 65:5, 65:16, 87:2, 89:7, 94:14, 94:15, 94:16, 95:3, 98:4, 99:11, 100:1, 100:3, 100:18, 100:19, 102:7, 107:8, 107:11, 121:14, 127:9, 143:19, 144:20, 145:19, 147:19, 148:12, 148:15, 149:5, 149:6, 149:21, 150:6, 150:8, 151:6, 151:11, 152:7, 156:13, 159:13, 159:15, 164:1, 164:2, 164:4, 166:3, 201:9, 227:14, 228:11, 237:20, 238:22, 240:16, 240:20, 259:1
**tolerated**
215:6
**tome**
38:8
**tone**
125:10, 194:18, 217:15, 218:14, 270:8
**took**
55:10, 60:22, 61:2, 112:19, 129:18, 138:8, 150:11, 157:4, 157:6, 170:8, 180:2, 193:12, 246:4, 255:3
**tool**
266:3
**top**
71:17

**topic**
5:22
**topics**
8:12, 41:16
**touched**
260:3
**touching**
237:15
**touchy**
46:1
**toward**
148:3, 148:9
**track**
11:20
**transcript**
4:8, 12:17, 24:20, 34:8, 41:2, 78:2, 117:13, 140:11, 162:18, 171:13, 276:8, 277:2, 279:4
**transcription**
278:5
**transpired**
6:16, 95:18, 236:19
**transpiring**
150:13
**transportation**
70:17, 70:19, 71:1
**treat**
55:6, 56:3, 136:13, 138:13, 204:12
**treated**
51:7, 51:19, 116:16, 154:14, 206:7, 268:17, 268:22
**treating**
116:22, 126:22, 144:5, 154:17, 155:4, 234:17, 249:3
**treatment**
126:14, 137:6, 142:19, 142:20, 154:2, 154:9, 201:22, 226:19, 272:18
**treats**
113:1
**tricky**
10:15
**tried**
12:5, 42:20, 42:21, 43:20, 96:16, 97:20, 206:8
**trim**
262:22
**trip**
100:7, 149:2
**trucks**
179:14
**true**
98:5, 104:21, 141:6, 141:9, 144:4, 146:5, 150:14, 150:15, 200:20, 200:21, 200:22, 201:1, 204:14, 232:3, 248:7, 263:12, 272:9, 278:4, 279:4
**truly**
222:16
**trust**
121:14, 156:6, 223:20, 224:16
**truth**
5:3, 5:4, 135:10
**try**
5:19, 6:12, 6:16, 59:9, 60:15, 82:19, 104:22, 108:14, 108:19, 121:19, 128:16, 170:5, 172:14, 172:15, 200:18, 210:16, 249:18, 257:6, 262:1
**try-wall**
176:22, 177:8
**try-walls**
177:10, 177:11, 177:16, 177:17, 177:21
**trying**
6:14, 6:19, 7:12, 7:19, 11:20, 12:9, 17:2, 28:9, 36:8, 36:12, 39:5, 39:6, 42:16, 42:18, 46:19, 54:4, 56:1, 59:17, 60:17, 89:15, 93:10, 98:14, 105:7, 107:2, 114:6, 115:12, 116:9, 118:3, 118:18, 128:4, 136:5, 137:19, 144:11, 145:17, 153:5, 166:4, 169:16, 192:9, 196:19, 197:17, 210:9, 210:16, 234:10, 236:4, 240:12, 255:17, 255:21, 265:11, 267:7, 274:10
**tuesday**
1:15
**turn**
44:6, 58:22, 190:20, 200:14, 261:19
**tutelage**
188:8, 214:3
**tv**
200:7
**twice**
20:3, 101:11
**two**
31:6, 31:20, 35:21, 73:4, 77:2, 83:17, 83:21, 94:9, 104:20, 111:8, 114:16, 118:5, 122:16, 128:19, 129:13, 132:5, 143:3, 143:5, 147:4, 177:11, 182:3, 194:6, 211:10, 211:11, 215:22, 237:1, 245:20, 275:9
**type**
34:13, 34:14, 57:2, 133:2, 137:13, 144:6, 175:2, 177:11, 181:7, 201:2, 209:7, 223:13, 233:8, 234:17, 255:8
**typewriting**
279:7
**typically**
74:19, 77:14

**U**

**uh-huh**
6:13, 16:18, 17:13, 21:10, 26:9, 44:12, 47:21, 48:16, 58:1, 87:10, 115:9, 119:16, 139:1, 139:12, 149:15, 155:2, 167:8, 175:17, 177:3, 177:19, 182:9, 185:3, 189:13, 190:12, 192:12, 194:19, 208:6, 220:5, 220:21, 227:6, 231:11, 233:10, 235:15, 239:2, 241:11, 254:2, 254:13, 256:14, 258:10, 264:18

**ultimately**
66:9, 67:4, 167:2, 175:3, 185:15, 185:16, 185:21
**un-huh**
109:1
**unbeknownst**
141:19
**uncomfortable**
219:18
**uncommon**
114:19, 123:22
**under**
25:7, 34:13, 34:14, 70:13, 71:2, 71:19, 169:13, 170:2, 170:9, 188:7, 214:3, 229:21, 262:19, 279:7
**underlined**
119:11
**underneath**
67:4, 71:22, 72:1, 175:16, 253:15
**understand**
6:4, 6:16, 16:20, 28:8, 36:13, 37:18, 39:6, 40:14, 46:19, 53:18, 56:2, 59:15, 60:20, 63:14, 74:1, 75:1, 75:7, 87:5, 87:7, 135:11, 144:11, 146:8, 156:9, 173:3, 200:15, 201:7, 254:6, 255:13, 255:18
**understanding**
6:7, 6:9, 63:13, 150:1, 187:19, 233:9, 235:21, 238:21, 246:20, 248:14
**understood**
225:14, 253:21, 253:22, 254:4, 254:9
**undervalued**
209:8, 209:9
**unfair**
161:3
**unfairly**
117:1
**unfamiliar**
262:16
**unfold**
127:14
**unfortunate**
7:16, 206:2, 271:1
**unfortunately**
276:18
**united**
1:1
**unless**
186:5
**unnecessary**
153:10, 153:11, 241:18
**unpack**
108:14, 108:19
**until**
56:5, 95:15, 109:17, 121:22, 127:14, 153:22, 170:11, 197:1
**upbeat**
51:17
**upset**
52:15, 52:18, 53:5, 70:3, 100:12, 113:11, 113:20, 127:3, 129:9, 151:4, 151:5, 153:12, 155:1, 163:14, 163:21, 169:15, 208:14, 208:15, 211:22, 228:12, 228:15, 251:10, 251:11, 272:17
**upstate**
185:9
**use**
21:16, 22:11, 58:21, 65:20, 76:18, 211:14
**uses**
120:3
**using**
15:10, 15:12, 15:13, 23:19, 131:1
**usually**
16:13, 77:10, 160:4, 167:9, 183:4, 190:17, 209:17, 236:10
**utility**
76:3

**V**

**valid**
125:4
**validity**
131:16
**van**
158:15, 208:21, 252:14
**van's**
142:20
**varies**
199:14
**variety**
5:21, 5:22
**various**
63:6
**vault**
63:4, 63:5
**verbal**
6:13, 106:6
**verify**
177:7
**versus**
200:9
**veterans**
254:17
**vets**
254:17, 255:4
**vibe**
103:21
**vicinity**
140:1, 140:2
**video**
98:21
**viewed**
181:18
**virginia**
32:21, 72:7, 72:10, 160:19, 247:16, 247:17
**virginia's**
160:20
**voice**
6:22, 130:3, 270:8, 270:14, 270:21
**vora**
64:5, 162:10, 162:13, 164:1, 252:8, 252:9, 252:10, 268:3

**W**

**wait**
97:10
**walk**
58:11, 64:8, 76:12, 76:15, 77:5, 168:10, 224:8, 246:13, 257:8, 257:10, 257:22
**walked**
50:1, 105:20, 123:1, 132:4, 205:12, 224:3
**walking**
77:7, 85:7, 86:4, 123:13, 123:17, 123:22, 132:8, 205:13, 240:10, 273:13, 274:4, 274:7
**walks**
153:12, 208:13
**wall**
244:13, 244:19

**wallace**
16:7, 70:14, 70:16, 70:17, 70:22, 72:16, 72:17, 106:22, 126:8, 126:17, 127:22, 128:1, 128:15, 129:18, 132:4, 132:8, 132:13, 133:15, 136:22, 145:7, 148:15, 149:11, 208:19, 219:6, 219:17, 267:20, 269:17
**walsh**
3:11, 4:3, 4:5, 5:7, 5:10, 25:20, 34:3, 77:19, 108:8, 108:17, 170:16, 170:22, 171:7, 171:17, 172:2, 172:7, 172:17, 185:19, 186:2, 186:8, 186:13, 188:3, 189:6, 192:4, 193:3, 205:19, 207:1, 210:13, 212:20, 214:10, 217:2, 218:3, 218:5, 218:18, 219:4, 222:13, 224:19, 234:1, 241:21, 247:10, 250:12, 250:14, 257:3, 260:7, 261:7, 261:19, 261:22, 276:3, 276:7, 276:12, 276:21
**wanted**
46:1, 59:10, 64:13, 69:18, 101:9, 102:2, 106:20, 124:21, 126:21, 138:1, 146:5, 166:5, 171:14, 173:1, 175:1, 198:1, 214:1, 228:7, 248:4, 253:8, 276:4
**wanting**
94:10
**wants**
42:10, 53:3, 58:8, 166:3, 257:7
**ware**
92:14
**warehouse**
21:22, 22:3, 22:9, 22:13, 62:12, 68:16, 68:19, 69:4, 69:12, 70:4, 74:1, 74:6, 74:8, 74:11, 74:15, 74:18, 75:2, 75:4, 75:8, 78:14, 81:1, 83:8, 84:10, 86:17, 92:13, 98:12, 104:17, 113:5, 122:2, 133:13, 138:18, 139:5, 139:11, 139:14, 141:19, 157:5, 176:17, 179:2, 179:16, 180:5, 183:5, 183:13, 188:2, 192:7, 196:14, 200:11, 201:20, 203:1, 203:15, 211:18, 211:20, 213:16, 213:17, 214:7, 214:15, 215:7, 223:14, 223:15, 223:22, 244:6, 244:7, 244:8, 247:13, 247:19, 248:11, 251:11, 251:22, 273:11
**warned**
30:19
**warning**
4:18, 95:7, 163:4, 163:7, 228:8, 264:17
**warnings**
53:22, 54:2, 54:7, 54:10
**warrant**
189:10
**wars**
270:3
**washington**
3:7, 258:19
**watch**
200:8
**watched**
95:1, 162:8, 250:17
**watches**
123:19, 123:20
**way**
5:16, 9:9, 11:18, 17:9, 18:3, 18:4, 19:7, 51:22, 57:2, 74:9, 74:12, 74:15, 76:13, 102:4, 108:15, 112:11, 112:20, 113:1, 120:22, 131:22, 137:6, 137:12, 137:14, 138:22, 139:19, 154:14, 154:18, 164:4, 164:22, 167:15, 169:21, 188:21, 193:7, 193:12, 195:13, 197:9, 197:10, 202:19, 206:22, 207:4, 207:5, 207:22, 209:7, 212:18, 220:16, 223:5, 231:19, 234:17, 236:6, 240:2, 240:3, 241:8, 241:14, 251:8, 253:7, 262:8, 265:22, 266:18, 270:5, 270:16, 271:1, 272:13
**ways**
19:16, 253:21
**we'll**
24:22, 34:4, 58:10, 66:6, 95:6, 108:13, 108:14, 171:18, 202:1, 237:8
**we're**
6:14, 6:17, 17:2, 17:20, 19:9, 25:20, 36:6, 56:21, 69:3, 69:4, 74:20, 92:3, 100:20, 108:17, 147:17, 164:18, 171:20, 172:9, 176:21, 183:16, 190:15, 190:20, 196:19, 198:22, 208:12, 211:18, 211:19, 221:13, 257:17, 260:7, 265:7, 266:21, 276:18
**we've**
12:19, 62:17, 78:17, 108:10, 121:20, 140:13, 153:21, 172:18, 173:7, 188:8, 188:9
**weapons**
63:5
**week**
91:1, 121:22, 247:19
**weeks**
109:15, 150:13, 249:6
**weight**
89:19, 89:22,

90:1, 90:20
**weights**
91:6
**went**
18:22, 24:8, 31:5, 31:7, 31:8, 31:9, 31:15, 42:19, 51:8, 51:22, 55:16, 69:15, 72:14, 72:19, 72:20, 72:21, 73:2, 73:3, 73:10, 73:13, 73:15, 73:16, 73:17, 74:9, 82:3, 82:6, 82:17, 84:18, 92:5, 121:15, 123:14, 125:22, 131:6, 148:21, 157:11, 158:1, 158:5, 158:6, 158:8, 167:12, 168:8, 169:5, 169:11, 175:9, 225:20, 233:18, 237:10, 237:13, 238:21, 244:20, 245:18, 248:3, 254:15, 259:2, 260:15
**weren't**
125:6, 194:14, 233:14, 255:14, 271:11, 274:1
**whatever**
19:19, 50:1, 57:16, 58:6, 59:18, 59:20, 79:9, 84:3, 85:12, 94:22, 96:18, 100:11, 100:12, 100:14, 100:15, 103:9, 106:14, 108:13, 112:16, 116:6, 116:11, 133:7, 140:6, 149:17, 149:19, 172:10, 196:10, 198:4, 203:6, 219:10, 245:20, 265:15, 271:21
**whatever's**
250:7
**whatnot**
229:8
**when's**
32:1, 32:5
**whenever**
85:14, 109:12
**whereas**
177:10
**whereof**
279:13
**wherever**
57:15, 190:4
**whether**
11:22, 15:4, 43:18, 44:9, 44:22, 64:11, 66:15, 81:5, 81:22, 84:8, 84:9, 87:7, 95:21, 95:22, 111:11, 112:2, 118:13, 126:4, 126:5, 138:7, 148:15, 155:19, 156:19, 156:22, 160:1, 160:7, 161:20, 161:21, 162:9, 167:1, 169:12, 189:3, 215:15, 263:17, 273:7, 274:12, 276:14, 277:1
**whisper**
224:22
**whispering**
146:22, 224:4
**whoa**
106:16, 129:15, 129:16
**whoever**
27:7
**whole**
5:4, 7:14, 44:20, 60:18, 85:21, 130:1, 130:2, 131:10, 147:15, 150:4, 153:15, 163:16, 164:14, 165:21, 166:4, 187:12, 206:6, 227:18, 227:22, 238:21, 240:13, 249:3, 251:11
**wife**
9:7, 29:7, 29:9, 29:15, 88:13, 88:19, 91:18, 92:1, 92:18, 152:19, 152:20, 155:10, 170:3, 202:9, 202:10, 203:18, 225:20, 258:1
**wife's**
258:15, 258:18
**willing**
51:16, 265:15
**win**
51:11, 51:12
**winchester**
220:10
**winston**
149:6, 202:8, 205:6
**wire**
211:19
**wit**
163:15
**withdrawn**
167:17
**within**
76:20, 122:1, 228:5
**without**
51:3, 55:16, 63:18, 108:4, 153:16, 233:7
**witness**
116:15, 170:21, 186:7, 188:9, 274:14, 276:11, 276:20, 277:4, 277:6, 279:13
**witnessed**
161:16, 162:12, 242:10, 242:22
**woman**
194:5, 222:6, 263:17, 268:20, 269:4
**women**
112:14, 222:2, 263:13
**wonderful**
276:17
**wondering**
78:8
**word**
30:22, 242:1, 242:2
**words**
272:13
**wordy**
165:11, 165:13
**worked**
10:17, 16:5, 22:2, 22:21, 31:11, 43:16, 52:3, 52:14, 70:13, 71:14, 74:16, 75:19, 78:16, 79:18, 80:12, 80:16, 81:1, 84:9, 84:10, 84:12, 84:16, 84:21, 135:4, 138:17, 138:21, 139:3, 169:18, 180:1, 182:15, 183:21, 196:13, 197:16, 202:12, 216:18, 232:12, 253:15, 256:1, 256:2, 258:14, 259:5
**worker**
191:12

**workers**
211:18
**working**
32:3, 32:7, 59:16, 68:13, 72:3, 77:8, 105:6, 170:10, 189:19, 191:9, 191:10, 210:10, 255:20, 258:16
**workplace**
31:4, 128:4, 152:2, 163:15, 163:22, 229:19, 244:5, 267:12
**works**
34:2, 78:19, 116:7, 116:8, 182:20, 183:10
**world**
34:19, 39:16, 276:19
**worried**
257:17
**worst**
154:12
**wouldn't**
60:11, 64:10, 103:1, 168:13, 241:22, 267:8, 271:1, 273:2
**wow**
109:18, 191:9
**wrath**
166:8
**wright**
2:3, 3:12
**write**
23:8, 58:18, 58:20, 68:3, 75:6, 75:15, 161:17
**write-up**
58:21
**write-ups**
49:22, 58:5, 59:1, 189:11
**writing**
133:6, 265:17, 265:18
**written**
4:18, 45:17, 53:22, 54:2, 54:7, 54:10, 163:4, 163:7, 228:8, 248:14, 249:8, 249:14, 250:2
**wrong**
51:2, 60:2, 60:5, 84:13, 84:14, 92:6, 230:2, 248:13, 264:12, 266:4, 267:8
**wrongful**
14:19, 14:20
**wrongfully**
57:22, 58:4, 59:3, 59:5, 59:22
**wrote**
65:6, 65:19, 65:22, 133:11

**Y**

**year**
20:4, 95:22, 170:12
**years**
19:19, 24:3, 62:4, 62:6, 62:8, 80:15, 101:3, 105:6, 152:19, 218:13, 253:11, 257:9, 257:10
**yell**
251:12
**yep**
7:4, 12:21, 31:21, 276:20
**yesterday**
100:1
**yo**
20:11, 35:18, 37:21, 38:9, 97:14, 99:11, 99:14, 100:4, 142:20, 158:7, 195:7, 202:16, 212:6, 219:13, 221:2
**yourself**
259:3, 270:2

**0**

**00**
110:15, 110:17, 221:13
**01648**
1:8
**0275**
26:1
**0824**
26:2, 26:13

**1**

**10**
28:1
**1000**
3:5, 3:6
**11**
28:1
**117**
4:15, 4:16
**12**
4:10, 101:3, 110:15, 110:17, 279:20
**13**
4:16, 133:9
**1300**
2:7
**1320**
3:16
**14**
1:15, 101:3, 140:15
**140**
4:17
**15**
85:17
**16**
85:17
**162**
4:18
**17**
1:8, 85:17
**172**
4:4
**18**
2:5, 3:14, 53:11, 121:22, 163:18

**2**

**20**
39:8, 39:10, 279:20
**20024**
3:7
**2003**
80:14
**2009**
105:3, 244:2
**2012**
61:2, 245:13, 252:17
**2013**
61:21, 61:22
**2014**
85:17
**2015**
81:4, 105:5
**2016**
4:15, 4:16, 53:11, 80:14, 81:3, 85:20, 87:6, 105:5
**2017**
61:18, 189:22
**2018**
19:22, 20:1
**2019**
20:2, 26:13, 26:14, 26:18, 27:14, 27:20, 30:4, 33:2, 33:3, 33:12, 33:17, 33:21, 35:11, 35:15, 35:16, 36:3,

36:4, 37:5, 41:19, 44:7, 44:22
**202**
3:8, 25:8, 26:2, 26:13
**2020**
1:15, 4:10, 20:4, 38:13, 38:15, 38:16, 38:17, 39:1, 45:4, 46:12, 46:14, 46:21, 47:5, 48:1, 220:22, 279:15
**2023**
279:20
**21202**
1:14, 2:6, 3:15
**22**
235:1
**23**
279:20
**24**
4:11, 279:14
**25**
4:10
**261**
4:5
**27**
4:15
**2784**
25:8, 26:8
**279**
1:21

**3**

**3**
277:9
**30**
69:5, 167:10, 221:14
**304766**
1:20
**31**
28:1, 221:21, 222:9, 222:18, 222:21
**34**
4:12
**36**
177:2
**3rd**
39:10

**4**

**4**
221:13, 221:14, 221:21, 222:9, 222:18, 222:21
**40**
4:13
**410**
2:7, 3:16
**425**
26:2, 26:13
**45**
1:16, 277:9
**460**
25:8
**48**
177:2

**5**

**5070**
3:8

**6**

**60**
167:10
**659**
2:7, 3:16

**7**

**77**
4:14
**783**
3:8

**8**

**8:-cv--tdc**
1:8

**9**

**9**
1:16
**90**
167:9, 167:10
**96**
12:8
**99**
12:8

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

GREENBELT DIVISION

---------------------------X

EVANGELINE J. PARKER, )

Plaintiff, ) Civil Action No.

v. ) 8:17-CV-01648-TDC

REEMA CONSULTING SERVICES, INC., )

Defendant. )

---------------------------X

30(b)(6) VIDEOTAPED DEPOSITION OF

REEMA CONSULTING SERVICES, INC.,

BY AND THROUGH ITS AGENCY REPRESENTATIVE,

CATHY ANN PRICE,

AND APPEARING IN HER PERSONAL CAPACITY

Washington, D.C.

Tuesday, February 25, 2020

Pages: 1 - 327

Reported by: Cindy L. Sebo, RMR, CRR, RPR, CSR, CCR, CLR, RSA, LiveDeposition Authorized Reporter

Job Number: 295568

February 25, 2020

9:29 a.m.

Videotaped Deposition of CATHY ANN PRICE held at the law offices of:

Fish & Richardson
1000 Maine Avenue, Southwest
Suite 1000
Washington, D.C. 20024

Pursuant to notice, before Cindy L. Sebo, Registered Merit Court Reporter, Certified Real-Time Reporter, Registered Professional Reporter, Certified Shorthand Reporter, Certified Court Reporter, Certified LiveNote Reporter, Real-Time Systems Administrator, LiveDeposition Authorized Reporter and a Notary Public in and for the District of Columbia.

A P P E A R A N C E S:

For the Plaintiff:

JOANNA WASIK, ESQUIRE
TRISTIN BROWN, ESQUIRE
WASHINGTON LAWYERS' COMMITTEE
FOR CIVIL RIGHTS AND URBAN AFFAIRS
700 14th Street, Northwest
Suite 400
Washington, D.C. 20005
202.319.1000
joanna_wasik@washlaw.org
tristin_brown@washlaw.org

-and-

TRACEA L. RICE, ESQUIRE
JOSEPH V. COLAIANNI, ESQUIRE
FISH & RICHARDSON
1000 Maine Avenue, Southwest
Washington, D.C. 20024
202.626.7747
trice@fr.com
colaianni@fr.com

A P P E A R A N C E S (Continued):

For the Defendant:

DONALD WALSH, ESQUIRE
WRIGHT, CONSTABLE, & SKEEN, LLP
7 Saint Paul Street, 18th Floor
Baltimore, Maryland 21202
410.659.1320
dwalsh@wcslaw.com

ALSO PRESENT:

JONATHAN PERRY, Videographer
RAJESH S. VORA, President, Reema Consulting Services, Inc.

\- - -

I N D E X

\- - -

| WITNESS | PAGE NO. |
|---|---|
| CATHY ANN PRICE | |
| By Ms. Wasik | 13, 184, 321 |
| By Mr. Walsh | 317 |

\- - -

E X H I B I T S

\- - -

| 30(b)(6) DEPOSITION EXHIBIT NUMBER | DESCRIPTION | PAGE NO. |
|---|---|---|
| Number 1 | Plaintiff's Notice of Deposition to Defendant Reema Consulting Services, Inc., Pursuant to FRCP 30(b)(6) | 16 |
| Number 2 | Offer Letter, Vora to Parker, November 26, 2014, Bates stamped REEMA000295 | 49 |
| Number 3 | Offer letter, Vora to Parker, March 16, 2015, Bates stamped REEMA000304 | 59 |

Page 6

- - -

E X H I B I T S (Continued)

- - -

| 30(b)(6) DEPOSITION EXHIBIT NUMBER | DESCRIPTION | PAGE NO. |
|---|---|---|
| Number 4 | Offer letter, Vora to Parker, May 16, 2015, Bates stamped REEMA000303 | 66 |
| Number 5 | Letter of Employment Verification, Price to Whom It May Concern, January 22, 2016, Bates stamped REEMA000322 | 74 |
| Number 6 | Memorandum, Vora to Parker, April 7, 2016, Bates stamped REEMA000281 | 83 |
| Number 7 | Employee Performance Evaluation, Bates stamped REEMA000349 through REEMA000350 | 97 |

Page 7

- - -

E X H I B I T S (Continued)

- - -

| 30(b)(6) DEPOSITION EXHIBIT NUMBER | DESCRIPTION | PAGE NO. |
|---|---|---|
| Number 8 | Initial Employee Performance Evaluation, Bates stamped REEMA000351 through REEMA000352 | 99 |
| Number 9 | Employee Performance Evaluation, Bates stamped REEMA000353 through REEMA000354 | 99 |
| Number 10 | Employment Handbook, Bates stamped REEMA000008 through REEMA000058 | 103 |
| Number 11 | Sexual Harassment Policy Manual for Reema Consulting Services, Inc., Bates stamped REEMA000059 through REEMA000065 | 132 |

Page 8

- - -

E X H I B I T S (Continued)

- - -

| 30(b)(6) DEPOSITION EXHIBIT NUMBER | DESCRIPTION | PAGE NO. |
|---|---|---|
| Number 12 | Harassment Policy Receipt and Acknowledgment Form, Bates stamped REEMA000181 | 137 |
| Number 13 | Reema Consulting Services, Inc. Sexual and Other Unlawful Harassment Investigation Questionnaire, Bates stamped REEMA000232 through REEMA000236 | 150 |
| Number 14 | Reema Consulting Services, Inc. Sexual and Other Unlawful Harassment Investigation Report, Bates stamped REEMA000237 through REEMA000238 | 160 |
| Number 15 | E-mail string, Bates stamped REEMA000194 through REEMA000195 | 167 |
| Number 16 | E-mail string | 173 |

Page 9

- - -

E X H I B I T S (Continued)

- - -

| 30(b)(6) DEPOSITION EXHIBIT NUMBER | DESCRIPTION | PAGE NO. |
|---|---|---|
| Number 17 | E-mail string, Bates stamped REEMA000283 | 185 |
| Number 18 | Supervisory Sexual Harassment & EEO Compliance Training Workbook, Bates stamped REEMA000066 through REEMA000080 | 202 |
| Number 19 | Memorandum for Record, by Jennings, May 12, 2016, Bates stamped REEMA000177 | 209 |
| Number 20 | E-mail, Moppins to Rajesh Vora, cc: Price and Reema Vora, May 13, 2016, Bates stamped REEMA000196 through REEMA000197 | 227 |
| Number 21 | Statement of Carlos Carter, Sr., Bates stamped REEMA000231 | 233 |

- - -

E X H I B I T S (Continued)

- - -

| 30(b)(6) DEPOSITION EXHIBIT NUMBER | DESCRIPTION | PAGE NO. |
|---|---|---|
| Number 22 | Written Warning, Bates stamped 000171 through 000172 | 236 |
| Number 23 | Written Warning, Bates stamped REEMA000174 through REEMA000175 | 244 |
| Number 24 | Letter, Parker to Price, May 17, 2016, Bates stamped REEMA000248 | 288 |
| Number 25 | Memorandum, Price to Parker, May 18, 2016, Bates stamped REEMA000347 through REEMA000348 | 297 |
| Number 26 | E-mail string, Bates stamped REEMA000282 | 301 |
| Number 27 | Memorandum from Vora, May 18, 2016, Bates stamped REEMA000345 through REEMA000346 | 303 |

- - -

E X H I B I T S (Continued)

- - -

| 30(b)(6) DEPOSITION EXHIBIT NUMBER | DESCRIPTION | PAGE NO. |
|---|---|---|
| Number 28 | Statement of Events from Angela Wallace, Bates stamped REEMA000137 through REEMA000138 | 305 |
| Number 29 | Quiz and Training Acknowledgment, Bates stamped REEMA000119 through REEMA000120 | 307 |
| Number 30 | Calendar Entries | 316 |

CATHY ANN PRICE

------------------

P R O C E E D I N G S

-------------------

Washington, D.C.

February 26, 2020; 9:29 a.m.

THE VIDEOGRAPHER: This is the 30(b)(6) deposition of Reema Consulting Services, Incorporated. It's Media Unit 1 in the testimony of Cathy Price, taken by the Plaintiff, in the matter of Evangeline J. Parker versus Reema Consulting Services, Incorporated, the case filed in the U.S. District Court for the District of Maryland, Greenbelt Division, Case Number 8:17-CV-01648-TDC.

We are at the offices of Fish & Richardson, 1000 Maine Avenue, Southwest, in Washington, D.C.

The date is February 25th, 2020.

The videographer is Jonathan Perry, and the court reporter is Cindy Sebo, both here on behalf of U.S. Legal Support.

Going on the record at 9:29 a.m.

CATHY ANN PRICE

Appearances will be listed in the stenographic record.

And would the reporter please swear in the witness?

- - -

CATHY ANN PRICE,

after having been first duly sworn, was examined and testified as follows:

- - -

- - -

EXAMINATION BY COUNSEL FOR PLAINTIFF

- - -

BY MS. WASIK:

Q. Okay. Ms. Price, good morning --

A. Good morning.

Q. -- thank you for being here.

My name is Joanna Wasik, and I represent the Plaintiff, Ms. Evangeline Parker.

Before we get started with the question section, I'd like to just go over some ground rules for the deposition.

Do you understand that you've been sworn to provide truthful and complete responses as though you were in court today?

Page 14

CATHY ANN PRICE

A. Yes.

Q. Okay. And your attorney may object to some of my questions, but unless he instructs you not to answer, you -- you still have to answer my questions.

Do you understand that?

A. Yes.

Q. Okay. If I ask you a question and you answer my question, I will assume that you understood what I was asking.

So if you don't understand my question, can you please state that?

A. Yes.

Q. Thank you.

Another thing that I'll ask is that you answer audibly, with a yes or a no. Please don't shake your head or nod, because that's difficult for the court reporter to get down.

Is that okay?

A. Yes, um-hum.

Q. And you can take a break at any time today. I just ask that if there's a question pending, if you could please answer the question first, and then you can take a break after

Page 15

CATHY ANN PRICE

that --

A. Yes.

Q. -- is that okay?

Is there any reason, medical or otherwise, that you are not able to give accurate testimony today?

A. No.

Q. Okay. Ms. Price, have you ever been deposed before?

A. No, not in this form, no.

Q. Not in this form.

What about in any form? Have you been deposed?

A. Yes.

Q. Okay. When -- when was that?

A. Seven, eight years -- I'm not accurate in the time frame --

Q. Okay.

A. -- just sat before counsel, answered a few questions. And that was it.

Q. Okay. What kind of case was that, if you remember?

A. I do not remember the case. It was --

Page 16

CATHY ANN PRICE

Q. Okay.

A. -- a while ago.

Q. Did it have to do with your job at the time?

A. With me and being in the HR role.

Q. Okay. And was that at Reema?

A. No.

Q. Okay. What employer was that with?

A. Alpha Corporation.

Q. Okay.

Okay. And was someone suing your employer at that time, if you recall?

A. I can't recall -- I can't recall what the situation was.

Q. Okay.

Okay. Have you ever testified at trial?

A. No.

Q. Okay.

All right. I'd like to show you a document to get started.

\- - -

(30(b)(6) Deposition Exhibit Number 1, Plaintiff's Notice of

Page 17

CATHY ANN PRICE

Deposition to Defendant Reema Consulting Services, Inc., Pursuant to FRCP 30(b)(6), marked for identification, as of this date.)

\- - -

BY MS. WASIK:

Q. Have you seen this document before?

A. Yes.

Q. Okay. And do you understand that you're appearing today to testify pursuant to this document?

A. Yes.

Q. Okay. Do you understand that you've been designated by Reema to testify on behalf of the company today?

A. Yes.

Q. Okay. I'd like you to turn to the list of topics that begins on Page 4 -- at the bottom of Page 4, please.

Okay. Do you understand that you've been designated to testify on this list of topics that continues through Page 6?

A. Yes.

Page 18

CATHY ANN PRICE

Q.   Okay.  And are there any topics listed on here on which you're not prepared to testify?

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  I can attest --

BY MS. WASIK:

Q.   To all the topics?

A.   -- to all the topics, yes.

Q.   Thank you.

Okay.  Ms. Price, did you prepare for your deposition today?

A.   Yes.

Q.   How did you prepare?

A.   Reviewing the documents that were sent to me in the two binders --

Q.   Okay.

A.   -- as well as any of my notes that I might have had.

Q.   Okay.  Did you do anything other than reviewing documents?

A.   No.

Q.   Did you meet with any attorneys?

A.   My attorney, Mr. Walsh, yes.

Page 19

CATHY ANN PRICE

Q.   Okay.  And how long did you meet with Mr. Walsh for?

A.   What?  An hour, two hours, maybe, at the most.

Q.   Okay.  And when -- when was that meeting?

A.   Last month.  I don't have an exact date, but last month sometime.

Q.   Okay.  Was anyone else at that meeting?

A.   No.

Q.   Okay.  Did you meet with anyone besides Mr. Walsh to prepare for your testimony today?

A.   No.

Q.   Okay.  What about did you discuss your testimony today with anyone besides Mr. Walsh?

A.   No.

Q.   Okay.  You didn't speak with Mr. Moppins, for example?

A.   No.

Q.   Okay.  What about any other former Reema employees?

Page 20

CATHY ANN PRICE

A.   No.

Q.   Okay.  You said you reviewed some documents.  You mentioned two binders.

Do you remember what was in those binders?

A.   The ones that was sent were documents, like, of the policy manual, I guess everything that was submitted; offer letters -- I think I can remember offer letters; e-mails; and the EEOC filings.  I think that was the things that were in there.

Q.   Okay.  And you mentioned that you reviewed your notes.

What kind of notes were those?

A.   My personal notes that I take when I'm working, something to keep -- my to-do list.

Q.   Okay.  So were those notes that you wrote at the time you were working at Reema?

A.   Yes.

Q.   Were there notes that you wrote during the time that Ms. Parker was working at Reema?

A.   Yes.

Q.   Did you bring those notes with you

Page 21

CATHY ANN PRICE

today?

A.   Yes.

Q.   Okay.

MS. WASIK:  If we could please mark those notes as Exhibit 2, I guess it would be.

MR. WALSH:  Did you make copies, or do you just have the original?

THE WITNESS:  I just have the original.

MR. WALSH:  Okay --

MS. WASIK:  Okay.  I --

MR. WALSH:  -- so keep going --

MS. WASIK:  -- I'd still like --

MR. WALSH:  -- and ask her to explain --

MS. WASIK:  -- to mark them, and then we -- maybe we can make copies or --

MR. WALSH:  Let me try this -- can you show her what it is that you have?

MS. WASIK:  Sure.

MR. WALSH:  Explain what that is.

THE WITNESS:  These are my work notes.  So I do this when I'm on a, just

Page 22

CATHY ANN PRICE

my day-to-day, daily task, where if I sit in a meeting, I just take general notes --

BY MS. WASIK:

Q.    Okay.

A.    -- so these are those personal notes that I have for myself.

Q.    And, again, those were all from when you worked at Reema?

A.    Yes.

Q.    Okay.

MS. WASIK:  So I will like to mark those as Exhibit 2 today.  We can make copies during a break.

I'm fine with Ms. Price holding on to them right now.

MR. WALSH:  There's only certain pages that have --

THE WITNESS:  Yes.

MR. WALSH:  -- any relevance to this proceeding --

MS. WASIK:  Okay.

MR. WALSH:  -- that's -- that's why -- and she can identify those pages for you.  And I'm happy to produce

Page 23

CATHY ANN PRICE

those --

MS. WASIK:  Okay.

MR. WALSH:  -- I just -- her whole personal binder --

MS. WASIK:  Okay.

THE WITNESS:  Right.

MR. WALSH:  -- has no relevance to --

MS. WASIK:  I see.

MR. WALSH:  -- most of what this is.

MS. WASIK:  All right.  Well, let's identify as an exhibit -- let's put a pin in that.  We can come back and make an exhibit of the ones that are relevant.

BY MS. WASIK:

Q.    Okay.  Thank you for bringing those.

Okay.  Have you discussed this lawsuit in general with anyone besides Mr. Walsh?

A.    No.

Q.    Okay.  If this case goes to trial, are you planning to testify as a witness for Reema?

MR. WALSH:  Objection.

Page 24

CATHY ANN PRICE

THE WITNESS:  Yes --

MR. WALSH:  You can answer.

THE WITNESS:  -- if I'm asked to.

BY MS. WASIK:

Q.    Okay.

Okay.  Are you being paid for your testimony today?

A.    No, not that I know of.

Q.    Okay.  Reema is not paying you to testify today or to --

A.    Not that I know of.

Q.    -- for your work being here today?

A.    Not that -- unless -- I -- we haven't discussed that.

Q.    Okay.

MR. WALSH:  Can -- just remind -- try and keep your voice up.

THE WITNESS:  Okay.  I'm sorry.

Yeah --

BY MS. WASIK:

Q.    Thanks.

A.    -- that hasn't been discussed.

Q.    Okay.  Ms. Price, I'd like to ask you a little bit about your educational background.

Page 25

CATHY ANN PRICE

A.    Okay.

Q.    Did you go to college?

A.    Yes.

Q.    Okay.  And where was that?

A.    Southern University A&M College.

Q.    Okay.  And do you -- did you obtain a degree from them?

A.    Yes.

Q.    What was your degree in?

A.    Bachelor's of Science in political science.

Q.    Okay.  And when did you graduate?

A.    Oh, God.

Q.    Approximately.

A.    Okay.

About 2000 -- it was probably around 2000.

Q.    Okay.  Did you go on to any further schooling after that?

A.    I did start a MBA program, but I did not finish.

Q.    Okay.  And where was your MBA program?

A.    University of Phoenix.

Page 26

CATHY ANN PRICE

Q.    Okay.  When did you start that?

A.    2001.

Q.    Okay.

Okay.  What was your first job after, I guess, the University of Phoenix-program part that you completed?

A.    I was working while going to the --

Q.    Okay.

A.    -- University of Phoenix.  So one of my first jobs was -- hmm, what was I doing?

Oh, I was an HR assistant for Albemarle Corporation.

Q.    Okay.  And approximately what years did you work at Albemarle?

A.    That had to be 2000 to 2002, I think.  I'm not 100 percent.

Q.    Okay.  When -- when did you start working at Reema?

A.    In October -- I don't know the exact date, but October 2014.

Q.    2014.

Okay.  This might be easier.

What was the job that you held just before you started working at Reema?

Page 27

CATHY ANN PRICE

A.    Where was I before?  Where was I before?

I think I was the HR director at Federal Conference.

Q.    Okay.  And how -- approximately what -- what years were you at Federal Conference?

A.    That would have been 2010 to 2012 or '13, I think.

Q.    Okay.

Okay.  All right.  And if you recall, where did you work before Federal Conference?

A.    The Virginia Employment Commission.

Q.    Okay.  And what was your role there?

A.    An employment specialist -- reemployment specialist.

Q.    Okay.  Now, when you started working at Reema in October 2014, what was your position?

A.    Part-time HR manager.

Q.    Okay.  And what were your job duties as the part-time HR manager?

A.    To -- general HR management; benefit coordination; payroll processing; ER issues, administrating any employee relations issues; and

Page 28

CATHY ANN PRICE

hiring, the recruiting and hiring.

Q.    Okay.  And at that time, did Reema have another person also in an HR position, or were you the only HR manager?

A.    At that time, I was the only HR manager.

Q.    Okay.  And how long did you hold that part-time HR manager position?

A.    That was throughout the whole -- my whole time -- my whole tenure at Reema.

Q.    Okay.  So when did your tenure at Reema end?

A.    Oh, my goodness.

I'm thinking 2017 -- sometime in 2017 or 20- -- early 2018.  I'm not 100 percent on the dates.

Q.    Okay.  And when you say "part-time," how many hours a week were you doing this job?

A.    About 20 hours.

Q.    Okay.  Who did you report to?

A.    Mr. Vora.

Q.    And did you have anyone reporting to you?

A.    At that time, I did not.

Page 29

CATHY ANN PRICE

Q.    Okay.  At any time that you were at Reema, did you have anyone --

A.    Yes --

Q.    -- reporting to you?

A.    -- I did eventually get a HR assistant -- or HR clerk that reported to me.

Q.    Okay.  And when was that that you got the assistant?

A.    That probably would have been towards the end of 2015 or early 2016.

Q.    Okay.  And what was the name of the HR assistant?

A.    Latisha Washington.

Q.    Okay.  What were her job duties?

A.    Just strictly administrative: processing, benefit enrollment applications --

Q.    Okay.

A.    -- setting up people in the system for payroll.  She may process offer letters or do any type of postings -- job postings.

Q.    Okay.

Okay.  Did she report to anyone else except you?

A.    No; it was just me.

Page 30

CATHY ANN PRICE

Q.    Okay.

Okay.  You said before that one of your job duties was HR management.

What does that entail?

A.    Just the daily HR -- any type of HR administrative needs that needed to be handled, ask -- and training staff --

Q.    Okay.

A.    -- answering any type of management questions --

Q.    Okay.

A.    -- providing advice and guidance to them; mitigating any employee questions; addressing any issues that had to deal with policy.

Q.    Okay.  And you also mentioned employee relations.

What do you mean by "employee relations"?

A.    Any issues that came up among the management or just among the staff; that I would investigate or look into to see -- to mitigate or see where training or -- or if anything -- any disciplinary action needed to be taken.

Page 31

CATHY ANN PRICE

Q.    Okay.  Did that involve investigating complaints of sexual harassment?

A.    Yes.

Q.    What about hostile work environment?

A.    Yes.

Q.    And discrimination?

A.    Yes.

Q.    Okay.  And you mentioned disciplinary action.

Were you empowered to take disciplinary action against employees?

A.    Not "empowered."  I will do the investigation, make the recommendation.  I would speak with in-house counsel to get guidance.

Q.    Okay.  Is there anyone else you would have to speak with who would ultimately make the decision?

A.    Well, I always would get into -- coordinate with Mr. Vora and make sure that we're following protocol as far as policy is concerned or the law.

Q.    Okay.

Okay.  Did you receive any training for your HR position at Reema?

Page 32

CATHY ANN PRICE

A.    Can you elaborate a little more --

Q.    Sure --

A.    -- on what you mean?

Q.    -- did you receive any sort of HR training for the position that -- for the HR position that you held at Reema?

A.    I did not get formal training as far as a Bachelor's degree, or anything, but I did take training in general through the SHRM platform.

Q.    Okay.  And can you explain what SHRM is?

A.    Society for Human Resource Management.  It's the professional society for all HR managers.

Q.    And when did you take that SHRM training?

A.    That was throughout my lifetime of being a HR manager.

Q.    Okay.  So is that something you did sort of yourself because you wanted to learn, or is it something that Reema required?

A.    No; that was something I did for myself.

Page 33

CATHY ANN PRICE

Q.    Okay.

Okay.  Now, outside of you and Ms. Washington, did any of the other employees at Reema have HR responsibilities while you worked there?

A.    HR responsibilities?

Not in the context of being a manager, but you had managers who had people -- responsibility of managing their people.

Q.    Okay.  Can you tell me what you mean by people responsibility?

A.    Making sure that they were -- that their staff was following the policies and procedures of Reema.  So that meant managing their time, managing their schedules, managing performance.

Q.    Okay.  Did any employees outside of you and Ms. Washington have responsibilities for investigating HR complaints?

A.    It was just me.

Q.    Okay.  So Ms. Washington -- that was not part of her job --

A.    No.

Q.    -- duties?

Page 34

CATHY ANN PRICE

Just you?

A.    Yes.

Q.    Got it.  Got it.

Now, you mentioned before if you wanted to take disciplinary action, you would run that by in-house counsel and Mr. Vora.

What about managers?  If they wanted to take disciplinary actions, what did they have to do?

A.    They have to include me, and then I would follow, if it was something that I need to follow, with in-house counsel or Mr. Vora.

Q.    Okay.

Okay.  Okay.  Have you been working since you left Reema?

A.    Yes.

Q.    Okay.  And what was your next job after working at Reema?

A.    Director of shared services for Catholic Charities.

Q.    Okay.  And are you currently in that position?

A.    Yes.

Q.    Okay.  What are some of your job

Page 35

CATHY ANN PRICE

functions there?

A.    I oversee all of the benefits, payroll, the HRI system, compliance, government contracts.

Q.    Okay.  And when you left Reema, was that a voluntary separation on your part?

A.    Yes.

Q.    Okay.  Are you familiar with an individual named Larry Moppins?

A.    Yes.

Q.    Okay.  And when you were working at Reema, what was Mr. Moppins' position?

A.    He was the subject matter expert for the contract.

Q.    Okay.  Who did he report to?

A.    Mr. Vora.

Q.    Okay.  Did he report to anyone else?

A.    No.

Q.    Okay.  So Mr. Vora was the only person above Mr. Moppins in the corporate hierarchy?

A.    Correct.

Q.    Okay.  Can you explain what the "subject matter expert" means?

Page 36

CATHY ANN PRICE

A.    In government contracting, he was basically the program manager --

Q.    Okay.

A.    -- so he oversaw the execution of the contract, the performance of the contract, to ensure that the contract was being performed in accordance to the -- to the language; also managed, oversaw -- oversaw the workforce.

Q.    Okay.  What do you mean by "oversaw the workforce"?  What were his job duties in that respect?

A.    He had -- he had say in hiring, because he wasn't directly a Reema employee --

Q.    Okay.

A.    -- that was left to the deputy program manager.  But he would make the recommendations because he was the subject matter expert to know what positions needed to be filled in the -- for the contract.

Q.    Okay.  So did he have authority to hire, or did he make hiring recommendations?

A.    He had the -- he made hiring recommendations, and I would make the hires.

Q.    Did those hiring recommendations also

Page 37

CATHY ANN PRICE

have to be run by Mr. Vora?

A.    Not all of them, but some of them would, yeah --

Q.    Okay.

A.    -- depending on the position.

Q.    Okay.  So what types of positions would have to be run by Mr. Vora?

A.    More the management-level positions, the lower-level positions --

Q.    Okay.

A.    -- or just strictly, like, the clerks.  The lower-level -- the clerk's position was just basic hire.

Q.    Got it.

What about promotions?  Did Mr. Moppins have authority to promote employees?

A.    He recommended promotions, and that would come to me.  And then I would sit with Mr. Vora to talk about whether or not this promotion was --

Q.    Okay.

A.    -- was viable.

Q.    So did Mr. Vora approve all promotions that happened at Reema during the time

Page 38

CATHY ANN PRICE

you worked there?

A.    To my knowledge, he did.

Q.    Okay.

Okay.  What about terminations?  Did Mr. Moppins have authority to terminate employees?

A.    Again, he would recommend a termination of an employee --

Q.    Okay.

A.    -- and then that would come to me. And then I would sit with in-house counsel and then Mr. Vora, and then we would make a determination from that.

Q.    Okay.  What about discipline of employees?  Could Mr. Moppins discipline employees without checking with other people?

A.    Yes, he could.  He could exhibit -- delegate -- mainly, he came to me, but he would sell -- he would tell me what was going on, and then I would instruct of what needs to happen.

Q.    Okay.  So in a discipline situation, was Mr. Moppins the decision-maker, or were you the decision-maker?

A.    Mainly me, I guess you would say,

Page 39

CATHY ANN PRICE

because he would come to me, tell me what the situation would be, and then I would give the recommendation as to what needs to happen.

Q.    Okay.

Okay.  Was receiving HR complaints one of Mr. Moppins' job duties?

A.    Receiving HR complaints?

Q.    Correct.

A.    Yes.  He could -- people would go to him and -- if they had an issue, and they will talk to him, yes.

Q.    Okay.  What about conducting investigations into HR complaints?  Was that one of his job duties?

A.    No.  He usually turn that over to me.

Q.    Okay.  Now, when you say "usually," does that mean he sometimes didn't?

A.    If I wasn't there, depending on the severity of what was going on, he would do it. That rarely happened.

But for the -- for the majority of the time, I do the investigations.

Q.    So how did Reema decide whether an HR investigation would be done by you or by

Page 40

CATHY ANN PRICE

Mr. Moppins?

A.    It wasn't a decision of how it was going to be done, generally.  I'm not there every day, and so I would get a text or a call if there's an issue going on.  And if I'm not there and it's something that needs to be addressed immediately, then I would give the guidance on how that needs to be done given that Mr. Moppins was the program manager for the project.

Q.    Okay.  Did Mr. Moppins have any HR training?

A.    I can't -- I can't answer that.  He was there before I got there.

Q.    Okay.  But you're not aware of any HR training that he had -- for example, he never told you about any HR training that -- that he had had in the past?

A.    He didn't tell me.  The only training that I can attest to is what I gave to supervisors.

Q.    Okay.  You mentioned you're not -- you weren't there every day.

Were you -- were there specific days that you worked at Reema?

Page 41

CATHY ANN PRICE

A.    I was mainly there Monday through Thursdays and some Fridays.

Q.    Okay.  And what -- what were the hours that you generally kept on those days?

A.    The general core hours, 9:00 -- I think I was doing 9:00 to 2:00, or something like that.  But I end up being there more than the normal 20 hours a week.

Q.    Okay.

Okay.  Ms. Price, have you heard of the term "all-hands meeting"?

A.    Um-hum.

Q.    Okay.  Can you tell me --

MR. WALSH:  That's yes?

BY MS. WASIK:

Q.    -- what an all-hands --

THE WITNESS: Yes.

I'm sorry.  Yes.

BY MS. WASIK:

Q.    Thank you.

Can you tell me what an all-hands meeting is?

A.    It's when all the staff is called into a meeting for a specific update or some

Page 42

CATHY ANN PRICE

specific subject matter.

Q.    Okay.  And is -- is that kind of meeting manna -- mandatory for all staff members?

A.    Yes.

Q.    Okay.  Who -- who typically called all-staff meetings?

A.    Generally, that's either Demarcus or Mr. Moppins.

Q.    Okay.  And who is Demarcus?

A.    Demarcus Pickett is the deputy program manager at the time.

Q.    Okay.  When did he work at Reema, if you recall?

A.    The entire time that I had been there.

Q.    Okay.

Okay.  How often did Mr. Pickett or Mr. Moppins call all-hands meetings?

A.    Those were periodic depending on what was changing on -- under the contracts --

Q.    Okay.

A.    -- if there was a need to -- a change in direction or a change in orders, or something, then a all-hand meeting would come -- would be

Page 43

CATHY ANN PRICE

called to give out new instructions on what needs to be done.

Q.    Okay.  And how did Mr. Pickett or Mr. Moppins call them?  By e-mail?  By phone?  Otherwise --

A.    E-mail and/or sometime they'd just walk through the warehouse and say, All-hands meeting.  Sometime they were just periodic -- sporadic.

Q.    Okay.  Were they sometimes scheduled ahead of time?

A.    Yes.

Q.    And sometimes they were sporadic --

A.    Um-hum.

Q.    -- what you just said?

Okay.

MR. WALSH:  That's yes?

THE WITNESS:  Yes.  I'm sorry.

BY MR. WALSH:

Q.    That's okay.

Okay.  So what are the -- some of the topics that could be discussed at an all-hands meeting, typically?

A.    Any issues that were transpiring in

Page 44

CATHY ANN PRICE

the warehouse, like they weren't making quota or they were damaging products; or even if the client was coming to the warehouse -- visits; as well as any issues that was generally prevailing in the warehouse itself; conduct in the warehouse; behavior that was disrupting performance.

Q.    Okay.  So you mentioned that -- well, strike that.

Was it typical for HR issues to be discussed at all-hands meetings?

A.    Periodically, because I would be in attendance at those meetings.

Q.    So if an HR issue was going to be discussed -- discussed at a meeting, would you get a heads-up ahead of time?

A.    Yes.

Q.    Okay.  And then if an HR issue was being discussed at a meeting, would you lead that, or would Mr. Moppins or Mr. Pickett?

A.    They'll introduce it, and then I will come in and discuss -- if it was something severe, then I would come in and discuss with -- whatever the issue was, remind them of the

Page 45

CATHY ANN PRICE

policy, and then, if necessary, formulate training.

Q.    Okay.  Can you give me some examples of HR issues that were discussed at all-hands meetings while you worked at Reema?

A.    One particular one was the music in the warehouse --

Q.    I'm sorry.  I didn't hear that.

The music?

A.    -- the music in the warehouse was extremely loud.  And they had been told numerous -- numerous times to turn it down or to turn the channels, because it -- it was just loud music, and it was disruptive to the front part of the warehouse.

So at that time, I initiated -- I need to talk to the staff to talk to them about the music and the conversations in the back of the warehouse.  I -- I can hear them.

So he called a all-hands meeting for that.

Q.    Okay.  Are there any other examples?

A.    There's been a all-hands meeting for all the supervisors at one time in regards to

Page 46

CATHY ANN PRICE

management of people and how they were managing their teams, making sure that they were being accountable for -- making sure that people were showing up on schedules -- at their scheduled time, and if they weren't, that they were addressing the issues with the employees --

Q.    Okay.

A.    -- more so around how employees were performing on certain duties in the -- in the warehouse, trying to get back control -- let the managers get back control of their employees.

Because it sound like, at one point, that they were kind of getting out of control, and the managers weren't wanting to intervene into that.  So we had a all-hands meeting for that.

Q.    If I'm understanding correctly, that was a meeting with just managers?

A.    That was just managers, but it's also called a "all-hand [sic] meeting."  When he's calling everybody in, even managers -- if it's all the managers coming off the floor, then that's a all-hands meeting.

Q.    I just want to make sure I understand

Page 47

CATHY ANN PRICE

correctly.

So it's called an "all-hands meeting" even though nonmanagers are not included in it?

A.    Right.

Q.    Okay.  So that example you just gave of the managers were talking to each other, it was called an "all-hands" --

A.    Right.

Q.    -- but it didn't actually include all the employees in the warehouse?

A.    Correct --

Q.    Okay.

A.    -- correct.

Q.    Going back to all-hands meetings where all the employees were included, what are some other times that HR issues were discussed?

A.    I really can't recall specifics --

Q.    Okay.

A.    -- I just remember the music, because that was --

Q.    Sure.

A.    -- affecting me.  So . . .

Q.    So is it fair to say that issues relating to the contract were more often

Page 48

CATHY ANN PRICE

discussed at all-hands meetings than HR issues?

A.    Yes.

Q.    And HR issues were sort of not the -- not the regular course of business at an all-hands meeting?

A.    Yes.

Q.    Okay.  Okay.

Okay.  What about if there's an HR issue that only affects one employee?  Is it typical to bring that up in an all-hands meeting?

A.    Not to my knowledge, no.

Q.    Okay.  So is it fair to say, if you bring up HR issues at an all-hands meeting, it's really about things that affect many employees?

A.    Correct.

Q.    Okay.

Okay.  Ms. Price, do you remember when Ms. Parker was hired by Reema?

A.    I vaguely do.

Q.    Okay.  I can -- I can show you a document that might help.

A.    Okay.

MS. WASIK:  So I believe this is 2, right?

Page 49

CATHY ANN PRICE

MR. WALSH:  Thank you.

MS. WASIK:  Thanks.

-  -  -

(30(b)(6) Deposition Exhibit
Number 2, Offer of Letter, Bates
stamped REEMA000295, marked for
identification, as of this date.)

-  -  -

THE WITNESS:  Thank you.

Yes.

BY MS. WASIK:

Q.    Do you recognize this document?

A.    Yes.

Q.    Okay.  What is it?

A.    It's an offer letter.

Q.    Okay.  Offer letter for who?

A.    Evangeline Parker.

Q.    Okay.  And when was this document given to Ms. Parker?

A.    November 26th, 2014.

Q.    Okay.  And I see in the second paragraph, it says, Your effective start date is December 1st, 2014.

Do you see that?

Page 50

CATHY ANN PRICE

A.    Yes.

Q.    So was that Ms. Parker's first day of employment at Reema?

A.    I believe so.

Q.    Okay.  Now, in the first sentence, in the first paragraph, it has an offer of employment as a general clerk II.

Do you see that?

A.    Um-hum.

Q.    So was that Ms. Parker's first job title at Reema?

A.    Yes.

Q.    Okay.  What were her job duties in that position?

A.    Oh.  General clerk II?

If I remember correctly, general clerks and -- they worked in the warehouse or they worked in the transportation part doing more -- a little bit more of the administrative work.  They're not necessarily -- if I remember correctly, I don't think they were necessarily on the floor pulling items.  They were doing more of the coordination of the logistics for fulfillment.

Page 51

CATHY ANN PRICE

Q.    Okay.

Okay.  Who did Ms. Parker report to in this position?

A.    Demarcus Pickett.

Q.    Okay.

Okay.  Did she also report to Mr. Moppins?

A.    Indirectly.

Q.    Indirectly.

What do you mean by "indirectly"?

A.    She reported to Demarcus Pickett, and -- but she would take instructions from Mr. Moppins if he gave instructions.

Q.    Okay.  Did she also report to Angela Wallace?

A.    At this time, no.

Q.    Okay.  And who -- who is Angela Wallace?

A.    Angela Wallace was an employee at Reema who was in transportation.

Q.    Okay.  And what was her job title at Reema during that time?

A.    Okay.  That's hard --

Q.    Sure.

Page 52

CATHY ANN PRICE

A.    -- at that time, she may have been a manager --

Q.    Okay.

A.    -- a transportation manager.

Q.    Okay.  Did Ms. Wallace work at Reema the entire time that you worked there?

A.    Yes.

Q.    Okay.  And as a general clerk II, did Ms. Parker have anyone reporting to her?

A.    No.

Q.    Okay.  Are you familiar with an individual named Donte Jennings?

A.    Yes.

Q.    Okay.  Do you recall when Donte Jennings began working for Reema?

A.    I can't -- I can't remember that -- the exact date, no.

Q.    Was it around the same time as Ms. Parker?

A.    I don't remember that.  It's like he started sometime afterwards.

Q.    Okay.

Okay.  When you say sometime after, do you think it was 2015, 2016 or in 2014?

Page 53

CATHY ANN PRICE

A.    It might have been in 2015 --

Q.    Okay.

A.    -- like, the earlier part of 2015, if I remind --

Q.    Okay.

A.    -- remember.

Q.    Would he have received an offer letter when he was hired?

A.    Yes.

Q.    Do you remember what position he was first hired into?

A.    I do not.

Q.    Okay.

MR. WALSH:  Is it okay if she looks at her notes to -- if that helps?

MS. WASIK:  Oh, certainly --

THE WITNESS:  Okay.

BY MS. WASIK:

Q.    If you have notes that would help, sure.

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  Yes.  I'm thinking he was hired around February or January,

Page 54

CATHY ANN PRICE

because I have a note in his -- noting here, new hire, Donte Jennings, about -- asking about an ID.  So . . .

MR. WALSH:  What year?

THE WITNESS:  2015.

BY MS. WASIK:

Q.  Okay.

Okay.  Do you have in your notes what position he had?

A.  Let's see.

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  I do not have it in here.

BY MS. WASIK:

Q.  Okay.  If you recall, did he have a position that was above Ms. Parker's in the hierarchy or below her or roughly the same?

A.  I -- I want to say it was either the same or the entry-level position.  It may have been a shipping and receiving clerk.  I'm not -- I'm not 100 percent on that.

Q.  Is general clerk II an entry-level position?

Page 55

CATHY ANN PRICE

A.  Not really.  It's a shipping -- you have a shipping and receiving clerk, and then you have a general clerk II --

Q.  Okay.

A.  -- and then you -- those -- but those two work in the warehouse doing pretty much a -- almost a similar job, but the general clerk may do more administrative stuff.

Q.  I see.  I see.

Okay.  When Mr. Jennings was hired in January or February 2015, were he and Ms. Parker working in the warehouse together?

A.  Yes.

Q.  Okay.

Okay.  So after general clerk II, what was the next position that Ms. Parker held at Reema?

A.  I -- I can't recall --

Q.  Okay.

A.  -- she had a number of title changes, so . . .

Q.  Sure.

Did Reema keep in any -- did Reema keep in writing anywhere the positions that

Page 56

CATHY ANN PRICE

employees had while they worked there?

A.  Yes.

Q.  Okay.  So what kind of document would tell me what her next position at Reema was?

A.  It would be either a position-change form or promotion letter or even a restructuring letter, if the warehouse got restructured.

Q.  Okay.  Did Reema always give one of those types of letters to employees, or were sometimes employees moved or promoted without a letter?

A.  It was -- it was -- to my recollection, we always gave a letter to all the employees whenever -- whenever they had a position or a pay change.

Q.  Okay.

Okay.  Is it possible that Ms. Parker's next position was shipping supervisor?

A.  I can't agree, but it -- those were one of her titles.

Q.  That was one of her titles?

A.  Um-hum.

Q.  Okay.  If that was one of her titles,

Page 57

CATHY ANN PRICE

do you remember approximately when that was one of her titles?

A.  No, I don't --

Q.  Okay.

A.  -- unless I see a -- a document, I can't really remember.

Q.  Okay.  What is a shipping supervisor?  What do they do?

A.  You have receivings and shipping in the warehouse.  And so the shipping supervisor is just oversighting all the shipping and receiving people in the back, making sure that the items get in the order -- fulfilling the order, that the items are being pulled from the shelves and packed appropriately and shipped off.

Q.  Okay.

Okay.  So is that a higher position than general clerk II?

A.  Yes.

Q.  Okay.  Would it come with a increase in pay?

A.  Yes.

Q.  You mentioned that Ms. Parker had a number of positions.

Page 58

CATHY ANN PRICE

Who was the person that was deciding what her position movements were?

A. Those positions -- again, this is government contracting, and so it depends on the contract and what the client feels is a need.

So the client may come and say, We're going to reduce your labor pool. So Mr. Moppins will come and make a recommendation as to what that workforce should look like. And then that comes to me, and then me and Mr. Vora would approve whether or not that's okay.

Q. Okay. But the client didn't decide where Ms. Parker would go --

A. No.

Q. -- in the warehouse, correct?

A. No.

Q. So that was -- Mr. Moppins would -- would make that decision?

A. He would make the recommendation for that, yeah --

Q. Okay.

A. -- we always got a e-mail from him recommending.

Q. Okay. Do shipping supervisors

Page 59

CATHY ANN PRICE

usually have any direct reports?

A. For the most part, yes, I think so.

Q. Okay. Okay.

All right. Let's look at another document.

MS. WASIK: Thanks.

- - -

(30(b)(6) Deposition Exhibit Number 3, Letter of Offer, Bates stamped REEMA000304, marked for identification, as of this date.)

- - -

THE WITNESS: Um-hum. Um-hum.

BY MS. WASIK:

Q. Do you recognize this document?

A. Yes.

Q. What is it?

A. It is a offer of promotion and salary increase.

Q. Okay. So does this document state that Ms. Parker is getting a promotion to receiving supervisor/materials coordinator?

A. Yes.

Q. Okay. And did this promotion come

Page 60

CATHY ANN PRICE

with a salary increase?

A. Yes.

Q. Okay. Now, you mentioned before that shipping supervisor was one of Ms. Parker's titles.

Was this receiving supervisor position before or after the shipping supervisor, if you recall?

A. I can't recall.

Q. Okay.

Okay. So did Mr. Moppins recommend that Ms. Parker receive the promotion to receiving supervisor?

A. Yes.

Q. Okay. And you approved it?

A. Yes. I think this was one of the positions that was also an internal post, and she applied for that position, too.

Sometimes we had internal postings of positions that become vacant, and the employees would apply for them. And I think this might have been one of those.

Q. And Mr. Vora approved of this promotion as well?

Page 61

CATHY ANN PRICE

A. Yes.

Q. Okay. Why did -- why did Mr. Moppins promote Ms. Parker into this position -- or why was she selected for this position?

A. That -- I'm trying to remember if she was one of two people that applied, because I think -- again, I'm strongly remembering that she applied for this position. And I'm thinking that she was one of two people that applied, and she was the strongest candidate.

Q. Okay. Why was she the strongest candidate?

A. Given her experience and her performance --

Q. Okay.

A. -- at the time.

Q. What about her performance at the time made her the strongest candidate?

A. She was doing her job, and that made her the strongest candidate. She had a little more knowledge about what was happening in the warehouse, and that made her the stronger candidate for the position.

Q. Okay. And what were her job duties

Page 62

CATHY ANN PRICE

as receiving supervisor?

A.    Pretty much the same as the shipping. The setup is in -- it's in the other side.  The shipping supervisor and the receiving supervisor, as you see the parentheses, material coordinator -- it's the same position; it's just different titles given in the warehouse.

So it was sent -- just a different side of the warehouse logis- -- logistics.

Q.    Okay.  Who did she report to in this position?

A.    If I'm not mistaken, it was still Demarcus, Demarcus Pickett.

Q.    Okay.  Did she report to a Ms. Daughtry at this time?

A.    Oh, I'm sorry.  Yes, Tambeni -- Tambeni -- I'm -- I'm sorry.  Correct myself -- Tambeni Daughtry, yeah.

Q.    Okay.  So Tambeni Daughtry and Mr. Pickett.

Did she keep reporting indirectly to Mr. Moppins?

A.    Yes.

Q.    Okay.

Page 63

CATHY ANN PRICE

Okay.  Did she have any direct reports in this role?

A.    I'm trying to remember.

I need to correct myself.  I don't think she did.  I don't think she had direct reports for the -- the shipping nor the receiving.

Q.    Okay.  I'm sorry.  So your correction -- you mean she did not have direct reports as a shipping supervisor?

A.    Right.  I don't . . .

Q.    What about a Jason Rogers?  Is it possible that he reported to her when she was shipping supervisor?

A.    May I?

Q.    You may.

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  Yes, he did -- she did -- he did report to her.

BY MS. WASIK:

Q.    At the time she was shipping supervisor?

A.    Yes.

Page 64

CATHY ANN PRICE

Q.    And did that jog your memory as to whether she was shipping supervisor before or after this position of receiving supervisor?

A.    It did not --

Q.    Okay --

A.    -- I'm sorry.

Q.    -- okay.

A.    No.  I'm sorry.  I want to make sure.

Q.    Looking back at Exhibit 3, in the middle of the page, there's a section that says Addendum.

Do you see that?

A.    Um-hum.

Q.    It says that Ms. Parker will be required to complete professional-development courses.

Did Ms. Parker complete those courses?

A.    At this point, I don't think that any were assigned to her.  I don't think any were -- were assigned to her, other than taking on supervisor training --

Q.    Okay.

A.    -- but she did do that.

Page 65

CATHY ANN PRICE

Q.    Okay.  When did she do that supervisor training?

A.    This is 2015.

It had to be in the same year, probably a couple of months after she got the position.

Q.    And was that training done in-house at Reema, or was Ms. Parker sort of off-site somewhere during that training?

A.    In-house at Reema.

Q.    In-house.

Okay.  And who --

A.    I conducted it.

Q.    You conducted it?

A.    Um-hum.

Q.    Got it.

CERTIFIED STENOGRAPHER:  Just let her finish the question.

THE WITNESS:  Oh, I'm sorry.

BY MS. WASIK:

Q.    Okay.  Let's look at another document.

MR. WALSH:  Thank you.

Page 66

CATHY ANN PRICE

- - -

(30(b)(6) Deposition Exhibit Number 4, Letter of Offer, Bates stamped REEMA000303, marked for identification, as of this date.)

- - -

BY MS. WASIK:

Q. Just let me know if you recognize this document.

(Whereupon, the witness reviews the material provided.)

THE WITNESS: I do recognize this document.

BY MS. WASIK:

Q. Okay. And what is this?

A. This is another letter of promotion -- internal promotion to assistant manager.

Q. Okay. And was this position also known as assistant inventory control manager?

A. Yes.

Q. Okay. And did this promotion come with a salary increase?

A. Yes.

Page 67

CATHY ANN PRICE

Q. And did Mr. Moppins recommend Ms. Parker for this promotion?

A. I think he did, yes.

Q. And you approved it?

A. Yes.

Q. And Mr. Vora approved it?

A. Yes.

Q. Okay. Why did Mr. Moppins recommend Ms. Parker for this promotion?

A. Because she was doing well in receivings. And if I'm not mistaken, some -- this was a restructuring in the warehouse.

(Whereupon, the witness reviews the material provided.)

THE WITNESS: So -- March 2016 -- March 2016 -- this was done due to contract modifications. And so Ms. Parker along with Mr. Rogers were shifted in personnel. She became an assistant manager, logistics department, reporting to Angela.

And then there was also a change with Mr. Rogers. And both of them were converted to salaried employees instead of

Page 68

CATHY ANN PRICE

hourly.

BY MS. WASIK:

Q. Okay. When you say "reporting to Angela," you mean Angela Wallace?

A. Angela Wallace, yes.

Q. Okay. And what were her job duties as assistant manager?

A. The logistics department was more around the invoice -- the billing of the vendors, the invoicing, the transportation of the merchandise to its locations --

Q. Okay.

A. -- if that location was out of the country, then they were responsible for doing the logistics to make sure that the products got where they needed to be.

Q. Okay. Did Ms. Parker still report indirectly to Mr. Moppins in this role?

A. Yeah. Most of the managers all reported indirectly to Mr. Moppins.

Q. And was she reporting to Mr. Pickett at this time or no longer?

A. Yes, because he was -- Angela reported to him.

Page 69

CATHY ANN PRICE

Q. Did she have any direct reports as assistant manager?

A. In this position, I don't remember her having any reports.

Q. Okay. And looking again at the middle of the page, there's the same Addendum. Do you see that?

A. Um-hum.

Q. Were there any additional courses that Ms. Parker took in connection with this promotion?

A. This may be the one where she was starting to take -- I can't remember the title -- IRC training. It was a special training for logistics --

Q. Okay.

A. -- I think this was the time that she was recommended for that training.

Q. Who recommended her for that training?

A. If I'm not mistaken, Mr. Moppins recommended her for that training.

Q. Okay. And why did Mr. Moppins recommend her to take that training?

Page 70

CATHY ANN PRICE

A.     Because it was needed -- we needed that as part of the contract fulfillment, and she was in the role.  And so she was the best choice to go ahead and take the training and fulfill that obligation --

Q.     Okay.

A.     -- because she was most familiar with the process.

Q.     And did she receive that training in-house or off-site somewhere?

A.     I think it was online --

Q.     Online.

A.     -- I'm not sure.

Q.     Okay.  Is that a training that Reema paid for Ms. Parker to take?

A.     Yes.

Q.     Okay.

Okay.  Now, after this position, do you recall what Ms. Parker's next role at Reema was?

A.     I'm sorry.  I'll refer back to my notes.

(Whereupon, the witness reviews the material provided.)

Page 71

CATHY ANN PRICE

THE WITNESS:  I'm not clear to what her next title was, but it -- it may have been back into the warehouse.  I'm not 100 percent.

BY MS. WASIK:

Q.     Okay.  Did she ever hold the role of quality compliance control?

A.     Yes, she did.  Yes.

Q.     Is it possible that that was her next position?

A.     It could be possible, yes.

Q.     Okay.  And when she moved into quality compliance control, who decided that she would make that move?

A.     That was discussed with Larry and Mr. Vora in regards to what was needed, again, for the fulfillment of the contract.

Q.     Okay.  So did Mr. Moppins make that recommendation that she would move?

A.     Yes.

Q.     Okay.  And what are the job -- what were her job duties in quality compliance control?

A.     I think -- I'm not 100 percent -- I

Page 72

CATHY ANN PRICE

think that position was created in order to ensure that we were getting our -- our fulfillment done correctly and that our inventory was correct.

Q.     Were there issues with the fulfillment and inventory prior to that?

A.     They had some issues, yes.

Q.     Okay.  What were the issues?

A.     Sometimes the -- there were a couple of issues where the client may have gotten the wrong products or if things didn't get there in time, which sometimes was not RCSI issue, but it was the vendors or the suppliers that we used getting things to the locations in time.  It could be issues with the country that we're trying to get into.

So we put in place someone who could focus in on that.

Q.     Okay.  So is it fair to say that Mr. Moppins recommended that Ms. Parker move into that role to help remedy some of those issues?

A.     Yes.

Q.     Okay.  In that role, was she reporting directly to Mr. Moppins?

Page 73

CATHY ANN PRICE

A.     I do not recall in that role who she reported to.

Q.     Okay.  And do you recall if she received a change in pay when she took over the quality compliance control role?

A.     I don't remember.  But if she did -- would -- she would have gotten another one of these letters.

Q.     Okay.

Okay.  Did Ms. Parker ever hold the role of compliance/logistic manager?

A.     Don't recall that.

Q.     Okay.  Or compliance officer/logistic manager?

A.     Don't recall that title.

Q.     Okay.  Well, after quality compliance control, do you recall what her next position was at Reema?

A.     She should have been -- I think that would have been the final to assistant warehouse manager.

Q.     Okay.  Sure.

Yeah.  Thanks.

Page 74

CATHY ANN PRICE

- - -

(30(b)(6) Deposition Exhibit
Number 5, Letter of Employment
Verification, Bates stamped
REEMA000322, marked for
identification, as of this date.)

- - -

BY MS. WASIK:

Q.    Let me know if you recognize this document.

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  Um-hum.  I'm familiar with this.

BY MS. WASIK:

Q.    Okay.  So in the second paragraph, the second sentence, do you see where it says, She was eventually promoted to material coordinator and then to the position of logistic manager, which she currently holds?

A.    Um-hum.

Q.    So do you remember when she held the logistic manager position?

A.    That's part of the title with this

Page 75

CATHY ANN PRICE

assistant manager under -- I'm thinking under Angela Wallace.

(Whereupon, the witness continues to review the material provided.)

THE WITNESS:  Logistics manager?

BY MS. WASIK:

Q.    For Exhibit 4, the assistant manager, I thought that was for assistant inventory control manager.

Is that incorrect?

A.    Assistant inventory control manager?

Well, Ms. Wallace was that at the time; she was inventory control manager --

Q.    Okay.

A.    -- so I think, at that time, Ms. Parker was holding the "logistics" title while she was assistant manager.

Q.    Okay.  So are you saying that Exhibit 4 and 5 are the same -- talking about the same position for Ms. Parker, or are they two different positions?

That's what I'm trying to figure out.

A.    So when she had her QC role, her quality assurance role, that was added to her

Page 76

CATHY ANN PRICE

logistic manager's role.  And I'm trying to see, because these titles cross over.  They're the same, but they refer to them differently.

One second.

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  I see my notes about her getting the added responsibility, but I don't see that as -- I think that was with her QC role.  That was the added responsibilities to the logistics manager, but I'm not sure she should -- if this is her title, she would have gotten another offer letter.

BY MS. WASIK:

Q.    When you say "her QC role," which role are you referring to?

A.    I mean her quality assurance that we just -- just recently talked about.  That was the added responsibilities to her logistic manager role.

Q.    Okay.

Okay.  And so looking at Exhibit 5, it says she currently holds the position of

Page 77

CATHY ANN PRICE

logistic manager.

A.    Um-hum.

Q.    Who was she reporting to then?

A.    That would be Demarcus --
Demarcus Pickett.

Q.    Okay.  Did she also report indirectly to Mr. Moppins?

A.    Yes.

Q.    Okay.

Okay.  Did she have any direct reports when she was in that role?

A.    No.

Q.    Okay.  And when you say that the position -- the responsibilities were added on, whose recommendation was it that the responsibilities would be added on?

A.    That was, again, part of the conversation for this role being created.  So that's how the roles got added on during the recommendation of Mr. Moppins.

Q.    Okay.

Okay.  Now, looking back at -- at Exhibit 5, you wrote this letter, correct?

A.    Yes.

Page 78

CATHY ANN PRICE

Q.    Okay.  Who did you write it to?

A.    I think this was for an employer -- it was either employer or for the training that she wanted to take --

Q.    When you --

A.    -- the ITAR training.

Q.    -- when you say "an employer," who would that be?

A.    Not an employer, for -- I'm sorry. It was -- I think this was for the recommendation for her training.

Q.    So why did Ms. Parker need a letter for -- to take the training?

A.    This was some type of specific training.

Q.    Okay.  Who put on this training?

A.    That, I'm not aware of.  It was outside of Reema.

Q.    Okay.  I guess who did you send this letter to?  Who received it in the end?

A.    I gave this to Ms. Parker, and she put it with a package for Demarcus.

Q.    Okay.

Okay.  And did Ms. Parker end up

Page 79

CATHY ANN PRICE

taking this training?

A.    She started it, yes.

Q.    Okay.  Is it standard for recommendations to be required to take the type of trainings that Ms. Parker was taking?

A.    Again, this was some special certification training, so it was a whole package she had to put together --

Q.    Okay.

A.    -- in order to take the training.

Q.    And when you say "she started it," did she finish it?

A.    No, she did not.

Q.    Okay.  Why didn't she finish it?

A.    She was termed.

Q.    Okay.

CERTIFIED STENOGRAPHER:  Did you say "termed"?

THE WITNESS:  Termed.  I'm sorry.

BY MS. WASIK:

Q.    By "termed," do you mean terminated?

A.    Terminated, yeah.

Q.    Okay.  I'd like to look at the second paragraph from the bottom, where it starts with

Page 80

CATHY ANN PRICE

The outlook.

A.    Um-hum.

Q.    So why -- why did you write this sentence:  The outlook for Ms. Parker's continued employment with us is very good, and we hope to have her with our company for many years to come?

A.    That's a general statement of her status at that time.

Q.    Okay.  And why was her outlook very good at that time?

A.    Because she was active; she had satisfactory performance.

Q.    Okay.

Okay.  And was her performance satisfactory according to you or according to other people at the company?

A.    Just according to the feedback that we were receiving --

Q.    Okay.

A.    -- whether that was from Mr. Pickett or Mr. Moppins.

Q.    Okay.  Did you discuss her performance with Mr. Pickett or Mr. Moppins before writing this letter?

Page 81

CATHY ANN PRICE

A.    I can't remember.

Q.    Okay.  And why did you hope to have her with the company for many years to come?

A.    Well, that's just a general statement that I put in with -- as long as an employee is doing well at that time or satisfactory at that time, we hope that they will stay with the company, as long as they're doing satisfactory performance.

Q.    Okay.  Now, this letter is dated January 2016, right?

A.    Um-hum.

Q.    Around that time, do you recall what Mr. Jennings' position was?

A.    I do not --

Q.    Okay.

A.    -- I can look and see if I can remember.

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  So from what I can see, Mr. Jennings was on the ATA side of the contract at that time in January.  And he possibly was a shipping and receiving

Page 82

CATHY ANN PRICE

clerk.

BY MS. WASIK:

Q.    Okay.  And in the hierarchy, how does shipping and receiving clerk compare to logistic manager?

A.    It's still the entry-level position.

Q.    Mr. Jennings' position is the entry-level position?

A.    Um-hum.

Q.    Okay.  And logistic manager is above that, correct?

A.    Yes.

Q.    Okay.

Okay.  So after this title that -- in Exhibit 5, did Ms. Parker's title change again at Reema?

A.    I believe so.  I think it was then -- after this, she became the assistant warehouse manager.

Q.    Okay.  And do you remember when that was?

This might also help.

A.    Okay.

Page 83

CATHY ANN PRICE

- - -

(30(b)(6) Deposition Exhibit Number 6, Memorandum, Bates stamped REEMA000281, marked for identification, as of this date.)

- - -

MR. WALSH:  Thank you.

MS. WASIK:  Thanks.  Six, please.

THE WITNESS:  Thank you.  Okay.

Yes.  April 7, 2016, there was a re -- realignment -- or a reassignment as the contracts changed.

BY MS. WASIK:

Q.    So looking at the first paragraph, if you look at the third sentence, it says, Has been reassigned effective March 1st, 2016 --

A.    Yes.

Q.    -- do you see that?

A.    Um-hum.

Q.    So was the date of the change --

A.    March --

Q.    -- in March 2016?

Page 84

CATHY ANN PRICE

A.    -- yes, ma'am, March 1st, 2016.

Q.    Okay.  And who recommended that Ms. Parker would now be the warehouse assistant manager?

A.    This recommendation was from Mr. Moppins' re -- realignment, or reassignment.

Q.    Okay.  And did you approve that change in role?

A.    Yes.

Q.    And did Mr. Vora approve it?

A.    Yes.

Q.    Okay.  Did she gain additional job duties in -- in this new role?

A.    Yes.

Q.    Okay.  And what -- what were those duties?

A.    The responsibilities of the warehouse -- taking on the warehouse as well as her current duties --

Q.    Okay.

A.    -- for the ATA side of the contract.

Q.    Was there a change in pay with this change in position?

A.    Yes.

Page 85

CATHY ANN PRICE

Q.    What was the change in pay?

A.    Her salary went to 69,365.

Q.    And was that an increase from her previous salary?

A.    Yes.

Q.    Okay.  Who did she report to in this role?

A.    Sean Reeves.

Q.    Okay.  Anyone else?

A.    And still it would have been indirectly to Mr. Moppins.

Q.    Okay.  Did she have any direct reports in this position?

A.    Yes, the individuals in that side of the warehouse, the shipping and receiving clerks, the general clerks.

Q.    Okay.

Okay.  All right.  And after this position, did Ms. Parker hold any other positions at Reema before she was terminated?

A.    No.

Q.    So this was the last one that she held?

A.    Um-hum.

Page 86

CATHY ANN PRICE

Q. Okay.
Okay.
MR. WALSH: That's yes?
THE WITNESS: Yes.
I'm sorry.
MR. WALSH: We all do it.
BY MS. WASIK:
Q. When Ms. Parker worked at Reema, did Reema conduct performance evaluations of its employees?
A. Yes.
Q. Okay.
MR. WALSH: I'm sorry. Can we just take a quick break? It sounds like you're shifting topics.
MS. WASIK: Sure. I actually -- before we take a break, if Ms. Price wouldn't mind marking which parts of her notes are relevant to the case so that we can have those copied and take a look at those --
THE WITNESS: Okay. Yes.
MS. WASIK: -- that would be great.
MR. WALSH: Okay.

Page 87

CATHY ANN PRICE

THE WITNESS: Yes.
MR. WALSH: Do you have Post-its?
THE WITNESS: I've got it.
MS. WASIK: Yeah. We can --
MR. WALSH: Ah, you've got some?
Okay.
MS. WASIK: Okay. All right. Great.
MR. WALSH: Do you want to do it off the record?
MS. WASIK: That's fine, yeah.
MR. WALSH: Okay.
THE VIDEOGRAPHER: Off the record at 10:47. This is the end of Media Unit Number 1.

- - -

(Whereupon, a recess was taken from 10:47 a.m. to 11:10 a.m.)

- - -

THE VIDEOGRAPHER: On the record at 11:10. This is the beginning of Media Unit 2 in the testimony of Cathy Price.

Page 88

CATHY ANN PRICE

BY MS. WASIK:
Q. Okay. Ms. Price, thank you for going through your notes that you brought with -- with you today.
When you were going through them, how did you decide what would be turned over to us and what would not be?
A. Based on what was relevant to the case at hand and talking with my attorney.
Q. Okay. So did you mark everything that had Ms. Parker in it?
A. Yes.
Q. Okay. And what about Mr. Jennings --
A. Yes.
Q. -- did you mark those items?
A. Um-hum.
Q. Did you mark items re -- related to Mr. Moppins?
A. If it was in there, yes, in that time period --
Q. Okay. When you say "that time period," what is the time period?
A. I gave January 1 through May 30th, I think is the time frame that you have.

Page 89

CATHY ANN PRICE

Q. And what years does that time frame cover?
A. 2016.
Q. Okay. Were there notes in there from before 2016?
A. No, not in -- not in that notebook that you have.
Q. Okay.
Okay. So what -- I guess what time period does -- does the notebook itself cover?
A. It covers the whole year 2016 --
Q. Okay.
A. -- but only the parts of where this case is relevant to; it was January 1 through May 30th.
Q. Do you have similar notebooks for 2015 or 2014?
A. Yes.
Q. Okay. And where are those notebooks?
A. I only have the 2016 and the 2015. The rest of them are at home.
Q. Okay. And you just pointed down.
Do you have 2015 with you?
A. Yes.

Page 90

CATHY ANN PRICE

Q.   I see.

Okay.  Is it possible that there are notes related to the case in this 2015 notebook?

A.   I don't think so.  It's mostly the information about hires, and stuff, unless -- it's sporadic stuff.  I'm not sure.

Q.   Okay.  Have you ever looked through the 2016 notes to determine whether there are things in there that are relevant to this lawsuit?

A.   The 2015 one?

Q.   Oh, I'm sorry, 2015.

A.   Only when you asked me about a hire or a job title.

Q.   So you have looked through those before to see if they're rel -- any of those are relevant to the case?

A.   Yes.  It was sitting right here.

Q.   Okay.  When did you go through them to see if any of those are relevant to the case?

A.   When you asked me about a position, like when Evangeline got hired or when Donte was hired.  I think Donte's was in here (indicating) --

Page 91

CATHY ANN PRICE

Q.   I see.

A.   -- not Evangeline, but Donte, because this is January 1 --

Q.   Okay.

A.   -- 2015.

Q.   Before today -- before today's deposition, had you ever gone through any of your notebooks to see if there are documents relevant to this lawsuit in those notebooks?

A.   I just pulled all of -- all of them out, yes, and I just went through to see if anything was relevant to the -- the case, Exhibit 1.

Q.   Okay.  And when did you do that?

A.   Last month.

Q.   Last month.

Was it before or after you met with your lawyers to prepare for the deposition?

A.   After.

Q.   After.

Okay.  And did you give those notebooks to your lawyers at that time?

A.   They have not left my possession, no.

Q.   So do you keep them at your house?

Page 92

CATHY ANN PRICE

A.   Yeah.  They -- they're my notebooks.  Yes.

Q.   Okay.  So I'm guessing you did not turn them over to Reema before you left the employment of Reema?

A.   They're not Reema's property; they're my personal notebooks.

Q.   Okay.  But they contain information about your job functions in HR while you worked at Reema, correct?

A.   Correct.

Q.   So the 2016, you marked for us. 2015 -- I'm actually going to ask that on the next break, you mark whatever's relevant to the lawsuit, including the hiring of Donte Jennings, in that notebook --

A.   Okay.

Q.   -- so we can do that next.

MR. WALSH:  Well, I'm going to object.  I mean, to the extent you can identify things that you want her -- that you consider relevant.  I mean --

MS. WASIK:  Yeah.

MR. WALSH:  -- so far, you've asked

Page 93

CATHY ANN PRICE

when Donte was hired.  I don't know that that was necessarily relevant, but she provided that information.

So if we -- during a break, we want to identify what you think may be relevant.  We can look through the notebooks, that's fine, but --

MS. WASIK:  Okay.

MR. WALSH:  -- not just a -- what her perception of what may be relevant is not necessarily appropriate.

MS. WASIK:  Absolute -- okay.

BY MS. WASIK:

Q.   And you mentioned there was also a 2014 notebook.

A.   Um-hum.

Q.   Did you bring that with you today?

A.   No, I did not.

Q.   And why didn't you bring that one with you?

A.   I didn't think it was necessary.

Q.   What -- what are the contents of the 2014 notebook?

A.   The same as all the notebooks:

Page 94

CATHY ANN PRICE

They're my daily HR functions.

Q.    Okay.  Would the 2014 notebook have anything about Ms. Parker in it?

A.    Probably her hire, her recruiting stuff, whether or not she did a offer letter.

Q.    Okay.

Okay.  Other than these 2014, 2015, 2016 notebooks, did you take any other notes that have -- did you take any other notes that have to do with your HR function at Reema?

A.    Could you explain -- give me an example?

Q.    Sure.

So are all your notes contained in these notebooks, or are there other ones that you have at your house?

A.    No.  The majority of my notes are in here (indicating).  Like, I probably would write on a piece of paper, or something, some scraps, but I don't have those.  But the main notes are in here (indicating).

Q.    Okay.  When you were looking through your notes just now before the break, did you come across anything that you thought was

Page 95

CATHY ANN PRICE

classified?

A.    Not at this point of that period.  It's not in here -- anything that I spoke with counsel, or anything that's not -- I didn't see anything in here that would've deemed classified.

Q.    Okay.  And when you say "here," you mean both the notebooks --

A.    Yes.

Q.    -- you brought today?

Okay.

Okay.  Going back to a question I asked before the break, when Ms. Parker worked at Reema, did -- did Reema conduct performance evaluations on its employees?

A.    Yes.

Q.    Okay.  And how often were those conducted?

A.    Six months and annually.

Q.    Okay.  And were the evaluations written down?

A.    Yes.

Q.    Who usually wrote the evaluations?

A.    It would be the supervisors and -- like, at that time, when Demarcus went to deputy

Page 96

CATHY ANN PRICE

program manager, he would do the evaluations.

Q.    Okay.  When the supervisor would write the evaluation, did they take anyone else's input into account, or was it just the supervisor's reflections?

A.    I think that Larry Moppins made recommendations to the performance reviews.

Q.    Okay.  Did supervisors take into account the input of the employees' direct reports at all when doing the evaluations?

A.    No --

Q.    Okay.

A.    -- not that I'm aware of.

Q.    Did -- did HR have a role in the performance evaluations?

A.    No, other than to just collect them.  We kind of review and make sure that they were complete and then to -- to get them and make sure they were signed and put in the file.

Q.    Okay.  So HR didn't have a role in the content of the --

A.    No.

Q.    -- evaluations?

Okay.  What about Mr. Vora?  Did he

Page 97

CATHY ANN PRICE

have a role in the evaluation process?

A.    No.

Q.    Okay.

Okay.  What was the -- what's the purpose of a performance evaluation?

A.    To give us an idea of how the employee's performing out in the warehouse.  That helps us when it does come to promotions or looking at internal promotions.  So it was mainly to help the employee and the supervisors know where that employee stood as far as performance and to make any adjustments that needed to be made.

If they needed some additional performance improvement plan, or something, then they would get that as part of the performance review.

Q.    Okay.

Okay.  I'd like to show you a few documents.

- - -

(30(b)(6) Deposition Exhibit Number 7, Employee Performance Evaluation, Bates stamped

Page 98

CATHY ANN PRICE

REEMA000349 through REEMA000350, marked for identification, as of this date.)

- - -

BY MS. WASIK:

Q.    Let me know if you recognize this document.

A.    I do.

Q.    Okay.  What is this?

A.    It's an employee performance evaluation.

Q.    Okay.  For which employee?

A.    Evangeline Parker.

Q.    Okay.  And what time period does this performance evaluation cover?

A.    February 15th through March 31st, 2016.

Q.    Okay.  And who wrote this performance evaluation?

A.    Sean Reeves.

Q.    Okay.

All right.  I'd like to show you another one.

Page 99

CATHY ANN PRICE

- - -

(30(b)(6) Deposition Exhibit Number 8, Initial Employee Performance Evaluation, Bates stamped REEMA000351 through REEMA000352, marked for identification, as of this date.)

- - -

BY MS. WASIK:

Q.    Okay.  What is this document, when you've had a chance?

A.    Another performance evaluation, the annual one.

Q.    Okay.  And what time period does this cover?

A.    This is 9/25/2015 to 12/1/2015.

Q.    All right.  And who wrote this one?

A.    Tambeni Daughtry.

Q.    Okay.

All right.  I have one more.

- - -

(30(b)(6) Deposition Exhibit Number 9, Employee Performance Evaluation, Bates stamped

Page 100

Page

CATHY ANN PRICE

REEMA000353 through REEMA000354, marked for identification, as of this date.)

- - -

BY MS. WASIK:

Q.    And what is this document?

A.    Another employee performance evaluation, an annual one.

Q.    Okay.  And it's for Ms. Parker, correct?

A.    Correct.

Q.    And who wrote this one?

A.    Angela Wallace.

Q.    And what time period does this cover?

A.    This is 5/16/2015 to 10/9/2015.

Q.    Okay.  Other than these three, did Ms. Parker get any more performance evaluations while she worked at Reema?

A.    If she did, it would have been part of her personnel file.

Q.    Okay.  But she was supposed to get two per year; is that right?  Six months and then a year?

A.    Yes --

Page 101

Page

CATHY ANN PRICE

Q.    Okay --

A.    -- I --

Q.    -- so she should have gotten two in 2014, two in 2015 --

A.    She wouldn't have gotten any in 2014 because she --

Q.    Okay.

A.    -- didn't come until the end of the year.

Q.    Gotcha.

So she should have had two for 2015.

And then how many should she have gotten in 2016?

A.    She probably would not have gotten any because she didn't complete 2016.  She --

Q.    Okay.

A.    -- termed at May 2016.

Q.    Okay.  So -- so what -- I guess when are the performance evaluations completed?  When are the annuals and when are the six-month?

A.    Generally, they're in June and the end of the year.

Q.    Okay.  So look at -- looking at Exhibit 7.

Page 102

CATHY ANN PRICE

Do you see that one?
A. Yes.
Q. Okay. That's -- is this the only one she would have gotten in 2016?
A. I see 45 days on here, so this tells me that this was a performance evaluation when she got a promotion.
Q. Oh, I see.
Okay. So when an employee gets a promotion, is that another time that she might get a performance evaluation?
A. Um-hum.
Q. Okay.
MR. WALSH: That's yes?
THE WITNESS: Yes. I'm sorry.
Yes.
BY MS. WASIK:
Q. Okay. So is Exhibit 7, her performance evaluation, done in connection with her promotion to assistant warehouse operations manager?
A. Yes.
Q. Okay. When Ms. Parker got other promotions, did she also get performance

Page 103

CATHY ANN PRICE

evaluations with those?
A. Again, if she did, they should have been in her personnel file. Some of those promotions, again, were just reassignments or position changes --
Q. Okay.
A. -- due to the contract.
Q. Okay.
Okay. I'd like to show you another document.
MS. WASIK: What number are we up to?
CERTIFIED STENOGRAPHER: This is 10.
- - -
(30(b)(6) Deposition Exhibit Number 10, Employment Handbook, Bates stamped REEMA000008 through REEMA000058, marked for identification, as of this date.)
- - -
BY MS. WASIK:
Q. All right. Do you recognize this document?

Page 104

CATHY ANN PRICE

A. I do.
Q. What -- what is it?
A. It's the Reema Employee Handbook.
Q. Okay. Do you know when this handbook was in effect?
A. As of June 2013.
Q. Okay. Was it in effect all the way until Ms. Parker was terminated?
A. Yes.
Q. Okay. Do you know who created this document?
A. I think this was in existence before I got there. So I think it's the in-house counsel that created this.
Q. Okay. Was this revised at any time while Ms. Parker was working at Reema?
A. Not to my knowledge. I think it was in the process of being revised.
Q. Okay. When was it in the process of being revised?
A. That would have been 2016/2017, somewhere in that time frame.
Q. Okay. Was that after Ms. Parker had left Reema?

Page 105

CATHY ANN PRICE

A. No; I think it was during the time she was there. It was just time to do a update because of the law's change.
Q. Okay. But there wasn't a new version that was in effect --
A. No --
Q. -- while she was an employee, correct?
A. -- no, correct.
Q. Okay. Does this handbook reflect Reema's human resources policies?
A. Yes.
Q. Okay. And does it apply -- or at the time Ms. Parker worked there, did it apply to all employees?
A. Yes.
Q. Okay. Did it apply -- apply to all employees regardless of their position in the company?
A. Yes.
Q. Okay. So it imply -- it applies to high-level managers, like Mr. Moppins?
A. Yes.
Q. Okay. And did it apply to employees

Page 106

CATHY ANN PRICE

who have entry level positions?
A. Yes.
Q. Okay. And as HR manager, did you also have to follow this handbook?
A. Yes.
Q. Okay. I -- now, you'll see in the bottom right-hand corner, there are page numbers --
A. Um-hum.
Q. -- like REEMA00008 --
A. Yes.
Q. -- if you could turn to the one that says 17 at the end.
If you could look at the section that says, Employment at will.
Do you see that?
A. Yes.
Q. Okay. Now, if you look down at the second paragraph, the second sense -- sentence, do you see Either the employee or RCSI may end the employment relationship at any time with a two-week advance notice?
A. Yes.
Q. And then the next sentence says that

Page 107

CATHY ANN PRICE

If the employee is being terminated for a serious violation of RCSI policy, gross incompetence in job performance or where he or she represents a security risk, the two-week period may be waived.
Do you see that?
A. Yes.
Q. Okay. So according to Reema, what is -- what is a "security risk" in this sentence?
A. A security risk would be anything that would violate the contract in the sense of theft or -- even if -- given the nature of what the contract was, if anything that would put company the at risk or the -- or the agency, the government client, at risk.
Q. Okay. And what is gross incompetence in job performance, according to Reema?
A. Well, that would be -- there's a conduct section in here.
Q. Okay.
A. Let's see if I can find it.
(Whereupon, the witness reviews the material provided.)
THE WITNESS: So that would infer to anything like Section 205 or

Page 108

CATHY ANN PRICE

Sections 401, any kind of violations of those.
There's also a section that discuss -- and I'm trying to see where it's at -- the standard of conduct or any violate -- any extreme violations of company policy where -- and all of Section 1000.
BY MS. WASIK:
Q. Okay. Looking back at Page 17, where we were, it also says, Serious violation of RCSI policy.
A. Um-hum.
Q. Is that different or the same thing as gross incompetence in job performance?
A. Well, gross -- I guess I would say gross incompetence in job performance would be that you just are failing to perform your job satisfactorily --
Q. Okay.
A. -- and so violation of policies is anything that's violating this handbook -- what's written in this handbook or any policies that have been administered by notice.

Page 109

CATHY ANN PRICE

Q. And how does Reema decide if something is a violation of RCSI policy or a serious violation of RCSI policy?
MR. WALSH: Objection.
To the extent you can answer.
THE WITNESS: Okay.
Repeat the question again.
BY MS. WASIK:
Q. Sure.
So I'm -- do you see the sentence where it says, A serious violation of RCSI policy?
A. Um-hum.
Q. How does Reema decide if something is a serious violation of RCSI policy?
MR. WALSH: Objection.
THE WITNESS: My own interpretation?
BY MS. WASIK:
Q. Well, no; speaking for Reema --
A. For Reema --
Q. -- as a designee for Reema.
A. -- for Reema, a serious violation of RCSI policy would be anything that would be --

Page 110

CATHY ANN PRICE

like an insubordination; anything that would be of theft; anything that would be of conduct, behavior -- inappropriate behavior that would disrupt the workplace or that would put the contract at risk, that would put the company business at risk, as well as create other issues in the workplace --

Q.    Okay.

A.    -- that's --

Q.    And who -- who makes that decision about whether or not something is a serious violation?

A.    Well, that's when we take things to our in-house counsel.

Q.    Okay.  Looking at the last sentence on this page, do you see where it says, Terminations for performance are generally preceded by a period during which the program manager interacts with the employee to make him or her aware of the specific performance problems, and the employee is provided with an opportunity to improve performance?

Do you see that?

A.    Yes.

Page 111

CATHY ANN PRICE

Q.    Okay.  What does Reema mean by "interact with an employee"?

A.    So termination for performance is pretty much during the introductory period of employ -- an employee working at Reema, that if there's an employee that's failing to not meet the standards of the job performance -- or the satisfactory job performance, that you -- that the program manager is giving the employee an opportunity to let them know where they're not performing and to give them an opportunity to correct their -- their actions.

Q.    Okay.  So termination for performance can only happen during the introductory period?  Did I understand that correctly?

A.    No --

MR. WALSH:  Objection.

THE WITNESS:  -- not just --

MR. WALSH:  You can answer.

THE WITNESS:  Okay.

-- no, not just during the introductory period, no.

BY MS. WASIK:

Q.    Okay.  So I guess my question is --

Page 112

CATHY ANN PRICE

this sentence says that the program manager interacts with employee.

What does that interaction look like under this part of the policy?

A.    It can be a conversation; it could be a written; it could be in any form of communication with the employee to let them know that they're not performing as -- as expected on the -- on -- in their job.

Q.    Okay.  And over what sort of time period does that usually take place?

MR. WALSH:  Objection.

THE WITNESS:  That's -- that varies.

BY MS. WASIK:

Q.    Okay.  Let's look at Section -- I'm sorry -- Page 53.

MR. WALSH:  And you mean the Bates-stamped number, correct?

MS. WASIK:  Yeah.

BY MS. WASIK:

Q.    When I refer to the page numbers, I mean the ones that say Reema --

A.    Okay.

Page 113

CATHY ANN PRICE

Q.    -- a bunch of zeros, and then has a number at the bottom --

A.    Yes.

Q.    -- so REEMA53, please.

Okay.  All right.  I'd like you to look at the last paragraph at the bottom of the page.

Do you see where it says, Disciplinary actions are usually corrective and progressive in nature?

A.    Um-hum.

Q.    What does -- what does "corrective and progressive," you know, mean for Reema?

A.    In general, it gives an employee an opportunity to correct themselves as long as it's not, again, anything that is severe or of gross misconduct.

Q.    Okay.  And why does Reema give that opportunity to correct in certain circumstances?

A.    Because it could be something to do with training.  Maybe the -- the employee needs to be guided a little more, maybe needs to get a better understanding; or it could be the employee is put in a situation where they're starting that

Page 114

CATHY ANN PRICE

position, things have shifted in the warehouse, and they're given new instructions. And so give them an opportunity to improve their performance.

Q. Okay. And what is "progressive in nature" -- what does that mean?

A. Not all disciplinary actions are immediate terminations. Sometimes that -- that supervisor may give the option of a write-up to let that employee know the severity of what they're doing and to give them an opportunity to correct.

But, again, it varies.

Q. Okay. So you mentioned a write-up. What are other disciplinary actions other than termination that -- that Reema can take?

A. Suspension --

Q. Okay.

A. -- sometimes it could be a demotion.

Q. Is there anything else?

A. Those are some of the things that I can recall.

Q. Okay. And has -- or while you were working at Reema, had Reema ever written anyone

Page 115

CATHY ANN PRICE

up?

A. Yes.

Q. Had Reema ever suspended anyone?

A. Yes.

Q. Okay. And what about -- had Reema ever used demotion as a disciplinary action?

A. Yes.

Q. Okay. Who -- who makes the decision as to what kind of discipline is imposed?

A. Again, it's me and the in-house counsel.

Q. Is the employee's supervisor involved in that decision?

A. When they bring it to me as something that they think is a problem, then I would go and have a conversation with our in-house counsel as to, okay, this is what's going on and this may be my recommendation. And I get guidance in that way and provide that back to the supervisor.

Q. Okay. If the supervisor brings an issue to you, do you usually document that anywhere, or did you when you were HR manager?

A. Yeah. I would either write it in my notes as a meeting or I would get it in an

Page 116

CATHY ANN PRICE

e-mail.

Q. Okay.

All right. Now, you mentioned insubordination earlier.

What -- what is insubordination, according to Reema?

A. When an employee is not listening to their supervisor or is in direct opposition of what the supervisor has instructed --

Q. Okay.

A. -- or anyone in management has instructed.

Q. Okay. If someone has a disagreement with their boss, is that insubordinate -- insubordination?

A. No, not a disagreement, no.

Q. Okay. So what's the difference between having a disagreement with your boss and insubordination?

A. Well, insubordination would be if I give you an instruction to do something and you flat out just tell me no, you're not going to do it or you continue to do what I told you not to do.

Page 117

CATHY ANN PRICE

Q. Okay.

Okay. So when you worked at Reema, other than the employee handbook, did Reema have any documents that laid out Reema policies regarding discipline?

A. No.

Q. Okay. And what about any other documents that laid out Reema's policies regarding termination?

A. No.

Q. Okay. And what about now at Reema? Does Reema have any other documents laying out policies regarding discipline?

A. No, not that I'm aware of --

Q. Okay.

A. -- since my last day, no.

Q. And what about termination?

A. No.

Q. Okay. When an employee receives a written warning, what is the goal of that written warning?

A. To document and put that employee -- to give that employee something in writing to let them see the severity of whatever the infraction

Page 118

CATHY ANN PRICE

is or the area of where they're not performing.
Usually, if someone's written up, it's to help them understand the seriousness of what -- what they're being written up for and to give them an option -- an opportunity to correct themselves.
Q. Okay. So is one of the goals of a written warning to let the employee do better in the future?
A. One of them, yes.
Q. Okay. When do employees typically receive written warnings? Is it during a performance appraisal or at any time or -- when do those arise?
A. Either way. They can arise during a performance evaluation. They can arise at the time that a management observes some type of poor performance or an infraction of a policy.
So they vary.
Q. Okay. What about if an employee is out of the office? Is it typical for an employee to get written up when they're not in the office?
A. Again, that's going to determine whether -- when that infraction, or whatever

Page 119

CATHY ANN PRICE

they're getting written up for, was discovered. If it's something like the employee was responsible for shipping of something to go out, and we know that that employee was responsible for that and it was discovered and, just so happened, the employee is on vacation -- they may get written up, but it'll get delivered when they come back.
Q. Okay.
Okay. Going back to Exhibit 10, I'd like to turn to Page 52. That's REEMA52.
Okay. Now looking at the bottom section on sexual harassment.
Do you see that?
A. Yes.
Q. Was this section in effect while Ms. Parker was employed at Reema?
A. Yes.
Q. Okay. The entire time she was employed at Reema?
A. Yes.
Q. Okay. So while -- while you worked at Reema, if an -- if an employee experienced sexual harassment, what should that person do?

Page 120

CATHY ANN PRICE

A. The general protocol is -- that they've been trained to do is to notify someone, whether it's their supervisor -- if they didn't feel comfortable with their supervisor, they were to come to HR and to give us notification of the situation.
Q. Okay. And why does Reema encourage people to report sexual harassment?
A. Because we want to make sure that -- one, that we know what's going on; and, two, that we can rectify the situation.
Q. Okay. Can employees make complaints verbally?
A. Yes.
Q. Can they make them in writing?
A. Yes.
Q. Okay. So once a complaint is reported to Reema, what does Reema do next?
A. I, as the HR manager, take the complaint serious, and I begin to create an investigation.
Q. What if the complaint goes to a manager --
A. If it --

Page 121

CATHY ANN PRICE

Q. -- the initial complaint --
A. Okay.
Q. -- what if it goes to a manager instead of to HR?
A. Then the manager is supposed to notify HR immediately.
Q. Okay. So you said that HR does the investigation; is that right?
A. Um-hum.
Q. Okay. Is any --
MR. WALSH: That's yes?
THE WITNESS: Yes. I'm sorry.
MR. WALSH: That's okay.
BY MS. WASIK:
Q. -- is anyone outside of HR involved in the investigation?
A. Elaborate, please.
Q. If I understand you correctly -- correct me if I'm wrong, but if HR receives a complaint, then you said that HR starts to perform an investigation --
A. Um-hum.
Q. -- is that accurate?
A. Yes.

Page 122

CATHY ANN PRICE

Q. Okay. Who is involved in performing that investigation?

A. Just me.

Q. Okay. So not Ms. Washington either?

A. No, she -- she does not have any responsibilities to that.

Q. Okay. And why is it Reema's policy to only have you involved in the investigation?

A. Because I am the company representative and the official officer of the policy, so -- on-site.

Q. Okay. So while you were at Reema, did any managers do HR investigations?

A. Not to my knowledge, no.

Q. Now, you mentioned earlier that Mr. Moppins sometimes did HR investigations --

A. Um-hum.

Q. -- was that accurate?

A. Yes, but that was more to -- looking into arguments or employees doing something on the job, like taking long breaks, or something like that, or different accusations.

But he did not do any type of sexual or workplace harassment investigations. Those

Page 123

CATHY ANN PRICE

were solely my responsibility.

Q. Okay. So what were the risk -- what were the types of investigations that only HR did, and what were the types of -- actually, strike that.

What were the types of investigations that only HR did?

A. Well, I did most investigations that were brought to me that were of a -- of a serious nature, like if it was theft, if it was any type of violence in the workplace, if that happened -- anything that it was of a serious nature, I investigated that.

Q. Okay. And what were the types of investigations that Mr. Moppins did?

A. He didn't do a whole lot of investigations. He would just investigate stuff that would be general -- just complaints between the staff. If they were having issues with each other or if they were having issues with a supervisor, he would try to mitigate that --

Q. Okay.

A. -- but he did not do any type of official investigations, no.

Page 124

CATHY ANN PRICE

Q. Okay. What about if Mr. Moppins was named in a complaint? Could he be involved in that investigation?

A. No.

Q. Okay. So when you did an HR investigation, how did you document it?

A. I have a form that I completed, and I would use that form as my form of documentation of the interviews or any type of conversations that came to me. I would try to make a note and put it into -- into the form --

Q. Okay.

A. -- or summarize it in the form.

Q. When you were doing an investigation, how would you do that? What were the -- what were the parts of the investigation that -- that you did?

A. Well, if the complaint would come -- the complainant would come to me to express that they had a problem, I would sit down with that individual privately and begin to interview them to get more information about the allegations.

And then to make sure that -- I would

Page 125

CATHY ANN PRICE

get witnesses out of that individual if they can tell me who witnessed anything, as well as what would be that person's expected outcome, what would they like to see happen.

Then I would schedule meetings with witnesses to get their point of view of what happened. And I would capture all this information -- where possible, I would try to get it in writing. So if they can send me an e-mail of the statement that they gave me or if they can write it out, whatever the statement that they gave me, and send it to me, I'll collect those, put it all together with the investigation form.

And then I would have a meeting with the counsel, in-house counsel, to get further guidance as to how we should handle it.

Q. Okay.

Okay. How did you decide which witnesses to interview?

A. Well, it wasn't a which individual to interview. If the individual told me that these were the people that could validate the story, I interviewed all.

Q. Okay.

Page 126

CATHY ANN PRICE

Okay. What did you do if witnesses were saying opposite things? How did you decide who was telling the truth?

A. That's not my place to decide who's telling the truth. I'm taking the information. And so I have to just take the information with a nonbiased opinion.

And from that information, I have to gather what's what --

Q. Okay.

A. -- based on facts.

Q. Okay. So when you spoke with in-house counsel, were you making recommendations, or were you just presenting all of the evidence?

A. Presenting all the evidence.

Q. Okay. Did you share the results of investigations with anyone except for in-house counsel?

A. Unless it escalate to the company counsel -- outside counsel, that would be the only person that would get any information from the results.

Once -- once the investigation is

Page 127

CATHY ANN PRICE

through and there has been some type of decision made, that -- that is communicated to the individual themselves who made the complaint.

Q. Okay.

Okay. And what you just described, was that the typical process when Ms. Parker worked there?

A. Yes.

Q. Okay. Did you take steps to protect the confidentiality of people who made complaints?

A. Yes.

Q. What -- what were those steps?

A. First of all, I'm the only one that's taking the information. That information is not entered into their personnel file. So that's going -- that goes into a separate folder or -- and it's stamped with "confidential" on it.

And then, again, it's only discussed with the in-house counsel and/or Mr. Vora so that he's mostly aware of what's happening.

Q. But did you also discuss the investigation with the witnesses that you interviewed?

Page 128

CATHY ANN PRICE

A. Yes, but only to get their side of the story, not to give information but to gather information.

Q. Okay. At the end of a sexual harassment investigation, for example, can that result in disciplinary action against the alleged harasser?

A. It -- not the -- typically, no, not against the harasser. But it depends on all the facts and the information of what's going on.

Q. So what is the typical outcome of a sexual harassment investigation if not action against the -- the harasser?

MR. WALSH: Objection.

THE WITNESS: Well, this was our first sexual harassment in the sense of --

BY MS. WASIK:

Q. Okay.

A. -- full formal investigations with witnesses. And, again, based on the facts of the information in the investigation, it is rare when you have a participant -- when you have the individual filing the harassment also having some issues themselves as far as conduct in the

Page 129

CATHY ANN PRICE

workplace.

Q. So when you say "this," just to clarify for the record, you mean Ms. Parker's complaint of sexual harassment; is that right?

A. Correct.

Q. Okay.

Okay. Did you take any steps -- or strike that.

How does Reema prevent retaliation against the person who makes a complaint?

A. Well, we try to mitigate anyone from further talking about the case if they were witnesses or if it's the complainant themselves.

The first thing I try to do is stop the conversation in the workplace. And then to make sure that a witness -- or that a complainant is not retaliated against is more based on making sure that they're protected. If we need to -- we got to be careful in making sure that we don't move them and have adverse impact that way, or removing the person that they're complaining about.

But, again, all of that has to be based on whether or not there's factual

Page 130

CATHY ANN PRICE

information that it actually took place.

Q. So you -- am I correct in understanding that first, Reema decides whether or not the sexual harassment took place and then decides to take action to protect the complainant from retaliation?

A. Based on the information, only based on the facts of what we can prove, what -- what we can validate that the complainant has said.

If we can validate that, yes, then we will take all precautions to protect the -- the complainant.

Q. Okay.

Okay. I'd like to look at Page 52, same -- same exhibit in front of you.

If you could look at the very last bullet point on that page. It's at the very bottom --

A. Um-hum.

Q. -- it says, Other verbal or physical conduct of a sexual nature.

A. Um-hum.

Q. So from Reema's perspective, what if two employees are discussing the sexual activity

Page 131

CATHY ANN PRICE

of a third employee while at work? Is that -- is that prohibited by Reema's policy?

MR. WALSH: Objection.

THE WITNESS: Again, I can't -- I can't attest to that because that's -- to me, that's hearsay. And unless someone can observe -- give me evidence that they overheard that, then I would investigate it.

But if it's just general conversations between two employees . . .

BY MS. WASIK:

Q. Well, what if two employees -- and let me make this clear. If this is really happening -- let's say this is really happening at work.

What if two employees are just discussing the sexual history of a third employee during -- during work? Would that be a violation of Reema's policy?

MR. WALSH: Objection.

THE WITNESS: Again, that has to do with are they in -- they may be doing work, but are they having general

Page 132

CATHY ANN PRICE

conversation to the side; are they -- is this being observed by other employees hearing this conversation; is the person themselves hearing the conversation.

I -- I really can't answer that.

BY MS. WASIK:

Q. Okay.

Okay. Let's look at another document.

\- - -

(30(b)(6) Deposition Exhibit Number 11, Sexual Harassment Policy Manual for Reema Consulting Services, Inc., Bates stamped REEMA000059 through REEMA000065, marked for identification, as of this date.)

\- - -

MS. WASIK: Here you go.

MR. WALSH: Thanks.

THE WITNESS: I forgot about this.

BY MS. WASIK:

Q. Okay. Do you recognize this document?

Page 133

CATHY ANN PRICE

A. I do.

Q. Okay. And I didn't see a date on this document.

Do you know when it was in effect?

A. This was -- it may have been 2015.

And I must correct myself. I do remember this. This was 2015. This was during the time we did a major sexual harassment training.

Q. So -- so when you say "in 2015," was it in effect -- what was -- when did it start being in effect?

A. I don't have the exact date.

Q. Okay. But sometime in 2015, it came into effect?

A. Yes --

Q. Okay.

A. -- and this is -- I don't think this is the original document, though, because it would have had a date on it.

Part of -- I think this is part of the document, because it had other pieces to it.

Q. Okay. Was this still in effect when you left Reema?

Page 134

                    CATHY ANN PRICE

     A.    Yes.

     Q.    Okay.  So who created this document?

     A.    In-house counsel.

     Q.    So, presumably, if we asked in-house counsel, they would know when it came into effect?

     A.    They should, yes.

     Q.    How often is this document updated?

     A.    To my knowledge, it had -- this was the only document, that I know of.  I don't think it's been updated.

     Q.    Okay.

           Okay.  And I never asked.  What -- what is this document?

     A.    It is Sexual Harassment Policy Manual for Reema Consulting Services.

     Q.    Okay.  And were employees required to follow this document when it was in effect?

     A.    Yes.

     Q.    And were all employees required to follow this document, regardless of their position in the company?

     A.    Yes.

     Q.    Okay.  Could an employee face

Page 135

                    CATHY ANN PRICE

discipline for not following this manual --

     A.    Yes.

     Q.    -- when it was in effect?

           MR. WALSH:  Objection.

           THE WITNESS:  I'm sorry.

           MR. WALSH:  That's okay.

           THE WITNESS:  Yes.

BY MS. WASIK:

     Q.    Okay.  Why did Reema write this policy in 2015?

     A.    This was -- again, I believe it was due to a change in laws.  And we were doing a sexual harassment training, and this was part of the package we wanted to give to the employees.

           I think it came with an acknowledgment sheet with it, and -- I'm trying to think.

           Yeah.  This is the best that I --

     Q.    Okay.

     A.    -- remember, is that it -- it was just due to changes in policies.

     Q.    Okay.  Do -- do you remember what the changes in laws were that prompted this manual?

     A.    I do not.

Page 136

                    CATHY ANN PRICE

     Q.    Okay.  Was this manual handed out to employees?

     A.    Yes.

     Q.    Okay.  In physical copy or by e-mail or otherwise?

     A.    Both, I think.  I think they -- they received it hand -- during the training, and they got it in e-mail.

     Q.    And to your recollection, that was 2015, not 2016, correct?

     A.    To my best knowledge, I think so.

     Q.    Okay.

     A.    They have my notebooks, so I can't look.

     Q.    So --

           MR. WALSH:  I'm sorry --

           MS. WASIK:  Yeah.

           MR. WALSH:  -- if she had her notebooks, it might make -- you still have her notebook -- it might help in --

           MS. WASIK:  Sure.

           MR. WALSH:  -- identifying a date.

           MS. WASIK:  Yeah.

           THE WITNESS:  Thank you.

Page 137

                    CATHY ANN PRICE

           MR. WALSH:  Thank you.

           (Whereupon, the witness reviews the material provided.)

           THE WITNESS:  Okay.  I can't find it in here.

BY MS. WASIK:

     Q.    I have a document that might jog your memory --

     A.    Okay.

     Q.    -- if it is irrelevant, just tell me.

     A.    Okay.

           MS. WASIK:  And is this 12?

           CERTIFIED STENOGRAPHER:  Twelve, yes.

           MS. WASIK:  Okay.

                    - - -

           (30(b)(6) Deposition Exhibit
            Number 12, Harassment Policy
            Receipt and Acknowledgement Form,
            Bates stamped REEMA000181, marked
            for identification, as of this
            date.)
                    - - -
           (Whereupon, the witness reviews

Page 138

CATHY ANN PRICE

the material provided.)

THE WITNESS: Okay. Yes --

BY MS. WASIK:

Q. Okay. Does this --

A. -- this is the other part of that --

Q. -- help jog your memory --

A. -- yes.

Q. -- regarding my earlier question?

Okay. So the date I see on Exhibit 12 is May 2nd, 2016.

Do you see that?

A. Yes.

Q. Is that when the sexual harassment manual came into effect?

A. Yes, it could have been.

Q. It could have been or -- or -- or was -- is that the date when it came into effect?

A. Well, the manual could have been in effect, but I know that this is the second part of the sheet that goes with the manual. So this could have been with another round of training that was done in 2016.

Q. Okay. If -- when employees received the manual for the first time ever, did they sign

Page 139

CATHY ANN PRICE

acknowledgment forms like this (indicating)?

A. Yes.

Q. Okay. And were all employees required to sign these acknowledgment forms?

A. Yes.

Q. Okay.

A. But they get them at each training, and this training was done annually.

Q. So did the manual come into effect in 2015 or 2016?

I'm just asking if this jogs your memory.

A. I got -- this sign-in sheet does -- this acknowledgment form does go with this manual, but the manual could have been in effect 2015, and I'm -- I don't know why I'm thinking that it's 2015 --

Q. Okay.

A. -- but we did have a sexual harassment training in 2016 also.

Q. Okay. I guess -- when Ms. Parker worked there, was she required to follow this manual, is my question, because she was terminated in 2016.

Page 140

CATHY ANN PRICE

So when Ms. Parker worked at Reema, was she required to follow this manual?

A. Yes. If she got this form and she got the receipt of this manual, then yes.

Q. Okay. So she was required to follow it starting May 2nd, 2016?

A. Again, if this manual was in effect --

Q. Okay.

A. -- she's just saying she's acknowledged that she's received the manual --

Q. Okay.

A. -- and they get it every time they did training --

Q. Okay.

A. -- even though nothing may have changed.

So I can't -- what I'm saying is I can't give you 100 percent accuracy of when this was in effect unless -- I got to go dig around and look up.

Q. If Reema has no other acknowledgment forms for Ms. Parker in 2015, would that suggest to you that it probably came into effect in -- on

Page 141

CATHY ANN PRICE

this date?

A. That could be.

MR. WALSH: Objection.

BY MS. WASIK:

Q. Okay.

Okay. Let's see.

Now looking at the manual, Exhibit 11. If you could turn to Page REEMA62.

Oh. The very bottom of the page -- it's Section 5, Prevention, and then Paragraph C.

Do you see where I'm looking?

A. Um-hum.

Q. Why does Reema instruct employees to keep conversations clean and avoid vulgar language, talk about sex?

A. Because it's a professional work environment.

Q. Okay. So what's the risk of having employees talk about sex in a professional work environment?

A. Well, it's not just sex. It says avoid vulgar language, talk about sex, explicit jokes, sexual end -- innuendoes, sexist remark, commissing on -- commenting on coworkers'

Page 142

CATHY ANN PRICE

appearances, profanity in your conversation.
So it is about professional conduct in the workplace.
Q. Okay. So what's the risk of having employees talk about those things you just mentioned in the workplace?
A. That it's disruptive and that someone's feelings can get hurt, and it can cause problems.
Q. Okay. Now, if you could look at the next page, REEMA63, and go down to Section 7, Complaint Procedures.
A. Um-hum.
Q. So I'm going to use the terms "alleged victim" and "alleged harasser."
Are you familiar with those terms?
A. Yes.
Q. Okay. So if an employee feels they're being sexually harassed, Reema's policy says that the victim should inform their -- her alleged harasser about the behavior --
A. Correct.
Q. -- is that right?
Okay. Are there any specific things

Page 143

CATHY ANN PRICE

that the alleged victim should say to alleged harassers to inform them?
MR. WALSH: Objection.
THE WITNESS: Basically, it would just be "stop" or -- you know, those are examples -- or, you know, it's -- "what you're saying is not appropriate or what you did is not appropriate, I'll report it, or whatever" -- whatever puts the person on notice.
BY MS. WASIK:
Q. Okay. And as far as you can remember, was this section in effect when Ms. Parker was an employee there?
A. To my remembrance, yes.
Q. Okay. And then if the alleged victim isn't satisfied, then the alleged victim should go to HR; is that right?
A. Yes.
Q. Okay. Looking at the top of Page 64, the first full paragraph, do you see the reference to Monica Lewis?
A. Yes.
Q. Okay. Who is Monica Lewis?

Page 144

CATHY ANN PRICE

A. She was the former HR manager.
Q. When was she at Reema, if you know?
A. I don't know.
Q. Okay. But "former" meaning just before you?
A. Yes.
Q. Okay.
A. So this may be a typo.
Q. Okay. But it doesn't jog your memory as to when this was in effect?
A. No, it doesn't --
Q. Okay.
A. -- I'm sorry.
Q. All right.
Okay. Looking on the same page, the section on documentation.
I'm looking at the three bullet points.
A. Um-hum.
Q. Can you tell me what the difference is between "founded," "unfounded" and "inconclusive"?
A. "Founded" meaning that there was evidence or proof that the harassment was true

Page 145

CATHY ANN PRICE

and occurred; "unfounded" meaning that there was no evidence or no conclusion of actual sexual harassment as based by the definition; and "inconclusive" was we couldn't get any evidence or any information at all to validate the complaint or the victim themselves.
Q. Okay. And who makes that decision whether something is founded, unfounded or inconclusive?
A. Again, that would be -- once we collected all the information and we sit with in-house counsel and we'll discuss what this is and -- and what we have --
Q. Okay.
A. -- and the in-house counsel would tell us or our outside counsel would tell us whether we have evidence of -- or -- or proof -- enough proof of sexual harassment.
Q. Okay. So are any managers involved in that decision whether or not something is founded, unfounded --
A. No.
Q. -- or inclusive?
Okay. What does Reema do if someone

Page 146

CATHY ANN PRICE

brings false charges of harassment?

MR. WALSH: Objection.

THE WITNESS: False charges of harassment --

BY MS. WASIK:

Q. So I -- so --

A. -- then that becomes -- it -- if -- if there's no -- I -- I can't determine what's a false charge. I take all sexual harassment complaints that's brought to me as serious. So I investigate all of them.

Q. Okay. If you don't mind turning to Page REEMA65 --

A. Um-hum.

Q. -- Section 11, Return to work.

A. Um-hum.

Q. So the first sentence says, This policy cannot be used to bring false charges.

A. Um-hum.

Q. So how does Reema determine if a charge is false?

A. Again, it would be on the evidence of -- of what -- what we collected during the investigation.

Page 147

CATHY ANN PRICE

Q. Okay. And does in-house counsel make that state -- make that decision whether or not something is false?

A. They would help us come to the conclusion whether or not we have any viable evidence or whether or not nothing seems to be founded --

Q. Okay.

A. -- in the -- in the claim itself.

Q. You said they help you come to the conclusion.

Are they sort of -- is it working with HR --

A. Yeah.

Q. -- they decide whether or not something is a false charge, or is in-house counsel making that decision?

A. No, they're not -- I mean, they're taking the information that we give and they're giving guidance; they're giving the advice, the legal advice of what we have.

Is this founded? Is it unfounded? Do we not have enough evidence? And how do we move forward?

Page 148

CATHY ANN PRICE

Q. Okay. What's the difference between unfounded and a false charge?

A. Unfounded and false charge?

Well, I really don't -- I couldn't answer that.

Q. Okay. Looking at Section 11 some more -- I'm looking at the last sentence. If the complaint is determined to be unfounded, all necessary steps will be taken to ensure alleged harasser's reputation is restored.

Do you see that part?

A. Um-hum, yes.

Q. Okay. Has that reputation -- or has that section ever been used, to your knowledge?

A. Not to my knowledge.

Q. Okay.

A. And I'm sorry. Let me correct myself.

What do you mean has -- has it been used?

Q. Has Reema ever taken necessary steps to ensure that the alleged harasser's reputation is restored?

A. In all cases, we always try to make

Page 149

CATHY ANN PRICE

sure that whoever the complainant or the harasser or even the victim -- that everybody's reputation stays intact.

That -- that's part of the con -- confidentiality. That's part of how you handle the case, making sure that no one continues to gossip or continues to stir up the situation or communicate about the situation, even through the general workplace.

Sometimes information gets out among employees, but we try to make sure that that get cut off.

Q. Okay. So other than these two exhibits, 10 and 11, does Reema have any other written policies about sexual harassment?

A. Not to my knowledge.

Q. Okay.

Okay. So there were no other sort of guidelines or manuals, e-mails, that you -- that you know, of laying out Reema's policies on sexual harassment?

A. Not to my remembrance, no.

Q. Okay. And as far as you know, is this manual still in effect at Reema today?

Page 150

CATHY ANN PRICE

A.    Again, I don't know.  I'm not there.

Q.    Okay.

Okay.  When did Reema first become aware of the existence of a potential rumor that Ms. Parker was having a sexual relationship with another manager?

MR. WALSH:  Objection.

THE WITNESS:  HR was first given notice of a rumor around April 25th.

BY MS. WASIK:

Q.    Okay.

-  -  -

(30(b)(6) Deposition Exhibit Number 13, Reema Consulting Services, Inc. Sexual and Other Unlawful Harassment Investigation Questionnaire, Bates stamped REEMA000232 through REEMA000236, marked for identification, as of this date.)

-  -  -

BY MS. WASIK:

Q.    Okay.  Let me know if you recognize this document.

Page 151

CATHY ANN PRICE

A.    Yes, I do.

Q.    Okay.  Now, I see the date on this is April 25th, 2016 --

A.    Um-hum.

Q.    -- do you see that?

A.    Yes.

Q.    So what is this document?

A.    This is my investigation questionnaire.

Q.    Okay.  Did you fill it out on that date, April 25th, 2016?

A.    Yes, I believe so, yes.

Q.    Okay.  I guess -- so what prompted you to create this document?

A.    This is to take the complaint from Miss Evangeline Parker when she came to complain -- to make the complaint about the sexual harassment and the rumors.

Q.    Okay.  So did she come and make that complaint on that date, April 25th, 2016?

A.    No; she did on around the 21st.

Q.    Okay.  So Ms. Parker came and complained to HR on April 21st; is that --

A.    Around April 20 -- that week.  I know

Page 152

CATHY ANN PRICE

it was the week of the 18th through the 21st.

Q.    Okay.  And did she come straight to HR, or did she make the complaint somewhere else?

A.    She made the complaint somewhere else, to Demarcus Pickett.

Q.    Okay.  And what happened with the complaint after that?

A.    Demarcus tried to handle it himself, to my understanding, because he never came -- he never came to HR.  Then it got escalated to Larry Moppins, and that's when it came to HR's attention.

Q.    How did it get escalated to Larry?

A.    The three employees -- Manley, Donte and Donald -- were complaining about Ms. Parker -- I'm sorry -- Manley, Arnel and Donald.

Q.    Okay.  Go -- going back to the April 21st, 2016, complaint by Ms. Parker, what was the subject of that complaint?

A.    Her behavior in the warehouse, that she was being rude and her conduct was unprofessional, and that she had confronted Donte about the rumor, that if he wanted to know who

Page 153

CATHY ANN PRICE

she was sleeping with, that she -- he needed to ask her.

Q.    Okay.  So how did -- so Mr. Pickett tried to handle the complaint regarding Ms. Parker's behavior in the workplace?

A.    No; he tried to handle the complaint about the rumor.  This is all prior to HR getting involved, so I'm only giving you hearsay of what was given to me after the fact.

So, apparently, this took place outside of the workplace.  There was an exchange between employees outside of the workplace.  And then when they came in on Monday or Tuesday, this kind of escalated.

And Demarcus ended up getting Evangeline -- Ms. Parker went to Demarcus to tell him about what was going on or what was being said, or they were having a conversation about it.  And he told her, according to Ms. Parker, that he would handle it.

Q.    Okay.  So it seems like there's two HR complaints, if I'm --

A.    Yes.

Q.    -- understanding you correctly: one

CATHY ANN PRICE

is Ms. Parker's behavior in the warehouse --
A. Um-hum.
Q. -- and one is about --
MR. WALSH: That's yes? That's yes?
THE WITNESS: Yes --
MR. WALSH: Okay.
THE WITNESS: -- I'm sorry --
BY MS. WASIK:
Q. -- and is the other HR --
THE WITNESS: -- thank you.
BY MS. WASIK:
Q. -- complaint the one about the rumor, as you called it?
A. Yes.
Q. Okay. So the date of April 21st, 2016 -- which HR complaint was that in reference to?
A. Both -- it's still both of them.
Q. Both of them.
But Mr. Pickett just tried to handle the complaint about the rumor; is that right?
A. Correct.
Q. Okay. So how did the complaint about

CATHY ANN PRICE

Ms. Parker's behavior in the workplace start?
A. That went straight to Larry. Those three employees went to Larry to complain.
Q. Okay. And when did HR first hear about the rumor, that HR complaint?
MR. WALSH: I -- I'm sorry. Can you define what you mean by "the rumor"?
THE WITNESS: Yes.
MS. WASIK: Sure. I'm using Ms. Price's term.
BY MS. WASIK:
Q. Ms. Price, when you said "the rumor," what -- what do you mean that to be?
A. The -- the discussion -- the sexual harassment of the statement that Ms. Parker was sleeping with Mr. Pickett to get her promotion.
Q. Okay. So I'm going to call that "the rumor," if that's okay with you.
A. That's fine.
Q. Okay. When did HR first hear about the rumor?
A. I heard about the rumor on . . .
(Whereupon, the witness reviews the material provided.)

CATHY ANN PRICE

THE WITNESS: My notes is saying April 25th.
BY MS. WASIK:
Q. Okay. So on April 25th, how did you hear -- how did HR or you hear about the rumor?
A. Mr. Moppins pick -- came over and informed me that there was some issues going on -- that there were several problems going on.
Q. Okay. What did he tell you?
A. He began to explain that he had three employees that had come to him to discuss Ms. Parker's behavior and that one of the employees explained that they were cussed out, in his terms, by Ms. Parker about -- about the rumor.
And that's when I was like, What rumor? What are we talking about?
And then, apparently, Mr. Moppins had a conversation with Mr. Pickett, and that's when the two situations kind of became one big situation.
Q. Okay. So you heard about the -- the potential existence of the rumor from Mr. Moppins before you heard about it from Ms. Parker; is

CATHY ANN PRICE

that right?
A. Pretty much correct, yes.
Q. Okay. So when did you hear about it from Ms. Parker?
A. There was . . .
(Whereupon, the witness reviews the material provided.)
THE WITNESS: Okay.
So I'm sorry. Let me correct myself on the dates --
BY MS. WASIK:
Q. Sure.
A. -- 4/21, there was a staff meeting, and that's where Manley -- well, I'm sorry -- prior to the staff meeting, Manley, Arnel and Donald confronted Larry about Ms. Parker's conduct in the warehouse.
At the same time, Ms. Parker was having a conversation with Mr. Demarcus about what was going on in the warehouse in regards to the rumor and that -- she had confronted Donte about the rumor when she made her statement.
Then the 25th -- in between that time, Ms. Parker finally came to me and formally

Page 158

CATHY ANN PRICE

filed a complaint about the sexual harassment against Mr. Jennings.

Q. Okay. When you say "staff meeting," is that an all-hands meeting?

A. That's the all-hands meeting.

Q. And did that happen on April 21st?

A. Yes, from what I have in my notes.

Q. Okay.

Okay. Going back to Exhibit 13. When Ms. Parker came to you on April 25th, what did you discuss with her?

A. She came to me to -- to tell me about what was happening about how things were escalating about the rumor that she was having an affair with Mr. Pickett and that she felt that it was Mr. Jennings who was perpetuating the rumor.

And that -- and that was pretty much -- that she wanted to file a complaint, and that was pretty much all she said at the time.

Q. And it says up here, Complaint Against: Larry Moppins.

Correct?

A. At the initial time -- it wasn't Larry Moppins until later after the meeting.

Page 159

CATHY ANN PRICE

Then Larry got added to it.

Q. So who -- who did Ms. Parker file a complaint against when she came into your office?

A. Initially, it was against Donte.

Q. Donte Jennings?

A. Um-hum.

Q. Okay. And so when did she file -- or add Mr. Moppins as a subject of the complaint?

A. If my memory is correct me -- with the notes that I have, it was after the meeting. And there was another meeting that happened after that, and then she came back to me to say that she felt like it was Mr. Moppins who was perpetuating all of this.

And so I guess she had gathered -- I can't attest to her observation, but somehow, she had learned that it was Mr. Moppins who seems to be perpetuating the rumor.

Q. Okay. So when did you create this document, Exhibit 13? During your first meeting when she came to HR or later, when she added Mr. Moppins?

A. This was -- this -- this document was created after all -- after I did all the

Page 160

CATHY ANN PRICE

interviews and I've talked to everybody. And this was the summary of everything that I had gathered.

Q. Let me show you another document.

MS. WASIK: This is 14?

CERTIFIED STENOGRAPHER: Um-hum.

MS. WASIK: Okay.

\- - -

(30(b)(6) Deposition Exhibit Number 14, Reema Consulting Services, Inc. Sexual and Other Unlawful Harassment Investigation Report, Bates stamped REEMA000237 through REEMA000238, marked for identification, as of this date.)

\- - -

BY MS. WASIK:

Q. Do you recognize Exhibit 14?

A. Yes.

Q. What is 14?

A. Fourteen is my investigation report.

Q. Okay. So how is 13 different from 14?

A. Because this is the questionnaire

Page 161

CATHY ANN PRICE

where I'm interviewing different people involved and I'm putting a summary together. And then this is my final report of everything that I've gathered -- all the information that I've gathered throughout the investigation --

Q. Okay.

A. -- and this is generally what I submit to in-house counsel.

Q. Fourteen --

A. Um-hum.

Q. -- is what you submit to in-house counsel?

A. Yes.

Q. Okay. And 13 you also created at the end of your investigation?

A. Yes --

Q. Okay.

A. -- as a tool for my investigation. But I put all the summaries -- where I gather my witnesses, and all of that, this is documentation of that.

Q. Okay. Is there any separate documentation of Ms. Parker's complaint about the rumor to HR?

Page 162

CATHY ANN PRICE

A. She sent an e-mail, I believe -- I think there's an e-mail where she -- she sat and she wrote it out, and she sent it via e-mail to me after she came and gave a verbal.

Q. Okay.

Okay. Let's look at 13 for a second.

If you look at Section 3, there are some boxes and categories.

A. Um-hum.

Q. Who chose which ones would be checked?

A. I did.

Q. You did?

A. Um-hum.

Q. And did you do that based on what Ms. Parker was telling you?

A. Yes.

Q. Okay. And now looking at the next section, Number 4, did you fill out all of Section 4?

A. Yes.

Q. Okay. And did you fill it out sort of over time during your investigation or all at the end or all at the beginning? How -- how did

Page 163

CATHY ANN PRICE

you fill out Number 4?

A. This was after my talk with Ms. Parker.

Q. So -- so Number 4 you filled out all on April 25th after speaking with Ms. Parker?

A. Yes.

Q. Okay. So if you look at Number 4 and look at Number 3 under it -- it's on the first page, Page 232. It's the last paragraph on that page.

If you look at the third sentence, it says, After the meeting, Mr. Moppins had a meeting with each of the individuals.

Do you see that?

A. Um-hum.

Q. Is that something that Ms. Parker told you?

(The witness mumbles under her breath while reviewing the material provided.)

THE WITNESS: No. This is -- this is information I found -- I found out from talking to Mr. Moppins.

Page 164

CATHY ANN PRICE

BY MS. WASIK:

Q. Okay. So in Section 4, is that stuff -- does that include content from what Ms. Parker told you as well as what other people told you?

A. Yes.

Q. Okay.

Okay. Looking at Section 5, there's a quote from Ms. Parker.

Do you see that?

A. Um-hum.

Q. When did she say that?

A. That was in this interview.

Q. On April 25th?

A. Um-hum.

Q. Okay.

MR. WALSH: That's yes?

THE WITNESS: Yes. I'm sorry. I keep -- sorry.

BY MS. WASIK:

Q. So on April 25th, she did make a complaint about Mr. Moppins; is that right?

A. If you want to take -- yeah, if you want to take this as a complaint.

Page 165

CATHY ANN PRICE

Q. Well, no -- I don't -- I mean, I don't want to take it any way.

Is -- when she says, No, since it was with Mr. Moppins, I wanted to bring it directly to HR, what was "it," in your understanding?

A. I'm trying to remember all the parts to this.

Yeah. This was when -- her complaint was after the meeting, yeah, with Mr. Moppins, in addition to Donte Jennings.

Q. So this part in Section 5 -- you added that on a day later than April 25th?

A. Not to my remembrance. I think this was during the conversation with her on the 25th.

Q. Got it. Got it.

Okay. Okay. Now I want to look at Section 6 right below that.

Now, Statement 1 -- do you see that part? It says, No witness saw the door slam in her face by Mr. Moppins.

A. Yes.

Q. What's the basis of -- of that information?

A. Because Ms. Parker said that

Page 166

CATHY ANN PRICE

Mr. Moppins slammed the door in the all -- all meeting. I went by and I asked employees that were participants in the meeting did they happen to see Mr. Moppins slam a door, and none of the participants at the meeting said that they -- they didn't see him slam the door in anyone's face.

Q. Okay. So you wrote this statement, No witness saw the door slam in her face by Mr. Moppins after you had done your investigation?

A. This is during the investigation.

Q. During the investigation?

A. Um-hum.

Q. Okay.

Okay. Now looking at Statement Number 2, it says, See statement by Mr. Moppins attached.

Do you see that?

A. Um-hum -- yes.

Q. I'd like to show you a document. I'm wondering is this the statement by Mr. Moppins -- oh.

Page 167

CATHY ANN PRICE

- - -

(30(b)(6) Deposition Exhibit Number 15, E-mail string, REEMA000194 through REEMA000195, marked for identification, as of this date.)

- - -

(Whereupon, the witness reviews the material provided.)

THE WITNESS: I think there's another -- another e-mail.

Oh, this is it.

(The witness mumbles under her breath while reviewing the material provided.)

THE WITNESS: Yes, this is it.

BY MS. WASIK:

Q. Okay. We can put that aside. We'll come back to that later.

And Statement Number 3 -- did you also write that during the investigation?

(The witness mumbles under her breath while reviewing the material provided.)

Page 168

CATHY ANN PRICE

THE WITNESS: Yes.

BY MS. WASIK:

Q. Okay. And the same question for Statement Number 4: Did you write that during your investigation?

A. Correct, because there -- there became a complaint filed by Mr. Jennings at the same time -- I'm sorry -- Ms. -- Ms. -- Ms. Parker made an additional statement about Mr. Jenkins [sic] that I wanted to investigate, which was about an incident that happened back in 2014 -- or 20- -- 2015 -- the end of 2015.

Q. Okay. Was that --

A. And that's Number 4 --

Q. Okay.

A. -- in Section 4.

Q. Okay. All right.

Okay. Looking at Section 7 on the next page, who filled out this section?

A. I did.

Q. Okay. And how did you decide which names went here?

A. Well, those were the names that she mentioned to be witnesses to Mr. Moppins'

Page 169

CATHY ANN PRICE

behavior with her.

Q. Okay. Why isn't Donte Jennings listed here?

A. Because she didn't -- she didn't mention him to be a witness.

Q. Didn't she mention that Mr. Jennings was the source of the rumor?

A. She did.

Q. Was that -- was the rumor -- is this an HR complaint about -- that includes the rumor?

A. It does. It includes the rumor; it includes her allegations of Mr. Moppins --

Q. Okay.

A. -- but I couldn't find any evidence to the rumor other than what she brought to me. Because contrary to what she was saying, Mr. Pickett was telling me it was someone else.

So I couldn't come -- come to a conclusion about who actually started the rumor.

Q. Okay. So why isn't Mr. Jennings one of your witnesses in Number 7?

A. Because these were the people that she mentioned to be her witnesses against Mr. Moppins. She was mostly about Mr. Moppins'

Page 170

CATHY ANN PRICE

actions.

Q. Okay. And what were Mr. Moppins' actions that she was mostly talking about with you?

A. About the incident at the meeting and about -- she felt that he was the one who kept the rumor going or was spreading the rumor.

Q. Okay. So is Number 7 only a list of witnesses that Ms. Parker felt would be favorable to Ms. Parker?

A. I can't -- I don't know.

Q. Okay. Did you separately come up with a list of witnesses that you were going to interview?

A. No.

Q. No.

So you -- did you only interview the witnesses in Number 7 here?

A. Yes.

Q. Okay. So in this HR complaint, is Ms. Parker the complainant?

Using the terms in Reema's sexual harassment manual, is Ms. Parker the complainant?

A. Yes.

Page 171

CATHY ANN PRICE

Q. Okay. Is she also the alleged victim?

A. Yes.

Q. Okay. And is Mr. Jennings an alleged harasser?

A. I couldn't come to a conclusion for that. That was unfounded.

Q. Is Mr. Moppins an alleged harasser?

A. I couldn't come to a conclusion for that either, because what he was doing was talking to another manager and asking pertinent questions. So I couldn't come to a conclusion of whether or not that was founded actions -- that his actions were not founded.

Q. Okay. But -- so I guess who are the people that Ms. Parker is filing a complaint on?

A. She's filing the complaint on Mr. Moppins and Mr. Jennings.

Q. Okay. I want to look back at the manual. It's -- I believe it's Exhibit 11.

And if we could look at Page 62.

If you look in the middle of the page, Additional definitions --

A. Um-hum.

Page 172

CATHY ANN PRICE

Q. -- do you see that section?

And if you look at C, Alleged harasser --

A. Um-hum.

Q. -- it says, The person accused of violating this policy.

A. Correct.

Q. So why were Mr. Moppins and Mr. Jennings not the alleged harassers?

A. According to the definition, they are.

Q. Okay.

All right. And who -- I'm guessing -- are you the investigator of this complaint?

A. Yes.

Q. Okay.

Okay. All right. Let's look at another document.

Oh, I'm sorry. I have one more question on this document before we shift gears.

Looking again at -- at the top of Exhibit 13, Section 1, it says, Complaint against Larry Moppins.

Page 173

CATHY ANN PRICE

Why is only Mr. Moppins listed there?

A. Oh. Because, initially, when she came in -- now it's coming to me -- when she initially came in, her complaint initially was about Donte and the rumor, but then it was about Mr. Moppins, which was her main focus of the complaint. Because she felt like he was the one that was being disrespectful, that was continuing the rumor --

Q. Okay.

A. -- and so that was the one she wanted to file a formal complaint against.

Q. Okay. All right.

MS. WASIK: Here's another document.

\- - -

(30(b)(6) Deposition Exhibit Number 16, E-mail string, marked for identification, as of this date.)

\- - -

BY MS. WASIK:

Q. Okay. Do you recognize -- excuse me -- do you recognize this document?

Page 174

CATHY ANN PRICE

A. Yes, ma'am.

Q. Okay. And what is this document?

A. This was my e-mail to those who were involved, because the rumor continued -- you know, issues from this -- this -- this complaint continued to be discussed. So this was me sending out a directive to tell everyone to shut down any continued conversations about this particular topic.

Q. Okay. And what was that particular topic that you wanted them to not discuss?

A. About any of -- any content that deal with Ms. -- Ms. Parker's allegations, about the rumor or any other parts of it.

Q. When you say "other parts of it," what do you mean?

A. Even about Mr. Donte being the source of it or even about the Manley/Arnel part of the -- the whole situation; complaining about Ms. Parker.

Q. Okay. So this e-mail is both about the sexual harassment complaint and about Ms. Parker's behavior.

Am I understanding that right?

Page 175

CATHY ANN PRICE

A. About not -- not about her behavior; it's about the continued conversation about all of those different topics that were going on simultaneously.

Q. Okay. Was one of those topics Ms. Parker's behavior in the warehouse?

A. Just the conversation about what she was doing in the warehouse, not about her behavior, but about continued conversations among the employees about what was going on in the warehouse.

Q. When you say "what was going on in the warehouse," what -- what do you mean by that?

A. By her conduct -- what the employees had complained, I wanted to make sure that supervisors were aware that that was -- that conversation needed to stop.

Q. Okay. So it was the -- the complaint by Manley, Arnel and Donald about Ms. Parker's behavior --

A. Yes.

Q. -- is that -- okay.

So this e-mail is about telling everyone to stop talking about what Manley, Arnel

Page 176

CATHY ANN PRICE

and Donald said about Ms. Parker and also about the rumor; is that fair?

A. Somewhat. It's -- again, it's just stop all communications, because it was multiple issues going on simultaneously. So this was to the management and those involved to make sure that they understood that they were to stop themselves and stop their subordinates from having conversations about any of these topics.

Q. Okay. Was this e-mail sent before or after Ms. Parker came into HR and made a complaint?

A. This was later in the day, I think.

This was around what time? 2:30 -- 2:23 -- yeah, it was afterwards, I believe.

Q. Okay. So looking at the e-mail you sent in the middle of the page at 1:17 p.m. -- do you see that one --

A. Okay.

Q. -- the main e-mail?

A. Okay.

Q. I'm looking at the first sentence. It says, Due to recent events that have brought to HR's attention in regards to workplace gossip

Page 177

CATHY ANN PRICE

and rumors.

A. Um-hum.

Q. Did everyone on this e-mail know what the gossip and rumors you were referring to were?

A. Everyone in the e-mail did, yes.

Q. Okay. And how did they already know what these workplace gossip and rumors were?

A. Because Ms. Parker had went to Demarcus. She had the meeting -- she had the interactions between Larry, Angela and Demarcus when they had a separate meeting. So they were already all aware of what was going on.

Q. Okay. And in the middle paragraph, you make a reference to the workplace code of conduct and sexual harassment policies --

A. Um-hum.

Q. -- do you see that part?

A. Um-hum.

Q. Is that a reference to the sexual harassment policy that we already looked at?

A. That was -- that was to whatever sexual harassment policies that was enacted at that time --

Q. Okay.

Page 178

CATHY ANN PRICE

A.    -- so, again, I don't remember when this, but if this was active prior to, then this trumped what was in the policy manual.

Q.    Okay.  And if the sexual harassment manual was not in effect, then what's this a reference to?

A.    Then that's to the handbook.

Q.    The handbook?

A.    Um-hum.

Q.    Okay.

Okay.  Why is Angela Wallace one of the recipients of this e-mail?

A.    Because she was also a part of the meetings.  She was brought in the meeting with Larry, Demarcus and Evangeline.  And she was also one of the people that Ms. Parker had went to and had confided in.

Q.    Okay.  Why is Mr. Moppins on -- copied on this e-mail instead of in the To line?

A.    Because Mr. Moppins is our subject matter expert.  He's --

Q.    Okay.

A.    -- not one of Reema's direct employees.

Page 179

CATHY ANN PRICE

Q.    Okay.  Was he -- as a subject matter expert, was he bound by the employee manual?

A.    Yes.

Q.    And the sexual harassment policy?

A.    Um-hum.

Q.    Okay.

MR. WALSH:  That's yes?

THE WITNESS:  Yes.

BY MS. WASIK:

Q.    Okay.  So did you always treat him sort of differently on e-mails as the subject matter expert because he's not a normal Reema employee?

A.    I always copied him on anything HR-related to make sure that he was in -- aware of certain things.  If I'm directly talking to him, then he's in the body of the e-mail.

Q.    Okay.  And why is Donte Jennings not the receipt -- not one of the recipients here?

A.    He's not management.

Q.    So how did you choose who would receive this e-mail?

A.    It was management and those involved in the -- in the situation at hand that got the

Page 180

CATHY ANN PRICE

e-mail --

Q.    Okay.

A.    -- I didn't send it to Arnel; I didn't send it to Donte; I didn't send it to any of the subordinates.

Q.    Okay.  Did you send any sort of separate e-mail to the folks you just mentioned?

A.    No, because I expected -- because these folks -- those folks reported to these people.

Q.    So what did you -- you expected the people on this e-mail to go and talk to Mr. Jennings and Manley and the folks you just --

A.    Not talk, but to manage if that was happening out in the workplace -- in -- in the work areas.

Q.    Okay.  Do you know if anyone went and talked to Donte to tell him to stop -- to follow this e-mail?

A.    I do not --

Q.    Okay.

A.    -- I can't confirm that it was delivered down --

Q.    Okay.

Page 181

CATHY ANN PRICE

A.    -- but my expectation was that that was -- that's what was -- that that was what was happening.

Q.    Okay.

And whose -- who did you think on this e-mail would go and tell Mr. Jennings?

A.    Demarcus.

Q.    Okay.  And I'm sorry.  You mentioned before that if the content of an e-mail relates directly to Mr. Moppins, you'll put him in the To line --

A.    Yes.

Q.    -- so does that mean in this e-mail, you weren't actually talking directly to Mr. Moppins; you were talking to the other folks?  Is that accurate?

A.    As far as Reema employees, the top line was to them.  And then Mr. Moppins -- I was talking to him.  He was copied in on it to be put on awareness also.

Q.    Okay.  But why didn't you put him in the To line?

A.    I didn't think to put him in the To line.

Page 182

CATHY ANN PRICE

Q.    Okay.  How often do you request that no one reply to an e-mail?

MR. WALSH:  Objection.

THE WITNESS:  I don't understand.

BY MS. WASIK:

Q.    So in this e-mail, you asked that -- that no one sort of reply to the e-mail, right?

A.    Correct.

Q.    Okay.  How often did you -- did you do that?

MR. WALSH:  Objection.

THE WITNESS:  If I needed to make sure -- this wasn't an e-mail that I needed a response to, so I put "do not reply."  If I don't need a response, I want it to be understood that that was the final statement.

BY MS. WASIK:

Q.    Okay.

MS. WASIK:  I think we can break for lunch, if now works for you.

MR. WALSH:  Okay.

THE VIDEOGRAPHER:  Off the record.

Page 183

CATHY ANN PRICE

at 12:51.  This is the end of Media Unit Number 2.

- - -

(Whereupon, at 12:51 p.m., a luncheon recess was taken.)

- - -

Page 184

CATHY ANN PRICE

A F T E R N O O N      S E S S I O N

(2:00 p.m.)

- - -

CATHY ANN PRICE,

was called for continued examination and, after having been previously duly sworn, was examined and testified further as follows:

- - -

THE VIDEOGRAPHER:  On the record at 2:00 p.m.  This is the beginning of Media Unit 3 in the testimony of Cathy Price.

- - -

EXAMINATION (CONTINUED) BY COUNSEL FOR PLAINTIFF

- - -

BY MS. WASIK:

Q.    Okay.  So, Ms. Price, before the break we talked a little bit about Ms. Parker's HR complaint.

Did you start your investigation of that complaint immediately, or did you wait a little while to start it?

A.    When she brought the complaint me, I did the investigation immediately.  I started it immediately.

Page 185

CATHY ANN PRICE

Q.    Okay.  So did you start that same day or the next day or the next two days?

A.    The same day.

Q.    The same day?

A.    Um-hum.

Q.    Okay.  I'd like to show you another document.

MS. WASIK:  Thank you.

MR. WALSH:  Thank you.

- - -

(30(b)(6) Deposition Exhibit Number 17, E-mail string, Bates stamped REEMA000283, marked for identification, as of this date.)

- - -

MR. WALSH:  Is this 17?

CERTIFIED STENOGRAPHER:  Yes.

MR. WALSH:  Thank you.

BY MS. WASIK:

Q.    Let me know if you recognize this document.

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  Yes, I do recognize

Page 186

CATHY ANN PRICE

this document.

BY MS. WASIK:

Q.    And what is this document?

A.    This is an e-mail that was sent out to Ms. Parker and Mr. Moppins, Angela and Demarcus, to discuss the whole situation of the rumor, the incident with Mr. Moppins and to get some reconciliation about it.

Q.    Did Angela get this e-mail as well? I don't think I see her in the To line.  Did she get it separately, maybe?

A.    She may have gotten it separately, because I was having problems with my e-mail at this time, because it even went to Ms. Parker's wrong e-mail address; but she was present in the meeting.

Q.    Okay.  And so did this meeting happen while you were investigating the complaint or before?

A.    No, this is towards the end.

Q.    So was the investigation still ongoing, or had it ended?

A.    It was pretty much wrapped up, and this is me trying to bring some closure.

Page 187

CATHY ANN PRICE

Q.    Okay.  So at this point in time, had you already reached a determination on whether the complaint was founded or unfounded or inconclusive?

A.    I had not reached a final determination.  I still had to talk with legal counsel, but what I did want to do was to try to bring some healing back to the team because they were kind of -- what's a good word for it?  Trust -- felt like it wasn't there, that they were able to get back on track and do what they needed to do as far as the job was concerned.

Q.    Okay.  So you hadn't made a decision on whether or not there had been a hostile work environment?

A.    No.

Q.    Okay.  And you hadn't made a decision on whether or not there had been retaliation against Ms. Parker?

A.    Not a final decision, no.

Q.    Okay.  Had you made an initial decision?

A.    Again, we were still in discussion with in-house counsel.

Page 188

CATHY ANN PRICE

Q.    Okay.  And I see that the e-mail says, Come with an open -- sorry.

Just come with open for change and to be teachable.

Do you see that?

A.    Yeah.

Q.    Okay.  What did you intend to teach Ms. Parker?

A.    Well, that's just a saying of being open and being willing to listen and hear what was going on.

Part of the discussion here also was about Ms. Parker and her management with her employees.  Again, it was three things going on simultaneously, and I was trying to get peace back into the warehouse so that we could start performing on our contract because that was suffering with all of the different issues that were going on.

Q.    Okay.  And you said you were still in discussions with counsel.

Had you already presented your report to counsel or not -- or not yet at this time?

A.    By this time, I think -- I'm not

Page 189

CATHY ANN PRICE

100 percent -- that counsel should have had my investigative report.

Q.    Okay.  And I -- I think you just mentioned that there were three things going on simultaneously.

Can you remind me again what those three things were?

A.    It was the rumor, the -- the rumor with Donte and that issue, then the rumor with Mr. Moppins or the -- or the harassment or hostile complaint with Mr. Moppins and then the issue with Ms. Parker and her subordinates.

Q.    The third issue with Ms. Parker was about Ms. Parker's behavior as a manager --

A.    Her conduct --

Q.    -- is that right?

A.    -- yes, as manager.

Q.    Okay.  And the issue with Mr. Moppins -- you started to say hostile work environment; was that right?

A.    Well, her complaint towards him was more about the hostile work environment.

Q.    I see.  Okay.

So who ended up attending this

Page 190

CATHY ANN PRICE

meeting?

A.    All of them: Larry, Angela, Demarcus, Ms. Parker and myself.

Q.    Okay.  Was Mr. Jennings part of the meeting?

A.    No.

Q.    Why -- why was not -- why was he not invited?

A.    Again, he was -- he -- I was dealing with the management.

Q.    Okay.  Did Mr. Jennings not need the -- the reconciliation that you hoped to get?

A.    No, because at this time, Mr. Jennings wasn't -- if I -- if I remember correctly, he had been moved to the SPEAR side of the warehouse, and so it's not that he didn't need it.  This was about the management team and being -- getting back some control in the warehouse in regards to all the situations that had transpired.

Q.    Okay.  So what happened during this meeting?

A.    Well, I laid out the purpose and the intent, which was just really to get everybody

Page 191

CATHY ANN PRICE

focused back on the mission to -- most of it was about Ms. Parker and Larry had a -- had an argument and a disagreement in their meeting and to get them to see each other, what was -- what each other was trying to get -- was trying to say from their point of view.

Angela was mainly a witness.  She was just there as a -- just to observe --

Q.    Okay.

A.    -- and, also, to just get some clarity around how we're going to move with all of this going on.

Q.    Okay.  Did you ask the managers to apologize to one another?

A.    Yeah --

Q.    Okay.

A.    -- I did.

Q.    Did they all do that?

A.    All of them did, kind of haphazardly, but they did.

Q.    Okay.  So Ms. Parker apologized in --

A.    Yeah --

Q.    -- the meeting?

A.    -- she apologized for being --

Page 192

CATHY ANN PRICE

raising her voice to Larry and -- and for getting a little out of sorts with him --

Q.    Okay.

A.    -- she said that she wanted to make sure that he heard her side and that's all she was trying to do.

Q.    Okay.  Did you ask -- during this meeting, did you tell the -- the participants to refrain from speaking about these issues in the future?

A.    Yes.

Q.    Okay.  And why did you give that instruction?

A.    I just reiterated the e-mail that I had sent out again to see if this -- if this can come to some type of closure so that, again, we can focus on the work because this was causing our performance on the contract to suffer.

Q.    Okay.  Did Ms. Price -- strike that.

Did Ms. Parker express any concerns about her job security to you during or after this meeting?

A.    She did.

Q.    Okay.  What did she say to you?

Page 193

CATHY ANN PRICE

A.    She made the comment to me -- and I'm trying to find her -- her -- my notes to her.

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  I'm trying to see if I have anything.  I thought I had it in my notes -- I thought I had it in my notes, but it probably is in one -- may I look at my investigation details or my --

BY MS. WASIK:

Q.    Sure.  Yeah.  Which -- which exhibit is that?

A.    Fourteen and 13.

Let's see.

Q.    Okay.  Thank you.

A.    I'm trying to see if it was in either one of those.  I do remember seeing somewhere, in my notes or something, that she did mention that she felt that Mr. Moppins was basically threatening her from having any further promotions within the company.

Q.    Okay.  Did you respond to her concern in that meeting?

A.    If I can find where my notes are, I

Page 194

CATHY ANN PRICE

could give you a more definite answer, but I would assume -- I'm assuming that I did.

Q. Okay. Do you remember how you responded?

A. I do not remember --

Q. Okay.

A. -- I do not recall how I responded.

Q. Okay. Did you tell her that her job wasn't in jeopardy?

MR. WALSH: Objection.

THE WITNESS: I can't remember what I told her.

BY MS. WASIK:

Q. Okay. Okay. Let's look at another document -- oh -- it is already Exhibit 15.

MS. WASIK: Thank you.

(Sotto voce discussion between co-counsel.)

BY MS. WASIK:

Q. It's the e-mail from Mr. Moppins to you on April 27th.

A. Okay. Yes. Okay.

Q. Okay. Do you know why Mr. Moppins sent you this e-mail?

Page 195

CATHY ANN PRICE

A. This was my -- after my interview with him that I told him that he should send me something in writing to back up his statements.

Q. Okay. Did you take notes during that meeting with him?

A. I took some notes, yes.

Q. And where are those contained?

A. You should have a copy of them. The one for 4/25, I think, if you have that copy -- I think that's --

Q. Okay.

A. -- some of the notes that I took at the meeting. Yes.

Q. And in -- in general, when you were interviewing witnesses during your investigation, did you take notes?

A. From -- yes.

Q. And where did you keep those notes?

A. Those are the notes that are in here (indicating).

Q. Okay. So you're pointing to your notebook, right?

A. My notebook, yeah.

Q. Okay. So I'd like to look at the

Page 196

CATHY ANN PRICE

second paragraph of Mr. Moppins' e-mail, and it has sort of an indented paragraph, and it says, I asked him directly was he sleeping with Ms. Parker.

Do you see that part?

A. Um-hum.

Q. Okay.

A. Yes. I'm sorry.

Q. Do you know when that conversation between Mr. Moppins and Mr. Pickett occurred?

A. Well, he says February of this year, he approached Mr. Pickett, so I assume that's when that conversation transpired.

Q. Okay. And before Mr. Moppins wrote you this e-mail in Exhibit 15, had he told you about that conversation ever before?

A. He had not at that time.

Q. Okay. Had Mr. Pickett told you about that conversation ever before?

A. I had no knowledge of it until this investigation.

Q. Okay. And now looking at the fourth paragraph, it says, We did not speak on this matter again until the week of April 18th through

Page 197

CATHY ANN PRICE

April 22nd.

Do you see that?

A. Yes.

Q. Okay. So who is Mr. Ferguson?

A. Manley.

Q. Okay. And what was his job position at the time?

A. He was either a material coordinator or warehouse specialist, I believe. Yeah.

Q. Okay. And in relationship to Mr. Moppins, did he report to Mr. Moppins, directly or indirectly?

A. He reported to Ms. Parker.

Q. Okay. Now, it says, Mr. Ferguson informed me and Mr. Pickett the rumor within the warehouse of a personal relationship between Ms. Parker and/or Mr. Pickett or myself.

Do you see that?

A. Um-hum.

Q. Okay. Now, before this e-mail in Exhibit 15, did Mr. Moppins tell anyone else at Reema about this rumor?

A. Not to my knowledge. It had not gotten to me till around maybe -- I think this

Page 198

CATHY ANN PRICE

was the week I was referring to -- yeah, the 18th through the 22nd was when Ms. Parker came to me -- I'm not sure what exact date it was -- to tell me about the rumor and Mr. Moppins and the meeting.
Q. Okay. Okay.
Now I just want to go down to the last paragraph on this page --
A. Um-hum.
Q. -- it says, Immediately upon arrival, she went into how she was locked out of the all-hands meeting.
Do you see that?
A. Yes.
Q. Okay. So is "she" in that sentence -- is that Ms. Parker?
A. Yes.
Q. Okay. Do you know when that all-hands meeting occurred?
A. I believe in my notes I have the 21st, April 21st --
Q. Okay. Okay.
A. -- I think that's in my investigation report, too.

Page 199

CATHY ANN PRICE

Q. And what was discussed at that all-hands meeting on April 21st?
A. I was not in the meeting, so I can give you what I was told, which is in the investigation report on section -- Exhibit 14 --
Q. Okay.
A. -- Number 2. And, actually, it says February 22nd was the meeting. Mr. Moppins allowed the employees to voice any concerns they had. The above employees mentioned the inappropriate conduct of supervisors in general. After the staffing meeting, Mr. Moppins followed up individually with each employee. He was told by other employees (Mattie Littleton and Donte Jenkins [sic]) that Ms. Parker has been disrespectful to subordinates and had approached each of them about an alleged rumor between her and Demarcus Pickett (her supervisor).
Q. Okay. And when it says "The above employees," who is that referring to?
A. What section are we at?
Q. That same section that you just read. It's the second sentence.
A. Manley Ferguson, Donald Gatling,

Page 200

CATHY ANN PRICE

Arnel Ragunton.
Q. Okay. And you said this was told to you because you weren't in the meeting.
A. Correct.
Q. Who told this to you?
A. I'm trying to get -- this was either Ms. Wallace or Mr. Moppins himself.
Q. Do you know who was present at the -- that meeting that day?
A. As far as all the employees that were there? I do not.
Q. Okay. But it was -- was it a meeting for all employees?
A. Yes --
Q. Okay.
A. -- it was all hands.
Q. Okay. Do you know -- are there any, like, notes or minutes kept of that meeting?
A. Not to my knowledge.
Q. Okay. Were there e-mail invitations to this meeting?
A. I don't recall one.
Q. Okay. Did anyone follow up with e-mails about things that had been said in -- in

Page 201

CATHY ANN PRICE

that meeting?
A. Not to my knowledge.
Q. Okay. Now, turning back to Exhibit 15, the bottom, who locked Ms. Parker out of the meeting?
A. That was -- she said that Larry had locked her out of the meeting.
Q. Okay. Did Larry lock her out of the meeting?
A. I do not know.
Q. Did you ask Mr. Moppins whether or not --
A. I did --
Q. -- he locked her out of the meeting?
A. -- and he said he did not.
Q. Okay.
THE WITNESS: Oh, I'm sorry.
BY MS. WASIK:
Q. Did you ask anyone else, who locked her out of the meeting?
A. I asked a couple of other employees that was there, was the door locked, and I think I put here -- I think it was Ms. Ma -- Wallace was one of the ones that I asked, and she said

Page 202

CATHY ANN PRICE

that she did not recall the door being locked, nor did she recall Mr. Moppins slamming the door in Ms. Parker's face.

Q. Okay. Then it says, the next sentence down -- it says, How it wasn't right that we had the meeting without her.

So was -- was Ms. Parker present at this all-hands meeting?

A. Ms. Parker had left out to go take a call outside. And the meeting went on, so she was outside taking a call.

Q. Okay. All right.

- - -

(30(b)(6) Deposition Exhibit Number 18, Supervisory Sexual Harassment & EEO Compliance Training Workbook, Bates stamped REEMA000066 through REEMA000080, marked for identification, as of this date.)

- - -

BY MS. WASIK:

Q. And I'm sorry. Before we go to this exhibit, you said that Ms. Wallace said that the

Page 203

CATHY ANN PRICE

door was not locked in the meeting?

A. She said she did not recall anyone locking the door.

Q. Okay. Did you interview Ms. Wallace as part of your investigation, or when did you speak with her?

A. Yeah, she was as part of the investigation, especially with the fact that she was a witness when they were in a meeting, when Demarcus -- Mr. Moppins, Ms. Parker -- she was there as a witness in that meeting where Ms. Parker got -- and Larry got upset and they were speaking loudly to each other.

So I spoke with Ms. Wallace to get more information about what was going on, yes.

Q. Okay. Did you take notes of that meeting with Ms. Wallace?

A. It would be either in the investigation detail or in my --

Q. In your notes?

A. -- in my notes.

Q. Okay. Okay. Do you recognize Exhibit 18?

A. Yes.

Page 204

CATHY ANN PRICE

Q. And what is this document?

A. This was -- I created this for supervisory sexual harassment and EEO compliance trainings.

Q. When did you create it?

A. This was for May 2nd, 2016.

Q. Okay. So was the training given on May 2nd, 2016, or did you develop it on May 22nd -- May 2nd, 2016?

A. The training was done -- the PowerPoint for training was created on April 29th, so the training was to -- probably delivered on May 2nd.

Q. Okay. Did you lead the training?

A. Yes.

Q. And who -- who attended the training?

A. There should be an attendance sign-in sheet with this. So I don't remember --

Q. Okay.

A. -- but all the supervisors were required to attend.

Q. Okay. So did people who were not supervisors not attend this training?

A. They had a separate training.

Page 205

CATHY ANN PRICE

Q. Okay. Did the people who attended this training receive this workbook in any way?

A. Yes.

Q. How did they receive it?

A. Printed.

Q. Okay. And now, while Ms. Parker was an employee, did Reema give this training on any date other than May 2nd, 2016?

A. We gave a form of this training once a year, sometimes twice a year, so, yes. And it was one for supervisors and one for all employees.

Q. And how was attendance documented at those other trainings?

A. Sign-in sheets.

Q. Where were those sign-in sheets stored at Reema?

A. In the HR files for training and development.

Q. Okay. Do you know where they would be now at Reema?

A. I do not.

Q. Okay. But they were kept in your files, the HR files?

Page 206

CATHY ANN PRICE

A. Yeah, in the general HR files for training and development --

Q. Okay.

A. -- anytime I did training or any training was done, we kept a portfolio of the training and the materials and the sign-in sheets.

Q. Would there be e-mail invitations inviting employees to the training?

A. Yes.

Q. Okay. And is that true for all the -- the trainings that were done once a year, maybe twice a year?

A. Yes.

Q. Okay. And who would have sent those e-mail invitations?

A. Myself.

Q. Okay. All right. Now, if you look at Page REEMA78 of this training, it just says, Please refer to the separate handout.

Would that handout have been the sexual harassment policy manual?

A. It could have been the one we talked about earlier --

Page 207

CATHY ANN PRICE

Q. Okay.

A. -- with the acknowledgment form.

Q. Okay.

A. I'm sorry. The exhibit number, you want -- it could have been Exhibit 11.

Q. Okay. Was it Exhibit 11?

A. I can't remember. I can't recall exactly which document it was --

Q. Okay.

A. -- all of this is generally put together -- whatever is handed out is put together in a packet with the sign-in sheet, and so that's the best way that I can recall. And since I don't have all of that, I can't recall.

Q. Okay. Are there any other documents it could have been besides the sexual harassment manual?

MR. WALSH: Objection.

THE WITNESS: Other than the employee manual.

BY MS. WASIK:

Q. Got it.

All right. Was Mr. Moppins required to attend these trainings?

Page 208

CATHY ANN PRICE

A. Yes.

Q. Okay. All right.

Did Ms. Parker take vacation in May 2016, if you recall?

A. I believe she did, and I think it was the first or second week in May.

Q. Okay. While you were at Reema, did employees have to request vacation in writing?

A. Yes, they're supposed to.

Q. Okay. How did they do that?

A. There's a Request for Leave form.

Q. Okay. And is approval given in writing?

A. Yes.

Q. Okay. And where would those requests and approvals be kept?

A. They're kept in the employee personnel file, and a copy is just kept in a general book for payroll purposes.

Q. A payroll book?

A. Well, it's a leave request book.

Q. A leave request book.

A. Um-hum.

Q. Okay. And was that part of your HR

Page 209

CATHY ANN PRICE

files, the leave request book?

A. Yeah. That's so that we can track for payroll.

Q. Okay.

Okay. If I told you that Ms. Parker took vacation from May 11th to May 16th, do you have any reason to believe that's not accurate?

A. I do not have any reason --

Q. Okay.

A. -- to believe.

Q. Okay. Let's look at another document.

MS. WASIK: Oh. Thank you.

\- - -

(30(b)(6) Deposition Exhibit Number 19, Memorandum for Record, Bates stamped REEMA000177, marked for identification, as of this date.)

\- - -

BY MS. WASIK:

Q. Do you recognize this document?

A. Yes.

Q. Okay. And what is it?

Page 210

CATHY ANN PRICE

A.    This is a complaint of hostile work environment by Donte Jennings against Evangeline Parker.

Q.    Okay.  And who wrote this document -- this document?

A.    I'm assuming he did.

Q.    Okay.  But you don't know who wrote it?

A.    It came to me via e-mail.

Q.    Okay.  Who -- who sent it to you?

A.    He did.

Q.    Is "he" Mr. Jennings or --

A.    I'm sorry.

Q.    -- Mr. Moppins?

A.    Yes, Donte Jennings.

Q.    Okay.  If you look in the upper left-hand corner --

A.    Oh.  Mr. Moppins.

Q.    -- do you see --

A.    I see Mr. Moppins, yes.

Q.    Did Mr. Moppins send this to you?

A.    He forwarded this to me.

Q.    Okay.  And is -- do you know -- is lmoppins@gmail.com his personal e-mail, or is

Page 211

CATHY ANN PRICE

that his work e-mail?

A.    I'm assuming that's his personal e-mail.

Q.    Okay.  Do you know why Mr. Moppins had this memo before HR did?

A.    Again, sometimes people went to him first.

Let me see here.  I believe the rest of the e-mail correspondence that would have been with this would have been Larry said that he received this and he was forwarding it to HR.

Q.    Okay.  Did you view this as an HR complaint?

A.    Yes.

Q.    Okay.  Now, looking at the first paragraph, it says, On May 2nd, 2016, I was called to the human resources office.

So was Mr. Jennings called to the human resources office on that day?

A.    He probably -- he possibly were -- was.

Q.    Did you call him in?

A.    It would be me, yes.

Q.    Okay.  And why did you call him in on

Page 212

CATHY ANN PRICE

that day?

A.    That's what I have to look for my notes to see.  I believe this was to the other part of Ms. -- Ms. Parker's complaint when she said in the investigation details -- when she mentioned Mr. Jennings in Section 4, about his exposure to her and Ms. Thompson --

Q.    Okay.

A.    -- and that was me addressing that and talking to him about that specific issue.

Q.    But by that point, you had already ended your investigation, right?

A.    I had not done a final conclusion.  I had submitted my information to Reema for consideration, but I still had to deal with this part of it, which was --

Q.    What do you mean?

A.    -- about the exposure.

Q.    So on May 2nd, 2016, you only talked to Donte Jennings about the -- the alleged exposure?

A.    Right.  And he says, Claiming -- he says, Claiming I started a rumor about her, I had shown her a body part --

Page 213

CATHY ANN PRICE

Q.    Okay.

A.    -- and that the claims were unfounded.

Q.    Okay.  Did you take notes on that meeting with Mr. Jennings?

A.    I did.

Q.    And where are those kept?

A.    In my notebook.

Q.    Okay.  Which -- which notebook are you referring to?

A.    This is the one you have, 2016.

Q.    Okay.  Now, looking at the second paragraph, Jennings says, I was made aware of the complaint.

And, again, is that -- is that just the complaint about the exposure?

A.    He says, Since that time I was made aware of the complaint, Ms. Parker has been creating an uncomfortable work environment for me.

Q.    Right.

A.    And so, yes, he's talking about on the May 2nd.

Q.    So the complaint is just the exposure

Page 214

CATHY ANN PRICE

complaint?

A.    Yes.

Q.    Okay.

Okay.  Now, looking at the second-to-last paragraph, where it starts with, I consider Ms. Parker's interaction.

A.    Um-hum.

Q.    Looking at the last section, it mentions Title VII of the Civil Rights Act.

A.    Um-hum.

Q.    Is Mr. Jennings a lawyer, to your knowledge?

A.    Not to my knowledge --

Q.    Okay.

A.    -- I can't attest to his background.

Q.    Okay.  Do you know why he mentions the Civil Rights Act?

A.    I do not.  These are employees.  They all will pull in some type of legal doctrine to justify their case.  So, no, I do not.

Q.    Okay.  So did HR see this as a gender discrimination complaint?  Race discrimination -- I guess, what kind of complaint did you see this as?

Page 215

CATHY ANN PRICE

A.    A hostile work environment complaint.

Q.    Okay.  Did Mr. Jennings discuss these issues with Ms. Parker before doing this hostile work environment complaint?

A.    No, not to my awareness.

Q.    You did make Ms. Parker aware of this complaint by Donte Jennings?

A.    I did.

Q.    How did you do that?

A.    I had a meeting with her.

Q.    When did you have a meeting with her?

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  Okay.  I don't have a date noted in here.  So I do not have a date when I spoke with her.

BY MS. WASIK:

Q.    Okay.  Do you have notes of that meeting, if not a date?

A.    I have the notes of -- some notes of the meeting with him when I was investigating his complaint.

Q.    But do you have any notes of a meeting with Ms. Parker where you informed her of

Page 216

CATHY ANN PRICE

Mr. Jennings' complaint?

A.    No.  I don't have any details in here.

Q.    Okay.  Did you do an investigation of Mr. Jennings' HR complaint?

A.    I took his account of what was going on, and he said that Kenton Birgans was a witness to him.  Kenton provided a statement via e-mail, as well as Carlos, who provided a statement.

Q.    So did you -- after speaking with Mr. Jennings, did you go speak with Mr. Carter and Mr. Birgans?

A.    I spoke with Carlos over the phone.  And I did go and speak with Mr. Birgans face to face, and I asked him what happened.  He just said that he did notice that Ms. Parker and him were having some interactions.  And I asked him -- I said, Well, could -- he didn't really want to talk at that time, so I said, Could you please provide me something in writing?

Q.    Do you have notes of your conversation with Mr. Carlos Carter?

A.    Let's see.  I don't think I have notes in here (indicating).

Page 217

CATHY ANN PRICE

Q.    Did you take notes in general?

A.    Somewhere I took notes.  It may not have been in this handbook -- in this notebook, but somewhere I took notes.

Q.    Where would those notes be?

A.    I have no idea.  Sometimes I was -- people would come immediately and I would just grab a piece of paper and take notes --

Q.    Were there --

A.    -- and stick it in the folder.

Q.    I'm sorry.

A.    I'm sorry.

Q.    Are you finished?

A.    I'm good.

Q.    -- were there any other witnesses you spoke to besides Mr. Carter and Mr. Birgans?

A.    No.

Q.    Okay.  Why didn't you speak to Ms. Parker?

A.    I had already spoken with her, again, previously about -- when I told her that he said that he did not do those -- that he did not expose himself and that he said -- he basically denied her -- her account of the claim.

Page 218

CATHY ANN PRICE

Q. When did you speak with her?
A. That's what we just got through talking about. I don't remember the exact date on that.
Q. Because -- so this is dated May 12th, 2016, right?
A. Which one?
Q. Mr. -- Exhibit 19.
A. That's his written notice; but he came before that. He complained before that about her harassing him down in his work area.
Q. So when -- when did HR get the complaint --
A. So 5/1 --
MR. WALSH: Wait.
BY MS. WASIK:
Q. -- from Donte Jennings?
A. -- I had a complaint from Donte, saying Van was approaching Donte again in his work area, harassing him about the rumor -- this was the same time -- this is 5/1. This is the same time where he said that she asked him again, if she wanted to know who I'm messing with, you need to come ask me. Don't ask Romaine.

Page 219

CATHY ANN PRICE

So Romaine Thompson was a former employee of RCSI.
Q. So May 1st, 2016 -- are you referring to a meeting between you and Ms. Parker or you and Mr. Jennings?
A. Me and -- this is me and Mr. Jennings.
I'm sorry. I'm getting confused.
Q. So is that the first time that he made an HR complaint, was May 1st?
A. Yes.
Q. So why does this memorandum for record have a date of May 12th on it?
A. That's when he sent it, but he's referring to a -- May 2nd, when he was called into the office. And while he was called my into the office, he filed his own complaint. So he's saying May 2nd. I have May 1st in here (indicating).
Q. So looking at the second paragraph, it says, Since the time I was made aware of the complaint, Ms. Parker has been creating an uncomfortable work environment for me.
Do you see that?

Page 220

CATHY ANN PRICE

A. I do.
Q. He was made aware of the complaint on May 2nd, right?
A. Her -- yes, her complaint.
Q. So what he's complaining about has been happening after May 2nd, right, according to him?
MR. WALSH: Are you --
THE WITNESS: No, because during the conversation from my notes, he was also complaining about the fact that she was approaching him about the rumor prior to that. And since I made -- when I was investigating her part with him, he made this complaint that since then, she's been continuing to antagonize him in the work area.
So, again, we have three to four different, separate issues happening simultaneously.
BY MS. WASIK:
Q. Sure. Let's go back to May 1st.
On May 1st, I believe you're saying you had a meeting with just Mr. Jennings; is that

Page 221

CATHY ANN PRICE

right?
A. Um-hum.
Q. Okay. And --
MR. WALSH: That's yes?
THE WITNESS: Yes.
I'm sorry. I'm sorry.
BY MS. WASIK:
Q. -- and what was discussed during that meeting?
A. I brought him in to discuss the allegations that Ms. Parker had made against him about the rumor and about him exposing himself.
Q. Okay. And what did he say about the exposure?
A. He said that that was not true; she was making up lies against him. And he said, As a matter of fact, she has been antagonizing me. And he told her that it wasn't him, that she needed to go ask Romaine.
Q. So when he says, She has been antagonizing me -- is that a hostile work environment complaint, according to you?
A. Not at this time when I was investigating, no, because he just said she was

Page 222

CATHY ANN PRICE

antagonizing, and I said, Well, tell me a little bit more about that. And he said, Well, she's -- she continues to give me -- to ostracize me out of the area or she's -- I'm trying to think of what else he was saying -- that she was verbally abusive to him.

Q. So on May 1st, you did not treat that as an HR complaint by Mr. Jennings; is that right?

A. I asked him is there -- did he want me to make this a formal complaint, and at that time, he said no.

And then, apparently, this kept on because of the other issue, and I'm assuming this is why he sent this written -- this written document.

Q. Okay. Going back to May 1st, you said you discussed the exposure and the rumor.

What did Mr. Jennings say about the rumor?

A. He said it wasn't him, he didn't do it, that that was a false allegation.

Q. Okay. Now, let's go to May 2nd.

Did you have any meetings on May 2nd?

Page 223

CATHY ANN PRICE

A. I think May 1st or May 2nd is the same -- the same meeting.

Q. Were there any meetings with Ms. Parker during that time?

A. There was a meeting during this time or after -- right after this time, but I do know that I talked with her about what Donte had said after I received -- no, it wasn't after I received it -- during the time I talked to Mr. Donte, when he said about her antagonizing him in the workplace and ostracizing and -- and speaking to -- to him abusively.

Q. So when was that meeting with -- with Ms. Parker about what Donte had said?

A. Let's see. It's got to be somewhere where I have -- because she was -- they were both instructed to stay away from each other. At that time, Donte was put on the SPEAR side.

Let's see.

(Whereupon, the witness reviews the material provided.)

THE WITNESS: Okay. Somewhere I'm missing my notes, because there is notes in here about a meeting with Van, because

Page 224

CATHY ANN PRICE

I do remember with my notes here that I -- that Donte went to Demarcus about Van and Don- -- Demarcus said that he would handle it.

BY MS. WASIK:

Q. So did you have a meeting with Ms. Parker, or did Mr. -- you thought Mr. Pickett was having a meeting with Ms. Parker?

A. I ended up having also a meeting with Ms. Parker. I'm not sure if Mr. Pickett actually did have a meeting with her, but I ended up having one with her.

Q. And when was that?

A. That's the date I can't -- I'm missing time somewhere.

Q. But you believe it was before she went on vacation?

A. Yes, I do believe so.

Q. And what was discussed during that meeting?

A. To ask her whether or not -- well, to confirm the allegations that Donte was making against her.

Q. And what did she say?

Page 225

CATHY ANN PRICE

A. She said that he was falsifying -- he was fabricating a lie and that it wasn't true.

Q. And now, you -- you mentioned earlier they were instructed to stay away from each other.

A. Um-hum.

Q. Does that mean Ms. Parker and Mr. Jennings?

A. Yes.

Q. Who gave that instruction?

A. I did. I told Mr. Jennings that he was to refrain from going around Ms. Parker, and I told Ms. Parker to -- not to interact with Mr. Jennings because at that time, he was no longer reporting to her.

Q. When did you tell that to Mr. Jennings?

A. I do not recall the date on that.

Q. Okay. Did you do it verbally or in writing or a different way?

A. I want to say it was in an e-mail.

Q. And what about telling Ms. Parker to stay away from Mr. Jennings? How did you do that?

Page 226

CATHY ANN PRICE

A. I believe that's in an e-mail also.

Q. Okay. At the time that Ms. Parker worked at Reema, did Reema have video cameras in the -- the work areas where Ms. Parker worked?

A. Only in the warehouse in certain areas --

Q. Okay.

A. -- in the back warehouse.

Q. Would that cover any of the areas where Ms. Parker and Mr. Jennings would have interacted?

A. I cannot say because it had certain spots that it would cover, so I don't know.

Q. Okay.

All right. So going back to this Exhibit 19. Did you consider this to be a formal HR complaint?

A. I did.

Q. Okay. Did you investigate this?

A. To the best of my ability, yes.

Q. What did you do to investigate this?

A. Again, when I met with Ms. Parker.

Q. When did you meet with Ms. Parker?

A. I just considered this a formal

Page 227

CATHY ANN PRICE

statement based upon a conversation from May 2nd.

Q. Okay.

A. Okay?

Q. So you didn't do another investigation after this?

A. No. No.

Q. Okay. So what did you do with this document? Did you file it away, and that was it?

A. I filed it -- yes.

Q. Okay. Let's look at another document.

\- - -

(30(b)(6) Deposition Exhibit Number 20, E-mail, Bates stamped REEMA000196 through REEMA000197, marked for identification, as of this date.)

\- - -

MS. WASIK: Twenty.

BY MS. WASIK:

Q. Let me know if you recognize this document.

A. I do.

Q. Okay. And looking at the recipients

Page 228

CATHY ANN PRICE

of this e-mail, who is Rajesh Vora?

A. Mr. Vora is the president of Reema.

Q. Okay. And who is Reema Vora?

A. She's in-house counsel.

Q. Okay. So at the time this e-mail was sent, you had concluded your investigation of Ms. Parker's HR complaint, right?

A. By this time, yes.

Q. Okay. And had in-house counsel reached a determination on -- on her HR complaint?

A. As far as the hostile work environment and the sexual harassment piece, we were unable to find any conclusion to that because there was no evidence being provided in -- that -- that would substantiate her claim.

Q. And in-house counsel made that decision?

MR. WALSH: Objection.

BY MS. WASIK:

Q. Is -- is it accurate to say that in-house counsel made that decision?

A. Yes.

MR. WALSH: Objection.

Page 229

CATHY ANN PRICE

BY MS. WASIK:

Q. Is that determination documented anywhere?

It might not be in this e-mail.

A. Oh, okay.

Q. I just mean in general.

Is that determination that there was no evidence that would substantiate her claim documented anywhere?

A. I believe there would be e-mail between me and in-house counsel, which is . . .

Q. Would anyone else have been on that e-mail?

A. No.

Q. And was Ms. Parker made aware that Reema had determined that there was no evidence that would substantiate her claim?

A. I believe she was, in writing. I can't remember 100 percent.

Q. What kind of writing would that have been?

A. If would have been just an update e-mail about her case.

Q. Okay. And what had you given to

Page 230

CATHY ANN PRICE

in-house counsel at that time, before the determination was reached?

Is it just the investigation report we looked at before?

A. Any documentations that supported the investigation report and the investigation questionnaire and anything that supplemented that, like the statements from the employees.

Q. Okay. Okay. Let's go back to that.

All right. Looking at Exhibit 20, do you know what caused Mr. Moppins to send this e-mail?

A. I do not know his intent to why he sent it.

Q. Looking at the first sentence, it says, I have spoken to the human resources manager.

Do you see that?

A. Um-hum.

Q. When did he --

A. Yes.

Q. -- speak with you?

A. I do not recall the exact date of when he possibly could have spoke with me.

Page 231

CATHY ANN PRICE

Q. Okay. Was it before or after you made a determination that there was no evidence that would substantiate Ms. Parker's claim?

A. I do not recall.

Q. Okay. What did you and Mr. Moppins discuss in that conversation?

A. I don't recall. I really don't recall the conversation.

Q. Did you advise Mr. Moppins to speak directly to Mr. Vora?

A. No. I believe he took that upon himself --

Q. Okay.

A. -- and it may have been -- I see that this is dated on a Friday, and I may not have been in the office.

Q. After this e-mail, did Mr. Moppins speak to Mr. Vora?

MR. WALSH: If you know.

THE WITNESS: I don't know.

BY MS. WASIK:

Q. You don't know.

Were you present at a conversation about this e-mail?

Page 232

CATHY ANN PRICE

A. No, not -- I do not recall.

Q. Would that conversation be documented anywhere?

MR. WALSH: If you know.

THE WITNESS: That, I don't know.

BY MS. WASIK:

Q. Okay.

Okay. Oh, okay.

Sorry. Looking at the third paragraph from the bottom, do you see --

MR. WALSH: Which exhibit?

MS. WASIK: Exhibit 20.

MR. WALSH: Thank you.

BY MS. WASIK:

Q. -- looking at the third paragraph from the bottom, the sentence that starts, On May 12th.

Do you see that?

A. Um-hum. Yes.

Q. It says, Mr. Moppins -- oh, I'm sorry.

It says, I received an e-mail on my personal e-mail account that had a letter from Donte Jennings, stating that he was begin

Page 233

CATHY ANN PRICE

harassed by Ms. Parker for no reason.

Is that Exhibit 19 that we just looked at? Do you know?

A. I would assume so.

Q. Okay. All right.

\- - -

(30(b)(6) Deposition Exhibit Number 21, Statement of Carlos Carter, Sr., Bates stamped REEMA000231, marked for identification, as of this date.)

\- - -

BY MS. WASIK:

Q. Let me know if you recognize this document.

A. This looks familiar.

Q. Okay. And what is this?

A. This looks like Carlos -- Carlos testifying to a statement by Kenton Birgans.

Q. And what was Carlos Carter's job title at that time?

A. He was over the SPEARs program. So he was -- I can't remember his exact title.

Q. Okay. And did he work with

Page 234

CATHY ANN PRICE

Ms. Parker at all?

A.    Indirectly.

Q.    How did they work together indirectly?

A.    If something was needed -- Ms. Parker was on the ATA side, and SPEARs was a separate contract. So if something was needed, he would probably interact with Ms. Parker to get some logistics done.

Q.    Okay. And why did he write this statement?

A.    So I am assuming this was the statement in support as a witness to Donte's claim.

Q.    Okay. Did anyone ask Mr. Carter to give this statement?

MR. WALSH:  If you know.

THE WITNESS:  I don't know.

BY MS. WASIK:

Q.    Did you ask Mr. Carter to give this statement?

A.    I don't remember asking him to give this statement, only the statement to his own accounts.

Page 235

CATHY ANN PRICE

Q.    Okay. Other than you, who had the authority to ask for a statement of this type?

A.    I don't know anyone that would ask him to do it. A supervisor might suggest that if something needs to be said, they may want to submit it in writing.

Q.    Okay. Would Mr. Moppins have the authority to suggest that he make a written statement?

A.    I don't think it's about authority. I think, as management, if he felt that it was something valuable to what -- the investigation that I was doing, he probably would suggest that somebody would put it in writing.

Q.    Did you, as HR manager, receive this document?

A.    I did.

Q.    When did you receive it?

A.    I do not remember. I do not recall.

Q.    Okay. So he didn't come into HR and write it?

A.    I don't know where it was written.

Q.    Okay. Do you know why he wrote this statement instead of Mr. Birgans?

Page 236

CATHY ANN PRICE

A.    I do not.

Q.    Okay. Okay.

- - -

(30(b)(6) Deposition Exhibit Number 22, Written Warning, Bates stamped 000171 through 000172, marked for identification, as of this date.)

- - -

(Whereupon, the witness reviews the material provided.)

BY MS. WASIK:

Q.    Do you recognize this document?

A.    Yes.

Q.    Okay. And what is it?

A.    It is a written warning by Larry Moppins to Evangeline Parker.

Q.    Okay. And if you look at the bottom right -- left-hand corner, it says, Page 1 of 3.

Do you say that --

A.    Um-hum.

Q.    -- do you see that?

A.    Yes.

Q.    Should -- should there be a third

Page 237

CATHY ANN PRICE

page to this?

A.    The signature page.

Q.    Okay. Did Mr. Moppins get your approval, as HR manager, before writing this warning?

A.    This was done possibly in my absence. I was out on this date.

Q.    By "this date," do you mean May 16th, 2016?

A.    On May 16th, 17th and 18th, yes, I was out. I do believe that's the correct dates.

Q.    Okay. So you did not review this before it was written; is that right?

A.    Right. I got a call about pretty much what he was stating in this (indicating), and he was advised to go ahead and issue a written warning.

Q.    When you say "he was advised," does that mean you advised him?

A.    Yes. But this would have went through in-house counsel first before it would have been issued.

Q.    When you advised him to give her a written warning, did you advise what the

Page 238

CATHY ANN PRICE

corrective action should be?

A. No, I did not.

Q. Did you advise any corrective action at all?

A. I don't recall advising any corrective action. Again, this would have possibly been in consultation with our in-house counsel.

Q. But you don't recall advising that Ms. Parker should be terminated?

A. I don't recall -- like I said, these things are done through in-house counsel with -- with advisement with our in-house counsel.

Q. Okay. And when was this warning given to Ms. Parker?

A. If I'm not mistaken, the date of her termination.

Q. Okay. So looking at the corrective action at the bottom that we were just talking about, would Mr. Moppins have recommended this corrective action to in-house counsel?

A. I don't know if he did or didn't --

Q. Okay.

A. -- he wrote the written warning, and

Page 239

CATHY ANN PRICE

I'm sure that it would have went through in-house counsel process before it would have been issued to the employee.

Q. Okay. And what were the things that Ms. Parker did that led you to advise that she should receive a written warning?

A. Again, I didn't advise it. That was in consultation with in-house counsel.

Q. You said you got a call from Mr. Moppins, right?

A. Yes, and I told him he's -- he can do a written warning.

Q. Okay. So what did Ms. Parker do to make you say that he could do a written warning?

A. Because Ms. Parker continued to be insubordinate to the instructions that not only I had given her; she continued to have inappropriate behavior with the employees, her subordinates.

When -- with regards to her language with the employees in the back of the warehouse, apparently it continued, where she was becoming more abusive in language. She was threatening the employees by saying, I'm your boss, and

Page 240

CATHY ANN PRICE

you're going to do what I tell you to do.

And even after my e-mails about cease from having these conversations and even in one-on-one meetings about not continuing to speak about this issue in the workplace, she continued to do so. In addition to, her interactions with Mr. Moppins were becoming insubordinate.

Q. When you say she didn't listen to the instructions given by you, which instructions are you referring to?

A. About not to have -- to continue to have conversations, outside of myself, about the whole case, about the whole investigation.

Q. When you say "the whole case," what do you mean?

A. The investigation that was going on for her claims and any other claims that were going on.

Q. So for her claims, do you mean the hostile work environment and the rumor? Is that right?

A. Right. And Ms. Parker would not let -- just would not let it go.

Q. So who wrote this written warning up?

Page 241

CATHY ANN PRICE

A. Mr. Moppins.

Q. Okay. And who wrote up the Corrective Action Required part of this written warning?

A. He probably did, in guidance with our counsel.

Q. Okay.

Okay. Looking at the third paragraph down under Reason for Warning, where it says, Mr. Arnel Ragunton stated.

Do you see that part?

A. Okay.

Q. Okay.

A. Yes.

Q. Who did Mr. Ragunton state that to?

A. Mr. Moppins.

Q. Okay. Do you know when he stated that to Mr. Moppins?

A. I can only assess, during -- back in the April time frame, around April 25th -- or the -- yeah, between the 21st and the 25th of April --

Q. Okay.

A. -- I'm not 100 percent, but this is

Page 242

CATHY ANN PRICE

my guess.

Q.   And then the next paragraph says, Mr. Donald Gatling stated the same as Mr. Ragunton.

A.   Yes.

Q.   So who did he state that to?

A.   Mr. Moppins.

Q.   Okay.  And when did he state that to Mr. Moppins?

A.   I would assume around the same time frame.  These were the three people mentioned previously.

Q.   Okay.  And the same questions for Mr. Manley Ferguson in the next paragraph.  He also stated this to Mr. Moppins, right?

A.   Yes.

Q.   Okay.  And when did he state that to Mr. Moppins?

A.   The same time frame: the 18th, the 21st through the 22nd, somewhere in there.

Q.   Okay.  But none of these three individuals came and stated anything directly to HR; is that right?

A.   They did not.

Page 243

CATHY ANN PRICE

Q.   Okay.  Do you know if Mr. Moppins documented his conversations with any of these three individuals?

A.   I cannot attest to that.

Q.   Okay.  Then the last paragraph says, I also spoke with Ms. Mattie Littleton.

Do you see that paragraph?

A.   Yes.

Q.   So did Ms. Mattie Littleton speak with anyone besides Ms. Moppins -- Mr. Moppins about these concerns?

A.   She did come and talk to me, and she -- she did say that Ms. Parker did ask her about the rumors, and she said that she didn't want anything to do with it and that she was not going to engage in that conversation.

Q.   Okay.  Did you document that conversation anywhere?

A.   I think I may have.  I'm not 100 percent.

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  Okay.  I can't -- I can't find it in my notes right now.

Page 244

CATHY ANN PRICE

BY MS. WASIK:

Q.   Okay.  In looking at the second page, at the very bottom, the section that says Employee's Comments.

A.   Um-hum.  Yes.

Q.   Do you know who wrote that section?

A.   I assume it was Ms. Parker.

Q.   Okay.  Okay.

- - -

(30(b)(6) Deposition Exhibit Number 23, Written Warning, Bates stamped REEMA000174 through REEMA000175, marked for identification, as of this date.)

- - -

BY MS. WASIK:

Q.   Okay.  So is this another written warning to Ms. Parker from Mr. Moppins?

A.   Yes.

Q.   Okay.  And did Mr. Moppins receive your approval to write this written warning?

A.   Again, this would have gone through our in-house counsel, but my approval was for a written warning.  I didn't know two different

Page 245

CATHY ANN PRICE

cases.  But, yes.

Q.   So did you discuss this in your phone call with him also?

A.   All of this was one phone call.

Q.   Okay.  And -- and going back, when you were out from the 16th through the 18th, were you on vacation, or were you out for work business?

A.   I was doing a workshop during that time.

Q.   Okay.  So did Mr. Moppins write up this warning as well?

A.   Yes.

Q.   And who wrote up the corrective action piece of this?

A.   He wrote it up probably in consultation with in-house counsel.

Q.   Okay.  Now, the first paragraph under Reason for Warning -- it says, Ms. Parker, you were given specific instructions from the program manager of RCSI to not mistreat and not to visit the work areas of subordinate employees who you named in a harassment complaint that you filed with HR.

Page 246

CATHY ANN PRICE

Do you see that?

A.    Yes.

Q.    Okay.  So does "program manager" refer to Mr. Moppins?

A.    Yes.

Q.    Okay.  When did Mr. Moppins give Ms. Parker that instruction?

A.    I do not know if he was following up behind the e-mail that I had sent out, again, about ceasing from having continued conversations and as well as when during the time when I had -- was telling you about the separation of Ms. Parker and Mr. Jenkins [sic] in the warehouse.

Q.    When did Mr. Jennings get sent to SPEAR?

A.    I don't recall the date on there.

Q.    Was it after Ms. Parker's HR complaint or before?

A.    I honestly can't remember when the time frame of that was.

Q.    Was it after his complaint against Ms. Parker?

A.    No, it wasn't that.  I don't think

Page 247

CATHY ANN PRICE

so.  I don't think so.

Q.    So you don't know if Mr. -- when Mr. Moppins gave these instructions to Ms. Parker; is that right?

A.    I don't.

Q.    Okay.  Do you know that he definitely gave her those instructions?

A.    I can't attest to whether there's something in documentation.  It could be in an e-mail that I'm copied on.

Q.    Okay.  So what were the things that Ms. Parker did to receive this written warning?

A.    So this was, again, the continuation of her and Mr. Donte having words and interactions in the warehouse.  And, again, this is substantiated by the letter that you just -- we just did in Exhibit 19 and Exhibit 21.

Q.    So what specifically did Ms. Parker do, according to Reema, to get this written warning?

A.    She, again, continued to violate the policy of what we told her, not to interact with Mr. Jennings.  She would go to his -- my understanding, he -- she would go to his end

Page 248

CATHY ANN PRICE

where he worked and she would antagonize him, say things or make gestures to him.  She would say things as he would pass by towards him.

So it was a continuing antagonizing or a provoking of Mr. Jennings.

Q.    Okay.  And what was that time period that she was doing that?

A.    I do not have the details for that.

Q.    Okay.  And when was this warning given to Ms. Parker?

A.    I believe these were issued at the same time.

Q.    So when were they issued -- or I'm sorry.  Strike that.

When were they given to her?

A.    I believe the day of her termination -- I'm not sure 100 percent -- or upon when she returned back from work, one of the two.

Q.    Okay.  Now, looking at the section just above Corrective Action.  It says, Carlos Carter and I spoke with Mr. Birgans in regards to this encounter.

A.    Um-hum.

Page 249

CATHY ANN PRICE

Q.    When did that conversation happen?

A.    I don't have a date for that.

Q.    So Mr. Moppins had that conversation separately from HR?

A.    Yes.

Q.    Looking at the second paragraph, under Reason for Warning, starting, On May 12th, 2016 --

A.    Um-hum.

Q.    -- do you see where I am?

A.    Yes.

Q.    -- it says, I received a letter from Donte Jennings stating that you had been acting in an unprofessional manner towards him.

Do you know whether Mr. Moppins investigated that accusation by Mr. Jennings?

A.    I believe -- I don't know about investigated, but I know that he inquired of the situation, and that was mentioned in his last -- in the other written warning.

Q.    In the other written warning or in his e-mail?

A.    In his e-mail.  I'm sorry.

Q.    Is that Exhibit 20?

Page 250

CATHY ANN PRICE

A.    Yes.

Q.    Okay.  Did Mr. Moppins ask Ms. Parker about her interactions with Mr. Jennings?

A.    I can -- I don't know if he did or didn't --

Q.    Okay.

A.    -- if it was during this time, she was gone, so I don't think he had a chance to have a discussion directly with her.

Q.    Now, in -- in Exhibit 19, which we looked at before, is that what Mr. Moppins is referring to in this written warning?

MR. WALSH:  If you know.

THE WITNESS:  I don't know exactly, but I would assume, given the date --

BY MS. WASIK:

Q.    Okay.

A.    -- the date of the exhibit.

Q.    And you don't know if Mr. Moppins did an investigation of this hostile work environment complaint?

A.    I started that investigation.  So I don't know if he had conversations as a manager with these individuals.

Page 251

CATHY ANN PRICE

Q.    Okay.  And do you know whose handwriting is here at the bottom under Employee Comments?

A.    Again, I would assume that was Ms. Parker.

Q.    Okay.  And looking at the -- the second page of this --

A.    Um-hum.  Yes.

Q.    -- where it says PM's Signature, whose signature would that be?

A.    That's Mr. Moppins'.

Q.    Okay.  Do you know why this is not signed by Ms. Parker?

A.    She refused to sign.

Q.    Okay.  Now looking back at the first page, where it says Corrective Action Required.

When did -- when did Reema expect Ms. Parker to take corrective action?

A.    Could you further explain your question?

Q.    Sure.

Actually, let's look at the top.  That might be easier.

So do you see the top where it says,

Page 252

CATHY ANN PRICE

The purpose of this, in bold?

If you look at the -- the second sentence, it says, The intent is to define for you the seriousness of the situation so that you must -- you make take immediate corrective action.

Do you see that?

A.    Yes.

Q.    When did Reema expect her to take immediate corrective action?

A.    Well, as you know, with any written warning, it also can be given and issued with a termination.

Q.    Okay.  Okay.  So now let's go back to the investigation report.

I believe that was Exhibit 14.

Okay.  What date did you -- oh, I'm sorry.

Looking at the very bottom, the second page, do you see where it says Report Date?

A.    Um-hum.

Q.    And that says May 17th, 2016?

A.    Correct.

Page 253

CATHY ANN PRICE

Q.    So is that the date that you completed this report?

A.    I believe so.

Q.    Okay.  So you -- you gave it to in-house counsel before it was completed?

A.    I gave in-house counsel all documentations -- let's see -- the investigation questionnaire they had previously -- no, I gave in-house counsel on 5/17.  So I did not complete it until 5/17.

Q.    Okay.

Okay.  So looking at the top for the dates, it says, April 18th, 2016, through May 17th, 2016.

Do you see that?

A.    Yes.

Q.    So are those the dates of the investigation?

A.    The entire -- the entire scenario, yes.

Q.    Okay.  You said you were out of the office on May 17th, 2016.

A.    Correct.  But I still did my -- finished my investigation online and had that

Page 254

CATHY ANN PRICE

submitted.

Q. Okay.

Okay. So did you write all of this?

A. Yes.

Q. Okay. Why is the first date April 18th, 2016?

A. That was a Monday, I believe. And that's the first day that I think -- something transpired on that Monday or that Tuesday, I believe it was. I think I just included that Monday for that week. It may have been a typo.

Q. So, before, you said you started your investigation after Ms. Parker's HR complaint on April 25th; is that accurate?

A. On April 25th, right, is what I said --

Q. Okay.

A. -- the 21st or the 25th is what I said, I think.

Q. So you started your investigation on either April 21st or April 25th, 2016?

A. Yes.

Q. Okay. And you concluded it on May 17th, 2016?

Page 255

CATHY ANN PRICE

A. Yes.

Q. So what is the date that it went to in-house counsel?

A. The 17th.

Q. Okay. And when did in-house counsel make the determination that there was no evidence that would substantiate Ms. Parker's claim?

MR. WALSH: Objection.

THE WITNESS: I can't remember exactly when the date would have been. I think that would have been a phone conversation.

BY MS. WASIK:

Q. Was it before or after Ms. Parker was terminated?

A. It was before she was terminated.

Q. Okay. Do you remember the day Ms. Parker was terminated?

Do you remember the date of that?

A. Was it -- I don't -- I would be guessing, but I believe it was the 18th or something like that. Um-hum.

Q. That's what I understand to be correct also.

Page 256

CATHY ANN PRICE

A. Okay.

Q. So when would in-house counsel have made the determination on Ms. Parker's harassment complaint, the 17th or the 18th or after that?

MR. WALSH: Objection.

THE WITNESS: It was not afterwards; it was before. And my thing was there was several conversations -- phone conversations in regards to the case. So I can't remember exactly the date of when we got the final decision. I think that was taken in consideration with all of the other evidence that we were gathering or that we had and the e-mails from Mr. Moppins.

BY MS. WASIK:

Q. So on May 17th, you were off-site at -- I think you said a workshop; is that right?

A. Yes.

Q. Okay. And was that a full-day workshop?

A. Yes.

Q. Okay. And at -- on that same day, did you finish writing this report after you got

Page 257

CATHY ANN PRICE

home, or were you writing it during the workshop?

A. During the workshop --

Q. Okay.

A. -- in my laptop.

Q. When did you send it? Was it the afternoon? The morning?

A. I don't remember.

Q. Okay. And you said there were -- there were phone conversations about the case.

Did those happen after you sent this report?

A. I don't recall.

Q. Were they happening during the investigation?

A. Yes, with the in-house counsel, yes.

Q. Okay. How often did you talk to in-house counsel during the investigation?

A. As often as I needed to get clarification about an incident or what I was doing.

Q. Okay. And if Ms. Parker was terminated on the 18th, in-house counsel made the decision on her sexual harassment complaint either the 17th or the 18th --

Page 258

CATHY ANN PRICE

A. I can't --

Q. -- does that sound right?

A. -- I can't -- you're going to make me guess, and I don't want to guess.

Q. Okay. Fair enough.

You said, That was taken in consideration with all the other evidence we were gathering and the e-mails from Mr. Moppins.

What do you mean, all the -- the other evidence that you were gathering?

A. The other statements from the witnesses and any other interviews that I had did.

Q. Okay. So were those -- and then -- sorry. The e-mails from Mr. Moppins -- what is that in reference to?

A. The ones you just referenced in the exhibits.

Q. Okay. Is that Exhibit 20?

A. Nineteen, 20, 21, 15.

Q. Okay. So in-house counsel was taking all of that into consideration together?

A. Yes.

Q. All right. I'd like to look at the

Page 259

CATHY ANN PRICE

top where it says Issue Investigated, In- --

A. What document are we looking at?

Q. Oh. I'm sorry.

Yeah, Document 14.

A. Okay.

Q. Thank you for asking.

-- where it says Issue Investigated --

Do you see where I'm looking?

A. Um-hum.

Q. -- Inappropriate conduct and behavior of managers.

So whose behavior were you investigating?

A. In this document, it was all the managers, from Evangeline Parker, Demarcus Pickett, Larry Moppins.

Q. Okay. And what was the inappropriate conduct that you were investigating?

A. Well, with Ms. -- Ms. Parker, again, it was her interactions with her subordinates; with Demarcus, it was him and his attempt at trying to handle a harassment issue outside of HR and his part in this whole -- in this whole

Page 260

CATHY ANN PRICE

thing; and the complaint against Mr. Moppins against -- by Evangeline Parker.

Q. Is that the hostile work environment complaint?

A. Yes.

Q. Okay. What about -- was Mr. Jennings' conduct part of this investigation?

A. No.

Q. When you said Mr. Pickett was trying to handle an HR matter, can you explain what you meant by that?

A. Apparently, Ms. Parker and -- went to Mr. Pickett in regards to this whole matter, and he said that he would take care of it, but it never got to the HR department. So I don't know exactly what he meant by "take care of it."

Q. Okay. So you investigated the fact that Mr. Pickett did that?

A. Yes, as a manager, because it was a factor in how everything fell out.

Q. Okay. Do you have Exhibit 13 in front of you? I want to look at 13 and 14 sort of together.

A. Yes.

Page 261

CATHY ANN PRICE

Q. In Exhibit 13, can you turn to Section 9 that's on Page 235?

A. Yes.

Q. Do you see it says, It makes me fearful about my job, that Mr. Moppins will hinder my ability to advance in the company?

A. Yes. That's -- and that was the statement I was looking for when you asked me that previously.

Q. Oh, okay. So was that a statement by Ms. Parker?

A. Yes.

Q. And did she make that statement to you when she came to HR on April 25th?

A. Yes.

Q. Okay. Was that part of your investigation, Mr. Moppins' ability -- you know, hindrance of her ability to advance in the company?

A. His -- I investigated the claim that he -- that he made that statement towards her, yes.

Q. Okay. How did you investigate that claim?

Page 262

CATHY ANN PRICE

A. I asked him did he make that statement and threaten her employment.
Q. Okay. And what did he say?
A. He said he did not.
Q. Okay. So were you the one who made the decision about which issues would be investigated?
A. No. I had to sit down and talk with counsel and figure out how we were going to investigate all these issues at the same time, because they were all coming in at the exact same time.
Q. Okay. And when did you sit down with counsel to do that?
A. I don't remember the dates.
Q. Would it be toward the beginning of your investigation?
A. Yes, more than likely.
Q. Was it before you started your investigation?
A. No, because I think I was still gathering information and claims were still coming in, you know, different people were coming to file their complaint; so it was somewhere

Page 263

CATHY ANN PRICE

towards the middle part or the latter/earlier part of it.
Q. And was anyone else part of that conversation or just you and counsel?
A. At this time, it would just be me and counsel.
Q. Okay. And did you-all make the decision to investigate all of these issues about inappropriate conduct and behavior of managers together?
A. We had to. It was no other way to investigate this and separate because they were all intertwined.
Q. Okay. And then right under Issue Investigated in Exhibit 14, it says Participants.
Do you see that?
A. Um-hum.
Q. So what are participants?
Are they the managers whose behavior you're investigating, or something else?
A. These were all the managers who were involved in the whole issue of the hostile work environment, the claims of sexual harassment or the complaints by the employees about the conduct

Page 264

CATHY ANN PRICE

of Ms. Parker.
Q. Okay. Now, we talked about, before, how the sexual harassment manual uses the terms "alleged victim" and "alleged harasser."
Is there a reason you don't use those terms in this report?
A. No, because, again, this was more about conduct and behavior.
Q. Okay.
Okay. Now, looking at the -- the numbered paragraphs in this report, are they written, roughly, in chronological order, as far as you know?
A. I wouldn't put 100 percent on it, but it kind of does flow somewhat that way.
Q. Okay.
Okay. All right. Let's look at Number 6. It's toward the bottom of the first page. It says, HR conducted an investigation --
A. Um-hum.
Q. -- do you see that?
Okay. So who were all the witnesses that you interviewed for this investigation?
A. Ms. Parker, Demarcus. I couldn't do

Page 265

CATHY ANN PRICE

Romaine Thompson because she was a former employee, so I had no access to her. And that's where I started, with those two.
Q. Okay. What about Mr. Jennings?
A. He was brought in later for an interview about whether or not he started the rumor.
Q. Okay. What about Ms. Wallace?
A. She was always just a witness, but she did give an account to what she overheard in the meetings with Demarcus and Mr. Moppins.
Q. Okay. What about Mr. Birgans?
A. He was only there for -- his part of it was the issue between Ms. Parker and Mr. Jennings, the hostile work environment, inappropriate behavior between Mr. Jennings and Ms. Parker.
Q. So did you interview Mr. Birgans?
A. I can't remember if I did or didn't. I think I did indirectly have a conversation with him, but I didn't note it down. I think I just asked him questions.
Q. Okay. Are there any other witnesses that you interviewed?

Page 266

CATHY ANN PRICE

A. Let's see.
Ms. Littleton was someone that I spoke with; Carlos was someone that I talked to; and there's someone else -- I believe those were the main -- the main people -- and I believe I spoke with Ken. That's right.
Q. You did interview Mr. Birgans?
A. Yes.
Q. Okay.
Okay. Did you interview each of these people one time or multiple times?
A. Some, multiple; others, just one time.
Q. Okay. Did you do anything besides witness interviews during this investigation?
A. Such as?
Q. Anything else.
A. No. No, just gathering other people's testimony towards what they observed happened.
Q. Okay.
Okay. Let's look at Number 2 in Exhibit 14. I believe it's the third-to-last sentence I'm looking at. It says, Mr. Moppins

Page 267

CATHY ANN PRICE

then proceeded to investigate what rumor and Ms. Parker behavior and conduct with the employees.
Do you see that?
A. I see it.
Q. Okay. When did Mr. Moppins do this investigation?
A. I think that was in his office when he spoke with the employees individually.
Q. So after the all-hands meeting?
A. Yes.
Q. So did he investigate the rumor in those meetings?
A. That, I don't know. I wasn't in the room with him. I think he was asking not about the rumor, but he was asking about how Ms. Parker had approached them in bringing the rumor to them, about whether or not they were saying anything.
Q. Okay. Did Mr. Moppins speak with HR before what it says here, Proceed to investigate what rumor and Ms. Parker behavior and conduct with the employees?
A. No. HR was -- I'm trying to figure

Page 268

CATHY ANN PRICE

out where we were at the -- in the middle of this -- no, because, again, Ms. Parker didn't come and file a complaint till later on that day or later on in the process --
Q. Okay.
A. -- so he was just doing his PM thing as management.
Q. Okay. So he didn't tell HR he was going to investigate a rumor before having these conversations in his office?
A. No. It was my understanding that he was just addressing issues of conduct about attitudes out in the workplace between supervisors and the employees --
Q. Okay.
A. -- because they had come to him to complain.
Q. Okay. Now, the last sentence of Number 2 -- it says, They said that Demarcus Pickett knew about the incident.
What is "the incident"?
A. About the rumors and about how she spoke to them in the -- back in the warehouse.
Q. Okay. So when you were writing this

Page 269

CATHY ANN PRICE

information in Number 2, was that based on what Mr. Moppins told you?
A. That was based on what Mr. Moppins, Mr. Pickett -- what I had gather -- gathered from him and what I had spoken with some of the employees, like Manley and Donte and as well as -- who else was it? -- Arnel. I'm sorry. Arnel.
Q. Okay. And so when you say, Mr. Moppins then proceeded to investigate what rumor -- that sentence -- as far as you know, that investigation was just limited to his meetings after the -- the all-hands meeting?
A. As far as I know, because that was probably prior to the all-hands meeting, because the employees had approached him about what was going on in the warehouse.
Q. Okay. Did Mr. Moppins continue to investigate the rumor after that period?
A. No. That was brought to me.
Q. Do you know why Mr. Moppins didn't bring the rumor to HR himself?
A. I'm not clear on what you're asking.
Q. Sure. I can rephrase.

Page 270

CATHY ANN PRICE

It says, Mr. Moppins then proceeded to investigate what rumor and Ms. Parker behavior and conduct with the employees.

Why didn't Mr. Moppins go to HR about the rumor, if you know?

A.   I don't know about the rumor.  I just think that Mr. Moppins was doing his job as a manager of the project and that his employees -- those employees came to him and filed a complaint about how she -- she was conducting herself in the warehouse about the alleged rumor.

And so I think he was just doing his job as a manager to try to look into what the problem was, and he was trying to mitigate it.  But I guess once he learned that this was around something bigger, then he brought it to HR, because, again, they said Mr. Pickett knew about it, and I guess once he inquired of Mr. Pickett and realized that this was something of a sexual harassment nature, then he brought it to us to handle.

Q.   Did Mr. Pickett bring it to HR to handle?

A.   No, and that was part of the problem.

Page 271

CATHY ANN PRICE

Mr. Pickett did not -- he knew about it and did not come to HR at all.  And that's in Number 3.

Q.   Okay.  Now, looking at Number 1, it says, HR was brought into an employee relations issue by Ms. Parker came to HR to complain.

Is that a reference to Ms. Parker's HR complaint on April 25th?

A.   Yes.  HR was brought in to an employee relations -- Ms. Parker came to HR -- by Ms. Parker who came to HR to complain about Mr. Moppins and the meeting that was had -- yes.

Q.   Okay.  So Number 1 actually happened on April 25th, is that right, if it refers to her HR complaint?

A.   Yeah, I guess you would say that --

Q.   Okay.

A.   -- it could be out of order --

Q.   Okay.

A.   -- the document is not perfect.

Q.   Sure.

Looking at Number 5 now -- I know I'm skipping around --

A.   Yes.

Q.   -- it says, Mr. Moppins came to HR

Page 272

CATHY ANN PRICE

after the meeting between Ms. Parker and himself.

When did Mr. Moppins come to HR?

A.   This was one with him, I believe, Ms. Wallace, Demarcus and whatever date that happened on.  And I think that was the same day.  All of this transpired the same day, the 25th, possibly.

Q.   Okay.  So Mr. Moppins came to HR on the 25th, you think?

A.   I think.

Q.   Okay.  And it says, HR informed him that her behavior was disrespectful and that she was insubordinate in her conduct.  HR would give her a warning to correct and, after that, termination.

Do you see that part?

A.   Yes.

Q.   So is that the decision you made also on the 25th?

A.   Based upon the sole -- only about the conduct, not about the rumor, only about her interactions with her subordinate when she was cussing them out and telling them that she was the boss and if they had anything to say, how she

Page 273

CATHY ANN PRICE

would -- she was threatening their jobs.

Q.   Okay.  Did HR ever give her a warning?

A.   We did not, because other issues started to come out about the whole case.  So, again, we ended up getting two, three more claims at the same time.  All of this was happening at the same time.

Q.   And when you mean other claims, you mean the -- the rumor and the hostile work environment complaint against --

A.   Yes.

Q.   -- Mr. Moppins?

Okay.  Did HR give Ms. Parker any written warnings at all during this whole time?

A.   Not during this part of the time, no.

Q.   Okay.

All right.  Let's look back down at Number 6.  I'm looking at the second sentence, During this investigation, it became apparent.

Do you see the sentence that starts with that?

A.   Yes.

Q.   Okay.  So you determined that the

Page 274

CATHY ANN PRICE

rumor actually started with Ms. Parker sharing with another employee that she had feelings for her boss?

A. Yes.

Q. How did you come to that determination?

A. When I took into account all the information that was being given. Again, this -- this particular rumor started outside of the Reema workplace. This was conversations going on between Ms. Parker, Ms. Romaine Thompson. And, apparently, in my talking with Ms. Wallace, Ms. Parker had confided in Ms. Wallace that she had feelings with Mr. -- for Mr. Pickett.

So I had no evidence pointing to the fact that Mr. Jennings had actually brought the rumor into the workplace but that the rumors kicked off when Ms. Parker cussed out Mr. Jennings in -- in the warehouse.

Q. So where it says the rumor actually started with Ms. Parker, is that based on something Ms. Wallace told you?

A. Yes.

Q. Okay. Did you ask Ms. Parker about

Page 275

CATHY ANN PRICE

that?

A. I did.

Q. And did she agree that she had started the rumor about herself?

A. She did not --

Q. Okay.

A. -- she felt that it was started by Mr. Jennings.

Q. And did you talk to Mr. Pickett about this part?

A. I did.

Q. And did Mr. Pickett agree that Ms. Parker had started the rumor?

A. He did not.

Q. Okay. So if Mr. Pickett and Ms. Parker do not agree that Ms. Parker started the rumor, why did you determine that -- that that had happened?

A. Because, again, all of the other conversations in the interviews, I'm being told that these con -- these phone conversations are between Ms. Romaine Thompson and Ms. Parker about whatever the allegation was about her sleeping with Mr. Pickett and that that's how all of this

Page 276

CATHY ANN PRICE

ended up back into the workplace.

And, again, no one knew anything until Ms. Parker made the allegation against Donte out loud in the warehouse, according to what I was given as information.

Q. Did you also conclude that Ms. Parker was responsible for spreading the rumor?

A. I did not say that she spread the rumor. No.

Q. You just concluded that she started the rumor?

A. That she was possibly the source of the rumor.

Q. Well, it says the rumor actually started with Ms. Evangeline Parker. So you concluded that Ms. Parker started the rumor?

A. You can interpret that, yes.

Q. Okay.

MS. WASIK: I see we have five minutes left on the video, so we'll just keep going for a few more minutes.

BY MS. WASIK:

Q. Okay. Now looking at the very top of the next page, Page 238, the second sentence

Page 277

CATHY ANN PRICE

says, From this, the rumor grew.

A. Yes. Because the sense -- sentence also said, In addition, Ms. Parker had told a close friend and former employee, Romaine Thompson, and then, From this, the rumor grew.

Q. And you did not interview Ms. Thompson, correct?

A. Yeah, she was a former employee.

Q. How did you find out that Ms. Parker had told Ms. Thompson?

A. From Mr. Pickett.

Q. Mr. Pickett. Okay.

And what do you mean by "the rumor grew"?

A. Again, this happened outside of the workplace. These are individuals who are all associated outside of the workplace. And my understanding is there were conversations over the weekend and the conversations -- the only name that was mentioned was Ms. Thompson, Mr. Pickett and Ms. Parker.

Q. Okay. And then you write, It was told Donte Jennings, who asked Demarcus Pickett,

Page 278

CATHY ANN PRICE

and then Romaine Thompson also asked Demarcus Pickett.

So who told Donte Jennings?

A. My understanding is that's when Romaine -- I'm sorry -- Evan- -- Ms. Parker came in, made the accusation; when he said that he didn't do it, It must have been your friend Romaine. And I guess Mr. Jennings went to Mr. Pickett to inquire about the fact that he was being brought up in the middle of this allegation.

Q. Okay. And now, after that, it says, Mr. Pickett took it upon himself to tell Ms. Parker what was going on, and this caused Mr. Park -- Parker to react.

What does that refer to?

A. Apparently, again, phone conversations were going on and he was informing Ms. Parker of what was transpiring and she became more agitated about the fact that people were inquiring about this rumor.

Q. Okay. Did Ms. Parker ever tell anyone she was involved in a sexual relationship with Demarcus Pickett?

Page 279

CATHY ANN PRICE

A. Not to my knowledge, and she did not -- and I asked that question, and she emphatically said no.

Q. Okay.

MS. WASIK: Why don't we take a break just because we're running out of video? Let them switch.

THE VIDEOGRAPHER: Off the record at 3:57. This is the end of Media Unit Number 3.

- - -

(Whereupon, a recess was taken from 3:57 p.m. to 4:15 p.m.)

- - -

THE VIDEOGRAPHER: On the record at 4:15. This is the beginning of Media Unit Number 4 in the testimony of Cathy Price.

BY MS. WASIK:

Q. Okay.

MR. WALSH: Before we start, I think she needed to clarify some dates. She looked at some things.

BY MS. WASIK:

Q. Sure.

Page 280

CATHY ANN PRICE

A. Yes.

So for -- I said that I was out on the -- I think the 16th and the 17th. And, actually, my dates out was the 13th and 14th. So I was in the office on the 16th, 17th and 18th.

MR. VORA: Of which month?

MR. WALSH: Of May?

THE WITNESS: Of May -- I'm sorry -- of 20- -- 2016.

BY MS. WASIK:

Q. 2016?

A. Yes.

Q. Okay. So when you sent Exhibit 14 to in-house counsel, were you in the office?

A. I was in the office, and I believe in-house counsel may have been there also.

Q. Okay. Over the break, did you jog your memory on when the decision was made by in-house counsel about Ms. Parker's HR complaint?

MR. WALSH: Objection.

THE WITNESS: Again, that -- I don't know the exact date that came about, but, again, there was conversations with in-house counsel regarding what we were

Page 281

CATHY ANN PRICE

going to do with Ms. Parker and the whole situation.

BY MS. WASIK:

Q. Were those conversations while you were in the office on the 17th and 18th?

A. I can't remember. I do not recall.

Q. Okay. Well, going back to Exhibit 14, I'd like to turn to the second page, Number 7.

A. A big calendar.

Q. Okay. Do you see the part where it says that Mr. Pickett took it upon himself to contact the client?

A. Yes.

Q. Is the -- does "the client" refer to the client of the contract?

A. Yes.

Q. Okay. And what did Mr. Pickett tell the client?

A. I don't know the -- what the conversation completely entailed of. But -- and, again, this came after the client reached back out to Mr. Moppins.

Q. Why did the client reach back out to

Page 282

CATHY ANN PRICE

Mr. Moppins?
A. I'm assuming they wanted to know what was going on.
Q. How did the client hear that anything was going on?
A. From Mr. Pickett; my assumption.
Q. Did you ask Mr. Pickett?
A. No, I did not get a chance to ask him about reaching out to the client.
Q. So when you wrote the information in Number 7, what was the basis of that?
A. To make note of what had transpired, just to have a note in there. I did not get a chance to interview him.
Q. So how did you know what transpired?
A. From Mr. Moppins.
Q. Mr. Moppins?
A. Um-hum.
Q. Okay. So Mr. Moppins told you that Mr. Pickett had called the client?
A. Yes.
Q. Did Mr. Moppins tell you what Mr. Pickett had told the client?
A. Just said that the client

Page 283

CATHY ANN PRICE

admitted -- acknowledged that there was some issues in the warehouse and wanted clarification on what was going on. At the time, we had work that needed to get done, and we were already having the client come in on-site to look at and make sure the stuff was getting out on time. And so we didn't need any more issues with our -- our performance.
Q. And when you say "issues," do you mean all of the issues that we've been talking about?
A. No, separately, just issues about getting -- making sure that we're getting stuff out on time and in a timely manner.
Q. So were those issues separate from the inappropriate conduct and behavior of managers?
A. Yeah. Yeah.
Q. Okay. So it says here, Mr. Pickett took it upon himself to contact the client and inform him of what had been transpiring in the last few weeks.
What do you mean by "what had been transpiring in the last few weeks"?

Page 284

CATHY ANN PRICE

A. Again, this is information that I'm getting from Mr. Moppins about what the client was telling him.
Q. Okay. And you didn't ask Mr. Moppins what he meant by "what had been transpiring in the last few weeks"?
A. I made the assumption, given the nature of what was going on in the office, that it was talking about the whole deal with what was happening with the insubordination with the employees. Because, remember, the client comes into our workspace sometimes --
Q. Okay.
A. -- so I don't know if employees had given them some insight on what was going on and Mr. Moppins -- Mr. Pickett was probably trying to address that --
Q. Okay.
A. -- so I don't know exactly how the nature of that conversation went.
Q. But from what you understood, did it involve Ms. Parker's behavior and the rumor and the hostile work environment complaint and -- there might be other things -- did it involve all

Page 285

CATHY ANN PRICE

of that?
A. I can't attest to whether or not it involved all of that.
Q. From what you understood what Mr. Moppins told you?
A. Again, I just wrote that the client was apparently put on -- given some notice that there was some issues in the warehouse or some -- the incidents transpiring in the warehouse. And, again, like it says here, the client asked why Mr. Pickett did not report the issues to Mr. Moppins or HR, and Mr. Moppins had no answer.
Q. Okay.
Okay. Looking at -- I think it's the second sentence in Number 7. It says, He proceeded to defame Mr. Jennings as the source of the issue.
What is that in reference to?
A. My understanding, again, is that this was Mr. Pickett discussion with the client about his belief that Mr. Jennings was the source of the rumor.
Q. Okay. But you had concluded that

Page 286

CATHY ANN PRICE

Mr. Jennings was not the source of the rumor, right?

A. Correct. That was my statement in the last.

Q. Okay.

Okay. Looking at Number 8, it says, HR meet with Ms. Parker, Mr. Pickett and Mr. Moppins.

Is that the meeting we discussed earlier that was around April 27th?

A. Yes.

Q. Okay. All right. Let's look at Number 9.

Since this meeting, I have employee Donte Jennings to file formal complaint of harassment against Ms. Parker.

What does that mean, "I have employee Donte Jennings to file formal complaint"?

A. That's a typo. I had employee Donte Jennings to file a formal complaint.

Q. Okay. Does that mean you asked Donte Jennings to file a formal complaint?

A. I did not. He brought it forth himself.

Page 287

CATHY ANN PRICE

Q. Okay. And that's the written complaint by Mr. Jennings that we looked at earlier?

A. As well as, remember I told you that he came to the office to verbally complain about Ms. Parker's behavior.

Q. Okay. Looking at Number 10, Mr. Moppins has issued written warning for Ms. Parker and has told her to cease all communication with Mr. Jennings.

Were those written warnings the ones we looked at before dated May 16th?

A. No, remember I told you I think there's an e-mail -- and I'm not 100 percent, but I believe there's an e-mail that discusses about may instructed the two not to be interacting.

Q. Did you write that e-mail or Mr. Moppins wrote the e-mail?

A. I'm trying to remember if it was me or him. I can't recall.

Q. Okay. Well, if it says here Mr. Moppins has issued a written warning, do you think --

A. It may be him --

Page 288

CATHY ANN PRICE

Q. It may be him?

A. -- but I'm not 100 percent.

Q. Okay. And what's the difference between a warning by e-mail or a warning -- like, a written warning like we looked at before?

A. They're the same.

Q. Okay. All right. Going down to Number 12, it says, Ms. Parker submitted a written rebuttal to Mr. Jennings' claims, and then the Meeting with Mr. Vora, Reema Vora, HR and Larry Moppins.

So I'm going to show you a document, and if you could please let me know if that's the written rebuttal that's -- that's referenced here.

\- - -

(30(b)(6) Deposition Exhibit Number 24, Letter, Bates stamped REEMA000248, marked for identification, as of this date.)

\- - -

THE WITNESS: Yes.

BY MS. WASIK:

Q. Okay.

Page 289

CATHY ANN PRICE

Okay. So how did -- well, first let me ask, did you receive this from Ms. Parker?

A. I can't remember how I got this.

Q. Okay. And the date at the top is May 17th, 2016.

Is that when you got it?

A. I can't recall.

Q. Okay. All right. Looking at the second sentence at the top of this letter, it says, Mr. Carter pulled me aside and informed me that I'm no longer able to enter the SPEAR department due to Mr. Jennings feeling like I'm harassing him.

Did anybody besides Mr. Carter tell Ms. Parker that she's not allowed to enter SPEAR?

A. Mr. Moppins may have or myself. He was probably just reinforcing what was told.

Q. Okay. And how did Mr. Moppins let Ms. Parker know?

A. Again, I don't recall whether it was an e-mail.

Q. Okay. And the same for when you told her?

A. Yes.

Page 290

CATHY ANN PRICE

Q. Did you get this letter from Ms. Parker before or after you had sent Exhibit 14 to in-house counsel?

A. I don't recall.

Q. Okay. Did you take this letter from Ms. Parker into account when drafting your investigative report in Exhibit 14?

A. It would have to have been, if I have it listed as Number 12 in the investigation.

Q. Okay. So did you do any further investigation after receiving this letter?

A. I don't believe I did, because by the 17th, all of the previous evidence weighted was still in regards to the conduct and the inappropriate behavior of Ms. Parker.

Q. Okay. Did you interview Mr. Reeves at all?

A. Mr. Sean Reeves, no.

Q. Okay. Do you know if Ms. Parker sent a similar letter to Mr. Reeves?

A. I do not know. He never said anything.

Q. Okay. Okay. Looking back at Exhibit 14, the investigation report.

Page 291

CATHY ANN PRICE

I'd like to go back to Number 12.

It says, Meeting with Mr. Vora, Reema Vora, HR and Larry Moppins.

Did that meeting occur?

A. I would say yes. I'm not 100 percent clear or can recall it, but I would say yes.

Q. When did that meeting occur?

A. On the 17th.

Q. Okay. And who -- who was present in that meeting?

A. Mr. Vora; Reema, which is in-house counsel; HR; and Mr. Moppins.

Q. Okay. And what was discussed at that meeting?

MR. WALSH: Objection. I'm going to instruct her not to answer on the basis that it's attorney-client privilege.

BY MS. WASIK:

Q. Okay. Is there any documentation of -- well, strike that.

Were any decisions about Ms. Parker's employment made at that meeting?

MR. WALSH: Objection, the same -- the same objection as before,

Page 292

CATHY ANN PRICE

discussing anything about that meeting.

Obviously, counsel was present. It's the control group making decisions at that point in time. It's a privileged meeting and conversation.

MS. WASIK: Okay.

BY MS. WASIK:

Q. Let's turn to the Recommendations section of this report.

Who determined what these recommendation would be?

A. That would've came out of the counsel of -- our in-house counsel.

Q. Okay. Who -- who wrote these down? Was it you, or was it counsel?

A. I did. Those were my notes taken.

Q. Okay. And when did you write this Recommendations section?

A. At the time that this document was written.

Q. Was it after the meeting mentioned in Number 12?

A. It could possibly.

Q. Is it possible you wrote them before

Page 293

CATHY ANN PRICE

that meeting?

A. No. It probably -- based on what I see here, I think it was as a result of the meeting.

Q. Okay.

Okay. Why did Reema chose to demote Mr. Demarcus Pickett?

A. Again, for conduct of how he handled the situation, which was against company policy.

Q. Okay. Why did Reema decide to do sexual harassment and other harassment training?

A. That is a -- a natural protocol that happens. Anytime we have an incident, I do a refresher course to ensure that everybody understands what is not -- what Reema expects in the workplace.

Q. Okay. Did Reema have a staff meeting to follow up, like Number 4 says?

A. If I recall, I do believe so --

Q. Okay.

A. -- that was to do the training.

Q. So the -- the staff meeting was to have -- so the staff meeting was to hold the training referenced in Number 3?

Page 294

CATHY ANN PRICE

A. Yes.
Q. Okay. And did that staff meeting occur before or after Ms. Parker was terminated?
A. I think we were trying to determine that before. I don't 100 percent recall. I don't exactly have a date, but there would possibly be an e-mail attached to the announcement for the training.
Q. Okay. Now, there's no recommendation that Mr. Jennings should be disciplined, right?
A. Correct, not in this.
Q. Okay. And -- and why is that not one of the recommendations?
A. Because, again, this had -- this was solely in conjunction with Ms. Parker's behavior as a supervisor, as a member of management and what evidence we had that had come to the forefront about how she conducted herself.
Q. But this investigational report is the report that you issued after investigating her HR complaint, right?
A. Correct.
Q. Okay. And that -- okay.
And there's no recommendation that

Page 295

CATHY ANN PRICE

Mr. Moppins should receive any discipline, right?
A. Correct, not in this report, no.
Q. Okay. And why is that not a recommendation?
A. There was nothing that we found that would warrant Mr. Moppins having any type of recommendation of disciplinary action. He was doing his job as a manager.
Q. Okay. I'd like to go to the bottom section that says Documentation.
Do you see that?
A. Yes.
Q. Okay. So Documentation -- is that -- does that refer to all the documentation that was provided along with this report to --
A. Our counsel.
Q. -- to counsel?
A. Yes.
Q. Okay. So Number 1, Complaint Forms for Evangeline Parker.
Is that the HR complaint that Ms. Parker submitted?
A. Yes.
Q. Okay. And then for Donte Jennings,

Page 296

CATHY ANN PRICE

what does that refer to?
A. The same form that he submitted as a formal complaint.
Q. Okay. And Complaint Forms for Larry Moppins -- what is that a reference to?
A. His e-mails.
Q. Okay. And then Number 2 is Written Disciplinary Actions for Evangeline Parker and Demarcus Pickett.
So what are the written disciplinary actions for Evangeline Parker?
A. The ones that you just submitted as Exhibit 13 and 14, I think.
Q. Is it Exhibit 22 and 23, by any chance?
A. Not -- oh. Yes -- I'm sorry -- 22 and 23.
Q. Okay. So when you sent this investigative report to counsel, you also sent Exhibit 22 and 23 along with it?
A. Yes.
Q. And then Written Disciplinary Actions for Demarcus Pickett --
A. Yes.

Page 297

CATHY ANN PRICE

Q. -- what is that in reference to?
A. He was put on a PIP plan, a performance improvement plan.
Q. Okay. Excuse me.
And what are the supplemental documents referred to in Number 3?
A. Any of the statements from the witnesses or, like, Carlos or Kenton or any -- any documentation that would supplement what is written in this document.
Q. Okay.
Okay. Was this report shared with anyone outside of the folks who were in the meeting in Number 12?
A. Not to my knowledge, no.
Q. Okay. I'd like to talk about the day that Ms. Parker was terminated next.
So I'll show you a document.
- - -
(30(b)(6) Deposition Exhibit Number 25, Memorandum, Bates stamped REEMA000347 through REEMA000348, marked for identification, as of this date.)

Page 298

CATHY ANN PRICE

- - -

MS. WASIK: What number are we up to?

CERTIFIED STENOGRAPHER: Twenty-five.

BY MS. WASIK:

Q. Okay. So what is the date of Ms. Parker's termination?

A. May 18th.

Q. And what time of day was she terminated?

A. I don't recall.

Q. Okay. Were you in the meeting where she was terminated?

A. Yes.

Q. Okay. Where did it happen?

A. On-site at the warehouse.

Q. Okay. Was it in an office or conference room or somewhere else?

A. I believe it was in a conference room.

Q. Okay. And who -- who was present in that meeting?

A. Me, Reema and Evangeline. I think

Page 299

CATHY ANN PRICE

that's -- that's all I can remember that was present.

Q. Was Mr. Moppins present?

A. I don't recall him being present.

Q. Okay. Who -- who led the meeting?

A. Reema, our in-house counsel.

Q. Okay. And is Ms. Reema the one who gave Ms. Parker the written warnings?

A. Yes, she -- all of this was done at the same time.

Q. Okay. And Ms. -- was Ms. Reema the one who told her she was terminated?

A. Yes.

Q. Okay. Did Ms. Parker say anything?

A. She was quiet. Yeah, she didn't say anything.

Q. Okay. Now, looking at Exhibit 25, do you recognize this document?

A. Yes.

Q. And who wrote this?

A. I did.

Q. Okay. And was this also given to Ms. Parker during that meeting?

A. Yes.

Page 300

CATHY ANN PRICE

Q. Okay. All right. What happened after that meeting concluded?

A. Ms. Parker -- she made a statement. I can't recall exact -- her exact words. I think she said something like -- I'm paraphrasing -- that she was surprised -- that's about really all she said. She didn't say a whole lot --

Q. Okay.

A. -- and she gathered her things, and we asked that she return company property. And she went in the back, and she got what she needed, and she came back, and she returned the cell phone. I don't know if she had -- I can't remember if she had keys or not.

Q. Okay. When you said she went to the back, is that an area where she kept her stuff?

A. Well, the back is the warehouse, the actual warehouse. It's two parts to the building.

Q. So is that where she was gathering some of her items that she --

A. Yes. Her office was back there.

Q. Okay. Was she escorted to the back of the warehouse?

Page 301

CATHY ANN PRICE

A. Yes.

Q. By who?

A. Sean Reeves.

Q. Okay.

A. I'm sorry. No. Correction. I believe it was Angela Wallace.

Q. Okay. So, then, who did she hand her items over to?

A. Me. She left it with me.

Q. Okay. And then was she escorted out of the office?

A. No. She was allowed to leave the office.

Q. Okay.

Okay. I want to show you one more document.

- - -

(30(b)(6) Deposition Exhibit Number 26, E-mail string, Bates stamped REEMA000282, marked for identification, as of this date.)

- - -

Page 302

CATHY ANN PRICE

(Whereupon, the witness reviews the material provided.)

BY MS. WASIK:

Q. Let me know if you recognize this document.

A. I don't recall this document, but . . .

Q. Well, let's -- let's start at the -- with the bottom e-mail.

Do you see an e-mail from Ms. Parker to you on May 18th?

A. I do.

Q. Okay. Do you see where it says, I would like to schedule a time to come and meet with you today to follow up on the issue from yesterday?

Do you see that?

A. Yes.

Q. What is Ms. Parker referring to there?

A. I honestly can't recall.

Q. Turning back to Exhibit 24. It's a letter from Ms. Parker to you.

Is it possible that she means that?

Page 303

CATHY ANN PRICE

A. It could be possible, yes.

Q. Okay. And did you respond to this e-mail?

A. I can't recall. I believe I -- I did.

MS. WASIK: All right. Here you go.

- - -

(30(b)(6) Deposition Exhibit Number 27, Memorandum, Bates stamped REEMA000345 through REEMA000346, marked for identification, as of this date.)

- - -

THE WITNESS: I'm sorry. Is there an Exhibit 25?

BY MS. WASIK:

Q. Twenty-five was --

MR. WALSH: Yes.

BY MS. WASIK:

Q. -- the official separation of employment notice.

THE WITNESS: I'm sorry. I just want to keep your things in order.

Page 304

CATHY ANN PRICE

CERTIFIED STENOGRAPHER: Thank you.

BY MS. WASIK:

Q. Are you familiar with this document?

A. Yes.

Q. Okay. Did you write it?

A. No. This was written by in-house counsel.

Q. Okay. And do you know when it was written?

A. I believe the 18th is when it was written.

Q. Okay. Was it written after Ms. Parker's termination or before?

A. That, I do not recall. I think this may have been after her termination --

Q. Okay.

A. -- once we discovered the cell phone had been erased.

Q. Okay. And was this document given to Ms. Parker?

A. Again, I don't recall if it was. This is just a record of the violation for file.

Q. Okay. All right.

Page 305

CATHY ANN PRICE

- - -

(30(b)(6) Deposition Exhibit Number 28, Statement of Events from Angela Wallace, Bates stamped REEMA000137 through REEMA000138, marked for identification, as of this date.)

- - -

(Whereupon, the witness reviews the material provided.)

BY MS. WASIK:

Q. Do you recognize this document?

A. I do.

Q. And what is this?

A. Ms. Wallace sent a statement about her involvement in the whole case.

Q. Okay. Did Ms. Wallace write this statement?

A. I assume she did.

Q. Okay. Why did she write it?

A. Again, she wanted to at least have her documentation of her side in written form.

Q. Okay. And Ms. Wallace was a witness to various meetings, right?

Page 306

CATHY ANN PRICE

A. Correct.

Q. So did you ask her to write this as a witness statement?

A. No. I think she just did it to make sure that she had her statements correct at this point. Because she was being asked to be involved in so many things, I think she just wanted to have something in writing.

Q. Okay. Did she give this to HR?

A. Yes, she did.

Q. And when did she give it to HR?

A. I think it's the date of the -- of the letter.

Q. Okay. So after Ms. Parker had already been terminated?

A. Yeah.

Q. Okay. All right.

There is sort of a handwritten note on the side that says April 25th --

A. Um-hum.

Q. -- do you see that?

Do you know who wrote that?

A. I do not.

Q. Okay. Do you know what it's in

Page 307

CATHY ANN PRICE

reference to?

A. It might have been the meeting. That was the meeting on the 25th --

Q. Okay.

A. -- and that doesn't -- I don't think that looks like my handwriting, but it could be. So I'm not 100 percent.

Q. Did you discuss this statement with Ms. Wallace at all after she sent it to you?

A. No. It wasn't a need for me to discuss it with her.

Q. Okay. Okay.

\- - -

(30(b)(6) Deposition Exhibit Number 29, Quiz and Training Acknowledgment, Bates stamped REEMA000119 through REEMA000120, marked for identification, as of this date.)

\- - -

MS. WASIK: It's? I'm sorry.

CERTIFIED STENOGRAPHER: Twenty-nine.

MS. WASIK: Twenty-nine. Okay.

Page 308

CATHY ANN PRICE

BY MS. WASIK:

Q. Do you recognize this document?

A. Yes.

Q. Okay. And who created it?

A. I did.

Q. Okay. And when did you create this?

A. For the sexual harassment training.

Q. Okay. And was that training held on May 24th?

A. I would assume so. That's what's on here.

Q. Okay. And who was that training given to?

A. This seems like all employees.

Q. Did that include managers?

A. Yes --

Q. Okay.

A. -- this possibly was the training mentioned in the -- the document.

Q. Okay. And is this document that we're looking at -- is it -- is it a quiz after the training?

A. It's a posting after -- a posting -- a pre- and posttraining quiz, yes.

Page 309

CATHY ANN PRICE

Q. Okay. Had Reema ever given a quiz like this while Ms. Parker was working there?

A. Yes.

Q. When did Reema do that?

A. When they had their supervisor training.

Q. And did Reema keep the results of that quiz?

A. Yes.

Q. Where were those maintained?

A. The same place where the training documents are.

Q. Okay. So is that in your HR files?

A. Yes.

Q. And did you develop the training that was given on May 24th?

A. Yes.

Q. Outside of Ms. Parker, have there been other instances where employees at Reema complained of sexual harassment?

MR. WALSH: Objection.

THE WITNESS: I do not recall.

BY MS. WASIK:

Q. You don't recall any other instances?

Page 310

CATHY ANN PRICE

A. I can't recall any -- any instances at this point.

Q. Okay. Has any employee at Reema, other than Ms. Parker, made a complaint of sexual harassment against Mr. Moppins?

MR. WALSH: Objection.

THE WITNESS: Again, I do not recall any.

BY MS. WASIK:

Q. Okay. Has Reema received any other complaints of hostile work environment?

MR. WALSH: Objection.

THE WITNESS: No, not that I'm aware of.

BY MS. WASIK:

Q. Okay. What about retaliation?

MR. WALSH: Objection.

THE WITNESS: No.

BY MS. WASIK:

Q. Okay. And gender discrimination?

MR. WALSH: Objection.

THE WITNESS: No.

BY MS. WASIK:

Q. Okay. Now, Ms. Price, going back to

Page 311

CATHY ANN PRICE

something you said earlier, you said that Mr. Moppins was the subject matter expert; is that right?

A. Um-hum. Yes.

Q. Okay. And how is that different from a Reema employee?

A. It's not different in the sense Mr. Moppins is the liaison -- he's the client relations-type person. Again, he manages the contract itself between our -- Reema's employees and the client. So if there's any change or modifications to the contract, it is Mr. Moppins who execute that for Reema. If there's a change in the workforce structure or the pay structure, Mr. Moppin [sic] negotiates all of that and executes that in -- or implement that in Reema.

Q. Okay. Did Reema see Mr. Moppins as one of Reema's employees?

MR. WALSH: Objection.

THE WITNESS: Mr. Moppins was not a direct report hire of -- of Reema Consulting. He was a contract, I believe. I'm not 100 percent --

Page 312

CATHY ANN PRICE

BY MS. WASIK:

Q. Okay.

A. -- again, he was there before I got there.

Q. Okay. Was the source of Mr. Moppins' payroll different from other employees?

MR. WALSH: Objection.

THE WITNESS: I -- I did not oversee the payroll as far as how people were issued checks. I only implemented time.

BY MR. WALSH:

Q. Okay. Who oversaw payroll?

A. That would be Mr. Vora and our payroll manager.

Q. I see. Okay. Okay.

MS. WASIK: Okay. Why don't we take a break, and then we come back, and I'll have not many questions for you --

THE WITNESS: Thank you.

MS. WASIK: -- if any?

Thank you.

THE VIDEOGRAPHER: Off the record at 4:52.

Page 313

CATHY ANN PRICE

\- - -

(Whereupon, a recess was taken from 4:52 p.m. to 5:23 p.m.)

\- - -

THE VIDEOGRAPHER: On the record at 5:23. This is the beginning of Media Unit Number 5 in the testimony of Cathy Price.

BY MS. WASIK:

Q. Ms. Price, since you left Reema, have you talked to any other former Reema employees?

A. I have not.

Q. Have you spoken with Mr. Moppins?

A. Hum-um.

Q. Mr. Jennings?

MR. WALSH: That's no?

THE WITNESS: No. I'm sorry.

BY MS. WASIK:

Q. Have you -- Mr. Moppins?

A. No.

Q. Mr. Jennings?

A. No.

Q. Mr. Pickett?

A. No.

Q. Okay. What about anyone who's still

Page 314

CATHY ANN PRICE

working at Reema?

A. No --

Q. Have you spoken with anyone --

A. -- none.

Q. -- since you left?

Okay.

Okay. When did Reema decide that there was no evidence that would substantiate Ms. Parker's HR complaint?

A. Again, I think once we gathered all the evidence in the meeting that we had on the 17th --

Q. And is that May 17th, 2016?

A. Yes.

Q. Okay.

MS. WASIK: Okay. And, Mr. Walsh, we request that the other two notebooks that Ms. Price wrote in, took notes in, in regard to her job at Reema be produced to us. We reserve the right to request the entirety of the notebook that she gave us.

We'd like to hold the deposition open on -- on that basis.

We'll be following up -- following

Page 315

CATHY ANN PRICE

up in writing on that request.

MR. WALSH: Well, she's here now. I don't know that you can hold it open because of that, but we can deal with it outside of the deposition. You'll have to identify what it is that you want from those notebooks, and then we can go from there.

The pages that you copied today -- we're going to mark those as an exhibit as well --

MS. WASIK: Yes. Let's mark those as an exhibit.

MR. WALSH: -- so we don't forget that.

MS. WASIK: That's right.

MR. WALSH: Did you have other questions?

I don't know if you had other questions.

MS. WASIK: Those are all my questions for Ms. Price.

MR. WALSH: Okay.

MS. WASIK: Thank you.

Page 316

CATHY ANN PRICE

MR. WALSH: So other --

MS. WASIK: Thanks for your time.

MR. WALSH: -- other than marking that one -- the pages as an exhibit -- let's just do that.

MS. WASIK: Yes. I'm not sure what number we're on.

CERTIFIED STENOGRAPHER: Thirty.

\- - -

(30(b)(6) Deposition Exhibit Number 30, Calendar Entries, marked for identification, as of this date.)

\- - -

CERTIFIED STENOGRAPHER: Do you want 31, 32 --

MS. WASIK: Let's do them all as 30, please, yeah.

Thanks.

MR. WALSH: Just have her look at them, just verify they're all in her notebook, all from her notebook.

THE WITNESS: Okay.

Okay.

Page 317

CATHY ANN PRICE

\- - -

EXAMINATION BY COUNSEL FOR DEFENDANT

\- - -

BY MR. WALSH:

Q. I just have a couple very quick questions.

I think we'll use my copies of the exhibits. It's easier.

There's some handwriting on the bottom of Deposition Exhibit Number 17.

Is that your handwriting?

A. No.

Q. Okay. And did you -- you've never seen this document with that handwriting on it before, other than today?

A. No.

Q. Okay. On Exhibit 22, there was some handwriting that was pointed out as well, as on Exhibit 23. These were the written warnings that were prepared by Mr. Moppins.

Do you know if that handwriting existed on those documents at the time that you had that meeting with Reema and Mr. Vora and Mr. Moppins on the 17th?

Page 318

CATHY ANN PRICE

A. I believe so.

Q. So you believe these had already been presented to Ms. Parker -- do you know whose handwriting that is?

A. I believe that's Ms. Parker's handwriting.

Q. Okay. And do you know whether she had already seen these by the time you had that meeting on May 17th, 2016?

A. I can't recall. I believe she did, but I'm not 100 percent.

Q. Okay. And if -- if I look at Exhibit 23, there is a signature page for Mr. Moppins on the second page, and it shows a signature date of 5/18/16.

A. Oh. I'm sorry. Yes.

Q. Does that refresh your recollection as to whether Ms. Parker had seen these prior to the 18th of May?

A. It does refresh she got these on the same day of the termination and that it was issued.

Q. Okay. That's when she was presented with these?

Page 319

CATHY ANN PRICE

A. Yes.

Q. Okay. And while you were in that meeting with -- with Reema Vora and Ms. Parker for her termination, is that -- did you see Ms. Parker fill out this information at that time?

A. I do recall her writing on the documents --

Q. Okay.

A. -- yes.

Q. Thank you.

And then the -- the last document I just want to ask you about is -- Exhibit 26 has some handwriting on the bottom of that as well.

Had you seen that handwriting on the bottom of that exhibit prior to today?

A. No.

Q. And that's not your handwriting?

A. No, it's not.

Q. Okay. One other thing that I want to ask you about was video cameras. I know there were some questions that were asked of you previously about that.

At any time did you try to find video

Page 320

CATHY ANN PRICE

footage of -- that would substantiate or dispel any of these litigations -- I'm sorry -- any of these allegations?

A. We did, when it was the allegation about going back and forth between SPEAR and ATA with Ms. Parker and Mr. Jennings. But when we looked at the -- the footage again, it's in certain spots in the warehouse and it didn't cover the main area of the warehouse, so we didn't -- we didn't have anything to look at. We didn't have any footage of the individuals or any of the employees in the common area.

Q. Okay. And -- and just so that's clear, you said "we." Who are you referring to as "we"?

A. Oh. Reema, as the company itself.

Q. Okay. But you were the one that looked for the video?

A. Yes.

Q. Okay.

MR. WALSH: Thank you. I have nothing further.

Page 321

CATHY ANN PRICE

- - -

EXAMINATION (CONTINUED) BY COUNSEL FOR PLAINTIFF

- - -

BY MS. WASIK:

Q. When did you review this video footage?

A. A date, I can't recall. It would be the time that I got the complaint from Mr. Jennings, I believe. And I tried to see if there was any evidence of it on video camera.

Q. And was that the verbal complaint from Mr. Jennings or the formal written complaint?

A. The verbal.

MS. WASIK: Okay. That's all.

MR. WALSH: We'll read and sign.

MS. WASIK: Thank you.

THE VIDEOGRAPHER: Off the record at 5:30 p.m. This is the end of today's testimony of Cathy Price.

CERTIFIED STENOGRAPHER: Regular delivery for your transcript?

MR. WALSH: Yes, regular is fine.

MS. WASIK: Regular. And can we

CATHY ANN PRICE

get a rough draft?

CERTIFIED STENOGRAPHER: Yes, I'll send you a rough draft shortly.

- - -

(Witness excused.)

- - -

(Deposition concluded at 5:30 p.m.)

C E R T I F I C A T E

DISTRICT OF COLUMBIA:

I, Cindy L. Sebo, a Notary Public within and for the Jurisdiction aforesaid, do hereby certify that the foregoing deposition was taken before me, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said deponent was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true record of the testimony given by the witness; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

WITNESS my hand and official seal this 3rd day of March, 2020.

[signature]

______________________________

Cindy L. Sebo, RMR/CRR/RPR/CSR/CCR/RSA,
LiveLitigation Authorized Reporter
Notary Public

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

E R R A T A

PAGE LINE CHANGE
____ ____ ______________________________
Reason For Change: ______________________________

PAGE LINE CHANGE
____ ____ ______________________________
Reason For Change: ______________________________

PAGE LINE CHANGE
____ ____ ______________________________
Reason For Change: ______________________________

PAGE LINE CHANGE
____ ____ ______________________________
Reason For Change: ______________________________

PAGE LINE CHANGE
____ ____ ______________________________
Reason For Change: ______________________________

PAGE LINE CHANGE
____ ____ ______________________________
Reason For Change: ______________________________

PAGE LINE CHANGE
____ ____ ______________________________
Reason For Change: ______________________________

Page 326

Page

E R R A T A

PAGE LINE CHANGE

____ ____ ____________________________________

Reason For Change: ________________________________________

PAGE LINE CHANGE

____ ____ ____________________________________

Reason For Change: ________________________________________

PAGE LINE CHANGE

____ ____ ____________________________________

Reason For Change: ________________________________________

PAGE LINE CHANGE

____ ____ ____________________________________

Reason For Change: ________________________________________

PAGE LINE CHANGE

____ ____ ____________________________________

Reason For Change: ________________________________________

PAGE LINE CHANGE

____ ____ ____________________________________

Reason For Change: ________________________________________

_________ ____________________________

Date CATHY ANN PRICE

Page 327

Page

ACKNOWLEDGMENT OF DEPONENT

I, _______________________, do hereby certify that I have read the foregoing pages, 1 to 322, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached errata sheet.

_________ ____________________________

DATE SIGNATURE

Subscribed and sworn to before me this _____ day of____________, 20_____.

My Commission expires:

____________________________

____________________________

Notary Public

Exhibits

**EX 0001 Cathy Price 022520** 5:14 16:24,25 87:16 91:14 271:4,13 295:20
**EX 0002 Cathy Price 022520** 5:19 21:6 22:13 49:5,6 166:18 183:3 199:8 266:23 268:20 269:2 296:8
**EX 0003 Cathy Price 022520** 5:23 59:9,10 64:10 163:9 167:21 271:3 279:11 293:25 297:7
**EX 0004 Cathy Price 022520** 6:6 66:3,4 75:8, 20 162:20 163:2,5,8 168:5,15 279:18 293:19
**EX 0005 Cathy Price 022520** 6:9 74:3,4 76:24 77:24 82:16 271:22 313:8
**EX 0006 Cathy Price 022520** 6:15 83:3,4 264:19 273:20
**EX 0007 Cathy Price 022520** 6:18 97:23,24 101:25 102:19 169:22 170:9,19 281:10 282:12 285:17
**EX 0008 Cathy Price 022520** 7:6 12:17 99:3,4 286:7
**EX 0009 Cathy Price 022520** 7:10 99:23,24 286:14
**EX 0010 Cathy Price 022520** 7:15 103:17,18 119:11 287:8
**EX 0011 Cathy Price 022520** 7:18 132:12,13 141:9 171:21 207:6,7
**EX 0012 Cathy Price 022520** 8:6 137:18,19 138:11 288:9 290:10 291:2 292:23 297:15
**EX 0013 Cathy Price 022520** 8:9 150:14,15 158:10 159:21 172:24 260:22 261:2 296:14
**EX 0014 Cathy Price 022520** 8:16 160:10,11, 19 199:6 252:17 263:16 266:24 280:14 281:9 290:4,8,25
**EX 0015 Cathy Price 022520** 8:21 167:3,4 194:16 196:16 197:22 201:5
**EX 0016 Cathy Price 022520** 8:25 173:18,19
**EX 0017 Cathy Price 022520** 9:6 185:12,13 317:11
**EX 0018 Cathy Price 022520** 9:8 202:15,16 203:24
**EX 0019 Cathy Price 022520** 9:14 209:16,17 218:9 226:17 233:3 247:18 250:11
**EX 0020 Cathy Price 022520** 9:17 227:14,15 230:11 232:13 249:25 258:20
**EX 0021 Cathy Price 022520** 9:23 233:8,9 247:18
**EX 0022 Cathy Price 022520** 10:6 236:5,6 296:15,21 317:18
**EX 0023 Cathy Price 022520** 10:8 244:11,12 317:20 318:14
**EX 0024 Cathy Price 022520** 10:12 288:18,19 302:23
**EX 0025 Cathy Price 022520** 10:15 297:21,22 299:18 303:17
**EX 0026 Cathy Price 022520** 10:20 301:19,20 319:14
**EX 0027 Cathy Price 022520** 10:22 303:10,11
**EX 0028 Cathy Price 022520** 11:6 305:3,4
**EX 0029 Cathy Price 022520** 11:10 307:15,16
**EX 0030 Cathy Price 022520** 11:15 316:11,12

0

**000171** 236:7
**000172** 236:7

1

**1** 12:10 16:25 87:16 88:24 89:15 91:4,14 165:19 172:24 236:20 271:4,13 295:20
**10** 103:15,18 119:11 149:15 287:8
**10/9/2015** 100:16
**100** 26:17 28:16 54:23 71:5,25 140:20 189:2 229:20 241:25 243:21 248:18 264:15 287:15 288:3 291:6 294:6 307:8 311:24 318:12
**1000** 12:19 108:9
**10:47** 87:15,19
**11** 132:13 141:9 146:16 148:7 149:15 171:21 207:6,7
**11:10** 87:19,22
**11th** 209:7
**12** 137:13,19 138:11 288:9 290:10 291:2 292:23 297:15
**12/1/2015** 99:17
**12:51** 183:2,5
**12th** 218:6 219:14 232:18 249:8
**13** 27:10 150:15 158:10 159:21 160:23 161:15 162:7 172:24 193:14 260:22,23 261:2 296:14
**13th** 280:5
**14** 160:6,11,19,21,24 199:6 252:17 259:5 260:23 263:16 266:24 280:14 281:9 290:4, 8,25 296:14

**14th** 280:5
**15** 167:4 194:16 196:16 197:22 201:5 258:21
**15th** 98:17
**16** 173:19
**16th** 209:7 237:9,11 245:7 280:4,6 287:13
**17** 106:14 108:11 185:13,17 317:11
**17th** 237:11 252:24 253:15,23 254:25 255:5 256:5,18 257:25 280:4,6 281:6 289:6 290:14 291:9 314:13,14 317:25 318:10
**18** 202:16 203:24
**18th** 152:2 196:25 198:2 237:11 242:20 245:7 253:14 254:7 255:22 256:5 257:23, 25 280:6 281:6 298:10 302:12 304:11 318:20
**19** 209:17 218:9 226:17 233:3 247:18 250:11
**1:17** 176:18
**1st** 49:24 83:19 84:2 219:4,11,19 220:23, 24 222:8,18 223:2

**2**

**2** 21:6 22:13 48:24 49:6 87:23 166:18 183:3 199:8 266:23 268:20 269:2 296:8
**20** 28:20 41:9 151:25 227:15 230:11 232:13 249:25 258:20,21
**20-** 28:16 168:13 280:10
**2000** 25:17,18 26:16
**2001** 26:3
**2002** 26:16
**2010** 27:9
**2012** 27:9
**2013** 104:7
**2014** 26:21,22 27:19 49:21,24 52:25 89:18 93:16,24 94:3,8 101:5,6 168:13
**2015** 29:11 52:25 53:2,4 54:6 55:12 65:4 89:18,21,24 90:4,12,13 91:6 92:14 94:8 101:5,12 133:6,8,11,15 135:11 136:11 139:11,17,18 140:24 168:13
**2016** 29:11 52:25 67:16,17 81:12 83:13,19,25 84:2 89:4,6,12,21 90:9 92:13 94:9 98:18 101:14,16,18 102:5 136:11 138:11,23 139:11,21,25 140:7 151:4,12,21 152:20 154:18 204:7,9,10 205:9 208:5 211:17 212:20 213:12 218:7 219:4 237:10 249:9 252:24 253:14,15,23 254:7,22,25 280:10, 12 289:6 314:14 318:10
**2016/2017** 104:22
**2017** 28:15
**2018** 28:16
**2020** 12:6,21
**205** 107:25
**21** 233:9 247:18 258:21
**21st** 151:22,24 152:2, 20 154:17 158:7 198:22 199:3 241:22 242:21 254:19,22
**22** 236:6 296:15,17,21 317:18
**22nd** 197:2 198:3 199:9 204:10 242:21
**23** 244:12 296:15,18, 21 317:20 318:14
**232** 163:10
**235** 261:3
**238** 276:25
**24** 288:19 302:23
**24th** 308:10 309:17
**25** 297:22 299:18 303:17
**25th** 12:21 150:10 151:4,12,21 156:3,5 157:24 158:11 163:6 164:15,22 165:13,15 241:21,22 254:15,16, 19,22 261:15 271:8, 14 272:7,10,20 306:20 307:4
**26** 12:6 301:20 319:14
**26th** 49:21
**27** 303:11
**27th** 194:22 286:11
**28** 305:4
**29** 307:16
**29th** 204:13
**2:00** 41:7 184:3,11
**2:23** 176:16
**2:30** 176:15
**2nd** 138:11 140:7 204:7,9,10,14 205:9 211:17 212:20 213:24 219:16,19 220:4,7 222:24,25 223:2 227:2

**3**

**3** 59:10 64:10 162:8 163:9 167:21 184:12 236:20 271:3 279:11 293:25 297:7
**30** 316:12,19
**30(b)(6)** 12:9 17:4
**30th** 88:24 89:16
**31** 316:17
**31st** 98:17
**32** 316:17
**3:57** 279:10,14

**4**

**4** 17:20,21 66:4 75:8, 20 162:20,21 163:2, 5,8 164:3 168:5,15, 17 212:7 279:18 293:19
**4/21** 157:14
**4/25** 195:10

**401** 108:2
**45** 102:6
**4:15** 279:14,17
**4:52** 312:25 313:4

**5**

**5** 74:4 75:20 76:24 77:24 82:16 141:11 164:9 165:12 271:22 313:8
**5/1** 218:15,22
**5/16/2015** 100:16
**5/17** 253:10,11
**5/18/16** 318:16
**52** 119:12 130:15
**53** 112:18
**5:23** 313:4,7
**5:30** 321:20 322:10

**6**

**6** 17:24 83:4 165:18 264:19 273:20
**62** 171:22
**64** 143:21
**69,365** 85:3

**7**

**7** 83:13 97:24 101:25 102:19 142:12 168:19 169:22 170:9,19 281:10 282:12 285:17

**8**

**8** 99:4 286:7
**8:17-CV-01648-TDC** 12:17

**9**

**9** 99:24 261:3 286:14
**9/25/2015** 99:17
**9:00** 41:6,7
**9:29** 12:6,25

**A**

**A&m** 25:6
**a.m.** 12:6,25 87:19
**ability** 226:21 261:7,18,19
**absence** 237:7
**Absolute** 93:13
**abusive** 222:7 239:24
**abusively** 223:13
**access** 265:3
**accordance** 36:8
**account** 96:5,10 216:7 217:25 232:24 265:11 274:8 290:7
**accountable** 46:4
**accounts** 234:25
**accuracy** 140:20
**accurate** 15:6,18 121:24 122:19 181:17 209:8 228:22 254:15
**accusation** 249:17 278:7
**accusations** 122:23
**accused** 172:6
**acknowledged** 140:12 283:2
**Acknowledgement** 137:20
**acknowledgment** 135:17 139:2,5,15 140:23 207:3 307:17
**Act** 214:10,18
**acting** 249:14
**action** 30:25 31:10,12 34:6 115:7 128:7,13 130:6 238:2,4,7,20,22 241:4 245:16 248:22 251:17,19 252:7,11 295:8
**actions** 34:9 111:13 113:10 114:7,15 170:2,4 171:14,15 296:9,12,23
**active** 80:12 178:3
**activity** 130:25
**actual** 145:3 300:19
**add** 159:9
**added** 75:25 76:9,11,21 77:15,17,20 159:2,22 165:13
**Addendum** 64:12 69:7
**addition** 165:11 240:7 277:4
**additional** 69:10 84:13 97:15 168:10 171:24
**address** 186:16 284:18
**addressed** 40:7
**addressing** 30:15 46:7 212:10 268:13
**adjustments** 97:13
**administered** 108:25
**administrating** 27:25
**administrative** 29:16 30:7 50:20 55:9
**admitted** 283:2
**advance** 106:23 261:7,19
**adverse** 129:21
**advice** 30:13 147:21,22
**advise** 231:10 237:25 238:4 239:6,8
**advised** 237:17,19,20,24
**advisement** 238:14
**advising** 238:6,10
**affair** 158:16
**affect** 48:15
**affecting** 47:23
**affects** 48:10
**afternoon** 257:7
**agency** 107:14
**agitated** 278:21
**agree** 56:21 275:4,13,17
**ahead** 43:12 44:17 70:5 237:17
**Albemarle** 26:13,15
**all-hand** 42:25 46:21
**all-hands** 41:12,17,22 42:19 43:8,23 44:12 45:5,21,24 46:16,24 47:3,8,15 48:2,6,11,14 158:5,6 198:13,20 199:3 202:9 267:11 269:14,16

**all-staff**  42:7
**allegation**  222:23
  275:24 276:4 278:12
  320:5
**allegations**  124:24
  169:13 174:14 221:12
  224:23 320:4
**alleged**  128:7 142:16,
  22 143:2,17,18
  148:10,23 171:2,5,9
  172:3,10 199:18
  212:21 264:5 270:12
**allowed**  199:10 289:16
  301:13
**Alpha**  16:10
**and/or**  43:7 127:21
  197:18
**Angela**  51:16,19,20
  67:22 68:5,6,24 75:3
  100:14 177:11 178:12
  186:6,10 190:3 191:8
  301:7 305:5
**ANN**  12:1 13:1,7 14:1
  15:1 16:1 17:1 18:1
  19:1 20:1 21:1 22:1
  23:1 24:1 25:1 26:1
  27:1 28:1 29:1 30:1
  31:1 32:1 33:1 34:1
  35:1 36:1 37:1 38:1
  39:1 40:1 41:1 42:1
  43:1 44:1 45:1 46:1
  47:1 48:1 49:1 50:1
  51:1 52:1 53:1 54:1
  55:1 56:1 57:1 58:1
  59:1 60:1 61:1 62:1
  63:1 64:1 65:1 66:1
  67:1 68:1 69:1 70:1
  71:1 72:1 73:1 74:1
  75:1 76:1 77:1 78:1
  79:1 80:1 81:1 82:1
  83:1 84:1 85:1 86:1
  87:1 88:1 89:1 90:1
  91:1 92:1 93:1 94:1
  95:1 96:1 97:1 98:1
  99:1 100:1 101:1
  102:1 103:1 104:1
  105:1 106:1 107:1
  108:1 109:1 110:1
  111:1 112:1 113:1
  114:1 115:1 116:1
  117:1 118:1 119:1
  120:1 121:1 122:1
  123:1 124:1 125:1

126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1,5 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1
273:1 274:1 275:1
276:1 277:1 278:1
279:1 280:1 281:1
282:1 283:1 284:1
285:1 286:1 287:1

288:1 289:1 290:1
291:1 292:1 293:1
294:1 295:1 296:1
297:1 298:1 299:1
300:1 301:1 302:1
303:1 304:1 305:1
306:1 307:1 308:1
309:1 310:1 311:1
312:1 313:1 314:1
315:1 316:1 317:1
318:1 319:1 320:1
321:1 322:1
**announcement**  294:9
**annual**  99:14 100:9
**annually**  95:19 139:9
**annuals**  101:21
**answering**  30:10
**antagonize**  220:17
  248:2
**antagonizing**  221:18,
  22 222:2 223:11
  248:5
**anyone's**  166:8
**anytime**  206:5 293:14
**apologize**  191:15
**apologized**  191:22,25
**apparent**  273:21
**apparently**  153:11
  156:19 222:14 239:23
  260:13 274:13 278:18
  285:8
**appearances**  13:2
  142:2
**appearing**  17:12
**applications**  29:17
**applied**  60:19 61:7,9,
  10
**applies**  105:22
**apply**  60:22 105:14,
  15,18,25
**appraisal**  118:14
**approached**  196:13
  199:17 267:18 269:17
**approaching**  218:20
  220:13
**appropriately**  57:16
**approval**  208:13 237:5
  244:22,24
**approvals**  208:17
**approve**  37:24 58:12
  84:8,11

**approved** 60:16,24 67:5,7
**approximately** 25:15 26:14 27:6 57:2
**April** 83:13 150:10 151:4,12,21,24,25 152:20 154:17 156:3,5 158:7,11 163:6 164:15,22 165:13 194:22 196:25 197:2 198:22 199:3 204:13 241:21,23 253:14 254:7,15,16,22 261:15 271:8,14 286:11 306:20
**area** 118:2 218:12,21 220:18 222:5 300:17 320:10,13
**areas** 180:17 226:5,7,10 245:23
**argument** 191:4
**arguments** 122:21
**arise** 118:15,16,17
**Arnel** 152:17 157:16 175:20,25 180:4 200:2 241:11 269:8,9
**arrival** 198:11
**assess** 241:20
**assigned** 64:21,22
**assistant** 26:12 29:7,9,13 66:18,21 67:20 68:8 69:3 73:21 75:2,8,9,12,18 82:19 84:4 102:21
**assume** 14:10 194:3 196:13 233:5 242:11 244:8 250:16 251:5 305:20 308:11
**assuming** 194:3 210:7 211:3 222:15 234:13 282:3
**assumption** 282:7 284:8
**assurance** 75:25 76:19
**ATA** 81:23 84:22 234:7 320:6
**attached** 166:19 294:8
**attempt** 259:23
**attend** 204:22,24 207:25
**attendance** 44:14
204:18 205:14
**attended** 204:17 205:2
**attending** 189:25
**attention** 152:13 176:25
**attest** 18:7 40:20 131:6 159:17 214:16 243:5 247:9 285:3
**attitudes** 268:14
**attorney** 14:3 18:25 88:10
**attorney-client** 291:18
**attorneys** 18:24
**audibly** 14:17
**authority** 36:21 37:17 38:6 235:3,9,11
**Avenue** 12:19
**avoid** 141:15,23
**aware** 40:15 78:18 96:14 110:21 117:15 127:22 150:5 175:17 177:13 179:16 213:14,19 215:7 219:22 220:3 229:16 310:15
**awareness** 181:21 215:6

**B**

**Bachelor's** 25:11 32:9
**back** 23:15 45:19 46:11,12 47:15 57:13 64:10 70:22 71:4 77:23 95:12 108:11 115:20 119:9,11 152:19 158:10 159:13 167:20 168:12 171:20 187:9,12 188:17 190:19 191:2 195:4 201:4 220:23 222:18 226:9,16 230:10 239:22 241:20 245:6 248:19 251:16 252:15 268:24 273:19 276:2 281:8,23,25 290:24 291:2 300:12,13,17,18,23,24 302:23 310:25 312:19 320:6
**background** 24:25 214:16
**based** 88:9 126:12 128:21 129:18,25 130:8 145:4 162:16 227:2 269:2,4 272:21 274:22 293:3
**basic** 37:14
**basically** 36:3 143:5 193:20 217:24
**basis** 165:23 282:12 291:17 314:24
**Bates** 49:6 59:10 66:4 74:5 83:4 97:25 99:5,25 103:19 132:15 137:21 150:18 160:14 185:13 202:18 209:18 227:15 233:10 236:6 244:12 288:19 297:22 301:20 303:11 305:5 307:17
**Bates-stamped** 112:20
**began** 52:16 156:11
**begin** 120:21 124:22 232:25
**beginning** 87:22 162:25 184:11 262:17 279:17 313:7
**begins** 17:20
**behalf** 12:24 17:16
**behavior** 44:7 110:4 142:22 152:22 153:6 154:2 155:2 156:13 169:2 174:24 175:2,7,10,21 189:15 239:19 259:12,14 263:10,20 264:9 265:17 267:3,23 270:3 272:13 283:17 284:23 287:7 290:16 294:16
**belief** 285:23
**benefit** 27:23 29:17
**benefits** 35:3
**big** 156:21 281:11
**bigger** 270:17
**billing** 68:10
**binder** 23:5
**binders** 18:17 20:4,6
**Birgans** 216:8,13,15 217:17 233:20 235:25 248:23 265:13,19 266:8

**bit** 24:25 50:20 184:18 222:3
**body** 179:18 212:25
**bold** 252:2
**book** 208:20,21,22,23 209:2
**boss** 116:15,19 239:25 272:25 274:4
**bottom** 17:21 79:25 106:8 113:3,7 119:13 130:19 141:10 201:5 232:11,17 236:19 238:20 244:4 251:3 252:20 264:19 295:10 302:10 317:11 319:15,17
**bound** 179:3
**boxes** 162:9
**break** 14:22,25 22:14 86:15,18 92:15 93:5 94:24 95:13 182:21 184:18 279:7 280:18 312:19
**breaks** 122:22
**breath** 163:20 167:15, 24
**bring** 20:25 48:11,14 93:18,20 115:15 146:19 165:5 186:25 187:9 269:23 270:23
**bringing** 23:18 267:18
**brings** 115:21 146:2
**brought** 88:4 95:10 123:10 146:11 169:16 176:24 178:15 184:23 221:11 265:6 269:21 270:17,21 271:5,9 274:17 278:11 286:24
**building** 300:20
**bullet** 130:18 144:18
**bunch** 113:2
**business** 48:5 110:7 245:9

**C**

**calendar** 281:11 316:12
**call** 40:5 42:19 43:5 155:18 202:11,12 211:23,25 237:15 239:10 245:4,5
**called** 41:24 42:6 43:2 45:21 46:21 47:3,8 154:15 184:6 211:18,19 219:16,17 282:21
**calling** 46:22
**camera** 321:11
**cameras** 226:4 319:22
**candidate** 61:11,13, 19,21,24
**capture** 125:8
**care** 260:15,17
**careful** 129:20
**Carlos** 216:10,14,23 233:9,19,21 248:23 266:4 297:9
**Carter** 216:12,23 217:17 233:10 234:16,21 248:23 289:11,15
**Carter's** 233:21
**case** 12:15,17 15:22, 24 23:22 86:20 88:10 89:15 90:4,18,21 91:13 129:13 149:7 214:21 229:24 240:14,15 256:11 257:10 273:6 305:17
**cases** 148:25 245:2
**categories** 162:9
**Catholic** 34:21
**Cathy** 12:1,11 13:1,7 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1,24 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1,5, 12 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1

254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1,18 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1 309:1 310:1 311:1 312:1 313:1,8 314:1 315:1 316:1 317:1 318:1 319:1 320:1 321:1,21 322:1

**caused**  230:12 278:15
**causing**  192:18
**cease**  240:3 287:10
**ceasing**  246:11
**cell**  300:14 304:18
**certification**  79:8
**CERTIFIED**  65:18 79:18 103:14 137:14 160:7 185:18 298:5 304:2 307:23 316:9,16 321:22 322:3
**chance**  99:12 250:9 282:9,15 296:16
**change**  42:23,24 56:16 67:23 73:5 82:16 83:23 84:9,23,24 85:2 105:4 135:13 188:4 311:12,14
**changed**  83:15 140:18
**changing**  42:21
**channels**  45:14
**charge**  146:10,22 147:17 148:3,4
**charges**  146:2,4,19
**Charities**  34:21
**checked**  162:12
**checking**  38:17
**checks**  312:11

**choice**  70:4
**choose**  179:22
**chose**  162:11 293:7
**chronological**  264:13
**Cindy**  12:23
**circumstances**  113:20
**Civil**  214:10,18
**claim**  147:10 217:25 228:17 229:9,18 231:4 234:15 255:8 261:21,25
**Claiming**  212:23,24
**claims**  213:3 240:18, 20 262:23 263:24 273:7,10 288:10
**clarification**  257:20 283:3
**clarify**  129:4 279:22
**clarity**  191:12
**classified**  95:2,6
**clean**  141:15
**clear**  71:2 131:15 269:24 291:7 320:15
**clerk**  29:7 50:8,16 52:9 54:22,24 55:3, 4,8,16 57:19 82:2,5
**clerk's**  37:13
**clerks**  37:13 50:18 85:16,17
**client**  44:4 58:6,7,13 72:11 107:15 281:14, 16,17,20,23,25 282:5,10,21,24,25 283:6,21 284:3,12 285:7,12,22 311:9,12
**close**  277:5
**closure**  186:25 192:17
**co-counsel**  194:19
**code**  177:15
**collect**  96:17 125:13
**collected**  145:12 146:24
**college**  25:3,6
**comfortable**  120:5
**comment**  193:2
**commenting**  141:25
**Comments**  244:5 251:4
**commissing**  141:25
**Commission**  27:14

**common**  320:13
**communicate**  149:9
**communicated**  127:3
**communication**  112:8 287:11
**communications**  176:5
**company**  17:17 80:7,17 81:4,9 105:20 107:14 108:8 110:6 122:10 126:21 134:23 193:22 261:7,20 293:10 300:11 320:17
**compare**  82:5
**complain**  151:18 155:4 268:18 271:6,11 287:6
**complainant**  124:20 129:14,17 130:6,10, 13 149:2 170:22,24
**complained**  151:24 175:16 218:11 309:21
**complaining**  129:22 152:16 174:20 220:6, 12
**complaint**  120:18,21, 23 121:2,21 124:3,19 127:4 129:5,11 142:13 145:7 148:9 151:16,18,21 152:4, 5,8,20,21 153:5,7 154:14,18,23,25 155:6 158:2,19,21 159:4,9 161:24 164:23,25 165:9 168:8 169:11 170:21 171:17,18 172:16,24 173:5,8,13 174:6,23 175:19 176:13 184:19,21,23 186:19 187:4 189:12,22 210:2 211:14 212:5 213:15,17,19,25 214:2,23,24 215:2,5, 8,23 216:2,6 218:14, 19 219:11,18,23 220:3,5,16 221:23 222:9,12 226:18 228:8,12 245:24 246:20,23 250:22 254:14 256:5 257:24 260:2,5 262:25 268:4 270:10 271:8,15 273:12 280:20 284:24

286:16,19,21,23
287:3 294:22 295:20,
22 296:4,5 310:5
314:10 321:9,12,14
**complaints**  31:3 33:20
39:6,8,14 120:13
123:19 127:12 146:11
153:23 263:25 310:12
**complete**  13:24 64:16,
18 96:19 101:16
253:10
**completed**  26:7 101:20
124:8 253:3,6
**completely**  281:22
**compliance**  35:4 71:8,
14,23 73:6,14,17
202:17 204:4
**compliance/logistic**
73:12
**con**  149:5 275:22
**concern**  193:23
**concerned**  31:21
187:13
**concerns**  192:21
199:10 243:12
**conclude**  276:7
**concluded**  228:7
254:24 276:11,17
285:25 300:3 322:10
**conclusion**  145:3
147:6,12 169:20
171:7,10,13 212:14
228:15
**conduct**  44:6 86:10
95:14 107:19 108:6
110:3 128:25 130:22
142:3 152:23 157:18
175:15 177:16 189:16
199:12 259:12,20
260:8 263:10,25
264:9 267:3,23
268:13 270:4 272:14,
22 283:17 290:15
293:9
**conducted**  65:14,15
95:18 264:20 294:19
**conducting**  39:13
270:11
**conference**  27:5,8,13
298:20,21
**confided**  178:18
274:14

**confidential**  127:19
**confidentiality**
127:11 149:6
**confirm**  180:23 224:23
**confronted**  152:24
157:17,22
**confused**  219:9
**conjunction**  294:16
**connection**  69:11
102:20
**consideration**  212:16
256:13 258:8,23
**considered**  226:25
**consultation**  238:8
239:9 245:18
**Consulting**  12:9,14
17:3 132:15 134:17
150:15 160:11 311:23
**contact**  281:14 283:21
**contained**  94:15 195:8
**content**  96:22 164:4
174:13 181:10
**contents**  93:23
**context**  33:8
**continuation**  247:14
**continue**  116:24
240:12 269:19
**continued**  80:5 174:5,
7,9 175:3,10 184:6,
14 239:16,18,23
240:6 246:11 247:22
321:3
**continues**  17:24 75:4
149:7,8 222:4
**continuing**  173:9
220:17 240:5 248:5
**contract**  35:15 36:6,
7,20 47:25 58:6
67:18 70:3 71:18
81:24 84:22 103:8
107:11,13 110:6
188:18 192:19 234:8
281:17 311:11,13,23
**contracting**  36:2 58:5
**contracts**  35:5 42:21
83:15
**contrary**  169:17
**control**  46:11,12,14
66:21 71:8,14,24
73:6,18 75:10,12,14
190:19 292:4

**conversation**  77:19
112:6 115:17 129:16
132:2,4,5 142:2
153:19 156:20 157:20
165:15 175:3,8,18
196:10,14,17,20
216:23 220:11 227:2
231:7,9,24 232:3
243:17,19 249:2,4
255:13 263:5 265:21
281:22 284:21 292:6
**conversations**  45:19
124:10 131:12 141:15
174:9 175:10 176:10
240:4,13 243:3
246:11 250:24 256:9,
10 257:10 268:11
274:11 275:21,22
277:20,21 278:19
280:24 281:5
**converted**  67:25
**coordinate**  31:20
**coordination**  27:24
50:24
**coordinator**  59:23
62:7 74:20 197:9
**copied**  86:21 178:20
179:15 181:20 247:11
315:10
**copies**  21:8,19 22:14
317:8
**copy**  136:5 195:9,10
208:19
**core**  41:6
**corner**  106:8 210:18
236:20
**corporate**  35:21
**Corporation**  16:10
26:13
**correct**  35:23 39:9
47:12,14 48:16 58:16
62:18 63:5 72:5
77:24 82:12 92:11,12
100:11,12 105:9,10
111:13 112:20
113:16,20 114:12
118:6 121:20 129:6
130:3 133:7 136:11
142:23 148:18 154:24
157:3,10 158:23
159:10 168:7 172:8
182:9 200:5 237:12

252:25 253:24 255:25 272:15 277:9 286:4 294:12,23 295:3 306:2,6
**correction** 63:10 301:6
**corrective** 113:10,13 238:2,4,7,19,22 241:4 245:15 248:22 251:17,19 252:6,11
**correctly** 46:18 47:2 50:17,22 72:4 111:16 121:19 153:25 190:16
**correspondence** 211:10
**counsel** 13:12 15:20 31:15 34:7,13 38:12 95:5 104:15 110:15 115:12,17 125:16 126:14,20,22 127:21 134:4,6 145:13,16,17 147:2,18 161:9,13 184:14 187:8,25 188:22,24 189:2 228:5,10,18,23 229:12 230:2 237:22 238:9,13,14,22 239:3,9 241:7 244:24 245:18 253:6,7,10 255:4,6 256:3 257:16,18,23 258:22 262:10,15 263:5,7 280:15,17,20,25 290:4 291:13 292:3, 13,14,16 295:17,18 296:20 299:7 304:8 317:3 321:3
**country** 68:15 72:16
**couple** 65:6 72:10 201:22 317:6
**courses** 64:17,19 69:10
**court** 12:15,23 13:25 14:19
**cover** 89:3,11 98:16 99:16 100:15 226:10, 14 320:10
**covers** 89:12
**coworkers'** 141:25
**create** 110:7 120:21 151:15 159:20 204:6 308:7
**created** 72:2 77:19 104:11,15 134:3 159:25 161:15 204:3, 12 308:5
**creating** 213:20 219:23
**cross** 76:3
**current** 84:20
**cussed** 156:14 274:19
**cussing** 272:24
**cut** 149:13

**D**

**D.C.** 12:5,20
**daily** 22:2 30:6 94:2
**damaging** 44:3
**date** 12:21 17:6 19:9 26:21 49:8,23 52:18 59:12 66:6 74:7 83:6,23 98:4 99:8 100:4 103:21 132:18 133:3,14,21 136:23 137:23 138:10,18 141:2 150:21 151:3, 12,21 154:17 160:16 167:7 173:21 185:15 198:4 202:21 205:9 209:20 215:16,17,20 218:4 219:14 224:15 225:19 227:18 230:24 233:12 236:9 237:8,9 238:17 244:15 246:18 249:3 250:16,19 252:18,22 253:2 254:6 255:3,11,20 256:12 272:5 280:23 288:21 289:5 294:7 297:25 298:8 301:22 303:14 305:8 306:13 307:20 316:14 318:16 321:8
**dated** 81:11 218:6 231:16 287:13
**dates** 28:17 157:11 237:12 253:14,18 262:16 279:22 280:5
**Daughtry** 62:16,19,20 99:19
**day** 40:5,23 50:3 117:17 165:13 176:14 185:2,3,4,5 200:10 211:20 212:2 248:17 254:9 255:18 256:24 268:4 272:6,7 297:17 298:11 318:22
**day-to-day** 22:2
**days** 40:24 41:5 102:6 185:3
**deal** 30:15 174:13 212:16 284:10 315:5
**dealing** 190:10
**December** 49:24
**decide** 39:24 58:13 88:7 109:2,15 125:19 126:3,5 147:16 168:22 293:11 314:8
**decided** 71:14
**decides** 130:4,6
**deciding** 58:2
**decision** 31:18 40:3 58:19 110:11 115:9, 14 127:2 145:8,21 147:3,18 187:14,18, 21,23 228:19,23 256:12 257:24 262:7 263:9 272:19 280:19
**decision-maker** 38:23, 24
**decisions** 291:22 292:4
**deemed** 95:6
**defame** 285:18
**Defendant** 17:2 317:3
**define** 155:8 252:4
**definite** 194:2
**definition** 145:4 172:11
**definitions** 171:24
**degree** 25:8,10 32:9
**delegate** 38:19
**delivered** 119:8 180:24 204:14
**delivery** 321:23
**Demarcus** 42:8,10,11 51:5,12 62:14 77:5,6 78:23 95:25 152:6,9 153:16,17 157:20 177:10,11 178:16 181:8 186:7 190:3 199:19 203:11 224:3, 4 259:18,23 264:25 265:12 268:21 272:5

277:25 278:3,25 293:8 296:10,24
**demote** 293:7
**demotion** 114:20 115:7
**denied** 217:25
**department** 67:21 68:9 260:16 289:13
**depending** 37:6 39:19 42:20
**depends** 58:5 128:10
**deposed** 15:10,14
**deposition** 12:9 13:22 16:24 17:2 18:13 49:5 59:9 66:3 74:3 83:3 91:8,19 97:23 99:3,23 103:17 132:12 137:18 150:14 160:10 167:3 173:18 185:12 202:15 209:16 227:14 233:8 236:5 244:11 288:18 297:21 301:19 303:10 305:3 307:15 314:23 315:6 316:11 317:11 322:10
**deputy** 36:16 42:11 95:25
**designated** 17:16,23
**designee** 109:23
**detail** 203:20
**details** 193:10 212:6 216:3 248:9
**determination** 38:14 187:3,7 228:11 229:3,8 230:3 231:3 255:7 256:4 274:7
**determine** 90:9 118:24 146:9,21 275:18 294:5
**determined** 148:9 229:17 273:25 292:11
**develop** 204:9 309:16
**development** 205:20 206:3
**difference** 116:18 144:21 148:2 288:4
**differently** 76:4 179:12
**difficult** 14:19
**dig** 140:21
**direct** 59:2 63:2,6,10 69:2 77:11 85:13
96:10 116:9 178:24 311:22
**direction** 42:24
**directive** 174:8
**directly** 36:14 72:25 165:5 179:17 181:11,15 196:4 197:13 231:11 242:23 250:10
**director** 27:4 34:20
**disagreement** 116:14,17,19 191:4
**disciplinary** 30:25 31:9,12 34:6,9 113:10 114:7,15 115:7 128:7 295:8 296:9,11,23
**discipline** 38:15,16,22 115:10 117:6,14 135:2 295:2
**disciplined** 294:11
**discovered** 119:2,6 304:18
**discrimination** 31:7 214:23 310:21
**discuss** 19:17 44:23,24 80:23 108:5 127:23 145:13 156:12 158:12 174:12 186:7 215:3 221:11 231:7 245:3 307:9,12
**discussed** 23:19 24:15,23 43:23 44:12,16,20 45:5 47:17 48:2 71:16 127:20 174:7 199:2 221:9 222:19 224:20 286:10 291:14
**discusses** 287:16
**discussing** 130:25 131:19 292:2
**discussion** 155:15 187:24 188:13 194:18 250:10 285:22
**discussions** 188:22
**dispel** 320:2
**disrespectful** 173:9 199:17 272:13
**disrupt** 110:5
**disrupting** 44:7
**disruptive** 45:15 142:8
**District** 12:15,16
**Division** 12:17
**doctrine** 214:20
**document** 16:22 17:9,13 48:22 49:13,19 56:4 57:6 59:6,16,21 65:23 66:10,14 74:11 98:8 99:11 100:7 103:11,25 104:12 115:22 117:23 124:7 132:10,25 133:4,20,23 134:3,9,11,15,19,22 137:8 150:25 151:8,15 159:21,24 160:5 166:22 172:20,22 173:16,25 174:3 185:8,22 186:2,4 194:16 204:2 207:9 209:13,23 210:6 222:17 227:9,12,23 233:16 235:17 236:14 243:18 259:3,5,16 271:20 288:13 292:20 297:11,19 299:19 301:17 302:6,7 304:4,20 305:13 308:3,20,21 317:15 319:13
**documentation** 124:9 144:17 161:21,24 247:10 291:20 295:11,14,15 297:10 305:23
**documentations** 230:6 253:8
**documented** 205:14 229:3,10 232:3 243:3
**documents** 18:16,22 20:4,8 91:9 97:21 117:5,9,13 207:16 297:7 309:13 317:23 319:9
**Don-** 224:4
**Donald** 152:16,18 157:17 175:20 176:2 199:25 242:4
**Donte** 52:13,16 54:3 90:23 91:3 92:16 93:2 152:15,24 157:22 159:5,6 165:11 169:3 173:6 174:18 179:19 180:5,19 189:10 199:16

210:3,16 212:21 215:8 218:18,19,20 223:8,11,15,19 224:3,23 232:25 247:15 249:14 269:7 276:5 277:25 278:4 286:16,19,21,23 295:25
**Donte's** 90:24 234:14
**door** 165:20 166:2,5, 7,10 201:23 202:2,3 203:2,4
**draft** 322:2,4
**drafting** 290:7
**due** 67:17 103:8 135:13,22 176:24 289:13
**duly** 13:8 184:7
**duties** 27:21 29:15 30:4 33:25 36:11 39:7,15 46:10 50:14 61:25 68:7 71:23 84:14,17,20

## E

**e-mail** 43:5,7 58:23 116:2 125:10 136:5,9 162:2,3,4 167:4,12 173:19 174:4,22 175:24 176:11,17,21 177:4,6 178:13,20 179:18,23 180:2,8, 13,20 181:7,10,14 182:3,7,8,14 185:13 186:5,10,14,16 188:2 192:15 194:21,25 196:2,16 197:21 200:21 206:9,17 210:10,25 211:2,4,10 216:9 225:22 226:2 227:15 228:2,6 229:5,11,14,24 230:13 231:18,25 232:23,24 246:10 247:11 249:23,24 287:15,16,18,19 288:5 289:22 294:8 301:20 302:10,11 303:4
**e-mails** 20:10 149:20 179:12 200:25 240:3
256:15 258:9,16 296:7
**earlier** 53:4 116:5 122:16 138:9 206:25 225:4 286:11 287:4 311:2
**early** 28:16 29:11
**easier** 26:23 251:24 317:9
**educational** 24:25
**EEO** 202:17 204:4
**EEOC** 20:11
**effect** 104:6,8 105:6 119:17 133:5,12,13, 16,24 134:7,19 135:4 138:15,18,20 139:10, 17 140:9,21,25 143:14 144:11 149:25 178:6
**effective** 49:23 83:19
**elaborate** 32:2 121:18
**else's** 96:4
**emphatically** 279:4
**employ** 111:6
**employed** 119:18,21
**employee** 27:25 30:14, 18,19 36:14 38:9 48:10 51:20 81:6 97:11,12,24 98:11,13 99:4,24 100:8 102:10 104:4 105:8 106:21 107:2 110:20,22 111:3,6,7,10 112:3,8 113:15,22,24 114:10 116:8 117:4,20,23,24 118:9,21,22 119:3,5, 7,24 131:2,19 134:25 142:19 143:15 179:3, 14 199:14 205:8 207:21 208:18 219:3 239:4 251:3 265:3 271:5,10 274:3 277:5,10 286:15,18, 20 310:4 311:7
**employee's** 97:8 115:13 244:5
**employees** 19:25 31:12 33:4,18 37:17 38:7, 16,17 46:7,9,12 47:11,16 48:15 56:2, 10,11,15 60:21 67:25 86:11 95:15 105:16, 19,25 118:12 120:13 122:21 130:25 131:12,14,18 132:3 134:18,21 135:15 136:3 138:24 139:4 141:14,20 142:6 149:12 152:15 153:13 155:4 156:12,14 166:3 175:11,15 178:25 181:18 188:15 199:10,11,15,21 200:11,14 201:22 205:13 206:10 208:9 214:19 230:9 239:19, 22,25 245:23 263:25 267:4,10,24 268:15 269:7,17 270:4,9,10 284:12,15 308:15 309:20 311:11,19 312:7 313:11 320:13
**employees'** 96:10
**employer** 16:9,13 78:3,4,8,10
**employment** 27:14,16 50:4,8 74:4 80:6 92:6 103:18 106:16, 22 262:3 291:23 303:23
**empowered** 31:11,13
**enacted** 177:23
**encounter** 248:24
**encourage** 120:8
**end** 28:13 29:11 41:8 78:21,25 87:15 101:9,23 106:14,21 128:5 141:24 161:16 162:25 168:13 183:2 186:21 247:25 279:10 321:20
**ended** 153:16 186:23 189:25 212:13 224:10,12 273:7 276:2
**engage** 243:17
**enrollment** 29:17
**ensure** 36:7 72:3 148:10,23 293:15
**entail** 30:5
**entailed** 281:22
**enter** 289:12,16
**entered** 127:17

**entire** 42:15 52:7 119:20 253:20
**entirety** 314:22
**Entries** 316:12
**entry** 106:2
**entry-level** 54:21,25 82:7,9
**environment** 31:5 141:18,21 187:16 189:21,23 210:3 213:20 215:2,5 219:24 221:23 228:14 240:21 250:21 260:4 263:24 265:16 273:12 284:24 310:12
**ER** 27:24
**erased** 304:19
**escalate** 126:21
**escalated** 152:11,14 153:15
**escalating** 158:15
**escorted** 300:24 301:11
**evaluation** 96:4 97:2, 6,25 98:12,16,20 99:5,13,25 100:9 102:7,12,20 118:17
**evaluations** 86:10 95:15,20,23 96:2,11, 16,24 100:18 101:20 103:2
**Evan-** 278:6
**Evangeline** 12:13 13:19 49:18 90:23 91:3 98:14 151:17 153:17 178:16 210:4 236:18 259:17 260:3 276:16 295:21 296:9, 12 298:25
**events** 176:24 305:4
**eventually** 29:6 74:19
**everybody's** 149:3
**evidence** 126:16,17 131:8 144:25 145:3, 5,18 146:23 147:7,24 169:15 228:16 229:9, 17 231:3 255:7 256:14 258:8,11 274:16 290:14 294:18 314:9,12 321:11
**exact** 19:8 26:20 52:18 133:14 198:4 218:4 230:24 233:24 262:12 280:23 300:5
**examination** 13:12 184:6,14 317:3 321:3
**examined** 13:9 184:7
**examples** 45:4,23 143:7
**exchange** 153:12
**excuse** 173:24 297:5
**excused** 322:8
**execute** 311:14
**executes** 311:17
**execution** 36:5
**exhibit** 16:24 21:6 22:13 23:14,16 38:18 49:5 59:9 64:10 66:3 74:3 75:8,20 76:24 77:24 82:16 83:3 91:14 97:23 99:3,23 101:25 102:19 103:17 119:11 130:16 132:12 137:18 138:11 141:9 150:14 158:10 159:21 160:10,19 167:3 171:21 172:24 173:18 185:12 193:12 194:16 196:16 197:22 199:6 201:5 202:15,25 203:24 207:5,6,7 209:16 218:9 226:17 227:14 230:11 232:12,13 233:3,8 236:5 244:11 247:18 249:25 250:11,19 252:17 258:20 260:22 261:2 263:16 266:24 280:14 281:9 288:18 290:4,8,25 296:14, 15,21 297:21 299:18 301:19 302:23 303:10,17 305:3 307:15 315:11,14 316:5,11 317:11,18, 20 318:14 319:14,17
**exhibits** 149:15 258:19 317:9
**existed** 317:23
**existence** 104:13 150:5 156:24
**expect** 251:18 252:10
**expectation** 181:2
**expected** 112:9 125:4 180:9,12
**expects** 293:16
**experience** 61:14
**experienced** 119:24
**expert** 35:14,25 36:19 178:22 179:3,13 311:3
**explain** 21:17,23 32:12 35:24 94:12 156:11 251:20 260:11
**explained** 156:14
**explicit** 141:23
**expose** 217:24
**exposing** 221:13
**exposure** 212:8,19,22 213:17,25 221:15 222:19
**express** 124:21 192:21
**extent** 92:21 109:6
**extreme** 108:7
**extremely** 45:12

**F**

**fabricating** 225:3
**face** 134:25 165:21 166:8,10 202:4 216:15,16
**fact** 153:10 203:9 220:12 221:18 260:18 274:17 278:10,21
**factor** 260:21
**facts** 126:12 128:11, 21 130:9
**factual** 129:25
**failing** 108:19 111:7
**fair** 47:24 48:13 72:20 176:3 258:6
**false** 146:2,4,10,19, 22 147:4,17 148:3,4 222:23
**falsifying** 225:2
**familiar** 35:9 52:12 70:8 74:14 142:17 233:17 304:4
**favorable** 170:10
**fearful** 261:6
**February** 12:6,21 53:25 55:12 98:17

196:12 199:9
**Federal** 27:5,8,13
**feedback** 80:18
**feel** 120:5
**feeling** 289:13
**feelings** 142:9 274:3, 15
**feels** 58:6 142:19
**fell** 260:21
**felt** 158:16 159:14 170:7,10 173:8 187:11 193:20 235:12 275:8
**Ferguson** 197:5,15 199:25 242:15
**figure** 75:23 262:10 267:25
**file** 96:20 100:21 103:4 127:17 158:19 159:3,8 173:13 208:19 227:9 262:25 268:4 286:16,19,21, 23 304:23
**filed** 12:15 158:2 168:8 219:18 227:10 245:24 270:10
**files** 205:19,25 206:2 209:2 309:14
**filing** 128:24 171:17, 18
**filings** 20:11
**fill** 151:11 162:20,23 163:2 319:6
**filled** 36:19 163:5 168:20
**final** 73:21 161:4 182:18 187:6,21 212:14 256:12
**finally** 157:25
**find** 107:21 137:5 169:15 193:3,25 228:15 243:25 277:11 319:25
**fine** 22:15 87:12 93:8 155:20 321:24
**finish** 25:22 65:19 79:13,15 256:25
**finished** 217:14 253:25
**Fish** 12:18
**flat** 116:23
**floor** 46:23 50:23
**flow** 264:16
**focus** 72:19 173:7 192:18
**focused** 191:2
**folder** 127:18 217:11
**folks** 180:8,10,14 181:16 297:14
**follow** 34:12,13 106:5 134:19,22 139:23 140:3,6 180:19 200:24 293:19 302:16
**footage** 320:2,8,12 321:7
**forefront** 294:19
**forget** 315:15
**forgot** 132:22
**form** 15:11,12,13 56:7 112:7 124:8,9,12,14 125:14 137:20 139:15 140:4 205:10 207:3 208:12 296:3 305:23
**formal** 32:8 128:20 173:13 222:12 226:17,25 286:16,19, 21,23 296:4 321:13
**formally** 157:25
**forms** 139:2,5 140:24 295:20 296:5
**formulate** 45:2
**forward** 147:25
**forwarded** 210:23
**forwarding** 211:12
**found** 163:23 295:6
**founded** 144:22,24 145:9,22 147:8,23 171:14,15 187:4
**Fourteen** 160:22 161:10 193:14
**fourth** 196:23
**frame** 15:18 88:25 89:2 104:23 241:21 242:12,20 246:22
**FRCP** 17:4
**Friday** 231:16
**Fridays** 41:3
**friend** 277:5 278:8
**front** 45:15 130:16 260:23
**fulfill** 70:5
**fulfilling** 57:14
**fulfillment** 50:25 70:3 71:18 72:4,7
**full** 128:20 143:22
**full-day** 256:21
**function** 94:11
**functions** 35:2 92:10 94:2
**future** 118:10 192:11

**G**

**gain** 84:13
**gather** 126:10 128:3 161:20 269:5
**gathered** 159:16 160:4 161:5,6 269:5 300:10 314:11
**gathering** 256:15 258:9,11 262:23 266:19 300:21
**Gatling** 199:25 242:4
**gave** 40:20 47:6 51:14 56:14 78:22 88:24 125:11,13 162:5 205:10 225:11 247:4, 8 253:5,7,9 299:9 314:22
**gears** 172:22
**gender** 214:22 310:21
**general** 22:3 23:20 27:23 32:10 41:6 50:8,16,17 52:9 54:24 55:4,8,16 57:19 80:8 81:5 85:17 113:15 120:2 123:19 131:11,25 149:10 195:15 199:12 206:2 208:20 217:2 229:7
**generally** 40:4 41:5 42:8 44:5 101:22 110:18 161:8 207:11
**gestures** 248:3
**give** 15:6 39:3 40:8 43:2 45:4 56:9 91:22 94:12 97:7 111:12 113:19 114:3,9,11 116:22 117:24 118:6 120:6 128:3 131:8

135:15 140:20 147:20 192:13 194:2 199:5 205:8 222:4 234:17, 21,23 237:24 246:7 265:11 272:14 273:3, 15 306:10,12
**giving** 111:10 147:21 153:9
**goal** 117:21
**goals** 118:8
**God** 25:14
**good** 13:15,16 80:6,11 187:10 217:15
**goodness** 28:14
**gossip** 149:8 176:25 177:5,8
**Gotcha** 101:11
**government** 35:4 36:2 58:5 107:15
**grab** 217:9
**graduate** 25:13
**great** 86:24 87:9
**Greenbelt** 12:16
**grew** 277:2,7,16
**gross** 107:3,16 108:16,17,18 113:17
**ground** 13:22
**group** 292:4
**guess** 20:8 21:6 26:6 38:25 78:20 89:10 101:19 108:17 111:25 139:22 151:14 159:16 171:16 214:24 242:2 258:5 270:16,19 271:16 278:9
**guessing** 92:4 172:15 255:22
**guidance** 30:13 31:15 40:8 115:19 125:17 147:21 241:6
**guided** 113:23
**guidelines** 149:20

**H**

**hand** 88:10 136:8 179:25 301:8
**handbook** 103:18 104:4,5 105:11 106:5 108:23,24 117:4 178:8,9 217:4

**handed** 136:2 207:12
**handle** 125:17 149:6 152:9 153:5,7,21 154:22 224:4 259:24 260:11 270:22,24
**handled** 30:7 293:9
**handout** 206:21,22
**hands** 200:17
**handwriting** 251:3 307:7 317:10,12,15, 19,22 318:5,7 319:15,16,19
**handwritten** 306:19
**haphazardly** 191:20
**happen** 38:21 39:4 111:15 125:5 158:7 166:4 186:18 249:2 257:11 298:17
**happened** 37:25 39:21 119:7 123:12 125:8 152:7 159:12 168:12 190:22 216:16 266:21 271:13 272:6 275:19 277:17 300:2
**happening** 61:22 127:22 131:16 158:14 180:16 181:4 220:7, 20 257:14 273:8 284:11
**happy** 22:25
**harassed** 142:20 233:2
**harasser** 128:8,10,14 142:16,22 149:2 171:6,9 172:4 264:5
**harasser's** 148:11,23
**harassers** 143:3 172:10
**harassing** 218:12,21 289:14
**harassment** 31:3 119:14,25 120:9 122:25 128:6,13,17, 24 129:5 130:5 132:13 133:9 134:16 135:14 137:19 138:14 139:21 144:25 145:4, 19 146:2,5,10 149:16,22 150:17 151:19 155:16 158:2 160:13 170:24 174:23 177:16,21,23 178:5 179:5 189:11 202:17

204:4 206:23 207:17 228:14 245:24 256:4 257:24 259:24 263:24 264:4 270:21 286:17 293:12 308:8 309:21 310:6
**hard** 51:24
**head** 14:18
**heads-up** 44:17
**healing** 187:9
**hear** 45:9,20 155:5,21 156:6 157:4 188:11 282:5
**heard** 41:11 155:23 156:23,25 192:6
**hearing** 132:4,5
**hearsay** 131:7 153:9
**held** 26:24 32:7 55:17 74:23 85:24 308:9
**helps** 53:16 97:9
**hierarchy** 35:22 54:19 82:4
**high-level** 105:23
**higher** 57:18
**hinder** 261:7
**hindrance** 261:19
**hire** 36:22 37:14 54:3 90:14 94:5 311:22
**hired** 48:19 53:9,12, 25 55:11 90:23,24 93:2
**hires** 36:24 90:6
**hiring** 28:2 36:13,22, 23,25 92:16
**history** 131:19
**hmm** 26:11
**hold** 28:8 71:7 73:11 85:20 293:24 314:23 315:4
**holding** 22:15 75:17
**holds** 74:21 76:25
**home** 89:22 257:2
**honestly** 246:21 302:22
**hope** 80:6 81:3,8
**hoped** 190:13
**hostile** 31:5 187:15 189:12,20,23 210:2 215:2,4 221:22 228:13 240:21 250:21 260:4 263:23 265:16

273:11 284:24 310:12
**hour** 19:4
**hourly** 68:2
**hours** 19:4 28:19,20 41:5,6,9
**house** 91:25 94:17
**HR** 16:6 26:12 27:4, 20,22,23 28:4,5,6,9 29:6,7,13 30:4,6 31:25 32:5,6,16,20 33:5,7,20 39:6,8,14, 24 40:11,15,17 44:11,15,19 45:5 47:17 48:2,4,9,14 92:10 94:2,11 96:15, 21 106:4 115:23 120:6,20 121:5,7,8, 16,20,21 122:14,17 123:4,8 124:6 143:19 144:2 147:14 150:9 151:24 152:4,11 153:8,23 154:11,18 155:5,6,21 156:6 159:22 161:25 165:6 169:11 170:21 176:12 184:19 205:19,25 206:2 208:25 211:6, 12,13 214:22 216:6 218:13 219:11 222:9 226:18 228:8,11 235:16,21 237:5 242:24 245:25 246:19 249:5 254:14 259:24 260:11,16 261:15 264:20 267:21,25 268:9 269:23 270:5, 17,23 271:3,5,6,8,9, 10,11,15,25 272:3,9, 12,14 273:3,15 280:20 285:13 286:8 288:11 291:4,13 294:22 295:22 306:10,12 309:14 314:10
**HR's** 152:12 176:25
**HR-RELATED** 179:16
**HRI** 35:4
**Hum-um** 313:14
**human** 32:14 105:12 211:18,20 230:17
**hurt** 142:9

**I**

**ID** 54:4
**idea** 97:7 217:7
**identification** 17:5 49:8 59:12 66:6 74:7 83:6 98:3 99:8 100:3 103:21 132:18 137:22 150:20 160:16 167:6 173:20 185:15 202:20 209:19 227:17 233:12 236:8 244:15 288:21 297:25 301:22 303:14 305:8 307:19 316:13
**identify** 22:24 23:14 92:22 93:6 315:7
**identifying** 136:23
**II** 50:8,16 52:9 54:24 55:4,16 57:19
**immediately** 40:8 121:7 184:21,24,25 198:11 217:8
**impact** 129:21
**implement** 311:17
**implemented** 312:11
**imply** 105:22
**imposed** 115:10
**improve** 110:23 114:4
**improvement** 97:16 297:4
**In-** 259:2
**in-house** 31:15 34:7, 13 38:12 65:8,11,12 70:11 104:14 110:15 115:11,17 125:16 126:14,19 127:21 134:4,5 145:13,16 147:2,17 161:9,12 187:25 228:5,10,18, 23 229:12 230:2 237:22 238:8,13,14, 22 239:2,9 244:24 245:18 253:6,7,10 255:4,6 256:3 257:16,18,23 258:22 280:15,17,20,25 290:4 291:12 292:14 299:7 304:7
**inappropriate** 110:4 199:12 239:19 259:12,19 263:10

265:17 283:17 290:16
**incident** 168:12 170:6 186:8 257:20 268:21, 22 293:14
**incidents** 285:10
**include** 34:11 47:10 164:4 308:16
**included** 47:4,16 254:11
**includes** 169:11,12,13
**including** 92:16
**inclusive** 145:24
**incompetence** 107:3,16 108:16,18
**inconclusive** 144:23 145:5,10 187:5
**Incorporated** 12:10,14
**incorrect** 75:11
**increase** 57:21 59:20 60:2 66:24 85:4
**indented** 196:3
**indicating** 90:25 94:19,22 139:2 195:21 216:25 219:20 237:16
**indirectly** 51:9,10,11 62:22 68:19,21 77:7 85:12 197:13 234:3,5 265:21
**individual** 35:10 52:13 124:22 125:2, 21,22 127:4 128:24
**individually** 199:14 267:10
**individuals** 85:15 163:14 242:23 243:4 250:25 277:18 320:12
**infer** 107:24
**inform** 142:21 143:3 283:22
**information** 90:6 92:9 93:4 124:23 125:9 126:6,7,9,23 127:16 128:3,4,11,22 130:2, 8 145:6,12 147:20 149:11 161:5 163:23 165:24 203:16 212:15 262:23 269:2 274:9 276:6 282:11 284:2 319:6

**informed** 156:8 197:16 215:25 272:12 289:11
**informing** 278:19
**infraction** 117:25 118:19,25
**initial** 99:4 121:2 158:24 187:22
**initially** 159:5 173:3,5
**initiated** 45:17
**innuendoes** 141:24
**input** 96:5,10
**inquire** 278:10
**inquired** 249:19 270:19
**inquiring** 278:22
**insight** 284:16
**instances** 309:20,25 310:2
**instruct** 38:21 141:14 291:17
**instructed** 116:10,13 223:18 225:5 287:17
**instruction** 116:22 192:14 225:11 246:8
**instructions** 43:2 51:13,14 114:3 239:17 240:10 245:21 247:4,8
**instructs** 14:4
**insubordinate** 116:15 239:17 240:8 272:14
**insubordination** 110:2 116:5,6,16,20,21 284:11
**intact** 149:4
**intend** 188:8
**intent** 190:25 230:14 252:4
**interact** 111:3 225:14 234:9 247:23
**interacted** 226:12
**interacting** 287:17
**interaction** 112:4 214:7
**interactions** 177:11 216:18 240:7 247:16 250:4 259:22 272:23
**interacts** 110:20 112:3

**internal** 60:18,20 66:18 97:10
**interpret** 276:18
**interpretation** 109:19
**intertwined** 263:14
**intervene** 46:15
**interview** 124:23 125:20,22 164:14 170:15,18 195:2 203:5 265:7,19 266:8,11 277:8 282:15 290:17
**interviewed** 125:24 127:25 264:24 265:25
**interviewing** 161:2 195:16
**interviews** 124:10 160:2 258:13 266:16 275:21
**introduce** 44:22
**introductory** 111:5, 15,23
**inventory** 66:21 72:4, 7 75:9,12,14
**investigate** 30:23 123:18 131:9 146:12 168:11 226:20,22 261:24 262:11 263:9, 13 267:2,13,22 268:10 269:11,20 270:3
**investigated** 123:14 249:17,19 259:2,9 260:18 261:21 262:8 263:16
**investigating** 31:2 33:20 186:19 215:22 220:15 221:25 259:15,20 263:21 294:21
**investigation** 31:14 39:25 120:22 121:9, 17,22 122:3,9 124:4, 7,15,17 125:14 126:25 127:24 128:6, 13,22 146:25 150:17 151:9 160:13,22 161:6,16,19 162:24 166:12,13,14 167:22 168:6 184:20,24 186:22 193:10 195:16 196:22 198:24 199:6

203:6,9,20 212:6,13 216:5 227:6 228:7 230:4,7 235:13 240:14,17 250:21,23 252:16 253:8,19,25 254:14,21 257:15,18 260:8 261:18 262:18, 21 264:20,24 266:16 267:8 269:13 273:21 290:10,12,25
**investigational** 294:20
**investigations** 39:14, 23 122:14,17,25 123:4,7,9,16,18,25 126:19 128:20
**investigative** 189:3 290:8 296:20
**investigator** 172:15
**invitations** 200:21 206:9,17
**invited** 190:9
**inviting** 206:10
**invoice** 68:10
**invoicing** 68:11
**involve** 31:2 284:23, 25
**involved** 115:13 121:16 122:2,9 124:3 145:20 153:9 161:2 174:5 176:7 179:24 263:23 278:24 285:4 306:8
**involvement** 305:17
**IRC** 69:15
**irrelevant** 137:11
**issue** 39:11 40:6 44:15,19,25 48:10 72:13 115:22 189:10, 13,14,19 212:11 222:15 237:17 240:6 259:2,8,24 263:15,23 265:15 271:6 285:19 302:16
**issued** 237:23 239:3 248:12,14 252:13 287:9,23 294:21 312:11 318:23
**issues** 27:24,25 30:15,21 43:25 44:5, 11 45:5 46:7 47:17, 24 48:2,4,14 72:6,8,

9,11,16,22 110:7 123:20,21 128:25 156:8 174:6 176:6 188:19 192:10 215:4 220:20 262:7,11 263:9 268:13 273:5 283:3,8,10,11,13,16 285:9,13
**ITAR** 78:7
**items** 50:23 57:13,15 88:16,18 300:22 301:9

J

**January** 53:25 55:12 81:12,24 88:24 89:15 91:4
**Jason** 63:13
**Jenkins** 168:11 199:16 246:14
**Jennings** 52:13,16 54:3 55:11 81:23 88:14 92:16 158:3,17 159:6 165:11 168:8 169:3,7,21 171:5,19 172:10 179:19 180:14 181:7 190:5,12,15 210:3,13,16 211:19 212:7,21 213:6,14 214:12 215:3,8 216:12 218:18 219:6, 8 220:25 222:9,20 225:9,12,15,18,24 226:11 232:25 246:16 247:24 248:6 249:14, 17 250:4 265:5,16,17 274:17,20 275:9 277:25 278:4,9 285:18,23 286:2,16, 19,21,23 287:3,11 289:13 294:11 295:25 313:15,21 320:7 321:10,13
**Jennings'** 81:15 82:8 216:2,6 260:8 288:10
**jeopardy** 194:10
**Joanna** 13:18
**job** 16:4 26:5,24 27:21 28:19 29:15,21 30:4 33:23 34:18,25 36:11 39:7,15 50:11, 14 51:22 55:8 61:20, 25 68:7 71:22,23 84:13 90:15 92:10 107:4,17 108:16,18, 19 111:8,9 112:10 122:22 187:13 192:22 194:9 197:7 233:21 261:6 270:8,14 295:9 314:20
**jobs** 26:11 273:2
**jog** 64:2 137:8 138:7 144:10 280:18
**jogs** 139:12
**jokes** 141:24
**Jonathan** 12:22
**June** 101:22 104:7
**justify** 214:21

K

**Ken** 266:7
**Kenton** 216:8,9 233:20 297:9
**keys** 300:15
**kicked** 274:19
**kind** 15:22 20:15 42:3 46:14 56:4 96:18 108:2 115:10 153:15 156:21 187:10 191:20 214:24 229:21 264:16
**knew** 268:21 270:18 271:2 276:3
**knowledge** 38:3 48:12 61:22 104:18 122:15 134:10 136:12 148:15,16 149:17 196:21 197:24 200:20 201:3 214:13,14 279:2 297:16

L

**labor** 58:8
**laid** 117:5,9 190:24
**language** 36:8 141:16, 23 239:21,24
**laptop** 257:5
**Larry** 35:10 71:16 96:7 152:12,14 155:3,4 157:17 158:22,25 159:2 172:25 177:11 178:16 190:3 191:3 192:2 201:7,9 203:13 211:11 236:18 259:18 288:12 291:4 296:6
**Latisha** 29:14
**latter/earlier** 263:2
**law** 31:22
**law's** 105:4
**laws** 135:13,24
**lawsuit** 23:20 90:11 91:10 92:16
**lawyer** 214:12
**lawyers** 91:19,23
**laying** 117:13 149:21
**lead** 44:20 204:15
**learn** 32:22
**learned** 159:18 270:16
**leave** 208:12,22,23 209:2 301:13
**led** 239:6 299:6
**left** 34:16 35:6 36:16 91:24 92:5 104:25 133:25 202:10 276:21 301:10 313:10 314:6
**left-hand** 210:18 236:20
**legal** 12:24 147:22 187:7 214:20
**letter** 49:6,16,17 53:9 56:7,8,12,14 59:10 66:4,17 74:4 76:15 77:24 78:13,21 80:25 81:11 94:6 232:24 247:17 249:13 288:19 289:10 290:2, 6,12,21 302:24 306:14
**letters** 20:9,10 29:20 56:10 73:9
**level** 106:2
**Lewis** 143:23,25
**liaison** 311:9
**lie** 225:3
**lies** 221:17
**lifetime** 32:19
**limited** 269:13
**list** 17:20,23 20:17 170:9,14
**listed** 13:2 18:3 169:4 173:2 290:10

**listen** 188:11 240:9
**listening** 116:8
**litigations** 320:3
**Littleton** 199:15 243:7,10 266:3
**lmoppins@gmail.com** 210:25
**location** 68:14
**locations** 68:12 72:15
**lock** 201:9
**locked** 198:12 201:5, 8,15,20,23 202:2 203:2
**locking** 203:4
**logis-** 62:10
**logistic** 74:20,24 76:2,21 77:2 82:5,11
**logistics** 50:24 62:10 67:21 68:9,16 69:16 75:6,17 76:12 234:10
**long** 19:2 28:8 81:6,9 113:16 122:22
**longer** 68:23 225:16 289:12
**looked** 90:8,16 177:21 230:5 233:4 250:12 279:23 287:3,13 288:6 320:8,19
**lot** 123:17 300:8
**loud** 45:12,14 276:5
**loudly** 203:14
**lower-level** 37:10,13
**lunch** 182:22
**luncheon** 183:6

**M**

**Ma** 201:24
**made** 36:23 61:19,20, 23 96:7 97:14 127:3, 4,11 152:5 157:23 168:10 176:12 187:14,18,22 193:2 213:14,18 219:11,22 220:3,14,15 221:12 228:18,23 229:16 231:3 256:4 257:23 261:22 262:6 272:19 276:4 278:7 280:19 284:8 291:23 300:4 310:5
**main** 94:21 173:7 176:21 266:6 320:10
**Maine** 12:19
**maintained** 309:11
**major** 133:9
**majority** 39:22 94:18
**make** 21:8,19 22:13 23:15 31:14,17,20 36:17,22,24 38:13 46:25 58:9,19,20 64:9 68:16 71:15,19 96:18,19 97:13 110:20 120:10,13,16 124:11,25 129:17 131:15 136:20 147:2, 3 148:25 149:12 151:18,20 152:4 164:22 175:16 176:7 177:15 179:16 182:13 192:5 215:7 222:12 235:9 239:15 248:3 252:6 255:7 258:4 261:14 262:2 263:8 282:13 283:7 306:5
**makes** 110:11 115:9 129:11 145:8 261:5
**making** 33:13 44:2 46:3,4 57:13 126:14 129:18,20 147:18 149:7 221:17 224:23 283:14 292:4
**manage** 180:15
**managed** 36:9
**management** 27:23 30:4,10,22 32:15 46:2 116:12 118:18 176:7 179:21,24 188:14 190:11,18 235:12 268:8 294:17
**management-level** 37:9
**manager** 27:20,22 28:5,7,9 32:20 33:9 36:3,17 40:10 42:12 52:3,5 66:19,21 67:21 68:8 69:3 73:12,15,22 74:21,24 75:2,6,8,10,12,14,18 76:12,21 77:2 82:6, 11,20 84:5 96:2 102:22 106:4 110:20 111:10 112:2 115:23 120:20,24 121:4,6 144:2 150:7 171:12 189:15,18 230:18 235:16 237:5 245:22 246:4 250:24 260:20 270:9,14 295:9 312:16
**manager's** 76:2
**managers** 32:16 33:9 34:8 46:12,15,19,20, 22,23 47:7 68:20 105:23 122:14 145:20 191:14 259:13,17 263:10,20,22 283:18 308:16
**manages** 311:10
**managing** 33:10,15,16 46:2
**mandatory** 42:4
**Manley** 152:15,17 157:15,16 175:20,25 180:14 197:6 199:25 242:15 269:7
**Manley/arnel** 174:19
**manna** 42:4
**manner** 249:15 283:15
**manual** 20:8 132:14 134:16 135:2,24 136:2 138:15,19,21, 25 139:10,16,24 140:3,5,8,12 141:8 149:25 170:24 171:21 178:4,6 179:3 206:23 207:18,21 264:4
**manuals** 149:20
**March** 67:16,17 83:19, 24,25 84:2 98:17
**mark** 21:5,18 22:12 88:11,16,18 92:15 315:11,13
**marked** 17:4 49:7 59:11 66:5 74:6 83:5 92:13 98:3 99:7 100:3 103:20 132:17 137:21 150:20 160:15 167:6 173:19 185:14 202:20 209:18 227:17 233:11 236:8 244:14 288:20 297:24 301:21 303:13 305:7 307:19 316:13
**marking** 86:19 316:4

**Maryland**  12:16
**material**  18:6 53:23 54:13 62:6 63:19 66:12 67:15 70:25 74:13,19 75:5 76:7 81:21 107:23 137:4 138:2 155:25 157:8 163:21 167:10,16,25 185:24 193:5 197:9 215:14 223:22 236:12 243:23 302:3 305:11
**materials**  206:7
**matter**  12:12 35:14,25 36:18 42:2 178:22 179:2,13 196:25 221:18 260:11,14 311:3
**mattie**  199:15 243:7, 10
**MBA**  25:21,23
**meaning**  144:5,24 145:2
**means**  35:25 302:25
**meant**  33:15 260:12,17 284:6
**Media**  12:10 87:15,23 183:2 184:11 279:10, 17 313:7
**medical**  15:5
**meet**  18:24 19:2,13 111:7 226:24 286:8 302:15
**meeting**  19:7,11 22:3 41:12,23,25 42:4,25 43:9,24 44:16,20 45:21,24 46:16,19, 21,24 47:3 48:6,11, 14 115:25 125:15 157:14,16 158:4,5,6, 25 159:11,12,21 163:13,14 165:10 166:3,4,6 170:6 177:10,12 178:15 186:17,18 190:2,6,23 191:4,24 192:9,23 193:24 195:6,14 198:6,13,20 199:3,4, 9,13 200:4,10,13,19, 22 201:2,6,8,10,15, 21 202:7,9,11 203:2, 10,12,18 213:6 215:11,12,20,22,25

219:5 220:25 221:10 223:3,6,14,25 224:7, 9,10,12,21 267:11 269:14,16 271:12 272:2 286:10,15 288:11 291:3,5,8,11, 15,23 292:2,6,22 293:2,5,18,23,24 294:3 297:15 298:14, 24 299:6,24 300:3 307:3,4 314:12 317:24 318:10 319:4
**meetings**  42:7,19 44:12,14 45:6 47:15 48:2 125:6 178:15 222:25 223:4 240:5 265:12 267:14 269:14 305:25
**member**  294:17
**members**  42:4
**memo**  211:6
**memorandum**  83:4 209:17 219:13 297:22 303:11
**memory**  64:2 137:9 138:7 139:13 144:10 159:10 280:19
**mention**  169:6,7 193:19
**mentioned**  20:4,13 30:17 31:9 34:5 40:22 44:9 57:24 60:4 93:15 114:14 116:4 122:16 142:7 168:25 169:24 180:8 181:9 189:5 199:11 212:7 225:4 242:12 249:20 277:22 292:22 308:20
**mentions**  214:10,17
**merchandise**  68:12
**messing**  218:24
**met**  91:18 226:23
**middle**  64:11 69:7 171:23 176:18 177:14 263:2 268:2 278:11
**mind**  86:19 146:13
**minutes**  200:19 276:21,22
**misconduct**  113:18
**missing**  223:24 224:16

**mission**  191:2
**mistaken**  62:13 67:12 69:22 238:17
**mistreat**  245:22
**mitigate**  30:23 123:22 129:12 270:15
**mitigating**  30:14
**modifications**  67:18 311:13
**Monday**  41:2 153:14 254:8,10,12
**Monica**  143:23,25
**month**  19:8,9 91:16,17 280:7
**months**  65:6 95:19 100:23
**Moppin**  311:16
**Moppins**  19:22 35:10, 21 37:17 38:6,16,23 40:2,9,11 42:9,19 43:5 44:21 51:8,14 58:8,18 60:12 61:3 62:23 67:2,9 68:19, 21 69:22,24 71:19 72:21,25 77:8,21 80:22,24 85:12 88:19 96:7 105:23 122:17 123:16 124:2 152:12 156:7,19,24 158:22, 25 159:9,14,18,23 163:13,24 164:23 165:5,10,21 166:2,5, 11,19,24 169:13,25 171:9,19 172:9,25 173:2,7 178:19,21 181:11,16,19 186:6,8 189:11,12,20 193:20 194:21,24 196:11,15 197:12,22 198:5 199:9,13 200:8 201:12 202:3 203:11 207:24 210:15,19,21, 22 211:5 230:12 231:6,10,18 232:21 235:8 236:18 237:4 238:21 239:11 240:8 241:2,17,19 242:8, 10,16,19 243:2,11 244:19,21 245:12 246:5,7 247:4 249:4, 16 250:3,12,20 256:16 258:9,16 259:18 260:2 261:6

265:12 266:25 267:7, 21 269:3,4,11,19,22 270:2,5,8 271:12,25 272:3,9 273:14 281:24 282:2,17,18, 20,23 284:3,5,17 285:6,13 286:9 287:9,19,23 288:12 289:17,19 291:4,13 295:2,7 296:6 299:4 310:6 311:3,9,13,18, 21 313:13,19 317:21, 25 318:15
**Moppins'** 35:13 39:7 84:7 168:25 169:25 170:3 196:2 251:12 261:18 312:6
**morning** 13:15,16 257:7
**move** 71:15,20 72:21 129:21 147:25 191:12
**moved** 56:11 71:13 190:16
**movements** 58:3
**multiple** 176:5 266:12,13
**mumbles** 163:19 167:14,23
**music** 45:7,10,11,15, 19 47:20

**N**

**named** 35:10 52:13 124:3 245:24
**names** 168:23,24
**natural** 293:13
**nature** 107:12 113:11 114:6 123:11,13 130:22 270:21 284:9, 21
**necessarily** 50:21,22 93:3,12
**needed** 30:7,25 36:19 68:17 70:2 71:17 97:13,15 153:2 175:18 182:13,15 187:13 221:20 234:6, 8 257:19 279:22 283:5 300:13
**negotiates** 311:16
**Nineteen** 258:21
**nod** 14:18
**nonbiased** 126:8
**nonmanagers** 47:4
**normal** 41:9 179:13
**note** 54:2 124:11 265:22 282:13,14 306:19
**notebook** 89:7,11 90:4 92:17 93:16,24 94:3 136:21 195:23,24 213:9,10 217:4 314:22 316:23
**notebooks** 89:17,20 91:9,10,23 92:2,8 93:8,25 94:9,16 95:8 136:14,20 314:18 315:8
**noted** 215:16
**notes** 18:19 20:14,15, 16,18,21,25 21:6,25 22:3,6 53:16,20 54:9 70:23 76:8 86:20 88:4 89:5 90:4,9 94:9,10,15,18,21,24 115:25 156:2 158:8 159:11 193:3,8,19,25 195:5,7,13,17,19,20 198:21 200:19 203:17,21,22 212:4 213:5 215:19,21,24 216:22,25 217:2,3,5, 6,9 220:11 223:24 224:2 243:25 292:17 314:19
**notice** 16:25 106:23 108:25 143:11 150:10 216:17 218:10 285:8 303:23
**notification** 120:6
**notify** 120:3 121:7
**noting** 54:2
**November** 49:21
**number** 12:17 16:25 49:6 55:21 57:25 59:10 66:4 74:4 83:4 87:16 97:24 99:4,24 103:12,18 112:20 113:3 132:13 137:19 150:15 160:11 162:20 163:2,5,8,9 166:18 167:4,21 168:5,15 169:22 170:9,19 173:19 183:3 185:13 199:8 202:16 207:5 209:17 227:15 233:9 236:6 244:12 264:19 266:23 268:20 269:2 271:3,4,13,22 273:20 279:11,18 281:10 282:12 285:17 286:7, 14 287:8 288:9,19 290:10 291:2 292:23 293:19,25 295:20 296:8 297:7,15,22 298:3 301:20 303:11 305:4 307:16 313:8 316:8,12 317:11
**numbered** 264:12
**numbers** 106:9 112:23
**numerous** 45:13

**O**

**object** 14:3 92:21
**objection** 23:25 109:5,17 111:18 112:13 128:15 131:4, 22 135:5 141:4 143:4 146:3 150:8 182:4,12 194:11 207:19 228:20,25 255:9 256:6 280:21 291:16, 24,25 309:22 310:7, 13,18,22 311:20 312:8
**obligation** 70:6
**observation** 159:17
**observe** 131:8 191:9
**observed** 132:3 266:20
**observes** 118:18
**obtain** 25:7
**occur** 291:5,8 294:4
**occurred** 145:2 196:11 198:20
**October** 26:20,21 27:19
**off-site** 65:9 70:11 256:18
**offer** 20:9,10 29:20 49:6,16,17 50:7 53:8 59:10,19 66:4 76:15 94:6

**office** 118:22,23 159:4 211:18,20 219:17,18 231:17 253:23 267:9 268:11 280:6,15,16 281:6 284:9 287:6 298:19 300:23 301:12,14
**officer** 122:11
**officer/logistic** 73:14
**offices** 12:18
**official** 122:11 123:25 303:22
**on-site** 122:12 283:6 298:18
**one-on-one** 240:5
**ongoing** 186:23
**online** 70:12,13 253:25
**open** 188:3,4,11 314:24 315:4
**operations** 102:21
**opinion** 126:8
**opportunity** 110:23 111:11,12 113:16,20 114:4,11 118:6
**opposite** 126:3
**opposition** 116:9
**option** 114:9 118:6
**order** 57:14 72:2 79:11 264:13 271:18 303:25
**orders** 42:24
**original** 21:9,11 133:20
**ostracize** 222:4
**ostracizing** 223:12
**outcome** 125:4 128:12
**outlook** 80:2,5,10
**overheard** 131:9 265:11
**oversaw** 36:5,9,10 312:14
**oversee** 35:3 312:10
**oversighting** 57:12

**P**

**p.m.** 176:18 183:5 184:3,11 279:14 313:4 321:20 322:10
**package** 78:23 79:8 135:15
**packed** 57:16
**packet** 207:13
**pages** 22:18,24 315:10 316:5
**paid** 24:7 70:16
**paper** 94:20 217:9
**paragraph** 49:23 50:7 74:17 79:25 83:17 106:20 113:7 141:11 143:22 163:10 177:14 196:2,3,24 198:9 211:17 213:14 214:6 219:21 232:11,16 241:9 242:3,15 243:6,8 245:19 249:7
**paragraphs** 264:12
**paraphrasing** 300:6
**parentheses** 62:6
**Park** 278:16
**Parker** 12:13 13:19 20:22 48:19 49:18,20 51:3 52:10,20 55:12, 17 57:24 58:14 59:22 60:13 61:4 64:15,18 65:9 67:3,10,18 68:18 69:11 70:16 72:21 73:11 75:17,21 78:13,22,25 79:6 84:4 85:20 86:9 88:12 94:4 95:13 98:14 100:10,18 102:24 104:9,17,24 105:15 119:18 127:7 139:22 140:2,24 143:15 150:6 151:17, 23 152:17,20 153:17, 20 155:16 156:15,25 157:5,19,25 158:11 159:3 162:17 163:4, 6,17 164:5,10 165:25 168:10 170:10,11,22, 24 171:17 174:21 176:2,12 177:9 178:17 186:6 187:20 188:9,14 189:13,14 190:4 191:3,22 192:21 196:5 197:14, 18 198:3,17 199:16 201:5 202:8,10 203:11,13 205:7 208:4 209:6 210:4 213:19 215:4,7,25 216:17 217:20 219:5, 23 221:12 223:5,15 224:8,9,11 225:8,13, 14,23 226:3,5,11,23, 24 229:16 233:2 234:2,6,9 236:18 238:11,16 239:6,14, 16 240:23 243:14 244:8,19 245:20 246:8,14,24 247:5, 13,19 248:11 250:3 251:6,14,19 255:15, 19 257:22 259:17,21 260:3,13 261:12 264:2,25 265:15,18 267:3,17,23 268:3 270:3 271:6,10,11 272:2 273:15 274:2, 12,14,19,22,25 275:14,17,23 276:4, 7,16,17 277:4,11,23 278:6,15,16,20,23 281:2 286:8,17 287:10 288:9 289:3, 16,20 290:3,7,16,20 294:4 295:21,23 296:9,12 297:18 299:9,15,24 300:4 302:11,20,24 304:21 306:15 309:3,19 310:5 318:4,19 319:4,6 320:7
**Parker's** 50:3,11 54:18 56:19 60:5 70:20 80:5 82:16 129:4 153:6 154:2 155:2 156:13 157:17 161:24 174:14,24 175:7,20 184:18 186:15 189:15 202:4 212:5 214:7 228:8 231:4 246:19 254:14 255:8 256:4 271:7 280:20 284:23 287:7 291:22 294:16 298:9 304:14 314:10 318:6
**part** 26:6 33:23 35:7 45:15 50:19 53:4 59:3 70:3 74:25 77:18 97:17 100:20 112:5 133:22 135:14

138:6,20 148:12 149:5,6 165:12,20 174:19 177:18 178:14 188:13 190:5 196:6 203:6,8 208:25 212:5,17,25 220:15 241:4,12 259:25 260:8 261:17 263:2, 3,4 265:14 270:25 272:17 273:17 275:11 281:12

**part-time**  27:20,22 28:9,18

**participant**  128:23

**participants**  166:4,6 192:9 263:16,19

**parts**  86:19 89:14 124:17 165:7 174:15, 16 300:19

**pass**  248:4

**past**  40:18

**pay**  56:16 57:22 73:5 84:23 85:2 311:15

**paying**  24:10

**payroll**  27:24 29:20 35:4 208:20,21 209:4 312:7,10,14,16

**peace**  188:16

**pending**  14:24

**people**  29:19 33:9,10, 12 38:17 39:10 46:2, 4 57:13 61:7,10 80:17 120:9 125:23 127:11 161:2 164:5 169:23 171:17 178:17 180:11,13 204:23 205:2 211:7 217:8 242:12 262:24 266:6, 12 278:21 312:10

**people's**  266:20

**percent**  26:17 28:16 54:23 71:5,25 140:20 189:2 229:20 241:25 243:21 248:18 264:15 287:15 288:3 291:6 294:6 307:8 311:24 318:12

**perception**  93:11

**perfect**  271:20

**perform**  108:19 121:22

**performance**  33:17 36:6 44:8 61:15,18

80:13,15,24 81:10 86:10 95:14 96:8,16 97:6,12,16,17,24 98:11,16,19 99:5,13, 24 100:8,18 101:20 102:7,12,20,25 107:4,17 108:16,18 110:18,21,23 111:4, 8,9,14 114:4 118:14, 17,19 192:19 283:9 297:4

**performed**  36:7

**performing**  46:10 97:8 111:12 112:9 118:2 122:2 188:18

**period**  88:21,23 89:11 95:3 98:15 99:15 100:15 107:5 110:19 111:5,15,23 112:12 248:7 269:20

**periodic**  42:20 43:9

**Periodically**  44:13

**perpetuating**  158:17 159:15,19

**Perry**  12:22

**person**  28:4 35:21 58:2 119:25 126:23 129:11,22 132:4 143:11 172:6 311:10

**person's**  125:4

**personal**  20:16 22:6 23:5 92:8 197:17 210:25 211:3 232:24

**personnel**  67:20 100:21 103:4 127:17 208:19

**perspective**  130:24

**pertinent**  171:12

**Phoenix**  25:25 26:10

**Phoenix-program**  26:6

**phone**  43:5 216:14 245:3,5 255:12 256:10 257:10 275:22 278:18 300:14 304:18

**physical**  130:21 136:5

**pick**  156:7

**Pickett**  42:11,18 43:4 44:21 51:5,12 62:14, 21 68:22 77:6 80:21, 24 152:6 153:4 154:22 155:17 156:20 158:16 169:18

196:11,13,19 197:16, 18 199:19 224:8,11 259:18 260:10,14,19 268:21 269:5 270:18, 19,23 271:2 274:15 275:10,13,16,25 277:13,14,23,25 278:3,10,14,25 281:13,19 282:7,8, 21,24 283:20 284:17 285:12,22 286:8 293:8 296:10,24 313:23

**piece**  94:20 217:9 228:14 245:16

**pieces**  133:23

**pin**  23:14

**PIP**  297:3

**place**  72:18 112:12 126:5 130:2,5 153:11 309:12

**Plaintiff**  12:12 13:12,19 184:14 321:3

**Plaintiff's**  16:25

**plan**  97:16 297:3,4

**planning**  23:23

**platform**  32:11

**PM**  268:7

**PM's**  251:10

**point**  46:13 64:20 95:3 125:7 130:18 187:2 191:7 212:12 292:5 306:7 310:3

**pointed**  89:23 317:19

**pointing**  195:22 274:16

**points**  144:19

**policies**  33:14 105:12 108:22,24 117:5,9,14 135:22 149:16,21 177:16,23

**policy**  20:8 30:16 31:21 45:2 107:3 108:8,13 109:3,4,13, 16,25 112:5 118:19 122:8,12 131:3,21 132:14 134:16 135:11 137:19 142:20 146:19 172:7 177:21 178:4 179:5 206:23 247:23 293:10

**political**  25:11
**pool**  58:8
**poor**  118:18
**portfolio**  206:6
**position**  27:19 28:4,9
31:25 32:6,7 34:23
35:13 37:6,13 50:15
51:4 53:11 54:10,18,
21,25 55:17 56:5,16,
19 57:18 58:3 60:8,
19 61:4,5,9,24 62:7,
12 64:4 65:7 66:20
69:4 70:19 71:11
72:2 73:18 74:20,24
75:21 76:25 77:15
81:15 82:7,8,9 84:24
85:14,20 90:22 103:6
105:19 114:2 134:23
197:7
**position-change**  56:6
**positions**  36:19 37:7,
9,10 55:25 57:25
58:4 60:18,21 75:22
85:20 106:2
**possession**  91:24
**possibly**  81:25 211:21
230:25 237:7 238:8
272:8 276:13 292:24
294:8 308:19
**post**  60:18
**Post-its**  87:3
**posting**  308:24
**postings**  29:21 60:20
**posttraining**  308:25
**potential**  150:5
156:24
**Powerpoint**  204:12
**pre-**  308:25
**precautions**  130:12
**preceded**  110:19
**prepare**  18:12,15
19:14 91:19
**prepared**  18:3 317:21
**present**  186:16 200:9
202:8 231:24 291:10
292:3 298:23 299:3,
4,5
**presented**  188:23
318:4,24
**presenting**  126:15,17

**president**  228:3
**pretty**  55:7 62:3
111:5 157:3 158:18,
20 186:24 237:15
**prevailing**  44:5
**prevent**  129:10
**Prevention**  141:11
**previous**  85:5 290:14
**previously**  184:7
217:22 242:13 253:9
261:10 319:24
**Price**  12:1,11 13:1,7,
15 14:1 15:1,9 16:1
17:1 18:1,12 19:1
20:1 21:1 22:1,15
23:1 24:1,24 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1,
11 42:1 43:1 44:1
45:1 46:1 47:1 48:1,
18 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1,18
87:1,24 88:1,3 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1

152:1 153:1 154:1
155:1,13 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1,5,
12,17 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1,20
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1 258:1
259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:1 272:1 273:1
274:1 275:1 276:1
277:1 278:1 279:1,18
280:1 281:1 282:1
283:1 284:1 285:1
286:1 287:1 288:1
289:1 290:1 291:1
292:1 293:1 294:1
295:1 296:1 297:1
298:1 299:1 300:1
301:1 302:1 303:1
304:1 305:1 306:1
307:1 308:1 309:1
310:1,25 311:1 312:1

313:1,8,10 314:1,19 315:1,23 316:1 317:1 318:1 319:1 320:1 321:1,21 322:1
**Price's** 155:11
**Printed** 205:6
**prior** 72:7 153:8 157:16 178:3 220:13 269:16 318:19 319:17
**privately** 124:22
**privilege** 291:18
**privileged** 292:5
**problem** 115:16 124:21 270:15,25
**problems** 110:22 142:10 156:9 186:14
**procedures** 33:15 142:13
**Proceed** 267:22
**proceeded** 267:2 269:11 270:2 285:18
**proceeding** 22:21
**process** 29:20 70:9 97:2 104:19,20 127:7 239:3 268:5
**processing** 27:24 29:17
**produce** 22:25
**produced** 314:20
**products** 44:3 68:16 72:12
**profanity** 142:2
**professional** 32:15 141:17,20 142:3
**professional-development** 64:16
**program** 25:21,24 36:3,17 40:10 42:12 96:2 110:19 111:10 112:2 233:23 245:21 246:4
**progressive** 113:11,14 114:5
**prohibited** 131:3
**project** 40:10 270:9
**promote** 37:17 61:4
**promoted** 56:11 74:19
**promotion** 37:21 56:7 59:19,22,25 60:13,25 66:18,23 67:3,10 69:12 102:8,11,21 155:17
**promotions** 37:16,18,25 97:9,10 102:25 103:5 193:22
**prompted** 135:24 151:14
**proof** 144:25 145:18,19
**property** 92:7 300:11
**protect** 127:10 130:6,12
**protected** 129:19
**protocol** 31:21 120:2 293:13
**prove** 130:9
**provide** 13:24 115:20 216:21
**provided** 18:6 53:23 54:13 63:19 66:12 67:15 70:25 74:13 75:5 76:7 81:21 93:4 107:23 110:22 137:4 138:2 155:25 157:8 163:21 167:10,16,25 185:24 193:5 215:14 216:9,10 223:22 228:16 236:12 243:23 295:16 302:3 305:11
**providing** 30:13
**provoking** 248:6
**pull** 214:20
**pulled** 57:15 91:11 289:11
**pulling** 50:23
**purpose** 97:6 190:24 252:2
**purposes** 208:20
**pursuant** 17:4,12
**put** 23:14 72:18 78:17,23 79:9 81:6 96:20 107:13 110:5,6 113:25 117:23 124:12 125:14 161:20 167:19 181:11,20,22,24 182:15 201:24 207:11,12 223:19 235:15 264:15 285:8 297:3
**puts** 143:10
**putting** 161:3

**Q**

**QC** 75:24 76:11,17
**quality** 71:8,14,23 73:6,17 75:25 76:19
**question** 13:21 14:9,10,13,23,24 65:19 95:12 109:8 111:25 138:9 139:24 168:4 172:22 251:21 279:3
**questionnaire** 150:18 151:10 160:25 230:8 253:9
**questions** 14:4,6 15:21 30:11,14 171:13 242:14 265:23 312:20 315:19,21,23 317:7 319:23
**quick** 86:15 317:6
**quiet** 299:16
**quiz** 307:16 308:22,25 309:2,9
**quota** 44:2
**quote** 164:10

**R**

**Race** 214:23
**Ragunton** 200:2 241:11,16 242:5
**raising** 192:2
**Rajesh** 228:2
**rare** 128:22
**rarely** 39:21
**RCSI** 72:13 106:21 107:3 108:12 109:3,4,12,16,25 219:3 245:22
**reach** 281:25
**reached** 187:3,6 228:11 230:3 281:23
**reaching** 282:10
**react** 278:16
**read** 199:23 321:17
**realignment** 83:14 84:7
**realized** 270:20
**reason** 15:5 209:8,9 233:2 241:10 245:20

249:8 264:6
**reassigned** 83:19
**reassignment** 83:14
  84:7
**reassignments** 103:5
**rebuttal** 288:10,15
**recall** 16:13,14 27:12
  42:14 47:18 52:15
  54:17 55:19 60:9,10
  70:20 73:2,4,13,16,
  18 81:14 114:23
  194:8 200:23 202:2,3
  203:3 207:8,14,15
  208:5 225:19 230:24
  231:5,8,9 232:2
  235:20 238:6,10,12
  246:18 257:13 281:7
  287:21 289:8,21
  290:5 291:7 293:20
  294:6 298:13 299:5
  300:5 302:7,22 303:5
  304:15,22 309:23,25
  310:2,9 318:11 319:8
  321:8
**receipt** 137:20 140:5
  179:20
**receive** 31:24 32:5
  60:13 70:10 118:13
  179:23 205:3,5
  235:16,19 239:7
  244:21 247:13 289:3
  295:2
**received** 53:8 73:5
  78:21 136:8 138:24
  140:12 211:12 223:9,
  10 232:23 249:13
  310:11
**receives** 117:20
  121:20
**receiving** 39:6,8
  54:22 55:3 57:12
  59:23 60:7,14 62:2,5
  63:8 64:4 80:19
  81:25 82:5 85:16
  290:12
**receivings** 57:10
  67:12
**recent** 176:24
**recently** 76:20
**recess** 87:18 183:6
  279:13 313:3

**recipients** 178:13
  179:20 227:25
**recognize** 49:13 59:16
  66:9,13 74:10 98:7
  103:24 132:24 150:24
  160:19 173:24,25
  185:21,25 203:23
  209:23 227:22 233:15
  236:14 299:19 302:5
  305:13 308:3
**recollection** 56:14
  136:10 318:18
**recommend** 38:8 60:12
  67:2,9 69:25
**recommendation** 31:14
  39:4 58:9,20 71:20
  77:16,21 78:11 84:6
  115:19 292:12
  294:10,25 295:5,8
**recommendations**
  36:18,22,24,25 79:5
  96:8 126:15 292:9,19
  294:14
**recommended** 37:18
  69:19,20,23 72:21
  84:3 238:21
**recommending** 58:24
**reconciliation** 186:9
  190:13
**record** 12:25 13:3
  87:11,14,21 129:4
  182:24 184:10 209:17
  219:14 279:9,16
  304:23 312:24 313:6
  321:19
**recruiting** 28:2 94:5
**rectify** 120:12
**reduce** 58:8
**Reema** 12:9,14 16:7
  17:2,16 19:25 20:19,
  23 22:9 23:24 24:10
  26:19,25 27:19 28:3,
  11,13 29:3 31:25
  32:7,23 33:5,15
  34:16,19 35:6,13
  36:14 37:25 39:24
  40:25 42:13 45:6
  48:19 50:4,12 51:21,
  23 52:6,16 55:18,24
  56:5,9 65:9,11
  70:15,20 73:19 78:19
  82:17 85:21 86:9,10

92:5,6,11 94:11
  95:14 100:19 104:4,
  17,25 107:8,17
  109:2,15,21,22,23,24
  111:2,6 112:24
  113:14,19 114:16,25
  115:4,6 116:7 117:3,
  4,5,12,13 119:18,21,
  24 120:8,19 122:13
  129:10 130:4 132:14
  133:25 134:17 135:10
  140:2,23 141:14
  144:3 145:25 146:21
  148:22 149:15,25
  150:4,15 160:11
  179:13 181:18 197:23
  205:8,18,22 208:8
  212:15 226:4 228:3,4
  229:17 247:20 251:18
  252:10 274:11 288:11
  291:4,12 293:7,11,
  16,18 298:25 299:7,
  8,12 309:2,5,8,20
  310:4,11 311:7,14,
  17,18,23 313:10,11
  314:2,8,20 317:24
  319:4 320:17
**Reema's** 92:7 105:12
  117:9 122:8 130:24
  131:3,21 142:20
  149:21 170:23 178:24
  311:11,19
**REEMA000008** 103:19
**REEMA000058** 103:20
**REEMA000059** 132:16
**REEMA000065** 132:17
**REEMA000066** 202:19
**REEMA00008** 106:11
**REEMA000080** 202:19
**REEMA000119** 307:18
**REEMA000120** 307:18
**REEMA000137** 305:6
**REEMA000138** 305:7
**REEMA000174** 244:13
**REEMA000175** 244:14
**REEMA000177** 209:18
**REEMA000181** 137:21
**REEMA000194** 167:5
**REEMA000195** 167:5
**REEMA000196** 227:16
**REEMA000197** 227:16

**REEMA000231**  233:11
**REEMA000232**  150:19
**REEMA000236**  150:19
**REEMA000237**  160:14
**REEMA000238**  160:15
**REEMA000248**  288:20
**REEMA000281**  83:5
**REEMA000282**  301:21
**REEMA000283**  185:14
**REEMA000295**  49:7
**REEMA000303**  66:5
**REEMA000304**  59:11
**REEMA000322**  74:6
**REEMA000345**  303:12
**REEMA000346**  303:13
**REEMA000347**  297:23
**REEMA000348**  297:24
**REEMA000349**  98:2
**REEMA000350**  98:2
**REEMA000351**  99:6
**REEMA000352**  99:7
**REEMA000353**  100:2
**REEMA000354**  100:2
**REEMA52**  119:12
**REEMA53**  113:5
**REEMA62**  141:9
**REEMA63**  142:12
**REEMA65**  146:14
**REEMA78**  206:20
**reemployment**  27:17
**Reeves**  85:9 98:21
  290:17,19,21 301:4
**refer**  70:22 76:4
  112:23 206:21 246:5
  278:17 281:16 295:15
  296:2
**reference**  143:23
  154:18 177:15,20
  178:7 258:17 271:7
  285:20 296:6 297:2
  307:2
**referenced**  258:18
  288:15 293:25
**referred**  297:7
**referring**  76:18 177:5
  198:2 199:21 213:11
  219:4,16 240:11
  250:13 302:20 320:15
**refers**  271:14

**reflect**  105:11
**reflections**  96:6
**refrain**  192:10 225:13
**refresh**  318:18,21
**refresher**  293:15
**refused**  251:15
**regard**  314:20
**regular**  48:5 321:22,
  24,25
**reinforcing**  289:18
**reiterated**  192:15
**rel**  90:17
**related**  88:18 90:4
**relates**  181:10
**relating**  47:25
**relations**  27:25
  30:18,20 271:5,10
**relations-type**  311:10
**relationship**  106:22
  150:6 197:11,17
  278:24
**relevance**  22:20 23:8
**relevant**  23:16 86:20
  88:9 89:15 90:10,18,
  21 91:9,13 92:15,23
  93:3,7,11
**remark**  141:24
**remedy**  72:22
**remember**  15:23,24
  20:5,10 47:20 48:18
  50:17,21 52:17,21
  53:7,11 57:2,7 61:6
  63:4 69:4,14 73:7
  74:23 81:2,19 82:21
  133:8 135:21,23
  143:14 165:7 178:2
  190:15 193:18 194:4,
  6,12 204:19 207:8
  218:4 224:2 229:20
  233:24 234:23 235:20
  246:21 255:10,18,20
  256:11 257:8 262:16
  265:20 281:7 284:12
  287:5,14,20 289:4
  299:2 300:15
**remembering**  61:8
**remembrance**  143:16
  149:23 165:14
**remind**  24:17 44:25
  53:5 189:7

**removing**  129:22
**Repeat**  109:8
**rephrase**  269:25
**reply**  182:3,8,16
**report**  28:21 29:23
  35:16,18 51:3,7,15
  62:11,15 63:21 68:18
  77:7 85:7 120:9
  143:9 160:14,22
  161:4 188:23 189:3
  197:12 198:25 199:6
  230:4,7 252:16,21
  253:3 256:25 257:12
  264:7,12 285:12
  290:8,25 292:10
  294:20,21 295:3,16
  296:20 297:13 311:22
**reported**  29:7 51:12
  63:14 68:21,25 73:3
  120:19 180:10 197:14
**reporter**  12:23 13:4
  14:19
**reporting**  28:23 29:5
  52:10 62:22 67:21
  68:4,22 72:25 77:4
  225:16
**reports**  59:2 63:3,7,
  11 69:2,5 77:12
  85:14 96:11
**represent**  13:19
**representative**  122:11
**represents**  107:4
**reputation**  148:11,14,
  23 149:3
**request**  182:2 208:9,
  12,22,23 209:2
  314:18,21 315:2
**requests**  208:16
**required**  32:23 64:16
  79:5 134:18,21
  139:5,23 140:3,6
  204:22 207:24 241:4
  251:17
**reserve**  314:21
**Resource**  32:14
**resources**  105:12
  211:18,20 230:17
**respect**  36:12
**respond**  193:23 303:3
**responded**  194:5,8

**response** 182:15,16
**responses** 13:24
**responsibilities** 33:5,7,19 76:12,21 77:15,17 84:18 122:7
**responsibility** 33:10, 12 76:9 123:2
**responsible** 68:15 119:4,5 276:8
**rest** 89:22 211:9
**restored** 148:11,24
**restructured** 56:8
**restructuring** 56:7 67:13
**result** 128:7 293:4
**results** 126:18,24 309:8
**retaliated** 129:18
**retaliation** 129:10 130:7 187:19 310:17
**return** 146:16 300:11
**returned** 248:19 300:13
**review** 75:5 96:18 97:18 237:13 321:6
**reviewed** 20:3,14
**reviewing** 18:16,22 163:20 167:15,24
**reviews** 18:5 53:22 54:12 63:18 66:11 67:14 70:24 74:12 76:6 81:20 96:8 107:22 137:3,25 155:24 157:7 167:9 185:23 193:4 215:13 223:21 236:11 243:22 302:2 305:10
**revised** 104:16,19,21
**Richardson** 12:19
**right-hand** 106:8
**Rights** 214:10,18
**risk** 107:5,9,10,14,15 110:6,7 123:3 141:19 142:5
**Rogers** 63:13 67:19,24
**role** 16:6 27:15 63:3 68:19 70:4,20 71:7 72:22,24 73:2,6,12 75:24,25 76:2,11,17, 18,22 77:12,19 84:9, 14 85:8 96:15,21 97:2
**roles** 77:20
**Romaine** 218:25 219:2 221:20 265:2 274:12 275:23 277:6 278:2, 6,9
**room** 267:16 298:20,22
**rough** 322:2,4
**roughly** 54:19 264:13
**round** 138:22
**rude** 152:23
**rules** 13:22
**rumor** 150:5,10 152:25 153:8 154:14,23 155:6,8,13,19,22,23 156:6,16,18,24 157:22,23 158:15,17 159:19 161:25 169:8, 10,11,12,16,20 170:8 173:6,10 174:5,15 176:3 186:8 189:9,10 197:16,23 198:5 199:18 212:24 218:21 220:13 221:13 222:19,21 240:21 265:8 267:2,13,17, 18,23 268:10 269:12, 20,23 270:3,6,7,12 272:22 273:11 274:2, 10,18,21 275:5,14,18 276:8,10,12,14,15,17 277:2,6,15 278:22 284:23 285:24 286:2
**rumors** 151:19 177:2, 5,8 243:15 268:23 274:18
**run** 34:6 37:2,8
**running** 279:7

## S

**salaried** 67:25
**salary** 59:19 60:2 66:24 85:3,5
**sat** 15:20 162:3
**satisfactorily** 108:20
**satisfactory** 80:13,16 81:7,9 111:9
**satisfied** 143:18
**scenario** 253:20
**schedule** 125:6 302:15
**scheduled** 43:11 46:5
**schedules** 33:16 46:5
**schooling** 25:20
**science** 25:11,12
**scraps** 94:20
**Sean** 85:9 98:21 290:19 301:4
**Sebo** 12:23
**second-to-last** 214:6
**section** 13:21 64:11 106:15 107:19,25 108:4,9 112:17 119:14,17 141:11 142:12 143:14 144:17 146:16 148:7,15 162:8,20,21 164:3,9 165:12,18 168:17,19, 20 172:2,24 199:6, 22,23 212:7 214:9 244:4,7 248:22 261:3 292:10,19 295:11
**Sections** 108:2
**security** 107:5,9,10 192:22
**selected** 61:5
**sell** 38:20
**send** 78:20 125:10,13 180:4,5,7 195:3 210:22 230:12 257:6 322:4
**sending** 174:8
**sense** 106:20 107:11 128:17 277:3 311:8
**sentence** 50:6 74:18 80:5 83:18 106:20,25 107:9 109:11 110:16 112:2 146:18 148:8 163:12 176:23 198:17 199:24 202:6 230:16 232:17 252:4 266:25 268:19 269:12 273:20,22 276:25 277:3 285:17 289:10
**separate** 127:18 161:23 177:12 180:8 204:25 206:21 220:20 234:7 263:13 283:16
**separately** 170:13 186:12,13 249:5 283:13

**separation**  35:7
  246:13 303:22
**seriousness**  118:4
  252:5
**services**  12:10,14
  17:3 34:20 132:15
  134:17 150:16 160:12
**setting**  29:19
**setup**  62:4
**severe**  44:24 113:17
**severity**  39:20 114:10
  117:25
**sex**  141:16,20,22,23
**sexist**  141:24
**sexual**  31:3 119:14,25
  120:9 122:24 128:5,
  13,17 129:5 130:5,
  22,25 131:19 132:13
  133:9 134:16 135:14
  138:14 139:20 141:24
  145:3,19 146:10
  149:16,22 150:6,16
  151:19 155:15 158:2
  160:12 170:23 174:23
  177:16,20,23 178:5
  179:5 202:16 204:4
  206:23 207:17 228:14
  257:24 263:24 264:4
  270:20 278:24 293:12
  308:8 309:21 310:5
**sexually**  142:20
**shake**  14:18
**share**  126:18
**shared**  34:20 297:13
**sharing**  274:2
**sheet**  135:17 138:21
  139:14 204:19 207:13
**sheets**  205:16,17
  206:8
**shelves**  57:15
**shift**  172:22
**shifted**  67:19 114:2
**shifting**  86:16
**shipped**  57:16
**shipping**  54:22 55:2,3
  56:19 57:8,10,11,12
  58:25 60:5,8 62:3,5
  63:7,11,15,23 64:3
  81:25 82:5 85:16
  119:4

**shortly**  322:4
**show**  16:21 21:21
  48:21 97:20 98:23
  103:10 160:5 166:22
  185:7 288:13 297:19
  301:16
**showing**  46:5
**shown**  212:25
**shows**  318:15
**SHRM**  32:10,12,17
**shut**  174:8
**sic**  46:21 168:11
  199:16 246:14 311:16
**side**  62:4,10 81:23
  84:22 85:15 128:2
  132:2 190:16 192:6
  223:19 234:7 305:23
  306:20
**sign**  138:25 139:5
  251:15 321:17
**sign-in**  139:14 204:18
  205:16,17 206:7
  207:13
**signature**  237:3
  251:10,11 318:14,16
**signed**  96:20 251:14
**similar**  55:8 89:17
  290:21
**simultaneously**  175:5
  176:6 188:16 189:6
  220:21
**sit**  22:2 37:19 38:12
  124:21 145:12 262:9,
  14
**sitting**  90:19
**situation**  16:15 38:22
  39:3 113:25 120:7,12
  149:8,9 156:22
  174:20 179:25 186:7
  249:20 252:5 281:3
  293:10
**situations**  156:21
  190:20
**six-month**  101:21
**skipping**  271:23
**slam**  165:20 166:5,7,
  10
**slammed**  166:2
**slamming**  202:3
**sleeping**  153:2 155:17
  196:4 275:24

**society**  32:14,15
**sole**  272:21
**solely**  123:2 294:16
**someone's**  118:3 142:9
**sort**  32:5,22 48:4
  65:9 112:11 147:13
  149:19 162:23 179:12
  180:7 182:8 196:3
  260:23 306:19
**sorts**  192:3
**sotto**  194:18
**sound**  46:13 258:3
**sounds**  86:15
**source**  169:8 174:18
  276:13 285:18,23
  286:2 312:6
**Southern**  25:6
**Southwest**  12:19
**speak**  19:21 31:15,17
  196:24 203:7 216:12,
  15 217:19 218:2
  230:23 231:10,19
  240:5 243:10 267:21
**speaking**  109:21 163:6
  192:10 203:14 216:11
  223:13
**SPEAR**  190:16 223:19
  246:17 289:12,16
  320:6
**SPEARS**  233:23 234:7
**special**  69:15 79:7
**specialist**  27:16,17
  197:10
**specific**  40:24 41:25
  42:2 78:15 110:21
  142:25 212:11 245:21
**specifically**  247:19
**specifics**  47:18
**spoke**  95:4 126:13
  203:15 215:17 216:14
  217:17 230:25 243:7
  248:23 266:4,7
  267:10 268:24
**spoken**  217:21 230:17
  269:6 313:13 314:4
**sporadic**  43:10,14
  90:7
**spots**  226:14 320:9
**spread**  276:9
**spreading**  170:8 276:8

**Sr** 233:10
**staff** 30:8,22 33:14 41:24 42:4 45:18 123:20 157:14,16 158:4 293:18,23,24 294:3
**staffing** 199:13
**stamped** 49:7 59:11 66:5 74:5 83:5 97:25 99:6,25 103:19 127:19 132:16 137:21 150:18 160:14 185:14 202:18 209:18 227:15 233:10 236:7 244:13 288:19 297:23 301:21 303:12 305:6 307:17
**standard** 79:4 108:6
**standards** 111:8
**start** 25:21 26:2,18 49:23 133:12 155:2 184:20,22 185:2 188:17 279:21 302:9
**started** 13:20 16:22 26:25 27:18 52:22 79:3,12 169:20 184:24 189:20 212:24 250:23 254:13,21 262:20 265:4,7 273:6 274:2,10,22 275:5,8,14,17 276:11,16,17
**starting** 69:14 113:25 140:7 249:8
**starts** 79:25 121:21 214:6 232:17 273:22
**state** 14:13 59:21 147:3 241:16 242:7,9,18
**stated** 241:11,18 242:4,16,23
**statement** 80:8 81:5 125:11,12 155:16 157:23 165:19 166:9,18,23 167:21 168:5,10 182:18 216:9,10 227:2 233:9,20 234:12,14,17,22,24 235:3,10,25 261:9,11,14,22 262:3 286:4 300:4 305:4,16,19 306:4 307:9
**statements** 195:4 230:9 258:12 297:8 306:6
**stating** 232:25 237:16 249:14
**status** 80:9
**stay** 81:8 223:18 225:5,24
**stays** 149:4
**STENOGRAPHER** 65:18 79:18 103:14 137:14 160:7 185:18 298:5 304:2 307:23 316:9,16 321:22 322:3
**stenographic** 13:3
**steps** 127:10,14 129:8 148:10,22
**stick** 217:11
**stir** 149:8
**stood** 97:12
**stop** 129:15 143:6 175:18,25 176:5,8,9 180:19
**stored** 205:18
**story** 125:23 128:3
**straight** 152:3 155:3
**strictly** 29:16 37:12
**strike** 44:10 123:6 129:9 192:20 248:15 291:21
**string** 167:4 173:19 185:13 301:20
**stronger** 61:23
**strongest** 61:11,12,19,21
**strongly** 61:8
**structure** 311:15
**stuff** 55:9 90:6,7 94:6 123:18 164:4 283:7,14 300:17
**subject** 35:14,25 36:18 42:2 152:21 159:9 178:21 179:2,12 311:3
**submit** 161:9,12 235:7
**submitted** 20:9 212:15 254:2 288:9 295:23 296:3,13
**subordinate** 245:23 272:23
**subordinates** 176:9 180:6 189:13 199:17 239:20 259:22
**substantiate** 228:17 229:9,18 231:4 255:8 314:9 320:2
**substantiated** 247:17
**suffer** 192:19
**suffering** 188:19
**suggest** 140:24 235:5,9,14
**suing** 16:12
**summaries** 161:20
**summarize** 124:14
**summary** 160:3 161:3
**supervisor** 56:20 57:8,11 60:5,7,8,14 62:2,5 63:11,15,24 64:3,4,23 65:3 96:3 114:9 115:13,20,21 116:9,10 120:4,5 123:22 199:19 235:5 294:17 309:6
**supervisor's** 96:6
**supervisor/materials** 59:23
**supervisors** 40:21 45:25 58:25 95:24 96:9 97:11 175:17 199:12 204:21,24 205:12 268:15
**supervisory** 202:16 204:4
**supplement** 297:10
**supplemental** 297:6
**supplemented** 230:8
**suppliers** 72:14
**support** 12:24 234:14
**supported** 230:6
**supposed** 100:22 121:6 208:10
**surprised** 300:7
**suspended** 115:4
**Suspension** 114:18
**swear** 13:4
**switch** 279:8
**sworn** 13:8,24 184:7
**system** 29:19 35:4

**T**

**taking** 64:22 79:2,6 84:19 122:22 126:6

127:16 147:20 202:12
258:22
**talk**  37:20 39:12
45:18 141:16,20,23
142:6 163:3 180:13,
15 187:7 216:20
243:13 257:17 262:9
275:10 297:17
**talked**  76:20 160:2
180:19 184:18 206:24
212:20 223:8,10
264:3 266:4 313:11
**talking**  47:7 75:20
88:10 129:13 156:18
163:24 170:4 171:12
175:25 179:17
181:15,16,20 212:11
213:23 218:4 238:20
274:13 283:11 284:10
**Tambeni**  62:17,18,19,
20 99:19
**task**  22:2
**teach**  188:8
**teachable**  188:5
**team**  187:9 190:18
**teams**  46:3
**telling**  126:4,6
162:17 169:18 175:24
225:23 246:13 272:24
284:4
**tells**  102:6
**tenure**  28:11,12
**term**  41:12 155:11
**termed**  79:16,19,20,22
101:18
**terminate**  38:6
**terminated**  79:22,23
85:21 104:9 107:2
139:25 238:11
255:16,17,19 257:23
294:4 297:18 298:12,
15 299:13 306:16
**termination**  38:9
111:4,14 114:16
117:10,18 238:18
248:18 252:14 272:16
298:9 304:14,16
318:22 319:5
**terminations**  38:5
110:18 114:8
**terms**  142:15,17
156:15 170:23 264:4,

7
**testified**  13:9 16:17
184:8
**testify**  17:12,16,23
18:4 23:23 24:11
**testifying**  233:20
**testimony**  12:11 15:7
19:14,18 24:8 87:23
184:12 266:20 279:18
313:8 321:21
**text**  40:5
**theft**  107:12 110:3
123:11
**thing**  14:16 108:15
129:15 256:8 260:2
268:7 319:21
**things**  20:11 48:15
72:12,15 90:10 92:22
110:14 114:2,22
126:3 142:6,25
158:14 179:17 188:15
189:5,8 200:25
238:13 239:5 247:12
248:3,4 279:23
284:25 300:10 303:25
306:8
**thinking**  28:15 53:24
61:9 75:2 139:18
**third-to-last**  266:24
**Thirty**  316:9
**Thompson**  212:8 219:2
265:2 274:12 275:23
277:6,9,12,22 278:2
**thought**  75:9 94:25
193:7,8 224:8
**threaten**  262:3
**threatening**  193:21
239:24 273:2
**Thursdays**  41:3
**till**  197:25 268:4
**time**  14:22 15:18
16:5,13 20:19,22
28:3,6,11,25 29:2
33:16 37:25 39:23
42:12,15 43:12 44:17
45:17,25 46:6 51:17,
23 52:2,7,19 61:17,
19 62:16 63:23 68:23
69:18 72:13,15
75:14,16 80:9,11
81:7,8,14,24 88:20,
22,23,25 89:2,10

91:23 95:25 98:15
99:15 100:15 102:11
104:16,23 105:2,3,15
106:22 112:11
118:14,18 119:20
133:9 138:25 140:14
157:19,25 158:20,24
162:24 168:9 176:15
177:24 186:15 187:2
188:24,25 190:14
196:18 197:8 213:18
216:20 218:22,23
219:10,22 221:24
222:13 223:5,6,7,10,
19 224:16 225:15
226:3 228:6,9 230:2
233:22 241:21
242:11,20 245:11
246:12,22 248:7,13
250:8 262:11,13
263:6 266:12,14
273:8,9,16,17 283:4,
7,15 292:5,20 298:11
299:11 302:15 312:12
316:3 317:23 318:9
319:7,25 321:9
**timely**  283:15
**times**  45:13 47:17
266:12
**title**  50:12 51:22
55:21 69:14 71:3
73:16 74:25 75:17
76:14 82:15,16 90:15
214:10 233:22,24
**titles**  56:22,23,25
57:3 60:6 62:8 76:3
**to-do**  20:17
**today**  13:25 14:23
15:7 17:12,17 18:13
19:15,18 21:2 22:13
24:8,11,13 88:5 91:7
93:18 95:10 149:25
302:16 315:10 317:16
319:17
**today's**  91:7 321:20
**told**  40:17 45:12
116:24 125:22 153:20
163:18 164:5,6
194:13 195:3 196:16,
19 199:5,14 200:3,6
209:6 217:22 221:19
225:12,14 239:12
247:23 269:3 274:23

275:21 277:4,12,25 278:4 282:20,24 285:6 287:5,10,14 289:18,23 299:13
**tool** 161:19
**top** 143:21 172:23 181:18 251:23,25 253:13 259:2 276:24 289:5,10
**topic** 174:10,12
**topics** 17:20,23 18:2, 9,10 43:23 86:16 175:4,6 176:10
**track** 187:12 209:3
**trained** 120:3
**training** 30:8,24 31:24 32:6,8,10,18 40:12,16,17,19 45:3 64:23 65:3,8,10 69:15,19,21,23,25 70:5,10,15 78:4,7, 12,14,16,17 79:2,8, 11 113:22 133:10 135:14 136:8 138:22 139:8,9,21 140:15 202:18 204:8,11,12, 13,15,17,24,25 205:3,8,10,19 206:3, 5,6,7,10,20 293:12, 22,25 294:9 307:16 308:8,9,13,19,23 309:7,12,16
**trainings** 79:6 204:5 205:15 206:13 207:25
**transcript** 321:23
**transpired** 190:21 196:14 254:10 272:7 282:13,16
**transpiring** 43:25 278:20 283:22,25 284:6 285:10
**transportation** 50:19 51:21 52:5 68:11
**treat** 179:11 222:8
**trial** 16:18 23:22
**true** 144:25 206:12 221:16 225:3
**trumped** 178:4
**Trust** 187:11
**truth** 126:4,6
**truthful** 13:24
**Tuesday** 153:14 254:10
**turn** 17:19 39:16 45:13,14 92:5 106:13 119:12 141:9 261:2 281:9 292:9
**turned** 88:7
**turning** 146:13 201:4 302:23
**Twelve** 137:14
**Twenty** 227:20
**Twenty-five** 298:6 303:19
**Twenty-nine** 307:24,25
**two-week** 106:23 107:5
**type** 29:21 30:6,10 78:15 79:5 118:18 122:24 123:11,24 124:10 127:2 192:17 214:20 235:3 295:7
**types** 37:7 56:10 123:4,5,7,15
**typical** 44:11 48:11 118:22 127:7 128:12
**typically** 42:6 43:24 118:12 128:9
**typo** 144:9 254:12 286:20

**U**

**U.S.** 12:15,24
**ultimately** 31:17
**um-hum** 14:21 41:13 43:15 50:10 56:24 59:14 64:14 65:16 69:9 74:14,22 77:3 80:3 81:13 82:10 83:22 85:25 88:17 93:17 102:13 106:10 108:14 109:14 113:12 121:10,23 122:18 130:20,23 141:13 142:14 144:20 146:15,17,20 148:13 151:5 154:3 159:7 160:7 161:11 162:10, 15 163:16 164:12,16 166:15,21 171:25 172:5 177:3,17,19 178:10 179:6 185:6 196:7 197:20 198:10 208:24 214:8,11 221:3 225:7 230:20 232:20 236:22 244:6 248:25 249:10 251:9 252:23 255:23 259:11 263:18 264:21 282:19 306:21 311:5
**unable** 228:15
**uncomfortable** 213:20 219:24
**understand** 13:23 14:7,12 17:11,15,22 46:25 111:16 118:4 121:19 182:5 255:24
**understanding** 46:18 113:24 130:4 152:10 153:25 165:6 174:25 247:25 268:12 277:20 278:5 285:21
**understands** 293:16
**understood** 14:11 176:8 182:17 284:22 285:5
**unfounded** 144:22 145:2,9,22 147:23 148:3,4,9 171:8 187:4 213:4
**Unit** 12:10 87:15,23 183:2 184:12 279:10, 17 313:7
**University** 25:6,25 26:6,10
**Unlawful** 150:17 160:13
**unprofessional** 152:24 249:15
**update** 41:25 105:3 229:23
**updated** 134:9,12
**upper** 210:17
**upset** 203:13

**V**

**vacant** 60:21
**vacation** 119:7 208:4, 9 209:7 224:18 245:8
**vaguely** 48:20
**validate** 125:23 130:10,11 145:6
**valuable** 235:13

**Van** 218:20 223:25 224:3
**varies** 112:15 114:13
**vary** 118:20
**vendors** 68:10 72:14
**verbal** 130:21 162:5 321:12,15
**verbally** 120:14 222:6 225:20 287:6
**Verification** 74:5
**verify** 316:22
**version** 105:5
**versus** 12:13
**viable** 37:23 147:6
**victim** 142:16,21 143:2,17,18 145:7 149:3 171:3 264:5
**video** 226:4 276:21 279:8 319:22,25 320:19 321:6,11
**view** 125:7 191:7 211:13
**VII** 214:10
**violate** 107:11 108:7 247:22
**violating** 108:23 172:7
**violation** 107:3 108:12,22 109:3,4, 12,16,24 110:13 131:20 304:23
**violations** 108:2,7
**violence** 123:12
**Virginia** 27:14
**visit** 245:22
**visits** 44:4
**voce** 194:18
**voice** 24:18 192:2 199:10
**voluntary** 35:7
**Vora** 28:22 31:20 34:7,13 35:17,20 37:2,8,20,24 38:13 58:11 60:24 67:7 71:17 84:11 96:25 127:21 228:2,3,4 231:11,19 280:7 288:11 291:3,4,12 312:15 317:24 319:4
**vulgar** 141:15,23

**W**

**wait** 184:21 218:16
**waived** 107:5
**walk** 43:8
**Wallace** 51:16,19,20 52:6 68:5,6 75:3,13 100:14 178:12 200:8 201:24 202:25 203:5, 15,18 265:9 272:5 274:13,14,23 301:7 305:5,16,18,24 307:10
**Walsh** 18:25 19:3,14, 19 21:8,12,14,16,20, 23 22:17,20,23 23:4, 8,11,20,25 24:3,17 41:15 43:18,20 49:2 53:15 54:5 65:24 83:8 86:4,7,14,25 87:3,6,10,13 92:20, 25 93:10 102:15 109:5,17 111:18,20 112:13,19 121:12,14 128:15 131:4,22 132:21 135:5,7 136:17,19,23 137:2 141:4 143:4 146:3 150:8 154:5,8 155:7 164:18 179:8 182:4, 12,23 185:10,17,19 194:11 207:19 218:16 220:9 221:5 228:20, 25 231:20 232:5,12, 14 234:18 250:14 255:9 256:6 279:21 280:8,21 291:16,24 303:20 309:22 310:7, 13,18,22 311:20 312:8,13 313:16 314:17 315:3,15,18, 24 316:2,4,21 317:5 320:22 321:17,24
**wanted** 32:22 34:6,8 78:5 135:15 152:25 158:19 165:5 168:11 173:12 174:12 175:16 192:5 218:24 282:3 283:3 305:22 306:9
**wanting** 46:15
**warehouse** 43:8 44:2, 4,6,7 45:8,11,16,20 46:11 47:11 50:18 55:7,13 56:8 57:11 58:16 61:23 62:8,10 67:13 71:4 73:21 82:19 84:4,19 85:16 97:8 102:21 114:2 152:22 154:2 157:18, 21 175:7,9,12,14 188:17 190:17,20 197:10,17 226:6,9 239:22 246:15 247:16 268:24 269:18 270:12 274:20 276:5 283:3 285:9,11 298:18 300:18,19,25 320:9, 10
**warning** 117:21,22 118:9 236:6,17 237:6,18,25 238:15, 25 239:7,13,15 240:25 241:5,10 244:12,19,22,25 245:13,20 247:13,21 248:10 249:8,21,22 250:13 252:13 272:15 273:4 287:9,23 288:5,6
**warnings** 118:13 273:16 287:12 299:9 317:20
**warrant** 295:7
**Washington** 12:5,20 29:14 33:4,19,22 122:5
**Wasik** 13:14,18 17:8 18:8 21:5,13,15,18, 22 22:4,12,22 23:3, 6,10,13,17 24:5,21 41:16,20 48:24 49:3, 12 53:17,19 54:7,16 59:7,15 63:22 65:21 66:8,15 68:3 71:6 74:9,16 75:7 76:16 79:21 82:3 83:9,16 86:8,17,24 87:5,8,12 88:2 92:24 93:9,13, 14 98:6 99:10 100:6 102:18 103:12,23 108:10 109:9,20 111:24 112:16,21,22 121:15 128:18 131:13 132:7,20,23 135:9 136:18,22,24 137:7,

13,16 138:4 141:5 143:12 146:6 150:11, 23 154:10,13 155:10, 12 156:4 157:12 160:6,8,18 164:2,21 167:18 168:3 173:15, 23 179:10 182:6,19, 21 184:16 185:9,20 186:3 193:11 194:14, 17,20 201:19 202:23 207:22 209:14,22 215:18 218:17 220:22 221:8 224:6 227:20, 21 228:21 229:2 231:22 232:7,13,15 233:14 234:20 236:13 244:2,17 250:17 255:14 256:17 276:20,23 279:6,19, 24 280:11 281:4 288:24 291:19 292:7, 8 298:3,7 302:4 303:7,18,21 304:3 305:12 307:22,25 308:2 309:24 310:10, 16,20,24 312:2,18,22 313:9,18 314:17 315:13,17,22,25 316:3,7,18 321:5,16, 18,25

**week** 28:19 41:9 151:25 152:2 196:25 198:2 208:7 254:12

**weekend** 277:21

**weeks** 283:23,25 284:7

**weighted** 290:14

**whatever's** 92:15

**witnessed** 125:3

**witnesses** 125:2,7,20 126:2 127:24 128:21 129:14 161:21 168:25 169:22,24 170:10,14, 19 195:16 217:16 258:13 264:23 265:24 297:9

**wondering** 166:23

**word** 187:10

**words** 247:15 300:5

**work** 21:24 24:13 26:15 27:13 31:5 42:13 50:21 52:6 55:7 131:2,17,20,25 141:17,20 146:16 180:17 187:15 189:20,23 192:18 210:2 211:2 213:20 215:2,5 218:12,21 219:24 220:17 221:22 226:5 228:13 233:25 234:4 240:21 245:8, 23 248:19 250:21 260:4 263:23 265:16 273:11 283:4 284:24 310:12

**workbook** 202:18 205:3

**worked** 22:9 33:5 38:2 40:25 45:6 50:18,19 52:7 56:2 86:9 92:10 95:13 100:19 105:15 117:3 119:23 127:8 139:23 140:2 226:4,5 248:2

**workforce** 36:9,11 58:10 311:15

**working** 20:17,19,22 26:8,19,25 27:18 34:15,19 35:12 52:16 55:13 104:17 111:6 114:25 147:13 309:3 314:2

**workplace** 110:5,8 122:25 123:12 129:2, 16 142:4,7 149:10 153:6,12,13 155:2 176:25 177:8,15 180:16 223:12 240:6 268:14 274:11,18 276:2 277:18,19 293:17

**works** 182:22

**workshop** 245:10 256:19,22 257:2,3

**workspace** 284:13

**would've** 95:6 292:13

**wrapped** 186:24

**write** 78:2 80:4 94:19 96:4 115:24 125:12 135:10 167:22 168:5 234:11 235:22 244:22 245:12 254:4 277:24 287:18 292:18 304:6 305:18,21 306:3

**write-up** 114:9,14

**writing** 55:25 80:25 117:24 120:16 125:10 195:4 208:9,14 216:21 225:21 229:19,21 235:7,15 237:5 256:25 257:2 268:25 306:9 315:2 319:8

**written** 95:21 108:24 112:7 114:25 117:21 118:3,5,9,13,23 119:2,8 149:16 218:10 222:16 235:9, 23 236:6,17 237:14, 18,25 238:25 239:7, 13,15 240:25 241:4 244:12,18,22,25 247:13,20 249:21,22 250:13 252:12 264:13 273:16 287:2,9,12,23 288:6,10,15 292:21 296:8,11,23 297:11 299:9 304:7,10,12,13 305:23 317:20 321:13

**wrong** 72:12 121:20 186:16

**wrote** 20:19,21 77:24 95:23 98:19 99:18 100:13 162:4 166:9 196:15 210:5,8 235:24 238:25 240:25 241:3 244:7 245:15, 17 282:11 285:7 287:19 292:15,25 299:21 306:23 314:19

**Y**

**year** 54:5 65:5 89:12 100:23,24 101:10,23 196:12 205:11 206:13,14

**years** 15:17 26:14 27:7 80:7 81:4 89:2

**yesterday** 302:17

**you-all** 263:8

**Z**

**zeros** 113:2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

--------------------------------------x

EVANGELINE J. PARKER

Plaintiff,

-against-

REEMA CONSULTING SERVICES, INC.,

Defendant.

Civil Action No. 8:17-CV-01648-TDC

--------------------------------------x

(Via remote videoconference)

July 10, 2020
8:59 a.m.

Continued Videotaped Remote Videoconference Deposition of CATHY PRICE, before Kristi Cruz, a Notary Public of the State of New York.

A P P E A R A N C E S:

WASHINGTON LAWYERS COMMITTEE FOR CIVIL RIGHTS
Attorneys for Plaintiff
700 14th Street NW, Suite 400
Washington, D.C. 20005
BY: JOANNA WASIK, ESQ.
TRISTIN BROWN, ESQ.
202.319.1000
joanna_wasik@washlaw.org
(All via videoconference)

WRIGHT, CONSTABLE & SKEEN, LLP
Attorneys for Defendant
7 Saint Paul Street, 18th Floor
Baltimore, Maryland 21202
BY: DONALD WALSH, ESQ.
410.659.1354
dwalsh@wcslaw.com
(Via videoconference)

ALSO PRESENT:
MARTIN SHERILL, Remote Video Technician
RAJESH S. VORA (Via videoconference)

-------------------I N D E X-------------------

| WITNESS | EXAMINATION BY | PAGE |
| --- | --- | --- |
| CATHY PRICE | MS. WASIK | 322 |

EXHIBITS 31 THROUGH 35, PREVIOUSLY MARKED/IDENTIFIED, WERE INTRODUCED DURING THE PROCEEDING

PROCEEDINGS

THE VIDEOGRAPHER: This begins the videotaped deposition of Cathy Price in the matter of Parker versus Reema Consulting Services, Inc. This deposition is being held at U.S. Legal Support, Inc., remote videoconferencing, on June 10, 2020. My name is Martin Sherill from U.S. Legal Support, and I'm the video specialist. The court reporter today is Kristi Cruz, also from U.S. Legal Support. We are going on the record at 8:59 a.m. Counsel will now state their appearance for the record, starting with the taking attorney.

MS. WASIK: Joanna Wasik for plaintiff Evangeline Parker.

MR. WALSH: Donald Walsh on behalf of the defendant Reema Consulting.

MR. VORA: Rajesh Vora from Reema Consulting, president.

MS. BROWN: Tristin Brown, also representing the plaintiff.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

THE COURT REPORTER: The attorneys

C. PRICE

participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely. They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his/her testimony in this matter is under penalty of perjury. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting. Please indicate your agreement by stating your name and your agreement on the record.

MS. WASIK: Joanna Wasik, I agree.

MR. WALSH: Donald Walsh, I agree.

C A T H Y P R I C E,

resumed as a witness, having been duly re-sworn by a Notary Public, was examined and testified further as follows:

(Witness presented government-issued ID and all counsel agreed to proceed.)

EXAMINATION BY
MS. WASIK:

Q. Ms. Price, welcome back, and thank

Page 333

C. PRICE

you for your time this morning. The goal of today's deposition is to go over a few documents that we received after your last deposition was completed. So I won't be asking you the same questions that I was asking before, but we may refer to topics from your previous deposition just so that I can ask questions about these new documents.

A. Yes.

Q. The same ground rules apply as before, and there are a few new ground rules for today given the remote nature of what we're doing.

You understand that you've been designated by Reema to speak on behalf of the company?

A. Yes.

Q. And do you understand that you've sworn to provide truthful and complete responses as if you were in a court of law?

A. Yes.

Q. Is there anyone else in the room with you today?

A. No.

Page 334

C. PRICE

Q. During the deposition, you are not permitted to communicate with anyone outside of the deposition. So that means no text messages, no e-mails, no chat. Can you confirm that you understand that?

A. I understand.

Q. What device are you using to participate in the deposition today? Is it a laptop?

A. Yes.

Q. Okay. What other devices do you have in the room with you?

A. My office equipment for my other job, my laptop and cell phone.

Q. No iPad or anything in the room with you?

A. No.

Q. I will also ask that after today's deposition is over, if you could please delete the exhibits that we'll be sharing. You might have already received those from counsel and then we'll also be sharing them in the chat function today. So when the deposition is over, I will ask you to please delete all

Page 335

C. PRICE

those exhibits off your computer. Can you confirm that you will do that?

A. I will, yes.

Q. Okay. Thank you.

Well, let's go straight to the exhibit that we have marked as Exhibit 31. Your lawyer may have sent this to you earlier and we will also put it in the chat function of zoom right now so you can download it that way if you prefer. Please let me know when you've been able to open it.

A. I'm sorry. Is this a protected document? It's not allowing me to open.

Q. It should not be. Are you -- let me ask it this way: Did you receive these exhibits via e-mail from your counsel before the deposition?

A. I did. Can I open those?

Q. Yes, you may, absolutely.

A. Okay.

Q. It's the one labelled Exhibit 31.

A. Okay. I have it.

Q. So I'd like to go to the first page, the bottom right-hand corner says CP 000001.

Page 336

C. PRICE

Do you see that page?

MR. WALSH: It's Bates stamped in red.

THE WITNESS: Got it.

A. Yes.

Q. Okay, great. I see that this page has the words Evangeline Parker and I think it says "added responsibilities" under that. Am I right?

A. Correct.

Q. And why did you write Evangeline Parker added responsibilities on this date in your notes?

A. To my remembrance, it must be that she was getting added responsibilities to her job duties based on some contract changes.

Q. Okay. When we last spoke, we were trying to nail down the dates of Ms. Parker's various positions. You may recall that. And we talked about how at some point in 2016 Ms. Parker held the position of quality compliance control and then she became assistant warehouse manager. Does this note jog your memory as to when she became

Page 337

C. PRICE

assistant warehouse manager?

A.   It does not unfortunately because I don't have the rest of my notes to see what -- what this corresponds to in the notes.

Q.   Do you remember anything about what these added responsibilities might have been in, it looks like March 2016?

A.   I do not.  I'm sorry, I do not.

Q.   If Ms. Parker says that in March or April 2016 Mr. Moppins added the assistant warehouse operations manager responsibilities to her plate, do you have any reason to believe that that is not true?

A.   I do not.  That may be so.

Q.   Okay.  If you could please scroll now to the -- well, it's actually the fifth page of the PDF, but the Bates stamp at the bottom ends with the number 4.  So it's CP and then a bunch of zeros and then 4.

A.   Okay.

Q.   Are these your notes from a meeting?

A.   Yes, a Spear meeting.

Q.   Who was in that meeting?

A.   Larry and Mr. Vora.

Page 338

C. PRICE

Q.   And you?

A.   Yes, and myself.

Q.   Was there anyone else in this meeting?

A.   Not that I'm aware of, no, that I can recall.

Q.   I see a reference to the words "need good middle managers."  Do you see where I'm looking?

A.   Yes.

Q.   What is that a reference to?  Why did you write that note?

A.   The best of my recollection was, I'm not sure if this was at the time when spear was a new contract added to Reema and they were doing -- trying to identify how to staff that particular contract.  So I would be -- I would best guess that we were trying to identify how to lay out the workforce for that contract.

Q.   Is this a reference to people that you're -- strike that.

Are you trying to find people who would make good middle managers?  Was that a

Page 339

C. PRICE

point of discussion?

A.   I think we were just laying out what it should look like, and then we would look at what we had in the ATA side of the contract to see if we had anyone that fit what we laid out as a final look for the positions that were staffed for spear contract.

Q.   And if you look on the left, I see a list of star performers.  Do you see where I'm looking?

A.   Yes.

Q.   Who created that list of star performers?

A.   I think that was from us brainstorming who were our best employees at the time in the warehouse.

Q.   So that was Mr. Vora, Mr. Moppins, and you all brainstorming together; is that right?

A.   Yes.

Q.   Who made the decision to put Ms. Parker on the list?

A.   I think that was a common decision.

Q.   Why did you all reach that common

Page 340

C. PRICE

decision?

A.   Based on how she was performing in the warehouse, as with the rest of the other individuals on the list.

Q.   And how was she performing in the warehouse that made you put her on the list of star performers?

A.   I can't give you an exact.  It would probably be based on any performance reviews or recommendations from her supervisors at the time.  The same for all the rest of the other people on the list.

Q.   And is it fair to say that star performers is a list of employees who were performing very well at the company at the time?

A.   Well, they're performing a job, yes.  They're performing their job at best.

Q.   After this meeting was held and you made this list of star performers, were any decisions made about, you know, the spear side or the new contract or anything like that?

A.   I believe there was some actions taken after this particular brainstorming

Page 341

C. PRICE

session.  What exactly, I can't remember. This happened a few years ago and I can't give you the specifics of exactly what transpired right after that.

Q.    Did you end up moving people into middle manager roles or over to spear side?

A.    We did.

Q.    Do you remember who?

A.    I believe at that time it was -- one person I can remember was Mr. Carter, Carlos, and -- I'm trying to think -- I think he's the best person that I can think of that moved over there because I believe he over -- he was chosen to lead the spear contract.

Q.    But Ms. Parker was not moved over to spear; is that right?

A.    I can't remember if she was or not at that time.

Q.    Can you just -- I'm having trouble reading.  I think there's a note about deputy PM.  Do you see that?

A.    Yes.

Q.    Can you read that note to me?

A.    "Deputy PM logistic experience cross

Page 342

C. PRICE

training people."

Q.    And what is that a reference to?

A.    I'm assuming at the time we were creating a position of a deputy PM and we would be looking for people -- a person who had logistics experience and the ability to cross train other people on the team.

Q.    Other than the notes we already talked about, are there any notes on this page that refer to Ms. Parker?

A.    On this page?  No.  I think as you see, this is how it was.  Where her name is all the reference that I know of, just brainstorming a list of people that we wanted to look at.

Q.    Okay.  If you could please just scroll down to the very next page in your notes.  The Bates stamp ends in 5.

A.    Okay.

Q.    I understand from our last conversation that in April 2015, Ms. Parker was the receiving supervisor material coordinator.  Why did Mr. Moppins request for Ms. Parker to be converted to a salaried

Page 343

C. PRICE

position in this e-mail?

A.    It would be my recollection that on government contracts, most positions in the warehouse were under service contract X, and so they were a wage determined positions. Once they moved out of that, they would be moved, if they were in any type of management or supervisory role, then they would be converted to salary positions, but they no longer followed under the service contract X.

Q.    Is this e-mail an indication that Ms. Parker was moving into such a management or supervisory role?

A.    I think it was a consideration of if she was or was not because I see I have a question mark and I wrote out "Angela Wallace."  So I'm assuming either she was at the time or she was being considered to be converted.

Q.    And did you and Mr. Moppins have a discussion after this e-mail?

A.    It would have been me and Mr. Vora.

Q.    The e-mail is from Mr. Moppins, correct?

Page 344

C. PRICE

A.    It is, but any type of salary changes or anything like that, are that had to be approved by Mr. Vora.

Q.    So when Mr. Moppins asked, "I would like to speak with you regarding converting the following personnel to salary," did you reply to him that you could not speak with him?

A.    I didn't reply to him.  He knew -- that's why he wrote at the bottom "I've already spoke to Mr. Vora last week during your absence."  So I would have followed up with Mr. Vora first.  I don't take a action just because he's requested it.  I have to make sure that it was approved by Mr. Vora.

Q.    Okay.  So let me break down the procedure here.  So first Mr. Moppins spoke with Mr. Vora about the salary conversion; is that right?

A.    Right, because I was not around.

Q.    Okay.  And then Mr. Moppins asked to speak with you about the salary conversion, and after that you spoke with Mr. Vora?

A.    Yes.

Page 345

C. PRICE

Q.    Did you speak with Mr. Moppins about the salary conversion?

A.    He sent me the e-mail, so I don't think that I would have a need to speak to him other than to get any additional information as to why they were moving them around.  Final decision had to come from Mr. Vora as to any kind of salary changes that was going to affect the budget or the contract.

Q.    And so Mr. Moppins was just making the recommendation that Ms. Parker should be converted to salary; is that right?

A.    Correct.

Q.    And he made that recommendation both to Mr. Vora and to you?

A.    Correct, that was the discussion, yes.

Q.    Can you read me the note about Angela Wallace?

A.    Angela Wallace, two departments, I see assistant manager, logistic department, transportation and inventory, and that's it.

Q.    What is the meaning of that note?

A.    I think at the time she was being

Page 346

C. PRICE

considered to oversee two departments.  She was going to put over logistics and the transportation and inventory.

Q.    Do you remember if Ms. Parker was converted to salary after this e-mail?

A.    I believe she was.  I think there was a document with that.

Q.    Okay.  We can move on to the next page, the one that ends in 6 at the bottom right-hand corner.  Do you have that page in front of you?

A.    I'm sorry.

Q.    No problem.

A.    Yes.

Q.    In the middle of the page after the number 1, I think this says Evangeline tactical position.  Am I reading that right?

A.    I can't -- I can't make out my own handwriting.  It's either tactical or logistical.  I'm not sure.

Q.    I see.  Tactical or logistical. Okay.  What is the meaning of that note, either tactical or logistical?

A.    I do not recall at that time.

Page 347

C. PRICE

Q.    I see that this is a daily action log.  So was this -- what is a daily action log?

A.    That's just my to-dos, or what I need to do.

Q.    For what date was this your to-do list?

A.    6/10/15.

Q.    And were you having a meeting with Mr. Vora on that day?

A.    I don't think so.  I think Mr. Vora's meeting was 6/9/15.

Q.    It looks to me if you look on the left-hand side near the 1, 2, 3, it says "Management plus professional development." Am I reading that right?

A.    Correct.

Q.    Does that jog your memory as to what you were writing with regards to Ms. Parker?

A.    Again, this looks like a continuation of the changes on the contract and the positions, the restructuring.  And so these people were possibly put into management positions and was requiring some type of

Page 348

C. PRICE

management training.

Q.    Okay.  I'd like to move on to the next exhibit.  I believe you should also have it from counsel, it's Exhibit 32.  So if you could open that one, please.

A.    Okay.

Q.    Let me know when you see that e-mail.

A.    I have it.

Q.    Okay.  Thank you.  And I see the title of this e-mail is "Evangeline's added responsibilities."  Do you see that?

A.    Correct.

Q.    Why was Ms. Parker given added responsibilities with, I believe it's the International Traffic and Arm Regulation?

A.    I think that, again, was during the restructuring of a contract and there was a position that was -- I mean, not a position, I'm sorry, additional duties that were being added, and she -- this e-mail was addressing those duties that she would possibly be doing.

Q.    Who made the decision to give her these added ITAR responsibilities?

Page 349

C. PRICE

A.    That's contract; from the client.

Q.    So the client being State Department?

A.    Yes.

Q.    But did the State Department choose who within Reema's warehouse, what employees would have certain responsibilities?

A.    No.  It's just the position.

Q.    So did the State Department say we want Ms. Parker to have additional ITAR responsibilities?

A.    I can't attest to the conversation with the State Department, but no, that would have been modified in the contract itself and then we would execute based on contract modifications.

Q.    Okay.  So based on the contract modifications, Reema would choose which employees would get those responsibilities; is that correct?

A.    Correct.

Q.    So who at Reema made the decision as to who would get these responsibilities?

A.    That would have gone through another

Page 350

C. PRICE

conversation of deciding who was the best employee to handle those responsibilities, with recommendations from Mr. Moppins, also discussions with Mr. Vora.

Q.    Okay.  Mr. Moppins and Mr. Vora. Got it.  And what is Mr. Pickett's role in that?  Because I see the e-mail is from him.

A.    I believe, if I'm remembering correctly, at that time Mr. Pickett was shifted into the responsibility of deputy program manager, so that person would probably be reporting to Mr. Pickett.

Q.    And do you remember why you -- I'm sorry.  Looking down at the second page of this e-mail, I'm looking at the e-mail from you to Mr. Pickett on January 22, 2016.  Do you see that?

A.    Correct, yes.

Q.    Do you recall why you were asking Mr. Pickett to give you a statement on Ms. Parker's added responsibilities?

A.    I cannot 100 percent recall.  It probably would be to create a new job description.

Page 351

C. PRICE

Q.    Okay.  We can next go to, if you could please open Exhibit 34.  We're going to skip over 33 right now.  We had previously spoken about a meeting that happened on April 27, 2016.

Now, looking at the very top e-mail from you to Mr. Vora and Ms. Reema Vora, I see that you forwarded the e-mail about this meeting to them.  Were Mr. Vora and Ms. Vora present at the April 27, 2016, meeting?

A.    I do not recall.  I don't recall, I'm sorry.

Q.    Ms. Price, you understand that you're speaking on behalf of Reema today, correct?  On behalf of the company?

A.    I do, but you're asking me something that I don't recall.  Again, I don't have all my notes with me to reference anything else to see where this falls in context with the events that happened or transpired.

Q.    Before you held the April 27, 2016, meeting, did you discuss it with Mr. Vora and Ms. Vora?

A.    My best assessment would be that I

Page 352

C. PRICE

probably did with Reema before any action.  If this was in reference to anything to do with the topic of -- at hand, 9 out of 10 I did do a conversation with Mr. Vora and Reema prior to anything, any actions.

Q.    And did you debrief with them after this meeting occurred?

A.    Yes.

Q.    But you can't be sure whether or not they were present at the meeting; is that right?

A.    I can't recollect, recall them being present at that particular meeting.  There were a number of meetings happening at that time.  So again, in the correct course of the events, I can't recall at which meeting they were present at.

Q.    You mentioned that there were a bunch of -- many meetings happening at that time.  Are you referring to the meetings with the managers regarding the rumor and also the issues with Ms. Parker at that time?

MR. WALSH:  Objection.

A.    Correct, correct.

Page 353

C. PRICE

Q.   Do you recall whether Mr. Vora or Ms. Vora were at any of those meetings?

A.   I remember -- yes, I remember Mr. Vora and Reema coming down and having meetings with us, yes.

Q.   Which meetings were those?

A.   Again, there were a number of them. I can't remember the exact dates. My recollection is in my notebooks, and I don't have those.

Q.   Okay.  Let's move on to Exhibit 35. Let me know when you have it in front of you.

A.   I have it.

Q.   And I see that this e-mail is from Mr. Moppins to Ms. Vora and you, and the subject line is "As Requested."  And this e-mail attaches three counseling forms; is that right?

A.   Correct.

Q.   Did you request these documents from Mr. Moppins?

A.   I did, with advice from counsel.

Q.   Was this e-mail sent after the meeting that took place with you, Mr. Moppins,

Page 354

C. PRICE

and Ms. Vora?

A.   It had to, yes.

Q.   I would ask you to please scroll down to the counseling form for Mr. Pickett, which we had not discussed before.  It is Bates number -- I'm sorry, it's not Bates stamped, but if you could just scroll down until you see the written warning for Mr. Pickett.

A.   I see it.

Q.   Did Mr. Moppins write this warning?

A.   He provided the information for it, yes, he did.

Q.   I'm sorry.  Did he provide the information for someone else to write it or did he write it?

A.   He wrote it up.

Q.   Who determined the corrective action at the bottom?

A.   That language looks like it comes from our counsel, in-house counsel.

Q.   So it did not come from you; is that right?

A.   No.

Page 355

C. PRICE

Q.   And I see in the "Reason For Warning" section there's a reference to SME. Do you see that?

A.   Yes.

Q.   Is that a reference to Mr. Moppins?

A.   Correct.

Q.   And I also see references to the client.  Does that mean the State Department?

A.   Yes, he does.

Q.   Looking at number 3 in that text, it says that Mr. Pickett "asked the client to mediate a meeting between the SME and yourself so that you could explain why you told Ms. Parker of a privileged conversation between the two of us."  Do you see where I'm looking?

A.   Yes.

Q.   Who is "the two of us" in that sentence?  Is it Mr. Moppins and Mr. Pickett?

A.   Yes.

Q.   Can you explain to me what Mr. Moppins is referring to in that sentence?

A.   From my recollection, Mr. Pickett reached out to the client to get involved in

Page 356

C. PRICE

an internal issue which the client had no authority to do or to get involved in, and that's what he was referencing.

Q.   And what is the privileged conversation that he's referencing?

A.   A conversation between himself and Mr. Moppins.

Q.   Between Mr. Pickett and Mr. Moppins?

A.   Correct.

Q.   Do you know what that conversation was about?

A.   I was not present at their meeting.

Q.   Did you approve this written warning before it was issued?

A.   I reviewed the written warning and, again, it goes through the channel of the in-house counsel and just advisory to Mr. Vora.

Q.   And when you reviewed this written warning, did you understand what the privileged conversation was that's referenced here?

A.   My understanding was what I had in my notes when I asked from the investigation

Page 357

C. PRICE

that was going on at the time, which was a conversation between why Mr. Pickett did not handle the issue of the gossip that was happening and why he didn't bring it to HR. That was one piece of it that I do know of.

Q. Now, I understand from the last time we spoke that Mr. Moppins had asked Mr. Pickett if Mr. Pickett and Ms. Parker were in a romantic relationship. Is it possible that that's the privileged conversation that's being referenced here?

A. I think that that could be part of it. I don't think that was the sole conversation. I think it was the whole context of Mr. Pickett's actions, or non-actions really.

Q. And I see that the date of this is May 17, 2016. Do you see that in the upper right-hand corner?

A. I do.

Q. Is that the date that the warning was written?

A. Yes.

Q. So did Mr. Pickett receive this

Page 358

C. PRICE

warning on that date or a different date?

A. I do not recall the exhibit date that he received the warning.

Q. And as a result of this written warning, Mr. Pickett received a demotion; is that right?

A. Yes. He was put on a PIP too.

MS. WASIK: Ms. Price, those are actually all my questions for today. It's very brief. Thank you for your time.

And a reminder, please delete the exhibits that -- if you could just delete the e-mail from counsel, that would be great.

MR. WALSH: I have no questions, but we will read and sign.

THE WITNESS: It's done.

MR. WALSH: We're done. The videographer has to say something and then we'll go from there.

THE VIDEOGRAPHER: This ends today's deposition. We are going off the record at 9:35 a.m.

(Time noted: 9:35 a.m.)

Page 359

A C K N O W L E D G M E N T

STATE OF NEW YORK )
:SS
COUNTY OF )

I, CATHY PRICE, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of July 10, 2020; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

____________________
CATHY PRICE

Signed and subscribed to before me, this day of , 2020.

______________________________
Notary Public, State of New York

Page 360

C E R T I F I C A T E

STATE OF NEW YORK )
) SS.:
COUNTY OF SUFFOLK )

I, KRISTI CRUZ, a Notary Public within and for the State of New York, do hereby certify:

That CATHY PRICE, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of July 2020.

\-----------------------
KRISTI CRUZ

Page 361

***ERRATA SHEET***

NAME OF CASE: PARKER V. REEMA CONSULTING
DATE OF DEPOSITION: JULY 10, 2020
NAME OF WITNESS: CATHY PRICE

| PAGE | LINE | FROM | TO | REASON |
|---|---|---|---|---|
| ____ | _____ | ___________ | __________ | _____________ |
| ____ | _____ | ___________ | __________ | _____________ |
| ____ | _____ | ___________ | __________ | _____________ |
| ____ | _____ | ___________ | __________ | _____________ |
| ____ | _____ | ___________ | __________ | _____________ |
| ____ | _____ | ___________ | __________ | _____________ |
| ____ | _____ | ___________ | __________ | _____________ |
| ____ | _____ | ___________ | __________ | _____________ |
| ____ | _____ | ___________ | __________ | _____________ |
| ____ | _____ | ___________ | __________ | _____________ |
| ____ | _____ | ___________ | __________ | _____________ |

_______________________

Subscribed and Sworn before me
this _____ day of _________, 2020.

___________________ ______________________
Notary Public My Commission Expires:

Exhibits

**EX 0031 Cathy Price 07 1020** 330:7 335:7,22
**EX 0032 Cathy Price 07 1020** 348:5
**EX 0033 Cathy Price 07 1020**
**EX 0034 Cathy Price 07 1020** 351:3
**EX 0035 Cathy Price 07 1020** 330:7 353:12

0

**000001** 335:25

1

**1** 346:17 347:15
**10** 331:7 352:4
**100** 350:23
**17** 357:19

2

**2** 347:15
**2015** 342:22
**2016** 336:21 337:8,11 350:17 351:6,11,22 357:19
**2020** 331:8
**22** 350:17
**27** 351:6,11,22

3

**3** 347:15 355:11
**31** 335:7,22
**32** 348:5
**33** 351:4
**34** 351:3
**35** 353:12

4

**4** 337:19,20

5

**5** 342:19

6

**6** 346:10
**6/10/15** 347:9
**6/9/15** 347:13

8

**8:59** 331:12

9

**9** 352:4
**9:35** 358:23,24

A

**a.m.** 331:12 358:23,24
**ability** 342:7
**absence** 344:13
**absolutely** 335:20
**acknowledge** 332:3,6
**action** 344:14 347:2,3 352:2 354:19
**actions** 340:24 352:6 357:16
**added** 336:9,13,16 337:7,11 338:16 348:12,15,22,25 350:22
**additional** 345:6 348:21 349:11
**addressing** 348:22
**administered** 332:7
**advice** 353:23
**advisory** 356:18
**affect** 345:10
**agree** 332:15,16
**agreed** 332:22
**agreement** 332:13,14
**allowing** 335:14
**Angela** 343:17 345:20,21
**appearance** 331:13
**apply** 333:11
**approve** 356:14
**approved** 344:4,16
**April** 337:11 342:22 351:6,11,22
**Arm** 348:17
**arrangement** 332:11
**assessment** 351:25
**assistant** 336:24 337:2,11 345:22
**assuming** 342:4 343:18
**ATA** 339:5
**attaches** 353:18
**attest** 349:13
**attorney** 331:14
**attorneys** 331:25
**authority** 356:3
**aware** 338:6

B

**back** 332:25
**based** 336:17 340:3,10 349:16,18
**Bates** 336:3 337:18 342:19 354:7
**begins** 331:2
**behalf** 331:17 333:16 351:15,16
**bottom** 335:25 337:19 344:11 346:10 354:20
**brainstorming** 339:16,19 340:25 342:15
**break** 344:17
**bring** 357:5
**Brown** 331:21
**budget** 345:10
**bunch** 337:20 352:20

C

**Carlos** 341:11
**Carter** 341:11
**Cathy** 331:3
**cell** 334:15
**channel** 356:17
**chat** 334:5,23 335:9

**choose** 349:6,19
**chosen** 341:15
**client** 349:2,3 355:9, 12,25 356:2
**common** 339:24,25
**communicate** 334:3
**company** 333:17 340:16 351:16
**complete** 333:20
**completed** 333:5
**compliance** 336:23
**computer** 335:2
**confirm** 334:6 335:3
**consent** 332:11
**consideration** 343:15
**considered** 343:19 346:2
**Consulting** 331:5,18, 20
**context** 351:20 357:16
**continuation** 347:22
**contract** 336:17 338:16,18,21 339:5,8 340:23 341:15 343:5, 11 345:10 347:22 348:19 349:2,15,16, 18
**contracts** 343:4
**control** 336:23
**conversation** 342:22 349:13 350:2 352:5 355:15 356:6,7,11,22 357:3,11,15
**conversion** 344:19,23 345:3
**converted** 342:25 343:10,20 345:13 346:6
**converting** 344:6
**coordinator** 342:24
**corner** 335:25 346:11 357:20
**correct** 336:11 343:25 345:14,17 347:18 348:14 349:21,22 350:19 351:16 352:16,25 353:20 355:7 356:10
**corrective** 354:19
**correctly** 350:10
**corresponds** 337:5
**counsel** 331:12 332:10,22 334:22 335:17 348:5 353:23 354:22 356:18 358:14
**counseling** 353:18 354:5
**court** 331:10,23,25 333:21
**CP** 335:25 337:19
**create** 350:24
**created** 339:13
**creating** 342:5
**cross** 341:25 342:8
**Cruz** 331:10

**D**

**daily** 347:2,3
**date** 336:13 347:7 357:18,22 358:2,3
**dates** 336:19 353:9
**day** 347:11
**debrief** 352:7
**deciding** 350:2
**decision** 339:22,24 340:2 345:8 348:24 349:23
**decisions** 340:22
**declare** 332:8
**defendant** 331:18
**delete** 334:20,25 358:12,13
**demotion** 358:6
**department** 345:22 349:4,6,10,14 355:9
**departments** 345:21 346:2
**deposition** 331:3,5 332:2,4,5 333:3,5,8 334:2,4,9,20,24 335:18 358:22
**deputy** 341:21,25 342:5 350:11
**description** 350:25
**designated** 333:16
**determined** 343:6 354:19
**development** 347:16
**device** 334:8
**devices** 334:12
**discuss** 351:23
**discussed** 354:6
**discussion** 339:2 343:22 345:17
**discussions** 350:5
**document** 335:14 346:8
**documents** 333:4,9 353:21
**Donald** 331:17 332:16
**download** 335:10
**duly** 332:18
**duties** 336:17 348:21, 23

**E**

**e-mail** 335:17 343:2, 12,22,24 345:4 346:6 348:9,12,22 350:8,16 351:7,9 353:15,18,24 358:14
**e-mails** 334:5
**earlier** 335:8
**employee** 350:3
**employees** 339:16 340:15 349:7,20
**end** 341:6
**ends** 337:19 342:19 346:10 358:21
**equipment** 334:14
**Evangeline** 331:16 336:8,12 346:17
**Evangeline's** 348:12
**events** 351:21 352:17
**exact** 340:9 353:9
**EXAMINATION** 332:23
**examined** 332:19
**execute** 349:16
**exhibit** 335:7,22 348:4,5 351:3 353:12 358:3
**exhibits** 334:21 335:2,17 358:13
**experience** 341:25 342:7
**explain** 355:14,22

F

**fair** 340:14
**falls** 351:20
**final** 339:7 345:7
**find** 338:24
**fit** 339:6
**form** 354:5
**forms** 353:18
**forwarded** 351:9
**front** 346:12 353:13
**function** 334:24 335:9

G

**give** 340:9 341:3 348:24 350:21
**goal** 333:2
**good** 338:9,25
**gossip** 357:4
**government** 343:4
**government-issued** 332:21
**great** 336:7 358:14
**ground** 333:11,12
**guess** 338:19

H

**hand** 352:4
**handle** 350:3 357:4
**handwriting** 346:20
**happened** 341:3 351:5, 21
**happening** 352:15,20 357:5
**held** 331:6 336:22 340:20 351:22
**his/her** 332:8
**HR** 357:5

I

**ID** 332:22
**identify** 338:17,20
**in-house** 354:22 356:18
**indication** 343:12
**individuals** 340:5
**information** 345:6 354:13,16
**internal** 356:2
**International** 348:17
**inventory** 345:23 346:4
**investigation** 356:25
**involved** 355:25 356:3
**ipad** 334:16
**issue** 356:2 357:4
**issued** 356:15
**issues** 352:23
**ITAR** 348:25 349:11

J

**January** 350:17
**Joanna** 331:15 332:15
**job** 334:15 336:17 340:18,19 350:24
**jog** 336:25 347:19
**June** 331:7

K

**kind** 345:9
**knew** 344:10
**Kristi** 331:10

L

**labelled** 335:22
**laid** 339:6
**language** 354:21
**laptop** 334:10,15
**Larry** 337:25
**law** 333:21
**lawyer** 335:8
**lay** 338:20
**laying** 339:3
**lead** 341:15
**left** 339:9
**left-hand** 347:15
**Legal** 331:6,9,11
**lieu** 332:7
**list** 339:10,13,23 340:5,7,13,15,21 342:15 347:8
**log** 347:3,4
**logistic** 341:25 345:22
**logistical** 346:21,22, 24
**logistics** 342:7 346:3
**longer** 343:11

M

**made** 339:22 340:7,21, 22 345:15 348:24 349:23
**make** 338:25 344:16 346:19
**making** 345:11
**management** 343:8,13 347:16,24 348:2
**manager** 336:24 337:2, 12 341:7 345:22 350:12
**managers** 338:9,25 352:22
**manner** 332:12
**March** 337:8,10
**mark** 343:17
**marked** 335:7
**Martin** 331:8
**material** 342:23
**matter** 331:4 332:9
**meaning** 345:24 346:23
**means** 334:4
**mediate** 355:13
**meeting** 337:22,23,24 338:5 340:20 347:10, 13 351:5,10,11,23 352:8,11,14,17 353:25 355:13 356:13
**meetings** 352:15,20,21 353:3,6,7
**memory** 336:25 347:19
**mentioned** 352:19
**messages** 334:5
**middle** 338:9,25 341:7 346:16
**modifications** 349:17, 19
**modified** 349:15

**Moppins** 337:11 339:18 342:24 343:21,24 344:5,18,22 345:2,11 350:4,6 353:16,22,25 354:12 355:6,20,23 356:8,9 357:8
**morning** 333:2
**move** 346:9 348:3 353:12
**moved** 341:13,16 343:7,8
**moving** 341:6 343:13 345:7

**N**

**nail** 336:19
**nature** 333:13
**non-actions** 357:17
**Notary** 332:19
**note** 336:24 338:13 341:21,24 345:19,24 346:23
**notebooks** 353:10
**noted** 358:24
**notes** 336:14 337:4,5, 22 342:9,10,19 351:19 356:25
**number** 337:19 346:17 352:15 353:8 354:7 355:11

**O**

**oath** 332:7
**Objection** 352:24
**objections** 332:12
**occurred** 352:8
**office** 334:14
**open** 335:12,14,19 348:6 351:3
**operations** 337:12
**oversee** 346:2

**P**

**Parker** 331:4,16 336:8,13,22 337:10 339:23 341:16 342:11,22,25 343:13 345:12 346:5 347:20 348:15 349:11 352:23 355:15 357:9
**Parker's** 336:19 350:22
**part** 357:13
**participate** 334:9
**participating** 332:2
**parties** 332:10
**PDF** 337:18
**penalty** 332:9
**people** 338:22,24 340:13 341:6 342:2, 6,8,15 347:24
**percent** 350:23
**performance** 340:10
**performers** 339:10,14 340:8,15,21
**performing** 340:3,6, 16,18,19
**perjury** 332:10
**permitted** 334:3
**person** 332:7 341:11, 13 342:6 350:12
**personnel** 344:7
**phone** 334:15
**physically** 332:3
**Pickett** 350:10,13,17, 21 354:5,10 355:12, 20,24 356:9 357:3,9, 25 358:6
**Pickett's** 350:7 357:16
**piece** 357:6
**PIP** 358:8
**place** 353:25
**plaintiff** 331:16,22
**plate** 337:13
**PM** 341:22,25 342:5
**point** 336:21 339:2
**position** 336:22 342:5 343:2 346:18 348:20 349:9
**positions** 336:20 339:7 343:4,6,10 347:23,25
**possibly** 347:24 348:23
**prefer** 335:11
**present** 332:4 351:11 352:11,14,18 356:13
**presented** 332:21
**president** 331:20
**previous** 333:8
**previously** 351:4
**Price** 331:3 332:1,25 333:1 334:1 335:1 336:1 337:1 338:1 339:1 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1 348:1 349:1 350:1 351:1,14 352:1 353:1 354:1 355:1 356:1 357:1 358:1,9
**prior** 352:5
**privileged** 355:15 356:5,22 357:11
**problem** 346:14
**procedure** 344:18
**proceed** 332:22
**PROCEEDINGS** 331:1
**professional** 347:16
**program** 350:12
**protected** 335:13
**provide** 333:20 354:15
**provided** 354:13
**Public** 332:19
**put** 335:9 339:22 340:7 346:3 347:24 358:8

**Q**

**quality** 336:22
**question** 343:17
**questions** 333:6,9 358:10,15

**R**

**Rajesh** 331:19
**re-sworn** 332:19
**reach** 339:25
**reached** 355:25
**read** 341:24 345:19 358:16
**reading** 341:21 346:18 347:17

**reason** 337:13 355:2
**recall** 336:20 338:7 346:25 350:20,23 351:12,18 352:13,17 353:2 358:3
**receive** 335:16 357:25
**received** 333:4 334:22 358:4,6
**receiving** 342:23
**recollect** 352:13
**recollection** 338:14 343:3 353:10 355:24
**recommendation** 345:12,15
**recommendations** 340:11 350:4
**record** 331:12,14 332:14 358:22
**red** 336:4
**Reema** 331:4,18,19 333:16 338:16 349:19,23 351:8,15 352:2,5 353:5
**Reema's** 349:7
**refer** 333:7 342:11
**reference** 338:8,12,22 342:3,14 351:19 352:3 355:3,6
**referenced** 356:22 357:12
**references** 355:8
**referencing** 356:4,6
**referring** 352:21 355:23
**Regulation** 348:17
**relationship** 357:10
**remember** 337:6 341:2, 9,11,18 346:5 350:14 353:4,9
**remembering** 350:9
**remembrance** 336:15
**reminder** 358:12
**remote** 331:7 333:13
**remotely** 332:6
**reply** 344:8,10
**reporter** 331:10,24,25
**reporting** 332:5,12 350:13
**representing** 331:22
**request** 342:24 353:21
**requested** 344:15 353:17
**requiring** 347:25
**responses** 333:21
**responsibilities** 336:9,13,16 337:7,12 348:13,16,25 349:8, 12,20,24 350:3,22
**responsibility** 350:11
**rest** 337:4 340:4,12
**restructuring** 347:23 348:19
**result** 358:5
**resumed** 332:18
**reviewed** 356:16,20
**reviews** 340:10
**right-hand** 335:25 346:11 357:20
**role** 343:9,14 350:7
**roles** 341:7
**romantic** 357:10
**room** 332:4 333:23 334:13,16
**rules** 333:11,12
**rumor** 352:22

**S**

**salaried** 342:25
**salary** 343:10 344:2, 7,19,23 345:3,9,13 346:6
**scroll** 337:16 342:18 354:4,8
**section** 355:3
**sentence** 355:20,23
**service** 343:5,11
**Services** 331:5
**session** 341:2
**sharing** 334:21,23
**Sherill** 331:8
**shifted** 350:11
**side** 339:5 340:22 341:7 347:15
**sign** 358:16
**skip** 351:4
**SME** 355:3,13
**sole** 357:14
**speak** 333:16 344:6,8, 23 345:2,5
**speaking** 351:15
**spear** 337:23 338:15 339:8 340:22 341:7, 15,17
**specialist** 331:9
**specifics** 341:4
**spoke** 336:18 344:12, 18,24 357:8
**spoken** 351:5
**staff** 338:17
**staffed** 339:8
**stamp** 337:18 342:19
**stamped** 336:3 354:8
**star** 339:10,13 340:8, 14,21
**starting** 331:14
**state** 331:13 349:3,6, 10,14 355:9
**statement** 350:21
**stating** 332:13
**straight** 335:6
**strike** 338:23
**subject** 353:17
**supervisor** 342:23
**supervisors** 340:11
**supervisory** 343:9,14
**Support** 331:6,9,11
**swear** 331:24
**sworn** 333:20

**T**

**tactical** 346:18,20, 22,24
**taking** 331:14
**talked** 336:21 342:10
**team** 342:8
**testified** 332:20
**testimony** 332:9
**text** 334:4 355:11
**time** 333:2 338:15 339:17 340:12,17 341:10,19 342:4 343:19 345:25 346:25 350:10 352:16,21,23 357:2,7 358:11,24
**title** 348:12

**to-do** 347:7
**to-dos** 347:5
**today** 331:10 333:13, 24 334:9,24 351:15 358:10
**today's** 333:3 334:19 358:21
**told** 355:14
**top** 351:7
**topic** 352:4
**topics** 333:7
**Traffic** 348:17
**train** 342:8
**training** 342:2 348:2
**transpired** 341:4 351:21
**transportation** 345:23 346:4
**Tristin** 331:21
**trouble** 341:20
**true** 337:14
**truthful** 333:20
**type** 343:8 344:2 347:25

**U**

**U.S.** 331:6,8,11
**understand** 333:15,19 334:6,7 342:21 351:14 356:21 357:7
**understanding** 356:24
**upper** 357:19

**V**

**verbally** 332:8
**versus** 331:4
**video** 331:9
**videoconferencing** 331:7
**Vora** 331:19 337:25 339:18 343:23 344:4, 12,14,16,19,24 345:8,16 347:11 350:5,6 351:8,10,23, 24 352:5 353:2,3,5, 16 354:2 356:19
**Vora's** 347:13

**W**

**wage** 343:6
**waive** 332:11
**Wallace** 343:18 345:20,21
**Walsh** 331:17 332:16 336:3 352:24 358:15, 18
**wanted** 342:15
**warehouse** 336:24 337:2,12 339:17 340:4,7 343:5 349:7
**warning** 354:9,12 355:3 356:14,16,21 357:22 358:2,4,6
**Wasik** 331:15 332:15, 24 358:9
**week** 344:12
**words** 336:8 338:8
**workforce** 338:20
**write** 336:12 338:13 354:12,16,17
**writing** 347:20
**written** 354:9 356:14, 16,20 357:23 358:5
**wrote** 343:17 344:11 354:18

**Y**

**years** 341:3

**Z**

**zeros** 337:20
**zoom** 335:10

Exhibit 10

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

--------------------------------------x

EVANGELINE J. PARKER,

Plaintiff,

-against-

REEMA CONSULTING SERVICES, INC.,

Defendant.

Civil Action No. 8:17-CV-01648-TDC

--------------------------------------x

(Via remote videoconference)

July 24, 2020
9:59 a.m.

Videotaped Remote Videoconference

Deposition of RAJESH VORA, before Kristi Cruz, a Notary Public of the State of New York.

A P P E A R A N C E S:

FISH & RICHARDSON, P.C.
Attorneys for Plaintiff
1000 Maine Avenue, SW
Suite 1000
Washington, D.C. 20024
BY: JOSEPH COLAIANNI, ESQ.
202.626.6434
colaianni@fr.com
(Via videoconference)

WRIGHT, CONSTABLE & SKEEN, LLP
Attorneys for Defendant
7 Saint Paul Street, 18th Floor
Baltimore, Maryland 21202
BY: DONALD WALSH, ESQ.
410.659.1354
dwalsh@wcslaw.com
(Via videoconference)

ALSO PRESENT:
MIGUEL EVANGELISTA, Remote Video Technician

-------------------I N D E X-------------------

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| RAJESH VORA | MR. COLAIANNI | 7, 121 |
| | MR. WALSH | 119 |

--------------------EXHIBITS--------------------

| EXHIBIT | | FOR I.D. |
|---|---|---|
| 1 | Notice of Deposition | 10 |
| 2 | Letter dated November 26, 2014 | 38 |
| 3 | Promotion and salary increase offer letter dated March 16, 2015 | 39 |
| 4 | Offer of promotion letter dated May 16, 2015 | 43 |
| 5 | Letter of employment verification dated January 22, 2016 | 44 |
| 6 | Letter dated April 7, 2016 | 47 |
| 7 | Various documents | 50 |
| 8 | Sexual Harassment Policy Manual for Reema Consulting Services | 66 |
| 9 | Employee Handbook | 72 |
| 10 | Reema Consulting Services Inc. Sexual and Other Unlawful Harassment Investigation Questionnaire | 93 |

--------------------EXHIBITS--------------------

| EXHIBIT | | FOR I.D. |
|---|---|---|
| 11 | Written warnings | 100 |
| 12 | Officer Separation of Employment Notice | 111 |
| 13 | Reema Consulting Services Inc. Sexual and Other Unlawful Harassment Investigation Report | 113 |

PROCEEDINGS

THE VIDEOGRAPHER: Good morning. This is the video deposition of Rajesh Vora in the matter of Parker versus Reema Consulting Services, Incorporated, case number 817-CV-01648-(TDC). This deposition is being held at U.S. Legal Support remote videoconference on July 24, 2020. My name is Miguel Evangelista, the videographer. The court reporter is Kristi Cruz, and we are here from U.S. Legal Support. We are going on the record at 9:59 a.m.

Will all counsel please state their appearance for the record.

MR. COLAIANNI: Joseph Colaianni of Fish & Richardson on behalf of plaintiff, Ms. Parker.

MR. WALSH: And Donald Walsh on behalf of the defendant, RCSI.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically

present in the deposition room and that I will be reporting this deposition remotely. They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his/her testimony in this matter is under penalty of perjury. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting. Please indicate your agreement by stating your name and your agreement on the record.

MR. COLAIANNI: Joseph Colaianni for plaintiff; I agree.

MR. WALSH: And Donald Walsh; I agree.

R A J E S H V O R A,

called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

MR. WALSH: Before we start, just as a point of clarification, I see that there's another gentleman that's joined the Zoom call, Mr. Carrigan.

MR. COLAIANNI: Oh, yes.

Mr. Carrigan is with Fish & Richardson. Sorry, I didn't notice he had joined.

MR. WALSH: Okay. That's fine. I just wanted to make sure I understood. Thank you.

MR. COLAIANNI: No problem.

EXAMINATION BY
MR. COLAIANNI:

Q. Good morning, Mr. Vora.
A. Good morning to you.
Q. How are you today?
A. I'm doing well, thank you.
Q. Good, good. Could you please state your full name for the record?
A. Rajesh Kumar, R-A-J-E-S-H, K-U-M-A-R, S. Vora, V-O-R-A.
Q. And could you state your address for the record, please?
A. 8106 Hallmark Place, H-A-L-L-M-A-R-K, Gaithersburg, Maryland. G-A-I-T-H-E-R-S-B-U-R-G.
Q. And Mr. Vora, you are represented by counsel for the deposition here today; is that correct?

A. Yes.
Q. Have you provided testimony before in any context?
A. Yes. Back in 2004.
Q. That was in connection with a deposition?
A. For current deposition or previous one?
Q. The testimony that you gave in 2004, was that in connection with a deposition?
A. Yes, it was a deposition.
Q. Do you recall what case that involved?
A. There was a dispute of the brand contractor and contractor agreement, and subcontractor filed a lawsuit and I was -- I was deposed in that lawsuit.
Q. Okay.
A. It was between Stem International and SciTech Services, S-C-I Tech, SciTech Services.
Q. Aside from that deposition, have you provided testimony in any other context?
A. No.

Q. Let me just take a moment to explain to you the deposition process we will be following today. You understand that you've taken an oath to tell the truth during today's deposition, correct?
A. Understood, yes.
Q. And you understand that the testimony you are giving today is the same as though you were testifying in court before a judge or jury, correct?
A. Yes.
Q. If at any time today you do not understand one of my questions, please let me know and I will do my best to rephrase and get you a better question. Is that fair?
A. Yes, sir.
Q. Is there any reason in your mind that you believe you would not be able to provide complete and accurate testimony today, Mr. Vora?
A. No.
Q. If you need a break at any time during the deposition today, please just let us know and we will stop.

Page 10

R. VORA

A.    Okay.

Q.    I'm going to mark our first exhibit of the day.

(Exhibit 1, Notice of Deposition, marked for identification, as of this date.)

Q.    Do you see the document that I am marking as Exhibit 1?

A.    How I open the file?

Q.    I believe you may have to download the document.

A.    Okay.

Q.    To open it.

A.    And then save the file?

Q.    It should be a PDF document. Are you unable to open it?

A.    Okay. Yes.

Q.    Do you recognize what's been marked as Exhibit 1?

A.    It's a notice of deposition.

Q.    Yes. And are you appearing to testify here today by deposition pursuant to this notice?

A.    Yes.

Page 11

R. VORA

Q.    Did you do anything to prepare for your deposition today, Mr. Vora?

A.    I did talk to my counsel yesterday, one hour.

Q.    Did you do anything other than speak with your counsel to prepare for the deposition?

A.    I did review -- I did review the hire date of couple of employees.

Q.    Did you do anything else besides that and speak to your counsel?

A.    No.

Q.    Which employees did you check on the hire dates?

A.    Donte Jennings, Roman Thompson, Arnel, also Evangeline Parker.

Q.    Is that the complete list?

A.    I think so, yes.

Q.    So could you repeat the third name you said? I didn't pick that up.

A.    Arnel, A-R-N-E-L, Raguntan (phonetic).

Q.    And you checked on the date that those persons began employment at RCSI?

A.    Month. Not exact date, but month.

Page 12

R. VORA

Q.    Did you review any other documents in preparation for the deposition today?

A.    No.

Q.    Other than your counsel, did you speak to anyone else in preparation for the deposition today?

A.    No.

Q.    Could you just provide a brief overview of your education background, please?

A.    I have undergraduate degree from University of Bombay, and then I came to USA in 1987 and I did technical management courses at the University of Maryland.

Q.    What was your degree in at the University of Bombay?

A.    In accounting and finance. Also, I did a technical education in Mumbai for the computer information technology classes.

Q.    And you mentioned you took some classes at the University of Maryland; is that correct?

A.    Yes.

Q.    What types of classes were those?

A.    I wanted to -- I wanted to study for

Page 13

R. VORA

CPA, certified public accountant. So there are mandatory classes, 24 credit hours, for accounting, finance, audit, tax laws. Also I think there was some commercial laws and things like that. So I did study for that, but I did not appear for CPA exam. And then I took technical management courses.

Q.    Could you give me just a high level overview of your employment background maybe since you came to the U.S.?

A.    I started -- in December 1987 I started working with Goldberg Marcno [sic] as an accountant. There I worked as an accountant for almost like ten months, and due to lack of work I was laid off. And then I start working in November, December of '88 at Prospect Associates as an accountant, payroll accountant. There I worked for almost three years. And then I start working at Dimensions International I think from 1990 or -- I think it was 1990 or 1991, and I worked there until February '97 as a -- I started as a payroll accountant and then as a project accountant.

Q.    What did you do after that?

Page 14

R. VORA

A. Meantime, in 1995 I opened up my own business, Reema Consulting Services, and I start providing financial and consulting services to government clients. I had an expertise in setting up financing systems, so I had a -- at one point I had almost like ten clients ranging from $1 million company to $500 million company.

And then in 2005, I -- in 2004 I applied for the 8A certification -- Reema Consulting Services applied for the small business administration program for 8A program, and in 2005 we won our first contract with our team member SciTech Services, American business, we had almost like 36 employees, and I was president for the company for the last 25 years.

Q. And you've been president of the company since its founding?

A. Yes.

Q. And that's -- your current title is president. Is that accurate?

A. Yes, president and CEO.

Q. How is the company structured in

Page 15

R. VORA

terms of management? Do you make all the decisions or is there a board or something, management committee?

A. I'm the president and CEO and the only one board member. So I am a board member, president, and CEO.

Q. Who is the other board member?

A. There's no other board member.

Q. Oh, I'm sorry, I thought you said there was one other board member.

A. I am the board member, president, and CEO.

Q. Okay. Which employees at the company directly report to you?

A. I have a support staff that does billing, payroll, stuff like that, they directly report to me. I have a HR manager that directly report to me. And also all the program managers and subject matter experts, they report directly to me.

Q. What is a subject matter expert?

A. It's a person who has many, many years of experience in one specific thing.

Q. Are those subject matter experts

Page 16

R. VORA

employees of RCSI are they third parties?

A. They're 1099 contractors. They are third parties.

Q. Third party. Thank you. The program managers and the HR managers are RCSI employees, correct?

A. That is correct.

Q. How are company policies at RCSI created and implemented?

A. Are you -- sir, which policy are you talking about? Any specific policy?

Q. Sure. So if a policy -- well, let me start it over.

Are you responsible for approving all policies that are created at RCSI?

A. You have to repeat that question. Am I what?

Q. Are you responsible for approving all RCSI company policy?

A. Yes.

Let me increase the volume. Okay.

Q. Are you able to hear me okay?

A. Now I can hear better.

Q. Okay, good.

Page 17

R. VORA

Do you also make final decisions on day-to-day management activities?

A. That's a broad -- broad area you're talking about. Am I micromanaging employees? No. So what I do is that I manage managers and also I manage corporate staff who reports directly to me. There are rank and file workers, there are administrative staff at the programs, they report to the team leaders or managers, and they report to me.

Q. Do you make decisions with regard to hiring new employees?

A. Yes.

Q. Do you make decisions with regard to promoting employees?

A. Yes.

Q. Do you make the decisions with regard to terminating employees?

A. Yes.

Q. Hiring, terminating, and promoting employees, must those decisions be approved by you?

A. You said approved by me?

Q. Correct.

Page 18

R. VORA

A.    Yes.

Q.    Do you play any role in investigating complaints made by employees relating to their work at RCSI?

A.    No, that is HR function, and if any investigation that is -- investigate itself is a confidential function, so I would not do the investigation.  Our HR manager will do the investigation.

Q.    Does the HR manager typically consult with you either in connection with the investigation or after the investigation is complete?

A.    They will brief me about the investigation once the investigation is complete, and they will brief them also.  If there's a victim to the complaint, and if the victim ask, then they will brief them, also.

Q.    Sorry, I didn't hear the last thing you said.  They will brief?

A.    HR manager will provide a brief to me.  Brief, it's like a summary.  They will tell me what they did in the investigation and what they're recommending.

Page 19

R. VORA

Q.    Okay.  I heard that.

You recall a gentleman named Larry Moppins, correct?

A.    Yes.

Q.    He worked for a time at RCSI, correct?

A.    Yes.

Q.    What was his role?

A.    First he started as an employee from January 2013 through September 2013, and then he was a subject matter expert.  And the subject matter expert services he provided from September 2013 through July 2017.

Q.    What was his role when he was know employee at RCSI?

A.    When he was an employee, he was -- he was -- he was a liaison between the Department of State and Reema Consulting Services.  What we had is a performance-based contract where government tells us that this many shipments will come, this many shipments that we have to inventorize, and this many shipments has to go out.  And government will not tell us how to do it.  That part, we will

Page 20

R. VORA

have to figure it out how we're going to do it.  So we need to have a system in place, person in place, location in place to do all those things.  And Reema Consulting Services did not have the experience in the warehousing kind of work.

Before, we worked in contract work that facilitated with administrative support, security background support, printing social security cards, those kind of work.  So warehousing was the first task that we had, and so we needed a person who knows how to -- how to execute the contract on behalf of Reema Consulting Services.

Q.    Was Mr. Moppins hired for that specific contract in January 2013?

A.    Yes.

Q.    I'm sorry, you may have said that, but did that contract have a name?  Was there a name of that contract, or how would you identify it?

A.    Yes.

Q.    What was it called?

A.    This is Department of State

Page 21

R. VORA

Anti-Terrorism Assistance Contract; DSATA.

Q.    Mr. Moppins had expertise with regard to the matters of the DSATA contract?

A.    I'm sorry.  Can you repeat the question, please?

Q.    Sure.  Mr. Moppins had some specific expertise with regard to the subject matter of the DSATA contract?

A.    Yes.  He was working for the interim contractor, the contractor who worked before us.  That company name is Tessada International or Tessada Corporation, T-E-S-S-A-D-A.  He was working with them and he knew what kind of system that we will need, what kind of warehouse recking system we will need.  It's like if you go to Home Depot, they will have all the items there in their shop.

So, say if you want to pick up some sanitary items, it maybe on the first reck or second reck or third reck, things like that.  And also, you know, lots of equipment, like a forklift, scales, hand forklifts, all the equipment that -- shrink wrap, to make sure that you are, you know, properly shipping the

R. VORA

product to the embassies that we want to send out those equipments.

MR. WALSH: If I could just pause for a second, I'm watching the reporter's reaction, I'm trying to help you as we go along. I think the one word was interim that you were -- I'm just watching your facial reactions, trying to help you out here. The other was Tessada, is the name of the interim company. Just for what that's worth.

And to make things easy, I can tell you now that I'm sure we'll read and sign just to try and make sure we can help out with any of the issues.

(Discussion held off the written record.)

BY MR. COLAIANNI:

Q. Did you believe Mr. Moppins was important to RCSI winning the DSATA contract?

MR. WALSH: Objection.

A. Yes, he had that knowledge. You're asking that -- first I want to clarify the question. You're asking that Larry Moppins

R. VORA

was important to RCSI for the contract, correct?

Q. I'm asking whether you believe Larry Moppins was important to RCSI winning the DSATA contract.

A. No, he was not.

Q. Did RCSI -- strike that.

Was RCSI already awarded the DSATA contract before Mr. Moppins was hired?

A. Yes. It was -- Department of State issued a solicitation back in December 2011, and that was set aside for small business at the contract price. And we deal with another company, that lady name was Barbara, I forget her last name. But she help us write the technical proposal, and I prepared the price proposal, the first portion, also the staffing portion, how we are going to do certain things.

So we had, based on our writing and our suggestion, what happened is that a government provided a tour to the warehouse facility and we noticed that the lightings was improper. There was a big container in

R. VORA

between the warehouse that was a safety issue, very few recks, and government was using almost like a 75,000 square feet, almost a full warehouse.

So we come up with a suggestion that we reduce the warehouse size by one-third to 54,000 square feet. I'm just doing the estimates, okay? Also we install rigs, we buy new forklifts, we install cages to protect us, safety equipment, it's a wire cage so that it will be locked and only authorized persons will be able to access the facility. We install new cameras just to make sure that government property stays protected. Our staff did a great job in cleaning up the warehouse and removing all the tri walls. Tri walls are the packing boxes, [inaudible] boxes. So we removed all the tri walls and put the new tri walls. And also put a lot of safety equipment in place so that when staff is working in the back warehouse, we have a safe environment to work.

Q. And you think Mr. Moppins was important to the work that RCSI was doing on

R. VORA

the DSATA contract when he arrived in 2013?

MR. WALSH: Objection.

A. What we did is that as soon as we won the contract, people at DSATA program, they reach out to us with their resumes and qualifications, they reach out to us with the resume and their current title in the warehouse. That program was managed by another person, but he was living near Virginia Beach, so for him, driving was an issue. His name was Jerry, I think his name was Jerry, J-E-R-R-Y. For him, driving was an issue, and also he was not managing program well.

So after [inaudible], like for three months, from October to December 2012 -- we won the contract in October 2012, so October 2012 through December 2012 it was a transition period. And after that, we took over the contract.

Q. Were you finished with your answer?

A. Yes.

Q. Okay. So in October 2012 RCSI awarded the contract, and between October and

Page 26

R. VORA

December there was a transition period with a different person managing it, is that --

A. Yes.

Q. And Mr. Moppins --

A. But, no, no, but he was the Tessada employee. So during the transition period, it was incumbent to the old contractor, they had three months to remove their staff, to release the shipments that was in the transition, because the Department of State has a contract where they ship out stuff to various places all over the world. So it's like a FedEx. If you send something ground delivery, it takes seven days to reach the location in, say, California. But in between, somebody has to be there to monitor that it has been delivered or not delivered.

So in the Department of State contract, the old contractor has to monitor all the shipments that was in the transit. So during this three-month period, so they have to keep the staff, their staff, and we have to bring our staff to learn the process and improve the process.

Page 27

R. VORA

Q. And Mr. Moppins I think you said was retained by RCSI in January 2013; is that correct?

A. Yes.

Q. And --

A. Around that time.

Q. Okay. And his role was to work on the DSATA contract when he joined RCSI?

A. Yes.

Q. What was his specific role with respect to the contract?

A. That time his title was, I think his title was material coordinator? Or started as a material coordinator or a program manager. I don't recall.

Q. And what was his role when he joined RCSI with respect to the contract?

A. He was -- he was a liaison between Reema Consulting Services and the Department of State. What will happen is that Department of State will identify that this is what they want to get done. Department of State had a anti-terrorism program where they were sending out police equipment to various embassies, to

Page 28

R. VORA

various embassies, and they were teaching -- they were training the local policeman in fighting the terrorism.

Q. And Mr. Moppins was a liaison between the Department of State and RCSI?

A. Correct. He was -- he had the knowledge, because government will not disclose us such many things. What happens is government is supplying some sensitive equipment and it has a price list and a vendor and stuff like that. And we being a government contractor, if we get to know how much, you know, this person is charging for this stuff, and somehow if I can get access to the same material and if I bid it at low, same material with lower margin, I can win those kind of contracts.

So government would not allow us to use those, it's called requisitions, government will not allow us to have those requisitions, so we will have a liaison person who will be working for us and providing services to us to execute the contract.

Q. Did Mr. Moppins have contacts at the

Page 29

R. VORA

Department of State?

A. That part I don't know. But he work with -- he work with Department of State employees. The contacts that we had had a contractor authority. He did not have the contractor authority. So if the government sends somebody to the location and says, okay, we want to seek out $5 million of material and the shipping money is $1 million to 50 countries and, you know, this cost will come in, you know, three months from now. So we have to prepare ourselves to make sure that we have a right staff and we have a right matter to receive those equipments that the government want to receive it, inventory it, and then ship it.

But meantime, you know, there are various courses. So, say the course A has a kit that requires 50 items and there's another course C that requires 30 items, and in the kit A they're missing 10 items, then they will do the transfer between kit A and kit C. But they will keep a record of that transfer and they will let the government know, the

Page 30

R. VORA

Department of State know that we did this transfer, and when the material is brought back, that is replenished to the kit C just to make sure that -- because we have to keep record of funding for each country. The Department of State obligates, it's called assistance money for each country. So, say country like Afghanistan, and they're obligated $10 million, then we have to keep a record of how that $10 million is within the shipping or the material that we have to keep record.

Q. During the time that Mr. Moppins was an employee of RCSI, was he managing any other employees?

A. We had a deputy program manager who was responsible for managing employees.

Q. I'm sorry, I didn't hear. Did you say he was a program manager who was responsible for managing employees?

MR. WALSH: Objection.

A. There was a deputy program manager, DeMarcus Pickett, who was responsible for managing employees. And Larry Moppins, he

Page 31

R. VORA

had -- you know, back then when he was employee, he had a say in hiring employees, he can make recommendation in hiring employees, but it was our HR manager and myself who had the final say.

Q. Did Mr. Pickett report to Mr. Moppins during the time Mr. Moppins was an employee at RCSI?

A. I think he reported to me.

Q. Okay. Did any employees report to Mr. Moppins during the time he was an employee of RCSI?

A. I don't recall. If you want me to look at the time card, I can tell you after looking at the time card.

Q. At some point Mr. Moppins transitioned from an employee to a subject matter expert; is that correct?

A. Yes, in September 2013 or October 2013, around that time frame.

Q. And what was the reason for his transitioning at that time?

A. His -- the contract that we had was classified contract, and his secret clearance

Page 32

R. VORA

did not come through, so we cannot keep him as an employee. So he had a choice either to work for us as a 1099 contractor or he can work with his wife's company. His wife also had a small business. But he decided to work with us at that point.

Q. And as a subject matter expert, is it true he was no longer an employee of RCSI?

A. That is correct. He's no longer an employee of RCSI. He's a 1099 contractor. So say if you hired a person to fix the electricity in your house and, okay, that will be $2,000 contract, and that person comes to your house, brings his [inaudible], fixes the electrical fixture, ask $2,000 from you, you are done, you don't have any obligations with that person. Say our agreement with him terminated on July 2007 -- 2017, and if he's unemployed for six months, he will not be able to claim unemployment on RCSI. He's an independent contractor.

Q. Okay. Did he receive any benefits from RCSI during the time he was an independent contractor?

Page 33

R. VORA

A. We don't provide benefit. It's like an electrician, you know, electrician comes to your house and fixes that fixture, we don't write benefit to that person. You offer a glass of water if you are kind enough.

Q. Do you know if Mr. Moppins was working anywhere else at the time he was an independent contractor for RCSI?

A. That's not -- that's not -- I don't recall. But that's also not my concern because he's required to provide us a service, he provided the service as a subject matter expert. Outside that, if on a Saturday or Sunday say he's fixing somebody's car, that's not my problem.

Q. How did Mr. Moppins' responsibilities change when he transitioned from employee to subject matter expert?

A. Quite a bit. He -- he was reporting directly to me, but for any action, whether it be hiring or promotion or termination, he has to coordinate those actions with our HR manager. Also he will tell our managers what they're supposed to do, but he will not -- he

Page 34

R. VORA

will not -- he will not, you know, micromanage
the process between how that manager gets
those things done on their end.  He will tell
them that if they are doing the process wrong,
but he will not micromanage them.

THE WITNESS:  Can I take a break?  I
need to get some water.

MR. COLAIANNI:  Absolutely.

THE VIDEOGRAPHER:  Going off the
record at 10:50.

(Recess was taken.)

THE VIDEOGRAPHER:  Back on the
record at 1053.

BY MR. COLAIANNI:

Q.    During the time that Mr. Moppins was
a subject matter expert, did he manage any
employees at RCSI?

A.    Our deputy program manager was
responsible for managing and assist employees,
not the subject matter expert.

Q.    So the answer is no, he did not
manage any employees?

A.    Not directly.  Indirectly, yes, but
not directly.

Page 35

R. VORA

Q.    What do you mean by indirectly?

A.    So say there is an instruction from
Department of State that we have new
instructions, new process for receiving
certain equipment.  So the Department of State
will convey those requirements to Larry
Moppins, and then Larry Moppins will convey
those requirements to the warehouse managers,
sometime to all the employees.  So employee
will get instructions about how to do certain
things from him.  So indirectly, yes.

Q.    Did Mr. Moppins report to anybody at
RCSI during his time as a subject matter
expert?

A.    He reports to me.

Q.    How closely did you supervise
Mr. Moppins' work when he was a subject matter
expert?

A.    He's a 1099 contractor, so he's
required to do things that a contract ask us
to do.  So think of it like this.  Electrician
come to your house to do the fixture, and he
left the house and assign the people then to
the fixture.  And he did the job, in the even

Page 36

R. VORA

example, it's done, that's pretty much it.  So
he will execute the contract on our behalf.

Q.    Did you speak with him every day
when he was subject matter expert?

A.    Not every day.  I used to visit
warehouse once or twice a week.  So yes,
during my visit I would talk to him directly.
In other cases, if he wants me to be present
on certain days, like I said, there is
inventory, full inventory count process, and
that is almost like a 30 days or 45 days
process, 4 to 6 weeks.  So what happens is
during that time I will be attending warehouse
every day.  In those cases, I'll be talking to
him every day, but other times it is by phone,
by e-mail, like that.

Q.    And during Mr. Moppins' employment
as a subject matter expert, he did not have
authority to hire or terminate employees; is
that correct?

A.    That is correct.  He can recommend,
but he did not have that authority.

Q.    You also recall a former employee
named Evangeline Parker, correct?

Page 37

R. VORA

A.    Yes.

Q.    Did you ever work with Ms. Parker
directly?

A.    I'm sorry?

Q.    Did you ever work with Ms. Parker
directly?

A.    Did I work with Ms. Parker directly?

Q.    Yes, that's the question.

A.    No.  Indirectly, yes, but not
directly.  So I'm not like her direct
supervisor, but I'm overall president of the
company.  So indirectly, yes; directly, no.

Q.    Have you ever met Ms. Parker?

A.    Yes.

Q.    We're going to try to mark another
exhibit here.

A.    So I could close this exhibit that I
have?

Q.    Yes, you may.

A.    Okay.  So there's the new exhibit
that you have sent or you're going to send me?

Q.    It should be -- I'll give it to you
now.  Let me know if you see it, please.

A.    Yes.

Page 38

R. VORA

(Exhibit 2, Letter dated November 26, 2014, marked for identification, as of this date.)

Q.    Could you please take a look at that and let me know if you recognize it.

A.    Yes, I recognize this document.

Q.    Just for the record, could you indicate what Exhibit 2 is?

A.    It's the employment offer letter.

Q.    This is a letter dated November 26, 2014, from you to Ms. Parker, correct?

A.    Yes.

Q.    Is this her offer letter to begin employment at RCSI?

A.    Can you repeat your question, please?

Q.    Sure.  Is this, Exhibit 2, the offer letter to Ms. Parker to begin employment at RCSI?

A.    Yes, it's an offer of an employment.

Q.    And she was offered the position of general clerk 2, correct?

A.    Yes.

Q.    What are the responsibilities of a

Page 39

R. VORA

general clerk?

A.    I would not know all the details, but it is really the support, to support the transportation and logistics position.  It's the office work in the transportation office.  They will -- they will perform duties that transportation manager and logistics manager ask them to do.

Q.    Did you have any role in reviewing or assessing her work performance in her role as a general clerk?

A.    Work performance?  No, not directly.

Q.    And Ms. Parker accepted this offer, it was pursuant to Exhibit 2, correct?

A.    That is correct.

MR. COLAIANNI:  We're going to mark the next exhibit.

(Exhibit 3, Promotion and salary increase offer letter dated March 16, 2015, marked for identification, as of this date.)

Q.    If you could take a look at what's been entered here as Exhibit 3, please, and let me know if you recognize it.

Page 40

R. VORA

A.    Yes.

Q.    For the record, could you state what Exhibit 3 is?

A.    It is a promotion and salary increase offer letter.

Q.    For the record, I would just note that the document, Exhibit 3, is production number Reema 000304.  I will also, just while I'm doing this, note that Exhibit 2 was a document produced at production number Reema 000295.

With respect to Exhibit 3, Mr. Vora, this is a letter from you to Ms. Parker dated March 16, 2015, correct?

A.    Yes.

Q.    Is this the offer on the promotion to Ms. Parker?

A.    Yes.

Q.    The letter indicates that she's being offered a promotion to receiving supervisor effective March 16, 2015.  Is that accurate?

A.    Yes.

Q.    It also indicates an increase in her

Page 41

R. VORA

compensation, correct?

A.    That is correct.

Q.    I think you mentioned earlier that you are responsible -- one of your duties is to sign off on or approve promotions, correct?

A.    You have to repeat the question, I'm sorry.

Q.    Sorry.  Did you approve this promotion to receiving supervisor?

A.    Yes.

Q.    Was a recommendation that Ms. Parker be promoted made to you?

A.    The way this process works is that if we have an internal opening for a position, then the opening will be circulated within the warehouse staff, and then those candidates will apply.  Their resumes and their work performance will be evaluated by the three or four managers, and then it will be recommended to HR, HR manager that, you know, they have selected Ms. Parker as a candidate to be the materials receiving supervisor.  Then those information will be passed to me.

Also, on my end, I have to make sure

Page 42

R. VORA

that we have enough funding for this position, and that title that we are going to assign her complies with, it's called service contract, SCA, complies with the service contract rates and the benefits.

So I would just, you know, do my due diligence to make sure that we have, you know, requirement, that requirement is funded, and we have candidate who meet the requirement. So that is my job to my sure it's -- my job to make sure it's, you know, done correctly.

Q.    In her role as receiving supervisor, would Ms. Parker have been supervising other employees at RCSI?

A.    The way the structure works is that there would be supervisor, and underneath the supervisor there will be subordinates.  So she has to manage the subordinates.  Also, you know, there are times they have to work as a -- even though they are not supervisor, they have make sure that they receive the item, they inspect the item, they inventorize the item.  So it's a dual role.  It's not like a supervisor sitting on one big chair and

Page 43

R. VORA

watching over the place.  It's a hands-on job.

MR. COLAIANNI:  I'm going to introduce another exhibit.  It should be visible to you now.  This is Exhibit 4, and it's a document bearing the production number Reema 000303.

(Exhibit 4, Offer of promotion letter dated May 16, 2015, marked for identification, as of this date.)

Q.    Would you take a look at Exhibit 4 and let me know if you recognize it.

A.    Yes, I recognize this letter.

Q.    It's a letter from you to Ms. Parker dated May 16, 2015, correct?

A.    Yes.

Q.    What is the subject matter of this letter?

A.    It's a promotion.

Q.    Is this an offer of promotion to the role of assistant manager?

A.    Yes, and salary increase.

Q.    And you approved this promotion of Ms. Parker, correct?

A.    Yes.

Page 44

R. VORA

Q.    And in her role as an assistant manager, she would have been managing other employees at RCSI, correct?

A.    Subordinates that is assigned to her.

MR. COLAIANNI:  We'll mark another exhibit here.  Please bear with me for a second.

(Exhibit 5, Letter of employment verification dated January 22, 2016, marked for identification, as of this date.)

Q.    5 has been entered.  Do you recognize Exhibit 5?  Are you reading the letter, Mr. Vora?

A.    Yes.

Q.    Oh, I'm sorry, I didn't realize. Take your time.

A.    Yes, I finished reading it.

Q.    Do you recognize what's been marked as Exhibit 5?

A.    Yeah, I read it.

Q.    Have you seen it before today?

A.    Oh, yes.

Page 45

R. VORA

Q.    Who is Cathy Price?

A.    She's a human resources manager.

Q.    Exhibit 5 is a letter from Ms. Price dated January 22, 2016, correct?

A.    Yes.

Q.    For the record, Exhibit 5 is produced at Reema 000322.

What is the purpose of Ms. Price's letter of employment verification?

MR. WALSH:  Objection.

A.    They're required to take courses for the ITAR, it's called International Traffic and Arms Regulations.  So they're required to take those courses if they want to be -- if they want to identify specific items that is ITAR related.  So that take those courses, we have provide a letter of employment verification.  So this is a standard letter that we have issued to employees who has taken some high level courses.

Q.    Who was the intended audience of Mrs. Price's letter?

A.    I think this is to Department of Commerce, if I'm -- I think it's a Department

R. VORA

of Commerce.
Q. Did you approve the contents of Exhibit 5 before it was sent out?
A. No, I did not approve the content of the letter.
Q. Do you recall reviewing the letter before it was sent out?
A. I may have seen it. I don't recall. Once in a while I approve it, but I don't recall.
Q. It states in the letter that "The outlook for Ms. Parker's continued employment with us is very good and we hope to have her with our company for many years to come." Do you see that sentence in the second to last paragraph?
A. Yes.
MR. WALSH: I don't think there's a question pending. The only question was whether you saw that sentence.
THE WITNESS: Yes, that is what I'm saying. I read the sentence.
Q. At the time the letter was written, did you have any reason to disagree with that

R. VORA

statement?
A. No, at that time her documents were satisfactory.
MR. COLAIANNI: We'll mark another exhibit here.
(Exhibit 6, Letter dated April 7, 2016, marked for identification, as of this date.)
Q. Marked as Exhibit 6 is a document bearing production number Parker_000288. Can you let me know if you recognize this document, please? Actually, I believe the first page of this document is a letter you've already looked at. The second page is different. If you could focus on that, please.
A. Yes.
Q. With reference to the second page of Exhibit 6, this appears to be a letter from you to Ms. Parker dated April 7, 2016. Is that accurate?
A. Correct.
Q. What is the purpose of the letter you drafted here as Exhibit 6?

R. VORA

A. We had an opening for a warehouse assistant manager. We had a warehouse and we had an office. So in the warehouse, there was opening for the warehouse assistant manager, and she applied for it, and it was a lateral move. So this letter, you know, it gives reassignment of the trans -- it's a reassignment.
Q. Was her responsibilities as an assistant manager different than those of the warehouse assistant manager role?
A. Yes.
Q. Was there a salary increase in connection with the reassignment?
A. That I don't recall, but it does state that the new salary will be 69,365. So it appears it's a lateral transfer. I don't know in the details right now, I don't recall. But in a lateral transfer, sometime, you know, pay increases by a dollar or something like that, or sometime it's just same.
Q. Okay. Would you characterize this as a lateral move?
A. Yeah, it's a reassignment.
Q. And this is a reassignment that

R. VORA

Ms. Parker had requested; is that correct?
A. Can you repeat the question?
Q. Sure. Is this a reassignment that Ms. Parker had requested to be made?
A. I don't know. Somehow I'm having difficulty understanding few words.
Q. Was the reassignment described in this letter done at Ms. Parker's request?
A. No, it is done -- the reassignment is done based on the requirement of the contract. So if we need a person in the warehouse, and if that person is working in the logistics in the office and if that person says, okay, I want to have more experience, I want to have a different experience and applies for the internal opening of a warehouse assistant manager, then after evaluation, that internal transfer will be done.
Q. You approved the transfer that is described in Exhibit 6, correct?
A. Yes.
MR. COLAIANNI: I'm going to introduce the next exhibit, which should

R. VORA
be visible to you now as Exhibit 7.
(Exhibit 7, Various documents, marked for identification, as of this date.)
Q. This is a document that begins with document number Reema 000349. There's several pages here. Could you take a look at those briefly and let me know if you recognize it.
A. Yes, I read the documents.
Q. Thank you. Do you recognize the document marked as Exhibit 7?
A. There's one more exhibit, I'm sorry. Let me see it.
Okay. I finished reading it.
Q. Thank you. Do you recognize the document marked as Exhibit 7?
MR. WALSH: I'll object. It's multiple documents.
A. Correct.
MR. COLAIANNI: It is. That's fair.
Q. Let's start with the performance, employee performance evaluations. Do you recognize those?
A. It is done by our managers, and it

R. VORA
is forwarded to our human resources manager.
Q. Have you seen any of the employee performance evaluations here before today?
A. When I had to -- when I had to respond to interrogative questions that your office ask us. So during last year when I was responding to it, that time I have seen this document.
Q. Would you have seen these documents at the time they were prepared in order to comment or approve on the employee performance evaluation?
A. No, because it is done by the manager and it is forwarded to HR manager for recordkeeping and then filed.
Q. Do you have any reason to disagree with the performance evaluations that are identified here in Exhibit 7?
A. No. About those documents you reference? No, I don't have a disagreement.
Q. Could you turn to the page that is -- that ends in document number 357, please. Are you there?
A. Yes.

R. VORA
Q. This is titled Written Warning. Do you see that?
A. Yes.
Q. The date is September 1, 2015, and it concerns Ms. Parker, correct?
A. Yes.
Q. How -- strike that.
Could you describe the process at RCSI that goes into issuing a written warning to an employee?
A. So say employee is -- great question. This is a warehouse work and very important work. So if the instruction is that to follow certain things and if the instructions are not followed and employee will be write up for not follow the instructions. So that is the process. It helps them to see the severity of the issue that we have had, and going forward how not to make those kinds of errors.
Q. Do you need to approve the written warning letter to employee before it is issued?
A. No, it is done by manager to employee. Unless it's a serious nature, then

R. VORA
I, you know, then I will get involved.
Q. Do you recall reviewing or approving this written warning letter before it was issued to Ms. Parker?
A. Can you repeat the question? I'm sorry.
THE WITNESS: Can you hold on for a second?
(Discussion held off the record.)
MR. COLAIANNI: Do you want to take a break for a moment?
THE WITNESS: I'm fine.
MR. COLAIANNI: Okay.
Q. Let me ask my question again. Do you recall reviewing or approving this written warning letter to Ms. Parker before it was issued to her?
A. No. As I said before, that it will be issued by the manager to the employee or subordinate and it will be forwarded to HR manager for recordkeeping.
Q. Do you note here in the written warning letter -- Ms. Parker apparently wrote some comments in her handwriting. Do you see

Page 54

R. VORA

that?

A. Yes.

Q. Do you know whether -- well, let me back up.

In the comments here, Ms. Parker appeared to disagree with contents of the letter. Do you see that?

A. Yes.

Q. Do you know whether anything was done internally at RCSI to address the comments that Ms. Parker made here?

A. Let me -- let me explain what's the process in the warehouse, and the person or subordinates while working there, they're high school graduate or not even high school graduate. So they are not like you and me, if we just know that people will realize that we should not do these things. So this is the work where say the instruction is to take certain things, prepare the list, show the list not client, show the material to the client, what we have packed, and then ship it out.

With that instruction, it is your

Page 55

R. VORA

job duty, and if you don't follow that instruction and you think that your subordinates who are literally high school graduate. I'm not, you know, discriminating within, you know, group, educated or uneducated. But what I'm saying is you have to literally manage these people to make sure it's done right. If you are not doing it, as a manager and you say I'm not here to babysit, that's not a excuse that we look for, because if they ship out some really expensive item, it will be coming out of my pocket because our [inaudible] to the government, and then if four employees or five employees involved in the process of the packing tri wall and sending out to the foreign embassy, there's a shipping cost, material cost, and you don't know if the requirement --

So think it like this. There's a requirement, cost requirement in Nigeria, and we ship out the stuff that is still not approved by the Department of State and the shipment went out. The shipment was, say, $20,000, but once the material reach there, we

Page 56

R. VORA

don't know who will be there to receive the material because the Department of State is not informed. At the last minute if the Department of State says that course is postponed for a month, like currency [inaudible] and lots of work is postponed, in situation like that, if that material is shipped out to the foreign embassy and if there's no other person over there to -- if there's no embassy person over there to receive the material or the embassy person is on vacation, then there's a good chance that the whole pallet will be in some wrong hands, and then there's a liability to the Department of State and liability to us.

So when the job identifies that no matter how big or small thing is, that you have to let the Department of State see it before you ship it out, then you follow it, you know, instruction completely. You don't come back and say that I'm not here to babysit, and this not a babysitting business, this was a serious business that we are in. Lots of sensitive item, very high items. You

Page 57

R. VORA

have to be, what I say, conscious about what you are doing.

Q. Did you consider the actions for which Ms. Parker was being reprimanded here to be a serious matter or is this a minor infraction?

A. It can turn into serious matter, and the reason I tell you, say you give a direction to your kid that don't drive over 60 miles an hour, and your kids keep on driving 70, 75 miles an hour. If he gets a ticket, that's a minor thing. If he runs into major accident, that's a major thing. So it depends the severity.

If the package is not received at that end or the government say I'm not paying for it, I did not approve it before it went out, Mr. Vora, you have to pay out of your pocket, and I get a huge loss. And I cannot take all that money from the employee. They say I am not babysitting here. What I can do with it?

Q. Do you know whether any actions were taken in response to Ms. Parker's comments

Page 58

R. VORA

that you made here?

A.   Can you repeat the question, please?

Q.   I'm sorry.  Did you ask me to repeat the question?

A.   Can you repeat the question, please?

Q.   Yes, yes.  Do you know whether any actions were taken internally at RCSI in response to the comments Ms. Parker made here in the written warning letter?

A.   Not to my knowledge.  Not to my knowledge.  But it's a serious matter.  The whole idea is stating that the person has to understand the sensitivity of the work they are doing.  They cannot excuse themselves that I'm not here to do it.  It's the attitude, you know.  If you are listening to somebody who is telling you that this is how the process is, this is what they're required to do, and if you are not literally seeing that person, you just made up your mind how I'm going to do this, no idea about this thing, then even the manager who has return of this thing cannot help themselves.

Q.   At this point in time, Ms. Parker's

Page 59

R. VORA

manager was Angela Wallace; is that correct?

A.   Yes.  That's what it looks like from the letter.

Q.   Ms. Parker did not sign the letter here, but it is signed by Ms. Wallace.  Is the alternate PM signature, is that Mr. Pickett?

A.   I need to see that one.

Q.   I'm sorry?

A.   Yes, that's Mr. Pickett, alternate program manager.

Q.   It looks like Mr. Moppins signed as the program manager; is that correct?

A.   What we have is a standard form for the warning.  So he put his signature there, but he's not the program manager, he's a subject matter expert.  So take it like this, that you have a power of attorney, and that is a standard form, and let's say like four, five signatures.  The person will sign it not knowing that what is my title at this point.  They just put the signature, not realizing.  So that is what I guess.  But he was a subject matter expert.

Q.   Why was Mr. Moppins signing this

Page 60

R. VORA

letter at all if he was not program manager?

A.   It involves the instructions that is provided to her in the responsibility, and the instructions were not followed.  So it will be -- think it like this.  Say the instructions is to let the Department of State know.  That instruction is provided to [inaudible] Mr. Moppins by the Department of State.  That instruction is down to the shipping supervisor or the transportation manager, and the person who's responsible to follow these instructions did not follow the instructions.  So the manager, that is DeMarcus Pickett, will involve subject matter expert who let them know that what is happening and how -- what we need to do on our end and what she has to do on her end so that error does not repeat itself.

Q.   Was Ms. Wallace the program manager at this point for Ms. Parker's work?

A.   You ask me what program manager or you're asking about what supervisor?

Q.   Well, who was Ms. Parker's program manager at this point?

Page 61

R. VORA

A.   It's the layer.  The way it works is they report to their immediate supervisor, and immediate supervisor reports to the alternate program manager, DeMarcus Pickett.

Q.   Was there an overall project manager at this point?

A.   I would say no.  We had a subject matter expert, alternate program manager, and their title is also sort of incorrect in this warning.  It should be deputy program manager.

Q.   I'm sorry.  Which one should be deputy program manager?

A.   That alt PM signature, that should be deputy program manager signature.

Q.   I got it.  Mr. Pickett was a deputy program manager?

A.   Yes.

Q.   There was no -- I'm sorry.  Go ahead.

A.   So the way the contract was structured, there's a subject matter expert, then deputy program managers, managers, then they have a team lead or material coordinator, then they will have subordinates, shipping

Page 62

R. VORA

specialists, warehouse specialists, and things like that.

Q.   Was Mr. Moppins effectively acting as the program manager in his role as a subject matter expert?

A.   I'm sorry, I missed one word.  Can you repeat the question, please?

Q.   Sure.  Was Mr. Moppins effectively acting as the program manager here for this project in his role as subject matter expert?

A.   As I say again, he was a subject matter expert.  He receive the instructions from the Department of State, he provides those instructions to our staff.  Our staff is required to follow those instructions, and our staff is required to report to our deputy program managers.

Q.   Do you find it interesting that Mr. Moppins signed this warning letter as the program manager?

MR. WALSH:  Objection.

A.   Again, I'm saying that there's error in this form.  They use the same form for all the written warnings.  They did not change

Page 63

R. VORA

form.  So he's a subject matter expert, as I'm saying, there is a typo.  The PM should not be there; it should be SME.  You may have copies of the e-mail that Larry Moppins sent out to the staff, and the signature would have said that he's a subject matter expert, the signature block will not say that he's a program manager.

Q.   Was any action taken against Ms. Parker with respect to her grade or her pay as a result of this written warning letter?

A.   I don't recall, because the Department of State was -- I don't recall the detail, but some of the Department of State was able to stop the process before shipment goes out.

Q.   I'm sorry, I didn't connect that.  I was asking whether there was any internal action taken against Ms. Parker, such as a demotion or reduction in pay or something like that as a result of this written warning.

A.   As I'm saying, we really did not incur loss, but there was a potential of

Page 64

R. VORA

incurring a loss, and you don't know how much amount it will be if the instructions are not followed.  So I don't recall that there was any reduction in pay or performance improvement plan or things like that.  I don't recall.

MR. COLAIANNI:  Okay.  We'll mark another exhibit.  Would you like to take a break?

THE WITNESS:  Sure.  How many minutes?

MR. COLAIANNI:  However long you'd like.

MR. WALSH:  Hoe, why don't we just, if you could, how long do you think you're going to be?  Is this a good time to take a lunch break or you think you're only going to be another 45 minutes?  Let's just judge from that.

MR. COLAIANNI:  You know, it's hard to say.  I don't think I have that much more, but maybe we should -- you want to take a short lunch break, just -- and then we can maybe finish?  Maybe 30 minutes or

Page 65

R. VORA

so?  Does that work?

THE WITNESS:  I'm good.

MR. COLAIANNI:  So we'll take a half hour lunch break, Rajesh, you can eat lunch real quick and then we'll start?

THE WITNESS:  Yes.

MR. COLAIANNI:  Okay.

MR. WALSH:  We'll all be back on at 12:30.

THE VIDEOGRAPHER:  Going off the record at 11:56.

(Luncheon recess taken at 11:56 a.m.)

Page 66

R. VORA

A F T E R N O O N S E S S I O N

(Time noted: 12:35 p.m.)

THE VIDEOGRAPHER: We're back on the record at 12:35.

R A J E S H V O R A,

resumed and testified as follows:

CONTINUED EXAMINATION

BY MR. COLAIANNI:

Q. Good afternoon, Mr. Vora.

MR. COLAIANNI: We'll mark another exhibit. This will be Exhibit 8.

(Exhibit 8, Sexual Harassment Policy Manual for Reema Consulting Services, marked for identification, as of this date.)

Q. It's a document beginning at production number Reema 000059. Please let me know when you see it.

A. Yes.

Q. For the record, could you identify Exhibit 8, please?

A. This is a Sexual Harassment Policy Manual for Reema Consulting Services.

Q. Does this document reflect the

Page 67

R. VORA

current sexual harassment policy at RCSI in effect today?

A. Yes.

MR. WALSH: Objection.

A. Can you repeat your question? I'm sorry. I did not hear your question completely and I said yes.

Q. Does this document, Exhibit 8, reflect the current policy regarding sexual harassment at RCSI today?

A. Yes.

MR. WALSH: Objection.

Q. When did this document go into effect?

A. This was prepared by Monica Lewis I think back in 2011 or 2012. She was our previous HR manager.

Q. Prior to 2011, was there a different policy that was in effect?

A. Yes. That was prepared by Maureen Copeland, but they did not have all the updated versions. Also -- it was pretty much outdated, you know, not in depth so much and sexual harassment policies and procedures.

Page 68

R. VORA

Q. Did you play any role in creating the document marked as Exhibit 8?

A. I have reviewed it.

Q. Did you review it before it went into effect?

A. Yes.

Q. Any changes been made to the policies described in Exhibit 8 since it was created in 2011?

A. I don't know that there is much change into it, but I don't recall. I don't recall that much changes to it. It's still the same document. I think it's still the same document.

Q. And you approved Exhibit 8 before it was issued as the company policy?

A. That is correct.

Q. Did you make any changes to the document before approving it as company policy?

A. I'm not HR, but I don't have that legal or HR knowledge, you know, deep enough to make changes. I follow the recommendations on how it is prepared and I review it just to

Page 69

R. VORA

make sure it looks reasonable.

Q. Was anyone else besides HR involved in creating Exhibit 8?

A. That I don't recall. She may have taken some outside assistance or she may have taken some in-house counsels assistance, but that I don't recall. It is in-house, the SHR website -- it's the human resources website, it's the organization. So they access that website to put lots of information. She may have assistance from that HR website.

Q. Are there -- strike that.

What happens if an employee violates any of the policies in the Exhibit 8, sexual harassment policies?

MR. WALSH: Objection.

A. We take all the sexual harassment complaint seriously. The process is that, you know, say if an employee makes a complaint or makes a complaint to the immediate supervisor and the supervisor informs to the HR manager about -- and they're required to report to the HR manager about the sexual harassment that they may have experienced.

Page 70

R. VORA

So the HR manager will take any complaint seriously. She will schedule interview, investigation interview with the person who has experienced sexual harassment, the victim, and then she will also identify if there are witness, and also she will identify who is the -- who is the person who committed that sexual harassment.

So she will get all the information in a timely fashion and she will prepare the report, she will provide me all the recommendation. She will brief me what happened at the end, but I would not be able to see how she conducted that interview and all those things. I will not have access to those information. She keeps it confidential.

Q. Have any RCSI employees ever been disciplined for violating the sexual harassment policies?

MR. WALSH: Objection.

A. Yes.

Q. Do you need to approve the disciplinary measures before they are imposed against someone who violates the policy?

Page 71

R. VORA

A. I'm sorry, can you repeat the question? It's a long question.

Q. Do you need to approve any disciplinary measures against someone that violates the policy before those disciplinary measures are imposed?

MR. WALSH: Objection.

A. Still I don't know that question because it's a two-part question. Can I use the paper and write down the question (indicating)?

Q. Let me see if I can make it simpler.

A. Okay. It's a two-part question, so, you know...

Q. Sure.

A. Make it simple. I will be able to answer each part.

Q. So before somebody is disciplined for violating a sexual harassment policy, would you need to approve that discipline?

MR. WALSH: Objection.

A. They will provide recommendation and then, yes, I will be the responsible party to take that -- you know, to get that

Page 72

R. VORA

disciplinary action.

Q. Let me introduce another exhibit here.

A. What page number?

Q. This is Exhibit 9, and it is --

A. So should I close the Exhibit 8?

Q. Sure, you may do that.

(Exhibit 9, Employee Handbook, marked for identification, as of this date.)

Q. Exhibit 9 is a document that begins at production Reema 000008. When you get a moment, could you please look at Exhibit 9 and let me know if you recognize it?

A. Yes, it's the Employee Handbook.

Q. When was this handbook developed?

A. This was also done by Monica Lewis back in 2013, June 2013.

Q. Was this handbook in effect during the period of time that Ms. Parker was employed at RCSI from --

A. Yes.

Q. -- 2014 to 2016?

A. Yes.

Page 73

R. VORA

Q. Have there been any revisions made to the document between its creation and May 2016?

A. I don't recall. If it is a typo or something like that, then they have fix it, but I don't recall any major reason. If there's a significant change, then I will see it. They need to get my approval.

Q. Does this Employee Handbook represent RCSI's human resources policies that are in effect?

A. Yes.

Q. Does the handbook apply to all RCSI employees?

A. Yes.

Q. Including managers and subordinates?

A. Yes.

Q. Are there any employees that are exempt from following the handbook?

A. No.

Q. Are subject matter experts subject to the handbook?

MR. WALSH: Objection.

A. Yes.

Page 74

R. VORA

Q.   I'm sorry?

A.   Yes.

Q.   Is the handbook distributed to employees and subject matter experts when they begin employment with RCSI?

MR. WALSH:  Objection.

A.   Employees, yes.  Subject matter expert was also an employee before he become a subject matter expert.  So it was distributed to him also before he became a subject matter expert.

Q.   Who are you referring to?

A.   Larry Moppins.

Q.   Okay.  Were other subject matter experts, are they -- do they get a copy of the Employee Handbook?

MR. WALSH:  Objection.

A.   Yes, my answer is yes.  If they are going to work on our program, they need to know what is our policies and procedures so that they don't cross the line.

Q.   As a condition of them working on a contract, they are required to follow the procedures in the Employee Handbook?

Page 75

R. VORA

MR. WALSH:  Objection.

A.   So they are subject -- they are required to follow the instructions in the handbook.  But they're also independent contractor, so they have to obey all the rules -- not only the handbook, all the rules and regulations when they are working in our facility.

Think it like this.  If you have an electrician coming to your house and he has to fix the light fixture.  Now, you will not allow a person who you think is a danger to your house, to your family, and we make sure that person, you know, follows the rules and regulations that is applicable to the county, you know, has a license, has a reputations, is a good person to work with, who have references from other parties.  So you do all those things to protect yourself.

So the same thing, that Employee Handbook and other policies and procedures that applies to the employees as well as to the subject matter expert.

Q.   In the contract that Reema signs

Page 76

R. VORA

with the subject matter experts, does it state that they are required to follow the RCSI Employee Handbook?

A.   I -- you know, that was a long time ago in 2013, so I don't recall.  If you want me to look into it, I will look into it.  But what we have is an agreement to execute the contract.

Q.   And I'm referring here to contracts with any subject matter experts.  Does RCSI require in those contracts that those subject matter experts follow the policies and records of RCSI?

MR. WALSH:  Objection.

A.   Absolutely, absolutely, because they're working in our facility or they're working in a government facility, and we just want to make sure that even though, you know, the person is providing expert -- subject matter expert services, they have to follow the rules and regulations that is in compliance at the government facility or at our facility or our work locations.  So yes, they are required to follow those

Page 77

R. VORA

instructions.

Q.   What about for the sexual harassment policy manual, is that also specified in the contracts with subject matter experts that they follow these policies?

MR. WALSH:  Objection.

A.   I said all the policies, they are to follow all the policies and procedures.

Q.   And that is specified in the contract that RCSI entered into with subject matter experts?

MR. WALSH:  Objection.

A.   That part I don't recall.  But -- and as I said before, he started as an employee, so, you know, so he had -- he was provided all these documents before he become a subject matter expert.  But as I said before, subject matter expert are required to follow all the rules and regulations, all the policies and procedures we have in place.

Q.   Where is it specified that subject matter experts have to follow all the rules you have in place?

A.   We may have conveyed verbally, or it

Page 78

R. VORA

may be in agreement, but I don't recall.  But verbally, you know, say if we have training, either for sexual harassment or even a work related training or things like that, safety related training.

Let's take an example.  Say all the personnel in the warehouse, you know, when they're opening the tri walls helping to close, because we don't want the wiring to cut their fingers, or when they're operating the forklift, make sure that they have a license to operate.  They have passed the specified code to operate the forklift.  They have to get the certificate, they have to -- they need to pass the exam of the forklift operation, so that will be applicable to everybody.  This is what I'm saying is policies and procedures that we have in our place, that will be applicable.

Q.    Does RCSI require periodic sexual harassment training for its employees?

A.    Yes.  It's done semiyearly or annually.

Q.    Does that requirement apply to

Page 79

R. VORA

managers, as well?

A.    Yes.

Q.    Is the employee compliance with the sexual harassment training documented somewhere?

A.    We do issue certificate.  We do note before, you know, when they take the test, there's a quiz, and if they pass, then they will be issued a certificate.

Q.    What about subject matter experts, are they required to take sexual harassment training at RCSI?

A.    Yes, all of them; everybody.  As I said, if they're in our facility, they'll follow our rules.

Q.    And the compliance with those sexual harassment training for subject matter experts is also documented?

A.    That part I don't recall, but it should be.

Q.    And you think it would be in the form of a certificate?

A.    As I said, I don't recall, but yes, if it is -- if they take the exam, they will have certificate.

Page 80

R. VORA

Q.    Are you aware of a rumor that was circulating in the company several years ago about Ms. Parker and Mr. Pickett?

MR. WALSH:  Objection.

A.    Not at that time when it happened.

Q.    When did you first become aware of that so-called rumor?

A.    It was third week of May.  Around third week of May.  So around 17th; 16th, 17th of May.  I don't recall the exact date.

Q.    What year are you referring to?

A.    You're asking about the rumor, correct?

Q.    Yes.

A.    So I'm saying that I became aware of it around May 17th or May 16th.  I don't recall the exact date.

Q.    Oh, I'm sorry, you're saying May 2017 or May 2016?

A.    No, no, no, no, May 16th or 17th, 2016.

Q.    2016.  Thank you.  I was asking what year, though.  And how did you become aware of it?

Page 81

R. VORA

A.    Cathy Price brief me when she had finished her investigation report.

Q.    And what was your understanding of the so-called rumor?

A.    It's a rumor.  You know, I don't act on those things.  It's not -- it's a hearsay.  It may be true, it may not be true.  So as a company, we are responsible people.  If the rumor is untrue, we will get into lot of liabilities, lot of trouble.

Q.    I'm asking what your understanding of the issue was.

A.    What I'm saying is that we don't act on the rumors.

Q.    Was this rumor investigated?

A.    Okay.  Let me explain this to you.  It's a rumor, so we will not spend our resources investigating it.  Rumor can be anything.  Let's say somebody came late because of a health issue and people make a rumor that, hey, he's a boss, he can come whatever time that he can come, and that can be rumor.  So what I'm saying is we as a company don't act on the rumor.

Page 82

R. VORA

Q.   When you say you don't act on the rumor, what do you mean by that?

A.   Means our HR manager will not investigate if there's a rumor.  Somebody has to -- has to -- if somebody makes the complaint to HR manager that this is the rumor, then HR manager will investigate that part.  Without the complaint, HR manager cannot do much about it.

Q.   Had Ms. Price conducted an investigation relating to the rumor when she spoke to you in May 2016 or '17?

A.   Ms. Cathy Price, she did the investigation of the sexual harassment complaint that Evangeline Parker filed and also week later that Donte Jennings filed.  So she's the one who investigated once Evangeline and Donte filed a complaint about the sexual harassment.

Q.   Did you speak with Ms. Price about her investigation?

A.   Not during the time of investigation.

Q.   Did she just make a report to you of what she had investigated?

Page 83

R. VORA

A.   Once she finished the investigation, she would brief me.

Q.   At that time you would not have a discussion with her, though, about the investigation?

A.   In a briefing, she's professional.  You know, she will tell me that she has spoken to the victim, the harasser, the witnesses, all those things.  But until that time, it will be confidential, meaning she will not name the name.  She considers this a serious issue.

Q.   Did you take any action with respect to that complaint after Ms. Price had spoken to you?

A.   About -- after the investigation?

Q.   Correct.

A.   Or after the complaint?

Q.   After Ms. Price had briefed you.

A.   Yes.

Q.   What action did you take?

A.   This is I would say to you, that she briefed me about conduct of Ms. Parker in the warehouse, she investigated the complaint that

Page 84

R. VORA

her subordinates and other staff made to our deputy program manager and to the subject matter expert.  She check with other witnesses.  So she collected all the relevant information and she briefed me and she made her recommendation to terminate Evangeline Parker.

Q.   And what was your reaction to what she had told you at that time?

A.   We have to -- we as a company, we care for all the employees in the warehouse.  And I'll tell you how good we had in that place.  I did everything in my power to make that place a better place than what it was before 2012.  New lighting, new recking systems, professional people, HR in the facility.  Also better -- people who are in the office, you know, better workplace to work.

     And I'll give you example.  Before we started, the people who did the inventory or receiving of shipping, when they receive the material, they open the box on the floor, they sit on the floor.  And then they inspect

Page 85

R. VORA

the material, then [inaudible] the material by extending up near the tri wall and put those things back in.  And what we did is that, you know, we bought desk and a chair so that people can, you know, those small items, that they can put it on the table, they can -- it was a likeable environment.  People see it as a good place to work.  So for us, all employee matters.

     So when we receive a complaint, our HR manager, when I say "we," I mean HR manager, receive a complaint from fellow employees or subordinates -- and also I will tell you what it is.  These are high school, you know, graduate people, or high school or less than high school, and this is a better paying job for them.  Some of them were making, you know, $18 plus $4 in benefits, around $22 for the work.  If they were doing the same work at McDonald's, they would not get more than $10.  So, you know, people, you know, when they work with us, they are better pay and better benefits.  Company provided health insurance, medical, dental, 401(k)

R. VORA

plan --

MR. WALSH: I'm sorry. Rajesh -- and I'm sorry, Joe. Rajesh, I think you've gotten away from answering whatever the question originally was.

Joe, if you could ask the question again , I think maybe we could get back to what the answer would be to your question.

THE WITNESS: I'm sorry. I have bad habit of explaining the process.

MR. COLAIANNI: Maybe the court reporter can reread the last question, please.

(Record read.)

A. So when you care for all the employees, including subordinates, and we have to protect subordinates also, so my reaction was if the work environment is becoming hostile work environment to the employees or subordinates, for the subordinates or for the other person who has filed a complaint, her conduct was not acceptable. We could not live with those kind of conduct in our warehouse.

Q. Did you take any specific actions

R. VORA

based on your reaction to what Ms. Price had told you during the briefing?

A. That is, yes, and also what happened is that on May 18th we ask Evangeline Parker to return the government provided cell phone. That cell phone was used to take pictures of the products that has a defect or deficiency, and then they're required to send to us pictures through the Department of State. So if there's any discrepancy of products or item missing or things like that, you know, there will be a communication between the receiving person who has taken the picture, this assistant warehouse manager, the Department of State, and then Department of State has to process our -- has to [inaudible] to the vendors. So they will forward those informations to their paying office, and based on that information, they will short pay the vendor or vendor will be notified to replenish that material.

So those data on the cell phone, she wipe it out before handing it over to us, and once that happened, I said, you know, I said

R. VORA

to myself that I cannot tolerate this -- this was unacceptable to destroy the government property or data.

Q. So did you make any decisions regarding her employment when she did that?

A. Yes. So after that I ask Cathy Price and Reema Vora, our in-house counsel, to end employment relations with Reema Consulting Services, Evangeline Parker's employment relations with Reema Consulting Service.

Q. You mentioned that there was some information you believe was delivered from a phone, a cell phone; is that correct?

A. Yeah. Government provided a cell phone for to use to capture products, defective products, send those pictures to Department of State, then Department of State towards that to the paying office.

So think it like this. Say vendor send you a laptop and the screen is broken. So whatever same people or assistant manager does is they take a pictures of the laptop, sends that picture to the Department of State, and ask them what we need to do. So if the

R. VORA

government says, okay, go ahead and send this picture to the vendor, let them know the laptop screen is broken. So either they will not pay for the laptop or they will ask the vendor to replenish the laptop. But action will be taken based on this data that was captured on the cell phone and send it to the Department of State.

Q. Are you referring here to Ms. Parker's government issued cell phone?

A. The phone was issued by Reema Consulting Services and that was reimbursed by the government. So the term in the government contracting is called contractor operated government facility. So the acronym is G-O -- C-O-G-O, contract operated government operation. So government was paying for that cell phone. So if the data was there on the cell phone, that belongs to the government.

Q. Was this cell phone that you're talking about issued to Ms. Parker to use during her work at RCSI?

A. Yes.

Q. You indicated that some information

Page 90

R. VORA

had been deleted from it; is that correct?

A.    Yes.  What I'm saying is she did a hard reset.  Hard reset means everything on that phone will be wiped out.  It's called, the technical term is factory reset.

Q.    And how was it discovered that the information had been deleted?

A.    She hand over that phone to Cathy Price in her HR office, and the in-house counsel also noticed that cell phone has been factory reset, all the data has been deleted.

Q.    Was that issue discussed with Ms. Parker?

A.    The way that meeting went is that we don't ask employee for the termination through the end of the day.  So Reema and Cathy Price and Evangeline Parker, they're making the conference room, that is where they discuss about her conduct in the warehouse and she was provided the termination data.  So the data, when she handed over the phone to us, we noticed that it's reset, but we did not -- it did not strike to us in that 15, 20 minutes time frame.  And once we realized that all the

Page 91

R. VORA

data is gone, that worried us.  It's a government property.

Q.    Was this factory reset of the cell phone documented somewhere in the company --

A.    Yes.  I asked in-house counsel to prepare a memorandum, and it was observed by our HR manager, our in-house counsel, and I think it was Angela Wallace, also.

Q.    Did Ms. Parker have any explanation for the cell phone data being deleted?

A.    That we did not ask, and we did not expect any answer from her about that, also. When somebody does something like that, they have an intent to delete it.

Q.    You were not present at that meeting with Ms. Price and Ms. Vora, correct?

A.    It was Cathy Price -- this is what I recall, okay?  That it was Cathy Price, Reema Vora, and Evangeline Parker.

Q.    And this was the day that Ms. Parker's employment was terminated, correct?

A.    Yes.

Q.    Had you already made a decision to terminate her employment before learning about

Page 92

R. VORA

the deletion of the cell phone data?

A.    I was leaning towards the termination.  But once I realized that the data has been deleted, that was my final say, that I told our in-house counsel that --

MR. WALSH:  Rajesh, I don't want you to discuss anything that you discussed with in-house counsel.

THE WITNESS:  Okay.  I'm sorry.

Q.    But your final decision to terminate Ms. Parker was made after learning about this so-called deletion of data from the cell phone?

A.    It was -- it was all the items.  It was her conduct.  She was given a direct instruction not to visit that other person's workspace that was on the other side of the warehouse, not following those instructions. It was the deletion of the cell phone data. All those things made me, you know -- I determined that, you know, I don't want to work with this employee anymore.  I want that employee terminated.

MR. COLAIANNI:  We're going to mark

Page 93

R. VORA

another exhibit.

(Exhibit 10, Reema Consulting Services Inc. Sexual and Other Unlawful Harassment Investigation Questionnaire, marked for identification, as of this date.)

Q.    Exhibit 10 should be in front of you.  Please let me know when you see it.

A.    Okay.

Q.    Do you recognize Exhibit 10?

A.    Yes.  It's a Reema Consulting Services Inc. Sexual and Other Unlawful Harassment Investigation Questionnaire.

Q.    And this questionnaire is dated April 25, 2016, correct?

A.    Yes.

Q.    Is this the result of -- is this part of an investigation that was conducted in connection with the complaint?

A.    Also, first thing, that I was not there when Evangeline Parker filed this complaint with our HR in other, so -- but it is our policies and procedures so that when somebody complains about sexual or other

Page 94

R. VORA

unlawful harassment, she will take down -- she will prepare this investigation questionnaire, she will take down all the -- she will ask for the description of what happened, are there any witness, things like that.

Q. And this complaint was made by Ms. Parker against Mr. Moppins, correct?

A. Correct.

Q. You were not directly involved with this investigation, right?

A. No, I was not.

Q. Ms. Price was involved, right?

A. Yes, Ms. Price did the investigation.

Q. Do you know if anyone else was involved in the investigation besides Ms. Price?

A. Could you repeat the question, please?

Q. Sure. Do you know whether anyone else was involved in this investigation besides Ms. Price?

A. No. She keeps this investigation very confidential. She wants to preserve the

Page 95

R. VORA

identity of the people who made the complaint, the harasser, and the witnesses before she comes to any conclusion -- before she makes any recommendation. So she just, you know, she has to -- when she does the investigation, you know, she's professional, you know, she will talk to each of them very respectfully, and she will gather all the informations before coming to -- before making any recommendations.

Q. Was the questionnaire shown as Exhibit 10 provided to you at any point in time?

A. The first time I saw that is when I was preparing interrogatory response from your inquiry from around last year, but I did not have -- I did not see these things until last year.

Q. Do you know what the result was of the investigation of Mr. Moppins' conduct as described in this questionnaire?

A. I'm sorry. Which paragraph you're talking about?

Q. So this questionnaire we were

Page 96

R. VORA

looking at as Exhibit 10 --

A. Correct.

Q. -- which for the record is a document beginning at production numbers Reema 00001.

A. Okay.

Q. Exhibit 10 I think we established is a questionnaire relating to a complaint made by Ms. Parker against Mr. Moppins, correct?

A. Yes.

Q. Do you know what the ultimate result was of the investigation of this complaint?

A. She did check with -- as I said before, she did check with Evangeline, she did check with Larry Moppins, she did check with the witnesses and she did not find evidence that Larry Moppins is the one who spread the rumor.

Q. Was there any disciplinary action taken against Mr. Moppins as a result of this investigation?

A. No, because we did not find evidence that he was -- that he did spread the rumor. We did not find any evidence. "We" means our

Page 97

R. VORA

HR manager.

Q. Were you aware of any other complaints made against Mr. Moppins while he was either working as an employee or a subject matter expert for RCSI?

MR. WALSH: Objection.

A. I don't recall.

Q. Are all the complaints against employees documented at the company?

MR. WALSH: Objection.

A. Yes. If it is -- so if it is sex -- it is a sexual and unlawful harassment complaint, correct?

Q. I'm sorry, I didn't catch that.

A. So when you said that all the complaints are documented, means you're talking about sexual and other unlawful harassment complaints, correct?

Q. Yes, that's correct.

A. Okay.

MR. WALSH: And I'll do an objection just for the record. Go ahead, Rajesh, you can answer.

A. As soon as, you know, our HR

R. VORA

becomes -- our HR gets informed about the sexual harassment, she will document how small it is or how big it is, how big or small that complaint is, and she will do the investigation. First she will make a determination whether it really is a sexual harassment, and if it is sexual harassment, she will take the complaint, okay? But she will make the determination will it fall into the sexual harassment or it will not. And if it falls into it, she will start the whole process.

If it is not, then she will try to get with the party, or if there's a witness, but she will get all the parties together, she will explain what happened, they should not be doing those things, the person who did it, or harasser, alleged harasser, they may get a performance improvement plan, they may get a written warning. You know, a warning could lead to termination.

Q. Who makes the final decision as to whether an employee is disciplined as a result of an investigation for sexual or other

R. VORA

unlawful harassment?

MR. WALSH: Objection.

A. Cathy Price will brief me and I'll be the one who will make the final decision.

Q. In the case of the investigation into Mr. Moppins relating to Exhibit 10 here, did you make the final decision that Mr. Moppins should not be disciplined as a result of the investigation?

A. We did not find an evidence -- I'm repeating myself again. We did not find an evidence that Mr. Moppins was -- Mr. Moppins did spread the rumor. We did not find that evidence.

Q. And so you made the final decision not to discipline him based on the evidence that was found, right?

A. You have to repeat the question, I'm sorry.

Q. You made the final decision not to discipline Mr. Moppins based on the result of the investigation, correct?

A. Yes.

MR. COLAIANNI: I'd like to mark

R. VORA

another exhibit.

(Exhibit 11, Written warnings, marked for identification, as of this date.)

Q. I've just entered Exhibit 11. Take a look at Exhibit 11, it's a document beginning at production number Reema 000171, and let me know if you recognize it.

A. I recognize this document, but I was not in that meeting when they present this document to Evangeline Parker. Our in-house counsel and Cathy Price was in that meeting, and this memo was reviewed by HR -- sorry, our in-house counsel before it was presented to Evangeline Parker.

Q. When did you first see the Exhibit 11 document?

A. I think maybe May 18th or 17th. I don't recall the exact date.

Q. And the document was prepared by whom?

A. The document was prepared by Larry Moppins and it was reviewed and/or edited by our in-house counsel.

R. VORA

Q. And I take it that you saw the document after it had been reviewed by in-house counsel?

A. Yes.

Q. Did you propose any changes to the document before it was presented to Ms. Parker?

A. No. At that time I was very busy. I read it, but I was very busy. I had to prepare an urgent report for a Department of State client, so I was tied up with preparing that report. But I did review this. So your question is did I ask them to make any suggestions? No.

Q. Is there a policy at RCSI regarding the number of written warnings that an employee gets prior to being terminated?

MR. WALSH: Objection.

A. In our Employee Handbook there is no, like, number, that after one number you will be terminated or after four numbers you will be terminated. Depends on the severity of the issue, whether it's a verbal warning, written warning, performance improvement plan,

Page 102

R. VORA

or termination. It depends on the severity of the act.

Q. Exhibit 11 is dated May 16, 2016. Does that seem accurate to you?

MR. WALSH: Objection.

A. What was the last word you said? I'm sorry.

Q. Do you have any reason to dispute that Exhibit 11 was created on May 16, 2016?

A. No, I don't have a dispute about that. I will not, you know...

Q. It identifies Larry Moppins as Ms. Parker's supervisor. Do you see that?

A. Yes.

Q. Was Ms. Parker reporting to Mr. Moppins at this point in her career?

A. Again, these are the -- these are the standard form. What it is is that on the laptop or desktop, these are the HR standard forms that they have, so it will have -- the top part of it is the purpose of the written warning. It's pretty standard. There is a name of the employee who will get the warning, then there will be supervisor's name, and

Page 103

R. VORA

there will be date and location.

So Larry is our subject matter expert. What he did not do while preparing this memo or warning, he did not put down, you know, it's -- he did not cross it out the supervisor part and put in subject matter expert. So in my view, that's a typo.

Q. Was he supervising Ms. Parker's work at this point in time?

A. Indirectly.

Q. Who was Ms. Parker's direct report at this time?

A. DeMarcus Pickett. It says Shaun Reeves if she's working in the warehouse, or DeMarcus Pickett. Shaun Reeves, she was assistant warehouse manager. So the warehouse manager was Shaun Reeves. So she will report to Shaun Reeves and she will report to DeMarcus Pickett. They are the supervisors.

Q. If you look at the second page of Exhibit 11, please, there's some handwriting on the bottom from Ms. Parker. Do you see that?

A. I'm just going there. One second.

Page 104

R. VORA

Just hold on a second.

Q. Sure. Take your time.

A. Yes, I read the sentence, I read the comments.

Q. Ms. Parker alleges here that Mr. Wallace -- I'm sorry, Ms. Wallace and Mr. Pickett were witnesses to some of the conduct she complains about and did not provide statements. Do you see that?

A. Yes.

Q. Do you have an understanding as to why there were no statements provided here by Mr. Pickett and Ms. Wallace?

A. This is the warning. It's not the witness statement, it's not the place -- the warning is not the right place to include witness' statements.

Q. The corrective action required here is termination, correct?

A. Yes. You can recommend corrective action.

Q. Well, this isn't corrective action, right? This is the termination, correct?

A. Correct. His recommendation was the

Page 105

R. VORA

termination of employment.

Q. Do you know whether Mr. Pickett or Ms. Wallace were consulted in connection with the recommendations made in this letter?

A. That part I don't know. If they are witness, then they are witness. They will not be making any comments whether to terminate or not to terminate the person. You see my point?

Q. Right. That's not what I'm asking. I'm asking whether Mr. Pickett or Ms. Wallace were consulted in connection with the investigation that led to this termination recommendation.

A. My understanding is that -- that part I don't know. Whether they were consulted or not, that part I don't know. What we do as a company, we keep this matter very confidential just to make sure that if -- say, for example, say the termination did not happen, okay? For whatever reason. Then we don't want to put that person in a shameful environment or an unpleasant environment because if somebody made a recommendation and

Page 106

R. VORA

then it did not happen, so both the parties will be feeling shame. So we want to keep, you know, this information just need-to-know basis.

Q.    Is it the policy of RCSI, when conducting investigations based on unlawful contact, to interview witnesses to the conduct?

A.    Yes. If there are witnesses -- if they identify the witnesses, then yes, witnesses would be conducted -- witnesses would be interviewed.

Q.    Would witnesses provide statements in response to being interviewed relating to the alleged conduct?

MR. WALSH: Objection.

A.    I don't know the process in detail, but we are required to document all the statements from the witness, and if the witness has given a verbal statement, then our HR manager will document it and ask the person is this what they're trying to convey. If this person says yes, then they will, you know, put that person's signature.

Page 107

R. VORA

Also, I'll tell you what it is. These are the high school or not even high school people, so some of them -- you and me can write very well, you know, other person can understand. But these other people who are high school graduate or less, and they will not know how to put those thing in writing.

Q.    Turn over to the next page of Exhibit 11, please. It's the page ending in Reema 000173.

A.    Page 3 of 3 or you want me to look at the next page?

Q.    3 of 3. Ms. Parker did not sign this statement, correct?

A.    Yes.

Q.    The only signature here is Mr. Moppins, correct?

A.    Yes.

Q.    Why are there no witness signatures?

A.    As I said before, that this is the warning letter, a written warning from Larry Moppins to Evangeline Parker that was forwarded to our HR department, and as a

Page 108

R. VORA

person who has prepared this warning, he put his signature. And again, he put PM, it should be subject matter expert. So this goes to our HR department, and this is a serious matter, so our HR department, they will look into this thing. I will rely more on this investigation than the warning that is issued here.

Q.    And you approved the contents of this letter before it was shown to Ms. Parker, correct?

A.    I said I have reviewed this content and I did not have any objection to it. So yes.

Q.    And this was presented to Ms. Parker a day or two after May 16th, right, when she was formally terminated?

A.    It was presented on May 18th.

Q.    May 18th?

A.    Yes.

Q.    Sorry, go ahead.

A.    Because, you know, he has -- Larry Moppins has a signature and the date next to it.

Page 109

R. VORA

Q.    And May 18th was the date that Ms. Parker was terminated, correct?

A.    That is correct.

Q.    Could you turn over to the next page of Exhibit 11, please. Do you recognize this written warning beginning on page Reema 000174?

A.    Yes.

Q.    This is a separate warning from the previous warning we just looked at?

A.    Yes.

Q.    This warning was also done by -- or, excuse me, this warning was also dated May 16th and signed by Mr. Moppins, correct?

A.    Yes.

Q.    What is the reason for the separate warning letter?

A.    When I read it, it's a conduct -- I'm sorry, I lost my thought, but I'll start again.

MR. WALSH: Would you like the question repeated? Would that help you?

THE WITNESS: Yes, please, yes.

Q.    The question was just why there's a separate warning letter on the same date as

Page 110

R. VORA

the prior one we just looked at.

A.    When I briefly looked at the warnings, one is related with her temper in the meeting that she had with Larry Moppins and Evangeline Parker.  And the second one is for her conduct under the employee Donte Jennings who had filed hostile work environment complaint against Evangeline Parker.  She was instructed not to go to his workspace and not to make any inappropriate gestures and things like that, in the sense, you know, keep yourself, you know, to your work area, and she didn't.  So she did not follow the instructions, and she had a witness, a typical witness statement, so that is what the second warning is.

Q.    Was Mr. Jennings' complaint also investigated by Ms. Price?

A.    Yes.

Q.    What was Mr. Moppins' role in the investigation of Mr. Jennings' complaint?

MR. WALSH:  If you know.

A.    I don't know.  But, you know, he's our subject matter expert.  It's HR manager's,

Page 111

R. VORA

human resources manager's function.

Q.    Do you know if Mr. Moppins played any role with respect to the investigations of the complaints against Ms. Parker?

A.    He may have received complaint from employee, and once he receives a complaint, he can forward that message to the HR manager.  Besides that, he will not be -- he will not do the investigation.

Q.    Do you know whether Mr. Moppins was interviewed by Ms. Price as part of the complaints against Ms. Parker?

A.    I think so.  But, you know, I was not part of the investigation, but I would -- I will say no, she will do a thorough investigation.  She will reach out to every person that is mentioned in the complaint.  So yes.

Q.    I'll mark another exhibit.

(Exhibit 12, Officer Separation of Employment Notice, marked for identification, as of this date.)

Q.    I've just uploaded Exhibit 12.  Can you please take a look at Exhibit 12, which

Page 112

R. VORA

for the record is a document beginning at production number Reema 000347.

THE VIDEOGRAPHER:  Going off the record at 1:54.

(Recess was taken.)

THE VIDEOGRAPHER:  Back on the record at 1:56.

BY MR. COLAIANNI:

Q.    Did you have a chance to look at Exhibit 12, Mr. Vora?

A.    I did.

Q.    Do you recognize it?

A.    Yes.

Q.    Can you state what it is for the record, please?

A.    You're asking me?

Q.    Yes.

A.    It's the Officer Separation of Employment Notice.

Q.    And this was approved by you with respect to Ms. Parker, correct?

A.    Yes.

Q.    We'll mark one more document, please.

Page 113

R. VORA

A.    So should I close the other document?

Q.    You can, sure.

A.    Okay.

(Exhibit 13, Reema Consulting Services Inc. Sexual and Other Unlawful Harassment Investigation Report, marked for identification, as of this date.)

Q.    I've just introduced Exhibit 13, which is a document beginning at production number Reema 00006.  Would you let me know if you recognize Exhibit 13?

A.    Yes, I read this.

Q.    Do you recognize Exhibit 13?

A.    Yes.

Q.    When was the first time you saw Exhibit 13?

A.    I think Cathy Price briefed me about it.  I don't think she gave me the -- I don't recall first whether I saw the hard copy of it -- the hard copy of it I saw when I was preparing of the investigation, your interrogatory questions.  So she brief me about it.  I don't recall she gave me, you

Page 114

R. VORA

know, she printed out a copy and gave it to me.

Q.    Would she have done that at the time she briefed you after the completion of her investigation into the allegations against Ms. Parker?

A.    Yes, on May 17th.

Q.    Would you look at the second page of Exhibit 13.

A.    Okay.

Q.    In paragraph 12 there's a reference to a meeting on May 17, 2016.

A.    Okay.

Q.    With yourself, Reema Vora, HR, and Larry Moppins.  Do you see that?

A.    Yes.

Q.    Do you recall that meeting?

A.    Yes.

Q.    What was the purpose of that meeting?

A.    Cathy Price, she ask Evangeline about her conduct and she deny it.

Q.    I'm sorry.  I didn't catch the last thing you said.

Page 115

R. VORA

A.    Our HR manager, Cathy Price, was calling -- she called Evangeline Parker in a meeting with myself, Reema, and Larry Moppins, and she informed Evangeline about Mr. Jennings claim about the sexual harassment, and she flatly denied it.

Q.    Was Ms. Parker -- strike that.

Did Ms. Parker attend the meeting on May 17, 2016 that's referenced in paragraph 12?

A.    I think so.

Q.    And what was discussed at that meeting?  Just the claims Mr. Jennings had made?

MR. WALSH:  Objection.  Mr. Vora, if I could just object for a second.  I'll just caution you that to the extent that Ms. Vora was there and providing legal advice, we've taken the position that that meeting itself, the contents of that meeting or the exchanges with Ms. Vora in which she participated would be privileged and would be not subject to the discovery.

To the extent that the purpose of the meeting is being requested or the

Page 116

R. VORA

outcome of the meeting, that's one thing. But with respect to the substance of the discussions in that meeting, we've objected on the basis of attorney/client privilege and instruct the witness not to answer.

A.    I will not answer this question.

Q.    Okay.  You believe Ms. Parker would have attended this meeting, though.  Is that true?

A.    I said I think so, yes.

Q.    And what was the purpose of the meeting?

A.    When our HR manager does the investigation, she will reach out to everybody, and as part of reaching out and getting clarification, she wanted to check with Ms. Parker about Mr. Jennings' claim.

Q.    What was the result of the meeting?

A.    What was the result of the meeting? She flatly denied it.

Q.    I'm sorry?

A.    She denied it.

Q.    This was on May 17th?

Page 117

R. VORA

A.    I think so, yes.

Q.    At what point was the decision made by you to terminate Ms. Parker's employment?

A.    On May 18th.

Q.    And on May 18th -- strike that.

Were there any other meetings you were involved with between this meeting referenced here and Ms. Parker's termination the next day?

A.    As I said before, I was -- I had to prepare urgent report for the Department of State and I was tied up with that report.  So I don't recall if I was in any other meeting.

Q.    The documents we looked at earlier, Exhibit 11 references some written warnings that were provided to Ms. Parker, and those were dated May 16th, correct?

A.    Let me see.  Yes.  Exhibit -- which one?  11?

Q.    It's Exhibit 11.

A.    Yes, that is dated 16th.  Oh, wait, Exhibit 11 is a termination, officer separation of employment.  You're talking about that one or you're talking about

Page 118

R. VORA

something else?

Q.   Exhibit 11 is the first of two -- includes two written warnings.

A.   Yes, yes, that is dated May 16th.

Q.   Do you know when the information in Exhibit 11 was communicated to Ms. Parker?

A.   It was on 18th.  As we checked this before, there's a date, Larry Moppins put it down May 18th.  So it was delivered to Ms. Parker on May 18, 2016.

Q.   That was the day you had decided to terminate her employment, correct?

A.   After -- after Cathy Price briefed me about her investigation report, yes.

Q.   Was Cathy Price's briefing the May 17th?

MR. WALSH:  If you recall.

A.   I don't recall whether that was May 17th or May 18th.  But it is more from May 17th because -- I think it was more from May 17th than May 18th.

Q.   Was your briefing by Cathy Price at the meeting that's referenced in paragraph 12, Exhibit 13?

Page 119

R. VORA

A.   About this sexual or other unlawful harassment investigation report, correct?

Q.   Correct.

A.   Yeah, so May 17th.

Q.   And then you made the decision after that briefing to terminate her the following day?

A.   Yes, on May 18th.

Q.   Were you present when Ms. Parker was notified of her termination of employment?

A.   I was present in the office, but not in the conference room where Cathy Price and Reema was there with Evangeline Parker.

MR. COLAIANNI:  I think that's all I have.  I don't have any further questions at this time for the witness.

Thank you, Mr. Vora.

EXAMINATION BY
MR. WALSH:

Q.   Mr. Vora, I just want to try and clarify something.

In looking at Exhibit 13, which was that Sexual and Other Unlawful Harassment Investigation Report that you said Cathy put

Page 120

R. VORA

together, there were some questions about paragraph 12 and this meeting on 5/17.  In this particular memo, it says, "Ms. Parker submitted a written rebuttal to Mr. Jennings' claims.  Meeting with Mr. Vora, Reema Vora, HR, and Larry Moppins."

Were you present in a meeting with Ms. Price, with Reema and Larry Moppins where Ms. Parker was also invited into the room?

A.   Okay.  Now I see how this is written in the written part.  I think -- I'm sorry, first thing, I need to correct myself.  When Cathy Price does the investigation, she talks with that person only.  None of us will be in that meeting.  So as I said, and I don't recall that part, but Cathy Price did meet with Evangeline Parker and she made the rebuttal.

Q.   Okay.  What I'm asking you, do you recall a meeting with you, with Ms. Price, with Reema, with Mr. Moppins, and with Ms. Parker?  Do you recall a meeting?

A.   I don't recall it at all.

Q.   Okay.  Do you recall a meeting where

Page 121

R. VORA

it was just you, Reema, Larry Moppins, and Ms. Price?

A.   Which meeting we are talking about?

Q.   Do you recall a meeting where it was the four of you to discuss Ms. Parker's behavior in the sexual harassment investigation that Ms. Price put together?

A.   I think so, yes.

Q.   Okay.  And Ms. Parker wasn't present for that meeting, correct?

A.   That is correct.

MR. WALSH:  I have nothing further.

MR. COLAIANNI:  I need to ask one further question to follow up on that.

FURTHER EXAMINATION
BY MR. COLAIANNI:

Q.   So is it your testimony, Mr. Vora, that you don't believe Ms. Parker was present at the May 17th meeting identified in paragraph 12 of Exhibit 13?

A.   This is the meeting between all of Ms. Parker, myself, Reema, HR, and Larry Moppins?  I'm -- can you repeat the question, please?

R. VORA

Q. Is it your testimony that you do not believe Ms. Parker was present at that May 17th meeting that's referenced in paragraph 12 of Exhibit 13?

A. What I'm saying is that Cathy Price and Ms. Parker had a meeting. Myself, Larry or Reema were not in that meeting. It was a part of Cathy Price investigation.

Q. But the meeting that you did attend that's referenced in paragraph 12 --

A. I said I did not.

MR. WALSH: Wait, wait. Just hold on.

Go ahead, Joe.

MR. COLAIANNI: Thanks. Thank you.

Q. The meeting that's referenced in paragraph 12 identifies you. You're the Mr. Vora referenced there, correct?

A. Yes.

Q. Do you recall the meeting that's referenced here in Exhibit 12 -- excuse me, paragraph 12?

A. There was a meeting between myself, Reema Vora, Cathy Price, and Larry Moppins in

R. VORA

the conference room. I think so, yes.

Q. And do you recall Ms. Parker being at that meeting?

A. I don't recall.

Q. You don't recall her being there?

A. That's my understanding, I don't recall that she was in that meeting. It was four of us were in that conference room.

Q. Okay. I understand.

MR. COLAIANNI: Okay. Thank you. I got it. Nothing from me.

Thank you, Mr. Vora.

THE WITNESS: Okay. Thank you.

MR. WALSH: And I have nothing, but we will read and sign.

MR. COLAIANNI: Sounds good.

MR. WALSH: I think that's necessary.

THE VIDEOGRAPHER: This concludes today's deposition of Rajesh Vora. Going off the record at 2:14 p.m.

(Time noted: 2:14 p.m.)

A C K N O W L E D G M E N T

STATE OF NEW YORK )
:SS
COUNTY OF )

I, RAJESH VORA, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of July 24, 2020; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

____________________
RAJESH VORA

Signed and subscribed to before me, this day of , 2020.

______________________________
Notary Public, State of New York

C E R T I F I C A T E

STATE OF NEW YORK )
) SS.:
COUNTY OF SUFFOLK )

I, KRISTI CRUZ, a Notary Public within and for the State of New York, do hereby certify:

That RAJESH VORA, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 29th day of July 2020.

----------------------
KRISTI CRUZ

Page 126

***ERRATA SHEET***

U.S. LEGAL SUPPORT

90 Broad Street

New York, New York 10004

212.750.6434

REF: 311965

NAME OF CASE: PARKER V. REEMA CONSULTING SERVICES

DATE OF DEPOSITION: JULY 24, 2020

NAME OF WITNESS: RAJESH VORA

| PAGE | LINE | FROM | TO | REASON |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

_______________________

Subscribed and Sworn before me

this _____ day of _________, 2020.

____________________ ______________________

Notary Public My Commission Expires:

### Exhibits

**EX 0001 Rajesh Vora 07 2420** 3:10 10:5,9,20
**EX 0002 Rajesh Vora 07 2420** 3:11 38:2,9,18 39:15 40:10
**EX 0003 Rajesh Vora 07 2420** 3:12 39:19,24 40:4,8,13
**EX 0004 Rajesh Vora 07 2420** 3:14 43:5,8,11
**EX 0005 Rajesh Vora 07 2420** 3:16 44:10,15,22 45:4,7 46:4
**EX 0006 Rajesh Vora 07 2420** 3:18 47:7,10,20, 25 49:22
**EX 0007 Rajesh Vora 07 2420** 3:19 50:2,3,12, 17 51:19
**EX 0008 Rajesh Vora 07 2420** 3:20 66:12,13,22 67:9 68:3,9,16 69:4, 15 72:7
**EX 0009 Rajesh Vora 07 2420** 3:22 72:6,9,12, 14
**EX 0010 Rajesh Vora 07 2420** 3:23 93:3,8,11 95:13 96:2,8 99:7
**EX 0011 Rajesh Vora 07 2420** 4:4 100:3,6,7,17 102:4,10 103:22 107:11 109:6 117:16, 21,23 118:3,7
**EX 0012 Rajesh Vora 07 2420** 4:5 111:21,24,25 112:11 122:22
**EX 0013 Rajesh Vora 07 2420** 4:7 113:6,10,13, 15,18 114:10 118:25 119:23 121:21 122:5

### $

**$1** 14:8 29:10
**$10** 30:10,11 85:22
**$18** 85:19
**$2,000** 32:14,16
**$20,000** 55:25
**$22** 85:20
**$4** 85:19
**$5** 29:9
**$500** 14:9

### 0

**000008** 72:13
**00001** 96:6
**000059** 66:18
**00006** 113:12
**000171** 100:8
**000173** 107:12
**000174** 109:7
**000295** 40:12
**000303** 43:7
**000304** 40:9
**000322** 45:8
**000347** 112:3
**000349** 50:7

### 1

**1** 10:5,9,20 52:5
**10** 29:22 93:3,8,11 95:13 96:2,8 99:7
**1053** 34:14
**1099** 16:3 32:4,11 35:20
**10:50** 34:11
**11** 100:3,6,7,17 102:4,10 103:22 107:11 109:6 117:16, 20,21,23 118:3,7
**11:56** 65:12,14
**12** 111:21,24,25 112:11 114:12 115:10 118:24 120:3 121:21 122:5,11,18,22,23
**12:30** 65:10
**12:35** 66:3,5
**13** 113:6,10,13,15,18 114:10 118:25 119:23 121:21 122:5
**15** 90:24
**16** 39:20 40:15,22 43:9,15 102:4,10
**16th** 80:10,17,21 108:17 109:14 117:18,22 118:5
**17** 82:13 114:13 115:10
**17th** 80:10,17,21 100:19 114:8 116:25 118:17,20,21,22 119:5 121:20 122:4
**18** 118:11
**18th** 87:5 100:19 108:19,20 109:2 117:5,6 118:8,10,20, 22 119:9
**1987** 12:13 13:12
**1990** 13:21,22
**1991** 13:22
**1995** 14:2
**1:54** 112:5
**1:56** 112:8

### 2

**2** 38:2,9,18,23 39:15 40:10
**20** 90:24
**2004** 8:5,10 14:10
**2005** 14:10,14
**2007** 32:19
**2011** 23:12 67:17,19 68:10
**2012** 25:17,18,19,24 67:17 84:16
**2013** 19:11,14 20:17 25:2 27:3 31:20,21 72:19 76:6
**2014** 38:3,12 72:24
**2015** 39:21 40:15,22 43:9,15 52:5
**2016** 44:11 45:5 47:8, 21 72:24 73:4 80:20, 22,23 82:13 93:16 102:4,10 114:13 115:10 118:11
**2017** 19:14 32:19 80:20
**2020** 5:9
**22** 44:11 45:5
**24** 5:8 13:3
**25** 14:18 93:16

**26** 38:3,11
**2:14** 123:22,23

3

**3** 39:19,24 40:4,8,13 107:13,15
**30** 29:21 36:12 64:25
**357** 51:23
**36** 14:16

4

**4** 36:13 43:5,8,11
**401(k)** 85:25
**45** 36:12 64:19

5

**5** 44:10,14,15,22 45:4,7 46:4
**5/17** 120:3
**50** 29:10,20
**54,000** 24:8

6

**6** 36:13 47:7,10,20,25 49:22
**60** 57:11
**69,365** 48:16

7

**7** 47:7,21 50:2,3,12, 17 51:19
**70** 57:12
**75** 57:12
**75,000** 24:4

8

**8** 66:12,13,22 67:9 68:3,9,16 69:4,15 72:7
**8106** 7:20
**817-CV-01648-(TDC)** 5:6
**88** 13:17
**8A** 14:11,13

9

**9** 72:6,9,12,14
**97** 13:23
**9:59** 5:13

A

**A-R-N-E-L** 11:21
**a.m.** 5:13 65:14
**absolutely** 34:9 76:16
**acceptable** 86:23
**accepted** 39:14
**access** 24:13 28:15 69:10 70:16
**accident** 57:14
**accountant** 13:2,14, 15,18,19,24
**accounting** 12:17 13:4
**accurate** 9:20 14:23 40:23 47:22 102:5
**acknowledge** 5:25 6:4
**acronym** 89:16
**act** 81:6,14,25 82:2 102:3
**acting** 62:4,10
**action** 33:21 63:10,21 72:2 83:14,22 89:6 96:20 104:19,22,23
**actions** 33:23 57:4,24 58:8 86:25
**activities** 17:3
**address** 7:18 54:11
**administered** 6:5
**administration** 14:13
**administrative** 17:9 20:9
**advice** 115:19
**Afghanistan** 30:9
**afternoon** 66:10
**agree** 6:14,16
**agreement** 6:11,12 8:16 32:18 76:8 78:2
**ahead** 61:20 89:2 97:23 108:22 122:15
**allegations** 114:6
**alleged** 98:19 106:16
**alleges** 104:6
**alt** 61:14
**alternate** 59:7,10 61:4,9
**American** 14:16
**amount** 64:3
**and/or** 100:24
**Angela** 59:2 91:9
**annually** 78:24
**answering** 86:5
**anti-terrorism** 21:2 27:24
**anymore** 92:23
**apparently** 53:24
**appearance** 5:15
**appeared** 54:7
**appearing** 10:22
**appears** 47:20 48:17
**applicable** 75:16 78:17,20
**applied** 14:11,12 48:6
**applies** 49:17 75:23
**apply** 41:18 73:14 78:25
**approval** 73:9
**approve** 41:6,9 46:3, 5,10 51:12 52:22 57:18 70:23 71:4,21
**approved** 17:22,24 43:23 49:21 55:23 68:16 108:10 112:21
**approving** 16:15,19 53:3,16 68:20
**April** 47:7,21 93:16
**area** 17:4 110:14
**Arms** 45:14
**Arnel** 11:16,21
**arrangement** 6:9
**arrived** 25:2
**assessing** 39:11
**assign** 35:24 42:3
**assigned** 44:5
**assist** 34:20
**assistance** 21:2 30:8 69:6,7,12
**assistant** 43:21 44:2 48:3,5,10,11 49:18 87:15 88:22 103:17

**Associates** 13:18
**attend** 115:9 122:10
**attended** 116:10
**attending** 36:14
**attitude** 58:16
**attorney** 59:18
**attorney/client** 116:5
**attorneys** 5:23
**audience** 45:22
**audit** 13:4
**authority** 29:6,7 36:20,23
**authorized** 24:12
**awarded** 23:9 25:25
**aware** 80:2,7,16,24 97:3

**B**

**babysit** 55:10 56:23
**babysitting** 56:23 57:22
**back** 8:5 23:12 24:22 30:4 31:2 34:13 54:5 56:22 65:9 66:4 67:17 72:19 85:4 86:8 112:7
**background** 12:10 13:10 20:10
**bad** 86:10
**Barbara** 23:15
**based** 23:21 49:11 87:2,20 89:7 99:17, 22 106:7
**basis** 106:5 116:5
**Beach** 25:11
**bear** 44:8
**bearing** 43:6 47:11
**began** 11:24
**begin** 38:14,19 74:6
**beginning** 66:17 96:5 100:8 109:7 112:2 113:11
**begins** 50:6 72:12
**behalf** 5:17,20 20:14 36:3
**behavior** 121:7
**belongs** 89:20
**benefit** 33:2,5
**benefits** 32:23 42:6 85:19,24
**bid** 28:16
**big** 23:25 42:25 56:18 98:4
**billing** 15:17
**bit** 33:20
**block** 63:8
**board** 15:3,6,8,9,11, 12
**Bombay** 12:12,16
**boss** 81:22
**bottom** 103:23
**bought** 85:5
**box** 84:24
**boxes** 24:18,19
**brand** 8:15
**break** 9:23 34:7 53:12 64:10,18,24 65:5
**briefed** 83:20,24 84:6 113:19 114:5 118:14
**briefing** 83:7 87:3 118:16,23 119:7
**briefly** 50:9 110:3
**bring** 26:24
**brings** 32:15
**broad** 17:4
**broken** 88:21 89:4
**brought** 30:3
**business** 14:3,13,16 23:13 32:6 56:23,24
**busy** 101:9,10
**buy** 24:9

**C**

**C-O-G-O** 89:17
**cage** 24:11
**cages** 24:10
**California** 26:16
**call** 6:24
**called** 6:18 20:24 28:20 30:7 42:4 45:13 89:15 90:5 115:3
**calling** 115:3
**cameras** 24:14
**candidate** 41:22 42:10
**candidates** 41:17
**capture** 88:16
**captured** 89:8
**car** 33:15
**card** 31:15,16
**cards** 20:11
**care** 84:12 86:16
**career** 102:17
**Carrigan** 6:24 7:2
**case** 5:5 8:13 99:6
**cases** 36:9,15
**catch** 97:15 114:24
**Cathy** 45:2 81:2 82:14 88:7 90:9,17 91:18, 19 99:4 100:13 113:19 114:22 115:2 118:14,16,23 119:13, 25 120:14,17 122:6, 9,25
**caution** 115:17
**cell** 87:6,7,23 88:14, 15 89:8,11,19,20,21 90:11 91:4,11 92:2, 13,20
**CEO** 14:24 15:5,7,13
**certificate** 78:15 79:6,9,22,25
**certification** 14:11
**certified** 13:2
**chair** 42:25 85:5
**chance** 56:13 112:10
**change** 33:18 62:25 68:12 73:8
**characterize** 48:22
**charging** 28:14
**check** 11:13 84:4 96:14,15,16 116:18
**checked** 11:23 118:8
**choice** 32:3
**circulated** 41:16
**circulating** 80:3
**claim** 32:21 115:6 116:19
**claims** 115:13 120:6
**clarification** 6:22 116:18
**clarify** 22:24 119:22
**classes** 12:19,21,24 13:3
**classified** 31:25

**cleaning** 24:16
**clearance** 31:25
**clerk** 38:23 39:2,12
**client** 54:22,23 101:12
**clients** 14:5,8
**close** 37:18 72:7 78:10 113:2
**closely** 35:17
**code** 78:14
**Colaianni** 5:16 6:13, 25 7:7,9 22:19 34:9, 15 39:17 43:3 44:7 47:5 49:24 50:21 53:11,14 64:8,13,21 65:4,8 66:9,11 86:12 92:25 99:25 112:9 119:15 121:14,17 122:16 123:11,17
**collected** 84:5
**comment** 51:12
**comments** 53:25 54:6, 12 57:25 58:9 104:5 105:8
**Commerce** 45:25 46:2
**commercial** 13:5
**committed** 70:8
**committee** 15:4
**communicated** 118:7
**communication** 87:13
**company** 14:8,9,17,20, 25 15:15 16:9,20 21:12 22:11 23:15 32:5 37:13 46:15 68:17,20 80:3 81:9, 25 84:11 85:24 91:5 97:10 105:19
**compensation** 41:2
**complains** 93:25 104:9
**complaint** 18:18 69:19,20,21 70:3 82:7,9,16,19 83:15, 19,25 85:11,13 86:22 93:20,23 94:7 95:2 96:9,13 97:14 98:5,9 110:9,18,22 111:6,7, 18
**complaints** 18:4 97:4, 9,17,19 111:5,13
**complete** 9:20 11:17 18:14,17
**completely** 56:21 67:8
**completion** 114:5
**compliance** 76:23 79:4,16
**complies** 42:4,5
**computer** 12:19
**concern** 33:11
**concerns** 52:6
**concludes** 123:20
**conclusion** 95:4
**condition** 74:23
**conduct** 83:24 86:23, 24 90:20 92:16 95:21 104:9 106:9,16 109:18 110:7 114:23
**conducted** 70:15 82:11 93:19 106:12
**conducting** 106:7
**conference** 90:19 119:13 123:2,9
**confidential** 18:8 70:17 83:11 94:25 105:20
**connect** 63:19
**connection** 8:6,11 18:12 48:14 93:20 105:4,13
**conscious** 57:2
**consent** 6:9
**considers** 83:12
**consult** 18:12
**consulted** 105:4,13,18
**consulting** 5:5 14:3, 4,12 19:19 20:5,15 27:20 66:14,24 88:9, 11 89:13 93:3,12 113:6
**contact** 106:8
**contacts** 28:25 29:5
**container** 23:25
**content** 46:5 108:13
**contents** 46:3 54:7 108:10 115:20
**context** 8:4,24
**continued** 46:13 66:8
**contract** 14:14 19:21 20:8,14,17,20,21 21:2,4,9 22:21 23:2, 6,10,14 25:2,5,18, 21,25 26:11,20 27:9, 12,18 28:24 31:24,25 32:14 35:21 36:3 42:4,5 49:12 61:21 74:24 75:25 76:9 77:11 89:17
**contracting** 89:15
**contractor** 8:16 21:11 26:8,20 28:13 29:6,7 32:4,11,22,25 33:9 35:20 75:6 89:15
**contractors** 16:3
**contracts** 28:18 76:10,12 77:5
**convey** 35:7,8 106:23
**conveyed** 77:25
**coordinate** 33:23
**coordinator** 27:14,15 61:24
**Copeland** 67:22
**copies** 63:4
**copy** 74:16 113:21,22 114:2
**corporate** 17:7
**Corporation** 21:13
**correct** 7:25 9:6,11 12:22 16:7,8 17:25 19:4,7 23:3 27:4 28:7 31:19 32:10 36:21,22,25 38:12,23 39:15,16 40:15 41:2, 3,6 43:15,24 44:4 45:5 47:23 49:2,22 50:20 52:6 59:2,13 68:18 80:14 83:18 88:14 90:2 91:17,22 93:16 94:8,9 96:3,10 97:14,19,20 99:23 104:20,24,25 107:16, 19 108:12 109:3,4,14 112:22 117:18 118:13 119:3,4 120:13 121:11,12 122:19
**corrective** 104:19,21, 23
**correctly** 42:12
**cost** 29:11 55:18,21
**counsel** 5:14 6:8 7:24 11:4,7,11 12:5 88:8 90:11 91:6,8 92:6,9 100:13,15,25 101:4
**counsels** 69:7

**count** 36:11
**countries** 29:11
**country** 30:6,8,9
**county** 75:16
**couple** 11:9
**courses** 12:13 13:8 29:19 45:12,15,17,21
**court** 5:10,21,23 9:10 86:12
**CPA** 13:2,7
**created** 16:10,16 68:10 102:10
**creating** 68:2 69:4
**creation** 73:3
**credit** 13:3
**cross** 74:22 103:6
**Cruz** 5:11
**currency** 56:6
**current** 8:8 14:22 25:8 67:2,10
**cut** 78:10

**D**

**danger** 75:13
**data** 87:23 88:4 89:7, 19 90:12,21 91:2,11 92:2,5,13,20
**date** 10:7 11:9,23,25 38:4 39:22 43:10 44:13 47:9 50:5 52:5 66:16 72:11 80:11,18 93:7 100:5,20 103:2 108:24 109:2,25 111:23 113:9 118:9
**dated** 38:2,11 39:20 40:14 43:9,15 44:11 45:5 47:7,21 93:15 102:4 109:13 117:18, 22 118:5
**dates** 11:14
**day** 10:4 36:4,6,15,16 90:17 91:21 108:17 117:10 118:12 119:8
**day-to-day** 17:3
**days** 26:15 36:10,12
**deal** 23:14
**December** 13:12,17 23:12 25:17,19 26:2
**decided** 32:6 118:12
**decision** 91:24 92:11 98:23 99:5,8,16,21 117:3 119:6
**decisions** 15:3 17:2, 12,15,18,22 88:5
**declare** 6:6
**deep** 68:23
**defect** 87:8
**defective** 88:17
**defendant** 5:20
**deficiency** 87:8
**degree** 12:11,15
**delete** 91:15
**deleted** 90:2,8,12 91:11 92:5
**deletion** 92:2,13,20
**delivered** 26:17,18 88:13 118:10
**delivery** 26:14
**Demarcus** 30:24 60:15 61:5 103:14,16,20
**demotion** 63:22
**denied** 115:7 116:22, 24
**dental** 85:25
**deny** 114:23
**department** 19:19 20:25 23:11 26:11,19 27:20,21,23 28:6 29:2,4 30:2,7 35:4,6 45:24,25 55:23 56:3, 5,15,19 60:7,9 62:14 63:15,16 87:10,15,16 88:18,24 89:9 101:11 107:25 108:5,6 117:12
**depends** 57:15 101:23 102:2
**deposed** 8:18
**deposition** 5:3,7,24 6:2,3 7:24 8:7,8,11, 12,23 9:3,6,24 10:5, 21,23 11:3,7 12:3,7 123:21
**Depot** 21:17
**depth** 67:24
**deputy** 30:17,23 34:19 61:11,13,15,16,23 62:17 84:3
**describe** 52:9
**description** 94:5
**desk** 85:5
**desktop** 102:20
**destroy** 88:3
**detail** 63:16 106:18
**details** 39:3 48:18
**determination** 98:7,10
**determined** 92:22
**developed** 72:17
**difficulty** 49:7
**diligence** 42:8
**Dimensions** 13:20
**direct** 37:11 92:16 103:12
**direction** 57:10
**directly** 15:15,18,19, 21 17:8 33:21 34:24, 25 36:8 37:4,7,8,11, 13 39:13 94:10
**disagree** 46:25 51:17 54:7
**disagreement** 51:21
**disciplinary** 70:24 71:5,6 72:2 96:20
**discipline** 71:21 99:17,22
**disciplined** 70:19 71:19 98:24 99:9
**disclose** 28:9
**discovered** 90:7
**discovery** 115:23
**discrepancy** 87:11
**discriminating** 55:5
**discuss** 90:19 92:8 121:6
**discussed** 90:13 92:8 115:12
**discussion** 22:17 53:10 83:5
**discussions** 116:4
**dispute** 8:15 102:9,11
**distributed** 74:4,10
**document** 10:8,12,16 38:7 40:8,11 43:6 47:10,13,14 50:6,7, 12,17 51:9,23 66:17, 25 67:9,14 68:3,14, 15,20 72:12 73:3 96:5 98:3 100:7,10, 12,18,21,23 101:3,7

106:19,22 112:2,24 113:3,11
**documented**  79:5,18 91:5 97:10,17
**documents**  12:2 47:3 50:3,10,19 51:10,20 77:17 117:15
**dollar**  48:20
**Donald**  5:19 6:15
**Donte**  11:15 82:17,19 110:7
**download**  10:11
**drafted**  47:25
**drive**  57:10
**driving**  25:11,13 57:12
**DSATA**  21:2,4,9 22:21 23:6,9 25:2,5 27:9
**dual**  42:24
**due**  13:15 42:7
**duly**  6:18
**duties**  39:7 41:5
**duty**  55:2

**E**

**e-mail**  36:17 63:5
**earlier**  41:4 117:15
**easy**  22:13
**eat**  65:5
**edited**  100:24
**educated**  55:6
**education**  12:10,18
**effect**  67:3,15,20 68:6 72:20 73:12
**effective**  40:22
**effectively**  62:4,9
**electrical**  32:16
**electrician**  33:3 35:22 75:11
**electricity**  32:13
**embassies**  22:2 27:25 28:2
**embassy**  55:17 56:9, 11,12
**employed**  72:22
**employee**  19:10,16,17 26:7 30:15 31:3,9, 12,18 32:3,9,11 33:19 35:10 36:24

50:23 51:3,12 52:11, 12,16,23,25 53:20 57:21 69:14,20 72:9, 16 73:10 74:9,17,25 75:21 76:4 77:16 79:4 85:9 90:16 92:23,24 97:5 98:24 101:18,20 102:24 110:7 111:7
**employees**  11:9,13 14:17 15:14 16:2,7 17:5,13,16,19,22 18:4 29:5 30:16,18, 21,25 31:3,4,11 34:18,20,23 35:10 36:20 42:15 44:4 45:20 55:15 70:18 73:15,19 74:5,8 75:23 78:22 84:12 85:14 86:17,20 97:10
**employment**  11:24 13:10 36:18 38:10, 15,19,21 44:10 45:10,18 46:13 74:6 88:6,9,10 91:22,25 105:2 111:22 112:20 117:4,24 118:13 119:11
**end**  34:4 41:25 57:17 60:18 70:14 88:9 90:17
**ending**  107:11
**ends**  51:23
**entered**  39:24 44:14 77:11 100:6
**environment**  24:23 85:8 86:19,20 105:24 110:9
**equipment**  21:22,24 24:11,21 27:25 28:11 35:6
**equipments**  22:3 29:15
**error**  60:19 62:23
**errors**  52:21
**established**  96:8
**estimates**  24:9
**evaluated**  41:19
**evaluation**  49:19 51:13
**evaluations**  50:23 51:4,18

**Evangeline**  11:16 36:25 82:16,18 84:7 87:5 88:10 90:18 91:20 93:22 96:15 100:12,16 107:24 110:6,9 114:22 115:3,5 119:14 120:18
**Evangelista**  5:9
**evidence**  96:17,23,25 99:11,13,15,17
**exact**  11:25 80:11,18 100:20
**exam**  13:7 78:16 79:24
**EXAMINATION**  7:8 66:8 119:19 121:16
**examined**  6:19
**exchanges**  115:21
**excuse**  55:11 58:15 109:13 122:22
**execute**  20:14 28:24 36:3 76:8
**exempt**  73:20
**exhibit**  10:3,5,9,20 37:17,18,21 38:2,9, 18 39:15,18,19,24 40:4,8,10,13 43:4,5, 8,11 44:8,10,15,22 45:4,7 46:4 47:6,7, 10,20,25 49:22,25 50:2,3,12,13,17 51:19 64:9 66:12,13, 22 67:9 68:3,9,16 69:4,15 72:3,6,7,9, 12,14 93:2,3,8,11 95:13 96:2,8 99:7 100:2,3,6,7,17 102:4,10 103:22 107:11 109:6 111:20, 21,24,25 112:11 113:6,10,13,15,18 114:10 117:16,19,21, 23 118:3,7,25 119:23 121:21 122:5,22
**expect**  91:13
**expensive**  55:12
**experience**  15:24 20:6 49:15,16
**experienced**  69:25 70:5
**expert**  15:22 19:12,13 31:19 32:8 33:14,19

34:17,21 35:15,19 36:5,19 59:17,24 60:16 61:9,22 62:6, 11,13 63:2,7 74:9, 10,12 75:24 76:20,21 77:18,19 84:4 97:6 103:4,8 108:4 110:25
**expertise** 14:6 21:3,8
**experts** 15:20,25 73:22 74:5,16 76:2, 11,13 77:5,12,23 79:10,17
**explain** 9:2 54:13 81:17 98:17
**explaining** 86:11
**explanation** 91:10
**extending** 85:3
**extent** 115:17,24

**F**

**facial** 22:9
**facilitated** 20:9
**facility** 23:24 24:13 75:9 76:17,18,23,24 79:14 84:18 89:16
**factory** 90:6,12 91:4
**fair** 9:16 50:21
**fall** 98:10
**falls** 98:12
**family** 75:14
**fashion** 70:11
**February** 13:23
**Fedex** 26:13
**feeling** 106:3
**feet** 24:4,8
**fellow** 85:13
**fighting** 28:4
**figure** 20:2
**file** 10:10,15 17:8
**filed** 8:17 51:16 82:16,17,19 86:22 93:22 110:8
**final** 17:2 31:6 92:5, 11 98:23 99:5,8,16, 21
**finance** 12:17 13:4
**financial** 14:4
**financing** 14:6

**find** 62:19 96:17,23, 25 99:11,12,14
**fine** 7:4 53:13
**fingers** 78:11
**finish** 64:25
**finished** 25:22 44:20 50:15 81:3 83:2
**Fish** 5:17 7:2
**fix** 32:12 73:6 75:12
**fixes** 32:15 33:4
**fixing** 33:15
**fixture** 32:16 33:4 35:23,25 75:12
**flatly** 115:7 116:22
**floor** 84:24,25
**focus** 47:16
**follow** 52:15,17 55:2 56:20 60:13 62:16 68:24 74:24 75:4 76:3,13,21,25 77:6, 9,20,23 79:15 110:15 121:15
**foreign** 55:17 56:9
**forget** 23:15
**forklift** 21:23 78:12, 14,16
**forklifts** 21:23 24:10
**form** 59:14,19 62:24 63:2 79:22 102:19
**formally** 108:18
**forms** 102:21
**forward** 52:20 87:18 111:8
**forwarded** 51:2,15 53:21 107:25
**found** 99:18
**founding** 14:20
**frame** 31:21 90:25
**front** 93:8
**full** 7:15 24:5 36:11
**function** 18:6,8 111:2
**funded** 42:9
**funding** 30:6 42:2

**G**

**G-A-I-T-H-E-R-S-B-U-R-G** 7:22
**G-O** 89:16

**Gaithersburg** 7:21
**gather** 95:9
**gave** 8:10 113:20,25 114:2
**general** 38:23 39:2,12
**gentleman** 6:23 19:3
**gestures** 110:12
**get all** 70:10 98:16
**give** 13:9 37:23 57:9 84:21
**giving** 9:9
**glass** 33:6
**Goldberg** 13:13
**good** 5:2 7:10,11,14 16:25 46:14 56:13 64:17 65:3 66:10 75:18 84:13 85:9 123:17
**government** 14:5 19:21,24 23:23 24:3, 15 28:8,10,13,19,21 29:7,16,25 55:14 57:17 76:18,23 87:6 88:3,15 89:2,11,14, 16,17,18,20 91:3
**grade** 63:11
**graduate** 54:16,17 55:5 85:16 107:7
**great** 24:16 52:12
**ground** 26:14
**group** 55:6
**guess** 59:23

**H**

**H-A-L-L-M-A-R-K** 7:21
**habit** 86:11
**half** 65:4
**Hallmark** 7:20
**hand** 21:23 90:9
**handbook** 72:9,16,17, 20 73:10,14,20,23 74:4,17,25 75:5,7,22 76:4 101:20
**handed** 90:22
**handing** 87:24
**hands** 56:14
**hands-on** 43:2
**handwriting** 53:25 103:22

**happen** 27:21 105:22 106:2
**happened** 23:22 70:14 80:6 87:4,25 94:5 98:17
**happening** 60:17
**harasser** 83:9 95:3 98:19
**harassment** 66:13,23 67:2,11,25 69:16,18, 24 70:5,9,19 71:20 77:3 78:4,22 79:5, 11,17 82:15,20 93:5, 14 94:2 97:13,19 98:3,8,11 99:2 113:8 115:6 119:3,24 121:7
**hard** 64:21 90:4 113:21,22
**health** 81:21 85:25
**hear** 16:23,24 18:20 30:19 67:7
**heard** 19:2
**hearsay** 81:7
**held** 5:7 22:17 53:10
**helping** 78:9
**helps** 52:19
**hey** 81:22
**high** 13:9 45:21 54:15,16 55:4 56:25 85:15,16,17 107:3,7
**hire** 11:9,14 36:20
**hired** 20:16 23:10 32:12
**hiring** 17:13,21 31:3, 4 33:22
**his/her** 6:6
**Hoe** 64:15
**hold** 53:8 104:2 122:13
**Home** 21:17
**hope** 46:14
**hostile** 86:20 110:8
**hour** 11:5 57:11,12 65:5
**hours** 13:3
**house** 32:13,15 33:4 35:23,24 75:11,14
**HR** 15:18 16:6 18:6,9, 11,22 31:5 33:23 41:21 51:15 53:21 67:18 68:22,23 69:3, 12,22,24 70:2 82:4, 7,8,9 84:17 85:12 90:10 91:8 93:23 97:2,25 98:2 100:14 102:20 106:22 107:25 108:5,6 110:25 111:8 114:15 115:2 116:15 120:7 121:23
**huge** 57:20
**human** 45:3 51:2 69:9 73:11 111:2

**I**

**idea** 58:13,22
**identification** 10:6 38:4 39:21 43:10 44:12 47:8 50:4 66:15 72:10 93:6 100:4 111:23 113:9
**identified** 51:19 121:20
**identifies** 56:17 102:13 122:18
**identify** 20:22 27:22 45:16 66:21 70:6,7 106:11
**identity** 95:2
**implemented** 16:10
**important** 22:21 23:2, 5 24:25 52:14
**imposed** 70:24 71:7
**improper** 23:25
**improve** 26:25
**improvement** 64:6 98:20 101:25
**in-house** 69:7,8 88:8 90:10 91:6,8 92:6,9 100:12,15,25 101:4
**inappropriate** 110:11
**inaudible** 24:18 25:16 32:15 55:14 56:7 60:9 85:2 87:17
**include** 104:17
**includes** 118:4
**including** 73:17 86:17
**Incorporated** 5:5
**incorrect** 61:10
**increase** 16:22 39:20 40:6,25 43:22 48:13
**increases** 48:20
**incumbent** 26:8
**incur** 63:25
**incurring** 64:2
**independent** 32:22,25 33:9 75:5
**indicating** 71:12
**indirectly** 34:24 35:2,12 37:10,13 103:11
**information** 12:19 41:24 69:11 70:10,17 84:6 87:20 88:13 89:25 90:8 106:4 118:6
**informations** 87:19 95:9
**informed** 56:4 98:2 115:5
**informs** 69:22
**infraction** 57:7
**inquiry** 95:17
**inspect** 42:23 84:25
**install** 24:9,10,14
**instruct** 116:6
**instructed** 110:10
**instruction** 35:3 52:14 54:20,25 55:3 56:21 60:8,10 92:17
**instructions** 35:5,11 52:16,18 60:3,5,7, 13,14 62:13,15,16 64:3 75:4 77:2 92:19 110:15
**insurance** 85:25
**intended** 45:22
**intent** 91:15
**interesting** 62:19
**interim** 21:10 22:7,11
**internal** 41:15 49:17, 19 63:20
**internally** 54:11 58:8
**International** 8:20 13:21 21:13 45:13
**interrogative** 51:6
**interrogatory** 95:16 113:24
**interview** 70:4,15 106:8
**interviewed** 106:13,15

111:12
**introduce**  43:4 49:25
  72:3
**introduced**  113:10
**inventorize**  19:23
  42:23
**inventory**  29:16 36:11
  84:22
**investigate**  18:7
  82:5,8
**investigated**  81:16
  82:18,25 83:25
  110:19
**investigating**  18:4
  81:19
**investigation**  18:7,9,
  10,13,16,24 70:4
  81:3 82:12,15,22,23
  83:2,6,17 93:5,14,19
  94:3,11,15,17,22,24
  95:6,21 96:13,22
  98:6,25 99:6,10,23
  105:14 108:8 110:22
  111:10,15,17 113:8,
  23 114:6 116:16
  118:15 119:3,25
  120:14 121:8 122:9
**investigations**  106:7
  111:4
**invited**  120:10
**involve**  60:15
**involved**  8:14 53:2
  55:15 69:3 94:10,13,
  17,22 117:8
**involves**  60:3
**issue**  24:2 25:12,14
  52:19 79:6 81:13,21
  83:13 90:13 101:24
**issued**  23:12 45:20
  52:23 53:5,18,20
  68:17 79:9 89:11,12,
  22 108:8
**issues**  22:16
**issuing**  52:10
**ITAR**  45:13,17
**item**  42:22,23,24
  55:12 56:25 87:11
**items**  21:18,20 29:20,
  21,22 45:16 56:25
  85:6 92:15

**J**

**J-E-R-R-Y**  25:13
**January**  19:11 20:17
  27:3 44:11 45:5
**Jennings**  11:15 82:17
  110:8 115:5,13
**Jennings'**  110:18,22
  116:19 120:5
**Jerry**  25:12,13
**job**  24:16 35:25 42:11
  43:2 55:2 56:17
  85:18
**Joe**  86:4,7 122:15
**joined**  6:23 7:3 27:9,
  17
**Joseph**  5:16 6:13
**judge**  9:11 64:20
**July**  5:8 19:14 32:19
**June**  72:19
**jury**  9:11

**K**

**K-U-M-A-R**  7:17
**kid**  57:10
**kids**  57:11
**kind**  20:7,11 21:15,16
  28:18 33:6 86:24
**kinds**  52:21
**kit**  29:20,22,23 30:4
**knew**  21:15
**knowing**  59:21
**knowledge**  22:23 28:8
  58:11,12 68:23
**Kristi**  5:11
**Kumar**  7:16

**L**

**lack**  13:16
**lady**  23:15
**laid**  13:16
**laptop**  88:21,23 89:4,
  5,6 102:20
**Larry**  19:3 22:25 23:4
  30:25 35:7,8 63:5
  74:14 96:16,18
  100:23 102:13 103:3

107:23 108:23 110:5
  114:16 115:4 118:9
  120:7,9 121:2,23
  122:7,25
**late**  81:20
**lateral**  48:6,17,19,23
**laws**  13:4,5
**lawsuit**  8:17,18
**layer**  61:2
**lead**  61:24 98:22
**leaders**  17:10
**leaning**  92:3
**learn**  26:24
**learning**  91:25 92:12
**led**  105:14
**left**  35:24
**legal**  5:7,12 68:23
  115:18
**letter**  38:2,10,11,14,
  19 39:20 40:6,14,20
  43:9,13,14,18 44:10,
  16 45:4,10,18,19,23
  46:6,7,12,24 47:7,
  14,20,24 48:7 49:9
  52:23 53:4,17,24
  54:8 58:10 59:4,5
  60:2 62:20 63:13
  105:5 107:23 108:11
  109:17,25
**level**  13:9 45:21
**Lewis**  67:16 72:18
**liabilities**  81:11
**liability**  56:15,16
**liaison**  19:18 27:19
  28:5,22
**license**  75:17 78:12
**lieu**  6:5
**light**  75:12
**lighting**  84:16
**lightings**  23:24
**likeable**  85:8
**list**  11:17 28:11
  54:21,22
**listening**  58:17
**literally**  55:4,8
  58:20
**live**  86:23
**living**  25:10
**local**  28:3

**location** 20:4 26:15 29:8 103:2
**locations** 76:24
**locked** 24:12
**logistics** 39:5,8 49:14
**long** 64:13,16 71:3 76:5
**longer** 32:9,10
**looked** 47:15 109:10 110:2,3 117:15
**loss** 57:20 63:25 64:2
**lost** 109:19
**lot** 24:20 81:10,11
**lots** 21:22 56:7,25 69:11
**low** 28:16
**lower** 28:17
**lunch** 64:18,24 65:5,6
**luncheon** 65:13

M

**made** 18:4 41:13 49:5 54:12 58:2,9,21 68:8 73:2 84:2,6 91:24 92:12,21 94:7 95:2 96:9 97:4 99:16,21 105:5,25 115:14 117:3 119:6 120:18
**major** 57:14 73:7
**make** 7:5 15:2 17:2, 12,15,18 21:24 22:13,15 24:14 29:13 30:5 31:4 41:25 42:8,12,22 52:21 55:8 68:19,24 69:2 71:13,17 75:14 76:19 78:12 81:21 82:24 84:14 88:5 98:6,10 99:5,8 101:14 105:20 110:11
**makes** 69:20,21 82:6 95:4 98:23
**making** 85:19 90:18 95:10 105:8
**manage** 17:6,7 34:17, 23 42:19 55:8
**managed** 25:9
**management** 12:13 13:8 15:2,4 17:3
**manager** 15:18 18:9, 11,22 27:15 30:17, 20,23 31:5 33:24 34:3,19 39:8 41:21 43:21 44:3 45:3 48:3,5,10,11 49:18 51:2,15 52:24 53:20, 22 55:10 58:23 59:2, 11,13,16 60:2,12,14, 20,22,25 61:5,6,9, 11,13,15,17 62:5,10, 21 63:9 67:18 69:22, 24 70:2 82:4,7,8,9 84:3 85:12,13 87:15 88:22 91:8 97:2 103:17,18 106:22 111:8 115:2 116:15
**manager's** 110:25 111:2
**managers** 15:20 16:6 17:6,11 33:24 35:9 41:20 50:25 61:23 62:18 73:17 79:2
**managing** 25:14 26:3 30:15,18,21,25 34:20 44:3
**mandatory** 13:3
**manner** 6:10
**manual** 66:14,24 77:4
**March** 39:20 40:15,22
**Marcno** 13:13
**margin** 28:17
**mark** 10:3 37:16 39:17 44:7 47:5 64:8 66:11 92:25 99:25 111:20 112:24
**marked** 10:6,19 38:3 39:21 43:9 44:12,21 47:8,10 50:4,12,17 66:15 68:3 72:10 93:6 100:4 111:22 113:8
**marking** 10:9
**Maryland** 7:21 12:14, 21
**material** 27:14,15 28:16,17 29:9 30:3, 12 54:22 55:18,25 56:3,8,12 61:24 84:24 85:2 87:22
**materials** 41:23
**matter** 5:4 6:7 15:20, 22,25 19:12,13 21:8 29:14 31:19 32:8 33:13,19 34:17,21 35:14,18 36:5,19 43:17 56:18 57:6,8 58:12 59:17,24 60:15 61:9,22 62:6,11,13 63:2,7 73:22 74:5,8, 10,11,15 75:24 76:2, 11,13,21 77:5,12,18, 19,23 79:10,17 84:4 97:6 103:3,7 105:19 108:4,6 110:25
**matters** 21:4 85:10
**Maureen** 67:21
**Mcdonald's** 85:21
**meaning** 83:11
**means** 82:4 90:4 96:25 97:17
**meantime** 14:2 29:18
**measures** 70:24 71:5,7
**medical** 85:25
**meet** 42:10 120:17
**meeting** 90:15 91:16 100:11,13 110:5 114:13,18,21 115:4, 9,13,20,21,25 116:2, 4,10,14,20,21 117:8, 14 118:24 120:3,6,8, 16,21,23,25 121:4,5, 11,20,22 122:4,7,8, 10,17,21,24 123:4,8
**meetings** 117:7
**member** 14:15 15:6,7, 8,9,11,12
**memo** 100:14 103:5 120:4
**memorandum** 91:7
**mentioned** 12:20 41:4 88:12 111:18
**message** 111:8
**met** 37:14
**micromanage** 34:2,6
**micromanaging** 17:5
**Miguel** 5:9
**miles** 57:11,12
**million** 14:8,9 29:9, 10 30:10,11
**mind** 9:18 58:21

**minor** 57:6,13
**minute** 56:4
**minutes** 64:12,19,25 90:24
**missed** 62:7
**missing** 29:22 87:12
**moment** 9:2 53:12 72:14
**money** 29:10 30:8 57:21
**Monica** 67:16 72:18
**monitor** 26:17,20
**month** 11:25 56:6
**months** 13:15 25:17 26:9 29:12 32:20
**Moppins** 19:4 20:16 21:3,7 22:20,25 23:5,10 24:24 26:5 27:2 28:5,25 30:14, 25 31:8,12,17 33:7 34:16 35:8,13 59:12, 25 60:9 62:4,9,20 63:5 74:14 94:8 96:10,16,18,21 97:4 99:7,9,13,22 100:24 102:13,17 107:18,24 108:24 109:14 110:5 111:3,11 114:16 115:4 118:9 120:7,9, 22 121:2,24 122:25
**Moppins'** 33:17 35:18 36:18 95:21 110:21
**morning** 5:2 7:10,11
**move** 48:7,23
**multiple** 50:19
**Mumbai** 12:18

**N**

**named** 19:3 36:25
**nature** 52:25
**need-to-know** 106:4
**needed** 20:13
**Nigeria** 55:21
**Notary** 6:19
**note** 40:7,10 53:23 79:6
**noted** 66:3 123:23
**notice** 7:3 10:5,21,24 111:22 112:20
**noticed** 23:24 90:11, 23
**notified** 87:21 119:11
**November** 13:17 38:3, 11
**number** 5:6 40:9,11 43:7 47:11 50:7 51:23 66:18 72:5 100:8 101:17,21 112:3 113:12
**numbers** 96:5 101:22

**O**

**oath** 6:5 9:5
**obey** 75:6
**object** 50:18 115:16
**objected** 116:5
**objection** 22:22 25:3 30:22 45:11 62:22 67:5,13 69:17 70:21 71:8,22 73:24 74:7, 18 75:2 76:15 77:7, 13 80:5 97:7,11,22 99:3 101:19 102:6 106:17 108:14 115:15
**objections** 6:10
**obligated** 30:10
**obligates** 30:7
**obligations** 32:17
**observed** 91:7
**October** 25:17,18,19, 24,25 31:20
**offer** 33:5 38:10,14, 18,21 39:14,20 40:6, 17 43:8,20
**offered** 38:22 40:21
**office** 39:6 48:4 49:14 51:7 84:19 87:19 88:19 90:10 119:12
**officer** 111:21 112:19 117:23
**one-third** 24:7
**open** 10:10,14,17 84:24
**opened** 14:2
**opening** 41:15,16 48:2,5 49:17 78:9
**operate** 78:13,14
**operated** 89:15,17
**operating** 78:11
**operation** 78:16 89:18
**order** 51:11
**organization** 69:10
**originally** 86:6
**outcome** 116:2
**outdated** 67:24
**outlook** 46:13
**overview** 12:10 13:10

**P**

**p.m.** 66:3 123:22,23
**package** 57:16
**packed** 54:23
**packing** 24:18 55:16
**pages** 50:8
**pallet** 56:14
**paper** 71:11
**paragraph** 46:17 95:23 114:12 115:10 118:24 120:3 121:21 122:5, 11,18,23
**Parker** 5:4,18 11:16 36:25 37:3,6,8,14 38:12,19 39:14 40:14,18 41:12,22 42:14 43:14,24 47:21 49:2,5 52:6 53:5,17, 24 54:6,12 57:5 58:9 59:5 63:11,21 72:21 80:4 82:16 83:24 84:8 87:5 89:22 90:14,18 91:10,20 92:12 93:22 94:8 96:10 100:12,16 101:8 102:16 103:23 104:6 107:15,24 108:11,16 109:3 110:6,10 111:5,13 112:22 114:7 115:3, 8,9 116:9,19 117:17 118:7,11 119:10,14 120:4,10,18,23 121:10,19,23 122:3,7 123:3
**Parker's** 46:13 49:9 57:25 58:25 60:21,24 88:10 89:11 91:21 102:14 103:9,12

117:4,9  121:6
**Parker_000288**  47:11
**part**  19:25 29:3 71:18
  77:14 79:19 82:9
  93:19 102:22 103:7
  105:6,17,18 111:12,
  15 116:17 120:12,17
  122:9
**participated**  115:22
**participating**  5:24
**parties**  6:8 16:2,4
  75:19 98:16 106:2
**party**  16:5 71:24
  98:15
**pass**  78:16 79:8
**passed**  41:24 78:13
**pause**  22:4
**pay**  48:20 57:19
  63:12,22 64:5 85:24
  87:20 89:5
**paying**  57:17 85:18
  87:19 88:19 89:18
**payroll**  13:18,23
  15:17
**PDF**  10:16
**penalty**  6:7
**pending**  46:20
**people**  25:5 35:24
  54:18 55:8 81:9,21
  84:17,18,22 85:6,8,
  16,22 88:22 95:2
  107:4,6
**perform**  39:7
**performance**  39:11,13
  41:19 50:22,23 51:4,
  12,18 64:5 98:20
  101:25
**performance-based**
  19:20
**period**  25:20 26:2,7,
  22 72:21
**periodic**  78:21
**perjury**  6:8
**person**  6:5 15:23
  20:4,13 25:10 26:3
  28:14,22 32:12,14,18
  33:5 49:12,13,14
  54:14 56:10,11,12
  58:13,20 59:20 60:12
  70:5,8 75:13,15,18
  76:20 86:22 87:14

98:18 105:9,23
  106:22,24 107:5
  108:2 111:18 120:15
**person's**  92:17 106:25
**personnel**  78:8
**persons**  11:24 24:12
**phone**  36:16 87:6,7,23
  88:14,16 89:8,11,12,
  19,20,21 90:5,9,11,
  22 91:5,11 92:2,14,
  20
**phonetic**  11:22
**physically**  5:25
**pick**  11:20 21:19
**Pickett**  30:24 31:7
  59:7,10 60:15 61:5,
  16 80:4 103:14,16,20
  104:8,14 105:3,12
**picture**  87:14 88:24
  89:3
**pictures**  87:7,10
  88:17,23
**place**  7:20 20:3,4
  24:21 43:2 77:21,24
  78:19 84:14,15 85:9
  104:16,17
**places**  26:12
**plaintiff**  5:17 6:14
**plan**  64:6 86:2 98:20
  101:25
**play**  18:3 68:2
**played**  111:3
**PM**  59:7 61:14 63:3
  108:3
**pocket**  55:13 57:20
**point**  6:22 14:7 31:17
  32:7 58:25 59:21
  60:21,25 61:7 95:13
  102:17 103:10 105:10
  117:3
**police**  27:25
**policeman**  28:3
**policies**  16:9,16
  67:25 68:9 69:15,16
  70:20 73:11 74:21
  75:22 76:13 77:6,8,
  9,21 78:18 93:24
**policy**  16:11,12,13,20
  66:13,23 67:2,10,20
  68:17,21 70:25 71:6,
  20 77:4 101:16 106:6

**portion**  23:18,19
**position**  38:22 39:5
  41:15 42:2 115:19
**postponed**  56:6,7
**potential**  63:25
**power**  59:18 84:14
**preparation**  12:3,6
**prepare**  11:2,7 29:13
  54:21 70:11 91:7
  94:3 101:11 117:12
**prepared**  23:17 51:11
  67:16,21 68:25
  100:21,23 108:2
**preparing**  95:16
  101:12 103:4 113:23
**present**  6:2 36:9
  91:16 100:11 119:10,
  12 120:8 121:10,19
  122:3
**presented**  100:15
  101:7 108:16,19
**preserve**  94:25
**president**  14:17,19,
  23,24 15:5,7,12
  37:12
**pretty**  36:2 67:23
  102:23
**previous**  8:8 67:18
  109:10
**price**  23:14,17 28:11
  45:2,4 81:2 82:11,
  14,21 83:15,20 87:2
  88:8 90:10,17 91:17,
  18,19 94:13,14,18,23
  99:4 100:13 110:19
  111:12 113:19 114:22
  115:2 118:14,23
  119:13 120:9,14,17,
  21 121:3,8 122:6,9,
  25
**Price's**  45:9,23
  118:16
**printed**  114:2
**printing**  20:10
**prior**  67:19 101:18
  110:2
**privilege**  116:6
**privileged**  115:22
**problem**  7:7 33:16
**procedures**  67:25
  74:21,25 75:22 77:9,

21 78:18 93:24
**PROCEEDINGS** 5:1
**process** 9:3 26:24,25 34:3,5 35:5 36:11,13 41:14 52:9,18 54:14 55:16 58:18 63:17 69:19 86:11 87:17 98:13 106:18
**produced** 40:11 45:8
**product** 22:2
**production** 40:8,11 43:6 47:11 66:18 72:13 96:5 100:8 112:3 113:11
**products** 87:8,11 88:16,17
**professional** 83:7 84:17 95:7
**program** 14:13,14 15:20 16:6 25:5,9,14 27:15,24 30:17,20,23 34:19 59:11,13,16 60:2,20,22,24 61:5, 9,11,13,15,17,23 62:5,10,18,21 63:9 74:20 84:3
**programs** 17:10
**project** 13:24 61:6 62:11
**promoted** 41:13
**promoting** 17:16,21
**promotion** 33:22 39:19 40:5,17,21 41:10 43:8,19,20,23
**promotions** 41:6
**properly** 21:25
**property** 24:15 88:4 91:3
**proposal** 23:17,18
**propose** 101:6
**Prospect** 13:18
**protect** 24:10 75:20 86:18
**protected** 24:15
**provide** 9:20 12:9 18:22 33:2,12 45:18 70:12 71:23 104:10 106:14
**provided** 8:3,24 19:13 23:23 33:13 60:4,8 77:17 85:24 87:6 88:15 90:21 95:13 104:13 117:17
**providing** 14:4 28:23 76:20 115:18
**public** 6:19 13:2
**purpose** 45:9 47:24 102:22 114:20 115:24 116:13
**pursuant** 10:23 39:15
**put** 24:20 59:15,22 69:11 85:3,7 103:5,7 105:23 106:25 107:8 108:2,3 118:9 119:25 121:8

**Q**

**qualifications** 25:7
**question** 9:16 16:17 21:6 22:25 37:9 38:16 41:7 46:20 49:3 52:13 53:6,15 58:3,5,6 62:8 67:6,7 71:3,9,10,11,14 86:6,7,9,13 94:19 99:19 101:14 109:22, 24 116:8 121:15,24
**questionnaire** 93:5, 14,15 94:3 95:12,22, 25 96:9
**questions** 9:14 51:6 113:24 119:16 120:2
**quick** 65:6
**quiz** 79:8

**R**

**R-A-J-E-S-H** 7:16
**Raguntan** 11:21
**Rajesh** 5:3 7:16 65:5 86:3,4 92:7 97:23 123:21
**ranging** 14:8
**rank** 17:8
**rates** 42:5
**RCSI** 5:20 11:24 16:2, 6,9,16,20 18:5 19:6, 16 22:21 23:2,5,8,9 24:25 25:24 27:3,9, 18 28:6 30:15 31:9, 13 32:9,11,21,24 33:9 34:18 35:14 38:15,20 42:15 44:4 52:10 54:11 58:8 67:2,11 70:18 72:22 73:14 74:6 76:3,11, 14 77:11 78:21 79:12 89:23 97:6 101:16 106:6
**RCSI's** 73:11
**reach** 25:6,7 26:15 55:25 111:17 116:16
**reaching** 116:17
**reaction** 22:6 84:9 86:18 87:2
**reactions** 22:9
**read** 22:14 44:23 46:23 50:10 86:15 101:10 104:4 109:18 113:14 123:16
**reading** 44:15,20 50:15
**real** 65:6
**realize** 44:18 54:18
**realized** 90:25 92:4
**realizing** 59:22
**reason** 9:18 31:22 46:25 51:17 57:9 73:7 102:9 105:22 109:16
**reasonable** 69:2
**reassignment** 48:8,14, 24,25 49:4,8,10
**rebuttal** 120:5,19
**recall** 8:13 19:3 27:16 31:14 33:11 36:24 46:7,9,11 48:15,18 53:3,16 63:14,15 64:4,7 68:12,13 69:5,8 73:5,7 76:6 77:14 78:2 79:19,23 80:11, 18 91:19 97:8 100:20 113:21,25 114:18 117:14 118:18,19 120:17,21,23,24,25 121:5 122:21 123:3, 5,6,8
**receive** 29:15,16 32:23 42:22 56:2,12 62:13 84:23 85:11,13
**received** 57:16 111:6

**receives** 111:7
**receiving** 35:5 40:21 41:10,23 42:13 84:23 87:13
**recess** 34:12 65:13 112:6
**reck** 21:20,21
**recking** 21:16 84:16
**recks** 24:3
**recognize** 10:19 38:6, 7 39:25 43:12,13 44:15,21 47:12 50:9, 11,16,24 72:15 93:11 100:9,10 109:6 112:13 113:13,15
**recommend** 36:22 104:21
**recommendation** 31:4 41:12 70:13 71:23 84:7 95:5 104:25 105:15,25
**recommendations** 68:24 95:11 105:5
**recommended** 41:20
**recommending** 18:25
**record** 5:12,15 6:12 7:15,19 22:18 29:24 30:6,11,13 34:11,14 38:8 40:3,7 45:7 53:10 65:12 66:5,21 86:15 96:4 97:23 112:2,5,8,16 123:22
**recordkeeping** 51:16 53:22
**records** 76:13
**reduce** 24:7
**reduction** 63:22 64:5
**Reema** 5:4 14:3,11 19:19 20:5,14 27:20 40:9,11 43:7 45:8 50:7 66:14,18,24 72:13 75:25 88:8,9, 11 89:12 90:17 91:19 93:3,12 96:5 100:8 107:12 109:7 112:3 113:6,12 114:15 115:4 119:14 120:6, 9,22 121:2,23 122:8, 25
**Reeves** 103:15,16,18, 19
**reference** 47:19 51:21 114:12
**referenced** 115:10 117:9 118:24 122:4, 11,17,19,22
**references** 75:19 117:16
**referring** 74:13 76:10 80:12 89:10
**reflect** 66:25 67:10
**regard** 17:12,15,19 21:4,8
**regulations** 45:14 75:8,16 76:22 77:20
**reimbursed** 89:13
**related** 45:17 78:5,6 110:4
**relating** 18:5 82:12 96:9 99:7 106:15
**relations** 88:9,11
**release** 26:9
**relevant** 84:5
**rely** 108:7
**remote** 5:8
**remotely** 6:4
**remove** 26:9
**removed** 24:19
**removing** 24:17
**repeat** 11:19 16:17 21:5 38:16 41:7 49:3 53:6 58:3,4,6 60:19 62:8 67:6 71:2 94:19 99:19 121:24
**repeated** 109:22
**repeating** 99:12
**rephrase** 9:15
**replenish** 87:22 89:6
**replenished** 30:4
**report** 15:15,18,19,21 17:10,11 31:7,11 35:13 61:3 62:17 69:23 70:12 81:3 82:24 101:11,13 103:12,18,19 113:8 117:12,13 118:15 119:3,25
**reported** 31:10
**reporter** 5:10,22,23 86:13
**reporter's** 22:5
**reporting** 6:3,10 33:20 102:16
**reports** 17:7 35:16 61:4
**represent** 73:11
**represented** 7:23
**reprimanded** 57:5
**reputations** 75:17
**request** 49:9
**requested** 49:2,5 115:25
**require** 76:12 78:21
**required** 33:12 35:21 45:12,14 58:19 62:16,17 69:23 74:24 75:4 76:3,25 77:19 79:11 87:9 104:19 106:19
**requirement** 42:9,10 49:11 55:19,21 78:25
**requirements** 35:7,9
**requires** 29:20,21
**requisitions** 28:20,22
**reread** 86:13
**reset** 90:4,6,12,23 91:4
**resources** 45:3 51:2 69:9 73:11 81:19 111:2
**respect** 27:12,18 40:13 63:11 83:14 111:4 112:22 116:3
**respectfully** 95:8
**respond** 51:6
**responding** 51:8
**response** 57:25 58:9 95:16 106:15
**responsibilities** 33:18 38:25 48:9
**responsibility** 60:4
**responsible** 16:15,19 30:18,21,24 34:20 41:5 60:12 71:24 81:9
**result** 63:12,23 93:18 95:20 96:12,21 98:24 99:10,22 116:20,21
**resume** 25:8
**resumed** 66:7
**resumes** 25:6 41:18

**retained** 27:3
**return** 58:23 87:6
**review** 11:8 12:2 68:5,25 101:13
**reviewed** 68:4 100:14, 24 101:3 108:13
**reviewing** 39:10 46:7 53:3,16
**revisions** 73:2
**Richardson** 5:17 7:2
**rigs** 24:9
**role** 18:3 19:9,15 27:8,11,17 39:10,11 42:13,24 43:21 44:2 48:11 62:5,11 68:2 110:21 111:4
**Roman** 11:15
**room** 6:2 90:19 119:13 120:10 123:2,9
**rules** 75:7,15 76:22 77:20,23 79:15
**rumor** 80:2,8,13 81:5, 6,10,16,18,19,22,24, 25 82:3,5,8,12 96:19,24 99:14
**rumors** 81:15
**runs** 57:13

**S**

**S-C-I** 8:21
**safe** 24:23
**safety** 24:2,11,21 78:5
**salary** 39:19 40:5 43:22 48:13,16
**sanitary** 21:20
**satisfactory** 47:4
**Saturday** 33:14
**save** 10:15
**SCA** 42:5
**scales** 21:23
**schedule** 70:3
**school** 54:16 55:4 85:15,16,17 107:3,4, 7
**Scitech** 8:21 14:15
**screen** 88:21 89:4
**secret** 31:25
**security** 20:10,11
**seek** 29:9
**selected** 41:22
**semiyearly** 78:23
**send** 22:2 26:14 37:22 87:9 88:17,21 89:2,8
**sending** 27:24 55:17
**sends** 29:8 88:24
**sense** 110:12
**sensitive** 28:10 56:25
**sensitivity** 58:14
**sentence** 46:16,21,23 104:4
**separate** 109:9,16,25
**separation** 111:21 112:19 117:24
**September** 19:11,14 31:20 52:5
**service** 33:12,13 42:4,5 88:11
**services** 5:5 8:21,22 14:3,5,12,15 19:13, 20 20:5,15 27:20 28:24 66:14,24 76:21 88:10 89:13 93:4,13 113:7
**set** 23:13
**setting** 14:6
**severity** 52:19 57:15 101:23 102:2
**sex** 97:12
**sexual** 66:13,23 67:2, 10,25 69:15,18,24 70:5,9,19 71:20 77:3 78:4,21 79:5,11,16 82:15,19 93:4,13,25 97:13,18 98:3,7,8, 11,25 113:7 115:6 119:2,24 121:7
**shame** 106:3
**shameful** 105:23
**Shaun** 103:14,16,18,19
**ship** 26:12 29:17 54:23 55:12,22 56:20
**shipment** 55:24 63:17
**shipments** 19:22,24 26:10,21
**shipped** 56:9
**shipping** 21:25 29:10 30:12 55:18 60:11 61:25 84:23
**shop** 21:18
**short** 64:24 87:20
**show** 54:21,22
**shown** 95:12 108:11
**SHR** 69:8
**shrink** 21:24
**sic** 13:13
**side** 92:18
**sign** 22:14 41:6 59:5, 20 107:15 123:16
**signature** 59:7,15,22 61:14,15 63:6,8 106:25 107:18 108:3, 24
**signatures** 59:20 107:21
**signed** 59:6,12 62:20 109:14
**significant** 73:8
**signing** 59:25
**signs** 75:25
**simple** 71:17
**simpler** 71:13
**sir** 9:17 16:11
**sit** 84:25
**sitting** 42:25
**situation** 56:8
**size** 24:7
**small** 14:12 23:13 32:6 56:18 85:6 98:3,4
**SME** 63:4
**so-called** 80:8 81:5 92:13
**social** 20:10
**solicitation** 23:12
**somebody's** 33:15
**sort** 61:10
**Sounds** 123:17
**speak** 11:6,11 12:6 36:4 82:21
**specialists** 62:2
**specific** 15:24 16:12 20:17 21:7 27:11 45:16 86:25
**spend** 81:18
**spoke** 82:13
**spoken** 83:8,15
**spread** 96:18,24 99:14

**square** 24:4,8
**staff** 15:16 17:7,9 24:16,21 26:9,23,24 29:14 41:17 62:15,17 63:6 84:2
**staffing** 23:18
**standard** 45:19 59:14, 19 102:19,20,23
**start** 6:21 13:17,20 14:4 16:14 50:22 65:6 98:12 109:19
**started** 13:12,13,23 19:10 27:14 77:15 84:22
**state** 5:14 7:14,18 19:19 20:25 23:11 26:11,19 27:21,22,23 28:6 29:2,4 30:2,7 35:4,6 40:3 48:16 55:23 56:3,5,16,19 60:7,10 62:14 63:15, 16 76:2 87:10,16 88:18,24 89:9 101:12 112:15 117:13
**statement** 47:2 104:16 106:21 107:16 110:16
**statements** 104:10,13, 18 106:14,20
**states** 46:12
**stating** 6:11 58:13
**stays** 24:15
**Stem** 8:20
**stop** 9:25 63:17
**strike** 23:8 52:8 69:13 90:24 115:8 117:6
**structure** 42:16
**structured** 14:25 61:22
**study** 12:25 13:6
**stuff** 15:17 26:12 28:12,15 55:22
**subcontractor** 8:17
**subject** 15:20,22,25 19:12,13 21:8 31:18 32:8 33:13,19 34:17, 21 35:14,18 36:5,19 43:17 59:17,23 60:15 61:8,22 62:6,11,12 63:2,7 73:22 74:5,8, 10,11,15 75:3,24 76:2,11,12,20 77:5, 11,18,19,22 79:10,17 84:3 97:5 103:3,7 108:4 110:25 115:23
**submitted** 120:5
**subordinate** 53:21
**subordinates** 42:18,19 44:5 54:15 55:4 61:25 73:17 84:2 85:14 86:17,18,21
**substance** 116:3
**suggestion** 23:22 24:6
**suggestions** 101:15
**summary** 18:23
**Sunday** 33:15
**supervise** 35:17
**supervising** 42:14 103:9
**supervisor** 37:12 40:22 41:10,23 42:13,17,18,21,25 60:11,23 61:3,4 69:21,22 102:14 103:7
**supervisor's** 102:25
**supervisors** 103:20
**supplying** 28:10
**support** 5:8,12 15:16 20:9,10 39:4
**supposed** 33:25
**swear** 5:22
**sworn** 6:19
**system** 20:3 21:15,16
**systems** 14:6 84:17

**T**

**T-E-S-S-A-D-A** 21:14
**table** 85:7
**takes** 26:14
**talk** 11:4 36:8 95:8
**talking** 16:12 17:5 36:15 89:22 95:24 97:18 117:24,25 121:4
**talks** 120:14
**task** 20:12
**tax** 13:4
**teaching** 28:2
**team** 14:15 17:10 61:24
**Tech** 8:21
**technical** 12:13,18 13:8 23:17 90:6
**technology** 12:19
**telling** 58:18
**tells** 19:21
**temper** 110:4
**ten** 13:15 14:7
**term** 89:14 90:6
**terminate** 36:20 84:7 91:25 92:11 105:8,9 117:4 118:13 119:7
**terminated** 32:19 91:22 92:24 101:18, 22,23 108:18 109:3
**terminating** 17:19,21
**termination** 33:22 90:16,21 92:4 98:22 102:2 104:20,24 105:2,14,21 117:9,23 119:11
**terms** 15:2
**terrorism** 28:4
**Tessada** 21:12,13 22:10 26:6
**test** 79:7
**testified** 6:20 66:7
**testify** 10:23
**testifying** 9:10
**testimony** 6:7 8:3,10, 24 9:9,20 121:18 122:2
**thing** 15:24 18:20 56:18 57:13,14 58:22,23 75:21 93:21 107:8 108:7 114:25 116:2 120:13
**things** 13:6 20:5 21:21 22:13 23:20 28:9 34:4 35:12,21 52:15 54:19,21 62:2 64:6 70:16 75:20 78:5 81:7 83:10 85:4 87:12 92:21 94:6 95:18 98:18 110:12
**Thompson** 11:15
**thought** 15:10 109:19
**three-month** 26:22
**ticket** 57:13
**tied** 101:12 117:13

**time** 9:13,23 19:6 27:7,13 30:14 31:8, 12,15,16,21,23 32:24 33:8 34:16 35:14 36:14 44:19 46:24 47:3 51:8,11 58:25 64:17 66:3 72:21 76:5 80:6 81:23 82:23 83:4,10 84:10 90:25 95:14,15 101:9 103:10,13 104:3 113:17 114:4 119:17 123:23
**timely** 70:11
**times** 36:16 42:20
**title** 14:22 25:8 27:13,14 42:3 59:21 61:10
**titled** 52:2
**today** 7:12,24 9:4,9, 13,20,24 10:23 11:3 12:3,7 44:24 51:4 67:3,11
**today's** 9:5 123:21
**told** 84:10 87:3 92:6
**tolerate** 88:2
**top** 102:22
**tour** 23:23
**Traffic** 45:13
**training** 28:3 78:3,5, 6,22 79:5,12,17
**trans** 48:8
**transfer** 29:23,24 30:3 48:17,19 49:19, 21
**transit** 26:21
**transition** 25:20 26:2,7,10
**transitioned** 31:18 33:18
**transitioning** 31:23
**transportation** 39:5, 6,8 60:11
**tri** 24:17,19,20 55:16 78:9 85:3
**trouble** 81:11
**true** 32:9 81:8 116:11
**truth** 9:5
**turn** 51:22 57:8 107:10 109:5
**two-part** 71:10,14
**types** 12:24
**typical** 110:16
**typically** 18:11
**typo** 63:3 73:5 103:8

## U

**U.S.** 5:7,11 13:11
**ultimate** 96:12
**unable** 10:17
**unacceptable** 88:3
**undergraduate** 12:11
**underneath** 42:17
**understand** 9:4,8,14 58:14 107:6 123:10
**understanding** 49:7 81:4,12 104:12 105:16 123:7
**understood** 7:5 9:7
**uneducated** 55:7
**unemployed** 32:20
**unemployment** 32:21
**University** 12:12,14, 16,21
**unlawful** 93:4,13 94:2 97:13,18 99:2 106:7 113:7 119:2,24
**unpleasant** 105:24
**untrue** 81:10
**updated** 67:23
**uploaded** 111:24
**urgent** 101:11 117:12
**USA** 12:12

## V

**V-O-R-A** 7:17
**vacation** 56:13
**vendor** 28:11 87:21 88:20 89:3,6
**vendors** 87:18
**verbal** 101:24 106:21
**verbally** 6:6 77:25 78:3
**verification** 44:11 45:10,19
**versions** 67:23
**versus** 5:4
**victim** 18:18,19 70:6 83:9
**video** 5:3
**videoconference** 5:8
**view** 103:8
**violates** 69:14 70:25 71:6
**violating** 70:19 71:20
**Virginia** 25:11
**visible** 43:5 50:2
**visit** 36:6,8 92:17
**volume** 16:22
**Vora** 5:4 6:1 7:1,10, 17,23 8:1 9:1,21 10:1 11:1,3 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1, 13 41:1 42:1 43:1 44:1,16 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1,19 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1,10 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1, 8 89:1 90:1 91:1,17, 20 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1,11 113:1 114:1,15 115:1,15, 18,21 116:1 117:1 118:1 119:1,18,21 120:1,6 121:1,18 122:1,19,25 123:1, 13,21

## W

**wait** 117:22 122:13
**waive** 6:9
**wall** 55:16 85:3
**Wallace** 59:2,6 60:20 91:9 104:7,14 105:4, 12
**walls** 24:17,18,19,20 78:9
**Walsh** 5:19 6:15,21 7:4 22:4,22 25:3 30:22 45:11 46:19 50:18 62:22 64:15 65:9 67:5,13 69:17 70:21 71:8,22 73:24 74:7,18 75:2 76:15 77:7,13 80:5 86:3 92:7 97:7,11,22 99:3 101:19 102:6 106:17 109:21 110:23 115:15 118:18 119:20 121:13 122:13 123:15,18
**wanted** 7:5 12:25 116:18
**warehouse** 21:16 23:23 24:2,5,7,17,22 25:9 35:9 36:7,14 41:17 48:2,3,4,5,11 49:13, 18 52:13 54:14 62:2 78:8 83:25 84:12 86:24 87:15 90:20 92:19 103:15,17
**warehousing** 20:6,12
**warning** 52:2,10,23 53:4,17,24 58:10 59:15 61:11 62:20 63:12,23 98:21 101:24,25 102:23,24 103:5 104:15,17 107:23 108:2,8 109:7,9,10,12,13,17, 25 110:17
**warnings** 62:25 100:3 101:17 110:4 117:16 118:4
**watching** 22:5,8 43:2
**water** 33:6 34:8
**website** 69:9,11,12
**week** 36:7 80:9,10 82:17
**weeks** 36:13
**wife** 32:5
**wife's** 32:5
**win** 28:17
**winning** 22:21 23:5
**wipe** 87:24
**wiped** 90:5
**wire** 24:11
**wiring** 78:10
**witness'** 104:18
**witnesses** 83:9 84:5 95:3 96:17 104:8 106:8,10,11,12,14
**won** 14:14 25:5,18
**word** 22:7 62:7 102:7
**words** 49:7
**work** 13:16 18:5 20:7, 8,11 24:23,25 27:8 29:3,4 32:4,5,6 35:18 37:3,6,8 39:6, 11,13 41:18 42:20 52:13,14 54:20 56:7 58:14 60:21 65:2 74:20 75:18 76:24 78:4 84:20 85:9,20, 21,23 86:19,20 89:23 92:23 103:9 110:8,14
**worked** 13:14,19,22 19:6 20:8 21:11
**workers** 17:9
**working** 13:13,17,20 21:10,14 24:22 28:23 33:8 49:13 54:15 74:23 75:8 76:17,18 97:5 103:15
**workplace** 84:19
**works** 41:14 42:16 61:2
**workspace** 92:18 110:11
**world** 26:13
**worried** 91:2
**worth** 22:12
**wrap** 21:24
**write** 23:16 33:5 52:17 71:11 107:5
**writing** 23:21 107:9
**written** 22:17 46:24 52:2,10,22 53:4,16, 23 58:10 62:25 63:12,23 98:21 100:3 101:17,25 102:22 107:23 109:7 117:16 118:4 120:5,11,12
**wrong** 34:5 56:14
**wrote** 53:24

## Y

**year** 51:7 80:12,24 95:17,19
**years** 13:20 14:18 15:24 46:15 80:3
**yesterday** 11:4

## Z

**Zoom** 6:24

IN THE UNITED STATES DISTRICT

FOR THE DISTRICT OF MARYLAND

------------------------------x
EVANGELINE J. PARKER, :
:
Plaintiff, :
: Civil Action No.
vs. :
: 8:17-CV-01648-TDC
REEMA CONSULTING SERVICES, :
INC., :
:
Defendant. :
------------------------------x

Reston, Virgina

Thursday, March 5, 2020

VIDEOTAPED Deposition of:

ANGELA WALLACE,

the witness, was called for examination by counsel for the Plaintiff, pursuant to notice, commencing at 10:13 a.m., at Regus, 11921 Freedom Drive, Two Fountain Square, Suite 550, Reston, Virginia 20190, before Dawn A. Jaques, CSR, CLR, and Notary Public in and for the Commonwealth of Virginia.

U.S. LEGAL SUPPORT

(877) 479-2484

Page 2

APPEARANCES:

On behalf of the Plaintiff:

ANDREW R. KOPSIDAS, ESQ.
TRACEA RICE, ESQ.
Fish & Richardson, P.C.
1000 Maine Avenue, SW, Suite 1000
Washington, D.C. 20024
PHONE: (202) 626-6407 (Mr. Kopsidas)
(202) 626-7747 (Ms. Rice)
EMAIL: kopsidas@fr.com
trice@fr.com

On behalf of the Defendant:

GREGORY P. CURREY, ESQ.
Wright, Constable & Skeen, L.L.P.
7 Saint Paul Street, 18th Floor
Baltimore, Maryland 21202
PHONE: (410) 659-1354
FAX: (410) 659-1350
EMAIL: gcurrey@wcslaw.com

VIDEOGRAPHER: Gene Aronov

Page 3

I-N-D-E-X

| WITNESS: | | PAGE: |
|---|---|---|
| ANGELA WALLACE | | |
| Examination by Mr. Kopsidas ....... | | 5 |

E-X-H-I-B-I-T-S

| WALLACE DEPOSITION EXHIBIT: | | PAGE: |
|---|---|---|
| Exhibit 1 | 5/16/15 - 10/9/15 Employee Performance Evaluation REEMA000353 - 000354 ....... | 16 |
| Exhibit 2 | NOV 2014 - February 2015 Employee Performance Evaluation REEMA000358 - 000359 ........ | 19 |
| Exhibit 3 | 9/1/2015 Written Warning REEMA000357 ................. | 25 |
| Exhibit 4 | Compilation of miscellaneous documents PARKER_000011 - 000077 ...... | 46 |
| Exhibit 5 | June 19, 2015, Performance Expectations for Logistics Manager REEM000355 - 000356 ......... | 86 |

Page 4

P R O C E E D I N G S

THE VIDEOGRAPHER: Good morning. This is the videotape deposition of Angela Wallace, taken by the Plaintiff in the matter of Parker vs. Reema Consulting Services, Inc., in the United States District Court for the District of Maryland, Greenbelt Division, Civil Action No. 8:17-CV-01648-TDC.

This deposition is being held at Regus on March 5th, 2020. My name is Gene Aronov from U.S. Legal Support, and I'm the video specialist. The court reporter today is Dawn Jaques from -- also from U.S. Legal Support.

We're going on the record at 10:13 a.m. Counsel will now state their appearances for the record.

MR. KOPSIDAS: Andrew Kopsidas of Fish & Richardson on behalf of the Plaintiff.

MS. RICE: Tracea Rice from Fish & Richardson on behalf of the Plaintiff.

MR. CURREY: Gregory Currey on behalf of Reema Consulting Services.

Page 5

THE VIDEOGRAPHER: Will the court reporter please swear in the witness?

THE REPORTER: Raise your right hand, please.

(The witness was administered the oath.)

Whereupon,

ANGELA WALLACE,

was called as a witness, after having been first duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. KOPSIDAS:

Q Good morning, Ms. Wallace. Will you state your full name for the record, please?
A Angela Maria Wallace.
Q And what is your current address?
A 1428 Northgate Square, Unit 21, and that's Reston, Virginia 20190.
Q How long have you lived there?
A Seven years.
Q Do you have any plans to move in the near future?

Page 6

A   I hope to.

Q   Okay, but nothing definitive?

A   No.

Q   Okay.  Have you ever had your deposition taken before?

A   Yes.

Q   How many times?

A   Once.

Q   Once.  And what did that relate to?

A   It was a suit against a construction company.

Q   Okay.  Were you a party to that suit or --

A   Yes.

Q   Okay.  Have you ever testified in court?

A   Yes.

Q   In that same matter?

A   No.

Q   What sort of matter did you testify in court?

A   It was a case against me and a family

Page 7

member.

Q   When was that?

A   I don't recall the exact date, but over 10 years ago.

Q   And in the one where you had your deposition taken, you said -- were you the plaintiff in that matter?

A   Yes.

Q   But it didn't go to trial?

A   No.

Q   When was that, approximately?

A   It was over 10 years ago.  I don't recall a date.

Q   Okay.  Now, you appreciate that you are under oath today, correct?

A   Yes.

Q   And that means you must tell the truth --

A   Yes.

Q   -- the whole truth, and nothing but the truth.

A   Yes.

Page 8

Q   And you will do that?

A   Yes.

Q   You understand that by giving -- even though we're in an informal setting here in a conference room, that your testimony is just the same as if you were sitting on the witness stand in court, right?

A   Yes.

Q   And so, therefore, it is -- it is most important that your testimony be complete and truthful and accurate.  Do you understand that?

A   Yes.

Q   So if you don't understand any question that I ask, I want you to tell me that, okay?

A   Yes.

Q   And so if you answer my question, we will all understand that you understood it.

Is that fair?

A   Yes.

Q   Now, if at any time during the deposition today that you want to go back and

Page 9

change or add to or clarify anything that you've previously said, I want you to tell me and I'll let you do that, okay?

A   Yes.

Q   I'll try to take a break approximately every hour or so, but if you need to take a break sooner, just let me know.

A   Okay.

Q   Now, when we're done today, we have a court reporter who is writing everything down, and you will get a chance to review the transcript, and as part of that, you will get the chance to make any corrections that you need to make to your testimony.  Do you understand that?

A   Yes.

Q   Now, what you need to know, that if you change any of your testimony later, that I have the right to tell the jury that you did that.

Is that fair?

A   Yes.

Q   Is there any reason, medical or otherwise, that you cannot provide complete,

Page 10

truthful, and accurate testimony today?

A    No.

Q    If that changes at any time during the day, you will let me know, okay?

A    Yes.

Q    When -- what time frame did you work for Reema?

A    About 2013 to 2017.

Q    And was that -- is that the only time that you've worked for them?

A    Yes.

Q    What was your position during that period?

A    Manager.

Q    Of any -- of what in particular?

A    What did they call the group back then?  It was Transportation.

Q    Is that the same position you had for those four years?

A    No.

Q    What else did you do?

A    Team Lead.

Page 11

Q    Is that a sort of higher or lower position than the Manager position?

A    Lower.

Q    Oh.  So you were first a team lead, and then you were the manager?

A    First I was a clerk, and then a team lead, and then the manager.

Q    Okay.  And during what part of that 2013 to 2017 time frame were you the manager?

A    2015 to 2017.

Q    And are those the only three positions you held: clerk, team lead, and manager?

A    Yes.

Q    When you -- when your employment with the company ended in 2017, you were in the Manager position?

A    Yes.

Q    What were your duties in that Manager position?

A    To lead the team, and to roll out and ship to international facilities for the government.

Page 12

Q    Can you be a little more specific about what you mean, "roll out and ship to"?

A    Well, within the duties, I worked for a contractor for the U.S. State Department.  They would send orders, we would fulfill them and prepare them and ship them to the U.S. embassies all around the world, and I ensured that the team completed the tasks to get the equipment out.

Q    What sort of things were you shipping out?

A    It is policing gear.

Q    And that was to U.S. embassies all over the world?

A    Yes.

Q    Now, you're familiar with Evangeline Parker?

A    Yes.

Q    And you know her from your time at Reema?

A    Yes.

Q    Is that when you first met her?

A    Yes.

Page 13

Q    And what -- how did you know her professionally at Reema?  In other words, she was working for you, correct?

A    For a short time.

Q    What was she doing for you?

A    She was part of the team that fulfilled the orders and sent the equipment out.

Q    And that's when you were in the Manager position?

A    Yes.

Q    And do you remember what period that was?

A    Which period?

Q    That she was a member of your team.

A    I don't recall the exact dates.

Q    And then there came a point in time where she was no longer a member of your team, correct?

A    Correct.

Q    She was moved to some other position?

A    Correct, the warehouse.

Q    And you were not supervising her at

Page 14

that point?

A    No.

Q    How would you describe your relationship with her?

A    We didn't have one other than work relationship.  We weren't friends outside of it.

Q    And when she left your team, it was to take a promotion?

A    Yes.

Q    How many other members were on your team at the same time she was, approximately?

A    Maybe seven.  Six or seven.

Q    Do you recall about how long she was on your team before she got promoted?

A    I don't recall the exact dates that she was on the team.

Q    Well, you were Manager from 2015 to '17, so it would have been in that window?

A    In that window, yes, but I don't know the exact -- how many months within that time.

Q    Fair enough.

Did you ever have any serious issues

Page 15

with Ms. Parker's performance --

A    No.

Q    -- while you were her manager?

A    No.

Q    What -- what, if anything, did you do to prepare for your deposition today?

A    Nothing.

Q    Did you go back and review any old notes or emails or files or anything like that?

A    I don't have any.

Q    Did you meet with any lawyers to prepare for today?

A    No.

Q    Have you been in touch with lawyers for -- I should say have lawyers for Reema been in touch with you since your departure from the company?

A    No, besides being requested to be at this deposition.

Q    That's the only contact you've had with them?

A    Yes.

Page 16

Q    And I assume you're talking about Mr. Currey?

A    Yes.

Q    And what was the nature of those communications?

A    Questions regarding being, I guess -- I don't know if the word is eligible?

Q    I'm sorry?

A    Gathering information to see if I need to be subpoenaed.  Just questions.

Q    Yeah, and so let me be a little more specific.  What sort of -- what kind of questions were they asking you?  Can you remember?

A    I guess if I -- I really don't recall the questions.  You're going to have to --

Q    Okay, that's fair enough.  If you remember at any point, just let me know.

(Wallace Deposition Exhibit 1 was marked for identification.)

BY MR. KOPSIDAS:

Q    All right, Ms. Wallace, please take your time and review that, but what I -- for the

Page 17

record, what I've handed you is a document that we've marked as Exhibit Wallace 1, and it bears Bates numbers REEMA000353 through 354.

This is an Employee Performance Evaluation that it looks like you filled out in 2015 as Ms. Parker's manager; is that correct?

A    Correct.

Q    And I assume this is sort of a routine thing that you did?

A    Yes.

Q    And how often would you do these for your employees?

A    I believe it's once a year.

Q    And that's your signature down at the bottom?

A    Yes.

Q    If you look at the second page, page 354, you rated her job proficiency as Good, correct?

A    Yes.

Q    And then will you just read for the record your -- the comments that you wrote in?

Page 18

A Okay. I didn't bring my readers, so bear with me.
Q All right. I don't want you to struggle, so let me --
A Yes.
Q So you wrote there in the Comment section that Van -- that's what Ms. Parker would go by, correct?
A Yes.
Q "Van has shown a lot of progress in understanding the operation of Logistics. Where [sic] working on expanding her knowledge in inventory control. Van has good attitude and works well with others. Van appears to be making upward progress."
That was the assessment that you gave her in 2015, correct?
A Correct.
Q And then in terms of responsibility and accountability, you again circled and said her performance is Good, correct?
A Correct.

Page 19

Q And you wrote in the comments, "Van is responsible and accountable for what she does and does not do. The only suggestion I have for Van is she take control of work related issues with more confidence. She can do the work and knows how to communicate with her peers and management."
That was your assessment of her performance?
A Okay, yes.
Q Okay. And then down at the bottom it looks like you said her overall potential for promotion or greater responsibility was Good?
A Yes.
Q And your manager's overall employee rating of her was Successful.
A Correct.
(Wallace Deposition Exhibit 2 was marked for identification.)
BY MR. KOPSIDAS:
Q Ms. Wallace, you've been handed what's been marked as Exhibit 2 to your deposition. It's a document bearing Bates numbers REEMA000358 through 359.

Page 20

This is another performance review that you did for her, correct?
A Correct.
Q And it looks -- chronologically, it looks like this is actually -- this one actually precedes the one that we just described in Wallace 1, right?
A Yes.
Q And if we look at the first page marked 358, that's your signature at the bottom?
A Correct.
Q So if we look at the dates of this, this one appears to cover the time frame from November 2014 to February 2015, correct?
A Correct.
Q And the one that we looked at in Exhibit 1 was May of 2015 to October of 2015, right?
A Correct.
Q So it looks like you did these about every six months or so?

Page 21

A Not necessarily. I'm not sure of the reason they're so close besides they're two different departments.
Q Inventory Control versus Logistics?
A Correct.
Q I see, okay.
And she was -- you were supervising both of those departments, correct?
A Correct.
Q And her work -- Ms. Parker's work for you encompassed both departments?
A Correct, at different times, yes.
Q Okay. And so here in this review, Exhibit Wallace 2, if we look at the second page, you rated her performance as Good, correct?
A Correct.
Q I should say her job proficiency.
And then your comments for that, quote, "Van is doing an outstanding job at positioning herself for longevity at RCSI. She takes direction well and ask questions when -- "when the understanding is unclear."

Page 22

A    Correct.

Q    I think that's what that says.

Okay, that was your -- that was your assessment of her performance at this time, right?

A    Correct.

Q    And then in terms of responsibility and accountability, you rated her as Excellent, correct?

A    Correct.

Q    And your comment on her performance was that, quote, "Overall Van is a great worker. In order for her to be an effective team player she needs to continue to ask questions and take initiative to learn new procedures," correct?

A    Correct.

Q    And here again, you rated her overall potential for promotion and greater responsibility as Good, correct?

A    Correct.

Q    And your overall manager's employee review was that she is, quote, Successful?

A    Correct.

Page 23

Q    If there had been any sort of -- well, any negative issues, any disciplinary issues, any conduct issues, you would have noted that in these reviews, correct?

A    No, I wouldn't have noted it in the reviews.  We would have been -- she would have been written up.

Q    Why would they not go in her performance evaluation?

A    It would depend on the severity of it.

Q    I see.  Is it accurate to say, though, that anything that warranted a writing up would be severe enough to go in her performance evaluation?

A    Not at all.

Q    And why is that?

A    It depends.  You can be written up for being late.  You know, you had limited times to be late; you would be written up.  That doesn't necessarily mean that's going to go on your review because of the time length between the reviews.  It may have been something that had been corrected when she was written up, so it's not necessary to

Page 24

go into her review if she corrected it.

Q    I see.  So just because an employee gets written up, that doesn't mean it's necessarily something severe that should be noted in the performance evaluation?

A    Correct.  That would be to my discretion.

Q    Right.  However, if in your discretion it was something serious, you would put in the performance evaluation?

A    If it was repetitive and the action was not corrected, it would be in the performance review.

Q    During the time that Ms. Parker worked for you, did she ever act inappropriately or disrespectfully towards you?

A    Never.

Q    Did you ever see her -- while she was working for you, did you ever see her act inappropriately or disrespectfully of any other Reema employee?

A    No.

Page 25

Q    Do you recall ever writing Ms. Parker up for anything?

A    I may have.  I'm not 100 percent sure.  Whether it was turned in, I'm not 100 percent sure.

Q    I'm sorry, what do you mean "turned in"?

A    Like I say, if you write up an employee, it's your discretion.  There's been employees that I have written up, but I didn't turn in because they corrected action.

Q    I see.

A    So I don't recall if I turned it in, if she was written up.

Q    Okay.  So you don't recall anything that was serious enough that you had to write her up and turn it in?

A    I don't recall.

Q    Sorry, bear with me for one moment.

(Wallace Deposition Exhibit 3 was marked for identification.)

BY MR. KOPSIDAS:

Q Ms. Wallace, please take a moment to review this document. You've been handed what's been marked as Exhibit Wallace 3, a document bearing Bates number REEMA000857, a one-page document.

A (Witness reviewing Exhibit 3.)

Q Okay. Have you had a chance to look over the document, Ms. Wallace?

A Yes. Struggled, but yes, I did.

Q Okay. So this appears to be a written warning that Ms. Parker received on September 1st, 2015, correct?

A Yes. Yes.

Q And during that time, she was under your supervision?

A Correct.

Q Down at the bottom --

A Excuse me.

Q That's okay. Down at the bottom, there's a line that says "PM's Signature."

Do you see that?

A Yes.

Q And what -- what does "PM" stand for?

A Program Manager.

Q Do you recognize whose signature that is?

A My signature?

Q No, the --

A The Program? Yeah.

Q Whose is it?

A Larry Moppins.

Q And in this time frame, what job was he in?

A The Program Manager.

Q I see. That was his job title?

A Yes.

Q I see. Was it -- was he -- did you report to him?

A Yes -- well, I reported to Demarcus, who reported to Larry, but overall, Larry ran the warehouse. Mr. Moppins ran the warehouse.

Q And Demarcus is Mr. Pickett, Demarcus Pickett?

A Demarcus Pickett, yes.

Q And then under that it says, "ALT PM's Signature."

A The Alternate Program Manager, which is Demarcus Pickett.

Q Thank you. And then that's your signature on the Optional Witness Signature?

A Yes.

Q Okay. You did not write this written warning though; is that correct?

A Yes.

Q I'm sorry, let me ask a better question. Did you write this written warning?

A Yes.

Q You did, okay.

And why did you write it?

A For the reasons given in it, not following through, covering the team, and it looks like the --

THE REPORTER: I'm sorry, I didn't understand what you said. For the reasons given in it, not following through. What was the second thing?

THE WITNESS: Not following through on the job tasks.

BY MR. KOPSIDAS:

Q Okay. And do you remember the incident that led to this?

A No, only by reading this.

Q All right. And this, in your opinion, was not something severe enough to warrant going in her performance evaluation, correct?

A Well, apparently it must have. If you have it, it must have been turned in, even though she didn't sign it. You know, you can't force someone to sign it, but it was turned in.

Q Right, but I mean, I'm sorry, aside from being turned in, you didn't actually feel the need to note this in the performance evaluation --

A Correct.

Q -- that you did later?

A Correct.

Q And I'm sorry, again, you don't recall -- do you recall specifics about what

Page 30

incident this related to?

A    Just that it states right here regarding the ESRs.  There's procedures and protocols that have to be done before a shipment is released from the warehouse, and according to this, it wasn't followed.

Q    And that was her responsibility to do that?

A    To oversee, yes.

Q    Okay.  Was this something that had happened before, not just with her, but other people?

A    Yes.

Q    Is it something that happens fairly regularly?

A    No.

Q    No?  But it had happened before?

A    It happened before.

Q    And do you recall if it happened after Ms. Parker left your supervision?

A    Honestly, I can't say off the top of my head.

Page 31

Q    And what is --

A    I don't --

Q    What is an ESR?

A    It is an Electronic Shipping Request is what it is.

Q    And so I assume that as part of rolling out and shipping equipment to government facilities, there's a certain ESR process and inventory list process that needs to be followed?

A    Correct.

Q    And for whatever reason, in this one instance, that was not followed?

A    Correct.

Q    And so that, in terms of discipline or responsibility, that fell on Ms. Parker, who was supervising --

A    She was a team lead, I was the supervisor.  I wasn't her manager yet.  I was the supervisor, and she was the team lead under me.

Q    Right.  Now, she notes here that her sort of response to this written warning is that following those protocols was actually the

Page 32

responsibility of people who worked under her on her team at that time; is that correct?

MR. CURREY:  Objection.  The document speaks for itself.

BY MR. KOPSIDAS:

Q    Do you recall that being what she said?

A    What she's written here.

Q    Okay.  Would you say that it's accurate that the members of the team under the team lead are responsible for making sure that the ESR and inventory protocols are followed?

A    Everyone is responsible.  Ultimately, she's responsible as a team lead for the people under her.

Q    And are you ultimately responsible as her manager?

A    Yes.

Q    Okay.  But you weren't written up for this incident, I assume?

A    No.

Q    Was anybody who worked under

Page 33

Ms. Wallace at the time also written up for this incident?

A    Under me?

Q    Under -- I'm sorry, I botched that. Let me try it again.

Was anybody who worked under Ms. Parker at the time of this incident also written up for this incident?

A    I do not recall.

Q    You don't recall anybody else being written up?

A    No.

Q    Do you recall ever writing Ms. Parker up for anything other than this?

A    No, I do not recall.

Q    And to your recollection, was corrective action taken by Ms. Parker following this incident?

A    I don't recall that either.

Q    Now, you said before that you would probably note in the performance evaluation if somebody had been written up for something and not

Page 34

fixed it, is that --

A    Correct.

Q    So the fact that you didn't mention anything about this write-up in your performance evaluation of her, Exhibit 1, is it fair to assume from that that she took corrective action and this didn't happen again?

A    It could be.

Q    Do you recall ever having to do sexual harassment training while you worked at Reema?

A    Yes, we did.

Q    Do you recall when you did that?

A    No, I don't.

Q    Did you do it like when -- as part of an incoming employee, or --

A    It was during employment.

Q    Now, you're aware that there was another incident involving Ms. Parker that ultimately led to her termination, correct?

A    Not aware of the incident, but I sat in on it, on a meeting with her.  It was a requirement of the company.  When someone is being

Page 35

talked to, there has to be another party in there.

Q    Right.  And that other party was you?

A    Yes.

Q    Right.  And was that when she was terminated, or was that a different meeting?

A    No, she wasn't terminated at the time.

Q    Do you recall the sexual harassment training that you undertook to be after that meeting?

A    I believe it was before, but I'm not a hundred percent accurate.  I can't recall, but I believe it was before she was released.

Q    During your time at Reema, how many times would you say sexual harassment training was required with the employees?

A    Maybe once a year.  I'm not a hundred percent sure.  Maybe once a year, formal training.

Q    So you underwent it many -- several times?

A    Maybe twice.

Q    Do you know whether all employees were

Page 36

required to undertake it?

A    Yes.  It was a group setting.

Q    Did you ever see a Reema company policy or statement on harassment?

A    Yes.

Q    When?  During the training?

A    Yes.

Q    At any other time?

A    No.  We were all given a handbook.

Q    When were you given the handbook?

A    During the time of training.

Q    Do you recall any harassment training that was manager -- for managers only?

A    I don't recall.  It was a group setting.  I don't recall whether it was all just managers.  I believe it was all employees.

Q    How many employees approximately were there during the time you were there?

A    It fluctuated between maybe 15 to 25 at the most.

MR. KOPSIDAS:  All right, let's take a break.

Page 37

THE VIDEOGRAPHER:  We're going off the record.  The time is 10:56 a.m.

(A break was taken.)

THE VIDEOGRAPHER:  We are back on the record.  This is Video Unit No. 2.

The time is 11:13 a.m.

BY MR. KOPSIDAS:

Q    So when Ms. Parker left your supervision, what position did she go on to?

A    I'm not a hundred percent sure, but I believe it was a supervisor's position in the warehouse.

Q    And would you characterize that as a promotion for her?

A    Yes.

Q    But now she was not under your direct supervision anymore, correct?

A    Correct.

Q    Who did she report to in that new position, if you know?

A    I'm trying to think.  At this time, I can't recall who was in charge.  There were many

Page 38

changeovers, so I don't remember who she reported to in the warehouse. I think it may have been Shaun Reeves. I'm not a hundred percent sure, but it may have been Shaun Reeves.

Q Did you think she deserved that promotion?

A I'm not sure because I didn't manage the warehouse and what their requirements. I had nothing to do with that promotion.

Q I see. So you didn't know what that job entailed specifically?

A I didn't -- yeah, I didn't know what it entailed, and I wasn't involved in the proceedings for that promotion.

Q Who was involved in the proceedings?

A That would be between the warehouse and I'm assuming the Program Manager.

Q Mr. Moppins?

A Yes.

Q And the warehouse manager -- so the decision would have been made by the warehouse manager and Mr. Moppins, correct?

Page 39

A No. The decision would have been made by the warehouse manager. Mr. Moppins would have to sign off.

Q I see. And by "sign off," you mean approve of?

A Approve, yes.

Q And the warehouse manager is -- was, you believe at the time, Mr. Reeves?

A I believe it was Mr. Reeves. I'm not a hundred percent sure.

Q Do you know approximately how many people she was supervising as the warehouse supervisor?

A No, I do not.

Q Do you know of any other positions that she held following that one?

A She held multiple positions. I don't know the chronological order of them.

Q But generally, would you say that each one was sort of a step up in advancement?

A Most were. Some were lateral.

Q Why would somebody take a lateral

Page 40

move?

A When you go from one department to the next.

Q But why would -- why do people generally do that?

A It's a --

MR. CURREY: Objection to the extent it calls for speculation.

MR. KOPSIDAS: You can answer.

MR. CURREY: You can answer.

THE WITNESS: Okay.

MR. CURREY: I'm just objecting for the record.

THE WITNESS: It could be a personal choice. If you no longer want to be in the department, and if there's a position open in another department, if you're qualified, you can try out for that department, and if you're selected, you're moved. It doesn't necessarily mean you're going to get more money.

BY MR. KOPSIDAS:

Q Right. How many promotions did

Page 41

Ms. Parker have while she was under your supervision?

A Two.

Q And were you involved in the decision to promote her both times as her supervisor?

A Partially, yes.

Q And so did you think she had earned those promotions?

A Yes.

Q How specifically do you think she had -- why specifically do you think she had earned them?

A She was a good worker, and she had proven herself in her job.

Q So -- okay. So there came a time after she left your supervision that there was an incident involving Ms. Parker that ultimately led to her termination from Reema.

Would you agree with that?

A I don't know what the incident that led to her termination -- termination was.

Q Okay, let's back it up a little bit.

Page 42

You were involved in at least one meeting where Ms. Parker was talked to, correct?

A    Correct, but that did not lead to termination.

Q    Understandable.

A    Okay.

Q    When was that meeting, approximately, as best you can remember?

A    I don't recall when that meeting was.

Q    Who was in that meeting?

A    It would have been Ms. Parker, myself, Mr. Moppins, and I am not 100 percent sure if there was a fourth party in that meeting.

Q    And if I said the meeting was on or about April 25th, 2016, do you have any reason to disagree with that?  Do you have any reason to believe that that's not correct?

A    I don't know whether it's true or untrue because I don't remember the date.

Q    But Ms. Parker was not under your direct supervision at the time of this meeting, correct?

Page 43

A    Correct.

Q    And by the way, do you remember only one such meeting, or more than one?

A    There were two meetings.

Q    Two meetings, okay.
Do you remember about how far apart they were?

A    No, I don't recall.  I think they may have been close, but I don't recall how far apart they were.

Q    "Close" as like within a month of each other?

A    Yeah, honestly, I don't recall, but there were two meetings.

Q    Who was in the second meeting?

A    That would be myself, Ms. Parker, Mr. Pickett, and Mr. Moppins.

Q    Okay, so it seems like there were two meetings fairly close in time.  Mr. Moppins was at both, Ms. Parker was at both, you were at both --

A    Mm-hmm.

Q    -- and Mr. Pickett was at one of them,

Page 44

correct?

A    Yes.

Q    Do you recall if Mr. Pickett was at the first one or the second one?

A    I don't believe Mr. Pickett was at the first meeting.

Q    And it's only, as far as your involvement, only these two meetings, correct?

A    Correct.

Q    Do you recall who requested the meeting, the first -- let's just talk about the first one.  Do you recall who requested that meeting?

A    No, I don't.

Q    So what was the meeting about?

A    The details, unsure, because I had stopped that meeting, so it was just a little intense.  Again, what the particulars and the details of it were, I do not know, but I just stopped the meeting.

Q    I take it that you didn't call for the meeting?

Page 45

A    No.

Q    So why were you there, do you know?

A    It's a part of policy.  A man is not going to meet with a woman one on one.  There has to be another female in the room.  That's part of their policy.

Q    Okay.  So you were there basically as a witness, is that --

A    Yes, mm-hmm.

Q    And do you know what the incident was that caused for this meeting to be held?

A    No, I do not.

Q    Did you know -- strange question, but is it just that you don't recall now sitting here today, or did you not know when you stepped into the meeting?

A    I did not know when I stepped into the meeting.

Q    So obviously, I take it, then, that you hadn't done anything to prepare for this meeting?

A    Correct.

Page 46

Q   And you don't know whether Ms. Parker or Mr. Moppins requested the meeting?

A   No, I do not.

(Wallace Deposition Exhibit 4 was marked for identification.)

BY MR. KOPSIDAS:

Q   Ms. Wallace, you have been handed what has been marked as Exhibit 4 to your deposition. It's a document bearing Bates numbers PARKER_000011 through 77.

So I'm going to refer to -- see those little numbers at the bottom right corner?

A   Mm-hmm.

Q   So we call those production numbers or Bates numbers, and I'll just be referring to those. This is a sort of multiple document document.

A   Okay.

Q   So I'm just going to kind of indicate you to what I'm asking you about.

A   Okay.

Q   And if you'll -- so if you'll please

Page 47

first turn to the page marked PARKER_51.

A   Okay.

Q   Now, this appears to be -- I'll give you a second to read it.

A   Okay.

Q   But this appears to be the statement of events from Angela Wallace, dated May 23, 2016.

So go ahead and take a minute to read that.

A   Okay.

(Witness reviewing Exhibit 4.)  Okay.

Q   Have you had a chance to review it?

A   Mm-hmm.

Q   So this is a statement that you wrote following the two meetings?

A   That was required of me, yes.

Q   As some sort of company policy?

A   Yes.

Q   And I take it, when you wrote it, that was your truthful and accurate and complete assessment?

A   Correct.

Page 48

Q   Looking back at it today, is there anything in here that you now know is not correct?

A   No.

Q   So you state here in this first paragraph that there were two occasions that you were required to sit in on a meeting between Mr. Moppins and Ms. Parker, correct?

A   Correct.

Q   And during the first one, you were a witness, not a participant?

A   Correct.  I was a witness on both.

Q   And just so I understand, what do you mean as the difference between witness and participant?

A   Participant, to me, means I had some sort of involvement in -- involvement and knowledge of what was going on, so I would participate.

A witness, to me, is someone who's just required, as I said, to sit in and stand in because there is no male-to-female one-on-one meetings as part of the policy.

Page 49

Q   Thank you.

And then the next sentence, the first sentence in the third paragraph, you say, "To my understanding, Ms. Parker requested the meeting with Mr. Moppins."  Do you see that?

A   Yes.

Q   So that was your accurate understanding at the time?

A   Yeah.  That's what I wrote, so that must be.

Q   And the purpose of the meeting, as you understood it, was to discuss a rumor that had been circulating regarding how Ms. Parker obtained her promotion, correct?

A   Correct.

Q   And you state here that, at the time, you were unaware of what the rumor was; is that correct?

A   Correct.

Q   So going into this meeting, you had not even heard the rumor?

A   Correct.

Page 50

Q    You first learned about it at this meeting?

A    Correct.

Q    What did you think when you heard what the rumor was?

A    Shocked.

Q    Why?

A    It just -- I never heard anything like that, so I would have never suspected that as being an issue in the workplace.

Q    Right.  Did you believe it was probably true?

A    I didn't believe that it was true, but again, I'm hearing this for the first time.  I don't know what the background is, and I don't know what the details are.

Q    And so during this meeting, Ms. Parker brought to Mr. Moppins' attention -- well, wanted to discuss with Mr. Moppins this rumor that was circulating, correct?

A    Correct.

Q    And specifically, just to make sure

Page 51

we're on the same page, your understanding was that the rumor was that Ms. Parker obtained her promotions because she was sleeping with Mr. Pickett, who was the Alternate Program Manager?

A    Per Ms. Parker, this is what she said in the meeting.  Other than that, I hadn't heard that.

Q    Right.  And then you say in the next paragraph, "The conversation escalated when Ms. Parker tried to express her feelings in regards to Mr. Moppins taking sides with the employees of the warehouse."

Do you see that?

A    Yes.

Q    That was your -- that was your assessment at the time?

A    At the time, yes.

Q    And specifically what was -- well, I should say who was Mr. Moppins taking sides with?

A    I can't attest to who Mr. Moppins was taking sides with.  I wrote this based on things

Page 52

that Ms. Parker had said in that meeting.

So she addressed that Mr. Moppins, that he was siding with the employees.  Who the employees are, I don't know.

Q    Okay.  You weren't supervising the warehouse, right?

A    Correct.  And just to give an understanding how it's set up, in this warehouse, there is a whole back section which was filled with employees that make -- or work in the warehouse; and then there's a whole separate section, which they call the front house, and that's where I worked.  So I didn't have interaction with the employees in the warehouse unless I needed to go back there.

Q    Right, because you were doing more logistics?

A    Yeah, up front in Transportation, yes.

Q    Understood.  Thank you for that explanation.

Is the back section sometimes called SPEAR?

Page 53

A    SPEAR is two sections.  It's ATA and SPEAR, and they shared the warehouse, but SPEAR was located in the back part of the warehouse.

Q    I see.  And what was SPEAR and ATA?

A    SPEAR, I can never remember.  It's a long -- I don't know what you call it.  But the ATA stands for antiterrorist -- Antiterrorist Assistance Program.

Q    Mm-hmm. SPEAR, S-P-E-A-R, is an acronym, right?

A    Yes.

Q    So looking at this, it seems like your assessment of the meeting was that Ms. Parker was upset that there was this rumor circulating about her conduct and that Mr. Moppins had not done anything to squash it, if you will?

A    That's, yeah, her words.  That's how she felt.

Q    Okay.  And what was Mr. Moppins' reaction to that, as you can recall?

A    Well, the reason I said it was intense, because you have two people that are

Page 54

trying to get their point across, and their points are totally different.

So Ms. Parker is in there to address a rumor, and Mr. Moppins is there to let her know that that's not what this is about. It's about your attitude.

Q   So let's dig in on that a little bit.

So Ms. Parker calls this meeting with Mr. Moppins specifically to talk about the rumor, and his response is we have a problem with your attitude?

A   Well, he doesn't understand where she's coming from with the rumor because that's not the issue that he has with her, and it's not per se his issue with her, it's the people that work under her issue, and he has to address everyone's qualms.

Q   So what did he ever do to actually address her complaint that this rumor was circulating in the warehouse?

A   That I would not know on his actions.

Q   Are you aware of anything that

Page 55

Mr. Moppins did to actually respond to her complaint that this rumor was circulating?

A   No, and I wouldn't be part of that.

Q   Now, Mr. Moppins, as the Program Manager, he supervised both the warehouse and the front house, right?

A   Yes.

Q   Okay.  So if he was to take any action among all of the Reema employees, you would have heard about it because he was your supervisor as well?

A   No, that's a personal HR thing between him and HR and whatever employees are involved.

She wasn't my employee any longer, so I wouldn't have been privy to that.

Q   Sure, but he never went -- he never called a meeting for all the 15 to 25 Reema employees and said, "It's come to my attention that this rumor is circulating, and it's unfair and it needs to stop."  He never did anything like that, right?

A   Not -- not that I'm aware of.

Page 56

Q   In fact, you're not aware of any action that he took on this matter?

A   Correct.

Q   So in this first meeting, he doesn't specifically address her complaint that this rumor is circulating, right?

A   No.  She addresses it, he doesn't.

Q   Instead, he's saying to her there's a problem with your attitude, right?

A   Yeah.  He's unfamiliar with the rumor, and he's addressing the point that her employees have an issue with her.

Q   Okay.  Why do you -- why do you believe he was unfamiliar with the rumor at the time of this meeting?

A   Other than him saying that he hadn't heard of it, I don't know.

Q   So in the meeting he said he didn't know anything about the rumor?

A   Correct.

Q   And you don't know one way or the other whether that was a true statement?

Page 57

A   Correct.

Q   If you go down to the sixth paragraph, the one that begins, "Mr. Moppins also informed Ms. Parker," do you see that?

A   Yes.

Q   Okay.  The third sentence reads, "Complaints were made in reference to her behavior; no details were given at the time, except for the fact that Mr. Jennings and Ms. Thompson were having phone conversations outside of work relating to the rumor that Ms. Parker was sleeping with Mr. Pickett."

Do you see that?

A   Yes, that's according to Ms. Parker. That's what she stated.

Q   Right, but I really want to ask the first part of that sentence --

A   Mm-hmm.

Q   -- which is, "Complaints were made in reference to her behavior."

That's something you understood from Mr. Moppins, correct?

Page 58

A    Correct.

Q    You didn't have any firsthand knowledge of any such complaints, right?

A    Correct.

Q    You never heard any such complaints about her behavior?

A    Correct.

Q    And at this meeting, no details were given about any such complaints by Mr. Moppins, right?

A    Correct.

Q    Was it your understanding that Mr. Jennings was the source of the complaints about her behavior?

A    According to Ms. Parker's statement.

Q    Right, okay. And nothing that was said in this meeting sort of contradicted that, right?

A    What do you mean?

Q    Yeah, let me -- let me try to make it better. Did Mr. Moppins ever indicate that Mr. Jennings was not the source of the complaints?

Page 59

A    He never spoke about Mr. Jennings.

Q    Mr. Jennings was one of Mrs. -- Mr. Jennings reported to Mr. Parker [sic] -- to Ms. Parker?

A    I'm not a hundred percent sure if Mr. Jennings was under the ATA or SPEAR at that time, because he did work for SPEAR, so I'm not sure.

Q    Do you know, was Ms. Parker supervising ATA or SPEAR?

A    Supervising? I don't believe that she ever worked in SPEAR. I believe she was in the warehouse on the ATA side.

Q    Okay. And then it seems from your notes here that the discussion got a little bit emotional.

A    Yes.

Q    And at that point, you shut it down; is that correct?

A    And walked her out, yes.

Q    Okay. And is it accurate to say that she was emotional because she was bringing this

Page 60

issue of this rumor to Mr. Moppins and he wasn't doing anything about it?

MR. CURREY: Objection, calls for speculation as to another person's mind-set.

MR. KOPSIDAS: I'm asking if that's your recollection.

MR. CURREY: Just for the record, are you intending to introduce this at trial? Because if so, then we need to have this objection ruled on prior to the witness answering. Otherwise, if this is just a discovery recording, then --

MR. KOPSIDAS: Well, I don't know yet how I'm going to use it at trial because I haven't heard her answer yet, so -- but normally the way this works is you state your objection, and then prior to trial, if you feel it's really worthy, we can have the judge rule on it.

MR. CURREY: Okay. Do you understand, though, we're not waiving any objection by allowing her to answer.

You can go ahead an answer.

THE WITNESS: Okay, can you repeat the

Page 61

question, please?

BY MR. KOPSIDAS:

Q    Of course.

Was it your impression at the time of the meeting that Ms. Parker was -- had gotten emotional because she was attempting to bring this issue of the rumor to Mr. Moppins' attention, and he wasn't doing anything about it to her satisfaction?

MR. CURREY: Same objection.

THE WITNESS: She -- I would say that it was intense because both parties were trying to express their reasoning, and it wasn't going anywhere. So instead of letting it escalate and escalate, let's just shut this down and come back when we have cooler heads.

BY MR. KOPSIDAS:

Q    Sounds like a smart decision.

A    Yes.

Q    Would you say that Mr. Moppins was also emotional or agitated in the meeting?

A    I could tell it would go there, and

Page 62

that's why I shut it down. By Ms. Parker's emotional state --

Q   Right.

A   -- it was just the time to shut it down. For one, for me as a manager, I don't agree with -- I don't want to call it insubordination, but this is the manager.

Q   Right.

A   This is the upper management, and we don't want to go there, so let's just shut this down and come back to it.

I didn't want him to get elevated, she was already in the process of getting elevated, shut it down.

Q   Okay. Did you think that Mr. Moppins was also the sort who was going to get emotional about this as well?

A   Did I think he could get emotional?

Q   Yeah.

A   I'm pretty sure that's all in us as human beings; how we contain it is another thing. So I didn't want to see him lose that composure,

Page 63

nor her.

Q   Right.

A   It's a professional setting.

Q   Okay, fair enough.

And then there was a second meeting?

A   Yes.

Q   Okay. And in this one, you were present again as a witness?

A   Yes.

Q   And Mr. Moppins was there?

A   Yes.

Q   And this one Mr. Pickett was also there?

A   Correct.

Q   Okay. And at this meeting, do you recall who called this meeting?

A   No, I don't.

Q   And at this meeting, Ms. Parker, she apologized to Mr. Moppins for the tone that she had used?

A   Yes.

Q   But she was also still concerned that

Page 64

this rumor was not being dealt with, correct?

A   Correct.

Q   And in response to that, Mr. Moppins stated, "You are not listening to what's being said."

A   Correct. That's what I wrote, yes.

Q   So I take it that he did not during this second meeting either directly address the issue that she had, which was the rumor circulating, correct?

A   Well, he didn't understand the rumor, so he -- how can you address it if you don't fully understand it? It's what other people are saying.

Q   Well, understand it or not, he was aware of it, right?

A   Yeah. At this point, it's the second meeting, so yes, it was brought up in the first meeting.

Q   And she's asking him to do something about it, and he's not doing anything about it.

A   I'm not sure if she's asking him to do something about it versus understanding what she's

Page 65

saying.

Q   I'm sorry, I'm not quite following that. Can you explain?

A   At this point, I don't know if she's asking what action he's going to take, or asking that you acknowledge and understand what I'm saying is true, and then move forward from that.

Q   Okay. But either way, she wasn't hearing anything satisfactory from him, correct?

A   Correct, from her, that's the way it appeared.

Q   Right. So he wasn't acknowledging the rumor, nor was he saying that he was going to take any action about it?

A   He said he had no part in the rumor.

Q   Right, but he also wasn't even acknowledging it or taking any action for it, correct?

A   We never got to that point in the conversation.

Q   And why is that?

A   Because that meeting was -- I had

interrupted that meeting as well. It was going nowhere.

Q So what Mr. Moppins preferred to talk about during that meeting was -- he said to her, quote, "You're here because of your attitude," right?

A Yes.

Q So during the second meeting, again, Mr. Moppins preferred to talk about Ms. Parker's attitude rather than the rumor itself, correct?

A It's not just her attitude. It involved her and her team, and her team felt that there was some issues that needed to be addressed, and him as the Program Manager needed to address them with her as well.

Q Right. Do you know of any action that Mr. Moppins took following the second meeting about -- regarding the issue of this rumor?

A No, I do not.

Q And then the way the meeting ended was Mr. Moppins asked Ms. Parker to leave?

A Correct.

Q So is it accurate to say that in this second meeting, no resolution was reached on any issue really?

A Correct.

Q Subsequent to these two meetings, did you learn anything about this rumor outside of the two meetings?

A No.

Q Were you involved in any other meetings or any other discussions about Ms. Parker following this second meeting?

A No.

Q In between the first and the second meetings, did you have discussions or meetings with anybody about Ms. Parker where she was not present?

A No.

Q Do you know what actions, if any, Mr. Moppins or the company took following the second meeting with Ms. Parker?

A No, I do not.

Q You are aware, however, that she was

terminated following the second --

A Correct.

Q -- following the second meeting?

A Yes.

Q What is your understanding of the reasons why she was terminated?

A I wasn't given any.

Q How did you learn about it?

A Just coming in to work and she's not there.

Q Do you recall just prior to the first meeting that there was an all-hands meeting called by Mr. Moppins?

A Those were almost every other day, so which particular one, no, I don't.

Q Okay. Why did he generally call those so frequently?

A To stay on top of what was going on in the warehouse, what needed to be done; if there was any shortcomings, they needed to be addressed. Just to keep everybody afloat on what needed to be done as far as fulfilling all the tasks that we

had to for the Department of State.

Q Understood.

Do you recall an all-hands meeting held just before the first meeting that we've been discussing in which Ms. Parker was not there?

A No. There could have been, but I'm not sure.

Q In regards to these all-hands meetings, was Mr. Moppins strict about being on time for them?

A Yes.

Q Why do you say that?

A I'm only assuming that a military man, that's just the way that he ran the warehouse.

Q Right.

A Yeah.

Q So if a meeting was called for 9:00 a.m., he expected everybody to be there by 9:00 a.m.?

A At 8:50.

Q At 8:50. Do you ever recall him not letting somebody in who showed up at 9:01 or 9:03?

Page 70

A    Yeah.  The door was shut at the meeting time, so if you weren't there, you weren't -- you weren't in.

Q    Mm-hmm.  Did that ever happen to you?

A    No.  No.

Q    But you saw it happen to others?

A    Yes.

Q    Did you ever see it happen to Ms. Parker?

A    Yes, I believe it happened to her as well.

Q    Do you recall when you saw it happen to her?

A    That I do not, but I believe it did happen.  I'm not sure when it happened.

Q    Where she was just shut out of the meeting?

A    Yeah.  When the door shut, the door shut.  It doesn't matter who you are.

Q    When the door shuts at the start of the meeting, the door shuts, and no matter who you are, you're not getting in?

Page 71

A    Correct.

Q    All right.  Sorry, bear with me for a minute here.

A    Mm-hmm.

Q    You didn't work in the warehouse at any time, right?

A    Yes, I did, when I first started, but Ms. Parker was not an employee.

Q    Right, so let me fix that a little bit.  So at the time we've been talking about here, you were a supervisor, Logistics and Transportation?

A    Correct.

Q    So you didn't have -- you didn't work in the warehouse?

A    Correct.

Q    So if a rumor was circulating in the warehouse, it's pretty safe to say that good chance you would have heard it?

A    Correct, at least safe to say, as my person and character, I've never been one to participate in rumor mills or cliques or anything

Page 72

of that sort.  So if anything happens, trust and believe, I'm the last to know.

Q    All right.  Sorry, can I take you back to Exhibit 4, PARKER_51, so the first page of your statement.

A    Mm-hmm.

Q    That sixth paragraph we were talking about that starts with "Mr. Moppins also informed ..."

A    Mm-hmm.

Q    The second sentence there begins, "The current course of action was based on her attitude and demeanor."

What did you mean by the "current course of action"?

A    Whatever they were doing at the time was based off her personnel reporting to Mr. Moppins on her actions.

So when I say "course of action," the first meeting that was called, to me, that's a course of action.

Q    But you're also talking about from

Page 73

Mr. Moppins' perspective, not Ms. Parker's, correct?

A    Let me see.  Yes, when he talks about her demeanor, it's his -- I don't know if he would call it his perspective because he's not in the warehouse.  He's getting this from people that are in the warehouse.

Q    Mm-hmm.

A    So I guess his perception from what he's being told is her attitude.

Q    Was Mr. Moppins a hands-on manager in your opinion?

A    Not really a hands-on; that was Mr. Pickett's role.  If there's anything that needed to be escalated, then it would go from Mr. Pickett to Ms. Moppins [sic] -- I mean to Mr. Moppins.

Q    Would Mr. Moppins spend time in the warehouse though?

A    Yes, there were quite a few times that we'd have to do overtime throughout a certain part of the year, and we would work seven days a week,

Page 74

12, 13 hours a day, so he would oversee that.

Q    Do you know if Mr. Moppins was familiar with, you know, the floor workers in the warehouse?

A    I would say he was, yes.

Q    Do you know whether he socialized outside of work with any of them?

A    That I do not know, but I would -- I would assume no, but I do not know that.

Q    By the way, there was a reference in here to Ms. Thompson.  Who is that?

A    Romain Thompson?  She was an employee that used to work in the warehouse.

Q    Did she work -- did her position have any relationship to Ms. Parker's position?

A    I think they may have been in the -- I'm not quite sure of what Romain's title was, but they did the same type of work at one point.

Q    Do you know whether at any point Ms. Parker supervised Ms. Thompson, or vice versa?

A    I don't believe so.

Q    And at the last part of that paragraph

Page 75

there, the sixth paragraph, you state that, "no details were given at the time," that refers to Mr. Moppins' issue.  But then you go on to state, "except for the fact that Mr. Jennings and Ms. Thompson were having phone conversations outside of work relating to the rumor."

Do you see that?

A    Yes.

Q    How did you come to understand that Mr. Jennings and Ms. Thompson were having phone conversations outside of work relating to the rumor?

A    That's what Ms. Parker stated in the meeting.

Q    Did Mr. Moppins say or do anything about that?

A    Said that it was untrue -- well, that it was untrue that he had anything to do with any sort of rumors.

Q    That Mr. Moppins had anything to do?

A    Yes.

Q    Okay.  But he didn't say it was untrue

Page 76

that Mr. Jennings and Ms. Thompson were having conversations about it, right?

A    He wouldn't have known that.  Van is the one -- Ms. Parker is the one who brought that to his attention.

Q    Right.  As far as you know, did Mr. Moppins ever go and talk to Mr. Jennings or Ms. Thompson about the -- about this rumor?

A    Not that I'm aware of.  Ms. Thompson was no longer working there when she stated this.

Q    Oh, she had already left the company?

A    Yeah.

Q    Why was Mr. Pickett involved in that second meeting, do you know?

A    As the Alternate Program Manager.

Q    Okay, but why?

A    His reasonings?  That's my only assumption, he's the Program Manager.  This meeting may have called for more people to be witness to.  He didn't have a witness in the first meeting.

Q    Other than you.

Page 77

A    Yeah, exactly.  Because she was a female, so I needed to be there as a female.

Q    I see.  So it's your understanding that he just -- Mr. Moppins just needed a second witness there?

A    I'm -- that's what I'm assuming.

Q    Okay.  And your understanding about the rumor is that it involved an alleged affair between Ms. Parker and Mr. Pickett, right?

A    From Ms. Parker, yes, from her stating so, that's what I --

Q    And despite the fact that Mr. Pickett was there as well -- strike that, let me do it over again.

Even though Mr. Pickett was there as well, Mr. Moppins didn't want to discuss the rumor at all, is that accurate?

A    Yes.  I'm -- I'm not going to say he didn't want to discuss it.  That wasn't the intent of the meeting.

Q    Right.  But it wasn't discussed?

A    No.  She stated it, but at that time,

Page 78

it was like this meeting is going nowhere, so we're going to diffuse this.

Q    Was Mr. Pickett a participant or a witness?

A    A witness, to my understanding.

Q    Do you recall him saying anything in the meeting?

A    No, I don't recall him saying anything.

Q    How -- do you recall how Mr. Moppins responded when Ms. Parker apologized for her tone in the previous meeting?

A    I don't recall exactly how he responded.  I don't -- I don't think he refused the apology.

Q    Okay.  This policy that you've referred to that required you to be present, does that apply to all male-female meetings, or just ones that are talking about disciplinary or corrective action?

A    I believe it's all meetings.

Q    So even run-of-the-mill work meetings?

Page 79

A    When you say run-of-the-mill work meetings, do you mean like all hands are being called?

Q    No.  Like if Mr. Moppins has to go and talk to -- well, you, since you report to him, about something that you're working on -- not disciplinary, but just day to day --

A    Yeah, non-disciplinary does not.

Q    Okay.  Right, so it's really limited to sort of disciplinary or corrective type meetings?

A    Yes, yes.

Q    Do you know why that policy is in place?

A    I would assume for the safety of both that are involved, that there's someone else to witness the conversation, not just hearsay or, you know, he say/she say.  There's actually someone else there to witness.

Q    By the way, when we were talking about the all-hands meeting, and you remembered there was at least one time where Ms. Parker had been

Page 80

shut out for not being there on time --

A    Mm-hmm.

Q    -- do you recall what was discussed at that meeting in particular?

A    No, I do not.  All the meetings are going to be work related on what needs to be done or improved, or if we're going to stop doing a process.

Q    Were you involved at all or consulted at all about the decision to terminate Ms. Parker's employment?

A    No, I was not.

Q    The date on these notes, May 23, 2016, that's when you wrote them?

A    Yes.

Q    And you said that was pursuant to a company policy?

A    When I was asked by HR, I had to give a statement of accounts on being a witness in the meeting on what I saw.

Q    Do you know if that -- if it was company policy, or if you were just asked to do

Page 81

it?

A    I was just asked to do it.  I don't really know what that policy -- I couldn't tell you where it is in the handbook.

Q    Sure.  Do you remember who asked you to write these?

A    Ms. Price, Cathy Price.

Q    HR Manager?

A    Yes.

Q    Do you know whether -- were you asked to write this up before or after Ms. Parker was terminated?

A    That I don't recall because I don't know her termination date.

Q    Okay.

A    I don't know if she was still there or not.

Q    Okay.  Why don't we go ahead and take a break.

A    Okay.

MR. KOPSIDAS:  Off the record.

THE VIDEOGRAPHER:  We're going off the

Page 82

record. This is the end of Media Unit No. 2.

The time is 12:12 p.m.

(A break was taken.)

THE VIDEOGRAPHER: We're back on the record. This is the beginning of Media Unit No. 3. The time is 12:28 p.m.

BY MR. KOPSIDAS:

Q Ms. Wallace, thanks for hanging in there. Just to go back to something we talked about a little while ago, it was your understanding in that first meeting that when Ms. Parker asked Mr. Moppins about the rumor, that he indicated that he was unaware of the rumor.

A Correct.

Q Okay. And why do you say that? Why did you put that in your statement? What gave you that indication?

A That's what he said, he was unaware of any rumor.

Q Do you ever recall being interviewed by anybody about the rumor?

A No.

Page 83

Q Did you ever hear about management interviewing any other employees about the rumor?

A No.

Q Not before or after this meeting?

A Correct, no.

Q Do you recall any all-hands meetings where Ms. Parker's conduct was discussed?

A No.

Q Do you know who Maddie Littleton is?

A Yes.

Q I'm sorry, is that a man or a woman?

A It's a woman.

Q Okay. And who was she?

A She was an employee as well.

Q In the warehouse?

A No. She worked for me.

Q And did you know Donte Jennings?

A Yes.

Q He was a warehouse employee?

A Yes.

Q So he did not work for you?

A Correct.

Page 84

Q Have you kept in touch with either of those individuals since leaving the company?

A No.

Q Are you aware at any time of complaints that they had regarding Ms. Parker's conduct?

A No, I'm not.

(Interrupted by a knock at the door.)

MR. KOPSIDAS: Off the record.

THE VIDEOGRAPHER: We're going off the record. The time is 12:32 p.m.

(Pause in the proceedings.)

THE VIDEOGRAPHER: We're back on the record. The time is 12:33 p.m.

BY MR. KOPSIDAS:

Q Did you ever witness Ms. Parker being disrespectful to her subordinates?

A No.

Q And she was never insubordinate to you?

A No, she wasn't.

Q You were -- do you know why Ms. Parker

Page 85

was terminated?

A No, I do not.

Q Okay. And I believe you said before you had no involvement in that?

A Correct.

Q You weren't consulted by anybody?

A No.

Q And you didn't learn about it until after the fact?

A Correct.

Q Sitting here today, do you know why she was terminated?

A No, I do not know the exact reason she was terminated.

Q Did you ever file a complaint with Human Resources while you were working at Reema?

A No.

Q Are you aware of any other women who did?

A No.

Q Do you know if Ms. Parker ever filed a complaint with Human Resources?

Page 86

A    No, I do not.

Q    So would you expect if somebody filed a complaint with Human Resources, that that would be something that you would be made aware of?

A    No.  She was not my employee.

Q    Or for anyone, for that matter?

A    No, not unless it was brought to my attention.

Q    Because you were involved?

A    Well, I don't understand that question.

Q    Yeah, let me try again.

Is it accurate to say that you would only be aware of HR complaints being filed if you were specifically named in the complaint?

A    Correct.

(Wallace Deposition Exhibit 5 was marked for identification.)

BY MR. KOPSIDAS:

Q    Ms. Wallace, you've been handed what's been marked as Exhibit 5.  It's a document bearing Bates number REEMA000355 through 56.

Page 87

Does this document look familiar to you?

A    No, it does not.

Q    Okay.  Is that your signature on the second page?

A    Yes.

Q    I'll give you a minute to look at it.

A    Okay.  (Witness reviewing Exhibit 5.)

Okay, I understand what it is.

Q    Okay.  What's that?

A    It's a job description, I guess.  It's not something that I wrote.

Q    Right.

A    I guess it's just a template on the requirements of the job.

Q    So is it accurate to say that this is a sort of list of responsibilities that Ms. Parker was given when she was under your supervision?

A    Correct.

Q    So just sort of outlining the things that are expected of her?

A    Yes.

Page 88

Q    And this is standard for employees?

A    Yes, I would say so.  I think this is the only time I've seen this form.  When I signed it, obviously, but ...

Q    Right.  And just generally speaking, you agree that these are the things that Ms. Parker was responsible for when she was working for you?

A    Correct.

Q    By the way, did you ever see or hear of any other written warnings given to Ms. Parker other than the one we discussed earlier?

A    No, I did not.

If I may go back, I would rather say I don't recall, because there was multiple employees.  So I don't want to say a hundred percent that I haven't seen it because I really don't know at this point.  So I would rather say I don't recall seeing any other written warnings.

Q    That's fine.  Okay, thanks.

Do you recall an all-hands meeting in

Page 89

April of 2016 in which employees discussed Ms. Parker's conduct in the warehouse?

A    There may have been, yes.  I vaguely remember a meeting regarding that, an all-hands meeting.  Not that the all-hands meeting was based off of that, because it's an open discussion, and that was brought up in that meeting.

Q    Who brought it up?

A    I'm not sure which team member brought it up.

Q    What was your reaction at the time?

A    I don't recall if I had any specific reaction to that.

Q    Do you recall anything that was said about Ms. Parker's conduct, good or bad?

A    Basically referring back to the attitude of people feeling less than under her supervision, but all the details, no.

Q    Was that your experience when she worked under you and supervised other people?

A    No.

Q    Do you recall Ms. Parker being present

Page 90

at that meeting to address any of those concerns?

A    No, I do not.

Q    Okay.  I believe you said earlier that you did nothing substantive to prepare for this deposition.

A    Correct.

Q    In your conversations with Mr. Currey, and anybody else in his firm, what did they tell you to do, if anything, to get ready for the deposition?

A    I don't recall him telling me to do anything to prepare for it.

Q    Did they tell you to not do anything?

A    I don't believe that was brought up at all.

Q    Okay.  So you didn't -- you didn't review anything, documents or anything?

A    No, I don't have any documents.

Q    And you had no meetings with anybody --

A    No.

Q    -- lawyers or otherwise, to get ready?

Page 91

A    No.

Q    Is anybody paying you for your time to be here today?

A    No.

Q    Is anybody paying any expenses that you have with being present today?

A    No.

Q    Do you have at this time any involvement with Reema at all?

A    No, I don't.

Q    You have not been an employee of theirs since 2017?

A    Correct.

Q    Has anybody at Reema promised you anything in return for your testimony?

A    No.

Q    Have any lawyers promised you anything in return for your testimony?

A    No.

Q    In regards to that first meeting, you said you're the one who ended it because tensions were getting --

Page 92

A    There was tension, yes.

Q    Okay.  And then the same thing in the second one, tensions were escalating on both sides?

A    No, not on both sides.  Only Ms. Parker's side.

Q    Okay.  So she was getting emotional again?

A    Yes.

Q    And you decided that the meeting was unproductive and you would end it?

A    Well, he had also asked her to leave.

Q    Oh, in the second one?

A    Yes.

Q    Right, got it.

Do you recall in the second meeting Ms. Parker making any accusations towards Mr. Moppins that she was going to file any sort of complaint or press charges?

A    I do not recall that, no.

Q    And it's your understanding that that second meeting ended not by you escorting

Page 93

Ms. Wallace [sic] out of the room because she was emotional, but rather because Mr. Moppins asked her to leave?

A    Yes, it was a combination of both.  He asked her to leave, and I escorted her at the same time.

Q    All right, I have no further questions at this time.

A    Okay.

Q    He has the chance to ask you any questions now that he might have, if any, but if not, I want to thank you for the effort to come in today.  I really appreciate it.

A    You're welcome.

MR. CURREY:  I have nothing.  Thank you for your time this morning.

THE WITNESS:  Thank you.

THE REPORTER:  Signature?  I don't know if you want to do that on the record or not.

MR. KOPSIDAS:  So Ms. Wallace, you have the opportunity -- you have the opportunity to get a copy of your transcript and review it and

Page 94

make any corrections that you might want to make, you know, typos and things like that, and then sign it, which is normally what I recommend, but I'm not your lawyer here, but the alternative is that you can just waive -- what's called waive signature. You can say I don't need to sign it, I trust that it's okay, I'm not going to make any changes.

THE WITNESS: Mm-hmm.

MR. KOPSIDAS: You know, myself, I would prefer that you get the chance to review it just to make sure that everything is complete and truthful and accurate --

THE WITNESS: Okay.

MR. KOPSIDAS: -- but that's your call.

THE WITNESS: Yeah, I'd like to get a copy of it.

MR. KOPSIDAS: Okay. So either us or Mr. Currey will arrange for that to be sent to you when it's ready.

THE WITNESS: Okay.

Page 95

MR. KOPSIDAS: Okay.

THE WITNESS: Thanks.

MR. KOPSIDAS: Thank you.

THE VIDEOGRAPHER: Are we finished? Stand by.

We're off the record at 12:48 p.m., and this concludes today's testimony given by Angela Wallace.

(Whereupon, at 12:48 p.m., the taking of the deposition was concluded. Reading and signature were reserved.)

Page 96

IN THE UNITED STATES DISTRICT
FOR THE DISTRICT OF MARYLAND

-----------------------------x
EVANGELINE J. PARKER, :
:
Plaintiff, : Civil Action No.
vs. :
: 8:17-CV-01648-TDC
REEMA CONSULTING SERVICES, :
INC., :
Defendant. :
-----------------------------x

ACKNOWLEDGMENT OF DEPONENT

I, ANGELA WALLACE, do hereby acknowledge that I have read and examined pages 1 through 95 of the transcript of my deposition taken on Thursday, March 5, 2020, and that:

(Check appropriate box):

( ) the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

( ) Except for the changes noted in the attached errata sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

________ ______________________
DATE SIGNATURE

Page 97

WITNESS: Angela Wallace

DATE: March 5, 2020

CASE NAME: Evangeline J. Parker v. Reema Consulting Services, Inc.

CASE NO.: 8:17-CV-01648-TDC

Please note any errors and the corrections thereof on this errata sheet. The rules require a reason for any change or correction. It may be general, such as "To correct stenographic error," or "To clarify the record," or "To conform with the facts."

PAGE LINE CORRECTION REASON FOR CHANGE

__________________________________________________
__________________________________________________
__________________________________________________
__________________________________________________
__________________________________________________
__________________________________________________
__________________________________________________
__________________________________________________
__________________________________________________
__________________________________________________

Page 98

CERTIFICATE OF NOTARY PUBLIC

I, DAWN A. JAQUES, a Notary Public in and for the Commonwealth of Virginia, before whom the foregoing deposition was taken, do hereby certify that witness whose testimony appears in the foregoing pages was duly sworn by me; that the testimony of said witness was taken by me in shorthand at the time and place mentioned in the caption hereof and thereafter reduced to typewriting under my supervision; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition is taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the actions.

_________________________

Dawn A. Jaques, CSR, CLR
Notary Public in and for
Commonwealth of Virginia

My commission expires: 8/31/23
Registration No.: 132328

Exhibits

**EX 0001 Angela Wallace 030520** 3:9 16:18 20:18 34:5
**EX 0002 Angela Wallace 030520** 3:11 19:17,21
**EX 0003 Angela Wallace 030520** 3:13 25:20 26:7
**EX 0004 Angela Wallace 030520** 3:14 46:4,8 47:11 72:4
**EX 0005 Angela Wallace 030520** 3:16 86:17,21 87:8

0

**000077** 3:15
**000354** 3:10
**000356** 3:18
**000359** 3:12

1

**1** 3:9 16:18 17:2 20:8,18 34:5
**10** 7:4,12
**10/9/15** 3:9
**100** 25:3,4 42:12
**1000** 2:6
**10:13** 4:15
**10:56** 37:2
**11:13** 37:6
**12** 74:1
**12:12** 82:2
**12:28** 82:6
**12:32** 84:11
**12:33** 84:14
**12:48** 95:6,9
**13** 74:1
**1428** 5:17
**15** 36:19 55:17
**16** 3:10
**17** 14:18
**18th** 2:16
**19** 3:12,16
**1st** 26:12

2

**2** 3:11 19:17,21 21:14 37:5 82:1
**20024** 2:7
**2013** 10:8 11:9
**2014** 3:11 20:15
**2015** 3:11,16 11:10 14:17 17:6 18:17 20:15,18 26:13
**2016** 42:15 47:7 80:13 89:1
**2017** 10:8 11:9,10,15 91:12
**20190** 5:18
**202 626-6407** 2:8
**202 626-7747** 2:9
**2020** 4:10
**21** 5:17
**21202** 2:17
**23** 47:7 80:13
**25** 3:13 36:19 55:17
**25th** 42:15

3

**3** 3:13 25:20 26:4,7 82:6
**354** 17:3,18
**358** 20:11
**359** 20:1

4

**4** 3:14 46:4,8 47:11 72:4
**410 659-1350** 2:19
**410 659-1354** 2:18
**46** 3:15

5

**5** 3:4,16 86:17,21 87:8
**5/16/15** 3:9
**56** 86:22
**5th** 4:10

7

**7** 2:16
**77** 46:10

8

**86** 3:18
**8:17-CV-01648-TDC** 4:8
**8:50** 69:20,21

9

**9/1/2015** 3:13
**9:00** 69:18,19
**9:01** 69:22
**9:03** 69:22

A

**a.m.** 4:15 37:2,6 69:18,19
**accountability** 18:20 22:7
**accountable** 19:2
**accounts** 80:19
**accurate** 8:11 10:1 23:11 32:10 35:11 47:20 49:7 59:21 67:1 77:17 86:13 87:16 94:13
**accusations** 92:17
**acknowledge** 65:6
**acknowledging** 65:12, 17
**acronym** 53:10
**act** 24:15,19
**action** 4:7 24:11 25:11 33:17 34:6 55:8 56:2 65:5,14,17 66:16 72:12,15,19,21 78:20
**actions** 54:21 67:18 72:18
**add** 9:1
**address** 5:16 54:3,16, 19 56:5 64:8,12 66:14 90:1

**addressed** 52:2 66:13 68:20
**addresses** 56:7
**addressing** 56:11
**administered** 5:5
**advancement** 39:20
**affair** 77:8
**afloat** 68:21
**agitated** 61:21
**agree** 41:19 62:5 88:6
**ahead** 47:8 60:21 81:18
**all-hands** 68:12 69:3, 8 79:21 83:6 88:22 89:4,5
**alleged** 77:8
**allowing** 60:20
**ALT** 28:2
**Alternate** 28:4 51:4 76:15
**alternative** 94:4
**Andrew** 2:3 4:17
**Angela** 3:3 4:3 5:7,15 47:7 95:8
**answering** 60:10
**antiterrorist** 53:7
**anymore** 37:17
**apologized** 63:19 78:11
**apology** 78:15
**apparently** 29:11
**appearances** 2:1 4:16
**appeared** 65:11
**appears** 18:14 20:14 26:11 47:3,6
**apply** 78:18
**approve** 39:5,6
**approximately** 7:11 9:5 14:11 36:17 39:11 42:7
**April** 42:15 89:1
**Aronov** 2:22 4:10
**arrange** 94:20
**assessment** 18:16 19:7 22:4 47:21 51:17 53:13
**Assistance** 53:8
**assume** 16:1 17:8 31:6 32:20 34:5 74:9 79:15
**assuming** 38:17 69:13 77:6
**assumption** 76:18
**ATA** 53:1,4,7 59:6,10, 13
**attempting** 61:6
**attention** 50:18 55:18 61:7 76:5 86:8
**attest** 51:21
**attitude** 18:13 54:6, 11 56:9 66:5,10,11 72:12 73:10 89:17
**Avenue** 2:6
**aware** 34:17,20 54:22 55:22 56:1 64:15 67:22 76:9 84:4 85:18 86:4,14

**B**

**back** 8:22 10:16 15:8 37:4 41:22 48:1 52:9,15,21 53:3 61:15 62:11 72:3 82:4,9 84:13 88:14 89:16
**background** 50:15
**bad** 89:15
**Baltimore** 2:17
**based** 51:22 72:12,17 89:5
**basically** 45:7 89:16
**Bates** 17:3 19:22 26:5 46:9,15 86:22
**bear** 18:2 25:19 71:2
**bearing** 19:22 26:5 46:9 86:21
**bears** 17:2
**beginning** 82:5
**begins** 57:3 72:11
**behalf** 2:2,13 4:18, 20,21
**behavior** 57:8,20 58:6,14
**beings** 62:21
**bit** 41:22 54:7 59:15 71:10
**botched** 33:4
**bottom** 17:15 19:10 20:11 26:18,20 46:12
**break** 9:5,6 36:22 37:3 81:19 82:3
**bring** 18:1 61:6
**bringing** 59:22
**brought** 50:18 64:17 76:4 86:7 89:7,8,9 90:14

**C**

**call** 10:16 44:21 46:14 52:12 53:6 62:6 68:16 73:5 94:16
**called** 5:8 52:21 55:17 63:16 68:12 69:17 72:20 76:19 79:3 94:5
**calls** 40:8 54:8 60:3
**case** 6:22
**Cathy** 81:7
**caused** 45:11
**chance** 9:11,12 26:8 47:12 71:19 93:10 94:11
**change** 9:1,17
**changeovers** 38:1
**character** 71:21
**characterize** 37:13
**charge** 37:22
**charges** 92:19
**choice** 40:15
**chronological** 39:18
**chronologically** 20:5
**circled** 18:20
**circulating** 49:13 50:20 53:14 54:20 55:2,19 56:6 64:10 71:17
**Civil** 4:7
**clarify** 9:1
**clerk** 11:6,12
**cliques** 71:22
**close** 21:2 43:9,11,19
**combination** 93:4
**comment** 18:6 22:10
**comments** 17:22 19:1 21:18
**communicate** 19:6

**communications** 16:5
**company** 6:11 11:15 15:17 34:22 36:3 47:17 67:19 76:11 80:17,22 84:2
**Compilation** 3:14
**complaint** 54:19 55:2 56:5 85:15,22 86:3, 15 92:19
**complaints** 57:7,19 58:3,5,9,13,22 84:5 86:14
**complete** 8:10 9:22 47:20 94:12
**completed** 12:8
**composure** 62:22
**concerned** 63:22
**concerns** 90:1
**concluded** 95:10
**concludes** 95:7
**conduct** 23:3 53:15 83:7 84:6 89:2,15
**conference** 8:5
**confidence** 19:5
**Constable** 2:15
**construction** 6:10
**consulted** 80:9 85:6
**Consulting** 4:5,22
**contact** 15:20
**continue** 22:13
**contractor** 12:4
**contradicted** 58:17
**control** 18:13 19:4 21:4
**conversation** 51:10 65:20 79:17
**conversations** 57:10 75:5,11 76:2 90:7
**cooler** 61:16
**copy** 93:22 94:18
**corner** 46:12
**correct** 7:15 13:3,18, 19,21 17:6,7,19 18:8,17,18,21,22 19:16 20:3,4,12,15, 16,20 21:5,8,9,12, 15,16 22:1,5,8,9,14, 15,18,19,22 23:4 24:6 26:13,17 28:10 29:10,18,20 31:10,13 32:2 34:2,19 37:17, 18 38:22 42:2,3,17, 22 43:1 44:1,8,9 45:22 47:22 48:2,7, 8,11 49:14,15,18,19, 22 50:3,20,21 52:7 56:3,20 57:1,22 58:1,4,7,11 59:19 63:14 64:1,2,6,10 65:9,10,18 66:10,22 67:4 68:2 71:1,13, 16,20 73:2 82:14 83:5,22 85:5,10 86:16 87:19 88:9 90:6 91:13
**corrected** 23:21 24:1, 12 25:11
**corrections** 9:13 94:1
**corrective** 33:17 34:6 78:20 79:10
**Counsel** 4:15 5:11
**court** 4:6,12 5:1 6:16,21 8:7 9:10
**cover** 20:14
**covering** 28:18
**current** 5:16 72:12,14
**Currey** 2:14 4:21 16:2 32:3 40:7,10,12 60:3,7,18 61:10 90:7 93:15 94:20

**D**

**D.C.** 2:7
**date** 7:3,13 42:19 80:13 81:14
**dated** 47:7
**dates** 13:15 14:15 20:13
**Dawn** 4:12
**day** 10:4 68:14 74:1 79:7
**days** 73:22
**dealt** 64:1
**decided** 92:10
**decision** 38:21 39:1 41:4 61:18 80:10
**Defendant** 2:13
**definitive** 6:2
**Demarcus** 27:18,21 28:1,5
**demeanor** 72:13 73:4
**department** 12:4 40:2, 16,17,18 69:1
**departments** 21:3,8,11
**departure** 15:16
**depend** 23:10
**depends** 23:16
**deposition** 3:8 4:3,9 6:5 7:6 8:22 15:6,19 16:18 19:17,21 25:20 46:4,8 86:17 90:5,10 95:10
**describe** 14:3
**description** 87:11
**deserved** 38:5
**details** 44:16,19 50:16 57:8 58:8 75:2 89:18
**difference** 48:13
**diffuse** 78:2
**dig** 54:7
**direct** 37:16 42:21
**direction** 21:21
**directly** 64:8
**disagree** 42:16
**disciplinary** 23:2 78:19 79:7,10
**discipline** 31:14
**discovery** 60:11
**discretion** 24:7,8 25:9
**discuss** 49:12 50:19 77:16,19
**discussed** 77:21 80:3 83:7 88:12 89:1
**discussing** 69:5
**discussion** 59:15 89:6
**discussions** 67:10,14
**disrespectful** 84:17
**disrespectfully** 24:16,20
**District** 4:6
**Division** 4:7
**document** 17:1 19:22 26:3,4,6,9 32:3 46:9,16,17 86:21 87:1
**documents** 3:15 90:17, 18

**Donte** 83:17
**door** 70:1,18,20,21 84:8
**duly** 5:9
**duties** 11:18 12:3

E

**E-X-H-I-B-I-T-S** 3:7
**earlier** 88:12 90:3
**earned** 41:7,12
**effective** 22:12
**effort** 93:12
**Electronic** 31:4
**elevated** 62:12,13
**eligible** 16:7
**EMAIL** 2:10,20
**emails** 15:9
**embassies** 12:6,12
**emotional** 59:16,22 61:6,21 62:2,16,18 92:7 93:2
**employee** 3:9,11 17:4 19:14 22:20 24:2,21 25:9 34:15 55:14 71:8 74:12 83:14,19 86:5 91:11
**employees** 17:12 25:10 35:15,22 36:16,17 51:13 52:3,4,10,14 55:9,13,18 56:11 83:2 88:1,16 89:1
**employment** 11:14 34:16 80:11
**encompassed** 21:11
**end** 82:1 92:11
**ended** 11:15 66:20 91:21 92:22
**ensured** 12:7
**entailed** 38:11,13
**equipment** 12:8 13:7 31:7
**escalate** 61:14,15
**escalated** 51:10 73:15
**escalating** 92:3
**escorted** 93:5
**escorting** 92:22
**ESQ** 2:3,4,14
**ESR** 31:3,8 32:12
**ESRS** 30:3
**evaluation** 3:9,11 17:5 23:9,13 24:5,10 29:10,17 33:21 34:5
**Evangeline** 12:15
**events** 47:7
**everyone's** 54:17
**exact** 7:3 13:15 14:15,20 85:13
**Examination** 3:4 5:11
**examined** 5:10
**Excellent** 22:7
**Excuse** 26:19
**Exhibit** 3:8,9,11,13, 14,16 16:18 17:2 19:17,21 20:18 21:14 25:20 26:4,7 34:5 46:4,8 47:11 72:4 86:17,21 87:8
**expanding** 18:12
**expect** 86:2
**Expectations** 3:17
**expected** 69:18 87:21
**expenses** 91:5
**experience** 89:19
**explain** 65:3
**explanation** 52:20
**express** 51:11 61:13
**extent** 40:7

F

**facilities** 11:21 31:8
**fact** 34:3 56:1 57:9 75:4 77:12 85:9
**fair** 8:19 9:19 14:21 16:16 34:5 63:4
**fairly** 30:14 43:19
**familiar** 12:15 74:3 87:1
**family** 6:22
**FAX** 2:19
**February** 3:11 20:15
**feel** 29:16 60:16
**feeling** 89:17
**feelings** 51:11
**fell** 31:15
**felt** 53:18 66:12
**female** 45:5 77:2
**file** 85:15 92:18
**filed** 85:21 86:2,14
**files** 15:9
**filled** 17:5 52:9
**fine** 88:21
**finished** 95:4
**firm** 90:8
**firsthand** 58:2
**Fish** 2:5 4:18,20
**fix** 71:9
**fixed** 34:1
**floor** 2:16 74:3
**fluctuated** 36:19
**force** 29:13
**form** 88:3
**formal** 35:17
**forward** 65:7
**fourth** 42:13
**frame** 10:6 11:9 20:14 27:11
**frequently** 68:17
**friends** 14:6
**front** 52:12,18 55:6
**fulfill** 12:5
**fulfilled** 13:7
**fulfilling** 68:22
**full** 5:14
**fully** 64:12
**future** 5:22

G

**Gathering** 16:9
**gave** 18:16 82:16
**gcurrey@wcslaw.com** 2:20
**gear** 12:11
**Gene** 2:22 4:10
**generally** 39:19 40:5 68:16 88:5
**give** 47:3 52:7 80:18 87:7
**giving** 8:3
**good** 4:2 5:13 17:18 18:13,21 19:12 21:15 22:18 41:13 71:18 89:15
**government** 11:22 31:7

**great** 22:11
**greater** 19:12 22:17
**Greenbelt** 4:7
**Gregory** 2:14 4:21
**group** 10:16 36:2,14
**guess** 16:6,14 73:9 87:11,14

**H**

**hand** 5:3
**handbook** 36:9,10 81:4
**handed** 17:1 19:20 26:3 46:7 86:20
**hands** 79:2
**hands-on** 73:11,13
**hanging** 82:8
**happen** 34:7 70:4,6,8, 12,15
**happened** 30:11,17,18, 19 70:10,15
**harassment** 34:10 35:7,14 36:4,12
**head** 30:22
**heads** 61:16
**hear** 83:1 88:10
**heard** 49:21 50:4,8 51:7 55:10 56:17 58:5 60:14 71:19
**hearing** 50:14 65:9
**hearsay** 79:17
**held** 4:9 11:12 39:16, 17 45:11 69:4
**higher** 11:1
**honestly** 30:21 43:13
**hope** 6:1
**hour** 9:6
**hours** 74:1
**house** 52:12 55:6
**HR** 55:12,13 80:18 81:8 86:14
**human** 62:21 85:16,22 86:3
**hundred** 35:11,17 37:10 38:3 39:10 59:5 88:17

**I**

**I-N-D-E-X** 3:1
**identification** 16:19 19:18 25:21 46:5 86:18
**important** 8:10
**impression** 61:4
**improved** 80:7
**inappropriately** 24:15,20
**incident** 29:6 30:1 32:20 33:2,7,8,18 34:18,20 41:17,20 45:10
**incoming** 34:15
**indication** 82:17
**individuals** 84:2
**informal** 8:4
**information** 16:9
**informed** 57:3 72:9
**initiative** 22:14
**instance** 31:12
**insubordinate** 84:19
**insubordination** 62:6
**intending** 60:8
**intense** 44:18 53:22 61:12
**intent** 77:19
**interaction** 52:14
**international** 11:21
**interrupted** 66:1 84:8
**interviewed** 82:20
**interviewing** 83:2
**introduce** 60:8
**inventory** 18:13 21:4 31:9 32:12
**involved** 38:13,15 41:4 42:1 55:13 66:12 67:9 76:13 77:8 79:16 80:9 86:9
**involvement** 44:8 48:16 85:4 91:9
**involving** 34:18 41:17
**issue** 50:10 54:14,15, 16 56:12 60:1 61:7 64:9 66:18 67:3 75:3
**issues** 14:22 19:4 23:2,3 66:13

**J**

**Jaques** 4:12
**Jennings** 57:9 58:13, 22 59:1,2,3,6 75:4, 10 76:1,7 83:17
**job** 17:18 21:17,19 27:11,14 29:3 38:11 41:14 87:11,15
**judge** 60:17
**June** 3:16
**jury** 9:18

**K**

**kind** 16:12 46:19
**knock** 84:8
**knowledge** 18:12 48:17 58:3
**Kopsidas** 2:3,8 3:4 4:17 5:12 16:20 19:19 26:1 29:4 32:5 36:21 37:7 40:9,21 46:6 60:5,12 61:2,17 81:21 82:7 84:9,15 86:19 93:20 94:10, 15,19 95:1,3
**kopsidas@fr.com** 2:10

**L**

**L.L.P.** 2:15
**Larry** 27:10,19
**late** 23:17,18
**lateral** 39:21,22
**lawyer** 94:4
**lawyers** 15:11,14,15 90:22 91:17
**lead** 10:22 11:4,7,12, 20 31:17,19 32:11,14 42:3
**learn** 22:14 67:6 68:8 85:8
**learned** 50:1
**leave** 66:21 92:12 93:3,5
**leaving** 84:2
**led** 29:6 34:19 41:17, 21

**left** 14:7 30:20 37:8 41:16 76:11
**Legal** 4:11,13
**length** 23:20
**letting** 61:14 69:22
**limited** 23:17 79:9
**list** 31:9 87:17
**listening** 64:4
**Littleton** 83:9
**lived** 5:19
**located** 53:3
**logistics** 3:17 18:11 21:4 52:17 71:11
**long** 5:19 14:13 53:6
**longer** 13:17 40:15 55:14 76:10
**longevity** 21:20
**looked** 20:17
**lose** 62:22
**lot** 18:10
**lower** 11:1,3

**M**

**Maddie** 83:9
**made** 38:21 39:1 57:7, 19 86:4
**Maine** 2:6
**make** 9:13 50:22 52:10 58:20 94:1,7,12
**making** 18:14 32:11 92:17
**male-female** 78:18
**male-to-female** 48:21
**man** 45:3 69:13 83:11
**manage** 38:7
**management** 19:6 62:9 83:1
**manager** 3:17 10:14 11:2,5,7,9,12,15,18 13:9 14:17 15:3 17:6 27:3,13 28:4 31:18 32:17 36:13 38:17, 20,22 39:2,7 51:5 55:5 62:5,7 66:14 73:11 76:15,18 81:8
**manager's** 19:14 22:20
**managers** 36:13,16
**March** 4:10

**Maria** 5:15
**marked** 16:19 17:2 19:18,21 20:11 25:21 26:4 46:5,8 47:1 86:18,21
**Maryland** 2:17 4:7
**matter** 4:4 6:18,20 7:7 56:2 70:19,21 86:6
**means** 7:17 48:15
**Media** 82:1,5
**medical** 9:21
**meet** 15:11 45:4
**meeting** 34:21 35:5,9 42:2,7,9,10,13,14,21 43:3,15 44:6,11,13, 15,17,20,22 45:11, 16,18,21 46:2 48:6 49:4,11,20 50:2,17 51:7 52:1 53:13 54:8 55:17 56:4,15,18 58:8,17 61:5,21 63:5,15,16,18 64:8, 17,18 65:22 66:1,4, 8,17,20 67:2,11,20 68:3,12 69:3,4,17 70:2,17,21 72:20 75:14 76:14,19,21 77:20 78:1,7,12 79:21 80:4,20 82:11 83:4 88:22 89:4,5,7 90:1 91:20 92:10,16, 22
**meetings** 43:4,5,14,19 44:8 47:15 48:22 67:5,7,10,14 69:9 78:18,21,22 79:2,11 80:5 83:6 90:19
**member** 7:1 13:14,17 89:9
**members** 14:10 32:10
**mention** 34:3
**met** 12:21
**military** 69:13
**mills** 71:22
**mind-set** 60:4
**minute** 47:8 71:3 87:7
**miscellaneous** 3:14
**mm-hmm** 43:21 45:9 46:13 47:13 53:9 57:18 70:4 71:4 72:6,10 73:8 80:2

94:9
**moment** 25:19 26:2
**money** 40:20
**month** 43:11
**months** 14:20 20:22
**Moppins** 27:10,20 38:18,22 39:2 42:12 43:17,19 46:2 48:7 49:5 50:19 51:12,20, 21 52:2 53:15 54:4,9 55:1,4 57:3,22 58:9, 21 60:1 61:20 62:15 63:10,19 64:3 66:3, 9,17,21 67:19 68:13 69:9 72:8,18 73:11, 16,17,18 74:2 75:15, 20 76:7 77:4,16 78:10 79:4 82:12 92:18 93:2
**Moppins'** 50:18 53:19 61:7 73:1 75:3
**morning** 4:2 5:13 93:16
**move** 5:21 40:1 65:7
**moved** 13:20 40:19
**multiple** 39:17 46:16 88:15

**N**

**named** 86:15
**nature** 16:4
**necessarily** 21:1 23:19 24:4 40:19
**needed** 52:15 66:13,14 68:19,20,21 73:15 77:2,4
**negative** 23:2
**non-disciplinary** 79:8
**Northgate** 5:17
**Notary** 5:9
**note** 29:17 33:21
**noted** 23:3,5 24:4
**notes** 15:9 31:20 59:15 80:13
**NOV** 3:11
**November** 20:15
**number** 26:5 86:22
**numbers** 17:3 19:22 46:9,12,14,15

O

**oath** 5:5 7:15
**objecting** 40:12
**objection** 32:3 40:7 60:3,9,15,19 61:10
**obtained** 49:13 51:2
**occasions** 48:5
**October** 20:18
**one-on-one** 48:21
**one-page** 26:5
**open** 40:16 89:6
**operation** 18:11
**opinion** 29:8 73:12
**opportunity** 93:21
**Optional** 28:7
**order** 22:12 39:18
**orders** 12:5 13:7
**outlining** 87:20
**outstanding** 21:19
**oversee** 30:9 74:1
**overtime** 73:21

P

**P.C.** 2:5
**p.m.** 82:2,6 84:11,14 95:6,9
**paragraph** 48:5 49:3 51:10 57:2 72:7 74:22 75:1
**Parker** 4:4 12:16 18:7 24:14 25:1 26:12 30:20 31:15 33:7,13, 17 34:18 37:8 41:1, 17 42:2,11,20 43:16, 20 46:1 48:7 49:4,13 50:17 51:2,6,11 52:1 53:13 54:3,8 57:4, 12,14 59:3,4,9 61:5 63:18 66:21 67:10, 15,20 69:5 70:9 71:8 74:20 75:13 76:4 77:9,10 78:11 79:22 81:11 82:12 84:16,22 85:21 87:17 88:7,11 89:22 92:17
**Parker's** 15:1 17:6 21:10 58:15 62:1 66:9 73:1 74:15
80:11 83:7 84:5 89:2,15 92:6
**PARKER_000011** 3:15 46:10
**PARKER_51** 47:1 72:4
**part** 9:12 11:8 13:6 31:6 34:14 45:3,5 48:22 53:3 55:3 57:17 65:15 73:21 74:22
**Partially** 41:6
**participant** 48:10,14, 15 78:3
**participate** 48:18 71:22
**particulars** 44:18
**parties** 61:12
**party** 6:12 35:1,2 42:13
**Paul** 2:16
**pause** 84:12
**paying** 91:2,5
**peers** 19:6
**people** 30:12 32:1,14 39:12 40:4 53:22 54:15 64:13 73:6 76:19 89:17,20
**percent** 25:3,4 35:11, 17 37:10 38:3 39:10 42:12 59:5 88:17
**perception** 73:9
**performance** 3:9,11,16 15:1 17:4 18:21 19:8 20:2 21:15 22:4,10 23:9,13 24:5,10,12 29:10,17 33:21 34:4
**period** 10:13 13:11,13
**person** 71:21
**person's** 60:4
**personal** 40:14 55:12
**personnel** 72:17
**perspective** 73:1,5
**phone** 2:8,18 57:10 75:5,10
**Pickett** 27:21,22 28:1,5 43:17,22 44:3,5 51:4 57:12 63:12 73:16 76:13 77:9,12,15 78:3
**Pickett's** 73:14
**place** 79:14
**plaintiff** 2:2 4:4,18, 20 5:11 7:7
**plans** 5:21
**player** 22:12
**PM** 27:2
**PM's** 26:21 28:2
**point** 13:16 14:1 16:17 54:1 56:11 59:18 64:16 65:4,19 74:18,19 88:18
**points** 54:1
**policing** 12:11
**policy** 36:4 45:3,6 47:17 48:22 78:16 79:13 80:17,22 81:3
**position** 10:12,18 11:2,16,19 13:9,20 37:9,11,20 40:16 74:14,15
**positioning** 21:20
**positions** 11:11 39:15,17
**potential** 19:11 22:17
**precedes** 20:7
**prefer** 94:11
**preferred** 66:3,9
**prepare** 12:6 15:6,12 45:20 90:4,12
**present** 63:8 67:16 78:17 89:22 91:6
**press** 92:19
**pretty** 62:20 71:18
**previous** 78:12
**previously** 9:2
**Price** 81:7
**prior** 60:10,16 68:11
**privy** 55:15
**problem** 54:10 56:9
**procedures** 22:14 30:3
**proceedings** 38:14,15 84:12
**process** 31:8,9 62:13 80:8
**production** 46:14
**professional** 63:3
**professionally** 13:2
**proficiency** 17:18 21:17

**Program** 27:3,8,13 28:4 38:17 51:4 53:8 55:4 66:14 76:15,18
**progress** 18:10,15
**promised** 91:14,17
**promote** 41:5
**promoted** 14:14
**promotion** 14:8 19:12 22:17 37:14 38:6,9, 14 49:14
**promotions** 40:22 41:8 51:3
**protocols** 30:4 31:22 32:12
**proven** 41:14
**provide** 9:22
**Public** 5:9
**purpose** 49:11
**pursuant** 80:16
**put** 24:9 82:16

**Q**

**qualified** 40:17
**qualms** 54:17
**question** 8:14,17 28:13 45:13 61:1 86:11
**questions** 16:6,10,12, 15 21:21 22:13 93:7, 11
**quote** 21:19 22:11,21 66:5

**R**

**Raise** 5:3
**ran** 27:19,20 69:14
**rated** 17:18 21:15 22:7,16
**rating** 19:15
**RCSI** 21:20
**reached** 67:2
**reaction** 53:20 89:11, 13
**read** 17:21 47:4,8
**readers** 18:1
**reading** 29:7 95:11
**reads** 57:6
**ready** 90:9,22 94:21
**reason** 9:21 21:2 31:11 42:15,16 53:21 85:13
**reasoning** 61:13
**reasonings** 76:17
**reasons** 28:17,21 68:6
**recall** 7:3,13 13:15 14:13,15 16:14 25:1, 13,15,18 29:22 30:19 32:6 33:9,10,13,15, 19 34:9,12 35:7,11 36:12,14,15 37:22 42:9 43:8,9,13 44:3, 10,12 45:14 53:20 63:16 68:11 69:3,21 70:12 78:6,8,10,13 80:3 81:13 82:20 83:6 88:15,19,22 89:12,14,22 90:11 92:16,20
**received** 26:12
**recognize** 27:4
**recollection** 33:16 60:6
**recommend** 94:3
**record** 4:14,16 5:14 17:1,22 37:2,5 40:13 60:7 81:21 82:1,5 84:9,11,14 93:19 95:6
**recording** 60:11
**REEM000355** 3:18
**Reema** 4:5,22 10:7 12:19 13:2 15:15 24:21 34:10 35:13 36:3 41:18 55:9,17 85:16 91:9,14
**REEMA000353** 3:10 17:3
**REEMA000355** 86:22
**REEMA000357** 3:13
**REEMA000358** 3:12 19:22
**REEMA000857** 26:5
**Reeves** 38:3,4 39:8,9
**refer** 46:11
**reference** 57:7,20 74:10
**referred** 78:17
**referring** 46:15 89:16
**refers** 75:2
**refused** 78:14
**regularly** 30:15
**Regus** 4:9
**relate** 6:9
**related** 19:4 30:1 80:6
**relating** 57:11 75:6, 11
**relationship** 14:4,6 74:15
**released** 30:5 35:12
**remember** 13:11 16:13, 17 29:5 38:1 42:8,19 43:2,6 53:5 81:5 89:4
**remembered** 79:21
**repeat** 60:22
**repetitive** 24:11
**report** 27:17 37:19 79:5
**reported** 27:18,19 38:1 59:3
**reporter** 4:12 5:2,3 9:10 28:20 93:18
**reporting** 72:17
**Request** 31:4
**requested** 15:18 44:10,12 46:2 49:4
**required** 35:15 36:1 47:16 48:6,20 78:17
**requirement** 34:22
**requirements** 38:8 87:15
**reserved** 95:11
**resolution** 67:2
**Resources** 85:16,22 86:3
**respond** 55:1
**responded** 78:11,14
**response** 31:21 54:10 64:3
**responsibilities** 87:17
**responsibility** 18:19 19:12 22:6,17 30:7 31:15 32:1
**responsible** 19:2 32:11,13,14,16 88:7

**Reston** 5:18
**return** 91:15,18
**review** 9:11 15:8 16:22 20:2 21:13 22:21 23:19 24:1,13 26:3 47:12 90:17 93:22 94:11
**reviewing** 26:7 47:11 87:8
**reviews** 23:4,6,20
**Rice** 2:4,9 4:19
**Richardson** 2:5 4:18, 20
**role** 73:14
**roll** 11:20 12:2
**rolling** 31:7
**Romain** 74:12
**Romain's** 74:17
**room** 8:5 45:5 93:1
**routine** 17:8
**rule** 60:17
**ruled** 60:9
**rumor** 49:12,17,21 50:5,19 51:2 53:14 54:4,9,13,19 55:2,19 56:5,10,14,19 57:11 60:1 61:7 64:1,9,11 65:13,15 66:10,18 67:6 71:17,22 75:6, 12 76:8 77:8,16 82:12,13,19,21 83:2
**rumors** 75:19
**run-of-the-mill** 78:22 79:1

**S**

**S-P-E-A-R** 53:9
**safe** 71:18,20
**safety** 79:15
**Saint** 2:16
**sat** 34:20
**satisfaction** 61:9
**satisfactory** 65:9
**say/she** 79:18
**section** 18:7 52:9,12, 21
**sections** 53:1
**selected** 40:19
**send** 12:5
**sentence** 49:2,3 57:6, 17 72:11
**separate** 52:11
**September** 26:12
**Services** 4:5,22
**set** 52:8
**setting** 8:4 36:2,15 63:3
**severe** 23:13 24:4 29:9
**severity** 23:10
**sexual** 34:9 35:7,14
**shared** 53:2
**Shaun** 38:3,4
**ship** 11:21 12:2,6
**shipment** 30:4
**shipping** 12:9 31:4,7
**Shocked** 50:6
**short** 13:4
**shortcomings** 68:20
**showed** 69:22
**shown** 18:10
**shut** 59:18 61:15 62:1,4,10,14 70:1, 16,18,19 80:1
**shuts** 70:20,21
**sic** 18:12 59:3 73:16 93:1
**side** 59:13 92:6
**sides** 51:12,20,22 92:4,5
**siding** 52:3
**sign** 29:13,14 39:3,4 94:3,6
**signature** 17:14 20:11 26:21 27:4,6 28:3,7 87:4 93:18 94:6 95:11
**signed** 88:3
**sit** 48:6,20
**sitting** 8:6 45:14 85:11
**sixth** 57:2 72:7 75:1
**Skeen** 2:15
**sleeping** 51:3 57:12
**smart** 61:18
**socialized** 74:6
**sooner** 9:7
**sort** 6:20 11:1 12:9 16:12 17:8 23:1 31:21 39:20 46:16 47:17 48:16 58:17 62:16 72:1 75:19 79:10 87:17,20 92:18
**Sounds** 61:18
**source** 58:13,22
**speaking** 88:5
**speaks** 32:4
**SPEAR** 52:22 53:1,2,4, 5,9 59:6,7,10,12
**specialist** 4:11
**specific** 12:1 16:12 89:12
**specifically** 38:11 41:10,11 50:22 51:19 54:9 56:5 86:15
**specifics** 29:22
**speculation** 40:8 60:4
**spend** 73:18
**spoke** 59:1
**Square** 5:17
**squash** 53:16
**stand** 8:6 27:2 48:20 95:5
**standard** 88:1
**stands** 53:7
**start** 70:20
**started** 71:7
**starts** 72:8
**state** 4:15 5:14 12:4 48:4 49:16 60:15 62:2 69:1 75:1,3
**stated** 57:15 64:4 75:13 76:10 77:22
**statement** 36:4 47:6, 14 56:22 58:15 72:5 80:19 82:16
**states** 4:6 30:2
**stating** 77:10
**stay** 68:18
**step** 39:20
**stepped** 45:15,17
**stop** 55:20 80:7
**stopped** 44:17,20
**strange** 45:13
**Street** 2:16
**strict** 69:9

**strike** 77:13
**struggle** 18:4
**Struggled** 26:10
**subordinates** 84:17
**subpoenaed** 16:10
**Subsequent** 67:5
**substantive** 90:4
**Successful** 19:15 22:21
**suggestion** 19:3
**suit** 6:10,12
**Suite** 2:6
**supervised** 55:5 74:20 89:20
**supervising** 13:22 21:7 31:16 39:12 52:5 59:10,11
**supervision** 26:16 30:20 37:9,17 41:2, 16 42:21 87:18 89:18
**supervisor** 31:18,19 39:13 41:5 55:10 71:11
**supervisor's** 37:11
**Support** 4:11,13
**suspected** 50:9
**SW** 2:6
**swear** 5:2
**sworn** 5:9

**T**

**takes** 21:21
**taking** 51:12,20,22 65:17 95:9
**talk** 44:11 54:9 66:3, 9 76:7 79:5
**talked** 35:1 42:2 82:9
**talking** 16:1 71:10 72:7,22 78:19 79:20
**talks** 73:3
**tasks** 12:8 29:3 68:22
**team** 10:22 11:4,6,12, 20 12:7 13:6,14,17 14:7,11,14,16 22:12 28:18 31:17,19 32:2, 10,11,14 66:12 89:9
**telling** 90:11
**template** 87:14
**tension** 92:1
**tensions** 91:21 92:3
**terminate** 80:10
**terminated** 35:5,6 68:1,6 81:12 85:1, 12,14
**termination** 34:19 41:18,21 42:4 81:14
**terms** 18:19 22:6 31:14
**testified** 5:10 6:15
**testify** 6:20
**testimony** 8:5,10 9:14,17 10:1 91:15, 18 95:7
**thing** 17:9 29:1 55:12 62:21 92:2
**things** 12:9 51:22 87:20 88:6 94:2
**Thompson** 57:10 74:11, 12,20 75:5,10 76:1, 8,9
**time** 8:21 10:3,6,9 11:9 12:18 13:4,16 14:11,20 16:22 20:14 22:4 23:20 24:14 26:15 27:11 32:2 33:1,7 35:6,13 36:8, 11,18 37:2,6,21 39:8 41:15 42:21 43:19 49:8,16 50:14 51:17, 18 56:15 57:8 59:7 61:4 62:4 69:10 70:2 71:6,10 72:16 73:18 75:2 77:22 79:22 80:1 82:2,6 84:4,11, 14 88:3 89:11 91:2,8 93:6,8,16
**times** 6:7 21:12 23:17 35:14,20 41:5 73:20
**title** 27:14 74:17
**today** 4:12 7:15 8:22 9:9 10:1 15:6,12 45:15 48:1 85:11 91:3,6 93:13
**today's** 95:7
**told** 73:10
**tone** 63:19 78:11
**top** 30:21 68:18
**totally** 54:2
**touch** 15:14,16 84:1
**Tracea** 2:4 4:19
**training** 34:10 35:8, 14,18 36:6,11,12
**transcript** 9:11 93:22
**Transportation** 10:17 52:18 71:12
**trial** 7:9 60:8,13,16
**trice@fr.com** 2:11
**true** 42:18 50:12,13 56:22 65:7
**trust** 72:1 94:7
**truth** 7:18,20,21
**truthful** 8:11 10:1 47:20 94:13
**turn** 25:11,17 47:1
**turned** 25:4,7,13 29:12,14,16
**type** 74:18 79:10
**typos** 94:2

**U**

**U.S.** 4:11,13 12:4,6, 12
**ultimately** 32:13,16 34:19 41:17
**unaware** 49:17 82:13, 18
**unclear** 21:22
**understand** 8:3,11,13, 18 9:14 28:21 48:12 54:12 60:18 64:11, 13,14 65:6 75:9 86:10 87:9
**Understandable** 42:5
**understanding** 18:11 21:22 49:4,8 51:1 52:8 58:12 64:22 68:5 77:3,7 78:5 82:11 92:21
**understood** 8:18 49:12 52:19 57:21 69:2
**undertake** 36:1
**undertook** 35:8
**underwent** 35:19
**unfair** 55:19
**unfamiliar** 56:10,14
**Unit** 5:17 37:5 82:1,6
**United** 4:6

**unproductive** 92:11
**unsure** 44:16
**untrue** 42:19 75:17, 18,22
**upper** 62:9
**upset** 53:14
**upward** 18:15

**V**

**vaguely** 89:3
**Van** 18:7,10,13,14 19:1,3 21:19 22:11 76:3
**versa** 74:20
**versus** 21:4 64:22
**vice** 74:20
**video** 4:11 37:5
**videotape** 4:3
**Virginia** 5:18

**W**

**waive** 94:5
**waiving** 60:19
**walked** 59:20
**wallace** 3:3,8 4:3 5:7,13,15 16:18,21 17:2 19:17,20 20:8 21:14 25:20 26:2,4,9 33:1 46:4,7 47:7 82:8 86:17,20 93:1, 20 95:8
**wanted** 50:18
**warehouse** 13:21 27:20 30:5 37:12 38:2,8, 16,20,21 39:2,7,12 51:13 52:6,8,11,14 53:2,3 54:20 55:5 59:13 68:19 69:14 71:5,15,18 73:6,7,19 74:4,13 83:15,19 89:2
**warning** 3:13 26:12 28:10,13 31:21
**warnings** 88:11,20
**warrant** 29:9
**warranted** 23:12
**Washington** 2:7
**week** 73:22
**window** 14:18,19
**woman** 45:4 83:11,12
**women** 85:18
**word** 16:7
**words** 13:2 53:17
**work** 10:6 14:5 19:4,5 21:10 52:10 54:16 57:11 59:7 68:9 71:5,14 73:22 74:7, 13,14,18 75:6,11 78:22 79:1 80:6 83:21
**worked** 10:10 12:3 24:14 32:1,22 33:6 34:10 52:13 59:12 83:16 89:20
**worker** 22:11 41:13
**workers** 74:3
**working** 13:3 18:12 24:19 76:10 79:6 85:16 88:8
**workplace** 50:10
**works** 18:14 60:15
**world** 12:7,13
**worthy** 60:16
**Wright** 2:15
**write** 25:8,16 28:9, 13,16 81:6,11
**write-up** 34:4
**writing** 9:10 23:12 25:1 33:13
**written** 3:13 23:7,16, 18,22 24:3 25:10,14 26:11 28:9,13 31:21 32:8,19 33:1,8,11,22 88:11,19
**wrote** 17:22 18:6 19:1 47:14,19 49:9 51:22 64:6 80:14 87:12

**Y**

**year** 17:13 35:16,17 73:22
**years** 5:20 7:4,12 10:19

Exhibit 12

# Reema Consulting Services Inc.
# Sexual and Other Unlawful Harassment Investigation Report

Date(s); 04/18/2016 thru 05/17/2016
Issue Investigated: Inappropriate Conduct and Behavior of Managers
Participants: Evangeline Parker, Damarcus Pickett, Larry Moppins
Contract: DoS-ATA Location: Sterling, VA
Investigator: Cathy Price

1. HR was brought into an employee relations issue by Ms. Evangeline Parker came to the HR to complain about Mr. Larry Moppins and the meeting that they just had in regards to allegations made by employees; Manley Ferguson, Donald Gatling and Arnel Ragunton.
2. An employee staffing meeting was held on Friday, April 22, 2016, where Mr. Larry Moppins allow the employees to voice any concerns they had. The above employees mention the inappropriate conduct of supervisors (in general). After the staffing meeting, Mr. Moppins followed up individually with each employee. He was told by other employees (Mattie Littleton and Donte Jennings) that Ms. Parker has been disrespectful to subordinates and had approached each of them about an alleged rumor between her and Damarcus Pickett (her supervisor). She stated to each of the "if you want to know who I am fucking, ask me." Mr. Moppins then proceeded to investigate what rumor and Ms. Parker behavior and conduct with the employees. He inquired of the employees whether they told their supervisors. They said that Mr. Damarcus Pickett knew about the incident.
3. In speaking with Mr. Damarcus Pickett (Deputy Program Manager), Mr. Pickett agreed that they had come to him and he thought that he had handled the situation. Therefore, he felt no need to tell Mr. Moppins nor HR.
4. On April 25, 2016, Ms. Evangeline Parker was in a meeting with Mr. Moppins about being locked of a manager's meeting. Ms. Angela Wallace (Manager) was present. During the meeting, Ms. Evangeline Parker became irate and yelled at Mr. Moppins about her frustrations with him, including making an inappropriate comment about her and Mr. Damarcus Pickett having an affair. Ms. Wallace escorted Ms. Parker out of the office to regain her composure and to advise her that she had cross the line. Ms. Parker also told Mr. Moppins that she could sue him for Sexual harassment.
5. Mr. Moppins came to HR after the meeting between Ms. Parker and himself. HR informed him that her behavior was disrespectful and that she was insubordinate in her conduct. HR would give her a warning to correct and after that termination. In the second meeting to address her conduct, she accused Mr. Moppins in starting the rumor.
6. HR conducted an investigation. During this investigation, it became apparent that the rumor actually started with Ms. Evangeline Parker sharing with another employee (Angela Wallace) that she had feelings for her boss (Darmarcus Pickett). In addition, Ms.

Parker had told her close friend and former employee Romaine Thompson. From this, the rumor grew. It was told Donte Jenning who asked Damarcus Pickett and then Romaine Thompson also asked Damarcus Pickett. Mr. Pickett took it upon himself to tell Ms. Parker what was going on and this cause Mr. Parker to react.

7. During the investigation with Mr. Pickett, Mr. Pickett took it upon himself to contact the client and inform him of what had been transpiring in the last few weeks. He proceed to defame Mr. Jennings as the source of the issue. The client asked why Mr. Pickett did not report the issue Mr. Moppins or HR. He had no answer. In addition, Mr. Pickett also contacted Mr. Moppins' spouse to complain.
8. HR meet with Ms. Parker, Mr. Pickett and Mr. Moppins in an attempt to address all issue and cease further communication about he rumors. All parties were advised to cease from further communication, and if not disciplinary action would follow up to and including termination of employment. All agreed.
9. Since this meeting, I have employee Donte Jennings to file a formal complaint of harassment against Ms. Parker. She has been seen going to the SPEAR side antagonizing Mr. Jennings. When Mr. Jennings is speaking with other employees, Ms. Parker interrupts and cuts him off with body language and hand gestures. Kenton Birgans has witnessed such behavior from Ms. Parker.
10. Mr. Moppins has issued written warning for Ms. Parker and has told her to cease all communication with Mr. Jennings, as he does not report to her nor is he under the same contract. She was instructed not to go down to SPEAR. Ms. Parker has violated such instructions.
11. Mr. Moppins has requested a meeting with Mr. Vora.
12. 05/17/2016 Ms. Parker submitted a written rebuttal to Mr. Jennings claims. Meeting with Mr. Vora, Reema Vora, HR and Larry Moppins

## Recommendations:

1. Termination of employment for Evangeline Parker due to inappropriate behavior and misconduct (insubordination with superior).
2. Demotion of Damarcus Pickett under a performance improvement plan.
3. Sexual Harassment and Other Harassment Training
4. Staff Meeting to follow up.

Documentation:

1. Complaint forms for; Evangeline Parker, Donte Jennings and Larry Moppins
2. Written Disciplinary Actions for Evangeline Parker and Damarcus Pickett.
3. Supplemental documents.

Report date: 05/17/2016

## Cathy Price

**From:** Larry Moppins, Sr. <Larry.Moppins@RCSI-ATA.com>
**Sent:** Wednesday, April 27, 2016 1:42 PM
**To:** Cathy Price
**Subject:** RE: Request

Ms. Cathy,

In regards to your meeting today, I would like to interject the following statement:

In February of this year, I approached Mr. Pickett in regards to his lackluster work performance over the previous month or so, which was also notice by our client at the DOS/ATA.

> I ask Mr. Pickett behind closed doors what was his problem (completing tasks) and he stated that he was having personnel problems at home, for which I asked him, was his relationship with Evangeline Parker the reason behind his problems. He asked me what I meant by this and I asked him directly, was he sleeping with Ms. Parker cause I had been observing her spending long hours in his office for no apparent reasoning that I could ascertain and he answered no.

We did not speak on this matter again until the week of April 18th thru April 22nd when Mr. Ferguson informed me and Mr. Pickett of the rumor within the warehouse of a personal relationship between Ms. Parker and/or Mr. Pickett are myself.

Mr. Ferguson also advise me that Ms. Parker walked in one morning and after greeting him, stated that "if you want to know who I am fucking, ask me directly and I will tell you". He also informed me that Ms. Parker had approached Donte Jennings and Mattie Littleton about rumors circulating within the warehouse about whom she was sleeping with.

I asked Mr. Pickett to bring Mr. Jennings to my office so that this issue could be discussed to determine if Human Resources need to be informed. Mr. Jennings was reluctant to say anything until after I constantly urged him that now was the time to speak up if he had anything to say. He stated in front of both Mr. Pickett and myself that Ms. Parker approached him one morning upon entering the building and stated that "if you want to know who I am fucking, asked me and I will tell you". In addition, he stated that he had no idea of what she was talking about and ended the conversation.

After speaking with Mr. Jennings, I asked Mr. Pickett to bring in Ms. Littleton and her Manager (Angela Wallace) to discuss this issue. I asked Mrs. Littleton, had she been approached by Ms. Parker concerning a rumor concerning herself and she stated, yes. Mrs. Littleton stated that Ms. Parker confronted her about the rumor of whom she was sleeping with and she stated that she, Mrs. Littleton, promptly stopped her, and informed her she had no time for this type issues in the workplace and would not engage in farther conversation on this subject.

On April 22, 2016, upon Ms. Parker's arrival to the warehouse, she came into my office in an agitated state wanting to speak to me. I informed her that I was working on a project (Spear funding report) that I needed to complete and that I would speak her when I finished. Approximately, one hour later, she called me and asked could I speak with her now, and I informed her I was still busy. After another five minutes or so, I thought to myself that she was upset about something and called Ms. Parker back and instructed her to come to my office and bring with her Ms. Wallace.

Immediately upon arrival, she went into how she was locked out of the all-hands meetings (which she was five-to-ten minutes late for, outside in the car on her cellular phone) the day before and how it wasn't right that we had the meeting without her (even when she got in her car and drove away without informing anyone and never returned that day). How she did not appreciate me allowing staff members to talk about her during the staff meeting. That I should never have entertained their comments and that I did not have the managers back.

EXHIBIT 13

After several attempts to inform Ms. Parker that I had to list to all employees with any concerns or complaints that they may have, she only became louder and adamant that I was wrong for listening to them, especially to Donte Jennings.

It is important to interject that Mr. Jennings did not say anything in the all-hands meeting that even remotely connects to Ms. Parker. He only made the comment mentioned above, in a closed door meeting with Mr. Pickett and me. In addition, no one during the all-hands meeting even mentioned Ms. Parker's name.

Ms. Parker continued to be disrespectful throughout the meeting until Ms. Wallace intervene to state that she was wrong in her opinion that I should not speak with other employees.

On April 18, 2016, after speaking with the HR Manager (Ms. Cathy) on what had transpired on Friday (April 22, 2016), she advise me to inform Ms. Parker that her disrespectful manner would not be tolerated and this was her one and only warning. Upon attempting to convey this during the meeting with Ms. Parker, Mr. Pickett and Ms. Wallace present, she accused me of starting rumors about her and Mr. Pickett. I informed Ms. Parker that I was at a lost as to what she was speaking about and she informed that that I had asked Mr. Pickett if he and I was sleeping together.

I attempted to try an explain to Ms. Parker that as I am Mr. Pickett immediate supervisor and that I had reason for concern, I asked Mr. Pickett if he was having a relationship with her and which point the conversation became completely disrupted by Ms. Parker's agitated state.

Larry Moppins, Sr. | SME
Reema Consulting Services, Inc. | Contractor on behalf of U.S. Department of State
45055 Underwood Lane, Ste. 140 | Sterling, VA 20166 | United States
Direct: 703-657-0483 | Cell: 540-479-9245

**From:** Cathy Price [mailto:cathy.price@reemacsi.com]
**Sent:** Wednesday, April 27, 2016 11:40 AM
**To:** Larry Moppins, Sr. <Larry.Moppins@RCSI-ATA.com>
**Subject:** Request
**Importance:** High

Please send me your statement about the Parker issue for file. Just give me what you told me in the office today. You can do it via email.

**Cathy Price, SHRM-SCP, CPC, CDF**
HR Manager
Reema Consulting Services, Inc.
45055 Underwood Lane, Suite 140 | Sterling, VA 20166 | United States
Direct: 703-657-0551 | Fax: 571-313-8087
Hours: **Monday thru Friday | 10a.m. to 3p.m. EST**

*RCSI is committed to creating a diverse environment and is proud to be an equal opportunity employer. All qualified applicants will receive consideration for employment without regard to race, color, religion, gender, gender identity or expression, sexual orientation, national origin, genetics, disability, age, or veteran status.*

**CONFIDENTIALITY NOTICE:** This message and associated attachments are intended for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you are not the named recipient, please notify the sender immediately and do not disclose the contents to another person, use it for any purpose, or store/copy the information in any medium.

Exhibit 14

May 23, 2016

STATEMENT OF EVENTS FROM ANGELA WALLACE

There were two occasions where my presence was requested to sit in on a meeting with Mr. Moppins and Ms. Parker.

During the first meeting, I was witness, and not a participant, to a conversation between Mr. Moppins and Ms. Parker.

To my understanding, Ms. Parker requested the meeting with Mr. Moppins to discuss a rumor that had been circulating in the warehouse as to how Ms. Parker obtained her position. I was unaware of this rumor at the time. I was made aware, during the meeting, of the content of the rumor, which was that Ms. Parker must have been promoted because she is sleeping with Mr. Pickett or Mr. Moppins.

The conversation escalated when Ms. Parker tried to express her feelings in regards to Mr. Moppins taking sides with the employees of the warehouse. When asked by Mr. Moppins, how did she come to that conclusion, she stated your feeding into the rumor mill. Mr. Moppins stated that he had no notion of the rumor until it was brought to his attention that day.

April 25th

Ms. Parker told Mr. Moppins that she did not feel she had his support and he was choosing to listen to the warehouse employee's over her. Ms. Parker stated she felt he should be shutting those rumors down when approached by the warehouse workers. Mr. Moppins in turn told Ms. Parker, whether it was true or not, due to his position at RCSI, in all fairness he has to listen to everyone within the warehouse, not just the managers.

Mr. Moppins also informed Ms. Parker that this was not the problem at had that he had issue with. The current course of action was based on her attitude and demeanor in regards to her team in the warehouse and how she conducted herself. Complaints were made in reference to her behavior; no details were given at that time, except for the fact that Mr. Jennings and Ms. Thompson were having phone conversations outside of work relating to the rumor that Ms. Parker with sleeping with Mr. Pickett.

The conversation then began to escalate, and Mr. Moppins asked Ms. Parker to step out and get herself together and if she wanted to discuss this in a more rational tone, she could speak to him later.

The next meeting I was asked to sit in on involved Ms. Parker, Mr. Pickett, Mr. Moppins, and myself.

This meeting was a recap of the first meeting and Mr. Moppins notified Ms. Parker that the manner in which she spoke to him in the first meeting would not be tolerated. It was very disrespectful and out of line.

Ms. Parker apologized for her tone but not for her words. She still said Mr. Moppins was a contributor to the rumors and she thought he was not being professional in regards to this situation.

Mr. Moppins stated you are not listing to what being said. You are here because of your attitude, and the way you talk to your team and other is not acceptable, not because of a rumors. She stated again that he is unfair and has a part to play in the rumors.

At this point, the conversation seemed to be heading down the same path. Mr. Moppins asked her to leave the meeting so all could calm down.

5/23/14



EXHIBIT
15
30(b)(6) - REEMA
DEPOSITION EXHIBIT
30

**Cathy Price**

**From:** HR Support <hr@reemacsi.com>
**Sent:** Friday, March 4, 2016 11:01 AM
**To:** Cathy Price
**Subject:** RCSI-HR-DHS Positions Update

**DHS FILLED POSITIONS:**

1. **Receptionist-Bren Mar, VA**-Deandrea Cade is replacing Sharonne Byrd in this position. Deandrea is now going through her clearance process.
2. **Administrative Assistant II-Bren Mar, VA**-Tara Putnam is replacing Brittany Tallia in this position. Tara is now going through her clearance process.
3. **Administrative Assistant II-Bren Mar, VA**-Sarah Pollard is filling in for a new position under Mr. Mahron. Sarah is now going through her clearance process.
4. **Executive Assistant-Washington, DC**-Raquel Poindexter as of 03/04/2016 will be going through her pre-employment stage for new hire. Raquel will be replacing Michael Brown position.

**DHS OPEN POSITIONS:**

1. **Administrative Assistant II-Bren Mar, VA**-Patrick Chin replacement needed.
2. **Executive Assistant-Washington, DC**-Susan Hudson replacement needed.

**Cathy Price**

**From:** Larry Moppins, Sr. <Larry.Moppins@RCSI-ATA.com>
**Sent:** Monday, March 28, 2016 10:25 AM
**To:** 'Cathy Price'
**Cc:** HR Support; Damarcus Pickett; Carlos Carter
**Subject:** New Temp Hires

**Importance:** High

Ms. Cathy,

We are awaiting the contract modification for SPEAR to hire two new personnel (Donte Jennings & Rachelle Lee) as permanent hires.

Once Donte & Rachelle are transferred to SPEAR, two addition personnel will be needed to fill their positions within the ATA portion of the warehouse. We interview Mr. Lawrence James today as a potential candidate and accept him for the position of Shipping & Receiving Clerk, once the SPEAR modification is issued. Which leaves one remaining open position for a Shipping & Receiving Clerk.

Anticipated release date of contract modification is April 1, 2016.

Larry Moppins, Sr. | SME
Reema Consulting Services, Inc. | Contractor on behalf of U.S. Department of State
45055 Underwood Lane, Ste. 140 | Sterling, VA 20166 | United States
Direct: 703-657-0483 | Cell: 540-479-9245

DATE

PAGE

NOTES

Maryland UI
0051940490
FEIN - [redacted]

need rescind offer letter

Deandrea Cadet
last day work
3-29-16

tracy notified end of service
10-26-2015

Exit checklist need insurance through end of April.

Jullian - Temporary Employee

ATA/SPHERE
2 permanent $23.19
Matterial Coordinator supervisor
#22.03/hr SPEAP
Donte Jennings Supervisor

Clerk 3 ⇒ Rachelle Lee
18.74. stagger her

Blueline



DATE
4/18/16 Mon.
PAGE
NOTES
Payroll Additions
see Larry's email
Rachelle
in a car
accident
Temporary
Lunch
Donte Jennings
term SPEAR - ATA
reassignment
- demotion letter
- temporary letter
reassignment to Spear
full time
Rachelle - Spear
Mattie - S/R
Blueline



Regular Staff Mtg Warehouse
4/21/2016 W/Larry Moppins
Staff Meeting (04/21/16)
Malke = Sheba curami
- slave (feel like)
- I'm ur boss
- manley, arnee, donald
Rumors Warehouse
Shebaz on performance improvement plan
Larry said Vann that she should use a sheet
Donald - emailed sheet
they in charge
How he gets (still sat)
Jason => Arnel
Vann = I'm in charge
Vann => Manley
personal comment
personal dislike
Romaine => rumor
"If you want to know who I'm F..ing ask me"
Angela/Vann meet w/Larry
Donte => Vann asked him about the rumor
Jennings - donte exposing himself to Vann to Romaine
Vann. Sheba, Donte, Manley, Romaine, Malke
Sexuality Harassment Training
Manager / Staff
=> May 2nd



4/25/16

Evangeline Parker

complaint on Larry

Thursday - 10 am

meeting Larry slam door in her face due to her being female. Open door for DaMarcus but closed door on her

Larry took from the meeting to speak w/ staff. Evangeline wasn't @ meeting

during meet Jennings/Romaine Jason/Kathleen Evangeline/DaMarcus

2 people absent meeting and the meeting continue

DaMarcus & Her are friendly

Larry made a joke too. "You're sure your wife got beauty"

Dorle starting rumors. If there are anything you want to know about me

meeting w/ Larry

- her confronting Dorle

I can't do thing for you.

→ she was irate w/ Larry

- nasty rumor

- promoted

→ she repeated that to him in angry

→ she apologized to

4/25/16 → DaMarcus / Angela

Larry meeting did not go well you will not show one up

Hearing - Dorle approach DaMarcus Mr. Larry

DaMarcus brought it to my attention

Blueline

DATE

PAGE

Evangeline Damaus

NOTES

hostile work environment

(l) the man w/ power is threatening me

Did you ever had any intimate or sexual contact with D.P.? No - direct eye contact smile

Did you or have you ever seen D.P. outside of work? Yes but in a group setting

Did you ever have any intimate contact with D.P.? NO - deal eye contact smily

Have you seen each other outside of work in a nongroup setting?

Have you and van ever engage in any intimate contact?

Have you and Van ever had any intimate or sexual contact?

- connect on mental level

[illegible]

that behavior reactionary is what cause this to get to this level.

Blueline



DATE
PAGE
Evangeline / DaMarcus
Additional Notes
NOTES
DaMarcus was hot about the meeting
① got caught with Vann and that's
why you divorce
Romaine called same day
② I heard you and Vann got something
Vann got it from phone call with DaMarcus
DaMarcus → told Vann about the rumor to let her know what is going on
to DaMarcus
Vann confessed
She like him or type of people. She thought Angel said it
Key Players
?
RT
FW
MF
Vann
Boss
Rachel
W
N.K.
W
Larry closed the door on here.
Rachel - told her they were bad mouthing her in the meeting
Blueline

4/22/14
Peace Maker
Conflict Resolution
Prayer
1. Ground rules – Principles
2. Why this meeting
1. Glorify God
2. Get the log out of your own eye
3. Gently restore
4. Go and be reconciled
Focus on Mission Work
Personal/Professional boundary
are attached to your principles
Keep God first
1. Principles
people make mistakes
even ourselves - no one is perfect
we will
expect the best of others
and when they
make we allow for grace.
we agree to be mature and professional
African Americans
Are you willing to forgive?
- Rebuild trust
- Rebuild relationship
Intent
What made you do it?
Is my heart holding secretly resentment
Are we on the same page.
truthfully
5 We believe in there is a greater spirit that works through us.
Blueline

DATE
4/29/16
HR -
PAGE
NOTES
HR
Time sheets
w/ Dr's note
Payroll Alert
Employee Handbook
PPT for Training
- Monday ATA/SDEAL
- Thursday DHS
Review
Blueline
Rachel
W
Nikki
W
CW

DATE 5/1/16

Donte Jenning Compliant
Vann & DaMarcus

NOTES

Feb- Vahn approach Donte about come to ATA.

& Vann mentioned the rumor to him when she got promoted mon 2-weeks ago

If you want to know who I'm fucking as me. Don't ask Romaine

He Ask Romaine - she asking everybody. She don't know who said what.

Donte
He went to DaMarcus about Vann. DaMarcus said I will handle it. → meet in office w/ Lanay

Did you approached DaMarcus? Yes, I did

Donald and Manley overheard

(Gossip ⇒ exposure)

Blueline

DATE
PAGE
NOTES
TAPS — 8-20-16
Training @ employer site
Mark Ellison
mark.ellison@eeoc.gov
Maria Morocco, maria.morocco@eeoc.gov
Mindy Weinstein
mindy.weinstein@eeoc.g
Blueline



DATE
5/12/16
Lavon
Donte' Jenning
Notes
PAGE
NOTES
9:30-9:45 Manley, Kenton,
thanking Donald - @ table
Manley for in front of
removed trash for him the hut
• HR - Monday 5/21
Vonn - standing there
staring at Donte'
• Kenton
mouthing off talking
witnessed this
to Shebe - talking
to Donte. She overtalks
• sent long email
Donte'
She is antagonize him
to DaMarcus
to say something to her
She constantly come to SPEAK area
Who did you tell anyone about
the harassment? HR
How would you like to see
the situation resolved?
→ treat me w/ respect
Blueline



DATE 5/23/16 MON
HR To Do List
Damarcus' Demotion
NOTES
Meeting w/Larry
Meeting w/Damarcus
Damarcus:
Attendance issue
Why I was written up?
Will staff change attitude?
Building Trust =>
• Attendence
• Adminstrative Rights
• change WISE/System
• vault = ammunition
IT Software:
Remote-in (Admin)
WISE (Internally) offline
delete features
48 hour
2 Vendor
90-days
Infinity
PAWNL
Be Open to the change
2. Ready to be teachable
3 Be Willing
4. Be able to listen
Damarcus
DaMarcus Response
demeanor => defensive
marked up paper.
W
NIKKI
W
(LM)



DATE
PAGE
NOTES
DaMarcus
His personal life has been used against him, his job has not been affected
- I'm been interactive: yes
Jan 4 — my situation started in March.
Last month I've been:
- excluded from meeting
- treated differently
I've had job offers
5 months of observation
- stop holding hands
① => Varron/Dante (report incident)
② => Absence =>
Manager's perception
He will seek a new job.
Larry
① Be Accountable for all managers
② Personal over Professional
Blueline



## Cathy Price

**From:** Larry Moppins, Sr. <Larry.Moppins@RCSI-ATA.com>
**Sent:** Tuesday, May 31, 2016 1:16 PM
**To:** 'Rajesh Vora'; 'Reema Vora'
**Cc:** 'Cathy Price'
**Subject:** Donte Jennings

Good afternoon Mr. Vora,

Mr. Jennings was hospitalized last week due to serious blood pressure issues where he was force to leave the work area due to severe noise bleeding.

He has inquired if RCSI could advance him the three days' vacation needed to cover his time missed from work last week.

Larry Moppins, Sr. | SME
Reema Consulting Services, Inc. | Contractor on behalf of U.S. Department of State
45055 Underwood Lane, Ste. 140 | Sterling, VA 20166 | United States
Direct: 703-657-0483 | Cell: 540-479-9245

DISCLAIMER NOTICE: The information contained in this e-mail communication and any attached documentation may be privileged, confidential or otherwise protected from disclosure and is intended only for the use of the designated recipient(s).It is not intended for transmission to, or receipt by, any unauthorized person. The use, distribution, transmittal or re-transmittal by an unintended recipient of this communication is strictly prohibited without our express approval in writing or by e-mail. If you



**Cathy Price**

**From:** HR Support <hr@reemacsi.com>
**Sent:** Monday, June 13, 2016 10:26 AM
**To:** Cathy Price
**Subject:** RCSI-HR PAYROLL ALERT UPDATES June 1-15 2016

FYI:

1. **Brett S. Roberts (NEW HIRE)**-ATA-Temporary Shipping and Receiving Clerk, Effective Date: June 2, 2016, Employee ID #310

2. **Sandrea R. Harding (NEW HIRE)**-DHS-Administrative Assistant II in Alexandria, VA location, Effective Date: June 6, 2016, Employee ID#311

3. **Brandi N. Winston (FULL-TIME EMPLOYEE)**-ATA-Switched over from temporary to permanent employee, Effective Date: June 1, 2016 Employee ID #308

4. **Donald Gatling (Updated Direct Deposit Form)**-ATA-Reminder to send to jean this payroll period. Employee ID #294

*****No more additional changes I am aware of at this time*****

**Exhibit 16**

# Reema Consulting Services Inc.
# Sexual and Other Unlawful Harassment Investigation Questionnaire

## 1. Complainant/Reporter Information

| | | |
|---|---|---|
| **Name: Evangeline Parker** | **Contract/Department:** ATA | **Date of Interview:** |
| **Location: Sterling, VA** | **Direct Supervisor: Larry Moppins** | **Position Title: Logistic Manager** |
| **Home Phone:** | **Work Phone:** | **Email** |
| **Compliant Against: Larry Moppins** | **When: Monday, 04/25/2016** | **Filed With: HR, Cathy Price** |

2. **How are you or were you made aware of the alleged harassment/ retaliation/ discrimination happen directly to me.**
3. **What category(ies) does this claim fall under?:** *Check all that apply (√)*

- ☐ Bullying
- ☐ Cyber bullying
- ☐ Gender Discrimination
- ☐ Gender Inequity
- ☐ Sexual Harassment
- ☐ Sexual Assault
- ☒ Hostile Work Environment
- ☐ Sexual Misconduct
- ☐ Stalking
- ☐ Rape
- ☒ Retaliation
- ☐ Relationship Violence
- ☐ Defamation of Character

**4. Please describe the specific act(s) alleged harassment/retaliation/discrimination.**
*If addition space is needed, you may write on the reverse side of this form or attach a separate sheet(s):*

1. According to Miss. Parker, A manager's meeting was held on Thursday, April 21, 2016 for which she was late due to an emergency phone call. When she attempted to enter the meeting behind Mr. DaMarcus Pickett, Mr. Moppins open the door for DaMarcus and closed it in her face.
2. In addition, there is a rumor going around the workplace that she and Mr. Pickett are allegedly having an affair. She was told by Mr. Pickett that Mr. Moppins made a comment to him "is that why your marriage and performance is suffering? Because you are F%%##(@ Mr. Parker." *(HR NOTE: hearsay-Ms. Parker did not hear Mr. Moppins make that statement directly)*
3. A general staffing meeting was held on Friday, April 22, 2016. In the staffing meeting some employee complained about Ms. Parker's behavior. After the meeting, Mr. Moppin had a meeting with each of the individuals. As a result of the meetings, Mr. Moppins called Ms. Parker into the office with (DaMarcus Pickett and Angela Wallace) to address what the employees had said. Three employees (Donte Jennings, Manley Ferguson, Arnel Ragunton) told Mr. Moppins that Ms.

# Reema Consulting Services Inc.
# Sexual and Other Unlawful Harassment
# Investigation Questionnaire

Parker approached them and stated " if you want to know who I am f&*%#@ come ask me directly" (direct quote from Ms. Parker). In addition, her supervisor behavior has been demeaning (i.e. threatening their jobs, and telling them that she is boss and you do what I tell you). Ms. Parker said she felt irate and angry during the meeting because she felt that Mr. Moppins was attacking or blaming her for defending herself.

- She admitted that spoke disrespectfully to Mr. Moppins but she was trying to defend herself. She said that she apologized.
- She admitted that she did approach the accusing employees but she did not use the words that they claim.

Ms. Parker feels that Mr. Jennings is the source of the rumor that go started. Ms. Parker feels that the male employees do not respect or like her; and that they are trying to get her removed or fired.

4. Because she felt unfairly treated, Ms. Parker decided to file this complaint with HR. Ms. Parker then proceeded to share that others are "hooking-up" in the warehouse such as Jason Rogers (supervisor) and former employee Kathleen Davis; Donte Jennings and former employee and supervisor Romaine Thompson. Ms. Parker also stated that last year around November or December, prior to her promotion as Assistant Warehouse Manager, she and the former employee and supervisor Romaine Thompson was flashed by Donte Jennings in the breakroom. *(HR NOTE: This information could not be validated as Ms. Thompson termed 08/24/2015 and Mr. Jennings didn't start RCSI until 02/09/16. Therefore, the timeline does not lineup.)*

5. **Did you report the alleged incident(s) to your immediate supervisor or above?** ☐ **Yes** ☒ **No**

*If "Yes" please provide the name(s), relationship to you, and telephone number of whomever you spoke to:*

"No, since it was with Mr. Moppins, I wanted to bring it directly to HR."-- Ms. Parker

6. **Are there others who have witnessed or experienced the same behavior by the individual named above?** ☐ **Yes** ☐ **No** (*If so, please provide their name(s),* indicate if witness and provide a contact number(s)).

**Statement #1:** no witness saw the door slam in her face by Mr. Moppins
**Statement #2:** see statement by Mr. Moppins (attached)
**Statement #3:** This was verified by interviewing Mr. Pickett and Ms. Wallace who were present during the meeting the manager's meeting and the one-on-one with Ms. Parker and Mr. Moppins.
**Statement #4**: HR further investigated this claim with Mr. Jennings who adamantly disagrees that the alleged event did not take place. Ms. Thompson is no longer an employee with RCSI. However, Mr. Jennings was given a verbal warning about RCSI's sexual harassment policy and zero tolerance for such behavior.

# Reema Consulting Services Inc.
# Sexual and Other Unlawful Harassment Investigation Questionnaire

7. **Were there any witnesses to this specific event? ☒ Yes ☐ No** *(If yes, please provide their names, relationship to you and telephone numbers)*

| | Name | Relationship | Company | Telephone |
|---|---|---|---|---|
| 1. | Angela Wallace | Co-Worker | RCSI | 703-862-0585 |
| 2. | Kenton Birgans | employee | RCSI | 703-593-0785 |
| 3. | Manley Ferguson | employee | RCSI | 703-904-9277 |
| 4. | DaMarcus Pickett | Deputy PM | RCSI | 301-516--3621 |

# Reema Consulting Services Inc.
# Sexual and Other Unlawful Harassment
# Investigation Questionnaire

8. **Did you take any action(s) in an attempt to stop the harassment?** ☒**Yes** ☐ **No**
*Please explain your answer.*

9. **How has the alleged harassment/ retaliation/ discrimination affected you?**

It makes me fearful about my job. That Mr. Moppins will hinder my ability to advance in the company.

**Additional Information**

N/A

# Reema Consulting Services Inc.
# Sexual and Other Unlawful Harassment
# Investigation Questionnaire

I understand that submission of this form grants the Investigating Officer my permission to conduct a full investigation of the above complaint. This investigation may involve review of confidential documents and interviews with relevant persons, including company employees and other witnesses. I hereby certify that the information I have provided in this complaint is true, correct and complete to the best of my knowledge.

**Complainant:**

______________________________
Printed Name

______________________________ ______/______/______
Signature Date

**Interviewer/Investigator:**

______________________________ ______________________
Interviewer Printed Name Title

______________________________ ______/______/______
Interviewer Signature Date Received

***Please return this form to Human Resources, immediately.***

Exhibit 17

Gmail by Google

Cathy Price <cathy.price@reemacsi.com>

# FW: Recent Events ***DO NOT REPLY TO THIS EMAIL***

1 message

**Cathy Price** <cathy.price@reemacsi.com> Mon, Apr 25, 2016 at 2:23 PM
To: Evangeline Parker <eparker@rcsi-ata.com>

sorry wrong email

Exhibit #5

**From:** Cathy Price [mailto:cathy.price@reemacsi.com]
**Sent:** Monday, April 25, 2016 1:17 PM
**To:** 'Damarcus Pickett' <DaMarcus.Pickett@RCSI-ATA.com>; 'evangeline.parker@rcsi-ata.com' <evangeline.parker@rcsi-ata.com>; 'Angela Wallace' <Angela.Wallace@RCSI-ATA.com>
**Cc:** 'Larry Moppins, Sr.' <LarryMoppins@RCSI-ATA.com>
**Subject:** Recent Events ***DO NOT REPLY TO THIS EMAIL***
**Importance:** High

Due to recent events that have brought to HR's attention in regards to workplace gossip and rumors.

I am advising all parties on this email to cease having or entertaining this subject outside of HR. If I have not sat with you to hear your version, please come see independently. I will take information from all side and issue a final resolution. Also, I would like to advise individual about our workplace code of conduct and sexual harassment policies (review policy manual). Gossip is an ugly thing that can cause defamation of ones character and create a hostile work environment. I understand emotions are high and the natural reaction is to defend oneself. But that is not the best approach. If you have something to add to or want to share, please direct all conversation to me, ONLY.

Otherwise, there will be no discussion of this issue outside of HR. Not to employees, co-worker, supervisor, etc. Let's focus and return to the mission work at hand.

I appreciate your professionalism. I hope to bring healing and a fair resolution to issue.

Thanks!

**Cathy Price, SHRM-SCP, CPS, CDF**
HR Manager

Reema Consulting Services, Inc.

45055 Underwood Lane, Suite 140 | Sterling, VA 20166 | United States

Direct: 703-657-0551 | Fax: 571-313-8087

Hours: **Monday thru Friday |10a.m. to 3p.m. EST**

Exhibit 18

Exhibit #6

MEMORANDUM FOR RECORD

Date: May 12, 2016

Subject: Notification of Hostile Work Environment

Re: Interaction between Evangeline Parker and Donte Jennings

On May 2, 2016 I was called to the Human Resources Office and informed that Evangeline P[illegible] filed a sexual harassment complaint against me; claiming that I had started a rumor about he[illegible] I had shown her a body part. Though these claims were unfounded, I was instructed to take t[illegible] company sexual harassment training and complete the associated exam. I took the training a[illegible] completed and passed the exam.

Since the time I was made aware of the complaint, Ms. Parker has been creating an uncomfo[illegible] work environment for me. She has been making facial expressions, smirking and starring m[illegible] she passes me, making shooing off hand gestures as I'm walking away from conversing with [illegible] employees, and cutting me off during my conversations with other employees. According to [illegible] hostile work environment section of the sexual harassment training and guidance, these type[illegible] interactions are illegal in the workplace and employees should not be subject to hostile treat[illegible] complaints have been filed.

I consider Ms. Parkers interaction with me to be offensive and is ridiculing and mocking. H[illegible] interactions are interfering with my work performance, as I need to maintain a good working [illegible] and working respect from my peers, subordinates and supervisors. Her actions are in direct [illegible] of Title VII of the Civil Rights Act of 1964.

This memorandum serves as notification to REEMA Consulting Services, Inc. management [illegible] actions are occurring.

Donte Jennings
Warehouse Specialist/Clerk Supervisor
Office of Antiterrorism, Department of State
REEMA Consulting Services, Inc.

[signature] 5/12/2016

**Exhibit 19**

16-May-2016

On 13-May-16, I Carlos Carter was witness to a statement given by Mr. Kenton Birgans.

Mr. Moppins asked Mr. Birgans, had he witness an incident between Donte Jennings and Evangeline Parker.

Mr. Birgans did not want say anything about the situation. He wanted to stay out of the situation. Mr. Birgans said that he and Van were standing in the receiving area when Donte came up to thank Mr. Birgans for finishing a task that he asked him (Kenton) to assist him with. Kenton said that as Donte was walking away when Van made negative facial expressions and body movements towards Donte.

Kenton could not understand why she would make these body movement like that. He said that it was like she trying to chastise him, or belittle him.

To me, it sounded like Van had issues with Donte and this was her way to show it without saying what the real problem actually was.

Carlos Carter Sr.
Sr, Operations Manager

Exhibit #4

REEMA CONSULTING SERVICES, I

**Written Warning**

Employee: Evangeline Parker

Date: May 16, 2016

Supervisor: Larry Moppins

Location: On-Site

**The purpose of this written warning is to once again bring to your attention ongoing deficiencies in your conduct and/or performance. The intent is to define for you the seriousness of the situation so that you make take immediate corrective action. This written warning will be placed in your personnel file.**

**REASON FOR WARNING:** Poor management performance, abuse of managerial authority, explicit use of profanity when questioning employees, insubordination, and workplace misconduct

Ms. Parker, it has been brought to my attention by members of your direct staff that you have been subjecting them to unprofessional behavior on your behalf after an all-hands meeting conducted in April 2016 in which employees disclosed concerns.

Mr. Arnel Ragunton stated that you constantly remind him of who is in charge to the point where he feels that he is a slave. After the original announcement of your new position, there is no other need/requirement to announce any further mention of who is in-charge, unless you are attempting to belittle your subordinate.

Mr. Donald Gatling stated the same as Mr. Ragunton.

Mr. Manley Ferguson has stated similar concerns as well. However, his main concern is that you approached him one morning stating that, "If you want to know who I am fucking, ask me and I will tell you." Mr. Ferguson stated that he had no idea of what you were talking about at the time. In addition, he informed me that you then went to Mr. Donte Jennings and Ms. Mattie Littleton asking the same question.

After Mr. Pickett and I spoke to Mr. Jennings, who initially had no comment, Mr. Jennings confirmed that you approached him one morning and asked the following,
"Good morning, if you want to know who I am fucking, ask me and I will tell." He stated that he had no idea if what you were speaking on.

I also spoke with Ms. Mattie Littleton and she informed me that you also attempted to question her about the rumor of who you were sleeping with, however, she immediately cut you off and informed you that she knew nothing of what you were speaking about and resented the fact that you were conducting yourself at work in this manner.

Prior to my original at[illegible]pt to counsel you on your behavior, you came to my office in an agitated manner, saying that you wanted to speak to me but I informed you that I was busy. An hour later, you calledto ask if was I ready to speak with you and again I informed you that I was unable to speak due to having to complete a report for the Client.

After the last attemptto speak to me, I realize it was best to speak with you now and get the situation over, so I caled you upfront and instructed you to bring Ms. Wallace with you to my office.

Immediately in our conversation, you started ranting about how I was wrong to allow the employees to talk about you like that in the meeting; that I did not have the managers' backs; that I should have never spoken to the employees; and how Donte Jennings was wrong talking about you when he exposed himself in the breakroom a year ago.

This meeting ended abruptly as it started, because you were in such agitated state, you were not hearing anythingI had to say.

Upon attempting to counsel you again on Monday, you once again begin ranting about how I allowed the employees to talk about you and that I was wrong for asking DaMarcus to disclose if he was having an affair with you. You were going to press charges of sexual harassment against me for spreading untrue rumors about you and DaMarcus. You became so emotional that Ms. Wallace hadto escort you from the conference room.

I informed the on-site Human Resources Manager of employee statements, allegations which were investigated, and your behavior towards me.

**CORRECTIVE ACTION REQUIRED:** Termination of employment. Ms. Parker, your disrespectful behavior on your behalf is unprofessional and not condoned by Reema Consulting Services, Inc. At no time should you have approached any employee with this type inquiry. The disrespect that you show whenyou address a Supervisor cannot and will not be tolerated.

**EMPLOYEE'S COMMENTS** Ms Wallace was the only witness to the accusations that MR Moppins has stated in this counseling. There is a written comment from everyone but her. MR Pickett was also a witness to majority of what transpired between MR. Moppins and myself yet there's no statement from him either. Majority of what I'm being accused of is false. I will not sign this Counseling.

**The above has been discussed with me by my supervisor. I understand the contents and acknowledge and understand the corrective action required. I also acknowledge and understand the potential consequences of non-compliance.**

Employee's Signature ______________ Date: ______________

PM's Signature [signature] Date: 5-18-16

Alt. PM's Signature ______________ Date: ______________

Witness' (Optional) Signature ______________ Date: ______________

Exhibit 21

J.R. 000585

REEMA CONSULTING SERVICES, INC.

**Written Warning**

Employee: Evangeline Parker

Date: May 16, 2016

Supervisor: Larry Moppins

Location: On-Site

**The purpose of this written warning is to once again bring to your attention ongoing deficiencies in your conduct and/or performance. The intent is to define for you the seriousness of the situation so that you make take immediate corrective action. This written warning will be placed in your personnel file.**

**REASON FOR WARNING:** Failure to follow Instructions from the Program Manager

Ms. Parker, you were given specific instructions from the Program Manager of RCSI to not mistreat and not to visit the work areas of subordinate employees who you named in a harassment complaint that you filed with HR.

On May 12, 2016, I received a letter from Donte Jennings stating that you had been acting in an unprofessional manner towards him. When he was attempting to thank his co-workers for providing assistance in a task he was assigned, you begin making inappropriate gestures and facial expressions about him for no apparent reason.

Upon speaking with Mr. Jennings on his letter, he informed me that Mr. Kenton Birgans had witnessed one of the exchanges between Mr. Jennings and you.

Carlos Carter and I spoke with Mr. Birgans in regards to this encounter and he verified that you made inappropriate gestures and expressions to Mr. Jennings without any prior engagement or interaction by Mr. Jennings. Mr. Birgans felt that you disrespected Mr. Jennings and there was no reasoning for this action. Mr. Jennings did not reply to anything you did, he just walked on to his work area.

**CORRECTIVE ACTION REQUIRED:** Termination of employment. Ms. Parker, this type behavior on your behalf is unprofessional and not condoned by Reema Consulting Services, Inc.

**EMPLOYEE'S COMMENTS:** All the accusations in this Written Warning is completely false. I am absolutely sure MR. Brgans had none of these things to say.

**The above has been discussed with me by my supervisor. I understand the contents and acknowledge and understand the corrective action required. I also acknowledge and understand the potential consequences of non-compliance.**

Employee's Signature ______________________ Date: ______________

PM's Signature [signature] Date: 5-18-16

Alt. PM's Signature ______________________ Date: ______________

Witness' (Optional) Signature ______________________ Date: ______________



8106 Hallmark Place | Gaithersburg, MD 20879
Phone: 443-303-3630 • Fax: 410-676-2304

# MEMORANDUM

## Official Separation of Employment Notice

***PRIVATE AND CONFIDENTIAL***

DATE: May 18, 2016

TO:

Evangeline Parker (#278)
5829 Fisher Rd. #12
Temple Hills, MD 20748
eparker@rcsiata.com

FROM: Reema Consulting Services Inc. (RCSI)
Human Resources Department

Re: **Official Separation of Employment Notice**

Dear Ms. Parker,

The purpose of this letter is to notify you that your employment with Reema Consulting Services Inc. (RCSI) has been terminated effective **immediately- May 18, 2016**.

**The reason for this discharge is:** *(select at least one)*

☑ **Involuntary**

- ☐ Termination during introductory period
- ☒ **Inadequate work performance and or productivity** *(Managerial/Supervisory)*
- ☐ Poor attendance and or excessive tardiness
- X **Violation of company policy and or work rules** *(Section 1000-RCSI Rules and Regulations-Employee Conduct)*
- ☐ Willful misconduct and or malicious misconduct *(e.g. falsification of records, misrepresentation, theft, violence, etc.)*
- ☐ Layoff / Reduction-in-Force
- ☐ Furlough
- ☐ Other

☐ **Voluntary**

- ☐ Mutual Resignation
- ☐ Resignation with notice
- ☐ Resignation without notice

During a recent investigation of numerous complaints, by your subordinates, in regards to inappropriate behavior and conduct in the workplace by a manager. RCSI has gathered sufficient evidence to support our decision to terminate employment. It is our responsibility to ensure that all employees are treated with a level of respect from their immediate supervisors and or managers in the work environment. In addition, you have failed to follow verbal and written directives issued to you by RCSI management, including Human Resources. As a result, this matter has continued to interrupt workplace productivity and culture and your work performance as manager is unsatisfactory.

The following data outlines your benefit information which will be covered in detail in a separate document the "**Exit Checkout" form, where applicable, which you should receive with this notice.**

- Compensation accrued since last pay period

- Pay for unused vacation or sick leave, if applicable
- Medical/Dental/Vision coverage, limitations, or options to continue coverage
- Retirement Plan, if applicable
- Life Insurance continuation
- Unemployment Compensation, if available

**Eligibility for Rehire:**

In alignment with our company policy, you ☐ will ☒ **will not** be eligible for rehire under this contract and or within the company.

**Verification of Employment:**
All request for employment verification will be directed to Human Resources. All such inquires will be limited to verification of date of hire, date of termination, and job title.

**Items to Return to Company/Client:**
Please be sure to return all keys, credit card (if applicable), and any additional property belonging to client and or RCSI.

**Address Changes:**
Please confirm that the above address is accurate, as any further correspondence from the Company will be sent via mail to that address. Notify me via email at cathy.price@reemacsi.com should your address change.

Any and all future business related correspondence with Reema Consulting Services Inc. (RCSI) shall be directed exclusively to, (Cathy Price – HR Manager), using the below contact information. HR will ensure that the information is then routed to the correct party within the company.

I wish you well in your future endeavors,

Sincerely,

Cathy A. Price

Cathy Price
Human Resources Manager
Reema Consulting Services, Inc. (RCSI)
Email: cathy.price@reemacsi.com
Direct Line: (703) 657-0551 | Confidential Fax: (410) 676-2304

Exhibit 23

SEXUAL HARASSMENT POLICY MANUAL

FOR

REEMA CONSULTING SERVICES, INC.

Title VII, Civil Rights Act of 1964

Sexual Harassment Policy Manual
Table of Contents

1. Objective

2. Background and Types of Sexual Harassment

3. Sexual Harassment Definition

4. Additional Definitions

5. Prevention

6. Sexual Harassment Complaint

7. Complaint Procedures

8. Documentation

9. Resolution

10. Return to Work: Alleged Victim, Complainant and Others

11. Return to Work: Alleged Harasser

12. Conclusion

**1. Objective**

The objective of the Reema Consulting Services, Inc. Sexual Harassment Policy Manual is to define sexual harassment, prevent sexual harassment from occurring, train employees concerning sexual harassment, provide investigative procedures to follow establish disciplinary guidelines and ensure sexual harassment victims return to a safe and positive work environment after an investigation. A copy of this policy will be available for review during normal work hours at the job site and/or the Reema Consulting Services, Inc.'s satellite office in Havre de Grace, MD.

**2. Background and Types of Sexual Harassment**

Sexual harassment is considered a form of sexual discrimination by Title VII of the Civil Rights Act of 1964. The Equal Employment Opportunities Commission (EEOC) enforces this act and has mandated that all companies (including Reema Consulting Services, Inc.) have a legal responsibility to provide their employees with a harassment-free workplace. Reema Consulting Services, Inc. takes this responsibility very serious and has created this manual to help ensure a workplace for our employees that is harassment-free.

Sexual harassment victims can be female or male and harassment can occur between individuals of the opposite sex or between individuals of the same sex. While sexual harassment most often takes place in situations where there is a difference in authority or power, other forms of sexual harassment do occur. Reema Consulting Services, Inc. recognizes the following types of sexual harassment:

a. Quid Pro Quo
   Quid Pro Quo harassment occurs when sexual advances are demanded of an employee in exchange for some employment benefit such as pay increases, promotion, hiring, or continued employment. This type of behavior if proven true will be considered sexual harassment on the first occurrence by Reema Consulting Services, Inc.
b. Hostile Work Environment
   An intimidating or hostile work environment is considered sexual harassment when employees are subjected to behavior of a sexual nature or that could be considered as such by a reasonable person. While this behavior will not always constitute sexual harassment on the first occurrence, Reema Consulting Services, Inc. will not tolerate such behavior.

**3. Sexual Harassment Definition**

For the purpose of this policy, sexual harassment is defined as any threatening or unwelcome attention, either verbal or physical behavior of a sexual nature, in the workplace that a reasonable person would interpret as harassment of a sexual nature, when:

a. Submission to such conduct is made or threatened to be made explicitly or implicitly a term or condition of employment

b. Submission to or rejection of such conduct is used or threatened to be used as a basis for an employment decision.
c. Such conduct has the purpose or effect of interfering with an individual's work performance, or of creating a hostile or intimidating work environment.

Behavior that may be considered evidence of sexual harassment includes, but is not limited to, the following:

a. Physical sexual contact: assault, pinching, grabbing, touching, fondling, hugging
b. Offensive verbal language: explicit jokes, sexual remarks about a person's body or clothing, foul language, sexual suggestions and descriptions, sexual innuendos.
c. Nonverbal sexual conduct: staring, displaying sexual material, offensive hand or body gestures.

**4. Additional Definitions**

The following definitions will be used by Reema Consulting Services, Inc. for the purpose of this manual and any actions brought about from an alleged incident.

a. Alleged Victim: A person who allegedly has been harassed in violation of this policy
b. Complainant: The person who brings a complaint of violation of this policy. This person may be the alleged victim, a coworker, or other persons.
c. Alleged Harasser: The person accused of violating this policy
d. Investigator: The person assigned the responsibilities of conducting/leading an investigation of alleged sexual harassment.
e. Specific and Credible Allegations: Allegations that provide factual details such as, but not limited to:

    Time
    Place
    Actions
    Participants
    Witnesses

Allegations do not have to be based on first-hand observation of events to be specific and credible, but direct observation usually provides better details than indirect knowledge.

**5. Prevention**

Prevention is the best tool to eliminate sexual harassment in the workplace. Reema Consulting Services, Inc. is committed to providing a harassment-free workplace for all employees. Reema Consulting Services, Inc. strictly forbids sexual harassment under this policy. The following guidelines are expected to be adhered to by all employees.

a. Avoid any type of sexual behavior in the workplace
b. Do not hang, post, or bring to work any pornographic material. This would include posters, pictures, magazines, cartoons, letters, books or other such items.
c. Keep conversations clean. Avoid vulgar language, talk about sex, explicit jokes,

sexual innuendos, sexist remarks, commenting on co-worker s appearances and profanity in your conversations.

d. Keep your actions above reproach. Web sites and emails you view should be clean. Offensive hand gestures should not be made even if between friends. Don t look at a co-worker in an inappropriate manner.
e. Avoid all physical contact. There should never be any pinching, grabbing or fondling. Other contact such as hugging, rubbing, brushing, touching or kissing should also be avoided.
f. Avoid inner office dating. Affectionate behaviors between employees may be offensive to others and could be construed as sexual harassment if it occurs frequently.
g. Company dress code must be followed by all employees. View policy in the Human Resource Department.

**6. Sexual Harassment Complaint**

a. In determining whether alleged conduct is sexual harassment, Human Resources will consider all available evidence and the circumstances and context under which the alleged incident occurred. Although repeated incidents generally create a stronger claim of sexual harassment, a single serious incident can be sufficient. Reema Consulting Services, Inc. treats each incident confidentially on a case-by-case basis, ensures everyone s privacy is protected and ensures employees will also be treated lawfully.
b. Sexual harassment could be perpetrated by immediate supervisors, agents of the employer, supervisors in other areas, co-workers, or non-employees. A complaint this policy has been violated may be made through Human Resources. Complaints must state specific and credible allegations to warrant an investigation. Complainant generally has only 180 days after alleged incident to file a complaint. It may become more difficult to prove the allegations after significant time has passed and therefore prompt reporting is encouraged.
c. When deciding whether to investigate a complaint, Reema Consulting Services, Inc. will consider the desires of the victim but may initiate an investigation without the victim's consent if circumstances warrant such actions.

**7. Complaint Procedures**

If an employee feels victimized, they should take quick action to get the problem resolved. Reema Consulting Services, Inc. has developed the following procedures to be used in handling an alleged sexual harassment case.

a. Employee should record all information about the incident as soon as possible. Record the date, time, who was involved, names of any witnesses, and full details of the alleged harassment.
b. Alleged victim should inform the alleged harasser they were offended and they expect the behavior to stop immediately. Many times this will correct the situation, especially if the behavior was unintentional.
c. If after the alleged harasser is told of the offending behavior and the alleged

victim feels the situation is resolved, no further action is necessary. However, all documentation of the incident should be kept in case any future incidents happen.

If not satisfied with the alleged harasser's actions or another incident occurs, the alleged victim should report to *Monica Lewis* in Human Resources or their supervisor. A copy of the written documentation should also be provided at this time.

a. Reema Consulting Services, Inc. will initiate an investigation immediately. Human Resources will conduct an interview with the alleged victim within 3 business days. All details will be discussed and written documentation will be verified against alleged victim s statements. Human Resources will also interview the complainant (if different than the alleged victim), the alleged harasser, and other persons who might have valuable knowledge of the incident. Names and information will be kept confidential as much as possible during this process.
b. Human Resources will gather as much additional information as possible to help with the final determination of the case. Such information as time sheets, emails, expense reports, performance appraisals and disciplinary records will be used to help understand the context of the incident.

**8. Documentation**

After conducting interviews and reviewing all information, a decision will be made by Human Resources. A written finding will be issued within 5 days of when the complaint was filed. Both the alleged victim and alleged harasser will receive a copy of the findings. Third party complainants will only be notified the investigation is concluded.

a. The complaint will be determined to be one of the following:
   Founded-the incident was sexual harassment
   Unfounded-the incident was not sexual harassment
   Inconclusive-the evidence was conflicting, no eyewitnesses were able to support the complaint and/or there was insufficient evidence to prove harassment occurred.

**9. Resolution**

a. If sexual harassment is shown to have occurred, the disciplinary action taken will largely depend on two factors: The severity of the harassment and how often the incidents occurred. Disciplinary action may lead up to and include termination of employment. Disciplinary actions for violations of this policy should commensurate with the nature of the violation and the harasser's disciplinary history. Reema Consulting Services, Inc. believes those who violate this policy should be responsible for their actions regardless of contributing factors such as substance abuse, emotional stress or personal problems. Disciplinary action may also include required counseling, community service, financial restitution, educational classes and/or other actions as determined by Human Resources.
b. If the complaint proves to be unfounded or inconclusive, all parties will be reminded of Reema Consulting Services, Inc.'s policy on sexual harassment and warned of the consequences of violating the policy. A follow-up investigation

might be necessary to ensure all details and evidence pertaining to the incident was uncovered. Human Resources will determine the need for an additional investigation.

**10. Return to Work: Alleged Victim, Complainants and Others**

Alleged victim, complainant and others should expect to return to a positive, harassment-free work area. Retaliation from alleged harasser, co-workers or the company will not be tolerated.

a. Alleged victim will be made aware of all procedures and protective measures taken during the investigation.
b. Throughout the investigation procedures, resolution period and afterwards, any and all appropriate measures will be taken to protect the alleged victim, complainant and others from harm caused by the alleged harasser's behavior.

**11. Return to Work: Alleged Harasser**

This policy cannot be used to bring false charges. Anyone filing a false complaint under this policy will be subject to disciplinary action up to and including termination of employment. If the complaint is determined to be unfounded, all necessary steps will be taken to ensure alleged harassers reputation is restored and that he/she returns to a positive, harassment-free work area.

**12. Conclusion**

This policy will be reviewed and revised as needed every *2* years and is subject to review and revision at any other time as deemed necessary by *CEO*, and the Human Resource Department. Anyone wishing to discuss this policy, a specific incident, or other matters concerning this policy can contact *Monica Lewis* in the Human Resources Department or their area supervisor. All discussions will be strictly confidential.

**Exhibit 24**

EEOC Form 5 (11/09)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To: [ ] FEPA [X] EEOC

Agency(ies) Charge No(s): 570-2016-01933

Virginia Division of Human Rights and EEOC

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Ms. Evangeline J. Parker | (202) 425-0824 | 02-13-1979 |

Street Address / City, State and ZIP Code

5829 Fisher Road, Apartment #12, Temple Hills, MD 20748

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| REEMA CONSULTING SERVICES, INC | 15 - 100 | (703) 657-0402 |

Street Address / City, State and ZIP Code

45055 Underwood Lane, Suite 140, Sterling, VA 20166

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

Street Address / City, State and ZIP Code

2016 SEP 13 AM 9:12 WASHINGTON FIELD OFFICE EEOC

DISCRIMINATION BASED ON (Check appropriate box(es).)

[ ] RACE [ ] COLOR [X] SEX [ ] RELIGION [ ] NATIONAL ORIGIN
[X] RETALIATION [ ] AGE [ ] DISABILITY [ ] GENETIC INFORMATION
[X] OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE

Earliest: 03-01-2016 Latest: 05-18-2016

[ ] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was employed with the above named Respondent since December 1, 2014, until I was terminated on May 18, 2016. My job classification was Assistant Operations Manager.

I have been subjected to different terms and conditions of employment by the above named Respondent. For example on or about March 2016 a rumor was started regarding an intimate relation I was allegedly having with my Damarcus Pickett [Deputy Program Manager]. On or about April 21, 2016, Management interviews other employees regarding the allege rumor. The rumor and/or comments were sexual in nature. As a member of the management team, such rumor and/or comments were hindering my job environment and performance. On April 25, 2016, I made a formal complaint to Cathy Price[HR Manager] and informed her of the situation that was taking place. On April 27, 2016, Ms. Price held a meeting with me, Mr. Moppins [Program Manager], and Damarcus Pickett [Deputy Program Manager] regarding her findings.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

8-24-16 — Date

[signature] — Charging Party Signature

NOTARY – When necessary for State and Local Agency Requirements

PEDRO D. CAMPOS NOTARY PUBLIC PRINCE GEORGE'S COUNTY MARYLAND My Commission Expires March 12, 2017

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)

8, 26, 2016

J.R. 000597

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [ ] FEPA<br>[X] EEOC | 570-2016-01933 |

Virginia Division of Human Rights and EEOC

*State or local Agency, if any*

Apologies were made to one and other and I felt the situation would die itself down. On May 2, 2016, all employees were required to go through sexual harassment training, starting with Managers and Supervisors. Around the same week of the training Mr. Moppins started to remove individuals that were directly assigned to me and my department, without my prior knowledge. Subsequently, I went out on personal leave on May 11, 2016, and returned on May 17, 2016. Upon my return I was informed by Carlos Carter [Warehouse Worker] that I was not allowed to be near the work location of Mr. Jennings. Moppings. I then question Mr. Moppins and he informs me that Mr. Jennings made a formal complaint against me to Human Resources on May 12, during the time I was already on leave. In his complaint, Mr. Jennings alleges that I was harassing and making him uncomfortable. Yet shortly after me speaking with Mr. Woppings, he proceeds to come to my area and distract my employees. I inform Ms. Price via email of what had just taken place. The next day on May 18, 2016, I am terminated.

I believe I have been discriminated, retaliated, and discharge due to my sex[Female] and participation in a protected activity, in violation of Title VII of the Civil Rights Act of 1964 as, amended.

EEOC WASHINGTON FIELD OFFICE

2016 SEP 13 AM 9:12

131 M STREET N.E. WASHINGTON, DC 20507

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 8-24-16 [signature]<br>*Date* *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)*<br>8, 26, 2016 |

PEDRO D. CAMPOS
NOTARY PUBLIC
PRINCE GEORGE'S COUNTY
MARYLAND
My Commission Expires March 12, 2017

Exhibit 25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

Case No. 8:17-CV-01648-TDC

EVANGELINE J. PARKER, :
:
Plaintiff, :
:
:
vs. :
:
:
:
:
REEMA CONSULTING SERVICES, INC., :
:
Defendant. :
:

-------------------------------------
DEPOSITION UNDER ORAL EXAMINATION OF:
REEMA VORA
July 17, 2020
-----------
REPORTED BY: JENNIFER L. WIELAGE, CCR, RPR, CRR
------------

JOB # 311962

Page 2

TRANSCRIPT of the videotaped deposition of the above-named witness, called for Oral Examination in the above-entitled matter, said deposition being taken pursuant to Federal Court Rules, by and before JENNIFER L. WIELAGE, Certified Shorthand Reporter and Notary Public, on Friday, July 17, 2020, commencing at 10:00 in the forenoon.

Page 3

A P P E A R A N C E S:

FISH & RICHARDSON
1000 Maine Avenue, SW
Suite 1000
Washington, D.C. 20024
(202) 783-5070
BY:  JOSEPH COLAIANNI, ESQ.
colaianni@fr.com
Attorneys for Plaintiff

WRIGHT, CONSTABLE & SKEEN, LLP
7 Saint Paul Street, 18th Floor
Baltimore, Maryland 21202
(410) 659-1320
BY:  DONALD WALSH, ESQ.
dwalsh@wcslaw.com
Attorneys for Defendant

ALSO PRESENT - MIGUEL EVANGELISTA, Esquire
Video Services, RAJESH S. VORA

Page 4

R. Vora

THE VIDEOGRAPHER:  Good morning. This is the video deposition of Reema Vora in the matter of Parker vs. Reema Consulting Services Incorporated, Case No. 8:17-CV-0164-8-TDC.  This deposition is being held at U.S. Legal Support Remote Video Conference on July 17, 2020.  My name is Miguel Evangeline.  I'm the videographer. The court reporter is Jennifer Wielage and we're here from U.S. Legal Support.

At this time, the attorneys participating in this deposition acknowledge that I am not physically present in the deposition room.  They further acknowledge that in lieu of an oath administered in person, the witness will verbally declare her testimony in this matter is under penalty of perjury.  The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Page 5

R. Vora

Please indicate your agreement by stating your name and your agreement on the record.

THE DEPONENT:  Reema Vora, I agree.

MR. COLAIANNI:  This is Joseph Colaianni on behalf of Plaintiff.  I agree.

MR. WALSH:  And Donald Walsh on behalf of the Defendant and we agree.

REEMA VORA,
3320 Montgomery Drive, Apartment 422, Santa Clara, California 95054, having been first duly sworn, testifies as follows:
EXAMINATION BY MR. COLAIANNI:

Q.    Good morning, Ms. Vora.

A.    Good morning, Joseph.

Q.    Can you hear me okay over the video link?

A.    Yes.

Q.    Okay.  If you have trouble hearing any of my questions, please let me know, and I'll try to move closer to the speaker, but I'm sitting as close as I can.

Page 6

R. Vora

A.    Okay.

Q.    Could you please state your full name for the record, please?

A.    Reema Rajesh Vora.

Q.    And you indicated this prior to the deposition, but could you please state your address once again for the record this time?

A.    3320 Montgomery Drive, apartment 422, Santa Clara, California 95054.

Q.    Thank you.  And I would like to introduce myself.  My name is Joseph Colaianni.  I'm with the law firm of Fish & Richardson based in Washington, D.C., and I'm representing the Plaintiff, Ms. Parker, and I had some questions for you today in connection with the litigation matter.  Okay?

A.    Okay.

Q.    You are represented by counsel here today for the deposition, correct?

A.    Correct.

Q.    That's Mr. Walsh?

A.    Yes.

Q.    And have you had your deposition

Page 7

R. Vora

taken before, Ms. Vora?

A.    On this matter, no.

Q.    In any matter?

A.    No.

Q.    Have you given testimony in any situation before; a trial or administrative hearing?

A.    No.

Q.    So if you'll just bear with me for a few moments while I -- while I go over some of the ground rules, and you've probably have already had this explained to you by your counsel, but you understand you just took an oath to tell the truth, correct?

A.    Yes.

Q.    All right.  You understand your testimony here is the same as though it were given in a court of law, correct?

A.    Correct.

Q.    And is there any reason that you believe you would not be able to provide truthful, accurate testimony today?

A.    No.

Q.    If you have any trouble

Page 8

R. Vora

understanding any of my questions today for any reason, whether it be you can't hear my question or that it's not clear to you, please let me know.

A.    Okay.

Q.    If you go ahead and answer my question, I'll assume you understood it.  Is that fair?

A.    Yes.

Q.    If you need a break at any time, please let me know.  We can stop.  There's no reason for you to feel uncomfortable.  Just let us know if you need a break.  Okay?

After the deposition is completed, you'll have a chance to review your deposition transcript, and you can correct any errors in the transcript that may appear.  Okay?

A.    Okay.

Q.    Let's see, so let's -- let me just start off by indicating, you're here pursuant today to a Deposition Notice that was issued in the Parker v. RCSI litigation, correct?

Page 9

R. Vora

A.    Yes.

Q.    I'm going to try to introduce that deposition notice.  Bear with me one moment here please.

Do you see that deposition notice now?

A.    Yes.

Q.    Okay.

(Exhibit 1, Notice of Deposition of Reema Vora, was marked for Identification by the court reporter.)

BY MR. COLAIANNI:

Q.    Can you take a look at it real quickly, please?

A.    Let me download it.

Q.    You probably need to download it.  Yeah, I think that's right.

Are you able to access the document?

A.    Yes.

Q.    Okay.  Just let me know if you recognize the document, please.

A.    Yes, I do.

Q.    This is the deposition notice

Page 10

R. Vora

that you are testifying here today pursuant to this notice, correct?

A.    Correct.

Q.    Okay.  Did you do anything to prepare for today's deposition, Ms. Vora?

A.    I reviewed the case files, and I spoke with my counsel.

Q.    Okay.  Which case file did you review?

A.    The -- the internal documents that we have, that Don Walsh sent to us and the exhibits that he sent to us.

Q.    Do you recall which documents those were?

A.    The Interrogatories by the Plaintiff, the Plaintiff's Complaint, our responses, and then I spoke with our counsel.

Q.    Did you review any other documents, other than the ones you just identified, to prepare for the deposition?

A.    I reviewed the case file.  So those documents were in the case file.  If there were others related to those responses, yes.

Page 11

R. Vora

Q.    When you say the "case file," do you mean the publicly-available pleadings on the ECF Docket for the case?

A.    I'm referring to the documents that have been exchanged between counsel and myself.

Q.    Okay.  Great.  I asked you which documents those were and you identified some.  Were there others as well?

A.    No, not beyond -- beyond what I've stated.

Q.    Okay.  That was the universe of documents?

A.    Correct.

Q.    Okay.  And you mentioned you spoke to counsel.  I assume that's Mr. Walsh?

A.    Correct.

Q.    Did you speak to anyone else in connection with preparing for the deposition besides Mr. Walsh?

A.    No.

Q.    Are you currently employed, Ms. Vora?

A.    Yes.

Page 12

R. Vora

Q.    Where are you currently employed?

A.    Well, I am in-house counsel still for Reema Consulting Services, and that is -- you know, that is the nature of this topic right now.  I'm also the President of Alaris Incorporated and a contract manager at Northrop Grumman.

Q.    What is your current role at RCSI?

A.    In-house counsel.

Q.    Are there other in-house counsel at RCSI --

A.    No.

Q.    -- besides yourself?

You're the legal officer for the company?

A.    Yes.

Q.    How long have you been in that role at RCSI?

A.    Since January 2011.

Q.    When was RCSI founded?

A.    1995.

Q.    The "R" in RCSI is -- stands for Reema, correct?

Page 13

R. Vora

A.    Yes.

Q.    Which is your first name, correct?

A.    Yes.

Q.    Were you involved in founding the company or something of that nature?

A.    Well, since I was seven at the time, no.

Q.    But is there a "Reema" in the name of the company after you or is that just a coincidence?

A.    It's named after me.

(A discussion was held off the stenographic record.)

BY MR. COLAIANNI:

Q.    Where did you -- were you employed prior to RCSI?

A.    Prior to RCSI, I was -- well, I was employed by RCSI beginning in 2005, and I was employed with RCSI for that -- as a proposal manager -- or proposal writer, sorry -- proposal writer and contract administrator, and prior to that, I interned at the U.S. Coast Guard -- or during that

Page 14

R. Vora

period of time, I interned at the U.S. Coast Guard, interned at the Federal Trade Commission and interned Securities & Exchange Commission.

Q.    When did you receive your juries doctorate degree?

A.    In 2010.

Q.    Where did you attend law school?

A.    George Washington University Law School.

Q.    And where and when did you receive your undergraduate degree?

A.    In George Washington -- at the George Washington University in May 2007.

Q.    Since you became in-house counsel at RCSI, what are your responsibilities, your job responsibilities?

A.    My job responsibilities have been to maintain corporate compliance, interpret regulations, respond to questions, review -- review memos and documents brought by other corporate officers and conduct investigations as needed.

Q.    Did you have any management

Page 15

R. Vora

responsibilities as in-house counsel?

A.    I have, yes.

Q.    Can you describe that, please?

A.    I have managed program managers, and I have participated in the hiring of personnel as well as the review of personnel disciplinary warnings or harassment corrective action and I've also participated in the termination of employees.

Q.    Is your current title in-house counsel or something different?

A.    It's in-house counsel.

Q.    Do you have any involvement in decisions on whether to promote employees at RCSI?

A.    I've -- I've seen the recommendations. In terms of -- in relevance to this case at DS-ATA, I -- I may have had involvement in the recommendations for the -- the highest level of management, but not day-to-day personnel.

For other contracts, I have been involved in the recommendations and promotions of personnel on a regular basis.

Page 16

R. Vora

Q.    You used an acronym earlier, DS -- I didn't catch it.

A.    The department of State, Office of Anti-Terrorism Assistance.

Q.    And that is -- was a contract that RCSI was -- was working on; is that correct?

A.    Yes.

Q.    When was that contract terminated or -- or was that contract terminated?

A.    Yes.

Q.    Yeah. When was that contract terminated?

A.    September 30, 2017.

Q.    You mentioned that part of your duties involved investigating -- investigative work; is that correct?

A.    Yes.

Q.    Do you get -- do you have any responsibilities regarding investigating complaints made by employees?

A.    At times, yes.

Q.    Do you have any involvement in investigating complaints made by employees

Page 17

R. Vora

relating to harassment or employment discrimination issues?

A.    That is generally conducted by HR.

Q.    Are you at all involved in those investigations?

A.    I have been on other contracts at times in terms of asking the questions that are associated with the investigations.

Q.    With respect to this Department of State contract that you mentioned earlier, did you have any involvement --

A.    No.

Q.    -- in -- with respect to investigating complaints by employees in connection with that contract?

A.    No. We had on-site human resources which conducted the full investigation.

Q.    You're familiar, I assume, with a gentleman by the name of Larry Moppins, correct?

A.    Yes.

Q.    Have you met Mr. Moppins?

Page 18

R. Vora

A.   Yes.

Q.   You worked with Mr. Moppins, I assume, correct?

A.   Yes.

Q.   What was his role at RCSI?

A.   He is a subject matter expert.

Q.   What is a subject matter expert?

A.   He had detailed knowledge of the warehouse operations, the setup of the warehouse information technology system and the procedures for inventorying and inventory control that related to this operation.

Q.   Was he working at RCSI in connection with the Department of State contract you mentioned earlier?

A.   He was a consultant for RCSI on this Department of State contract.

Q.   He was a consultant?

A.   Yes.

Q.   He was not an employee of RCSI?

A.   No, not at the time of -- not for the purposes of this investigation.

Q.   Was he ever an employee of RCSI?

A.   Yes.

Page 19

R. Vora

Q.   When was he an employee?

A.   For about -- for -- less than a year at the very beginning, at which point we made him a consultant.

Q.   When you say at the very beginning, what time frame are you referring to?

A.   When this contract was awarded in 2012.

For under a year, he was an employee.  I do not have the exact dates. It's my recollection that it was a short period of time at which point we decided to make him a consultant.

Q.   Why was the decision made to transfer his status from employee to consultant?

A.   Because is contract had security clearance requirements that he was not eligible for, those requirements were no longer required by the Department of State, but it was a decision that we internally made that he would be consultant on this role, that he would not have that primary

Page 20

R. Vora

responsibility that an program manager or an employee of Reema Consulting would have.

Q.   So his job responsibilities changed --

A.   Absolutely.

Q.   -- when he transitioned from an employee to a consultant?

A.   Yes.

Q.   What were they -- what were the changes that occurred?

A.   Well, as a consultant, he had no authority to hire anyone, to discipline any employees and he had no management authority over the personnel in terms of actual management.  He was an independent consultant, and he invoiced us monthly and he was there to provide technical information and advice and guidance.

Q.   Did he have a boss or somebody he reported to directly to --

A.   Yes.

Q.   -- at the company while he was a consultant?

Who was that?

Page 21

R. Vora

A.   Rajesh Vora.

Q.   Did he report to anybody else besides Mr. Vora?

A.   He reported -- that was his direct report.  He was accountable to all of RCSI corporate leadership.

Q.   As a consulting -- as a consultant at RCSI on the Department of State contract, did Mr. Moppins manage a group of employees at the company?

A.   He did not manage employees.  He was a consultant.

Q.   He did not have any management responsibility for employees?

A.   No.

Q.   Did anyone report to Mr. Moppins during his time as a consultant at the company?

A.   No.

Q.   So Mr. Moppins -- Mr. Moppins reported directly to Mr. Vora, correct?

A.   Yes.

Q.   And your testimony is that he did not have any authority to hire or terminate

Page 22

R. Vora

employees --

A.    Yes.

Q.    -- while he was a consultant, correct?

A.    Yes.

Q.    Mr. Moppins is no longer employed -- or is no longer either employed or a consultant for RCSI, correct?

A.    Yes.

Q.    Do you recall when he -- when he terminated that relationship?

A.    I believe it was July 2017, but it's summer 2017.  I do not recall the exact month.

Q.    And you're also familiar with Ms. Evangeline Parker, correct?

A.    Yes.

Q.    Have you met Ms. Parker?

A.    Yes.

Q.    Did you work alongside with her while she was employed at RCSI?

A.    I came to the office.  I don't -- I did not work alongside with her.

Q.    And do you recall if she was

Page 23

R. Vora

retained -- or excuse me -- hired by Reema in 2014?

A.    That seems right.

Q.    Do you recall what her initial role or position was at RCSI?

A.    No.

Q.    Do you recall whether she was promoted in the company during her time as an employee?

A.    Yes.

Q.    And she was promoted, correct?

A.    She was promoted, yes.

Q.    Did you have any specific responsibilities relating to her promotions that she did receive?

A.    No.

Q.    Who was responsible for that function?

A.    So Cathy Price and Mr. Vora.

Q.    And who is Cathy Price?

A.    Our human resources manager at the time.

Q.    Cathy Price and Mr. Vora were responsible for analyzing Ms. Parker's work

Page 24

R. Vora

and for promotions; is that correct?

A.    Correct, yes.

Q.    Did you ever review any of Ms. Parker's performance evaluations?

A.    No.

Q.    Did you have any issues with her performance as an employee of RCSI?

MR. WALSH:  Objection.  I'm just going to instruct the witness, to the extent that any of her knowledge comes from -- to her as part of a privileged conversation, given the fact that she was in-house counsel, we're going to object and instruct her not to answer. If her answer is not related to information that came directly to her in her capacity as in-house counsel to provide legal opinions, then that's fine.

THE DEPONENT:  My answer is that it was all strictly related to privileged conversations.

BY MR. COLAIANNI:

Q.    Privileged conversations at the

Page 25

R. Vora

time of her employment or after the lawsuit was filed?

A.    After her allegation to -- to file charges for harassment.

Q.    Well, during the time while Ms. Parker was still employed at the company?

A.    Yes.

Q.    Okay.  So you're saying that any information you had about Ms. Parker's performance was communicated to you by what you're saying is a privileged conversation; is that fair?

A.    Define "performance."

Q.    Her work performance.

A.    At what period of time?

Q.    Well, she was working at RCSI.

A.    That's a very broad statement. Could you narrow it down?

Q.    Well, I asked you if you had any information about her performance as an employee at RCSI, and you told me that you did but only because of privileged communication you had during the time she was employed there; is that correct?

Page 26

R. Vora

A.    I had knowledge that she was promoted that was cc'd to me in e-mails.  And then beyond that, her individual work performance was not communicated to me until -- until the privileged conversations occurred.

I did not get actively involved in -- in the day-to-day details of employees' work.

MR. COLAIANNI:  I'm going to mark another document here.  Bear with me one moment, please.  I'm going to try to introduce this exhibit.

THE DEPONENT:  Okay.

(Exhibit 2, REEMA00059, was marked for Identification by the court reporter.)

BY MR. COLAIANNI:

Q.    I just introduced a new exhibit into the Chat, Reema.

Do you see that?

A.    Okay.  Yes, I see the exhibit.

Q.    And this exhibit is -- well, the production number is REEMA00059.

Page 27

R. Vora

It begins at that page; is that correct?

A.    That is the file name, yes.

Q.    I just want to make sure we're looking at the same exhibit.  That's all.  It's the -- the document bears a production -- the first page -- are you able to open the document, Ms. Vora?

A.    Yes.

Q.    Okay.  And the production number at the bottom of the first page is REEMA00059; is that correct?

A.    Yes.

Q.    And it's titled Sexual Harassment Policy Manual For Reema Consulting Services, Inc., correct?

A.    Correct.

Q.    Okay.  Do you recognize this document?

A.    I do.

Q.    And what is this document?

A.    It's the sexual harassment policy manual for Reema Consulting Services.

Q.    Did you play a role in drafting

Page 28

R. Vora

this document?

A.    Our human resources manager, Monica Lewis, drafted this document.

Q.    Do you recall when Ms. Lewis drafted the document?

A.    No.

Q.    Was it after you became in-house counsel at RCSI?

A.    Yes.

Q.    Do you know what prompted the development of this document?

A.    Well, we had updated our human resources manual.  Monica had taken -- undertaken the update of the human resources manual, and she then also drafted this policy, and I had carefully reviewed the human resources manual, and I don't recall whether I reviewed this or not.  Monica was employed with Reema Consulting Services prior to Ms. Parker starting with Reema Consulting Services to my recollection at this time.  I do not recall the exact dates of Ms. Lewis's employment, but Monica's name is also identified on page 6 of the manual.

Page 29

R. Vora

Q.    I just want you to clarify one point because I had trouble hearing with the audio.

You said Mrs. Lewis put this document after -- or prior to her employment at RCSI?  I didn't --

A.    Prior to Ms. Parker's employment with RCSI.

Q.    Okay.  Thank you.

Do you recall when this -- when this policy, that's described in Exhibit 2, went into effect at RCSI?

A.    It went into effect when she prepared it, so I don't have a recollection but Monica was no -- stopped working for RCSI I believe in 2013.  So it went into effect prior to 2000 -- to 2013 or before.  And 2013, I'm not a hundred percent sure of.  I need to -- I'd need to refresh -- you know, refresh my recollection of that time.

So I will -- if you would like, I can review the -- in the transcript, review the dates.

Q.    Sure.  I just noticed on -- well,

Page 30

R. Vora

page REEMA00066, there's a page here that has the date of May 2, 2016.

Does that assist you at all in -- in understanding the timing of when the document was created or when it went into effect?

A. Absolutely not. These too look like they're separate documents that were merged together.

If the special harassment training workbook is based on the sexual harassment training that was provided to the staff, this policy predates that training.

Q. Okay. The document beginning at page 00066, you think is a separate document from the policy?

A. A separate document altogether. It's based on a compliance training workbook. As you can see, there's a page 1, beginning on that page, and then there's a page 3 and page 4, which is not in the policy.

These are separate documents that have been merged together.

Q. Okay. So do these -- does this

Page 31

R. Vora

separate document, is this part of the policy now or did it add to the policy or --

A. It's annual training that's conducted, which is mentioned in the policy so it can be considered a supplement to a policy.

Q. Is there -- is there a formal training policy or procedures at RCSI for sexual harassment?

A. Well, training procedures and policies for sexual arrangement are identified in this manual.

Q. These are the formal RCSI policies for training with regards to sexual harassment?

A. Yes, right.

Q. Are employees required to undergo periodic training --

A. Yes.

Q. -- for sexual harassment? Okay. How often do they have to do that?

A. Annually.

Q. Are there consequences to employees that do not follow the sexual

Page 32

R. Vora

harassment policy of the company?

A. Yes.

Q. What are the consequences?

A. The consequences are stated within the disciplinary actions stated within the progressive disciplinary actions that are in the policy.

(Reporter clarification.)

The consequences of the -- the consequences are identified as progressive disciplinary actions as stated in the policy.

(Reporter clarification.)

A. The consequences are identified as progressive disciplinary action in the policy including and up to termination.

Q. Well, when you say "progressive disciplinary action," what do you mean by that?

A. That could mean a warning, a suspension or a termination or a performance improvement plan, if it is appropriate.

Q. Is the action progressive in the sense that it is intended to help people reform their conduct?

Page 33

R. Vora

A. Depending on the severity and the infraction.

Q. How is that determined?

A. That is the internal determination made by human resources and if -- if meriting additional discussion, human resources may bring it up to me, and then it is ultimately decided by HR or the company president if severe enough --

(Reporter clarification.)

A. If HR requests additional input, then it would -- the decision would be made ultimately by the company president.

MR. COLAIANNI: I'm going to mark another document here. I added this document to the Chat room. Let me know if you see it.

(Exhibit 3, Employee Handbook, was marked for Identification by the court reporter.)

THE DEPONENT: I see it.

BY MR. COLAIANNI:

Q. Could you take a look at it, please. And let me know if you recognize it

Page 34

R. Vora

it.

A.    I do recognize this.

Q.    And what is this document?

A.    This is the Employee Handbook.

Q.    And did you play any role in creating the Employee Handbook?

A.    Yes, I did.

Q.    What was her contribution to the Employee Handbook?

A.    I reviewed every section of it.

Q.    Who did the initial drafting of the Employee Handbook?

A.    Monica Lewis.

Q.    This version that we have here is dated June 2013.

Is this the version that is currently in effect at the company or is there a more recent one?

A.    It is currently in effect.

Q.    Is the Employee Handbook provided to every new employee when he or she joins the company?

A.    Yes.

Q.    I'd like to direct your attention

Page 35

R. Vora

to the production number -- the page with production number REEMA00053, please.

A.    Payees and direct deposit?

Q.    I'm sorry.  I didn't catch that?

A.    Which section are you referring to?

Q.    The page that says -- that ends in REEMA0053, and it's in the same document we're looking at, Exhibit 3.

A.    Yes, I'm looking at it.  I'm scrolling to it.

Q.    Okay.  Just let me know when you're there, please.

A.    I'm there.

Q.    There's a section in the middle of the page talking about complaints of harassment and it states that:  All complaints will be investigated promptly and in as confidential a manner as possible and then it goes on.  Just let me know if you see that.  It's right below the section with the bullets.

A.    I see it.

Q.    Were -- in your experience at

Page 36

R. Vora

Reema, were -- well, let me back up.

You're familiar with complaints of harassment that occurred at Reema, correct?

MR. WALSH:  Objection; foundation.

BY MR. COLAIANNI:

Q.    Can you answer the question?

A.    I'm sorry?  Can you repeat the question?

Q.    Are you familiar with instances where there were complaints of harassment at RCSI?

MR. WALSH:  Objection.  And I'll object and to the extent that that information comes to you in the nature of seeking legal counsel, to the extent that it is considered privileged, we're going to object to your answering the question.

THE DEPONENT:  I'm going to claim this as privilege.

MR. COLAIANNI:  What's the basis for stating it's privileged?  I'm

Page 37

R. Vora

asking you whether you were aware of complaints of harassment that were made while you were at RCSI.

MR. WALSH:  Well, A, it assumes that there were complaints and B to the extent that she would have been counsel, any of that information would have come to her in her role as counsel, which would be a privileged conversation.

MR. COLAIANNI:  Are you -- okay.

BY MR. COLAIANNI:

Q.    Are you aware of any complaints of harassment during your time at RCSI?

MR. WALSH:  And I'll instruct her the same way -- object and instruct her the same way.  To the extent that that information came to her in her role as in-house counsel, then I'll instruct her to not answer the question on the basis of attorney-client privilege.

A.    I'm going to invoke privilege because any information that came to me did

Page 38

R. Vora

come to me after I became in-house counsel.

MR. COLAIANNI: Okay. I disagree with that instruction. We'll -- I may take that up with the Court. I don't agree that that calls for privilege the way I phrased the question.

BY MR. COLAIANNI:

Q. Is it policy at RCSI to report claims of harassment to the manager of human resources?

A. Yes, absolutely.

Q. Are you aware of that not having been done in this situation?

A. No.

Q. Let's talk a little bit more about -- specifically about the issues of this matter.

Are you aware of a rumor relating to Ms. Parker and a gentleman named DaMarcus Pickett?

MR. WALSH: And I'll object to the extent that that information came to you in your context providing legal

Page 39

R. Vora

advice to Reema Consulting, I'm going to instruct you not to answer on the basis of the attorney-client privilege.

To the extent that that information came to you outside of that role as in-house counsel, you may answer Counsel's question.

A. That only came to me as in-house counsel. I was not aware of it prior to any -- prior to that being brought to my attention by human resources.

BY MR. COLAIANNI:

Q. What was your understanding of the so-called rumor?

MR. WALSH: Objection and instruct her not to answer. She just said that the information came to her solely through the basis of inhouse counsel. She said she had no knowledge outside of information she received. Anything she received at that point is going to be privileged communication.

Page 40

R. Vora

MR. COLAIANNI: So you're not going to allow her to answer any questions about what she knew about this rumor? Is that what I'm hearing?

THE DEPONENT: It only came to me in anticipation of litigation.

MR. WALSH: This was the agreement going into this deposition with Counsel. We've had this conversation. They agreed that they understood that her testimony would be the nature of privilege. We're not relying on advice of counsel and they would not get into it.

MR. COLAIANNI: Well, I'm not sure what agreements you're referring to, but I don't agree with the instruction.

MR. WALSH: Okay.

MR. COLAIANNI: I'll move on if you're not going to answer questions. Let me mark another exhibit.

THE DEPONENT: Okay.

BY MR. COLAIANNI:

Page 41

R. Vora

Q. Do you see the exhibit, Ms. Vora?

A. I see the exhibit ending in 0001.

Q. Yes.

A. Okay.

(Exhibit 4, Reema Consulting Services Incorporated Sexual and Other Unlawful Harassment Investigation Questionnaire, was marked for Identification by the court reporter.)

BY MR. COLAIANNI:

Q. Let me know if you recognize that document?

A. I do recognize that document.

Q. Have you seen this document before?

A. Yes.

Q. And just for the record, what is this document?

A. This is a Reema Consulting Services Incorporated Sexual and Other Unlawful Harassment Investigation Questionnaire.

Q. And this document indicates that there's a complaint lodged here against Larry

Page 42

R. Vora

Moppins; is that correct?

MR. WALSH: The doc -- objection. The document speaks for itself.

BY MR. COLAIANNI:

Q. You can answer the question.

A. Yes, it does.

Q. Do you remember the first time you saw this document?

A. I first saw this document when you submit the exhibit for her unemployment hearing.

Q. When you submitted exhibits to who?

A. To the Virginia Unemployment Commission.

Q. In connection with the claim that Ms. Parker had made?

A. Correct. And I consider this privileged information from here on out.

Q. Well, I didn't even ask a question yet. So let's listen to the questions first so we can figure out what's privileged and what isn't.

Page 43

R. Vora

Were you involved in the internal investigation relating to this Complaint against Mr. Moppins described in Exhibit 3?

MR. WALSH: To the extent that your involvement involves privileged communications, you could simply answer yes or no.

A. Yes.

BY MR. COLAIANNI:

Q. Okay. Did you have any role in the investigation?

A. Could you clarify please? I didn't hear you.

Q. Yeah, sorry. What was your role in the investigation?

A. My role in the investigation was related to the review -- to this specific investigation conducted by Cathy Price, I had no role in terms of that. My role in terms of a broader employee review, that is separate. So in terms of this investigation, am I aware of it, yes. My role would be that Cathy let me know that there was an investigation being conducted.

Page 44

R. Vora

Q. Did you -- well, if you just turn to page 3 of the document, please -- Exhibit 4.

A. Okay.

Q. Do you see there's a listing of four names there of RCSI employees?

A. Yes.

Q. Did you speak to any of those persons in connection with this investigation?

A. No.

Q. I'm going to show you another exhibit; one second here.

Do you see the exhibit I just entered into the Chat room?

(Reporter clarification.)

Q. I'll try to get closer to the speaker.

(Reporter interruption.)

Q. Ms. Reema -- do you --

A. Do you have a question. I didn't hear you either.

Q. Do you see the document I just entered into the Chat room as Exhibit 5?

Page 45

R. Vora

A. Yes, I do.

Q. Okay.

(Exhibit 5, REEMA00171, was marked for Identification by the court reporter.)

A. Actually, I see Exhibit 4. Is Exhibit 5 after?

Q. Yeah, there should be an Exhibit 5 identified there and it ends in page REEMA00171.

A. That's Exhibit 4.

Q. Should be Exhibit 5. But do you see the document?

A. I see it, yes, I see the document -- I see Exhibit 4.

Q. Well, Exhibit 4 was the previous document. The Complaint against Mr. Moppins. This will be Exhibit 5.

A. I mean if you want to open it and confirm, I think that would be of value.

Q. Oh, you know what you're -- I'm sorry. You know what you're seeing, somebody wrote Exhibit No. 4 on the document.

A. Right.

Page 46

R. Vora

Q. This has been used at different depositions and somebody physically wrote Exhibit 4 on it.

A. Okay.

Q. That does not relate to the use of the document here. I've marked it as Exhibit 5.

A. Okay. Yes. Then I see Exhibit 5 as you've marked it.

Q. Okay. Thank you.

Do you recognize Exhibit 5?

A. Yes, I do.

Q. And for the record, what is Exhibit 5?

A. Exhibit 5 is a written warning.

Q. A written warning to Ms. Parker, correct?

A. Correct.

Q. Did you play any role in -- in generating this warning to Ms. Parker?

MR. WALSH: And to the extent that that is going to rely on privileged information, a simple yes or no.

Page 47

R. Vora

A. Yes.

Q. Okay. And what was your role?

MR. WALSH: Describe your role without revealing privileged information.

A. My role was reviewing the warning and editing the warning.

Q. Do you know -- do you recall who drafted the warning letter?

A. I believe it was Larry.

Q. If you turn to the second page of the warning letter, Exhibit 5, please.

A. Okay.

Q. Do you see there's some handwriting at the bottom, which I believe is Ms. Parker's handwriting?

A. Yes.

Q. She references here a Ms. Wallace.

Did you know who Ms. Wallace is?

A. Yes.

Q. And who is she?

A. She's a manager at Reema Consulting -- she was a manager at Reema

Page 48

R. Vora

Consulting Services.

Q. Ms. Parker indicates that there's no statement provided here from Ms. Wallace in her first sentence.

Do you see that?

MR. WALSH: Objection.

A. I believe the document speaks for itself.

BY MR. COLAIANNI:

Q. Well, do you agree that Ms. Parker is saying here that there's not a written statement from Ms. Wallace?

A. Yes, that there's not a written statement from Ms. Wallace in this, yes.

Q. Do you know why there was no written statement from Ms. Wallace?

MR. WALSH: Just caution to the extent that that relies on privileged information. To the extent you can answer it outside the privileged information.

A. Having a witness present and noting that it says Ms. Wallace was a witness; why would she be listed in this

Page 49

R. Vora

counseling?

Q. I'm sorry. Ms. Wallace was a witness?

A. Ms. Wallace was a witness to the -- to the communication that Larry had with Ms. Parker.

Beyond that, there's -- and Ms. Wallace is recognized as a witness. It's not in dispute that she was a witness. So why would she be mentioned in the written warning?

Q. Well, I'm reading Ms. Parker's say there's no -- there was a written comment -- she says here, it's a quote: There's a written comment from everyone but her, referring to Ms. Wallace. And I'm asking if you understand why there was not a written comment from Ms. Wallace?

A. I assume that there was no written comment from Ms. Wallace because Ms. Wallace did not have a -- I don't know why. I would only be making assumptions.

Q. Okay.

A. And I don't want to make an

Page 50

R. Vora

assumption --

Q.    Okay.

A.    -- to the motivations or intentions behind the thought process in drafting this document at the time. I do not see a reason why any statement from Ms. Wallace would be included in this. This is not a -- this is a written warning to help her correct her behavior; not a documentation of the statement of events.

Q.    Do you recall whether there were written statements from other persons besides Ms. Wallace?

A.    I'm sorry. Could you clarify what you're asking? Written statements about what?

Q.    I'm referring to Mrs. Parker's statement that we just looked at where she said: There's a written comment from everyone but her.

And I'm saying do you recall there being written statements from other people besides Ms. Wallace?

MR. WALSH:  To the extent that

Page 51

R. Vora

that information comes to you as part of a privileged communication, I just caution you to not answer the question.

A.    I'm going to -- I'm going to not answer this question because I'm not aware.

BY MR. COLAIANNI:

Q.    Well, you are answering it. You're saying you don't know; is that fair?

A.    I can say I don't know. Yes. I don't know.

Q.    Ms. Parker also beneath that writes that there's no statement from Mr. Pickett. Do you see that, a few sentences down?

A.    Yes, I see that.

Q.    Same question: Do you understand why there was no statement from Mr. Pickett?

A.    There seems to be some misunderstanding. I believe that there may be some under misunderstanding in Ms. Parker's view of what a written counseling statement should be at Reema Consulting Services. Counseling is not a

Page 52

R. Vora

document where there's a statement from every person who's worked at Reema Consulting Services there.

Q.    Well, but she's indicating here that these people that she's --

A.    She is indicating that there's a statement from everyone but Ms. Wallace and Mr. Parker. That is not a factual statement that she's indicating because there are other employees who worked at Reema Consulting Services at the time who were not mentioned in this either. There is -- there's no mention of a statement from Cathy Price. There's no mention of a statement from, for example, myself. There is no mention of a statement from other personnel who are employed. So I'm confused as to what you are asking me.

Q.    What -- if you read what she wrote here, she's saying that Mr. Pickett and Ms. Wallace were witnesses to what she's complaining about and there's no statement from them.

MR. WALSH:  Is there a question?

Page 53

R. Vora

THE DEPONENT:  Is there a question?

MR. COLAIANNI:  I'm answering the witness's question. She just asked me a question.

BY MR. COLAIANNI:

Q.    And so I'm asking you if you understand why there were no statements from these people that allegedly witnessed what Ms. Parker was complaining about?

A.    I don't -- I don't know why there was no statement from them. There wouldn't -- there wouldn't be a statement from every person that an employee would say that I would want a statement for in a written counseling. That is not common practice. This is not a transcript or a statement of facts that we are gathering. This is a written warning.

Q.    Is it common policy to obtain statements from people who witnessed the conduct about which the person is complaining?

A.    Yeah. But would those same

R. Vora

statements be listed in a written warning, no.

Q. Where would these written statements be included?

A. It would be with human resources.

Q. Are you aware, in this particular situation, when the written statements submitted with human resources from other persons who witnessed the conduct other than -- (reporter clarification).

Let me try again. Are you aware whether there are written statements lodged with human resources from persons that witnessed the conduct Ms. Parker has alleged other than Wallace and Pickett?

MR. WALSH: And I'll object. To the extent that that information comes to you as part of a privileged communication, I'd instruct you not to answer.

THE DEPONENT: I'm going to claim privilege on this.

BY MR. COLAIANNI:

Q. I'm just asking whether there

R. Vora

were statements or not. That's a yes or no. You're not going to answer that?

MR. WALSH: You're not. You're asking the substance whether those statements even exist, and to the extent those statements exist or not, the only way this witness has information about that because part of her privileged communication she had with the people she was talking to. She was acting as in-house counsel. I don't know how you insist that she's not privileged. This was the same discussion I previously had with other counsel and everybody was okay with it.

MR. COLAIANNI: Well, I don't see how it reflects people's advice, so I don't agree with the privilege objection or the instruction.

BY MR. COLAIANNI:

Q. As part of the policy at RCSI, who would make the final decision to issue a

R. Vora

warning letter to employees such as the one we've marked as Exhibit 5?

MR. WALSH: I'll object. Can you narrow it down? Are we talking about any disciplinary warning or are we talking about this disciplinary warning?

MR. COLAIANNI: Well, if I ask about this one, are you going to tell her she can't answer it because of privilege?

MR. WALSH: Well, if you ask her the question, we can go from there. Your question is incredibly broad. It's any written warning that's given to an employee. I think we've already gone through the idea that there's different types of written warnings that can go back and forth between employees and a company.

MR. COLAIANNI: Well, the type of written warning -- my question referenced the type of warning we're talking about has been marked as

R. Vora

Exhibit 5. Who would make the final decision to issue this type of warning letter?

MR. WALSH: I'll object.

A. This is part of -- all part of privileged communications. This is all in anticipation of litigation.

BY MR. COLAIANNI:

Q. Just -- I'm asking about the policy at Reema. I'm asking you who would approve a written warning letter?

Is there a hierarchy or somebody who makes a final decision to issue it? That can't be privileged.

A. The policy at Reema Consulting Services is that final authority rests with the company president.

Q. Is that Mr. Vora?

A. That is correct.

Q. Okay. So he would make the final decision of a warning letter such as -- such as the warning letter we've marked as Exhibit 5?

MR. WALSH: I'll object but you

Page 58

R. Vora

could answer.

A. Yes.

BY MR. COLAIANNI:

Q. Forgive me if I've asked you this already --

A. I'm sorry. Could you repeat the question? I couldn't hear you.

Q. Sorry. Let me speak into the speaker. I may have asked this already, but do you recall who drafted the warning letter marked as Exhibit 5?

A. I believe it was Larry Moppins.

Q. Mr. Moppins, okay. I'm going to turn to page 3 of Exhibit 5, please. This is a signature page. Let me know if you're there, please.

A. Okay.

Q. So this was signed -- it looks by a Larry Moppins, Sr. Is that his handwriting? Do you understand that to be his signature?

A. Yes.

Q. There's also a line beneath that. It says Alt PM's signature.

Page 59

R. Vora

Do you see that?

A. Yes.

Q. Do you know what "Alt PM" stands for?

A. Alternate program manager.

Q. Would this -- do you know who the alternate program manager was in connection with this matter?

A. The deputy program manager was DaMarcus Pickett.

Q. Is that -- would he be the alternate program manager?

A. Yes.

Q. Is there a reason he didn't sign this, do you recall?

A. I believe that he was not present.

Q. There are no witness signatures on page 3 of Exhibit 5.

Is that -- is that usual for a -- a warning letter of this type?

MR. WALSH: Objection. You could answer.

A. It's -- it's -- it's something

Page 60

R. Vora

that HR should have signed.

Q. Is there a reason HR did not sign?

A. You'd have to ask Cathy Price. She was present, and I -- it might have been an oversight on her part. But she was present at the delivery, as was I.

Q. When you say "present at the delivery," do you mean the delivery of the letter to Ms. Parker?

A. Yes. And Mr. Moppins was not present. This may have been signed prior to that.

Q. Turn to the next page of Exhibit 5, please. It's REEMA000174.

A. Okay.

Q. Is this a separate written warning that was given to Ms. Parker on the same day as the previous letter we just talked about?

A. Yes.

Q. Do you know why there are two separate letters?

A. Yes. I going to claim privilege.

Page 61

R. Vora

Q. Do you know if Mr. Birgans -- let me back up.

Do you know Mr. Birgans? Is that name familiar?

A. Yes.

Q. He's identified here in this letter. Do you know that he was consulted in connection with the claim Ms. Parker made?

A. I do not know.

Q. I'm sorry. I didn't hear your answer.

A. I don't have actual knowledge. This is something that HR would have actual knowledge of.

Q. Okay. And these letters we've marked as Exhibit 5 both recommend termination of employment for Ms. Parker, correct?

A. Correct.

Q. So at the time these letters were delivered to her, the decision had been made to terminate her employment at RCSI, correct?

A. Yes.

Q. And she was terminated formally

Page 62

R. Vora

the next day, correct?
May -- it was after May 16, 2016.
A. I don't recall fully. If you allow me to refresh my recollection through the -- through the Virginia Unemployment Commission filings, then I could refresh my recollection.
Q. The warning letters we just looked at were dated May 16, 2016, correct?
A. That is the date, correct.
Q. Do you recall when -- approximately when these were drafted? Were they drafted on that date or around that date?
A. They were drafted around that date. I don't know the exact date.
Q. These warning letters were drafted after Ms. Parker had submitted her Complaint about Mr. Moppins, correct?
A. Yes. These warning letters were also drafted after John Tate Jennings had submitted a sexual harassment complaint against Ms. Parker -- a harassment complaint against Ms. Parker.

Page 63

R. Vora

Q. In the -- one second. In Exhibit 5, warning letters, you can look at the first page of the letter -- of Exhibit 5, if that helps. There's a "Reason For Warning" mentioned as poor performance -- excuse me, poor management performance, abuse of managerial authority, explicit use of profanity when questioning employees, insubordination and workplace misconduct.
Do you see that?
A. Yes, I do.
Q. Do you recall whether this was -- in Ms. Parker's role at this time, was this her first time managing employees at the company?
A. This is the first time -- I'm sorry. Is this assistant manager operations manager position the first time she's managing an employee?
Q. Correct, yes.
A. Or has she ever managed an employee under a different management role and title?
Q. Has she managed employees at RCSI

Page 64

R. Vora

prior to the role that she had on May 16, 2016?
A. I need to refresh my recollection about what title she held. And so I don't know at this time.
Q. Her -- I believe she was first hired as an inventory control clerk initially and then was promoted to assistant warehouse operations manager after that, prior to this -- prior to her final role.
A. So --
MR. WALSH: Based on the representation by counsel that those are the roles that she had. Is that what the question is? I don't believe that that's accurate. But that's why if your question is based on those representations, then I want to make sure that we got it clear.
A. Right. I don't -- I don't -- when I read her complaint, it seems that she alleged that she's gotten six promotions, and you're telling me two titles and I'm confused.

Page 65

R. Vora

Q. Well, what I have is she was originally retained -- excuse me -- hired as an inventory control clerk and her role was a receiving supervisor?
A. If you're telling me she's a receiving supervisor, then she has managed prior to this assistant operations manager role.
Q. In her prior supervisor positions, were there ever any complaints against her at the company?
A. I don't know the answer to that question.
Q. Just to finish my question. I was going to ask: Were there any other complaints against her relating to mistreatment of employees in her prior roles as a supervisor?
A. With Reema Consulting Services?
Q. Yes.
A. I'm not aware of the answer to that question. I don't know.
Q. Okay. I just wanted to get my question on the record because we've talking

Page 66

R. Vora

over one another.

I'd ask you to take a look at Exhibit 2 again, please. This is the document beginning at REEMA00059.

A. Correct.

Q. Yeah. And if you look at the -- could you look at the page that ends in REEMA0063, please?

A. Okay.

Q. At the bottom of that page, there's Paragraph 7 entitled Complaint Procedures. Do you see that?

A. Correct.

Q. And feel free to read as much of this as you want, but in Subparagraph B, it notes that the alleged victim should inform the alleged harasser they were offended and they expect the behavior to stop immediately.

Is it -- well, I'm sorry. Do you see that?

A. I do.

Q. Is it the policy for the alleged victim to -- to approach the alleged harasser?

Page 67

R. Vora

A. As I said it's a --

THE REPORTER: I'm sorry. I couldn't hear. Could you repeat your answer?

BY MR. COLAIANNI:

Q. Ms. Vora?

A. Counsel, the court reporter is asking you to repeat the answer -- or repeat the question.

MR. COLAIANNI: I heard her ask you to repeat the answer. That's what I heard.

THE DEPONENT: She asked you to repeat the question. I haven't answered at all yet.

MR. COLAIANNI: Ms. Court reporter, do you need the question repeated or the answer repeated?

THE REPORTER: I needed the answer repeated?

THE DEPONENT: The answer repeated? Okay.

So could you reask the question, please?

Page 68

R. Vora

MR. COLAIANNI: Could you read that back, Ms. Court reporter? I -- would you mind reading the question back, please?

(Designated question was read back.)

A. Okay. It's the policy -- it's recommended that the victim -- the alleged victim approach the alleged harasser to have an immediate cease and end to any harassment. However, the employee's always encouraged and allowed to come to human resources at any time. And that is why it says employee should and not employee must.

Q. You mentioned earlier a Complaint that Mr. -- a Mr. Jennings filed against Ms. Parker.

Do you recall that?

A. Yes.

Q. Was that Complaint investigated?

A. Yes.

Q. Were you involved in that investigation?

A. I was aware of the investigation.

Page 69

R. Vora

Q. You were not involved directly in the investigation. You were aware of it, is that your testimony?

A. Correct.

Q. Do you recall who investigated Ms. Jennings' Complaint against Ms. Parker?

A. Cathy Price.

Q. Anyone else?

A. Cathy Price is the only one I'm aware of.

Q. Do you recall were there any employees at RCSI that were consulted in connection with that investigation?

MR. WALSH: I'll just caution you to the extent that it's a yes-or-no answer as to whether you recall. Then we can deal with the substance of that information, if it is privileged, I'd caution you to not answer that part.

A. Yes, I do.

BY MR. COLAIANNI:

Q. Do you recall which employees were interviewed or consulted?

Page 70

R. Vora

MR. WALSH: Again, that would he by a yes or no, and we'll go as to the substance.

A.    Yes.

Q.    Can you tell me which ones?

MR. WALSH: To the extent that is a privileged communication, then I'd instruct you not to answer.

A.    It's a privileged communication that Cathy Price disclosed to me.

MR. COLAIANNI: The identity of the people you believe is privileged?

MR. WALSH: To the extent that that information came to her from Cathy Price, as she's indicated, then yes, that would be privileged.

MR. COLAIANNI: Are you okay, Ms. Vora, are you okay. We can take a break. I don't have a lot more.

THE DEPONENT: We can finish up. I actually -- I could probably -- can we stop in five minutes. I'd like to get a water break.

MR. COLAIANNI: Absolutely.

Page 71

R. Vora

THE DEPONENT: I've been speaking for the last hour and a half?

THE REPORTER: Do you want to take a break now?

THE DEPONENT: Let's take a break at 3:30 eastern standard time.

MR. COLAIANNI: I've marked another exhibit here. Give me one second, please.

I just introduced Exhibit 6 into the Chat room.

(Exhibit 6, REEMA000006, was marked for Identification by the court reporter.)

BY MR. COLAIANNI:

Q.    Are you able to access that?

A.    Yes.

Q.    This is the document that begins with REEMA000006.

A.    Yes.

Q.    Do you recognize Exhibit 6?

A.    Yes.

Q.    Could you state what it is for the record, please?

Page 72

R. Vora

A.    It's the Reema Consulting Services, Incorporated Sexual and Other Unlawful Harassment Investigation Report.

Q.    Did you play any role in creating this document?

A.    No.

Q.    Do you recall who did?

A.    Cathy Price.

Q.    Did you review this document before it was finalized?

A.    No.

Q.    This report, which was finalized on May 17, 2016, would you agree?

A.    It appears that way.

Q.    Which is the day Ms. Parker was -- either the day or the day before Ms. Parker was terminated from her employment at RCSI, correct?

A.    Correct.

Q.    What is the focus of Exhibit 6. Why does RCSI create investigative reports?

A.    Because it's per the employee manual and the employee harassment -- it's part of the employee manual and the employee

Page 73

R. Vora

sexual harassment policy.

Q.    Was this document given to Ms. Parker?

A.    I don't know. You'd have to ask that to Cathy Price.

Q.    Is it the policy of the company to deliver this to the employee?

A.    Yes.

Q.    Turn to the second page of the document, Paragraph 12, there's a reference to a meeting.

A.    Actually, I'm going to correct that last answer. It depends. It's the policy of the company to deliver a copy of the investigative questionnaire to the employ. To deliver a copy of the report to the employee is most likely dependent upon the employee's request for the report.

Q.    I see. Can you turn to the second page of Exhibit 6, please?

A.    Okay.

Q.    Paragraph 12, there's a reference to a meeting with Mr. Vora, yourself, HR, Larry Moppins.

Page 74

R. Vora

Do you see that?

A. Yes, I do.

Q. What was the purpose of that meeting?

A. The purpose of that meeting was to review the result of this report and the recommendations -- this report was not shared to us, but the recommendations on the findings Cathy Price's assessment.

Q. I'm sorry. You said the report was not shared with you?

A. The report -- the contents of the report were shared. The physical copy of the report was not shared.

Q. I see. Was the meeting that's referenced in Paragraph 12, was that the meeting -- was it determined during that meeting to terminate Ms. Parker's employment?

MR. WALSH: And to the extent that that calls for privileged communication because that meeting was there to provide legal advice, I'd instruct you not to answer.

THE DEPONENT: That is correct.

Page 75

R. Vora

Don's responses is correct. I provided legal advice.

MR. COLAIANNI: Okay. I don't think I have any further questions. Thank you for your time, Ms. Vora.

THE DEPONENT: Thank you so much.

MR. WALSH: I was just going to talk about reading and signing. Reema, you have the opportunity to review the transcript -- do it this way, we'll read and sign. Given the difficulties with people hearing, I think it makes sense for us to read and sign.

THE REPORTER: I agree. I need to read it.

THE VIDEOGRAPHER: This concludes today's deposition of Reema Vora. Going off the record at 3:34 p.m.

(Deposition concluded at 3:33 p.m.)

Page 76

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

I, Jennifer L. Wielage, CCR No. 30X100191600, Certified Court Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of Maryland that the foregoing is true and correct.

Dated this 17th day of July 2020.

____________________
Jennifer L. Wielage, CCR, RPR, CRR

Page 77

DEPOSITION ERRATA SHEET

Our Assignment No. 311962
Case Caption: PARKER V. REEMA

Page No._____Line No._____Change to:______________
Reason for change:_________________________________
Page No._____Line No._____Change to:______________
Reason for change:_________________________________
Page No._____Line No._____Change to:______________
Reason for change:_________________________________
Page No._____Line No._____Change to:______________
Reason for change:_________________________________
Page No._____Line No._____Change to:______________
Reason for change:_________________________________
Page No._____Line No._____Change to:______________
Reason for change:_________________________________
Page No._____Line No._____Change to:______________
Reason for change:_________________________________
Page No._____Line No._____Change to:______________
Reason for change:_________________________________
Page No._____Line No._____Change to:______________
Reason for change:_________________________________
Page No._____Line No._____Change to:______________
Reason for change:_________________________________
Page No._____Line No._____Change to:______________
Reason for change:_________________________________
Page No._____Line No._____Change to:______________
Reason for change:_________________________________
Page No._____Line No._____Change to:______________
Reason for change:_________________________________
Page No._____Line No._____Change to:______________

Page 78

______________________________________
Reason for change:____________________
Page No._____Line No._____Change to:______________
______________________________________
Reason for change:____________________
Page No._____Line No._____Change to:______________
______________________________________
Reason for change:____________________
Page No._____Line No._____Change to:______________
______________________________________
Reason for change:____________________
Page No._____Line No._____Change to:______________
______________________________________
Reason for change:____________________
Page No._____Line No._____Change to:______________
______________________________________
Reason for change:____________________
Page No._____Line No._____Change to:______________
______________________________________
Reason for change:____________________
Page No._____Line No._____Change to:______________
______________________________________
Reason for change:____________________
Page No._____Line No._____Change to:______________
______________________________________
Reason for change:____________________
Page No._____Line No._____Change to:______________
______________________________________
Reason for change:____________________
Page No._____Line No._____Change to:______________
______________________________________
Reason for change:____________________
Page No._____Line No._____Change to:______________
______________________________________
Reason for change:____________________
Page No._____Line No._____Change to:______________
______________________________________
Reason for change:____________________
Page No._____Line No._____Change to:______________
______________________________________
Reason for change:____________________
Page No._____Line No._____Change to:______________
______________________________________
Reason for change:____________________
Page No._____Line No._____Change to:______________

Page 79

______________________________________
Reason for change:____________________
Page No._____Line No._____Change to:______________
______________________________________
Reason for change:____________________
Page No._____Line No._____Change to:______________
______________________________________
Reason for change:____________________
Page No._____Line No._____Change to:______________
______________________________________
Reason for change:____________________
Page No._____Line No._____Change to:______________
______________________________________
Reason for change:____________________
Page No._____Line No._____Change to:______________
______________________________________
Reason for change:____________________
Page No._____Line No._____Change to:______________
______________________________________
Reason for change:____________________
Page No._____Line No._____Change to:______________
______________________________________
Reason for change:____________________

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of ____________, 20___.

___________________________________
REEMA VORA

**Exhibits**

**P-1 Reema Vora** 9:10
**P-2 Reema Vora** 26:16 29:12 66:4
**P-3 Reema Vora** 33:19 35:10 43:4
**P-4 Reema Vora** 41:6 44:3,4 45:7,12,16, 17,24 46:4
**P-5 Reema Vora** 44:25 45:4,8,9,10,13,19 46:8,9,12,15,16 47:13 56:3 57:2,23, 24 58:12,15 59:20 60:15,16 61:17 63:2, 3,4

**0**

**0001** 41:3
**00066** 30:16

**1**

**1** 9:10 30:20
**12** 73:11,23 74:17
**16** 62:3,10 64:2
**17** 4:9 72:14
**1995** 12:23

**2**

**2** 26:16 29:12 30:3 66:4
**2000** 29:18
**2005** 13:20
**2007** 14:15
**2010** 14:8
**2011** 12:21
**2012** 19:10
**2013** 29:17,18,19 34:16
**2014** 23:3
**2016** 30:3 62:3,10 64:3 72:14
**2017** 16:15 22:13,14
**2020** 4:9

**3**

**3** 30:21 33:19 35:10 43:4 44:3 58:15 59:20
**30** 16:15
**3320** 5:13 6:10
**3:30** 71:7
**3:33** 75:23
**3:34** 75:21

**4**

**4** 30:22 41:6 44:4 45:7,12,16,17,24 46:4
**422** 5:13 6:11

**5**

**5** 44:25 45:4,8,10,13, 19 46:8,9,12,15,16 47:13 56:3 57:2,24 58:12,15 59:20 60:16 61:17 63:3,4

**6**

**6** 28:25 71:11,13,22 72:21 73:21

**7**

**7** 66:12

**8**

**8:17-CV-0164-8-TDC** 4:6

**9**

**95054** 5:14 6:11

**A**

**absolutely** 20:6 30:8 38:13 70:25
**abuse** 63:7
**access** 9:19 71:17
**accountable** 21:6
**accurate** 7:23 64:17
**acknowledge** 4:16,18
**acronym** 16:2
**acting** 55:12
**action** 15:9 32:15,18, 23
**actions** 32:6,7,12
**actively** 26:8
**actual** 20:15 61:13,14
**add** 31:3
**added** 33:16
**additional** 33:7,12
**address** 6:8
**administered** 4:19
**administrative** 7:7
**administrator** 13:24
**advice** 20:19 39:2 40:14 55:19 74:23 75:3
**agree** 5:6,9,11 38:6 40:18 48:11 55:20 72:14 75:17
**agreed** 40:11
**agreement** 5:2,4 40:9
**agreements** 40:17
**ahead** 8:7
**Alaris** 12:6
**allegation** 25:4
**alleged** 54:15 64:23 66:17,18,23,24 68:9, 10
**allegedly** 53:10
**allowed** 68:13
**alongside** 22:21,24
**Alt** 58:25 59:4
**alternate** 59:6,8,13
**altogether** 30:18
**analyzing** 23:25
**annual** 31:4
**Annually** 31:23
**answering** 36:21 51:9 53:4
**Anti-terrorism** 16:5
**anticipation** 40:7 57:8
**apartment** 5:13 6:10

**appears** 72:15
**approach** 66:24 68:10
**approve** 57:12
**approximately** 62:13
**arrangement** 4:24 31:12
**assessment** 74:10
**assist** 30:4
**Assistance** 16:5
**assistant** 63:18 64:9 65:8
**assume** 8:8 11:17 17:21 18:4 49:20
**assumes** 37:5
**assumption** 50:2
**assumptions** 49:23
**attend** 14:9
**attention** 34:25 39:13
**attorney-client** 37:23 39:4
**attorneys** 4:14
**audio** 29:4
**authority** 20:13,14 21:25 57:17 63:8
**awarded** 19:9
**aware** 37:2,14 38:14, 20 39:11 43:23 51:7 54:7,12 65:22 68:25 69:3,11

B

**back** 36:2 56:20 61:3 68:3,5,7
**based** 6:15 30:12,19 64:13,18
**basis** 15:25 36:24 37:22 39:4,20
**bear** 7:10 9:4 26:12
**bears** 27:7
**beginning** 13:20 19:4, 7 30:15,20 66:5
**begins** 27:2 71:19
**behalf** 5:8,11
**behavior** 50:10 66:19
**beneath** 51:13 58:24
**Birgans** 61:2,4
**bit** 38:17
**boss** 20:20
**bottom** 27:12 47:16 66:11
**break** 8:11,14 70:20, 24 71:5,7
**bring** 33:8
**broad** 25:18 56:15
**broader** 43:21
**brought** 14:22 39:12
**bullets** 35:23

C

**California** 5:14 6:11
**calls** 38:6 74:21
**capacity** 24:18
**carefully** 28:17
**case** 4:5 10:7,9,22,23 11:2,4 15:19
**catch** 16:3 35:5
**Cathy** 23:20,21,24 43:19,24 52:14 60:5 69:8,10 70:11,16 72:9 73:6 74:10
**caution** 48:18 51:4 69:15,20
**cc'd** 26:3
**cease** 68:11
**chance** 8:16
**changed** 20:5
**charges** 25:5
**Chat** 26:21 33:17 44:16,25 71:12
**claim** 36:23 42:18 54:23 60:25 61:9
**claims** 38:11
**Clara** 5:14 6:11
**clarification** 32:9,13 33:11 44:17 54:11
**clarify** 29:2 43:13 50:15
**clear** 8:4 64:20
**clearance** 19:20
**clerk** 64:8 65:4
**close** 5:25
**closer** 5:24 44:18
**Coast** 13:25 14:2
**coincidence** 13:12
**Colaianni** 5:7,8,16 6:14 9:13 13:16 24:24 26:11,19 33:15,23 36:8,24 37:12,13 38:3,9 39:14 40:2,16,21,25 41:11 42:6 43:10 48:10 51:8 53:4,7 54:24 55:18,23 56:9, 22 57:9 58:4 67:6, 11,17 68:2 69:23 70:12,18,25 71:8,16 75:4
**comment** 49:15,16,19, 21 50:20
**Commission** 14:4,5 42:17 62:7
**common** 53:17,21
**communicated** 25:11 26:5
**communication** 25:24 39:25 49:6 51:3 54:20 55:10 70:8,10 74:22
**communications** 43:7 57:7
**company** 12:17 13:7,11 20:23 21:11,19 23:9 25:7 32:2 33:10,14 34:18,23 56:21 57:18 63:16 65:12 73:7,15
**complaining** 52:23 53:11,24
**complaint** 10:17 41:25 43:3 45:18 62:20,23, 24 64:22 66:12 68:16,21 69:7
**complaints** 16:22,25 17:16 35:17,19 36:3, 13 37:3,6,14 65:11, 17
**completed** 8:16
**compliance** 14:20 30:19
**concluded** 75:23
**concludes** 75:20
**conduct** 14:23 32:25 53:23 54:10,15
**conducted** 17:4,19 31:5 43:19,25
**Conference** 4:8
**confidential** 35:20
**confirm** 45:21
**confused** 52:18 64:25

**connection** 6:18 11:20 17:17 18:15 42:18 44:10 59:8 61:9 69:14
**consent** 4:23
**consequences** 31:24 32:4,5,10,11,14
**considered** 31:6 36:19
**consultant** 18:17,19 19:5,15,18,24 20:8,12,17,24 21:9,13,18 22:4,9
**consulted** 61:8 69:13,25
**consulting** 4:5 12:4 20:3 21:8 27:16,24 28:20,21 39:2 41:6,20 47:25 48:2 51:25 52:3,11 57:16 65:20 72:2
**contents** 74:13
**context** 38:25
**contract** 12:7 13:23 16:6,10,11,13 17:12,17 18:16,18 19:9,19 21:10
**contracts** 15:23 17:8
**contribution** 34:9
**control** 18:13 64:8 65:4
**conversation** 24:13 25:12 37:11 40:11
**conversations** 24:23,25 26:6
**copy** 73:15,17 74:14
**corporate** 14:20,23 21:7
**correct** 6:21,22 7:15,19,20 8:18,25 10:3,4 11:15,18 12:25 13:4 16:8,18 17:23 18:4 21:22 22:5,9,17 23:12 24:2,3 25:25 27:3,13,17,18 36:5 42:2,20 46:18,19 50:10 57:20 61:19,20,23 62:2,10,11,20 63:21 66:6,14 69:5 72:19,20 73:13 74:25 75:2
**corrective** 15:9
**counsel** 4:23 6:20 7:14 10:8,18 11:6,17 12:3,11,12 14:16 15:2,12,13 24:14,18 28:9 36:18 37:8,10,20 38:2 39:8,11,21 40:10,14 55:12,16 64:14 67:8
**Counsel's** 39:9
**counseling** 49:2 51:24,25 53:17
**court** 4:11 7:19 9:12 26:17 33:21 38:6 41:10 45:5 67:8,17 68:3 71:14
**create** 72:22
**created** 30:6
**creating** 34:7 72:5
**current** 12:9 15:11

**D**

**D.C.** 6:15
**Damarcus** 38:21 59:11
**date** 30:3 62:11,14,15,17
**dated** 34:16 62:10
**dates** 19:12 28:23 29:24
**day** 60:20 62:2 72:16,17
**day-to-day** 15:22 26:9
**deal** 69:18
**decided** 19:14 33:9
**decision** 19:16,23 33:13 55:25 57:3,14,22 61:22
**decisions** 15:15
**declare** 4:20
**Defendant** 5:11
**Define** 25:14
**degree** 14:7,13
**deliver** 73:8,15,17
**delivered** 61:22
**delivery** 60:8,10
**department** 16:4 17:11 18:15,18 19:22 21:9
**dependent** 73:18
**Depending** 33:2
**depends** 73:14
**DEPONENT** 5:5 24:21 26:15 33:22 36:22 40:6,24 53:2 54:22 67:14,22 70:21 71:2,6 74:25 75:7
**deposit** 35:4
**deposition** 4:3,7,15,17 6:7,21,25 8:15,17,23 9:4,6,11,25 10:6,21 11:20 40:9 75:20,23
**depositions** 46:3
**deputy** 59:10
**describe** 15:4 47:4
**designated** 68:6
**detailed** 18:9
**details** 26:9
**determination** 33:6
**determined** 33:4 74:18
**development** 28:12
**difficulties** 75:14
**direct** 21:6 34:25 35:4
**directly** 20:21 21:22 24:17 69:2
**disagree** 38:4
**disciplinary** 15:8 32:6,7,12,15,18 56:6,7
**discipline** 20:13
**disclosed** 70:11
**discrimination** 17:3
**discussion** 13:14 33:7 55:15
**dispute** 49:10
**doc** 42:3
**Docket** 11:4
**doctorate** 14:7
**document** 9:20,23 26:12 27:7,9,20,22 28:2,4,6,12 29:6 30:6,15,16,18 31:2 33:16,17 34:4 35:9 41:13,14,15,19,24 42:4,10,11 44:3,24 45:14,16,18,24 46:7 48:8 50:6 52:2 66:5 71:19 72:6,10 73:3,11

**documentation** 50:10
**documents** 10:11,14, 20,23 11:5,9,14 14:22 30:9,23
**Don** 10:12
**Don's** 75:2
**Donald** 5:10
**download** 9:16,17
**drafted** 28:4,6,16 47:10 58:11 62:13, 14,16,19,22
**drafting** 27:25 34:12 50:6
**Drive** 5:13 6:10
**DS** 16:3
**DS-ATA** 15:19
**duly** 5:15
**duties** 16:17

**E**

**e-mails** 26:3
**earlier** 16:2 17:12 18:16 68:16
**eastern** 71:7
**ECF** 11:4
**editing** 47:8
**effect** 29:13,14,17 30:7 34:18,20
**eligible** 19:21
**employ** 73:17
**employed** 11:23 12:2 13:18,20,21 22:8,22 25:7,25 28:20 52:18
**employee** 18:21,24 19:2,12,17 20:3,8 23:10 24:8 25:22 33:19 34:5,7,10,13, 21,22 43:21 53:15 56:17 63:20,23 68:14,15 72:23,24,25 73:8,18
**employee's** 68:12 73:19
**employees** 15:10,15 16:22,25 17:16 20:14 21:11,12,15 22:2 31:18,25 44:7 52:11 56:2,21 63:9,15,25 65:18 69:13,24
**employees'** 26:9
**employment** 17:2 25:2 28:24 29:6,8 61:18, 23 72:18 74:19
**encouraged** 68:12
**end** 68:11
**ending** 41:3
**ends** 35:8 45:10 66:8
**entered** 44:16,25
**entitled** 66:12
**errors** 8:18
**evaluations** 24:5
**Evangeline** 4:10 22:17
**events** 50:11
**exact** 19:12 22:14 28:23 62:17
**EXAMINATION** 5:16
**Exchange** 14:4
**exchanged** 11:6
**excuse** 23:2 63:6 65:3
**exhibit** 9:10 26:14, 16,20,23,24 27:6 29:12 33:19 35:10 40:23 41:2,3,6 42:12 43:4 44:3,14,15,25 45:4,7,8,9,12,13,16, 17,19,24 46:4,8,9, 12,15,16 47:13 56:3 57:2,23 58:12,15 59:20 60:15 61:17 63:2,4 66:4 71:9,11, 13,22 72:21 73:21
**exhibits** 10:13 42:14
**exist** 55:6,7
**expect** 66:19
**experience** 35:25
**expert** 18:7,8
**explained** 7:13
**explicit** 63:8
**extent** 24:11 36:16,19 37:7,19 38:24 39:6 43:5 46:22 48:19,20 50:25 54:18 55:7 69:16 70:7,14 74:20

**F**

**fact** 24:13
**facts** 53:19
**factual** 52:9
**fair** 8:9 25:13 51:10
**familiar** 17:21 22:16 36:3,12 61:5
**Federal** 14:3
**feel** 8:13 66:15
**figure** 42:24
**file** 10:9,22,23 11:2 25:5 27:4
**filed** 25:3 68:17
**files** 10:7
**filings** 62:7
**final** 55:25 57:2,14, 17,21 64:11
**finalized** 72:11,13
**findings** 74:10
**fine** 24:20
**finish** 65:15 70:21
**firm** 6:14
**Fish** 6:14
**focus** 72:21
**follow** 31:25
**Forgive** 58:5
**formal** 31:8,14
**formally** 61:25
**foundation** 36:7
**founded** 12:22
**founding** 13:6
**frame** 19:7
**free** 66:15
**full** 6:3 17:19
**fully** 62:4
**function** 23:19

**G**

**gathering** 53:19
**generally** 17:4
**generating** 46:21
**gentleman** 17:22 38:21
**George** 14:10,14,15
**Give** 71:9
**Good** 4:2 5:17,18
**Great** 11:8
**ground** 7:12
**group** 21:10
**Grumman** 12:8
**Guard** 13:25 14:3

**guidance** 20:19

H

**half** 71:3
**Handbook** 33:19 34:5, 7,10,13,21
**handwriting** 47:16,17 58:21
**harasser** 66:18,25 68:10
**harassment** 15:8 17:2 25:5 27:15,23 30:11, 13 31:10,16,21 32:2 35:18 36:4,13 37:3, 15 38:11 41:8,22 62:23,24 68:11 72:4, 24 73:2
**hear** 5:19 8:3 43:14 44:23 58:8 61:11 67:4
**heard** 67:11,13
**hearing** 5:23 7:8 29:3 40:5 42:13 75:14
**held** 4:7 13:14 64:5
**helps** 63:5
**hierarchy** 57:13
**highest** 15:21
**hire** 20:13 21:25
**hired** 23:2 64:8 65:3
**hiring** 15:6
**hour** 71:3
**HR** 17:5 33:9,12 60:2, 3 61:14 73:24
**human** 17:18 23:22 28:3,13,15,18 33:6,8 38:11 39:13 54:6,9, 14 68:13
**hundred** 29:19

I

**idea** 56:18
**Identification** 9:12 26:17 33:20 41:9 45:5 71:14
**identified** 10:21 11:9 28:25 31:13 32:11,14 45:10 61:7
**identity** 70:12
**immediately** 66:19
**improvement** 32:22
**in-house** 12:3,11,12 14:16 15:2,11,13 24:14,18 28:8 37:20 38:2 39:8,10 55:12
**included** 50:8 54:5
**including** 32:16
**Incorporated** 4:5 12:7 41:7,21 72:3
**incredibly** 56:15
**independent** 20:16
**indicating** 8:22 52:5, 7,10
**individual** 26:4
**inform** 66:17
**information** 18:11 20:18 24:17 25:10,21 36:17 37:8,19,25 38:24 39:7,19,22 42:21 46:24 47:6 48:20,22 51:2 54:18 55:9 69:19 70:15
**infraction** 33:3
**inhouse** 39:20
**initial** 23:5 34:12
**initially** 64:8
**input** 33:12
**insist** 55:13
**instances** 36:12
**instruct** 24:10,15 37:16,18,21 39:3,18 54:20 70:9 74:24
**instruction** 38:4 40:19 55:21
**insubordination** 63:10
**intended** 32:24
**intentions** 50:5
**internal** 10:11 33:5 43:2
**internally** 19:23
**interned** 13:24 14:2, 3,4
**interpret** 14:20
**Interrogatories** 10:16
**interruption** 44:20
**interviewed** 69:25
**introduce** 6:13 9:3 26:14
**introduced** 26:20 71:11
**inventory** 18:12 64:8 65:4
**inventorying** 18:12
**investigated** 35:19 68:21 69:6
**investigating** 16:17, 21,25 17:16
**investigation** 17:20 18:23 41:8,22 43:3, 12,16,17,19,22,25 44:11 68:24,25 69:3, 14 72:4
**investigations** 14:23 17:7,10
**investigative** 16:18 72:22 73:16
**invoiced** 20:17
**invoke** 37:24
**involved** 13:6 15:24 16:17 17:6 26:8 43:2 68:23 69:2
**involvement** 15:14,20 16:24 17:13 43:6
**involves** 43:6
**issue** 55:25 57:3,14
**issued** 8:24
**issues** 17:3 24:7 38:18

J

**January** 12:21
**Jennifer** 4:11
**Jennings** 62:22 68:17
**Jennings'** 69:7
**job** 14:18,19 20:4
**John** 62:22
**joins** 34:22
**Joseph** 5:7,18 6:13
**July** 4:9 22:13
**June** 34:16
**juries** 14:6

K

**knew** 40:4
**knowledge** 18:9 24:11 26:2 39:22 61:13,15

L

**Larry** 17:22 41:25 47:11 49:6 58:13,20 73:25
**law** 6:14 7:19 14:9,10
**lawsuit** 25:2
**leadership** 21:7
**legal** 4:7,12 12:16 24:19 36:18 38:25 74:23 75:3
**letter** 47:10,13 56:2 57:4,12,22,23 58:11 59:22 60:11,20 61:8 63:4
**letters** 60:24 61:16, 21 62:9,18,21 63:3
**level** 15:21
**Lewis** 28:4,5 29:5 34:14
**Lewis's** 28:23
**lieu** 4:18
**link** 5:20
**listed** 48:25 54:2
**listen** 42:23
**listing** 44:6
**litigation** 6:18 8:24 40:7 57:8
**lodged** 41:25 54:13
**long** 12:19
**longer** 19:22 22:7,8
**looked** 50:19 62:10
**lot** 70:20

M

**made** 16:22,25 19:5, 16,23 33:6,13 37:4 42:19 61:9,22
**maintain** 14:20
**make** 19:15 27:5 49:25 55:25 57:2,21 64:19
**makes** 57:14 75:15
**making** 49:23
**manage** 21:10,12
**managed** 15:5 63:22,25 65:7
**management** 14:25 15:21 20:14,16 21:14 63:7,23
**manager** 12:7 13:22 20:2 23:22 28:3 38:11 47:24,25 59:6, 8,10,13 63:18,19 64:10 65:8
**managerial** 63:8
**managers** 15:5
**managing** 63:15,20
**manner** 4:25 35:20
**manual** 27:16,24 28:14,16,18,25 31:13 72:24,25
**mark** 26:12 33:16 40:23
**marked** 9:11 26:17 33:20 41:9 45:5 46:7,10 56:3,25 57:23 58:12 61:17 71:8,14
**matter** 4:4,21 6:18 7:3,4 18:7,8 38:19 59:9
**meeting** 73:12,24 74:5,6,16,18,19,22
**memos** 14:22
**mention** 52:14,15,16
**mentioned** 11:16 16:16 17:12 18:16 31:5 49:11 52:12 63:6 68:16
**merged** 30:10,24
**meriting** 33:7
**met** 17:25 22:19
**middle** 35:16
**Miguel** 4:9
**mind** 68:4
**minutes** 70:23
**misconduct** 63:10
**mistreatment** 65:18
**misunderstanding** 51:21,22
**moment** 9:5 26:13
**moments** 7:11
**Monica** 28:4,14,19 29:16 34:14
**Monica's** 28:24
**Montgomery** 5:13 6:10
**month** 22:15
**monthly** 20:17
**Moppins** 17:22,25 18:3 21:10,17,21 22:7 42:2 43:4 45:18 58:13,14,20 60:12 62:20 73:25
**morning** 4:2 5:17,18
**motivations** 50:4
**move** 5:24 40:21

N

**named** 13:13 38:21
**names** 44:7
**narrow** 25:19 56:5
**nature** 12:5 13:7 36:17 40:13
**needed** 14:24 67:20
**Northrop** 12:8
**notes** 66:17
**notice** 8:23 9:4,6,10, 25 10:3
**noticed** 29:25
**noting** 48:24
**number** 26:25 27:11 35:2,3

O

**oath** 4:19 7:15
**object** 24:15 36:16,20 37:17 38:23 54:17 56:4 57:5,25
**objection** 24:9 36:6, 15 39:17 42:4 48:7 55:21 59:23
**objections** 4:24
**obtain** 53:21
**occurred** 20:11 26:7 36:4
**offended** 66:18
**office** 16:4 22:23
**officer** 12:16
**officers** 14:23
**on-site** 17:18
**open** 27:9 45:20
**operation** 18:13
**operations** 18:10 63:18 64:10 65:8
**opinions** 24:19

**opportunity** 75:11
**originally** 65:3
**oversight** 60:7

**P**

**p.m.** 75:22,24
**Paragraph** 66:12 73:11,23 74:17
**Parker** 4:4 6:16 8:24 22:17,19 25:7 28:21 38:21 42:19 46:17,21 48:3,12 49:7 51:13 52:9 53:11 54:15 60:11,19 61:9,18 62:19,24,25 68:18 69:7 72:16,18 73:4
**Parker's** 23:25 24:5 25:10 29:8 47:17 49:13 50:18 51:23 63:14 74:19
**part** 16:16 24:12 31:2 51:2 54:19 55:9,24 57:6 60:7 69:21 72:25
**participated** 15:6,9
**participating** 4:15
**parties** 4:22
**Payees** 35:4
**penalty** 4:22
**people** 32:24 50:24 52:6 53:10,22 55:11 70:13 75:14
**people's** 55:19
**percent** 29:19
**performance** 24:5,8 25:11,14,15,21 26:5 32:21 63:6,7
**period** 14:2 19:14 25:16
**periodic** 31:19
**perjury** 4:22
**person** 4:19 52:3 53:15,23
**personnel** 15:7,22,25 20:15 52:17
**persons** 44:10 50:13 54:10,14
**phrased** 38:7
**physical** 74:14
**physically** 4:16 46:3
**Pickett** 38:22 51:15, 19 52:21 54:16 59:11
**Plaintiff** 5:8 6:16 10:17
**Plaintiff's** 10:17
**plan** 32:22
**play** 27:25 34:6 46:20 72:5
**pleadings** 11:3
**PM** 59:4
**PM's** 58:25
**point** 19:4,14 29:3 39:24
**policies** 31:12,15
**policy** 27:16,23 28:17 29:12 30:14,17,22 31:2,3,5,7,9 32:2,8, 12,16 38:10 53:21 55:24 57:11,16 66:23 68:8 73:2,7,15
**poor** 63:6,7
**position** 23:6 63:19
**positions** 65:11
**practice** 53:18
**predates** 30:14
**prepare** 10:6,21
**prepared** 29:15
**preparing** 11:20
**present** 4:17 48:23 59:18 60:6,8,9,13
**president** 12:6 33:10, 14 57:18
**previous** 45:17 60:20
**previously** 55:15
**Price** 23:20,21,24 43:19 52:14 60:5 69:8,10 70:11,16 72:9 73:6
**Price's** 74:10
**primary** 19:25
**prior** 6:6 13:18,19,24 28:20 29:6,8,18 39:11,12 60:13 64:2, 10,11 65:8,10,18
**privilege** 36:23 37:23,24 38:7 39:5 40:13 54:23 55:20 56:12 60:25
**privileged** 24:12,23, 25 25:12,23 26:6 36:20,25 37:10 39:24 42:21,25 43:6 46:24 47:5 48:19,21 51:3 54:19 55:10,14 57:7, 15 69:20 70:8,10,13, 17 74:21
**procedures** 18:12 31:9,11 66:13
**process** 50:5
**production** 26:25 27:8,11 35:2,3
**profanity** 63:9
**program** 15:5 20:2 59:6,8,10,13
**progressive** 32:7,11, 15,17,23
**promote** 15:15
**promoted** 23:9,12,13 26:3 64:9
**promotions** 15:25 23:15 24:2 64:23
**prompted** 28:11
**promptly** 35:19
**proposal** 13:22,23
**provide** 7:22 20:18 24:19 74:23
**provided** 30:13 34:21 48:4 75:3
**providing** 38:25
**publicly-available** 11:3
**purpose** 74:4,6
**purposes** 18:23
**pursuant** 8:23 10:2
**put** 29:5

**Q**

**question** 8:4,8 36:9, 11,21 37:22 38:8 39:9 42:7,23 44:22 51:5,7,18 52:25 53:3,5,6 56:14,15,23 58:8 64:16,18 65:14, 15,23,25 67:10,15, 18,24 68:4,6
**questioning** 63:9
**questionnaire** 41:9,23 73:16
**questions** 5:23 6:17 8:2 14:21 17:9 40:4,

22 42:24 75:5
**quickly** 9:15
**quote** 49:15

**R**

**Rajesh** 6:5 21:2
**RCSI** 8:24 12:10,13,20,22,24 13:18,19,20,21 14:17 15:16 16:7 18:6,14,17,21,24 21:7,9 22:9,22 23:6 24:8 25:17,22 28:9 29:7,9,13,16 31:9,14 36:14 37:4,15 38:10 44:7 55:24 61:23 63:25 69:13 72:19,22
**read** 52:20 64:22 66:15 68:2,6 75:13,15,18
**reading** 49:13 68:4 75:10
**real** 9:14
**reask** 67:24
**reason** 7:21 8:3,13 50:7 59:15 60:3 63:5
**recall** 10:14 22:11,14,25 23:5,8 28:5,18,23 29:11 47:9 50:12,22 58:11 59:16 62:4,12 63:13 68:19 69:6,12,18,24 72:8
**receive** 14:6,13 23:16
**received** 39:23
**receiving** 65:5,7
**recent** 34:19
**recognize** 9:23 27:19 33:25 34:3 41:12,14 46:12 71:22
**recognized** 49:9
**recollection** 19:13 28:22 29:15,21 62:5,8 64:4
**recommend** 61:17
**recommendations** 15:18,20,24 74:8,9
**recommended** 68:9
**record** 5:4 6:4,8 13:15 41:18 46:14 65:25 71:25 75:21
**Reema** 4:3,4 5:5,12 6:5 9:11 12:4,25 13:10 20:3 23:2 26:21 27:16,24 28:20,21 36:2,4 39:2 41:6,20 44:21 47:24,25 51:24 52:3,11 57:11,16 65:20 72:2 75:11,20
**REEMA000006** 71:13,20
**REEMA000174** 60:16
**REEMA00053** 35:3
**REEMA00059** 26:16,25 27:13 66:5
**REEMA00066** 30:2
**REEMA00171** 45:4,11
**REEMA0053** 35:9
**REEMA0063** 66:9
**reference** 73:11,23
**referenced** 56:24 74:17
**references** 47:19
**referring** 11:5 19:7 35:6 40:17 49:17 50:18
**reflects** 55:19
**reform** 32:25
**refresh** 29:20,21 62:5,7 64:4
**regular** 15:25
**regulations** 14:21
**relate** 46:6
**related** 10:24 18:13 24:16,22 43:18
**relating** 17:2 23:15 38:20 43:3 65:17
**relationship** 22:12
**relevance** 15:18
**relies** 48:19
**rely** 46:23
**relying** 40:14
**remember** 42:9
**Remote** 4:8
**repeat** 36:10 58:7 67:4,9,12,15
**repeated** 67:19,21,23
**report** 21:3,6,17 38:10 72:4,13 73:17,19 74:7,8,11,13,14,15
**reported** 20:21 21:5,22
**reporter** 4:11 9:12 26:18 32:9,13 33:11,21 41:10 44:17,20 45:6 54:11 67:3,8,18,20 68:3 71:4,15 75:17
**reporting** 4:25
**reports** 72:22
**representation** 64:14
**representations** 64:19
**represented** 6:20
**representing** 6:16
**request** 73:19
**requests** 33:12
**required** 19:22 31:18
**requirements** 19:20,21
**resources** 17:19 23:22 28:3,14,15,18 33:6,8 38:12 39:13 54:6,9,14 68:13
**respect** 17:11,15
**respond** 14:21
**responses** 10:18,24 75:2
**responsibilities** 14:17,18,19 15:2 16:21 20:4 23:15
**responsibility** 20:2 21:15
**responsible** 23:18,25
**rests** 57:17
**result** 74:7
**retained** 23:2 65:3
**revealing** 47:5
**review** 8:16 10:10,19 14:21,22 15:7 24:4 29:23 43:18,21 72:10 74:7 75:12
**reviewed** 10:7,22 28:17,19 34:11
**reviewing** 47:7
**Richardson** 6:15
**role** 12:9,20 18:6 19:24 23:6 27:25 34:6 37:9,20 39:8 43:11,15,17,20,23 46:20 47:3,4,7 63:14,23 64:2,11 65:4,9 72:5

**roles**  64:15 65:18
**room**  4:17 33:17
  44:16,25 71:12
**rules**  7:12
**rumor**  38:20 39:16
  40:5

**S**

**Santa**  5:13 6:11
**school**  14:9,11
**scrolling**  35:12
**section**  34:11 35:6,
  16,22
**Securities**  14:4
**security**  19:19
**seeking**  36:18
**sense**  32:24 75:15
**sentence**  48:5
**sentences**  51:16
**separate**  30:9,16,18,
  23 31:2 43:22 60:18,
  24
**September**  16:15
**Services**  4:5 12:4
  27:16,24 28:20,22
  41:7,21 48:2 51:25
  52:4,12 57:17 65:20
  72:3
**setup**  18:10
**severe**  33:10
**severity**  33:2
**sexual**  27:15,23 30:12
  31:10,12,15,21,25
  41:7,21 62:23 72:3
  73:2
**shared**  74:8,12,14,15
**short**  19:13
**show**  44:13
**sign**  59:15 60:4
  75:13,16
**signature**  58:16,22,25
**signatures**  59:19
**signed**  58:19 60:2,13
**signing**  75:10
**simple**  46:24
**simply**  43:7
**sitting**  5:25
**situation**  7:7 38:15
  54:8

**so-called**  39:16
**solely**  39:20
**speak**  11:19 44:9 58:9
**speaker**  5:25 44:19
  58:10
**speaking**  71:3
**speaks**  42:4 48:8
**special**  30:11
**specific**  23:14 43:18
**specifically**  38:18
**spoke**  10:8,18 11:17
**Sr**  58:20
**staff**  30:14
**standard**  71:7
**stands**  12:24 59:4
**start**  8:22
**starting**  28:21
**state**  6:3,7 16:4
  17:12 18:15,18 19:22
  21:9 71:24
**stated**  11:12 32:5,6,
  12
**statement**  25:18 48:4,
  13,15,17 50:7,11,19
  51:14,19,24 52:2,8,
  9,14,15,17,23 53:13,
  14,16,19
**statements**  50:13,16,
  23 53:9,22 54:2,5,8,
  13 55:2,6,7
**states**  35:18
**stating**  5:3 36:25
**status**  19:17
**stenographic**  13:15
**stop**  8:12 66:19 70:23
**stopped**  29:16
**strictly**  24:22
**subject**  18:7,8
**submit**  42:12
**submitted**  42:14 54:9
  62:19,23
**Subparagraph**  66:16
**substance**  55:5 69:19
  70:4
**summer**  22:14
**supervisor**  65:5,7,10,
  19
**supplement**  31:6
**Support**  4:8,13

**suspension**  32:21
**sworn**  5:15
**system**  18:11

**T**

**talk**  38:17 75:10
**talked**  60:21
**talking**  35:17 55:11
  56:5,7,25 65:25
**Tate**  62:22
**technical**  20:18
**technology**  18:11
**telling**  64:24 65:6
**terminate**  21:25 61:23
  74:19
**terminated**  16:10,11,
  14 22:12 61:25 72:18
**termination**  15:10
  32:16,21 61:18
**terms**  15:18 17:9
  20:15 43:20,22
**testifies**  5:15
**testifying**  10:2
**testimony**  4:21 7:6,
  18,23 21:24 40:12
  69:4
**thought**  50:5
**time**  4:14 6:9 8:11
  13:9 14:2 18:22
  19:7,14 21:18 23:9,
  23 25:2,6,16,24
  28:22 29:21 37:15
  42:9 50:6 52:12
  61:21 63:14,15,17,19
  64:6 68:14 71:7 75:6
**times**  16:23 17:9
**timing**  30:5
**title**  15:11 63:24
  64:5
**titled**  27:15
**titles**  64:24
**today**  6:17,21 7:23
  8:2,23 10:2
**today's**  10:6 75:20
**told**  25:22
**topic**  12:5
**Trade**  14:3
**training**  30:12,13,14,
  19 31:4,9,11,15,19

**transcript** 8:17,18 29:23 53:18 75:12
**transfer** 19:17
**transitioned** 20:7
**trial** 7:7
**trouble** 5:22 7:25 29:3
**truth** 7:15
**truthful** 7:23
**turn** 44:2 47:12 58:15 60:15 73:10,20
**type** 56:22,24 57:3 59:22
**types** 56:19

**U**

**U.S.** 4:7,12 13:25 14:2
**ultimately** 33:9,14
**uncomfortable** 8:13
**undergo** 31:18
**undergraduate** 14:13
**understand** 7:14,17 49:18 51:18 53:9 58:21
**understanding** 8:2 30:5 39:15
**understood** 8:8 40:12
**undertaken** 28:15
**unemployment** 42:12,16 62:6
**universe** 11:13
**University** 14:10,15
**Unlawful** 41:8,22 72:4
**update** 28:15
**updated** 28:13
**usual** 59:21

**V**

**verbally** 4:20
**version** 34:15,17
**victim** 66:17,24 68:9, 10
**video** 4:3,8 5:20
**view** 51:23
**Virginia** 42:16 62:6
**Vora** 4:1,4 5:1,5,12, 17 6:1,5 7:1,2 8:1 9:1,11 10:1,6 11:1, 24 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1,2,4, 22 22:1 23:1,20,24 24:1 25:1 26:1 27:1, 9 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1,2 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1, 19 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1,7 68:1 69:1 70:1,19 71:1 72:1 73:1,24 74:1 75:1,6,21

**W**

**waive** 4:24
**Wallace** 47:20,21 48:4,13,15,17,24 49:3,5,9,17,19,21,22 50:8,14,24 52:8,22 54:16
**Walsh** 5:10 6:23 10:12 11:17,21 24:9 36:6, 15 37:5,16 38:23 39:17 40:8,20 42:3 43:5 46:22 47:4 48:7,18 50:25 52:25 54:17 55:4 56:4,13 57:5,25 59:23 64:13 69:15 70:2,7,14 74:20 75:9
**wanted** 65:24
**warehouse** 18:10,11 64:9
**warning** 32:20 46:16, 17,21 47:7,8,10,13 49:12 50:9 53:20 54:2 56:2,6,8,16,23, 24 57:3,12,22,23 58:11 59:22 60:19 62:9,18,21 63:3,5
**warnings** 15:8 56:19
**Washington** 6:15 14:10,14,15
**water** 70:24
**Wielage** 4:11
**witness's** 53:5
**witnessed** 53:10,22 54:10,15
**witnesses** 52:22
**work** 16:18 22:21,24 23:25 25:15 26:4,10
**workbook** 30:12,19
**worked** 18:3 52:3,11
**working** 16:7 18:14 25:17 29:16
**workplace** 63:10
**writer** 13:22,23
**writes** 51:14
**written** 46:16,17 48:13,14,17 49:11, 14,16,19,21 50:9,13, 16,20,23 51:23 53:17,20 54:2,4,8,13 56:16,19,23 57:12 60:18
**wrote** 45:24 46:3 52:21

**Y**

**year** 19:4,11
**yes-or-no** 69:17



Exhibit 26

8106 Hallmark Place
Gaithersburg, MD 20879
Phone: (443) 303-3630 | Fax: (410) 676-2304

**LETTER OF EMPLOYMENT VERIFICATION**

January 22, 2016

To Whom It May Concern:

This letter is to verify that Evangeline Parker currently works for our company since December 21, 2014 under our Department of State-Anti Terrorism Assistance contract.

Ms. Parker was initially hired as a General Clerk II in our Transportation and Inventory department. Ms. Parker was eventually promoted to Material Coordinator (e.g. Receiving Supervisor) and then to the position of Logistic Manager which she currently holds. In 2015, Ms. Parker was given added responsibilities of quality assurance for the warehouse where she is responsible for identifying commodities in the inventory that are either classified as a commerce item through the Bureau of Industry and Security (BIS) or items identified on the United States Munitions List (USML), administrated by the International Traffic in Arm Regulation (ITAR).

Her focus is on identifying and ensuring we classify the equipment under the right codes to be in compliance with federal laws and regulations for shipping items on either list out of the country. She also finds the Schedule B numbers that are governed by the US Census Bureau to track the number of commodities the US ships around the globe along with the value.

The outlook for Ms. Parker's continued employment with us is very good and we hope to have her with our Company for many years to come.

If you have any questions regarding his employment situation, please feel free to contact us at the number listed below.

Sincerely,

Cathy A. Price
Reema Consulting Services Inc. (RCSI)
Human Resource Manager
703-657-0551

30(b)(6) - REEMA
DEPOSITION EXHIBIT
CINDY L. SEBO, REALTIME
CERTIFIED MERIT REPORTER
DATE: 2/25/20
5

**Exhibit 27**

# EMPLOYEE PERFORMANCE EVALUATION

EVALUATION: 45 DAYS X 180 DAYS ANNUAL:

NAME OF EMPLOYEE: Evangaline Parker DATE: 31-Mar-16

DATE OF LAST EVALUATION:

REASON FOR SUBMISSION: Assistant Warehouse Operations Managers Assessment

JOB TITLE: Quality Control Specialist

DEPARTMENT: ATA Warehouse

SUPERVISOR:

MANAGER: Shaun Reeves

PERIOD COVERED

FROM: 15-Feb-16 TO: 31-Mar-16

DAILY DUTIES AND RESPONSIBILITIES: To assist the warehouse operations manager by ensuring that the receiving and shipping departments are conducting business efficiently and professionally. You are also to ensure that the receiving and shipping personnel have the correct training needed to accomplish their missions in a timely and effective manner.

AREAS OF SPECIAL EMPHASIS: To ensure that compliance for all items shipping out are accurate and entered into the wise system correctly. Contact manufacturers and research material as needed to get information needed for compliance purposes.

EMPLOYEE SIGNATURE: [signature] DATE: 4-1-16

SUPERVISOR'S SIGNATURE: DATE:

MANAGERS'S SIGNATURE: [signature] DATE: 4-1-16

4/1/2016 [illegible handwritten note]

REEMA000349

JOB PROFICIENCY: (CIRCLE ONE) EXCELLENT GOOD FAIR BELOW STANDARD

MANAGER/SUPERVISOR'S COMMENT: Ms. Parker has proven that she has what it takes to perform the daily duties as the Assistant Warehouse Operations Manager. Ms. Parker has the skills and knowledge needed to run her departments with very little help and guidance from upper management Ms. Parker is a great asset to the warehouse management team as I am very please with the way she has handled her new position.

1PLOYEE COMMENT:

RESPONSIBILITY & ACCOUNTABILITY (CIRCLE ONE) EXCELLENT GOOD FAIR BELOW STANDARD

MANAGER/SUPERVISOR'S COMMENT: Ms. Parker has done very well with making sure that all tasks are being completed in the time allotted. an always count on Ms. Parker to be where she is supposed to be doing what she is supposed to be doing. Ms. Parker puts in the extra hours that seem necessary to get the mission completed when needed and called upon.

EMPLOYEE COMMENT:

| | | | |
|---|---|---|---|
| OVERALL POTENTIAL FOR PROMOTION OR GREATER RESPONSIBILTY.............. | EXCELLENT | GOOD | NOT APPLICABLE |
| SUPERVISOR'S OVERALL EMPLOYEE REVIEW.............................. | SUCCESSFUL | FAIR | POOR |
| MANAGER'S OVERALL EMPLOYEE.............................. | SUCCESSFUL | FAIR | POOR |

Exhibit 28

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

GREENBELT DIVISION

----------------------------X

EVANGELINE J. PARKER,

Plaintiff,

V. Civil Action No.

REEMA CONSULTING SERVICES, 8:17-CV-01648-TDC

INC.,

Defendant.

----------------------------X

REMOTE VIDEOTAPED DEPOSITION OF

KENTON M. BIRGANS

Friday, July 17, 2020

9:04 AM EASTERN STANDARD TIME

---

U.S. Legal Support

1818 Market Street

Suite 1400

Philadelphia, PA 19103

877.479.2484

JOB NO.: 309913

REPORTER: Denise Dobner Vickery, RMR, CRR

Friday, July 17, 2020

9:04 AM EASTERN STANDARD TIME

Remote Videotaped Deposition of KENTON M. BIRGANS, conducted in the location of the witness in Washington, DC.

Pursuant to notice, before Denise Dobner Vickery, Certified Realtime Reporter, Registered Merit Reporter, and Notary Public in and for the District of Columbia.

REMOTE APPEARANCES:

For Plaintiff:

FISH & RICHARDSON
TRACEA L. RICE, ESQ.
trice@fr.com
1000 Maine Avenue SW
Washington, DC 20024
202.626.7747

For Defendant:

WRIGHT, CONSTABLE & SKEEN LLP
DONALD WALSH, ESQ.
dwalsh@wcslaw.com
7 Saint Paul Street, 18th Floor
Baltimore, MD 21202
410.659.1320

ALSO PRESENT: RAJESH S. VORA, President, Reema Consulting Services, Inc.
VIDEOGRAPHER: MARTIN SHERRILL

C O N T E N T S

| EXAMINATION OF KENTON M. BIRGANS | PAGE |
|---|---|
| BY MS. RICE | 7, 42 |
| BY MR. WALSH | 37 |

E X H I B I T S

| BIRGANS DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| Exhibit 1 | Subpoena | 11 |
| Exhibit 2 | Reema Employee Handbook June 2013 REEMA000008 - 57 | 20 |
| Exhibit 3 | Sexual Harassment Policy Manual For Reema Consulting Services, Inc. REEMA000059 - 114 | 22 |
| Exhibit 4 | Facebook Messenger PARKER000432 | 27 |

P R O C E E D I N G S

\- - -

THE VIDEOGRAPHER: This is the videotaped deposition of Kenton Birgans in the matter of Parker versus Reema Consulting Services, Incorporated. This deposition is being held at US Legal Support, Incorporated remote videoconferences on July 17, 2020. My name is Martin. I'm from US Legal Support and I'm the video specialist. The court reporter today is Denise also from US Legal Support.

Counsel now state their appearance for the record, starting with the taking attorney.

MS. RICE: Tracea Rice representing the Plaintiff, Evangeline Parker.

MR. WALSH: And Donald Walsh on behalf of the Defendant, Reema Consulting Services. I also have appearing today the president of the company, Rajesh Vora.

THE VIDEOGRAPHER: And we are going on the record at 9:04 a.m.

Would the court reporter please

Page 6

swear in the witness.

THE REPORTER: I am going to read a statement.

Attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely. They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his testimony in this matter is under penalty of perjury. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Please indicate your agreement by stating your name and your agreement on the record. Counsel.

MS. RICE: I, Tracea Rice, agree.

MR. WALSH: And Don Walsh agrees.

THE REPORTER: Will the witness kindly present his government issued identification by holding it up to the camera for verification.

THE WITNESS: (Displaying ID).

THE REPORTER: Thank you.

Page 7

THE WITNESS: You're welcome.

THE REPORTER: Do you acknowledge that your testimony in this matter is under penalty of perjury?

THE WITNESS: I do.

THE REPORTER: Thank you.

You may proceed.

MS. RICE: Thank you.

- - -

KENTON M. BIRGANS called for examination, and, after having acknowledged his testimony was under penalty of perjury, was examined and testified as follows:

EXAMINATION

BY MS. RICE:

Q. Good morning, Mr. Birgans. How are you?

A. I'm good. How are you?

Q. Doing pretty well.

First, if I may say thank you for taking some time out of your day to be here with us. As you just heard, my name is Tracea Rice and I'm representing Ms. Parker in today's case.

Have you ever been deposed before?

A. Who? I'm sorry?

Page 8

Q. Have you ever been deposed before?

A. No, ma'am.

Q. Okay. So we're going to go over a few of the rules of how today's deposition will work, but before we do that, can you please state your full name for the record?

A. Name is Kenton Maurice Birgans.

Q. And can you state your address?

A. 17357 Legacy Terrace, Round Hill, Virginia 20141.

Q. And are you represented at all by counsel here today?

A. No, ma'am.

Q. Okay. Now, Mr. Birgans, you just took an oath.

You appreciate that that oath means that you have to be truthful with your testimony here today?

A. I do.

Q. And you also understand that although we're not in a court, the testimony that you're giving today is equally as important as if you were in court. So what that means is not only should you be truthful, but you should also be complete and accurate in your testimony.

Page 9

You understand that?

A. I do.

Q. And you agree to do that today?

A. Yes, ma'am.

Q. Now, if you at any point in time you don't understand a question that I've asked, then I want you to tell me that. Okay?

A. Will do.

Q. Now, if you go ahead and answer the question, then we're going to understand that to mean that you understood the question that I asked you.

Does that make sense?

A. Yes, it does.

Q. And also if at any point in time because we want to do get truthful and complete testimony, if you find that you need to make a correction or modify something that you said, just let me know and I'll allow you to do that. Okay?

A. Yes, ma'am.

Q. Now, after this deposition is over, you're going to have a chance to review the transcript, and you can make any changes to that if you want. But if you do make changes to the

Page 10

testimony that you made today, you understand that I'll be able to tell a jury later on that you changed your testimony.

Is that fair?

A. That's fair.

Q. And that's another reason why it's important for you to be truthful and complete and accurate on the record today while we're here.

Excuse me.

Now, is there any reason, medical or otherwise, as to why you can't be truthful today?

A. No, ma'am.

Q. And if at any point in time that changes through today's deposition, will you stop and let me know that?

A. Yes, ma'am.

Q. And also I doubt that this is going to happen, but if at any point in time you feel that I'm acting in bad faith toward you, acting in a way that unreasonably embarrasses you or oppresses you, will you stop and let me know that as well?

A. Yes, ma'am.

Q. Okay. Now, I can never make any promises, but I will say it's not my goal here to

Page 11

take up a lot of your time today, but to the extent that we're here for a while, I'm going to take a break about every hour or so. But if at any point in time you feel like you need a break in between then, feel free to let me know and I'll allow you to take a break.

A. All Right. I appreciate it.

Q. Okay. Are you ready to get started?

A. Yes, ma'am.

Q. All right. So I am going to drop what is a District Court subpoena into the chat and have this marked as Exhibit 1.

A. Okay.

(Document marked for identification as Birgans Exhibit 1.)

BY MS. RICE:

Q. And I'm also going to share my screen so that you can see that.

Are you able to see that document?

A. Yes, ma'am.

Q. Okay. Now, Mr. Birgans, do you recognize what this document is?

A. Yeah. It looks like it's a subpoena to, I guess, appear in court per se.

Q. And have you received this document

Page 12

prior to today?

A. Yes, ma'am.

Q. And did you get a chance to review that?

A. Yes.

Q. And so you understand that you're here today pursuant to this District Court subpoena to provide sworn-in testimony before the United States District Court in the District of Maryland?

A. Yes, ma'am.

Q. Okay. Great.

One second here.

Okay. Mr. Birgans, can you just start off by telling us: When were you hired to work at Reema?

A. I started Reema, I want to say, March 23, 2015.

Q. And about how long were you employed there?

A. Up until the contract was over which was, I want to say, September of maybe 2017.

Q. Okay. And you said "up until the contract was over."

What contract were you working on?

Page 13

A. It was through the Department of State.

Q. And do you recall what was the exact department that you worked in at Reema?

A. Antiterrorism Division.

Q. Okay. And what was your position at the company?

A. When I started, I was, I believe, a receiver or warehouse specialist.

Q. And what types of duties did you have as a warehouse specialist?

A. When I first started, I was tasked to receive in equipment to verify that the equipment was correct against the PO.

Q. Okay. And are you familiar with the plaintiff in our case, Evangeline Parker?

A. Yes, ma'am.

Q. And why don't you tell us: How is it that you know Ms. Parker?

A. I believe she was the warehouse manager at the time when I started, if I can remember correctly.

Q. And when you say "she was the warehouse manager," was she actually your manager or in what capacity did you all work together?

Page 14

A. I believe she was the manager of my department.

Q. Okay. And was she promoted at all while you were there or did you work up under her until her termination?

A. I know I worked with her pretty much until she left. I might have got promoted myself before she left, but I can't honestly remember.

Q. Okay.

A. But I worked with her quite a bit, yeah.

Q. Okay. And so what was your opinion of Ms. Parker as a manager?

MR. WALSH: Objection.

You can answer, Mr. Birgans. From time to time I may make objections or Ms. Rice might make objections, but unless we tell you otherwise, you can answer the questions.

THE WITNESS: Okay.

BY MS. RICE:

Q. So I'll re-ask that question for you.

What was your opinion of Ms. Parker as a manager?

Page 15

MR. WALSH: Objection.

THE WITNESS: I thought she was fine. I didn't have any issues with her. I was pretty new there. So I didn't know the ins and outs of everything. So I pretty much just took whatever direction she gave me, but I thought she was a fair person. I liked her a lot. She's one of the closest ones there that I worked with there.

BY MS. RICE:

Q. Okay. And could you just describe how she treated you when you were at work?

MR. WALSH: Objection.

THE WITNESS: She treated me respectfully. If I had any issues or problems, she was there to walk me through those issues or problems. Like I said, she's one of my go-to people.

BY MS. RICE:

Q. And so could you say or would you say that you ever felt that she treated you as though you were a slave?

MR. WALSH: Objection.

THE WITNESS: Not at all.

BY MS. RICE:

Page 16

Q. Now, while you were at Reema, did you ever hear anyone complain about Ms. Parker's work performance?

A. Yes.

Q. And what were those complaints?

A. Came from Larry Moppins. Just -- just regular complaints that she wasn't doing her job to the best of her abilities basically. I can't be --

Q. And?

A. -- aware of what it was.

Q. Who was Mr. Moppins?

A. Mr. Moppins was the program manager at the position, at the warehouse.

Q. And when you say you heard these complaints, did you hear those complaints closer to the time when Ms. Parker was terminated or when did you hear that?

A. I'd probably say close to the time she was terminated.

Q. And what about your coworkers? Did any of them ever complain to you about having to work with Ms. Parker?

MR. WALSH: Objection.

THE WITNESS: None that I worked with, no.

Page 17

BY MS. RICE:

Q. Okay. And so none of your coworkers ever said that they felt like Ms. Parker was disrespectful towards them?

A. No. No.

MR. WALSH: Objection.

THE WITNESS: Ms. Parker was pretty much liked from everybody that I worked with.

BY MS. RICE:

Q. Okay. Now, are you familiar with Mr. Donte Jennings?

A. Yes.

Q. And how do you know Donte Jennings?

A. He worked with the spare department in the warehouse.

Q. Now, is the spare department, is that the same department that you were working in or a different department?

A. It's a different department. There were two contracts in the warehouse, and he worked at the other contract.

Q. Okay. Now, would you ever help at all with tasks in the spare department or were

those two pretty much separate?
A. We would all help each other at times. They had a thing called "all hands on deck" where we all stopped whatever we were doing to get one specific task completed.
Q. Okay. And in the course of your employment with Reema or at Reema, would you ever see Ms. Parker and Mr. Jennings interacting with one another?
A. Yes, ma'am.
Q. And in those instances, how would you see Mr. Jennings treat Ms. Parker?
MR. WALSH: Objection.
THE WITNESS: Those two had a -- they sometimes went back and forth with each other. I want to say they had some issues with each other.
BY MS. RICE:
Q. And describe what you mean when you say they went back and forth.
A. Just a lot of bickering back and forth. I'm not sure what the issue arose from, but they had, I will say, a troubled relationship. They were always getting on each other.

Q. And in those instances, would you say there was anyone in particular that provoked that or how did that -- how did that happen?
MR. WALSH: Objection.
THE WITNESS: I can't say anyone provoked it. I just saw it go back and forth between the two, Ms. Parker and Donte.
BY MS. RICE:
Q. Okay. Okay. Now, you mentioned who Larry Moppins was.
Are you also familiar with Carlos Carter?
A. Yes.
Q. And who is Carlos Carter?
A. Carlos was the -- I guess the warehouse manager for the spare department.
Q. Okay. And the spare department, that's where Mr. Jennings worked; correct?
A. That's correct.
Q. Now, do you ever recall Mr. Moppins and Mr. Carter interviewing you about any incidents between Mr. Jennings and Ms. Parker?
A. Vaguely, yes, ma'am.
Q. And what do you remember about that?
A. I just remember there was some issue

in the warehouse and they had asked me what had happened. I can't remember exactly what the issue was, but I do vaguely remember being talked to between those two.
Q. And so you said you can't remember what the issue was.
You don't remember anything about what you told them during that?
A. No, ma'am. That was, like, four or five years ago. So no.
Q. Okay. Now, do you recall whether anyone asked to take a statement on your behalf?
A. I honestly can't remember.
Q. Okay. Do you recall whether anyone asked you to review a statement that they had written?
A. I honestly can't remember.
Q. Okay. And you don't recall whether anyone asked you to sign a statement?
A. No, ma'am.
MS. RICE: Okay. I am now dropping a document that's been labeled as Bates REEMA000008 into the chat. I'm going to mark that as Exhibit 2.
(Document marked for

identification as Birgans Exhibit 2.)
BY MS. RICE:
Q. Are you able to see that document, Mr. Birgans?
A. Yes, ma'am.
Q. And have you seen this document before?
A. Yes, ma'am.
Q. What is it?
A. It's the employee handbook. Everybody gets it once they're employed at Reema.
Q. And at what point in time during your employment were you given this document?
A. I want to say when I started.
Q. And were you -- did you actually read the document?
A. Honestly not the whole thing. Maybe bits and pieces of it.
Q. Okay. And did anyone verify whether you had actually read the contents of this document?
A. I don't recall. I don't quite recall.
Q. Okay. I'm going to show you another document here.

Page 22

A. Yes, ma'am.
Q. I'm now dropping into the chat what has been marked as REEMA000059.
A. Uh-huh.
MS. RICE: And we're going to mark this here as Exhibit 3.
(Document marked for identification as Birgans Exhibit 3.)
BY MS. RICE:
Q. Are you able to see that document?
A. Yes, ma'am.
Q. Okay. And what is this document?
A. Sexual harassment policy for Reema.
Q. And have you seen this document before?
A. I want to say I probably seen it before.
Q. Okay. And, again, did you read this document while you were at Reema?
A. I want to say I might have read bits and pieces but not the whole thing.
Q. And did anyone ever verify whether you actually read this document?
A. Again, I can't recall.
Q. Okay. Now, during your period of

Page 23

time at Reema, how many times can you say you were given training regarding the sexual harassment policy?
A. Not often.
Q. And not often, if you had to guess, is not often one or two times? If you could just quantify it for me. What do you think not often equates to?
A. Maybe once, maybe twice at the most.
Q. And what was your total time at Reema again?
A. I want to say from 2015 to about 2017 I believe.
Q. So in two years, you had maybe one or two trainings on sexual harassment?
A. That's what I'm going to go with. Yes, ma'am.
Q. Okay.
A. Exactly what I recall, yeah.
Q. Now, you were employed with Reema. Are you aware of any rumors circulating that involved Ms. Parker?
MR. WALSH: Objection.
THE WITNESS: Yes, there was a rumor that went around.

Page 24

BY MS. RICE:
Q. And what was that rumor?
A. That her and Mr. Demarcus were having a relationship outside of work.
Q. And who is Demarcus?
A. He was the deputy program manager.
Q. Okay. And so where was he at in relation to Mr. Moppins' position?
A. He was right under Mr. Moppins.
Q. Okay. Now, how did you find out about that rumor?
MR. WALSH: Objection.
THE WITNESS: It was spread around throughout the warehouse.
BY MS. RICE:
Q. And if you had to say, were there a lot of people talking about it? Just a few? How many different people told you about the rumor?
A. I can't say no one specifically told me. It's just I overheard it a couple times probably from a few different people.
Q. Okay. And do you recall when you found out about that rumor? I know it's a long time ago, but if you can.
A. I can't recall specifically when I

Page 25

heard about it. It's just, like I said, it was just flirting around the warehouse periodically.
Q. Okay. And do you recall -- I know -- do you recall discussing that with anyone or no?
A. No, ma'am.
Q. Okay. Now, were you surprised that there was a rumor floating around the warehouse?
MR. WALSH: Objection.
THE WITNESS: Yes. That type rumor, yes.
BY MS. RICE:
Q. And why, why is that?
A. First of all, Demarcus was the deputy program manager. He was number 2 in charge, and you just don't think you would hear something like that about your deputy program manager.
Q. Okay. And so do you recall when it was that you found out that Ms. Parker was fired from her job at Reema?
A. I don't quite recall. I want to say I came to work one day and they just said that she wasn't there anymore.
Q. Okay. And when you found out that

Page 26

she had -- was no longer working with the company, was that surprising to you?

A.    It was definitely surprising, yes, ma'am.

Q.    And why is that?

A.    I thought she did a good job at what she did.  Like I said, I had no issues with her. The people that I worked with, they didn't have any issues with her.

Q.    And, again, after you found out she was fired, did you all ever speak to one another again?

A.    No, we didn't speak to her.  I believe we were told not to speak with her at all.

Q.    And did they tell you why you shouldn't speak with her?

A.    I believe it's because maybe some legal action between them.

Q.    And when you say you were told that, who actually told you not to speak to Ms. Parker?

A.    It came from Mr. Moppins.

Q.    Okay.  And did anyone else tell you that, or it came straight from Mr. Moppins?

A.    Came straight from Mr. Moppins.

Page 27

MS. RICE:  Okay.  I'm going to drop into the chat -- be one second here -- what has been marked as PARKER000432, and we're going to mark this as I believe Exhibit 4.

(Document marked for identification as Birgans Exhibit 4.)

BY MS. RICE:

Q.    I'm going to share my screen here in a second, but it's kind of small on the screen. So I'll blow up different portions and give you a chance to read through it.

A.    Yes, ma'am.

Q.    Give me one second.

Are you able to see that document?

A.    Yes, ma'am.

Q.    And do you recognize what that is?

A.    To me it looks like Facebook. Facebook Messenger.

Q.    And whose name is that right there at the top?

A.    That's me, Kenton Birgans.

Q.    And do you recall who this message was with?  I blow it up a little bit so you can see?

Page 28

A.    I'll look over.

Okay.  It was with Van.

Q.    Okay.  So you said that was your Facebook.  So I'm going to go on a limb here and say you have seen these messages before; correct?

A.    Correct.

Q.    And do you want to take a few seconds just to read through the content of the messages?  And I can scroll by just to give you a better view.  Just let me know when you want me to scroll to the next one.

A.    (Reviews document).

You can scroll to the next one.

(Reviews document).

You can scroll to the next.

(Reviews document).

Okay.

Q.    All right.  And so do you recall now having that conversation on Facebook with Ms. Parker?

A.    I do.

Q.    All right.  So let's see here.  I can read this one here.

So in this first message -- and is that from Ms. Parker or did you send that?

Page 29

A.    That's from Ms. Parker.

Q.    Okay.  So in this first message from Ms. Parker, she says:

"It makes me wonder if the things they said you stated are true."

Based on your belief, what things do you think she was referring to?

MR. WALSH:  Objection.

THE WITNESS:   I honestly cannot remember.  Like I said --

BY MS. RICE:

Q.    Okay.

A.    -- that was years ago.

Q.    And can you recall during that time at the warehouse hearing that anyone had said that you had said anything in relation to this rumor in any relation to her being fired?

MR. WALSH:  Objection.

THE WITNESS:  No, ma'am.

BY MS. RICE:

Q.    No.

One second here.

In this last message here, you said:

"I truly feel that they did you wrong."

Page 30

What were you referring to there?

A.    I can't remember exactly what I was referring to, but like I said, I just -- I don't know why she was terminated.  Like I said, I didn't have any issues with her.  I thought she was a good person.  She was a good leader.  The people that I worked with, they didn't have any issues with her as well.  So that's why I said I didn't understand why she was terminated.

Q.    Okay.

A.    It just didn't make any sense.

Q.    Now, Mr. Birgans, can I ask you?  What was your opinion of Larry Moppins as an individual?

MR. WALSH:  Objection.

THE WITNESS:  Very controlling.  He had to do it his way or it's no way.  He gets upset very often if you didn't do things the way that he wanted you to do it.

BY MS. RICE:

Q.    And when you say "he gets upset," what does that look like?

MR. WALSH:  Objection.

THE WITNESS:  To a point where he threatens to write you up.  He threatens

Page 31

to terminate you.  He threatens to take your money away from you.  He threatens to demote you.  Just a very threatening person.

BY MS. RICE:

Q.    What do you mean by "he threatens to take your money away"?

A.    He just says things that "I can take your money away."  I can -- basically saying he'll demote you.  He'll make you lose money.

Q.    Okay.  And so did you personally enjoy working with him?

MR. WALSH:  Objection.

THE WITNESS:  Not at all.

BY MS. RICE:

Q.    And why not?

A.    The statement I just stated.  Just the way he was.  He was controlling.  He was forceful.  Just not a good person to work with, in my opinion.

Q.    And could you describe what you mean when you say "he was forceful"?

A.    He just forced you to do things the way that he wanted it done, even if it wasn't right.

Q.    And so that was your personal

Page 32

experience with him.

Can you say you also witnessed him treating other employees that way?

MR. WALSH:  Object.

THE WITNESS:  Yes, ma'am.

BY MS. RICE:

Q.    And about how many times would you say you witnessed that happen?

A.    Quite often.  More often than not.

Q.    Now, would you ever hear of people complain about Mr. Moppins?

MR. WALSH:  Objection.

THE WITNESS:  Yes, I heard people complain about him.

BY MS. RICE:

Q.    And what types of things would they say?

A.    Basically pretty much the same thing that I was saying.  He was forceful.  Very -- what's the word I'm looking for?  Like I say, it had to be his way or no way.  If you didn't do it his way, then like I say, he would threaten you with your position, with your job.

Q.    And did you ever witness how Mr. Moppins treated women at Reema?

Page 33

MR. WALSH:  Objection.

THE WITNESS:  Yes.  It wasn't very good.

BY MS. RICE:

Q.    And why do you say "it wasn't very good"?

A.    A lot of sexual statements he used to say.

Q.    And if you can recall, what types of statements would he say to women at Reema?

A.    Not just women.  Everyone in general.  His main phrase was, "You can come get this lobster at 4:31," which we get off work at 4:30.  So he say, "You can come get this lobster at 4:31," which he was referring to his genitals.

Q.    And would he often say that?  Would he say that in public?

A.    He would say it in public.  He would say it in meetings.  He would say it pretty much often.

Q.    Now, given these things were publicly said, do you know of anyone who ever complained about Larry Moppins to, you know, HR or another manager?

A.    I don't know of anyone that

Page 34

complained because they were probably scared to say anything because, I mean, it wouldn't work in your favor.

Q.   And so I'll break that up.

First, why would you say that they would be scared to say anything?

MR. WALSH:  Objection.

THE WITNESS:  Fear the repercussions.

BY MS. RICE:

Q.   And what do you think those repercussions would be?

MR. WALSH:  Objection.

THE WITNESS:  Either you'll get written up or you'll get terminated.

BY MS. RICE:

Q.   And had you seen this happen to anyone before?

A.   I haven't seen it happen.  I've seen people getting written up for -- for things before but, yeah.

Q.   And so, in your opinion, who was in charge at Reema from your standpoint?

MR. WALSH:  Objection.

THE WITNESS:  My standpoint, it

Page 35

would be Larry and Kwan.

BY MS. RICE:

Q.   And who is Kwan?

A.   Kwan was the -- I guess the -- the person, he worked for the Department of State.  I guess that was Larry's boss per se.

Q.   And do you know his last name?

A.   Kwan Chun.

Q.   Okay.  And did you ever witness the relationship between Mr. Moppins and Mr. Chun?

A.   They had a very close relationship.

Q.   Okay.  Now, at your time at Reema, did you ever see Mr. Rajesh Vora a lot or was it primarily Mr. Moppins was there?

A.   We saw Mr. Rajesh quite a bit.

Q.   And so from your standpoint, when you said things wouldn't end up well, were you more so in fear of Mr. Moppins or in fear of Mr. Vora?

MR. WALSH:  Objection.

THE WITNESS:  Mr. Moppins.

Mr. Vora, we didn't have any issues with Mr. Vora.

BY MS. RICE:

Q.   Now, do you recall -- I think you

Page 36

said it was in 2017 when you left Reema.

That was around September 2017?  Did I get that right?

A.   I believe that was the right time.

Q.   Okay.  Now, after you left Reema in September of 2017, did you ever work with Mr. Moppins again?

A.   Yeah.  I moved to the next contract with Mr. Moppins to Limited Federal.

Q.   And what did you say the name of that contract was?

A.   Limited Federal.

Q.   Okay.  And what was your role at Limited Federal?

A.   I went there as an inventory control manager and I left as an operations manager.

Q.   Okay.  And was that similar to the same type of role that Ms. Parker had at Reema?

A.   It was similar.

Q.   Okay.  And in that role, what was your experience with Larry Moppins?

A.   Pretty much the same.

MR. WALSH:  Objection.

BY MS. RICE:

Q.   And so you saw no change in his

Page 37

behavior?

A.   Not at all.  Not at all.

Q.   And do you all still currently work together?

A.   No, I actually resigned due to Larry.

Q.   And why did you resign due to Larry?

A.   Just issues working under him.  Like I said, I left as operations manager and just the pressure, the conduct from Mr. Larry just wasn't worth it anymore.

MS. RICE:  Okay.  And that is actually all I have for you today.

I'll pass the witness if, Don, you have any questions?

MR. WALSH:  Sure.

EXAMINATION

BY MR. WALSH:

Q.   Mr. Birgans, thank you.  I'm Don Walsh.  I represent Reema.  I just have a handful of questions for you.

Just to stick on Larry for a second.  So it's your testimony that Larry treated you the same way as he treated everybody else; right?

A.   Correct.

Page 38

Q.    Okay.  So -- so he treated everybody with this sort of iron fist, if you will?

A.    Absolutely.

Q.    Okay.  Men and women, he treated them all the same?

A.    Yes.

Q.    Larry had high expectations for what he wanted on the contract, I take it?

A.    I wouldn't say he had high expectations.  He's just -- that's just the kind of guy he is.  He's forceful.  He's threatening.

Q.    Okay.

A.    That's just -- that's him.

Q.    Okay.  And Larry, Larry was in the military.  Were you aware of that?

A.    Yes, sir.

Q.    Okay.  Were you in the military?

A.    No, sir.

Q.    Okay.  Do you know whether Larry's style matched someone who was in the military?

MS. RICE:  Objection.

THE WITNESS:   I'm not sure.  Like I say, I've never been in the military.

BY MR. WALSH:

Q.    Okay.  Okay.  Thank you.

Page 39

You also were talking about the relationship between Donte and Ms. Parker.

A.    Uh-huh.

Q.    And I think you said it was a troubled relationship.

Do you know was Ms. Parker Donte's supervisor during that period of time?

A.    I don't recall.  Like I said, Donte worked for the spare department and Van worked for the ACA department.  They're two different contracts.

Q.    Okay.  Do you know whether Ms. Parker was a supervisor during the time that she was interacting with Mr. Jennings?

A.    I believe she was, correct.

Q.    And was Donte a supervisor?

A.    I don't think Donte was ever a supervisor.

Q.    Okay.  So at least in the hierarchy of Reema anyway, not with respect to the contracts but in the hierarchy of Reema, Ms. Parker was above Donte?

A.    Yes, you could say that.  Yes, sir.

Q.    Okay.  Thank you.

One minute, Mr. Birgans.  I think --

Page 40

let me just look through my notes.

Oh.  At any point in time, did you have any relationship with Ms. Parker outside of the office?

A.    No, sir.

Q.    Did you carpool with her?

A.    No, sir.

Q.    Okay.  And before your deposition today, I know you said you've not talked with Ms. Parker at all; correct?  Since she left?

A.    Just that message through Facebook.

Q.    Okay.  Have you spoken with her counsel prior to today?

A.    Have I spoken to her counsel?

Q.    Yes.  Yes, sir.

A.    Yes.

Q.    Okay.  And when was that?

A.    A month or two ago.  I'm not quite sure when.

Q.    Okay.  And what was said to you in that case in that conversation about this litigation?

A.    We just went over questions about the situation.

Q.    Okay.  Pretty much all the same

Page 41

thing that you said today?

A.    Correct.

Q.    Do you recall if you said anything in that conversation differently than what you said today?

A.    I don't recall.  No, sir.

Q.    Okay.  One other second, Mr. Birgans.  Let me just look.

A.    Okay.  Yes, sir.

Q.    Do you know whether Ms. Parker treated Manley Ferguson?  Are you familiar with how she may have treated Manley Ferguson?

A.    I don't recall how she treated Manley Ferguson.

Q.    Are you familiar with how she treated Arnel Ragunton?  Probably butchered his last name but...

A.    (Laugh).

I want to say she treated everyone pretty much fair.  Like I said, Ms. Parker was a good person.  Like I had no issues with her.  The people that I worked with, to my knowledge, had no issues with her.

Q.    All right.  Were you -- were you familiar with the complaints made by Manley

Page 42

Ferguson against Ms. Parker?

A.    No, sir.

Q.    Okay.  Were you familiar with the complaints made by Arnel against Ms. Parker?

A.    No, sir.

Q.    Okay.  One other thing you had talked about.  You had heard that rumor somewhere in the warehouse.

Do you recall who you heard it from?

A.    I don't recall who I heard it from.  Like I said, it was just floating around the warehouse.

Q.    Do you know whether you ever heard it from Ms. Parker?

A.    I don't think I heard it from Ms. Parker herself, no.

Q.    Okay.  I have no other questions for you, Mr. Birgans.  Thank you.

A.    Thank you, sir.

MS. RICE:  I'm going to do a very brief redirect, Mr. Birgans.

FURTHER EXAMINATION

BY MS. RICE:

Q.    You just, again, touched on the relationship between Mr. Jennings and Ms. Parker.

Page 43

Again, would you say the tension between them, was it mutual or was it one-sided?

A.    It was mutual.  They both used to go at each other.

Q.    And would you ever see Ms. Parker, you know, make negative facial gestures or have negative body language towards Mr. Jennings just out of the blue for no reason at all?

MR. WALSH:  Objection.

THE WITNESS:  I wouldn't say out of the blue, but I seen her make facial gestures towards Donte as well as Donte making facial gestures towards her.

BY MS. RICE:

Q.    And was Donte ever in your work area without permission?

MR. WALSH:  Objection.

THE WITNESS:  I can't quite say he was or he wasn't.

BY MS. RICE:

Q.    Okay.  You also talked about Mr. Moppins' treatment towards everyone that worked at Reema.

If you had to say, and in particular to the sexual comments, would he primarily say

Page 44

those things to men or say those to women?

MR. WALSH:  Objection.

THE WITNESS:  Primarily say it to women, but he used to say it to everyone as a whole.

BY MS. RICE:

Q.    And you said that when you did hear Mr. Moppins complain about Ms. Parker's work performance, was that during her entire duration that you were working there?

A.    No, sir.  I mean, sorry.  No, ma'am.

Q.    And so that was proximate to when?

A.    Mostly towards the time that she was terminated.

Q.    Okay.  And you spoke with Ms. Parker's lawyers before today.

Did any of her lawyers or counsel offer you anything in exchange for your testimony today?

A.    No, ma'am.

Q.    And did Ms. Parker offer you anything at all in exchange for your testimony today?

A.    No, ma'am.

MS. RICE:  Okay.  I have no

Page 45

further questions.

MR. WALSH:  I have nothing further.

Do you want to tell him about reading and signing or do you want me to?

MS. RICE:  You can tell him about reading and signing.

MR. WALSH:  So, Mr. Birgans, you have the right, as Ms. Rice told you earlier, to get a copy of the deposition to review that transcript to make changes that you feel may be appropriate.

THE WITNESS:  Okay.

MR. WALSH:  The only thing is you have to let the court reporter know now so that she knows how to deal with making sure that they get that transcript to you so you can review it.

You don't have to.  It's entirely your individual right whether you want to or not.  You can waive that right, assume that everything has been taken down accurately, but it is entirely up to you to let the court reporter know what you want to do.

THE WITNESS:  I'm just going to

Page 46

go ahead and be done with it.

MR. WALSH: Okay.

THE WITNESS: I think I've given everything to the best of my knowledge.

MR. WALSH: Thank you.

THE WITNESS: Yes, sir.

MS. RICE: And thank you for your time today, Mr. Birgans.

THE WITNESS: No problem.

MR. WALSH: Wait one second.

Go ahead. Go ahead, Martin.

THE VIDEOGRAPHER: We are going off the record at 9:43 a.m. This ends today's deposition.

THE REPORTER: Mr. Walsh, do you wish a copy of the transcript?

MR. WALSH: Oh, yes. Yes.

THE REPORTER: Thank you.

* * *

(Deposition concluded at 9:43 a.m.)

* * *

Page 47

CERTIFICATE OF REPORTER

DISTRICT OF COLUMBIA )

I, DENISE DOBNER VICKERY, CRR/RMR and Notary Public, hereby certify the witness was by me first duly remotely sworn to testify to the truth; that the said deposition was recorded stenographically by me and thereafter reduced to printing under my direction; and that said deposition is a true record of the testimony given by said witness.

I certify the inspection, reading and signing of said deposition were waived by counsel for the respective parties and by the witness; and that I am not a relative or employee of any of the parties, or a relative or employee of either counsel, and I am in no way interested directly or indirectly in this action.

Denise Dobner Vickery, CRR/RMR
Notary Public in and for the
District of Columbia

My Commission expires: February 28, 2023

Exhibits

**Exhibit 1** 4:9 11:12, 15
**Exhibit 2** 4:10 20:24 21:1 25:15
**Exhibit 3** 4:12 22:6,8
**Exhibit 4** 4:15 27:5,7

1

**1** 4:9 11:12,15
**1000** 3:7
**11** 4:9
**114** 4:14
**17** 5:8
**17357** 8:9
**18th** 3:15

2

**2** 4:10 20:24 21:1 25:15
**20** 4:10
**20024** 3:8
**2013** 4:10
**20141** 8:10
**2015** 12:18 23:12
**2017** 12:22 23:13 36:1,2,6
**202.626.7747** 3:9
**2020** 5:8
**21202** 3:16
**22** 4:12
**23** 12:18
**27** 4:15

3

**3** 4:12 22:6,8
**37** 4:4

4

**4** 4:15 27:5,7
**410.659.1320** 3:17
**42** 4:3
**4:30** 33:14
**4:31** 33:13,15

5

**57** 4:11

7

**7** 3:15 4:3

9

**9:04** 5:24
**9:43** 46:13,22

A

**a.m.** 5:24 46:13,22
**abilities** 16:8
**Absolutely** 38:3
**ACA** 39:10
**accurate** 8:25 10:8
**accurately** 45:22
**acknowledge** 6:5,8 7:2
**acknowledged** 7:12
**acting** 10:19
**action** 26:19
**address** 8:8
**administered** 6:9
**agree** 6:18 9:3
**agreement** 6:15,16
**agrees** 6:19
**ahead** 9:9 46:1,11
**Antiterrorism** 13:5
**anymore** 25:24 37:11
**appearance** 5:14
**APPEARANCES** 3:1
**appearing** 5:21
**area** 43:15
**Arnel** 41:16 42:4
**arose** 18:22
**arrangement** 6:13
**assume** 45:21
**attorney** 5:15
**Attorneys** 6:4
**Avenue** 3:7
**aware** 16:11 23:21 38:15

B

**back** 18:15,20,21 19:6
**bad** 10:19
**Baltimore** 3:16
**Based** 29:6
**basically** 16:8 31:8 32:18
**Bates** 20:23
**behalf** 5:20 20:12
**behavior** 37:1
**belief** 29:6
**bickering** 18:21
**Birgans** 4:2,8 5:4 7:10,16 8:7,14 11:15,21 12:14 14:15 21:1,4 22:8 27:7,22 30:12 37:19 39:25 41:8 42:18,21 45:8 46:8
**bit** 14:10 27:24 35:15
**bits** 21:18 22:20
**blow** 27:11,24
**blue** 43:8,11
**body** 43:7
**boss** 35:6
**break** 11:3,4,6 34:4
**butchered** 41:16

C

**called** 7:11 18:3
**camera** 6:23
**capacity** 13:25
**Carlos** 19:11,14,15
**carpool** 40:6
**Carter** 19:12,14,21
**case** 7:23 13:16 40:21
**chance** 9:23 12:3 27:12
**change** 36:25
**changed** 10:3
**charge** 25:16 34:23
**chat** 11:11 20:23 22:2 27:2
**Chun** 35:8,10

**circulating** 23:21
**close** 16:19 35:11
**closer** 16:16
**closest** 15:8
**comments** 43:25
**company** 5:22 13:7 26:2
**complain** 16:2,22 32:11,14 44:8
**complained** 33:23 34:1
**complaints** 16:5,7,16 41:25 42:4
**complete** 8:25 9:16 10:7
**completed** 18:5
**concluded** 46:22
**conduct** 37:10
**consent** 6:12
**CONSTABLE** 3:12
**Consulting** 3:22 4:13 5:5,20
**content** 28:8
**contents** 21:20
**contract** 12:21,24,25 17:23 36:8,11 38:8
**contracts** 17:22 39:11,21
**control** 36:15
**controlling** 30:16 31:17
**conversation** 28:19 40:21 41:4
**copy** 45:10 46:16
**correct** 13:14 19:18, 19 28:5,6 37:25 39:15 40:10 41:2
**correction** 9:18
**correctly** 13:22
**counsel** 5:13 6:12,17 8:12 40:13,14 44:17
**couple** 24:20
**court** 5:11,25 8:21,23 11:11,24 12:7,9 45:15,24
**coworkers** 16:21 17:3

**D**

**day** 7:21 25:23
**DC** 3:8
**deal** 45:16
**deck** 18:4
**declare** 6:10
**Defendant** 3:11 5:20
**Demarcus** 24:3,5 25:14
**demote** 31:2,9
**Denise** 5:11
**department** 13:1,4 14:2 17:16,18,19,20, 21,25 19:16,17 35:5 39:9,10
**deposed** 7:24 8:1
**deposition** 4:8 5:4,6 6:5,6,7 8:4 9:22 10:14 40:8 45:10 46:14,22
**deputy** 24:6 25:15,17
**describe** 15:11 18:19 31:20
**differently** 41:4
**direction** 15:6
**discussing** 25:4
**displaying** 6:24
**disrespectful** 17:5
**District** 11:11 12:7,9
**Division** 13:5
**document** 11:14,19,22, 25 20:22,25 21:3,6, 13,16,21,25 22:7,10, 12,14,19,23 27:6,15 28:12,14,16
**Don** 6:19 37:14,19
**Donald** 3:13 5:19
**Donte** 17:13,15 19:7 39:2,8,16,17,22 43:12,15
**Donte's** 39:6
**doubt** 10:17
**drop** 11:10 27:2
**dropping** 20:22 22:2
**due** 37:5,7
**duration** 44:9
**duties** 13:10
**dwalsh@wcslaw.com** 3:14

**E**

**earlier** 45:10
**embarrasses** 10:20
**employed** 12:19 21:11 23:20
**employee** 4:10 21:10
**employees** 32:3
**employment** 18:7 21:13
**end** 35:17
**ends** 46:13
**enjoy** 31:11
**entire** 44:9
**equally** 8:22
**equates** 23:8
**equipment** 13:13,14
**ESQ** 3:5,13
**Evangeline** 5:17 13:16
**exact** 13:3
**examination** 4:2 7:11, 14 37:17 42:22
**examined** 7:13
**exchange** 44:18,22
**Excuse** 10:9
**Exhibit** 4:9,10,12,15 11:12,15 20:24 21:1 22:6,8 27:5,7
**EXHIBITS** 4:8
**expectations** 38:7,10
**experience** 32:1 36:21
**extent** 11:2

**F**

**Facebook** 4:15 27:18, 19 28:4,19 40:11
**facial** 43:6,11,13
**fair** 10:4,5 15:7 41:20
**faith** 10:19
**familiar** 13:15 17:12 19:11 41:11,15,25 42:3
**favor** 34:3
**fear** 34:8 35:18
**Federal** 36:9,12,14
**feel** 10:18 11:4,5 29:24 45:12

**felt** 15:21 17:4
**Ferguson** 41:11,12,14 42:1
**find** 9:17 24:10
**fine** 15:3
**fired** 25:20 26:11 29:17
**FISH** 3:4
**fist** 38:2
**flirting** 25:2
**floating** 25:8 42:11
**Floor** 3:15
**forced** 31:22
**forceful** 31:18,21 32:19 38:11
**found** 24:23 25:20,25 26:10
**free** 11:5
**full** 8:6

**G**

**gave** 15:6
**general** 33:12
**genitals** 33:15
**gestures** 43:6,12,13
**give** 27:11,14 28:9
**giving** 8:22
**go-to** 15:18
**goal** 10:25
**good** 7:16,18 26:6 30:6 31:18 33:3,6 41:21
**government** 6:21
**Great** 12:12
**guess** 11:24 19:15 23:5 35:4,6
**guy** 38:11

**H**

**handbook** 4:10 21:10
**handful** 37:20
**hands** 18:3
**happen** 10:18 19:3 32:8 34:17,19
**happened** 20:2
**harassment** 4:12 22:13 23:3,15
**he'll** 31:9
**hear** 16:2,16,18 25:16 32:10 44:7
**heard** 7:22 16:15 25:1 32:13 42:7,9,10,13, 15
**hearing** 29:15
**held** 5:7
**hierarchy** 39:19,21
**high** 38:7,9
**Hill** 8:9
**hired** 12:15
**holding** 6:22
**honestly** 14:8 20:13, 17 21:17 29:9
**hour** 11:3
**HR** 33:23

**I**

**ID** 6:24
**identification** 6:22 11:15 21:1 22:8 27:7
**important** 8:22 10:7
**incidents** 19:22
**Incorporated** 5:6,7
**individual** 30:14 45:20
**ins** 15:5
**instances** 18:11 19:1
**interacting** 18:8 39:14
**interviewing** 19:21
**inventory** 36:15
**involved** 23:22
**iron** 38:2
**issue** 18:22 19:25 20:3,6
**issued** 6:21
**issues** 15:3,15,17 18:16 26:7,9 30:5,8 35:22 37:8 41:21,23

**J**

**Jennings** 17:13,15 18:8,12 19:18,22 39:14 42:25 43:7
**job** 16:8 25:21 26:6 32:23
**July** 5:8
**June** 4:10
**jury** 10:2

**K**

**Kenton** 4:2 5:4 7:10 8:7 27:22
**kind** 27:10 38:10
**kindly** 6:21
**knowledge** 41:22 46:4
**Kwan** 35:1,3,4,8

**L**

**labeled** 20:22
**language** 43:7
**Larry** 16:6 19:10 30:13 33:23 35:1 36:21 37:6,7,10,22, 23 38:7,14
**Larry's** 35:6 38:19
**Laugh** 41:18
**lawyers** 44:16,17
**leader** 30:6
**left** 14:7,8 36:1,5,16 37:9 40:10
**Legacy** 8:9
**legal** 5:7,9,12 26:19
**lieu** 6:9
**limb** 28:4
**Limited** 36:9,12,14
**litigation** 40:22
**LLP** 3:12
**lobster** 33:13,14
**long** 12:19 24:23
**longer** 26:1
**lose** 31:9
**lot** 11:1 15:8 18:21 24:17 33:7 35:13

**M**

**made** 10:1 41:25 42:4
**main** 33:12
**Maine** 3:7
**make** 9:13,17,24,25 10:24 14:16,17 30:11 31:9 43:6,11 45:11

**makes** 29:4
**making** 43:13 45:16
**manager** 13:21,24 14:1,13,25 16:13 19:16 24:6 25:15,18 33:24 36:16 37:9
**Manley** 41:11,12,14,25
**manner** 6:14
**Manual** 4:12
**March** 12:18
**mark** 20:24 22:6 27:4
**marked** 11:12,14 20:25 22:3,7 27:3,6
**Martin** 3:23 5:9 46:11
**Maryland** 12:10
**matched** 38:20
**matter** 5:5 6:11 7:3
**Maurice** 8:7
**MD** 3:16
**means** 8:16,23
**medical** 10:10
**meetings** 33:19
**men** 38:4 44:1
**mentioned** 19:9
**message** 27:23 28:24 29:2,23 40:11
**messages** 28:5,9
**Messenger** 4:15 27:19
**military** 38:15,17,20, 23
**minute** 39:25
**modify** 9:18
**money** 31:2,6,8,9
**month** 40:18
**Moppins** 16:6,12,13 19:10,20 24:9 26:22, 24,25 30:13 32:11,25 33:23 35:10,14,18,21 36:7,9,21 44:8
**Moppins'** 24:8 43:22
**morning** 7:16
**moved** 36:8
**mutual** 43:2,3

**N**

**negative** 43:6,7
**notes** 40:1
**number** 25:15

**O**

**oath** 6:9 8:15,16
**Object** 32:4
**Objection** 14:14 15:1, 13,23 16:24 17:7 18:13 19:4 23:23 24:12 25:9 29:8,18 30:15,23 31:12 32:12 33:1 34:7,13,24 35:20 36:23 38:21 43:9,17 44:2
**objections** 6:13 14:16,17
**offer** 44:18,21
**office** 40:4
**one-sided** 43:2
**operations** 36:16 37:9
**opinion** 14:12,24 30:13 31:19 34:22
**oppresses** 10:21
**outs** 15:5
**overheard** 24:20

**P**

**Parker** 5:5,18 7:23 13:16,19 14:13,24 16:17,23 17:4,8 18:8,12 19:7,22 23:22 25:20 26:21 28:20,25 29:1,3 36:18 39:2,6,13,22 40:3,10 41:10,20 42:1,4,14,16,25 43:5 44:21
**Parker's** 16:2 44:8,16
**PARKER000432** 4:16 27:3
**participating** 6:4
**parties** 6:12
**pass** 37:14
**Paul** 3:15
**penalty** 6:11 7:4,12
**people** 15:18 24:17, 18,21 26:8 30:7 32:10,13 34:20 41:22
**performance** 16:3 44:9
**period** 22:25 39:7
**periodically** 25:2
**perjury** 6:11 7:4,13
**permission** 43:16
**person** 6:9 15:7 30:6 31:3,18 35:5 41:21
**personal** 31:25
**personally** 31:10
**phrase** 33:12
**physically** 6:6
**pieces** 21:18 22:21
**plaintiff** 3:3 5:17 13:16
**PO** 13:14
**point** 9:5,15 10:13,18 11:4 21:12 30:24 40:2
**policy** 4:12 22:13 23:3
**portions** 27:11
**position** 13:6 16:14 24:8 32:23
**present** 3:21 6:6,21
**president** 3:21 5:22
**pressure** 37:10
**pretty** 7:19 14:6 15:4,5 17:9 18:1 32:18 33:19 36:22 40:25 41:20
**primarily** 35:14 43:25 44:3
**prior** 12:1 40:13
**problem** 46:9
**problems** 15:16,17
**proceed** 7:7
**program** 16:13 24:6 25:15,17
**promises** 10:25
**promoted** 14:3,7
**provide** 12:8
**provoked** 19:2,6
**proximate** 44:12
**public** 33:17,18
**publicly** 33:22
**pursuant** 12:7

**Q**

**quantify** 23:7
**question** 9:6,10,11 14:22

**questions** 14:19 37:15,21 40:23 42:17 45:1

R

**Ragunton** 41:16
**Rajesh** 3:21 5:22 35:13,15
**re-ask** 14:22
**read** 6:2 21:16,20 22:18,20,23 27:12 28:8,23
**reading** 45:5,7
**ready** 11:8
**reason** 10:6,10 43:8
**recall** 13:3 19:20 20:11,14,18 21:22,23 22:24 23:19 24:22,25 25:3,4,19,22 27:23 28:18 29:14 33:9 35:25 39:8 41:3,6,13 42:9,10
**receive** 13:13
**received** 11:25
**receiver** 13:9
**recognize** 11:22 27:17
**record** 5:14,24 6:17 8:6 10:8 46:13
**redirect** 42:21
**Reema** 3:22 4:10,13 5:5,20 12:16,17 13:4 16:1 18:7 21:11 22:13,19 23:1,11,20 25:21 32:25 33:10 34:23 35:12 36:1,5, 18 37:20 39:20,21 43:23
**REEMA000008** 4:11 20:23
**REEMA000059** 4:14 22:3
**referring** 29:7 30:1,3 33:15
**regular** 16:7
**relation** 24:8 29:16, 17
**relationship** 18:24 24:4 35:10,11 39:2,5 40:3 42:25
**remember** 13:22 14:8 19:24,25 20:2,3,5,7, 13,17 29:10 30:2
**remote** 3:1 5:8
**remotely** 6:8
**repercussions** 34:9,12
**reporter** 5:11,25 6:2, 20,25 7:2,6 45:15,24 46:15,18
**reporting** 6:7,14
**represent** 37:20
**represented** 8:11
**representing** 5:17 7:23
**resign** 37:7
**resigned** 37:5
**respect** 39:20
**respectfully** 15:15
**review** 9:23 12:3 20:15 45:11,18
**reviews** 28:12,14,16
**Rice** 3:5 4:3 5:16 6:18 7:8,15,22 11:16 14:17,21 15:10,19,25 17:2,11 18:18 19:8 20:21 21:2 22:5,9 24:1,15 25:12 27:1,8 29:11,20 30:20 31:4, 14 32:6,15 33:4 34:10,16 35:2,24 36:24 37:12 38:21 42:20,23 43:14,20 44:6,25 45:6,9 46:7
**RICHARDSON** 3:4
**role** 36:13,18,20
**room** 6:6
**Round** 8:9
**rules** 8:4
**rumor** 23:25 24:2,11, 18,23 25:8,11 29:17 42:7
**rumors** 23:21

S

**Saint** 3:15
**scared** 34:1,6
**screen** 11:18 27:9,10
**scroll** 28:9,11,13,15
**seconds** 28:8
**send** 28:25
**sense** 9:13 30:11
**separate** 18:1
**September** 12:22 36:2, 6
**Services** 3:22 4:13 5:6,21
**sexual** 4:12 22:13 23:2,15 33:7 43:25
**share** 11:17 27:9
**SHERRILL** 3:23
**show** 21:24
**sign** 20:19
**signing** 45:5,7
**similar** 36:17,19
**sir** 38:16,18 39:23 40:5,7,15 41:6,9 42:2,5,19 44:11 46:6
**situation** 40:24
**SKEEN** 3:12
**slave** 15:22
**small** 27:10
**sort** 38:2
**spare** 17:16,18,25 19:16,17 39:9
**speak** 26:11,13,14,17, 21
**specialist** 5:10 13:9, 11
**specific** 18:5
**specifically** 24:19,25
**spoke** 44:15
**spoken** 40:12,14
**spread** 24:13
**standpoint** 34:23,25 35:16
**start** 12:15
**started** 11:8 12:17 13:8,12,21 21:14
**starting** 5:14
**state** 5:13 8:5,8 13:2 35:5
**stated** 29:5 31:16
**statement** 6:3 20:12, 15,19 31:16
**statements** 33:7,10
**States** 12:9
**stating** 6:16
**stick** 37:22
**stop** 10:14,21

**stopped** 18:4
**straight** 26:24,25
**Street** 3:15
**style** 38:20
**subpoena** 4:9 11:11,23 12:8
**supervisor** 39:7,13, 16,18
**Support** 5:7,10,12
**surprised** 25:7
**surprising** 26:2,3
**SW** 3:7
**swear** 6:1
**sworn-in** 12:8

**T**

**taking** 5:15 7:21
**talked** 20:3 40:9 42:7 43:21
**talking** 24:17 39:1
**task** 18:5
**tasked** 13:12
**tasks** 17:25
**telling** 12:15
**tension** 43:1
**terminate** 31:1
**terminated** 16:17,20 30:4,9 34:15 44:14
**termination** 14:5
**Terrace** 8:9
**testified** 7:13
**testimony** 6:10 7:3,12 8:17,21,25 9:17 10:1,3 12:8 37:23 44:18,22
**thing** 18:3 21:17 22:21 32:18 41:1 42:6 45:14
**things** 29:4,6 30:19 31:7,22 32:16 33:21 34:20 35:17 44:1
**thought** 15:2,7 26:6 30:5
**threaten** 32:22
**threatening** 31:3 38:11
**threatens** 30:25 31:1, 2,5
**time** 7:21 9:5,15 10:13,18 11:1,4 13:21 14:16 16:17,19 21:12 23:1,10 24:24 29:14 35:12 36:4 39:7,13 40:2 44:13 46:8
**times** 18:3 23:1,6 24:20 32:7
**today** 5:11,21 8:12, 18,22 9:3 10:1,8,11 11:1 12:1,7 37:13 40:9,13 41:1,5 44:16,19,23 46:8
**today's** 7:23 8:4 10:14 46:14
**told** 20:8 24:18,19 26:14,20,21 45:9
**top** 27:21
**total** 23:10
**touched** 42:24
**Tracea** 3:5 5:16 6:18 7:22
**training** 23:2
**trainings** 23:15
**transcript** 9:24 45:11,17 46:16
**treat** 18:12
**treated** 15:12,14,21 32:25 37:23,24 38:1, 4 41:11,12,13,16,19
**treating** 32:3
**treatment** 43:22
**trice@fr.com** 3:6
**troubled** 18:23 39:5
**true** 29:5
**truthful** 8:17,24 9:16 10:7,11
**type** 25:10 36:18
**types** 13:10 32:16 33:9

**U**

**Uh-huh** 22:4 39:3
**understand** 8:20 9:1, 6,10 10:1 12:6 30:9
**understood** 9:11
**United** 12:9
**unreasonably** 10:20
**upset** 30:18,21

**V**

**vaguely** 19:23 20:3
**Van** 28:2 39:9
**verbally** 6:10
**verification** 6:23
**verify** 13:13 21:19 22:22
**versus** 5:5
**video** 5:10
**videoconferences** 5:8
**view** 28:10
**Virginia** 8:10
**Vora** 3:21 5:22 35:13, 19,22,23

**W**

**Wait** 46:10
**waive** 6:13 45:21
**walk** 15:16
**Walsh** 3:13 4:4 5:19 6:19 14:14 15:1,13, 23 16:24 17:7 18:13 19:4 23:23 24:12 25:9 29:8,18 30:15, 23 31:12 32:4,12 33:1 34:7,13,24 35:20 36:23 37:16, 18,20 38:24 43:9,17 44:2 45:2,8,14 46:2, 5,10,15,17
**wanted** 30:19 31:23 38:8
**warehouse** 13:9,11,20, 24 16:14 17:17,22 19:16 20:1 24:14 25:2,8 29:15 42:8,12
**Washington** 3:8
**witnessed** 32:2,8
**women** 32:25 33:10,11 38:4 44:1,4
**word** 32:20
**work** 8:5 12:16 13:25 14:4 15:12 16:3,23 24:4 25:23 31:18 33:13 34:2 36:6 37:3 43:15 44:8

**worked** 13:4 14:6,10 15:9 16:25 17:10,16, 23 19:18 26:8 30:7 35:5 39:9 41:22 43:23

**working** 12:25 17:19 26:1 31:11 37:8 44:10

**worth** 37:11

**WRIGHT** 3:12

**write** 30:25

**written** 20:16 34:15, 20

**wrong** 29:25

**Y**

**years** 20:10 23:14 29:13

Exhibit
29

# Employee Handbook

**June 2013**

2129 Pulaski Highway, Suite 100
Havre de Grace, MD 21078
Phone: (410) 671-7104
Fax: (410) 676-2304

30(b)(6) - REEMA
DEPOSITION EXHIBIT
CINDY L. SEBO, REALTIME
CERTIFIED MERIT REPORTER
DATE: 2/25/20
10