**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

|  |  |
|---|---|
| EVANGELINE J. PARKER, | |
|     Plaintiff, | |
|     v. | Civil Action No. TDC-17-1648 |
| REEMA CONSULTING SERVICES, INC., | |
|     Defendant. | |

**MEMORANDUM OPINION**

Plaintiff Evangeline Parker filed this civil action against Reema Consulting Services, Inc. ("RCSI") in which she is alleging that while working at RCSI, she was subjected to a hostile work environment based on sex and unlawful retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17 (2018). Pending before the Court is RCSI's Motion for Summary Judgment, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, RCSI's Motion will be DENIED.

**BACKGROUND**

**I.    Parker's Employment**

RCSI provides financial and consulting services to government clients. These services include warehousing, inventory, shipping, and logistics provided pursuant to government contracts with agencies such as the United States Department of State.

## A.     Hiring and Promotions

On December 1, 2014, Parker started employment at RCSI in its warehouse in Sterling, Virginia as a General Clerk II to work on a contract providing warehouse support to the Department of State, Office of Anti-Terrorism Assistance ("the DSATA Contract"). Joint Record ("J.R.") 1. On March 16, 2015, Parker was promoted to the position of Receiving Supervisor (Material Coordinator) for the DSATA Contract. Her direct supervisor in that role was Deputy Program Manager DaMarcus Pickett. On May 16, 2015, she was promoted to Assistant Manager for inventory control on the DSATA Contract, a position that required her to directly supervise two employees. Larry Moppins, an independent contractor whom RCSI retained to oversee the DSATA Contract and who reported directly to RCSI's President, Rajesh Vora, then transferred Parker into the position of "compliance quality control" officer in the summer of 2015. J.R. 20. In that role, Parker reported directly to Moppins. On March 1, 2016, based on Moppins's recommendation, Parker was reassigned to the position of Logistics Manager "with the added responsibilities of Warehouse Assistant Manager." J.R. 4. In this position, which came with higher pay and additional responsibilities, Parker continued to report indirectly to Moppins and supervised several employees, including shipping, receiving, and general clerks. Parker reported to Pickett and, in her capacity as the Assistant Warehouse Manager, to Shaun Reeves, the Warehouse Operations Manager who also reported to Pickett. According to Pickett, who reported directly to Moppins, Parker was recommended for promotions because "of her work performance," including "out-working a lot of people." J.R. 255. Moppins similarly commended her as "a good worker," J.R. 152, and consistently recommended her promotion. RCSI included Parker on a list of the company's "star performers" based on her work reviews. J.R. 450.

2

### B.    The Rumor

In February 2016, Moppins asked Pickett if he was "fucking" Parker.  J.R. 233.  The following day, Romaine Thomson, a former RCSI employee, asked Pickett over the phone whether he was sleeping with Parker and said that the "warehouse" was "talking." J.R. 235-36.  Pickett then informed Parker of these questions from Moppins and Thomson.  Pickett concluded that there was a rumor circulating in the warehouse that he and Parker were having a sexual relationship, and he attributed it to Donte Jennings, an entry-level RCSI employee who previously reported to Parker and with whom Thomson spoke frequently.  Parker also attributed the rumor to Jennings, in part because she believed Jennings was envious of her rapid rise.

Once Pickett informed Parker of the rumor, she spoke to Thomson, who stated that Jennings had told her the rumor, and confronted Jennings, who did not reveal that he was aware of or responsible for the rumor.  After she initially confronted these individuals, she felt that "things were being said" around the warehouse but that she "couldn't prove it." J.R. 44.

On April 21, 2016, when Parker and Pickett both arrived a few minutes late to an all-staff meeting, Moppins allowed Pickett to enter but slammed the door immediately after him and locked Parker out.  Parker knocked and heard laughter from inside the meeting room, but Moppins did not unlock the door, so she left and went home.  Later, Pickett and another employee, Rachelle Lee, told Parker that during the meeting, she was criticized as a manager, that Jennings and Manley Ferguson, who reported to Parker, complained about her, and that employees discussed how she used her sexuality to get to the top, while Moppins allowed the discussion to continue and asked questions.

After the staff meeting, Moppins had Ferguson come to his office, and Ferguson told Moppins of a "rumor within the warehouse of a personal relationship" between Parker and Pickett

3

or between Parker and Moppins himself. J.R. 553. Ferguson told Moppins that Parker had approached him and said, "If you want to know who I am fucking, ask me directly and I will tell you." J.R. 553. Moppins then called Jennings to his office, and after he was pressed, Jennings said that Parker had approached him and made a substantially similar statement to him. According to Parker, she did not make these statements to Ferguson and Jennings, and she did not ask anyone other than Thomson and Jennings about the rumors until after the all-staff meeting on April 21, 2016. Moppins also became aware that Jennings was "constantly telling" the rumor to Cathy Price, RCSI's part-time human resources manager, and Carlos Carter, who directly supervised Jennings. J.R. 165. After the April 21 staff meeting, Parker asked two other employees, Maddie Littleton and Tambeni Daltrey, if they were aware of the rumor or involved in spreading it.

