IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

SOUTHERN DIVISION

EVANGELINE PARKER,                    ) CIVIL ACTION
                                      ) NO. TDC-17-1648
          Plaintiff,                  )
                                      )
v.                                    )
                                      )
REEMA CONSULTING SERVICES, INC.,      )
                                      )
          Defendant.                  )

TRANSCRIPT OF JURY TRIAL PROCEEDINGS - EXCERPT -
P.M. PROCEEDINGS
BEFORE THE HONORABLE THEODORE D. CHUANG,
UNITED STATES DISTRICT JUDGE,
AND A JURY
TUESDAY, DECEMBER 7, 2021; 1:33 P.M.
GREENBELT, MARYLAND

FOR THE PLAINTIFF:

          FISH & RICHARDSON P.C.
          BY:  ANDREW R. KOPSIDAS, ESQUIRE
          BY:  DANIEL A. TISHMAN, ESQUIRE
          BY:  TRACEA L. RICE, ESQUIRE
          1000 Maine Avenue, SW
          Suite 1000
          Washington, DC  20024
          (202) 783-5070
               -and-
          WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND
          URBAN AFFAIRS
          BY:  JOANNA K. WASIK, ESQUIRE
          700 14th Street NW
          Suite 400
          Washington, DC  20036
          (202) 319-1000

OFFICIAL COURT REPORTER:
Renee A. Ewing, RPR, RMR, CRR - (301) 344-3227

   ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***

APPEARANCES (Continued):

FOR THE DEFENDANT:

        WRIGHT, CONSTABLE & SKEEN, LLP
        BY:  DONALD J. WALSH, ESQUIRE
        BY:  MARIE J. IGNOZZI, ESQUIRE
        7 St. Paul Street
        18th Floor
        Baltimore, Maryland  21202
        (410) 659-1354

THE COURT:  Thank you, everyone.  Please be seated.
So we have another issue; is that correct?

MS. WASIK:  Yes, Your Honor, that's right.

THE COURT:  Mm-hmm.

MS. WASIK:  Two issues, one small, one potentially requiring discussion.  The small issue is that we would seek to move Exhibit 23 into evidence.  I don't believe I moved at the time it was offered.

MR. WALSH:  No objection, Your Honor.

THE COURT:  Let me just remind myself of what 23 is.  Have we talked about it yet already or no?

MS. WASIK:  I did cover it with Ms. Price.

THE COURT:  Right.  And everyone agreed on this redaction at the bottom previously?

MS. WASIK:  Yes, Your Honor.

THE COURT:  Okay.  So we will put that on the record when the jury comes back.  Exhibit 23, you said?

MS. WASIK:  Yes.

THE COURT:  Okay.

MS. WASIK:  Thank you.

THE COURT:  Is there anything else?

MS. WASIK:  Yes.  The other issue is that just now on cross, Ms. Price testified that on May 2nd, Mr. Jennings came to her to complain about the hostile work environment that Ms. Parker was causing for him.  That is contradicted by her

deposition testimony on page 212.  But in order to impeach her, I would have to use the words the "alleged exposure" which is precluded by Your Honor's ruling on a motion in limine.

THE COURT:  Say this again.

MS. WASIK:  I can direct Your Honor to the specific pages if that would help.

THE COURT:  Yeah.

MS. WASIK:  So it's Ms. Price's deposition which is I.D. 4.

THE COURT:  Mm-hmm.

MS. WASIK:  And page 212, I think line 20 to 23 is the most probative, but there is stuff around it as well.

THE COURT:  Let's see.  Why did you call him in that day?  That's when I had to look -- well, I mean, isn't this the same issue as the exhibit?

MS. WASIK:  It is, Your Honor.

THE COURT:  There was -- you know, the defense wants to get in that they were doing things regarding Mr. Jennings, and you want to say, well, there is other stuff going on. Right?

MS. WASIK:  That's right.  But the -- the stipulation that we agreed to only covered a potential verbal warning to Mr. Jennings that was given.  It did not cover this May 2nd meeting.

THE COURT:  So what would you say happened here?  So

remind me again what's the testimony that she gave that you think you need to address?

MS. WASIK:  Yes, Your Honor.  Ms. Price testified that on May 2nd, Mr. Jennings came to her to complain about the hostile work environment that he felt Ms. Parker was creating for him.  And the deposition testimony states that on May 2nd, she only spoke to him about the separate incident, the alleged exposure with Romaine Thompson.

THE COURT:  Remind me, is there another document that maybe -- maybe Mr. Walsh can -- is there another document that supported Ms. Price's testimony that the May 2nd incident/meeting related to Ms. Parker's issues as well, or is it just you just think this is an inconsistency that is new for the first time?

MS. WASIK:  The -- the May 12th complaint by Mr. Jennings, which is now in evidence, contradicts Ms. Price's testimony that on May 2nd, she spoke to Ms. Parker about --

THE COURT:  What number is that again, the Jennings statement?

MR. WALSH:  It's 17, Your Honor.

MS. WASIK:  Oh, 112.

THE COURT:  No.  112 is the Carter thing. You said 17?

MR. WALSH:  17.  Correct, Your Honor.

THE COURT:  Well, this one says, "On May 2nd, I was

called to human resources and informed that Ms. Parker had filed a sexual harassment claim against me."  And you are saying that that actually relates to the other stuff, not about this?

MS. WASIK:  Well, that's what the deposition testimony makes pretty clear even if this exhibit is a little more vague.

THE COURT:  So, I don't recall exactly whether this line was highlighted, but you are saying between this statement and her testimony, the impression is that Ms. Price was focused on trying to resolve Ms. Parker's issues, called him in to discuss them, and you are saying, in fact, the discussion was either in part or in whole about this other allegation she made which didn't actually involve her, right, it involved a different employee as a victim?

MS. WASIK:  That's right.

THE COURT:  Remind me again what is the evidence we have, either from the investigation or otherwise, about what this exposure episode was about?  Was that in Exhibit 13?

MS. WASIK:  It's in the redacted portion of Exhibit 13.

THE COURT:  I am not sure if I still have the un-redacted.  Let me see.

MS. WASIK:  I believe Ms. Parker had raised an issue with Ms. Price about an exposure incident involving another

employee and Mr. Jennings.

MR. WALSH:  That was at statement 4, Your Honor, that we --

THE COURT:  Yeah.  I see it.  I have it now. "Ms. Parker also stated that last year around November or December, prior to her promotion as assistant warehouse manager, she and the former employee and supervisor, Romaine Thompson, was flashed by Donte Jennings."

So actually it does involve Ms. Parker as a victim. Correct?

MS. WASIK:  It involves Ms. Parker as a complainant, I believe.

THE COURT:  Victim of the flashing, if you want to call it "victim," but, like, it's saying that she and I am assuming the former employee and supervisor is Ms. Thompson were flashed by Mr. Jennings?

MS. WASIK:  Yes.  That's right.

THE COURT:  Okay.  So you want to be able to cross-examine and say this was about a separate incident and you want to get into the details of it, or you just want to point out it's a separate incident?

MS. WASIK:  I just want to point out that on May 2nd, Ms. Price did not, in fact, receive a hostile work environment complaint from Mr. Jennings about Ms. Parker.  That didn't happen until May 12th.  She received -- she --

THE COURT:  Oh, I see.  Okay.

MS. WASIK:  Yeah.

THE COURT:  So leaving -- what's your view on this, Mr. Walsh?

MR. WALSH:  Your Honor, as I understand what Ms. Wasik was talking about is the testimony that she wants to use with Ms. Price, the reason why it's difficult because it says the "alleged exposure," and that's something that we have all agreed to redact and keep out of this particular case, and she feels that, as I understood it, that Ms. Wasik presented to me that she cannot completely cross-examine the witness without using the words the "alleged exposure."

I have suggested that we could simply substitute "alleged exposure" for the other -- other incidents involving Mr. Jennings or something to that nature and instruct the witness that she's not to talk about those other incidents and that that would accomplish the same purpose that we are doing, the same with the stipulation.

THE COURT:  So you don't deny that it would make sense or at least that there is an ability to try to cross-examine and say that prior times she talked about discussions with Mr. Jennings about other topics; it's just a matter of how we do that?

MR. WALSH:  That's correct.  Just trying to be sensitive to the issues.

THE COURT:  Right.  I mean -- I mean, I think going forward, we have to be concerned about whether getting into one thing is going to open the door to other things.  And to some degree, this does sort of open the door to other things, but I also think the way we handled it with the stipulation, I don't think anybody would fairly think that we should now open up the entire set of other allegations to reexamine -- to -- to be part of the case.  So I think Mr. Walsh's suggestion or something along the lines makes sense.

I think -- I mean I guess -- you know, again, if she's not reading the transcript verbatim and there is no disagreement that we are referring to another incident, I think that's fine.  I guess the question is what do we know about how Ms. Price will react to questions along those lines without knowing that -- what we are doing here or how we should handle that.

MR. WALSH:  Well, that was going to be the next statement that I said, Your Honor.  We excused Ms. Price for a moment so we could have this discussion.  She's out in the hallway.

THE COURT:  Right.

MR. WALSH:  I think what we would have to do outside of the jury's presence, let her know that we are not discussing these other incidents, and where it says "alleged exposure," that we are not permitting her to say that, but we can say

something along the lines that it is other incidents or other allegations involving Mr. Jennings.

THE COURT:  So would it make sense to call her in and have me do that here on the record?

MR. WALSH:  I believe so, Your Honor, if --

THE COURT:  As opposed to having one of you do it separately?

MR. WALSH:  Absolutely.

THE COURT:  Why don't we do that if that's okay with everyone.

MS. WASIK:  Yes, Your Honor.

THE COURT:  Okay.  So someone can go get her, and that way, we can do that before we bring the jury in.

(Whereupon Ms. Price enters the witness box.)

THE COURT:  So, Ms. Parker (sic), counsel and I agree we should have a brief discussion with you before we bring the jury in just to inform you about some of the rulings -- one of the rulings I made that could affect how you are questioned throughout the rest of the examination.  We want to discuss that with you before we bring the jury back.

There is apparently an episode that comes up in your reports and in the deposition transcript involving other allegations made about Mr. Jennings by Ms. Parker.  Generally, we have all agreed that these other allegations unrelated to the rumor or whether Ms. Parker was making gestures to

Mr. Jennings in response to that whole episode, but prior -- allegations of prior misconduct by Mr. Jennings was not part of this case, so we have all agreed to leave that outside of the case.

So I think the instruction is that to the extent you get questions in which those other issues arise, at least unless you hear further from me, you should avoid talking about the specifics of those other allegations.  However, I understand there may be some questions about some of your prior testimony in the deposition in which you acknowledged, I think at one point, that one of the subjects or the subject of discussion on a certain date was the alleged exposure, which I understand to have been one of the allegations that Mr. Jennings had exposed himself at some point.

And I think counsel and I have agreed that they can ask you about that but just try to -- they are going to try to refer to it as another incident or another issue or another -- something like that, and then we ask you to hopefully understand that that's -- understand that's why they are asking it.  We are trying not to get into the topic of this alleged exposure.  And to the extent that someone reads from the transcript and substitutes in the word "alleged incident" or something for exposure, that we all understand that and not sort of ask for any further explanation which could happen if we didn't talk to you about this now.

And so to the extent they say, Did you talk about this other incident?, if that's actually true, accept that we are using that term instead of exposure, you will understand that and be able to answer appropriately.

Do you understand this?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Any questions?

THE WITNESS:  No, sir.

THE COURT:  Anything else counsel would like me to discuss with Ms. Price?

MR. WALSH:  Nothing for defense, Your Honor.

THE COURT:  Okay.  So I think we can call the jury back in.  Thank you all very much.

(The jury panel enter the courtroom at 1:49 p.m.)

THE COURT:  Thank you, everyone.  Please be seated.

Ladies and gentlemen of the jury, welcome back.  We appreciate your patience.

Before we continue with the testimony of Ms. Price, I just wanted to alert you that there was another exhibit that should have been admitted into evidence, that's Exhibit 23 which was referenced earlier, but Exhibit 23 is now in evidence.

Go ahead, Mr. Walsh.  Mr. Walsh, we can continue with your examination.

MR. WALSH:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WALSH:

Q.    Ms. Price, I just want to go back to where I think we left off.  When you -- if you look at Exhibit 14 in the binder in front of you, that was that email direction that you had provided, I will give you a second to get that.

A.    Yes.

Q.    And that was your direction to ensure that people let you do your job.  Correct?

A.    Yes.

Q.    And that they let the -- the witnesses, the evidence, whatever come through you to do your investigation?

A.    Correct.

Q.    All right.  Now, did Mr. Moppins abide by that?  Did he go out and collect any information or provide you with any additional things?

A.    After the date of this email, I think what was happening was people were still going to Mr. Moppins complaining and making statements to him, and he would then get the information, send me an email, or refer them to me.

Q.    Okay.  And did Mr. Pickett follow that direction?

A.    For the most part, yes.  I don't believe that I heard anymore -- any allegations of him stating anything after this.

Q.    And how about Ms. Parker, did she follow your direction here about letting you do your job?

A.    For -- between the time this email went out, there were more stories or more allegations coming that she was still asking questions or still trying to have conversations about it, but for the most part, again, they went towards Mr. Moppins or they would -- nothing never came to H.R. to -- to verify that.

Q.    Okay.  And has it always been your policy that if any allegations come to H.R. about harassment or hostile work environment, do you investigate those?

A.    I do.  I take every allegation serious, I have to because I don't know what's what, so I do try to investigate all allegations that come into the office.

Q.    Okay.  Did -- did anybody ever come to you to complain about Mr. Moppins making comments in the warehouse?

A.    Comments, not to my knowledge, no.

Q.    Okay.  Did anybody ever come to you to complain about Mr. Moppins speaking inappropriately?

A.    That, yes.

Q.    Okay.

A.    I have had complaints about that.

Q.    What was the nature of his speaking inappropriately that they complained about?

A.    Just kind of strong military style language, aggressive language.  Like, You guys need to get your butt in order, get your work done, or something like that.  I think it was more

about how he spoke versus what he said that I heard employees complain about.

Q. And was Mr. Moppins ex-military?

A. Yes, he was.

Q. And did you get a sense for his approach was also, I guess, similar to something you might see in the military?

A. It definitely was because not only was he ex-military but so were the representatives of the contract, they were ex-military. The warehouse carried a sort of culture of it where everyone was Miss -- Ms. Price, Mr. Smith, you know, using last names to be formal and respectful.

Q. Okay. Your investigation eventually came to a conclusion. Correct?

A. Correct.

Q. Okay. And this was after you had informed everybody to go through harassment training as well. Correct?

A. Correct.

Q. And just so that it's clear, did -- did Mr. -- sorry, I'm trying a blank -- did Mr. Jennings go through that training?

A. Yes, everybody.

Q. Everybody. Okay. Thank you, ma'am.

I want to show you, if you look in that binder, Exhibit 21. I believe it's in evidence.

A. Yes.

Q. And Exhibit 21 is your conclusion of your investigation

Price - Cross

report.  Correct?

A.    Yes.

Q.    All right.  I just want to ask you a few questions about this.

So at the top of this particular form, it indicates that it was -- the dates were 4/18 through 5/17?

A.    That is correct.

Q.    And is that the period under which you did your investigation?

A.    Yes.

Q.    And why is it that you wrote this up on the 17th?

A.    That was when I had gotten all the information and kind of sat back to summarize it, comparing it with my notes, and trying to sift through what was -- what was needed to be put into the report for in-house counsel.

Q.    Okay.  And why is it that you were going to in-house counsel?

A.    For guidance to see if I had done everything that I needed to do or was there something else that I needed to go out and get more information about.

Q.    Okay.  And what I want to refer you to is on the second page of this particular exhibit.

A.    Yes.

Q.    And this are your recommendations and also documentation; do you see that section, ma'am?

A.    Yes.

Q.    I want to start with the documentation first.  It says, "Complaint forms for Evangeline Parker, Donte Jennings, and Larry Moppins?"

A.    Correct.

Q.    What we saw previously was Exhibit 6 -- I'm sorry, Exhibit 17, which was Mr. Jennings' comments to you.

      Was that part of your documentation?

A.    That's part of supporting documentation.  There is an actual complaint form.

Q.    An actual complaint form that was filed as well?

A.    Yes.

Q.    Okay.  And that was part of your file?

A.    Yes.

Q.    All right.  The next thing says, "Written disciplinary actions for Evangeline Parker and DaMarcus Pickett."

A.    Correct.  Yes.

Q.    And if you -- pause you there.  If you look at Exhibit 23 --

A.    Yes.

Q.    -- is that the written disciplinary actions for Evangeline Parker and DaMarcus Pickett?

A.    Correct.

Q.    Okay.  And those were prepared by Mr. Moppins or were they prepared by you?

A.      They were prepared by Mr. -- Evangeline's were prepared by Mr. Moppins.  DaMarcus received a performance improvement plan that was prepared in part by me and Mr. Moppins.  I needed to get technical information from Mr. Moppins.

Q.      And why was Mr. Pickett provided with a performance improvement plan?

A.      Due to his -- his managerial handling of the whole incident.  At no time did Mr. Pickett come to H.R. with any -- at any point of him knowing what was going on in the warehouse. He tried to handle the situation himself, and it just seems that in him trying to handle it, it escalated.  It continued to grow and grow and grow.  And so at no point did Mr. Pickett come to say -- you know, come to H.R. to say, Hey, this is what's happening, I don't know if you are aware, but these are the things that I am hearing or this is what's going on.

Q.      And you felt that was a serious infraction of what your policies were?

A.      Within policy and given the nature of what was happening at that time with all the rumors, all of the accusations, that Mr. Pickett did not handle that well.  In addition to Mr. Pickett called the client, the government client to inform them of what was happening in the workplace.

Q.      Was that appropriate?

A.      No, not at all.

Q.      And why was that not appropriate?

A.    The client has no impact on -- or the client should not be made aware of any internal issues that are happening within the employer.  They are separate and divorced from us and that could impact the contract.  It could impact revenue from the contract or even renewal of the contract.

Q.    Ma'am, if you want to -- looking at this particular exhibit again at the "Recommendations" section that we have on here, the first number one says, "Termination of employment for Evangeline Parker due to inappropriate behavior and misconduct."

A.    Correct.

Q.    Was that one of your recommendations, ma'am?

A.    Yes.

Q.    And why is it that you made that recommendation?

A.    Because in the course of this, Ms. Parker, unfortunately, would not allow due process to happen.  She kept interfering, kept trying to defend with her subordinates about this situation, getting into it with Mr. Moppins, which became kind of out of control to the point where Ms. Wallace had to intervene, and then not following the directives that I gave, which was to not talk about this situation, to direct any and every comment towards me.

Q.    Then there is -- there is -- number two says, "Demotion of DaMarcus Pickett under a performance improvement plan?"

A.    Yes.

Q.   And that's what you mentioned.

I just want to ask you a question.  The performance improvement plan for Mr. Pickett, was that prepared by you or was that prepared by Mr. Moppins?

A.   It was prepared by me with the guidance of Mr. Moppins because there were some technical pieces that I needed his advice on how to handle with DaMarcus.

Q.   And why is it that Mr. Moppins prepared the disciplinary notes with respect to Ms. Parker?

A.   Because at that time I believe he was given instructions from general counsel that he was able to write those warnings and I was to review them.

Q.   Okay.  And did you agree with those -- those warnings and those recommendations?

A.   Yes.

Q.   And did you review them?

A.   Yes.

Q.   Recommendation number three is, "Sexual harassment and other harassment training."

Had that been accomplished at that point in time?

A.   Yes.  That was done earlier on May 2nd.

Q.   And then the last thing here, "Staff meeting to follow up."

A.   Yes.

Q.   Do you know whether that occurred?

A.    I believe it did.  Yes, it did.

Q.    And what was the nature of that staff meeting?

A.    To get the -- that did happen because if I remember correctly, I was in attendance.  I am not 100 percent in memory.  Again, this happened six years ago.  But the purpose of it was to get everyone back focused on the mission work because that was suffering.  With the fact that the client was now aware of all of the turmoil that was happening, we were -- we were suffering with getting -- fulfilling our inventory distributions that we needed to do.  We wanted to make sure that the whole -- all of the employees on the contract were redirected to focus on the mission work, to not have any further discussions about what has transpired, and to give them warning that if we continued to have any discussions, that we would follow up with disciplinary action.

Q.    And did the staff follow that after that point in time?

A.    To my knowledge, they did.  I didn't hear anymore mention of anything from anyone.  No one came back to the H.R. office to complain about anything.  It kind of started to get quiet again.

Q.    Ma'am, you were present when Ms. Parker was terminated.  Correct?

A.    Yes.

Q.    If you turn to Exhibit 19.

A.    Yes.

Q.    And was this the -- one of the disciplinary actions that was provided to Ms. Parker at her termination?

A.    I believe so.

Q.    Have you --

A.    Yes.

Q.    Okay.  And the second page -- I guess the third page, it showed that it was signed by Mr. Moppins?

A.    Yes.

Q.    And then there is some handwriting under employees' comments.

Were you present when Ms. Parker provided those comments?

A.    Yes.

Q.    Who was present in that meeting?

A.    It was me, Reema, I can't remember if Mr. Vora was there or not, and Ms. Parker, and I am trying to remember if Larry was present or not.  I can't remember if the two of them were present.

Q.    Okay.  When you say "Reema," you mean "Reema Vora"?

A.    Ms. Vora, in-house counsel, yes.

Q.    Thank you.

Did Ms. Parker say anything at that termination meeting?

A.    She did not.  She was quiet.

Q.    Okay.  And if you look at Exhibit 20, was that the other disciplinary warning that was provided to Ms. Parker at that time?

A.    Yes.

            MR. WALSH:  Thank you, ma'am.  I have no further questions, Your Honor.

            THE COURT:  Thank you.

        Redirect, Ms. Wasik?

            MS. WASIK:  Yes, Your Honor.

                        REDIRECT EXAMINATION

BY MS. WASIK:

Q.    Now, Ms. Price, I'd like to direct your attention to -- I'd like to direct your attention to Exhibit 13 in your binder, please.

        Mr. Sayres, can we please bring that up?

A.    Yes.

Q.    And I just want to make sure that everyone is clear on how this document works.

        You are the only person who wrote this document. Correct?

A.    Correct.

Q.    Ms. Parker didn't write any of this?

A.    No.

Q.    And she never reviewed this document herself.  Right?

A.    No.  This was my investigation questionnaire.

Q.    Okay.  And I'd like to turn to the last page, page 5 of the document.

A.    Yes.

Q.     Ms. Parker was the complainant in this situation.  Right?

A.     Correct.

Q.     Okay.  And she never signed or adopted this document in any way?

A.     No, she did not.

Q.     Thank you.

       Now if I could please direct your attention to Exhibit 112 in your binder.

A.     Yes.

Q.     So if I am understanding this correctly, this is a statement by Carlos Carter about something that Mr. Kenton Birgans allegedly said.  Right?

A.     Correct.

Q.     And so I believe you described it just now as a hearsay situation?

A.     Yes.

Q.     And you don't remember asking Mr. Carter to give this statement.  Right?

A.     Correct.

Q.     And you don't know who asked Mr. Carter to give this statement?

A.     Not this statement.  Not to collect it from Mr. Birgans, no.

Q.     So you agree that you don't know who asked Mr. Carter to write this document that's in front of us?

A.    No.

Q.    And you don't know where it was written?

A.    No, I don't.

Q.    And you also have no idea why Mr. Carter would write this statement about something that Mr. Birgans was allegedly saying instead of Mr. Birgans just writing it himself.  Right?

A.    Mr. Carter -- this is an assumption.  I don't know, again, because I can't remember all of the details from back then, but I was speaking with Mr. Carter, and Mr. Carter was telling me about what Mr. Birgans had witnessed.  And when I talked to Mr. Birgans, he wouldn't talk to me.  He wouldn't -- he didn't want to get involved.  So I don't know if Mr. Carter was able to convince him or he was trying to help him by writing the statement for him.  I don't know.

Q.    Okay.  And you agree that that explanation you just gave is an assumption on your part?

A.    Correct.

Q.    Because you don't actually know --

A.    That's correct.  I agree.

Q.    Now, Ms. Price, I believe that you testified just now that on May 2nd, 2016, Mr. Jennings came to complain to you about the hostile work environment that Ms. Parker was creating?