### C.    The Response

The next day, on April 22, 2016, Parker asked to meet with Moppins to discuss the rumor, and had a meeting with Moppins, Pickett, and Angela Wallace, who previously supervised Parker and worked in a unit outside the warehouse. Parker objected to being excluded from the staff meeting, told Moppins that she understood that the rumor was discussed in the meeting, and argued that Moppins should have helped quash the rumor and support her as a manager. Moppins asserted that he had an obligation to listen to the employees' criticisms of her, acknowledged that Ferguson and Jennings had mentioned a rumor that Parker and Moppins were sleeping together, and stated that after the meeting he had them come to his office to discuss it further. He then "accused [Parker] of being the reason the rumor was in the warehouse" and said that at this point he could not do "the big things planned" for her, including promoting her to run an addition to the warehouse. J.R. 52. During the meeting, both Parker and Moppins became upset and shouted at each other.

4

On April 25, 2016, Moppins asked Parker to attend another meeting with him, Wallace, and Pickett. Moppins said that he should have fired her during the previous meeting based on the way she talked to him. Parker apologized for her tone in the first meeting but revealed that she knew Moppins had asked Pickett whether he and Parker were having an affair, which caused Moppins to begin yelling at Parker again.

Immediately after this exchange, Parker went to Price, the part-time human resources manager, and filed a complaint about Moppins for a "hostile work environment" and "retaliation," in which she stated that Jennings was the "source of the rumor." J.R. 574-75. Price responded by sending Parker, Pickett, Wallace, and Moppins an email entitled "Recent Events ***DO NOT REPLY TO THIS EMAIL***," in which Price "advise[d] all parties on the email to cease having or entertaining this subject outside of HR," stated that "there will be no discussion" of the rumor "outside of HR," including "[n]ot to employees, co-worker, supervisor, etc.," and urged the recipients to direct any further conversation about the issue only to her. J.R. 579.

Price then arranged an April 27, 2016 meeting between her, Parker, Moppins, and Pickett in which she urged the parties to apologize. After Parker apologized for her tone in previously addressing Moppins about the rumor, Moppins refused to apologize and instead stated, "Apology? Huh-uh. I already know what I'm going to do." J.R. 65. Moppins soon stopped replying to Parker's emails on standard work matters and stopped inviting her to management meetings.

Parker took vacation from May 12 to May 16, 2016. On May 12, 2016, Jennings submitted a complaint entitled "Notice of Hostile Work Environment" stating that "[o]n May 2, 2016 I was . . . informed that Evangeline Parker filed a sexual harassment complaint against me; claiming that I had started a rumor about her" and that "[s]ince the time I was made aware of this complaint,

Ms. Parker has been creating an uncomfortable work environment for me" with negative "facial expressions" and "hand gestures." J.R. 580.

Meanwhile, on May 13, 2016, Moppins emailed Vora and Price, stating that Parker "has threatened to file Sexual Harassment charge on me for supposedly starting rumors," "I have been unable to counsel her without her repeatedly stating that I started unfavorable rumors," and that "I feel that I have no recourse but to speak with you directly about Ms. Parker's attempt to hold me hostage from performing any disciplinary actions on her." J.R. 706.

Moppins then drafted two formal notices to Parker, each of which was dated May 16, 2016 and entitled "Written Warning" (collectively "the Warnings"). J.R. 582, 585. In the first Warning ("Warning No. 1"), Moppins recounted various employees' grievances with Parker's management style and her manner of confronting them about the rumor, including the statements she allegedly made to Ferguson and Jennings, criticized the way she responded to him during their meetings, noted that Parker was "going to press charges of sexual harassment against me for spreading untrue rumors," and recommended Parker's termination. J.R. 582-83. In the second Warning ("Warning No. 2"), Moppins wrote to Parker that "you were given specific instructions" to "not visit the work areas of subordinate employees who you named in a harassment complaint," but Jennings had submitted his May 12, 2016 complaint about Parker's behavior towards him and another employee, Kenton Birgans, had witnessed Parker make "inappropriate gestures and expressions" to Jennings. J.R. 585. For this alleged misconduct, Moppins also recommended Parker's termination.

When Parker returned to work on May 17, 2016, she attempted to enter Jennings's workspace for an urgent project when Carter approached her and informed her that she was prohibited from entering Jennings's workspace. Parker then went to Moppins, who confirmed the instruction and told her that because of Jennings's complaint, "you can't go around [him] and [he]

6

can't come around you." J.R. 71. Parker attempted to see Price, who said she was busy. Jennings, however, repeatedly entered Parker's workspace, smirked at her, talked to other employees and gave them high fives and hugs, and distracted Ferguson, who thus became less responsive to Parker. Later that day, Parker sent Price a letter detailing her concerns with Jennings's behavior and, when she did not receive a reply, followed-up by email the next day, May 18, 2016. That same day, Parker was given the Warnings and fired. She refused to sign the Warnings and asserted that the allegations contained in them were false.