A.    Correct.

Q.    And you gave a deposition in this case.  Right?

A.    Correct.

Q.    And that deposition was under oath?

A.    Correct.

Q.    And you told the truth in that deposition?

A.    To the best of my remembrance, yes.

Q.    If I could please direct your attention to I.D. 4 in your binder, page 212.  Let me know when you are there.

A.    Okay.

Q.    Okay.  I would like to direct your attention to line 20 and I am going to read down from there.  So on -- I asked, "So on May 2nd, 2016, you only talked to Donte Jennings about a separate incident unrelated to Mr. Jennings' hostile work environment complaint against Ms. Parker?"  And you answered, "Right."

      Is that what your depo testimony says?

A.    That's what it says.

Q.    So it is the case that on May 2nd, you did not speak with Donte Jennings about any alleged hostile work environment that Ms. Parker was creating for him?

A.    Yes, I did.  I did.  I discussed with him both.

Q.    So you agree that you provided incorrect testimony in your deposition?

A.    I would agree to that, yes.

Q.    You provided incorrect information under oath?

A.    Incorrect information, yes.

Q.    Okay.  Now, Ms. Price, I believe you also testified --
withdrawn.

Could I please direct your attention to Trial Exhibit 15
in your binder?  Mr. Sayers, if we could please show it?  Thank
you.

Now, this is the email in which Mr. Moppins tells you
that he had asked Mr. Pickett behind closed doors was he
sleeping with Ms. Parker.  Right?

A.    Correct.

Q.    And I believe you testified just now that this email
wasn't revealed to you until after your investigation.  Right?

A.    No.  I got this email on the 27th.

Q.    So when you got this email, you were just two days into
your investigation.  Right?

A.    Correct.  What I testified was that the comment in there,
he said he talked to him in February, but I didn't -- no one
said anything to H.R. until this.

Q.    Until this April 27th email.  Right?

A.    Correct.

Q.    And now, Ms. Price, in your investigation report, you
recommended Ms. Parker's termination.  Right?

A.    Yes.

Q.    And she is the only person for whom you recommended
termination out of your entire investigation.  Right?

A.    Correct.

MS. WASIK:  No further questions, Your Honor.

THE COURT:  Okay.  Anything else, Mr. Walsh?

MR. WALSH:  Nothing further, Your Honor.

THE COURT:  Okay.  Thank you very much, Ms. Price. We appreciate you coming to testify.  You are free to go now.

THE WITNESS:  Thank you.

THE COURT:  So is it appropriate now, Counsel, for me to provide the stipulation?

MS. WASIK:  Yes, Your Honor.

THE COURT:  So, ladies and gentlemen, another piece of information to put on the record for you is that I believe it's Exhibit 13 which I believe we were just referring to just a few minutes ago, there is -- let me make sure I have this correct -- there is a statement at the bottom of -- would it make sense to put this up on the screen just so they know what I am talking about?

MR. WALSH:  I think it would, Your Honor.  I, unfortunately, don't have a redacted copy that I can put on the screen.

THE COURT:  Do we have a version like that that Mr. Sayres can pull up?  Why don't we do that because Exhibit 13 is in evidence and we are at, I believe, page 2.

At the bottom there, you see below the blacked-out portion, there is a statement there that says, "However, Mr. Jennings was given a verbal warning about RCSI's sexual

harassment policy and zero tolerance for such behavior."  The parties have agreed that in considering that statement, the parties agree on the following fact: that Ms. Price's warning to Mr. Jennings about RCSI's harassment policy also involved other allegations unrelated to Ms. Parker's claims which the parties have agreed to redact from the record.

So you should consider that stipulation, which is an agreed-upon fact by the parties, as part of the evidence when you consider Exhibit 13.

Anything else on that issue?

MR. WALSH:  Nothing for defense, Your Honor.

MS. WASIK:  No, Your Honor.

THE COURT:  Okay.  Any further evidence from the plaintiff?

MR. KOPSIDAS:  No, Your Honor.  Plaintiff rests.

THE COURT:  Okay.  And I believe we said the next step would be to move into the defense case.  Since we just started after the break, Mr. Walsh, do you have any additional witnesses, or Ms. Ignozzi, additional witnesses?

MS. IGNOZZI:  Not witnesses at this time.  We would like to make a motion.

THE COURT:  Okay.  Why don't we go on the headset briefly.

(The following took place at sidebar outside the presence of the jury; all counsel present.)

THE COURT:  Can everyone hear me?

MR. WALSH:  Yes, Your Honor.

THE COURT:  So, Ms. Ignozzi, do you want to make your motion?

MS. IGNOZZI:  Yes, Your Honor.

THE COURT:  What I would suggest we do is make your motion for the record, I will defer on further argument about it until the next break, but I do want you to be able to put it on the record now and then we will go straight to the next witness, so go ahead.

MS. IGNOZZI:  Thank you.

The defendant, at this time, would make a motion for judgment on the basis that the plaintiff has failed to make a prima facie case with respect to both the claims for hostile work environment --

THE COURT REPORTER:  I'm sorry.  I couldn't hear you.

MS. IGNOZZI:  Do I need to repeat anything?

THE COURT:  Why don't you start again with the motion and what the basis is.

MS. IGNOZZI:  Sure.

So defendant would make a motion for judgment that the plaintiff has failed to make a prima facie case both with respect to the claims for hostile work environment as well as for the claims of retaliation, that there has been no evidence put into the record that there has been a hostile work

environment created by the defendant.

The facts in the record are such that the statements from the plaintiff are based on what was relayed to her by Mr. Pickett. Those came from either Romaine Thompson, for whom we have no liability, she is not an employee, as well as a single statement from Mr. Moppins to Mr. Pickett that occurred behind closed doors with no other employees that were present.

The only other evidence in the record was that statements were made in the warehouse generally from Mr. Birgans and that Ms. Parker spoke to Mr. Jennings herself and asked him statements to the effect of, If you want to know who I am sleeping with, you should ask me.

There is also no evidence of anything that was said during the all-hands meeting because Ms. Parker was not present for that meeting herself and has no direct knowledge of any statements that were made there as well.

THE COURT: Okay. So, again, I am going to defer on ruling on the motion. Obviously, I will hear a little further argument from both sides, so we will do that either at a break or at the end of the day today if there is no further break.

So we can go back to the open session and have the defense call your first witness. Thank you.

MS. IGNOZZI: Thank you.

(End of sidebar discussion.)

THE COURT: Okay. Go ahead, Ms. Ignozzi or

Mr. Walsh, whoever is going to be calling the witness.

MR. WALSH:  Your Honor, defense calls Rajesh Vora.

THE DEPUTY CLERK:  Sir, please step forward to the witness stand.  Remain standing and please raise your right hand.

RAJESH K. VORA, DEFENDANT'S WITNESS, SWORN

THE DEPUTY CLERK:  You may be seated, sir.

Speak clearly into the microphone, please state your first and last name, and then spell your first and last name for the record.

THE WITNESS:  Can you hear me?

THE COURT:  Yes.  Get as close as you can to the microphone and speak up.

THE WITNESS:  Can you hear me?

THE DEPUTY CLERK:  Yes.

THE COURT:  Okay.  My first name is Rajesh Kumar, R-A-J-E-S-H, K-U-M-A-R, last name Vora, V-O-R-A.

THE DEPUTY CLERK:  Thank you, sir.

THE COURT:  Go ahead, Mr. Walsh.

DIRECT EXAMINATION

BY MR. WALSH:

Q.    Mr. Vora, you are familiar with Reema Consulting Services, Inc.  Correct?

A.    Yes.

Q.    How is it that you are familiar with Reema Consulting

Services, Inc.?

A.    I incorporated that company on June 26th, 1995.

Q.    Mr. Vora, you might need to move just a little closer to the microphone.

THE COURT:  Or move it closer to you.  Either way.

THE WITNESS:  I incorporated -- can you hear me now?

BY MR. WALSH:

Q.    Yes.  Thank you.

A.    I incorporated Reema Consulting Services with the state of Maryland on June 26th, 1995.

Q.    Okay.  And are you the sole owner of RCSI?

A.    Yes.  I am the sole owner, 100 percent.

Q.    Why did you start RCSI?

A.    I, during my employment and my research at the library, I learned that -- I learned the aspect of the business and I saw an opportunity in creating a -- in providing the services, consulting services for the government contractors who has a -- who have a need to establish -- I saw a need in the market to have software.  The software name is called Deltek Costpoint. So it's like a software like a Oracle.  You know, it comes in -- it's called commercial off the shelf --

THE COURT REPORTER:  I'm sorry.

THE WITNESS:  The customer is the software so that we can do, like, different modules, federal accounting, billing, purchasing, receiving, shipping, all those little separate

modules, and so that, you know, essentially, you know, process all the back office work.

Q.    So, Mr. Vora, RCSI was a government contractor.  Correct?

A.    It became a government contractor later on.

Q.    Let's focus a little bit on the contract that's involved in this particular case.

When was that contract awarded to RCSI?

A.    It was awarded on -- I don't -- September 29th, 2012.

Q.    And what was the nature of the contract that RCSI was awarded?

A.    Department of State has embassies all over the world, and this particular contract was to provide logistic support to the embassies.  So that all the embassies has a requirement to, you know, to provide local police -- to train the local police force or the embassy personnel so that in case of attack or something like that, those -- those personnel were to safeguard the embassy.

Q.    Mr. Vora, in performing this contract, this contract was performed at a warehouse.  Correct?

A.    Yes.

Q.    And about how many employees did you need to staff that contract at the warehouse?

A.    Depends on the time of the year, but between, you know, 15 and 25 employees.  I mean 18 and 25 employees.

Q.    And did you manage to hire that staff in order to fill

that warehouse contract?

A.    We -- we bring forward like three or four -- around five employees from the previous contractor and then we had another ten plus employees in our new contract.

Q.    And was Mr. Moppins one of those employees that you brought forward?

A.    Yes.

Q.    Was Mr. Pickett one of those employees you had brought forward?

A.    Yes.

Q.    And when did RCSI cease to perform this contract?

A.    On September 30th, 2017.

Q.    And why was it that RCSI ceased to perform this contract?

A.    Government has a program for Alaskan native companies where they can get a source contract from the Department of State so those Alaskan native companies are -- you know, what they do is they approach the -- the small business procurement office and they offer that they do this work and they will do it for less.  And those were some company that we have done this kind of warehousing work for the client --

THE COURT REPORTER:  I'm sorry.

THE COURT:  Mr. Vora, can you just speak slowly, please?  As slowly as you can.  Thank you.

THE WITNESS:  So our Alaskan native company, they have a -- government can give them a sole source work, so if

Alaskan native company comes and tells the contracting officer that we can do this work for less or, you know, we will provide a better service, then the government can give source work to them and they can take over the contract.

BY MR. WALSH:

Q.    So another company took over the contract?

A.    Correct.  It was not a company doing the bid.  It was during a sole source to the Alaskan native company.

Q.    And did your employees then go work for that new company?

A.    Most of them.

Q.    Okay.  Thank you.

In -- where was this warehouse that this contract was being performed at?

A.    In Sterling, Virginia.

Q.    And did you have an office there?

A.    Yes.

Q.    How often would you be there?

A.    In the beginning, I was there almost every day.  In the warehouse, we have 30 plus million dollars of inventory, including explosives, guns, machine guns, lots of bullets, almost like a, you know, all this side of the, you know, with, you know, bullets.  So there was lots of inventory that is, you know, required for training the police force.

Q.    What -- you are familiar with who Mr. Moppins is. Correct?

A.    Yes.

Q.    What was Mr. Moppins' role with respect to this contract?

A.    So the way we established that operation is that we had a subject matter expert or you can call it program manager, he will be the liaison between our staff and the government. Government can communicate to the program manager that is Larry Moppins, and he will provide instruction to the rest of the staff.

Then underneath the program manager, you would have a technical program manager.  That was DaMarcus Pickett. Underneath, you would have other three supervisors: inventory manager, then you have a shipping manager, and shipping office -- sorry.  No.  You have an inventory, then you have a operation, and you have a logistics -- sorry, like a shipping, you know, they are doing the -- the paperwork for airlines or the trucking companies.

Q.    And how was it that people were hired for this particular contract?

A.    So -- so different kind of papers.  So say somebody who is a laborer, like, you know, the lowest category was laborer, above that was like a shipping receiver clerk.  Above that was a warehouse --

THE COURT REPORTER:  I'm sorry, sir.  I need you to repeat that.

THE WITNESS:  Okay.  So I am going from bottom to the

Vora - Direct

top.  So the lowest category in the warehouse was a laborer.  So above the laborer, we have a shipping receiving clerk.  Above the shipping receiving clerk was a warehouse facility.  Then we have a -- a -- team leader supervisors, like inventory, and then you will have, you know, deputy program manager.

BY MR. WALSH:

Q.    So did Mr. Moppins have the ability to hire people at Reema?

A.    No.

Q.    Did Mr. Moppins have the ability to terminate people at Reema?

A.    I'm sorry.  I'm sorry.  Mr. Moppins -- Mr. Moppins or Mr. DaMarcus, what they do is they will enter with the person, but they don't -- you know, they cannot say, Okay, this person gets hired.

Q.    Who has the say as to whether somebody gets hired?

A.    Basically through the recommendation by employees that they will interview the person and then they would send me all the information and I would make a -- you know, what we do is -- it's a big process.  It's a recruiting process.  You have to do the drug testing and make sure the person is not using any illegal drugs or things like that.

      Also, we have to do the background check, you know, make sure he doesn't have any, you know, like, criminal activities or things like that.  Also, you know, somebody from the H.R.

has to do the reference check just to make sure, you know, we are hiring a person that has, you know, like a good credit rating.

So it's a big process. But before, you know, the full thing happens, all this activity has to take place. And then Cathy Price will inform me that we are ready to hire this person. And then I will, you know, I will make sure that we have enough funding to -- to continue certain -- to get this person and continue providing the services.

Q.    Okay. So in that binder that's in front of you, if you look at Exhibit 1 for a second.

A.    I left my glasses there.

Q.    Stay there. We will get them for you.

MR. WALSH: May I approach, Your Honor?

THE COURT: Yes.

(Pause.)

BY MR. WALSH:

Q.    Mr. Vora, we are looking at Exhibit 1.

A.    Yes, I have it in front of me.

Q.    And this --

THE COURT: Mr. Vora, just make sure, when you are looking at the book, also to have the microphone as close to you as possible. The microphone, just make sure you are talking into the microphone.

THE WITNESS: Okay.

BY MR. WALSH:

Q.    Mr. Vora, what is this document?

A.    This is the offer letter for the -- for the employment.

Q.    Okay.  And Ms. Parker's offer letter?

A.    Yes.

Q.    And you signed that letter?

A.    Yes.

Q.    And was it your custom to sign all offer letters to new employees?

A.    Depends.  If I am on a vacation -- you know, ordinarily I go for a one-month vacation to India, so during that time, you know, either Reema will put my electronic signature or Cathy Price will put my electronic signature.

Q.    And Mr. Vora, if you turn to Exhibit 3, I believe this is a promotion letter for Ms. Parker.

      Is that your signature on that letter as well?

A.    Yes.

Q.    And was that your custom, to sign those letters when you were available as well?

A.    Yes.

Q.    Okay.  Let's just talk about promotions for a second at RCSI.

      Did any -- anybody other than you at RCSI have the ability to give anybody a promotion at RCSI?

A.    What they can do is they can recommend but they cannot

authorize because what happens is that -- what we had was a firm fixed price contract, so -- so say I hired him to, you know, do a oral presentation, and I said, Okay, you know, you will have $40,000 legal fee for the whole case, then you have to manage how you are going to handle all case in the $40,000 sum.  Whether you hire paralegal at $50 an hour or $500 an hour, that would be your -- that will be your judgment, but let it also be your money because the ceiling is set.  So if I have to give increase to anyone, I have to make sure that it covers my -- it -- you know, it doesn't cause a loss to the company.

Q.    So Mr. Vora, you approve all the promotions?

A.    Yes.

Q.    Okay.  And you also mentioned Cathy Price.

What was Cathy Price's role vis-à-vis you at RCSI?

A.    She was our H.R. manager.

Q.    And Reema Vora has been mentioned is your daughter?

A.    Yes.

Q.    What was her role?

A.    She was our legal counsel.

Q.    And was she a practicing attorney at that time?

A.    Yes.

Q.    Thank you.

Did you work with Ms. Parker during the period of time that you were -- that she was at Reema?

A.    Yes.

Q.    Okay.  How often would you see Ms. Parker?

A.    Usually what I do is that -- you know, say if I go there three days -- you know, when I am here, I would go on a weekly basis.  If I am not here, then I come on a month.  But when I go there, I make my round, and if somebody is busy and they are doing their work or they are in a meeting or whatever, then I will not stop by the office.  Otherwise, I will go and say hi to all almost all -- all people.

Q.    So you walk around the warehouse?

A.    Yes.

Q.    Okay.

A.    Just to cheer up the whole team.

Q.    Okay.  From time to time, did you see Mr. Birgans there as well?

A.    Yes.

Q.    Did you interact with Mr. Birgans?

A.    I did.

Q.    How about Mr. Pickett, did you see him from time to time?

A.    Yes.

Q.    Would you interact with Mr. Pickett?

A.    Yes.

Q.    Do you know where Mr. Pickett's office was at RCSI?

A.    Yes.  So we had a big warehouse, and the front of the warehouse was, like, office setting and the back of the warehouse was the warehouse setting.  So in the front of the

warehouse, we have a loading office, then DaMarcus Pickett's office, and then in this -- in the room -- sorry.  In the area all the way in the end, we have a conference room, and then next to it was our H.R. manager's office.  Before that, there was a -- you know, a shipping manager's office where, you know -- and also before that, there was another office, small office.

Q.    And was your office up in that area as well?

A.    Yes.  We had -- we had a table in that office, that is an H.R. office, so basically H.R., concert, and my office was in that one area.

Q.    And how often did you interact with Mr. Moppins while he was there?

A.    Every time I go there, I would spend at least, you know, 15, 20 minutes' time to see how things are going because it's -- it was a very critical contract.  As I said, it was a $30 million dollar inventory that, you know, we had to manage.  And we just wanted to make sure that we have a -- you know, not only 99 percent of activity but also we have to make sure that our client is satisfied with, you know, the services that we are providing if there is an issue that is coming up, you know, in the next year or, you know, three months from now because what happens is there are -- there is a equipment requirement, the police, you know, gears requirement in Nigeria.  Then to ship that whole thing to Nigeria, you know, getting the

airlines, you know, connecting, you know, to the person who is in Nigeria just to make sure that, you know, the other person is there, so gather trainers.  So we have to coordinate that -- all that part.  And once the electronic shipping request comes in from the government, then we have to -- then it's all go, go, go.  But before that, we have to plan for it.  It's, Okay, the next it is coming up in Nigeria; how we are going to meet those requirements in Nigeria?

Q.    And you would discuss that with Mr. Moppins?

A.    Yes.

Q.    Okay.

A.    Because that's -- you know, there are some sensitive items that we will not discuss because, you know, we are a government contractor so we don't want to get to know the other contractors without being on this side of the business, but he would discuss things that is coming up with, you know, like the -- how much -- how much more work is coming or, you know, what is going to happen.

Q.    So, Mr. Vora, let's talk about Mr. Moppins' ability to fire or discipline employees.

      Did Mr. Moppins have authority from you to discipline employees?

A.    To some -- to some extent.  It depends on severity.  You know, if it's a serious incident, he will do it.

Q.    What did you consider a serious incident that Mr. Moppins

could act on?

A.    One incident, one person walked on with like a $20 T-shirt, and I said, We don't want this person in this office anymore, and we fired him.

Q.    Anything else that you considered a serious incident that you can recall?

A.    Say somebody's not pulling the hose in driving the forklift or they did not, you know, stop or --

THE COURT REPORTER:  I'm sorry, sir.

THE WITNESS:  In the warehouse, we have to drive forklift to move material from one aisle to the -- you know, to the location, the shipping locations.  So if somebody is not driving, you know, or not paying attention, like, driving the forklift, then, you know, we have to discipline that person. Depends on how serious it is.  If it is -- if it was going to cause an accident, then, you know, no, that person's manager or deputy program manager, they can discipline that person.

BY MR. WALSH:

Q.    And those are for safety kinds of violations?

A.    I'm sorry?

Q.    They are for safety violations?

A.    Yes.

Q.    Okay.  Did Mr. Moppins have the -- did you give him the ability to fire employees for reasons other than safety violations?

A.    Then he has to -- if it is -- if we have a misconduct that can be serious, then, you know, then he will have authority to fire.  And this is, you know, if there is a --

THE COURT REPORTER:  I'm sorry, sir.

THE WITNESS:  If a terminator in the office, then he would consult H.R. manager and then that person would be removed.  If we can wait until the end of the day, then he will send me an email or he will pick up the phone and he will call me that, Mr. Vora, this is what is happening and we need to fire this person.  I will understand what was being considered, and I would say yes or no.

BY MR. WALSH:

Q.    Okay.  What about Mr. Pickett, did Mr. Pickett have the ability to terminate people?

A.    It depends what time of the day it happened because we had two shift: morning, 6:30 to 2:30 shift, and afternoon, 10:30 to 6:30 shift.  So say -- say an incident happened at six p.m. and it was a serious incident, then, you know, DaMarcus Pickett has to, you know, you know, has to get in the action. Either he would call me or he would call Larry or he would call Cindy Price and, you know, that person will get fired.

Q.    Okay.  Mr. Vora, let's just go back to Ms. Parker for a second.

When did you first learn that there was an issue relative to Ms. Parker?

A.    Around May 17th.

Q.    And how is it that you came to learn around May 17th that there was an issue with Ms. Parker?

A.    I think I learned from Larry Moppins asking my presence next week in the office, so I was there in the office.

Q.    I am going to ask you to look in that binder in front of you at Exhibit 18, please.

      Mr. Vora, are you on Exhibit 18?

A.    Yes.

Q.    And is this the email from Mr. Moppins to you that you just referenced?

A.    Yes.

Q.    And this is on May 13th?

A.    Yes.

Q.    Okay.  And in this particular email, what was your understanding of what Mr. Moppins was sharing with you?

      THE COURT:  Can I just ask:  Is this in evidence right now?

      MR. WALSH:  It is, Your Honor.

      MS. WASIK:  That's correct, Your Honor.

      THE COURT:  Okay.  Go ahead.

      THE WITNESS:  Can you repeat the question, please?

BY MR. WALSH:

Q.    What was your understanding of why Mr. Moppins was sending this to you?

A.    Misconduct in the workplace.

Q.    And did you respond back to Mr. Moppins when he sent you this email?

A.    I think so, yes.

Q.    And do you recall what you said back to Mr. Moppins?

A.    No.  On this long email, I just responded, Yes, I will be in the office.

Q.    And did you subsequently have a conversation with Mr. Moppins about Ms. Parker?

A.    On May 17th maybe briefly in his office.

Q.    On May 17th in whose office?

A.    In Larry Moppins' office.

Q.    In Larry Moppins'.

       And who was present in that meeting?

A.    I think it was Larry and myself.

Q.    And do you recall what Mr. Moppins told you in that conversation?

A.    He did talk about, you know, briefly about it, and -- and then, you know -- he did talk briefly about it.

Q.    Did you also meet with Ms. Price about this situation?

A.    Yes.

Q.    And when did you meet with Ms. Price?

A.    So I had the office, you know, along with Ms. Price and, you know, Ms. Price and Ms. Vora's office, so I learned about it back at my office.

Q.   And did you have a meeting with Ms. Price alone or did you have a meeting with Ms. Price with anyone else present?

A.   I had a meeting with Ms. Price, Ms. Vora, and Larry Moppins.

Q.   And I don't want you to get into the specifics of that since counsel was present, but just generally, what was the substance of that conversation?

A.   It was about -- it was about Ms. Parker's misconduct --

Q.   Okay.

A.   -- at the workplace.

Q.   Okay.  And subsequent to that meeting, was there a determination made to terminate Ms. Parker?

A.   Not at this point.

Q.   Okay.  Was there eventually a determination made to terminate Ms. Parker?

A.   It -- once Ms. Price submitted her investigation report.

THE COURT REPORTER:  I'm sorry.

THE WITNESS:  Ms. Price provided me her investigation report.