## II.     Procedural History

On August 24, 2016, Parker filed a formal Charge of Discrimination with the United States Equal Employment Opportunity Commission, in which she alleged sex discrimination and retaliation based on these events.

On May 15, 2017, Parker filed the Complaint in this case, asserting claims of a hostile work environment based on sex, discriminatory termination, and retaliatory termination, in violation of Title VII. On December 7, 2017, the Court (Titus, J.) dismissed all of Parker's claims on the grounds that the alleged harassment against her based on the rumor that she had an affair with another employee was not actionable under Title VII because it could not constitute a hostile work environment "because of sex." *Parker v. Reema Consulting Services, Inc.*, 915 F.3d 297, 302 (4th Cir. 2019). Parker appealed to the United States Court of Appeals for the Fourth Circuit, which reversed the dismissal of Parker's hostile work environment and retaliatory termination claims on the grounds that her allegations could establish a claim based on sex. *See id.* at 306. On remand, the parties completed discovery, and RCSI has now filed the present Motion.

7

## DISCUSSION

In its Motion for Summary Judgment, RCSI argues that, even with the Fourth Circuit's ruling that Parker has a viable legal theory, based on the record evidence, Parker cannot establish facts sufficient to prevail on her claims of a hostile work environment or retaliation under Title VII. Parker opposes the Motion.

### I.      Legal Standard

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

### II.     Hostile Work Environment

A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015). To prove such a claim, a plaintiff must show that (1) the plaintiff experienced unwelcome conduct; (2) the conduct was based on the

8

plaintiff's race, color, religion, national origin, age, or sex; (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Baqir v. Principi*, 434 F.3d 733, 745-46 (4th Cir. 2006); *Parker*, 915 F.3d at 302. "In measuring whether the offensive conduct is severe or pervasive enough to warrant relief, we must look at the totality of the circumstances, including: the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)).

RCSI does not contest that Parker experienced "unwelcome conduct" sufficient to establish the first element of a hostile work environment claim, which includes the discussions by Moppins, Jennings, Ferguson, and others of the rumor that she was having a sexual relationship with Pickett; her exclusion from the April 21 staff meeting; the decision to bar her from interacting with Jennings while he was allowed to roam free in her work area; and the decision to terminate her, all of which caused her to voice objections to management. *See Strothers v. City of Laurel*, 895 F.3d 317, 328-29 (4th Cir. 2018) (stating that the element of "unwelcome conduct" is "not a high hurdle" and that "an employee can demonstrate that certain conduct is unwelcome simply by voicing [an] objection to the alleged harasser or to the employer"). Rather, RCSI argues that Parker has not demonstrated that she was subjected to harassment sufficiently severe or pervasive to constitute a hostile work environment, that the facts establish that the harassment was based on sex, and that liability is imputable to RCSI.

## A.    Severe or Pervasive

In seeking summary judgment, RCSI argues that Parker has not demonstrated that the spread of the rumor and other unwelcome conduct meets the standard of harassment sufficiently "severe or pervasive" to alter the conditions of her employment and "create an abusive or hostile atmosphere." *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009). This element has both subjective and objective components. *Id.* As to the subjective component, the plaintiff must have subjectively perceived the environment to be hostile or abusive. *Id.* Where Parker repeatedly alerted Price to how the rumor and others' responses were affecting her work, she has satisfied this requirement. *See id.* at 176 (finding that a plaintiff's emotional distress and complaints to supervisors met the subjective component).

In assessing whether the environment "was objectively severe or pervasive," courts "must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008)); *Parker*, 915 F.3d at 304. No "single factor is dispositive" because the "real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships." *Cent. Wholesalers, Inc.*, 573 F.3d at 176 (citations omitted).

In its ruling on the Motion to Dismiss, the Fourth Circuit has already concluded that the allegations in the Complaint, if true, are sufficient to support a finding of "severe or pervasive" harassment. *Parker*, 915 F.3d at 304-05. In particular, the court relied on the allegations that Moppins asked Pickett whether he was having an affair with Parker; that he excluded Parker from a staff meeting at which the rumor was discussed; that he berated Parker, blamed her for the rumor,

10

and told her he should have fired her and would give her no further promotions; that she then faced a false harassment complaint by a male employee who started the rumor and was thus barred from interacting with him; and that she was then terminated. *Id.*