BY MR. WALSH:

Q.   And Mr. Vora, if you could look at Exhibit 21 in that binder in front of you.

A.   It was the investigation report.  Yes.

Q.   And was this the investigation report that Ms. Price provided to you?

A.    Yes.

Q.    And subsequent to reading -- did you review this investigation report from Ms. Price?

A.    Yes, I did.

Q.    And subsequent to reviewing that investigation report from Ms. Price, did you -- was Ms. Parker terminated?

A.    Based on this, I believe.

Q.    And who terminated Ms. Parker?

A.    It was -- it was my decision, and Ms. Price and Ms. Vora terminated Ms. Evangeline Parker.

Q.    Could you lean into that microphone a little?  Pull it closer.

A.    I'm sorry.

Q.    Who made the decision to terminate Ms. Parker?

A.    I made that decision.

Q.    Could anyone else have made that decision to terminate?

A.    No.

Q.    So tell me why did you make the decision to terminate Ms. Parker.

A.    To me, all employees should respect each other, all employees.  It doesn't matter whether you are a temporary worker or you are shipping receipt clerk or you are the deputy program manager or you are the program manager, you know, you just respect the whole team.  You know, you cannot really -- or you cannot, you know, threaten somebody that take drugs and

things like that.  See, at the end of the day, everybody has to put food on the table.  Even if you threaten a person that I am going to terrify you or, you know, I am going to --

THE COURT REPORTER:  I'm sorry, sir.

THE WITNESS:  I'm sorry.

THE COURT:  Just speak slowly, please, and into the microphone.

THE WITNESS:  What I want is that I want, you know, like a peaceful work environment.  I don't want somebody bullying somebody else.  And in high school or high school equivalent, you know, employees, if you threaten them with their job -- and if this is their honest living and if you threaten them with their job, it affects the whole family.  You have to, you know, worry about the small people also.

BY MR. WALSH:

Q.    Mr. Vora, in the end, there were two disciplinary notices and terminations that were provided to Ms. Parker.

Did you review those disciplinary notices before they were provided to Ms. Parker?

A.    Yes, I did.

Q.    Okay.  And did you agree with the substance of those disciplinary notices?

A.    I did agree to it.

MR. WALSH:  Your Honor, I have no further questions.

THE COURT:  Okay.  Cross-examination.

MR. KOPSIDAS:  Your Honor, Mr. Tishman will do the cross-examination.

THE COURT:  Okay.

CROSS-EXAMINATION

BY MR. TISHMAN:

Q.    Good afternoon, Mr. Vora.

A.    Good afternoon to you.

Q.    You started RCSI, didn't you?

A.    I did.

Q.    You are the president, CEO, and sole owner.  Right?

A.    Yes.

Q.    You agree it's important to show people respect and to respect employees.  Correct?

A.    Absolutely.

Q.    You shouldn't bully people about their jobs.  Correct?

A.    Absolutely.

Q.    Now, the DOS contract at RCSI involved a warehouse in Sterling, Virginia.  Right?

A.    Mm-hmm.

Q.    And I thought I heard you say on direct that you were there every single day at one point in time.  Right?

A.    In the beginning, yes.

Q.    But there was a time when you came in about once or twice a week.  Right?

A.    Once a week, or, you know, if I am on a vacation, then I

Vora - cross

will not be there for a whole month.

Q.    So --

A.    In the beginning, we had -- we had to move the inventory from the previous contractor to the new contract, and I worked with all the employees.  You know, doing the inventory, you have to have a log sheet.  So on the log sheet, you would identify the product, the serial number, you know, whether it is in good condition, bad condition, you know, all the details.

So you look at the product and then you do the count and then you load the count onto the -- the worksheet and you just make sure that all the records that is on the paper and all the actual inventory counts, all those two sides meet because, you know, at the end of the day, it's a government property.  You just have to make sure that if the government has a $30 million inventory, you know, there shouldn't be a dollar more or a dollar less in that inventory.  It should match with the record.

Q.    I'm sorry, Mr. Vora, but is it correct that you typically visited the warehouse once or twice a week?

A.    Yes.

Q.    You were not responsible for making final decisions on day-to-day management activities.  Correct?

A.    Yes.  I don't do the micromanagement, micromanagement, you know.  I will not look over somebody's shoulder like a micro manager, but if I assign a task to my deputy program

manager, I will assume that he will do his job.  Unless there is a problem, then I will look.

Q.    You wouldn't micromanage.  You would assume that unless there was a problem, things were going all right?

A.    I'm sorry.  Can you repeat the question?

Q.    I am just making sure I understood what you said.

      You wouldn't micromanage.  Is that right?

A.    That is correct.

Q.    You weren't responsible for day-to-day management?

A.    I was the head of the -- I am the head of the company.

Q.    You do make decisions on hiring new employees.  Right?

A.    Based on the recommendation of the people who interviewed the person.

Q.    And promoting employees.  Right?

A.    Based on the recommendation of those employees.

Q.    And when you started this company in 1995, you wanted to hire good mission-driven people.  Right?

A.    That is true.

Q.    And you wanted to create an environment of respect?

A.    That is true.

Q.    Now, one of the people that RCSI hired was Ms. Evangeline Parker.  Right?

A.    That is true.

Q.    She was a good mission-driven employee, wasn't she?

A.    And that is true.

Q.    In fact, she was hired in 2014 as a general clerk. Right?

A.    That is true.

Q.    And in the -- the hierarchy that you described earlier, that's towards the bottom.  Right?

A.    That is true.

Q.    And if I can have Mr. Sayres pull up previously admitted Exhibit 3.

In March 2015, Ms. Parker was promoted to a receiving supervisor.  Correct?

And you should be able to see that on the screen if that helps.

A.    Oh, yes.  Okay.

Q.    And just a reminder that I think the microphone is not right by the screen, so I will do my best to keep the questions involving the screen to a minimum.

But you did also sign this -- this letter, Exhibit 3. Correct?

A.    Yes.

Q.    You approved this promotion and change in compensation. Correct?

A.    Correct.

Q.    And just two months later, in May of 2015, Ms. Parker was promoted again.  Isn't that right?

A.    Correct.  See what happens is that -- the whole idea is

that the employee goes from one department to other department to the other department.  They learn processes.  So once they learn the process, they become all around.  Basically it's called cross-training.

Q.    So she learned the process.

Mr. Sayres, if you would pull up previously admitted Exhibit 4.

So this is -- sorry, previously admitted Exhibit 4.  This is No. 3, Mr. Sayres.  Sorry.

And Exhibit 4 is dated May 16.  This is a promotion letter just two months later?

A.    Mm-hmm.

Q.    And you signed this.  Right?

A.    Yes.

Q.    And you approved a raise in compensation at that time?

A.    Yes.

Q.    And Mr. Sayres, if you could pull up previously admitted Exhibit 12.

In April of 2016, April 7th, you approved Ms. Parker for a promotion to a warehouse assistant manager.  Correct?

A.    Yes.

Q.    And that came with an increase in salary.  Correct?

A.    Yes.

Q.    Now, you are aware that less than three weeks later, Ms. Parker made a complaint of harassment on April 25th, 2016?

A.     If you look at the time frame, I become aware of the complaint on May 17th.

Q.     Okay.  But -- and Mr. Sayres, you can pull that down.

But sitting here now, you are aware that on April 25th of 2016 --

A.     On April 25th, yes.

Q.     -- Ms. Parker made a complaint of sexual harassment against Mr. Larry Moppins.  Correct?

A.     Yes.

Q.     And on May 18th, less than six weeks after you approved her for her last promotion and pay increase, you fired her.  Correct?

A.     Because of misconduct.

Q.     I think I heard you say that Mr. Moppins would sometimes call you and talk to you about firing someone.  Right?

A.     If it was a misconduct.  You know, he would not tell -- say he want to -- you know, there was an incident where Manley was talking too much and he told me, and I said, No, that's not an excuse to fire anybody.  All right?

You know, if it is a conduct related, work related we have an issue, then you let me know.  If somebody is checking -- you know, if somebody is having a conversation, somebody likes to talk, okay, that is not an excuse to fire a person.  As long as he is doing his job and he is, you know, like a cool head, you know, not causing any trouble but he is doing the

job, you know, that should not be an excuse.

Q.    Now, sometimes he would email you to talk about firing people, too.  Right?

A.    I don't think so.

Q.    Sometimes he would ask to meet you in person to talk about firing people?

A.    If there is a misconduct, very serious or something, you know, some serious thing like theft or something like that, then he would let me know.

Q.    Now, the first time that you learned of the situation that led to Ms. Parker's termination was when you got an email from Mr. Moppins on May 13th.  Right?

A.    Ever since he want to discuss this issue.

Q.    And Mr. Sayres, if I can have you pull up, please, previously admitted Exhibit 18.

      I believe we looked at this on your direct examination. Is that right, Mr. Vora?

A.    Yes.  This is Larry Moppins send me this email for a meeting request.

Q.    And this is an email from Mr. Moppins to you on May 13th with a subject line "Evangeline Parker - Misconduct."  Right?

A.    Yes.

Q.    "Importance level - high?"

A.    Mm-hmm.

Q.    And what he wanted to do with this email, it says, is to

clear up some not so clear areas.  He's attached an outlining of events that he submitted to human resources.  Right?  We have highlighted it on the screen if that helps.

A.    Yes.

Q.    And underneath that, he provides a number of a list of the misconduct that he's mentioning.  Right?

A.    Mm-hmm.

Q.    And paragraph number two says, "She has threatened to file sexual harassment charge on me for supposedly starting rumors about her relationship with the deputy p.m., a question which I asked him directly (in February) as his immediate supervisor," and it goes on.  Right?

A.    Okay.  I hear you.

Q.    And this is an email to you from Mr. Moppins requesting a meeting.  Right?

A.    Yes.

Q.    And I think you said you did meet with him on the 17th?

A.    Yes.

Q.    And eventually you met with him, Mr. Moppins, that is, along with Ms. Reema Vora and Ms. Cathy Price.  Right?

A.    Yes.

Q.    That's a meeting where the four of you got together to discuss Ms. Parker's behavior and the sexual harassment investigation that Ms. Price put together.  Right?

A.    Yes.

Vora - cross

Q.    Now, on May 16th of 2016, Mr. Moppins drafted a written warning recommending that Ms. Parker be terminated for allegedly mistreating Mr. Jennings.  Is that right?

A.    I don't know that I did that on May 16th.

        THE COURT:  Can you move to the microphone, sir?

        THE WITNESS:  I don't know that I did that warning on May 16th, but I definitely did on May 18th.

BY MR. TISHMAN:

Q.    And Mr. Sayres, if you could please pull up previously admitted Exhibit 20.

        This is a written warning dated May 16th.  Right?

A.    Mm-hmm.

Q.    And it says the reason for the warning, failure to follow instructions from the program manager, and it describes a letter from Mr. Donte Jennings.  Is that right?

A.    That's what it looks like.

Q.    And at the bottom, it includes the recommended corrective action?

A.    Yes.

Q.    And it says, "Corrective action required:  Termination of employment."  Correct?

A.    Yes.  That's what it is.

Q.    Now, on that same day, Ms. Parker received another warning; isn't that right?

        If it helps, Mr. Sayres, could you please pull up

Vora - cross

previously admitted Exhibit 19?

Exhibit 19 shown on the screen is another written warning.

A.    Yes.

Q.    And this one gives as a reason for warning poor management performance.  Right?

A.    Yes.

Q.    And it goes on to describe the basis for that, the reason for warning?

A.    It says, Poor management performance, abuse of managerial authority, explicit use of profanity.

Q.    A few reasons are listed.

And Mr. Sayres, if I could direct to the next page, the paragraph that begins "Upon attempting."  Scroll down just a hair.

And Mr. Vora, do you see where it says, in this written warning, it says, "You are going to press charges of sexual harassment against me for spreading untrue rumors about you and DaMarcus."

And he's referring to Mr. Pickett.  Correct?

A.    Excuse me.  Which paragraph are we talking about?

Q.    It's being highlighted on the screen if that helps.  It's on the second page.

A.    Okay.

Q.    That's what he says in this written warning on May 16th.

Right?

A.    Yes.

Q.    And Ms. Parker disagreed with the warnings, didn't she?

A.    In our office, we don't force anybody.  You know, it's -- you know, if you want to put down the comments, you put down the comments.  If you want to sign, you want to sign.  If you don't want to sign, you don't sign.  You had that right.

Q.    And Ms. Parker didn't sign; instead, she put employee comments at the bottom.  Right?

A.    Correct.

Q.    And what she says is that Ms. Wallace was the only witness -- sorry.  If you can pull that up again.

It says, "Ms. Wallace was the only witness to the accusations that Mr. Moppins has stated in this counseling."

And there is a written comment from everyone but her.  It says that.  Right?

A.    Okay.

Q.    And it also says:  Mr. Pickett was also a witness to the majority of what transpired between Mr. Moppins and myself; yet, there's no statement from him either.

A.    Mm-hmm.

Q.    So Ms. Parker believed that there was no statement from Ms. Wallace or Mr. Pickett.  Right?

A.    That's what she believes.

Q.    And it's the policy of RCSI, when conducting

investigations based on unlawful conduct, to interview

witnesses to the alleged conduct.  Right?

A.    Okay.  Now you are confusing two things.

Q.    Well, sir, I am just asking you a question as to whether

it's the policy of RCSI, when conducting investigations based

on unlawful conduct, to interview the witnesses to the alleged

conduct?  Isn't that true?

A.    That's the policy.

Q.    Okay.  And --

A.    As I said, a warning -- okay.

Q.    Mr. Vora, when I am done with my questions, your counsel

will have a chance to ask you follow-up questions.

A.    Okay.

Q.    And it's the policy to interview witnesses because you

want to have a fair investigation, a fair and thorough

investigation.  Right?

A.    Yes.

Q.    And your company documents witness statements.  Right?

A.    That is true.

Q.    And according to Ms. Parker, there were no witness

statements from Ms. Wallace.  Right?

A.    Not in this warning.

Q.    Now, your company will sometimes accept verbal rather

than written statements; isn't that right?

A.    Because those employees, they are high school graduate,

you know, high school equivalent --

THE COURT REPORTER:  I'm sorry.

THE WITNESS:  Those employees in the warehouses, they are high school graduate or, you know, or equivalent, so they can talk things through, but they will not be able to write precisely like lawyers.

BY MR. TISHMAN:

Q.    So that's your view of your employees, that they are not able to write a witness statement?

A.    Some of them.

Q.    And that's how you -- that's what you think of your employees?

A.    Some of them, you know, like, they are a really good hard worker, okay, but they are not precise like -- just like you.

MR. TISHMAN:  Okay.  No further questions, Mr. Vora. I will pass the witness.  Thank you.

THE COURT:  Any redirect, Mr. Walsh?

MR. WALSH:  There is not, Your Honor.

THE COURT:  Thank you, Mr. Vora.  You can return back to your seat.

Can I just talk to counsel on the headset just for a moment?

(The following discussion was held at sidebar outside the presence of the jury; all counsel present.)

THE COURT:  Can both sides hear me?

MR. WALSH:  Yes.

THE COURT:  Was that Mr. Walsh?

MR. WALSH:  Yes, that was.

THE COURT:  And for the plaintiffs?

MR. KOPSIDAS:  Yes, Your Honor.  I can hear you.

THE COURT:  So as I understand our schedule now, we have no other witnesses left.  The only one after that we have is Mr. Moppins for tomorrow morning.  Is that correct?

MR. WALSH:  That's correct.

THE COURT:  So what I propose we do is we send the jury home now, tell them to come back tomorrow morning, we will have Mr. Moppins tomorrow, and likely we would have the instructions and the closings.  And so once the jury goes home, we can take a quick break, we can address the motion, and perhaps we can see how far we can get on locking down the instructions.

Does that make sense to everybody?

MR. KOPSIDAS:  Yes for the plaintiff.

MR. WALSH:  Yes.

THE COURT:  We will do that then.  Thank you.

MR. KOPSIDAS:  Thank you.

THE COURT:  Okay.

(End of sidebar discussion.)

THE COURT:  Ladies and gentlemen of the jury, some hopefully good news from your perspective.  We have run out of

witnesses for today and so we are going to send you home a little earlier than usual.  Again, I will leave it to you how you want to handle the next couple of hours, what you want to do with it.  We do ask you to return tomorrow morning at 9:00. We know we have at least one other witness tomorrow.

We are generally ahead of schedule and so we are anticipating finishing the case tomorrow, both that witness and hearing the instructions on the law and also the closing arguments.  It doesn't mean that you will complete your deliberations tomorrow.  You may be able to start them but that process may take us into the afternoon, so you will at least hopefully get the case tomorrow.  If something changes, we will let you know tomorrow, but at least that's a possibility that you will have a chance to start your deliberations tomorrow. And as you know, we still have several other days on our schedule.  We have Thursday and also Monday and Tuesday of next week for however much time you need.

So that's our schedule.  We have started the defense case.  It's not over yet.  So remember don't discuss the case among yourselves on the way out or on the way in.  Keep an open mind.  Don't do any outside research.  Don't discuss it with anyone else.  Just enjoy the evening and we will see you tomorrow morning.  Thank you very much.

(The jury panel exit the courtroom at 3:08 p.m.)

THE COURT:  Okay.  I think we can see everybody in 15

minutes.  Would that make sense?

MR. KOPSIDAS:  That's fine.

(Recess taken from 3:09 p.m. until 3:27 p.m.)

THE COURT:  Thank you, everyone.  Please be seated.

So I think the next step is to hear a little bit more not over the headsets about the motion.  So, Ms. Ignozzi, do you want to -- I did hear everything you said already, but if you want to recap what your argument is and then we will hear from the plaintiffs.

MS. IGNOZZI:  Thank you.  Is it all right with the Court if I just remain here at my desk and use my laptop?

THE COURT:  That's fine.

MS. IGNOZZI:  So, to reiterate, the defendant would move for a motion for judgment that the plaintiff has not made a prima facia case on the claims of hostile work environment and on retaliation.

With respect to the claim of hostile work environment, the plaintiff must prove that she was subjected to unlawful harassment, ridicule, or other abusive conduct based on sex and that that was imputable to the employer.

I stated earlier some of the facts that were in evidence from the plaintiff's case in chief, and for this purpose, there is no evidence that there was any statements or rumors that can be imputable to the employer here that were created by Reema Consulting.

The plaintiff's statements that she heard a rumor came from Mr. Pickett, but she also testified that Mr. Pickett stopped when he called her and just told her, "I have got this handled, don't worry about it," and that was the end of it. She indicated that Mr. Moppins had spoken to Mr. Pickett at some point in time but that it was behind closed doors, it was just between the two of them, nobody else was involved, and, again, that Mr. Pickett confirmed that that was the end of the discussion.

THE COURT:  Well, why isn't that part of the workplace?  I mean, both -- these are two employees but he's discussing it with Mr. Pickett, why isn't that starting a rumor if it's not perpetuating a rumor?

MS. IGNOZZI:  Because there was no further discussion.  There is no evidence that it went outside of the confines of that closed-door discussion between Mr. Pickett and Mr. Moppins.  And that when Mr. Pickett --

THE COURT:  I guess what I am asking, maybe my question wasn't precise, it's -- you are saying there is no evidence that the rumor was either started or perpetuated, and it's unclear perhaps whether Mr. Moppins started -- you know, got this idea on his own or whether he got it from someone else, but why couldn't a jury infer that he was furthering something that was already out there?

MS. IGNOZZI:  Well, there is no evidence that it

predates anything before the March/April time frame. In fact, Ms. Parker testified that she became aware what she was, for effect on the hero (phonetic) purposes, informed occurred at this all-hands meeting in or around April. It's undisputed that the conversation between Mr. Moppins and Mr. Pickett predates that. So there is nothing that occurred before February of 2016 that we know of with respect to a rumor in the record. And because there is no evidence that Mr. Moppins ever spoke to anyone else, it certainly didn't originate with him if there was a rumor in the warehouse.

The only other evidence that we hear comes from Mr. Birgans who generically said there was a rumor but can't identify from where it came, who even said it, when he heard it, where he heard it, other than it was out there. But coincidently, we do know that Ms. Parker went to Mr. Jennings directly and she confronted Mr. Jennings who she testified appeared confused and didn't seem to know what he was -- she was referring to.

So it sounds like the only other evidence at this point is that Ms. Parker is the one who initiated the spread to a person that was in the warehouse, and from there, it went. That's all we know.

THE COURT: Okay.

MS. IGNOZZI: And just to reiterate, Romaine Thompson, I know that there was some testimony about her, but

she's not an employee so there would be no liability there.

With respect to the retaliation claims, there is two kind of correlating stories that have made it to the record in the plaintiff's case in chief.  You have the plaintiff's version that she perceived to have been terminated as a result of her making this report surrounding these rumors.

At the same time that that's going on, there is a history of events that occurred that was laid out in the exhibits -- that's in Exhibits 19 and 20, and in 21, that's the H.R. report -- that identified the specific instances that occurred where there was an outburst by Ms. Parker and an incidence of insubordination, two meetings, which Ms. Wallace, through the video deposition, confirmed Ms. Parker was out of control and had to be escorted out, that there were reports from employees that Ms. Parker was mistreating them, and so that ultimately led to the decision to terminate her wholly unrelated to anything with the claim of harassment.

THE COURT:  Okay.  Thank you.  Anybody want to speak for the plaintiff on this issue?

MR. KOPSIDAS:  Yes.  I will if you don't mind, Your Honor.

THE COURT:  Go ahead.

MR. KOPSIDAS:  Okay.  On -- first, on the hostile work environment claim, defendants seem to be -- have a mistaken underlying assumption which is that the rumor has to

have originated in -- within RCSI, at least that's what I think I heard to -- you know, to that effect.  The fact of the matter is it doesn't matter where the rumor actually originated or with whom it originated, only that it was circulating within RCSI.  And there is considerable, substantial evidence that it was doing that.

We have, for example, beyond Ms. Parker's substantial testimony, that she, you know, was aware of the rumors circulating within the warehouse, that she felt --

THE COURT:  Where was that testimony, Mr. Kopsidas?  I mean, we all agree that she heard Mr. Pickett say that he heard it from Mr. Moppins and from Ms. Thompson.  Ms. Parker also acknowledged that she asked people or told people, If you want to know something about my personal life, then ask me.

I know we have Mr. Birgans, as was just acknowledged by the other side, but which testimony -- where did she -- I am trying to remember if she gave any testimony about another employee telling her that the rumor was circulating other than Mr. Pickett actually?  She didn't testify about Ms. Thompson as far as I recall.

MR. KOPSIDAS:  So, unfortunately, without a daily transcript, Your Honor, I cannot say for certain that she -- she testified about hearing it from another employee besides Mr. Parker (sic).

THE COURT:  Mr. Pickett, you mean?  Mr. Pickett?

MR. KOPSIDAS:  I'm sorry.  Mr. Pickett, yeah.

But what we do have is, for example, her contemporaneous notes of Exhibit 33 in which she states, I was informed by Mr. Pickett that Mr. Moppins once receiving the information that I was holding a personal grudge against Manley Ferguson due to a rumor that I had been sleeping with -- with Mr. Pickett.

THE COURT:  What page are you on there on the exhibit?

MR. KOPSIDAS:  So I am on the first page, second paragraph of Exhibit 33.

THE COURT:  Okay.

MR. KOPSIDAS:  In addition, Exhibit 15, an email from Mr. Moppins to Cathy Price, Mr. Moppins acknowledges, around the third full paragraph, that he had heard from Mr. Ferguson that the rumor was spreading in the warehouse.

THE COURT:  Mm-hmm.

MR. KOPSIDAS:  Similarly, in Exhibit 14, you have an email from Cathy Price to Mr. Pickett, Ms. Parker, but also Mr. Moppins talking about -- essentially talking about the rumor.  She doesn't specifically call it out, but she talks about gossip is ugly and can create a hostile work environment.

So both Ms. Parker and Mr. Pickett testified that Mr. Moppins was involved in spreading the rumor, and, in fact, we heard Mr. Pickett this morning state, in retrospect, Larry

Moppins was involved because of his relationship with Donte Jennings.

I may move on briefly to the retaliation claim. That claim stands on its own because certainly with respect to retaliation, there is substantial testimony and exhibits that, number one, Ms. Parker failed -- sorry -- filed a complaint against Mr. Moppins regarding spreading the rumor; number two, Mr. Moppins is quoted in one of the documents -- in a couple of the documents as stating that he was essentially fearful that Ms. Parker was going to file or threaten to file a complaint against him, again, relating to the rumor; and three, a meeting was held between -- requested and held between Mr. Moppins and the upper management, the Voras and Ms. Price; and that, four, she was subsequently fired, and all of this happened within the span of a few days.

So there is certainly at least enough for the jury to infer a case of retaliation there.

THE COURT: Okay. So, on the motion, the issue is whether there is a -- whether a reasonable jury could find in favor of the plaintiff based on the evidence that was presented in the plaintiff's case. I do find that a jury could reach that conclusion, so I am going to deny the motion.