Upon a review of the record, the Court finds that the evidence is sufficient to support the core allegations in the Complaint. In his deposition, Pickett testified that in February 2016, Moppins asked him if he was "fucking" Parker, J.R. 233, and that Romaine Thomson, a former RCSI employee, asked him the next day if he was having an affair with Parker. Both Parker and Pickett testified in their depositions that when they arrived late to the April 21, 2016 staff meeting, Moppins allowed Pickett to enter but then excluded Parker, and Parker testified that Moppins then slammed the door on her. Though Moppins has denied that the rumor was discussed during the meeting, Parker has testified that during her April 22 meeting with him, Moppins acknowledged that statements were made at the meeting about a rumor that she was sleeping with Moppins that caused him to have separate discussions with Ferguson and Jennings after the meeting during which Ferguson informed him of a "rumor within the warehouse of a personal relationship" between Parker and Pickett or between Parker and Moppins himself, and both told Moppins that Parker had confronted them about the rumor. J.R. 553. Thus, even without considering the accounts of the meeting that Parker received from others, there is a genuine issue of material fact whether the rumor was discussed at the April 21 staff meeting.

Based on the deposition testimony of Parker, Pickett, and Moppins, the evidence also establishes that when Parker approached Moppins on April 22 to address the rumor and seek his help in ending it, Moppins accused Parker of fueling the rumor by confronting others about it and told her that he would not consider her for future promotions. Both she and Moppins became agitated. In a second meeting on April 25, after Moppins told Parker that he should have fired her

11

for the way she talked to him in the first meeting, Parker apologized but then revealed to Moppins that she knew he had asked Pickett if she was sleeping with him, which caused Moppins to raise his voice and become angry again.

The evidence also includes the written harassment complaint by Jennings against Parker, the truth of which Parker has denied, which then caused RCSI to bar Parker from entering Jennings's workspace, even while Jennings was allowed to freely enter her area, engage with and distract other employees, and smirk and laugh at her. Jennings's claim that Parker violated the no-contact provision was one of the purported reasons for Parker's termination.

The evidence in the record thus provides substantial support to the allegations previously deemed by the Fourth Circuit to establish "severe or pervasive" harassment. *Parker*, 915 F.3d at 305. The conduct was pervasive in that it lasted for four months, from no later than February 2016 through May 2016, with the more acute harassment occurring between April 21, 2016 and May 18, 2016. This conduct included the staff meeting; the multiple meetings between Parker, Moppins, Pickett, and Price, at which Moppins yelled at her and threatened to deny her promotions; the harassment by Jennings and Ferguson; and Moppins's refusal to respond to emails and invite her to meetings. *See Boyer-Liberto*, 786 F.3d at 280-81 (holding that even two isolated incidents of harassment could be sufficient to establish a severe or pervasive hostile work environment). The severity of the harassment is established in part by the fact that it included actions by a supervisor, Moppins, who not only participated in the rumor by asking Pickett about it, but also responded to Parker's complaints by becoming angry and raising his voice on two occasions and telling Parker that he would no longer consider her for promotions. Moppins also refused to apologize even when Price asked him to do so and Parker herself apologized to him for raising her voice, instead dismissing the request by stating, "Apology? Huh-uh. I already know what I'm

12

going to do." J.R. 65; *see Parker*, 915 F.3d at 305 (noting that the fact that Moppins, a supervisor, allegedly slammed a door on Parker and screamed at her rendered the harassment "all the more threatening"); *Boyer-Liberto*, 786 F.3d at 278 (noting that "a supervisor's power and authority invests his or her harassing conduct with a "particular threatening character" (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998))).

Parker's humiliation reinforces the severity. *Parker*, 915 F.3d at 305. To start, the rumor itself demeaned Parker by suggesting that Parker had obtained her position only through sex, an allegation that "goes right to the core of somebody's merit as a human being." *Id.* Other evidence of such humiliation includes Moppins's public exclusion of Parker from the April 21 staff meeting, which resulted in laughter among the staff and which she testified was "embarrassing," J.R. 49, and the fact that when Parker was barred from Jennings's workspace, she was effectively blindsided in that she learned of that prohibition only when she entered the workspace and Jennings's supervisor told her she was banned from the area. Notably, neither Price nor Moppins could identify anyone who formally notified Parker of Jennings's complaint or the prohibition. Further, Jennings's subsequent, persistent loitering in Parker's workplace, which included laughing, smirking, and conversations with her subordinates, and resulted in Ferguson's disregard of Parker's work-related instructions, only added to this humiliation, by highlighting Parker's precarious position and diminished authority. In her May 17 letter to Price, Parker characterized the restrictions and the antics of Jennings and Ferguson as "being personally attacked." J.R. 703.

Finally, the harassment interfered with Parker's work performance. *Parker*, 915 F.3d at 305. Beyond the disruption to her work caused by the bar on entering Jennings's work area and the interference and disruption that Jennings caused when he entered her work area, Parker's work was hampered by Moppins's apparent decision in May 2016 to stop inviting Parker to meetings

13

she would normally attend and his failure to reply to Parker's work-related emails, by which he effectively withheld approval of actions that required "his sign off," including "spending money on cleaning supplies for the warehouse." J.R. 69, 85.