Just briefly on the hostile work environment claim, I don't think there is any doubt that there was unwelcome harassment, ridicule, or abusive conduct. In particular, there

was the information about the rumor that came from several places.  We have not just Mr. Moppins acknowledging that he was talking to Mr. Pickett about it, which that may not mean that there is evidence that he disseminated it past Mr. Pickett, it certainly means that he was aware of that from somewhere, and one could infer that that meant either that he was told the rumor or that he was at least part of the process of people in the warehouse talking about it.

There is also Mr. Birgans' testimony that he heard the rumor on several occasions within the office.  There is the testimony from Mr. Pickett that Ms. Thompson told him about the rumor and said that Mr. -- or indicated Mr. Jennings had started it, again, only to show the effect on him.  But even just focusing on what Ms. Thompson said, even though she was no longer a current employee, I think it was established that she certainly had ongoing relationships with current employees, so one could infer from that rumor was present.

And then also, as Mr. Kopsidas pointed out, there is the written documentation of Mr. Ferguson informing Mr. (sic) Parker that the rumor was circulating.  So there is certainly that type of information there.  There is no real dispute about the issue about whether -- whether one could argue that this was conduct based on sex based on the Fourth Circuit's prior ruling.

On the severity or pervasiveness to alter the conditions

of employment, there is sufficient evidence.  Largely, when one combines the evidence that there was a rumor of some kind plus the issues regarding the -- being shut out of the all-hands meeting and then at some point being excluded from emails, excluded from other meetings -- now, some of this may be evidence that relates to both a retaliation claim and a hostile work environment claim.  One could argue it might go more towards the issue of retaliation, but these actions taken by Mr. Moppins at least is on the side of the scale of the plaintiff's argument.

As to whether it could be imputed to the employer, there is evidence of involvement by Mr. Moppins at a couple different stages: one in asking about this issue with Mr. Pickett; also in conversations with people like Mr. Ferguson; and then also these actions taken after a complaint was raised, again, dual evidence on both retaliation and hostile work environment, including the shutting Ms. Parker out of the meeting.

But also even if one were to conclude that management was not involved in the initiation of the rumor, under our jury instructions, if the company is negligent in responding to it, meaning that they knew or should have known of it and taken reasonable actions calculated to stop it, there are two different views of how this happened, but, again, viewing the evidence in the light most favorable to the plaintiff, as the Court must in this motion, their evidence that all of these

efforts to establish that Ms. Parker was somehow harassing Mr. Jennings, I suppose the other way around, although on the one theory, that is the defense theory on why she was terminated.

The plaintiffs have offered a competing theory, that that was an additional effort to discredit her, and also show that rather than focusing on her allegation, they focused on some other allegation from Mr. Jennings, and, therefore, it did not take reasonable steps to address the harassment.

So, again, at that very deferential standard to the plaintiff, the Court will deny the motion.

On the retaliation claim, some of the same evidence comes into play.  There certainly is protected activity or evidence of protected activity based on just starting with the oral complaints made in the meetings before Ms. Price got involved and then, of course, the actual complaint made to Ms. Price as H.R.

There was -- certainly Ms. Price acknowledged that she was aware of that complaint filed by Ms. Parker.  The termination is certainly a materially adverse action.  The key question, of course, is the causation, whether the complaint was a but for cause of a termination, and I think that's a factual question that the jury will need to decide.  Among other evidence that would at least support a reasonable jury's conclusion are the statements by Mr. Moppins and the written

materials where he acknowledged that one reason he was terminating her was because he believed she was going to file a harassment claim against him.  That, of course, can be read in many different ways, but the plaintiff's theory that that shows that the termination was based on the fact that she was complaining at least is enough to get to the jury.

So I am going to deny the motion.

Next up is the jury instructions.  I don't know if the parties have had a chance to look at the instructions in any great detail to see what, if anything, has changed from the last time we talked about them.

I do have some suggested language on the limiting instructions.  I would suggest, if one looks at page 7 of the jury instructions, I go through what is evidence.  I state, "If you are instructed that certain evidence was admitted for one purpose only, you may not consider it for any other purpose." And I propose that after that, we list and remind the jury of the limiting instructions that were provided.

And I think I have four specific ones that came up.  The first is the testimony of Ms. Parker and Mr. Pickett that Romaine Thompson made statements or otherwise acknowledged that Mr. Jennings started or repeated -- well, repeated the rumor. Those statements were admitted only for the limited purpose of showing their effect on Ms. Parker, Mr. Pickett, and their later actions.  Those statements may not be considered to

establish that Mr. Jennings, in fact, started the rumor or repeated it to others.

Second, the testimony of Mr. Birgans that he heard the rumor from others in the workplace is admitted only for the limited purpose of showing that the rumor was stated by workers within RCSI. That testimony may not be considered to establish that the rumor that Ms. Parker and Mr. Pickett were having an affair was true.

Third, the written statement by Carlos Carter, Exhibit No. I believe it's 112, but we will check on that, was admitted only for the limited purpose of showing its effect on Ms. Price and taking actions relating to Ms. Parker and may not be considered to establish that what Mr. Carter said in the statement was true.

And fourth, the testimony of Ms. Parker that Ms. Rochelle Lee told her that the rumor was discussed at the all-hands meeting was admitted only for the limited person of showing its effect on Ms. Parker and her later actions. It was not admitted to show that the rumor was, in fact, discussed at the all-hands meeting.

I may move the order around there to be a little more chronological, but first off, are there any other limiting instructions that I gave that I missed covering in those four?

MR. WALSH: I don't believe there were any others, Your Honor.

MR. KOPSIDAS:  That list sounds complete, Your Honor, except for the possibility of a stipulation with respect to Exhibit 18 -- 13.  I am not sure if you want to handle that along with limiting instructions or not.

THE COURT:  I mean, the stipulations I typically do are, as I said, if -- I mean, I will give an instruction if there's stipulations of fact that they can accept as true.  I don't typically reread stipulations.  So I think we would either stand on what we have, or if the parties -- if one side wants to, I would say we could have the stipulation written up and admitted as another exhibit, which is, again, what often happens with stipulations that's perhaps a little bit more central to the case, and then they will have it in evidence. And so once they are told that stipulations are evidence, they will have access to that again.  So if you want that, we can have that done.

MR. KOPSIDAS:  I don't think that will be necessary, Your Honor, but -- but let me confer with the team, and if we change our minds, we will get back to you.

THE COURT:  If you change your mind, I would suggest that you draft it up and see if you can get the other side to agree to the exact language.  I think we had a direct quote on what the language was, so it would just be -- usually we'd put it on a caption, have it signed by both counsel, and then we will give it an exhibit number.

So, again, as I said, since it was a stipulation, I typically do that.  If one party wants that, I will include that.  So if you agree, you know, later tonight on that, then just prepare it for tomorrow so we have it ready to go.

What I will do is I will take these limiting instructions and insert them as track changes into the current draft and we will try to send it out this evening, and then if you want to suggest any wordsmithing, you can do that in the morning.

Anything else from the instructions that you think either we need to add, subtract, or modify from what we had earlier?

MR. CORKERY:  Nothing for plaintiff, Your Honor.

THE COURT:  Mr. Walsh or Ms. Ignozzi?

MR. WALSH:  Your Honor, at this time, I don't believe there is anything else either.

THE COURT:  I am just flipping through because sometimes something pops out.

MR. WALSH:  Your Honor, I apologize, but just to make sure, after we went through these last time, you did not email either side copies of the revised instructions.

THE COURT:  We might not have.  I think it was very -- it was very -- we didn't have that much to change.  So we will send these again tonight with the track changes certainly showing you the -- these limiting instructions in there and then we can sort it out in the morning.

What I -- remind me again, did we say how long we think

the Moppins' testimony will take?

MS. IGNOZZI:  Probably about an hour.

THE COURT:  On direct?

MS. IGNOZZI:  On direct.

THE COURT:  And then on cross?

MR. KOPSIDAS:  30 minutes or so.

THE COURT:  Okay.  So that takes us roughly to the mid-morning.  So at that point, we would perhaps try to -- what I would prefer to do, if possible, is to, again, meet tomorrow morning about 8:40 and see if there are any additional edits to the jury instructions.  There is a little bit of a processing angle to this that the sooner we know what they are, the better.  I know in theory something could arise in Mr. Moppins' testimony, but I think we can all think ahead and nothing comes to mind.

So why don't we do that as our morning discussion before 9:00, obviously knowing that something could come up in the Moppins' testimony.

And then after the Moppins' testimony, we will confirm there is no further changes to the jury instructions hopefully, we will take that break, and then -- I mean, I guess it depends.  If we are close enough to lunchtime, we might give them a long lunch and then start early in the afternoon.  If we are still too early for that, then I would suggest we at least do the jury instructions.

And then I know counsel usually are quite sensitive to the idea of having the closings separated by lunch, so we'd probably if we get -- they don't seem to feel that strongly about the jury instructions, and they will have written copies of them anyway so I don't mind doing the instructions first, and then if we need to, we would have lunch and then do the closings in the afternoon, starting relatively early in the afternoon, and then hopefully they will have the case at that point.

So what I would suggest is in addition to looking for any potential changes to the jury instructions that we can discuss first thing in the morning, just meet and confer about exhibits, make sure that all the exhibits that we know about there is an agreement on what's in and what's not in, including the redacted versions, confirm with the clerk that the originals we have match up with that.

Are there new exhibits that will be coming in through Mr. Moppins or are they just going to be the ones we have already used?

MS. IGNOZZI:  No.  Everything is already in.

THE COURT:  Do you agree with that from your side?

MR. KOPSIDAS:  I agree with it in our side.

THE COURT:  So, again, try to finalize the exhibits so that it's not something we need to worry about after closings because, obviously, after closings, we want to get the

exhibits to the jury as soon as possible.

Yes.

MR. WALSH:  Just a slight question about exhibits.  I am assuming that we will use the binder that the witnesses have been using, and pure assumption on my part, that prior to obviously going back, the parties will be able to go through, pull out the exhibits that we obviously did not enter that were all in that binder but have not been admitted into evidence?  Not all of the exhibits in the binder have been admitted.

THE COURT:  Right.  And we also have the identification exhibits there, too, so those would come out.  Yes.  So I think the idea is to -- you can jointly work on doing that, confer with Ms. Solomon about it because you are going to want to look at her list and make sure that the ones in there match her list and that there is nothing more, nothing less.  But yes, I believe we can use the set that the witnesses have been using.  So yes.

And I think we don't have anything other than documents.  Right?  We don't have recordings, videos, firearms, things like that, so this should be easier in terms of what we give them.

Lastly, on the issue of closing arguments, can you give me a sense of how long these are projected to be?

MR. KOPSIDAS:  This is a guess, but I am going to say ours will be about 30 to 45 minutes.

MR. WALSH:  The same, Your Honor.

THE COURT:  And when you say that, Mr. Kopsidas, are you referring -- are you including the -- any rebuttal time?

MR. KOPSIDAS:  It is likely that we will choose to preserve a few minutes for rebuttal, yeah, but included in that time.

THE COURT:  Okay.  Well, it doesn't sound like it's going to be an issue.  As you may -- you just may want to recall that my view of rebuttal is that it's got to be real rebuttal, not something that you are just sort of saving.  It should be things that are directly responsive to things the defense has said, and so if they don't say it, then you can't use it, and so if you really want to say it, you should say it in your opening and it really should just be things that you -- directly came up or that you -- certainly ideally things that you couldn't have anticipated.

I believe in my standard scheduling order, we also have -- let me just check that just so everyone is recalling it -- rebuttal as a maximum of 15 minutes.  That sort of presumes you are using the full hour, so just keep an eye on those -- those requirements.

What about exhibits, demonstrative aids to be used, are there plans for that?

MR. KOPSIDAS:  We will likely have some that we will be using.  Obviously, if we use exhibits, they will be only admitted once.  We will probably have some demonstratives and

we will disclose those tonight, and if defense has any objections, hopefully they will let us know tonight and we would be prepared to talk about them in the morning.

THE COURT:  Same thing for you?

MR. WALSH:  Absolutely, Your Honor.  We have had an amazing working relationship throughout this trial.  It's kept things hopefully smooth for both sides.

THE COURT:  It's been pretty good, I have to acknowledge.  I would, again, remind you -- I started to talk about it but didn't formally talk about it -- that if you are -- so admitted exhibits are certainly fine.  We have had cases where the parties make a mistake and include un-admitted exhibits.  That's obviously not an ideal situation, so just double check that what you are using actually was put into evidence.

The PowerPoint type thing, again, if you can all reach an agreement, it should be fine with me.

The one thing I do have some concerns about, as I said, is if you are quoting from the jury instructions, don't use any highlighting of particular words or phrases, either colors, italics, bolds, etc.  Don't use an ellipsis in terms of taking out words.  Obviously, it has to be an excerpt if you are going to do that, but make it a full excerpt and not something where you are bracketing or changing words and so forth like that.

And then I didn't say this last time because I didn't

think it would come up in the opening, but, again, the instructions are the -- the guidance to the jury on the law, and so it's fine to say there is an instruction and perhaps to quote from the instruction. I really would prefer not to have counsel paraphrasing, elaborating, or giving their spin on what the instructions are. That includes things like the burden of proof. The instruction is what it is. I don't think it's helpful to have either side try to give their homespun analogies about what, you know, the burden of proof is or what a particular element means.

There is an instruction, of course, saying that the Court's instructions control, but if I hear that from either side, I am going to sua sponte give a limiting instruction, say I am reminding you again the instruction is that whatever the lawyer said on this topic, you don't follow that, and I don't think that's really -- so just try to stay away from that. You have limited time. Use your time to focus on the facts and how they match up to the law and not trying to reinterpret the instructions.

Any questions about that?

MR. KOPSIDAS: None, Your Honor.

MR. WALSH: No, sir.

THE COURT: Okay. So we will owe you an electronic version of the jury instructions. Perhaps, just because we have had some technological glitches, we will probably ask you,

or even if we don't, please respond back and say you got it and you were able to open it and then we can sort of have some peace of mind about that.

So we will see you tomorrow morning at about 8:40 to discuss anything about the jury instructions, any disputes about the closing argument, demonstratives, hopefully there won't be any, and I will see you tomorrow.  Thank you.

MR. WALSH:  Thank you, Your Honor.

MR. KOPSIDAS:  Thank you, Your Honor.

(The proceedings were concluded at 3:57 p.m.)

- - - - -

INDEX TO TESTIMONY

PLAINTIFF'S WITNESSES:

CATHY PRICE                                          PAGE

    Cross-examination by Mr. Walsh               13
    Redirect examination by Ms. Wasik            23

DEFENDANT'S WITNESSES:

RAJESH K. VORA                                      PAGE

    Direct examination by Mr. Walsh              32
    Cross-examination by Mr. Tishman             52

C E R T I F I C A T E

I, Renee A. Ewing, an Official Court Reporter for the United States District Court for the District of Maryland, do hereby certify that the foregoing is a true and correct transcript of the stenographically reported proceedings taken on the date and time previously stated in the above matter; that the testimony of witnesses and statements of the parties were correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription to the best of my ability; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

Renee A  Ewing
_____

Renee A. Ewing, RPR, RMR, CRR
Official Court Reporter
February 3, 2022

| | | | | |
|---|---|---|---|---|
| **$** | 26:11, 56:19, 56:25, 57:5, 60:1, 69:7 | **6** | 46:19, 60:18, 60:20, 76:20, 89:11 | **aids** [1] - 84:21 |

**$**

**$20** [1] - 45:2
**$30** [2] - 43:16, 53:14
**$40,000** [2] - 41:4, 41:5
**$50** [1] - 41:6
**$500** [1] - 41:6

**1**

**1** [2] - 39:11, 39:18
**100** [2] - 21:4, 33:12
**1000** [2] - 1:16, 1:16
**10:30** [1] - 46:17
**112** [4] - 5:21, 5:22, 24:8, 78:10
**12** [1] - 56:18
**12th** [2] - 5:15, 7:25
**13** [8] - 6:19, 6:21, 23:10, 28:12, 28:22, 29:9, 79:3, 88:5
**13th** [3] - 47:13, 58:12, 58:20
**14** [2] - 13:4, 72:18
**14th** [1] - 1:20
**15** [6] - 27:3, 34:24, 43:15, 66:25, 72:13, 84:18
**16** [1] - 56:10
**16th** [5] - 60:1, 60:4, 60:7, 60:11, 61:25
**17** [4] - 5:20, 5:23, 5:24, 17:7
**17th** [7] - 16:11, 47:1, 47:2, 48:10, 48:11, 57:2, 59:17
**18** [5] - 34:24, 47:7, 47:8, 58:15, 79:3
**18th** [3] - 2:5, 57:10, 60:7
**19** [4] - 21:24, 61:1, 61:2, 70:9
**1995** [3] - 33:2, 33:10, 54:16
**1:33** [1] - 1:11
**1:49** [1] - 12:14

**2**

**2** [1] - 28:22
**20** [6] - 4:11, 22:23, 26:9, 43:15, 60:10, 70:9
**20024** [1] - 1:17
**20036** [1] - 1:21
**2012** [1] - 34:8
**2014** [1] - 55:1
**2015** [2] - 55:9, 55:23
**2016** [7] - 25:21,

26:11, 56:19, 56:25, 57:5, 60:1, 69:7
**2017** [1] - 35:12
**202** [2] - 1:17, 1:21
**2021** [1] - 1:11
**2022** [1] - 89:16
**21** [4] - 15:23, 15:25, 49:21, 70:9
**212** [3] - 4:1, 4:11, 26:7
**21202** [1] - 2:6
**23** [8] - 3:7, 3:10, 3:17, 4:11, 12:20, 12:21, 17:18, 88:5
**25** [2] - 34:24
**25th** [3] - 56:25, 57:4, 57:6
**26th** [2] - 33:2, 33:10
**27th** [2] - 27:12, 27:18
**29th** [1] - 34:8
**2:30** [1] - 46:16
**2nd** [12] - 3:23, 4:23, 5:4, 5:6, 5:11, 5:17, 5:25, 7:22, 20:21, 25:21, 26:11, 26:17

**3**

**3** [5] - 40:14, 55:8, 55:17, 56:9, 89:16
**30** [3] - 36:19, 81:6, 83:24
**301** [1] - 1:23
**30th** [1] - 35:12
**319-1000** [1] - 1:21
**32** [1] - 88:8
**33** [2] - 72:3, 72:11
**344-3227** [1] - 1:23
**3:08** [1] - 66:24
**3:09** [1] - 67:3
**3:27** [1] - 67:3
**3:57** [1] - 87:10

**4**

**4** [6] - 4:9, 7:2, 26:6, 56:7, 56:8, 56:10
**4/18** [1] - 16:6
**400** [1] - 1:20
**410** [1] - 2:6
**45** [1] - 83:24

**5**

**5** [1] - 23:23
**5/17** [1] - 16:6
**52** [1] - 88:9

**6**

**6** [1] - 17:6
**659-1354** [1] - 2:6
**6:30** [2] - 46:16, 46:17

**7**

**7** [3] - 1:11, 2:5, 77:13
**700** [1] - 1:20
**783-5070** [1] - 1:17
**7th** [1] - 56:19

**8**

**8:40** [2] - 81:10, 87:4

**9**

**99** [1] - 43:19
**9:00** [2] - 66:4, 81:17

**A**

**abide** [1] - 13:14
**ability** [8] - 8:20, 38:7, 38:10, 40:24, 44:19, 45:24, 46:14, 89:10
**able** [11] - 7:18, 12:4, 20:11, 25:13, 30:8, 55:11, 64:5, 64:9, 66:10, 83:6, 87:2
**absolutely** [4] - 10:8, 52:14, 52:16, 85:5
**abuse** [1] - 61:10
**abusive** [2] - 67:19, 73:25
**accept** [3] - 12:2, 63:23, 79:7
**access** [1] - 79:15
**accident** [1] - 45:16
**accomplish** [1] - 8:17
**accomplished** [1] - 20:20
**according** [1] - 63:20
**accounting** [1] - 33:24
**accusations** [2] - 18:19, 62:14
**acknowledge** [1] - 85:9
**acknowledged** [6] - 11:10, 71:13, 71:15, 76:18, 77:1, 77:21
**acknowledges** [1] - 72:14
**acknowledging** [1] - 74:2
**act** [1] - 45:1
**ACTION** [1] - 1:4
**action** [6] - 21:15,

46:19, 60:18, 60:20, 76:20, 89:11
**actions** [9] - 17:16, 17:21, 22:1, 75:8, 75:15, 75:22, 77:25, 78:12, 78:18
**activities** [2] - 38:24, 53:22
**activity** [4] - 39:5, 43:19, 76:13, 76:14
**actual** [4] - 17:10, 17:11, 53:12, 76:16
**add** [1] - 80:10
**addition** [3] - 18:20, 72:13, 82:10
**additional** [5] - 13:16, 29:18, 29:19, 76:6, 81:10
**address** [3] - 5:2, 65:14, 76:9
**admitted** [20] - 12:20, 55:7, 56:6, 56:8, 56:17, 58:15, 60:10, 61:1, 77:15, 77:23, 78:4, 78:10, 78:17, 78:19, 79:11, 83:8, 83:9, 84:25, 85:11, 85:12
**adopted** [1] - 24:3
**adverse** [1] - 76:20
**advice** [1] - 20:7
**affair** [1] - 78:8
**AFFAIRS** [1] - 1:19
**affect** [1] - 10:18
**affects** [1] - 51:13
**afternoon** [7] - 46:16, 52:6, 52:7, 66:11, 81:23, 82:7, 82:8
**aggressive** [1] - 14:23
**ago** [2] - 21:5, 28:13
**agree** [16] - 10:15, 20:13, 24:24, 25:15, 25:19, 26:21, 26:23, 29:3, 51:21, 51:23, 52:12, 71:11, 79:22, 80:3, 82:21, 82:22
**agreed** [9] - 3:13, 4:22, 8:9, 10:24, 11:3, 11:15, 29:2, 29:6, 29:8
**agreed-upon** [1] - 29:8
**agreement** [2] - 82:14, 85:17
**ahead** [8] - 12:23, 30:10, 31:25, 32:19, 47:21, 66:6, 70:22, 81:14
**aided** [1] - 89:9
**AIDED** [1] - 1:24

**aids** [1] - 84:21
**airlines** [2] - 37:15, 44:1
**aisle** [1] - 45:11
**Alaskan** [5] - 35:14, 35:16, 35:24, 36:1, 36:8
**alert** [1] - 12:19
**all-hands** [5] - 31:14, 69:4, 75:3, 78:16, 78:20
**allegation** [4] - 6:13, 14:10, 76:7, 76:8
**allegations** [12] - 9:7, 10:2, 10:23, 10:24, 11:2, 11:8, 11:13, 13:23, 14:2, 14:8, 14:12, 29:5
**alleged** [12] - 4:2, 5:7, 8:8, 8:12, 8:13, 9:24, 11:12, 11:20, 11:22, 26:18, 63:2, 63:6
**allegedly** [3] - 24:12, 25:5, 60:3
**allow** [1] - 19:16
**almost** [3] - 36:18, 36:21, 42:8
**alone** [1] - 49:1
**alter** [1] - 74:25
**amazing** [1] - 85:6
**analogies** [1] - 86:9
**AND** [2] - 1:11, 1:18
**ANDREW** [1] - 1:14
**angle** [1] - 81:12
**answer** [1] - 12:4
**answered** [1] - 26:13
**anticipated** [1] - 84:15
**anticipating** [1] - 66:7
**anyway** [1] - 82:5
**apologize** [1] - 80:17
**APPEARANCES** [1] - 2:1
**appeared** [1] - 69:17
**appreciate** [2] - 12:17, 28:5
**approach** [3] - 15:5, 35:17, 39:14
**appropriate** [3] - 18:23, 18:25, 28:7
**appropriately** [1] - 12:4
**approve** [1] - 41:11
**approved** [4] - 55:20, 56:15, 56:19, 57:10
**April** [7] - 27:18, 56:19, 56:25, 57:4, 57:6, 69:4
**area** [3] - 43:2, 43:8, 43:11
**areas** [1] - 59:1

**argue** [2] - 74:22, 75:7
**argument** [5] - 30:7, 31:19, 67:8, 75:10, 87:6
**arguments** [2] - 66:9, 83:21
**arise** [2] - 11:6, 81:13
**aspect** [1] - 33:15
**assign** [1] - 53:25
**assistant** [2] - 7:6, 56:20
**assume** [2] - 54:1, 54:3
**assuming** [2] - 7:15, 83:4
**assumption** [4] - 25:7, 25:16, 70:25, 83:5
**attached** [1] - 59:1
**attack** [1] - 34:15
**attempting** [1] - 61:14
**attendance** [1] - 21:4
**attention** [7] - 23:9, 23:10, 24:7, 26:6, 26:9, 27:3, 45:13
**attorney** [1] - 41:20
**authority** [3] - 44:21, 46:3, 61:11
**authorize** [1] - 41:1
**available** [1] - 40:19
**Avenue** [1] - 1:16
**avoid** [1] - 11:7
**awarded** [3] - 34:7, 34:8, 34:10
**aware** [10] - 18:14, 19:2, 21:8, 56:24, 57:1, 57:4, 69:2, 71:8, 74:5, 76:19