RCSI's counterarguments do no more than establish that the facts remain contested. Though RCSI notes that witnesses have said that Moppins insisted on timely attendance at meetings and previously excluded staff members from meetings to which they arrived late, where Parker has testified that she and Pickett arrived at the same time, but Pickett was admitted and she was not, there is a genuine issue of material fact on Moppins's reason for excluding her. While RCSI argues that the statements by Ferguson and Jennings to Moppins reflected that the rumor was not pervasive and that it was Parker who caused the rumor by confronting others about it, there was other evidence that the rumor was already circulating, including Moppins's acknowledgment that he asked Pickett about it in February 2016 and Moppins's deposition testimony that Jennings was "constantly telling Cathy Price" and his direct manager, Carlos Carter, about the rumor. J.R. 165. In addition, Birgans testified that he "overheard" the rumor "a couple times" "from a few different people." J.R. 638. Moppins also testified that he had heard a variation on the rumor, that Parker was "trying to entice" Jennings to have sex with her," which "two or three" people told Moppins. J.R. 170-71. The statements by Moppins, Pickett, and Birgans that they heard others tell them of these rumors would constitute admissible evidence, since the fact that the statements were made, not the truth of the rumors, is the probative evidence. *See* Fed. R. Evid. 801(c) (defining hearsay as including only statements offered for the truth of the matter asserted). Moreover, a reasonable jury could fairly conclude that Parker's inquiries about the rumor provide additional evidence that others had initiated them and that they persisted, as there was no apparent reason for her to engage in such questioning in the absence of actual rumors.

14

Finally, though RCSI argues that Jennings's harassment complaint was not false in that it was Parker who harassed Jennings and not the other way around, Parker's denial of Jennings's allegations, coupled with Pickett's deposition testimony that he saw Jennings antagonizing Parker by staring at her, establishes, at a minimum, a genuine issue of material fact on this issue.

Accordingly, the Court finds that the record contains sufficient evidence to meet the requirement of "severe or pervasive" harassment.

**B.     Based on Sex**

In its opinion in this case, the Fourth Circuit rejected the argument that the type of harassment alleged by Parker is not harassment "based on sex" because her claim is grounded in "traditional negative stereotypes regarding the relationship between the advancement of women in the workplace and their sexual behavior" which "may cause superiors and co-workers to treat women in the workplace differently from men." *Parker*, 915 F.3d at 303. The record provides sufficient evidence to support Parker's allegations in the Complaint that Parker was the target of a harassing rumor that she was having an affair with a supervisor, including the deposition testimony of Pickett and Birgans, who stated that the rumor was that Parker was having a sexual relationship with Pickett, and the statements of Moppins, who confirmed that he had asked Pickett whether he was having an affair with Parker and stated that Ferguson told him the rumor was that Parker was having an affair with Pickett or Moppins himself.

RCSI nevertheless argues that Parker has not established this element because she has not produced sufficient evidence to show that the rumor was that Parker "was having an affair with her supervisor *in order to obtain promotions*." Mot. Summ. J. Reply at 4, ECF No. 119-1. Although the Fourth Circuit, in reversing the dismissal of Parker's Complaint, characterized the rumor as one that "Parker, a female subordinate, had sex with her male superior to obtain

15

promotion," *Parker*, 915 F.3d at 303, it did not limit its conclusion that such harassment based on a rumor is "based on sex" to scenarios in which the rumor explicitly referenced sex in exchange for promotions. Here, where Pickett had been a supervisor to Parker and was at a higher level of the organization, Parker had received several promotions during a short period of time, and Ferguson had worked at RCSI significantly longer than Parker but ended up working under her, a reasonable jury could conclude that the spreading of the rumor implicitly questioned whether Parker had used sex to attain career advancement within RCSI.

Moreover, even if the rumor was not directly linked to Parker's promotions, it still constituted harassment "based on sex" because its impact derived from a sex-based double standard under which women believed to have engaged in an office affair are treated differently than similarly situated men. *See, e.g. Spain*, 26 F.3d at 447-48 (finding that a rumor that a woman was having an affair with her supervisor and had "gained influence" with him was sex-based because "if a male had a relationship bringing him into repeated close contact with" the supervisor, "it would have been less likely for co-workers to have believed that the relationship had a sexual basis" so "the resulting poor interpersonal relationships, negative evaluations, and denial of advancement might not have occurred for a male"). Indeed, the record establishes that Pickett, the other primary target of the rumor, did not experience the type of harassment faced by Parker. Pickett was specifically allowed into the April 21 staff meeting while Parker was not. Although Pickett encountered some limited negative treatment from Moppins, who temporarily stopped emailing him or inviting him to meetings, Moppins eventually resumed regular communication with Pickett, he did not shout at Pickett, and he did not seek to have him fired. There is also no evidence that Pickett encountered the type of hostility and ridicule from subordinates such as Jennings or Ferguson that Parker experienced. Finally, the evidence showed notable disparate

16

treatment in the way that management treated the complaint by Jennings, a male employee, against Parker for harassment. While Parker's complaint against Jennings did not result in any directive to him to avoid contact with Parker, and Jennings was allowed to roam free in her workspace, undermining her in front of her subordinates, Jennings's complaint resulted in Parker being barred from his workspace and later fired, ostensibly in part for continuing to interact with Jennings. Thus, the evidence supports the conclusion that of the various individuals in these events, only Parker, the female manager targeted by the rumor, endured hostility from Moppins and subordinates and was punished with termination. Accordingly, there is, at a minimum, a genuine issue of material fact on whether the harassment Parker endured was based on sex.