**B**

**background** [1] - 38:23
**bad** [1] - 53:8
**Baltimore** [1] - 2:6
**based** [12] - 31:3, 50:7, 54:12, 54:15, 63:1, 63:5, 67:19, 73:20, 74:23, 76:14, 77:5
**basis** [4] - 30:13, 30:19, 42:4, 61:8
**became** [3] - 19:18, 34:4, 69:2
**become** [2] - 56:3, 57:1
**BEFORE** [1] - 1:10
**beginning** [3] - 36:18, 52:22, 53:3
**begins** [1] - 61:14
**behavior** [3] - 19:9,

29:1, 59:23
**behind** [3] - 27:7, 31:7, 68:6
**believes** [1] - 62:24
**below** [1] - 28:23
**best** [3] - 26:5, 55:15, 89:10
**better** [2] - 36:3, 81:13
**between** [10] - 6:9, 14:1, 34:23, 37:5, 62:19, 68:7, 68:16, 69:5, 73:12
**beyond** [1] - 71:7
**bid** [1] - 36:7
**big** [3] - 38:20, 39:4, 42:23
**billing** [1] - 33:24
**binder** [12] - 13:4, 15:22, 23:10, 24:8, 26:7, 27:4, 39:10, 47:6, 49:22, 83:4, 83:8, 83:9
**Birgans** [12] - 24:12, 24:22, 25:5, 25:6, 25:10, 25:11, 31:9, 42:13, 42:16, 69:12, 71:15, 78:3
**Birgans'** [1] - 74:9
**bit** [4] - 34:5, 67:5, 79:12, 81:11
**blacked** [1] - 28:23
**blacked-out** [1] - 28:23
**blank** [1] - 15:19
**bolds** [1] - 85:21
**book** [1] - 39:22
**bottom** [7] - 3:14, 28:14, 28:23, 37:25, 55:5, 60:17, 62:9
**box** [1] - 10:14
**bracketing** [1] - 85:24
**break** [6] - 29:18, 30:8, 31:19, 31:20, 65:14, 81:21
**brief** [1] - 10:16
**briefly** [6] - 29:23, 48:10, 48:18, 48:19, 73:3, 73:23
**bring** [5] - 10:13, 10:16, 10:20, 23:12, 35:2
**brought** [2] - 35:6, 35:8
**bullets** [2] - 36:20, 36:22
**bully** [1] - 52:15
**bullying** [1] - 51:10
**burden** [2] - 86:6, 86:9
**business** [3] - 33:15, 35:17, 44:15

**busy** [1] - 42:5
**butt** [1] - 14:24
**BY** [22] - 1:14, 1:15, 1:15, 1:19, 2:4, 2:4, 13:2, 23:8, 32:21, 33:7, 36:5, 38:6, 39:17, 40:1, 45:18, 46:12, 47:23, 49:20, 51:15, 52:5, 60:8, 64:7

**C**

**calculated** [1] - 75:22
**cannot** [6] - 8:11, 38:14, 40:25, 50:24, 50:25, 71:22
**caption** [1] - 79:24
**Carlos** [2] - 24:11, 78:9
**carried** [1] - 15:9
**Carter** [12] - 5:22, 24:11, 24:17, 24:20, 24:24, 25:4, 25:7, 25:9, 25:12, 78:9, 78:13
**case** [24] - 8:9, 9:8, 11:3, 11:4, 25:25, 26:17, 29:17, 30:14, 30:22, 34:6, 34:15, 41:4, 41:5, 66:7, 66:12, 66:19, 67:15, 67:22, 70:4, 73:17, 73:21, 79:13, 82:8
**cases** [1] - 85:11
**category** [2] - 37:20, 38:1
**Cathy** [7] - 39:6, 40:12, 41:13, 41:14, 59:20, 72:14, 72:19
**CATHY** [1] - 88:4
**causation** [1] - 76:21
**causing** [2] - 3:25, 57:25
**cease** [1] - 35:11
**ceased** [1] - 35:13
**ceiling** [1] - 41:8
**central** [1] - 79:13
**CEO** [1] - 52:10
**certain** [4] - 11:12, 39:8, 71:22, 77:15
**certainly** [12] - 69:9, 73:4, 73:16, 74:5, 74:16, 74:20, 76:13, 76:18, 76:20, 80:22, 84:14, 85:11
**certify** [1] - 89:4
**chance** [3] - 63:12, 66:14, 77:9
**change** [4] - 55:20,

79:19, 79:20, 80:21
**changed** [1] - 77:10
**changes** [5] - 66:12, 80:6, 80:22, 81:20, 82:11
**changing** [1] - 85:24
**charge** [1] - 59:9
**charges** [1] - 61:17
**check** [5] - 38:23, 39:1, 78:10, 84:17, 85:14
**checking** [1] - 57:21
**cheer** [1] - 42:12
**chief** [2] - 67:22, 70:4
**choose** [1] - 84:3
**chronological** [1] - 78:22
**CHUANG** [1] - 1:10
**Cindy** [1] - 46:21
**Circuit's** [1] - 74:23
**circulating** [4] - 71:4, 71:9, 71:18, 74:20
**CIVIL** [2] - 1:4, 1:18
**claim** [11] - 6:2, 67:17, 70:17, 70:24, 73:3, 73:4, 73:23, 75:6, 75:7, 76:12, 77:3
**claims** [6] - 29:5, 30:14, 30:23, 30:24, 67:15, 70:2
**clear** [5] - 6:6, 15:18, 23:14, 59:1
**clearly** [1] - 32:8
**clerk** [6] - 37:21, 38:2, 38:3, 50:22, 55:1, 82:15
**CLERK** [4] - 32:3, 32:7, 32:15, 32:18
**client** [7] - 18:21, 19:1, 21:7, 35:20, 43:20
**close** [3] - 32:12, 39:22, 81:22
**closed** [4] - 27:7, 31:7, 68:6, 68:16
**closed-door** [1] - 68:16
**closer** [3] - 33:3, 33:5, 50:12
**closing** [3] - 66:8, 83:21, 87:6
**closings** [5] - 65:13, 82:2, 82:7, 82:25
**coincidently** [1] - 69:15
**collect** [2] - 13:15, 24:22
**colors** [1] - 85:20
**combines** [1] - 75:2
**coming** [7] - 14:2, 28:5, 43:21, 44:7,

44:16, 44:17, 82:17
**comment** [3] - 19:22, 27:15, 62:15
**comments** [8] - 14:14, 14:15, 17:7, 22:10, 22:11, 62:5, 62:6, 62:9
**commercial** [1] - 33:21
**COMMITTEE** [1] - 1:18
**communicate** [1] - 37:6
**companies** [3] - 35:14, 35:16, 37:16
**company** [14] - 33:2, 35:19, 35:24, 36:1, 36:6, 36:7, 36:8, 36:9, 41:10, 54:10, 54:16, 63:18, 63:23, 75:20
**comparing** [1] - 16:13
**compensation** [2] - 55:20, 56:15
**competing** [1] - 76:5
**complain** [7] - 3:24, 5:4, 14:13, 14:16, 15:2, 21:19, 25:21
**complainant** [2] - 7:11, 24:1
**complained** [1] - 14:22
**complaining** [2] - 13:18, 77:6
**complaint** [14] - 5:15, 7:24, 17:10, 17:11, 26:13, 56:25, 57:2, 57:7, 73:6, 73:10, 75:15, 76:16, 76:19, 76:21
**Complaint** [1] - 17:3
**complaints** [2] - 14:20, 76:15
**complete** [2] - 66:9, 79:1
**completely** [1] - 8:11
**computer** [1] - 89:9
**COMPUTER** [1] - 1:24
**computer-aided** [1] - 89:9
**COMPUTER-AIDED** [1] - 1:24
**concerned** [1] - 9:2
**concerns** [1] - 85:18
**concert** [1] - 43:10
**conclude** [1] - 75:18
**concluded** [1] - 87:10
**conclusion** [4] - 15:13, 15:25, 73:22, 76:25
**condition** [2] - 53:8

**conditions** [1] - 74:25
**conduct** [8] - 57:20, 63:1, 63:2, 63:6, 63:7, 67:19, 73:25, 74:23
**conducting** [2] - 62:25, 63:5
**confer** [3] - 79:18, 82:12, 83:13
**conference** [1] - 43:3
**confines** [1] - 68:16
**confirm** [2] - 81:19, 82:15
**confirmed** [2] - 68:8, 70:13
**confronted** [1] - 69:16
**confused** [1] - 69:17
**confusing** [1] - 63:3
**connecting** [1] - 44:1
**consider** [4] - 29:7, 29:9, 44:25, 77:16
**considerable** [1] - 71:5
**considered** [5] - 45:5, 46:10, 77:25, 78:6, 78:13
**considering** [1] - 29:2
**CONSTABLE** [1] - 2:3
**consult** [1] - 46:6
**Consulting** [4] - 32:22, 32:25, 33:9, 67:25
**CONSULTING** [1] - 1:7
**consulting** [1] - 33:17
**contemporaneous** [1] - 72:2
**continue** [4] - 12:18, 12:23, 39:8, 39:9
**Continued** [1] - 2:1
**continued** [2] - 18:11, 21:14
**contract** [26] - 15:8, 19:4, 19:5, 21:11, 34:5, 34:7, 34:9, 34:12, 34:18, 34:22, 35:1, 35:4, 35:11, 35:13, 35:15, 36:4, 36:6, 36:12, 37:2, 37:18, 41:2, 43:16, 52:17, 53:4
**contracting** [1] - 36:1
**contractor** [5] - 34:3, 34:4, 35:3, 44:14, 53:4
**contractors** [2] - 33:17, 44:15
**contradicted** [1] - 3:25
**contradicts** [1] - 5:16

**control** [3] - 19:19, 70:13, 86:12
**conversation** [5] - 48:8, 48:17, 49:7, 57:22, 69:5
**conversations** [2] - 14:3, 75:14
**convince** [1] - 25:13
**cool** [1] - 57:24
**coordinate** [1] - 44:3
**copies** [2] - 80:19, 82:4
**copy** [1] - 28:18
**CORKERY** [1] - 80:11
**correct** [56] - 3:2, 5:24, 7:10, 8:24, 13:9, 13:13, 15:13, 15:14, 15:16, 15:17, 16:1, 16:7, 17:5, 17:17, 17:23, 19:11, 21:22, 23:18, 24:2, 24:13, 24:19, 25:17, 25:19, 25:24, 26:1, 26:3, 27:9, 27:15, 27:19, 27:25, 28:14, 32:23, 34:19, 36:7, 36:25, 47:20, 52:13, 52:15, 53:18, 53:22, 54:8, 55:10, 55:18, 55:21, 55:22, 55:25, 56:20, 56:22, 57:8, 57:12, 60:21, 61:20, 62:10, 65:8, 65:9, 89:4
**Correct** [2] - 23:17, 34:3
**corrective** [2] - 60:17, 60:20
**correctly** [3] - 21:4, 24:10, 89:8
**correlating** [1] - 70:3
**Costpoint** [1] - 33:19
**counsel** [17] - 10:15, 11:15, 12:9, 16:15, 16:17, 20:11, 22:19, 29:25, 41:19, 49:6, 63:11, 64:21, 64:24, 79:24, 82:1, 86:5, 89:11
**Counsel** [1] - 28:7
**counseling** [1] - 62:14
**count** [2] - 53:9, 53:10
**counts** [1] - 53:12
**couple** [3] - 66:3, 73:8, 75:12
**course** [5] - 19:15, 76:16, 76:21, 77:3, 86:11
**COURT** [116] - 1:1, 1:23, 3:1, 3:4, 3:10,

3:13, 3:16, 3:19, 3:21, 4:4, 4:7, 4:10, 4:13, 4:17, 4:25, 5:9, 5:18, 5:22, 5:25, 6:8, 6:17, 6:22, 7:4, 7:13, 7:18, 8:1, 8:3, 8:19, 9:1, 9:21, 10:3, 10:6, 10:9, 10:12, 10:15, 12:7, 12:9, 12:12, 12:15, 23:4, 28:2, 28:4, 28:7, 28:10, 28:20, 29:13, 29:16, 29:22, 30:1, 30:3, 30:6, 30:16, 30:18, 31:17, 31:25, 32:12, 32:16, 32:19, 33:5, 33:22, 35:21, 35:22, 37:23, 39:15, 39:21, 45:9, 46:4, 47:17, 47:21, 49:17, 51:4, 51:6, 51:25, 52:3, 60:5, 64:2, 64:17, 64:19, 64:25, 65:2, 65:4, 65:6, 65:10, 65:20, 65:22, 65:24, 66:25, 67:4, 67:12, 68:10, 68:18, 69:23, 70:18, 70:22, 71:10, 71:25, 72:8, 72:12, 72:17, 73:18, 79:5, 79:20, 80:12, 80:15, 80:20, 81:3, 81:5, 81:7, 82:21, 82:23, 83:10, 84:1, 84:6, 85:4, 85:8, 86:23
**Court** [6] - 67:11, 75:25, 76:11, 89:2, 89:3, 89:16
**Court's** [1] - 86:12
**courtroom** [2] - 12:14, 66:24
**cover** [2] - 3:12, 4:23
**covered** [1] - 4:22
**covering** [1] - 78:23
**covers** [1] - 41:9
**create** [2] - 54:19, 72:22
**created** [2] - 31:1, 67:24
**creating** [4] - 5:5, 25:23, 26:19, 33:16
**credit** [1] - 39:2
**criminal** [1] - 38:24
**critical** [1] - 43:16
**cross** [8] - 3:23, 7:19, 8:11, 8:21, 51:25, 52:2, 56:4, 81:5
**CROSS** [2] - 13:1, 52:4
**Cross** [2] - 88:5, 88:9

**cross-examination** [2] - 51:25, 52:2
**CROSS-EXAMINATION** [2] - 13:1, 52:4
**Cross-examination** [2] - 88:5, 88:9
**cross-examine** [3] - 7:19, 8:11, 8:21
**cross-training** [1] - 56:4
**CRR** [2] - 1:23, 89:15
**culture** [1] - 15:9
**current** [3] - 74:15, 74:16, 80:6
**custom** [2] - 40:8, 40:18
**customer** [1] - 33:23

## D

**daily** [1] - 71:21
**DaMarcus** [10] - 17:16, 17:22, 18:2, 19:24, 20:7, 37:10, 38:13, 43:1, 46:18, 61:19
**DANIEL** [1] - 1:15
**date** [3] - 11:12, 13:17, 89:6
**dated** [2] - 56:10, 60:11
**dates** [1] - 16:6
**daughter** [1] - 41:16
**day-to-day** [2] - 53:22, 54:9
**days** [4] - 27:13, 42:3, 66:15, 73:15
**DC** [2] - 1:17, 1:21
**December** [1] - 7:6
**DECEMBER** [1] - 1:11
**decide** [1] - 76:23
**decision** [6] - 50:9, 50:14, 50:15, 50:16, 50:18, 70:16
**decisions** [2] - 53:21, 54:11
**defend** [1] - 19:17
**DEFENDANT** [1] - 2:2
**defendant** [4] - 30:12, 30:21, 31:1, 67:13
**Defendant** [1] - 1:8
**DEFENDANT'S** [2] - 32:6, 88:6
**defendants** [1] - 70:24
**defense** [10] - 4:17, 12:11, 29:11, 29:17, 31:22, 32:2, 66:18, 76:3, 84:11, 85:1
**defer** [2] - 30:7, 31:17

**deferential** [1] - 76:10
**definitely** [2] - 15:7, 60:7
**degree** [1] - 9:4
**deliberations** [2] - 66:10, 66:14
**Deltek** [1] - 33:19
**demonstrative** [1] - 84:21
**demonstratives** [2] - 84:25, 87:6
**Demotion** [1] - 19:23
**deny** [4] - 8:19, 73:22, 76:11, 77:7
**department** [3] - 56:1, 56:2
**Department** [2] - 34:11, 35:15
**depo** [1] - 26:15
**deposition** [11] - 4:1, 4:8, 5:6, 6:5, 10:22, 11:10, 25:25, 26:2, 26:4, 26:22, 70:13
**deputy** [5] - 38:5, 45:17, 50:22, 53:25, 59:10
**DEPUTY** [4] - 32:3, 32:7, 32:15, 32:18
**describe** [1] - 61:8
**described** [2] - 24:14, 55:4
**describes** [1] - 60:14
**desk** [1] - 67:11
**detail** [1] - 77:10
**details** [3] - 7:20, 25:8, 53:8
**determination** [2] - 49:12, 49:14
**different** [6] - 6:15, 33:24, 37:19, 75:12, 75:23, 77:4
**difficult** [1] - 8:7
**Direct** [1] - 88:8
**DIRECT** [1] - 32:20
**direct** [15] - 4:5, 19:21, 23:9, 23:10, 24:7, 26:6, 26:9, 27:3, 31:15, 52:20, 58:16, 61:13, 79:22, 81:3, 81:4
**direction** [4] - 13:5, 13:8, 13:21, 13:24
**directives** [1] - 19:20
**directly** [4] - 59:11, 69:16, 84:10, 84:14
**disagreed** [1] - 62:3
**disagreement** [1] - 9:12
**disciplinary** [9] - 17:15, 17:21, 20:8,

21:15, 22:1, 22:24, 51:16, 51:18, 51:22
**discipline** [4] - 44:20, 44:21, 45:14, 45:17
**disclose** [1] - 85:1
**discredit** [1] - 76:6
**discuss** [12] - 6:12, 10:19, 12:10, 44:9, 44:13, 44:16, 58:13, 59:23, 66:19, 66:21, 82:11, 87:5
**discussed** [3] - 26:20, 78:16, 78:19
**discussing** [2] - 9:23, 68:12
**discussion** [12] - 3:6, 6:12, 9:19, 10:16, 11:11, 31:24, 64:23, 65:23, 68:9, 68:15, 68:16, 81:16
**discussions** [3] - 8:22, 21:13, 21:14
**dispute** [1] - 74:21
**disputes** [1] - 87:5
**disseminated** [1] - 74:4
**distributions** [1] - 21:10
**District** [2] - 89:3
**DISTRICT** [3] - 1:1, 1:2, 1:10
**DIVISION** [1] - 1:3
**divorced** [1] - 19:3
**document** [9] - 5:9, 5:10, 23:15, 23:16, 23:21, 23:24, 24:3, 24:25, 40:2
**documentation** [5] - 16:24, 17:2, 17:8, 17:9, 74:19
**documents** [4] - 63:18, 73:8, 73:9, 83:18
**dollar** [3] - 43:17, 53:15, 53:16
**dollars** [1] - 36:19
**DONALD** [1] - 2:4
**done** [6] - 14:25, 16:18, 20:21, 35:19, 63:11, 79:16
**Donte** [6] - 7:8, 17:3, 26:11, 26:18, 60:15, 73:1
**door** [3] - 9:3, 9:4, 68:16
**doors** [3] - 27:7, 31:7, 68:6
**DOS** [1] - 52:17
**double** [1] - 85:14
**doubt** [1] - 73:24

**down** [6] - 26:10, 57:3, 61:14, 62:5, 65:15
**draft** [2] - 79:21, 80:6
**drafted** [1] - 60:1
**drive** [1] - 45:10
**driven** [2] - 54:17, 54:24
**driving** [3] - 45:7, 45:13
**drug** [1] - 38:21
**drugs** [2] - 38:22, 50:25
**dual** [1] - 75:15
**due** [4] - 18:7, 19:9, 19:16, 72:6
**during** [5] - 31:14, 33:14, 36:8, 40:11, 41:23

### E

**early** [3] - 81:23, 81:24, 82:7
**easier** [1] - 83:20
**edits** [1] - 81:10
**effect** [7] - 31:11, 69:3, 71:2, 74:13, 77:24, 78:11, 78:18
**effort** [1] - 76:6
**efforts** [1] - 76:1
**either** [17] - 6:13, 6:18, 31:4, 31:19, 33:5, 40:12, 46:20, 62:20, 68:20, 74:6, 79:9, 80:9, 80:14, 80:19, 85:20, 86:8, 86:12
**elaborating** [1] - 86:5
**electronic** [4] - 40:12, 40:13, 44:4, 86:23
**element** [1] - 86:10
**ellipsis** [1] - 85:21
**email** [23] - 13:5, 13:17, 13:20, 14:1, 27:6, 27:10, 27:12, 27:13, 27:18, 46:8, 47:10, 47:15, 48:3, 48:6, 58:2, 58:11, 58:18, 58:20, 58:25, 59:14, 72:13, 72:19, 80:18
**emails** [1] - 75:4
**embassies** [3] - 34:11, 34:13
**embassy** [2] - 34:15, 34:17
**employee** [12] - 6:15, 7:1, 7:7, 7:15, 31:5, 54:24, 56:1, 62:8, 70:1, 71:18, 71:23, 74:15

**employees** [31] - 15:1, 21:11, 31:7, 34:21, 34:24, 35:3, 35:4, 35:5, 35:8, 36:9, 38:17, 40:9, 44:20, 44:22, 45:24, 50:20, 50:21, 51:11, 52:13, 53:5, 54:11, 54:14, 54:15, 63:25, 64:3, 64:8, 64:12, 68:11, 70:14, 74:16
**employees'** [1] - 22:9
**employer** [4] - 19:3, 67:20, 67:24, 75:11
**employment** [5] - 19:8, 33:14, 40:3, 60:21, 75:1
**end** [9] - 31:20, 43:3, 46:7, 51:1, 51:16, 53:13, 65:23, 68:4, 68:8
**End** [1] - 31:24
**enjoy** [1] - 66:22
**ensure** [1] - 13:8
**enter** [3] - 12:14, 38:13, 83:7
**enters** [1] - 10:14
**entire** [2] - 9:7, 27:24
**environment** [19] - 3:24, 5:5, 7:23, 14:9, 25:22, 26:13, 26:18, 30:15, 30:23, 31:1, 51:9, 54:19, 67:15, 67:17, 70:24, 72:22, 73:23, 75:7, 75:16
**episode** [3] - 6:19, 10:21, 11:1
**equipment** [1] - 43:23
**equivalent** [3] - 51:11, 64:1, 64:4
**escalated** [1] - 18:11
**escorted** [1] - 70:14
**ESQUIRE** [6] - 1:14, 1:15, 1:15, 1:19, 2:4, 2:4
**essentially** [3] - 34:1, 72:20, 73:9
**establish** [5] - 33:18, 76:1, 78:1, 78:6, 78:13
**established** [2] - 37:3, 74:15
**etc** [1] - 85:21
**Evangeline** [7] - 17:3, 17:16, 17:22, 19:9, 50:10, 54:21, 58:21
**EVANGELINE** [1] - 1:4
**Evangeline's** [1] - 18:1
**evening** [2] - 66:22,

80:7
**events** [2] - 59:2, 70:8
**eventually** [3] - 15:12, 49:14, 59:19
**evidence** [41] - 3:7, 5:16, 6:17, 12:20, 12:22, 13:11, 15:23, 28:22, 29:8, 29:13, 30:24, 31:8, 31:13, 47:17, 67:21, 67:23, 68:15, 68:20, 68:25, 69:8, 69:11, 69:19, 71:5, 73:20, 74:4, 75:1, 75:2, 75:6, 75:12, 75:16, 75:24, 75:25, 76:12, 76:13, 76:24, 77:14, 77:15, 79:13, 79:14, 83:8, 85:15
**Ewing** [4] - 1:23, 89:2, 89:14, 89:15
**ex** [3] - 15:3, 15:7, 15:9
**ex-military** [3] - 15:3, 15:7, 15:9
**exact** [1] - 79:22
**exactly** [1] - 6:8
**EXAMINATION** [4] - 13:1, 23:7, 32:20, 52:4
**examination** [9] - 10:19, 12:24, 51:25, 52:2, 58:16, 88:5, 88:5, 88:8, 88:9
**examine** [3] - 7:19, 8:11, 8:21
**example** [2] - 71:7, 72:2
**except** [1] - 79:2
**excerpt** [2] - 85:22, 85:23
**EXCERPT** [1] - 1:9
**excluded** [2] - 75:4, 75:5
**excuse** [4] - 57:19, 57:23, 58:1, 61:21
**excused** [1] - 9:18
**Exhibit** [42] - 3:7, 3:17, 6:19, 6:20, 12:20, 12:21, 13:4, 15:22, 15:25, 17:6, 17:7, 17:18, 21:24, 22:23, 23:10, 24:7, 27:3, 28:12, 28:21, 29:9, 39:11, 39:18, 40:14, 47:7, 47:8, 49:21, 55:8, 55:17, 56:7, 56:8, 56:10, 56:18, 58:15, 60:10, 61:1, 61:2, 72:3,