### C.     Imputable to the Employer

RCSI also argues that the evidence does not satisfy the requirement is that the harassment be imputable to the employer. Under Title VII, liability may be imputed to an employer in several circumstances. First, if the harasser is a supervisor, the employer is strictly liable if the supervisor's actions culminated in a tangible employment action. *Strothers v. City of Laurel*, 895 F.3d 317, 333 & n.6 (4th Cir. 2018) (citing *Vance v. Ball State Univ.*, 570 U.S. 421, 429-30 (2013)). A supervisor is someone empowered to "effect a significant change in employment status," such as firing, failing to promote, or "a decision causing a significant change in benefits." *Id.* (quoting *Vance*, 570 U.S. at 424). Second, if the harasser is the victim's co-worker, the employer may be held liable if it "knew or should have known about the harassment and failed to take effective action to stop it." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333-34 (4th Cir. 2003) (en banc).

RCSI is strictly liable for the harassment by Moppins. Moppins was Parker's supervisor because he was empowered to effect significant changes in her employment status, as

17

demonstrated by his own remark that he would withhold promotions from Parker, his issuance of the Warnings calling for Parker's termination, and employees' widespread understanding that Moppins could and would fire people spontaneously. For example, Pickett testified that "[e]verybody" believed Moppins was in control of hiring and firing decisions and that "we've all seen [Moppins] fire people," J.R. 258, and Birgans testified that Moppins would "threaten[] to demote you" or would threaten "your job," and that employees feared they would be "terminated" for complaining about Moppins. J.R. 640-42. Price's acknowledgment that the decision to issue the Warnings that Parker would be terminated was made by Moppins, "in consultation with in-house counsel," not by her, reinforces this conclusion. Moreover, Moppins's harassment culminated in a tangible employment action: Parker's termination. *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (listing "firing" as a "tangible employment action"). Because Moppins was Parker's second- or third-level supervisor, his harassment culminated in her firing, and a reasonable jury could conclude that Moppins harassed Parker based on her sex, RCSI is strictly liable for his actions.

Even if RCSI were not strictly liable because Moppins is a supervisor, it could still be liable for the harassment because there is sufficient evidence to show that RCSI was aware of the harassment and failed to take effective action to stop it. In late April 2016, Parker informed Price, RCSI's part-time human resources manager, of the rumor and the harassment by Moppins and Jennings, but Price's only substantive responses were (1) to send a short email to only a few managers, not to any subordinates such as Jennings, asking them to stop discussing the rumor; (2) to ask Moppins to apologize—upon which he instead threatened Parker's career; and (3) to conduct a staff-wide anti-sexual harassment training. Notably, Moppins discounted Price's email about not discussing the rumor as "something I would have threw aside." J.R. 171. Price also did nothing

18

to correct Moppins's behavior, perhaps because she did not believe that she could discipline Moppins given that he was written "into the contract" with RCSI's client. J.R. 228.

RCSI's inept response extended to Parker's harassment by Jennings. Remarkably, Price stated in her deposition that she was unsure if anyone told Jennings to stop circulating the rumor. Though Parker and Pickett have both testified that Jennings continued to enter Parker's workspace, laugh and smirk, and distract her subordinates, RCSI took no action to stop such conduct. Moppins stated that he did not remember "an issue" with Jennings entering Parker's workspace, and he never checked to ensure Jennings was not entering Parker's area. J.R. 178-79. Price thought she instructed Jennings to not enter Parker's area by email but could not recall when such an email was sent, and RCSI has produced no other evidence to corroborate this vague recollection. Price's final, formal investigative report on Parker's complaints, which covered the period from April 18, 2016 to May 17, 2016, did not acknowledge any harassment by Jennings and did not recommend any specific discipline or instructions for Jennings. Indeed, Parker never received a reply from Price after she reached out on May 18 to complain about Jennings entering her workspace. Because Parker has presented evidence that RCSI knew about the rumor and harassment by Moppins and Jennings but failed to take effective action to stop it, there is, at a minimum, a genuine issue of material fact whether on whether the harassment by co-workers is imputable to RCSI.