72:11, 72:13, 72:18, 78:9, 79:3
**exhibit** [8] - 4:15, 6:6, 12:19, 16:22, 19:7, 72:9, 79:11, 79:25
**exhibits** [15] - 70:8, 73:5, 82:13, 82:17, 82:23, 83:1, 83:3, 83:7, 83:9, 83:11, 84:21, 84:24, 85:11, 85:13
**Exhibits** [1] - 70:9
**exit** [1] - 66:24
**expert** [1] - 37:4
**explanation** [2] - 11:24, 25:15
**explicit** [1] - 61:11
**explosives** [1] - 36:20
**exposed** [1] - 11:13
**exposure** [12] - 4:2, 5:8, 6:19, 6:25, 8:8, 8:12, 8:14, 9:24, 11:12, 11:21, 11:23, 12:3
**extent** [4] - 11:5, 11:21, 12:1, 44:23
**eye** [1] - 84:19

### F

**facia** [1] - 67:15
**facie** [2] - 30:14, 30:22
**facility** [1] - 38:3
**fact** [13] - 6:12, 7:23, 21:7, 29:3, 29:8, 55:1, 69:1, 71:2, 72:24, 77:5, 78:1, 78:19, 79:7
**facts** [3] - 31:2, 67:21, 86:17
**factual** [1] - 76:23
**failed** [3] - 30:13, 30:22, 73:6
**failure** [1] - 60:13
**fair** [2] - 63:15
**fairly** [1] - 9:6
**familiar** [3] - 32:22, 32:25, 36:24
**family** [1] - 51:13
**far** [2] - 65:15, 71:20
**favor** [1] - 73:20
**favorable** [1] - 75:24
**fearful** [1] - 73:9
**February** [4] - 27:16, 59:11, 69:7, 89:16
**federal** [1] - 33:24
**fee** [1] - 41:4
**felt** [3] - 5:5, 18:16, 71:9
**Ferguson** [4] - 72:5,

72:15, 74:19, 75:14
**few** [5] - 16:3, 28:13, 61:12, 73:15, 84:4
**file** [5] - 17:13, 59:9, 73:10, 77:2
**filed** [4] - 6:2, 17:11, 73:6, 76:19
**fill** [1] - 34:25
**final** [1] - 53:21
**finalize** [1] - 82:23
**fine** [6] - 9:13, 67:2, 67:12, 85:11, 85:17, 86:3
**finishing** [1] - 66:7
**fire** [6] - 44:20, 45:24, 46:3, 46:10, 57:19, 57:23
**firearms** [1] - 83:19
**fired** [4] - 45:4, 46:21, 57:11, 73:14
**firing** [3] - 57:15, 58:2, 58:6
**firm** [1] - 41:2
**first** [15] - 5:14, 17:2, 19:8, 31:22, 32:9, 32:16, 46:24, 58:10, 70:23, 72:10, 77:20, 78:22, 82:5, 82:12
**FISH** [1] - 1:14
**five** [1] - 35:2
**fixed** [1] - 41:2
**flashed** [2] - 7:8, 7:16
**flashing** [1] - 7:13
**flipping** [1] - 80:15
**Floor** [1] - 2:5
**focus** [3] - 21:12, 34:5, 86:17
**focused** [3] - 6:10, 21:6, 76:7
**focusing** [2] - 74:14, 76:7
**follow** [8] - 13:21, 13:24, 20:22, 21:15, 21:16, 60:13, 63:12, 86:15
**follow-up** [1] - 63:12
**following** [4] - 19:20, 29:3, 29:24, 64:23
**food** [1] - 51:2
**FOR** [4] - 1:2, 1:13, 1:18, 2:2
**force** [3] - 34:15, 36:23, 62:4
**foregoing** [1] - 89:4
**forklift** [3] - 45:8, 45:11, 45:14
**form** [3] - 16:5, 17:10, 17:11
**formal** [1] - 15:11
**formally** [1] - 85:10

**former** [2] - 7:7, 7:15
**forms** [1] - 17:3
**forth** [1] - 85:24
**forward** [5] - 9:2, 32:3, 35:2, 35:6, 35:9
**four** [5] - 35:2, 59:22, 73:13, 77:19, 78:23
**Fourth** [1] - 74:23
**fourth** [1] - 78:15
**frame** [2] - 57:1, 69:1
**free** [1] - 28:5
**front** [8] - 13:5, 24:25, 39:10, 39:19, 42:23, 42:25, 47:6, 49:22
**fulfilling** [1] - 21:9
**full** [4] - 39:4, 72:15, 84:19, 85:23
**funding** [1] - 39:8
**furthering** [1] - 68:23

## G

**gather** [1] - 44:3
**gears** [1] - 43:24
**general** [2] - 20:11, 55:1
**generally** [4] - 10:23, 31:9, 49:6, 66:6
**generically** [1] - 69:12
**gentlemen** [3] - 12:16, 28:10, 65:24
**gestures** [1] - 10:25
**given** [4] - 4:23, 18:18, 20:10, 28:25
**glasses** [1] - 39:12
**glitches** [1] - 86:25
**gossip** [1] - 72:22
**government** [13] - 18:21, 33:17, 34:3, 34:4, 35:14, 35:25, 36:3, 37:5, 37:6, 44:5, 44:14, 53:13, 53:14
**graduate** [2] - 63:25, 64:4
**great** [1] - 77:10
**GREENBELT** [1] - 1:12
**grow** [3] - 18:12
**grudge** [1] - 72:5
**guess** [7] - 9:10, 9:13, 15:6, 22:6, 68:18, 81:21, 83:23
**guidance** [3] - 16:18, 20:5, 86:2
**guns** [2] - 36:20
**guys** [1] - 14:24

## H

**H.R** [14] - 14:5, 14:8, 18:8, 18:13, 21:18, 27:17, 38:25, 41:15, 43:4, 43:10, 46:6, 70:9, 76:17
**hair** [1] - 61:15
**hallway** [1] - 9:20
**hand** [1] - 32:5
**handle** [8] - 9:15, 18:10, 18:11, 18:20, 20:7, 41:5, 66:3, 79:3
**handled** [2] - 9:5, 68:4
**handling** [1] - 18:7
**hands** [5] - 31:14, 69:4, 75:3, 78:16, 78:20
**handwriting** [1] - 22:9
**harassing** [1] - 76:1
**harassment** [17] - 6:2, 14:8, 15:16, 20:18, 20:19, 29:1, 29:4, 56:25, 57:7, 59:9, 59:23, 61:18, 67:19, 70:17, 73:25, 76:9, 77:3
**hard** [1] - 64:13
**head** [3] - 54:10, 57:25
**headset** [2] - 29:22, 64:21
**headsets** [1] - 67:6
**hear** [16] - 11:7, 21:17, 30:1, 30:16, 31:18, 32:11, 32:14, 33:6, 59:13, 64:25, 65:5, 67:5, 67:7, 67:8, 69:11, 86:12
**heard** [14] - 13:22, 15:1, 52:20, 57:14, 68:1, 69:13, 69:14, 71:2, 71:11, 71:12, 72:15, 72:25, 74:9, 78:3
**hearing** [3] - 18:15, 66:8, 71:23
**hearsay** [1] - 24:14
**held** [3] - 64:23, 73:12
**help** [2] - 4:6, 25:13
**helpful** [1] - 86:8
**helps** [4] - 55:12, 59:3, 60:25, 61:22
**hereby** [1] - 89:4
**hero** [1] - 69:3
**herself** [3] - 23:21, 31:10, 31:15
**hi** [1] - 42:7
**hierarchy** [1] - 55:4
**high** [6] - 51:10,

58:23, 63:25, 64:1, 64:4
**highlighted** [3] - 6:9, 59:3, 61:22
**highlighting** [1] - 85:20
**himself** [3] - 11:14, 18:10, 25:6
**hire** [5] - 34:25, 38:7, 39:6, 41:6, 54:17
**hired** [6] - 37:17, 38:15, 38:16, 41:2, 54:21, 55:1
**hiring** [2] - 39:2, 54:11
**history** [1] - 70:7
**hmm** [9] - 3:4, 4:10, 52:19, 56:12, 58:24, 59:7, 60:12, 62:21, 72:17
**holding** [1] - 72:5
**home** [3] - 65:11, 65:13, 66:1
**homespun** [1] - 86:8
**honest** [1] - 51:12
**Honor** [48] - 3:3, 3:9, 3:15, 4:5, 4:16, 5:3, 5:20, 5:24, 7:2, 8:5, 9:18, 10:5, 10:11, 12:6, 12:11, 12:25, 23:3, 23:6, 28:1, 28:3, 28:9, 28:17, 29:11, 29:12, 29:15, 30:2, 30:5, 32:2, 39:14, 47:19, 47:20, 51:24, 52:1, 64:18, 65:5, 70:21, 71:22, 78:25, 79:1, 79:18, 80:11, 80:13, 80:17, 83:25, 85:5, 86:21, 87:8, 87:9
**Honor's** [1] - 4:3
**HONORABLE** [1] - 1:10
**hopefully** [8] - 11:18, 65:25, 66:12, 81:20, 82:8, 85:2, 85:7, 87:6
**hose** [1] - 45:7
**hostile** [17] - 3:24, 5:5, 7:23, 14:8, 25:22, 26:12, 26:18, 30:14, 30:23, 30:25, 67:15, 67:17, 70:23, 72:22, 73:23, 75:6, 75:16
**hour** [4] - 41:6, 41:7, 81:2, 84:19
**hours** [1] - 66:3
**house** [3] - 16:15, 16:16, 22:19
**human** [2] - 6:1, 59:2

## I

**I.D** [2] - 4:9, 26:6
**idea** [5] - 25:4, 55:25, 68:22, 82:2, 83:12
**ideal** [1] - 85:13
**ideally** [1] - 84:14
**identification** [1] - 83:11
**identified** [1] - 70:10
**identify** [2] - 53:7, 69:13
**Ignozzi** [5] - 29:19, 30:3, 31:25, 67:6, 80:12
**IGNOZZI** [15] - 2:4, 29:20, 30:5, 30:11, 30:17, 30:20, 31:23, 67:10, 67:13, 68:14, 68:25, 69:24, 81:2, 81:4, 82:20
**illegal** [1] - 38:22
**immediate** [1] - 59:11
**impact** [3] - 19:1, 19:4
**impeach** [1] - 4:1
**importance** [1] - 58:23
**important** [1] - 52:12
**impression** [1] - 6:10
**improvement** [4] - 18:2, 18:6, 19:24, 20:3
**imputable** [2] - 67:20, 67:24
**imputed** [1] - 75:11
**IN** [1] - 1:1
**in-house** [3] - 16:15, 16:16, 22:19
**inappropriate** [1] - 19:9
**inappropriately** [2] - 14:17, 14:21
**INC** [1] - 1:7
**Inc** [2] - 32:23, 33:1
**incidence** [1] - 70:11
**incident** [17] - 5:7, 6:25, 7:19, 7:21, 9:12, 11:17, 11:22, 12:2, 18:8, 26:12, 44:24, 44:25, 45:2, 45:5, 46:17, 46:18, 57:17
**incident/meeting** [1] - 5:12
**incidents** [4] - 8:14, 8:16, 9:24, 10:1
**include** [2] - 80:2, 85:12
**included** [1] - 84:4
**includes** [2] - 60:17, 86:6

**including** [4] - 36:20, 75:17, 82:14, 84:2
**inconsistency** [1] - 5:13
**incorporated** [3] - 33:2, 33:6, 33:9
**incorrect** [3] - 26:21, 26:24, 26:25
**increase** [3] - 41:9, 56:22, 57:11
**INDEX** [1] - 88:1
**India** [1] - 40:11
**indicated** [2] - 68:5, 74:12
**indicates** [1] - 16:5
**infer** [4] - 68:23, 73:17, 74:6, 74:17
**inform** [3] - 10:17, 18:21, 39:6
**information** [12] - 13:15, 13:20, 16:12, 16:20, 18:4, 26:24, 26:25, 28:11, 38:19, 72:4, 74:1, 74:21
**informed** [4] - 6:1, 15:15, 69:3, 72:3
**informing** [1] - 74:19
**infraction** [1] - 18:16
**initiated** [1] - 69:20
**initiation** [1] - 75:19
**insert** [1] - 80:6
**instances** [1] - 70:10
**instead** [3] - 12:3, 25:6, 62:8
**instruct** [1] - 8:15
**instructed** [1] - 77:15
**instruction** [9] - 11:5, 37:7, 79:6, 86:3, 86:4, 86:7, 86:11, 86:13, 86:14
**instructions** [30] - 20:10, 60:14, 65:13, 65:16, 66:8, 75:20, 77:8, 77:9, 77:13, 77:14, 77:18, 78:23, 79:4, 80:5, 80:9, 80:19, 80:23, 81:11, 81:20, 81:25, 82:4, 82:5, 82:11, 85:19, 86:2, 86:6, 86:12, 86:19, 86:24, 87:5
**insubordination** [1] - 70:12
**interact** [3] - 42:16, 42:20, 43:12
**interested** [1] - 89:11
**interfering** [1] - 19:16
**internal** [1] - 19:2
**intervene** [1] - 19:20
**interview** [4] - 38:18,

63:1, 63:6, 63:14
**interviewed** [1] - 54:12
**inventory** [12] - 21:9, 36:19, 36:22, 37:11, 37:13, 38:4, 43:17, 53:3, 53:5, 53:12, 53:15, 53:16
**investigate** [2] - 14:9, 14:11
**investigation** [19] - 6:18, 13:12, 15:12, 15:25, 16:9, 23:22, 27:11, 27:14, 27:20, 27:24, 49:16, 49:18, 49:23, 49:24, 50:3, 50:5, 59:24, 63:15, 63:16
**investigations** [2] - 63:1, 63:5
**involve** [2] - 6:14, 7:9
**involved** [10] - 6:14, 25:12, 29:4, 34:5, 52:17, 68:7, 72:24, 73:1, 75:19, 76:15
**involvement** [1] - 75:12
**involves** [1] - 7:11
**involving** [5] - 6:25, 8:14, 10:2, 10:22, 55:16
**issue** [19] - 3:2, 3:6, 3:22, 4:15, 6:24, 11:17, 29:10, 43:21, 46:24, 47:3, 57:21, 58:13, 70:19, 73:18, 74:22, 75:8, 75:13, 83:21, 84:7
**issues** [7] - 3:5, 5:12, 6:11, 8:25, 11:6, 19:2, 75:3
**italics** [1] - 85:21
**items** [1] - 44:13

### J

**Jennings** [35] - 3:23, 4:18, 4:23, 5:4, 5:16, 5:18, 7:1, 7:8, 7:16, 7:24, 8:15, 8:22, 10:2, 10:23, 11:1, 11:2, 11:13, 15:19, 17:3, 25:21, 26:11, 26:18, 28:25, 29:4, 31:10, 60:3, 60:15, 69:15, 69:16, 73:2, 74:12, 76:2, 76:8, 77:22, 78:1
**Jennings'** [2] - 17:7, 26:12

**JOANNA** [1] - 1:19
**job** [7] - 13:9, 13:25, 51:12, 51:13, 54:1, 57:24, 58:1
**jobs** [1] - 52:15
**jointly** [1] - 83:12
**JUDGE** [1] - 1:10
**judgment** [4] - 30:13, 30:21, 41:7, 67:14
**June** [2] - 33:2, 33:10
**jury** [33] - 3:17, 10:13, 10:17, 10:20, 12:12, 12:14, 12:16, 29:25, 64:24, 65:11, 65:13, 65:24, 66:24, 68:23, 73:16, 73:19, 73:21, 75:19, 76:23, 77:6, 77:8, 77:14, 77:17, 81:11, 81:20, 81:25, 82:4, 82:11, 83:1, 85:19, 86:2, 86:24, 87:5
**JURY** [2] - 1:9, 1:11
**jury's** [2] - 9:23, 76:24

### K

**keep** [4] - 8:9, 55:15, 66:20, 84:19
**Kenton** [1] - 24:11
**kept** [3] - 19:16, 19:17, 85:6
**key** [1] - 76:20
**kin** [1] - 89:11
**kind** [8] - 14:23, 16:12, 19:18, 21:19, 35:20, 37:19, 70:2, 75:2
**kinds** [1] - 45:19
**knowing** [3] - 9:15, 18:9, 81:17
**knowledge** [3] - 14:15, 21:17, 31:15
**known** [1] - 75:21
**KOPSIDAS** [23] - 1:14, 29:15, 52:1, 65:5, 65:18, 65:21, 67:2, 70:20, 70:23, 71:21, 72:1, 72:10, 72:13, 72:18, 79:1, 79:17, 81:6, 82:22, 83:23, 84:3, 84:23, 86:21, 87:9
**Kopsidas** [3] - 71:10, 74:18, 84:1
**Kumar** [1] - 32:16
**KUMAR** [1] - 32:17

### L

**laborer** [4] - 37:20,

38:1, 38:2
**ladies** [3] - 12:16, 28:10, 65:24
**laid** [1] - 70:8
**language** [5] - 14:23, 14:24, 77:12, 79:22, 79:23
**laptop** [1] - 67:11
**largely** [1] - 75:1
**Larry** [12] - 17:4, 22:15, 37:6, 46:20, 47:4, 48:12, 48:13, 48:15, 49:3, 57:8, 58:18, 72:25
**last** [11] - 7:5, 15:11, 20:22, 23:23, 32:9, 32:17, 57:11, 77:11, 80:18, 85:25
**lastly** [1] - 83:21
**law** [3] - 66:8, 86:2, 86:18
**lawyer** [1] - 86:15
**lawyers** [1] - 64:6
**LAWYERS'** [1] - 1:18
**leader** [1] - 38:4
**lean** [1] - 50:11
**learn** [4] - 46:24, 47:2, 56:2, 56:3
**learned** [6] - 33:15, 47:4, 48:24, 56:5, 58:10
**least** [13] - 8:20, 11:6, 43:14, 66:5, 66:11, 66:13, 71:1, 73:16, 74:7, 75:9, 76:24, 77:6, 81:24
**leave** [2] - 11:3, 66:2
**leaving** [1] - 8:3
**led** [2] - 58:11, 70:16
**Lee** [1] - 78:16
**left** [3] - 13:4, 39:12, 65:7
**legal** [2] - 41:4, 41:19
**less** [6] - 35:19, 36:2, 53:16, 56:24, 57:10, 83:16
**letter** [8] - 40:3, 40:4, 40:6, 40:15, 40:16, 55:17, 56:11, 60:15
**letters** [2] - 40:8, 40:18
**letting** [1] - 13:25
**level** [1] - 58:23
**liability** [2] - 31:5, 70:1
**liaison** [1] - 37:5
**library** [1] - 33:14
**life** [1] - 71:14
**light** [1] - 75:24
**likely** [3] - 65:12, 84:3, 84:23

**limine** [1] - 4:3
**limited** [5] - 77:23, 78:5, 78:11, 78:17, 86:17
**limiting** [7] - 77:12, 77:18, 78:22, 79:4, 80:5, 80:23, 86:13
**line** [4] - 4:11, 6:9, 26:9, 58:21
**lines** [3] - 9:9, 9:14, 10:1
**list** [5] - 59:5, 77:17, 79:1, 83:14, 83:15
**listed** [1] - 61:12
**living** [1] - 51:12
**LLP** [1] - 2:3
**load** [1] - 53:10
**loading** [1] - 43:1
**local** [2] - 34:14
**location** [1] - 45:12
**locations** [1] - 45:12
**locking** [1] - 65:15
**log** [2] - 53:6
**logistic** [1] - 34:12
**logistics** [1] - 37:14
**look** [14] - 4:14, 13:4, 15:22, 17:18, 22:23, 39:11, 47:6, 49:21, 53:9, 53:24, 54:2, 57:1, 77:9, 83:14
**looked** [1] - 58:16
**looking** [4] - 19:6, 39:18, 39:22, 82:10
**looks** [2] - 60:16, 77:13
**loss** [1] - 41:10
**lowest** [2] - 37:20, 38:1
**lunch** [3] - 81:23, 82:2, 82:6
**lunchtime** [1] - 81:22

### M

**ma'am** [6] - 15:21, 16:25, 19:6, 19:12, 21:21, 23:2
**machine** [2] - 36:20, 89:8
**Maine** [1] - 1:16
**majority** [1] - 62:19
**manage** [3] - 34:25, 41:5, 43:17
**management** [6] - 53:22, 54:9, 61:6, 61:10, 73:13, 75:18
**manager** [18] - 7:7, 37:4, 37:6, 37:9, 37:10, 37:12, 38:5, 41:15, 45:16, 45:17,

46:6, 50:23, 53:25, 54:1, 56:20, 60:14
**manager's** [2] - 43:4, 43:5
**managerial** [2] - 18:7, 61:10
**Manley** [2] - 57:17, 72:5
**March** [1] - 55:9
**March/April** [1] - 69:1
**MARIE** [1] - 2:4
**market** [1] - 33:18
**MARYLAND** [2] - 1:2, 1:12
**Maryland** [3] - 2:6, 33:10, 89:3
**match** [4] - 53:16, 82:16, 83:15, 86:18
**material** [1] - 45:11
**materially** [1] - 76:20
**materials** [1] - 77:1
**matter** [6] - 8:23, 37:4, 50:21, 71:2, 71:3, 89:6
**maximum** [1] - 84:18
**mean** [14] - 4:14, 9:1, 9:10, 22:18, 34:24, 66:9, 68:11, 71:11, 71:25, 74:3, 79:5, 79:6, 81:21
**meaning** [1] - 75:21
**means** [2] - 74:5, 86:10
**meant** [1] - 74:6
**meet** [8] - 44:7, 48:20, 48:22, 53:12, 58:5, 59:17, 81:9, 82:12
**meeting** [22] - 4:24, 20:22, 21:2, 22:13, 22:21, 31:14, 31:15, 42:6, 48:14, 49:1, 49:2, 49:3, 49:11, 58:19, 59:15, 59:22, 69:4, 73:11, 75:4, 75:17, 78:17, 78:20
**meetings** [3] - 70:12, 75:5, 76:15
**memory** [1] - 21:5
**mention** [1] - 21:17
**mentioned** [3] - 20:1, 41:13, 41:16
**mentioning** [1] - 59:6
**met** [1] - 59:19
**micro** [1] - 53:25
**micromanage** [2] - 54:3, 54:7
**micromanagement** [2] - 53:23
**microphone** [10] - 32:8, 32:13, 33:4,

39:22, 39:23, 39:24, 50:11, 51:7, 55:14, 60:5
**mid** [1] - 81:8
**mid-morning** [1] - 81:8
**might** [5] - 15:6, 33:3, 75:7, 80:20, 81:22
**military** [5] - 14:23, 15:3, 15:6, 15:7, 15:9
**million** [3] - 36:19, 43:17, 53:14
**mind** [6] - 66:21, 70:20, 79:20, 81:15, 82:5, 87:3
**minds** [1] - 79:19
**minimum** [1] - 55:16
**minutes** [6] - 28:13, 67:1, 81:6, 83:24, 84:4, 84:18
**minutes'** [1] - 43:15
**Misconduct** [1] - 58:21
**misconduct** [9] - 11:2, 19:10, 46:1, 48:1, 49:8, 57:13, 57:16, 58:7, 59:6
**Miss** [1] - 15:10
**missed** [1] - 78:23
**mission** [4] - 21:6, 21:12, 54:17, 54:24
**mission-driven** [2] - 54:17, 54:24
**mistake** [1] - 85:12
**mistaken** [1] - 70:25
**mistreating** [2] - 60:3, 70:15
**modify** [1] - 80:10
**modules** [2] - 33:24, 34:1
**moment** [2] - 9:19, 64:22
**Monday** [1] - 66:16
**money** [1] - 41:8
**month** [3] - 40:11, 42:4, 53:1
**months** [3] - 43:22, 55:23, 56:11
**Moppins** [71] - 13:14, 13:18, 14:4, 14:14, 14:17, 15:3, 17:4, 17:24, 18:2, 18:3, 18:4, 19:18, 20:4, 20:5, 20:8, 22:7, 27:6, 31:6, 35:5, 36:24, 37:7, 38:7, 38:10, 38:12, 43:12, 44:9, 44:21, 44:25, 45:23, 47:4, 47:10,