Finally, RCSI argues that liability cannot be imputed to it because it has established the affirmative defense established by *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). Under this defense, an employer may not be vicariously liable for a hostile work environment created by a supervisor that does not result in a tangible employment action if (1) it "exercised reasonable care to prevent and correct promptly" any harassing behavior; and (2) the plaintiff "unreasonably failed to take advantage of

19

any preventive or corrective opportunities provided by the employer to avoid harm." *See Faragher*, 524 U.S. at 807. This argument is incorrect for three reasons. First, the defense does not apply because there was a tangible employment action, in this instance, the termination of Parker. *See Faragher*, 524 U.S. at 807 (stating that the defense is available "[w]hen no tangible employment action is taken"); *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 244 (4th Cir. 2000) (stating that the defendant employer could raise this affirmative defense because the plaintiff "does not allege that she suffered a tangible employment action" due to her supervisor's harassment). Second, Parker, in fact, took advantage of the corrective opportunity of filing an internal complaint, which she did by notifying Price of the alleged harassment. Third, even if the defense were available, as discussed above, there is sufficient evidence to support the conclusion that once notified, RCSI did not take reasonable care to correct the harassment promptly. *See supra.* The fact that Price had never investigated a sexual harassment complaint may have contributed to RCSI's deficiencies. *See Smith*, 202 F.3d at 245 (finding that an employer could not succeed under the defense because it did not exercise reasonable care to correct promptly the harassment, in part because the investigation, the first one conducted by the investigator, was inadequate). Regardless, in her deposition, Price aptly summarized RCSI's ineffectuality: when asked whether "a sexual harassment investigation" can "result in disciplinary action against the alleged harasser," Price responded, "[T]ypically, no, not against the harasser." J.R. 363. Whether RCSI took reasonable steps to promptly correct the problem is, at a minimum, the subject of genuine issues of material fact that must be decided by a jury.

Because a reasonable jury could return a verdict in favor of Parker on each element of her hostile work environment claim based on the admissible evidence, the Motion will be denied as to this claim.

## III.    Retaliation

RCSI also seeks summary judgment on Parker's retaliation claim. Under Title VII, it is unlawful for an employer to retaliate against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3. A Title VII retaliation claim may be established through direct evidence of retaliatory intent or through the following burden-shifting framework:

> [A] plaintiff bears the initial burden of establishing a prima facie case of retaliation. Once this burden is carried, the burden shifts to the defendant, who is obliged to articulate a legitimate, non-retaliatory justification for the adverse employment action. If the defendant carries this burden, the onus is on the plaintiff to then demonstrate that the non-retaliatory reason advanced by the defendant is a mere pretext.

*EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005) (internal citations omitted).

To establish a *prima facie* case of retaliation, a plaintiff must present facts that establish that (1) the plaintiff engaged in a protected activity; (2) the employer took a materially adverse action against the plaintiff; and (3) there was a causal link between the two events. *Boyer-Liberto*, 786 F.3d at 281. For a retaliation claim, a "materially adverse" action is one which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

Here, the evidence establishes that Parker engaged in protected activity when she complained first to a supervisor, Moppins, and then to the human resources manager, Price, about the sexual harassment she was experiencing. *See Parker*, 915 F.3d at 305; *Boyer-Liberto*, 786 F.3d 282 ("[A]n employee is protected from retaliation when she opposes a hostile work environment that, although not fully formed, is in progress."). It is undisputed that RCSI took a materially adverse action: firing Parker, an action that would well dissuade "a reasonable worker

21

from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68. As for causation, the fact that Parker was terminated only a handful of weeks after she first reported the harassment to Moppins and Price suffices to satisfy this element of a *prima facie* case. *See, e.g.*, *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (discussing cases finding causation when the materially adverse actions occurred four and six months after the protected activity). Though RCSI argues that there is no causation because Vora, the owner of RCSI, and not Moppins or Price, actually terminated Parker, the record contains adequate evidence for a reasonable factfinder to conclude that Moppins was the actual decisionmaker who terminated Parker, while Vora merely ratified Moppins's decision. *See Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 288-89 (4th Cir. 2004) (stating that the individual "acting pursuant to a discriminatory animus need not be the 'formal decisionmaker' to impose liability upon an employer," so long as the plaintiff presents sufficient evidence to establish that the subordinate was the one 'principally responsible' for, or the 'actual decisionmaker' behind, the action" (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151-52 (2000))). In any event, even the actions of issuing the formal Warnings calling for termination, undisputedly issued by Moppins, would constitute a materially adverse action that would "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68.