47:16, 47:24, 48:2, 48:5, 48:9, 48:16, 49:4, 57:8, 57:14, 58:12, 58:18, 58:20, 59:14, 59:19, 60:1, 62:14, 62:19, 65:8, 65:12, 68:5, 68:17, 68:21, 69:5, 69:8, 71:12, 72:4, 72:14, 72:20, 72:24, 73:1, 73:7, 73:8, 73:12, 74:2, 75:9, 75:12, 76:25, 82:18
**Moppins'** [8] - 37:2, 44:19, 48:12, 48:13, 81:1, 81:13, 81:18, 81:19
**morning** [14] - 46:16, 65:8, 65:11, 66:4, 66:23, 72:25, 80:8, 80:24, 81:8, 81:10, 81:16, 82:12, 85:3, 87:4
**most** [5] - 4:12, 13:22, 14:4, 36:10, 75:24
**motion** [16] - 4:3, 29:21, 30:4, 30:7, 30:12, 30:18, 30:21, 31:18, 65:14, 67:6, 67:14, 73:18, 73:22, 75:25, 76:11, 77:7
**move** [10] - 3:7, 29:17, 33:3, 33:5, 45:11, 53:3, 60:5, 67:14, 73:3, 78:21
**moved** [1] - 3:7
**MR** [73] - 3:9, 5:20, 5:24, 7:2, 8:5, 8:24, 9:17, 9:22, 10:5, 10:8, 12:11, 12:25, 13:2, 23:2, 28:3, 28:17, 29:11, 29:15, 30:2, 32:2, 32:21, 33:7, 36:5, 38:6, 39:14, 39:17, 40:1, 45:18, 46:12, 47:19, 47:23, 49:20, 51:15, 51:24, 52:1, 52:5, 60:8, 64:7, 64:15, 64:18, 65:1, 65:3, 65:5, 65:9, 65:18, 65:19, 65:21, 67:2, 70:20, 70:23, 71:21, 72:1, 72:10, 72:13, 72:18, 78:24, 79:1, 79:17, 80:11, 80:13, 80:17, 81:6, 82:22, 83:3, 83:23, 83:25, 84:3, 84:23, 85:5, 86:21, 86:22, 87:8,

87:9
**MS** [44] - 3:3, 3:5, 3:12, 3:15, 3:18, 3:20, 3:22, 4:5, 4:8, 4:11, 4:16, 4:21, 5:3, 5:15, 5:21, 6:5, 6:16, 6:20, 6:24, 7:11, 7:17, 7:22, 8:2, 10:11, 23:6, 23:8, 28:1, 28:9, 29:12, 29:20, 30:5, 30:11, 30:17, 30:20, 31:23, 47:20, 67:10, 67:13, 68:14, 68:25, 69:24, 81:2, 81:4, 82:20
**must** [2] - 67:18, 75:25

## N

**name** [5] - 32:9, 32:16, 32:17, 33:19
**names** [1] - 15:11
**native** [5] - 35:14, 35:16, 35:24, 36:1, 36:8
**nature** [5] - 8:15, 14:21, 18:18, 21:2, 34:9
**necessary** [1] - 79:17
**need** [14] - 5:2, 14:24, 30:17, 33:3, 33:18, 34:21, 37:23, 46:9, 66:17, 76:23, 80:10, 82:6, 82:24
**needed** [6] - 16:14, 16:19, 18:3, 20:6, 21:10
**negligent** [1] - 75:20
**never** [3] - 14:5, 23:21, 24:3
**new** [7] - 5:13, 35:4, 36:9, 40:8, 53:4, 54:11, 82:17
**news** [1] - 65:25
**next** [14] - 9:17, 17:15, 29:16, 30:8, 30:9, 43:4, 43:22, 44:7, 47:5, 61:13, 66:3, 66:16, 67:5, 77:8
**Nigeria** [5] - 43:24, 43:25, 44:2, 44:7, 44:8
**NO** [1] - 1:4
**nobody** [1] - 68:7
**none** [1] - 86:21
**NOTES** [1] - 1:24
**notes** [3] - 16:13, 20:9, 72:3
**nothing** [9] - 12:11,

14:5, 28:3, 29:11, 69:6, 80:11, 81:14, 83:15
**notices** [3] - 51:16, 51:18, 51:22
**November** [1] - 7:5
**number** [10] - 5:18, 19:8, 19:23, 20:18, 53:7, 59:5, 59:8, 73:6, 73:7, 79:25
**NW** [1] - 1:20

## O

**oath** [2] - 26:2, 26:24
**objection** [1] - 3:9
**objections** [1] - 85:2
**obviously** [8] - 31:18, 81:17, 82:25, 83:6, 83:7, 84:24, 85:13, 85:22
**occasions** [1] - 74:10
**occurred** [6] - 20:25, 31:6, 69:3, 69:6, 70:8, 70:10
**OF** [3] - 1:2, 1:9, 1:24
**offer** [4] - 35:18, 40:3, 40:4, 40:8
**offered** [2] - 3:8, 76:5
**office** [32] - 14:12, 21:18, 34:2, 35:18, 36:15, 37:12, 42:7, 42:22, 42:24, 43:1, 43:2, 43:4, 43:5, 43:6, 43:7, 43:8, 43:9, 43:10, 45:3, 46:5, 47:5, 48:7, 48:10, 48:11, 48:12, 48:23, 48:24, 48:25, 62:4, 74:10
**officer** [1] - 36:1
**Official** [1] - 89:2
**OFFICIAL** [1] - 1:23
**official** [1] - 89:16
**often** [4] - 36:17, 42:1, 43:12, 79:11
**once** [10] - 44:4, 49:16, 52:23, 52:25, 53:19, 56:2, 65:13, 72:4, 79:14, 84:25
**one** [44] - 3:5, 5:25, 9:2, 10:6, 10:17, 11:10, 11:11, 11:13, 19:8, 19:12, 21:18, 22:1, 27:16, 35:5, 35:8, 40:11, 43:11, 45:2, 45:11, 52:21, 54:21, 56:1, 61:5, 65:7, 66:5, 69:20, 73:6, 73:8, 74:6,

74:17, 74:22, 75:1, 75:7, 75:13, 75:18, 76:3, 77:1, 77:13, 77:15, 79:9, 80:2, 85:18
**one-month** [1] - 40:11
**ones** [3] - 77:19, 82:18, 83:14
**ongoing** [1] - 74:16
**open** [6] - 9:3, 9:4, 9:6, 31:21, 66:20, 87:2
**opening** [2] - 84:13, 86:1
**operation** [2] - 37:3, 37:14
**opportunity** [1] - 33:16
**opposed** [1] - 10:6
**Oracle** [1] - 33:20
**oral** [2] - 41:3, 76:14
**order** [5] - 4:1, 14:24, 34:25, 78:21, 84:16
**ordinarily** [1] - 40:10
**originals** [1] - 82:16
**originate** [1] - 69:9
**originated** [3] - 71:1, 71:3, 71:4
**otherwise** [3] - 6:18, 42:7, 77:21
**outburst** [1] - 70:11
**outcome** [1] - 89:12
**outlining** [1] - 59:1
**outside** [6] - 9:22, 11:3, 29:24, 64:23, 66:21, 68:15
**owe** [1] - 86:23
**own** [2] - 68:22, 73:4
**owner** [3] - 33:11, 33:12, 52:10

## P

**P.C** [1] - 1:14
**p.m** [7] - 12:14, 46:18, 59:10, 66:24, 67:3, 87:10
**P.M** [2] - 1:9, 1:11
**PAGE** [2] - 88:4, 88:7
**page** [14] - 4:1, 4:11, 16:22, 22:6, 23:23, 26:7, 28:22, 61:13, 61:23, 72:8, 72:10, 77:13
**pages** [1] - 4:6
**panel** [2] - 12:14, 66:24
**paper** [1] - 53:11
**papers** [1] - 37:19
**paperwork** [1] - 37:15

**paragraph** [5] - 59:8, 61:14, 61:21, 72:11, 72:15
**paralegal** [1] - 41:6
**paraphrasing** [1] - 86:5
**PARKER** [1] - 1:4
**Parker** [84] - 3:25, 5:5, 5:17, 6:1, 6:24, 7:5, 7:9, 7:11, 7:24, 10:15, 10:23, 10:25, 13:24, 17:3, 17:16, 17:22, 19:9, 19:15, 20:9, 21:21, 22:2, 22:11, 22:15, 22:21, 22:24, 23:19, 24:1, 25:22, 26:13, 26:19, 27:8, 31:10, 31:14, 40:15, 41:23, 42:1, 46:22, 46:25, 47:3, 48:9, 49:12, 49:15, 50:6, 50:8, 50:10, 50:14, 50:19, 51:17, 51:19, 54:22, 55:9, 55:23, 56:19, 56:25, 57:7, 58:21, 60:2, 60:23, 62:3, 62:8, 62:22, 63:20, 69:2, 69:15, 69:20, 70:11, 70:13, 70:15, 71:12, 71:24, 72:19, 72:23, 73:6, 73:10, 74:20, 75:17, 76:1, 76:19, 77:20, 77:24, 78:7, 78:12, 78:15, 78:18
**Parker's** [9] - 5:12, 6:11, 27:21, 29:5, 40:4, 49:8, 58:11, 59:23, 71:7
**part** [15] - 6:13, 9:8, 11:2, 13:22, 14:4, 17:8, 17:9, 17:13, 18:3, 25:16, 29:8, 44:4, 68:10, 74:7, 83:5
**particular** [11] - 8:9, 16:5, 16:22, 19:6, 34:6, 34:12, 37:17, 47:15, 73:25, 85:20, 86:10
**parties** [9] - 29:2, 29:3, 29:6, 29:8, 77:9, 79:9, 83:6, 85:12, 89:7
**party** [2] - 80:2, 89:11
**pass** [1] - 64:16
**past** [1] - 74:4
**patience** [1] - 12:17
**Paul** [1] - 2:5
**Pause** [1] - 39:16

**pause** [1] - 17:18
**pay** [1] - 57:11
**paying** [1] - 45:13
**peace** [1] - 87:3
**peaceful** [1] - 51:9
**people** [19] - 13:8, 13:18, 37:17, 38:7, 38:10, 42:8, 46:14, 51:14, 52:12, 52:15, 54:12, 54:17, 54:21, 58:3, 58:6, 71:13, 74:7, 75:14
**perceived** [1] - 70:5
**percent** [3] - 21:4, 33:12, 43:19
**perform** [2] - 35:11, 35:13
**performance** [6] - 18:2, 18:5, 19:24, 20:2, 61:6, 61:10
**performed** [2] - 34:19, 36:13
**performing** [1] - 34:18
**perhaps** [6] - 65:15, 68:21, 79:12, 81:8, 86:3, 86:24
**period** [2] - 16:8, 41:23
**permitting** [1] - 9:25
**perpetuated** [1] - 68:20
**perpetuating** [1] - 68:13
**person** [24] - 23:16, 27:23, 38:13, 38:14, 38:18, 38:21, 39:2, 39:7, 39:9, 44:1, 44:2, 45:2, 45:3, 45:14, 45:17, 46:6, 46:10, 46:21, 51:2, 54:13, 57:23, 58:5, 69:21, 78:17
**person's** [1] - 45:16
**personal** [2] - 71:14, 72:5
**personnel** [2] - 34:15, 34:16
**perspective** [1] - 65:25
**pervasiveness** [1] - 74:25
**phone** [1] - 46:8
**phonetic** [1] - 69:3
**phrases** [1] - 85:20
**pick** [1] - 46:8
**Pickett** [48] - 13:21, 17:16, 17:22, 18:5, 18:8, 18:12, 18:20, 18:21, 19:24, 20:3, 27:7, 31:4, 31:6,

35:8, 37:10, 42:18, 42:20, 46:13, 46:19, 61:20, 62:18, 62:23, 68:2, 68:5, 68:8, 68:12, 68:16, 68:17, 69:5, 71:11, 71:19, 71:25, 72:1, 72:4, 72:7, 72:19, 72:23, 72:25, 74:3, 74:4, 74:11, 75:13, 77:20, 77:24, 78:7
**Pickett's** [2] - 42:22, 43:1
**piece** [1] - 28:10
**pieces** [1] - 20:6
**place** [2] - 29:24, 39:5
**places** [1] - 74:2
**plaintiff** [13] - 29:14, 29:15, 30:13, 30:22, 31:3, 65:18, 67:14, 67:18, 70:19, 73:20, 75:24, 76:11, 80:11
**Plaintiff** [1] - 1:5
**PLAINTIFF** [1] - 1:13
**plaintiff's** [7] - 67:22, 68:1, 70:4, 73:21, 75:10, 77:4
**PLAINTIFF'S** [1] - 88:3
**plaintiffs** [3] - 65:4, 67:9, 76:5
**plan** [5] - 18:3, 18:6, 19:24, 20:3, 44:6
**plans** [1] - 84:22
**play** [1] - 76:13
**plus** [3] - 35:4, 36:19, 75:2
**point** [16] - 7:21, 7:22, 11:11, 11:14, 18:9, 18:12, 19:19, 20:20, 21:16, 49:13, 52:21, 68:6, 69:19, 75:4, 81:8, 82:9
**pointed** [1] - 74:18
**police** [4] - 34:14, 36:23, 43:24
**policies** [1] - 18:17
**policy** [8] - 14:7, 18:18, 29:1, 29:4, 62:25, 63:5, 63:8, 63:14
**poor** [1] - 61:5
**Poor** [1] - 61:10
**pops** [1] - 80:16
**portion** [2] - 6:20, 28:24
**possibility** [2] - 66:13, 79:2
**possible** [3] - 39:23, 81:9, 83:1

**potential** [2] - 4:22, 82:11
**potentially** [1] - 3:5
**PowerPoint** [1] - 85:16
**practicing** [1] - 41:20
**precise** [2] - 64:14, 68:19
**precisely** [1] - 64:6
**precluded** [1] - 4:3
**predates** [2] - 69:1, 69:6
**prefer** [2] - 81:9, 86:4
**prepare** [1] - 80:4
**prepared** [10] - 17:24, 17:25, 18:1, 18:3, 20:3, 20:4, 20:5, 20:8, 85:3
**presence** [4] - 9:23, 29:24, 47:4, 64:24
**present** [13] - 21:21, 22:11, 22:13, 22:16, 22:17, 29:25, 31:7, 31:14, 48:14, 49:2, 49:6, 64:24, 74:17
**presentation** [1] - 41:3
**presented** [2] - 8:10, 73:20
**preserve** [1] - 84:4
**president** [1] - 52:10
**press** [1] - 61:17
**presumes** [1] - 84:18
**pretty** [2] - 6:6, 85:8
**previous** [2] - 35:3, 53:4
**previously** [10] - 3:14, 17:6, 55:7, 56:6, 56:8, 56:17, 58:15, 60:9, 61:1, 89:6
**PRICE** [1] - 88:4
**price** [1] - 41:2
**Price** [45] - 3:12, 3:23, 5:3, 6:10, 6:25, 7:23, 8:7, 9:14, 9:18, 10:14, 12:10, 12:18, 13:3, 15:10, 23:9, 25:20, 27:1, 27:20, 28:4, 39:6, 40:13, 41:13, 46:21, 48:20, 48:22, 48:23, 48:24, 49:1, 49:2, 49:3, 49:16, 49:18, 49:24, 50:3, 50:6, 50:9, 59:20, 59:24, 72:14, 72:19, 73:13, 76:15, 76:16, 76:18, 78:11
**Price's** [5] - 4:8, 5:11, 5:16, 29:3, 41:14
**prima** [3] - 30:14,

30:22, 67:15
**probative** [1] - 4:12
**problem** [2] - 54:2, 54:4
**PROCEEDINGS** [2] - 1:9, 1:9
**proceedings** [2] - 87:10, 89:5
**process** [9] - 19:16, 34:1, 38:20, 39:4, 56:3, 56:5, 66:11, 74:7
**processes** [1] - 56:2
**processing** [1] - 81:11
**procurement** [1] - 35:17
**product** [2] - 53:7, 53:9
**profanity** [1] - 61:11
**program** [11] - 35:14, 37:4, 37:6, 37:9, 37:10, 38:5, 45:17, 50:23, 53:25, 60:14
**projected** [1] - 83:22
**promoted** [2] - 55:9, 55:24
**promoting** [1] - 54:14
**promotion** [7] - 7:6, 40:15, 40:24, 55:20, 56:10, 56:20, 57:11
**promotions** [2] - 40:21, 41:11
**proof** [2] - 86:7, 86:9
**property** [1] - 53:13
**propose** [2] - 65:10, 77:17
**protected** [2] - 76:13, 76:14
**prove** [1] - 67:18
**provide** [6] - 13:15, 28:8, 34:12, 34:14, 36:2, 37:7
**provided** [12] - 13:6, 18:5, 22:2, 22:11, 22:24, 26:21, 26:24, 49:18, 49:25, 51:17, 51:19, 77:18
**provides** [1] - 59:5
**providing** [3] - 33:16, 39:9, 43:21
**pull** [11] - 28:21, 50:11, 55:7, 56:6, 56:17, 57:3, 58:14, 60:9, 60:25, 62:12, 83:7
**pulling** [1] - 45:7
**purchasing** [1] - 33:25
**pure** [1] - 83:5
**purpose** [8] - 8:17, 21:5, 67:22, 77:16,

77:23, 78:5, 78:11
**purposes** [1] - 69:3
**put** [16] - 3:16, 16:14, 28:11, 28:15, 28:18, 30:8, 30:25, 40:12, 40:13, 51:2, 59:24, 62:5, 62:8, 79:23, 85:14

## Q

**questioned** [1] - 10:18
**questionnaire** [1] - 23:22
**questions** [14] - 9:14, 11:6, 11:9, 12:7, 14:3, 16:3, 23:3, 28:1, 51:24, 55:15, 63:11, 63:12, 64:15, 86:20
**quick** [1] - 65:14
**quiet** [2] - 21:19, 22:22
**quite** [1] - 82:1
**quote** [2] - 79:22, 86:4
**quoted** [1] - 73:8
**quoting** [1] - 85:19

## R

**raise** [2] - 32:4, 56:15
**raised** [2] - 6:24, 75:15
**Rajesh** [2] - 32:2, 32:16
**RAJESH** [3] - 32:6, 32:17, 88:7
**rather** [2] - 63:23, 76:7
**rating** [1] - 39:3
**RCSI** [20] - 33:11, 33:13, 34:3, 34:7, 34:9, 35:11, 35:13, 40:22, 40:23, 40:24, 41:14, 42:22, 52:8, 52:17, 54:21, 62:25, 63:5, 71:1, 71:5, 78:6
**RCSI's** [2] - 28:25, 29:4
**reach** [2] - 73:21, 85:16
**react** [1] - 9:14
**read** [2] - 26:10, 77:3
**reading** [2] - 9:11, 50:2
**reads** [1] - 11:21
**ready** [2] - 39:6, 80:4
**real** [2] - 74:21, 84:8
**really** [6] - 50:24, 64:13, 84:12, 84:13,

86:4, 86:16
**reason** [5] - 8:7, 60:13, 61:5, 61:8, 77:1
**reasonable** [4] - 73:19, 75:22, 76:9, 76:24
**reasons** [2] - 45:24, 61:12
**rebuttal** [5] - 84:2, 84:4, 84:8, 84:9, 84:18
**recalling** [1] - 84:17
**recap** [1] - 67:8
**receipt** [1] - 50:22
**receive** [1] - 7:23
**received** [3] - 7:25, 18:2, 60:23
**receiver** [1] - 37:21
**receiving** [5] - 33:25, 38:2, 38:3, 55:9, 72:4
**Recess** [1] - 67:3
**recommend** [1] - 40:25
**recommendation** [5] - 19:14, 20:18, 38:17, 54:12, 54:15
**recommendations** [3] - 16:24, 19:12, 20:14
**Recommendations** [1] - 19:7
**recommended** [3] - 27:21, 27:23, 60:17
**recommending** [1] - 60:2
**record** [13] - 3:16, 10:4, 28:11, 29:6, 30:7, 30:9, 30:25, 31:2, 31:8, 32:10, 53:17, 69:8, 70:3
**recorded** [1] - 89:8
**recordings** [1] - 83:19
**records** [1] - 53:11
**recruiting** [1] - 38:20
**redact** [2] - 8:9, 29:6
**redacted** [4] - 6:20, 6:23, 28:18, 82:15
**redaction** [1] - 3:14
**redirect** [2] - 23:5, 64:17
**Redirect** [1] - 88:5
**REDIRECT** [1] - 23:7
**redirected** [1] - 21:12
**REEMA** [1] - 1:7
**Reema** [13] - 22:14, 22:18, 32:22, 32:25, 33:9, 38:8, 38:11, 40:12, 41:16, 41:24, 59:20, 67:24

**reexamine** [1] - 9:7
**refer** [3] - 11:17, 13:20, 16:21
**reference** [1] - 39:1
**referenced** [2] - 12:21, 47:11
**referring** [5] - 9:12, 28:12, 61:20, 69:18, 84:2
**regarding** [3] - 4:18, 73:7, 75:3
**reinterpret** [1] - 86:18
**reiterate** [2] - 67:13, 69:24
**related** [3] - 5:12, 57:20
**relates** [2] - 6:3, 75:6
**relating** [2] - 73:11, 78:12
**relationship** [3] - 59:10, 73:1, 85:6
**relationships** [1] - 74:16
**relative** [1] - 46:24
**relatively** [1] - 82:7
**relayed** [1] - 31:3
**remain** [2] - 32:4, 67:11
**remember** [8] - 21:3, 22:14, 22:15, 22:16, 24:17, 25:8, 66:19, 71:17
**remembrance** [1] - 26:5
**remind** [7] - 3:10, 5:1, 5:9, 6:17, 77:17, 80:25, 85:9
**reminder** [1] - 55:14
**reminding** [1] - 86:14
**removed** [1] - 46:7
**Renee** [4] - 1:23, 89:2, 89:14, 89:15
**renewal** [1] - 19:5
**repeat** [4] - 30:17, 37:24, 47:22, 54:5
**repeated** [3] - 77:22, 78:2
**report** [11] - 16:1, 16:15, 27:20, 49:16, 49:19, 49:23, 49:24, 50:3, 50:5, 70:6, 70:10
**reported** [1] - 89:5
**REPORTER** [10] - 1:23, 30:16, 33:22, 35:21, 37:23, 45:9, 46:4, 49:17, 51:4, 64:2
**Reporter** [2] - 89:2, 89:16

**reports** [2] - 10:22, 70:14
**representatives** [1] - 15:8
**request** [2] - 44:4, 58:19
**requested** [1] - 73:12
**requesting** [1] - 59:14
**required** [2] - 36:23, 60:20
**requirement** [3] - 34:13, 43:23, 43:24
**requirements** [2] - 44:8, 84:20
**requiring** [1] - 3:6
**reread** [1] - 79:8
**research** [2] - 33:14, 66:21
**resolve** [1] - 6:11
**resources** [2] - 6:1, 59:2
**respect** [14] - 20:9, 30:14, 30:23, 37:2, 50:20, 50:24, 52:12, 52:13, 54:19, 67:17, 69:7, 70:2, 73:4, 79:2
**respectful** [1] - 15:11
**respond** [2] - 48:2, 87:1
**responded** [1] - 48:6
**responding** [1] - 75:20
**response** [1] - 11:1
**responsible** [2] - 53:21, 54:9
**responsive** [1] - 84:10
**rest** [2] - 10:19, 37:7
**rests** [1] - 29:15
**result** [1] - 70:5
**retaliation** [10] - 30:24, 67:16, 70:2, 73:3, 73:5, 73:17, 75:6, 75:8, 75:16, 76:12
**retrospect** [1] - 72:25
**return** [2] - 64:19, 66:4
**revealed** [1] - 27:11
**revenue** [1] - 19:4
**review** [4] - 20:12, 20:16, 50:2, 51:18
**reviewed** [1] - 23:21
**reviewing** [1] - 50:5
**revised** [1] - 80:19
**RICE** [1] - 1:15
**RICHARDSON** [1] - 1:14
**ridicule** [2] - 67:19, 73:25
**RIGHTS** [1] - 1:18