RCSI asserts that it is entitled to summary judgment because, pursuant to the burden-shifting retaliation framework, it fired Parker for legitimate, non-retaliatory reasons, specifically, her alleged insubordination and her failure to comply with the requirement that she stay away from Jennings. This argument fails for multiple reasons. To start, the burden-shifting framework need not be followed where the record provides direct evidence of retaliatory animus. *See Hill*, 354 F.3d at 284 (in a discrimination case, describing "direct or circumstantial evidence" of animus as

22

one of "two avenues of proof" through which "a plaintiff may avert summary judgment"). Here, the record contains direct and circumstantial evidence of retaliatory animus. When Parker complained to Moppins about the rumor and his failure to take steps to stop its spread, Moppins explicitly blamed Parker for the rumor, threatened not to promote her, and when asked to apologize to Parker on April 25, he refused to do so and instead stated, "I already know what I'm going to do," which Parker accurately took as a veiled threat to her employment, which was then terminated only three weeks later. J.R. 65. Then, in a May 13, 2016 email to Vora and Price, Moppins stated that Parker "has threatened to file Sexual Harassment charge on me for supposedly starting rumors about her relationship" with Pickett and that "I feel that I have no other recourse but to speak with you directly about Ms. Parker's attempt to hold me hostage from performing any disciplinary actions on her." J.R. 706-07. Similarly, in Warning No. 1, dated May 16, 2016, which formed a basis for the termination of Parker, Moppins wrote, "You were going to press charges of sexual harassment against me for spreading untrue rumors about you and" Pickett and recommended "[t]ermination of employment," because "at no point should you have approached any employee with this type of inquiry," and "[t]he disrespect that you show when you address a Supervisor cannot and will not be tolerated." J.R. 583. Significantly, Price has testified that she authorized Moppins to draft one of the Warnings in part because, contrary to Price's wishes, Parker continued to have conversations with others "about the whole case," by which she meant "the hostile work environment and the rumor," and Parker "just would not let it go." J.R. 391. Although RCSI argues that the interest in terminating Parker as expressed in these statements was based on the manner in which she spoke to Moppins in registering her complaints, and her supposed responsibility for perpetuating the rumor by asking other employees about it, this evidence, viewed in the light most favorable to Parker, could allow a reasonable jury to conclude that Moppins's

decision to seek Parker's termination was motivated by dissatisfaction with Parker's decision to register complaints about the sexually charged rumor.

Further, even if, within the burden-shifting framework, RCSI has offered legitimate non-retaliatory reasons for Parker's termination, there is evidence that establishes a genuine issue of material fact as to whether those reasons were pretextual. First, although RCSI argues that Parker was insubordinate and mistreated employees such as Jennings, it is undisputed that Parker had received frequent promotions and glowing performance reviews at RCSI, including a March 31, 2016 evaluation that found her work "excellent" less than two months before her termination. J.R. 631. In January 2016, Price wrote that, "The outlook for Ms. Parker's continued employment with us is very good and we hope to have her with our Company for many years to come." J.R. 629.

Second, although RCSI claims that one rationale for Parker's termination, contained in the Warning No. 2, was that she ostensibly received an instruction "not to visit the work areas of subordinate employees who you named in a harassment complaint you filed" and subsequently violated that prohibition, J.R. 585, RCSI has produced no definitive evidence that Parker was actually given this instruction before Warning No. 2 was drafted on or after May 16, 2016. In discussing who told Parker to stay away from Jennings, Moppins testified, "I don't know if it was myself or Cathy Price or whatever." J.R. 163. Price, meanwhile, testified that Moppins provided the instruction but did not know when he did so. In contrast, Parker has testified that she was on vacation from May 12 to May 16, and she learned of the prohibition only upon her return when a co-worker mentioned the prohibition to her, the day *after* Warning No. 2 was drafted. Her account of how she learned about the restriction is corroborated by her letter to Price of May 17, 2016. Notably, Moppins, could not recall when he actually gave Warning No. 2 to Parker, but he did not sign it until May 18. Finally, Moppins's claims that despite the instructions to stay away from

Jennings, Parker "couldn't stay away from him," and that it was "issues everyday . . . like every Monday or Tuesday," J.R. 163, are contradicted by the evidence that Parker was at work at most one full day—on May 17—from the time she learned of the order to stay away from Jennings until she was fired on May 18.

Third, as discussed above, there are genuine issues of material fact on whether Parker actually was insubordinate to Moppins or harassed Jennings. Where Pickett, a supervisor, testified that he not consider the way Parker raised her voice to Moppins to be insubordination and that he did not consider "either one of them at fault," J.R. 279, and Parker apologized to Moppins both on April 25, and at the meeting convened by Price on April 27 even while Moppins refused to apologize, the question whether Parker's interactions with Moppins in complaining about the rumor constituted insubordination warranting termination is for a jury to decide. Moreover, both Pickett and Parker have testified that it was Jennings who was harassing Parker in her workspace, not the other way around, yet only Parker was disciplined.

In light of this evidence, a reasonable jury could conclude that RCSI's purported non-retaliatory reasons for terminating Parker were pretextual. Because the record contains sufficient evidence for a jury to return a verdict for Parker on her retaliation claim, the Court will deny the Motion as to this claim.

## CONCLUSION

For the foregoing reasons, RCSI's Motion for Summary Judgment will be DENIED.  A

separate Order shall issue.


Date:  May 17, 2021

THEODORE D. CHUANG
United States District Judge