**RMR** [2] - 1:23, 89:15
**Rochelle** [1] - 78:15
**role** [3] - 37:2, 41:14, 41:18
**Romaine** [5] - 5:8, 7:7, 31:4, 69:24, 77:21
**room** [2] - 43:2, 43:3
**roughly** [1] - 81:7
**round** [1] - 42:5
**RPR** [2] - 1:23, 89:15
**ruling** [3] - 4:3, 31:18, 74:24
**rulings** [2] - 10:17, 10:18
**rumor** [32] - 10:25, 68:1, 68:12, 68:13, 68:20, 69:7, 69:10, 69:12, 70:25, 71:3, 71:18, 72:6, 72:16, 72:21, 72:24, 73:7, 73:11, 74:1, 74:7, 74:10, 74:12, 74:17, 74:20, 75:2, 75:19, 77:22, 78:1, 78:4, 78:5, 78:7, 78:16, 78:19
**rumors** [6] - 18:19, 59:10, 61:18, 67:23, 70:6, 71:8
**run** [1] - 65:25

## S

**safeguard** [1] - 34:16
**safety** [3] - 45:19, 45:21, 45:24
**salary** [1] - 56:22
**sat** [1] - 16:13
**satisfied** [1] - 43:20
**saving** [1] - 84:9
**saw** [3] - 17:6, 33:15, 33:18
**sayers** [1] - 27:4
**Sayres** [11] - 23:12, 28:21, 55:7, 56:6, 56:9, 56:17, 57:3, 58:14, 60:9, 60:25, 61:13
**scale** [1] - 75:9
**schedule** [4] - 65:6, 66:6, 66:16, 66:18
**scheduling** [1] - 84:16
**school** [5] - 51:10, 63:25, 64:1, 64:4
**screen** [8] - 28:15, 28:19, 55:11, 55:15, 55:16, 59:3, 61:2, 61:22
**scroll** [1] - 61:14
**seat** [1] - 64:20

**seated** [4] - 3:1, 12:15, 32:7, 67:4
**second** [9] - 13:6, 16:21, 22:6, 39:11, 40:21, 46:23, 61:23, 72:10, 78:3
**section** [2] - 16:25, 19:7
**see** [24] - 4:13, 6:23, 7:4, 8:1, 15:6, 16:18, 16:25, 28:23, 42:1, 42:13, 42:18, 43:15, 51:1, 55:11, 55:25, 61:16, 65:15, 66:22, 66:25, 77:10, 79:21, 81:10, 87:4, 87:7
**seek** [1] - 3:6
**seem** [3] - 69:17, 70:24, 82:3
**send** [8] - 13:20, 38:18, 46:8, 58:18, 65:10, 66:1, 80:7, 80:22
**sending** [1] - 47:25
**sense** [8] - 8:20, 9:9, 10:3, 15:5, 28:15, 65:17, 67:1, 83:22
**sensitive** [3] - 8:25, 44:12, 82:1
**sent** [1] - 48:2
**separate** [6] - 5:7, 7:19, 7:21, 19:3, 26:12, 33:25
**separated** [1] - 82:2
**separately** [1] - 10:7
**September** [2] - 34:8, 35:12
**serial** [1] - 53:7
**serious** [10] - 14:10, 18:16, 44:24, 44:25, 45:5, 45:15, 46:2, 46:18, 58:7, 58:8
**service** [1] - 36:3
**SERVICES** [1] - 1:7
**Services** [3] - 32:23, 33:1, 33:9
**services** [4] - 33:16, 33:17, 39:9, 43:20
**session** [1] - 31:21
**set** [3] - 9:7, 41:8, 83:16
**setting** [2] - 42:24, 42:25
**several** [3] - 66:15, 74:1, 74:10
**severity** [2] - 44:23, 74:25
**sex** [2] - 67:19, 74:23
**sexual** [7] - 6:2, 20:18, 28:25, 57:7, 59:9,

59:23, 61:17
**sharing** [1] - 47:16
**sheet** [2] - 53:6
**shelf** [1] - 33:21
**shift** [3] - 46:16, 46:17
**ship** [1] - 43:25
**shipping** [11] - 33:25, 37:12, 37:14, 37:21, 38:2, 38:3, 43:5, 44:4, 45:12, 50:22
**shirt** [1] - 45:3
**shorthand** [1] - 89:8
**shoulder** [1] - 53:24
**show** [6] - 15:22, 27:4, 52:12, 74:13, 76:6, 78:19
**showed** [1] - 22:7
**showing** [5] - 77:24, 78:5, 78:11, 78:17, 80:23
**shown** [1] - 61:2
**shows** [1] - 77:4
**shut** [1] - 75:3
**shutting** [1] - 75:17
**sic** [2] - 10:15, 74:19
**sic)** [1] - 71:24
**side** [11] - 36:21, 44:15, 71:16, 75:9, 79:9, 79:21, 80:19, 82:21, 82:22, 86:8, 86:13
**sidebar** [4] - 29:24, 31:24, 64:23, 65:23
**sides** [4] - 31:19, 53:12, 64:25, 85:7
**sift** [1] - 16:14
**sign** [8] - 40:8, 40:18, 55:17, 62:6, 62:7, 62:8
**signature** [3] - 40:12, 40:13, 40:16
**signed** [5] - 22:7, 24:3, 40:6, 56:13, 79:24
**similar** [1] - 15:6
**similarly** [1] - 72:18
**simply** [1] - 8:13
**single** [2] - 31:6, 52:21
**sitting** [1] - 57:4
**situation** [8] - 18:10, 19:18, 19:21, 24:1, 24:15, 48:20, 58:10, 85:13
**six** [3] - 21:5, 46:17, 57:10
**SKEEN** [1] - 2:3
**sleeping** [3] - 27:8, 31:12, 72:6
**slight** [1] - 83:3
**slowly** [3] - 35:22,

35:23, 51:6
**small** [5] - 3:5, 3:6, 35:17, 43:6, 51:14
**Smith** [1] - 15:10
**smooth** [1] - 85:7
**software** [4] - 33:19, 33:20, 33:23
**sole** [5] - 33:11, 33:12, 35:25, 36:8, 52:10
**Solomon** [1] - 83:13
**someone** [4] - 10:12, 11:21, 57:15, 68:22
**sometimes** [5] - 57:14, 58:2, 58:5, 63:23, 80:16
**somewhere** [1] - 74:5
**soon** [1] - 83:1
**sooner** [1] - 81:12
**sorry** [26] - 15:18, 17:6, 30:16, 33:22, 35:21, 37:13, 37:14, 37:23, 38:12, 43:2, 45:9, 45:20, 46:4, 49:17, 50:13, 51:4, 51:5, 53:18, 54:5, 56:8, 56:9, 62:12, 64:2, 72:1, 73:6
**sort** [7] - 9:4, 11:24, 15:9, 80:24, 84:9, 84:18, 87:2
**sound** [1] - 84:6
**sounds** [2] - 69:19, 79:1
**source** [4] - 35:15, 35:25, 36:3, 36:8
**SOUTHERN** [1] - 1:3
**span** [1] - 73:15
**speaking** [3] - 14:17, 14:21, 25:9
**specific** [3] - 4:5, 70:10, 77:19
**specifically** [1] - 72:21
**specifics** [2] - 11:8, 49:5
**spell** [1] - 32:9
**spend** [1] - 43:14
**spin** [1] - 86:5
**spoken** [1] - 68:5
**sponte** [1] - 86:13
**spread** [1] - 69:20
**spreading** [4] - 61:18, 72:16, 72:24, 73:7
**St** [1] - 2:5
**staff** [7] - 20:22, 21:2, 21:16, 34:21, 34:25, 37:5, 37:8
**stages** [1] - 75:13
**stand** [2] - 32:4, 79:9
**standard** [2] - 76:10, 84:16

**standing** [1] - 32:4
**stands** [1] - 73:4
**start** [6] - 17:2, 30:18, 33:13, 66:10, 66:14, 81:23
**started** [11] - 21:19, 29:18, 52:8, 54:16, 66:18, 68:20, 68:21, 74:13, 77:22, 78:1, 85:9
**starting** [4] - 59:9, 68:12, 76:14, 82:7
**State** [2] - 34:11, 35:16
**state** [4] - 32:8, 33:9, 72:25, 77:14
**statement** [19] - 5:19, 6:9, 7:2, 9:18, 24:11, 24:18, 24:21, 24:22, 25:5, 25:14, 28:14, 28:24, 29:2, 31:6, 62:20, 62:22, 64:9, 78:9, 78:14
**statements** [15] - 13:19, 31:2, 31:8, 31:11, 31:16, 63:18, 63:21, 63:24, 67:23, 68:1, 76:25, 77:21, 77:23, 77:25, 89:7
**states** [2] - 5:6, 72:3
**States** [1] - 89:3
**STATES** [2] - 1:1, 1:10
**stating** [2] - 13:23, 73:9
**stay** [2] - 39:13, 86:16
**stenographically** [1] - 89:5
**STENOTYPE** [1] - 1:24
**step** [3] - 29:17, 32:3, 67:5
**steps** [1] - 76:9
**Sterling** [2] - 36:14, 52:18
**still** [6] - 6:22, 13:18, 14:2, 14:3, 66:15, 81:24
**stipulation** [8] - 4:21, 8:18, 9:5, 28:8, 29:7, 79:2, 79:10, 80:1
**stipulations** [5] - 79:5, 79:7, 79:8, 79:12, 79:14
**stop** [3] - 42:7, 45:8, 75:22
**stopped** [1] - 68:3
**stories** [2] - 14:2, 70:3
**straight** [1] - 30:9
**Street** [2] - 1:20, 2:5
**strong** [1] - 14:23

**strongly** [1] - 82:3
**stuff** [3] - 4:12, 4:19, 6:3
**style** [1] - 14:23
**sua** [1] - 86:13
**subject** [3] - 11:11, 37:4, 58:21
**subjected** [1] - 67:18
**subjects** [1] - 11:11
**submitted** [2] - 49:16, 59:2
**subordinates** [1] - 19:17
**subsequent** [3] - 49:11, 50:2, 50:5
**subsequently** [2] - 48:8, 73:14
**substance** [2] - 49:7, 51:21
**substantial** [3] - 71:5, 71:7, 73:5
**substitute** [1] - 8:13
**substitutes** [1] - 11:22
**subtract** [1] - 80:10
**suffering** [2] - 21:7, 21:9
**sufficient** [1] - 75:1
**suggest** [6] - 30:6, 77:13, 79:20, 80:8, 81:24, 82:10
**suggested** [2] - 8:13, 77:12
**suggestion** [1] - 9:8
**Suite** [2] - 1:16, 1:20
**sum** [1] - 41:6
**summarize** [1] - 16:13
**supervision** [1] - 89:9
**supervisor** [4] - 7:7, 7:15, 55:10, 59:12
**supervisors** [2] - 37:11, 38:4
**support** [2] - 34:12, 76:24
**supported** [1] - 5:11
**supporting** [1] - 17:9
**suppose** [1] - 76:2
**supposedly** [1] - 59:9
**surrounding** [1] - 70:6
**SW** [1] - 1:16
**SWORN** [1] - 32:6

### T

**T-shirt** [1] - 45:3
**table** [2] - 43:9, 51:2
**talks** [1] - 72:21
**task** [1] - 53:25
**TDC-17-1648** [1] - 1:4
**team** [4] - 38:4, 42:12, 50:24, 79:18

**technical** [3] - 18:4, 20:6, 37:10
**technological** [1] - 86:25
**temporary** [1] - 50:21
**ten** [1] - 35:4
**term** [1] - 12:3
**terminate** [8] - 38:10, 46:14, 49:12, 49:15, 50:14, 50:16, 50:18, 70:16
**terminated** [7] - 21:21, 50:6, 50:8, 50:10, 60:2, 70:5, 76:4
**terminating** [1] - 77:2
**termination** [10] - 19:8, 22:2, 22:21, 27:21, 27:24, 58:11, 60:20, 76:20, 76:22, 77:5
**terminations** [1] - 51:17
**terminator** [1] - 46:5
**terms** [2] - 83:20, 85:21
**terrify** [1] - 51:3
**testified** [11] - 3:23, 5:3, 25:20, 27:1, 27:10, 27:15, 68:2, 69:2, 69:16, 71:23, 72:23
**testify** [2] - 28:5, 71:19
**TESTIMONY** [1] - 88:1
**testimony** [29] - 4:1, 5:1, 5:6, 5:11, 5:17, 6:6, 6:10, 8:6, 11:9, 12:18, 26:15, 26:21, 69:25, 71:8, 71:10, 71:16, 71:17, 73:5, 74:9, 74:11, 77:20, 78:3, 78:6, 78:15, 81:1, 81:14, 81:18, 81:19, 89:7
**testing** [1] - 38:21
**THE** [141] - 1:1, 1:2, 1:10, 1:13, 2:2, 3:1, 3:4, 3:10, 3:13, 3:16, 3:19, 3:21, 4:4, 4:7, 4:10, 4:13, 4:17, 4:25, 5:9, 5:18, 5:22, 5:25, 6:8, 6:17, 6:22, 7:4, 7:13, 7:18, 8:1, 8:3, 8:19, 9:1, 9:21, 10:3, 10:6, 10:9, 10:12, 10:15, 12:6, 12:7, 12:8, 12:9, 12:12, 12:15, 23:4, 28:2, 28:4, 28:6, 28:7, 28:10, 28:20, 29:13, 29:16, 29:22,

30:1, 30:3, 30:6, 30:16, 30:18, 31:17, 31:25, 32:3, 32:7, 32:11, 32:12, 32:14, 32:15, 32:16, 32:18, 32:19, 33:5, 33:6, 33:22, 33:23, 35:21, 35:22, 35:24, 37:23, 37:25, 39:15, 39:21, 39:25, 45:9, 45:10, 46:4, 46:5, 47:17, 47:21, 47:22, 49:17, 49:18, 51:4, 51:5, 51:6, 51:8, 51:25, 52:3, 60:5, 60:6, 64:2, 64:3, 64:17, 64:19, 64:25, 65:2, 65:4, 65:6, 65:10, 65:20, 65:22, 65:24, 66:25, 67:4, 67:12, 68:10, 68:18, 69:23, 70:18, 70:22, 71:10, 71:25, 72:8, 72:12, 72:17, 73:18, 79:5, 79:20, 80:12, 80:15, 80:20, 81:3, 81:5, 81:7, 82:21, 82:23, 83:10, 84:1, 84:6, 85:4, 85:8, 86:23
**theft** [1] - 58:8
**THEODORE** [1] - 1:10
**theory** [5] - 76:3, 76:5, 77:4, 81:13
**thereafter** [1] - 89:9
**therefore** [1] - 76:8
**thereof** [1] - 89:12
**third** [3] - 22:6, 72:15, 78:9
**Thompson** [10] - 5:8, 7:8, 7:15, 31:4, 69:25, 71:12, 71:19, 74:11, 74:14, 77:21
**thorough** [1] - 63:15
**threaten** [5] - 50:25, 51:2, 51:11, 51:13, 73:10
**threatened** [1] - 59:8
**three** [7] - 20:18, 35:2, 37:11, 42:3, 43:22, 56:24, 73:11
**throughout** [2] - 10:19, 85:6
**Thursday** [1] - 66:16
**Tishman** [2] - 52:1, 88:9
**TISHMAN** [5] - 1:15, 52:5, 60:8, 64:7, 64:15
**TO** [1] - 88:1
**today** [2] - 31:20, 66:1

**together** [2] - 59:22, 59:24
**tolerance** [1] - 29:1
**tomorrow** [15] - 65:8, 65:11, 65:12, 66:4, 66:5, 66:7, 66:10, 66:12, 66:13, 66:14, 66:23, 80:4, 81:9, 87:4, 87:7
**tonight** [4] - 80:3, 80:22, 85:1, 85:2
**took** [2] - 29:24, 36:6
**top** [2] - 16:5, 38:1
**topic** [2] - 11:20, 86:15
**topics** [1] - 8:22
**towards** [4] - 14:4, 19:22, 55:5, 75:8
**TRACEA** [1] - 1:15
**track** [2] - 80:6, 80:22
**train** [1] - 34:14
**trainers** [1] - 44:3
**training** [5] - 15:16, 15:19, 20:19, 36:23, 56:4
**transcribed** [1] - 89:9
**TRANSCRIPT** [1] - 1:9
**transcript** [5] - 9:11, 10:22, 11:22, 71:22, 89:5
**TRANSCRIPTION** [1] - 1:24
**transcription** [1] - 89:10
**transpired** [2] - 21:13, 62:19
**Trial** [1] - 27:3
**TRIAL** [1] - 1:9
**trial** [1] - 85:6
**tried** [1] - 18:10
**trouble** [1] - 57:25
**trucking** [1] - 37:16
**true** [13] - 12:2, 54:18, 54:20, 54:23, 54:25, 55:3, 55:6, 63:7, 63:19, 78:8, 78:14, 79:7, 89:4
**truth** [1] - 26:4
**try** [9] - 8:20, 11:16, 14:11, 80:7, 81:8, 82:23, 86:8, 86:16
**trying** [12] - 6:11, 8:24, 11:20, 14:3, 15:19, 16:14, 18:11, 19:17, 22:15, 25:13, 71:17, 86:18
**Tuesday** [1] - 66:16
**TUESDAY** [1] - 1:11
**turmoil** [1] - 21:8
**turn** [3] - 21:24, 23:23,

40:14
**twice** [2] - 52:23, 53:19
**two** [17] - 3:5, 19:23, 22:16, 27:13, 46:16, 51:16, 53:12, 55:23, 56:11, 59:8, 63:3, 68:7, 68:11, 70:2, 70:12, 73:7, 75:22
**type** [2] - 74:21, 85:16
**typically** [4] - 53:18, 79:5, 79:8, 80:2

### U

**ugly** [1] - 72:22
**ultimately** [1] - 70:15
**un-admitted** [1] - 85:12
**un-redacted** [1] - 6:23
**unclear** [1] - 68:21
**under** [7] - 16:8, 19:24, 22:9, 26:2, 26:24, 75:19, 89:9
**underlying** [1] - 70:25
**underneath** [3] - 37:9, 37:11, 59:5
**understood** [2] - 8:10, 54:6
**undisputed** [1] - 69:4
**unfortunately** [3] - 19:15, 28:18, 71:21
**United** [1] - 89:3
**UNITED** [2] - 1:1, 1:10
**unlawful** [3] - 63:1, 63:6, 67:18
**unless** [3] - 11:6, 54:1, 54:3
**unrelated** [4] - 10:24, 26:12, 29:5, 70:16
**untrue** [1] - 61:18
**unwelcome** [1] - 73:24
**up** [33] - 9:6, 10:21, 16:11, 20:23, 21:15, 23:12, 28:15, 28:21, 32:13, 42:12, 43:8, 43:21, 44:7, 44:16, 46:8, 55:7, 56:6, 56:17, 58:14, 59:1, 60:9, 60:25, 62:12, 63:12, 77:8, 77:19, 79:10, 79:21, 81:17, 82:16, 84:14, 86:1, 86:18
**upper** [1] - 73:13
**URBAN** [1] - 1:19
**usual** [1] - 66:2

## V

**V-O-R-A** [1] - 32:17
**vacation** [3] - 40:10, 40:11, 52:25
**vague** [1] - 6:7
**verbal** [3] - 4:22, 28:25, 63:23
**verbatim** [1] - 9:11
**verify** [1] - 14:5
**version** [3] - 28:20, 70:4, 86:24
**versions** [1] - 82:15
**versus** [1] - 15:1
**victim** [4] - 6:15, 7:9, 7:13, 7:14
**video** [1] - 70:13
**videos** [1] - 83:19
**view** [3] - 8:3, 64:8, 84:8
**viewing** [1] - 75:23
**views** [1] - 75:23
**violations** [3] - 45:19, 45:21, 45:25
**Virginia** [2] - 36:14, 52:18
**vis-à-vis** [1] - 41:14
**visited** [1] - 53:19
**Vora** [32] - 22:14, 22:18, 22:19, 32:2, 32:17, 32:22, 33:3, 34:3, 34:18, 35:22, 39:18, 39:21, 40:2, 40:14, 41:11, 41:16, 44:19, 46:9, 46:22, 47:8, 49:3, 49:21, 50:9, 51:16, 52:6, 53:18, 58:17, 59:20, 61:16, 63:11, 64:15, 64:19
**VORA** [2] - 32:6, 88:7
**Vora's** [1] - 48:24
**Voras** [1] - 73:13

## W

**wait** [1] - 46:7
**walk** [1] - 42:9
**walked** [1] - 45:2
**Wallace** [6] - 19:19, 62:11, 62:13, 62:23, 63:21, 70:12
**Walsh** [13] - 5:10, 8:4, 12:23, 28:2, 29:18, 32:1, 32:19, 64:17, 65:2, 80:12, 88:5, 88:8
**WALSH** [47] - 2:4, 3:9, 5:20, 5:24, 7:2, 8:5, 8:24, 9:17, 9:22, 10:5, 10:8, 12:11, 12:25, 13:2, 23:2, 28:3, 28:17, 29:11, 30:2, 32:2, 32:21, 33:7, 36:5, 38:6, 39:14, 39:17, 40:1, 45:18, 46:12, 47:19, 47:23, 49:20, 51:15, 51:24, 64:18, 65:1, 65:3, 65:9, 65:19, 78:24, 80:13, 80:17, 83:3, 83:25, 85:5, 86:22, 87:8
**Walsh's** [1] - 9:8
**wants** [4] - 4:17, 8:6, 79:10, 80:2
**warehouse** [28] - 7:6, 14:14, 15:9, 18:9, 31:9, 34:19, 34:22, 35:1, 36:12, 36:19, 37:22, 38:1, 38:3, 42:9, 42:23, 42:24, 42:25, 43:1, 45:10, 52:17, 53:19, 56:20, 69:10, 69:21, 71:9, 72:16, 74:8
**warehouses** [1] - 64:3
**warehousing** [1] - 35:20
**warning** [17] - 4:22, 21:14, 22:24, 28:25, 29:3, 60:2, 60:6, 60:11, 60:13, 60:24, 61:3, 61:5, 61:9, 61:17, 61:25, 63:10, 63:22
**warnings** [3] - 20:11, 20:13, 62:3
**Washington** [2] - 1:17, 1:21
**WASHINGTON** [1] - 1:18
**WASIK** [31] - 1:19, 3:3, 3:5, 3:12, 3:15, 3:18, 3:20, 3:22, 4:5, 4:8, 4:11, 4:16, 4:21, 5:3, 5:15, 5:21, 6:5, 6:16, 6:20, 6:24, 7:11, 7:17, 7:22, 8:2, 10:11, 23:6, 23:8, 28:1, 28:9, 29:12, 47:20
**Wasik** [4] - 8:6, 8:10, 23:5, 88:5
**ways** [1] - 77:4
**week** [5] - 47:5, 52:24, 52:25, 53:19, 66:17
**weekly** [1] - 42:3
**weeks** [2] - 56:24, 57:10

**welcome** [1] - 12:16
**whole** [11] - 6:13, 11:1, 18:7, 21:11, 41:4, 42:12, 43:25, 50:24, 51:13, 53:1, 55:25
**wholly** [1] - 70:16
**withdrawn** [1] - 27:2
**witness** [16] - 8:11, 8:16, 10:14, 30:10, 31:22, 32:1, 32:4, 62:12, 62:13, 62:18, 63:18, 63:20, 64:9, 64:16, 66:5, 66:7
**WITNESS** [19] - 12:6, 12:8, 28:6, 32:6, 32:11, 32:14, 33:6, 33:23, 35:24, 37:25, 39:25, 45:10, 46:5, 47:22, 49:18, 51:5, 51:8, 60:6, 64:3
**witnessed** [1] - 25:10
**WITNESSES** [2] - 88:3, 88:6
**witnesses** [12] - 13:11, 29:19, 29:20, 63:2, 63:6, 63:14, 65:7, 66:1, 83:4, 83:16, 89:7
**word** [1] - 11:22
**words** [5] - 4:2, 8:12, 85:20, 85:22, 85:24
**wordsmithing** [1] - 80:8
**worker** [2] - 50:22, 64:14
**workers** [1] - 78:5
**workplace** [5] - 18:22, 48:1, 49:10, 68:11, 78:4
**works** [1] - 23:15
**worksheet** [1] - 53:10
**world** [1] - 34:11
**worry** [3] - 51:14, 68:4, 82:24
**WRIGHT** [1] - 2:3
**write** [6] - 20:11, 23:19, 24:25, 25:4, 64:5, 64:9
**writing** [2] - 25:6, 25:14
**written** [15] - 17:15, 17:21, 25:2, 60:1, 60:11, 61:2, 61:16, 61:25, 62:15, 63:24, 74:19, 76:25, 78:9, 79:10, 82:4
**wrote** [2] - 16:11, 23:16

## Y

**year** [3] - 7:5, 34:23, 43:22
**years** [1] - 21:5
**yourselves** [1] - 66:20

## Z

**zero** [1] - 29:1